# 23-24cv

## United States Court of Appeals for the Second Circuit

BALWINDER SINGH,

*Plaintiff-Appellant,*

v.

THE CITY OF NEW YORK, P.O. MANDEEP CHEEMA,
Tax Id. No. 950196, Individually and in his Official Capacity,
POLICE OFFICERS JOHN DOE #1-10, Individually and in
their Official Capacity (the name John Doe being fictitious,
as the true names are presently unknown),

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT,
EASTERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## VOLUME I OF VI (PAGES JA-1–JA-192)

COHEN & FITCH LLP
*Attorneys for Plaintiff-Appellant*
233 Broadway, Suite 900
New York, New York 10279
(212) 374-9115
jfitch@cohenfitch.com

NEW YORK CITY LAW DEPARTMENT
*Attorneys for Defendants-Appellees*
100 Church Street, Room 6-178
New York, New York 10007
(212) 356-2490
Alexander.li@usdoj.gov

0862

# TABLE OF CONTENTS

Docket Entries .......................................................................JA-1

Complaint, Dated January 31, 2019...........................................JA-10

Plaintiff's Notice of Motion for Summary Judgment,
Dated July 12, 2021 ...............................................................JA-24

Plaintiff's Statement of Undisputed Facts, Dated July 12, 2021...............JA-26

Plaintiff's Supporting Declaration by Gerald M. Cohen,
Dated July 12, 2021 ...............................................................JA-34

    Exhibit A to Cohen Declaration -
    Excerpts of Transcript of EBT of Balwinder Singh (Plaintiff),
    Taken October 5, 2020......................................................JA-36

    Exhibit B to Cohen Declaration -
    Excerpts of Transcript of Video-Conference EBT of
    Amandeep Kaur (Non-Party Witness),
    Taken December 3, 2020 ....................................................JA-49

    Exhibit C to Cohen Declaration -
    Excerpts of Transcript of EBT of P.O. Mandeep Cheema
    (Defendant), Taken October 7, 2020.....................................JA-53

    Exhibit D to Cohen Declaration -
    Audio Recording of the 911 Call..........................................JA-99
    *(Submitted on Separate Thumbdrive)*

    Exhibit E to Cohen Declaration -
    Excerpts of Transcript of EBT of Nicole Milonas
    (Non-Party Witness), Taken October 22, 2020 .............................JA-100

    Exhibit F to Cohen Declaration -
    Pre-Hospital Care Report of Jamaica Hospital Medical
    Center Regarding Balwinder Singh,
    Dated February 28, 2018................................................JA-116

Exhibit G(1-3) to Cohen Declaration -
Full Video Recording .......................................................................JA-119
*(Submitted on Separate Thumbdrive)*

Exhibit H to Cohen Declaration -
Aided Report from Incident Occurred,
Dated February 28, 2018....................................................................JA-120

Exhibit I to Cohen Declaration -
Excerpts of Transcript of EBT of Justin Davis
(Non-Party Witness), Taken November 5, 2020 .............................JA-122

Exhibit J to Cohen Declaration -
Excerpts of Transcript of EBT of Malinda Walker
(Non-Party Witness), Taken October 27, 2020 ...............................JA-131

Exhibit K to Cohen Declaration -
Expert Radiologist Reports ..............................................................JA-137

Exhibit L to Cohen Declaration -
Photographs of Plaintiff's Face Injury.............................................JA-145

Exhibit M to Cohen Declaration -
Excerpts of Transcript of EBT of Marisabel Schapira
(Non-Party Witness), Taken October 22, 2020 ...............................JA-154

The City of New York and Officer Mandeep Chemma's
Notice of Cross-Motion for Summary Judgment,
Dated September 24, 2021 .........................................................JA-156

The City of New York and Officer Mandeep Chemma's
Response to Statement of Undisputed Facts and
Counter-Statement of Material Fact, Dated September 24, 2021 ..........JA-158

The City of New York and Officer Mandeep Chemma's
Supporting Declaration by Hannah V. Faddis,
Dated September 24, 2021 .........................................................JA-179

Exhibit A to Faddis Declaration -
Complaint, Dated January 31, 2019
(Reproduced herein at pgs. JA-10-JA-23)........................................JA-182

Exhibit B to Faddis Declaration -
City of New York and Mandeep Chemma's Answer,
Dated April 29, 2019........................................................................JA-183

Exhibit C to Faddis Declaration -
Transcript of EBT of Balwinder Singh (Plaintiff),
Taken October 5, 2020......................................................................JA-193

Exhibit D to Faddis Declaration -
Transcript of EBT of P.O. Mandeep Cheema (Defendant),
Taken October 7, 2020......................................................................JA-384

Exhibit E to Faddis Declaration -
Transcript of EBT of Justin Davis (Non-Party Witness),
Taken November 5, 2020...................................................................JA-619

Exhibit F to Faddis Declaration -
Transcript of EBT of Malinda Walker (Non-Party Witness),
Taken October 27, 2020....................................................................JA-782

Exhibit G to Faddis Declaration -
Transcript of EBT of Nicole Milonas (Non-Party Witness),
Taken October 22, 2020....................................................................JA-867

Exhibit H to Faddis Declaration -
Transcript of EBT of Marisabel Schapira
(Non-Party Witness), Taken October 22, 2020 ...............................JA-986

Exhibit I to Faddis Declaration -
Transcript of Video-Conference EBT of Amandeep Kaur
(Non-Party Witness), Taken December 3, 2020...........................JA-1086

Exhibit J to Faddis Declaration -
Transcript of Video-Conference EBT of Lakhwinder Singh
(Non-Party Witness), Taken December 15, 2020.........................JA-1183

Exhibit K to Faddis Declaration -
NYPD Intergraph Computer Aided Dispatch System
Event Chronology ........................................................................JA-1298

Exhibit L to Faddis Declaration -
Pre-Hospital Care Report of Jamaica Hospital Medical
Center Regarding Balwinder Singh, Dated February 28, 2018
(Reproduced herein at pgs. JA-116-JA-118)..................................JA-1303

Exhibit M to Faddis Declaration -
Medical Records of Jamaica Hospital Medical Center
Regarding Balwinder Singh ...........................................................JA-1304

Exhibit N to Faddis Declaration -
EMS Video...................................................................................JA-1333
*(Submitted on Separate Thumbdrive)*

Exhibit O to Faddis Declaration -
Surveillance Video Still Images ....................................................JA-1334

Exhibit P to Faddis Declaration -
Audio Recording of the 911 Call made by Amandeep Kaur,
Dated February 28, 2018...............................................................JA-1340
*(Submitted on Separate Thumbdrive)*

Plaintiff's Response to Defendants' Counter-Statement of Material
Facts Pursuant to Local Rule 56.1, Dated November 12, 2021 .............JA-1341

Plaintiff's Reply Affirmation by Gerald M. Cohen,
Dated November 29, 2021 .......................................................................JA-1376

Exhibit N to Cohen Reply Affirmation -
Video Recording ..........................................................................JA-1378
*(Submitted on Separate Thumbdrive)*

Exhibit O-1 to Cohen Reply Affirmation -
Still Photo from Video of Incident.................................................JA-1379

Exhibit O-2 to Cohen Reply Affirmation -
Still Photo from Video of Incident.................................................JA-1380

Exhibit O-3 to Cohen Reply Affirmation -
Still Photo from Video of Incident.................................................JA-1381

Exhibit O-4 to Cohen Reply Affirmation -
Still Photo from Video of Incident.................................................JA-1382

Exhibit O-5 to Cohen Reply Affirmation -
Still Photo from Video of Incident...................................................JA-1383

Letter from Hannah V. Faddis to Hon. Eric Komitee,
Dated May 10, 2022 ....................................................................JA-1384

Report and Recommendation of Hon. Steven L. Tiscione,
Dated June 28, 2022 ...................................................................JA-1385

Memorandum and Order of Hon. Eric Komitee,
Dated September 30, 2022 .........................................................JA-1404

Stipulation and Order of Partial Dismissal, Dated December 2, 2022..JA-1431

Judgment of United States District Court Eastern District of
New York, Dated December 6, 2022, Appealed From ...........................JA-1434

Plaintiff's Notice of Appeal, Dated January 4, 2023...............................JA-1436

**[JA-1]**

4/10/23, 10:28 AM                    Eastern District of New York - LIVE Database 1.7 (Revision 1.7.1.1)

**Query    Reports    Utilities    Help    Log Out**

APPEAL,ACO

## U.S. District Court
## Eastern District of New York (Brooklyn)
## CIVIL DOCKET FOR CASE #: 1:19-cv-00632-EK-ST

Singh v. The City of New York et al                    Date Filed: 02/01/2019
Assigned to: Judge Eric R. Komitee                     Date Terminated: 12/06/2022
Referred to: Magistrate Judge Steven Tiscione          Jury Demand: Plaintiff
Cause: 28:1983 Civil Rights                            Nature of Suit: 440 Civil Rights: Other
                                                       Jurisdiction: Federal Question

**Plaintiff**

**Balwinder Singh**                    represented by   **Gerald M. Cohen**
                                                        Cohen & Fitch, LLP
                                                        225 Broadway
                                                        Suite 2700
                                                        New York, NY 10007
                                                        212-374-9115
                                                        Fax: 332-777-2172
                                                        Email: gcohen@cohenfitch.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Ilyssa S. Fuchs**
                                                        Cohen and Fitch LLP
                                                        110 E. 59th St.
                                                        Suite 3200
                                                        New York, NY 10022
                                                        212-374-9115
                                                        Fax: 332-777-2172
                                                        Email: ifuchs@cohenfitch.com
                                                        *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**The City of New York**              represented by   **Hannah Victoria Faddis**
                                                        New York City Law Department
                                                        100 Church Street
                                                        New York, NY 10007
                                                        (212)356-2486
                                                        Fax: (212)356-1148
                                                        Email: hfaddis@law.nyc.gov
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**P.O. Mandeep Cheema**               represented by   **Hannah Victoria Faddis**
*Tax Id. No. 950196, Individually and in his Official*                   (See above for address)
*Capacity*                                              *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Police Officers John Doe #1-10**
*Individually and in their Official Capacity (the*
*name John Doe being fictitious, as the true names*
*are presently unknown),*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/01/2019 | 1 | COMPLAINT against P.O. Mandeep Cheema, Police Officers John Doe #1-10, The City of New York filing fee $ 400, receipt number ANYEDC-11158558 Was the Disclosure Statement on Civil Cover Sheet completed - YES,, filed by Balwinder Singh. (Attachments: # 1 Civil Cover Sheet) (Fuchs, Ilyssa) (Entered: 02/01/2019) |
| 02/01/2019 | 2 | Proposed Summons. Re 1 Complaint, by Balwinder Singh (Fuchs, Ilyssa) (Entered: 02/01/2019) |
| 02/04/2019 | | Case Assigned to Judge Nicholas G. Garaufis and Magistrate Judge Steven Tiscione. Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. (Davis, Kimberly) (Entered: 02/04/2019) |
| 02/04/2019 | 3 | In accordance with Rule 73 of the Federal Rules of Civil Procedure and Local Rule 73.1, the parties are notified that *if* all parties consent a United States magistrate judge of this court is available to conduct all proceedings in this civil action including a (jury or nonjury) trial and to order the entry of a final judgment. Attached to the Notice is a blank copy of the consent form that should be filled out, signed and filed electronically **only if all** parties wish to consent. The form may also be accessed at the following link: http://www.uscourts.gov/uscourts/FormsAndFees/Forms/AO085.pdf. **You may withhold your consent without adverse substantive consequences. Do NOT return or file the consent unless all parties have signed the consent.** (Davis, Kimberly) (Entered: 02/04/2019) |
| 02/04/2019 | 4 | This attorney case opening filing has been checked for quality control. See the attachment for corrections that were made, if any. (Davis, Kimberly) (Entered: 02/04/2019) |
| 02/04/2019 | 5 | Summons Issued as to P.O. Mandeep Cheema, Police Officers John Doe #1-10, The City of New York. (Davis, Kimberly) (Entered: 02/04/2019) |
| 02/05/2019 | 6 | SUMMONS Returned Executed by Balwinder Singh. The City of New York served on 2/5/2019, answer due 2/26/2019. (Fuchs, Ilyssa) (Entered: 02/05/2019) |
| 02/19/2019 | 7 | SUMMONS Returned Executed by Balwinder Singh. P.O. Mandeep Cheema served on 2/13/2019, answer due 3/6/2019. (Fuchs, Ilyssa) (Entered: 02/19/2019) |
| 02/26/2019 | 8 | Consent MOTION for Extension of Time to File Answer by The City of New York. (Faddis, Hannah) (Entered: 02/26/2019) |
| 02/27/2019 | | ORDER granting 8 Motion for Extension of Time to Answer The City of New York answer due 4/29/2019. So Ordered by Magistrate Judge Steven Tiscione on 2/27/2019. (Vasquez, Lea) (Entered: 02/27/2019) |
| 04/29/2019 | 9 | ANSWER to 1 Complaint, by P.O. Mandeep Cheema, The City of New York. (Faddis, Hannah) (Entered: 04/29/2019) |
| 04/30/2019 | 10 | SCHEDULING ORDER: An in-person initial conference will be held at 10:00 a.m. on May 21, 2019 before the undersigned in Hearing Room N504 in the North Wing. All counsel must attend. Counsel are directed to complete the attached Discovery Plan Worksheet and electronically file same with the Court no later than May 17th. So Ordered by Magistrate Judge Steven Tiscione on 4/30/2019. (Vasquez, Lea) (Entered: 04/30/2019) |
| 04/30/2019 | 11 | First MOTION to Adjourn Conference *currently scheduled for 5/21/19 at 10:00 a.m.* by Balwinder Singh. (Fuchs, Ilyssa) (Entered: 04/30/2019) |
| 04/30/2019 | | ORDER granting 11 Motion to Adjourn Conference: The initial conference scheduled for May 21st will instead be held at 12:00 p.m. on May 29, 2019. So Ordered by Magistrate Judge Steven Tiscione on 4/30/2019. (Vasquez, Lea) (Entered: 04/30/2019) |
| 05/10/2019 | 12 | Proposed Scheduling Order *Proposed Discovery Plan Worksheet* by Balwinder Singh (Fuchs, Ilyssa) (Entered: 05/10/2019) |
| 05/31/2019 | 13 | Minute Entry for Initial Conference Hearing held on 5/29/2019 before Magistrate Judge Steven Tiscione: Cohen, Fuchs for Plaintiff; Faddis for Defendants. The Court sets the following discovery deadlines: Deadline for completion of Rule 26(a) initial disclosures - 6/5/19; Completion of Phase I discovery - 7/29/19; Deadline for motions to join new parties or amend pleadings - 8/28/19; First requests for production of documents and interrogatories due by - 9/12/19; All fact discovery to be completed by 12/27/19; Exchange of plaintiff's expert reports - 12/27/19; Exchange of defendants' expert reports - 1/27/20; Expert depositions completed by - 2/26/20; All discovery completed by - 2/26/20; Final date to take first step in dispositive motion practice - 3/27/20. An in-person settlement conference will be held on August 13, 2019 at 12:00 p.m. Parties are to submit their respective settlement positions via ex parte electronic filing no later than August 10, 2019. |

| | | Counsel are to refer to the Settlement Section of this Court's Individual Rules in preparation for the conference. (FTR Log #12:04 - 12:07.) (Vasquez, Lea) (Entered: 05/31/2019) |
|---|---|---|
| 08/06/2019 | 14 | Consent MOTION to Adjourn Conference *Scheduled for August 13, 2019* by P.O. Mandeep Cheema, The City of New York. (Faddis, Hannah) (Entered: 08/06/2019) |
| 08/12/2019 | | ORDER denying 14 Motion to Adjourn Conference: The conference scheduled for August 13th will proceed as scheduled but instead be held as a status conference. So Ordered by Magistrate Judge Steven Tiscione on 8/12/2019. (Vasquez, Lea) (Entered: 08/12/2019) |
| 08/15/2019 | 15 | Minute Entry for Status Conference held on 8/13/2019 before Magistrate Judge Steven Tiscione: Fuchs, Cohen for Plaintiff; Faddis for Defendants. For the reasons discussed on the record, the settlement conference is adjourned to October 2, 2019 at 12:00 p.m. Parties shall file ex parte submissions by September 30, 2019. (FTR Log #12:07 - 12:38.) (Vasquez, Lea) (Entered: 08/15/2019) |
| 08/22/2019 | 16 | Letter MOTION for Extension of Time to Amend 1 Complaint, , Letter MOTION for Extension of Time to Complete Discovery *based on Adjournment of Settlement Conference* by Balwinder Singh. (Fuchs, Ilyssa) (Entered: 08/22/2019) |
| 09/03/2019 | | ORDER granting 16 Motion for Extension of Time to Amend ; granting 16 Motion for Extension of Time to Complete Discovery: New discovery deadlines will be set at the October 2nd conference is the case cannot be settled. So Ordered by Magistrate Judge Steven Tiscione on 9/3/2019. (Vasquez, Lea) (Entered: 09/03/2019) |
| 09/27/2019 | 17 | Consent MOTION to Adjourn Conference *for October 2, 2019* by P.O. Mandeep Cheema, The City of New York. (Faddis, Hannah) (Entered: 09/27/2019) |
| 09/27/2019 | | ORDER denying 17 Motion to Adjourn Conference. The October 2nd conference will proceed as scheduled but instead be held as a status conference. So Ordered by Magistrate Judge Steven Tiscione on 9/27/2019. (Vasquez, Lea) (Entered: 09/27/2019) |
| 10/04/2019 | 18 | Minute Entry for Status Conference held on 10/2/2019 before Magistrate Judge Steven Tiscione: Cohen for Plaintiff; Faddis for Defendants. Parties are still awaiting receipt of Plaintiff's medical records, including from Plaintiff's recent surgery. Accordingly, the settlement conference is adjourned to November 25, 2019 at 2:00 p.m. Parties shall submit ex parte settlement statements by November 22, 2019. (FTR Log #12:11 - 12:17.) (Vasquez, Lea) (Entered: 10/04/2019) |
| 11/22/2019 | 19 | Letter *re Plaintiff's Settlement Position* by Balwinder Singh (Fuchs, Ilyssa) (Entered: 11/22/2019) |
| 11/22/2019 | 20 | Letter *Ex Parte Settlement Position Statement* by P.O. Mandeep Cheema, The City of New York (Faddis, Hannah) (Entered: 11/22/2019) |
| 11/26/2019 | 21 | Minute Entry for Settlement Conference held on 11/25/2019 before Magistrate Judge Steven Tiscione: Cohen & Fuchs for Plaintiff; Faddis for Defendants. Settlement discussions were held but the parties were unable to reach a disposition at this time. For the reasons discussed on the record, the deadline for completion of fact discovery is extended to March 31, 2020. The Court will hold a further settlement conference on April 7, 2020 at 11:00 a.m. (FTR Log #2:01 - 2:02, 2:52 - 3:00.) (Vasquez, Lea) (Entered: 11/26/2019) |
| 02/12/2020 | | Case Reassigned to Judge Eric R. Komitee. Judge Nicholas G. Garaufis no longer assigned to the case. Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. (Mahoney, Brenna) (Entered: 02/12/2020) |
| 03/09/2020 | 22 | Letter MOTION for Extension of Time to Complete Discovery by Balwinder Singh. (Fuchs, Ilyssa) (Entered: 03/09/2020) |
| 03/09/2020 | | ORDER denying 22 Motion for Extension of Time to Complete Discovery without prejudice to renew once the application complies with this Court's Individual Rules regarding requesting adjournments or extensions of time. So Ordered by Magistrate Judge Steven Tiscione on 3/9/2020. (Vasquez, Lea) (Entered: 03/09/2020) |
| 03/09/2020 | 23 | Letter MOTION for Extension of Time to Complete Discovery by Balwinder Singh. (Attachments: # 1 Exhibit Proposed Discovery Plan) (Fuchs, Ilyssa) (Entered: 03/09/2020) |
| 03/09/2020 | | ORDER granting 23 Motion for Extension of Time to Complete Discovery. Fact discovery is extended to May 29, 2020, parties to exchange expert reports by June 20, 2020, expert depositions to be completed by July 29, 2020 and all discovery to be completed by July 31, 2020. The final date to take the first step in dispositive motion practice is extended to August 31, 2020. The settlement conference scheduled for April 7th will instead be held at 11:00 a.m. on June 4, 2020. So Ordered by Magistrate Judge Steven Tiscione on 3/9/2020. (Vasquez, Lea) (Entered: 03/09/2020) |

| 05/27/2020 | 24 | Joint MOTION to Adjourn Conference , MOTION for Extension of Time to Complete Discovery by P.O. Mandeep Cheema, The City of New York. (Attachments: # 1 Exhibit Proposed Case Management Plan) (Faddis, Hannah) (Entered: 05/27/2020) |
| --- | --- | --- |
| 05/29/2020 | | ORDER granting 24 Motion to Adjourn Conference; deferring ruling on 24 Motion for Extension of Time to Complete Discovery. The request to extend discovery for an additional days will be discussed during at the settlement conference. The settlement conference scheduled for June 4th will instead be held at 2:30 p.m. on June 12, 2020 and will be held by phone with all parties. Counsel for Plaintiff shall call into the conference at 2:30 p.m. with the Plaintiff on the line and counsel for Defendants shall call into the conference at 3:00 p.m. with principals on the line. Counsel are further directed to contact the court PRIOR TO JUNE 12TH to obtain the conference call-in information. So Ordered by Magistrate Judge Steven Tiscione on 5/29/2020. (Vasquez, Lea) Modified on 5/29/2020 (Vasquez, Lea). (Entered: 05/29/2020) |
| 06/08/2020 | 25 | Letter *Ex Parte Settlement Statement* by P.O. Mandeep Cheema, The City of New York (Attachments: # 1 Exhibit Defendants' Settlement Offer) (Faddis, Hannah) (Entered: 06/08/2020) |
| 06/16/2020 | 27 | Minute Order for Settlement Conference held on 6/12/2020 before Magistrate Judge Steven Tiscione: Fuchs & Cohen for Plaintiff; Faddis for Defendants. Settlement discussions were held but the parties were unable to reach a disposition at this time. In light of the ongoing NYPD mobilization and restrictions imposed by the pandemic, the Joint MOTION for Extension of Time to Complete Discovery 24 is granted as follows: All fact discovery to be completed by 8/28/20; Exchange of expert reports - 9/29/20; Expert depositions completed by - 10/29/20; All discovery completed by - 10/29/20; Final date to take first step in dispositive motion practice - 11/30/20. (Vasquez, Lea) (Entered: 06/16/2020) |
| 08/28/2020 | 28 | Joint MOTION for Extension of Time to Complete Discovery by P.O. Mandeep Cheema, The City of New York. (Attachments: # 1 Proposed Order) (Faddis, Hannah) (Entered: 08/28/2020) |
| 08/28/2020 | | ORDER deferring ruling and setting hearing on 28 Joint MOTION for Extension of Time to Complete Discovery : A motion hearing by phone will be held before the undersigned at 3:00 p.m. on September 2, 2020 with all counsel. Counsel are directed to connect to the conference using call-in number 888-557-8511 with access code 3152145. So Ordered by Magistrate Judge Steven Tiscione on 8/28/2020. (Vasquez, Lea) (Entered: 08/28/2020) |
| 09/03/2020 | 29 | Minute Order for Motion Hearing held on 9/3/2020proceedings held before Magistrate Judge Steven Tiscione: Fuchs, Cohen for Plaintiff; Faddis for Defendants. For the reasons discussed on the record, the Joint MOTION for Extension of Time to Complete Discovery 28 is granted and the Court adopts the proposed schedule for all remaining discovery [28-1] as follows: All of Fact Discovery Completed By October 27, 2020; Exchange of Expert Reports Completed By November 30, 2020; Expert Depositions Completed By December 28, 2020; COMPLETION OF ALL DISCOVERY January 29, 2021; Final date to take first step in dispositive motion practice: January 29, 2021.COUNSEL SHALL FILE JOINT STATUS REPORTS ON A MONTHLY BASIS BY THE LAST DAY OF EACH MONTH BEGINNING WITH SEPTEMBER 30TH.Parties will advise the Court when a settlement conference would be productive. (FTR Log #AT&T (3:00 - 3:10).) (Vasquez, Lea) (Entered: 09/03/2020) |
| 09/30/2020 | 30 | STATUS REPORT by Balwinder Singh (Fuchs, Ilyssa) (Entered: 09/30/2020) |
| 09/30/2020 | | STATUS REPORT ORDER: Counsel shall file the next status report by 10/30/2020. So Ordered by Magistrate Judge Steven Tiscione on 9/30/2020. (Vasquez, Lea) (Entered: 09/30/2020) |
| 10/23/2020 | 31 | Joint MOTION for Extension of Time to Complete Discovery *and Status Report* by P.O. Mandeep Cheema, The City of New York. (Attachments: # 1 Proposed Order Proposed Case Management Plan) (Faddis, Hannah) (Entered: 10/23/2020) |
| 10/26/2020 | | ORDER granting 31 Motion for Extension of Time to Complete Discovery: All fact discovery to be completed by 11/27/20; Exchange of plaintiff's expert reports - 11/30/20; Exchange of defendants' expert reports - 12/28/20; Expert depositions completed by - 1/29/21; All discovery completed by - 1/29/21; Final date to take first step in dispositive motion practice - 3/1/21. In lieu of the next status report, a telephone conference will be held at 2:00 p.m. on December 2, 2020 with all counsel. Counsel shall call connect to the conference using dial-in number 888-557-8511 with access code 3152145. This conference will not be adjourned. **THE PARTIES ARE REMINDED that audio or video recording of proceedings by any party other than the Court, is strictly prohibited by Local Civil Rule 1.8. Violation of this rule may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed appropriate by the Court.** So Ordered by Magistrate Judge Steven Tiscione on 10/26/2020. (Vasquez, Lea) (Entered: 10/26/2020) |
| 11/30/2020 | 32 | Letter MOTION for Extension of Time to Complete Discovery by Balwinder Singh. (Attachments: # 1 Exhibit Revised Scheduling Plan) (Fuchs, Ilyssa) (Entered: 11/30/2020) |

| 12/06/2020 | 33 | Minute Order for Telephone Conference held on 12/2/2020 before Magistrate Judge Steven Tiscione: Fuchs, Cohen for Plaintiff, Faddis for Defendants. In light of ongoing delays in scheduling caused by pandemic-related restrictions, the Letter MOTION for Extension of Time to Complete Discovery 32 is granted. The deadline for exchange of initial expert reports is extended to December 21, 2020; the deadline for exchange of rebuttal expert reports is extended to January 18, 2021; the deadline for completion of all discovery, including expert depositions, is extended to February 19, 2021; and the deadline for beginning dispositive motion practice is extended to March 19, 2021.

**NEXT STATUS REPORT REMAINS DUE BY DECEMBER 30, 2020.**

The Court will hold a telephone conference on January 21, 2021 at 10:00 a.m. Counsel shall call connect to the conference using dial-in number 888-557-8511 with access code 3152145.

**THE PARTIES ARE REMINDED that audio or video recording of proceedings by any party other than the Court, is strictly prohibited by Local Civil Rule 1.8. Violation of this rule may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed appropriate by the Court.** (FTR Log #AT&T 2:00 - 2:10.) (Vasquez, Lea) (Entered: 12/06/2020) |
| 12/30/2020 | 34 | STATUS REPORT by Balwinder Singh (Cohen, Gerald) (Entered: 12/30/2020) |
| 01/13/2021 | 35 | Consent MOTION for Extension of Time to Complete Discovery by P.O. Mandeep Cheema, The City of New York. (Attachments: # 1 Proposed Order Proposed Revised Discovery Order) (Faddis, Hannah) (Entered: 01/13/2021) |
| 01/14/2021 | | ORDER granting 35 Motion for Extension of Time to Complete Discovery:

The deadline for exchange of rebuttal expert reports is extended to February 17, 2021; the deadline for completion of all discovery, including expert depositions, is extended to March 19, 2021; and the deadline for beginning dispositive motion practice is extended to April 19, 2021.

A telephone conference will be held at 10:00 a.m. on February 19, 2021 before the undersigned with all counsel. Counsel shall call connect to the conference through dial-in number 888-557-8511 with access code 3152145.

**THE PARTIES ARE REMINDED that audio or video recording of proceedings by any party other than the Court, is strictly prohibited by Local Civil Rule 1.8. Violation of this rule may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed appropriate by the Court.**

So Ordered by Magistrate Judge Steven Tiscione on 1/14/2021. (Vasquez, Lea) (Entered: 01/14/2021) |
| 02/22/2021 | 36 | Minute Entry for Telephone Conference held on 2/19/2021 before Magistrate Judge Steven Tiscione: Fuchs, Cohen for Plaintiff, Faddis for Defendants. Parties have exchanged expert reports but recently identified certain medical records that had not previously been disclosed despite proper releases being given to the medical providers. Based on these new records, Defendants' request for an extension of the discovery schedule is granted. Defendants shall exchange any rebuttal expert reports based on the newly discovered records by April 5, 2021; all expert depositions shall be completed by May 5, 2021; and the deadline for beginning dispositive motion practice is extended to June 4, 2021. The Court will hold a telephone conference on April 7, 2021 at 10:30 a.m. The parties shall use the same information which was provided for today's conference.

**THE PARTIES ARE REMINDED that audio or video recording of proceedings by any party other than the Court, is strictly prohibited by Local Civil Rule 1.8. Violation of this rule may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed appropriate by the Court.** (Vasquez, Lea) (Entered: 02/22/2021) |
| 04/02/2021 | 37 | Consent MOTION to Adjourn Conference *Scheduled for April 7, 2021* by P.O. Mandeep Cheema, The City of New York. (Faddis, Hannah) (Entered: 04/02/2021) |
| 04/02/2021 | | ORDER granting 37 Motion to Adjourn Conference. The telephone conference scheduled for April 7, 2021 will instead be held at 10:00 a.m. on April 22, 2021 before the undersigned with all counsel. Counsel shall call connect to the conference through dial-in number 888-557-8511 with access code 3152145.

**THE PARTIES ARE REMINDED that audio or video recording of proceedings by any party other than the Court, is strictly prohibited by Local Civil Rule 1.8. Violation of this rule may result in sanctions,** |

| | | |
|---|---|---|
| | | **including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed appropriate by the Court.**<br><br>So Ordered by Magistrate Judge Steven Tiscione on 4/2/2021. (DeSaro, Matthew) (Entered: 04/02/2021) |
| 04/23/2021 | 38 | Minute Entry for Telephone Conference held on 4/22/2021 before Magistrate Judge Steven Tiscione: Cohen, Fuchs for Plaintiff; Faddis for Defendants. Parties report that discovery is essentially complete. Defendants will be moving for summary judgment and Plaintiff is also contemplating making a dispositive motion. Both parties shall file their premotion conference letters by the June 4, 2021 deadline. Parties report that further settlement discussions would not be productive at this time but will advise the Court if that changes. (Vasquez, Lea) (Entered: 04/23/2021) |
| 06/03/2021 | 39 | Letter *re Plaintiff's Contemplated Summary Judgment Motion* by Balwinder Singh (Attachments: # 1 Exhibit A - Relevant Portions of Cheema Deposition) (Fuchs, Ilyssa) Modified on 6/4/2021 (Guy, Alicia). (Entered: 06/03/2021) |
| 06/04/2021 | 40 | Letter MOTION for pre motion conference *Regarding Defendants' Anticipated Motion for Summary Judgment* by P.O. Mandeep Cheema, The City of New York. (Faddis, Hannah) (Entered: 06/04/2021) |
| 06/08/2021 | 41 | RESPONSE in Opposition re 39 MOTION for pre motion conference *Regarding Plaintiff's Anticipated Motion for Summary Judgment* filed by P.O. Mandeep Cheema, The City of New York. (Faddis, Hannah) (Entered: 06/08/2021) |
| 06/09/2021 | 42 | Letter *in Opposition re Defendants' Anticipated Motion for Summary Judgment* by Balwinder Singh (Fuchs, Ilyssa) (Entered: 06/09/2021) |
| 06/10/2021 | | ORDER re 39 Motion for Pre Motion Conference; re 40 Motion for Pre Motion Conference -- Plaintiff shall serve his motion by July 12, 2021; Defendants shall serve their cross-motion and opposition by August 26, 2021; Plaintiff shall serve his opposition and reply, if any, by October 12, 2021, and Defendants shall serve their reply, if any, by October 22, 2021. Each submission should be made in a single brief, following the page limits in Rule III.C of the Court's Individual Practices and Rules. As a courtesy to the Court, the parties are encouraged not to file their motion papers and submit courtesy copies until the motion has been fully briefed, unless doing so might cause a party to miss a statutory deadline. *See* Rule III.C.2 this Court's Individual Practices and Rules. Ordered by Judge Eric R. Komitee on 6/10/2021. (Guy, Alicia) (Entered: 06/10/2021) |
| 08/20/2021 | 43 | Consent MOTION for Extension of Time to File *Opposition to Plaintiff's Motion for Summary Judgment and Defendants' Cross-Motion for Summary Judgment to September 10, 2021* by P.O. Mandeep Cheema, The City of New York. (Faddis, Hannah) (Entered: 08/20/2021) |
| 08/23/2021 | | ORDER granting 43 Motion for Extension of Time to File -- The application is granted on consent. The briefing schedule is amended as follows: Defendants shall serve their cross-motion and opposition by September 10, 2021; Plaintiff shall serve his opposition and reply, if any, by October 27, 2021; and Defendants shall serve their reply, if any, by November 8, 2021. Each submission should be made in a single brief, following the page limits in Rule III.C of the Court's Individual Practices and Rules. As a courtesy to the Court, the parties are encouraged not to file their motion papers and submit courtesy copies until the motion has been fully briefed, unless doing so might cause a party to miss a statutory deadline. *See* Rule III.C.2 this Court's Individual Practices and Rules. Ordered by Judge Eric R. Komitee on 8/23/2021. (Guy, Alicia) (Entered: 08/23/2021) |
| 09/09/2021 | 44 | Consent MOTION for Extension of Time to File *Opposition to Plaintiff's Motion for Summary Judgment and Defendants' Motion for Summary Judgment* by P.O. Mandeep Cheema, The City of New York. (Faddis, Hannah) (Entered: 09/09/2021) |
| 09/10/2021 | | ORDER granting 44 Motion for Extension of Time to File -- The application is granted on consent. The briefing schedule is amended as follows: Defendants shall serve their cross-motion and opposition by September 24, 2021; Plaintiff shall serve his opposition and reply, if any, by November 12, 2021; and Defendants shall serve their reply, if any, by November 26, 2021. Pursuant to Rule I.C.1 of this Court's Individual Practices and Rules, requests for extensions of time must be made at least two business days prior to the scheduled deadline. Failure to comply with this rule without showing good cause may result in denial of such requests in the future. The parties should expect that no further extensions will be granted, absent extraordinary circumstances. Ordered by Judge Eric R. Komitee on 9/10/2021. (Guy, Alicia) (Entered: 09/10/2021) |
| 11/22/2021 | 45 | Letter MOTION for Extension of Time to File *Serve Fully Submitted Summary Judgment Motions, etc.* by Balwinder Singh. (Fuchs, Ilyssa) (Entered: 11/22/2021) |
| 11/23/2021 | | ORDER granting 45 Motion for Extension of Time to File -- The application is granted on consent. Defendants shall serve their reply, if any, by November 29, 2021. Regarding the parties' first inquiry, Plaintiff shall file all |

| | | |
|---|---|---|
| | | of the motion papers on ECF. Regarding the parties' second inquiry, the parties are relieved of their obligation to submit courtesy copies, and are directed to consult Rule II.A.4 of this Court's Individual Practices and Rules regarding the filing of non-text exhibits. Ordered by Judge Eric R. Komitee on 11/23/2021. (Guy, Alicia) (Entered: 11/23/2021) |
| 11/29/2021 | 46 | Notice of MOTION for Summary Judgment re *Plaintiff* by Balwinder Singh. (Attachments: # 1 Memorandum in Support re Plaintiff's Motion for Summary Judgment, # 2 Rule 56.1 Statement re Plaintiff's Motion for Summary Judgment, # 3 Declaration Gerald M. Cohen, # 4 Exhibit A, # 5 Exhibit B, # 6 Exhibit C, # 7 Exhibit D, # 8 Exhibit E, # 9 Exhibit F, # 10 Exhibit G(1-3), # 11 Exhibit H, # 12 Exhibit I, # 13 Exhibit J, # 14 Exhibit K, # 15 Exhibit L, # 16 Exhibit M) (Fuchs, Ilyssa) (Entered: 11/29/2021) |
| 11/29/2021 | 47 | EXHIBIT *F (corrected)* by Balwinder Singh. Related document: 46 Notice of MOTION for Summary Judgment re *Plaintiff* filed by Balwinder Singh. (Fuchs, Ilyssa) (Entered: 11/29/2021) |
| 11/29/2021 | 48 | MOTION for Summary Judgment re *Defendants Cross-Motion and Opposition to Plaintiff's Motion* by Balwinder Singh. (Attachments: # 1 Memorandum in Support re Defendants' Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Motion, # 2 Rule 56.1 Statement re Response to Plaintiff's 56.1 & Defendants Counter-Statement, # 3 Declaration Hannah V. Faddis, # 4 Exhibit A, # 5 Exhibit B, # 6 Exhibit C, # 7 Exhibit D, # 8 Exhibit E, # 9 Exhibit F, # 10 Exhibit G, # 11 Exhibit H, # 12 Exhibit I, # 13 Exhibit J, # 14 Exhibit K, # 15 Exhibit L, # 16 Exhibit M, # 17 Exhibit N, # 18 Exhibit O, # 19 Exhibit P) (Fuchs, Ilyssa) (Entered: 11/29/2021) |
| 11/29/2021 | 49 | MEMORANDUM in Opposition re 48 MOTION for Summary Judgment re *Defendants Cross-Motion and Opposition to Plaintiff's Motion*, 46 Notice of MOTION for Summary Judgment re *Plaintiff Reply in Further Support of Motion* filed by Balwinder Singh. (Attachments: # 1 Rule 56.1 Statement re Response to Defendants' 56.1, # 2 Declaration Gerald M. Cohen, # 3 Exhibit N, # 4 Exhibit O(1-5)) (Fuchs, Ilyssa) (Entered: 11/29/2021) |
| 11/29/2021 | 50 | REPLY in Opposition re 46 Notice of MOTION for Summary Judgment re *Plaintiff*, 49 Memorandum in Opposition, 48 MOTION for Summary Judgment re *Defendants Cross-Motion and Opposition to Plaintiff's Motion in Further Support of Defendants' Cross-Motion* filed by Balwinder Singh. (Attachments: # 1 Rule 56.1 Statement re Reply to Plaintiff's Counter-Statement) (Fuchs, Ilyssa) (Entered: 11/29/2021) |
| 12/06/2021 | 51 | USB Drive containing non-text Exhibits submitted by Balwinder Singh. Related document: 46 Notice of MOTION for Summary Judgment re *Plaintiff* filed by Balwinder Singh, 50 Reply in Opposition, filed by Balwinder Singh. (Lee, Tiffeny) (Entered: 12/07/2021) |
| 04/09/2022 | | ORDER REFERRING MOTION: The Parties' motions for summary judgment (ECF Nos 46 48 ) are respectfully referred to Magistrate Judge Steven Tiscione for a Report and Recommendation. Ordered by Judge Eric R. Komitee on 4/9/2022. (Guy, Alicia) (Entered: 04/09/2022) |
| 04/09/2022 | | SCHEDULING ORDER: A telephone conference will be held on April 13, 2022, at 10:30 a.m. before the undersigned. The parties are directed to call 888-808-6929 five minutes before the scheduled start of the conference and use access code 564-7824. Ordered by Judge Eric R. Komitee on 4/9/2022. (Guy, Alicia) (Entered: 04/09/2022) |
| 04/13/2022 | | Incorrect Case/Document/Entry Information -- The Scheduling Order erroneously entered today, April 13, 2022, has been deleted. (Guy, Alicia) (Entered: 04/13/2022) |
| 04/13/2022 | 52 | NOTICE of Appearance by Gerald M. Cohen on behalf of All Plaintiffs (aty to be noticed) (Cohen, Gerald) (Entered: 04/13/2022) |
| 04/13/2022 | 53 | Minute Entry for proceedings held before Judge Eric R. Komitee: Telephone Conference held on 4/13/2022 regarding the Court's referral of the Parties' motions for summary judgment (docket entries 46 & 48 ) to Magistrate Judge Tiscione. The Parties are to advise the Court by May 13, 2022, if they consent to either (a) having Judge Tiscione decide the motions pursuant to 28 U.S.C. § 636(c), rather than simply rendering a report and recommendation, or (b) consent for all purposes. The form to consent to having Magistrate Judge Tiscione decide the referred motion, and the form to consent for all purposes, are attached. To advise the Court of their collective determination, the parties should file the relevant consent form.(Electronically Recorded.) (Attachments: # 1 NOTICE, CONSENT, AND REFERENCE OF A CIVIL ACTION TO A MAGISTRATE JUDGE, # 2 NOTICE, CONSENT, AND REFERENCE OF A DISPOSITIVE MOTION TO A MAGISTRATE JUDGE) (Guy, Alicia) (Entered: 04/16/2022) |
| 05/10/2022 | 54 | Letter *Regarding No Consent to Magistrate Judge* by P.O. Mandeep Cheema, The City of New York (Faddis, Hannah) (Entered: 05/10/2022) |
| 06/28/2022 | 55 | REPORT AND RECOMMENDATIONS re 46 Notice of MOTION for Summary Judgment re *Plaintiff* filed by Balwinder Singh, 48 MOTION for Summary Judgment re *Defendants Cross-Motion and Opposition to Plaintiff's Motion* filed by Balwinder Singh. For the reasons stated in the attached Report & Recommendation, |

| | | |
|---|---|---|
| | | this Court respectfully recommends that (1) Plaintiffs Motion for Summary Judgment be denied; and (2) Defendants Cross-Motion for Summary Judgment be granted in part and denied in part. Objections to R&R due by 7/12/2022. So Ordered by Magistrate Judge Steven Tiscione on 6/28/2022. (Mistry-Sehgal, Nikita) (Entered: 06/28/2022) |
| 08/04/2022 | 56 | Letter *re Request Adoption of Report & Recommendation and Schedule Telephonic Conference to Set Trial Date* by Balwinder Singh (Fuchs, Ilyssa) (Entered: 08/04/2022) |
| 09/30/2022 | 57 | **MEMORANDUM & ORDER ADOPTING REPORT AND RECOMMENDATIONS.** The R&R 55 is adopted in part. Plaintiff's Motion for Summary Judgment on his excessive-force claim 46 is DENIED. Defendant Cheema's Motion for Summary Judgment 48 is GRANTED as to Plaintiff's Section 1983 claims for false arrest and excessive force, and state-law claim for assault and battery. The parties shall file letters by October 6, 2022, indicating whether they have stipulated to the dismissal of the municipal liability claim, and (if not) whether they intend to do so. **ORDER ATTACHED.** Ordered by Judge Eric R. Komitee on 9/30/2022. (Iseman, Eugenie). (Entered: 09/30/2022) |
| 10/06/2022 | 58 | Letter MOTION for Extension of Time to File *Stipulation of Dismissal as to Monell Claim* by Balwinder Singh. (Fuchs, Ilyssa) (Entered: 10/06/2022) |
| 10/07/2022 | | ORDER granting 58 Motion for Extension of Time to File -- The joint request is granted. No later than November 7, 2022, the parties shall file a stipulation of dismissal. Ordered by Judge Eric R. Komitee on 10/7/2022. (AG) (Entered: 10/07/2022) |
| 11/02/2022 | 59 | Letter *re Parties Inability to Agree on a Stipulation and Order of Voluntary Dismissal* by Balwinder Singh (Attachments: # 1 Exhibit A - Plaintiff's Proposed Stipulation and Judgment, # 2 Exhibit B - Stipulation and Judgment in Jeffrey v. City of New York, et al. 20 CV 2843 (NGG), # 3 Exhibit C - 9/23/21 Email, # 4 Exhibit D - Defendants' Proposed Stipulation) (Fuchs, Ilyssa) (Entered: 11/02/2022) |
| 11/09/2022 | | SCHEDULING ORDER: A status conference will be held on November 22, 2022, at 9:30 a.m. in Courtroom 6G North before the undersigned. Ordered by Judge Eric R. Komitee on 11/09/2022. (AG) (Entered: 11/11/2022) |
| 11/20/2022 | 60 | Consent MOTION to Adjourn Conference *or Convert to Telephonic Appearance* by P.O. Mandeep Cheema, The City of New York. (Faddis, Hannah) (Entered: 11/20/2022) |
| 11/21/2022 | | ORDER terminating 60 Motion to Adjourn Conference -- The status conference will proceed as scheduled on November 22, 2022, at 9:30 a.m. Plaintiff's counsel shall appear in person; Defendants' counsel can appear by telephone. Defendant's counsel is directed to call 888-808-6929 five minutes before the scheduled start of the conference and use access code 564-7824. Ordered by Judge Eric R. Komitee on 11/21/2022. (AG) (Entered: 11/21/2022) |
| 11/22/2022 | 61 | Minute Entry for proceedings held before Judge Eric R. Komitee: Status Conference held on 11/22/2022. Case called. Discussion held. As discussed, the parties will submit a stipulation of dismissal as to the sole remaining claim and the Court will enter judgment. (FTR Log #9:38 - 9:52.) (AG) (Entered: 11/22/2022) |
| 12/02/2022 | 62 | STIPULATION of Dismissal *Stipulation of Partial Dismissal as to Monell Claims* by P.O. Mandeep Cheema, The City of New York (Faddis, Hannah) (Entered: 12/02/2022) |
| 12/05/2022 | | ORDER DISMISSING CASE -- As stipulated and agreed between the parties in the joint Stipulation of Partial Dismissal as to *Monell* Claims 62 filed on December 2, 2022 (the "Monell Stipulation"), all claims for municipal liability brought pursuant to 42 U.S.C. § 1983 against the City of New York shall be dismissed with prejudice. The Clerk of Court is respectfully directed to enter judgment consistent with the parties' *Monell* Stipulation and this Court's Memorandum and Order 55 dated September 30, 2022, and close this case. Ordered by Judge Eric R. Komitee on 12/5/2022. (AG) (Entered: 12/05/2022) |
| 12/06/2022 | 63 | CLERK'S JUDGMENT, that Plaintiffs motion for summary judgment on his excessive-force claim is denied; that Cheemas cross-motion for summary judgment is granted as to Plaintiffs Section 1983 claims for false arrest and excessive force, and state-law claim for assault and battery; and the following is stipulated and agreed as follows: 1. The above-referenced claims for municipal liability brought pursuant to 42 U.S.C. § 1983 against the City of New York are hereby dismissed with prejudice; 2. Pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure, any and all of the claims that were asserted or could have been asserted by or on behalf of plaintiff Balwinder Singh against defendant the City of New York, including its successors and assigns, for municipal liability pursuant to 42 U.S.C. § 1983, arising out of the facts and circumstances that are the subject of this action, are hereby dismissed and discontinued, with prejudice, and without attorneys fees, costs, or disbursements to any party as against any other party; 3. This Stipulation contains all the terms and conditions agreed upon by counsel for defendants and counsel for plaintiff hereto, and no oral agreement entered into at any time nor any written agreement entered into prior to the execution of this Stipulation shall be deemed to exist, or to bind the parties hereto, or to vary the terms and conditions contained herein; and 4. |

| | | |
|---|---|---|
| | | This Stipulation shall be binding upon the parties immediately upon signature and shall be submitted to the Court for entry as an Order. (Signed by Jalitza Poveda, Deputy Clerk on 12/6/2022) (SG) (Entered: 12/06/2022) |
| 01/04/2023 | 64 | NOTICE OF APPEAL as to 63 Clerk's Judgment,,,,,, 57 Order Adopting Report and Recommendations,,, Order on Motion for Summary Judgment,,,,,, Order on Report and Recommendations,, by Balwinder Singh. Filing fee $ 505, receipt number ANYEDC-16276729. (Fitch, Joshua) (Entered: 01/04/2023) |
| 01/04/2023 | | Electronic Index to Record on Appeal sent to US Court of Appeals. 64 Notice of Appeal, Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (VJ) (Entered: 01/04/2023) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/10/2023 13:28:01 | | |
| **PACER Login:** | Blandy33 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:19-cv-00632-EK-ST |
| **Billable Pages:** | 11 | **Cost:** | 1.10 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
BALWINDER SINGH,

Plaintiff,

-against-

THE CITY OF NEW YORK, P.O. MANDEEP
CHEEMA, Tax Id. No. 950196, Individually and in his
Official Capacity, and POLICE OFFICERS "JOHN
DOE" #1-10, Individually and in their Official Capacity
(the name John Doe being fictitious, as the true names are
presently unknown),

Defendants.

-----------------------------------------------------------------X

**COMPLAINT**

**JURY TRIAL DEMANDED**

**ECF CASE**

Plaintiff BALWINDER SINGH, by his attorneys, COHEN & FITCH LLP, complaining of the defendants, respectfully alleges as follows that:

**PRELIMINARY STATEMENT**

1.      Plaintiff brings this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988 for violations of his civil rights, as said rights are secured by said statutes and the Constitutions of the State of New York and the United States.

**JURISDICTION**

2.      This action is brought pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988, and the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

3.      Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343 and 1367.

**VENUE**

4.      Venue is properly laid in the Eastern District of New York under U.S.C. §1391(b), in that this is the District in which the claim arose.

- 1 -

**JURY DEMAND**

5.      Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

**PARTIES**

6.      Plaintiff BALWINDER SINGH is an Indian American male and has been at all relevant times a resident of Queens County in the State of New York.

7.      Defendant, THE CITY OF NEW YORK, was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

8.      Defendant, THE CITY OF NEW YORK, maintains the New York City Police Department, a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, The City of New York.

9.      At all times hereinafter mentioned, the individually named defendants P.O. MANDEEP CHEEMA, Tax Id. No. 950196 and P.O.s "JOHN DOE" #1-#10 ("NYPD defendants") were duly sworn police officers of said department and were acting under the supervision of said department and according to their official duties.

10.     At all times hereinafter mentioned the defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

11.     Each and all of the acts of the NYPD defendants alleged herein were done by said defendants while acting within the scope of their employment by defendant THE CITY OF NEW YORK.

- 2 -

12.     Each and all of the acts of the NYPD defendants alleged herein were done by said defendants while acting in furtherance of their employment by defendant THE CITY OF NEW YORK.

<u>**FACTS**</u>

13.     On or about February 28, 2018, at approximately 6:50 a.m. plaintiff BALWINDER SINGH was lawfully in his home at 130-18 Atlantic Avenue in Queens, New York.

14.     At the aforesaid time and place, plaintiff's wife called 911 requesting medical assistance for him due to a medical issue.

15.     Thereafter, despite the fact plaintiff's wife requested EMS, several NYPD officers – including defendants CHEEMA and/or "JOHN DOE" #1-10 – arrived at plaintiff's home.

16.     The defendant officers – CHEEMA and/or "JOHN DOE" #1-10 – then entered plaintiff's home, and ordered him to get dressed.

17.     After plaintiff was dressed, defendants CHEEMA and/or "JOHN DOE" #1-10 ordered plaintiff to turn around, place his hands behind back, and informed him that they were going to handcuff him, even though he had not committed any crimes or violations of the law.

18.     Plaintiff complied with defendants CHEEMA and/or "JOHN DOE" #1-10 and held out his hands to allow these officers to handcuff him, but then, without provocation or any legal/legitimate reason to do so, one of the aforementioned defendant officers violently tackled plaintiff to the ground causing him to suffer, *inter alia*, serious physical injury to his shoulder, lower back, and neck.

19.     Plaintiff was then detained by these officers before they eventually transported him to a nearby hospital.

20.     Plaintiff remained at the hospital, for several hours before he was finally released without being charged with any crimes and/or infractions.

21.     At no time on February 28, 2018 did plaintiff commit any crimes and/or offenses or behave unlawfully in any way, nor did the defendant officers CHEEMA and/or "JOHN DOE" #1-10 have probable cause for his arrest.

22.     Moreover, defendants CHEEMA and/or "JOHN DOE" #1-10's use of force against plaintiff upon arresting him on February 28, 2018 was neither justified, nor reasonable under the circumstances.

23.     As a result of his arrest and the unreasonable force employed by the defendant officers CHEEMA and/or "JOHN DOE" #1-10, Mr. Singh suffered, *inter alia*, a torn rotator cuff to his right shoulder requiring surgical repair.

24.     Further, as a result of this injury, plaintiff was unable to work and lost wages.

25.     As a result of the foregoing, plaintiff sustained, *inter alia*, loss of liberty, lost wages, mental anguish, shock, fright, apprehension, embarrassment, humiliation, physical injury, and deprivation of his constitutional rights.

**FEDERAL CLAIMS**

**FIRST CLAIM FOR RELIEF**
**DEPRIVATION OF FEDERAL RIGHTS UNDER 42 U.S.C. § 1983**

26.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

27.     All of the aforementioned acts of defendants, their agents, servants and employees, were carried out under the color of state law.

28.     All of the aforementioned acts deprived plaintiff of the rights, privileges and immunities guaranteed to citizens of the United States by the Fourth and Fourteenth

Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

29.     The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers with all the actual and/or apparent authority attendant thereto.

30.     The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

31.     Defendants, collectively and individually, while acting under color of state law, engaged in conduct which constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

**SECOND CLAIM FOR RELIEF**
**FALSE ARREST UNDER 42 U.S.C. § 1983**

32.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

33.     As a result of the aforesaid conduct by defendants CHEEMA and/or "JOHN DOE" #1-10, plaintiff's person and possessions were illegally and improperly seized and searched without consent, a valid warrant, probable cause, privilege or consent, in violation of his constitutional rights as set forth in the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States.

34.     As a result of the aforesaid conduct by defendants CHEEMA and/or "JOHN DOE" #1-10, plaintiff was subjected to an illegal, improper and false arrest by the defendants,

**[JA-15]**

taken into custody, and caused to be falsely imprisoned, detained, and confined, without any probable cause, privilege or consent.

35.     As a result of the foregoing, plaintiff's liberty was restricted for an extended period of time, he was put in fear for his safety, and he was humiliated and subjected to handcuffing and other physical restraints, without probable cause.

## THIRD CLAIM FOR RELIEF
## EXCESSIVE FORCE UNDER 42 U.S.C. § 1983

36.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

37.     The level of force employed by defendants CHEEMA and/or "JOHN DOE" #1-10 was objectively unreasonable and in violation of the constitutional rights of the plaintiff.

38.     As a result of the foregoing, plaintiff sustained, inter alia, bodily injuries, including, but not limited to, a torn rotator cuff in his right shoulder requiring surgical repair, neck and back pain, and swelling of his hands and wrists.

## FOURTH CLAIM FOR RELIEF
## FAILURE TO INTERCEDE UNDER 42 U.S.C. § 1983

39.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

40.     Defendants CHEEMA and/or "JOHN DOE" #1-10 had an affirmative duty, and the opportunity to intercede, when plaintiff's constitutional rights were being violated in defendants' CHEEMA and/or "JOHN DOE" #1-10 presence by the use of excessive force.

41.     Defendants CHEEMA and/or "JOHN DOE" #1-10 further violated plaintiff's constitutional rights when they failed to intercede and prevent the violation or further violation of plaintiff's constitutional rights and the injuries or further injuries caused as a result of said failure.

42.     As a result of the defendants' CHEEMA and/or "JOHN DOE" #1-10 failure to intercede when plaintiff's constitutional rights were being violated in defendants' CHEEMA and/or "JOHN DOE" #1-10 presence, plaintiff sustained, *inter alia*, physical and emotional injuries, plaintiff's liberty was restricted for an extended period of time, he was put in fear for his safety, and he was humiliated and subjected to handcuffing and other physical restraints, without justification.

### FIFTH CLAIM FOR RELIEF FOR
### MUNICIPAL LIABILITY UNDER 42 U.S.C. § 1983

43.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

44.     Defendants caused excessive force to be utilized against plaintiff without justification or provocation causing plaintiff severe injuries in violation of his constitutional rights.

45.     Defendants caused plaintiff's liberty to be restricted through their violent and illegal acts of excessive force in violation of the constitutional rights of plaintiff.

46.     Defendants caused plaintiff to be handcuffed continuously while he was admitted to the hospital for treatment for his injuries despite having no reasonable justification for doing so, despite the fact that he posed no risk of flight or danger and had not committed any crime or offense.

47.     The acts complained of were carried out by the aforementioned individual defendants and subordinate officers of the NYPD officers, including P.O. CHEEMA and/or P.O. "JOHN DOE"'s #1-10 in their capacities as NYPD officers and officials, with all the actual and/or apparent authority attendant thereto.

48.     The acts complained of were carried out by the aforementioned individual defendants and subordinate NYPD officers, including P.O. CHEEMA and/or P.O. "JOHN DOE"'s #1-10 in their capacities as NYPD officers and officials pursuant to the customs, policies, usages, practices, procedures, and rules of the City of New York.

49.     The failure to train officers and employees, and the failure to supervise and/or discipline staff responsible for theses acts are so institutionalized as to represent a policy or custom of unconstitutional violations that have resulted in the deprivation of plaintiffs' rights.

50.     The aforementioned customs, policies, usages, practices, procedures and rules of the City of New York, the NYPD include, but are not limited to, the following unconstitutional practices:

      i.      Utilizing excessive force in connection with arrests when there is no excuse or justification for any such force;

      ii.     Requiring that individuals be and remain handcuffed during any hospitalization following arrests regardless of whether a crime has been committed and/or the necessity of the handcuffing to prevent escape or danger to themselves or others; and/or,

      iii.    Deliberate indifference to training officers in how to respond to jobs involving individuals requiring medical attention;

      iv.     Deliberate indifference to training officers responding to non-violent individuals who are intoxicated;

51.     The existence of the aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct by the NYPD and from the statistics, records and reports maintained by City Agencies.

52.     The foregoing customs, policies, usages, practices, procedures and rules of the City of New York, and NYPD constituted a deliberate indifference to the safety, well-being and constitutional rights of plaintiffs.

53.     The foregoing customs, policies, usages, practices, procedures and rules of the City of New York, and NYPD were the direct and proximate cause of the constitutional violations suffered by plaintiffs as alleged herein.

54.     The foregoing customs, policies, usages, practices, procedures and rules of the City of New York, and NYPD were the moving force behind the constitutional violations suffered by plaintiff as alleged herein.

55.     As a result of the foregoing customs, policies, usages, practices, procedures and rules of the City of New York, and NYPD, plaintiff was arrested without probable cause or any legal basis and subjected to excessive force, detention, search, restraints, handcuffing and verbal, mental and physical abuse in violation of their constitutional rights.

56.     Defendants, collectively and individually, while acting under color of state law, were directly and actively involved in violating the constitutional rights of plaintiff.

57.     Defendants, collectively and individually, while acting under color of state law, acquiesced in and encouraged a pattern of unconstitutional conduct by subordinate NYPD officers, and were directly responsible for the violation of the constitutional rights of plaintiff.

58.     All of the foregoing acts by defendants deprived plaintiff of federally protected rights, including, but not limited to, the right:

ii.     Not to be deprived of liberty without due process of law;

iii.    To be free from search, seizure and arrest not based upon probable cause;

iv.     To be free from excessive force incident to arrest; and,

v.      To receive equal protection under the law;

Case 1:19-cv-00632   Document 1   Filed 02/01/19   Page 10 of 14 PageID #: 10

## PENDANT STATE CLAIMS

59.     Plaintiff repeats, reiterates and realleges each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

60.     On or about April 9, 2018, and within (90) days after the claim herein accrued, the plaintiff duly served upon, presented to and filed with defendant THE CITY OF NEW YORK, a Notice of Claim setting forth all facts and information required under the General Municipal Law § 50 (e).

61.     Defendant THE CITY OF NEW YORK has wholly neglected or refused to make an adjustment or payment thereof and more than thirty (30) days have elapsed since the presentation of such claim as aforesaid.

62.     Defendant THE CITY OF NEW YORK demanded a hearing pursuant to General Municipal Law § 50-h and said hearing was held on or about June 8, 2018.

63.     This action was commenced within one (1) year and ninety (90) days after the causes of action herein accrued.

64.     Plaintiff has and/or will comply with all conditions precedent to maintaining the instant action.

65.     This action falls within one or more of the exceptions as outlined in C.P.L.R. § 1602.

### FIRST CLAIM FOR RELIEF UNDER N.Y. STATE LAW
### FALSE ARREST/IMPRISONMENT

66.     Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

67.     Defendants CHEEMA, and/or "JOHN DOE" #1-10 arrested plaintiff in the absence of probable cause and without a warrant.

68.     As a result of the foregoing, plaintiff was falsely imprisoned, his liberty was restricted for an extended period of time, he was put in fear for his safety, he suffered economic damages, and was humiliated and subjected to handcuffing and other physical restraints.

69.     Plaintiff was conscious of said confinement and did not consent to the same.

70.     The confinement of plaintiff was without probable cause and was not otherwise privileged.

71.     As a result of the aforesaid conduct by defendants CHEEMA, and/or "JOHN DOE" #1-10, plaintiff was subjected to an illegal, improper and false arrest by the defendants and taken into custody and caused to be falsely imprisoned, detained, confined, incarcerated and prosecuted by the defendants in criminal proceedings. The aforesaid actions by the defendants constituted a deprivation of plaintiff's rights.

72.     As a result of the aforementioned conduct, plaintiff has suffered physical and mental injury, together with embarrassment, humiliation, shock, fright and loss of freedom.

## SECOND CLAIM FOR RELIEF UNDER N.Y. STATE LAW
### ASSAULT

73.     Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

74.     Defendants CHEEMA, and/or "JOHN DOE" #1-10 aforementioned actions placed plaintiff in apprehension of imminent harmful and offensive bodily contact.

75.     As a result of defendants' conduct, plaintiff has suffered physical pain and mental anguish, together with shock, fright, apprehension, embarrassment, and humiliation.

### THIRD CLAIM FOR RELIEF UNDER N.Y. STATE LAW
### BATTERY

76.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

77.     Defendants CHEEMA, and/or "JOHN DOE" #1-10 touched plaintiff in a harmful and offensive manner.

78.     Defendants CHEEMA, and/or "JOHN DOE" #1-10 did so without privilege or consent from plaintiff.

79.     As a result, plaintiff sustained, inter alia, bodily injuries, including, but not limited to, a torn rotator cuff in his right shoulder requiring surgical repair, neck and back pain, and swelling of his hands and wrists.

80.     Further, as a result of defendants' conduct, plaintiff has suffered physical pain and mental anguish, together with shock, fright, apprehension, embarrassment and humiliation.

### FOURTH CLAIM FOR RELIEF UNDER N.Y. STATE LAW
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

81.     Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

82.     The aforementioned conduct of defendants CHEEMA, and/or "JOHN DOE" #1-10, was extreme and outrageous, and exceeded all reasonable bounds of decency.

83.     The aforementioned conduct was committed by defendants CHEEMA, and/or "JOHN DOE" #1-10, while acting within the scope of their employment by defendant THE CITY OF NEW YORK.

84.     The aforementioned conduct was committed by defendants CHEEMA, and/or "JOHN DOE" #1-10, while acting in furtherance of their employment by defendant THE CITY OF NEW YORK.

85.     The aforementioned conduct was intentional and done for the sole purpose of causing severe emotional distress to plaintiff.

86.     As a result of the aforementioned conduct, plaintiff suffered severe emotional distress, mental injury, together with embarrassment, humiliation, shock, fright and loss of freedom.

**FIFTH CLAIM FOR RELIEF UNDER N.Y. STATE LAW**
**NEGLIGENT HIRING/TRAINING/SUPERVISION/RETENTION**

87.     Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

88.     Defendant CITY OF NEW YORK selected, hired, trained, retained, assigned and supervised all members of its Police Department, including the defendants individually named above.

89.     Defendant CITY OF NEW YORK was negligent and careless when it selected, hired, trained, retained, assigned, and supervised all members of its Police Department including the defendants individually named above.

90.     Due to the negligence of the defendants as set forth above, plaintiff suffered mental injury, pain and trauma, together with embarrassment, humiliation shock, fright, and loss of freedom.

91.     As a result of the foregoing, plaintiff is entitled to compensatory damages and is further entitled to punitive damages against the individual defendants.

**[JA-23]**

Case 1:19-cv-00632   Document 1   Filed 02/01/19   Page 14 of 14 PageID #: 14

**WHEREFORE**, the plaintiff respectfully requests judgment against defendants as follows:

      i.    an order awarding compensatory damages in an amount to be determined at trial;

      ii.    an order awarding punitive damages in an amount to be determined at trial;

      iii.    reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

      iv.    directing such other and further relief as the Court may deem just and proper, together with attorneys' fees, interest, costs and disbursements of this action.

Dated: New York, New York
      January 31, 2019

               BY:       /S           
                         JOSHUA FITCH
                         GERALD COHEN
                         ILYSSA FUCHS
                         COHEN & FITCH LLP
                         *Attorneys for Plaintiff*
                         233 Broadway, Suite 1800
                         New York, N.Y. 10279
                         (212) 374-9115
                         jfitch@cohenfitch.com
                         gcohen@cohenfitch.com
                         ifuchs@cohenfitch.com

**[JA-24]**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- X

BALWINDER SINGH,

        Plaintiff,

  -against-

THE CITY OF NEW YORK, et al.

        Defendants.

---------------------------------------------------------------------- X

**NOTICE OF MOTION
FOR SUMMARY
JUDGMENT PURSUANT
TO FED. R. CIV. P. 56**

**<u>19 CV 00632
(EK)(ST)</u>**

  **PLEASE TAKE NOTICE** that upon the Memorandum of Law in Support of Plaintiff's *Motion for Summary Judgment* Pursuant to Rule 56 dated July 12, 2021, the Declaration of Gerald M. Cohen, Esq. dated July 12, 2021, and the supporting exhibits annexed thereto; and upon all prior pleadings and proceedings had herein, plaintiff Balwinder Singh will move this Court before the Honorable Eric R. Komitee, United States District Judge, at the United States District Court for the Eastern District of New York, located at 225 Cadman Plaza East, Brooklyn, NY 11201, for a decision and order pursuant to Rule 56  of the Federal Rules of Civil Procedure as to plaintiff's Excessive Force claim (Claim #3 of Plaintiff's Complaint), on the grounds that no genuine issue of material facts exist as to this claim that warrant a trial, and together with such other relief as the Court deems just and proper.

  **PLEASE TAKE FURTHER NOTICE** that, pursuant to the Court's Order dated June 10, 2021, defendants' opposition papers and cross-motion, if any, shall be served no later than August 26, 2021, and plaintiff's reply papers, if any, shall be served no later than October 12,

Case 1:19-cv-00632-EK-ST   Document 46   Filed 11/29/21   Page 2 of 2 PageID #: 138

2021, and that defendants' reply papers, if any, shall be served no later than October 22, 2021, and that the parties are encouraged not file their motion papers and submit courtesy copies until the motion has been fully briefed unless doing so might cause a party to miss a statutory deadline.

Dated: New York, New York
   July 12, 2021

        COHEN & FITCH, LLP
        *Attorneys for Plaintiff*
        110 E. 59th St., Ste. 3200
        New York, New York 1007
        (212) 374-9115

        By: _____/s_____
         GERALD M. COHEN

TO: **BY E-MAIL & ECF**

THE NEW YORK CITY LAW DEPT.
*Attorneys for Defendants*
100 Church St.
New York, NY 10007
Tel: (212) 356-2332
Fax: (212) 356-3509
By: Hannah V. Faddis, Esq.

- 2 -

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

BALWINDER SINGH,

                    Plaintiff,

           -against-

THE CITY OF NEW YORK, et. al,

                    Defendants.

-------------------------------------------------------------------X

**PLAINTIFF'S
STATEMENT OF
UNDISPUTED
FACTS**

**19 CV 632 (EK) (ST)**

       Plaintiff Balwinder Singh, by his attorney, hereby submits this statement pursuant to Local Rule 56.1(c) of the Local Civil Rules of the United States District Court for the Southern and Eastern Districts of New York, to set forth material facts as to which he contends there are no genuine issues to be tried:

       1.     On February 28, 2018, plaintiff, Balwinder Singh, was 5'7" tall and weighed approximately 190 pounds. (See Relevant Portions of Plaintiff Balwinder Singh Deposition ("Singh Dep."), annexed to the Declaration of Gerald M. Cohen ("Cohen Dec."), Exhibit ("Ex.") A at 60)

       2.     At the time, plaintiff was working for Uber and Lyft as a for-hire driver. (Id. at 23)

       3.     Many years prior to this incident, in 2004, plaintiff received treatment for alcohol abuse. (Id. at 13)

       4.     On February 28, 2018, plaintiff had an alcohol relapse. (Id.  at 31).

5.      Specifically, that morning, plaintiff came home at approximately 1:00 a.m., after having had a drink with an old friend, and continued to drink a six-pack of beer.  (Id.)

6.      Plaintiff became intoxicated from drinking the beer. (See Relevant Portions of Mandeep Cheema Deposition ("Cheema Dep."), Cohen Dec., Ex. C at 71-72)

7.      At approximately 6:15 am plaintiff's wife, Amandeep Kaur, called 911 to have Mr. Singh taken to the hospital to be evaluated. (Audio Recording of 911 Call ("911 Call"), Cohen Dec., Ex. D)

8.      Ms. Kaur was concerned for her husband's health and wanted him taken to the hospital to be evaluated. (See Relevant Portions of Amandeep Kaur Deposition ("Kaur Dep."), Cohen Dec., Ex. B at 17-18).

9.      At no point during her call with 911, did Ms. Kaur allege that plaintiff assaulted or threatened to assault her, nor did she allege plaintiff had committed any crime against her. (911 Call, Ex. D).

10.     At approximately 6:30 am two Emergency Medical Technicians ("EMTs"), Nicole Milonas and Marisabel Schiapira, arrived at plaintiff's home located at 130-18 Atlantic Ave. 3rd, Queens, NY 11419. (See Pre-Hospital Care Report Summary ("PHC Report"), Cohen Dec., Ex. F)

11.     Neither EMT had an independent recollection of responding to plaintiff's home on February 28, 2018. (See Relevant Portions of Nicole Milonas Deposition ("Milonas Dep."), Cohen Dec., Ex. E 29; Relevant Portions of Marisabel Schiapira Deposition ("Schiapira Dep."), Cohen Dec., Ex. M at 26).

12.     However, Nicole Milonas prepared a Prehospital Care Report Summary documenting this incident. (PHC Report, Ex. F)

13.     In the Prehospital Care Report Summary (PCR), she reported that plaintiff had a Glasgow Coma Score (GCS) of 15. (Milonas Dep., Ex. E at 85-86; (PHC Report, Ex. F).

14.     Ms. Milonas explained that a person with a GCS of 15 means "they are oriented, they are able to follow basic commands and they are able to walk on their own." (Milonas Dep., Ex. E at 18).

15.     A person with a GCS of 15 is generally capable of refusing medical attention. (Id. at 18-19)

16.     Ms. Milonas's report also indicated that plaintiff was breathing normally, he was alert, and his skin color was normal. (PHC Report, Ex. F;  Milonas Dep., Ex. E 85-87)

17.     Ms. Milonas determined that plaintiff was not suffering from alcohol poisoning. (Milonas Dep., Ex. E at 60).

18.     While Ms. Milonas had no recollection as to whether plaintiff stated he was going to harm himself, she stated that if he had made any statements to that effect, she would have included that in her report. (Id. at 50) ("Q. If he would have said that he was going to hurt himself, is that something you would have put in the report? A. Yes, that is something I would have put in the report.").

19.     Plaintiff never told the EMTs that he was suicidal or had any intention of harming himself. (Id.)

20.     Plaintiff was being uncooperative with the EMTs and refused to go to the hospital.  (Milonas Dep., Ex. E 55-56).

21.     The EMTs requested police officers respond to plaintiff's apartment.  (Id.)

22.     When the police arrived at Mr. Singh's apartment, plaintiff was sitting on his couch. (See Video of Incident ("Video"), Cohen Dec., Ex. G(1)[1] at 0:00-0:10).

23.     At no point on February 28, 2018, did the EMTs ever inform the police that plaintiff attempted to physically harm them. (Cheema Dep., Ex. C at 74, 130) ("Q. Did you get informed by anybody that he was attempting physical harm, like the EMTs, or his wife? A. They didn't tell that to me.) (See Relevant Portions of Justin Davis Deposition ("Davis Dep."), Cohen Dec., Ex. I at 68).

24.     At no point on February 28, 2018, did plaintiff's wife, Ms. Kaur, tell the police officers that plaintiff physically assaulted her. (Davis Dep., Ex. I at 67; (Cheema Dep., Ex. C at 130).

25.     At no point on February 28, 2018, while the police officers were present inside plaintiff's apartment, did plaintiff attempt to physically assault anybody inside the apartment. (Cheema Dep., Ex. C at 130) (Q. So, Mr. Singh did not engage in any explicit attempted physical harm to others, right? A. He didn't try to punch anybody. He didn't try to kick anybody or anything. He didn't ball his fist. He didn't show any signs in his body, like, during the whole incident that he was going to explicitly hit somebody.)

26.     At no point on February 28, 2018, did anyone, including the EMTs and Ms. Kaur, report to the officers who responded plaintiff's apartment that plaintiff had

---

[1] Attached as **Exhibit G(1)** is the full Video Recording of the incident occurring on February 28, 2018. Additionally attached is **Exhibit G(2)**, which is the portion of the Video that shows the use of force against plaintiff in real-time and **Exhibit G(3)**, which is the portion of the Video that shows the use of force against plaintiff in slow motion.

4

committed any crime or violation of the law. (Davis Dep., Ex. I at 67-68) (Q. Throughout the entire time you were there, no one in the apartment told you he had committed a crime prior to your arrival? A. No.) (Cheema Dep., Ex. C at 130-132).

27.     At no point on February 28, 2018, did any of the officers observe plaintiff commit any crime or violation of the law. (Davis Dep., Ex. I at 67-68 ("Q. Throughout the entire time you were there you didn't observe Mr. Singh commit a crime, correct? A. No."). (Cheema Dep., Ex. C at 130-132).

28.     At no point on February 28, 2018, did plaintiff ever indicate to any of the police officers that he was suicidal or he intended to harm himself. (Id. at 81-82).

29.     Shortly after entering his apartment on February 28, 2018, the police officers attempted to convince plaintiff to voluntarily go to the hospital to get evaluated. (Id. at 82).

30.     Officer Cheema told plaintiff that if he did not go voluntarily to the hospital, then the officers would have to handcuff plaintiff and take him to the hospital without his consent. (Id. at 84-89).

31.     Given those choices, plaintiff begrudgingly agreed to go to the hospital without being handcuffed. (Id. at 97-98).

32.     Upon agreeing to go to the hospital, plaintiff began to get dressed and readied himself to go to the hospital. (Video, Ex. G(1) at 4:07-8:00)

33.     Just as he was finished getting dressed, plaintiff jokingly told the police officers that he no longer wanted to go to the hospital. (Cheema Dep., Ex. C at 101).

34.     The plaintiff then put his arms behind his back and jokingly told Officer Cheema that he was going to have to handcuff him. (Id.)

5

35.     Plaintiff then quickly brought his hands forward, smiled back in Cheema's direction, and said, "I'm just joking. You're not going to handcuff me," as he took a step forward towards the door with his hands up in front of him. (Id. at 102).

36.     As plaintiff took this step forward, he did not ball up his fist. (Id. at 103)

37.     As plaintiff took this step forward, he did not say anything to indicate he was going to attack anybody. (Id. at 103-105)

38.     Officer Cheema believed that plaintiff took a step forward towards Officer Walker.  (Id. at 103-104).

39.     In response to plaintiff taking this step forward, Officer Cheema grabbed and then slammed plaintiff down to the ground to handcuff him. (Video, Ex. G(1) at 8:03-8:06; G(2); G(3))

40.     Plaintiff suffered an aggravation of a prior right shoulder injury from being taken down to the ground. (See Plaintiff's Expert Reports ("Expert Reports), Cohen Dec., Ex. K)

41.     Plaintiff also received an abrasion to his face from the impact of hitting the floor. (See Photos of Plaintiff's Face Injury ("Photos"), Cohen Dec., Ex. L; PHC Report, Ex. F)

42.     The video shows plaintiff beginning to walk past Officer Walker towards the door before Officer Cheema grabbed and slammed him to the ground. (Video, Ex. G(1) at 8:02; G(2); G(3)).

43.     Officer Davis did not believe plaintiff was going to attack Officer Walker when he took the step forward. (Davis Dep., Ex. I at 82) (Q. Did you believe at the

6

moment that Officer Cheema grabbed Mr. Singh to handcuff him that Mr. Singh was going to attack your partner Officer Walker? A. No, she was not -- not in that proximity.)

44.     Officer Davis did not believe plaintiff was going to attack him when he took the step forward. (Id.) (Q. Did you think at the moment that Officer Cheema reached out to Mr. Singh he was going to attack you?... A. Attack me, no. I was standing behind him or off to the side, so I wouldn't be a victim of him attacking me.)

45.     Officer Davis did not attempt to handcuff plaintiff before Officer Cheema did. (Id. at 80-81).

46.     Officer Walker does not have any memory of being in fear of being attacked by Mr. Singh. (See Relevant of Malinda Walker Deposition ("Walker Dep.") Cohen Dec., Ex. J at 58) ("Q. You don't have any memory of being in fear of being attacked by Mr. Singh; is that right? A. Right").

47.     New York City Police Officers are supposed to prepare Domestic Incident Reports anytime they respond to a dispute or crime involving family members. (Cheema Dep., Ex. C at 196-197) (Q. Officer Cheema, under what circumstances do you fill out a Domestic Incident Report? A. A Domestic Incident Report would be if you have any kind of dispute, or any kind of crime that was alleged between people who are in a family type relationship.).

48.     None of the officers who responded to plaintiff's home on February 28, 2018, prepared a domestic incident report. (Cheema Dep., Ex. C at 196-198; Davis Dep., Ex. I at 73-74; Walker Dep., Ex. J at 39)

Dated: New York, New York
          July 12, 2021

7

Respectfully submitted,

By: _____/S_____
GERALD COHEN
JOSHUA FITCH
COHEN & FITCH LLP
Attorneys for Plaintiff
110 East 59th Street, Suite 3200
New York, N.Y. 10022
(212) 374-9115
gcohen@cohenfitch.com
jfitch@cohenfitch.com

TO: **BY E-MAIL & ECF**

THE NEW YORK CITY LAW DEPT.
*Attorneys for Defendants*
100 Church St.
New York, NY 10007
Tel: (212) 356-2332
Fax: (212) 356-3509
By:   Hannah V. Faddis, Esq.

8

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
BALWINDER SINGH,

                    Plaintiff,

      -against-                             **<u>19 CV 00632</u>**
                                                     **(EK)(ST)**

THE CITY OF NEW YORK, et al.

                    Defendants.

--------------------------------------------------------X

#### DECLARATION OF GERALD M. COHEN IN SUPPORT OF PLAINTIFF'S <br> <u>MOTION FOR SUMMARY JUDGMENT</u>

    GERALD M. COHEN, an attorney admitted to practice in the State of New York, declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, as follows:

    1.      I am a partner with the law firm of Cohen & Fitch LLP, one of the attorneys of record for plaintiff Balwinder Singh. As such, I am familiar with the facts stated below, and I submit this Declaration to place on the record the relevant documents in support of plaintiff's motion for summary judgment.

    1.      Attached as **Exhibit A** are the relevant portions of the Deposition of plaintiff Balwinder Singh.

    2.      Attached as **Exhibit B** are the relevant portions of the Deposition of Amandeep Kaur.

    3.      Attached as **Exhibit C** are the relevant portions of the Deposition of defendant Mandeep Cheema.

    4.      Attached as **Exhibit D** is the Audio Recording of the 911 Call.

5.      Attached as **Exhibit E** are the relevant portions of the Deposition of Nicole Milonas.

6.      Attached as **Exhibit F** is the Pre-Hospital Care Report Summary taken by Emergency Medical Services on February 28, 2018.

7.      Attached as **Exhibit G(1)** is the full Video Recording of the incident occurring on February 28, 2018. Additionally attached is **Exhibit G(2)**, which is the portion of the Video that shows the use of force against plaintiff in real-time and **Exhibit G(3)**, which is the portion of the Video that shows the use of force against plaintiff in slow motion.

8.      Attached as **Exhibit H** is the Aided Report from the incident occurring on February 28, 2018.

9.      Attached as **Exhibit I** are the relevant portions of the Deposition of Justin Davis.

10.     Attached as **Exhibit J** are the relevant portions of the Deposition of Malinda Walker.

11.     Attached as **Exhibit K** are Plaintiff's Expert Reports.

12.     Attached as **Exhibit L** are Photographs of Plaintiff's Face Injury.

13.     Attached as **Exhibit M** are the relevant portions of the Deposition of Marisabel Schiapira.

Dated: New York, New York
       July 12, 2021

                              Respectfully submitted,

                              _____/S_____
                              Gerald M. Cohen
                              Cohen & Fitch, LLP
                              110 E. 59th St., Suite 3200
                              New York, NY 10022
                              (212) 374-9115
                              gcohen@cohenfitch.com

2

```
                                                      Page 1
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   ---------------------------------------------------------X
     BALWINDER SINGH,
 3
                                            PLAINTIFF,
 4
                     -against-             Civil Action No.:
 5                                         19-cv-632 NGG-ST
 6   THE CITY OF NEW YORK, P.O. MANDEEP CHEEMA, TAX ID. NO.
     950196, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AND
 7   POLICE OFFICERS "JOHN DOE" #1-10, INDIVIDUALLY AND IN THEIR
     OFFICIAL CAPACITY,
 8
                                            DEFENDANTS.
 9   ---------------------------------------------------------X
10
11                        DATE:  October 5, 2020
12                        TIME:  10:36 A.M.
13
14            EXAMINATION BEFORE TRIAL of the Plaintiff,
15   BALWINDER SINGH, taken by the Defendant, pursuant to a
16   Court Order, and held via ZOOM at 130-18 Atlantic Avenue,
17   South Richmond, New York 11419, before Sandra Troiani, a
18   Notary Public of the State of New York.
19
20
21
22
23
24
25
```

B. SINGH

Page 13

1     Q.    Did you quit to do something different or were

2  you not working or something else?

3     A.    Yeah -- no, I -- I was not working.

4     Q.    After 2000, when was the next time you were

5  employed?

6     A.    And then I think I was -- I was working -- I -- I

7  worked, but on and off, not continually.

8     Q.    Okay.  When did you start working again after

9  2000?

10     A.    I think somewhere in 2003.

11     Q.    Was there a reason that you weren't working from

12  2000 to 2003?

13     A.    Yes, I -- I had a -- I had an alcoholic problem

14  at that time.

15     Q.    Did you receive any treatments between 2000 and

16  2003 for your drinking problem?

17     A.    No, I seek the treatment in 2004.

18     Q.    And what did that treatment consist of?

19     A.    I have to check into my record.  I think it's --

20  it's a rehabilitation.  I have to go for everyday for a few

21  hours and I want to get clear one thing, that during my

22  alcoholism, I -- I did not work.

23     Q.    Okay.  And you said you started working again in

24  2003?

25     A.    Yes, ma'am.

B. SINGH

```
                                                    Page 23
 1      Q.      How many hours a week were you working at that
 2   time?
 3      A.      When I start with yellow taxi, that was, like,
 4   nine hours, ten hours.  Somewhere -- yes.  And then
 5   somewhere in May 2016, I start driving Uber on full-time
 6   job.
 7      Q.      When you started driving for Uber, how many hours
 8   per week were you driving?
 9      A.      I was driving -- I was driving -- okay.  I think
10   driving at least eight to nine hours or ten hours a day so
11   at around 60/70 hours a week.
12      Q.      And how long did you continue driving for Uber?
13      A.      I continually driving Uber and then -- okay.  I
14   -- however, I was -- I was continue driving Uber and then I
15   switched to Lyft and then I continue driving Uber and Lyft
16   until December -- December 2000 -- December 31, 2018 or I
17   could say January 1st, 2019.
18      Q.      When did you start driving for Lyft?
19      A.      Somewhere in the middle of 2018.  I -- I don't
20   remember the exact month and date.
21      Q.      Was it after February of 2018?
22      A.      Yes, I still have to look in -- in the documents.
23   I think it is after, yeah.
24      Q.      So after the date of this incident, right?
25      A.      Yes.
```

B. SINGH

```
                                                         Page 31
 1      A.      No, she's just housewife.

 2      Q.      And how long have you been married?

 3      A.      Since May 2006.

 4      Q.      Prior to your current marriage, were you married

 5   to anyone else ever?

 6      A.      No.

 7      Q.      Mr. Singh, I want to talk about the incident.

 8   Can you start by telling me why you brought this lawsuit?

 9      A.      Yeah.  Okay.  So before the incident -- before

10   the incident even before the incident, I went outside and I

11   met one of my old friend and we had a -- one -- one or two

12   beers and then I -- like sometime in the -- in the -- in

13   the night before the incident, I came home and I already

14   bought a few -- few -- few beers and came straight back to

15   my house and I start drinking beers and my wife was --

16   realized that I -- I am doing something in the living room

17   and she came and she saying that I should have not been

18   drinking because I had a problem back -- back in 2008 and

19   -- so I -- why did I drink so -- and then in -- in hurry

20   she called the EMT so that -- I -- I -- I was drinking a

21   few beers and -- okay.  So want to hear the whole thing,

22   like, why do I bring the lawsuit?

23      Q.      Let me -- I'll ask the question.  So, Mr. Singh,

24   what time did you get home that night; do you remember?

25      A.      I remember -- I think somewhere -- somewhere in
```

B. SINGH

```
                                                      Page 32
 1   the midnight or -- or after midnight.
 2       Q.      You said you met up with a friend; where were you
 3   with your friend before that?
 4       A.      Somewhere in Richmond Hill.
 5       Q.      Were you at someone's house, a bar, a restaurant,
 6   something else?
 7       A.      I think a restaurant.  Yes, could be restaurant.
 8   Yes.
 9       Q.      Was there a reason that you were with your friend
10   that night?
11       A.      No, there no reason.  I just accidently met him
12   when I went to get groceries.  I just accidently met him.
13       Q.      I'm sorry.  You said you went out to get
14   groceries and accidently met him?
15       A.      Yes.
16       Q.      Where did you go to get groceries?
17       A.      I'm not exact remember, but somewhere in the --
18   either could be Wayfair or the Indian store, but in -- it
19   was in Richmond Hill, yes.
20       Q.      And did you go grocery shopping and then meet
21   your friend or you ran into him before you went grocery
22   shopping or something else?
23       A.      Yeah, when I went to get the grocery and then I
24   met my friend.
25       Q.      Had you already gone grocery shopping when you
```

B. SINGH

```
                                                      Page 33
 1    ran into your friend?
 2         A.     Excuse me?
 3         Q.     Had you already gone grocery shopping when you
 4    met your friend?
 5         A.     Yes.
 6         Q.     Do you remember where you accidently met your
 7    friend?
 8         A.     Some -- not -- not far from my house.  Could be
 9    somewhere on Atlantic Avenue, I think.
10         Q.     What is your friend's name?
11         A.     His last name Singh.
12         Q.     And what's his first name?
13         A.     I think I call him the small name.  It is Rupel.
14         Q.     How do you know him?
15         A.     He just an old friend of mine.
16         Q.     Do you know him from work, from something else?
17         A.     No, I think I had -- I had worked for him in the
18    past, like, with the -- I help him with the immigration
19    that his work form, things like that.
20         Q.     Do you keep in touch with him now?
21         A.     No.  No, he does not live here.  I think he has
22    moved to California.
23         Q.     And you said you think you got home sometime
24    after midnight; is that right?
25         A.     Yes.
```

B. SINGH

Page 34

```
 1       Q.      When you got home, was anyone in your house
 2    awake?
 3       A.      I think -- no, no one -- no one was awake.  No,
 4    everybody -- my wife and kid was sleeping, yeah.
 5       Q.      So you said you had purchased a couple of beers
 6    on your way home; is that right?
 7       A.      Yes.  Yeah, when I was -- yeah, when I was coming
 8    home I was -- a few -- got a few beers, yes.  I bought a
 9    few beers.
10       Q.      Do you remember how many beers you bought on the
11    way home?
12       A.      I think a -- a pack of six cans.
13       Q.      And you said that you were drinking the beer
14    after you went home?
15       A.      Yes, from the friend, I only -- I only -- only
16    had one beer because I had to drive to home, but that was
17    not far, yeah.  I had only one beer.
18       Q.      And then after you got home, how many beers did
19    you have?
20       A.      I hardly had consumed my fourth beer when my wife
21    realized that I had been drinking in the living room.
22       Q.      And what time did your wife come out and find you
23    in the living room?
24       A.      I think quarter -- I'm not sure of the time,
25    maybe quarter to 6 or 6:00, something like that.  Quarter
```

B. SINGH

```
                                                        Page 35
 1   to 6 or 6, yeah.  6 a.m. in the morning.

 2        Q.    So between midnight and 6:00 in the morning you

 3   had four beers; is that right?

 4        A.    Four beers, yeah.

 5              MR. COHEN:  Objection.  Just to clarify, he

 6              didn't testify that he was at home at midnight.

 7              He said sometime after midnight.  He does not

 8              remember when he got home.

 9              MS. FADDIS:  Okay.

10        Q.    Mr. Singh, can you be more specific about when

11   you got home?

12        A.    Yeah, I think after midnight.  Yeah, so I would

13   say it could be 12:30, quarter to one or 1, like that.

14        Q.    Is it fair to say between midnight and 1:00 that

15   you got home?

16        A.    Yes.  Yeah.  Yeah.

17        Q.    Okay.  So the latest you think you got home was

18   about 1:00, right?

19        A.    Yes.

20        Q.    And you said your wife came out between quarter

21   to 6 and 6 a.m.; is that right?

22        A.    Yes.

23        Q.    So between about 1 a.m. and about 6 a.m. you had

24   four beers; is that fair?

25        A.    Yes, I was drinking gradually, yes.
```

B. SINGH

                                                    Page 36

1      Q.     Okay.  When your wife came out and found you in

2   the living room, at that point were you intoxicated?

3      A.     Yes, I -- I -- I -- I had consumed at least

4   three-and-a-half beer at -- by that time.

5      Q.     What did your wife say to you when she found you

6   in the living room?

7      A.     She was saying that you are -- you -- you are --

8   you -- you -- you -- you -- you are drunk and because you

9   drink the beer and you should have not drank the beer

10  because in the past you were alcoholic and you also had a

11  liver problem at that time and that's it.  That's what she

12  said.

13     Q.     Was your wife mad when she found you that you had

14  been drinking?

15     A.     No, she did -- she did not that mad, but she

16  said, Okay.  If you have drunk, that's fine so -- so now --

17  from what I want to do, I will call the -- she -- she said

18  she would call the emergency, the ambulance and she said

19  you have to go to the -- the hospital.

20     Q.     Did she say why she thought you needed to go to

21  the hospital?

22     A.     Yes, because she said you are -- you are drunk,

23  that's why you have to go to hospital.

24     Q.     Did you feel like you needed to go to the

25  hospital at that point?

B. SINGH

Page 58

1    you remember that?

2        A.    Yes, ma'am.

3        Q.    Okay.  And you said at some point your brother

4    had told you to go to the hospital; is that right?

5        A.    Yes, in -- in -- somewhere in the conversation he

6    --

7        Q.    Okay.  Do you remember how long before you

8    actually exited the apartment your brother told you to go

9    to the hospital?

10       A.    Could be five, seven minutes earlier I was taken

11   to the hospital.

12       Q.    And you said when he told you to go to the

13   hospital you said, okay; is that right?

14       A.    I said, okay, yeah, but he -- yes, I said okay,

15   yup.

16       Q.    Does that mean that at that point you had decided

17   that you were going to go to the hospital?

18       A.    Yes.

19       Q.    All right.  And was that the point where you

20   started getting dressed to leave the house?

21       A.    After that, yes.

22       Q.    While you were getting dressed, did you speak to

23   any of the police officers who were present?

24       A.    Yes, I -- I was not specifically talking to any

25   of the police officer, but I was acting like -- talking,

B. SINGH

Page 59

 1  like, socially that, Okay, Officer, you also drink and

 2  nobody take you to the hospital, but -- for any reason or

 3  nobody was taking you in handcuffs to the reason, you --

 4  you guys drink, you guys smoke, but I mean socially, not

 5  specifically the officers, everybody, you know.  I mean to

 6  say about everybody.

 7      Q.     And did any of the police officers respond, in

 8  any way, as you were saying that?

 9      A.     Yeah, they were going, yeah, yeah, yeah, in the

10  way, like, they were agreeing on my statement at -- at a

11  funny -- a funny way, like, yeah, yeah.  Yeah, you're

12  right, yeah, yeah, like that.

13      Q.     Did you have any conversation with your wife

14  during that period where you were getting dressed?

15      A.     Yes, there was no conversation.  Wife was not

16  saying anything, but I was saying that -- I was saying, by

17  -- by calling her name, Bobbi, this is not right.  You --

18  you are sending me to the hospital with handcuffs on.  This

19  is not -- this is not right.  I -- I -- even I had not done

20  anything -- but she was -- she was quite on that -- on that

21  thing.  Didn't say anything.

22      Q.     When you said that, did your wife respond in any

23  way?

24      A.     No, she -- she -- I think at some point she said,

25  it's okay.  You should go hospital.  You'll be fine.  Don't

B. SINGH

```
                                                           Page 60
 1   worry.
 2       Q.      And while you were getting dressed, did you have
 3   any conversation with your brother?
 4       A.      There's some conversation, but at -- at some
 5   point before I was taken five or ten minutes before, he
 6   came -- he came into the living room and was saying that,
 7   why -- he -- he was trying to say that I -- I -- I had a --
 8   problem to the officers and I told hold him, this is a --
 9   this is not -- not your -- your business, just go inside
10   the room and he -- he -- and then he was pushed by the --
11   by -- by the -- by the tall officer, the Cheema officer
12   towards the -- towards the room, yeah.  And that's all the
13   conversation I had with them -- my brother.
14       Q.      And while you were getting dressed, did you have
15   any conversation with the EMTs?
16       A.      No, at -- at that time I had no conversation with
17   the EMT after the police arrived, at all.
18       Q.      You said after the police arrived you didn't have
19   anymore conversation with the EMTs?
20       A.      Yeah -- no.
21       Q.      Mr. Singh, how tall are you?
22       A.      My official height is 5'7".
23       Q.      And how much do you weigh?
24       A.      Right now I weigh 184 or 85, 184, 85 pound.
25       Q.      How much did you weigh in February of 2018?
```

B. SINGH

```
                                                        Page 61
 1      A.      Might be 190.

 2      Q.      How tall is your wife?

 3      A.      I think she is 5'2" or 5'3".  Could be 5'2" or

 4   5'3".

 5      Q.      Do you know how much she weighs?

 6      A.      Right now, I think she's 16 -- 170.  Could be

 7   170, yeah.

 8      Q.      Is that about how much she weighed in --

 9      A.      Yeah.

10      Q.      Okay.  So you said, going back to the incident,

11   after you pulled your hands to your chest, Officer Cheema

12   threw you to the ground; is that right?

13      A.      Yes, ma'am.

14      Q.      Could you describe how he did that?

15      A.      How he did that?  Okay.  First of all, it

16   happened in -- in a moment -- within seconds.  Within one

17   or two seconds.  When I was okay to handcuff and then I

18   said, five second, wait.  Wait.  It could take one second

19   to say wait, wait.  Just after saying the wait, wait, I was

20   in the -- in the grab of Mr. Cheema and had been thrown

21   down.

22      Q.      Where did you feel him grab you?

23      A.      He grabbed me -- I'm unable to pick up my -- my

24   left shoulder, but I'm going to say from the -- from the

25   back of -- of my -- with the -- with the cops both hands as
```

Case 23-24, Document 28, 04/19/2023, 3501815, Page55 of 198
**[JA-49]**

```
                                                        Page 1
 1   UNITED STATES DISTRICT COURT

     EASTERN DISTRICT OF NEW YORK

 2   ----------------------------------------X

     BALWINDER SINGH,

 3

                                        PLAINTIFF,

 4

 5              -against-      Case No.:

                              19-cv-632(NGG)(ST)

 6

 7   THE CITY OF NEW YORK, et al.,

 8                                      DEFENDANTS.

     ----------------------------------------X

 9

10                        DATE: December 3, 2020

11                        TIME: 1:09 p.m.

12

13

14              VIDEO-CONFERENCE DEPOSITION of a NON-PARTY

15   witness, AMANDEEP KAUR, taken by the Defendants, pursuant

16   to a Subpoena and to the Federal Rules of Civil Procedure,

17   held at the above date and time, before Rose Marie

18   Iacobellis, a Notary Public of the State of New York.

19

20

21

22

23

24

25
```

A. KAUR

Page 17

```
 1    more and I didn't want him to drink more, and that was the
 2    response he was giving me.  Usually, that's not the right
 3    response, the response should have been that -- I won't
 4    drink it, but he was giving me -- he was acting funny and
 5    he way saying that so what if I drink, you know, I'm not
 6    doing anything against you.
 7         Q.    When you say he was acting funny, what do you
 8    mean by that?
 9         A.    Childish, immature, that's what I mean and like,
10    you know -- like childish behavior.
11         Q.    Did he seem drunk?
12         A.    No, not at that point, no.
13         Q.    When you were speaking with him in the living
14    room, was he sitting down or standing up or something else?
15         A.    He was sitting on the sofa quite relaxed, you
16    know.
17         Q.    What was his tone of voice, was he quiet, was he
18    loud, something else?
19         A.    No.  Actually, he was actually afraid that I
20    found out, so he was afraid that my wife found out, so he
21    was hesitant to speak and he was hesitant to look me in the
22    eyes.  So, he was afraid, he was not angry.
23         Q.    Were you angry with him for drinking?
24         A.    I was concerned and angry at the same time, but I
25    was concerned for him that how can you look after me if you
```

A. KAUR

```
                                                    Page 18
 1    can't even look after for yourself?
 2        Q.      What was your concern for his health at that
 3    paint?
 4        A.      I was concerned because, you know, his acidity
 5    level in his body is a lot, and because of drinking, it
 6    raises that acidity level.  So, I was really concerned for
 7    his health, and that's the only reason why I was concerned.
 8        Q.      Had you ever known your husband to drink before
 9    that day?
10        A.      No, this was the first time that he drink in
11    front of me.  In the past, I heard that liquor did cause a
12    lot of problems -- health problems, that, you know, this
13    caused vomiting, this caused a lot of acidity problems, his
14    immune system.  So, I heard that, but this was the first
15    time that he drink in front of me.
16        Q.      When you say you heard things before about his
17    drinking, previously or something else?
18        A.      No.  My mother-in-law basically, she passed away
19    in 2017, so my mother-in-law used to tell me that don't
20    ever let him drink because he has some health concerns and
21    that is caused by liquor English.  And even my husband,
22    Mr. Singh, he even told me numerous times that he did have
23    issues with drinking.  So, my mother-in-law always used to
24    tell me that he has these problems, so make sure that he
25    doesn't drink.
```

A. KAUR

Page 21

1    Q.    Had you ever had any arguments between you before

2    about his drinking?

3    A.    No, there was no fighting, there was no arguing

4    before because he never drink in front of me before, so

5    there was no point of arguing before.

6    Q.    At some point, you called 9-1-1, right?

7    A.    Yes, because as I said before, my mother-in-law

8    did warn me that his health will deteriorate quickly if he

9    drinks.  So, I did not want to wait until he started

10   vomiting or, you know, if anything bad happens, so I was

11   afraid and I called 9-1-1.

12   Q.    Had your mother-in-law told you that his drinking

13   had caused him to vomit in the past?

14   A.    Yes, yes, indeed, my mother-in-law did say that,

15   you know, he had vomiting issues and even his throat used

16   to swell and he could not eat for almost two days, that's

17   what my mother-in-law told me.  So, I did not want to wait

18   until it gets to that point, so I called 9-1-1.

19   Q.    Did you understand at that point that your

20   husband had been an alcoholic or thought he just had health

21   complications or something else?

22   A.    No, I would not say that he's alcoholic because

23   since I started living with him, he's not been an

24   alcoholic.  I don't know what happened in the past, but he

25   does have health concerns, health issues, but he's not

```
                                                    Page 1
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    -------------------------------------------X
      BALWINDER SINGH,
 3
                               PLAINTIFF,
 4
                 -against-          Case
 5                                  1:19-cv-00632
 6
      THE CITY OF NEW YORK, P.O. MANDEEP CHEEMA,
 7    Tax Id. No. 950196, Individually and in his
      Official Capacity, and POLICE OFFICERS
 8    "JOHN DOE" #1-10, Individually and in their
      Official Capacity (the name John Doe being
 9    fictitious, as the true names are presently
      unknown),
10
                               DEFENDANTS.
11    -------------------------------------------X
12
13                  DATE: October 7, 2020
14                  TIME: 10:20 a.m.
15
16
17          EXAMINATION BEFORE TRIAL of the
18    Defendant, P.O. MANDEEP CHEEMA, taken by
19    the Plaintiff, pursuant to a Order, held on
20    a Virtual Zoom, before Alexis A. Vargas, a
21    Notary Public of the State of New York.
22
23
24
25
```

```
                                          Page 7
 1                    M. CHEEMA
 2          A.    I am 30 years old.
 3          Q.    How tall are you?
 4          A.    I am 6 foot 3.
 5          Q.    Was that your approximate
 6    height on the date of February 28th of
 7    2018?
 8          A.    Yes.
 9          Q.    How much do you weigh, sir?
10          A.    Right now, I weigh about 280
11    pounds.
12          Q.    How much did you weigh on
13    February 28th of 2018?
14          A.    That I don't recall.
15          Q.    Do you believe it was more,
16    less, or about the same?
17          A.    It was less.
18          Q.    Was it significantly less, like
19    20, 30 pounds less?
20          A.    I would say so, yes.
21          Q.    Can you give me a range of how
22    much less?
23          A.    About 260, 265.
24          Q.    I see you wearing eyeglasses.
25    Are those corrective eyeglasses?
```

Case 1:19-cv-00632-EK-ST   Document 46-6   Filed 11/29/21   Page 4 of 47 PageID #: 201

```
                                          Page 68
                           M. CHEEMA
 1
 2    from dispatch about the history of EDPs at
 3    the apartment?
 4         A.    Not that I recall.
 5         Q.    EDP incidents, or domestic
 6    incidents, or anything like that?
 7         A.    Not that I recall, no.
 8         Q.    You have no memory of being
 9    told that there is a history of domestic
10    incidents at this apartment?
11         A.    Correct.  I don't have any
12    memory of being told that.
13         Q.    You have no memory of there
14    being prior incidents of emotional
15    disturbed persons at this apartment,
16    correct?
17         A.    Correct.  I didn't know that
18    before going there.
19         Q.    When you got to the front door
20    of the apartment, did you knock?
21         A.    That I can't tell you.
22         Q.    Do you know who let you into
23    the apartment?
24         A.    I don't remember who let me in.
25         Q.    Were you the first person to
```

Case 1:19-cv-00632-EK-ST   Document 46-6   Filed 11/29/21   Page 5 of 47 PageID #: 202

Page 71

1                    M. CHEEMA

2        Q.    Who was the first person you

3   spoke with?

4        A.    It was the EMTs.

5        Q.    Which one of the EMTs did you

6   speak with?

7        A.    I cannot tell you that.

8        Q.    Were the EMTs female or male?

9        A.    Female.

10       Q.    Do you remember what they

11  looked like?

12       A.    Two short females.

13       Q.    Do you remember if they were

14  African American, Caucasian, or something

15  else to identify what they looked like?

16       A.    That I couldn't tell you.

17       Q.    You spoke to one of the two

18  EMTs, correct?

19       A.    Yes.

20       Q.    What, if anything, did she say

21  to you?

22       A.    The first thing I always ask is

23  if they are okay.  They said that they were

24  okay, and that they were fine.  Then they

25  told us that the wife called saying that he

Page 72

                        M. CHEEMA
1
2      was intoxicated, and that he is being
3      uncooperative with them.  He was being
4      uncooperative with them to the point where
5      it made them feel unsafe.
6           Q.    Did they explain to you in what
7      way they were feeling unsafe?
8                 MR. SCHEINER:  Objection to
9            form.
10          A.    They did, but at this time, I
11     don't remember exactly what was said.
12          Q.    Did they explain to you how he
13     was being uncooperative?
14          A.    Yes.  They told me that they
15     explained to him the consequences of his
16     condition, and the fact that they would
17     have to have him get evaluated at the
18     hospital.
19          Q.    Did you have an understanding
20     from the EMTs what his condition was?
21          A.    Yes.
22          Q.    Can you tell me what that was?
23          A.    That he was intoxicated.  He
24     was incoherent.  He had signs of an altered
25     mental state, and that they couldn't leave

```
                                        Page 73
 1                 M. CHEEMA
 2   him for fear that something might happen to
 3   him if they didn't get him evaluated.
 4         Q.    Did they explain what they
 5   feared might happen to him?
 6         A.    Yes.
 7         Q.    What did they explain to you?
 8         A.    From my understanding, it was
 9   that he could accidentally fall, he could
10   hit his head, it was something to that
11   effect.
12         Q.    Was he sitting at the time this
13   was all happening?
14         A.    When we got there, he was
15   sitting.  I don't know what happened before
16   we got there.
17         Q.    At some point, did you have a
18   conversation with Mr. Singh?
19         A.    I did.
20         Q.    What was the nature of your
21   conversation with Mr. Singh?
22         A.    First, I asked him how he's
23   doing, what's going on, why are we here.
24   That's common practice for me.  I always
25   try to find out from the person themselves,
```

```
                                         Page 74
 1                 M. CHEEMA
 2   what led to EMS or police being over here.
 3   I gave him a chance to explain what was
 4   going on with him.  He was rambling a lot.
 5   He was very incoherent.  I couldn't get
 6   anything out of him.  It was a lot of
 7   yelling and cursing in English and in
 8   Punjabi, which I understood.
 9        Q.    Let me step back for a second.
10   Did the EMTs ever tell you that he
11   threatened to assault them in any way?
12        A.    The EMTs, I don't remember if
13   they told me that he threatened to assault
14   them.  He had very erratic behavior that
15   caused them concern for their safety before
16   we got there.
17        Q.    So, the EMTs did not say that
18   Mr. Singh assaulted them in any way; is
19   that correct?
20        A.    Correct.
21        Q.    The EMTs did not say that
22   Mr. Singh attempted to assault them in any
23   way; is that correct?
24        A.    Correct.
25        Q.    Did you guys obtain permission
```

Page 75

```
 1                M. CHEEMA
 2  to enter Mr. Singh's home from Mr. Singh?
 3       A.    No.
 4       Q.    Did you obtain permission to
 5  enter Mr. Singh's home from his wife?
 6            MR. SCHEINER:   Objection to
 7        form.
 8       A.    No.
 9       Q.    Going back to your conversation
10  with Mr. Singh, you said he was hard to
11  understand, but he was saying words in
12  English and in Punjabi; is that correct?
13       A.    Yes.
14       Q.    Do you remember any of the
15  specific words he used with you in English,
16  or can you translate the meaning of what he
17  said to you in Punjabi?
18       A.    It was mostly just swear words.
19  I can't tell you exactly what was said.  I
20  remember he was swearing a lot, and he kept
21  looking at his wife saying, "Look what you
22  did, you brought all these people here,
23  you're going to pay."
24       Q.    He said the words, "You are
25  going to pay."?
```

```
                                          Page 78
 1                    M. CHEEMA
 2    wife?
 3                 MR. SCHEINER:  Objection.
 4         A.    That I can't remember for sure.
 5         Q.    Were there any specific threats
 6    he made to his wife in your presence?
 7                 MR. SCHEINER:  Objection.
 8         A.    Specifically, I don't remember.
 9    I did not take any notes of anything that
10    he said.  It was what was going on at the
11    time we were there at that call.
12         Q.    Did you have a conversation
13    with his wife at that time?
14         A.    I did.
15         Q.    Did she ever indicate to you
16    that he threatened to assault her?
17                 MR. SCHEINER:  Objection.
18         A.    She didn't mention anything
19    about that.  She was just more concerned
20    about what was going on at that moment.
21    It's 7:00 in the morning.  There's police
22    officers and EMTs over there.  She was
23    more, from what my understanding was, she
24    was more concerned with what was going on.
25    She didn't mention to me anything about
```

Page 79

M. CHEEMA

1
2      insults or anything like that.

3          Q.     Did she mention to you anything

4      regarding his threats to assault her?

5          A.     I don't remember asking about

6      that, only because I understood what he was

7      saying, so I don't remember asking her

8      anything specific, because we were just

9      dealing with him at that moment.

10         Q.     You didn't write down anywhere,

11     either in your Memo Book or anywhere else,

12     anything that you are now saying you

13     believe made you think something was going

14     to happen if you left?

15             MR. SCHEINER:  Objection to

16          form.

17         A.     What?

18         Q.     You didn't document or write

19     down any of the words he was saying that

20     made you feel like the situation was

21     escalating?

22         A.     No, I didn't document it.

23         Q.     Did he make any gestures

24     towards his wife?

25         A.     Not that I can recall.  I

```
                                            Page 80
 1                    M. CHEEMA
 2    remember every time I would try to calm him
 3    down, he kept focusing his attention to
 4    her.
 5        Q.    When you say focusing his
 6    attention to her, he was just saying, "I
 7    can't believe you did this, I can't believe
 8    you called all these people," to that
 9    effect, correct?
10              MR. SCHEINER:   Objection to
11          form.
12        A.    And also the other part,
13    "You're going to pay for what you did."
14        Q.    That made you believe that
15    there was going to be physical violence as
16    a result?
17        A.    That made me believe that the
18    situation was escalating from when we first
19    got there.  I don't know what happened when
20    EMS was there first, but from the moment we
21    got there, I can see it was slowly
22    escalating.
23        Q.    Just going back, did he make
24    any physical gestures or threatening
25    maneuvers towards his wife while you were
```

```
                                              Page 81
 1                    M. CHEEMA
 2    there?
 3                 MR. SCHEINER:  Objection.
 4         A.    Not that I recall.
 5         Q.    Did he attempt to attack his
 6    wife at all while you were there?
 7         A.    No.
 8         Q.    Did he attempt to attack
 9    anybody while you were there?
10                 MR. SCHEINER:  Objection to
11          form.
12         A.    Can you please rephrase that?
13         Q.    Did he attempt to assault
14    anybody while you were present in the
15    apartment?
16                 MR. SCHEINER:  Objection to
17          form.
18         A.    No.
19         Q.    Did he say anything about
20    harming himself while you were in the
21    apartment?
22         A.    No.
23         Q.    Did he ever say anything about,
24    "I want to kill myself," or anything to
25    indicate he was suicidal in any way?
```

```
                                              Page 82
 1                    M. CHEEMA
 2          A.    No.
 3          Q.    After your initial conversation
 4   with him, what happened next?  What were
 5   you saying to him while he was sort of
 6   talking about all of the things you just
 7   described?
 8          A.    At that point, I'm just trying
 9   to convince him that, based on what the
10   circumstances are and based on our
11   position, that it would be best for him to
12   go to the hospital to get evaluated.  I was
13   convincing him to just get dressed and go
14   to the hospital, and if everything is fine,
15   he wasn't going to be there that long.
16          Q.    You perceived his statements to
17   his wife to be threatening, correct?
18          A.    I perceived them to be that the
19   situation was escalating.
20          Q.    What does that mean?
21          A.    Meaning from just not saying
22   anything to her to automatically going to
23   like that, I believe that now he can
24   potentially be a danger, yes.
25          Q.    Potentially be a danger to her,
```

Page 83

|   |   |
|---|---|
| 1 | M. CHEEMA |
| 2 | correct? |
| 3 | A.   To anybody in that house, |
| 4 | including us. |
| 5 | Q.   You didn't believe his |
| 6 | statements rose to the level of menacing, |
| 7 | which is a crime under the penal law, |
| 8 | correct? |
| 9 | MR. SCHEINER:  Objection to |
| 10 | form. |
| 11 | A.   No, not to the level of |
| 12 | menacing.  Menacing is something completely |
| 13 | different. |
| 14 | Q.   How about rose to the level of |
| 15 | harassment? |
| 16 | MR. SCHEINER:  Objection. |
| 17 | A.   To harassment, to harassment, I |
| 18 | can't say for certain, only because, like I |
| 19 | said, I do remember that the statements did |
| 20 | cause me some concern, but I can't tell you |
| 21 | for sure if it was harassment. |
| 22 | Q.   His statements to his wife did |
| 23 | not rise to the level of a crime or |
| 24 | violation of the New York Penal Law, |
| 25 | Administrative Code, or any other violation |

Page 84

                       M. CHEEMA
1
2       that you enforce as a Police Officer; is
3       that correct?
4                   MR. SCHEINER:  Objection to
5           form.
6           A.    Yes.
7           Q.    So, seeing this incident
8       unfold, you are trying to convince him to
9       go to the hospital, correct?
10          A.    Yes.
11          Q.    At some point, does he sort of
12      come around and agree to go to the
13      hospital?
14          A.    Yes.
15          Q.    What does he say to you to
16      agree?
17          A.    I don't remember exactly what
18      he was saying, but at some point, I
19      remember he didn't outwardly say, "Okay
20      guys, you are right, I'll go to the
21      hospital."  It was something that I took as
22      he was grudgingly going to do.  Then he
23      gets up and then he starts to get dressed.
24          Q.    So, he grudgingly agreed to go
25      to the hospital, correct?

Page 85

M. CHEEMA

1

2       A.    Yes.

3       Q.    Did you, at any point, tell

4    him, "If you don't agree to go to the

5    hospital, we are going to force you to go

6    to the hospital."?

7       A.    When I was explaining to him

8    what the situation was, I lay down what the

9    options are.  At the end of the day, he's

10   still an adult.  I explained to him what

11   the two options are, and I let him make an

12   informed decision.  It can come off as

13   threatening, but it's not.  It's protocol.

14   They're an adult.  This is what we have on

15   the table.  It is their decision to make,

16   and I will prefer it the easier way.  Just

17   like that.

18      Q.    So, what were the options that

19   you gave him?

20      A.    They were basically what I told

21   him before.  I said, "If you are saying

22   that you don't need to be medically

23   evaluated, your stay at the hospital is not

24   going to be that long.  We feel, and the

25   EMS, the medical professionals, feel that

Page 86

```
                           M. CHEEMA
 1
 2    you can't be in this apartment by yourself,
 3    and we can't leave, because we're not
 4    helping you in the situation.  If we feel
 5    you need help, we can't just leave you."
 6    It's something that happens.  Like I stated
 7    earlier, maybe an accident happens and
 8    something severe happened to him, because
 9    he's in that state.  The second option I
10    made to him was, "We don't have a choice in
11    this matter.  I know you don't want to go,
12    but if you don't want to go, then we would
13    have to place you in handcuffs, and we
14    would have to take you to the hospital.  We
15    would have to take you to the ambulance and
16    go with you to the hospital."
17         Q.   So, I didn't hear an option
18    there.  It sounded like he either has to
19    go, or he has to go.
20              MR. SCHEINER:  Objection to
21         form.
22         A.   There's really no other, those
23    are the two options.  There's really no
24    third option.
25         Q.   What was the second option?
```

Page 87

```
 1                    M. CHEEMA
 2    It's either he has to go, or he has to go.
 3    What was the second option?
 4                    MR. SCHEINER:  Objection to
 5          form.
 6          A.    The choice was for him to make,
 7    like how would he want to go.  He could go
 8    as a gentleman, and we can put in the word,
 9    just to take care of him, he doesn't want
10    to be there that long, or he can go into
11    the hospital, take a screening, and his
12    stay is going to be much longer.  Those
13    were the two options.  It's either his stay
14    is really short, or his stay is really
15    long.
16          Q.    So, you gave him the options.
17    The options were that he could cooperate
18    with you and go to the hospital, and you
19    would tell the hospital staff that he was
20    cooperative, so that he would have a short
21    stay, or he could not cooperate with you,
22    and come in, go into the hospital forcibly
23    with handcuffs, and you would then indicate
24    to hospital staff that he was
25    uncooperative, which would require him to
```

Page 88

M. CHEEMA

2    have a longer stay in the hospital, those

3    were the two options?

4                    MR. SCHEINER:  Objection to

5            form.  That misstates testimony.

6            Q.    Were those the options you gave

7    him, sir?

8                    MR. SCHEINER:  Objection to

9            form.

10           A.    Clearly, I'm not a medical

11   professional.  I don't work at the

12   hospital.  I don't know how long a person

13   can stay in or not.  What I was trying to

14   explain to him, for the perception of the

15   people who work at the hospital, like the

16   nurses, or the doctors, they can observe

17   for themselves what the situation is, based

18   off of the report that they get from us and

19   the EMS.  They ultimately make the

20   determination.

21           Q.    Did you tell him that if he was

22   cooperative, he would have a good report

23   with the hospital from you?

24                   MR. SCHEINER:  Objection to

25           form.

```
                                            Page 89
 1                    M. CHEEMA
 2         A.    I would tell him that there's
 3    two options of dealing with this.  Either
 4    he can go and there's nothing wrong.  If he
 5    feels something is wrong, that's fine.  He
 6    can tell the hospital about that, and I
 7    didn't perceive his stay to be very long.
 8    I said that if we bring you in handcuffs,
 9    now they are going to want to know why is
10    he in handcuffs, why is he screaming, and
11    so on and so forth.  Those were the options
12    I made to him on the table.
13         Q.    So, you gave him an option to
14    go into the hospital without handcuffs on,
15    and an option to go to the hospital with
16    handcuffs on?
17         A.    Not in so many words.
18         Q.    You told him that if he was
19    cooperative, he wouldn't need to be
20    handcuffed?
21         A.    I would tell him that we could
22    do this simply, he can walk into the
23    ambulance, there's no need for handcuffs.
24         Q.    And then you gave him the
25    alternative option, which was that if he
```

Page 96

                        M. CHEEMA
1
2    down, or anything like that?
3         A.    That I don't remember if I did
4    or not.
5         Q.    Were you concerned at all that
6    he was going to attack you or anything?
7              MR. SCHEINER:  Objection.
8         A.    I was just a little concerned,
9    but nothing to the point where I would have
10   to take any action while he was getting
11   dressed.  It was just a concern from
12   earlier, from the wife situation.
13        Q.    Did he make any threatening
14   moves towards you?
15        A.    Not towards me.
16        Q.    Did he make any threatening, or
17   menacing gestures, or make any comments to
18   you?
19        A.    He was just rambling a lot.  I
20   don't remember exactly what he was saying.
21   I do remember the way he started yelling at
22   that point, and just like little words that
23   he would be able to get out just started to
24   make me believe, like, yeah, he's becoming
25   a little more erratic, a little more

Case 23-24, Document 28, 04/19/2023, 3501815, Page80 of 198
**[JA-74]**

Page 97

```
                    M. CHEEMA
1
2    aggressive.
3        Q.    When he started getting
4    dressed, did that indicate to you that he
5    was picking option one, which was to go in
6    cooperatively?
7        A.    Yes.
8        Q.    So, you were under the belief
9    that he was trying to get dressed and going
10   to cooperate, yes?
11       A.    Yes.
12       Q.    Did he make any threatening
13   gestures or comments to any of your
14   partners?
15            MR. SCHEINER:  Objection to
16       form.
17       A.    That I couldn't tell you for
18   sure.  I don't remember.
19       Q.    How about to the EMTs while you
20   were present, did he make any threatening
21   comments or gestures to the EMTs?
22            MR. SCHEINER:  Objection to
23       form.
24       A.    No.
25       Q.    I presume you saw the video.
```

Page 98

M. CHEEMA

1      We are going to watch the video in a few

2      minutes.  At some point, he does get

3      dressed, is that right?

4          A.    Yes.

5          Q.    You're present the entire time

6      while he's getting dressed?

7          A.    Yes.

8          Q.    He's wearing long johns and a

9      thermal shirt, is that right?

10     A.    I guess.  I'm not too sure what

11     he was wearing.

12         Q.    Did he say anything to you

13     like, "Why are you in my house?  I'm just

14     drinking.  There's nothing wrong with

15     drinking.  It's not illegal to drink."  Did

16     he say anything to that effect to you?

17         A.    I don't remember him saying

18     anything like that to me.

19         Q.    Now, was there anybody else

20     present in the apartment, other than the

21     officer, the EMTs, his wife, and him?

22         A.    Yeah, there was another guy

23     over there.

24         Q.    Did he interact with you at

Page 101

M. CHEEMA

1

2     A.     Something that he doesn't want

3     to go to the hospital.  I said to him,

4     "You're already dressed at this point.  Why

5     are you going to back out now, you already

6     got dressed."  He starts going towards the

7     door.  I don't think he opened the door.  I

8     don't remember that part.  Then all of a

9     sudden he said, "I don't want to go to the

10    hospital."  It was something to that

11    effect.

12        Q.     As he's near the door, he says,

13    "I don't want to go to the hospital."?

14        A.     The sofa is near the door.  The

15    way we were standing, of course, he's going

16    to be by the door.  He was saying that he

17    doesn't want to go anymore.

18        Q.     After he says that he doesn't

19    want to go anymore, what happens next?

20        A.     I explained to him before that

21    he's already dressed, let's just go.  I

22    explained to him that we are going to

23    handcuff him and take him to the hospital.

24    Then he said, "Fine.  You're going to have

25    to handcuff me."

Page 102

M. CHEEMA

1

2      Q.    Is that when he put his hands
3   behind his back?

4      A.    Right when he said that
5   statement, he started putting his hands
6   behind his back, and then I was getting
7   ready to handcuff him.

8      Q.    And then what happened after
9   that?

10      A.    He pulls his arms to the front
11   saying, "I'm just joking.  You're not going
12   to handcuff me."  Then he takes a step
13   towards my partner, Officer Walker.

14      Q.    When you say he takes a step,
15   what kind of step?

16      A.    It was a sudden step towards my
17   partner.

18      Q.    And then what happened?

19      A.    At that point, based off of his
20   behavior, and based off of everything that
21   led up to that point, just different levels
22   of aggression that he kept displaying the
23   whole time, his behavior changing, and at
24   that point I no longer felt, like, okay
25   this is a safe scene, so I grabbed him from

Page 103

M. CHEEMA

1
2      behind, and then I took him to the floor
3      where me and Officer Davis handcuffed him.
4          Q.    You said he took a step towards
5      your partner?
6          A.    A sudden step.
7          Q.    Did he say anything as he took
8      a sudden step?
9          A.    I don't remember if he said
10     anything.  It was just the initial action
11     of him bringing his hands to the front and
12     saying, "No, no, no, you're not going to
13     handcuff me."  Then he took that sudden
14     step, which made me no longer feel safe.
15         Q.    Did he do any kind of gesture,
16     like he was going to attack your partner?
17              MR. SCHEINER:  Objection to
18         form.
19         A.    That I don't remember for sure.
20     It all happened really quickly.
21         Q.    You indicate a sudden step.
22     Other than the sudden step and bringing his
23     hands forward, did he ball up his fists?
24         A.    That I don't remember.  I was
25     behind him.

Page 104

                    M. CHEEMA
1
2        Q.    Did he touch your partner?
3        A.    No.
4        Q.    Did he say anything to your
5    partner to indicate that he was about to
6    attack your partner?
7              MR. SCHEINER:  Objection to
8         form.
9        A.    That I don't remember.
10       Q.    Other than taking a sudden step
11   and putting his hands forward, did he do
12   anything else to indicate that he was about
13   to be aggressive in any way?
14       A.    It was my determination, based
15   off of everything that happened from the
16   time that we got in and to that very
17   moment, and the different levels of
18   escalation.  He was becoming more and more
19   unpredictable, and that's what led me to
20   have to restrain him in that way.
21       Q.    Was he angry when he put his
22   arms behind his back and made that sudden
23   step?
24             MR. SCHEINER:  Objection to
25        form.

Page 105

                    M. CHEEMA

1           A.     He was angry the whole time.

2   He never stopped.  Again, I don't know for

3   sure, because I'm not him, but from what I

4   understood, he was the entire time not

5   happy about us being over there.

6           Q.     Was he laughing at the time

7   that he put his arms behind his back?

8           A.     I do remember that.  He was

9   laughing and his mood would change from

10  laughter to, like, excitement, to yelling.

11  He was laughing at that moment, yeah.

12          Q.     Right before he took this

13  sudden step and put his arms behind his

14  back, he jokingly said, "Go ahead and

15  arrest me."  Then he took the sudden step

16  and moved his hands forward, and that's

17  when you grabbed him and threw him to the

18  ground, correct?

19               MR. SCHEINER:  Objection to

20           form.

21          A.     He took the sudden step.  At

22  that point, I didn't know what he was going

23  to do, so I took him to the ground.

24          Q.     When you took him to the

Page 121

1                    M. CHEEMA
2     that?
3          A.    Yes.
4          Q.    Is that accurate, or is that
5     not accurate?
6          A.    That's accurate.
7          Q.    He did not physically threaten
8     others?
9          A.    No.  Other than the statement
10    that I brought up earlier, there were no
11    physical threats.
12         Q.    Even assuming that prior
13    statement you brought up, you don't believe
14    that was physically threatening others,
15    right?
16         A.    I believe it caused for alarm,
17    but as far as a physical threat, that
18    didn't qualify as a physical threat.
19         Q.    This box that's checked no
20    regarding physically threatened others is
21    accurate, correct?
22         A.    Yes.
23         Q.    "Verbally threatened others,"
24    you also checked no, correct?
25         A.    Correct.

```
                                              Page 122
 1                     M. CHEEMA
 2          Q.     Is that accurate?
 3          A.     That's accurate.
 4          Q.     "Spoke of harming self or
 5     others," you checked no, correct?
 6          A.     That's accurate.
 7          Q.     "Unable to care for himself,"
 8     you checked no, is that accurate?
 9          A.     No.
10          Q.     You believe he was unable to
11     care for himself?
12          A.     Yes.
13          Q.     And that's because he was
14     intoxicated?
15          A.     Correct, and other factors.
16          Q.     What were the other factors?
17          A.     The whole behavior thing I was
18     talking about earlier.  The fact that his
19     behavior would change between being angry,
20     and playful, and excited, like different
21     behaviors that I brought up earlier.
22          Q.     He was intoxicated, he was
23     acting intoxicated?
24          A.     And erratic and aggressive.
25          Q.     Even though he was erratic and
```

Page 123

1                   M. CHEEMA

2     aggressive, as you indicated, he didn't

3     physically threaten others, he didn't speak

4     of harming others, he didn't verbally

5     threaten others, correct?

6                   MR. SCHEINER:  Objection to

7              form.

8          A.    Right.

9          Q.    It's also checked that he was

10    not suspected of being under narcotic

11    influence, is that right?

12         A.    Yes.

13         Q.    That's correct, right?

14         A.    From what my knowledge was,

15    yes.

16         Q.    Then it says, "Under suspected

17    alcohol influence," and you also checked

18    no, correct?

19         A.    Right.

20         Q.    And that's incorrect, is that

21    right?

22         A.    That's 100 percent incorrect.

23         Q.    He admitted to being under the

24    influence of alcohol, correct?

25         A.    Correct.

Page 129

                    M. CHEEMA

1

2    tells me that you want to clarify something

3    that you testified to before.

4         A.    Yes.

5         Q.    We just had a 25 minute break.

6    You had an opportunity to speak to your

7    attorney during that break?

8         A.    Yes.

9         Q.    And now you want to clarify

10   your prior testimony?

11        A.    Yes.

12        Q.    Go ahead.  Please tell us what

13   you want to clarify.

14        A.    It pertains to the Aided

15   Report.  Can you pull that up?

16        Q.    Sure.  Where do you want to go

17   to?

18        A.    I want to go to the parts,

19   attempted physical harm to others, and the

20   verbally threatening others part.  Those

21   two.  When you were asking me about those

22   two specifically, the way I interpreted it

23   was, as far as physical threats go and

24   explicit physical threat.  For example,

25   balling up a fist and charging towards the

Case 1:19-cv-00632-EK-ST   Document 46-6   Filed 11/29/21   Page 34 of 47 PageID #: 231

```
                                        Page 130
 1                M. CHEEMA
 2   person, or attempting to hit them or
 3   anything, that's what I would use as a
 4   physical threat.  Something very explicit,
 5   like I have to stop this person, otherwise
 6   they are actually going to complete the
 7   act.
 8        Q.   So, Mr. Singh did not engage in
 9   any explicit attempted physical harm to
10   others, right?
11        A.   He didn't try to punch anybody.
12   He didn't try to kick anybody or anything.
13   He didn't ball his fist.  He didn't show
14   any signs in his body, like, during the
15   whole incident that he was going to
16   explicitly hit somebody.
17        Q.   He didn't do that in front of
18   you, right?
19        A.   No.
20        Q.   Did you get informed by anybody
21   that he was attempting physical harm, like
22   the EMTs, or his wife?
23        A.   They didn't tell that to me.
24        Q.   Now, with respect to the
25   verbal, what did you want to say?
```

Page 131

M. CHEEMA

1

2      A.      With the verbal threat, I did

3  say earlier that he did tell his wife,

4  "You're going to pay, you did this to me."

5  I didn't perceive that as a physical

6  threat.   A physical threat would be to me

7  saying, "I'm going to kill you.   I'm going

8  to punch you.   I'm going to beat you up."

9  I took it as something that wasn't

10  threatening in physical body form.   That's

11  what I took as a threat.

12      Q.      So, what are you saying?   Was

13  that a verbal threat, or was that not a

14  verbal threat?

15      A.      It was a threat, but it wasn't

16  a threat that would be something that, me,

17  acting as a Law Enforcement Officer, I

18  would feel that I would have to deal with,

19  as in arresting him or documenting it.   It

20  was just a general threat.   For example, if

21  somebody says, "I'm going to write nasty

22  things about you," when it's not true.

23  Those are general threats.   I'm talking

24  about in perspective of a Law Enforcement

25  Officer, like a verbal threat to me would

Page 132

```
 1                 M. CHEEMA
 2     be someone who says and has intention of
 3     committing physical harm.
 4          Q.    You did not perceive him to say
 5     or have intention to commit physical harm,
 6     is that what you're saying?
 7               MR. SCHEINER:  Objection to
 8          form.
 9          A.    As far as the verbally
10     threatening part on the Aided Report, I
11     answered no, but I didn't see that the
12     threat that he made originally was
13     pertinent to any crime, or anything like
14     that.  That's why it was a no on the
15     report.
16          Q.    Okay.  We are going to turn our
17     attention to the video.
18          A.    Okay.
19               MR. SCHEINER:  For the record,
20          can you describe the video file, like
21          by the name of the file and how long
22          it is, or what the time stamp is.
23          What I was saying was, can you
24          identify the file for the record.
25               MR. COHEN:  Yes.  Can I
```

Page 152

                    M. CHEEMA

1  proceeded the still, I'm not sure that he

2  agreed at this point.

3       Q.    Do you see that he's getting

4  ready to get up and get dressed or no?

5       A.    No.  I see that his wife is

6  getting his clothes.

7       Q.    Now, his wife is standing right

8  next to him, right?

9       A.    Right.

10      Q.    You weren't concerned enough to

11 separate them by his actions, you allowed

12 her to stand next to him, correct?

13      A.    Yes.

14      Q.    You didn't feel like he was

15 going to attack her in front of you, right?

16      A.    Not with me standing right

17 there, no.

18      Q.    But you believed his behavior

19 was erratic, right?

20      A.    His behavior was changing at

21 this point.  It became erratic later on.

22      Q.    You were comfortable enough

23 with his behavior that you didn't believe

24 he was going to attack his wife?

```
                                          Page 158
 1                  M. CHEEMA
 2    and 10 seconds mark?
 3         A.    Yes.
 4         Q.    Did he look like he was going
 5    to fall over you, or anything like that?
 6         A.    No.
 7         Q.    Was he so drunk that he
 8    couldn't even put on his shoe?
 9              MR. SCHEINER:  Objection to
10         form.
11         A.    That I couldn't tell you.
12         Q.    How drunk did you believe he
13    was?
14              MR. SCHEINER:  Objection to
15         form.
16         A.    There's no scale on level of
17    intoxication.  It's not like we did a
18    breathalyzer.  I don't know.
19         Q.    Did it appear to you that he
20    was able to get dressed pretty much
21    unassisted?
22         A.    To me, it appeared that way at
23    the time, yeah.
24         Q.    You testified earlier that you
25    were concerned that he was going to fall
```

Page 159

```
                        M. CHEEMA
 1
 2     and bump his head.  Looking at the video,
 3     is that still what you believe?
 4                  MR. SCHEINER:  Objection to
 5          form.
 6          A.    That was a general concern.
 7     Whenever we deal with people who are
 8     intoxicated, I don't know their exact level
 9     of intoxication.  It's just a very general
10     thing that could happen if you are
11     intoxicated, so that was what we think
12     about.  It didn't pertain to him directly.
13     It was just something that is a concern for
14     us.
15          Q.    Did you ask Mr. Singh's wife if
16     she had anywhere to go in order not to stay
17     in the house with Mr. Singh?
18          A.    I don't remember asking her
19     that, no.
20          Q.    Did it ever cross your mind
21     that maybe you didn't have the authority to
22     bring him to the hospital, and that if you
23     did have some alarm, you would consider
24     asking Ms. Singh to find somewhere else to
25     go?
```

Page 165

1                    M. CHEEMA

2          Q.    Do you know what's in that cup?

3          A.    No.

4          Q.    Did he ask his wife for a glass

5     of water before going?

6               MR. SCHEINER:  Objection to

7          form.

8          A.    I don't remember.

9          Q.    As his wife is coming out with

10    the glass of water, he starts to do that

11    motion you described earlier, is that

12    right?

13               MR. SCHEINER:  Objection to

14          form.

15          A.    Yes.

16          Q.    I'm going to play it, and then

17    I'm going to stop it when we get to that

18    motion.  That motion is at about 7 minutes

19    and 58 seconds.  Do you see that?

20          A.    Yes.

21          Q.    What's the motion he's doing?

22          A.    He is saying, "They are going

23    to have to handcuff me."  Now, I'm getting

24    ready to place him in handcuffs.

25          Q.    And then what happens?

Page 166

                    M. CHEEMA

1

2       A.      He brings his arms to the

3    front.

4       Q.      You see he puts his arms to the

5    front and flashes a smile at you?

6            MR. SCHEINER:  Objection to

7        form.

8       Q.    Is that right?

9       A.    Can you rewind that?

10      Q.    Yeah.  I'm going to play it all

11   the way through.  It was starting at 7

12   minutes and 55 seconds.  He puts his hands

13   behind his back.  You saw that he smiled at

14   you before you grabbed him?

15           MR. SCHEINER:  Objection to

16       form.

17      A.    I'm not even sure if that was a

18   smile in the video.

19      Q.    Let me rewind it again.  Did

20   that look like a smile?

21           MR. SCHEINER:  Objection to

22       form.

23      A.    Yes.

24      Q.    He smiled at you right before

25   you threw him down, right?

Page 167

1              M. CHEEMA

2              MR. SCHEINER:   Objection to

3        form.

4        A.    That's when he was joking

5    around saying, "Oh, you're not going to

6    handcuff me."  I didn't take it as him

7    smiling directly at me.  I took it as now

8    his behavior just changed from being hyper

9    aggressive to now he's laughing and joking.

10       Q.    Now, you said he stepped

11   towards your partner.  Which partner were

12   you talking about?

13       A.    Officer Walker.

14       Q.    Over here, the female officer?

15       A.    Yes.

16       Q.    How did you distinguish his

17   step towards Officer Walker versus the step

18   towards the door?

19             MR. SCHEINER:   Objection to

20        form.

21       A.    At that point, I'm behind him.

22   I see him.  Then I see Officer Walker right

23   over there.  I'm looking from behind him,

24   and I see him take a sudden step towards

25   her with his hands out.

```
                                              Page 188
 1                    M. CHEEMA
 2     hospital staff.
 3         Q.     Did you tell the hospital staff
 4     what happened at the apartment, or anything
 5     like that?
 6               MR. SCHEINER:  Objection to
 7          form.
 8         A.    No.  We didn't tell them
 9     anything.
10         Q.     Did you ever consider charging
11     Mr. Singh with a crime?
12               MR. SCHEINER:  Objection to
13          form.
14         A.    No.
15         Q.     Why did you not think that it
16     would be appropriate to charge him with a
17     crime?
18               MR. SCHEINER:  Objection to
19          form.
20         A.    At that time, there was no
21     crime that I could think of that he could
22     be charged with.  Our main concern when we
23     got there was getting him his medical help.
24     I wasn't thinking about arresting him with
25     a crime.  The whole point of us being there
```

                                                          Page 196

1                    M. CHEEMA
2               MR. SCHEINER:  Objection to
3          form.
4          Q.    Does that ring a bell as to
5     anything that may have occurred on January
6     18th of 2017?
7               MR. SCHEINER:  Objection to
8          form.
9          A.    I see it, but I don't remember
10    any of these incidences.
11         Q.    You went to the CCRB once and
12    you believe it was for the 2015 incident?
13         A.    Yes.
14              MR. COHEN:  I'm going to need a
15         five minute break, Alan.  I think I'm
16         done.  I want to confirm that I'm not
17         missing anything.  I think I'm done.
18              MR. SCHEINER:  Okay.
19              (Whereupon, a five minute break
20         was taken.)
21         Q.    Officer Cheema, under what
22    circumstances do you fill out a Domestic
23    Incident Report?
24         A.    A Domestic Incident Report
25    would be if you have any kind of dispute,

Page 197

                      M. CHEEMA

1

2    or any kind of crime that was alleged

3    between people who are in a family type

4    relationship.

5        Q.    There are circumstances where

6    you do a Domestic Incident Report even

7    though there's no one arrested, right?

8        A.    I still do one, even if there

9    was no arrest or anything.

10       Q.    Like if there's a dispute in

11   the home, you fill out a Domestic Incident

12   Report, correct?

13             MR. SCHEINER:  Objection to

14        form.

15       A.    Correct.

16       Q.    Do you know what the purpose is

17   to have a Domestic Incident Report?

18             MR. SCHEINER:  Objection to

19        form.

20       A.    Not really, no.

21       Q.    How do you know when it's the

22   right time to do one and not do one?

23             MR. SCHEINER:  Objection to

24        form.

25       A.    It really depends on, in my

```
                                              Page 198
  1                    M. CHEEMA
  2   experience, an individual case, unless the
  3   911 call comes over as a family type job,
  4   then you have to do one, but if doesn't
  5   then it goes by case by case based off what
  6   the facts are.
  7        Q.    If there's a dispute in the
  8   home, you normally write one?
  9              MR. SCHEINER:  Objection to
 10        form.
 11        A.    I personally would, yeah.
 12        Q.    You didn't prepare a Domestic
 13   Incident Report in this case, correct?
 14        A.    Correct.
 15        Q.    Was there any particular reason
 16   why you did not prepare a Domestic Incident
 17   Report?
 18              MR. SCHEINER:  Objection to
 19        form.
 20        A.    From what I can recollect, from
 21   what I was thinking that day, was it was
 22   just taking care of him medically.  At that
 23   moment, the only thing I was concerned
 24   about was taking care of him medically, and
 25   doing it in the safest and easiest way
```

Page 199

```
                         M. CHEEMA
 1
 2      possible.
 3           Q.    Is it fair to say that a
 4      Domestic Incident Report is supposed to
 5      document that the police were called to a
 6      home where there was a dispute amongst
 7      family members?
 8                 MR. SCHEINER:  Objection to
 9           form.
10           A.    I would say that's fair.
11           Q.    You don't believe that this was
12      an incident that required a Domestic
13      Incident Report, is that right?
14                 MR. SCHEINER:  Objection to
15           form.
16           A.    Correct.
17                 MR. COHEN:  I don't have any
18           further questions.  Officer Cheema, I
19           appreciate your patience and your
20           answering the questions to the best
21           of your ability.  Thank you very
22           much.
23                 MR. SCHEINER:  Gerald, can you
24           give us a few minutes to confer on
25           our own before we close the record?
```

**[JA-99]**

Case 1:19-cv-00632-EK-ST   Document 46-7   Filed 11/29/21   Page 1 of 1 PageID #: 245

# EXHIBIT

# "D"

(Audio Recording Could Not Be Attached Due to the Digital Size
Constraints of ECF Filing. Original Provided to Defense Counsel & Filed
with the Court)

```
                                                    Page 1
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    -----------------------------------------X
      BALWINDER SINGH,
 3
                                PLAINTIFF,
 4
              -against-     Case 1:19-cv-00632
 5
 6    THE CITY OF NEW YORK, P.O. MANDEEP CHEEMA,
      Tax Id. No. 950196, Individually and in his
 7    Official Capacity, and POLICE OFFICERS
      "JOHN DOE" #1-10, Individually and in their
 8    Official Capacity (the name John Doe being
      fictitious, as the true names are presently
 9    unknown),
10                              DEFENDANTS.
      -----------------------------------------X
11
12                    DATE: October 22, 2020
13                    TIME: 2:11 p.m.
14
15
16         EXAMINATION BEFORE TRIAL of the
17    Non-Party Witness, NICOLE MILONAS, taken by
18    the Plaintiff, pursuant to a Subpoena, held
19    on a Virtual Zoom, before Alexis A. Vargas,
20    a Notary Public of the State of New York.
21
22
23
24
25
```

Case 23-24, Document 28, 04/19/2023, 3501815, Page107 of 198
**[JA-101]**

```
                                        Page 18
 1              N. MILONAS
 2  drunk and did drink.
 3      Q.    What's the purposes of making a
 4  determination of whether somebody is
 5  intoxicated or something else?
 6      A.    It has to do with their mental
 7  state, if they have decision making
 8  capacity.
 9      Q.    When it comes to decision
10  making capacity, were you trained about
11  people refusing medical attention?
12      A.    Yes.
13      Q.    Under what circumstances can
14  someone refuse medical attention?
15      A.    If they are alert and oriented,
16  have decision making capacity, have a
17  Glasgow Coma Scale of 15, which means they
18  are oriented, they are able to follow basic
19  commands, and they are able to walk on
20  their own.  If they are mentally in tact.
21  We basically follow, there actually is
22  protocol that New York City has.  If a
23  patient is alert with a GCS of 15, and no
24  evidence of apparent medical or physical
25  conditions which may limit the patient's
```

Page 29

```
1              N. MILONAS
2      Q.    This is the same document that
3 you have, correct?
4      A.    Yes.
5      Q.    How did you become alerted to
6 the job at 130-18 Atlantic Avenue?
7      A.    I would assume we were driving
8 and they called us for an assignment, and
9 when we put ourselves that we were going to
10 it, this was the job that came up, this
11 incident address.
12      Q.    When you say you would assume,
13 you're making that assumption because you
14 don't have any independent recollection of
15 it; is that correct?
16      A.    Yes.
17      Q.    Do you remember when dispatch
18 alerted you to the job what exactly you
19 were told about the job?
20      A.    They say the assignment, for
21 example, and they throw the job up on our
22 screen, and it would say the unit number,
23 the incident location, and what the call
24 type is, and then it would have a summary
25 of, generally, what it was about, but that
```

```
                                        Page 46
 1                 N. MILONAS
 2         A.    I have no recollection.  I'm
 3   referring just based off what I wrote in
 4   the narrative.
 5         Q.    The next line says, "Patient
 6   not cooperative with unit questioning."  In
 7   what way was the patient not being
 8   cooperative with questioning?
 9         A.    Again, I have no recollection
10   of this job, but if I were to write that
11   along with the entire narrative, that means
12   that we were trying to ask him questions,
13   especially during an assessment, and he was
14   not forthcoming.  He did not want to
15   cooperate, answer the questions that we
16   were asking.
17         Q.    The next sentence says,
18   "Patient became aggressive with crew."  Do
19   you have any independent recollection as to
20   how he became aggressive?
21         A.    I have no recollection.
22         Q.    Was he threatening you or your
23   partner?
24         A.    I have no recollection of the
25   job, but from what I wrote directly after
```

Page 49

```
 1              N. MILONAS
 2  job, aside from what I wrote.
 3       Q.    Looking at the narrative, you
 4  didn't write anything in there about him
 5  claiming that he was going to kill himself;
 6  is that correct?
 7       A.    I did not write anything in the
 8  report that states that.
 9       Q.    If he would have said that he
10  was going to kill himself, is that
11  something you would have put in the report?
12       A.    Yes.
13       Q.    If he attempted to assault you
14  or your partner, or did assault you or your
15  partner, is that something you would have
16  put in the report?
17       A.    Yes and no.  If he did assault
18  us, we would definitely put that.
19  Attempting falls along the line of
20  belligerently coming up to us in our space
21  and in our faces.  That's another way of
22  basically writing it.  He's coming at us
23  aggressively in our faces.  If you're
24  asking if I wrote that he tried to throw a
25  punch, no, that is not something I wrote.
```

```
                                          Page 50
 1                  N. MILONAS
 2        Q.    I asked you whether he said he
 3   was going to kill himself.  Do you
 4   recollect if he ever said he was going to
 5   hurt himself?
 6        A.    I have no independent
 7   recollection of this job.
 8        Q.    If he would have said that he
 9   was going to hurt himself, is that
10   something you would have put in the report?
11        A.    Yes, that is something I would
12   have put in the report.
13        Q.    Based on your independent
14   recollection, do you remember anything that
15   would have made you think that he was going
16   to kill himself or hurt himself that
17   evening?
18        A.    I have no independent
19   recollection, but from what I wrote in my
20   report, the wife stated that the patient is
21   a harm to himself.  I may have not wrote
22   what she said specifically, but she did say
23   he was a harm to himself, or he might have
24   done something to make her feel this way.
25   Again, what I wrote was that the patient
```

Page 51

N. MILONAS

1

2  was not answering our questions and wasn't

3  cooperating.  Most likely, I had asked him,

4  which is something we ask people routinely,

5  if he wanted to hurt himself, if he wanted

6  to hurt anyone else, any auditory visible

7  hallucinations.  If he's not cooperative

8  with me, regardless of if I asked him that,

9  he wouldn't have given me an answer.

10       Q.    As far as you know, was the

11  wife a medical professional?

12       A.    I don't recall this job, let

13  alone that she was a medical professional.

14       Q.    Based on your review of the

15  report and the video that we've seen so

16  far, did you think that the Plaintiff was

17  suicidal in any way?

18            MS. FADDIS:  Objection to the

19       form.  You can answer.

20       A.    The fact that the wife stated

21  that he is a harm to himself that I had

22  written in the narrative, that's what we

23  went by.

24       Q.    Did you know what her basis for

25  making the allegation that he was a threat

```
                                          Page 52
 1              N. MILONAS
 2   to himself was?
 3       A.    I do not recall, specifically.
 4   We do not write things verbatim all the
 5   time.  Then it would be a 20 page paper.
 6   If he is not acting normal, and he is a
 7   harm to himself, and the fact that he was
 8   not acting rational with me, that I stated
 9   he wasn't cooperative and he became
10   belligerent, and didn't have rational
11   thinking, and he wasn't in a state normal
12   to his baseline as per his wife.
13       Q.    Looking at your narrative now,
14   you didn't write down anything in the
15   narrative, specifically, as to your
16   assessment that he was a harm to himself;
17   is that correct?
18       A.    That is correct.  I wrote that
19   he wasn't answering our questions and
20   wasn't cooperative.  I could have asked
21   him, but he most likely didn't tell me from
22   what I wrote.
23       Q.    Not answering questions or
24   being cooperative, in and of itself,
25   doesn't necessarily tell you if somebody is
```

Case 23-24, Document 28, 04/19/2023, 3501815, Page114 of 198
**[JA-108]**

```
                                          Page 55
 1                N. MILONAS
 2   completely different text of this.  I've
 3   never seen anything in this format before.
 4        Q.    I'm going to scroll down.  We
 5   are here at 6:28 in the morning.  Do you
 6   see that?
 7        A.    Yes.
 8        Q.    It says, "Event comment EMS
 9   unit on scene."  Do you see that?
10        A.    Yes.
11        Q.    Would it be fair to say that at
12   6:28 in the morning on 2/28/18 you were on
13   the scene at the Atlantic Avenue address?
14        A.    Comparing it with my report,
15   yes, it seems correct.
16        Q.    I'm going to direct your
17   attention to the 10 minutes later,
18   06:38:03.  Under the comments it says,
19   "Please send RMP, uncooperative PT."  Do
20   you see that?
21        A.    Yes.
22        Q.    Would that refresh your
23   recollection as to whether or not you
24   called for a Police Department, or they had
25   just arrived?
```

Page 56

                    N. MILONAS

1

2       A.     I still don't have any

3   independent recollection of this job, but

4   looking at that, it states that I or my

5   partner called them.

6       Q.     You said either you or your

7   partner.  Do you remember who made the

8   decision to call for police back-up?

9       A.     I do not recall that.

10      Q.     Generally speaking, if you need

11  to call the police, do you make that call

12  from inside the apartment, near the

13  apartment, something else?

14      A.     Generally, if there's a threat

15  to ourselves, we will try to leave the

16  apartment.  If there is any possible way

17  that we can't, or we feel like it would be

18  more of a threat if we did, then one of us

19  would step out and do it, or we will turn

20  away and call it over the air on the radio.

21      Q.     Do you remember whether or not

22  you stayed in the apartment while you

23  waited for the Police Department in this

24  case?

25      A.     I do not recall.  Generally, if

Page 57

```
 1                    N. MILONAS
 2     it's a case where we would've had to leave,
 3     or been able to leave, it would be on that
 4     document where we would tell the dispatcher
 5     that we needed to leave the residence.
 6          Q.     Based on what we saw so far,
 7     there's nothing on the dispatch document
 8     that you saw that indicates that you left
 9     the apartment; is that correct?
10          A.     That is correct.
11          Q.     What were your intentions when
12     the police were called?
13               MS. FADDIS:  Objection to form.
14          Go ahead.
15          A.     There was no intention.  There
16     was a threat to myself and my partner, and
17     the patient was being uncooperative, so we
18     needed police there for our safety.
19          Q.     At that point, when you called,
20     there was no intention to have the police
21     remove the patient to the hospital, or
22     remove the patient from the apartment?
23               MS. FADDIS:  Objection.  Go
24          ahead.
25          A.     I don't recall this incident
```

Page 59

```
 1              N. MILONAS
 2   attention, you would have just left and not
 3   called the police; is that correct, or is
 4   that fair?
 5        A.    If he had the ability to refuse
 6   then, yes, you're more than welcome to
 7   refuse.  We don't kidnap anyone.  If you're
 8   intoxicated, you don't have rational
 9   thinking, if you're not alert and oriented,
10   if you don't have decisional capacity, then
11   we don't just leave you.
12        Q.    Based on your independent
13   recollection, did he appear to be suffering
14   from any of the symptoms of alcohol
15   poisoning?
16        A.    I still don't recall this job.
17   It would be based off my narrative and the
18   patient care report summary.
19        Q.    If he would have exhibited
20   symptoms of alcohol poisoning, would you
21   have put that in the patient care summary?
22        A.    Yes, most likely.
23        Q.    Let's back up for a second.
24   Can you tell us what the symptoms of
25   alcohol poisoning are?
```

Page 60

                    N. MILONAS

1

2        A.      Generally, he would have to be

3    severely highly intoxicated, and he wasn't

4    at that point from my assessment.  He was

5    still able to answer the four questions.

6    He wasn't on the floor unconscious.  He

7    still had a semi steady gait.  He was

8    cognitive enough to threaten us, or be

9    belligerent and yell profanities.

10       Q.      Based on that, the information

11   that you just gave us, how did you make the

12   determination that he was unable to refuse

13   and had to go to the hospital?

14       A.      The fact that he's unable to

15   refuse, we refer to the army protocol.  I

16   stated this twice already.  He did not meet

17   the criteria.  He did not have rational

18   thinking.  He was able to stand, but he did

19   not have a complete steady gait, so he did

20   not fit the criteria where he was able to

21   refuse care.  He did not have that decision

22   making capacity.

23       Q.      I want to make sure I'm clear.

24   What was the basis for you to make the

25   determination that he needed medical

Case 1:19-cv-00632-EK-ST   Document 46-8   Filed 11/29/21   Page 15 of 17 PageID #: 260

Page 85

N. MILONAS

1

2      A.    I can't recall this job.

3  Generally, if someone doesn't have a

4  decisional capacity, I will not be giving

5  them anything to sign, because they can't

6  properly review or understand what it is.

7      Q.    I want to direct your attention

8  to the second page of this report at 6:48

9  a.m., and it says, "Glasgow Coma score."

10  Do you see what I'm talking about?

11      A.    Yes.

12      Q.    Based on this report, is it

13  correct that the Glasgow Coma score was 15?

14      A.    Yes.

15      Q.    Can you give me the breakdown

16  about how we got to the number 15?

17      A.    His motor was six, which is the

18  highest score you can get.  Verbal, he was

19  a five, and eye opening he was a four.

20  Everything that he was able to do he did,

21  but that doesn't have to do with your

22  mental capacity to think rationally.

23  That's only a piece of it.  Like I said in

24  my narrative, he was alert and oriented

25  four out of four, but he had periods of

Page 86

N. MILONAS

 1           being incoherent.  He didn't have a

 2           perfectly steady gait and he was acting

 3           irrationally.

 4

 5           Q.    I want to go through some of

 6           these other entries here.  According to

 7           this entry that I see where it says,

 8           "Assessment Type ABC."  His breathing was

 9           normal?

10           A.    Yes, it wasn't labored.  He

11           didn't have any signs of difficulty

12           breathing.

13           Q.    Under neurological it says,

14           "Mental status, oriented-person,

15           oriented-place, oriented-time,

16           oriented-event."  Do you see that?

17           A.    Yes, I do.  That means he was

18           able to answer those four questions.

19           Q.    He had the Glasgow Coma score

20           of 15, and he was oriented four times four,

21           meaning to person, place, time and event;

22           is that correct?

23           A.    That is a GCS of 15 and no

24           evidence of apparent medical or physical

25           conditions, which may limit the patient's

Case 1:19-cv-00632-EK-ST   Document 46-8   Filed 11/29/21   Page 17 of 17 PageID #: 262

Page 87

1               N. MILONAS

2   ability to think rationally.  Those two are

3   only a piece of what deems someone to have

4   decisional making capacity.

5       Q.    Putting aside decisional making

6   capacity for a second, it's accurate that

7   he had normal breathing, and he had a

8   Glasgow Coma score of 15, and he was

9   oriented to person, place, time and event,

10  that's accurate?

11      A.    That is accurate that I wrote

12  in the report.

13      Q.    I'm trying to nail down if the

14  report is accurate.

15      A.    Okay.

16      Q.    Where it says, "Chief complaint

17  (primary):  Alcohol Intox.  Provider

18  Impression: Monitoring required."  What

19  does that mean?

20      A.    The primary complaint was that

21  he was intoxicated and the result of him

22  being intoxicated.  The provider in

23  question was that he needed to be seen and

24  evaluated by a doctor.

25      Q.    Based on the review of this

Case 1:19-cv-00632-EK-ST   Document 47   Filed 11/29/21   Page 2 of 4 PageID #: 311

11-FEB-2020 09:37 From:EE999          1800          To:919173002283          Page:2/4

## Prehospital Care Report Summary
### Jamaica Hospital Medical Center
Date:02/28/2018 Call #:0608  Booklet:93478354 Branch: JHMC  Time Zone:America/New_York

| Call Information: | | # Patients Transported | |
|---|---|---|---|
| | | In My Unit: | 1 |
| Disposition: | Treated/Transported | # Patients at Scene: | 1 |
| Unit #: | 54F1 - 54F1, Ground-Ambulance - BLS  Trip Type: Initial Trip | | |
| Run Type to Scene: Patient Response  Emergent (Immediate Response) | | Call Received: | 06:16:15 |
| Incident Facility: | | Dispatched: | 06:16:33 |
| Incident Location: | 130-18 ATLANTIC AVE ##3FL - Queens, NY 11419 (Queens County) | En Route: | 08:16:49 |
| Incident Location Type: | Home/Residence | On Scene: | 06:28:30 |
| | | Patient Contact: | 06:32:00 |
| Receiving Facility: | 34 Jamaica Hospital (Hospital) - 8900 Van Wyck Expressway - Jamaica, NY 11418 | Left Scene: | 06:57:53 |
| Facility Address: | 8900 Van Wyck Expressway - Jamaica, NY 11418 | At Destination: | 07:05:40 |
| Destination Type: | Hospital Emergency Dept | Transfer of Care: | 07:32:54 |
| Dest. Reason: | Nearest/Most Accessible Facility | In Service: | 08:01:03 |
| Registration # | N/A | | |
| | | Time On Scene: | 29 Min |
| Loaded Mileage: | 0.9 (Total Mileage: 0.9) | Time to Destination: | 48 Min |
| Crew Members: | Marisabel Schiapira, EMT Basic(DS)(DH); Nicole Mionas, EMT Basic(DOC) | Total Time of Run: | 105 Min |
| Personal Protective Equipment Used: | | | |
| Marisabel Schiapira - Gloves | | | |
| Nicole Mionas - Gloves | | | |
| Moved to Amb By: Other  Transport Position: Semi/Full Fowlers  From Amb By: Stretcher | | | |
| Call Origin: N/A | Lights/Siren:  Scene - Lights and Sirens, Destination - No Lights and Sirens | | |

| Patient Information: | | | |
|---|---|---|---|
| Name: | BALWINDER SINGH | DOB: | ███████9 |
| Address: | 130-18 ATLANTIC AVE ##3FL - RICHMOND HILL, NY | Gender:Male | |
| | 11419 | Age:  38 Years | |
| County: Queens | | Weight: | |
| Phone: | | Broselow: | |
| Email: | | | |
| SSN: | ██████00 | | |
| Driver License: | | | |

| Other Contact Info | | | |
|---|---|---|---|
| Name: | | Phone: | Cell Phone: |
| Relationship: | | | |
| Current Meds: GEMFIBROZIL (600 ) | | Comments: | |
| | Other | | QUETIAPINE |
| | Other | | ZOLPIDEM |
| | PANTOPRAZOLE | | |
| Env Allergies: NKA | | Comments: | |
| Med Allergies: NO KNOWN ALLERGIES (NKA) | | Comments: | |
| Patient Physician: | | | |
| Advanced Directives: | | | |
| PMH: | Hyperlipicemia, GERD/Reflux, Psychiatric Problems | | |
| Comment: | Psychiatric Problems: ANXIETY, BIPOLAR, DEPRESSION | | |
| Patient Physical Limitations: | | | |
| Comment: | | | |

| Payer Information: | | | | | |
|---|---|---|---|---|---|
| Priority: | Name: HEALTH FIRST | Type: | Policy #: SZ06955A | Group #: | |
| Policy Holder: , , Apt | | | Phone: | DOB: | |
| Relationship of Patient to Insured: | | | | | |

Advance Beneficiary Notice

02/10/20 15:50 inda lnforma          Confidential PHI 49 2000-2020  Stryker - NextraEMS®      02/28/2018 Call# 0608 EK, 93478354 - 1 of 3          PCR 1 of 1

EXHIBIT
1

Not a Medical Necessity: No        Non Covered Service:   No
Mileage Beyond Closest Appropriate Facility: No    Preferred Physician:   No
Requested Service:
Representative Relation:

**Clinical:**

Onset Date/Time:
Dispatch Reason (EMD): DRUG   4 DRUG
Medical Need:

Chief Complaint (Primary): Alcohol Intox   Duration:
Provider Impression: Monitoring Required
Mechanism of Injury:
Protocol 1:   Standard Approach to the Patient       Protocol 2:

**Assessments:**

| Time | Employee | Type | Summary |
|---|---|---|---|
| 06:32:00 | Milonas, Nicole | ABC | **Pertinent Negatives:**<br>Airway: General: Patent<br>Breathing: Rate: Normal Quality: Unlabored<br>Circulation: General: Normal Skin Color: Normal Skin Condition: Normal<br>Skin Capillary Refill: Normal |
| 06:32:00 | Milonas, Nicole | Neurological | Mental Status: Oriented-Person, Oriented-Place, Oriented-Time, Oriented-Event<br>AVPU: Alert<br>**Pertinent Negatives:**<br>Mental Status: Not Normal<br>Neurological: All Neuro Abnormal, Abnormal Gait - Normal for Pt: Yes |
| 06:47:00 | Milonas, Nicole | ABC | **Pertinent Negatives:**<br>Airway: General: Patent<br>Breathing: Rate: Normal Quality: Unlabored<br>Circulation: General: Normal Skin Color: Normal Skin Condition: Normal<br>Skin Capillary Refill: Normal |
| 06:47:00 | Milonas, Nicole | Neurological | Mental Status: Oriented-Person, Oriented-Place, Oriented-Time, Oriented-Event<br>AVPU: Alert<br>**Pertinent Negatives:**<br>Mental Status: Not Normal<br>Neurological: All Neuro Abnormal, Abnormal Gait - Normal for Pt: Yes |

**Vitals:**

| Time | Employee | Summary |
|---|---|---|
| 06:33:00 | Milonas, Nicole | BP: Systolic Refused/ Diastolic Refused<br>Pulse: Refused<br>Resp: 22 |
| 06:48:00 | Milonas, Nicole | BP: Systolic Refused/ Diastolic Refused<br>Pulse: Refused<br>Resp: 22<br>Glasgow Coma Score: E (4) + V (5) + M (6) = 15 - Adult |

**Treatments/Medications:**

| Time | Employee | Summary |
|---|---|---|

**Supply**

Qty Supply

**ECG Device Incident Number:**

**Narrative History Text:**
UNIT DISPATCHED TO INCIDENT ADDRESS FOR THE DRUG. UPON ARRIVAL UNIT FOUND THIRTY EIGHT YEAR OLD MALE SEATED ON THE COUCH IN HIS RESIDENCE. PTS WIFE STATES THAT THE PT WOKE HER AND HER SON UP. PTS WIFE STATES THAT THE PT WAS DRINKING AND IS NOT ACTING NORMAL. PTS WIFE STATES THAT THE PT IS A HARM TO HIMSELF. PT ALERT AND ORIENTED X FOUR/ FOUR WITH PERIODS OF INCOHERENCY. POSITIVE SEMI STEADY GAIT. PT IN AN IRRATIONAL STATE. PT NON COOPERATIVE WITH UNIT QUESTIONING. PT BECAME AGGRESSIVE WITH CREW. PT BEGAN YELLING PROFANITIES AND BELIGERENTLY APPROACHING CREW. PD ARRIVED ON SCENE. PT STILL AGGRESSIVE AND UNCOOPERATIVE. PT RESTRAINED BY PD. NO KNOWN COMPLAINTS. POSITIVE ABRASION TO RIGHT SIDE OF PTS FOREHEAD AND RIGHT TEMPORAL REGION SUSTAINED DURING PT RESISTING PD APPREHENSION. PT TRANSPORTED TO HOSPITAL THIRTY FOUR WITHOUT INCIDENT AND CARE TRANSFERRED FOR FURTHER EVALUATION.

**Unable to Sign:**
**Unable to Sign Reason:** Other
**Authorized Representative:**
**Authorized Representative Signature:** No
**Secondary Documentation:**
**Secondary Documentation Signature:** No
**Comment:**
PT IS INTOXICATED

**Auth Signature:** No   **Privacy Sig:** No   **Unable to Sign:** Yes   **Refused to Sign:** No

**Signature Image(s):**

| Authorization Signature | Privacy Notice Signature |
|---|---|
|  |  |

Receiving RN / MD Signature - RESUELLO RN - 02/28/2018 07:32         Technician Signature - Mitonas, Nicole - 02/28/2018 08:04

**Recommended Service Level:** BLS  / **Dispatch Service Level:** BLS

**[JA-119]**

# EXHIBIT

# "G(1-3)"

(Videos Could Not Be Attached Due to the Digital Size
Constraints of ECF Filing. Original Provided to Defense
Counsel & Filed with the Court)

## NEW YORK CITY POLICE DEPARTMENT

Worksheet : Aided
Status : Approved
Report # : AID-2018-102-000301
Incident Date : 02/28/2018 06:50 Wednesday



### INCIDENT INFORMATION

**OCCURRENCE DATE**

From: 02/28/2018 06:50 Wednesday

Body Worn Camera?: No

### AIDED PERSON

Type: Civilian

Name: BALWINDER SINGH

Is Aided Victim of a Crime?: No

Homeless: No

Address Type: NYC

| Building No.: 130-18 | Street Name: ATLANTIC AVENUE | Unit Type: BUILDING | Unit #: 3 |
|---|---|---|---|
| Borough: Queens | State: New York | | |
| Contact Type | Contact Sub-Type | Contact Sub-Type Other | Value |
| Phone | Home | | — |
| Email | | | — |
| Sex: Male | Race: Asian or Pacific Islander | | |
| Date of Birth: 04/10/1979 | Age: 38 | | |
| Sick/Injured : Yes | Emotionally Disturbed : No | Lost Person : No | Deceased : No |
| Runaway Child : No | Unconscious : No | Abused/Abandoned/Neglected Child/etc. : No | Bicycle Involved : No |
| Suspected Narcotics Related : No | Other : No | If Other, Explain : | |

Treatment: Hospitalized

| Removed to ?: Hospital | Hospital Code: 7311-Jamaica Hospital | Transported to Hospital By: NYS Registered Ambulance | Ambulance Plate #: 54F |
|---|---|---|---|
| ACR/PCR #: 93478354 | Treated By: 54F | Admission #: | |

### LOCATION OF OCCURRENCE

| Jurisdiction: NYPD | Location Category: Residential | Location Type: Apt. Building | Location Within: |
|---|---|---|---|
| Location Identifier: Inside of | | Location Name: | |

**ADDRESS**

| Address Type: Street Address | Location Identifier: Inside of | | |
|---|---|---|---|
| Building No.: 130-18 | Street Name: ATLANTIC AVENUE | Unit Type: BUILDING | Unit #: 3 |
| Borough: Queens | State: New York | | |
| Corner: | Intersecting Street: | | |
| Cross Street1: 130 STREET | Cross Street2: 131 STREET | | |
| Pct: 102 | Sector: A | PSA: | |
| Latitude: 40.695923 | | Longitude: -73.818634 | |

### GENERAL AIDED INFORMATION

Children or Dependent Adults Uncared for?: No

### DEPT. OR AGENCY INVOLVED

City Involved?: No

### NOTIFICATIONS

**DEPARTMENT NOTIFICATIONS**

**D00001**

**[JA-121]**

## NOTIFICATIONS

### NOTIFICATIONS AND DUPLICATE COPIES FOR

| Type | Name/Pct | Log Number | Delivery |
|------|----------|-----------|----------|

### AIDED VICTIM NOTIFICATIONS

REQUIRED IF AIDED IS ADMITTED OR DIES

## ADDITIONAL INFORMATION

### IF EDP

Prior History: No                    CIT trained UMOS on scene: No

### ACTIONS OF EDP (CHECK ALL THAT APPLY)

| | | | |
|---|---|---|---|
| Attem. Physical harm to self : No | Attem. Physical harm to others : No | Placed self in dangerous situation : No | Physically threatened others : No |
| Verbally threatened others : No | Spoke of harming self or others : No | Unable to care for self : No | |
| Under suspected narcotic influence : No | Type of narcotic, if known : | Method of ingestion, if known : | Informed by, if known : |
| Under suspected alcohol influence : No | Type of alcohol, if known : | | |
| Other (Explain in Details) : No | If Other, Explain : | | |

### CPR/AED ADMINISTERED

| | | | |
|---|---|---|---|
| Mouth to Mouth: No | CEW Used?: No | | |
| AED Used?: No | AED/CPR Log No: | Aided Resuscitated: | |

### NALOXONE ADMINISTERED

| | | | |
|---|---|---|---|
| Naloxone Used?: No | Naloxone Log No: | Number of Uses: | Naloxone effective?: |

### O.C. SPRAY

Was O.C. Spray Used?: No

## DETAILS

AT T/P/O AIDED INTOX/COMBATIVE REMOVED TO JAMAICA HOSPITAL FOR TREATMENT

## ADDITIONAL REPORTS PREPARED

| Form Type | Report No | Violation Section | Pct |
|-----------|-----------|-------------------|-----|

## DEPARTMENT PERSONNEL

### REPORTING OFFICER

| | | | |
|---|---|---|---|
| Agency: New York City Police Department | Command: 102 | Command Description: 102 PRECINCT | NCIC Number: 03030 |
| Tax Number: 950196 | Rank: POLICE OFFICER MALE | Last NAME: CHEEMA | First Name: MANDEEP |

### ENTERED BY

| | | | |
|---|---|---|---|
| Agency: New York City Police Department | Command: 102 | Command Description: 102 PRECINCT | NCIC Number: 03030 |
| Tax Number: 950196 | Rank: POLICE OFFICER MALE | Last Name: CHEEMA | First Name: MANDEEP |

## ENDORSEMENT HISTORY

| Submitted By: | Approved/Rejected By: | Note: | Status: | Endorsement Date: |
|---------------|----------------------|-------|---------|-------------------|
| MANDEEP S CHEEMA 950196 POM 102 PRECINCT New York City Police Department 03030 | SHEREEN M SUMMA 933366 SGT 102 PRECINCT New York City Police Department 03030 | | Approved | 02/28/2018 08:26 Wednesday |

**D00002**

```
                                                    Page 1

 1

 2     UNITED STATES DISTRICT COURT

 3     EASTERN DISTRICT OF NEW YORK

 4     CIVIL ACTION NO.:  19-cv-632 NGG-ST

 5     - - - - - - - - - - - - - - - - - - - - -x

 6     BALWINDER SINGH,

 7                          Plaintiff,

 8            -against-

 9     THE CITY OF NEW YORK, P.O. MANDEEP CHEEMA,

10     Tax Id. No. 950196, Individually and in

11     his Official Capacity, and POLICE OFFICERS

12     "JOHN DOE" #1-10, individually and in

13     their Official Capacity

14                          Defendants.

15     - - - - - - - - - - - - - - - - - - - - -x

16

                           November 5, 2020

17                         1:04 p.m.

18            DEPOSITION of POLICE OFFICER

       JUSTIN DAVIS, a Non-Party witness in the

19     above-entitled action, held via Veritext

       Virtual, taken before Barbara Tortora, a

20     Shorthand Reporter and Notary Public of

       the State of New York, pursuant to Rule 26

21     et seq. of the Federal Rules of Civil

       Procedure, Notice and stipulations between

22     Counsel.

23                   *      *      *

24

25
```

```
                                                  Page 66
  1           POLICE OFFICER DAVIS
  2   were viewing as a -- how I do say?  Like
  3   an aid, what you would consider an aided
  4   job.  We were there to aid EMS.
  5       Q.    I understand that's how it came
  6   in.
  7       A.    That's how we were still viewing
  8   it as well.
  9       Q.    But I'm saying, when you got
 10   there and you saw that she was making
 11   those allegations that he had a prior
 12   history of doing what you're saying, did
 13   you go to see if there actually was
 14   domestic incident issues with this
 15   location?
 16       A.    No, because --
 17             MS. FADDIS:  Objection to form.
 18       You can answer.
 19       A.    No, there was no crime, so he --
 20   we were just being guided by EMS in terms
 21   of him needing medical help.  The entire
 22   situation of us standing there and having
 23   this conversation was to physically just
 24   get him dressed.
 25       Q.    You indicate there's no crime.
```

```
                                          Page 67
 1            POLICE OFFICER DAVIS
 2   So none of the verbal assaults as you
 3   described them a moment ago amounted to a
 4   crime; is that right?
 5        A.   No.
 6             MS. FADDIS:   Objection to form.
 7        You can answer.
 8        Q.   He wasn't committing harassment
 9   in your view; is that correct?
10        A.   No.
11        Q.   He wasn't menacing her in your
12   view; is that correct?
13        A.   No, no, he didn't attempt to
14   assault her while you were present,
15   correct.   No.
16        Q.   She never told you that he
17   assaulted her; is that right?
18        A.   Yes.
19        Q.   Yes, she never told you that he
20   assaulted her, right?
21        A.   Yes, she never told me.
22        Q.   Sorry, I maybe asked the
23   question in a weird way.
24             Throughout the entire time you
25   were there you didn't observe Mr. Singh
```

Page 68

```
 1          POLICE OFFICER DAVIS
 2   commit a crime, correct?
 3       A.    No.
 4       Q.    Throughout the entire time you
 5   were there, no one in the apartment told
 6   you he had committed a crime prior to your
 7   arrival?
 8       A.    No.
 9       Q.    The entire time you were there,
10   your only understanding of your job was to
11   assist him, as to bring Mr. Singh to the
12   hospital?
13       A.    Yes.
14       Q.    You did not make an independent
15   evaluation when you arrived to Mr. Singh's
16   apartment as to whether he was a danger to
17   himself?
18            MS. FADDIS:   Objection.
19       A.    No, I was -- rephrase the
20   question.
21       Q.    The question is, did you make an
22   independent evaluation as to whether he
23   was a danger to himself?
24       A.    In my opinion, yes, just the way
25   he was acting, the way he was going at
```

```
                                          Page 73
 1            POLICE OFFICER DAVIS
 2    seemed fearful.  And in some circles may
 3    have not wanted to tell us everything that
 4    was going on, but kept making the
 5    suggestion -- not suggestion, asking us to
 6    take him.  And based off my experience and
 7    training, that is usually a sign of
 8    someone who is being fearful if we leave
 9    something else might happen.
10        Q.    You didn't see him attempt to
11    strike her in any way?
12        A.    No.
13        Q.    We've already gone over this,
14    you didn't believe any of the comments he
15    was making to his wife rose to a level of
16    crime or offense under the New York Penal
17    Law or any other laws in New York?
18        A.    No.
19        Q.    Even though she appeared to you
20    to be fearful for her safety, you didn't
21    believe this incident warranted
22    documentation in a domestic incident
23    report?
24            MS. FADDIS:  Objection to form.
25        You can answer.
```

Page 74

```
 1        POLICE OFFICER DAVIS
 2        A.    No, didn't feel as though -- it
 3  was more or less in our eyes a medical
 4  case.  What we refer to as emotionally
 5  disturbed, under the influence, not in his
 6  right state of mind.  Just saying random
 7  things, not coherent enough to argue with
 8  anybody, saying random things.  If someone
 9  said something he would say something
10  argumentative back, but it wasn't a back
11  and forth argument, a constructive
12  conversation more or less.  You understand
13  what I'm saying?
14        Q.    While you were there, at some
15  point did you convince him to go to the
16  hospital?
17        A.    Yes, we explained to him
18  multiple times.  In situations like that,
19  three officers, we'll all try to have a
20  conversation and just explain.  Because in
21  his mind he believed he was being
22  arrested.  We have to explain you're not
23  being arrested, we're just going to get
24  you to the hospital to see a medical
25  professional, see a doctor, get checked
```

Page 80

```
1           POLICE OFFICER DAVIS
2   the wife.  There was no way to tell what
3   he was going to do.
4      Q.    But when you saw him, I guess,
5   turn around, did you move to try to
6   handcuff him as well or were you reacting
7   to what Officer Cheema was doing?
8      A.    I was reacting to both of them.
9   Situations like that happen very fast.
10  Someone turning around like that,
11  especially like he could have hit one of
12  us, he could have had something in his
13  hand.  We don't know what he was doing.
14     Q.    My question is, prior to Officer
15  Cheema attempting to handcuff him, did you
16  believe that the actions Mr. Singh was
17  taking warranted you to go and try to
18  handcuff him as well?
19         MS. FADDIS:  Objection to form.
20     You can answer.
21     A.    I felt like he was being
22  verbally aggressive enough that it would
23  pass verbal aggression at some point.
24     Q.    But I'm saying, did you make an
25  attempt to handcuff him before Officer
```

Page 81

POLICE OFFICER DAVIS

1
2      Cheema did?
3           A.    No.
4           Q.    Did you think the actions he was
5      taking at the moment he was grabbed by
6      Officer Cheema to be handcuffed warranted
7      him to be handcuffed at that moment?
8           A.    Yes.
9           Q.    What was the reason it was
10     warranted for him to be handcuffed at that
11     moment?
12          A.    For the safety of others at that
13     point, which would include us as officers
14     and EMS and his family.  If he goes from
15     being compliant and wanting to leave and
16     get everything down to now turning around,
17     moving his arms like that, now he's
18     becoming a risk.  He is going into the
19     back of the EMS truck, we can't put him in
20     the back of the EMS truck making actions
21     like that because it could be a danger to
22     the EMS workers, as well as one of us
23     sitting there in close proximity.  A
24     rationale person is not going to turn
25     around and do things with his hands.

```
                                          Page 82
 1            POLICE OFFICER DAVIS
 2   Where we feel like now it's a safety
 3   issue, yes, you are placed in handcuff.
 4       Q.    Did you think he was about to
 5   attack you at the moment?
 6       A.    I thought he was going to run
 7   and try to attack somebody.
 8       Q.    Did you think at the moment that
 9   Officer Cheema reached out to Mr. Singh he
10   was going to attack you?
11            MS. FADDIS:  Objection to form.
12       Go ahead.
13       A.    Attack me, no.  I was standing
14   behind him or off to the side, so I
15   wouldn't be a victim of him attacking me.
16       Q.    Did you believe at the moment
17   that Officer Cheema grabbed Mr. Singh to
18   handcuff him that Mr. Singh was going to
19   attack your partner Officer Walker?
20       A.    No, she was not -- not in that
21   proximity.
22       Q.    Did you believe at the moment
23   that Officer Cheema went to handcuff Mr.
24   Singh that he was about to attack his
25   wife, Mr. Singh's wife?
```

```
                                              Page 1

 1

 2    UNITED STATES DISTRICT COURT

 3    EASTERN DISTRICT OF NEW YORK

 4    CIVIL ACTION NO.:  19-cv-632 NGG-ST

 5    - - - - - - - - - - - - - - - - - - - -x

 6    BALWINDER SINGH,

 7                        Plaintiff,

 8          -against-

 9    THE CITY OF NEW YORK, P.O. MANDEEP CHEEMA,

10    Tax Id. No. 950196, Individually and in

11    his Official Capacity, and POLICE OFFICERS

12    "JOHN DOE" #1-10, individually and in

13    their Official Capacity

14                        Defendants.

15    - - - - - - - - - - - - - - - - - - - -x

16

                      October 27, 2020

17                      2:31 p.m.

18          DEPOSITION of POLICE OFFICER

      MALINDA WALKER, a Non-Party witness in the

19    above-entitled action, held via Veritext

      Virtual, taken before Barbara Tortora, a

20    Shorthand Reporter and Notary Public of

      the State of New York, pursuant to Rule 26

21    et seq. of the Federal Rules of Civil

      Procedure, Notice and stipulations between

22    Counsel.

23                 *      *      *

24

25
```

Page 38

```
1                    WALKER
2        Q.    This aided, Mr. Singh, wasn't
3   arrested or charged with anything; is that
4   correct?
5        A.    Correct.
6        Q.    In your experience, I know it's
7   not very long experience, in your
8   experience as a police officer, if he had
9   committed a crime, would he have been
10  charged with something?
11           MS. FADDIS:  Objection to form.
12      But you can answer.
13       A.    I'm sorry, repeat the question.
14       Q.    Let me rephrase the question.
15           If Mr. Singh committed an
16  offense, a violation or crime of any sort,
17  would he have been charged in this
18  situation?
19           MS. FADDIS:  Objection.  You can
20      answer.
21       A.    If he committed a crime, yes, he
22  would have been arrested.
23       Q.    Certainly a domestic violence
24  type of situation, is it accurate to say,
25  the NYPD has a zero tolerance policy and
```

```
                                        Page 39
 1                    WALKER
 2    must make an arrest if there's an
 3    allegation of domestic violence?
 4              MS. FADDIS:  Objection to form.
 5        You can answer.
 6        A.    To my understanding, yes.
 7        Q.    Do you know if there was a
 8    domestic incident report filed in
 9    connection with this incident?
10        A.    Not that I know of.
11        Q.    You didn't prepare a domestic
12    incident report; is that right?
13        A.    Correct.
14        Q.    If a domestic incident report
15    was created, would you have had that
16    marked in your memo book?
17        A.    Yes.
18        Q.    Is there, like, a DIR number,
19    domestic incident report number that you
20    can reference?
21        A.    What do you mean?
22        Q.    I don't know, you know, like
23    summons have a summons number.  I'm
24    wondering if DIRs have the same kind of
25    thing.
```

```
                                          Page 40
 1                      WALKER
 2        A.      Once it gets input into the
 3   system then, yes, it will have a number.
 4   I wouldn't have that number in my memo
 5   book.
 6        Q.      Under what circumstances are
 7   domestic incident reports usually written?
 8        A.      I'm sorry, repeat that question.
 9        Q.      Under what circumstances are
10   domestic incident reports prepared?
11        A.      If the wife called and said
12   there was a dispute or some type of
13   disagreement, then it would have been
14   prepared.
15        Q.      So you're required to file a DIR
16   when there's some sort of dispute or
17   disagreement between family members?
18        A.      Yes, or an assault or anything.
19        Q.      But there are circumstances
20   under which a DIR is filled out, it's not
21   necessarily a crime and an arrest is not
22   necessarily made; is that correct?
23        A.      I'm sorry, I didn't understand
24   the question.
25        Q.      There are circumstances when a
```

```
                                            Page 41
 1                    WALKER
 2    DIR is completed, even though there isn't
 3    an arrest made?
 4         A.     Correct.
 5         Q.     The NYPD keeps track of even
 6    arguments if police are called; is that
 7    correct?
 8         A.     Correct.
 9         Q.     Generally when there's an
10    argument between spouses or other family
11    members a DIR is required; is that right?
12         A.     Correct.
13         Q.     I'm going to show you the video.
14    Just let me put that up on my computer.
15    Just give me one second.
16              Just to step back for one
17    second.  You know, I know you don't have a
18    lot of recollection of the incident or the
19    substance of the information given by Mr.
20    Singh's wife.  That said, if knowing what
21    you've already told me about the incident,
22    what you remember, that Mr. Singh's wife
23    called the police or called someone for
24    assistance, would this be a situation
25    which a DIR should have been filled out?
```

```
                                                    Page 58
 1                      WALKER
 2        answer.
 3        A.      From the video, it looks like he
 4   put his hand behind his back but then
 5   pulled away and did another movement.
 6        Q.      What was that movement?
 7        A.      He stepped forward.
 8        Q.      Did it look like he was going to
 9   attack anybody?
10        A.      I'm not too sure.
11        Q.      You don't have a recollection of
12   him trying to attack you at that moment at
13   8:03, 8:04?
14        A.      No, I don't remember.
15        Q.      As you sit here today, you don't
16   have any memory of him trying to attack
17   you?
18        A.      No.
19        Q.      You don't have any memory of
20   being in fear of being attacked by Mr.
21   Singh; is that right?
22        A.      Right.
23        Q.      If you were in fear of being
24   attacked, would that be something you
25   would have remembered?
```

# Jordan Haber, MD DACR FACR
## Board Certified Radiologist

1 Greenbriar Lane
Dix Hills, New York 11746
516-673-6530
jhaber@consultingradiologist.com
www.consultingradiologist.com

Gerald Cohen
Cohen & Fitch LLP
110 East 59th Street, Suite 3200
New York, NY 10022

Date: November 30, 2020
Reg: Singh, Balwinder
Date of incident: February 28, 2018

To Whom It May Concern:

**The following examinations have been submitted for review:**
- MRI of the right shoulder performed At Queens Radiology PC on January 17, 2013
- MRI of the right shoulder performed at standup MRI of East Elmhurst PC on December 7, 2016
- MRI of the right shoulder performed at Merge PACS on March 28, 2018
- Operative Note, Dr. Richard Seldes, dated August 16, 2019

**Discussion:**
**MRI of the right shoulder performed January 17, 2013**
Examination was performed utilizing multiple sequences in the transaxial, coronal, and sagittal planes. Examination demonstrates entrapment at the acromioclavicular joint. There is small fluid collection at the subacromial bursa. There are noted local hypertrophic changes at this joint. There are chondral and subchondral changes at the greater tuberosity. A grade 1 slap lesion is noted. There are some mild degenerative changes at the inferior labrum. Examination demonstrates a tear central within the tendon of the supraspinatus without evidence of retraction. The subscapularis tendon appears intact as is the infraspinatus tendon. The long head of the biceps is well situated in the bicipital groove. The osseous structures appear otherwise unremarkable.
My impression:
- Entrapment at the acromioclavicular joint
- Subacromial bursitis
- Tear central within the supraspinatus tendon without evidence of retraction
- Subscapularis and infraspinatus tendons appear unremarkable
- Chondral and subchondral changes are noted at the greater tuberosity
- Grade 1 slap lesion noted

**MRI of the right shoulder performed December 7, 2016**

Submitted history: Right shoulder pain with weakness and numbness with moderate effect on range of motion. Examination was performed in the oblique coronal, sagittal, and transaxial planes. This examination is being compared with the prior examination performed preoperatively on January 17, 2013. Patient is status post rotator cuff repair with subacromial decompression and debridement of the acromial clavicular joint. There is evidence of some mild persistent entrapment demonstrated at the acromial clavicular joint. Examination demonstrates increased signal at the distal end of the supraspinatus muscle just proximal to the tendon. This is consistent with localized myositis. Some reactive changes are noted. Examination demonstrates a tear of the supraspinatus tendon measuring 1.3 cm located on the articular surface. A small joint effusion is noted. Postsurgical changes are noted in the humeral head. Grade 1 slap lesion is noted. Some degenerative changes are noted at the inferior labrum. The long head of the biceps is well situated in the bicipital groove. The subscapularis and infraspinatus tendons appear intact.

My impression:

- Status post rotator cuff surgery with subacromial decompression and debridement of the acromioclavicular joint
- There is evidence of mild residual entrapment demonstrated of the supraspinatus muscle
- There is evidence of some localized myositis at the distal supraspinatus muscle just proximal to the tendon
- Examination demonstrates a 1.3 cm tear of the supraspinatus tendon located at the articular
- Small effusion is present.
- Grade 1 slap lesion is noted
- Degenerative changes at the inferior labrum.

**MRI of the right shoulder performed March 28, 2018**

Submitted history: Patient complains of right shoulder and arm pain with numbness, weakness, and minimal range of motion. Patient is status post-injury reported on February 28, 2018.

Examination was performed in the oblique coronal sagittal and transaxial planes. This examination is being compared with the prior examinations of 2013 and 2016. Status post acromioplasty and debridement as noted on the prior MRI of 2016. Residual entrapment is noted at the supraspinatus muscle with some localized myositis unchanged from the prior examination of 2016. Examination demonstrates a 1.7 cm tear at the articular surface of the supraspinatus which has increased in size compared to the tear formally noted on examination of December 7, 2016, at which time it measured 1.3 cm and extends further into the body of the tendon. Postsurgical changes are noted at the greater tuberosity. Grade 1 slap lesion is noted. Degenerative changes are noted at the posterior labrum. Mild effusion is noted. The long head of the biceps is well situated in the bicipital groove. Examination demonstrates a tear at the subscapularis tendon. The infraspinatus tendon appears intact.

My impression:

- Examination demonstrates some residual entrapment of the supraspinatus muscle with some localized myositis.
- There is evidence of a 1.7 cm tear at the articular surface of the supraspinatus tendon which extends further into the tendinous substance than the tear of the supraspinatus formally identified on the MRI examination of December 7, 2016
- Examination demonstrates a tear of the subscapularis tendon
- Degenerative changes are noted at the posterior labrum
- Grade 1 slap lesion is noted.

**In summary:**

From the perspective of MRI imaging, the MRI performed on January 17, 2013, demonstrated a tear within the central portion of the supraspinatus muscle.  In the interim between the first MRI and the second MRI, the rotator cuff repair was performed.  The follow-up MRI that was performed on Dec 7, 2016, demonstrated a 1.3 cm tear at the articular surface of the supraspinatus.  After the incident of February 28, 2018, a follow-up MRI of the right shoulder was performed.  This follow-up examination performed on March 28, 2018, demonstrated that the tear at the supraspinatus tendon, which was confined to the articular surface, currently extends further into the substance of the tendon and now measures 1.7 cm.  Additionally, there is now evidence on this post-incident MRI of a tear of the subscapularis tendon which was not present on the MRI examination of December 7, 2016.  Within a reasonable degree of medical certainty, the increased size of the tear of the supraspinatus compared to the prior MRI examination of December 7, ,2016, coupled with the presence of a new tear at the subscapularis tendon in the context of the significant increase in pain at the right shoulder following the incident of February 28, 2018, is attributable to this incident.

I, Jordan Haber being a physician duly licensed to practice medicine in the State of New York, pursuant to the applicable provisions of civil practice law and rule section 2106, hereby affirm, under penalties of perjury that the statements contained herein are true and accurate. There is no actual or implicit doctor-patient relationship between the subject of this report and myself. I am prepared to testify in this case at both deposition and trial. As discovery progresses, I will review pertinent records and material and may form additional opinions that I may also express at the trial.

Sincerely,

Jordan Haber M.D.

# GABRIEL L. DASSA, D.O., F.A.A.O.S.

**Board Certified Orthopedic Surgeon**

2772 Third Avenue
Bronx NY 10455
718 993-3536

December 7, 2020

**Patient:**   **Singh, Baldwinder**

## COMPREHENSIVE ORTHOPAEDIC EVALUATION:
## History of Chief Complaint:

The patient is a 40-year-old male who presents today for evaluation for injury sustained on February 28, 2018.  The patient was injured on the above date when he was assaulted by the police.  The patient states that he was drinking at home and was a little intoxicated when his wife called EMS to bring him to the hospital.  The patient states the police did arrive and in the process of handcuffing they tackled him to the ground causing him to land hard on his right shoulder.  The patient also injured his low back.  We reviewed a video that showed the incident and how the patient was forcefully thrown to the ground as he described.  The patient was seen emergently at Jamaica Hospital Emergency Room where he was evaluated.  The patient's record reflects that he did develop an exacerbation of pain for prior injury to the right shoulder as well as his lower back.  The patient was seen by me for an injury which occurred in 2010 and had returned back to work after being out of work for many years.  The patient had returned back to work subsequent to his last evaluation with me in 2017 and was working productively without significant problems until the incident of February 28, 2018.   He began to feel pain in his right shoulder as well as in lumbar spine.  The patient did complete an MRI of the right shoulder on March 28, 2018 documented residual entrapment of the supraspinatus muscle with impingement syndrome and myositis.  There was advancement and worsening of a tear that was seen on an MRI of the same shoulder from December 7, 2016.  On that MRI of December 7, 2016, there was a 1.3 cm tear of the supraspinatus tendon at the articular surface that progressed to 1.7 cm tear at the articular surface.  The patient also was noted to have a SLAP tear.  The patient's MRI study was reviewed by independent radiologist Dr. Jordan Haber.  My colleagues review of this MRI does concur with the advancement of findings in comparison to December 7, 2016 MRI.  The patient's record reflects he did undergo operative arthroscopic surgery by Dr. Richard Seldes on August 16, 2019 where the patient was treated with arthroscopic acromioplasty for impingement syndrome, debridement of rotator cuff tear and SLAP tear as well as distal clavicle excision, excision of loose bodies as well as injection to the right shoulder.

**Page 2**
**Patient:  Singh, Baldwinder**

The patient's postsurgical course continued to be complicated by lower back pain.  The patient did complete an MRI of the lumbar spine which documented advancement of prior lumbar spine pathology.  The patient comes today with complaints of persistent pain in the right shoulder associated with stiffness.  Pain is exacerbated by overhead activity, lifting more than 5 pounds, and any repetitive use of the right arm.  The patient also complains of radiating low back pain.  Pain is exacerbated by sitting for more than 15 minutes.

**Past Medical History:**
1.      Hypertension.
2.      Acid reflux.

**Current Medications**:                    Tylenol.

**Allergies:**                              Seasonal allergies.

**Past Surgical History**:                  Right shoulder surgery.

**Social History**:                         Negative.

**Review of Systems**:                      As per history of present illness.

**Physical Examination:**
Musculoskeletal Examination:

**Right Shoulder:**

Inspection:  There is healed surgical portal.  There is swelling of the right shoulder.

Palpation examination:  There is diffuse tenderness over the right shoulder as well as tenderness over the AC joint.

(Range of motion was measured using handheld goniometer).

| Range of Motion | Normal | Measured Rt. | Lt. |
|---|---|---|---|
| Flexion | 170 degrees | 145 degrees | 170 degrees |
| Abduction | 170 degrees | 145 degrees | 170 degrees |
| Internal rotation | 60 degrees | 35 degrees | 60 degrees |
| External rotation | 90 degrees | 65 degrees | 90 degrees |
| Extension | 30 degrees | 5 degrees | 30 degrees |
| Adduction | 40 degrees | 15 degrees | 40 degrees |

**Page 3**
**Patient:** Singh, Baldwinder

**Lumbosacral Spine:**

Palpation examination: There is myospasm from L1 through L5.

(Range of motion was measured using handheld goniometer).

| Range of Motion | Normal | Measured | |
|---|---|---|---|
| Flexion | 90 degrees | 30 degrees | |
| Extension | 30 degrees | 20 degrees | |
| Lateral Bending | 40 degrees | 10 degrees | right and left |
| Lateral Rotation | 30 degrees | 10 degrees | right and left |

Special Tests: Positive straight leg test on the right at 10 degrees.

Neurologic: Intact.

**Review of Records:**
1.   Hospital records Jamaica Hospital.
2.   August 16, 2019, operative report Richard Seldes, M.D. right shoulder surgery.
3.   Multiple medical records Dr. Richard Seldes.
4.   Medical records Empire Surgical Center.
5.   March 28, 2018, MRI of the right shoulder.
6.   December 7, 2016, MRI of the right shoulder.
7.   February 6, 2017, narrative report Dr. Gabriel Dassa.
8.   November 30, 2020, Dr. Jordan Haber Narrative report.

**Impression:**
1.   Right shoulder sprain/strain superimposed upon prior right shoulder injury and surgery previously recovered.
2.   Exacerbation of worsening of supraspinatus tendon tear with AC joint derangement as well as SLAP tear with articular cartilage damage at the distal clavicle with multiple loose bodies and impingement syndrome.
3.   Status post right shoulder arthroscopic surgery with residual adhesive capsulitis.
4.   Exacerbation of lumbar radiculopathy.
5.   Lumbar sprain/strain superimposed on preexisting lumbar injury.

**Discussion:** The patient was injured on the above date and sustained injuries to several areas of the body. The patient's symptoms and clinical findings are consistent with the above diagnosis and were directly caused by the incident on February 28, 2018.. The patient presents today for evaluation for injuries that were sustained on February 28, 2018. Today's exam revealed restricted range of motion to lumbar spine and right shoulder.

**Page 4**
**Patient:  Singh, Baldwinder**


Today's exam revealed findings of lumbar nerve root compression as evidenced by positive straight leg raise test.  Today's exam revealed findings of adhesive capsulitis to the right shoulder.  It is my professional opinion, with a reasonable degree of medical certainty, that today's evaluation and findings represent objective evidence of persistent orthopedic impairment to the right shoulder.  It is also my opinion, if the history provided in the medical record is true and accurate that the incident, as outlined above, is a competent cause of the patient's injuries and orthopedic impairments.  It is my opinion, given the nature of the patient's injuries with continued subjective pain and abnormal physical findings the patient's impairments remain to be significant and have a significant permanent component.  It is clear that the patient's incident with police of February 28, 2018 is a clear cause of exacerbation of preexisting conditions which had recovered to the point where the patient went from being unemployable to being employed.  There was a significant change in the patient's functional status and his ability to work subsequent to February 28, 2018.  There is objective evidence of worsening of damage to the patient's right shoulder in comparing MRIs of 2016 and February 28, 2018.  Additionally, the patient had increase in radicular symptoms of lumbar spine.  New MRIs of lumbar spine do indicate worsening of previous preexisting lumbar pathology with a new disc herniation at L5-S1.  The patient would benefit from additional treatment in the form of pain management.  He would also benefit from EMGs and NCVs of lower extremities.  Additionally, the patient would benefit from spine surgery consultation.  The patient was examined today and the ranges of motions were recorded using a handheld goniometer.  The values of all measurements were compared to normal range of motion values.  The assessments made were those of passive range of motion, which was recorded independent of the participation of the patient, which is truly an objective assessment.  The patient did not interfere with the proper performance of range of motion assessment.

**Prognosis**:  Guarded.

**Disability Status**:  Permanent.

**Recommended Treatment:**
1.     Physical therapy.
2.     Pain management.
3.     Spine surgery consultation.
4.     EMG and NCV of the lower extremities.

**Return Orthopedic Appointment:**

On a p.r.n. basis.

At least 45 minutes spent with the patient.

**Page 5**
**Patient:** Singh, Baldwinder


**Affidavit**


I, Dr. Gabriel Dassa, D.O., F.A.A.O.S., being a physician being duly licensed and practicing in the State of New York pursuant to CPLR Section 2106, hereby affirm under the penalties of perjury that the statements contained herein are true and accurate.

Gabriel L. Dassa, D.O., F.A.A.O.S.
Board Certified Orthopedic Surgeon

GD/mb



[JA-146]

Case 1:19-cv-00632-EK-ST   Document 46-15   Filed 11/29/21   Page 3 of 10 PageID #: 299



Case 1:19-cv-00632-EK-ST   Document 46-15   Filed 11/29/21   Page 4 of 10 PageID #: 300







Case 1:19-cv-00632-EK-ST   Document 46-15   Filed 11/29/21   Page 7 of 10 PageID #: 301



**[JA-151]**

Case 1:19-cv-00632-EK-ST   Document 46-15   Filed 11/29/21   Page 8 of 15 PageID #: 304





Case 1:19-cv-00632-EK-ST   Document 46-15   Filed 11/29/21   Page 10 of 10 PageID #: 306



```
                                              Page 1
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    -----------------------------------------X
      BALWINDER SINGH,
 3
                              PLAINTIFF,
 4
              -against-     Case 1:19-cv-00632
 5
 6    THE CITY OF NEW YORK, P.O. MANDEEP CHEEMA,
      Tax Id. No. 950196, Individually and in his
 7    Official Capacity, and POLICE OFFICERS
      "JOHN DOE" #1-10, Individually and in their
 8    Official Capacity (the name John Doe being
      fictitious, as the true names are presently
 9    unknown),
10                            DEFENDANTS.
      -----------------------------------------X
11
12                    DATE: October 22, 2020
13                    TIME: 11:12 a.m.
14
15
16         EXAMINATION BEFORE TRIAL of the
17    Non-Party Witness, MARISABEL SCHAPIRA,
18    taken by the Plaintiff, pursuant to a
19    Subpoena, held on a Virtual Zoom, before
20    Alexis A. Vargas, a Notary Public of the
21    State of New York.
22
23
24
25
```

Page 26

1              M. SCHAPIRA

2        Q.     Aside from the paperwork, do

3    you remember responding to that location?

4        A.     Honestly, I get thousands of

5    jobs.  I don't want to sit here and lie,

6    because I really cannot recall anything

7    regarding this job other than what you're

8    showing me in the paperwork.

9        Q.     When you reviewed the

10   paperwork, did that refresh your memory as

11   to anything that happened on this job?

12       A.     Not at all.  Nothing at all.

13       Q.     I'm going to ask you some

14   questions, and maybe it will refresh your

15   memory, and if you don't remember, or you

16   don't know something, just let us know.

17       A.     Okay.

18       Q.     On February 28th of 2018, how

19   were you alerted to the job, or how would

20   you have been alerted to this job at 130-18

21   Atlantic Avenue?

22       A.     The dispatcher sends the jobs.

23       Q.     When the dispatcher sends them,

24   do they come over the radio?

25       A.     They come over the radio and

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------- X
BALWINDER SINGH,

                              Plaintiff,

                 -against-

THE CITY OF NEW YORK, P.O MANDEEP CHEEMA,
Tax Id. No 950196, Individually and in his Official Capacity,
and POLICE OFFICERS "JOHN DOE" #1-10, Individually
and in their Official Capacity,

                             Defendants.
----------------------------------------------------------------- X

**NOTICE OF CROSS-MOTION
FOR SUMMARY JUDGMENT**

19-CV-632 (EK) (ST)

        **PLEASE TAKE NOTICE** that upon defendants The City of New York and Officer Mandeep Cheema's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendants' Motion for Summary Judgment dated September 24, 2021, the Declaration of Senior Counsel Hannah V. Faddis, dated September 24, 2021, and the exhibits annexed thereto, the annexed Local Rule 56.1 Statement, and upon all prior pleadings and proceedings had herein, Defendants will move this Court, before the Honorable Eric Komitee, United States District Judge, at the United States Courthouse for the Eastern District of New York, located at 225 Cadman Plaza East, Brooklyn, New York 11201, at a date and time to be determined by the Court, for an Order, pursuant to Fed. R. Civ. P. 56 granting summary judgment in favor of Defendants and dismissing this action in its entirety, together with such other relief as the Court deems just and proper.

        **PLEASE TAKE FURTHER NOTICE** that plaintiff's reply and opposition papers shall be filed on or before November 12, 2021.

        **PLEASE TAKE FURTHER NOTICE** that defendants' reply papers, if any, shall be filed on or before November 26, 2021.

**[JA-157]**

Dated:      New York, New York
            September 24, 2021

                                GEORGIA M. PESTANA
                                Corporation Counsel of the
                                  City of New York
                                *Attorney for Defendants*
                                100 Church Street, 3rd Floor
                                New York, New York 10007
                                (212) 356-2468

By:    /s/ _____
            Hannah V. Faddis
            *Senior Counsel*

TO:   <u>VIA EMAIL</u>
       Gerald Cohen
       Ilyssa Fuchs
       *Counsel for the Plaintiff*

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X

BALWINDER SINGH,

                                        Plaintiff,

              -against-

THE CITY OF NEW YORK, P.O MANDEEP CHEEMA,
Tax Id. No 950196, Individually and in his Official Capacity,
and POLICE OFFICERS "JOHN DOE" #1-10, Individually
and in their Official Capacity,

                                        Defendants.

------------------------------------------------------------------- X

**DEFENDANTS' RESPONSE
TO PLAINTIFF'S
STATEMENT OF
UNDISPUTED FACTS AND
COUNTER-STATEMENT OF
MATERIAL FACT
PURSUANT TO LOCAL
RULE 56.1NOTICE OF
MOTION FOR SUMMARY
JUDGMENT**

19-CV-632 (EK) (ST)

Defendants the City of New York and Officer Mandeep Cheema, by their attorney,

Georgia M. Pestana, Corporation Counsel of the City of New York hereby submit this statement

pursuant to Local Rule 56.1 of the Local Civil Rules of the United States District Court for the

Southern and Eastern Districts of New York, to set forth material facts as to which they contend

there are no genuine issues to be tried and in response to plaintiff's statement of undisputed facts:

**DEFENDANTS' RESPONSE TO PLAINTIFF'S 56.1 STATEMENT:[1]**

1.      On February 28, 2018, plaintiff, Balwinder Singh, was 5'7" tall and weighed

approximately 190 pounds. (See Relevant Portions of Plaintiff Balwinder Singh Deposition

("Singh Dep."), annexed to the Declaration of Gerald M. Cohen ("Cohen Dec."), Exhibit ("Ex.")

A at 60)

**DEFENDANTS' RESPONSE: Admitted.**

2.      At the time, plaintiff was working for Uber and Lyft as a for-hire driver. (Id. at

23)

---

[1] Defendants' responses appear in **bold** type.

**DEFENDANTS' RESPONSE: Deny the substance and materiality of these factual allegations. Plaintiff testified that he believed he was working for Uber in February 2018, but did not start working for Lyft until sometime later that year. (Deposition Transcript of Plaintiff Balwinder Singh ("Pl. Dep. Tr."), annexed to the Declaration of Hannah V. Faddis ("Faddis Decl.) as Exhibit "C", 23:1-24:14).**

3.    Many years prior to this incident, in 2004, plaintiff received treatment for alcohol abuse. (Id. at 13)

**DEFENDANTS' RESPONSE: Admit the substance of plaintiff's testimony, but deny the materiality of these factual allegations.**

4.    On February 28, 2018, plaintiff had an alcohol relapse. (Id.  at 31).

**DEFENDANTS' RESPONSE: Deny the substance and materiality of these factual allegations. The testimony cited by plaintiff does not support the fact alleged, except insofar as plaintiff testified that on February 28, 2018, he consumed alcohol.**

5.    Specifically, that morning, plaintiff came home at approximately 1:00 a.m., after having had a drink with an old friend, and continued to drink a six-pack of beer.  (Id.)

**DEFENDANTS' RESPONSE: Deny the factual allegations insofar as the testimony cited by plaintiff does not support the facts alleged, except that plaintiff testified that on February 28, 2018, he consumed alcohol with a friend, purchased a six-pack of beer on the way home, and came home sometime after midnight. (Pl. Dep. Tr., Faddis Decl., Ex. C, 31:7-32:1).**

6.    Plaintiff became intoxicated from drinking the beer. (See Relevant Portions of Mandeep Cheema Deposition ("Cheema Dep."), Cohen Dec., Ex. C at 71-72)

**DEFENDANTS' RESPONSE: Admit that plaintiff was intoxicated on February 28, 2018.**

7.      At approximately 6:15 am plaintiff's wife, Amandeep Kaur, called 911 to have Mr. Singh taken to the hospital to be evaluated. (Audio Recording of 911 Call ("911 Call"), Cohen Dec., Ex. D)

**DEFENDANTS' RESPONSE: Admit and respectfully refer the Court to the evidence cited.**

8.      Ms. Kaur was concerned for her husband's health and wanted him taken to the hospital to be evaluated. (See Relevant Portions of Amandeep Kaur Deposition ("Kaur Dep."), Cohen Dec., Ex. B at 17-18).

**DEFENDANTS' RESPONSE: Admit and respectfully refer the Court to the evidence cited.**

9.      At no point during her call with 911, did Ms. Kaur allege that plaintiff assaulted or threatened to assault her, nor did she allege plaintiff had committed any crime against her. (911 Call, Ex. D).

**DEFENDANTS' RESPONSE: Deny and respectfully refer the Court to the entirety of the referenced 911 call.  Ms. Kaur told the 911 operator that she and the plaintiff were fighting. (911 Call, Faddis Decl., Ex. P)**

10.      At approximately 6:30 am two Emergency Medical Technicians ("EMTs"), Nicole Milonas and Marisabel Schiapira, arrived at plaintiff's home located at 130-18 Atlantic Ave. 3rd, Queens, NY 11419. (See Pre-Hospital Care Report Summary ("PHC Report"), Cohen Dec., Ex. F)

**DEFENDANTS' RESPONSE: Admit.**

3

11.     Neither EMT had an independent recollection of responding to plaintiff's home on February 28, 2018. (See Relevant Portions of Nicole Milonas Deposition ("Milonas Dep."), Cohen Dec., Ex. E 29; Relevant Portions of Marisabel Schiapira Deposition ("Schiapira Dep."), Cohen Dec., Ex. M at 26).

**DEFENDANTS' RESPONSE: Admit that at the time of their depositions in this action, neither EMT had an independent recollection of the underlying events.**

12.     However, Nicole Milonas prepared a Prehospital Care Report Summary documenting this incident. (PHC Report, Ex. F)

**DEFENDANTS' RESPONSE: Admit.**

13.     In the Prehospital Care Report Summary (PCR), she reported that plaintiff had a Glasgow Coma Score (GCS) of 15. (Milonas Dep., Ex. E at 85-86; (PHC Report, Ex. F).

**DEFENDANTS' RESPONSE: Admit.**

14.     Ms. Milonas explained that a person with a GCS of 15 means "they are oriented, they are able to follow basic commands and they are able to walk on their own." (Milonas Dep., Ex. E at 18).

**DEFENDANTS' RESPONSE: Admit the substance, but deny the materiality of the facts alleged, insofar as EMT Milonas testified that plaintiff lacked capacity to refuse medical attention on February 28, 2018.  (Milonas Dep. Tr., Ex. G, Faddis Decl., 60:10-12).**

15.     A person with a GCS of 15 is generally capable of refusing medical attention. (Id. at 18-19)

**DEFENDANTS' RESPONSE: Admit.**

4

16.     Ms. Milonas's report also indicated that plaintiff was breathing normally, he was alert, and his skin color was normal. (PHC Report, Ex. F;  Milonas Dep., Ex. E 85-87)

**DEFENDANTS' RESPONSE: Admit.**

17.     Ms. Milonas determined that plaintiff was not suffering from alcohol poisoning. (Milonas Dep., Ex. E at 60).

**DEFENDANTS' RESPONSE: Deny.   EMT Milonas testified that there was no indication in the PCR that the plaintiff was suffering from alcohol poisoning. (Milonas Dep., Ex. G, Faddis Decl., 59:12-60:9).**

18.     While Ms. Milonas had no recollection as to whether plaintiff stated he was going to harm himself, she stated that if he had made any statements to that effect, she would have included that in her report. (Id. at 50) ("Q. If he would have said that he was going to hurt himself, is that something you would have put in the report? A. Yes, that is something I would have put in the report.").

**DEFENDANTS' RESPONSE: Admit.**

19.     Plaintiff never told the EMTs that he was suicidal or had any intention of harming himself. (Id.)

**DEFENDANTS' RESPONSE: Deny the substance and materiality of the facts alleged.   EMT Milonas testified that there was no indication in the PCR regarind any threats of suicide or self-harm, and that plaintiff's wife stated that plaintiff posed a risk of harm to himself. (Milonas Dep., Ex. G, Faddis Decl., 50:8-51:9, 95:9-17).**

20.     Plaintiff was being uncooperative with the EMTs and refused to go to the hospital.  (Milonas Dep., Ex. E 55-56).

5

**DEFENDANTS' RESPONSE: Admit and respectfully refer the Court to the cited evidence.**

21.    The EMTs requested police officers respond to plaintiff's apartment.  (Id.)

**DEFENDANTS' RESPONSE: Admit and respectfully refer the Court to the cited evidence.**

22.    When the police arrived at Mr. Singh's apartment, plaintiff was sitting on his couch. (See Video of Incident ("Video"), Cohen Dec., Ex. G(1)[2] at 0:00-0:10).

**DEFENDANTS' RESPONSE: Admit.**

23.    At no point on February 28, 2018, did the EMTs ever inform the police that plaintiff attempted to physically harm them. (Cheema Dep., Ex. C at 74, 130) ("Q. Did you get informed by anybody that he was attempting physical harm, like the EMTs, or his wife? A. They didn't tell that to me.) (See Relevant Portions of Justin Davis Deposition ("Davis Dep."), Cohen Dec., Ex. I at 68).

**DEFENDANTS' RESPONSE: Deny.  The EMTs informed Officer Cheema that plaintiff was uncooperative to a point where they felt unsafe (Cheema Dep. Tr., Ex. D, Faddis Decl., 71:20-72:5) and that they had concerns for their safety. (Cheema Dep. Tr., Ex. D, Faddis Decl., 79:9-16).**

24.    At no point on February 28, 2018, did plaintiff's wife, Ms. Kaur, tell the police officers that plaintiff physically assaulted her. (Davis Dep., Ex. I at 67; (Cheema Dep., Ex. C at 130).

**DEFENDANTS' RESPONSE: Admit.**

---

[2] Attached as **Exhibit G(1)** is the full Video Recording of the incident occurring on February 28, 2018. Additionally attached is **Exhibit G(2)**, which is the portion of the Video that shows the use of force against plaintiff in real-time and **Exhibit G(3)**, which is the portion of the Video that shows the use of force against plaintiff in slow motion.

25.     At no point on February 28, 2018, while the police officers were present inside plaintiff's apartment, did plaintiff attempt to physically assault anybody inside the apartment. (Cheema Dep., Ex. C at 130) (Q. So, Mr. Singh did not engage in any explicit attempted physical harm to others, right? A. He didn't try to punch anybody. He didn't try to kick anybody or anything. He didn't ball his fist. He didn't show any signs in his body, like, during the whole incident that he was going to explicitly hit somebody.)

**DEFENDANTS' RESPONSE: Deny substance and materiality of the facts alleged, insofar as plaintiff subjective intent is legally irrelevant.  Further, Officer Cheema and Officer Davis testified that they believed the plaintiff posed a physical threat when he raised his hands and took a sudden step toward Officer Walker.  (See ¶¶ 98-106, *infra*).**

26.     At no point on February 28, 2018, did anyone, including the EMTs and Ms. Kaur, report to the officers who responded plaintiff's apartment that plaintiff had committed any crime or violation of the law. (Davis Dep., Ex. I at 67-68) (Q. Throughout the entire time you were there, no one in the apartment told you he had committed a crime prior to your arrival? A. No.) (Cheema Dep., Ex. C at 130-132).

**DEFENDANTS' RESPONSE: Admit except insofar as the EMTs reported to police that they felt threatened by the plaintiff. See ¶ 23, *supra*.**

27.     At no point on February 28, 2018, did any of the officers observe plaintiff commit any crime or violation of the law. (Davis Dep., Ex. I at 67-68 ("Q. Throughout the entire time you were there you didn't observe Mr. Singh commit a crime, correct? A. No."). (Cheema Dep., Ex. C at 130-132).

7

**DEFENDANTS' RESPONSE: Deny the substance and materiality of the facts alleged, and respectfully refer the Court to ¶¶ 23-25.**

28.　　At no point on February 28, 2018, did plaintiff ever indicate to any of the police officers that he was suicidal or he intended to harm himself. (<u>Id</u>. at 81-82).

**DEFENDANTS' RESPONSE: Deny the substance of the facts alleged, and state that Officer Cheema observed plaintiff's behavior to be erratic (<u>See</u> ¶ 87), was aware that the EMTs had determined that he had signs of an altered mental state, and that they could not leave him for fear that something might happen to him (<u>See</u> ¶ 83), and that Officer Cheema agreed with the EMTs assessment that plaintiff required medical attention. (<u>See</u> ¶92).**

29.　　Shortly after entering his apartment on February 28, 2018, the police officers attempted to convince plaintiff to voluntarily go to the hospital to get evaluated. (<u>Id</u>. at 82).

**DEFENDANTS' RESPONSE: Admit.**

30.　　Officer Cheema told plaintiff that if he did not go voluntarily to the hospital, then the officers would have to handcuff plaintiff and take him to the hospital without his consent. (<u>Id</u>. at 84-89).

**DEFENDANTS' RESPONSE: Deny and respectfully refer the Court to the evidence cited.**

31.　　Given those choices, plaintiff begrudgingly agreed to go to the hospital without being handcuffed. (<u>Id</u>. at 97-98).

**DEFENDANTS' RESPONSE: Deny.  Plaintiff testified that he agreed with his wife that he would go to the hospital before police officers arrived. (Pl. Dep. Tr., Ex. C, Faddis Decl., 43:7-11).**

8

32.     Upon agreeing to go to the hospital, plaintiff began to get dressed and readied himself to go to the hospital. (Video, Ex. G(1) at 4:07-8:00)

**DEFENDANTS' RESPONSE: Admit that at some point during the incident, plaintiff began to put on additional clothes. (Police Video, Ex. O, Faddis Decl.)**

33.     Just as he was finished getting dressed, plaintiff jokingly told the police officers that he no longer wanted to go to the hospital. (Cheema Dep., Ex. C at 101).

**DEFENDANTS' RESPONSE: Deny.  The cited evidence does not support the facts alleged.**

34.     The plaintiff then put his arms behind his back and jokingly told Officer Cheema that he was going to have to handcuff him. (Id.)

**DEFENDANTS' RESPONSE: Deny.  The cited evidence does not support the facts alleged, except admit that plaintiff told Officer Cheema to handcuff him. (Cheema Dep. Tr., 101:12-15).**

35.     Plaintiff then quickly brought his hands forward, smiled back in Cheema's direction, and said, "I'm just joking. You're not going to handcuff me," as he took a step forward towards the door with his hands up in front of him. (Id. at 102).

**DEFENDANTS' RESPONSE: Admit.**

36.     As plaintiff took this step forward, he did not ball up his fist. (Id. at 103)

**DEFENDANTS' RESPONSE: Deny.  The evidence cited does not support the facts alleged.  Officer Cheema testified that he did not know if plaintiff balled his fist, because he was standing behind him. (Cheema Dep. Tr., Ex. D, Faddis Decl., 103:21-25; Police Video, Ex. O, Faddis Decl., 7:45-8:20).**

37.     As plaintiff took this step forward, he did not say anything to indicate he was going to attack anybody. (Id. at 103-105)

**DEFENDANTS' RESPONSE: Deny.  The evidence cited does not support the facts alleged.  Officer Cheema testified that he did not remember the plaintiff saying anything as he stepped toward Officer Walker. (Cheema Dep. Tr., Ex. D, Faddis Decl., 104:4-9).**

38.     Officer Cheema believed that plaintiff took a step forward towards Officer Walker.  (Id. at 103-104).

**DEFENDANTS' RESPONSE: Admit that plaintiff took a sudden step toward Officer Walker. (Cheema Dep. Tr., Ex. D, Faddis Decl., 103:4-6, 167:16-25; Police Video, Ex. O, Faddis Decl., 7:57-8:04).**

39.     In response to plaintiff taking this step forward, Officer Cheema grabbed and then slammed plaintiff down to the ground to handcuff him. (Video, Ex. G(1) at 8:03-8:06; G(2); G(3))

**Defendants' Response: Admit that Officer Cheema took plaintiff to the ground after plaintiff took a step toward Officer Walker.  (Cheema Dep. Tr., Ex. D, Faddis Decl., 105:13-24; Police Video, Ex. O, Faddis Decl., 7:57-8:04).**

40.     Plaintiff suffered an aggravation of a prior right shoulder injury from being taken down to the ground. (See Plaintiff's Expert Reports ("Expert Reports), Cohen Dec., Ex. K)

**DEFENDANTS' RESPONSE: Deny the substance and materiality of the facts alleged, insofar as the evidence cited is opinion, not fact, and state further that causation of any alleged injury is a question of fact for a jury.**

10

41.     Plaintiff also received an abrasion to his face from the impact of hitting the floor. (See Photos of Plaintiff's Face Injury ("Photos"), Cohen Dec., Ex. L; PHC Report, Ex. F)

**DEFENDANTS' RESPONSE: Deny the substance and materiality of the facts alleged, insofar as the evidence cited is opinion, not fact, and state further that causation of any alleged injury is a question of fact for a jury.**

42.     The video shows plaintiff beginning to walk past Officer Walker towards the door before Officer Cheema grabbed and slammed him to the ground. (Video, Ex. G(1) at 8:02; G(2); G(3)).

**DEFENDANTS' RESPONSE: Deny the characterization of video evidence, and respectfully refer the Court to the cited evidence.**

43.     Officer Davis did not believe plaintiff was going to attack Officer Walker when he took the step forward. (Davis Dep., Ex. I at 82) (Q. Did you believe at the moment that Officer Cheema grabbed Mr. Singh to handcuff him that Mr. Singh was going to attack your partner Officer Walker? A. No, she was not -- not in that proximity.)

**DEFENDANTS' RESPONSE: Deny and respectfully refer the Court to the entirety of Officer Davis's testimony.  Officer Davis testified repeatedly that he believed it was a possibility, at the moment that plaintiff stepped in Officer Walker's direction, that he could attack anyone, including her.  Officer Davis further described the plaintiff's behavior as erratic.  (Davis Dep. Tr., Ex. E, Faddis Decl., 120:15-122:24).**

44.     Officer Davis did not believe plaintiff was going to attack him when he took the step forward. (Id.) (Q. Did you think at the moment that Officer Cheema reached out to Mr. Singh he was going to attack you?... A. Attack me, no. I was standing behind him or off to the side, so I wouldn't be a victim of him attacking me.)

**DEFENDANTS' RESPONSE: Deny and respectfully refer the Court to the entirety of Officer Davis's testimony. Officer Davis testified repeatedly that he believed it was a possibility, at the moment that plaintiff stepped in Officer Walker's direction, that he could attack anyone, including her. Officer Davis further described the plaintiff's behavior as erratic. (Davis Dep. Tr., Ex. E, Faddis Decl., 120:15-122:24).**

45.     Officer Davis did not attempt to handcuff plaintiff before Officer Cheema did. (Id. at 80-81).

**DEFENDANTS' RESPONSE: Deny and state that Officer Davis assisted Officer Cheema in handcuffing plaintiff. (Davis Dep. Tr., Ex. E., Faddis Decl., 78:15-21).**

46.     Officer Walker does not have any memory of being in fear of being attacked by Mr. Singh. (See Relevant of Malinda Walker Deposition ("Walker Dep.") Cohen Dec., Ex. J at 58) ("Q. You don't have any memory of being in fear of being attacked by Mr. Singh; is that right? A. Right").

**DEFENDANTS' RESPONSE: Admit that Officer Walker had almost no independent recollection of the incident involving Mr. Singh at the time of her deposition.**

47.     New York City Police Officers are supposed to prepare Domestic Incident Reports anytime they respond to a dispute or crime involving family members. (Cheema Dep., Ex. C at 196-197) (Q. Officer Cheema, under what circumstances do you fill out a Domestic Incident Report? A. A Domestic Incident Report would be if you have any kind of dispute, or any kind of crime that was alleged between people who are in a family type relationship.).

**DEFENDANTS' RESPONSE: Admit the substance of Officer Cheema's testimony, but deny the materiality of these factual allegations.**

12

48.     None of the officers who responded to plaintiff's home on February 28, 2018, prepared a domestic incident report. (Cheema Dep., Ex. C at 196-198; Davis Dep., Ex. I at 73-74; Walker Dep., Ex. J at 39)

**DEFENDANTS' RESPONSE: Admit the substance, but deny the materiality of these factual allegations.**

**DEFENDANTS' STATEMENT OF MATERIAL FACTS**

A.  Parties

49.     On February 28, 2018, plaintiff Balwinder Singh resided at 131-18 Atlantic Avenue, Queens, New York (the "location"). (Complaint, Ex. A, Faddis Decl., ¶ 13).

50.     On February 28, 2018, Officer Mandeep Cheema was a member of the New York City Police Department ("NYPD") assigned to the 102nd Precinct in Queens.  (Cheema Dep. Tr., Ex. C, Faddis Decl., 35:14-19).

B.  Plaintiff's Spoliation of Evidence

51.     Plaintiff maintained a home security video system which recorded one view of the interior of his apartment, including a portion of the living room, kitchen, front door, and hallway. (Pl. Dep. Tr., Ex. C, Faddis Decl., 109:3-19).

52.     Plaintiff's home security video system records sound. (Pl. Dep. Tr., Ex. C, Faddis Decl., 115:23-116:12)

53.     Plaintiff produced in this action video from his home security system, bearing time stamps from 6:32 a.m. to 6:37 a.m. ("EMS Video," Ex. N, Faddis Decl.) and 6:44:42 a.m. to 6:53:34 a.m. ("Police Video," Ex. O, Faddis Decl.)

54.     The videos produced by plaintiff in this action are video recordings taken with a cell phone of playback from the plaintiff's home security video system. (Pl. Dep. Tr., Ex. C, Faddis Decl., 113:17-22).

55.     Plaintiff deleted the remainder of the video from his home security system from February 28, 2018. (Pl. Dep. Tr., Ex. C, Faddis Decl., 113:17-114:11).

C.   Plaintiff is Highly Intoxicated

56.     On the evening of February 27, 2018, plaintiff was drinking with his friend, Rupel Singh.  (Pl. Dep. Tr., Ex. C, Faddis Decl., 31:7-22, 33:10-13).

57.     Plaintiff does not recall where they were drinking. (Pl. Dep. Tr., Ex. C, Faddis Decl., 32:2-8).

58.     Plaintiff does not recall how many drinks he had on the evening of February 27, 2018, but approximated that he consumed between five and six beers.  (Pl. Dep. Tr., Ex. C, Faddis Decl., 31:7-22, 35:2-4).

59.     Plaintiff does not recall what time he arrived home on the morning of February 28, 2018. (Pl. Dep. Tr., Ex. C, Faddis Decl., 143:21-24).

D.   Plaintiff's Wife Summons Assistance

60.     At approximately 6 a.m., plaintiff's wife, Amandeep Kaur found him drinking in the living room of their apartment. (Pl. Dep. Tr., Ex. C, Faddis Decl., 35:20-22).

61.     Plaintiff's wife, Amandeep Kaur, called 911 at approximately 6:15 a.m. on February 28, 2018. (911 Call, Ex. P, Faddis Decl.; Pre-Hospital Care Report ("PCR"), Ex. L, Faddis Decl.; ICAD 911 Event Chronology ("ICAD"), Ex. K, Faddis Decl.)

62.     Ms. Kaur reported to the 911 operator that her husband, the plaintiff, drank too much. (911 Call, Ex. P, Faddis Decl.)

63.    Ms. Kaur reported to the 911 operator that the plaintiff needed to go to a hospital. (911 Call, Ex. P, Faddis Decl.)

64.    Ms. Kaur reported to the 911 operator that she and the plaintiff were fighting. (911 Call, Ex. P, Faddis Decl.)

E.    Emergency Medical Services Respond

65.    At approximately, 6:28 a.m., two emergency medical technicians ("EMTs") from Jamaica Hospital Medical Center, EMT Nicole Milonas and EMT Marisabel Schiapira, arrived at the location. (PCR, Ex. L, Faddis Decl.)

66.    The plaintiff's wife, Ms. Kaur, told the EMT Milonas that he had been drinking and was not acting normal. (PCR, Ex. L, Faddis Decl.)

67.    The plaintiff's wife, Ms. Kaur, told EMT Milonas that plaintiff was a harm to himself. (PCR, Ex. L, Faddis Decl.)

68.    EMT Milonas noted that plaintiff was alert and oriented with "periods of inconsistency," meaning "he was able to answer [four questions], but there was a problem with his rationality where he was speaking and it was incomprehensible or unclear.  He wasn't directly answering our questions when we were discussing other things.  He wasn't able to take what we were saying, understand it and respond." (Milonas Dep. Tr., Ex. G, Faddis Decl., p. 44:11-23; PCR, Ex. L, Faddis Decl.).

69.    EMT Milonas noted that plaintiff had a semi steady gait, meaning "he's probably able to stand up, but he's not balanced." (Milonas Dep Tr., Ex. G, Faddis Decl., p. 44:24-45:10; PCR, Ex. L, Faddis Decl.).

70.    EMT Milonas noted that plaintiff was "in an irrational state," meaning that "he was incoherent, he wasn't able to take what we were saying, understand it, and formulate a

15

response that was of a rational thinking." (Milonas Dep. Tr., Ex. G, Faddis Decl., p. 45:11-22; PCR, Ex. L, Faddis Decl.).

71.     EMT Milonas noted that the plaintiff was "not cooperative with unit questioning," meaning EMTs "were trying to ask him questions, especially during an assessment, and he was not forthcoming.  He did not want to cooperate, answer the questions we were asking." (Milonas Dep. Tr., Ex. G, Faddis Decl., p. 46:5-16; PCR, Ex. L, Faddis Decl.).

72.     EMT Milonas noted that the plaintiff "became aggressive with crew.  Patient began yelling profanities and belligerently approaching crew," meaning "there was a threat." (Milonas Dep. Tr., Ex. G, Faddis Decl., p. 46:17-47:5; PCR, Ex. L, Faddis Decl.).

73.     EMT Milonas concluded that plaintiff needed medical treatment. (Milonas Dep. Tr., Ex. G, Faddis Decl., p. 58:18-22).

74.     EMT Milonas concluded that plaintiff was unable to refuse medical attention, because, "He did not meet the criteria.  He did not have rational thinking.  He was able to stand, but he did not have a complete steady gait, so he did not fit the criteria where he was able to refuse care.  He did not have that decision making capacity." (Milonas Dep. Tr., Ex. G, Faddis Decl., p. 60:10-22).

75.     At approximately 6:38 a.m., the EMTs requested police assistance at the location. ("PLZ SEND RMP [radio motor patrol car], UNCO-OP PT", ICAD, Ex. K, Faddis Decl., p. 2)

76.     At approximately 6:44 a.m., the EMTs again requested police assistance at plaintiff's home.  ("RMP NEEDED ASAP," ICAD, Ex. K, Faddis Decl., p. 3).

77.     Plaintiff deleted the video from his home security system for the period of time during which the EMTs were requesting police assistance. (Pl. Dep. Tr., Ex. C, Faddis Decl., 113:17-114:25; EMS Video, Ex. N, Faddis Decl.; Police Video, Ex. O, Faddis Decl.)

16

F.   NYPD Officers Respond

78.   At approximately 6:44 a.m., defendant Officer Mandeep Cheema arrived at plaintiff's home with his two partners, Officer Justin Davis and Officer Malinda Walker. (Police Video, Ex. O, Faddis Decl.; Cheema Dep. Tr., Ex. D, Faddis Decl., 32:22-24).

79.   The officers spoke with the plaintiff, his wife, and the EMTs. (Cheema Dep. Tr., Ex. D, Faddis Decl., 71:17-19, 78:12-14).

80.   When Officer Cheema arrived at the apartment, he spoke with one of the EMTs. (Cheema Dep. Tr., Ex. D, Faddis Decl., 70:1-7).

81.   When Officer Cheema arrived at the apartment, he observed that plaintiff was intoxicated.  (Cheema Dep. Tr., Ex. D, Faddis Decl., 114:3-9).

82.   Officer Cheema was informed by one of the EMTs that plaintiff was being uncooperative with them to the point that they felt unsafe. (Cheema Dep. Tr., Ex. D, Faddis Decl., 71:20-71:5; 74:9-16).

83.   Officer Cheema understood from the EMTs that plaintiff was "intoxicated.  He was incoherent.  He had signs of an altered mental state, and that they couldn't leave him for fear that something might happen to him if they didn't get him evaluated." (Cheema Dep. Tr., Ex. D, Faddis Decl., 72:19-73:3).

84.   Plaintiff's wife thought that plaintiff needed to go to the hospital. (Kaur Dep. Tr., Ex. I, Faddis Decl., 30:12-14).

85.   Officer Cheema spoke with the plaintiff and asked him to voluntarily go to the hospital. (Cheema Dep. Tr., Ex. D, Faddis Decl., 84:7-89:12).

86.   Officer Cheema spoke "nicely" with the plaintiff. (Pl. Dep. Tr., Ex. C, Faddis Decl., 47:6-10).

17

87.    The plaintiff was "pissed off" when police arrived at the location. (Pl. Dep. Tr., Ex. C, Faddis Decl., 46:6-15).

88.    The plaintiff was incoherent and argumentative.  ("He was rambling a lot.  He was very incoherent.  I couldn't get anything out of him.  It was a lot of yelling and cursing in English and in Punjabi, which I understood." Cheema Dep. Tr., Ex. D, Faddis Decl., 74:4-8).

89.    The plaintiff told his wife in Punjabi, in sum and substance, that it was her fault EMS and police were in the apartment, that she should not speak with them, and that "he was going to take some type of action towards her once [they] left." (Cheema Dep. Tr., Ex. D, Faddis Decl., 75:14-76:24).

90.    Officer Cheema told the plaintiff that the police and EMS had determined that he needed medical attention, and if he would not go to the hospital voluntarily, they would have to take him involuntarily. (Cheema Dep. Tr., Ex. D, Faddis Decl., 85:3-86:16).

91.    Plaintiff's wife wanted him to go to the hospital. (Pl. Dep. Tr., Ex. C, Faddis Decl., 42:23-25, 44:12-17).

92.    Plaintiff's brother wanted him to go to the hospital. (Pl. Dep. Tr., Ex. C, Faddis Decl., 57:13-18).

93.    Officer Cheema agreed with the EMTs assessment that plaintiff was so intoxicated that he required medical attention. (Cheema Dep. Tr., Ex. D, Faddis Decl., 95:4-11).

94.    At some point, plaintiff started to get dressed. (Cheema Dep. Tr., Ex. D, Faddis Decl, 95:12-14).

95.    When plaintiff began to get dressed, Officer Cheema believed the plaintiff was cooperating in going to the hospital (Cheema Dep. Tr., Ex. D, Faddis Decl., 97:8-11).

18

96.     After getting dressed, plaintiff changed his mind about going to the hospital and said, "I don't want to go." (Cheema Dep. Tr., Ex. D, Faddis Decl., 99:25-100:20).

97.     At that point, Officer Cheema told him they would have to handcuff him to take him to the hospital. (Cheema Dep. Tr., Ex. D, Faddis Decl., 101:18-25).

98.     When Officer Cheema told the plaintiff he would have to handcuff him, the plaintiff said "Fine. You're going to have to handcuff me" and put his hands behind his back. (Cheema Dep. Tr., Ex. D, Faddis Decl., 101:18-25).

99.     Officer Cheema was getting ready to handcuff plaintiff, when plaintiff pulled his arms to the front, saying, "I'm just joking. You're not going to handcuff me," raises his hands to his chest, and took a sudden step toward Officer Walker.  (Cheema Dep. Tr., Ex. D, Faddis Decl., 102:2-17; Pl. Dep. Tr., Ex. C, Faddis Decl., 53:6-15).

100.    On February 28, 2018, Officer Walker was 5 feet two inches tall, and weighed approximately 140 pounds.  (Walker Dep. Tr., Ex. F, Faddis Decl., 6:2-13).

101.    Officer Walker flinched when plaintiff took a sudden step toward her. (Police Video, Ex. O, Faddis Decl., 8:02).

102.    At the time plaintiff took a sudden step toward Officer Walker, Officer Cheema was standing behind the plaintiff. (Police Video, Ex. O, Faddis Decl., 8:02)

103.    At that point, based on the preceding events, Officer Cheema felt the scene was no longer safe. (Cheema Dep. Tr., Ex. D, 102:10-103:14).

104.    In response, Officer Cheema grabbed plaintiff from behind, wrapping his arms across his chest in a seatbelt hold, and took him to the ground. (Cheema Dep. Tr., 102:18-103:3; Police Video, Ex. O, Faddis Decl.; Pl. Dep. Tr., Ex. C, Faddis Decl., 62:5-12).

19

105.    Officer Cheema and Officer Davis handcuffed the plaintiff on the floor. (Cheema Dep. Tr., Ex. D, 102:18-103:3).

106.    After plaintiff was handcuffed, all three officers assisted him in standing up. (Police Video, Ex. O, Faddis Decl., 8:00-8:21).

107.    Officer Walker believed that taking plaintiff to the floor was a reasonable response to his unexpected movement. (Walker Dep. Tr., Ex. F, 60:18-61:1).

108.    Officer Davis believed it was a possibility, at the moment that plaintiff stepped in Officer Walker's direction, that he could attack anyone, including her.  (Davis Dep. Tr., Ex. E, Faddis Decl., 120:15-122:24).

109.    Officer Davis did not see a tactically sound alternative means of restraining the plaintiff after he took the sudden step toward Officer Walker other than taking him to the floor. (Davis Dep. Tr., Ex. E, Faddis Decl., 126:4-128:4).

110.    The officers escorted plaintiff down the stairs to the ambulance, which transported him to JHMC.  (Police Video, Ex. O, Faddis Decl., 8:20-8:30; PCR, Ex. L, Faddis Decl., JHMC Recs., Ex. M, Faddis Decl.)

    G.  Plaintiff Was Transported to Jamaica Hospital Medical Center

111.    Plaintiff arrived at JHMC at approximately 7:48 a.m., almost two hours after his wife called 911.    (JHMC Recs., Ex. M, Faddis Decl., p. 1).

112.    At approximately 8:06 a.m., a blood sample was taken from the plaintiff by JHMC for alcohol screening. (JHMC Recs., Ex. M, Faddis Decl., p. 19).

113.    Plaintiff's blood alcohol level, two hours after his wife called 911, was 247 mg/dL. (JHMC Recs., Ex. M, Faddis Decl., p. 19).

114.    The New York State Vehicle and Traffic Law defines intoxication as any blood alcohol level exceeding 80 mg/dL.  N.Y. V.T.L. § 31-1192.

115.    JHMC staff noted the plaintiff was "hand cuffed by police, verbally abusive, noisy and uncooperative." (JHMC Recs., Ex. M, Faddis Decl., p. 5).

116.    Plaintiff's wife reported to JHMC staff that she called 911 because she was concerned about his drinking habits because plaintiff has liver disease. (JHMC Recs., Ex. M, Faddis Decl., p. 15).

117.    The officers left the plaintiff at the hospital approximately 40 minutes after his arrival.  (Cheema Dep. Tr., Ex. D, Faddis Decl., 185:9-12).

118.    Plaintiff was discharged from JHMC at approximately 3:06 p.m. on February 28, 2018.  (JHMC Recs., Ex. M, Faddis Decl., p. 1).

Dated:        New York, New York
              September 24, 2021

                            GEORGIA M. PESTANA
                            Corporation Counsel of the
                             City of New York
                            *Attorney for Defendants*
                            100 Church Street, 3rd Floor
                            New York, New York 10007
                            (212) 356-2468


              By:   /s/
                            Hannah V. Faddis
                            *Senior Counsel*


TO:   VIA EMAIL
      Gerald Cohen
      Ilyssa Fuchs
      *Counsel for the Plaintiff*

21

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
BALWINDER SINGH,

                              Plaintiff,

              -against-

THE CITY OF NEW YORK, P.O MANDEEP CHEEMA,
Tax Id. No 950196, Individually and in his Official Capacity,
and POLICE OFFICERS "JOHN DOE" #1-10, Individually
and in their Official Capacity,

                              Defendants.
------------------------------------------------------------------- X

**DECLARATION OF
HANNAH V. FADDIS IN
SUPPORT OF
DEFENDANTS' MOTION
FOR SUMMARY
JUDGMENT**

19-CV-632 (EK) (ST)

     HANNAH V. FADDIS, an attorney duly admitted to practice in the Courts of New York,

declares under penalty of perjury and pursuant to 28 U.S.C. § 1746 that the following is true and

correct:

     1.     I am a Senior Counsel in the office of Georgia M. Pestana, Corporation Counsel of

the City of New York, and the attorney assigned to represent defendants The City of New York

and Officer Mandeep Cheema.  As such, I am familiar with the facts and circumstances stated

herein and submit this declaration in support of defendants' Motion for Summary Judgment

pursuant to Fed. R. Civ. P. 56.

     2.     Annexed hereto as Exhibit "A" is a true and correct copy of the Complaint filed by

plaintiff in this matter in the Eastern District of New York. (ECF No. 1).

     3.     Annexed hereto as Exhibit "B" is a true and correct copy of defendants' Answer to

the Complaint.  (ECF No. 9).

     4.     Annexed hereto as Exhibit "C" is a true and correct copy of transcript of the

deposition of plaintiff Balwinder Singh, conducted on October 5, 2020.

5.      Annexed hereto as Exhibit "D" is a true and correct copy of the transcript of the deposition of defendant Officer Mandeep Cheema, conducted on October 7, 2020.

6.      Annexed hereto as Exhibit "E" is a true and correct copy of the transcript of the deposition of Officer Justin Davis, conducted on November 5, 2020.

7.      Annexed hereto as Exhibit "F" is a true and correct copy of the transcript of the deposition of Officer Malinda Walker, conducted on October 27, 2020.

8.      Annexed hereto as Exhibit "G" is a true and correct copy of transcript of the deposition of EMT Nicole Milonas, conducted on October 22, 2020.

9.      Annexed hereto as Exhibit "H" is a true and correct copy of transcript of the deposition of EMT Marisabel Schiapira, conducted on October 22, 2020.

10.     Annexed hereto as Exhibit "I" is a true and correct copy of transcript of the deposition of Amandeep Kaur, conducted on December 3, 2020.

11.     Annexed hereto as Exhibit "J" is a true and correct copy of transcript of the deposition of Lakhwinder Singh, conducted on December 15, 2020.

12.     Annexed hereto as Exhibit "K" is a true and correct copy of the NYPD Intergraph Computer Aided Dispatch System Event Chronology ("ICAD"), Event No. D18022803746, for the February 28, 2018, 911 call and radio transmissions relating to the 911 call originating from 130-18 Atlantic Avenue, Queens, NY, in regards to plaintiff's intoxication.  This document was produced bearing Bates Numbers D150-D154.

13.     Annexed hereto as Exhibit "L" is a copy of the Prehospital Care Report ("PCR") Summary prepared by EMT Milonas in connection with plaintiff's transportation to Jamaica Hospital Medical Center ("JHMC") on February 28, 2018.

14.     Annexed hereto as Exhibit "M" is a copy of medical records for plaintiff from JHMC relating to his admission on February 28, 2018.

15.     Annexed hereto as Exhibit "N" is a copy of a video (the "EMS Video") created by plaintiff purporting to depict a portion of the incident within the location on February 28, 2018.

16.     Annexed hereto as Exhibit "O" is a copy of a video (the "Police Video") created by plaintiff purporting to depict a portion of the incident within the location on February 28, 2018.

17.     Annexed hereto as Exhibit "P" is a true and correct copy of the audio recording of the 911 call made by Amandeep Kaur on February 28, 2018. This file was produced bearing Bates Number D8.

Dated: New York, New York
       September 24, 2021

GEORGIA M. PESTANA
Corporation Counsel of the
City of New York
*Attorney for Defendants*
100 Church Street
New York, New York 10007
(212) 356-2486

By:   /s/   _____
      Hannah V. Faddis
      *Senior Counsel*

TO:   VIA EMAIL
      Gerald Cohen
      Ilyssa Fuchs
      *Counsel for the Plaintiff*

3

[JA-182]

**Exhibit A to Faddis Declaration -**
**Complaint, Dated January 31, 2019**
**(Reproduced herein at pgs. JA-10-JA-23)**

**[JA-183]**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------X

BALWINDER SINGH,

                      Plaintiff,

          -against-

THE CITY OF NEW YORK, et al.,

                   Defendants.

--------------------------------------------------------X

**ANSWER TO THE COMPLAINT ON BEHALF OF DEFENDANTS CITY OF NEW YORK AND CHEEMA**

19-CV-632 (NGG) (ST)

Jury Trial Demanded

       Defendants City of New York and Cheema, by their attorney Zachary W. Carter, Corporation Counsel of the City of New York, for their Answer to the Complaint, dated February 4, 2019, respectfully:

       1.  Deny the allegations in paragraph "1" of the Complaint, except admit that plaintiff has commenced this action as stated therein.

       2.  Deny the allegations in paragraph "2" of the Complaint, except admit that plaintiff has commenced an action as stated therein.

       3.  Deny the allegations in paragraph "3" of the Complaint, except admit that plaintiff purports to invoke the jurisdiction of the Court as stated therein.

       4.  Deny the allegations in paragraph "4" of the Complaint, except admit that plaintiff purports to base venue in this district as stated therein.

       5.  State that paragraph "5" of the Complaint sets forth a jury demand, to which no response is required.

       6.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph "6" of the Complaint.

       7.  Admit the allegations in paragraph "7" of the Complaint.

8. Deny the allegations in paragraph "8" of the Complaint, except admit that the City maintains a police department and respectfully refers the Court to the New York City Charter and Administrative Code for a full recitation of the relationship between the City and its police department.

9. Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph "9" of the Complaint, except admit that on February 28, 2018, Officer Mandeep Cheema was employed by the City as a police officer and state that the allegations that he was acting under supervision and according to his official duties are legal conclusions that do not require a response.

10. State that paragraph "10" of the Complaint contains conclusions of law, rather than averments of fact, to which no response is required.

11. Deny the allegations in paragraph "11" of the Complaint.

12. Deny the allegations in paragraph "12" of the Complaint.

13. Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph "13" of the Complaint, except admit that on February 28, 2018, plaintiff was at 130-18 Atlantic Avenue in Queens, New York.

14. Admit the allegations in paragraph "14" of the Complaint.

15. Deny the allegations in paragraph "15" of the Complaint.

16. Deny the allegations in paragraph "16" of the Complaint.

17. Deny the allegations in paragraph "17" of the Complaint.

18. Deny the allegations in paragraph "18" of the Complaint.

19. Deny the allegations in paragraph "19" of the Complaint.

20. Deny knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph "20" of the Complaint.

21. Deny the allegations in paragraph "21" of the Complaint.

22. Deny the allegations in paragraph "22" of the Complaint.

23. Deny the allegations in paragraph "23" of the Complaint.

24. Deny the allegations in paragraph "24" of the Complaint.

25. Deny the allegations in paragraph "25" of the Complaint.

26. In response to the allegations in paragraph "26" of the Complaint, defendants repeat and reallege the responses in the preceding paragraphs of this answer, as if fully stated herein.

27. Deny the allegations in paragraph "27" of the Complaint.

28. Deny the allegations in paragraph "28" of the Complaint.

29. Deny the allegations in paragraph "29" of the Complaint.

30. Deny the allegations in paragraph "30" of the Complaint.

31. Deny the allegations in paragraph "31" of the Complaint.

32. In response to the allegations in paragraph "32" of the Complaint, Defendants repeat and reallege the responses in the preceding paragraphs of this answer, as if fully stated herein.

33. Deny the allegations in paragraph "33" of the Complaint.

34. Deny the allegations in paragraph "34" of the Complaint.

35. Deny the allegations in paragraph "35" of the Complaint.

36. In response to the allegations in paragraph "36" of the Complaint, defendants repeat and reallege the responses in the preceding paragraphs of this answer, as if fully stated herein.

37. Deny the allegations in paragraph "37" of the Complaint.

38. Deny the allegations in paragraph "38" of the Complaint.

39. In response to the allegations in paragraph "39" of the Complaint, defendants repeat and reallege the responses in the preceding paragraphs of this answer, as if fully stated herein.

40. Deny the allegations in paragraph "40" of the Complaint, except state that any allegations regarding any duty are conclusions of law to which no response is required..

41. Deny the allegations in paragraph "41" of the Complaint.

42. Deny the allegations in paragraph "42" of the Complaint.

43. In response to the allegations in paragraph "43" of the Complaint, defendants repeat and reallege the responses in the preceding paragraphs of this answer, as if fully stated herein.

44. Deny the allegations in paragraph "44" of the Complaint.

45. Deny the allegations in paragraph "45" of the Complaint.

46. Deny the allegations in paragraph "46" of the Complaint.

47. Deny the allegations in paragraph "47" of the Complaint.

48. Deny the allegations in paragraph "48" of the Complaint.

49. Deny the allegations in paragraph "49" of the Complaint.

50. Deny the allegations in paragraph "50" of the Complaint.

51. Deny the allegations in paragraph "51" of the Complaint.

52. Deny the allegations in paragraph "52" of the Complaint.

53. Deny the allegations in paragraph "53" of the Complaint.

54. Deny the allegations in paragraph "54" of the Complaint.

55. Deny the allegations in paragraph "55" of the Complaint.

56. Deny the allegations in paragraph "56" of the Complaint.

57. Deny the allegations in paragraph "57" of the Complaint.

58. Deny the allegations in paragraph "58" of the Complaint.

59. In response to the allegations in paragraph "59" of the Complaint, defendants repeat and reallege the responses in the preceding paragraphs of this answer, as if fully stated herein.

60. Deny knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph "60" of the Complaint.

61. Deny knowledge and information sufficient to form a belief as to the allegations in paragraph "61" of the Complaint.

62. Deny knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph "62" of the Complaint.

63. Admit the allegations in paragraph "63" of the Complaint.

64. Deny knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph "64" of the Complaint.

65. Deny the allegations in paragraph "65" of the Complaint, insofar as it contains any averments of fact; insofar as it contains conclusions of law, no response is required.

- 5 -

**[JA-188]**

66. In response to the allegations in paragraph "66" of the Complaint, defendants repeat and reallege the responses in the preceding paragraphs of this answer, as if fully stated herein.

67. Deny the allegations in paragraph "67" of the Complaint.

68. Deny the allegations in paragraph "68" of the Complaint.

69. Deny the allegations in paragraph "69" of the Complaint.

70. Deny the allegations in paragraph "70" of the Complaint.

71. Deny the allegations in paragraph "71" of the Complaint.

72. Deny the allegations in paragraph "72" of the Complaint.

73. In response to the allegations in paragraph "73" of the Complaint, defendants repeat and reallege the responses in the preceding paragraphs of this answer, as if fully stated herein.

74. Deny the allegations in paragraph "74" of the Complaint.

75. Deny the allegations in paragraph "75" of the Complaint.

76. In response to the allegations in paragraph "76" of the Complaint, defendants repeat and reallege the responses in the preceding paragraphs of this answer, as if fully stated herein.

77. Deny the allegations in paragraph "77" of the Complaint.

78. Deny the allegations in paragraph "78" of the Complaint.

79. Deny the allegations in paragraph "79" of the Complaint.

80. Deny the allegations in paragraph "80" of the Complaint.

81. In response to the allegations in paragraph "81" of the Complaint, defendants repeat and reallege the responses in the preceding paragraphs of this answer, as if fully stated herein.

82. Deny the allegations in paragraph "82" of the Complaint.

83. Deny the allegations in paragraph "83" of the Complaint.

84. Deny the allegations in paragraph "84" of the Complaint.

85. Deny the allegations in paragraph "85" of the Complaint.

86. Deny the allegations in paragraph "86" of the Complaint.

87. In response to the allegations in paragraph "87" of the Complaint, defendants repeat and reallege the responses in the preceding paragraphs of this answer, as if fully stated herein.

88. Deny the allegations in paragraph "88" of the Complaint, insofar as it contains any averments of fact, except admit that the City maintains a police department and respectfully refers the Court to the New York City Charter and Administrative Code for a full recitation of the relationship between the City and its police department; insofar as it contains conclusions of law, no response is required.

89. Deny the allegations in paragraph "89" of the Complaint.

90. Deny the allegations in paragraph "90" of the Complaint.

Deny the allegations in paragraph "91" of the Complaint.

**FIRST AFFIRMATIVE DEFENSE**

91. The Complaint fails to state a claim upon which relief can be granted.

- 7 -

## SECOND AFFIRMATIVE DEFENSE

92. The individual defendant have not violated any rights, privileges or immunities under the Constitution or laws of the United States or the State of New York or any political subdivision thereof, nor have they violated any Act of Congress providing for the protection of civil rights.

## THIRD AFFIRMATIVE DEFENSE

93. The individual defendant acted reasonably in the proper and lawful exercise of their discretion and did not violate any clearly established constitutional or statutory right of which a reasonable person would have known, and, therefore, they are entitled to qualified immunity.

## FOURTH AFFIRMATIVE DEFENSE

94. There was probable cause or other justification for plaintiff's arrest or detention.

## FIFTH AFFIRMATIVE DEFENSE

95. Any injury alleged to have been sustained resulted from plaintiff's own culpable or negligent conduct, or the culpable or negligent conduct of a third party, and was not the proximate result of any act of the defendants.

## SIXTH AFFIRMATIVE DEFENSE

96. Plaintiffs are not entitled to punitive damages as against the City or the individual defendants in their official capacities.

## SEVENTH AFFIRMATIVE DEFENSE

97. Plaintiff provoked or was at fault for any alleged incident.

- 8 -

[JA-191]

### EIGHTH AFFIRMATIVE DEFENSE

98. Plaintiff failed to mitigate his alleged damages.

### NINTH AFFIRMATIVE DEFENSE

99. Plaintiff has failed to comply with New York General Municipal Law §§ 50(e), et seq.

### TENTH AFFIRMATIVE DEFENSE:

100.    At all times relevant to the acts alleged in the complaint, the duties and functions of the municipal defendant's officials entailed the reasonable exercise of proper and lawful discretion.  Therefore, defendant City is entitled to governmental immunity from liability.

### ELEVENTH AFFIRMATIVE DEFENSE

101.    At all times relevant to the acts alleged in the complaint, defendant Cheema acted reasonably in the proper and lawful exercise of his discretion.

**WHEREFORE,** defendants City of New York and Cheema demand judgment

dismissing the Complaint in its entirety, together with the costs and disbursements of this action,

and such other and further relief as the Court may deem just and proper.

Dated:    New York, New York
              April 29, 2019

                                   ZACHARY W. CARTER
                                   Corporation Counsel of the
                                   City of New York
                                   *Attorney for Defendants*
                                   100 Church Street
                                   New York, New York 10007
                                   (212) 356-2486

                                          /s/
                    By:   _____
                                   HANNAH V. FADDIS
                                   *Senior Counsel*
                                   Special Federal Litigation Division

TO:   **VIA ECF**
        Ilyssa Fuchs, Esq.
        Cohen & Fitch LLP
        *Attorneys for Plaintiff*