# 23-24cv

# United States Court of Appeals
# for the Second Circuit

BALWINDER SINGH,

*Plaintiff-Appellant,*

v.

THE CITY OF NEW YORK, P.O. MANDEEP CHEEMA,
Tax Id. No. 950196, Individually and in his Official Capacity,
POLICE OFFICERS JOHN DOE #1-10, Individually and in
their Official Capacity (the name John Doe being fictitious,
as the true names are presently unknown),

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT,
EASTERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## VOLUME III OF VI (PAGES JA-384–JA-618)

COHEN & FITCH LLP
*Attorneys for Plaintiff-Appellant*
233 Broadway, Suite 900
New York, New York 10279
(212) 374-9115
jfitch@cohenfitch.com

NEW YORK CITY LAW DEPARTMENT
*Attorneys for Defendants-Appellees*
100 Church Street, Room 6-178
New York, New York 10007
(212) 356-2490
Alexander.li@usdoj.gov

0862

i

# TABLE OF CONTENTS

Docket Entries ........................................................................................JA-1

Complaint, Dated January 31, 2019.........................................................JA-10

Plaintiff's Notice of Motion for Summary Judgment,
Dated July 12, 2021 ................................................................................JA-24

Plaintiff's Statement of Undisputed Facts, Dated July 12, 2021...............JA-26

Plaintiff's Supporting Declaration by Gerald M. Cohen,
Dated July 12, 2021 ................................................................................JA-34

    Exhibit A to Cohen Declaration -
    Excerpts of Transcript of EBT of Balwinder Singh (Plaintiff),
    Taken October 5, 2020.................................................................JA-36

    Exhibit B to Cohen Declaration -
    Excerpts of Transcript of Video-Conference EBT of
    Amandeep Kaur (Non-Party Witness),
    Taken December 3, 2020 ..............................................................JA-49

    Exhibit C to Cohen Declaration -
    Excerpts of Transcript of EBT of P.O. Mandeep Cheema
    (Defendant), Taken October 7, 2020 ...........................................JA-53

    Exhibit D to Cohen Declaration -
    Audio Recording of the 911 Call.................................................JA-99
    *(Submitted on Separate Thumbdrive)*

    Exhibit E to Cohen Declaration -
    Excerpts of Transcript of EBT of Nicole Milonas
    (Non-Party Witness), Taken October 22, 2020 ............................JA-100

    Exhibit F to Cohen Declaration -
    Pre-Hospital Care Report of Jamaica Hospital Medical
    Center Regarding Balwinder Singh,
    Dated February 28, 2018..............................................................JA-116

Exhibit G(1-3) to Cohen Declaration -
Full Video Recording .......................................................................JA-119
*(Submitted on Separate Thumbdrive)*

Exhibit H to Cohen Declaration -
Aided Report from Incident Occurred,
Dated February 28, 2018....................................................................JA-120

Exhibit I to Cohen Declaration -
Excerpts of Transcript of EBT of Justin Davis
(Non-Party Witness), Taken November 5, 2020 .............................JA-122

Exhibit J to Cohen Declaration -
Excerpts of Transcript of EBT of Malinda Walker
(Non-Party Witness), Taken October 27, 2020 ...............................JA-131

Exhibit K to Cohen Declaration -
Expert Radiologist Reports ..............................................................JA-137

Exhibit L to Cohen Declaration -
Photographs of Plaintiff's Face Injury.............................................JA-145

Exhibit M to Cohen Declaration -
Excerpts of Transcript of EBT of Marisabel Schapira
(Non-Party Witness), Taken October 22, 2020 ...............................JA-154

The City of New York and Officer Mandeep Chemma's
Notice of Cross-Motion for Summary Judgment,
Dated September 24, 2021 .................................................................JA-156

The City of New York and Officer Mandeep Chemma's
Response to Statement of Undisputed Facts and
Counter-Statement of Material Fact, Dated September 24, 2021 ...........JA-158

The City of New York and Officer Mandeep Chemma's
Supporting Declaration by Hannah V. Faddis,
Dated September 24, 2021 .................................................................JA-179

Exhibit A to Faddis Declaration -
Complaint, Dated January 31, 2019
(Reproduced herein at pgs. JA-10-JA-23).......................................JA-182

Exhibit B to Faddis Declaration -
City of New York and Mandeep Chemma's Answer,
Dated April 29, 2019.......................................................................JA-183

Exhibit C to Faddis Declaration -
Transcript of EBT of Balwinder Singh (Plaintiff),
Taken October 5, 2020..................................................................JA-193

Exhibit D to Faddis Declaration -
Transcript of EBT of P.O. Mandeep Cheema (Defendant),
Taken October 7, 2020..................................................................JA-384

Exhibit E to Faddis Declaration -
Transcript of EBT of Justin Davis (Non-Party Witness),
Taken November 5, 2020...............................................................JA-619

Exhibit F to Faddis Declaration -
Transcript of EBT of Malinda Walker (Non-Party Witness),
Taken October 27, 2020................................................................JA-782

Exhibit G to Faddis Declaration -
Transcript of EBT of Nicole Milonas (Non-Party Witness),
Taken October 22, 2020................................................................JA-867

Exhibit H to Faddis Declaration -
Transcript of EBT of Marisabel Schapira
(Non-Party Witness), Taken October 22, 2020 ..............................JA-986

Exhibit I to Faddis Declaration -
Transcript of Video-Conference EBT of Amandeep Kaur
(Non-Party Witness), Taken December 3, 2020...........................JA-1086

Exhibit J to Faddis Declaration -
Transcript of Video-Conference EBT of Lakhwinder Singh
(Non-Party Witness), Taken December 15, 2020.........................JA-1183

Exhibit K to Faddis Declaration -
NYPD Intergraph Computer Aided Dispatch System
Event Chronology ......................................................................JA-1298

Exhibit L to Faddis Declaration -
Pre-Hospital Care Report of Jamaica Hospital Medical
Center Regarding Balwinder Singh, Dated February 28, 2018
(Reproduced herein at pgs. JA-116-JA-118)..................................JA-1303

Exhibit M to Faddis Declaration -
Medical Records of Jamaica Hospital Medical Center
Regarding Balwinder Singh ........................................................JA-1304

Exhibit N to Faddis Declaration -
EMS Video..................................................................................JA-1333
*(Submitted on Separate Thumbdrive)*

Exhibit O to Faddis Declaration -
Surveillance Video Still Images ...................................................JA-1334

Exhibit P to Faddis Declaration -
Audio Recording of the 911 Call made by Amandeep Kaur,
Dated February 28, 2018.............................................................JA-1340
*(Submitted on Separate Thumbdrive)*

Plaintiff's Response to Defendants' Counter-Statement of Material
Facts Pursuant to Local Rule 56.1, Dated November 12, 2021 .............JA-1341

Plaintiff's Reply Affirmation by Gerald M. Cohen,
Dated November 29, 2021 ........................................................JA-1376

Exhibit N to Cohen Reply Affirmation -
Video Recording .........................................................................JA-1378
*(Submitted on Separate Thumbdrive)*

Exhibit O-1 to Cohen Reply Affirmation -
Still Photo from Video of Incident................................................JA-1379

Exhibit O-2 to Cohen Reply Affirmation -
Still Photo from Video of Incident................................................JA-1380

Exhibit O-3 to Cohen Reply Affirmation -
Still Photo from Video of Incident................................................JA-1381

Exhibit O-4 to Cohen Reply Affirmation -
Still Photo from Video of Incident................................................JA-1382

Exhibit O-5 to Cohen Reply Affirmation -
Still Photo from Video of Incident...................................................JA-1383

Letter from Hannah V. Faddis to Hon. Eric Komitee,
Dated May 10, 2022 ......................................................................JA-1384

Report and Recommendation of Hon. Steven L. Tiscione,
Dated June 28, 2022 ......................................................................JA-1385

Memorandum and Order of Hon. Eric Komitee,
Dated September 30, 2022 ...........................................................JA-1404

Stipulation and Order of Partial Dismissal, Dated December 2, 2022..JA-1431

Judgment of United States District Court Eastern District of
New York, Dated December 6, 2022, Appealed From ...........................JA-1434

Plaintiff's Notice of Appeal, Dated January 4, 2023...............................JA-1436

```
                                            Page 1
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    ----------------------------------------X
      BALWINDER SINGH,
 3
                           PLAINTIFF,
 4
            -against-        Case
 5                          1:19-cv-00632
 6
      THE CITY OF NEW YORK, P.O. MANDEEP CHEEMA,
 7    Tax Id. No. 950196, Individually and in his
      Official Capacity, and POLICE OFFICERS
 8    "JOHN DOE" #1-10, Individually and in their
      Official Capacity (the name John Doe being
 9    fictitious, as the true names are presently
      unknown),
10
                           DEFENDANTS.
11    ----------------------------------------X
12
13                   DATE: October 7, 2020
14                   TIME: 10:20 a.m.
15
16
17         EXAMINATION BEFORE TRIAL of the
18    Defendant, P.O. MANDEEP CHEEMA, taken by
19    the Plaintiff, pursuant to a Order, held on
20    a Virtual Zoom, before Alexis A. Vargas, a
21    Notary Public of the State of New York.
22
23
24
25
```

```
                                                   Page 2
 1    A P P E A R A N C E S:

 2

 3    COHEN & FITCH, LLP
        Attorneys for the Plaintiff
 4      110 E. 59th Street, Suite 3200
        New York, New York 10022
 5      BY: GERALD COHEN, ESQ. via Zoom

 6

 7    NEW YORK CITY LAW DEPARTMENT
        Attorneys for the Defendants
 8      100 Church Street
        New York, New York 10007
 9      BY: ALAN SCHEINER, ESQ. via Zoom

10

11    ALSO PRESENT: ILYSSA FUCHS, ESQ. via Zoom

12

13              *         *         *

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                                              Page 3
 1                 STIPULATIONS
 2          IT IS HEREBY STIPULATED AND AGREED,
 3     by and among counsel for the respective
 4     parties hereto, that the filing, sealing
 5     and certification of the within deposition
 6     shall be and the same are hereby waived;
 7          IT IS FURTHER STIPULATED AND AGREED
 8     that all objections, except as to form of
 9     the question, shall be reserved to the time
10     of the trial;
11          IT IS FURTHER STIPULATED AND AGREED
12     that the within deposition may be signed
13     before any Notary Public with the same
14     force and effect as if signed and sworn to
15     before the Court.
16                   *      *      *
17
18
19
20
21
22
23
24
25
```

Page 4

1  P. O. M A N D E E P  C H E E M A, called as

2  a witness, having been first duly sworn by

3  a Notary Public of the State of New York,

4  was examined and testified as follows:

5  EXAMINATION BY

6  MR. COHEN:

7       Q.    Please state your name for the

8  record.

9       A.    P.O. Mandeep Cheema.

10      Q.    Please state your address for

11  the record.

12      A.    1 Police Plaza, New York, New

13  York 10038.

14      Q.    Good morning, Mr. Cheema.  My

15  name is Gerald Cohen.  As you may know

16  already, I represent an individual by the

17  name of Balwinder Singh, which is the

18  Plaintiff in the action against you and the

19  City of New York for an incident that took

20  place on February 28th of 2018.  In a few

21  moments, I'm going to ask you some

22  questions about that incident, and your

23  involvement in that incident.  Before I do

24  that, I want to go over a couple of the

25  ground rules for this deposition.

```
                                                        Page 5
 1                        M. CHEEMA
 2          A.      Okay.
 3          Q.      First thing, as you can see,
 4      there is a Court Reporter taking down
 5      everything we say.  It's critical to answer
 6      all of the questions orally.  Do you
 7      understand?
 8          A.      Yes.
 9          Q.      Similarly, if I ask you a
10      question, and you don't understand the
11      question, you have to let me know.  If you
12      answer the question, I will assume you
13      understood it.
14          A.      Yes, I understand.
15          Q.      Because the Court Reporter is
16      taking down what we say, we can't talk at
17      the same time.  There will be moments where
18      you will anticipate what my question will
19      be.  I ask that you wait until I finish my
20      question, and then answer it.  Do you got
21      it?
22          A.      Yes.
23          Q.      There also might be moments
24      where you may want to consult with the
25      attorney that's here for you from the City
```

```
                                                    Page 6
 1                        M. CHEEMA
 2      of New York, Mr. Scheiner, and that will be
 3      fine.  If there's a question pending, and
 4      you understand the question, I ask that you
 5      answer the question to the best of your
 6      ability, and then you can ask for a break.
 7           A.    Understood.
 8                 MR. SCHEINER:  I have one
 9              objection, that if he has a concern
10              about privilege, that he can consult
11              with me before answering the
12              question.
13                 MR. COHEN:  That's fine.
14                 MR. SCHEINER:  Otherwise,
15              you're correct.
16           Q.    Finally, you're going to get a
17      copy of the transcript.  We will have one
18      mailed to your attorneys, and you will have
19      an ability to correct anything that you say
20      today.  However, you should just be aware
21      that should this case proceed to trial, any
22      corrections you make may be used against
23      you.  Do you understand?
24           A.    I do.
25           Q.    Mr. Cheema, how old are you?
```

[JA-390]

```
                                              Page 7
 1                    M. CHEEMA
 2          A.    I am 30 years old.
 3          Q.    How tall are you?
 4          A.    I am 6 foot 3.
 5          Q.    Was that your approximate
 6   height on the date of February 28th of
 7   2018?
 8          A.    Yes.
 9          Q.    How much do you weigh, sir?
10          A.    Right now, I weigh about 280
11   pounds.
12          Q.    How much did you weigh on
13   February 28th of 2018?
14          A.    That I don't recall.
15          Q.    Do you believe it was more,
16   less, or about the same?
17          A.    It was less.
18          Q.    Was it significantly less, like
19   20, 30 pounds less?
20          A.    I would say so, yes.
21          Q.    Can you give me a range of how
22   much less?
23          A.    About 260, 265.
24          Q.    I see you wearing eyeglasses.
25   Are those corrective eyeglasses?
```

**[JA-391]**

```
                                             Page 8
 1                    M. CHEEMA
 2         A.    Yes.
 3         Q.    Are you near-sighted or
 4    far-sighted?
 5         A.    I always confuse the two.  I
 6    can't see long distances.
 7         Q.    You can't see things that are
 8    far away?
 9         A.    Correct.
10         Q.    You're near-sighted?
11         A.    Correct.
12         Q.    I really can't see your face
13    that well.  Can you pull the camera
14    downward?
15         A.    Yes.
16         Q.    How long have you been wearing
17    eyeglasses?
18         A.    Since I was about eight or nine
19    years old.
20         Q.    Do you regularly get check-ups
21    for your eyeglasses?
22         A.    Every year or two or so, yes.
23         Q.    Has your eyesight gotten
24    progressively worse over time?
25         A.    Not significantly, little
```

```
                                                    Page 9
 1                    M. CHEEMA
 2     differences.
 3          Q.    When is the last time you had
 4     your prescription updated?
 5          A.    That would be in February of
 6     this year.
 7          Q.    Did your eyes get a little
 8     worse?
 9          A.    Yes.
10          Q.    Prior to February of this year,
11     that being 2020, when was the time before
12     that that you had your eyes checked?
13          A.    That I don't remember.
14          Q.    Do you know how different your
15     prescription was in February, how much
16     worse it got, like do you know what your
17     prescription was, how it changed?
18          A.    No.
19          Q.    It was a small incremental
20     change?
21               MR. SCHEINER:   Objection.
22          A.    Yes.
23          Q.    On February 28th of 2018, were
24     you wearing your eyeglasses when you were
25     working?
```

```
                                                    Page 10
 1                    M. CHEEMA
 2        A.     Yes.
 3        Q.     Do you always wear your
 4   eyeglasses when you work?
 5        A.     Yes.
 6        Q.     Do you ever wear contact
 7   lenses?
 8        A.     No.
 9        Q.     Officer Cheema, what is your
10   highest level of education?
11        A.     I have a Bachelor's Degree.
12        Q.     In what?
13        A.     Emergency Management.
14        Q.     Where did you get that
15   Bachelor's Degree?
16        A.     That was at Metropolitan
17   College of New York.
18        Q.     When did you attend
19   Metropolitan College of New York?
20        A.     That was from January of 2014
21   to September of 2015.
22        Q.     Were you working during the
23   time you were at Metropolitan College?
24        A.     Yes.
25        Q.     What were you doing?
```

**[JA-394]**

```
                                              Page 11
 1                    M. CHEEMA
 2         A.    I was a Police Officer at the
 3    102nd Precinct.
 4         Q.    You got your degree while
 5    working as a Police Officer?
 6         A.    Yes.
 7         Q.    Did you go to school at night,
 8    or during the day, or something else?
 9         A.    I was working midnight shifts,
10    so my shift would start at 11:15 p.m., so I
11    would attend classes beforehand.
12         Q.    Prior to going to Metropolitan
13    College, did you have any other college
14    credits from anywhere else?
15         A.    I do.
16         Q.    Where?
17         A.    Queensborough Community
18    College.
19         Q.    When did you attend
20    Queensborough?
21         A.    That was from January of 2010
22    to May or June of 2011.
23         Q.    Did you attend Queensborough
24    before you became a Police Officer?
25         A.    Yes.
```

```
                                              Page 12
 1                    M. CHEEMA
 2         Q.    Did you get an Associate's
 3   Degree at Queensborough?
 4         A.    I did.
 5         Q.    Did you get an Associate's
 6   Degree in a specific area, or is it just a
 7   general Associate's Degree?
 8         A.    General.
 9         Q.    Were you working while you were
10   going to Queensborough College?
11         A.    I was.
12         Q.    What were you doing then?
13         A.    I was a Pharmacy Technician.
14         Q.    At some point, you joined the
15   Police Academy?
16         A.    I did.
17         Q.    When was that?
18         A.    That was in July of 2011.
19         Q.    What prompted you to join the
20   Police Academy?
21         A.    I don't really remember.  I
22   took the test, I passed, and I gave it a
23   chance.
24         Q.    You didn't want to pursue any
25   career in Pharmacy Technician, or anything
```

Case 23-24, Document 30, 04/19/2023, 3501826, Page19 of 241
**[JA-396]**

```
                                        Page 13
 1                    M. CHEEMA
 2    like that, become a Pharmacist?
 3         A.    Maybe at the time.  I'm not
 4    really sure what changed my mind.
 5    Something did, and here I am.
 6         Q.    Do you have any prior Military
 7    experience?
 8         A.    No.
 9         Q.    Any other prior Law Enforcement
10    experience?
11         A.    No.
12         Q.    Other than Pharmacy Technician,
13    what other jobs did you have prior to
14    becoming a Police Officer?
15         A.    Well, I was a Pharmacy
16    Technician at Rite Aid.  When I first
17    started at Rite Aid, I was a stock person,
18    and before that I was a high school
19    student.
20         Q.    Now, just going to when you
21    became a Police Officer.  Where were you
22    first assigned?
23         A.    I was assigned to the 75th
24    Precinct.
25         Q.    That's in Brooklyn?
```

```
                                              Page 14
  1                      M. CHEEMA
  2          A.     North Brooklyn, yes.
  3          Q.     Prior to being assigned to the
  4    75th Precinct, you did the whole Police
  5    Academy, right?
  6          A.     Correct.
  7          Q.     How long were you at the Police
  8    Academy for?
  9          A.     Six months.
 10          Q.     You did the basic training to
 11    become a Police Officer there?
 12          A.     Yes.
 13          Q.     When you graduated from the
 14    Police Academy, you were first assigned to
 15    the 75th Precinct.  What were your duties
 16    at the 75th Precinct when you first were
 17    assigned?
 18          A.     When I was in the 75th
 19    Precinct, I was assigned to what was at the
 20    time called Operation Impact, and I was on
 21    foot patrol mostly.
 22          Q.     When you say Operation Impact,
 23    what were your duties as an Operation
 24    Impact Officer?
 25          A.     Impact was, they would assign
```

```
                                        Page 15
 1              M. CHEEMA
 2   me an approximate two block radius, and my
 3   job was to patrol up and down those two
 4   blocks, and show my presence and respond.
 5        Q.    You were uniform for Operation
 6   Impact, correct?
 7        A.    Yes.
 8        Q.    After you were doing that
 9   assignment at the 75th Precinct, were you
10   assigned something else to do at the 75th
11   Precinct?
12        A.    No.
13        Q.    Were you then moved to a
14   different precinct?
15        A.    Yes.
16        Q.    Which was that?
17        A.    102nd Precinct in Queens.
18        Q.    What was your assignment at the
19   102nd Precinct?
20        A.    Patrol.
21        Q.    Patrol Officer?
22        A.    Yes.
23        Q.    Are you currently still a
24   Patrol Officer?
25        A.    I am.
```

```
                                          Page 16
 1                    M. CHEEMA
 2          Q.     Are you still assigned to the
 3   102nd Precinct?
 4          A.     I am.
 5          Q.     Were you assigned to the 102nd
 6   Precinct the entire time from after your
 7   initial stint at the 75th Precinct until
 8   today?
 9          A.     Yes.
10          Q.     Was your assignment always
11   Patrol Officer?
12          A.     Yes.
13          Q.     At some point, during your time
14   at 102nd Precinct, you decided to enroll
15   into a Bachelor's Program for Emergency
16   Management?
17          A.     Yes, I did.
18          Q.     What years were that when you
19   did that?
20          A.     That was January of 2014 to
21   September of 2015.
22          Q.     What was the reason that you
23   decided to do that?
24          A.     Mostly, I wanted to earn a
25   college degree, and just to have it in case
```

Case 23-24, Document 30, 04/19/2023, 3501826, Page23 of 241
**[JA-400]**

```
                                            Page 17
 1                  M. CHEEMA
 2    opportunities, either in the NYPD or
 3    elsewhere, came about.
 4         Q.    Are you planning to be an ESU
 5    Officer?
 6              MR. SCHEINER:  Objection.
 7         A.    No.
 8         Q.    Are any members of your family
 9    Police Officers?
10         A.    No.
11         Q.    Prior to becoming a Police
12    Officer, were any of your friends Police
13    Officers?
14         A.    No.
15         Q.    Do you speak any languages
16    other than English?
17         A.    I do.
18         Q.    What languages do you speak?
19         A.    I speak Punjabi.
20         Q.    Were you born in the United
21    States?
22         A.    Yes.
23         Q.    Are your parents from a country
24    outside of the United States?
25         A.    Yes.
```

Case 23-24, Document 30, 04/19/2023, 3501826, Page24 of 241
**[JA-401]**

```
                                             Page 18
 1                    M. CHEEMA
 2        Q.    Where are they from?
 3        A.    India.
 4        Q.    I just want to step back a
 5   little bit and talk to you a little bit
 6   about your training.  You received some
 7   training at the Police Academy, correct?
 8        A.    I did.
 9        Q.    Did you get also some training
10   on-the-job about how to be a Police
11   Officer?
12             MR. SCHEINER:  Objection.  You
13          can answer if you understand the
14          question.  Otherwise, you can ask for
15          clarification.
16        A.    When you're asking about
17   on-the-job training, what exactly, can you
18   specify a little bit more about what you
19   mean by that?
20        Q.    Periodically, do you get some
21   training on-the-job, something comes up,
22   you get sent back to the Academy, do you
23   have training in your precinct on different
24   various topics on how to be a Police
25   Officer?
```

Case 23-24, Document 30, 04/19/2023, 3501826, Page25 of 241
**[JA-402]**

```
                                            Page 19
 1                    M. CHEEMA
 2          A.    Oh, yes.
 3          Q.    During your training, both at
 4   the Police Academy and throughout your
 5   career as a Police Officer, did you ever
 6   get training on how to interact with
 7   individuals who are intoxicated by alcohol?
 8              MR. SCHEINER:  Objection to
 9        form.
10          Q.    Do you understand the question,
11   sir?
12          A.    No, not specifically to what
13   you're asking about specifically
14   intoxicated person.
15          Q.    Did you ever receive training
16   on how you're supposed to act when you
17   encounter an individual who is intoxicated?
18          A.    No.
19          Q.    Did you ever get training on
20   police encounters with individuals who, as
21   a Police Officer, you encounter lots of
22   different individuals, so did you ever get
23   training on how to interact with
24   individuals who are intoxicated on the
25   street?
```

```
                                                     Page 20
 1                      M. CHEEMA
 2                 MR. SCHEINER:   Objection to
 3          form.
 4          A.     Not specifically.
 5          Q.     Not specifically intoxicated
 6    individuals?
 7          A.     Correct.
 8          Q.     How about emotionally disturbed
 9    individuals, did you get training on that?
10          A.     Yes.
11          Q.     Is there a distinction, as far
12    as the Police is concerned, between what
13    they categorize as an emotionally disturbed
14    person and an intoxicated individual?
15                 MR. SCHEINER:   Objection to
16          form and foundation.  When I object,
17          unless I direct you not to answer,
18          you can answer the question, because
19          there's no judge to rule on my
20          objections.  I'm making the
21          objections to be resolved later, if
22          necessary.  So, if you understand the
23          question, if you think you can
24          respond, then do so.  Otherwise, you
25          can ask for clarification, or state
```

```
                                              Page 21
 1                    M. CHEEMA
 2          whatever the problem is.  My
 3          objection is not an instruction for
 4          you not to answer, unless I say so.
 5                    THE WITNESS:  Okay.
 6          Q.    Let me repeat the question.
 7   You said you did receive some training on
 8   how Police Officers are supposed to act
 9   when you encounter an emotionally disturbed
10   person, correct?
11          A.    Yes.
12          Q.    Now, is there a distinction, as
13   far as you know, as a Police Officer,
14   between emotionally disturbed individuals,
15   people who are categorized as emotionally
16   disturbed persons by NYPD, and people who
17   are intoxicated by alcohol or some other
18   substance?
19                    MR. SCHEINER:  Objection to
20          form and foundation.
21          A.    I can't recollect if there's
22   any specific distinction between those two.
23          Q.    You said you have received
24   training on emotionally disturbed
25   individuals and persons, what does that
```

```
                                                      Page 22
 1                       M. CHEEMA
 2      training entail?
 3                  MR. SCHEINER:  Objection to
 4            form.
 5           A.    The training is, whenever you
 6      are dealing with a person who is
 7      emotionally disturbed, is to utilize
 8      deescalation techniques, and also to use
 9      time, distance, and to use less legal force
10      when necessary.
11           Q.    Just for sake of brevity, I'm
12      going to call it EDP.  You understand what
13      that means, correct?
14           A.    Yes.
15           Q.    Do EDPs include intoxicated
16      individuals?
17                  MR. SCHEINER:  Objection to
18            form.
19           A.    Not necessarily.
20           Q.    How do you determine if someone
21      is an EDP or not?
22           A.    First is how we receive the
23      call.  Not every person who is intoxicated,
24      we get the call as an EDP.  Sometimes it's
25      just an intoxication.  A lot of it is,
```

Case 23-24, Document 30, 04/19/2023, 3501826, Page29 of 241
**[JA-406]**

```
                                          Page 23
 1                     M. CHEEMA
 2    what's the person's history, do they have a
 3    psychiatric history, what are they
 4    diagnosed with, the person who's making the
 5    911 call, why did they call, how the person
 6    is acting.  That's pretty much like the
 7    factors that we use to determine if someone
 8    is EDP, or if they are unable to care for
 9    themselves, or if they are a danger to
10    others.
11         Q.    Now, when did you get that
12    training regarding EDP?
13         A.    Originally, it was in the
14    Police Academy, but we have received
15    training over the years in intervals.
16         Q.    Do you remember when the last
17    time you got training was on EDP?
18         A.    No.
19         Q.    What you described just now
20    summarizes your best recollection of how
21    you understand how to treat an EDP, or
22    under what circumstances someone qualifies
23    as an EDP?
24              MR. SCHEINER:  Objection to
25         form.
```

```
                                                  Page 24
 1                    M. CHEEMA
 2        A.    Yes.
 3        Q.    You said it depends on their
 4   history.  Is there a way to run their
 5   history before you have an encounter with
 6   an individual?
 7             MR. SCHEINER:  Objection to
 8        form.
 9        A.    Whenever we get a 911 call, our
10   dispatch will know if there had been prior
11   EDP calls in that location.  We will get
12   information through dispatch as well.  The
13   majority of the time, when somebody calls
14   the 911, it's usually for a family member.
15   When they call 911, they will say what they
16   are diagnosed with, because they are the
17   ones who are most familiar with what their
18   condition is.  A lot of times, we will ask
19   the person themselves when we get there,
20   like are you diagnosed with anything, how
21   are you feeling, do you take any kinds of
22   medications, have you been taking your
23   medications.
24        Q.    You talked about dispatch
25   providing you some information when you get
```

Case 23-24, Document 30, 04/19/2023, 3501826, Page31 of 241

Page 25

1                    M. CHEEMA

2    911 calls.  Do they also provide you, if

3    there's a prior domestic incident report at

4    that location?

5         A.    Now they do.  I don't remember

6    if they did at that time.

7         Q.    When you say at that time,

8    you're talking about February 28th of 2018?

9         A.    Correct.

10        Q.    You're not sure if, on that

11   date, you were provided with the history of

12   domestic incident reports at that

13   particular location?

14        A.    Correct.

15        Q.    We described a little bit about

16   what information you get when someone is an

17   EDP from dispatch.  What information do you

18   get when someone is intoxicated from

19   dispatch?

20        A.    When someone is intoxicated,

21   it's the same, it's an ambulance case, just

22   like an EDP call would be, but the dispatch

23   tells us whatever age the person is, male

24   or female, that they are intoxicated, and

25   if they are unconscious or conscious.

Page 26

                    M. CHEEMA

1
2          Q.     Just so we're clear, you
3     previously testified that you haven't got
4     any specific training on what you're
5     supposed to do when you get a call that an
6     individual is intoxicated, correct?
7               MR. SCHEINER:  Objection to
8          form.
9          A.     Nothing specific.
10         Q.     You never got training, just so
11    we're clear on the record, by any of the
12    NYPD regarding how you're supposed to
13    encounter or treat an individual who is
14    intoxicated, but not necessarily EDP?
15              MR. SCHEINER:  Objection to
16         form.
17         A.     Not that I can recollect at
18    this time.
19         Q.     Were you ever given any
20    training or training materials during the
21    course of your career at the NYPD
22    describing under what circumstances you can
23    forcibly take someone to the hospital?
24         A.     Yes.
25         Q.     Under what conditions can you

```
                                           Page 27
 1                   M. CHEEMA
 2    forcibly take someone to the hospital?
 3              MR. SCHEINER:  Objection to
 4         form.
 5         Q.    As an NYPD Officer.
 6              MR. SCHEINER:  Objection to
 7         form.
 8         A.    As an NYPD Officer, if we
 9    determine that a person is unable to care
10    for themselves, or if they are behaving in
11    a way that might pose a danger to anybody
12    else, and we feel, along with consulting
13    EMS, the other medical professionals, if we
14    feel like this person, it would be in their
15    best interest with their livelihood to go
16    get checked out to go to the hospital, then
17    we can take them to the hospital.
18         Q.    Just so we're clear, your
19    understanding is that if you feel it's in
20    the best interest of the individual to get
21    checked out, you're allowed, as an NYPD
22    Officer, to forcibly take them to the
23    hospital?
24              MR. SCHEINER:  Objection.
25         Misstates testimony.
```

Page 28

M. CHEEMA

1

2     A.    Yes.  From what I understand,

3   when a person cannot take care of

4   themselves, or they are unable to take care

5   of themselves, and it's in their best

6   interest to go to the hospital and be

7   medically evaluated, then yes.

8     Q.    Do you have any textbooks or

9   guides that you were given during your

10  training that describes what you're

11  supposed to do when you encounter

12  individuals who are intoxicated?

13        MR. SCHEINER:  Objection to

14    form.

15    A.    We have the Patrol Guide.  I

16  can't recollect at this moment if they do

17  have anything with intoxicated persons.

18    Q.    Let me ask you.  Prior to

19  attending this deposition, did you review

20  any documents?

21    A.    I did.

22    Q.    What documents did you review?

23    A.    I reviewed the Aided Report and

24  the Memo Book.

25    Q.    Did you review any Patrol Guide

**[JA-412]**

```
                                             Page 29
 1                    M. CHEEMA
 2   procedures, or anything like that?
 3        A.    No.
 4        Q.    Do you still have a copy of the
 5   Patrol Guide?
 6        A.    I do.
 7        Q.    Where do you keep it?
 8        A.    That's in my locker.
 9        Q.    When's the last time that you
10   looked at it?
11        A.    Probably around 2017.
12        Q.    It's been three years or so?
13        A.    Yes.
14        Q.    It's not something you look at
15   regularly?
16        A.    Sometimes, if I have an unusual
17   911 call, I will refer to the manual.  The
18   last time I fully studied the manual was in
19   2017.
20        Q.    Now, from the time you entered
21   the Police Academy until the date of this
22   incident, were you informed under what
23   circumstances you could declare someone to
24   be a danger to themselves?
25                    MR. SCHEINER:  Objection to
```

```
                                        Page 30
  1                    M. CHEEMA
  2          form.
  3          A.    Can you repeat the question?
  4          Q.    During your time as a Police
  5     Officer, including the Police Academy, were
  6     you ever instructed under what
  7     circumstances you can declare someone to be
  8     a danger to themselves?
  9               MR. SCHEINER:  Objection to
 10          form.
 11          A.    Not that I can recall,
 12     especially from the Academy.  That was a
 13     long time ago.
 14          Q.    How about during your time as a
 15     Police Officer on the job, has anybody
 16     said, if you see an individual doing the
 17     following things, that's one of the ways
 18     you can declare someone to be a danger to
 19     themselves?
 20          A.    Over time, we have received
 21     precinct training.  I can't tell you the
 22     last time that was.  I don't remember off
 23     of the top of my head.
 24          Q.    How about with regard to
 25     declaring someone to be a danger to others,
```

Case 23-24, Document 30, 04/19/2023, 3501826, Page37 of 241

**[JA-414]**

Page 31

```
 1                   M. CHEEMA
 2   were you ever given any instruction as to
 3   what circumstances you can determine that
 4   an individual is going to be a danger to
 5   other people?
 6              MR. SCHEINER:  Objection to
 7         form.
 8         A.    Yes.
 9         Q.    What kind of instruction were
10   you given?
11         A.    It's basically, you determine
12   based off of the behavior of the subject.
13   If the person is openly threatening other
14   people, already assaulted somebody, or
15   anything of that sort, then we can
16   determine that that person is a danger to
17   be around other people.
18         Q.    Are you permitted to have
19   someone checked out in the hospital simply
20   because they are intoxicated?
21              MR. SCHEINER:  Objection to
22         form.
23         A.    Can you please rephrase that
24   for me?
25         Q.    Let's say you come up and you
```

```
                                              Page 32
  1                    M. CHEEMA
  2    encounter someone while you're on duty as a
  3    Police Officer, and they are intoxicated,
  4    they are not doing anything criminal
  5    necessarily, but they are intoxicated and
  6    acting in an intoxicated way, is that the
  7    basis alone for requiring them to go to the
  8    hospital?
  9         A.    No.
 10         Q.    I'm going to direct your
 11    attention to the incident itself.  On
 12    February 28th of 2018, you were working as
 13    an NYPD Police Officer, sir?
 14         A.    Yes.
 15         Q.    What was your tour of duty that
 16    day, do you remember?
 17         A.    I was working the midnight
 18    shift, so that was 11:15 p.m. to 7:50 a.m.
 19         Q.    You started, technically, on
 20    February 27th, that evening before?
 21         A.    Yes.
 22         Q.    Who were you working with?
 23         A.    I was working with Officer
 24    Comrie and Davis.  Her new name is Walker.
 25         Q.    Were you guys partners, all
```

```
                                            Page 33
 1                    M. CHEEMA
 2   three of you?
 3         A.    Yes.  I was the Training
 4   Officer at the time, and they were in the
 5   Field Training Program.
 6         Q.    So, they were relatively new
 7   Officers?
 8         A.    Yes.
 9         Q.    Were you guys in an RMP, or on
10   foot patrol?
11         A.    RMP.
12         Q.    Who was driving the RMP that
13   day?
14         A.    That was me.
15         Q.    Prior to going out that day,
16   did you attend a role call?
17         A.    Yes.
18         Q.    Can you describe for me if
19   there were any special conditions that day,
20   or anything of note that you remember at
21   that role call that the Supervisor
22   communicated to the group?
23         A.    No.
24         Q.    Looking at your Memo Book, did
25   that refresh your recollection as to if
```

Page 34

```
                          M. CHEEMA
 1
 2    there were any special conditions that day?
 3        A.    My Memo Book would only contain
 4    my assignment, my partner, and my car.  Any
 5    other instruction, usually it's just
 6    remembered for that day, and then the next
 7    day it's gone.
 8                MR. COHEN:  Let's mark these
 9        documents, please.
10                (Whereupon, An Aided Report was
11        marked as Plaintiff's Exhibit 1 for
12        identification as of this date by the
13        Reporter.)
14                (Whereupon, a Memo Book was
15        marked as Plaintiff's Exhibit 2 for
16        identification as of this date by the
17        Reporter.)
18                (Whereupon, a NYPD Misconduct
19        Complaint was marked as Plaintiff's
20        Exhibit 3 for identification as of
21        this date by the Reporter.)
22        Q.    I'm going to show you your Memo
23    Book.  We are going to go over your
24    markings.  Maybe that will clear up some of
25    the questions.  Do you see that, sir?
```

```
                                              Page 35
 1                  M. CHEEMA
 2        A.    Yeah.
 3        Q.    This is marked as Plaintiff's
 4   Exhibit 2.  I'm starting on the first
 5   xeroxed page, which is what, can you
 6   describe that first page?
 7        A.    That's the cover page of the
 8   Memo Book.
 9        Q.    That indicates that it belonged
10   to you right, sir?
11        A.    Yes.
12             MR. COHEN:  For the record,
13         that's bates stamped 00003.
14        Q.    I'm going to bates stamp 00004.
15   Can you just read what it says at the
16   bottom?
17        A.    "Wednesday, 2/28/18, Tour is
18   2315 to 0750, and the assignment is 102nd
19   Precinct."
20        Q.    I am going to scroll over to
21   the next page.  I'd like you to read the
22   entries if you can for me.
23        A.    "2315 present for duty.  2320
24   present for role call.  Sergeant Soblick.
25   Color of the day is white.  The summons
```

```
                                          Page 36
 1                    M. CHEEMA
 2      return date for Criminal Court is 5/15/18.
 3      For Civil Court is 4/18/18.  At 102
 4      Adam/Boy A/B RMP #3239.  0300 with P.O.
 5      Davis and P.O. Comrie."
 6           Q.    Let me stop you right there.
 7      A/B, those were the sectors you were
 8      required to patrol that day?
 9           A.    Yes.
10           Q.    And that's the RMP number you
11      just read.  It says, "0300 meal."  Is that
12      the time you are supposed to take meal?
13           A.    Yeah, that's one of my meal
14      times.  That's when it starts.
15           Q.    Was that the meal time you
16      actually took, or that's the meal time you
17      were assigned to take?
18           A.    We were assigned to take.
19           Q.    P.O. Davis and P.O. Comrie,
20      that's P.O. Walker?
21           A.    Yes.
22           Q.    Those are the two people you
23      were walking with?
24           A.    Yes.
25           Q.    So, your Memo Book contains
```

```
                                        Page 37
 1                    M. CHEEMA
 2     details of your assignment that day, and
 3     who you were working with, correct?
 4          A.    Yes.
 5          Q.    As far as you understand, what
 6     is the purpose of the Memo Book?
 7               MR. SCHEINER:  Objection to
 8           form and foundation.
 9          A.    A Memo Book is basically a
10     record of the events that happened for that
11     day.
12          Q.    Is it fair to say it's a
13     document that you create in order to refer
14     to, should you have to testify in the
15     future, so you don't have to just rely on
16     your memory?
17               MR. SCHEINER:  Objection to
18           form.
19          A.    Yes.
20          Q.    Is it also fair to say that it
21     details, like you said, a record of what
22     you did that day, correct?
23               MR. SCHEINER:  Objection to
24           form.
25          A.    Yes.
```

**[JA-421]**

```
                                              Page 38
 1                    M. CHEEMA
 2        Q.     As being a Police Officer, is
 3   it important for you to accurately detail
 4   what you do throughout the day in your Memo
 5   Book?
 6             MR. SCHEINER:   Objection to
 7         form.
 8        A.     Yes.
 9        Q.     Are you trained by NYPD and the
10   NYPD Supervisors throughout your career as
11   a Police Officer to do just that, which is
12   accurately detail what you do during the
13   day, correct?
14             MR. SCHEINER:   Objection to
15         form.
16        A.     Yes.
17        Q.     It's important to note anything
18   that happens unusual, or that may require
19   you to remember for proceedings such as
20   this, correct?
21             MR. SCHEINER:   Objection to
22         form.
23        A.     Can you rephrase that for me,
24   or ask the question again?
25        Q.     My point is that, if something
```

Page 39

                      M. CHEEMA

1   unusual happens throughout your tour on a

2   particular day, it's important to note that

3   in your Memo Book so that if later down the

4   road you have to testify about it, you can

5   refresh your memory by looking at your Memo

6   Book, correct?

7            MR. SCHEINER:  Objection to

8        form.

9        A.    Yes.

10       Q.    Did you have an independent

11  recollection of this event that we are

12  talking about today on February 28th of

13  2018, or did you have to refresh your

14  memory through the Memo Book and other

15  documents?

16       A.    I had to refresh my memory

17  through the Memo Book and other documents.

18       Q.    Now, I want to briefly go

19  through some of the stuff here in your Memo

20  Book throughout the day, even though it

21  doesn't appear to be necessarily connected

22  to this incident.  I want to make it clear,

23  because I can't read it so well.  At 2330

24  you filled gas, is that right?

Case 23-24, Document 30, 04/19/2023, 3501826, Page46 of 241
**[JA-423]**

```
                                        Page 40
 1                    M. CHEEMA
 2         A.    That's how we get the car.
 3         Q.    So, you're just identifying
 4    that you got a full tank of gas?
 5         A.    We are just making notes about
 6    how we received the car from the previous
 7    shift.
 8         Q.    Then you also searched the car
 9    for any contraband, is that right?
10         A.    Correct.
11         Q.    There's a mention of a Taser
12    here.  Is that just equipment you took with
13    you?
14         A.    Yes.
15         Q.    This 2330 note, that isn't part
16    of an incident you responded to, correct?
17         A.    No.
18         Q.    It's just noting how you
19    received the car, what car you were using,
20    and the like, correct?
21         A.    Yes.
22         Q.    At 2340 it says, "Hospital
23    Canvass."  I don't know what the last word
24    is.
25         A.    It says, "Hospital Canvass
```

Case 23-24, Document 30, 04/19/2023, 3501826, Page47 of 241

```
                                           Page 41
 1                    M. CHEEMA
 2    from."
 3           Q.    What does that mean?  What is
 4    that referring to?
 5           A.    If another precinct has
 6    somebody who, let's say it be missing, or a
 7    gunshot victim that might have
 8    independently checked themselves into the
 9    hospital, they are looking for somebody,
10    they ask every precinct in the city that
11    has a hospital in their confines to go
12    canvass the hospital to see if they can
13    find a person matching who they are looking
14    for.
15           Q.    How long did that job take?
16           A.    Not long at all.
17           Q.    It looks like at 2354 you put
18    in a code, 90X.  What is that referring to?
19           A.    That was in regards to the
20    dispute on the 90-28 Van Wyck Expressway.
21           Q.    That's the previous entry at
22    2340?
23           A.    Yes.
24           Q.    Did you not make it to the
25    Hospital Canvass because you got stopped at
```

```
                                          Page 42

 1                   M. CHEEMA

 2   a dispute?

 3         A.    Correct.  The Hospital Canvass'

 4   are not what's considered a priority.

 5   Whenever we have a Hospital Canvass, it's

 6   basically them saying, "Hey, can you please

 7   go check this out for us."  If we get a 911

 8   call on the way there, then we would have

 9   to go to the Memo Book first.

10         Q.    So, there was a dispute on

11   90-28.  Just take me through your tour.  I

12   kind of want to go through it.

13         A.    Do you want me to read it?

14         Q.    Read it and explain everything.

15         A.    "2340 we get a dispute, 90-28

16   Van Wyck.  At 2354, 90X unfounded.  We

17   tried to call back, the new location was

18   changed and we checked that location,

19   checked the call back, it was a VM,

20   voicemail, no one at location.  We marked

21   that as unfounded.  2354 is negative

22   results at Jamaica times two, Jamaica

23   Hospital.  That would be for the two

24   hospital canvasses.  At 0140 we were

25   visited by a Supervisor.  I couldn't tell
```

```
                                            Page 43
 1                    M. CHEEMA
 2   you who that was.  I can't read that.  I
 3   know it was a Lieutenant."
 4        Q.    They scratched your Memo Book?
 5        A.    Correct.
 6        Q.    Just so we're clear on the
 7   record, he scratched it, meaning he signed
 8   it, made sure you were documenting
 9   everything you were supposed to be
10   documenting in your Memo Book?
11             MR. SCHEINER:  Objection to
12        form and foundation.
13        A.    Not necessarily.
14        Q.    What's the purpose of the
15   scratching of the Memo Book?
16        A.    It's really just to check-up on
17   us, make sure that we are not doing
18   anything that is against department policy.
19   That's what the NVO stands for, no
20   violations observed.
21        Q.    Is he also looking through your
22   entries and making sure you're documenting
23   your time and actually working during the
24   time period that you're on tour?
25             MR. SCHEINER:  Objection to
```

```
                                        Page 44
 1                  M. CHEEMA
 2        form and foundation.
 3        A.    You would have to ask the
 4   Supervisor that.
 5        Q.    Has a Supervisor who scratched
 6   your Memo Book ever explained to you what
 7   he or she is looking for?
 8        A.    In my Memo Book?
 9        Q.    Yeah.
10        A.    I'm sure maybe early in my
11   career, but not as far as I can remember.
12        Q.    After you meet with the
13   Supervisor, he scratches your Memo Book,
14   where do you go next?
15        A.    At 0149 we get a 1010, which is
16   an investigate.  An ERS Box is a call box
17   that have police and fire on it and people
18   flick it.  It sends a signal saying at that
19   location, so they send a police unit to
20   respond to check it out and make sure
21   everything is okay over there.
22        Q.    Let's go to the next page,
23   which is bates stamped D00006.  It's all
24   blacked out.  Do you have any recollection
25   of what happened?
```

Page 45

                    M. CHEEMA

1          A.    I don't have my stuff with me,

2    so no.

3          Q.    Just a summary.  Was there an

4    arrest?

5          A.    I don't remember.

6          Q.    Do you actually have your Memo

7    Book with you right now?

8          A.    No.

9          Q.    You have no recollection of

10   what happened when you went to go look at

11   this box?

12         A.    No.

13         Q.    Did you make an arrest that

14   day?

15         A.    I don't remember if I made an

16   arrest that day or not.  I'm not sure.

17         Q.    Let's go down on bates stamp

18   D00006.  At 2:00 a.m., it looks like the

19   top is 2:00 a.m., do you see that?

20         A.    Yes.

21         Q.    Do you want to tell me what's

22   going on?

23         A.    It looks like it says, "90X at

24   113th Street."  That means I marked the job

```
                                            Page 46
 1                    M. CHEEMA
 2    as unfounded.  I don't know what that job
 3    was.  That was probably on the previous
 4    page.
 5          Q.    Then at 0235 there's another
 6    entry, correct?
 7          A.    Yes.
 8          Q.    What is that entry referring
 9    to?
10          A.    That is what you called earlier
11    a scratch.  The Supervisor and Sergeant
12    came to inspect us.
13          Q.    At 0302 there's a code of 1063
14    at SH.  What does that mean?
15          A.    That means meal at station
16    house.
17          Q.    How long was your meal for?
18          A.    An hour.
19          Q.    And that's 98 to go back on
20    duty?
21          A.    Yes.
22          Q.    From 0402 to 0630 you had no
23    activity, as far as we can tell, from the
24    Memo Book?
25          A.    Yes.
```

```
                                           Page 47
 1                   M. CHEEMA
 2        Q.     Nothing note worthy happened,
 3   you were just patrolling around?
 4        A.     Correct.
 5        Q.     This was in the middle of
 6   February, right, do you remember what the
 7   temperature was?
 8        A.     No, I don't.  I'm sure it was
 9   cold.
10        Q.     Do you know if it was snowing,
11   or if it was clear out, or something else?
12        A.     That I couldn't tell you
13   specifically.
14        Q.     At 0630 you have another
15   notation.  What is that notation referring
16   to?
17        A.     That's another 1010, which is
18   investigate, and suspicious person at
19   119-02 91 Avenue, Apartment 3A.
20        Q.     Did you respond to that
21   location?
22        A.     We did.  We checked it out and
23   at 0637 we marked it 91, meaning non-crime
24   corrected.
25        Q.     That means you didn't find
```

```
                                            Page 48
 1                    M. CHEEMA
 2   anybody?
 3         A.    Yes.   Maybe there was someone
 4   there.   If there was nobody there, it would
 5   be a 90X, which is unfounded.   If I marked
 6   it a 91, that means we checked it out,
 7   there was nothing suspicious, no crime
 8   going on, it was not a police issue, so we
 9   marked it a 91.
10         Q.    Now, we get to 0645.   Is this
11   our incident?
12         A.    Yes.
13         Q.    Can you tell me what the codes
14   referred to on 0645?
15         A.    A 1054 means an ambulance case,
16   S is serious, and intox at 130-18 Atlantic
17   Avenue.
18         Q.    When you say serious, what is
19   that referring to?  What does that mean, as
20   far as you understand?
21         A.    That's how the job is coded.
22   I'm sure the dispatchers can explain to you
23   what that is.   That's how we receive the
24   job.
25         Q.    When you get the code serious,
```

```
                                              Page 49
 1                    M. CHEEMA
 2   what do you understand that to mean?
 3         A.    It could mean a lot of things.
 4   It could be someone is intoxicated, someone
 5   has difficulty breathing.  It could mean
 6   different things.  I don't know how they
 7   code these jobs.  That's how it comes up
 8   when they get transmitted to us.
 9         Q.    How was it transmitted to you?
10         A.    We get the job as an EMS
11   request.
12         Q.    Does it come through your
13   radio?
14         A.    That comes through the radio.
15   The way it's worded like that, if you were
16   to look up the job through the computer.
17         Q.    Did you get this while you were
18   in the car, or while you were on foot, or
19   something else?
20         A.    We were in the car.  We are
21   patrol officers, so we go to where the next
22   911 call is.  We patrol around.  When
23   dispatch informs us, it's usually as 102
24   Adam, and then we will respond and they
25   say, okay go over here, EMS is requesting
```

```
                                            Page 50
  1                  M. CHEEMA
  2    you to this location.
  3         Q.    Did you end up going to that
  4    location?
  5         A.    We did.
  6         Q.    What did you do?
  7         A.    We go to the location.  We walk
  8    up the stairs, and then we enter the
  9    apartment where we encountered Mr. Singh,
 10    his wife, and the EMS.
 11         Q.    Did you write anything else
 12    about this incident in your Memo Book?
 13         A.    Not that I recall with the Memo
 14    Book.
 15         Q.    Looking at your Memo Book, did
 16    you write anything else about this
 17    incident?
 18         A.    No, nothing else from the
 19    incident.  The only thing I see here is at
 20    0805 we marked it a 97H to Jamaica.
 21         Q.    And then there's an Aided
 22    #0301?
 23         A.    Right.
 24         Q.    Let me be clear.  On bates
 25    stamp D00007 of your Memo Book, as it's
```

```
                                            Page 51

 1                      M. CHEEMA
 2     delineated in Plaintiff's Exhibit 2, the
 3     only three lines referring to this incident
 4     are the 0645 a.m., 1054 to the location,
 5     and then the 0805 a.m. 97H to Jamaica along
 6     with the report.  I guess that's four
 7     lines.  I will mark this.  Those are the
 8     only markings referring to this incident,
 9     is that right?
10          A.    Right.
11          Q.    For the record, I highlighted
12     the 0805 entry, and the 0645 entry, I
13     circled the two places you made annotations
14     about this incident, correct?
15          A.    Yes.
16          Q.    There are no other annotations
17     about this particular incident in your Memo
18     Book, right?
19          A.    Not in this exhibit, no.
20          Q.    Not in this exhibit, or not in
21     this Memo Book?
22          A.    I don't recall any other parts
23     of the Memo Book.  I am looking at the four
24     lines on the exhibit right now.
25                MR. COHEN:  I presume, and I
```

Page 52

```
 1                    M. CHEEMA
 2          don't know for sure, that the City of
 3          New York did not black out these
 4          areas if it related to this incident.
 5          Do you know, Alan, if these blacked
 6          out lines have anything to do with
 7          this incident?
 8               MR. SCHEINER:  I wasn't
 9          involved in the discovery, so I don't
10          know what's under the black out.
11               MR. COHEN:  Can you be pretty
12          certain that you wouldn't black out
13          something that has to do with the
14          case?
15               MR. SCHEINER:  I really
16          hesitate to speak for my colleagues
17          on this.  I have no idea what the
18          issues were here.  I'm not indicating
19          one way or another.  I really don't
20          want to speculate anything about it,
21          because I don't know.
22          Q.    After this initial call at 0645
23     from your Memo Book, it says, "0730
24     Hospital Canvass, 42nd Precinct."  What is
25     that referring to?
```

Page 53

M. CHEEMA

1

2         A.     That's the Hospital Canvass

3     again.   The 42nd Precinct was asking us

4     through dispatch to check the hospital for

5     whatever they are looking for.

6         Q.     Were you already at the

7     hospital?

8         A.     We get the call, based on, like

9     when I write in my Memo Book, it's based on

10    whatever time central dispatch gives us the

11    call.   It's not about what time I get

12    there.   When I finalize the job, when I put

13    negative results on 8:00, that means I

14    already checked it out, and that everything

15    is good.

16        Q.     Where it says the negative

17    results at 0750 over here, that means you

18    were already at the hospital at that time?

19        A.     Or it could also mean that

20    they, like central checked it for us, or

21    they cancelled it, the request.   I'm not

22    100 percent sure that I was at the hospital

23    at 0750.   It could be a different thing.

24        Q.     But you were at the hospital at

25    0805?

Case 23-24, Document 30, 04/19/2023, 3501826, Page60 of 241
**[JA-437]**

```
                                          Page 54
 1                    M. CHEEMA
 2         A.    Yeah.
 3         Q.    Was the hospital in question
 4    here the Jamaica Hospital?
 5         A.    Yes.
 6         Q.    So, you were completing
 7    multiple jobs at once, you were bringing
 8    Mr. Singh to the hospital, but at the same
 9    time responding to these other jobs, is
10    that right?
11         A.    Yeah.  They are not called
12    jobs.  They are not really like 911 calls.
13    They are 911 calls at the individual
14    precinct, but for us it's not a job.  It's
15    not something where I would have to speak
16    to somebody at length, or prepare any
17    paperwork or anything.  My attention was
18    for the call intox call that I got at
19    130-18 Atlantic Avenue.
20         Q.    We are going to go through the
21    details of Mr. Singh's incident with you,
22    but I want to finish through the Memo Book.
23    After you prepared the Aided Report, and it
24    looks like you did that around 0805 a.m.,
25    is that right?
```

```
                                           Page 55

 1                  M. CHEEMA
 2        A.     At 0805 is when I marked the
 3   job.  I could have done the Aided Report a
 4   little before, or while I was in the
 5   hospital, or during.  When I mark the job,
 6   it's a final, and whatever reports I
 7   prepared.  It's not necessarily the time I
 8   did all that stuff at that time.
 9        Q.     How do you prepare an Aided
10   Report?  Do you do a paper copy first?
11        A.     No.  At that time, I'm not sure
12   if we did do a paper copy, because over the
13   years we started using tablets.  I'm pretty
14   sure that I did it on Forms, which is this
15   program.  I'm not sure if there is any
16   paper copy.  I don't remember doing a paper
17   copy.  I remember doing it strictly on
18   Forms.
19        Q.     That Forms program, is that
20   available on a tablet?
21        A.     Correct.
22        Q.     That tablet is something that
23   you guys carry with you, or you have in the
24   RMP?
25        A.     They are in the cars, and it's
```

Page 56

```
                          M. CHEEMA
 1
 2    accessible through the department cell
 3    phones.
 4        Q.    Did you have a portable
 5    department cell phone on February 28th of
 6    2018?
 7        A.    I am not 100 percent sure.  We
 8    had a few different phones over the years.
 9    I'm not sure which one I had.
10        Q.    Did you have a department cell
11    phone?
12        A.    Yes.
13        Q.    You're not sure if it was one
14    that allowed you to do an Aided Report?
15        A.    I'm not sure if it's the one I
16    have currently.  I don't remember when I
17    got that one.
18        Q.    You said you prepare your Memo
19    Book.  Do you do them contemporaneously at
20    the time the incidents are happening, or do
21    you finalize your Memo Book after the end
22    of your tour, or something in the middle
23    between the two?
24            MR. SCHEINER:  Objection to
25        form.
```

```
                                            Page 57
 1                  M. CHEEMA
 2        A.     Sometimes the nature of the
 3   call doesn't allow me the time to update
 4   the Memo Book right away, so a lot of times
 5   it is looked back through the ICAT System,
 6   which is the dispatch system for how the
 7   jobs are given to us.  We will look through
 8   that to try to get times.  If I happen to
 9   look at my watch at that time, I will
10   remember it was at this time, so I will
11   document it at this time when I know the
12   job is completed, or if I'm in between the
13   job, let's say, for example, if I'm at the
14   hospital waiting, or something like that.
15        Q.     It's fair to say that it's
16   something, the way you prepare these Memo
17   Book entries, you do them at the time when
18   you have a chance to do it, or sometimes at
19   the end of your tour, right?
20               MR. SCHEINER:  Objection to
21        form.
22        A.     Whenever we get the chance
23   through the day.  If I have a job which is
24   not really considered a priority, like a
25   heavy priority, I can take the time to
```

```
                                        Page 58
 1                  M. CHEEMA
 2    write it in my Memo Book.  Sometimes we
 3    have in progress jobs, like robberies,
 4    assault, anything that demands us to get
 5    there really quickly, and I won't
 6    necessarily have the time to pencil it into
 7    my book before I get there.
 8        Q.    Do you look at your Memo Book
 9    entries at the end of the tour and make
10    sure everything is correct before you leave
11    for the day?
12            MR. SCHEINER:  Objection to
13         form.
14        A.    I think I do well enough during
15    the day that I try to keep track of
16    everything.  At the end of the day, it's
17    really more of just, you know, making sure
18    I return the property that I was given
19    throughout the tour.  Just in case I have a
20    prisoner in my car, double check the back
21    seat and make sure they didn't drop
22    anything.  I make sure I submit the keys,
23    because we get in trouble if we don't
24    submit the keys.
25            MR. COHEN:  Everyone, I'm
```

Page 59

M. CHEEMA

1
2       sorry, I'm going to have to log off
3       for 10 minutes.  I will be back.  I
4       have another court appearance.
5               (Whereupon, a 10 minute break
6       was taken.)
7               MR. SCHEINER:  The witness
8       wanted to clarify something while we
9       were on break.
10              MR. COHEN:  Okay, that's fine.
11      Let me just set the foundation.
12      Q.      Officer Cheema, you wanted to
13  clarify certain things about your testimony
14  you gave earlier this morning, correct?
15      A.      Yes.
16      Q.      While we were on break, without
17  telling me what was said, you had an
18  opportunity to speak to your attorney?
19      A.      Yes.
20      Q.      After you spoke with your
21  attorney, that's why you want to now
22  clarify your testimony?
23              MR. SCHEINER:  Objection to
24       form.
25      Q.      Tell me what specifically you

Case 23-24, Document 30, 04/19/2023, 3501826, Page66 of 241
**[JA-443]**

```
                                              Page 60
 1                    M. CHEEMA
 2     wanted to testify to.
 3          A.     Two things.  So, in regards to
 4     the Patrol Guide, yes, I do keep a copy of
 5     the Patrol Guide in my locker.  That is the
 6     one that I referred to back in 2017 when I
 7     was studying.  We also have an online
 8     version that's continuously updated.
 9     Obviously, when I'm in the field, I can
10     only access the online version.  If I ever
11     do come across an incident that I need a
12     little more guidance on, that might be a
13     little unusual, I always refer to the
14     online version of the Patrol Guide.
15     Secondly, the Memo Book.  Now, the Memo
16     Book, I do put details in it, but I think
17     the detail thing, I was assuming that you
18     meant specific.  The details that I put in
19     it, let's say to prepare for court, or for
20     a trial or something, would be the job it
21     is, what kind of job I have, and also that
22     if I do need to prepare for court, that I
23     have, for example, the aided number that I
24     can refer to that number directly to
25     prepare for that case.  Whenever I'm
```

**[JA-444]**

```
                                           Page 61
 1                 M. CHEEMA
 2   prepared for court or anything, I can refer
 3   to that number.  I don't have to dig around
 4   to try to find it.  I know it's readily
 5   there, so I can refer to that in order to
 6   prepare.
 7        Q.    Just respect to, you said you
 8   have the online Patrol Guide.  Do you ever
 9   refer to that regularly?
10        A.    Regularly, yes.
11        Q.    When is the last time you
12   referred to it?
13        A.    Sometime this year I referred
14   to it.
15        Q.    In 2020?
16        A.    Yes.
17        Q.    Would you say one time, two
18   times?
19        A.    I don't know for sure.  We do
20   have them accessible in the tablets in our
21   cars.  I remember looking at it one time
22   this year at one point.
23        Q.    Do you remember what subject
24   you looked at the Patrol Guide for in this
25   year?
```

```
                                          Page 62
 1                  M. CHEEMA
 2        A.     Not particularly.  It was a 911
 3   call.  I think it was a 911 call.  I don't
 4   remember exactly what it was.  I wanted to
 5   make sure that the proper steps were being
 6   followed, because I wasn't sure about all
 7   of the steps.  It was an unusual call that
 8   we don't get all of the time.
 9        Q.     Did you have this electronic
10   Patrol Guide availability in 2018, February
11   of 2018?
12        A.     In February of 2018, I couldn't
13   tell you for sure.  Sometimes I don't know
14   what's going on with the tablet or
15   anything.  We did have the Patrol Guide
16   online.  I'm not sure if it was in the
17   tablet though.
18        Q.     It's October of 2020 right now.
19   You said you referred to it once in this
20   year, from January to October.  That's 10
21   months.  How many times do you think you
22   referred to it in 2019?
23        A.     That I cannot tell you for
24   sure.
25        Q.     Do you think it was more than
```

```
                                              Page 63
 1                    M. CHEEMA
 2    one time?
 3         A.    Yes.
 4         Q.    More than five times?
 5         A.    That I don't know.
 6         Q.    Somewhere between one and five
 7    times you probably referred to it?
 8              MR. SCHEINER:  Objection to
 9         form.
10         A.    Yes.
11         Q.    I want to close out the
12    notations in your Memo Book real quick.
13              MR. SCHEINER:  Gerald, the
14         question you asked earlier, if we
15         redacted anything related to this
16         incident.  During the break we
17         checked, and there was something we
18         redacted, which was just the number
19         for the Aided Report.  That was the
20         mistake.  You will get the
21         un-redacted part.  That just contains
22         the number.  Other than the number
23         for the Aided Report, there was
24         nothing redacted that relates to this
25         incident.
```

Case 23-24, Document 30, 04/19/2023, 3501826, Page70 of 241
**[JA-447]**

```
                                                Page 64
 1                   M. CHEEMA
 2              MR. COHEN:  Thank you for the
 3         clarification.
 4         Q.    So, Officer Cheema, after you
 5    wrote down the time entry at 0805, you then
 6    have a few other entries.  One is referring
 7    to a taser.  Can you tell us what that's
 8    referring to?
 9         A.    That's the tasers that we are
10    given to by the precinct.  They belong to
11    the precinct.  They are not our individual
12    tasers.  We sign them out at the beginning
13    of our shift, and we give it back at the
14    end of our shift.
15         Q.    You were getting ready to go
16    off your shift at around 8:00 a.m.?
17         A.    That's 8:10.
18         Q.    You started to return the
19    equipment, like the taser, and what else is
20    over here, you checked the RMP for
21    contraband?
22         A.    Yes.
23         Q.    You gave back the keys for the
24    RMP, correct?
25         A.    Yes.
```

Page 65

                    M. CHEEMA
1
2        Q.    Then I guess at 0820 it was end
3    of tour, EOT?
4        A.    Yes.
5        Q.    So, this was the last job you
6    had, dealing with Mr. Singh, was that the
7    last job you had at the end of your tour?
8        A.    Yes.
9        Q.    That and I know you said it
10   wasn't considered a job, but you also did a
11   canvass at the hospital since you were
12   there, correct?
13       A.    Right.
14       Q.    Let's turn to the incident.  At
15   some point, you got a radio run, correct?
16       A.    Yes.
17       Q.    That radio run indicated that
18   you should go to Mr. Singh's apartment; is
19   that correct?
20       A.    Yes.
21       Q.    That apartment was located at
22   130-18 Atlantic Avenue?
23       A.    Yes.
24       Q.    And you were told to go to
25   Apartment 3?

Case 1:19-cv-00632-EK-ST   Document 48-7   Filed 11/29/21   Page 66 of 235 PageID #: 654

```
                                               Page 66
 1                    M. CHEEMA
 2         A.     I don't remember what apartment
 3    it was.
 4         Q.     Was it a third floor apartment?
 5         A.     I remember it was a walk-up.
 6    It could have been the second or third.
 7         Q.     Can you describe the building,
 8    was this a multi-unit building?
 9         A.     Yeah.   It was a private house
10    with multi-family apartments.
11         Q.     Was there one apartment on each
12    floor, or were there multiple apartments on
13    each floor?
14         A.     That I can't tell you.   I don't
15    know.
16         Q.     When you arrived at the house,
17    did you park on the street, on the
18    driveway, something else?
19         A.     I don't remember that.
20         Q.     You were driving, correct?
21         A.     Yes.
22         Q.     You presumably parked the car?
23         A.     Yes.
24         Q.     Was it a marked police car?
25         A.     Yes.
```

```
                                              Page 67
 1                   M. CHEEMA
 2        Q.    Did you put on your lights or
 3   sirens on your way to the location?
 4        A.    That I don't remember for sure.
 5        Q.    Looking at your Memo Book, with
 6   the notation of serious, does that indicate
 7   that you might have put your lights and
 8   sirens on, or you're not sure?
 9        A.    I'm not sure.
10        Q.    Once you parked your car, you
11   went into the building; is that correct?
12        A.    Yes.
13        Q.    Did someone have to let you
14   into the building, or were you able to gain
15   entry into the building on your own?
16        A.    Again, I can't tell you that
17   for sure.
18        Q.    Did you meet with the EMTs in
19   front of the building or inside the
20   apartment?
21        A.    Inside the apartment.
22        Q.    You had no discussion with the
23   EMTs prior to going into the apartment?
24        A.    No.
25        Q.    Did you run or get information
```

Page 68

```
 1                    M. CHEEMA
 2    from dispatch about the history of EDPs at
 3    the apartment?
 4          A.    Not that I recall.
 5          Q.    EDP incidents, or domestic
 6    incidents, or anything like that?
 7          A.    Not that I recall, no.
 8          Q.    You have no memory of being
 9    told that there is a history of domestic
10    incidents at this apartment?
11          A.    Correct.  I don't have any
12    memory of being told that.
13          Q.    You have no memory of there
14    being prior incidents of emotional
15    disturbed persons at this apartment,
16    correct?
17          A.    Correct.  I didn't know that
18    before going there.
19          Q.    When you got to the front door
20    of the apartment, did you knock?
21          A.    That I can't tell you.
22          Q.    Do you know who let you into
23    the apartment?
24          A.    I don't remember who let me in.
25          Q.    Were you the first person to
```

Case 23-24, Document 30, 04/19/2023, 3501826, Page75 of 241

```
                                                     Page 69
 1                    M. CHEEMA
 2     come into the apartment, or were your
 3     partners the first people to come into the
 4     apartment?
 5          A.    I don't remember who the first
 6     person was in the apartment.
 7          Q.    Did all of you enter into the
 8     apartment?
 9          A.    Yes.
10          Q.    When you entered into the
11     apartment, what was the first thing you
12     observed?
13          A.    The first thing we observed was
14     the EMTs, another woman, and then when we
15     made our way in, we found a man sitting on
16     the couch.
17          Q.    Going back to the dispatch, do
18     you remember what you were specifically
19     told by dispatch when going to this
20     apartment?
21          A.    All we were told by dispatch
22     was that EMS is requesting keys to the
23     apartment.
24          Q.    Did you hear from dispatch that
25     there had been a 911 call?
```

Case 23-24, Document 30, 04/19/2023, 3501826, Page76 of 241
**[JA-453]**

```
                                                    Page 70
 1                         M. CHEEMA
 2          A.    When EMS requests, they will
 3     tell us further, the dispatch will tell us
 4     further what kind of job it is.
 5          Q.    Did they do that in this case?
 6          A.    I don't remember for sure if
 7     they did.  The dispatch did tell us that it
 8     was an intox male that EMS was requesting,
 9     but other than that we didn't get other
10     information through our dispatcher.
11          Q.    You didn't get information
12     about whether someone called 911, or any
13     specific information about what you were
14     about to encounter in entering the
15     apartment; is that correct?
16          A.    Correct.
17          Q.    You just were told there was an
18     intox and to go to that location, correct?
19          A.    Yes.
20          Q.    So, you said you entered the
21     apartment.  Tell me what you observed.
22          A.    We entered the apartment.  We
23     see the EMTs, another female standing next
24     to the EMTs, and then we see a male on the
25     couch.
```

```
                                              Page 71
 1                    M. CHEEMA
 2         Q.    Who was the first person you
 3    spoke with?
 4         A.    It was the EMTs.
 5         Q.    Which one of the EMTs did you
 6    speak with?
 7         A.    I cannot tell you that.
 8         Q.    Were the EMTs female or male?
 9         A.    Female.
10         Q.    Do you remember what they
11    looked like?
12         A.    Two short females.
13         Q.    Do you remember if they were
14    African American, Caucasian, or something
15    else to identify what they looked like?
16         A.    That I couldn't tell you.
17         Q.    You spoke to one of the two
18    EMTs, correct?
19         A.    Yes.
20         Q.    What, if anything, did she say
21    to you?
22         A.    The first thing I always ask is
23    if they are okay.  They said that they were
24    okay, and that they were fine.  Then they
25    told us that the wife called saying that he
```

Case 23-24, Document 30, 04/19/2023, 3501826, Page78 of 241
**[JA-455]**

```
                                        Page 72
  1                M. CHEEMA
  2    was intoxicated, and that he is being
  3    uncooperative with them.  He was being
  4    uncooperative with them to the point where
  5    it made them feel unsafe.
  6         Q.    Did they explain to you in what
  7    way they were feeling unsafe?
  8               MR. SCHEINER:  Objection to
  9         form.
 10         A.    They did, but at this time, I
 11    don't remember exactly what was said.
 12         Q.    Did they explain to you how he
 13    was being uncooperative?
 14         A.    Yes.  They told me that they
 15    explained to him the consequences of his
 16    condition, and the fact that they would
 17    have to have him get evaluated at the
 18    hospital.
 19         Q.    Did you have an understanding
 20    from the EMTs what his condition was?
 21         A.    Yes.
 22         Q.    Can you tell me what that was?
 23         A.    That he was intoxicated.  He
 24    was incoherent.  He had signs of an altered
 25    mental state, and that they couldn't leave
```

```
                                              Page 73
 1                  M. CHEEMA
 2    him for fear that something might happen to
 3    him if they didn't get him evaluated.
 4          Q.    Did they explain what they
 5    feared might happen to him?
 6          A.    Yes.
 7          Q.    What did they explain to you?
 8          A.    From my understanding, it was
 9    that he could accidentally fall, he could
10    hit his head, it was something to that
11    effect.
12          Q.    Was he sitting at the time this
13    was all happening?
14          A.    When we got there, he was
15    sitting.  I don't know what happened before
16    we got there.
17          Q.    At some point, did you have a
18    conversation with Mr. Singh?
19          A.    I did.
20          Q.    What was the nature of your
21    conversation with Mr. Singh?
22          A.    First, I asked him how he's
23    doing, what's going on, why are we here.
24    That's common practice for me.  I always
25    try to find out from the person themselves,
```

```
                                           Page 74
 1                   M. CHEEMA
 2    what led to EMS or police being over here.
 3    I gave him a chance to explain what was
 4    going on with him.  He was rambling a lot.
 5    He was very incoherent.  I couldn't get
 6    anything out of him.  It was a lot of
 7    yelling and cursing in English and in
 8    Punjabi, which I understood.
 9         Q.    Let me step back for a second.
10    Did the EMTs ever tell you that he
11    threatened to assault them in any way?
12         A.    The EMTs, I don't remember if
13    they told me that he threatened to assault
14    them.  He had very erratic behavior that
15    caused them concern for their safety before
16    we got there.
17         Q.    So, the EMTs did not say that
18    Mr. Singh assaulted them in any way; is
19    that correct?
20         A.    Correct.
21         Q.    The EMTs did not say that
22    Mr. Singh attempted to assault them in any
23    way; is that correct?
24         A.    Correct.
25         Q.    Did you guys obtain permission
```

```
                                              Page 75
 1                      M. CHEEMA
 2     to enter Mr. Singh's home from Mr. Singh?
 3          A.    No.
 4          Q.    Did you obtain permission to
 5     enter Mr. Singh's home from his wife?
 6                MR. SCHEINER:  Objection to
 7           form.
 8          A.    No.
 9          Q.    Going back to your conversation
10     with Mr. Singh, you said he was hard to
11     understand, but he was saying words in
12     English and in Punjabi; is that correct?
13          A.    Yes.
14          Q.    Do you remember any of the
15     specific words he used with you in English,
16     or can you translate the meaning of what he
17     said to you in Punjabi?
18          A.    It was mostly just swear words.
19     I can't tell you exactly what was said.  I
20     remember he was swearing a lot, and he kept
21     looking at his wife saying, "Look what you
22     did, you brought all these people here,
23     you're going to pay."
24          Q.    He said the words, "You are
25     going to pay."?
```

Case 23-24, Document 30, 04/19/2023, 3501826, Page82 of 241

Page 76

```
                         M. CHEEMA
 1
 2         A.     Something to that effect.  I
 3    remember he said that in Punjabi.
 4    Basically, he said, "Don't cause any more
 5    problems or anything for yourself by
 6    talking with them."
 7         Q.     I'd like to know the exact
 8    language that he used so that it's very
 9    precise.  We are all adults here.  Can you
10    tell me the swear words he used?
11         A.     I would say it, but I don't
12    remember exactly what he was saying.  All I
13    remember was him just looking at his wife
14    and just cursing a lot.  I would say the
15    words, but I don't remember exactly what he
16    said.  It was two and a half years ago.  I
17    don't remember the exact words, but I do
18    remember him cursing a lot, and him just
19    looking at his wife and saying something to
20    the effect of, "Look what you did.  You did
21    this.  You brought all these people here."
22    He was pretty much implying to her that he
23    was going to take some type of action
24    towards her once we left.
25         Q.     Before you said he said
```

```
                                                Page 77
 1                    M. CHEEMA
 2   something to the extent of, "You're going
 3   to pay."  Now you said it was an
 4   implication that there was something he
 5   might do when you left.  Was it something
 6   specific he said, or was it just your
 7   feeling from his tone that he was going to
 8   take some sort of retribution for having
 9   the police come?
10            MR. SCHEINER:  Objection to
11         form, and objection to the
12         characterization of the testimony.
13        A.    Whatever my feeling is, it
14   doesn't mean anything.  Based off of what
15   he was saying at that time made me believe
16   that something was going to happen if we
17   just packed up and left him over there.  I
18   can't say for sure what he was going to do.
19   All I know is that he just kept looking at
20   her and told her, "You did this to me,
21   you're going to pay, you did this."  That
22   made me believe that the situation was
23   escalating at that point.
24        Q.    Did he ever specifically say,
25   "I am going to hurt you," in any way to his
```

```
                                              Page 78
 1                     M. CHEEMA
 2    wife?
 3               MR. SCHEINER:  Objection.
 4         A.    That I can't remember for sure.
 5         Q.    Were there any specific threats
 6    he made to his wife in your presence?
 7               MR. SCHEINER:  Objection.
 8         A.    Specifically, I don't remember.
 9    I did not take any notes of anything that
10    he said.  It was what was going on at the
11    time we were there at that call.
12         Q.    Did you have a conversation
13    with his wife at that time?
14         A.    I did.
15         Q.    Did she ever indicate to you
16    that he threatened to assault her?
17               MR. SCHEINER:  Objection.
18         A.    She didn't mention anything
19    about that.  She was just more concerned
20    about what was going on at that moment.
21    It's 7:00 in the morning.  There's police
22    officers and EMTs over there.  She was
23    more, from what my understanding was, she
24    was more concerned with what was going on.
25    She didn't mention to me anything about
```

```
                                              Page 79
 1                    M. CHEEMA
 2    insults or anything like that.
 3         Q.    Did she mention to you anything
 4    regarding his threats to assault her?
 5         A.    I don't remember asking about
 6    that, only because I understood what he was
 7    saying, so I don't remember asking her
 8    anything specific, because we were just
 9    dealing with him at that moment.
10         Q.    You didn't write down anywhere,
11    either in your Memo Book or anywhere else,
12    anything that you are now saying you
13    believe made you think something was going
14    to happen if you left?
15              MR. SCHEINER:  Objection to
16         form.
17         A.    What?
18         Q.    You didn't document or write
19    down any of the words he was saying that
20    made you feel like the situation was
21    escalating?
22         A.    No, I didn't document it.
23         Q.    Did he make any gestures
24    towards his wife?
25         A.    Not that I can recall.  I
```

Page 80

                        M. CHEEMA

1

2    remember every time I would try to calm him

3    down, he kept focusing his attention to

4    her.

5        Q.    When you say focusing his

6    attention to her, he was just saying, "I

7    can't believe you did this, I can't believe

8    you called all these people," to that

9    effect, correct?

10               MR. SCHEINER:   Objection to

11        form.

12       A.    And also the other part,

13   "You're going to pay for what you did."

14       Q.    That made you believe that

15   there was going to be physical violence as

16   a result?

17       A.    That made me believe that the

18   situation was escalating from when we first

19   got there.   I don't know what happened when

20   EMS was there first, but from the moment we

21   got there, I can see it was slowly

22   escalating.

23       Q.    Just going back, did he make

24   any physical gestures or threatening

25   maneuvers towards his wife while you were

Case 23-24, Document 30, 04/19/2023, 3501826, Page87 of 241

```
                                          Page 81
 1                   M. CHEEMA
 2    there?
 3              MR. SCHEINER:   Objection.
 4        A.    Not that I recall.
 5        Q.    Did he attempt to attack his
 6    wife at all while you were there?
 7        A.    No.
 8        Q.    Did he attempt to attack
 9    anybody while you were there?
10              MR. SCHEINER:   Objection to
11         form.
12        A.    Can you please rephrase that?
13        Q.    Did he attempt to assault
14    anybody while you were present in the
15    apartment?
16              MR. SCHEINER:   Objection to
17         form.
18        A.    No.
19        Q.    Did he say anything about
20    harming himself while you were in the
21    apartment?
22        A.    No.
23        Q.    Did he ever say anything about,
24    "I want to kill myself," or anything to
25    indicate he was suicidal in any way?
```

Case 23-24, Document 30, 04/19/2023, 3501826, Page88 of 241
**[JA-465]**

```
                                            Page 82
 1                    M. CHEEMA
 2          A.    No.
 3          Q.    After your initial conversation
 4   with him, what happened next?  What were
 5   you saying to him while he was sort of
 6   talking about all of the things you just
 7   described?
 8          A.    At that point, I'm just trying
 9   to convince him that, based on what the
10   circumstances are and based on our
11   position, that it would be best for him to
12   go to the hospital to get evaluated.  I was
13   convincing him to just get dressed and go
14   to the hospital, and if everything is fine,
15   he wasn't going to be there that long.
16          Q.    You perceived his statements to
17   his wife to be threatening, correct?
18          A.    I perceived them to be that the
19   situation was escalating.
20          Q.    What does that mean?
21          A.    Meaning from just not saying
22   anything to her to automatically going to
23   like that, I believe that now he can
24   potentially be a danger, yes.
25          Q.    Potentially be a danger to her,
```

Page 83

```
 1                  M.  CHEEMA
 2    correct?
 3         A.    To anybody in that house,
 4    including us.
 5         Q.    You didn't believe his
 6    statements rose to the level of menacing,
 7    which is a crime under the penal law,
 8    correct?
 9              MR. SCHEINER:  Objection to
10         form.
11         A.    No, not to the level of
12    menacing.  Menacing is something completely
13    different.
14         Q.    How about rose to the level of
15    harassment?
16              MR. SCHEINER:  Objection.
17         A.    To harassment, to harassment, I
18    can't say for certain, only because, like I
19    said, I do remember that the statements did
20    cause me some concern, but I can't tell you
21    for sure if it was harassment.
22         Q.    His statements to his wife did
23    not rise to the level of a crime or
24    violation of the New York Penal Law,
25    Administrative Code, or any other violation
```

```
                                         Page 84
 1                      M.  CHEEMA
 2    that you enforce as a Police Officer; is
 3    that correct?
 4                    MR.  SCHEINER:   Objection to
 5       form.
 6        A.    Yes.
 7        Q.    So, seeing this incident
 8    unfold, you are trying to convince him to
 9    go to the hospital, correct?
10        A.    Yes.
11        Q.    At some point, does he sort of
12    come around and agree to go to the
13    hospital?
14        A.    Yes.
15        Q.    What does he say to you to
16    agree?
17        A.    I don't remember exactly what
18    he was saying, but at some point, I
19    remember he didn't outwardly say, "Okay
20    guys, you are right, I'll go to the
21    hospital."  It was something that I took as
22    he was grudgingly going to do.  Then he
23    gets up and then he starts to get dressed.
24        Q.    So, he grudgingly agreed to go
25    to the hospital, correct?
```

```
                                                Page 85
 1                       M. CHEEMA
 2           A.    Yes.
 3           Q.    Did you, at any point, tell
 4      him, "If you don't agree to go to the
 5      hospital, we are going to force you to go
 6      to the hospital."?
 7           A.    When I was explaining to him
 8      what the situation was, I lay down what the
 9      options are.  At the end of the day, he's
10      still an adult.  I explained to him what
11      the two options are, and I let him make an
12      informed decision.  It can come off as
13      threatening, but it's not.  It's protocol.
14      They're an adult.  This is what we have on
15      the table.  It is their decision to make,
16      and I will prefer it the easier way.  Just
17      like that.
18           Q.    So, what were the options that
19      you gave him?
20           A.    They were basically what I told
21      him before.  I said, "If you are saying
22      that you don't need to be medically
23      evaluated, your stay at the hospital is not
24      going to be that long.  We feel, and the
25      EMS, the medical professionals, feel that
```

```
                                        Page 86
 1                  M. CHEEMA
 2   you can't be in this apartment by yourself,
 3   and we can't leave, because we're not
 4   helping you in the situation.  If we feel
 5   you need help, we can't just leave you."
 6   It's something that happens.  Like I stated
 7   earlier, maybe an accident happens and
 8   something severe happened to him, because
 9   he's in that state.  The second option I
10   made to him was, "We don't have a choice in
11   this matter.  I know you don't want to go,
12   but if you don't want to go, then we would
13   have to place you in handcuffs, and we
14   would have to take you to the hospital.  We
15   would have to take you to the ambulance and
16   go with you to the hospital."
17        Q.    So, I didn't hear an option
18   there.  It sounded like he either has to
19   go, or he has to go.
20             MR. SCHEINER:  Objection to
21        form.
22        A.    There's really no other, those
23   are the two options.  There's really no
24   third option.
25        Q.    What was the second option?
```

```
                                              Page 87
 1                  M. CHEEMA
 2    It's either he has to go, or he has to go.
 3    What was the second option?
 4                  MR. SCHEINER:  Objection to
 5        form.
 6        A.    The choice was for him to make,
 7    like how would he want to go.  He could go
 8    as a gentleman, and we can put in the word,
 9    just to take care of him, he doesn't want
10    to be there that long, or he can go into
11    the hospital, take a screening, and his
12    stay is going to be much longer.  Those
13    were the two options.  It's either his stay
14    is really short, or his stay is really
15    long.
16        Q.    So, you gave him the options.
17    The options were that he could cooperate
18    with you and go to the hospital, and you
19    would tell the hospital staff that he was
20    cooperative, so that he would have a short
21    stay, or he could not cooperate with you,
22    and come in, go into the hospital forcibly
23    with handcuffs, and you would then indicate
24    to hospital staff that he was
25    uncooperative, which would require him to
```

Page 88

M. CHEEMA

1
2       have a longer stay in the hospital, those
3       were the two options?
4               MR. SCHEINER:  Objection to
5            form.  That misstates testimony.
6           Q.    Were those the options you gave
7       him, sir?
8               MR. SCHEINER:  Objection to
9            form.
10          A.    Clearly, I'm not a medical
11      professional.  I don't work at the
12      hospital.  I don't know how long a person
13      can stay in or not.  What I was trying to
14      explain to him, for the perception of the
15      people who work at the hospital, like the
16      nurses, or the doctors, they can observe
17      for themselves what the situation is, based
18      off of the report that they get from us and
19      the EMS.  They ultimately make the
20      determination.
21          Q.    Did you tell him that if he was
22      cooperative, he would have a good report
23      with the hospital from you?
24              MR. SCHEINER:  Objection to
25           form.

Case 23-24, Document 30, 04/19/2023, 3501826, Page95 of 241
**[JA-472]**

Page 89

                    M. CHEEMA

1
2       A.    I would tell him that there's
3   two options of dealing with this.  Either
4   he can go and there's nothing wrong.  If he
5   feels something is wrong, that's fine.  He
6   can tell the hospital about that, and I
7   didn't perceive his stay to be very long.
8   I said that if we bring you in handcuffs,
9   now they are going to want to know why is
10  he in handcuffs, why is he screaming, and
11  so on and so forth.  Those were the options
12  I made to him on the table.
13      Q.    So, you gave him an option to
14  go into the hospital without handcuffs on,
15  and an option to go to the hospital with
16  handcuffs on?
17      A.    Not in so many words.
18      Q.    You told him that if he was
19  cooperative, he wouldn't need to be
20  handcuffed?
21      A.    I would tell him that we could
22  do this simply, he can walk into the
23  ambulance, there's no need for handcuffs.
24      Q.    And then you gave him the
25  alternative option, which was that if he

```
                                        Page 90
  1               M. CHEEMA
  2   refused to go, that he would then need to
  3   be put in handcuffs?
  4        A.    Yeah.  I explained to him from
  5   our side, and I also tried to reason with
  6   him, like, okay, it's not for us, do it for
  7   your family.  We were there because
  8   somebody called, and that they obviously
  9   feel that you need to go get evaluated, go
 10   and get yourself checked out.
 11        Q.    I just want to understand the
 12   two options.  It sounds like the two
 13   options were going without handcuffs or
 14   going with handcuffs, is that right?
 15             MR. SCHEINER:  Objection to
 16        form.
 17        A.    That's like very basic of what
 18   it is.  It was more to that.  It's
 19   everything that I laid out before, about
 20   the whole going in with handcuffs and going
 21   without, and then when we actually get to
 22   the hospital, and then what our report is
 23   going to be to the nursing staff about him.
 24   There was more to it.  It wasn't simply
 25   with or without handcuffs.
```

Page 91

```
 1                     M. CHEEMA
 2          Q.     Give me option one, without the
 3     handcuffs.  Tell me what option one would
 4     look like.
 5          A.     Option one would be that you
 6     get dressed.  You go into the ambulance.
 7     We go to the hospital.  Clearly, you feel
 8     nothing's wrong with you, you feel like
 9     you're absolutely fine, you let the nursing
10     staff and doctors make the determination.
11     I'm not a doctor.
12          Q.     And your report to the hospital
13     in option one would be what?
14          A.     That he's intoxicated.  From
15     what I see, he's intoxicated.  He's
16     cooperative.  There was no force necessary.
17     He's complied with all of my orders and
18     that was it.
19          Q.     Option two was what?
20          A.     Option two would be now that we
21     would have to place you in handcuffs, and
22     we would have to take you into the
23     ambulance, the same thing, escort with you.
24     Now, you're going into the hospital with
25     handcuffs, and now there's more questions
```

Case 23-24, Document 30, 04/19/2023, 3501826, Page98 of 241
**[JA-475]**

```
                                        Page 92
 1                M. CHEEMA
 2   that come up.  Now, hospital security gets
 3   involved, why is he in handcuffs, is he
 4   under arrest, was he combative, why is he
 5   in handcuffs.  So, the first people we
 6   generally meet at that situation would be
 7   security coming up to us right away, as
 8   opposed to that he was a regular patient
 9   who just had a stretcher, or walked in on
10   their own volition.
11        Q.    What did you tell him your
12   report to the hospital would be if it went
13   down as option two?
14             MR. SCHEINER:  Objection to
15        form.
16        A.    It's really not my report.
17   It's really just, in a situation like that,
18   they would ask us only about the
19   handcuffing part.  They would ask EMS about
20   any other signs they observed.  They are
21   more trained to observe for that stuff and
22   test for that stuff.  They would only ask
23   me about the handcuffing part, which I
24   would tell them that he was placed in
25   handcuffs because of this.
```

```
                                              Page 93
  1                    M. CHEEMA
  2        Q.    So, you explained those options
  3   to him.  What did he say after you
  4   explained those options to him?
  5        A.    I don't remember exactly what
  6   he said.  I do remember him starting to go
  7   get dressed.
  8        Q.    He understood he had no choice,
  9   he had to go to the hospital?
 10             MR. SCHEINER:  Objection to
 11        form and foundation.
 12        A.    I don't know.  All I remember
 13   was that he started getting dressed.
 14        Q.    Was it your understanding that
 15   he seemed to understand that you weren't
 16   going to give him another option, you were
 17   going to take him to the hospital with or
 18   without his consent?
 19             MR. SCHEINER:  Objection to
 20        form.
 21        A.    I explained everything to him.
 22   Whatever he understood was whatever he
 23   understood.
 24        Q.    When you were communicating
 25   with him, were you trying to make him
```

Case 23-24, Document 30, 04/19/2023, 3501826, Page100 of 241
**[JA-477]**

Page 94

                    M. CHEEMA

1    understand that you were taking him to the

2    hospital with or without his consent?

3         A.    I was trying to make him

4    understand that going to the hospital would

5    be the right thing for him, but with or

6    without consent, I wouldn't put it like

7    that.  It was really just me trying to

8    explain to him, this is what we're

9    presented with, and you have to go get

10   yourself checked out.

11        Q.    My question is, aside from what

12   he understood, did you make the

13   determination you were going to take him to

14   the hospital regardless of whether he

15   consented or not?

16        A.    Made a determination that he

17   was going to have to go to the hospital.

18        Q.    Regardless of whether he

19   consented, correct?

20        A.    At that point, I wasn't

21   thinking about that.  When you're on a call

22   like that, you're trying to dispute with

23   the person to just go, just go.  I don't

24   remember thinking, like, yeah, by any means

Case 23-24, Document 30, 04/19/2023, 3501826, Page101 of 241
**[JA-478]**

```
                                                Page 95
 1                     M. CHEEMA
 2     necessary.  I just remember that I wanted
 3     him to just please go.
 4          Q.    Now, looking back, you made a
 5     determination to take him to the hospital
 6     no matter what, is that right?
 7          A.    He had to get himself checked
 8     out.
 9          Q.    You made that determination?
10          A.    Right, after consulting EMS,
11     yes.
12          Q.    You said he started to get
13     dressed, correct?
14          A.    Yes.
15          Q.    Were you present with him while
16     he was getting dressed?
17          A.    Yes.
18          Q.    What was he wearing when you
19     came to the apartment?
20          A.    I believe it was a shirt and
21     shorts.
22          Q.    Were you able to see if he had
23     any weapons on him?
24          A.    No, not at that time.
25          Q.    Did you do a search, or a pat
```

Page 96

                        M. CHEEMA
1
2    down, or anything like that?
3         A.    That I don't remember if I did
4    or not.
5         Q.    Were you concerned at all that
6    he was going to attack you or anything?
7              MR. SCHEINER:   Objection.
8         A.    I was just a little concerned,
9    but nothing to the point where I would have
10   to take any action while he was getting
11   dressed.   It was just a concern from
12   earlier, from the wife situation.
13        Q.    Did he make any threatening
14   moves towards you?
15        A.    Not towards me.
16        Q.    Did he make any threatening, or
17   menacing gestures, or make any comments to
18   you?
19        A.    He was just rambling a lot.   I
20   don't remember exactly what he was saying.
21   I do remember the way he started yelling at
22   that point, and just like little words that
23   he would be able to get out just started to
24   make me believe, like, yeah, he's becoming
25   a little more erratic, a little more

Case 23-24, Document 30, 04/19/2023, 3501826, Page103 of 241
**[JA-480]**

```
                                                  Page 97
 1                      M. CHEEMA
 2     aggressive.
 3          Q.    When he started getting
 4     dressed, did that indicate to you that he
 5     was picking option one, which was to go in
 6     cooperatively?
 7          A.    Yes.
 8          Q.    So, you were under the belief
 9     that he was trying to get dressed and going
10     to cooperate, yes?
11          A.    Yes.
12          Q.    Did he make any threatening
13     gestures or comments to any of your
14     partners?
15               MR. SCHEINER:  Objection to
16          form.
17          A.    That I couldn't tell you for
18     sure.  I don't remember.
19          Q.    How about to the EMTs while you
20     were present, did he make any threatening
21     comments or gestures to the EMTs?
22               MR. SCHEINER:  Objection to
23          form.
24          A.    No.
25          Q.    I presume you saw the video.
```

```
                                              Page 98
 1                   M. CHEEMA
 2    We are going to watch the video in a few
 3    minutes.  At some point, he does get
 4    dressed, is that right?
 5         A.    Yes.
 6         Q.    You're present the entire time
 7    while he's getting dressed?
 8         A.    Yes.
 9         Q.    He's wearing long johns and a
10    thermal shirt, is that right?
11         A.    I guess.  I'm not too sure what
12    he was wearing.
13         Q.    Did he say anything to you
14    like, "Why are you in my house?  I'm just
15    drinking.  There's nothing wrong with
16    drinking.  It's not illegal to drink."  Did
17    he say anything to that effect to you?
18         A.    I don't remember him saying
19    anything like that to me.
20         Q.    Now, was there anybody else
21    present in the apartment, other than the
22    officer, the EMTs, his wife, and him?
23         A.    Yeah, there was another guy
24    over there.
25         Q.    Did he interact with you at
```

Case 23-24, Document 30, 04/19/2023, 3501826, Page105 of 241
**[JA-482]**

```
                                             Page 99
 1                    M. CHEEMA
 2     all?
 3           A.    I think so, to the effect of
 4     what's going on.  I don't remember what I
 5     said to him or anything.  I was just more
 6     concerned, like, why is this guy out here.
 7           Q.    Did you have any conversation
 8     with him at all?
 9           A.    I think more towards before we
10     left the apartment.
11           Q.    What was the nature of that
12     conversation?
13           A.    I told him to just go back and
14     walk away.  Well, I was thinking to myself.
15           Q.    At some point, Mr. Singh is
16     fully dressed, correct?
17           A.    Yes.
18           Q.    He puts on his glasses, is that
19     right?
20           A.    Yes.
21           Q.    And he's about to walk out the
22     door, do you remember that?
23           A.    There was something that
24     happened before that.
25           Q.    What happened right before he
```

```
                                              Page 100
 1                    M. CHEEMA
 2    was about to walk out the door?
 3            A.     So, the way I remember the
 4    video, we can watch it again to clarify.   I
 5    do remember him putting his hands behind
 6    his back, and then like bringing them
 7    forward.  I don't know if that was the
 8    first time he tried to walk out the door,
 9    or if it was the second time.  I do
10    remember that action happening before he
11    walked out the door, because he started to
12    change his mind, that he did not want to go
13    to the hospital.
14            Q.     What indicated to you that he
15    changed his mind, and that he didn't want
16    to go to the hospital?
17            A.     He told me.
18            Q.     What did he say?
19            A.     He said, "I don't want to go.
20    I don't want to go."
21            Q.     That was at what point?
22            A.     That was right after he got
23    dressed.
24            Q.     And then what happened?  Then
25    he put his hands behind his back?
```

Page 101

                          M. CHEEMA
1
2           A.      Something that he doesn't want
3    to go to the hospital.  I said to him,
4    "You're already dressed at this point.  Why
5    are you going to back out now, you already
6    got dressed."  He starts going towards the
7    door.  I don't think he opened the door.  I
8    don't remember that part.  Then all of a
9    sudden he said, "I don't want to go to the
10   hospital."  It was something to that
11   effect.
12          Q.      As he's near the door, he says,
13   "I don't want to go to the hospital."?
14          A.      The sofa is near the door.  The
15   way we were standing, of course, he's going
16   to be by the door.  He was saying that he
17   doesn't want to go anymore.
18          Q.      After he says that he doesn't
19   want to go anymore, what happens next?
20          A.      I explained to him before that
21   he's already dressed, let's just go.  I
22   explained to him that we are going to
23   handcuff him and take him to the hospital.
24   Then he said, "Fine.  You're going to have
25   to handcuff me."

Page 102

                    M. CHEEMA

1

2        Q.    Is that when he put his hands

3   behind his back?

4        A.    Right when he said that

5   statement, he started putting his hands

6   behind his back, and then I was getting

7   ready to handcuff him.

8        Q.    And then what happened after

9   that?

10        A.    He pulls his arms to the front

11   saying, "I'm just joking.  You're not going

12   to handcuff me."  Then he takes a step

13   towards my partner, Officer Walker.

14        Q.    When you say he takes a step,

15   what kind of step?

16        A.    It was a sudden step towards my

17   partner.

18        Q.    And then what happened?

19        A.    At that point, based off of his

20   behavior, and based off of everything that

21   led up to that point, just different levels

22   of aggression that he kept displaying the

23   whole time, his behavior changing, and at

24   that point I no longer felt, like, okay

25   this is a safe scene, so I grabbed him from

```
                                              Page 103
 1                    M. CHEEMA
 2    behind, and then I took him to the floor
 3    where me and Officer Davis handcuffed him.
 4         Q.    You said he took a step towards
 5    your partner?
 6         A.    A sudden step.
 7         Q.    Did he say anything as he took
 8    a sudden step?
 9         A.    I don't remember if he said
10    anything.  It was just the initial action
11    of him bringing his hands to the front and
12    saying, "No, no, no, you're not going to
13    handcuff me."  Then he took that sudden
14    step, which made me no longer feel safe.
15         Q.    Did he do any kind of gesture,
16    like he was going to attack your partner?
17              MR. SCHEINER:  Objection to
18          form.
19         A.    That I don't remember for sure.
20    It all happened really quickly.
21         Q.    You indicate a sudden step.
22    Other than the sudden step and bringing his
23    hands forward, did he ball up his fists?
24         A.    That I don't remember.  I was
25    behind him.
```

Page 104

                    M. CHEEMA

1

2        Q.     Did he touch your partner?

3        A.     No.

4        Q.     Did he say anything to your

5    partner to indicate that he was about to

6    attack your partner?

7             MR. SCHEINER:   Objection to

8         form.

9        A.     That I don't remember.

10        Q.     Other than taking a sudden step

11    and putting his hands forward, did he do

12    anything else to indicate that he was about

13    to be aggressive in any way?

14        A.     It was my determination, based

15    off of everything that happened from the

16    time that we got in and to that very

17    moment, and the different levels of

18    escalation.   He was becoming more and more

19    unpredictable, and that's what led me to

20    have to restrain him in that way.

21        Q.     Was he angry when he put his

22    arms behind his back and made that sudden

23    step?

24             MR. SCHEINER:   Objection to

25         form.

Page 105

                    M. CHEEMA

1         A.    He was angry the whole time.

2   He never stopped.  Again, I don't know for

3   sure, because I'm not him, but from what I

4   understood, he was the entire time not

5   happy about us being over there.

6         Q.    Was he laughing at the time

7   that he put his arms behind his back?

8         A.    I do remember that.  He was

9   laughing and his mood would change from

10  laughter to, like, excitement, to yelling.

11  He was laughing at that moment, yeah.

12        Q.    Right before he took this

13  sudden step and put his arms behind his

14  back, he jokingly said, "Go ahead and

15  arrest me."  Then he took the sudden step

16  and moved his hands forward, and that's

17  when you grabbed him and threw him to the

18  ground, correct?

19             MR. SCHEINER:  Objection to

20        form.

21        A.    He took the sudden step.  At

22  that point, I didn't know what he was going

23  to do, so I took him to the ground.

24        Q.    When you took him to the

Page 106

                        M. CHEEMA

1

2    ground, do you know what part of his body

3    hit the ground?

4         A.    From what I saw, it was just

5    the abdomen area.

6         Q.    Did he have a bruise on his

7    face when you picked him up?

8         A.    That I don't remember.

9         Q.    You were standing behind him,

10   correct?

11        A.    Yes.

12        Q.    You twisted him down to the

13   ground.  Did you get on top of him when you

14   brought him down?

15        A.    I don't think I was completely

16   on top of him.  I was on the side, because

17   I was trying to get his arms behind his

18   back.  He wasn't giving us his arms.

19        Q.    If you're facing him, did you

20   take him down to the left, or did you take

21   him down to the right?

22            MR. SCHEINER:  Objection to

23        form.

24        A.    To the right.  From what I

25   believe, it was to the right.  I'm

Page 107

```
 1                    M. CHEEMA
 2      right-handed, so it was more towards the
 3      right.
 4           Q.    When you took him down, were
 5      you facing the other way?
 6           A.    Yes.
 7           Q.    Did you ever come to learn
 8      whether there was domestic incident reports
 9      between him and his wife?
10           A.    No.
11           Q.    Did you get the names of the
12      EMTs that you were dealing with?
13           A.    That I don't remember.  We
14      usually just get the shield numbers.  It
15      depends on the circumstance.  Sometimes
16      you're not afforded that luxury.
17           Q.    I'm going to show you the Aided
18      Report now.  Other than the Aided Report
19      and your Memo Book, did you create any
20      other documentation in connection with this
21      incident?
22           A.    No.
23           Q.    Can you see the Aided Report
24      that is now up on the screen?
25           A.    Yes.
```

Page 108

```
 1                   M. CHEEMA
 2          Q.    It's a two-page document, and
 3     for purposes of the record, it's bates
 4     stamped D00001 and D00002.  Do you see
 5     that, sir?
 6          A.    Yes.
 7          Q.    I'm going to go over every box,
 8     just to be thorough.  This is the document
 9     that you prepared in connection with this
10     incident with Mr. Singh, correct?
11          A.    Yes.
12          Q.    The incident date was 2/28/2018
13     at 6:50 a.m.; is that correct?
14          A.    Yes.
15          Q.    The report number is how you
16     track it in the NYPD system?
17          A.    Yes.
18          Q.    Now, in the first box, the top
19     of the first page, there's a section that
20     asks whether a body camera was worn, is
21     that right?
22          A.    Yes.
23          Q.    You clicked no, is that right?
24          A.    Yes.
25          Q.    You weren't wearing a body
```

```
                                              Page 109
 1                    M. CHEEMA
 2    camera that day?
 3          A.    We weren't issued body cameras
 4    at that time.
 5          Q.    The form already had that as an
 6    option?
 7          A.    Yes.
 8          Q.    There must have been some
 9    people in the NYPD wearing body cams, but
10    you at the time were not wearing a body
11    cam?
12                MR. SCHEINER:   Objection to
13           form.
14          A.    I was not issued a body camera
15    at that time.
16          Q.    This document, the one we are
17    actually looking at, is filled out on a
18    computer, right?
19          A.    Yes.
20          Q.    There's a drop-down menu for
21    all of these questions that are filled out,
22    is that right?
23          A.    Yes.
24          Q.    Like body worn camera, there
25    would be a drop down menu, and you have an
```

Page 110

```
 1                    M. CHEEMA
 2    option to click yes or no?
 3         A.    Correct.
 4         Q.    That's true for a lot of the
 5    information filled out on this form,
 6    correct?
 7              MR. SCHEINER:  Objection to
 8         form.
 9         A.    Anything that's a yes or no
10    question would that have option.
11         Q.    In this particular case, Aided
12    Person, the NYPD refers to the Aided Person
13    as people who are needing medical
14    treatment, correct?
15         A.    Correct.
16         Q.    Here it says, type.  I'm
17    assuming there was a drop-down for
18    civilian, something else?
19         A.    Yes.
20         Q.    This person is a civilian,
21    correct?
22         A.    Correct.
23         Q.    Did you fill in all of this
24    information about his address?
25         A.    Yes.
```

Case 23-24, Document 30, 04/19/2023, 3501826, Page117 of 241
**[JA-494]**

```
                                              Page 111
 1                    M. CHEEMA
 2          Q.    You actually typed it in
 3   yourself?
 4          A.    Yes.
 5          Q.    Where did you get all of this
 6   information from?
 7          A.    What do you mean, the date of
 8   birth and everything?
 9          Q.    Yeah, his date of birth.  I'm
10   assuming you knew the address already.  How
11   about his race, did you get it from him?
12          A.    I don't remember if I got it
13   from him.  If I can't get it from the
14   person, I will try to get it from someone
15   who knows him in the house, but I don't
16   remember if I got it from him or not.
17          Q.    You don't remember?
18          A.    Correct.
19          Q.    There's a section down here as
20   to what he's being brought in for, correct?
21          A.    Correct.
22          Q.    You wrote he was sick/injured,
23   correct?
24          A.    Right.
25          Q.    There was an option here for
```

```
                                            Page 112

 1                    M. CHEEMA
 2   yes or no, right?
 3        A.      Correct.
 4        Q.      You selected that he was sick?
 5        A.      Sick or injured.
 6        Q.      In what way was he injured?
 7        A.      That was the best option that I
 8   could pick out of this.  There was no other
 9   option, like the system was still, they
10   were still working the kinks out of it.
11   There was no other thing for intox, or
12   anything like that.  Sick or injured was
13   the only thing that I could pick up from
14   over here that would classify.  That was
15   the best thing I could pick at the time,
16   and usually if that's the best thing, I
17   would elaborate further in the narrative.
18        Q.      You didn't think he was an
19   emotionally disturbed person?
20        A.      No.
21        Q.      You didn't treat him like an
22   emotionally disturbed person?
23        A.      No.
24        Q.      Down here he was hospitalized.
25   This is where you took him, that's that
```

Page 113

```
 1                    M. CHEEMA
 2   information down here?
 3        A.     Correct.
 4        Q.     What is this number right here?
 5        A.     That is the ACR.  That is the
 6   Ambulance Report.
 7        Q.     You cross referenced the
 8   document that's prepared by the EMTs, is
 9   that right?
10        A.     No.  I didn't cross reference.
11   I don't look at their paperwork.  In order
12   to link the paperwork between different
13   agencies, I include the ACR number there,
14   but at no point do I look at their
15   paperwork to see what they write or
16   anything.
17        Q.     How did you get that
18   information?
19        A.     I asked them.
20        Q.     This is some information about
21   the location of the incident.  Going back
22   to the top here before we go down.  It
23   says, "Suspected Narcotics Related."  You
24   wrote no, because you didn't believe he had
25   used a narcotic substance?
```

Page 114

                        M. CHEEMA
1
2        A.     Correct.
3        Q.     You were pretty sure he had
4    just been intoxicated by alcohol?
5        A.     It wasn't that I was pretty
6    sure.  There was nothing for me to observe,
7    at that time, if he was under the influence
8    of anything else.  The only thing I could
9    gauge was the intoxication.
10       Q.     Is there any reason why you
11   didn't put intoxication by alcohol in the
12   If Other, explain box?
13       A.     Again, I was still learning the
14   whole computerized system, because before
15   that it was a paper system, so over the
16   years, as I had gotten better at it, I've
17   been able to clarify it more.
18       Q.     Was that a mistake, not putting
19   intoxicated by alcohol in the explanation
20   box?
21            MR. SCHEINER:  Objection to
22        form.
23       A.     It wasn't a mistake.  It was
24   that I didn't understand the system fully
25   at that time.  I make it a point to put a

Page 115

                        M. CHEEMA

1

2    narrative where I could actually type out

3    what my observations were.

4         Q.    In this box where it says, If

5    Other, Explain, is that a drop-down, or was

6    that an area where you can put a narrative?

7         A.    I don't remember the last time

8    I did an Aided Report, so I don't remember

9    exactly.  I do know you can type something

10   over there.  I don't know if it's a

11   drop-down or not.

12        Q.    You didn't have to make any

13   other notifications, is that right?

14        A.    Correct.

15        Q.    Now, there is this whole

16   section if the person is an EDP, right?

17        A.    Right.

18        Q.    Even though you indicated he

19   was acting sort of bizarre, and he was

20   making sort of nonsense when he was talking

21   to you, you didn't think he was an EDP,

22   correct?

23             MR. SCHEINER:  Objection to

24        form.

25        A.    At that time, I didn't actually

Page 116

1                    M. CHEEMA
2    put him as an EDP, no.
3         Q.    Did you fill out all of these
4    other boxes, even though you determined he
5    wasn't an EDP?
6         A.    I don't know if those are like
7    drop-downs, or what I did with all of that.
8    At that time, I was still learning the
9    computerized system, so I didn't know fully
10   how to do it.
11        Q.    In this section, there's an
12   indication here, or a question that needs
13   to be filled out where it says, "Attempted
14   physical harm to self."  Right next to it,
15   it says no.  He didn't attempt to
16   physically harm himself, correct?
17        A.    Correct.
18        Q.    That's why you put it in as no?
19        A.    Like I said, I don't know if,
20   at that time, it was just prefilled out, or
21   if you had to scroll up.  I know that in
22   some reports, they automatically have a
23   prewritten thing where you have to change
24   it.  I'm not sure, at that time, what was
25   going on with this.  I don't know if I put

```
                                          Page 117
 1                    M. CHEEMA
 2    in the no, or if it was already
 3    preprogrammed there.
 4          Q.    You still had this whole form
 5    in front of you, correct?
 6          A.    Yes.
 7          Q.    You either saw that it was
 8    prefilled out, you indicated that he didn't
 9    have any history of EDP, right?
10          A.    That I knew of.  That I was
11    aware of.
12          Q.    As far as you knew, when this
13    form was filled out, he had no prior
14    history of being an EDP, correct?
15          A.    Correct.
16          Q.    That's what was indicated on
17    the form?
18          A.    Yeah.
19          Q.    Also, what's indicated on the
20    form is that he did not attempt physical
21    harm to himself, correct?
22          A.    Yes.
23          Q.    In reality, he didn't attempt
24    to physically harm himself, correct?
25          A.    Correct.
```

```
                                          Page 118
 1                    M. CHEEMA
 2          Q.    It also says here, in the
 3    section where it requests whether he
 4    attempted physical harm to others, it says
 5    no.
 6          A.    Right.
 7          Q.    You finished this form with
 8    that indicated, that he did not attempt
 9    physical harm to others, is that right?
10              MR. SCHEINER:  Objection to
11         form.
12          A.    Correct.
13          Q.    He didn't attempt physical harm
14    to others, right?
15              MR. SCHEINER:  Objection.
16          A.    No, not while we were there,
17    no.
18          Q.    You end up signing this form
19    electronically, or endorsing it somehow,
20    correct?
21          A.    Yes.
22          Q.    That's your name at the bottom?
23          A.    Yes.
24          Q.    At some point, when you
25    complete the form, you have to hit submit,
```

```
                                        Page 119
 1                     M. CHEEMA
 2     and that's the same as if you sign the
 3     form?
 4          A.    Yes.
 5          Q.    So, it has the same force and
 6     effect as if you signed it, and did it in
 7     the regular course of your business,
 8     correct?
 9               MR. SCHEINER:  Objection.
10          A.    Yes.
11          Q.    And you have a duty, as a
12     Police Officer, to accurately fill out this
13     form, correct?
14               MR. SCHEINER:  Objection.
15          A.    When it allows.  Sometimes
16     technology can be a little not functioning.
17          Q.    You have a duty, to the best of
18     your ability, to fill out this form and
19     make it as accurate as possible, correct?
20               MR. SCHEINER:  Objection to
21          form.
22          A.    Yes.
23          Q.    The purpose is so that there's
24     a clean, authentic, factual record of the
25     event, correct?
```

```
                                              Page 120
 1                    M. CHEEMA
 2                    MR. SCHEINER:   Objection to
 3           form.
 4           A.    Yes.
 5           Q.    Going back, you signed the form
 6      after this particular box of, placed self
 7      in dangerous situation was clicked no,
 8      correct?
 9           A.    Correct.
10           Q.    Did he place himself in a
11      dangerous situation, as far as you believe?
12                    MR. SCHEINER:   Objection to
13           form.
14           A.    Yeah.
15           Q.    Even though he placed himself
16      in a dangerous situation, and you believe
17      he placed himself in a dangerous situation,
18      you submitted the form indicating he did
19      not place himself in a dangerous situation,
20      correct?
21           A.    The form was submitted with a
22      no in the check box, yeah.
23           Q.    You also have no checked off
24      for the box indicating whether he
25      physically threatened others.  Do you see
```

Case 23-24, Document 30, 04/19/2023, 3501826, Page127 of 241

```
                                              Page 121
 1                    M. CHEEMA
 2   that?
 3         A.    Yes.
 4         Q.    Is that accurate, or is that
 5   not accurate?
 6         A.    That's accurate.
 7         Q.    He did not physically threaten
 8   others?
 9         A.    No.  Other than the statement
10   that I brought up earlier, there were no
11   physical threats.
12         Q.    Even assuming that prior
13   statement you brought up, you don't believe
14   that was physically threatening others,
15   right?
16         A.    I believe it caused for alarm,
17   but as far as a physical threat, that
18   didn't qualify as a physical threat.
19         Q.    This box that's checked no
20   regarding physically threatened others is
21   accurate, correct?
22         A.    Yes.
23         Q.    "Verbally threatened others,"
24   you also checked no, correct?
25         A.    Correct.
```

```
                                        Page 122
 1                   M. CHEEMA
 2         Q.    Is that accurate?
 3         A.    That's accurate.
 4         Q.    "Spoke of harming self or
 5   others," you checked no, correct?
 6         A.    That's accurate.
 7         Q.    "Unable to care for himself,"
 8   you checked no, is that accurate?
 9         A.    No.
10         Q.    You believe he was unable to
11   care for himself?
12         A.    Yes.
13         Q.    And that's because he was
14   intoxicated?
15         A.    Correct, and other factors.
16         Q.    What were the other factors?
17         A.    The whole behavior thing I was
18   talking about earlier.  The fact that his
19   behavior would change between being angry,
20   and playful, and excited, like different
21   behaviors that I brought up earlier.
22         Q.    He was intoxicated, he was
23   acting intoxicated?
24         A.    And erratic and aggressive.
25         Q.    Even though he was erratic and
```

```
                                        Page 123
 1                    M. CHEEMA
 2    aggressive, as you indicated, he didn't
 3    physically threaten others, he didn't speak
 4    of harming others, he didn't verbally
 5    threaten others, correct?
 6                    MR. SCHEINER:   Objection to
 7          form.
 8          A.    Right.
 9          Q.    It's also checked that he was
10    not suspected of being under narcotic
11    influence, is that right?
12          A.    Yes.
13          Q.    That's correct, right?
14          A.    From what my knowledge was,
15    yes.
16          Q.    Then it says, "Under suspected
17    alcohol influence," and you also checked
18    no, correct?
19          A.    Right.
20          Q.    And that's incorrect, is that
21    right?
22          A.    That's 100 percent incorrect.
23          Q.    He admitted to being under the
24    influence of alcohol, correct?
25          A.    Correct.
```

Page 124

1               M. CHEEMA
2        Q.    You didn't input in other to
3   explain details, it just says no?
4        A.    Yeah.
5        Q.    Now, how long have you been a
6   Police Officer for by the time this
7   incident occurred?
8        A.    Six and a half years.
9        Q.    How many Aided Reports have you
10  filled out prior?
11       A.    A lot.
12       Q.    Like 100?
13       A.    That's accurate, maybe a little
14  more.
15       Q.    Even the written reports that
16  existed, do they have these boxes where you
17  check off whether they were physically or
18  verbally threatening to others or to
19  themselves?
20            MR. SCHEINER:  Objection to
21       form.
22       A.    Yes.
23       Q.    You're familiar with the
24  different boxes where you check yes or no
25  for, correct?

Page 125

                         M. CHEEMA

1

2        A.    Yes.

3        Q.    The only change is that now

4    it's on an iPad, or some other computer

5    device, correct?

6              MR. SCHEINER:  Objection to

7         form.

8        A.    Yes.

9        Q.    Prior to this incident, you

10   filled out numerous forms that contain this

11   information, correct?

12             MR. SCHEINER:  Objection to

13        form.

14       A.    Yes.

15       Q.    Now, under Details it says, "At

16   T/P/O Aided Intox/Combative removed to

17   Jamaica Hospital for treatment."  Just so

18   the record is clear, T/P/O means time and

19   place of occurrence?

20       A.    Correct.

21       Q.    That's the time up here, which

22   is February 28th of 2018 at 6:50, and the

23   place is his address, correct?

24       A.    Yes.

25       Q.    What kind of treatment was he

```
                                           Page 126
 1                    M. CHEEMA
 2   taken at Jamaica Hospital for?
 3         A.     He was just taken to Jamaica
 4   Hospital for an evaluation.   Whatever the
 5   treatment was that he got over there,
 6   that's between the hospital and him.
 7         Q.     Did he exhibit any symptoms of
 8   alcohol poisoning?
 9                MR. SCHEINER:   Objection to
10          form and foundation.
11         A.     I can't tell you that.   I don't
12   know about the alcohol poisoning thing.
13         Q.     Was he vomiting?
14         A.     No, not when we got there.
15         Q.     Did anybody ever tell you that
16   he was vomiting prior to you getting there?
17         A.     No one told us anything about
18   that.
19         Q.     Was he having problems
20   breathing?
21         A.     I can't tell you.
22         Q.     Did he indicate in any way that
23   he was having headaches?
24         A.     Not that I remember, no.
25         Q.     Did anybody indicate to you, or
```

Case 23-24, Document 30, 04/19/2023, 3501826, Page133 of 241
**[JA-510]**

```
                                                    Page 127
 1                      M. CHEEMA
 2   did you observe in any way that he was dry
 3   heaving in any way?
 4                MR. SCHEINER:  Objection to
 5         form.
 6         A.     Again, I'm not an expert in
 7   that about breathing.
 8         Q.     Did he indicate in any way that
 9   he was going to pass out or go unconscious?
10         A.     No.
11         Q.     Did he appear to have pale skin
12   or blue tint skin?
13                MR. SCHEINER:  Objection to
14         form.
15         A.     Not that I remember.
16         Q.     Did he appear to have low body
17   temperature?
18                MR. SCHEINER:  Objection to
19         form and foundation.
20         A.     I did not check his
21   temperature.  I don't know.
22         Q.     Did the EMTs check his
23   temperature?
24         A.     I don't know.
25         Q.     Did they indicate to you in any
```

```
                                               Page 128
 1                    M. CHEEMA
 2    way that they believe he might be
 3    exhibiting signs of alcohol poisoning?
 4         A.    I didn't ask them, and they
 5    didn't tell me.
 6         Q.    Have you ever taken anybody to
 7    the hospital for barely being drunk?
 8              MR. SCHEINER:  Objection to
 9         form.
10         A.    No.
11         Q.    I'm going to show you the video
12    in a moment.
13         A.    Okay.
14              MR. SCHEINER:  Gerald, do you
15         mind if we take a short break now?
16              MR. COHEN:  Sure.  Let's take a
17         short lunch break.
18              (Whereupon, a 25 minute break
19         was taken.)
20              MR. SCHEINER:  The witness
21         wants to clarify something before we
22         start.
23              MR. COHEN:  Sure.  I will set
24         the foundation for that.
25         Q.    Officer Cheema, your attorney
```

Page 129

```
                        M. CHEEMA
 1
 2    tells me that you want to clarify something
 3    that you testified to before.
 4         A.    Yes.
 5         Q.    We just had a 25 minute break.
 6    You had an opportunity to speak to your
 7    attorney during that break?
 8         A.    Yes.
 9         Q.    And now you want to clarify
10    your prior testimony?
11         A.    Yes.
12         Q.    Go ahead.  Please tell us what
13    you want to clarify.
14         A.    It pertains to the Aided
15    Report.  Can you pull that up?
16         Q.    Sure.  Where do you want to go
17    to?
18         A.    I want to go to the parts,
19    attempted physical harm to others, and the
20    verbally threatening others part.  Those
21    two.  When you were asking me about those
22    two specifically, the way I interpreted it
23    was, as far as physical threats go and
24    explicit physical threat.  For example,
25    balling up a fist and charging towards the
```

Case 23-24, Document 30, 04/19/2023, 3501826, Page136 of 241

Page 130

                    M. CHEEMA
1
2    person, or attempting to hit them or
3    anything, that's what I would use as a
4    physical threat.  Something very explicit,
5    like I have to stop this person, otherwise
6    they are actually going to complete the
7    act.
8         Q.    So, Mr. Singh did not engage in
9    any explicit attempted physical harm to
10   others, right?
11        A.    He didn't try to punch anybody.
12   He didn't try to kick anybody or anything.
13   He didn't ball his fist.  He didn't show
14   any signs in his body, like, during the
15   whole incident that he was going to
16   explicitly hit somebody.
17        Q.    He didn't do that in front of
18   you, right?
19        A.    No.
20        Q.    Did you get informed by anybody
21   that he was attempting physical harm, like
22   the EMTs, or his wife?
23        A.    They didn't tell that to me.
24        Q.    Now, with respect to the
25   verbal, what did you want to say?

Page 131

                              M. CHEEMA
1
2          A.     With the verbal threat, I did
3    say earlier that he did tell his wife,
4    "You're going to pay, you did this to me."
5    I didn't perceive that as a physical
6    threat.  A physical threat would be to me
7    saying, "I'm going to kill you.  I'm going
8    to punch you.  I'm going to beat you up."
9    I took it as something that wasn't
10   threatening in physical body form.  That's
11   what I took as a threat.
12         Q.     So, what are you saying?  Was
13   that a verbal threat, or was that not a
14   verbal threat?
15         A.     It was a threat, but it wasn't
16   a threat that would be something that, me,
17   acting as a Law Enforcement Officer, I
18   would feel that I would have to deal with,
19   as in arresting him or documenting it.  It
20   was just a general threat.  For example, if
21   somebody says, "I'm going to write nasty
22   things about you," when it's not true.
23   Those are general threats.  I'm talking
24   about in perspective of a Law Enforcement
25   Officer, like a verbal threat to me would

Page 132

                        M. CHEEMA
1
2    be someone who says and has intention of
3    committing physical harm.
4         Q.    You did not perceive him to say
5    or have intention to commit physical harm,
6    is that what you're saying?
7              MR. SCHEINER:  Objection to
8         form.
9         A.    As far as the verbally
10   threatening part on the Aided Report, I
11   answered no, but I didn't see that the
12   threat that he made originally was
13   pertinent to any crime, or anything like
14   that.  That's why it was a no on the
15   report.
16        Q.    Okay.  We are going to turn our
17   attention to the video.
18        A.    Okay.
19             MR. SCHEINER:  For the record,
20        can you describe the video file, like
21        by the name of the file and how long
22        it is, or what the time stamp is.
23        What I was saying was, can you
24        identify the file for the record.
25             MR. COHEN:  Yes.  Can I

Page 133

```
 1              M. CHEEMA
 2      identify it by the length of the
 3      video?  I think it's the only one
 4      that was 8 minutes and 50 seconds
 5      long.
 6          MR. SCHEINER:  Okay.  Yeah, I
 7      think that's sufficient.  If you have
 8      a file name, that would be useful,
 9      too.
10          MR. COHEN:  I think it's just
11      called, "Police Video."
12          MR. SCHEINER:  I want to note
13      on the record that, even though,
14      generally, I'm not familiar with
15      discovery, I do know that that
16      particular video was produced, I
17      think after the others, I think
18      earlier this week.  For technical
19      reasons, the witness was not able to
20      see that video, so, in other words,
21      we got it, but we couldn't use it in
22      preparation.  Nevertheless, I'm not
23      objecting to you asking about it.
24      You can go ahead.  I just wanted to
25      note that.
```

Page 134

1              M. CHEEMA

2          MR. COHEN:  Hannah mentioned

3      that she only got two videos.  I

4      think they got lost in translation or

5      something.  I thought we produced it.

6      I produced it this week, as soon as

7      she told me.  It substantially was

8      seen as the other video.  It has a

9      little bit more coverage, slightly

10     more coverage.

11         MS. FUCHS:  Just for

12     clarification, the original video

13     that we had produced, which was 5

14     minutes and 54 seconds, starts a

15     little bit, it looks like after this

16     video starts and runs not as long.

17     That's really the main difference.

18     We thought that they were the same

19     duplicate videos, but it turns out

20     that one was longer than the other.

21         MR. COHEN:  This one contains

22     more time.  We will mark the video as

23     Exhibit 4.

24         (Whereupon, a Police Video was

25     marked as Plaintiff's Exhibit 4 for

Page 135

1                    M. CHEEMA

2          identification as of this date by the

3          Reporter.)

4          Q.     Can you see the video on the

5     screen?

6          A.     Yes.

7          Q.     I'm going to start playing it.

8     I believe this starts when you just get

9     into the apartment.  I'm pausing it at five

10    seconds into the video.  Do you see

11    yourself on that video, sir?

12         A.     Yes.

13         Q.     You were the first person to

14    enter the apartment?

15         A.     Yes.

16         Q.     On the right-hand side of the

17    screen, there appears to be an individual

18    in a uniform, an EMT with a pony tail.  Do

19    you see that?

20         A.     Yes.

21         Q.     That was one of the EMTs we had

22    discussed earlier?

23         A.     Yes.

24         Q.     Right to the left of you in the

25    video, to the right on the screen, as we're

```
                                           Page 136
 1                    M. CHEEMA
 2    looking at it, is an individual in a Gap
 3    Sweatshirt, correct?
 4          A.    Yes.
 5          Q.    Do you know who that individual
 6    is?
 7          A.    No.
 8          Q.    Right behind you in the video
 9    is an African American NYPD Officer.  Was
10    that one of the officers you were working
11    with that day?
12          A.    Yes.
13          Q.    Do you remember which officer
14    that is?
15          A.    Officer Davis.
16          Q.    To the right of you in the
17    video, and to the left of us looking at it
18    on the screen, is Mr. Singh, is that right?
19          A.    Yes.
20          Q.    Do you see anybody else in this
21    video?
22          A.    No.
23          Q.    There appears to be, right
24    behind the gentleman with the Gap
25    Sweatshirt, you see a foot, and if you look
```

```
                                           Page 137
 1                    M. CHEEMA
 2    up at his face, there's a little light that
 3    catches the face.  Do you know who that is?
 4         A.    No.
 5         Q.    Did you observe a child at the
 6    house at all?
 7         A.    I don't remember if there was a
 8    child there or not.
 9         Q.    I'm going to continue playing
10    the video.  If there's something you see in
11    the video that you want to talk about or
12    explain, just let me know and I will stop
13    it.
14              MR. SCHEINER:  Objection to
15         form.
16         A.    Okay.
17         Q.    I'm stopping it at 16 seconds.
18    It looks like, as soon as you came in, you
19    turned your attention directly to
20    Mr. Singh, is that right?
21         A.    Correct.
22         Q.    Did you say something to him?
23         A.    I'm sure I did.  It was
24    probably just the same thing I tell
25    everybody when I first meet them, how they
```

```
                                          Page 138

  1                       M. CHEEMA
  2    are doing.
  3          Q.    Did you know if he was the
  4    subject or anything like that at that
  5    point?
  6          A.    No.  I think one of the EMTs
  7    probably made a motion towards him, or they
  8    probably made a gesture to him.  That's how
  9    I knew he was the subject.
 10          Q.    At that point, you hadn't
 11    spoken to the EMTs, right?
 12          A.    When I walk into a scene, I can
 13    do multiple things at one time.  Even
 14    though I have my direction to him, I can
 15    talk to the EMTs on the side.
 16          Q.    Did you have a conversation
 17    prior to turning to his direction?
 18          A.    Repeat the question.
 19          Q.    Did you have a conversation
 20    with the EMTs yet at this point?
 21          A.    At that point, I'm pretty sure
 22    I did.
 23          Q.    You did?
 24          A.    Yeah.
 25          Q.    Where?
```

```
                                              Page 139
 1                    M. CHEEMA
 2                    MR. SCHEINER:   Objection to
 3          form.
 4          A.    What?
 5          Q.    Where did you have the
 6   conversation with the EMTs?
 7          A.    They are right in the room.   I
 8   can listen to what they are telling me,
 9   while also keeping my eyes on him.
10          Q.    Looking at this video, you
11   believe that you were listening to what
12   they were saying while you were keeping
13   your eyes on him?
14          A.    Yes.
15          Q.    I am continuing the video.   I'm
16   stopping at 37 seconds.   At this point,
17   were you having a conversation with him, or
18   with them, or with both, or was it
19   something else?
20          A.    There were a lot of people in
21   that apartment.   I can't tell you, in that
22   moment, who exactly I was talking to.
23   Whenever I'm dealing with a subject, I
24   always just focus on them.   You never know
25   what can happen, so any time I know that
```

```
                                                    Page 140
 1                         M. CHEEMA
 2      this is a person that we are here for, I
 3      always try to make them feel like I'm
 4      paying attention to them, while I'm also
 5      listening and talking and trying to get
 6      information from other sources.
 7            Q.    Just so we're clear, do you
 8      believe though, at the time that
 9      transpired, from the last time I stopped
10      around 16 seconds or so to 37 seconds, you
11      were speaking to him, or you were speaking
12      to someone else, or maybe to all?
13            A.    From what I believe, I was
14      speaking to both, just as general practice
15      for when I do this.
16            Q.    I'm going to continue playing.
17      I'm stopping at 1 minute and 4 seconds.  Do
18      you see the interaction you had with the
19      individual with the Gap Sweatshirt?
20            A.    Yes.
21            Q.    Can you tell me what was said,
22      if you remember?
23            A.    I did not want him standing
24      anywhere behind us, so I pretty much tried
25      to convince him to go into his room.
```

```
                                          Page 141

 1                  M. CHEEMA
 2        Q.    Do you know what he said back
 3   to you?
 4        A.    No, I don't.  I don't remember.
 5        Q.    He appeared to be talking to
 6   Mr. Singh.  Do you know what he said to
 7   Mr. Singh?
 8        A.    No.
 9        Q.    I'm going to continue playing.
10   I'm stopping at 1 minute and 10 seconds.
11   Do you see that?
12        A.    Yes.
13        Q.    It appears that you turned your
14   back to Mr. Singh, correct?
15        A.    Yes.
16        Q.    Why did you do that?
17        A.    I had the other two officers
18   over there.  At that point, he's sitting
19   there, so I turned my head for a little
20   bit.  I got both of the other officers over
21   there, and I can turn around really
22   quickly, if anything were to escalate.
23        Q.    Did you talk to anybody when
24   you turned around at that point?
25        A.    The video is cut off.  The
```

```
                                           Page 142
 1                      M. CHEEMA
 2    screen is cut off.  I don't know if I
 3    talked to the wife, or if I talked to EMS
 4    at that moment.
 5         Q.    I'm going to continue playing.
 6    I stopped 1 minute and 54 seconds.  Officer
 7    Davis is going back and forth and
 8    eventually comes to the side of Mr. Singh.
 9    Do you know what's happening there?
10         A.    Not at that exact moment.  He's
11    also an officer, so I'm sure he's getting
12    information from EMS too.  I don't know
13    what he's doing.
14         Q.    I'm not talking about the
15    still.  I'm talking about what proceeded
16    the still.  You saw him going back and
17    forth.  We can't hear what's going on.
18    There's no audio.  I wasn't there.  I need
19    to know if you remember anything.
20         A.    He's probably just doing the
21    same thing that I was doing, just trying to
22    gather information in the short amount of
23    time that he can.
24         Q.    Do you know what information he
25    gathered, or could you hear what was going
```

```
                                        Page 143
 1                    M. CHEEMA
 2   on, and what information that he was
 3   gathering?
 4        A.    I don't remember what was said.
 5   I don't have a better recollection of that.
 6        Q.    Looking at his actions going
 7   back and forth from about 1 minute and 20
 8   seconds to 1 minute and 54 seconds, as you
 9   sit here today, you don't know what he was
10   doing, right?
11        A.    At this still, if you play it,
12   I'm pretty sure I will know what he was
13   doing, but I don't remember what's going on
14   with this still right now.
15        Q.    Not this particular still.
16   What proceeded the still, do you remember,
17   it's okay if you don't, but do you remember
18   what he was doing?
19        A.    He was gathering information
20   from the people who were at the scene.
21        Q.    When he's bending down near
22   where Mr. Singh is, do you know what he's
23   doing at that location?
24        A.    No.
25        Q.    I'm going to continue playing.
```

Page 144

                    M. CHEEMA
1
2    We will see if we can figure it out.  I'm
3    stopping at 2 minutes and 3 seconds.  Did
4    that indicate what he was doing?
5         A.    The screen is cut off.  I don't
6    know what he placed in front of him.
7         Q.    I'm going to continue playing.
8    I'm stopping at 2 minutes and 7 seconds.
9    You don't have an independent recollection
10   of what he was doing?
11        A.    Not at that specific action.
12        Q.    I'm going to continue playing.
13   I'm stopping at 2 minutes and 28 seconds.
14   You see the action of the EMTs on the
15   right, it looks like she's filling out some
16   paperwork, or looking at something.  Do you
17   know what she's doing?
18             MR. SCHEINER:  Objection to
19        form.
20        A.    No.
21        Q.    How about Officer Davis here,
22   he's bending down again.  Do you know what
23   he's doing?
24        A.    I don't know what he's doing.
25   I see him talking to him.  I don't know

Case 23-24, Document 30, 04/19/2023, 3501826, Page151 of 241

Page 145

```
                        M. CHEEMA
 1
 2    what he's doing.
 3         Q.    Do you know what Mr. Singh is
 4    doing at this point?
 5         A.    No.  He's blocking Mr. Singh,
 6    so I can't see what he's doing.
 7         Q.    Is he cursing at you at this
 8    point?
 9         A.    In this still, or what
10    proceeded the still?
11         Q.    Up until this point, from the
12    beginning when I started until 2 minutes
13    and 28 seconds, which is where we are
14    stopped at right now.
15         A.    Yes.
16         Q.    Do you know what he said?
17         A.    I don't remember what he said.
18         Q.    I'm going to continue playing.
19    I'm stopping at 2 minutes and 41 seconds.
20    Can you tell what Officer Davis was doing
21    there?
22         A.    It looks like he's talking to
23    someone that's out of the view of the
24    video.
25         Q.    Right before that, he was
```

Page 146

```
                         M. CHEEMA
 1
 2      bending over and talking, it looked like he
 3      was talking to Mr. Singh, or doing
 4      something while Mr. Singh was seated on the
 5      couch.  Were you able to observe what he
 6      was doing?
 7           A.    No.  Everything is cutting all
 8      of that off.
 9           Q.    I was wondering if you had an
10      independent memory of what he was doing.
11           A.    Not at that moment, no.
12           Q.    Someone flashed by the screen.
13      This is 2 minutes and 49 seconds.  It
14      stopped at what looks to be like
15      Mr. Singh's wife.
16           A.    Can you rewind that a little
17      bit?
18           Q.    Yes.  I stopped it at 2 minutes
19      and 45 seconds.  Do you see right at the
20      bottom right here?
21           A.    Yeah.  Do you have a better
22      facial thing?  I can't tell.
23           Q.    Do you think that's one of the
24      EMTs?
25           A.    I don't know.  It's so grainy,
```

```
                                              Page 147
 1                    M. CHEEMA
 2    and it was February, so a lot of people
 3    were wearing hats, so I don't know.
 4          Q.    Looking at this, it doesn't
 5    refresh your memory as to who he's actually
 6    talking to?
 7          A.    No.  I know that he was looking
 8    across, and like looking at his wife.  He's
 9    just talking to everybody, he's talking to
10    us, he's talking to his wife at the same
11    time.
12          Q.    Officer Davis, who was he
13    talking to?
14          A.    I don't know.  It could have
15    been the EMTs.
16          Q.    I'm going to continue playing.
17    I'm stopping here at 2 minutes and 59
18    seconds.  Do you see the individual with
19    the Gap Sweatshirt, he comes out again?
20          A.    Yes.
21          Q.    Did you say anything to him
22    after that?
23          A.    I don't remember if I said
24    anything to him.
25          Q.    Did you ever learn that this
```

```
                                              Page 148
 1                     M. CHEEMA
 2    person is Mr. Singh's brother?
 3           A.    No.
 4           Q.    I'm going to continue playing.
 5    I'm stopping at 3 minutes and 17 seconds.
 6    You're talking to Mr. Singh there.  Shortly
 7    before the 3 minutes and 17 seconds mark,
 8    you're talking to Mr. Singh.  Is that when
 9    you're outlining those options we
10    discussed?
11           A.    No.
12           Q.    What are you saying to him
13    there?
14           A.    I remember that's when he made
15    the statement where he said, "You're going
16    to pay."  That's where I'm telling him not
17    to talk to his wife like that, not in front
18    of us.
19           Q.    Let me go back a little bit.
20    It appears you get a little angry starting
21    at 2 minutes and 57 seconds.  I stopped at
22    3 minutes and 15 seconds.  It appears that
23    you're getting a little upset with
24    Mr. Singh.  Is that a fair assessment?
25                 MR. SCHEINER:  Objection.
```

```
                                            Page 149
 1                    M. CHEEMA
 2          A.    No.
 3          Q.    What's going on there?  Did you
 4     tell him not to threaten his wife, is that
 5     what you're telling him?
 6          A.    Yes.  I said, "Do not threaten
 7     your wife," because while that didn't
 8     constitute the verbal threat that I was
 9     telling you about earlier, that didn't
10     constitute a crime, I was still looking out
11     for him.  I was basically telling him not
12     to say anything in front of us that could
13     end up in him getting in trouble.
14          Q.    Were you talking to him in
15     English or Punjabi?
16          A.    A little bit of both.  I tried
17     to help him understand.
18          Q.    What kind of tone were you
19     using when you were talking to him from 2
20     minutes and 57 seconds to 3 minutes and 15
21     seconds?
22          A.    It wasn't the same tone that I
23     was using to speak with him about the
24     options.  At this point, I can see that the
25     behavior is changing, so it was just
```

```
                                       Page 150
 1                    M. CHEEMA
 2   reacting to that.
 3         Q.    Were you being a little more
 4   stern with him, because you didn't like the
 5   way he was talking to his wife?
 6               MR. SCHEINER:  Objection to
 7          form.
 8         A.    I couldn't tell you.  I was
 9   being a little more, at this point, a lot
10   more, I mean you walked into this job like
11   it's a serious job, but now that the
12   behavior changed, my behavior changed as
13   well.  It became even more serious to me.
14   Serious as in, we have to, anything that
15   could cause the situation to escalate, we
16   want to try to diffuse at this moment.
17         Q.    What was your tone while you
18   were talking to Mr. Singh?
19               MR. SCHEINER:  Objection to
20          form.
21         A.    I don't remember exactly what
22   my tone was, other than the fact of what I
23   just explained.
24         Q.    You got a little more serious
25   when you heard him talk to his wife,
```

```
                                              Page 151
 1                    M. CHEEMA
 2   correct?
 3        A.    Yes.
 4        Q.    I'm going to pause it right
 5   here at 3 minutes and 30 seconds.  Do you
 6   see someone on the left side over there
 7   right in this area?
 8        A.    Yes.
 9        Q.    Who is that?
10        A.    That's his wife, from what I
11   understood.
12        Q.    What is his wife doing in this
13   scene at 3 minutes and 30 seconds?
14             MR. SCHEINER:  Objection to
15         form.
16        A.    I don't know what she's doing.
17        Q.    Can you tell what she's doing
18   at 3 minutes and 42 seconds?
19        A.    Yes.
20        Q.    What is she doing?
21        A.    She's getting him clothes.
22        Q.    At this point, did he agree to
23   go to the hospital?
24        A.    I'm not sure, at this point, if
25   he agreed.  Not in this still, or even what
```

Page 152

                    M. CHEEMA

 1
 2   proceeded the still, I'm not sure that he
 3   agreed at this point.
 4        Q.    Do you see that he's getting
 5   ready to get up and get dressed or no?
 6        A.    No.  I see that his wife is
 7   getting his clothes.
 8        Q.    Now, his wife is standing right
 9   next to him, right?
10        A.    Right.
11        Q.    You weren't concerned enough to
12   separate them by his actions, you allowed
13   her to stand next to him, correct?
14        A.    Yes.
15        Q.    You didn't feel like he was
16   going to attack her in front of you, right?
17        A.    Not with me standing right
18   there, no.
19        Q.    But you believed his behavior
20   was erratic, right?
21        A.    His behavior was changing at
22   this point.  It became erratic later on.
23        Q.    You were comfortable enough
24   with his behavior that you didn't believe
25   he was going to attack his wife?

Page 153

                    M. CHEEMA
1
2                   MR. SCHEINER:   Objection to
3        form.
4        A.    I wasn't comfortable with her
5    standing there, but she is handing him
6    clothes, and he seems to be receptive to
7    putting them on.
8        Q.    You asked Mr. Singh's brother,
9    or the individual with the Gap Sweatshirt
10   on, to leave the room, right?
11       A.    Right.
12       Q.    You didn't ask his wife to
13   leave the room?
14       A.    Correct.
15       Q.    You, in fact, let her get close
16   enough to Mr. Singh that he could
17   potentially attack her, if you believed he
18   was, in fact, erratic enough to do that?
19                  MR. SCHEINER:   Objection to
20       form.
21       A.    At the time, my presumption
22   wasn't that he was close enough.  My
23   presumption was that I put myself in a
24   position where I could be clear if anything
25   like that were about to happen.

Page 154

1                        M. CHEEMA

2           Q.      I'm going to continue playing.

3     I'm stopping at 4 minutes and 45 seconds.

4     It looks like Mr. Singh is putting on his

5     pants, is that right?

6           A.      Yes.

7           Q.      At that point, did he need to

8     go to the hospital?

9           A.      He didn't expressly say it, but

10    just from the action of him putting his

11    clothes on would make me believe that he

12    was being compliant.

13          Q.      Had you told him about his

14    options at that point?

15          A.      Yes.

16          Q.      When in this video did you tell

17    him about the options that we discussed?

18          A.      It was between when me and

19    Davis were talking.  I make it a point to

20    put it in there.  I made it a point to let

21    him know that when Davis stopped talking,

22    to let him understand what the options

23    were.

24          Q.      Was that while he was getting

25    dressed, or while his wife was handing him

Page 155

```
 1                    M. CHEEMA
 2   his clothes, or before that?
 3            MR. SCHEINER:  Objection to
 4       form.
 5       A.    It was hard to get a word in
 6   edge wise, so it was before he started
 7   getting dressed.
 8       Q.    It was before this point,
 9   before 4 minutes and 45 seconds?
10       A.    Yes.
11       Q.    Is it before he stood up and
12   started grabbing his clothes?
13       A.    Yes.
14       Q.    I'm going to go back a little
15   bit.  At the 3 minutes and 43 second mark,
16   he's about to stand up.  You told him right
17   around that time?
18       A.    I can't tell you a specific
19   time.  There was a lot going on between
20   trying to get as much information as we
21   could from the EMS and the wife, trying to
22   talk with him, and then in between all of
23   that, it was there.  There was no set time.
24       Q.    At 3 minutes and 13 seconds, it
25   looks like you're saying something to him,
```

```
                                          Page 156
 1                      M. CHEEMA
 2    or talking to him in a very stern way.  It
 3    wasn't at that point that you told him
 4    these options?
 5                    MR. SCHEINER:  Objection to
 6        form.
 7        A.    No.
 8        Q.    I'm going to go back to 4
 9    minutes and 22 seconds.  While this is
10    playing, I'm going to ask you a couple of
11    questions.  We started at 4 minutes and 22
12    seconds, and the video is playing.  It's at
13    4 minutes and 37 seconds right now.  He's
14    putting on his pants, do you see that?
15        A.    Yes.
16        Q.    Do you know what was being said
17    while he was doing that?
18        A.    I don't remember exactly what
19    was being said between us at that point.  I
20    just remember him just talking a lot.
21        Q.    Are you talking to him during
22    this interaction while he's putting on his
23    clothes?
24        A.    I don't remember.
25        Q.    We're at 5 minutes and 30
```

Page 157

                        M. CHEEMA
1
2      seconds.  Is he yelling while he's putting
3      on his clothes?
4           A.    I don't remember if he's
5      yelling or anything.  I just remember him
6      talking a lot.
7           Q.    You saw Officer Davis say
8      something or gesture towards the individual
9      with the white Gap Sweatshirt down the
10     hall?
11          A.    Yes.
12          Q.    Do you know what he said to
13     him?
14          A.    No.
15          Q.    The individual with the white
16     Gap Sweatshirt goes back into the room
17     after he gestures to him?
18                MR. SCHEINER:  Objection to
19          form.
20          A.    Yes.
21          Q.    You saw that when he was trying
22     to step into his shoe, that he kind of lost
23     his balance right there?
24          A.    Yes.
25          Q.    That was around the 6 minutes

**[JA-541]**

```
                                        Page 158
 1                    M. CHEEMA
 2   and 10 seconds mark?
 3          A.     Yes.
 4          Q.     Did he look like he was going
 5   to fall over you, or anything like that?
 6          A.     No.
 7          Q.     Was he so drunk that he
 8   couldn't even put on his shoe?
 9                 MR. SCHEINER:   Objection to
10          form.
11          A.     That I couldn't tell you.
12          Q.     How drunk did you believe he
13   was?
14                 MR. SCHEINER:   Objection to
15          form.
16          A.     There's no scale on level of
17   intoxication.   It's not like we did a
18   breathalyzer.   I don't know.
19          Q.     Did it appear to you that he
20   was able to get dressed pretty much
21   unassisted?
22          A.     To me, it appeared that way at
23   the time, yeah.
24          Q.     You testified earlier that you
25   were concerned that he was going to fall
```

Page 159

1                    M. CHEEMA
2      and bump his head.  Looking at the video,
3      is that still what you believe?
4                    MR. SCHEINER:  Objection to
5          form.
6          A.    That was a general concern.
7      Whenever we deal with people who are
8      intoxicated, I don't know their exact level
9      of intoxication.  It's just a very general
10     thing that could happen if you are
11     intoxicated, so that was what we think
12     about.  It didn't pertain to him directly.
13     It was just something that is a concern for
14     us.
15         Q.    Did you ask Mr. Singh's wife if
16     she had anywhere to go in order not to stay
17     in the house with Mr. Singh?
18         A.    I don't remember asking her
19     that, no.
20         Q.    Did it ever cross your mind
21     that maybe you didn't have the authority to
22     bring him to the hospital, and that if you
23     did have some alarm, you would consider
24     asking Ms. Singh to find somewhere else to
25     go?

```
                                        Page 160
 1                  M. CHEEMA
 2              MR. SCHEINER:   Objection to
 3        form.
 4        A.    That never came across, no.
 5        Q.    I'm continuing to play the
 6   video.  You see Mr. Singh is using the
 7   front door to assist in putting on his
 8   shoe?
 9        A.    Yeah.
10        Q.    At 6 minutes and 37 seconds,
11   you hand him his jacket?
12        A.    Yes.
13        Q.    Did he ask you for the jacket,
14   or you just handed it to him?
15        A.    I don't remember.
16        Q.    By this point, at 6 minutes and
17   38 seconds into this video, do you believe
18   that Mr. Singh is going to go to the
19   hospital with you and the EMTs
20   cooperatively?
21        A.    At the time, I believed that,
22   yes.
23        Q.    Do you know what he's saying as
24   he's putting on his jacket?  Did he say
25   that he was not going to go to the hospital
```

Case 1:19-cv-00632-EK-ST   Document 48-7   Filed 11/29/21   Page 161 of 235 PageID #: 749

```
                                          Page 161
 1                    M. CHEEMA
 2   at that point?
 3        A.    I'm not sure, at that point,
 4   that he was saying it.  He's kind of just,
 5   he's still directing his attention to his
 6   wife.  I'm not sure, at that moment, that
 7   that's what he said.
 8        Q.    I'm going to continue playing
 9   the video.  I'm starting at 6 minutes and
10   56 seconds on this video.  You see his
11   wife, at 7 minutes and 5 seconds, handing
12   him something.  What is she handing him?
13        A.    Those are his glasses.
14        Q.    Did his wife, during this
15   incident, appear to be fearful of him in
16   the sense that she believed he might be
17   attacking her?
18              MR. SCHEINER:  Objection to
19        form.
20        A.    My attention was solely focused
21   on him at that time.  I don't know what the
22   wife was thinking, what she was feeling.  I
23   was more concerned with getting him into
24   that ambulance.
25        Q.    I understand that you didn't
```

```
                                              Page 162
 1                  M. CHEEMA
 2    understand what she was thinking.  Did it
 3    appear to you, from your perception, that
 4    she appeared to be fearful of him?
 5               MR. SCHEINER:  Objection to
 6          form.
 7          A.    I didn't pay that much
 8    attention to her at that time.  I was just
 9    focused on him.  I don't know what she was
10    feeling, or what I think she was feeling.
11          Q.    I'm going to continue playing
12    the video.  At the 7 minutes and 45 seconds
13    mark, he puts his fingers to his mouth.  Do
14    you see that?
15          A.    Yes.
16          Q.    Do you know what he's saying
17    when he does that?
18          A.    No.  Around this time, he
19    started saying that he doesn't want to go
20    anymore.  I don't know what he was saying
21    at that moment.
22          Q.    Were you getting a little
23    impatient with him?
24               MR. SCHEINER:  Objection to
25          form.
```

Case 1:19-cv-00632-EK-ST   Document 48-7   Filed 11/29/21   Page 163 of 235 PageID #: 751

```
                                          Page 163
 1                    M. CHEEMA
 2        A.    Not necessarily.
 3        Q.    Were you getting annoyed by his
 4   behavior?
 5              MR. SCHEINER:  Objection to
 6         form.
 7        A.    At that time, not really.  It
 8   takes a lot to get on my nerves.
 9        Q.    Was he annoying you in any way,
10   because he was sort of stalling and taking
11   his sweet time to get ready to leave?
12              MR. SCHEINER:  Objection to
13         form.
14        A.    He wasn't annoying me.  It was
15   just, at this point, now I'm concerned that
16   all of a sudden he changed his mind, so
17   that brought my, just like before, when I
18   was speaking to him on the couch, that
19   raised my level of how I'm speaking to him,
20   because now I'm concerned.
21        Q.    The fact that he changed his
22   mind was concerning to you?
23        A.    Yes.
24        Q.    Do you know, specifically, at
25   what point he changed his mind, or did you
```

```
                                            Page 164
 1                    M. CHEEMA
 2    know it was around this time?
 3         A.    Around this time, yes.
 4         Q.    You can't tell, by looking at
 5    the video, exactly when he said, "I'm not
 6    going."?
 7         A.    Correct.
 8         Q.    I'm going to start playing the
 9    video.  I'm starting at 7 minutes and 45
10    seconds.  Do you see how he keeps fidgeting
11    with his glasses and everything?  That
12    wasn't annoying you and causing you to be
13    impatient with him?
14              MR. SCHEINER:  Objection to
15           form.
16         A.    No.  At that time, we knew why
17    we were there.  He's intoxicated.
18         Q.    I'm going to go back 10
19    seconds.  Right before he puts his arms
20    behind his back, do you see his wife in the
21    right-hand side of the screen?
22         A.    Yes.
23         Q.    Do you know what she has in her
24    hand?
25         A.    It looks like a cup.
```

```
                                          Page 165
  1                   M. CHEEMA
  2        Q.    Do you know what's in that cup?
  3        A.    No.
  4        Q.    Did he ask his wife for a glass
  5   of water before going?
  6              MR. SCHEINER:  Objection to
  7         form.
  8        A.    I don't remember.
  9        Q.    As his wife is coming out with
 10   the glass of water, he starts to do that
 11   motion you described earlier, is that
 12   right?
 13              MR. SCHEINER:  Objection to
 14         form.
 15        A.    Yes.
 16        Q.    I'm going to play it, and then
 17   I'm going to stop it when we get to that
 18   motion.  That motion is at about 7 minutes
 19   and 58 seconds.  Do you see that?
 20        A.    Yes.
 21        Q.    What's the motion he's doing?
 22        A.    He is saying, "They are going
 23   to have to handcuff me."  Now, I'm getting
 24   ready to place him in handcuffs.
 25        Q.    And then what happens?
```

**[JA-549]**

```
                                          Page 166
 1                     M. CHEEMA
 2        A.     He brings his arms to the
 3   front.
 4        Q.     You see he puts his arms to the
 5   front and flashes a smile at you?
 6               MR. SCHEINER:  Objection to
 7          form.
 8        Q.     Is that right?
 9        A.     Can you rewind that?
10        Q.     Yeah.  I'm going to play it all
11   the way through.  It was starting at 7
12   minutes and 55 seconds.  He puts his hands
13   behind his back.  You saw that he smiled at
14   you before you grabbed him?
15               MR. SCHEINER:  Objection to
16          form.
17        A.     I'm not even sure if that was a
18   smile in the video.
19        Q.     Let me rewind it again.  Did
20   that look like a smile?
21               MR. SCHEINER:  Objection to
22          form.
23        A.     Yes.
24        Q.     He smiled at you right before
25   you threw him down, right?
```

```
                                               Page 167
 1                    M. CHEEMA
 2              MR. SCHEINER:   Objection to
 3        form.
 4        A.    That's when he was joking
 5    around saying, "Oh, you're not going to
 6    handcuff me."  I didn't take it as him
 7    smiling directly at me.  I took it as now
 8    his behavior just changed from being hyper
 9    aggressive to now he's laughing and joking.
10        Q.    Now, you said he stepped
11    towards your partner.  Which partner were
12    you talking about?
13        A.    Officer Walker.
14        Q.    Over here, the female officer?
15        A.    Yes.
16        Q.    How did you distinguish his
17    step towards Officer Walker versus the step
18    towards the door?
19              MR. SCHEINER:   Objection to
20        form.
21        A.    At that point, I'm behind him.
22    I see him.  Then I see Officer Walker right
23    over there.  I'm looking from behind him,
24    and I see him take a sudden step towards
25    her with his hands out.
```

```
                                              Page 168
 1                    M. CHEEMA
 2         Q.    I'm going to play it.  Looking
 3    at the video from this perspective, did it
 4    appear to you that he was going to attack
 5    Officer Walker?
 6              MR. SCHEINER:  Objection to
 7         form.
 8         A.    Again, looking from the video,
 9    I can't say for sure.  All I can say is, at
10    that time, that's the thought that I
11    perceived.
12         Q.    Officer Walker was in the same
13    direction as the doorway?
14         A.    Correct.
15         Q.    So, he could have just been
16    stepping towards the doorway as well,
17    correct?
18              MR. SCHEINER:  Objection to
19         form.
20         A.    I did not see that that was
21    going to happen from his behavior.
22         Q.    Did Officer Walker make any
23    movements, defensive movements in any way?
24         A.    Again, if you want to rewind
25    the video, I'll talk about it.  I'm looking
```

```
                                            Page 169
  1                      M. CHEEMA
  2    from him, at that moment, from behind him,
  3    and just based off everything that has led
  4    up to that point, that's when I made that
  5    decision.
  6         Q.    I'm going to play it one time
  7    through starting at 7 minutes and 55
  8    seconds, and as it goes through to when you
  9    take him down.
 10             MR. SCHEINER:   Objection to
 11          form.
 12         A.    Okay.
 13         Q.    You see him now?
 14         A.    Yes.
 15         Q.    Looking at it on the video, did
 16    he make any sudden movements towards
 17    Officer Walker?
 18             MR. SCHEINER:   Objection to
 19          form.
 20         A.    From the video, I still
 21    perceive it the same way, just like I did
 22    at the scene.
 23         Q.    We described this earlier
 24    without the video.  You took him down from
 25    the back and you turned to the right,
```

Case 23-24, Document 30, 04/19/2023, 3501826, Page176 of 241
**[JA-553]**

```
                                            Page 170
 1                    M. CHEEMA
 2   right?
 3        A.    Yes.
 4        Q.    You turned to your right, and
 5   your body and his body went down to the
 6   ground, correct?
 7        A.    Yes.
 8        Q.    You got on the ground as well?
 9        A.    Yes.
10        Q.    Were you on top of him when you
11   got on the ground?
12              MR. SCHEINER:  Objection to
13         form.
14        A.    I don't remember if I was on
15   top of him.  All I remember was just trying
16   to grab his arms.
17        Q.    Did your knees hit the ground,
18   or did your body fall on top of his body?
19              MR. SCHEINER:  Objection to
20         form.
21        A.    I don't remember.
22        Q.    The right side of your body and
23   his body are going down to the ground in
24   that motion that we see on the video, it's
25   your testimony that his abdomen hits the
```

Page 171

```
 1              M. CHEEMA
 2  floor, not the right side of his body?
 3              MR. SCHEINER:  Objection to
 4       form.
 5       A.    The way I viewed it at the
 6  scene, was he was lying on his front.
 7       Q.    I understand that he ultimately
 8  ended up on the floor on his front.  The
 9  impact from the fall, you see how you're
10  turning the body towards the ground with
11  the right shoulder and right leg and knee
12  all going diagonally down to the ground
13  from the video, do you see that?
14       A.    Yeah, I saw that I grabbed him
15  from the right and took him down from the
16  right side.
17       Q.    Is it possible, or do you have
18  any recollection as to whether the right
19  side of his body hit the ground?
20       A.    I can't answer that
21  definitively, because I don't know how the
22  body reacts in that kind of situation.  I'm
23  not a trained wrestler, or anything like
24  that.  I don't know the physics behind it.
25  It was basically me grabbing him from
```

```
                                              Page 172
 1                      M. CHEEMA
 2      behind, and the next thing I know was that
 3      we are on the floor.
 4           Q.    Going to training, did you have
 5      training on how to take down people in the
 6      NYPD to arrest them?
 7                 MR. SCHEINER:  Objection to
 8            form.
 9           A.    We did have training in the
10      Police Academy, yes.
11           Q.    What does that training entail?
12                 MR. SCHEINER:  Objection to
13            form.
14           A.    From what my recollection is,
15      any time you're faced in a combative
16      situation with the subject, use the minimum
17      force possible.  The second you can get
18      them into handcuffs, that's perfect.
19           Q.    Do you believe that you used
20      the most minimal force possible in this
21      situation?
22                 MR. SCHEINER:  Objection to
23            form.
24           A.    I did.
25           Q.    You couldn't just grab him and
```

```
                                    Page 173
1                    M. CHEEMA
2    put him up against the frame of the door?
3              MR. SCHEINER:  Objection to
4         form.
5         A.    I don't know the layout of this
6    house.  I don't know what's going on with
7    that door, so it never occurred to me to
8    push him up against the wall.
9         Q.    How about push him up against
10   the couch, put him down on the couch?
11             MR. SCHEINER:  Objection to
12        form.
13        A.    These incidents happen so fast.
14   You don't have enough time to think that I
15   should make sure that he has a cushion to
16   fall on.  It just happens very quickly.
17        Q.    I just want to be clear.  You
18   believe that the minimal force possible,
19   given these circumstances, was to take him
20   down to the ground?
21             MR. SCHEINER:  Objection to
22        form.
23        A.    It was a simple take down, yes,
24   that was it.  That's the minimal amount of
25   force that I can use.
```

Page 174

```
                        M. CHEEMA
 1
 2          Q.    How about just grab him and
 3    hold him back from your perceived notion
 4    that he might have been stepping towards
 5    your fellow officer?
 6               MR. SCHEINER:  Objection to
 7          form.
 8          A.    I don't know what his level of
 9    strength is.  I don't believe that just
10    physically grabbing him would have been
11    tactical in that scenario.
12          Q.    What other ways were you
13    trained in subduing an arrestee, in this
14    case, that you could have employed other
15    tactics?
16               MR. SCHEINER:  Objection to
17          form.
18          A.    That's such a vague question.
19    I don't want to say this is what I could
20    have done, or anything like that.  That's
21    the situation that I was presented with.
22    There was no other way that I could, at
23    that time, to be an alternative.
24          Q.    I want to be clear, you're 6
25    foot 3, and at the time, how much did you
```

```
                                          Page 175
 1                    M.  CHEEMA
 2   weigh?
 3        A.    Like 260, 265.
 4        Q.    And Mr. Singh is 5 foot 7?
 5        A.    I didn't know that at that
 6   time.
 7        Q.    I believe it's on the Aided
 8   Report.  He's much smaller than you, is
 9   that fair to say?
10        A.    Right.
11        Q.    And weighs much less than you,
12   correct?
13             MR. SCHEINER:  Objection to
14         form.
15        A.    I don't know.  When I put 5
16   foot 7, that's a guess that I used.  I
17   didn't ask him, nor did I ask anybody else
18   how tall he was.  He could have been taller
19   or shorter.  It was a guess.
20        Q.    Did any of the other officers
21   attempt to arrest him at the point that you
22   tried to arrest him?
23             MR. SCHEINER:  Objection to
24         form.
25        A.    Rephrase that question.
```

Page 176

1                    M. CHEEMA

2          Q.     You went to grab him and bring

3     him down to the ground to put him in

4     handcuffs, right?

5          A.     Yes.

6          Q.     At the moment that you did

7     that, were any of the other officers

8     jumping to do that as well?

9          A.     Officer Davis was helping me

10    put his arms behind his back.

11         Q.     Did he do that before or after

12    he saw you take him down to the ground?

13              MR. SCHEINER:  Objection to

14         form.

15         A.     From what I can see, I don't

16    remember if he grabbed him or anything.

17    From what I can see, he's already on the

18    ground, he was hunching over and helping.

19         Q.     I'm going to continue playing.

20    I'm starting at 8 minutes and 4 seconds.

21    You and Officer Davis are handcuffing him.

22    We can't see it from the video, right?  At

23    8 minutes and 24 seconds, you saw how you

24    lifted him up?

25         A.     Yes.

```
                                        Page 177
 1                    M. CHEEMA
 2         Q.     You're on his right side,
 3    correct?
 4         A.     Yes.
 5         Q.     You lifted him up by the space
 6    in his elbow between where his hands are
 7    handcuffed and his shoulder, is that right?
 8         A.     Yes.
 9         Q.     You lifted him up by that
10    space, correct?
11         A.     Yes.
12         Q.     Are you trained at all to avoid
13    doing that for any reason to not injure
14    people who are arrested?
15              MR. SCHEINER:  Objection to
16         form.
17         A.     That to my recollection, no.
18         Q.     Is that the way you're trained,
19    to lift people up off the ground when you
20    handcuff them?
21              MR. SCHEINER:  Objection to
22         form.
23         A.     I can't say that for sure.
24         Q.     Is there a training at all in
25    the way you're supposed to help people come
```

```
                                        Page 178
  1                   M. CHEEMA
  2    up off the ground after they have been
  3    handcuffed?
  4              MR. SCHEINER:  Objection to
  5         form.
  6         A.    The training constantly
  7    changes.  Now, there is, based on more
  8    knowledge that we have.  At that time, from
  9    what I can recall, there was no like set
 10    way where you can lift somebody up.
 11         Q.    What is the training now?
 12         A.    Now, the training has changed
 13    to the point where you use multiple
 14    officers.  Once a person is handcuffed
 15    already, now you have the time to maybe
 16    request more officers who can help you,
 17    like lift him up in a more gentler way I
 18    would say.
 19         Q.    In a way to avoid injury to
 20    someone's shoulder or arm?
 21              MR. SCHEINER:  Objection to
 22         form.
 23         A.    I can't say for sure what the
 24    reasoning behind it is.
 25         Q.    Did you get the training?
```

Page 179

                    M. CHEEMA

1

2       A.    I did not get the training yet.

3       Q.    You know that they've changed

4   the way you are supposed to pick an

5   individual up off the floor?

6       A.    Yes.  It's from precinct level

7   training, like discussion based training,

8   but as far as physical training, no.

9       Q.    Are you supposed to be getting

10  training in the future about how to pick

11  people up off the floor?

12          MR. SCHEINER:  Objection to

13     form.

14      A.    I don't know.

15      Q.    Are you scheduled for a

16  training on how to pick up individuals off

17  the floor?

18      A.    Not at the moment, no.

19      Q.    You know that something has

20  changed since this incident regarding

21  training and how to pick individuals up off

22  the floor after they have been handcuffed?

23      A.    Yes.

24      Q.    I'm going to continue to play

25  the video.  Do you know what happened to

```
                                              Page 180
 1                      M. CHEEMA
 2   Mr. Singh's glasses?
 3          A.    No.
 4          Q.    Was he wearing his glasses
 5   after you dropped him to the ground?
 6          A.    I couldn't see if he had his
 7   glasses on or not.
 8          Q.    This is the closest I can get.
 9   Do you see this still?
10          A.    It's very grainy.
11          Q.    When you drove Mr. Singh to the
12   hospital, was he wearing glasses?
13          A.    When he was in the ambulance, I
14   don't remember if he was wearing glasses or
15   not.
16          Q.    Do you see his face right here
17   in this still at 8 minutes and 21 seconds?
18   Is he wearing glasses?
19              MR. SCHEINER:  Objection to
20        form.
21          A.    I can't tell.
22          Q.    At 8 minutes and 22 seconds, is
23   he wearing glasses?
24              MR. SCHEINER:  Objection to
25        form.
```

```
                                           Page 181
 1                    M. CHEEMA
 2          A.    Can you let the video play?
 3    When it stops, it becomes grainier.
 4          Q.    You don't have any recollection
 5    of what happened to his glasses?
 6          A.    No.
 7          Q.    You didn't make sure that he
 8    got his glasses back on after you picked
 9    him up?
10              MR. SCHEINER:  Objection to
11          form.  There's no evidence these
12          glasses came off.
13              MR. COHEN:  The video is clear
14          to me that his glasses came off.
15              MR. SCHEINER:  Well, not to me.
16          By the way, I want to note for the
17          record, that this video is a video
18          video.  In other words, someone
19          videoed another video playing on a
20          screen, so the video itself only
21          takes up about half the screen space
22          that I'm looking at, and it is, like
23          I said, a video of something playing
24          on a screen.  It's not the original
25          video itself, and I think you're
```

Page 182

1              M. CHEEMA

2         mischaracterizing what you could see

3         or not see on it.  That's my

4         objection.

5              MR. COHEN:  Thank you.  That's

6         noted.

7      Q.    After you pick him up off the

8    floor, you escort Mr. Singh down to the

9    ambulance, is that right?

10     A.    Yes.

11     Q.    You're holding him tightly,

12   correct?

13     A.    Not that tight, just holding

14   him so he doesn't fall.

15     Q.    What happened as you walked

16   down the stairs?  Did anything happen of

17   any significance?

18     A.    No, not that I recall.

19     Q.    Did Mr. Singh fall as you were

20   walking him down the stairs?

21     A.    No, not that I recall.

22     Q.    Did you push him at all while

23   he was walking down the stairs?

24     A.    Absolutely not.

25     Q.    Did you say anything to him as

```
                                      Page 183
 1                   M. CHEEMA
 2   you were walking him down the stairs?
 3        A.    I don't remember if I said
 4   anything to him.
 5        Q.    Did he say anything to you as
 6   you were walking him down the stairs?
 7        A.    I'm sure he did, but I can't
 8   remember.
 9        Q.    Did you say anything to him
10   like, "You could have done this the easy
11   way.  You're going to the hospital with
12   handcuffs on."?
13             MR. SCHEINER:  Objection to
14         form.
15        A.    Once it's done, it's done.
16   There's no point in rehashing the past,
17   let's just get him to get medical
18   attention.
19        Q.    Did you escort him into the
20   ambulance?
21        A.    I put him into the ambulance.
22   I forgot who rode in the ambulance.  I made
23   sure that he was secure in the ambulance,
24   but as far as riding with him to the
25   hospital, it could have been the other
```

```
                                                    Page 184
 1                         M. CHEEMA
 2     officers who went with him.
 3             Q.    Did you actually go to the
 4     hospital at some point?
 5             A.    Yes.
 6             Q.    Did you see Mr. Singh at the
 7     hospital?
 8             A.    Yes.
 9             Q.    Did you speak to any medical
10     staff when you got to the hospital?
11             A.    We were just dealing with him
12     mostly.
13             Q.    Was he handcuffed on his way to
14     the hospital?
15             A.    He was handcuffed on his way to
16     the hospital, yes.
17             Q.    How long was he handcuffed for?
18             A.    I can't say for sure.  It's
19     morning time.  I don't know what the
20     traffic was like.  When he gets to the
21     hospital, you cuff him to the gurney, or if
22     he calmed down by then, you uncuff him all
23     together.
24             Q.    He was handcuffed from the time
25     you handcuffed him in his home?
```

```
                                        Page 185
 1                   M. CHEEMA
 2        A.    Yes.
 3        Q.    He was handcuffed for the
 4   entire trip to the hospital, correct?
 5        A.    Yes.
 6        Q.    And he was handcuffed again at
 7   the hospital, right?
 8        A.    Yes.
 9        Q.    And how long did you remain at
10   the hospital with him?
11        A.    Approximately, 40 minutes or
12   so.
13        Q.    He remained handcuffed for the
14   entire time you were with him?
15        A.    Not behind his back.
16        Q.    Handcuffed to a gurney?
17        A.    Yes.
18        Q.    At the hospital, was he still
19   being belligerent, or aggressive, or
20   cursing, or anything like that?
21        A.    Just cursing.  His body
22   language, he didn't concern me with his
23   body language.  He was just yelling and
24   cursing.
25        Q.    At any point during your entire
```

```
                                         Page 186
 1                    M. CHEEMA
 2    interaction with Mr. Singh, did he kick
 3    you, strike you, or attempt to do those
 4    things?
 5         A.    Not towards me.
 6         Q.    How about towards anybody?
 7         A.    I can't speak for anybody else,
 8    just from the position that I was standing
 9    at the whole time.  I was always either on
10    the side of him or behind him.
11         Q.    You didn't observe him kick,
12    strike, or attempt to kick or strike
13    anybody while you were in custody of him?
14              MR. SCHEINER:  Objection to
15          form.
16         A.    Not that I can recall.  Not
17    from being at the scene at the time, no.
18         Q.    How about at the hospital?
19         A.    At the hospital, no.
20         Q.    At some point, you left the
21    hospital?
22         A.    Yes.
23         Q.    That's when you uncuffed him?
24         A.    Yes.  When we get to the
25    hospital, we go by based off what the
```

```
                                          Page 187
 1                   M. CHEEMA
 2    hospital security says.  So, I don't
 3    remember if I uncuffed him right before I
 4    left the hospital, or some time before,
 5    because he talks to the nurses over there,
 6    and they talk to the security, and they
 7    decide whether he needs to be handcuffed,
 8    or whether they are going to take over, or
 9    whether they are going to restrain him.
10    That's their determination.
11         Q.    Did they restrain him when you
12    were leaving?
13         A.    I don't remember that.
14         Q.    You took the cuffs back, right?
15         A.    Yes.
16         Q.    As far as you knew, he was no
17    longer restrained when you left?
18              MR. SCHEINER:  Objection to
19          form.
20         A.    As far as I knew.  I don't know
21    what they did afterwards.
22         Q.    At any point, did you talk to
23    the hospital staff?
24         A.    We were dealing with Mr. Singh
25    the whole time.  We let EMS talk to the
```

```
                                        Page 188
 1                    M. CHEEMA
 2    hospital staff.
 3         Q.    Did you tell the hospital staff
 4    what happened at the apartment, or anything
 5    like that?
 6              MR. SCHEINER:   Objection to
 7          form.
 8         A.    No.  We didn't tell them
 9    anything.
10         Q.    Did you ever consider charging
11    Mr. Singh with a crime?
12              MR. SCHEINER:   Objection to
13          form.
14         A.    No.
15         Q.    Why did you not think that it
16    would be appropriate to charge him with a
17    crime?
18              MR. SCHEINER:   Objection to
19          form.
20         A.    At that time, there was no
21    crime that I could think of that he could
22    be charged with.  Our main concern when we
23    got there was getting him his medical help.
24    I wasn't thinking about arresting him with
25    a crime.  The whole point of us being there
```

```
                                              Page 189
 1                    M. CHEEMA
 2    was just to get him to the hospital safely
 3    so that he can get the evaluation that he
 4    needed.  The whole crime thing didn't cross
 5    my mind.
 6         Q.    The same question for
 7    violation.  You didn't have a thought about
 8    charging him with a violation, or issuing
 9    him a summons, or anything like that,
10    correct?
11              MR. SCHEINER:  Objection to
12         form.
13         A.    No.  There was no enforcement
14    that would be thought about taken towards
15    him.  It was just making sure that he was
16    going to be okay.
17         Q.    Officer Cheema, have you had
18    CCRB complaints against you?
19         A.    Yes.
20         Q.    How many?
21         A.    From what I can recall, one or
22    two.
23         Q.    I'm going to show you
24    Plaintiff's Exhibit 3.  Officer Cheema, is
25    your Officer ID number 23383?
```

```
                                              Page 190

 1                    M. CHEEMA
 2         A.    I don't know what the Officer
 3    ID is.  If that's supposed to be my shield,
 4    it's 25433.  I don't know what Officer ID
 5    means.
 6              MS. FUCHS:  Just for
 7         clarification, that Officer ID number
 8         is a number that's assigned by the
 9         New York Civil Liberties Union.
10              MR. SCHEINER:  I want to ask
11         for information and also make an
12         objection to questioning regarding
13         this document.  I gather from that
14         and the comment about New York Civil
15         Liberties Union, that this is
16         prepared by the New York Civil
17         Liberties Union.
18              MR. COHEN:  That is correct.
19              MR. SCHEINER:  And it was not
20         produced by us, and as far as I know,
21         you have not produced it to us, so I
22         object to use of the document on the
23         grounds that it is not an official
24         record, questionable reliability, and
25         has not been produced in this
```

```
                                                    Page 191
 1                   M. CHEEMA
 2          litigation.
 3                   MR. COHEN:  It doesn't need to
 4          be produced if it's used for
 5          impeachment purposes only.  You know
 6          that.
 7                   MR. SCHEINER:  I don't know
 8          what's been requested in discovery.
 9          I'm just noting that it hasn't been
10          produced in litigation.
11                   MR. COHEN:  We got a discovery
12          request last week for the first time.
13                   MR. SCHEINER:  You had this
14          marked as an exhibit for the
15          deposition.  I think it would have
16          been appropriate to share it if it
17          has been requested, even if the
18          response is not due.
19                   MR. COHEN:  It's publicly
20          available.
21                   MR. SCHEINER:  There's a lot of
22          things publicly available.  It
23          doesn't mean we have to read them all
24          to prepare for the deposition.  I'm
25          objecting to this, also on its
```

```
                                               Page 192

  1                   M. CHEEMA
  2         reliability, it's prepared by a law
  3         firm basically.  More than basically,
  4         it is prepared by a law firm who is
  5         adverse to the City, and has no
  6         indicia of reliability.
  7             MR. COHEN:  Okay.  I'm going to
  8         ask questions about it.  You can make
  9         the decision whether to instruct your
 10         witness not to answer or not.  If you
 11         do make that decision, we have to
 12         bring it up to the court.
 13             MR. SCHEINER:  I'm noting the
 14         objection for later.  I'm preserving
 15         the objection.
 16             MR. COHEN:  I noted the
 17         objection.
 18         Q.    Officer Cheema, it says here,
 19     and your lawyer may be right, this is
 20     gathered from public records by another
 21     organization.
 22             MR. SCHEINER:  Objection.
 23         There's no evidence where it's
 24         gathered from.
 25             MR. COHEN:  It's gathered from
```

```
                                           Page 193
 1                M.  CHEEMA
 2          the CCRB records.
 3                MR.  SCHEINER:   How do you know
 4          that?
 5          Q.     Officer Cheema, it says that
 6     you have four incidences of CCRB
 7     complaints.  Does that seem right to you?
 8                MR.  SCHEINER:   Objection to
 9          form and objection to the document.
10          A.     That does not seem right to me.
11     I was only aware of one or two.
12          Q.     Three of them actually are from
13     the same incident date.  They are all from
14     January 18th of 2017.  One of them is from
15     July 30th of 2015.  Do you remember these
16     incidents?
17          A.     No.
18          Q.     Do you know who the
19     complainants were?
20          A.     No.
21          Q.     Did you ever have to go down to
22     the CCRB and give testimony about them?
23          A.     I did.
24          Q.     Which one?
25          A.     I don't know exactly which one,
```

Page 194

                    M. CHEEMA
 1
 2      if that's the exact case or not.  So, 2015
 3      was the last time I can remember.
 4          Q.    It indicates here that there
 5      was an allegation of excessive force or
 6      force with use of your nightstick.  Does
 7      that refresh your recollection as to the
 8      allegations of that complaint?
 9              MR. SCHEINER:  Objection to
10          form.
11          A.    I don't really remember.  I
12      don't carry nightsticks.  I don't remember
13      this case.
14          Q.    Did any of your CCRB complaints
15      result in a lawsuit like you're having here
16      today?
17              MR. SCHEINER:  Objection to
18          form.
19          A.    This is the first time I've
20      ever experienced anything like a lawsuit
21      before.  I don't know what happened with
22      all the other cases, but I was never called
23      about it, or aware of the findings,
24      whatever they found.
25          Q.    In the January 18th of 2017

Page 195

```
1                    M. CHEEMA
2     incident, there's also another allegation
3     of force.  Do you see that?
4          A.   Yes.
5          Q.   There's also an allegation that
6     you did an unlawful strip search, or a
7     strip search that was not warranted.
8               MR. SCHEINER:  Objection to
9          form.  Just so I don't have to repeat
10          the objection to the document, can we
11          note that as a standing objection to
12          all questions regarding the document.
13               MR. COHEN:  Noted.
14          Q.   Have you ever conducted a strip
15     search?
16          A.   I don't remember if I ever
17     conducted a strip search.
18          Q.   You don't know if you've ever
19     asked someone to strip in the bathroom at
20     the precinct to see if they had contraband
21     on them?
22          A.   No, I don't remember.
23          Q.   There's also an allegation that
24     you hit this complainant with an inanimate
25     object.
```

Page 196

```
 1                 M. CHEEMA
 2              MR. SCHEINER:  Objection to
 3         form.
 4         Q.    Does that ring a bell as to
 5    anything that may have occurred on January
 6    18th of 2017?
 7              MR. SCHEINER:  Objection to
 8         form.
 9         A.    I see it, but I don't remember
10    any of these incidences.
11         Q.    You went to the CCRB once and
12    you believe it was for the 2015 incident?
13         A.    Yes.
14              MR. COHEN:  I'm going to need a
15         five minute break, Alan.  I think I'm
16         done.  I want to confirm that I'm not
17         missing anything.  I think I'm done.
18              MR. SCHEINER:  Okay.
19              (Whereupon, a five minute break
20         was taken.)
21         Q.    Officer Cheema, under what
22    circumstances do you fill out a Domestic
23    Incident Report?
24         A.    A Domestic Incident Report
25    would be if you have any kind of dispute,
```

Page 197

                        M. CHEEMA

 1      
 2      or any kind of crime that was alleged
 3      between people who are in a family type
 4      relationship.
 5           Q.     There are circumstances where
 6      you do a Domestic Incident Report even
 7      though there's no one arrested, right?
 8           A.     I still do one, even if there
 9      was no arrest or anything.
10           Q.     Like if there's a dispute in
11      the home, you fill out a Domestic Incident
12      Report, correct?
13                  MR. SCHEINER:  Objection to
14            form.
15           A.     Correct.
16           Q.     Do you know what the purpose is
17      to have a Domestic Incident Report?
18                  MR. SCHEINER:  Objection to
19            form.
20           A.     Not really, no.
21           Q.     How do you know when it's the
22      right time to do one and not do one?
23                  MR. SCHEINER:  Objection to
24            form.
25           A.     It really depends on, in my

Page 198

```
                            M. CHEEMA
 1
 2      experience, an individual case, unless the
 3      911 call comes over as a family type job,
 4      then you have to do one, but if doesn't
 5      then it goes by case by case based off what
 6      the facts are.
 7           Q.   If there's a dispute in the
 8      home, you normally write one?
 9                MR. SCHEINER:  Objection to
10           form.
11           A.   I personally would, yeah.
12           Q.   You didn't prepare a Domestic
13      Incident Report in this case, correct?
14           A.   Correct.
15           Q.   Was there any particular reason
16      why you did not prepare a Domestic Incident
17      Report?
18                MR. SCHEINER:  Objection to
19           form.
20           A.   From what I can recollect, from
21      what I was thinking that day, was it was
22      just taking care of him medically.  At that
23      moment, the only thing I was concerned
24      about was taking care of him medically, and
25      doing it in the safest and easiest way
```

```
                                              Page 199

 1                    M. CHEEMA
 2   possible.
 3          Q.    Is it fair to say that a
 4   Domestic Incident Report is supposed to
 5   document that the police were called to a
 6   home where there was a dispute amongst
 7   family members?
 8              MR. SCHEINER:  Objection to
 9         form.
10          A.    I would say that's fair.
11          Q.    You don't believe that this was
12   an incident that required a Domestic
13   Incident Report, is that right?
14              MR. SCHEINER:  Objection to
15         form.
16          A.    Correct.
17              MR. COHEN:  I don't have any
18         further questions.  Officer Cheema, I
19         appreciate your patience and your
20         answering the questions to the best
21         of your ability.  Thank you very
22         much.
23              MR. SCHEINER:  Gerald, can you
24         give us a few minutes to confer on
25         our own before we close the record?
```

```
                                      Page 200

 1                  M. CHEEMA
 2           MR. COHEN:  Are you going to
 3      question the witness?
 4           MR. SCHEINER:  I don't know.  I
 5      want to confer with him.  If you
 6      don't mind waiting, you can wait
 7      there.  I don't know if it's going to
 8      be two minutes or five minutes.
 9           MR. COHEN:  Okay.
10           (Whereupon, a five minute break
11      was taken.)
12           MR. SCHEINER:  I have
13      questions.
14   EXAMINATION BY
15   MR. SCHEINER:
16      Q.    Officer Cheema, do you recall
17   Mr. Cohen asking you about whether or not
18   you remembered this incident before
19   reviewing documents and the video about the
20   incident, do you recall that questioning?
21      A.    Yes.
22      Q.    At the time that you first
23   learned about this lawsuit, but before you
24   looked at documents and the videos relating
25   to it, did you have any recollection about
```

```
                                                    Page 201
 1                  M.  CHEEMA
 2     the incident?
 3          A.    I had a general recollection of
 4     what happened that day.
 5          Q.    Then reviewing documentation of
 6     the incident and videos of the incident
 7     refreshed your recollection about some of
 8     the details?
 9          A.    Yes.
10               MR. SCHEINER:   That's all I
11          have.   Thank you.
12               (Whereupon, at 3:43 p.m., the
13          Examination of this Witness was
14          concluded.)
15
16
                 _____
17                        Mandeep Cheema
18
19     Subscribed and sworn to before me
20     this _____ day of _____ 20___.
21
       _____
22         NOTARY PUBLIC
23
24
25
```

```
                                              Page 202
 1                 E X H I B I T S

 2

 3    PLAINTIFF EXHIBITS

 4    EXHIBIT              EXHIBIT                 PAGE

 5    Exhibit 1           Aided Report             34

 6    Exhibit 2           Memo Book                34

 7    Exhibit 3           NYPD Misconduct Complaint  34

 8    Exhibit 4           Police Video             134

 9

10       (Exhibits retained by Court Reporter.)

11

12                 I N D E X

13

14    EXAMINATION BY                    PAGE

15    MR. COHEN                         4

16    MR. SCHEINER                      200

17

18       INFORMATION AND/OR DOCUMENTS REQUESTED

19    INFORMATION AND/OR DOCUMENTS        PAGE

20    (None)

21

22          QUESTIONS MARKED FOR RULINGS

23    PAGE LINE QUESTION

24    (None)

25
```

```
                                              Page 203
 1                C E R T I F I C A T E

 2

 3   STATE OF NEW YORK        )
                              :  SS.:
 4   COUNTY OF RICHMOND       )

 5

 6        I, ALEXIS A. VARGAS, a Notary Public

 7   for and within the State of New York, do

 8   hereby certify:

 9        That the witness whose examination is

10   hereinbefore set forth was duly sworn and

11   that such examination is a true record of

12   the testimony given by that witness.

13        I further certify that I am not

14   related to any of the parties to this

15   action by blood or by marriage and that I

16   am in no way interested in the outcome of

17   this matter.

18        IN WITNESS WHEREOF, I have hereunto

19   set my hand this 27th day of October 2020.

20

21

22

23

     _____
24        ALEXIS A. VARGAS

25
```

Page 204

```
 1
 2              ERRATA SHEET
         VERITEXT/NEW YORK REPORTING, LLC
 3
    CASE NAME: Singh v. City of New York
 4  DATE OF DEPOSITION: October 7, 2020
    WITNESS' NAME: Mandeep Cheema
 5
    PAGE/LINE(s)/     CHANGE          REASON
 6  ____/_____/_____/_____
    ____/_____/_____/_____
 7  ____/_____/_____/_____
    ____/_____/_____/_____
 8  ____/_____/_____/_____
    ____/_____/_____/_____
 9  ____/_____/_____/_____
    ____/_____/_____/_____
10  ____/_____/_____/_____
    ____/_____/_____/_____
11  ____/_____/_____/_____
    ____/_____/_____/_____
12  ____/_____/_____/_____
    ____/_____/_____/_____
13  ____/_____/_____/_____
    ____/_____/_____/_____
14  ____/_____/_____/_____
    ____/_____/_____/_____
15  ____/_____/_____/_____
    ____/_____/_____/_____
16  ____/_____/_____/_____
    ____/_____/_____/_____
17  ____/_____/_____/_____
    ____/_____/_____/_____
18  ____/_____/_____/_____
    ____/_____/_____/_____
19  ____/_____/_____/_____
20                  _____
                    MANDEEP CHEEMA
21
    Subscribed and Sworn To
22  Before Me This_____Day
    of_____, 2020.
23
    _____
24      Notary Public
25  My Commission Expires_____
```

**[& - 59th]**                                                                 Page 1

| & |
|---|
| **&**  2:3 |

| 0 |
|---|
| **00003**  35:13 |
| **00004**  35:14 |
| **00632**  1:5 |
| **0140**  42:24 |
| **0149**  44:15 |
| **0235**  46:5 |
| **0300**  36:4,11 |
| **0301**  50:22 |
| **0302**  46:13 |
| **0402**  46:22 |
| **0630**  46:22 47:14 |
| **0637**  47:23 |
| **0645**  48:10,14 51:4 |
|   51:12 52:22 |
| **0730**  52:23 |
| **0750**  35:18 53:17 |
|   53:23 |
| **0805**  50:20 51:5,12 |
|   53:25 54:24 55:2 |
|   64:5 |
| **0820**  65:2 |

| 1 |
|---|
| **1**  4:12 34:11 |
|   140:17 141:10 |
|   142:6 143:7,8 |
|   202:5 |
| **1-10**  1:8 |
| **10**  59:3,5 62:20 |
|   141:10 158:2 |
|   164:18 |
| **100**  2:8 53:22 56:7 |
|   123:22 124:12 |
| **10007**  2:8 |
| **10022**  2:4 |
| **10038**  4:13 |
| **1010**  44:15 47:17 |

**102**  36:3 49:23
**102nd**  11:3 15:17
  15:19 16:3,5,14
  35:18
**1054**  48:15 51:4
**1063**  46:13
**10:20**  1:14
**110**  2:4
**113th**  45:25
**119-02**  47:19
**11:15**  11:10 32:18
**13**  155:24
**130-18**  48:16
  54:19 65:22
**134**  202:8
**15**  148:22 149:20
**16**  137:17 140:10
**17**  148:5,7
**18th**  193:14
  194:25 196:6
**1:19**  1:5

| 2 |
|---|
| **2**  34:15 35:4 51:2 |
|   144:3,8,13 145:12 |
|   145:19 146:13,18 |
|   147:17 148:21 |
|   149:19 202:6 |
| **2/28/18**  35:17 |
| **2/28/2018**  108:12 |
| **20**  7:19 143:7 |
|   201:20 |
| **200**  202:16 |
| **2010**  11:21 |
| **2011**  11:22 12:18 |
| **2014**  10:20 16:20 |
| **2015**  10:21 16:21 |
|   193:15 194:2 |
|   196:12 |
| **2017**  29:11,19 60:6 |
|   193:14 194:25 |
|   196:6 |

**2018**  4:20 7:7,13
  9:23 25:8 32:12
  39:14 56:6 62:10
  62:11,12 125:22
**2019**  62:22
**2020**  1:13 9:11
  61:15 62:18
  203:19 204:4,22
**21**  180:17
**22**  156:9,11 180:22
**2315**  35:18,23
**2320**  35:23
**2330**  39:24 40:15
**23383**  189:25
**2340**  40:22 41:22
  42:15
**2354**  41:17 42:16
  42:21
**24**  176:23
**24796**  203:23
**25**  128:18 129:5
**25433**  190:4
**260**  7:23 175:3
**265**  7:23 175:3
**27th**  32:20 203:19
**28**  144:13 145:13
**280**  7:10
**28th**  4:20 7:6,13
  9:23 25:8 32:12
  39:13 56:5 125:22
**2:00**  45:19,20

| 3 |
|---|
| **3**  7:4 34:20 65:25 |
|   144:3 148:5,7,22 |
|   149:20 151:5,13 |
|   151:18 155:15,24 |
|   174:25 189:24 |
|   202:7 |
| **30**  7:2,19 151:5,13 |
|   156:25 |

**30th**  193:15
**3200**  2:4
**3239**  36:4
**34**  202:5,6,7
**37**  139:16 140:10
  156:13 160:10
**38**  160:17
**3:43**  201:12
**3a**  47:19

| 4 |
|---|
| **4**  134:23,25 140:17 |
|   154:3 155:9 156:8 |
|   156:11,13 176:20 |
|   202:8,15 |
| **4/18/18**  36:3 |
| **40**  185:11 |
| **41**  145:19 |
| **42**  151:18 |
| **42nd**  52:24 53:3 |
| **43**  155:15 |
| **45**  146:19 154:3 |
|   155:9 162:12 |
|   164:9 |
| **49**  146:13 |

| 5 |
|---|
| **5**  134:13 156:25 |
|   161:11 175:4,15 |
| **5/15/18**  36:2 |
| **50**  133:4 |
| **54**  134:14 142:6 |
|   143:8 |
| **55**  166:12 169:7 |
| **56**  161:10 |
| **57**  148:21 149:20 |
| **58**  165:19 |
| **59**  147:17 |
| **59th**  2:4 |

**[6 - answered]** Page 2

**6**

**6** 7:4 157:25
160:10,16 161:9
174:24
**6:50** 108:13
125:22

**7**

**7** 1:13 144:8
161:11 162:12
164:9 165:18
166:11 169:7
175:4,16 204:4
**75th** 13:23 14:4,15
14:16,18 15:9,10
16:7
**7:00** 78:21
**7:50** 32:18

**8**

**8** 133:4 176:20,23
180:17,22
**8:00** 53:13 64:16
**8:10** 64:17

**9**

**90-28** 41:20 42:11
42:15
**90x** 41:18 42:16
45:24 48:5
**91** 47:19,23 48:6,9
**911** 23:5 24:9,14
24:15 25:2 29:17
42:7 49:22 54:12
54:13 62:2,3
69:25 70:12 198:3
**950196** 1:7
**97h** 50:20 51:5
**98** 46:19

**a**

**a.m.** 1:14 32:18
45:19,20 51:4,5

54:24 64:16
108:13
**abdomen** 106:5
170:25
**ability** 6:6,19
119:18 199:21
**able** 67:14 95:22
96:23 114:17
133:19 146:5
158:20
**absolutely** 91:9
182:24
**academy** 12:15,20
14:5,8,14 18:7,22
19:4 23:14 29:21
30:5,12 172:10
**access** 60:10
**accessible** 56:2
61:20
**accident** 86:7
**accidentally** 73:9
**accurate** 119:19
121:4,5,6,21 122:2
122:3,6,8 124:13
**accurately** 38:3,12
119:12
**acr** 113:5,13
**act** 19:16 21:8
130:7
**acting** 23:6 32:6
115:19 122:23
131:17
**action** 4:18 76:23
96:10 100:10
103:10 144:11,14
154:10 203:15
**actions** 143:6
152:12
**activity** 46:23
**adam** 36:4 49:24

**address** 4:10
110:24 111:10
125:23
**administrative**
83:25
**admitted** 123:23
**adult** 85:10,14
**adults** 76:9
**adverse** 192:5
**afforded** 107:16
**african** 71:14
136:9
**age** 25:23
**agencies** 113:13
**aggression** 102:22
**aggressive** 97:2
104:13 122:24
123:2 167:9
185:19
**ago** 30:13 76:16
**agree** 84:12,16
85:4 151:22
**agreed** 3:2,7,11
84:24 151:25
152:3
**ahead** 105:15
129:12 133:24
**aid** 13:16,17
**aided** 28:23 34:10
50:21 54:23 55:3
55:9 56:14 60:23
63:19,23 107:17
107:18,23 110:11
110:12 115:8
124:9 125:16
129:14 132:10
175:7 202:5
**alan** 2:9 52:5
196:15
**alarm** 121:16
159:23

**alcohol** 19:7 21:17
114:4,11,19
123:17,24 126:8
126:12 128:3
**alexis** 1:20 203:6
203:24
**allegation** 194:5
195:2,5,23
**allegations** 194:8
**alleged** 197:2
**allow** 57:3
**allowed** 27:21
56:14 152:12
**allows** 119:15
**altered** 72:24
**alternative** 89:25
174:23
**ambulance** 25:21
48:15 86:15 89:23
91:6,23 113:6
161:24 180:13
182:9 183:20,21
183:22,23
**american** 71:14
136:9
**amount** 142:22
173:24
**angry** 104:21
105:2 122:19
148:20
**annotations** 51:13
51:16
**annoyed** 163:3
**annoying** 163:9,14
164:12
**answer** 5:5,12,20
6:5 18:13 20:17
20:18 21:4 171:20
192:10
**answered** 132:11

| | | | |
|---|---|---|---|
| **answering** 6:11 199:20 | **approximately** 185:11 | **assignment** 15:9 15:18 16:10 34:4 35:18 37:2 | **authentic** 119:24 |
| **anticipate** 5:18 | **area** 12:6 106:5 115:6 151:7 | **assist** 160:7 | **authority** 159:21 |
| **anybody** 27:11 30:15 48:2 81:9 81:14 83:3 98:20 126:15,25 128:6 130:11,12,20 136:20 141:23 175:17 186:6,7,13 | **areas** 52:4 | **associate's** 12:2,5 12:7 | **automatically** 82:22 116:22 |
| | **arm** 178:20 | **assume** 5:12 | **availability** 62:10 |
| | **arms** 102:10 104:22 105:8,14 106:17,18 164:19 166:2,4 170:16 176:10 | **assuming** 60:17 110:17 111:10 121:12 | **available** 55:20 191:20,22 |
| | | **atlantic** 48:16 54:19 65:22 | **avenue** 47:19 48:17 54:19 65:22 |
| **anymore** 101:17 101:19 162:20 | **arrest** 45:5,14,17 92:4 105:16 172:6 175:21,22 197:9 | **attack** 81:5,8 96:6 103:16 104:6 152:16,25 153:17 168:4 | **avoid** 177:12 178:19 |
| **apartment** 47:19 50:9 65:18,21,25 66:2,4,11 67:20,21 67:23 68:3,10,15 68:20,23 69:2,4,6 69:8,11,20,23 70:15,21,22 81:15 81:21 86:2 95:19 98:21 99:10 135:9 135:14 139:21 188:4 | **arrested** 177:14 197:7 | **attacking** 161:17 | **aware** 6:20 117:11 193:11 194:23 |
| | **arrestee** 174:13 | **attempt** 81:5,8,13 116:15 117:20,23 118:8,13 175:21 186:3,12 | |
| | **arresting** 131:19 188:24 | | **b** |
| | **arrived** 66:16 | | **b** 36:4,7 202:1 |
| | **aside** 94:12 | **attempted** 74:22 116:13 118:4 129:19 130:9 | **bachelor's** 10:11 10:15 16:15 |
| | **asked** 63:14 73:22 113:19 153:8 195:19 | | **back** 18:4,22 42:17,19 46:19 57:5 58:20 59:3 60:6 64:13,23 69:17 74:9 75:9 80:23 95:4 99:13 100:6,25 101:5 102:3,6 104:22 105:8,15 106:18 113:21 120:5 141:2,14 142:7,16 143:7 148:19 155:14 156:8 157:16 164:18,20 166:13 169:25 174:3 176:10 181:8 185:15 187:14 |
| **apartments** 66:10 66:12 | **asking** 18:16 19:13 53:3 79:5,7 129:21 133:23 159:18,24 200:17 | **attempting** 130:2 130:21 | |
| **appear** 39:22 127:11,16 158:19 161:15 162:3 168:4 | | **attend** 10:18 11:11 11:19,23 33:16 | |
| | **asks** 108:20 | **attending** 28:19 | |
| | **assault** 58:4 74:11 74:13,22 78:16 79:4 81:13 | **attention** 32:11 54:17 80:3,6 132:17 137:19 140:4 161:5,20 162:8 183:18 | |
| **appearance** 59:4 | | | |
| **appeared** 141:5 158:22 162:4 | **assaulted** 31:14 74:18 | **attorney** 5:25 59:18,21 128:25 129:7 | |
| **appears** 135:17 136:23 141:13 148:20,22 | **assessment** 148:24 | | **balance** 157:23 |
| | **assign** 14:25 | **attorneys** 2:3,7 6:18 | **ball** 103:23 130:13 |
| **appreciate** 199:19 | **assigned** 13:22,23 14:3,14,17,19 15:10 16:2,5 36:17,18 190:8 | | **balling** 129:25 |
| **appropriate** 188:16 191:16 | | **audio** 142:18 | **balwinder** 1:2 4:17 |
| **approximate** 7:5 15:2 | | | |

Case 23-24, Document 30, 04/19/2023, 3501826, Page214 of 241

**[JA-591]**

| | | | |
|---|---|---|---|
| **barely** 128:7 | 152:24 154:11 | 171:19,22 185:21 | **brings** 166:2 |
| **based** 31:12 53:8,9 | 158:12 159:3 | 185:23 | **brooklyn** 13:25 |
| 77:14 82:9,10 | 160:17 172:19 | **book** 28:24 33:24 | 14:2 |
| 88:17 102:19,20 | 173:18 174:9 | 34:3,14,23 35:8 | **brother** 148:2 |
| 104:14 169:3 | 175:7 196:12 | 36:25 37:6,9 38:5 | 153:8 |
| 178:7 179:7 | 199:11 | 39:4,7,15,18,21 | **brought** 75:22 |
| 186:25 198:5 | **believed** 152:19 | 42:9 43:4,10,15 | 76:21 106:14 |
| **basic** 14:10 90:17 | 153:17 160:21 | 44:6,8,13 45:8 | 111:20 121:10,13 |
| **basically** 31:11 | 161:16 | 46:24 50:12,14,15 | 122:21 163:17 |
| 37:9 42:6 76:4 | **bell** 196:4 | 50:25 51:18,21,23 | **bruise** 106:6 |
| 85:20 149:11 | **belligerent** 185:19 | 52:23 53:9 54:22 | **building** 66:7,8 |
| 171:25 192:3,3 | **belong** 64:10 | 56:19,21 57:4,17 | 67:11,14,15,19 |
| **basis** 32:7 | **belonged** 35:9 | 58:2,7,8 60:15,16 | **bump** 159:2 |
| **bates** 35:13,14 | **bending** 143:21 | 63:12 67:5 79:11 | **business** 119:7 |
| 44:23 45:18 50:24 | 144:22 146:2 | 107:19 202:6 | **c** |
| 108:3 | **best** 6:5 23:20 | **born** 17:20 | **c** 2:1 4:1 203:1,1 |
| **bathroom** 195:19 | 27:15,20 28:5 | **bottom** 35:16 | **call** 22:12,23,24 |
| **beat** 131:8 | 82:11 112:7,15,16 | 118:22 146:20 | 23:5,5 24:9,15 |
| **becoming** 13:14 | 119:17 199:20 | **box** 44:16,16 | 25:22 26:5 29:17 |
| 17:11 96:24 | **better** 114:16 | 45:12 108:7,18 | 33:16,21 35:24 |
| 104:18 | 143:5 146:21 | 114:12,20 115:4 | 42:8,17,19 44:16 |
| **beginning** 64:12 | **birth** 111:8,9 | 120:6,22,24 | 49:22 52:22 53:8 |
| 145:12 | **bit** 18:5,5,18 25:15 | 121:19 | 53:11 54:18,18 |
| **behaving** 27:10 | 134:9,15 141:20 | **boxes** 116:4 | 57:3 62:3,3,7 |
| **behavior** 31:12 | 146:17 148:19 | 124:16,24 | 69:25 78:11 94:22 |
| 74:14 102:20,23 | 149:16 155:15 | **boy** 36:4 | 198:3 |
| 122:17,19 149:25 | **bizarre** 115:19 | **break** 6:6 59:5,9 | **called** 4:1 14:20 |
| 150:12,12 152:19 | **black** 52:3,10,12 | 59:16 63:16 | 46:10 54:11 70:12 |
| 152:21,24 163:4 | **blacked** 44:24 | 128:15,17,18 | 71:25 80:8 90:8 |
| 167:8 168:21 | 52:5 | 129:5,7 196:15,19 | 133:11 194:22 |
| **behaviors** 122:21 | **block** 15:2 | 200:10 | 199:5 |
| **belief** 97:8 | **blocking** 145:5 | **breathalyzer** | **calls** 24:11,13 25:2 |
| **believe** 7:15 77:15 | **blocks** 15:4 | 158:18 | 54:12,13 |
| 77:22 79:13 80:7 | **blood** 203:15 | **breathing** 49:5 | **calm** 80:2 |
| 80:7,14,17 82:23 | **blue** 127:12 | 126:20 127:7 | **calmed** 184:22 |
| 83:5 95:20 96:24 | **body** 106:2 108:20 | **brevity** 22:11 | **cam** 109:11 |
| 106:25 113:24 | 108:25 109:3,9,10 | **briefly** 39:19 | **camera** 8:13 |
| 120:11,16 121:13 | 109:14,24 127:16 | **bring** 89:8 159:22 | 108:20 109:2,14 |
| 121:16 122:10 | 130:14 131:10 | 176:2 192:12 | 109:24 |
| 128:2 135:8 | 170:5,5,18,18,22 | **bringing** 54:7 | **cameras** 109:3 |
| 139:11 140:8,13 | 170:23 171:2,10 | 100:6 103:11,22 | |

**cams** 109:9
**cancelled** 53:21
**canvass** 40:23,25
  41:12,25 42:3,5
  52:24 53:2 65:11
**canvasses** 42:24
**capacity** 1:7,8
**car** 34:4 40:2,6,8
  40:19,19 49:18,20
  58:20 66:22,24
  67:10
**care** 23:8 27:9
  28:3,4 87:9 122:7
  122:11 198:22,24
**career** 12:25 19:5
  26:21 38:10 44:11
**carry** 55:23
  194:12
**cars** 55:25 61:21
**case** 1:4 6:21
  16:25 25:21 48:15
  52:14 58:19 60:25
  70:5 110:11
  174:14 194:2,13
  198:2,5,5,13 204:3
**cases** 194:22
**catches** 137:3
**categorize** 20:13
**categorized** 21:15
**caucasian** 71:14
**cause** 76:4 83:20
  150:15
**caused** 74:15
  121:16
**causing** 164:12
**ccrb** 189:18 193:2
  193:6,22 194:14
  196:11
**cell** 56:2,5,10
**central** 53:10,20

**certain** 52:12
  59:13 83:18
**certification** 3:5
**certify** 203:8,13
**chance** 12:23
  57:18,22 74:3
**change** 9:20
  100:12 105:10
  116:23 122:19
  125:3 204:5
**changed** 9:17 13:4
  42:18 100:15
  150:12,12 163:16
  163:21,25 167:8
  178:12 179:3,20
**changes** 178:7
**changing** 102:23
  149:25 152:21
**characterization**
  77:12
**charge** 188:16
**charged** 188:22
**charging** 129:25
  188:10 189:8
**check** 8:20 42:7
  43:16 44:20 53:4
  58:20 120:22
  124:17,24 127:20
  127:22
**checked** 9:12
  27:16,21 31:19
  41:8 42:18,19
  47:22 48:6 53:14
  53:20 63:17 64:20
  90:10 94:11 95:7
  120:23 121:19,24
  122:5,8 123:9,17
**cheema** 1:6,18 4:9
  4:14 5:1 6:1,25
  7:1 8:1 9:1 10:1,9
  11:1 12:1 13:1

14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1,12 60:1 61:1
62:1 63:1 64:1,4
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1,25 129:1
130:1 131:1 132:1
133:1 134:1 135:1

136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
189:17,24 190:1
191:1 192:1,18
193:1,5 194:1
195:1 196:1,21
197:1 198:1 199:1
199:18 200:1,16
201:1,17 204:4,20
**child** 137:5,8
**choice** 86:10 87:6
  93:8
**church** 2:8
**circled** 51:13
**circumstance**
  107:15
**circumstances**
  23:22 26:22 29:23
  30:7 31:3 82:10
  173:19 196:22
  197:5
**city** 1:6 2:7 4:19
  5:25 41:10 52:2
  192:5 204:3

[civil - conversation]                                                                 Page 6

| | | | |
|---|---|---|---|
| **civil** 36:3 190:9,14 190:16 | 191:19 192:7,16 192:25 195:13 196:14 199:17 200:2,9,17 202:15 | **complaints** 189:18 193:7 194:14 | **conscious** 25:25 |
| **civilian** 110:18,20 | | **complete** 118:25 130:6 | **consent** 93:18 94:3 94:7 |
| **clarification** 18:15 20:25 64:3 134:12 190:7 | **cold** 47:9 | **completed** 57:12 | **consented** 94:16 94:20 |
| | **colleagues** 52:16 | **completely** 83:12 106:15 | **consequences** 72:15 |
| **clarify** 59:8,13,22 100:4 114:17 128:21 129:2,9,13 | **college** 10:17,19 10:23 11:13,13,18 12:10 16:25 | **completing** 54:6 | **consider** 159:23 188:10 |
| | **color** 35:25 | **compliant** 154:12 | **considered** 42:4 57:24 65:10 |
| **classes** 11:11 | **combative** 92:4 125:16 172:15 | **complied** 91:17 | **constantly** 178:6 |
| **classify** 112:14 | | **computer** 49:16 109:18 125:4 | **constitute** 149:8 149:10 |
| **clean** 119:24 | **come** 31:25 49:12 60:11 69:2,3 77:9 84:12 85:12 87:22 92:2 107:7 177:25 | **computerized** 114:14 116:9 | **consult** 5:24 6:10 |
| **clear** 26:2,11 27:18 34:24 39:23 43:6 47:11 50:24 125:18 140:7 153:24 173:17 174:24 181:13 | | **comrie** 32:24 36:5 36:19 | **consulting** 27:12 95:10 |
| | **comes** 18:21 49:7 49:14 142:8 147:19 198:3 | **concern** 6:9 74:15 83:20 96:11 159:6 159:13 185:22 188:22 | **contact** 10:6 |
| | | | **contain** 34:3 125:10 |
| **clearly** 88:10 91:7 | **comfortable** 152:23 153:4 | **concerned** 20:12 78:19,24 96:5,8 99:6 152:11 158:25 161:23 163:15,20 198:23 | **contains** 36:25 63:21 134:21 |
| **click** 110:2 | | | **contemporaneou...** 56:19 |
| **clicked** 108:23 120:7 | **coming** 92:7 165:9 | | **continue** 137:9 140:16 141:9 142:5 143:25 144:7,12 145:18 147:16 148:4 154:2 161:8 162:11 176:19 179:24 |
| **close** 63:11 153:15 153:22 199:25 | **comment** 190:14 | **concerning** 163:22 | |
| | **comments** 96:17 97:13,21 | **concluded** 201:14 | |
| **closest** 180:8 | **commission** 204:25 | **condition** 24:18 72:16,20 | |
| **clothes** 151:21 152:7 153:6 154:11 155:2,12 156:23 157:3 | **commit** 132:5 | **conditions** 26:25 33:19 34:2 | |
| | **committing** 132:3 | **conducted** 195:14 195:17 | **continuing** 139:15 160:5 |
| **code** 41:18 46:13 48:25 49:7 83:25 | **common** 73:24 | **confer** 199:24 200:5 | **continuously** 60:8 |
| **coded** 48:21 | **communicated** 33:22 | **confines** 41:11 | **contraband** 40:9 64:21 195:20 |
| **codes** 48:13 | **communicating** 93:24 | **confirm** 196:16 | **conversation** 73:18,21 75:9 78:12 82:3 99:7 99:12 138:16,19 |
| **cohen** 2:3,5 4:6,15 6:13 34:8 35:12 51:25 52:11 58:25 59:10 64:2 128:16 128:23 132:25 133:10 134:2,21 181:13 182:5 190:18 191:3,11 | **community** 11:17 | **confuse** 8:5 | |
| | **complainant** 195:24 | **connected** 39:22 | |
| | **complainants** 193:19 | **connection** 107:20 108:9 | |
| | **complaint** 34:19 194:8 202:7 | | |

212-267-6868                                                                   516-608-2400

139:6,17
convince  82:9 84:8
  140:25
convincing  82:13
cooperate  87:17
  87:21 97:10
cooperative  87:20
  88:22 89:19 91:16
cooperatively  97:6
  160:20
copy  6:17 29:4
  55:10,12,16,17
  60:4
correct  6:15,19
  8:9,11 14:6 15:6
  18:7 20:7 21:10
  22:13 25:9,14
  26:6 37:3,22
  38:13,20 39:7
  40:10,16,20 42:3
  43:5 46:6 47:4
  51:14 55:21 58:10
  59:14 64:24 65:12
  65:15,19 66:20
  67:11 68:11,16,17
  70:15,16,18 71:18
  74:19,20,23,24
  75:12 80:9 82:17
  83:2,8 84:3,9,25
  94:20 95:13 99:16
  105:19 106:10
  108:10,13 110:3,6
  110:14,15,21,22
  111:18,20,21,23
  112:3 113:3 114:2
  115:14,22 116:16
  116:17 117:5,14
  117:15,21,24,25
  118:12,20 119:8
  119:13,19,25
  120:8,9,20 121:21

121:24,25 122:5
  122:15 123:5,13
  123:18,24,25
  124:25 125:5,11
  125:20,23 136:3
  137:21 141:14
  151:2 152:13
  153:14 164:7
  168:14,17 170:6
  175:12 177:3,10
  182:12 185:4
  189:10 190:18
  197:12,15 198:13
  198:14 199:16
corrected  47:24
corrections  6:22
corrective  7:25
couch  69:16 70:25
  146:5 163:18
  173:10,10
counsel  3:3
country  17:23
county  203:4
couple  4:24
  156:10
course  26:21
  101:15 119:7
court  1:3 3:15 5:4
  5:15 36:2,3 59:4
  60:19,22 61:2
  192:12 202:10
cover  35:7
coverage  134:9,10
create  37:13
  107:19
credits  11:14
crime  47:23 48:7
  83:7,23 132:13
  149:10 188:11,17
  188:21,25 189:4
  197:2

criminal  32:4 36:2
critical  5:5
cross  113:7,10
  159:20 189:4
cuff  184:21
cuffs  187:14
cup  164:25 165:2
currently  15:23
  56:16
cursing  74:7 76:14
  76:18 145:7
  185:20,21,24
cushion  173:15
custody  186:13
cut  141:25 142:2
  144:5
cutting  146:7
cv  1:5

**d**

d  4:1 202:12
d00001  108:4
d00002  108:4
d00006  44:23
  45:19
d00007  50:25
danger  23:9 27:11
  29:24 30:8,18,25
  31:4,16 82:24,25
dangerous  120:7
  120:11,16,17,19
date  1:13 7:6
  25:11 29:21 34:12
  34:16,21 36:2
  108:12 111:7,9
  135:2 193:13
  204:4
davis  32:24 36:5
  36:19 103:3
  136:15 142:7
  144:21 145:20
  147:12 154:19,21

157:7 176:9,21
day  11:8 32:16
  33:13,15,19 34:2,6
  34:7 35:25 36:8
  37:2,11,22 38:4,13
  39:3,21 45:15,17
  57:23 58:11,15,16
  85:9 109:2 136:11
  198:21 201:4,20
  203:19 204:22
deal  131:18 159:7
dealing  22:6 65:6
  79:9 89:3 107:12
  139:23 184:11
  187:24
decide  187:7
decided  16:14,23
decision  85:12,15
  169:5 192:9,11
declare  29:23 30:7
  30:18
declaring  30:25
deescalation  22:8
defendant  1:18
defendants  1:10
  2:7
defensive  168:23
definitively
  171:21
degree  10:11,15
  11:4 12:3,6,7
  16:25
delineated  51:2
demands  58:4
department  2:7
  43:18 56:2,5,10
depends  24:3
  107:15 197:25
deposition  3:5,12
  4:25 28:19 191:15
  191:24 204:4

Case 1:19-cv-00632-EK-ST   Document 48-7   Filed 11/29/21   Page 212 of 235 PageID #: 800

[describe - edp]                                          Page 8

describe 33:18
35:6 66:7 132:20
described 23:19
25:15 82:7 165:11
169:23
describes 28:10
describing 26:22
detail 38:3,12
60:17
details 37:2,21
54:21 60:16,18
124:3 125:15
201:8
determination
88:20 91:10 94:14
94:17 95:5,9
104:14 187:10
determine 22:20
23:7 27:9 31:3,11
31:16
determined 116:4
device 125:5
diagnosed 23:4
24:16,20
diagonally 171:12
difference 134:17
differences 9:2
different 9:14
15:14 18:23 19:22
49:6 53:23 56:8
83:13 102:21
104:17 113:12
122:20 124:24
difficulty 49:5
diffuse 150:16
dig 61:3
direct 20:17 32:10
directing 161:5
direction 138:14
138:17 168:13

directly 60:24
137:19 159:12
167:7
discovery 52:9
133:15 191:8,11
discussed 135:22
148:10 154:17
discussion 67:22
179:7
dispatch 24:10,12
24:24 25:17,19,22
49:23 53:4,10
57:6 68:2 69:17
69:19,21,24 70:3,7
dispatcher 70:10
dispatchers 48:22
displaying 102:22
dispute 41:20 42:2
42:10,15 94:23
196:25 197:10
198:7 199:6
distance 22:9
distances 8:6
distinction 20:11
21:12,22
distinguish 167:16
district 1:1,1
disturbed 20:8,13
21:9,14,16,24 22:7
68:15 112:19,22
doctor 91:11
doctors 88:16
91:10
document 37:13
57:11 79:18,22
108:2,8 109:16
113:8 190:13,22
193:9 195:10,12
199:5
documentation
107:20 201:5

documenting 43:8
43:10,22 131:19
documents 28:20
28:22 34:9 39:16
39:18 200:19,24
202:18,19
doe 1:8,8
doing 10:25 12:12
15:8 30:16 32:4
43:17 55:16,17
73:23 138:2
142:13,20,21
143:10,13,18,23
144:4,10,17,23,24
145:2,4,6,20 146:3
146:6,10 151:12
151:16,17,20
156:17 165:21
177:13 198:25
domestic 25:3,12
68:5,9 107:8
196:22,24 197:6
197:11,17 198:12
198:16 199:4,12
door 68:19 99:22
100:2,8,11 101:7,7
101:12,14,16
160:7 167:18
173:2,7
doorway 168:13
168:16
double 58:20
downs 116:7
downward 8:14
dressed 82:13
84:23 91:6 93:7
93:13 95:13,16
96:11 97:4,9 98:4
98:7 99:16 100:23
101:4,6,21 152:5
154:25 155:7

158:20
drink 98:16
drinking 98:15,16
driveway 66:18
driving 33:12
66:20
drop 58:21 109:20
109:25 110:17
115:5,11 116:7
dropped 180:5
drove 180:11
drunk 128:7 158:7
158:12
dry 127:2
due 191:18
duly 4:2 203:10
duplicate 134:19
duties 14:15,23
duty 32:2,15 35:23
46:20 119:11,17

e

e 2:1,1,4 4:1,1,1,1
202:1,12 203:1,1
earlier 46:10
59:14 63:14 86:7
96:12 121:10
122:18,21 131:3
133:18 135:22
149:9 158:24
165:11 169:23
early 44:10
earn 16:24
easier 85:16
easiest 198:25
eastern 1:1
easy 183:10
edge 155:6
edp 22:12,21,24
23:8,12,17,21,23
24:11 25:17,22
26:14 68:5 115:16

115:21 116:2,5
117:9,14
edps  22:15 68:2
education  10:10
effect  3:14 73:11
76:2,20 80:9
98:17 99:3 101:11
119:6
eight  8:18
either  17:2 79:11
86:18 87:2,13
89:3 117:7 186:9
elaborate  112:17
elbow  177:6
electronic  62:9
electronically
118:19
emergency  10:13
16:15
emotional  68:14
emotionally  20:8
20:13 21:9,14,15
21:24 22:7 112:19
112:22
employed  174:14
ems  27:13 49:10
49:25 50:10 69:22
70:2,8 74:2 80:20
85:25 88:19 92:19
95:10 142:3,12
155:21 187:25
emt  135:18
emts  67:18,23
69:14 70:23,24
71:4,5,8,18 72:20
74:10,12,17,21
78:22 97:19,21
98:22 107:12
113:8 127:22
130:22 135:21
138:6,11,15,20

139:6 144:14
146:24 147:15
160:19
encounter  19:17
19:21 21:9 24:5
26:13 28:11 32:2
70:14
encountered  50:9
encounters  19:20
ended  171:8
endorsing  118:19
enforce  84:2
enforcement  13:9
131:17,24 189:13
engage  130:8
english  17:16 74:7
75:12,15 149:15
enroll  16:14
entail  22:2 172:11
enter  50:8 69:7
75:2,5 135:14
entered  29:20
69:10 70:20,22
entering  70:14
entire  16:6 98:6
105:5 185:4,14,25
entries  35:22
43:22 57:17 58:9
64:6
entry  41:21 46:6,8
51:12,12 64:5
67:15
eot  65:3
equipment  40:12
64:19
errata  204:2
erratic  74:14
96:25 122:24,25
152:20,22 153:18
ers  44:16

escalate  141:22
150:15
escalating  77:23
79:21 80:18,22
82:19
escalation  104:18
escort  91:23 182:8
183:19
especially  30:12
esq  2:5,9,11
esu  17:4
evaluated  28:7
72:17 73:3 82:12
85:23 90:9
evaluation  126:4
189:3
evening  32:20
event  39:12
119:25
events  37:10
eventually  142:8
everybody  137:25
147:9
evidence  181:11
192:23
exact  76:7,17
142:10 159:8
194:2
exactly  18:17 62:4
72:11 75:19 76:12
76:15 84:17 93:5
96:20 115:9
139:22 150:21
156:18 164:5
193:25
examination  1:17
4:5 200:14 201:13
202:14 203:9,11
examined  4:4
example  57:13
60:23 129:24

131:20
excessive  194:5
excited  122:20
excitement  105:11
exhibit  34:11,15
34:20 35:4 51:2
51:19,20,24 126:7
134:23,25 189:24
191:14 202:4,4,5,6
202:7,8
exhibiting  128:3
exhibits  202:3,10
existed  124:16
experience  13:7
13:10 198:2
experienced
194:20
expert  127:6
expires  204:25
explain  42:14
48:22 72:6,12
73:4,7 74:3 88:14
94:9 114:12 115:5
124:3 137:12
explained  44:6
72:15 85:10 90:4
93:2,4,21 101:20
101:22 150:23
explaining  85:7
explanation
114:19
explicit  129:24
130:4,9
explicitly  130:16
expressly  154:9
expressway  41:20
extent  77:2
eyeglasses  7:24,25
8:17,21 9:24 10:4
eyes  9:7,12 139:9
139:13

[eyesight - form]                                                                    Page 10

| | | | |
|---|---|---|---|
| **eyesight** 8:23 | **february** 4:20 7:6 | **finally** 6:16 | **following** 30:17 |
| **f** | 7:13 9:5,10,15,23 | **find** 41:13 47:25 | **follows** 4:4 |
| **f** 203:1 | 25:8 32:12,20 | 61:4 73:25 159:24 | **foot** 7:4 14:21 |
| **face** 8:12 106:7 | 39:13 47:6 56:5 | **findings** 194:23 | 33:10 49:18 |
| 137:2,3 180:16 | 62:10,12 125:22 | **fine** 6:3,13 59:10 | 136:25 174:25 |
| **faced** 172:15 | 147:2 | 71:24 82:14 89:5 | 175:4,16 |
| **facial** 146:22 | **feel** 27:12,14,19 | 91:9 101:24 | **force** 3:14 22:9 |
| **facing** 106:19 | 72:5 79:20 85:24 | **fingers** 162:13 | 85:5 91:16 119:5 |
| 107:5 | 85:25 86:4 90:9 | **finish** 5:19 54:22 | 172:17,20 173:18 |
| **fact** 72:16 122:18 | 91:7,8 103:14 | **finished** 118:7 | 173:25 194:5,6 |
| 150:22 153:15,18 | 131:18 140:3 | **fire** 44:17 | 195:3 |
| 163:21 | 152:15 | **firm** 192:3,4 | **forcibly** 26:23 |
| **factors** 23:7 | **feeling** 24:21 72:7 | **first** 4:2 5:3 13:16 | 27:2,22 87:22 |
| 122:15,16 | 77:7,13 161:22 | 13:22 14:14,16 | **forgot** 183:22 |
| **facts** 198:6 | 162:10,10 | 22:22 35:4,6 42:9 | **form** 3:8 19:9 20:3 |
| **factual** 119:24 | **feels** 89:5 | 55:10 68:25 69:3 | 20:16 21:20 22:4 |
| **fair** 37:12,20 | **fellow** 174:5 | 69:5,11,13 71:2,22 | 22:18 23:25 24:8 |
| 57:15 148:24 | **felt** 102:24 | 73:22 80:18,20 | 26:8,16 27:4,7 |
| 175:9 199:3,10 | **female** 25:24 | 92:5 100:8 108:18 | 28:14 30:2,10 |
| **fall** 73:9 158:5,25 | 70:23 71:8,9 | 108:19 135:13 | 31:7,22 37:8,18,24 |
| 170:18 171:9 | 167:14 | 137:25 191:12 | 38:7,15,22 39:9 |
| 173:16 182:14,19 | **females** 71:12 | 194:19 200:22 | 43:12 44:2 56:25 |
| **familiar** 24:17 | **fictitious** 1:9 | **fist** 129:25 130:13 | 57:21 58:13 59:24 |
| 124:23 133:14 | **fidgeting** 164:10 | **fists** 103:23 | 63:9 72:9 75:7 |
| **family** 17:8 24:14 | **field** 33:5 60:9 | **fitch** 2:3 | 77:11 79:16 80:11 |
| 66:10 90:7 197:3 | **figure** 144:2 | **five** 63:4,6 135:9 | 81:11,17 83:10 |
| 198:3 199:7 | **file** 132:20,21,24 | 196:15,19 200:8 | 84:5 86:21 87:5 |
| **far** 8:4,8 20:11 | 133:8 | 200:10 | 88:5,9,25 90:16 |
| 21:13 37:5 44:11 | **filing** 3:4 | **flashed** 146:12 | 92:15 93:11,20 |
| 46:23 48:20 | **fill** 110:23 116:3 | **flashes** 166:5 | 97:16,23 103:18 |
| 117:12 120:11 | 119:12,18 196:22 | **flick** 44:18 | 104:8,25 105:21 |
| 121:17 129:23 | 197:11 | **floor** 66:4,12,13 | 106:23 109:5,13 |
| 132:9 179:8 | **filled** 39:25 109:17 | 103:2 171:2,8 | 110:5,8 114:22 |
| 183:24 187:16,20 | 109:21 110:5 | 172:3 179:5,11,17 | 115:24 117:4,13 |
| 190:20 | 116:13 117:13 | 179:22 182:8 | 117:17,20 118:7 |
| **fast** 173:13 | 124:10 125:10 | **focus** 139:24 | 118:11,18,25 |
| **fear** 73:2 | **filling** 144:15 | **focused** 161:20 | 119:3,13,18,21 |
| **feared** 73:5 | **final** 55:6 | 162:9 | 120:3,5,13,18,21 |
| **fearful** 161:15 | **finalize** 53:12 | **focusing** 80:3,5 | 123:7 124:21 |
| 162:4 | 56:21 | **followed** 62:6 | 125:7,13 126:10 |
| | | | 127:5,14,19 128:9 |

**[form - going]** Page 11

| | | | |
|---|---|---|---|
| 131:10 132:8 | 128:24 | **gentleman** 87:8 | 49:21,25 50:7 |
| 137:15 139:3 | **four** 51:6,23 193:6 | 136:24 | 54:20 64:15 65:18 |
| 144:19 150:7,20 | **frame** 173:2 | **gentler** 178:17 | 65:24 70:18 82:12 |
| 151:15 153:3,20 | **friends** 17:12 | **gerald** 2:5 4:15 | 82:13 84:9,12,20 |
| 155:4 156:6 | **front** 67:19 68:19 | 63:13 128:14 | 84:24 85:4,5 |
| 157:19 158:10,15 | 102:10 103:11 | 199:23 | 86:11,12,16,19,19 |
| 159:5 160:3 | 117:5 130:17 | **gesture** 103:15 | 87:2,2,7,7,10,18 |
| 161:19 162:6,25 | 144:6 148:17 | 138:8 157:8 | 87:22 89:4,14,15 |
| 163:6,13 164:15 | 149:12 152:16 | **gestures** 79:23 | 90:2,9,9 91:6,7 |
| 165:7,14 166:7,16 | 160:7 166:3,5 | 80:24 96:17 97:13 | 93:6,9 94:10,18,24 |
| 166:22 167:3,20 | 171:6,8 | 97:21 157:17 | 94:24 95:3 97:5 |
| 168:7,19 169:11 | **fuchs** 2:11 134:11 | **getting** 64:15 | 99:13 100:12,16 |
| 169:19 170:13,20 | 190:6 | 93:13 95:16 96:10 | 100:19,20 101:3,9 |
| 171:4 172:8,13,23 | **full** 40:4 | 97:3 98:7 102:6 | 101:13,17,19,21 |
| 173:4,12,22 174:7 | **fully** 29:18 99:16 | 126:16 142:11 | 105:15 108:7 |
| 174:17 175:14,24 | 114:24 116:9 | 148:23 149:13 | 113:22 127:9 |
| 176:14 177:16,22 | **functioning** | 151:21 152:4,7 | 129:12,16,18,23 |
| 178:5,22 179:13 | 119:16 | 154:24 155:7 | 133:24 140:25 |
| 180:20,25 181:11 | **further** 3:7,11 | 161:23 162:22 | 148:19 151:23 |
| 183:14 186:15 | 70:3,4 112:17 | 163:3 165:23 | 154:8 155:14 |
| 187:19 188:7,13 | 199:18 203:13 | 179:9 188:23 | 156:8 159:16,25 |
| 188:19 189:12 | **future** 37:15 | **give** 7:21 64:13 | 160:18,25 162:19 |
| 193:9 194:10,18 | 179:10 | 91:2 93:16 193:22 | 164:18 184:3 |
| 195:9 196:3,8 | | 199:24 | 186:25 193:21 |
| 197:14,19,24 | **g** | **given** 26:19 28:9 | **goes** 157:16 169:8 |
| 198:10,19 199:9 | **gain** 67:14 | 31:2,10 57:7 | 198:5 |
| 199:15 | **gap** 136:2,24 | 58:18 64:10 | **going** 4:21 6:16 |
| **forms** 55:14,18,19 | 140:19 147:19 | 173:19 203:12 | 11:12 12:10 13:20 |
| 125:10 | 153:9 157:9,16 | **gives** 53:10 | 22:12 31:4 32:10 |
| **forth** 89:11 142:7 | **gas** 39:25 40:4 | **giving** 106:18 | 33:15 34:22,23 |
| 142:17 143:7 | **gather** 142:22 | **glass** 165:4,10 | 35:14,20 45:23 |
| 203:10 | 190:13 | **glasses** 99:18 | 48:8 50:3 54:20 |
| **forward** 100:7 | **gathered** 142:25 | 161:13 164:11 | 59:2 62:14 67:23 |
| 103:23 104:11 | 192:20,24,25 | 180:2,4,7,12,14,18 | 68:18 69:17,19 |
| 105:17 | **gathering** 143:3 | 180:23 181:5,8,12 | 73:23 74:4 75:9 |
| **found** 69:15 | 143:19 | 181:14 | 75:23,25 76:23 |
| 194:24 | **gauge** 114:9 | **go** 4:24 11:7 27:15 | 77:2,7,16,18,21,25 |
| **foundation** 20:16 | **general** 12:7,8 | 27:16 28:6 32:7 | 78:10,20,24 79:13 |
| 21:20 37:8 43:12 | 131:20,23 140:14 | 34:23 39:19 41:11 | 80:13,15,23 82:15 |
| 44:2 59:11 93:11 | 159:6,9 201:3 | 42:7,9,12 44:14,22 | 82:22 84:22 85:5 |
| 126:10 127:19 | **generally** 92:6 | 45:11,18 46:19 | 85:24 87:12 89:9 |
| | 133:14 | | |

Case 23-24, Document 30, 04/19/2023, 3501826, Page222 of 241

[JA-599]

| | | | |
|---|---|---|---|
| 90:13,14,20,20,23 91:24 93:16,17 94:5,14,18 96:6 97:9 98:2 99:4 101:5,6,15,22,24 102:11 103:12,16 105:23 107:17 108:7 113:21 116:25 120:5 127:9 128:11 130:6,15 131:4,7,7 131:8,21 132:16 135:7 137:9 140:16 141:9 142:5,7,16,17,25 143:6,13,25 144:7 144:12 145:18 147:16 148:4,15 149:3 151:4 152:16,25 154:2 155:14,19 156:8 156:10 158:4,25 160:18,25 161:8 162:11 164:6,8,18 165:5,16,17,22 166:10 167:5 168:2,4,21 169:6 170:23 171:12 172:4 173:6 176:19 179:24 183:11 187:8,9 189:16,23 192:7 196:14 200:2,7 **good** 4:14 53:16 88:22 **gotten** 8:23 114:16 **grab** 170:16 172:25 174:2 176:2 **grabbed** 102:25 105:18 166:14 | 171:14 176:16 **grabbing** 155:12 171:25 174:10 **graduated** 14:13 **grainier** 181:3 **grainy** 146:25 180:10 **ground** 4:25 105:19,24 106:2,3 106:13 170:6,8,11 170:17,23 171:10 171:12,19 173:20 176:3,12,18 177:19 178:2 180:5 **grounds** 190:23 **group** 33:22 **grudgingly** 84:22 84:24 **guess** 51:6 65:2 98:11 175:16,19 **guidance** 60:12 **guide** 28:15,25 29:5 60:4,5,14 61:8,24 62:10,15 **guides** 28:9 **gunshot** 41:7 **gurney** 184:21 185:16 **guy** 98:23 99:6 **guys** 32:25 33:9 55:23 74:25 84:20 | | **h** | **h** 4:1 202:1 **half** 76:16 124:8 181:21 **hall** 157:10 **hand** 135:16 160:11 164:21,24 203:19 | **handcuff** 101:23 101:25 102:7,12 103:13 165:23 167:6 177:20 **handcuffed** 89:20 103:3 177:7 178:3 178:14 179:22 184:13,15,17,24 184:25 185:3,6,13 185:16 187:7 **handcuffing** 92:19 92:23 176:21 **handcuffs** 86:13 87:23 89:8,10,14 89:16,23 90:3,13 90:14,20,25 91:3 91:21,25 92:3,5,25 165:24 172:18 176:4 183:12 **handed** 107:2 160:14 **handing** 153:5 154:25 161:11,12 **hands** 100:5,25 102:2,5 103:11,23 104:11 105:17 166:12 167:25 177:6 **hannah** 134:2 **happen** 57:8 73:2 73:5 77:16 79:14 139:25 153:25 159:10 168:21 173:13 182:16 **happened** 37:10 44:25 45:11 47:2 73:15 80:19 82:4 86:8 99:24,25 100:24 102:8,18 103:20 104:15 179:25 181:5 | 182:15 188:4 194:21 201:4 **happening** 56:20 73:13 100:10 142:9 **happens** 38:18 39:2 86:6,7 101:19 165:25 173:16 **happy** 105:6 **harassment** 83:15 83:17,17,21 **hard** 75:10 155:5 **harm** 116:14,16 117:21,24 118:4,9 118:13 129:19 130:9,21 132:3,5 **harming** 81:20 122:4 123:4 **hats** 147:3 **head** 30:23 73:10 141:19 159:2 **headaches** 126:23 **hear** 69:24 86:17 142:17,25 **heard** 150:25 **heaving** 127:3 **heavy** 57:25 **height** 7:6 **held** 1:19 **help** 86:5 149:17 177:25 178:16 188:23 **helping** 86:4 176:9 176:18 **hereinbefore** 203:10 **hereto** 3:4 **hereunto** 203:18 **hesitate** 52:16 |

| | | | |
|---|---|---|---|
| **hey** 42:6 | 184:21 185:4,7,10 | 29:22 32:11 39:23 | 117:8,16,19 118:8 |
| **high** 13:18 | 185:18 186:18,19 | 40:16 48:11 50:12 | 123:2 |
| **highest** 10:10 | 186:21,25 187:2,4 | 50:17,19 51:3,8,14 | **indicates** 35:9 |
| **highlighted** 51:11 | 187:23 188:2,3 | 51:17 52:4,7 | 194:4 |
| **history** 23:2,3 | 189:2 | 54:21 60:11 63:16 | **indicating** 52:18 |
| 24:4,5 25:11 68:2 | **hospitalized** | 63:25 65:14 84:7 | 120:18,24 |
| 68:9 117:9,14 | 112:24 | 107:8,21 108:10 | **indication** 116:12 |
| **hit** 73:10 106:3 | **hour** 46:18 | 108:12 113:21 | **indicia** 192:6 |
| 118:25 130:2,16 | **house** 46:16 66:9 | 124:7 125:9 | **individual** 4:16 |
| 170:17 171:19 | 66:16 83:3 98:14 | 130:15 161:15 | 19:17 20:14 24:6 |
| 195:24 | 111:15 137:6 | 179:20 193:13 | 26:6,13 27:20 |
| **hits** 170:25 | 159:17 173:6 | 195:2 196:12,23 | 30:16 31:4 54:13 |
| **hold** 174:3 | **hunching** 176:18 | 196:24 197:6,11 | 64:11 135:17 |
| **holding** 182:11,13 | **hurt** 77:25 | 197:17 198:13,16 | 136:2,5 140:19 |
| **home** 75:2,5 | **hyper** 167:8 | 199:4,12,13 | 147:18 153:9 |
| 184:25 197:11 | | 200:18,20 201:2,6 | 157:8,15 179:5 |
| 198:8 199:6 | **i** | 201:6 | 198:2 |
| **hospital** 26:23 | **icat** 57:5 | **incidents** 56:20 | **individually** 1:7,8 |
| 27:2,16,17,23 28:6 | **idea** 52:17 | 68:5,6,10,14 | **individuals** 19:7 |
| 31:19 32:8 40:22 | **identification** | 173:13 193:16 | 19:20,22,24 20:6,9 |
| 40:25 41:9,11,12 | 34:12,16,20 135:2 | **include** 22:15 | 21:14,25 22:16 |
| 41:25 42:3,5,23,24 | **identify** 71:15 | 113:13 | 28:12 179:16,21 |
| 52:24 53:2,4,7,18 | 132:24 133:2 | **including** 30:5 | **influence** 114:7 |
| 53:22,24 54:3,4,8 | **identifying** 40:3 | 83:4 | 123:11,17,24 |
| 55:5 57:14 65:11 | **illegal** 98:16 | **incoherent** 72:24 | **information** 24:12 |
| 72:18 82:12,14 | **ilyssa** 2:11 | 74:5 | 24:25 25:16,17 |
| 84:9,13,21,25 85:5 | **impact** 14:20,22 | **incorrect** 123:20 | 67:25 70:10,11,13 |
| 85:6,23 86:14,16 | 14:24,25 15:6 | 123:22 | 110:5,24 111:6 |
| 87:11,18,19,22,24 | 171:9 | **incremental** 9:19 | 113:2,18,20 |
| 88:2,12,15,23 89:6 | **impatient** 162:23 | **independent** 39:11 | 125:11 140:6 |
| 89:14,15 90:22 | 164:13 | 144:9 146:10 | 142:12,22,24 |
| 91:7,12,24 92:2,12 | **impeachment** | **independently** | 143:2,19 155:20 |
| 93:9,17 94:3,5,15 | 191:5 | 41:8 | 190:11 202:18,19 |
| 94:18 95:5 100:13 | **implication** 77:4 | **india** 18:3 | **informed** 29:22 |
| 100:16 101:3,10 | **implying** 76:22 | **indicate** 67:6 | 85:12 130:20 |
| 101:13,23 125:17 | **important** 38:3,17 | 78:15 81:25 87:23 | **informs** 49:23 |
| 126:2,4,6 128:7 | 39:3 | 97:4 103:21 104:5 | **initial** 16:7 52:22 |
| 151:23 154:8 | **inanimate** 195:24 | 104:12 126:22,25 | 82:3 103:10 |
| 159:22 160:19,25 | **incidences** 193:6 | 127:8,25 144:4 | **injure** 177:13 |
| 180:12 183:11,25 | 196:10 | **indicated** 65:17 | **injured** 111:22 |
| 184:4,7,10,14,16 | **incident** 4:19,22 | 100:14 115:18 | 112:5,6,12 |
| | 4:23 25:3,12 | | |

| | | k | |
|---|---|---|---|

**injury** 178:19
**input** 124:2
**inside** 67:19,21
**inspect** 46:12
**instruct** 192:9
**instructed** 30:6
**instruction** 21:3
  31:2,9 34:5
**insults** 79:2
**intention** 132:2,5
**interact** 19:6,23
  98:25
**interaction** 140:18
  156:22 186:2
**interest** 27:15,20
  28:6
**interested** 203:16
**interpreted**
  129:22
**intervals** 23:15
**intox** 48:16 54:18
  70:8,18 112:11
  125:16
**intoxicated** 19:7
  19:14,17,24 20:5
  20:14 21:17 22:15
  22:23 25:18,20,24
  26:6,14 28:12,17
  31:20 32:3,5,6
  49:4 72:2,23
  91:14,15 114:4,19
  122:14,22,23
  159:8,11 164:17
**intoxication** 22:25
  114:9,11 158:17
  159:9
**investigate** 44:16
  47:18
**involved** 52:9 92:3
**involvement** 4:23

**ipad** 125:4
**issue** 48:8
**issued** 109:3,14
**issues** 52:18
**issuing** 189:8

**j**

**jacket** 160:11,13
  160:24
**jamaica** 42:22,22
  50:20 51:5 54:4
  125:17 126:2,3
**january** 10:20
  11:21 16:20 62:20
  193:14 194:25
  196:5
**job** 15:3 18:10,17
  18:21 30:15 41:15
  45:25 46:2 48:21
  48:24 49:10,16
  53:12 54:14 55:3
  55:5 57:12,13,23
  60:20,21 65:5,7,10
  70:4 150:10,11
  198:3
**jobs** 13:13 49:7
  54:7,9,12 57:7
  58:3
**john** 1:8,8
**johns** 98:9
**join** 12:19
**joined** 12:14
**joking** 102:11
  167:4,9
**jokingly** 105:15
**judge** 20:19
**july** 12:18 193:15
**jumping** 176:8
**june** 11:22

**keep** 29:7 58:15
  60:4
**keeping** 139:9,12
**keeps** 164:10
**kept** 75:20 77:19
  80:3 102:22
**keys** 58:22,24
  64:23 69:22
**kick** 130:12 186:2
  186:11,12
**kill** 81:24 131:7
**kind** 31:9 42:12
  60:21 70:4 102:15
  103:15 125:25
  149:18 157:22
  161:4 171:22
  196:25 197:2
**kinds** 24:21
**kinks** 112:10
**knee** 171:11
**knees** 170:17
**knew** 111:10
  117:10,12 138:9
  164:16 187:16,20
**knock** 68:20
**know** 4:15 5:11
  9:14,16 21:13
  24:10 40:23 43:3
  46:2 47:10 49:6
  52:2,5,10,21 57:11
  58:17 61:4,19
  62:13 63:5 65:9
  66:15 68:17,22
  73:15 76:7 77:19
  80:19 86:11 88:12
  89:9 93:12 100:7
  105:3,23 106:2
  115:9,10 116:6,9
  116:19,21,25
  126:12 127:21,24

133:15 136:5
  137:3,12 138:3
  139:24,25 141:2,6
  142:2,9,12,19,24
  143:9,12,22 144:6
  144:17,22,24,25
  145:3,16 146:25
  147:3,7,14 151:16
  154:21 156:16
  157:12 158:18
  159:8 160:23
  161:21 162:9,16
  162:20 163:24
  164:2,23 165:2
  171:21,24 172:2
  173:5,6 174:8
  175:5,15 179:3,14
  179:19,25 184:19
  187:20 190:2,4,20
  191:5,7 193:3,18
  193:25 194:21
  195:18 197:16,21
  200:4,7
**knowledge** 123:14
  178:8
**knows** 111:15

**l**

**laid** 90:19
**language** 76:8
  185:22,23
**languages** 17:15
  17:18
**laughing** 105:7,10
  105:12 167:9
**laughter** 105:11
**law** 2:7 13:9 83:7
  83:24 131:17,24
  192:2,4
**lawsuit** 194:15,20
  200:23

Case 23-24, Document 30, 04/19/2023, 3501826, Page225 of 241
**[JA-602]**

| | | | m |
|---|---|---|---|
| lawyer 192:19 | link 113:12 | 113:11,14 136:25 | m 4:1,1 5:1 6:1 7:1 |
| lay 85:8 | listen 139:8 | 158:4 166:20 | 8:1 9:1 10:1 11:1 |
| layout 173:5 | listening 139:11 | looked 29:10 57:5 | 12:1 13:1 14:1 |
| learn 107:7 147:25 | 140:5 | 61:24 71:11,15 | 15:1 16:1 17:1 |
| learned 200:23 | litigation 191:2,10 | 146:2 200:24 | 18:1 19:1 20:1 |
| learning 114:13 | little 8:25 9:7 18:5 | looking 33:24 39:6 | 21:1 22:1 23:1 |
| 116:8 | 18:5,18 25:15 | 41:9,13 43:21 | 24:1 25:1 26:1 |
| leave 58:10 72:25 | 55:4 60:12,13 | 44:7 50:15 51:23 | 27:1 28:1 29:1 |
| 86:3,5 153:10,13 | 96:8,22,25,25 | 53:5 61:21 67:5 | 30:1 31:1 32:1 |
| 163:11 | 119:16 124:13 | 75:21 76:13,19 | 33:1 34:1 35:1 |
| leaving 187:12 | 134:9,15 137:2 | 77:19 95:4 109:17 | 36:1 37:1 38:1 |
| led 74:2 102:21 | 141:19 146:16 | 136:2,17 139:10 | 39:1 40:1 41:1 |
| 104:19 169:3 | 148:19,20,23 | 143:6 144:16 | 42:1 43:1 44:1 |
| left 76:24 77:5,17 | 149:16 150:3,9,24 | 147:4,7,8 149:10 | 45:1 46:1 47:1 |
| 79:14 99:10 | 155:14 162:22 | 159:2 164:4 | 48:1 49:1 50:1 |
| 106:20 135:24 | livelihood 27:15 | 167:23 168:2,8,25 | 51:1 52:1 53:1 |
| 136:17 151:6 | llc 204:2 | 169:15 181:22 | 54:1 55:1 56:1 |
| 186:20 187:4,17 | llp 2:3 | looks 41:17 45:19 | 57:1 58:1 59:1 |
| leg 171:11 | located 65:21 | 45:24 54:24 | 60:1 61:1 62:1 |
| legal 22:9 | location 24:11 | 134:15 137:18 | 63:1 64:1 65:1 |
| length 54:16 133:2 | 25:4,13 42:17,18 | 144:15 145:22 | 66:1 67:1 68:1 |
| lenses 10:7 | 42:20 44:19 47:21 | 146:14 154:4 | 69:1 70:1 71:1 |
| level 10:10 83:6,11 | 50:2,4,7 51:4 67:3 | 155:25 164:25 | 72:1 73:1 74:1 |
| 83:14,23 158:16 | 70:18 113:21 | lost 134:4 157:22 | 75:1 76:1 77:1 |
| 159:8 163:19 | 143:23 | lot 22:25 24:18 | 78:1 79:1 80:1 |
| 174:8 179:6 | locker 29:8 60:5 | 49:3 57:4 74:4,6 | 81:1 82:1 83:1 |
| levels 102:21 | log 59:2 | 75:20 76:14,18 | 84:1 85:1 86:1 |
| 104:17 | long 8:6,16 14:7 | 96:19 110:4 | 87:1 88:1 89:1 |
| liberties 190:9,15 | 30:13 41:15,16 | 124:11 139:20 | 90:1 91:1 92:1 |
| 190:17 | 46:17 82:15 85:24 | 147:2 150:9 | 93:1 94:1 95:1 |
| lieutenant 43:3 | 87:10,15 88:12 | 155:19 156:20 | 96:1 97:1 98:1 |
| lift 177:19 178:10 | 89:7 98:9 124:5 | 157:6 163:8 | 99:1 100:1 101:1 |
| 178:17 | 132:21 133:5 | 191:21 | 102:1 103:1 104:1 |
| lifted 176:24 177:5 | 134:16 184:17 | lots 19:21 | 105:1 106:1 107:1 |
| 177:9 | 185:9 | low 127:16 | 108:1 109:1 110:1 |
| light 137:2 | longer 87:12 88:2 | lunch 128:17 | 111:1 112:1 113:1 |
| lights 67:2,7 | 102:24 103:14 | luxury 107:16 | 114:1 115:1 116:1 |
| line 202:23 204:5 | 134:20 187:17 | lying 171:6 | 117:1 118:1 119:1 |
| lines 51:3,7,24 | look 29:14 45:11 | | 120:1 121:1 122:1 |
| 52:6 | 49:16 57:7,9 58:8 | | 123:1 124:1 125:1 |
| | 75:21 76:20 91:4 | | |

**[m - moment]**                                                                                           Page 16

| | | | |
|---|---|---|---|
| 126:1 127:1 128:1 | maneuvers 80:25 | medications 24:22 | 200:6 |
| 129:1 130:1 131:1 | manual 29:17,18 | 24:23 | minimal 172:20 |
| 132:1 133:1 134:1 | mark 34:8 51:7 | meet 44:12 67:18 | 173:18,24 |
| 135:1 136:1 137:1 | 55:5 134:22 148:7 | 92:6 137:25 | minimum 172:16 |
| 138:1 139:1 140:1 | 155:15 158:2 | member 24:14 | minute 59:5 |
| 141:1 142:1 143:1 | 162:13 | members 17:8 | 128:18 129:5 |
| 144:1 145:1 146:1 | marked 34:11,15 | 199:7 | 140:17 141:10 |
| 147:1 148:1 149:1 | 34:19 35:3 42:20 | memo 28:24 33:24 | 142:6 143:7,8 |
| 150:1 151:1 152:1 | 45:25 47:23 48:5 | 34:3,14,22 35:8 | 196:15,19 200:10 |
| 153:1 154:1 155:1 | 48:9 50:20 55:2 | 36:25 37:6,9 38:4 | minutes 59:3 98:3 |
| 156:1 157:1 158:1 | 66:24 134:25 | 39:4,6,15,18,20 | 133:4 134:14 |
| 159:1 160:1 161:1 | 191:14 202:22 | 42:9 43:4,10,15 | 144:3,8,13 145:12 |
| 162:1 163:1 164:1 | markings 34:24 | 44:6,8,13 45:7 | 145:19 146:13,18 |
| 165:1 166:1 167:1 | 51:8 | 46:24 50:12,13,15 | 147:17 148:5,7,21 |
| 168:1 169:1 170:1 | marriage 203:15 | 50:25 51:17,21,23 | 148:22 149:20,20 |
| 171:1 172:1 173:1 | matching 41:13 | 52:23 53:9 54:22 | 151:5,13,18 154:3 |
| 174:1 175:1 176:1 | materials 26:20 | 56:18,21 57:4,16 | 155:9,15,24 156:9 |
| 177:1 178:1 179:1 | matter 86:11 95:6 | 58:2,8 60:15,15 | 156:11,13,25 |
| 180:1 181:1 182:1 | 203:17 | 63:12 67:5 79:11 | 157:25 160:10,16 |
| 183:1 184:1 185:1 | meal 36:11,12,13 | 107:19 202:6 | 161:9,11 162:12 |
| 186:1 187:1 188:1 | 36:15,16 46:15,17 | memory 37:16 | 164:9 165:18 |
| 189:1 190:1 191:1 | mean 18:19 41:3 | 39:6,15,17 68:8,12 | 166:12 169:7 |
| 192:1 193:1 194:1 | 46:14 48:19 49:2 | 68:13 146:10 | 176:20,23 180:17 |
| 195:1 196:1 197:1 | 49:3,5 53:19 | 147:5 | 180:22 185:11 |
| 198:1 199:1 200:1 | 77:14 82:20 111:7 | menacing 83:6,12 | 199:24 200:8,8 |
| 201:1 | 150:10 191:23 | 83:12 96:17 | mischaracterizing |
| mailed 6:18 | meaning 43:7 | mental 72:25 | 182:2 |
| main 134:17 | 47:23 75:16 82:21 | mention 40:11 | misconduct 34:18 |
| 188:22 | means 22:13 45:25 | 78:18,25 79:3 | 202:7 |
| majority 24:13 | 46:15 47:25 48:6 | mentioned 134:2 | missing 41:6 |
| making 20:20 23:4 | 48:15 53:13,17 | menu 109:20,25 | 196:17 |
| 40:5 43:22 58:17 | 94:25 125:18 | metropolitan | misstates 27:25 |
| 115:20 189:15 | 190:5 | 10:16,19,23 11:12 | 88:5 |
| male 25:23 70:8 | meant 60:18 | middle 47:5 56:22 | mistake 63:20 |
| 70:24 71:8 | medical 27:13 | midnight 11:9 | 114:18,23 |
| man 69:15 | 85:25 88:10 | 32:17 | moment 28:16 |
| management | 110:13 183:17 | military 13:6 | 78:20 79:9 80:20 |
| 10:13 16:16 | 184:9 188:23 | mind 13:4 100:12 | 104:17 105:12 |
| mandeep 1:6,18 | medically 28:7 | 100:15 128:15 | 128:12 139:22 |
| 4:9 201:17 204:4 | 85:22 198:22,24 | 159:20 163:16,22 | 142:4,10 146:11 |
| 204:20 | | 163:25 189:5 | 150:16 161:6 |

[moment - objection]                                                      Page 17

| | | | |
|---|---|---|---|
| 162:21 169:2<br>176:6 179:18<br>198:23<br>**moments** 4:21<br>5:17,23<br>**months** 14:9 62:21<br>**mood** 105:10<br>**morning** 4:14<br>59:14 78:21<br>184:19<br>**motion** 138:7<br>165:11,18,18,21<br>170:24<br>**mouth** 162:13<br>**moved** 15:13<br>105:17<br>**movements**<br>168:23,23 169:16<br>**moves** 96:14<br>**multi** 66:8,10<br>**multiple** 54:7<br>66:12 138:13<br>178:13 | **necessarily** 22:19<br>26:14 32:5 39:22<br>43:13 55:7 58:6<br>163:2<br>**necessary** 20:22<br>22:10 91:16 95:2<br>**need** 60:11,22<br>85:22 86:5 89:19<br>89:23 90:2,9<br>142:18 154:7<br>191:3 196:14<br>**needed** 189:4<br>**needing** 110:13<br>**needs** 116:12<br>187:7<br>**negative** 42:21<br>53:13,16<br>**nerves** 163:8<br>**never** 26:10 105:3<br>139:24 160:4<br>173:7 194:22<br>**nevertheless**<br>133:22 | **notation** 47:15,15<br>67:6<br>**notations** 63:12<br>**note** 33:20 38:17<br>39:3 40:15 47:2<br>133:12,25 181:16<br>195:11<br>**noted** 182:6<br>192:16 195:13<br>**notes** 40:5 78:9<br>**nothing's** 91:8<br>**notifications**<br>115:13<br>**noting** 40:18 191:9<br>192:13<br>**notion** 174:3<br>**number** 36:10<br>60:23,24 61:3<br>63:18,22,22<br>108:15 113:4,13<br>189:25 190:7,8<br>**numbers** 107:14<br>**numerous** 125:10 | **objection** 6:9 9:21<br>17:6 18:12 19:8<br>20:2,15 21:3,19<br>22:3,17 23:24<br>24:7 26:7,15 27:3<br>27:6,24 28:13<br>29:25 30:9 31:6<br>31:21 37:7,17,23<br>38:6,14,21 39:8<br>43:11,25 56:24<br>57:20 58:12 59:23<br>63:8 72:8 75:6<br>77:10,11 78:3,7,17<br>79:15 80:10 81:3<br>81:10,16 83:9,16<br>84:4 86:20 87:4<br>88:4,8,24 90:15<br>92:14 93:10,19<br>96:7 97:15,22<br>103:17 104:7,24<br>105:20 106:22<br>109:12 110:7<br>114:21 115:23<br>118:10,15 119:9 |
| **n** | **new** 1:1,6,21 2:4,4<br>2:7,8,8 4:3,12,12<br>4:19 6:2 10:17,19<br>32:24 33:6 42:17<br>52:3 83:24 190:9<br>190:14,16 203:3,7<br>204:2,3<br>**night** 11:7<br>**nightstick** 194:6<br>**nightsticks** 194:12<br>**nine** 8:18<br>**non** 47:23<br>**nonsense** 115:20<br>**normally** 198:8<br>**north** 14:2<br>**notary** 1:21 3:13<br>4:3 201:22 203:6<br>204:24 | **nurses** 88:16<br>187:5<br>**nursing** 90:23<br>91:9<br>**nv0** 43:19<br>**nypd** 17:2 21:16<br>26:12,21 27:5,8,21<br>32:13 34:18 38:9<br>38:10 108:16<br>109:9 110:12<br>136:9 172:6 202:7 | 119:14,20 120:2<br>120:12 123:6<br>124:20 125:6,12<br>126:9 127:4,13,18<br>128:8 132:7<br>137:14 139:2<br>144:18 148:25<br>150:6,19 151:14<br>153:2,19 155:3<br>156:5 157:18<br>158:9,14 159:4<br>160:2 161:18<br>162:5,24 163:5,12<br>164:14 165:6,13<br>166:6,15,21 167:2<br>167:19 168:6,18<br>169:10,18 170:12 |
| **n** 2:1 4:1 202:12<br>**name** 1:8 4:7,15<br>4:17 32:24 118:22<br>132:21 133:8<br>204:3,4<br>**names** 1:9 107:11<br>**narcotic** 113:25<br>123:10<br>**narcotics** 113:23<br>**narrative** 112:17<br>115:2,6<br>**nasty** 131:21<br>**nature** 57:2 73:20<br>99:11<br>**near** 8:3,10 101:12<br>101:14 143:21 | | **o** | |
| | | **o** 4:1 125:16,18<br>**object** 20:16<br>190:22 195:25<br>**objecting** 133:23<br>191:25 | |

[objection - partner]                                                    Page 18

170:19 171:3
172:7,12,22 173:3
173:11,21 174:6
174:16 175:13,23
176:13 177:15,21
178:4,21 179:12
180:19,24 181:10
182:4 183:13
186:14 187:18
188:6,12,18
189:11 190:12
192:14,15,17,22
193:8,9 194:9,17
195:8,10,11 196:2
196:7 197:13,18
197:23 198:9,18
199:8,14
**objections** 3:8
20:20,21
**observations**
115:3
**observe** 88:16
92:21 114:6 127:2
137:5 146:5
186:11
**observed** 43:20
69:12,13 70:21
92:20
**obtain** 74:25 75:4
**obviously** 60:9
90:8
**occurred** 124:7
173:7 196:5
**occurrence** 125:19
**october** 1:13 62:18
62:20 203:19
204:4
**officer** 10:9 11:2,5
11:24 13:14,21
14:11,24 15:21,24
16:11 17:5,12

18:11,25 19:5,21
21:13 27:5,8,22
30:5,15 32:3,13,23
33:4 38:2,11
59:12 64:4 84:2
98:22 102:13
103:3 119:12
124:6 128:25
131:17,25 136:9
136:13,15 142:6
142:11 144:21
145:20 147:12
157:7 167:13,14
167:17,22 168:5
168:12,22 169:17
174:5 176:9,21
189:17,24,25
190:2,4,7 192:18
193:5 196:21
199:18 200:16
**officers** 1:7 17:9
17:13 21:8 33:7
49:21 78:22
136:10 141:17,20
175:20 176:7
178:14,16 184:2
**official** 1:7,8
190:23
**oh** 19:2 167:5
**okay** 5:2 21:5
44:21 49:25 59:10
71:23,24 84:19
90:6 102:24
128:13 132:16,18
133:6 137:16
143:17 169:12
189:16 192:7
196:18 200:9
**old** 6:25 7:2 8:19
**once** 54:7 62:19
67:10 76:24

178:14 183:15
196:11
**ones** 24:17
**online** 60:7,10,14
61:8 62:16
**opened** 101:7
**openly** 31:13
**operation** 14:20
14:22,23 15:5
**opportunities** 17:2
**opportunity** 59:18
129:6
**opposed** 92:8
**option** 86:9,17,24
86:25 87:3 89:13
89:15,25 91:2,3,5
91:13,19,20 92:13
93:16 97:5 109:6
110:2,10 111:25
112:7,9
**options** 85:9,11,18
86:23 87:13,16,17
88:3,6 89:3,11
90:12,13 93:2,4
148:9 149:24
154:14,17,22
156:4
**orally** 5:6
**order** 1:19 37:13
61:5 113:11
159:16
**orders** 91:17
**organization**
192:21
**original** 134:12
181:24
**originally** 23:13
132:12
**outcome** 203:16
**outlining** 148:9

**outside** 17:24
**outwardly** 84:19

**p**

**p** 2:1,1 4:1,1
125:16,18
**p.m.** 11:10 32:18
201:12
**p.o.** 1:6,18 4:9
36:4,5,19,19,20
**packed** 77:17
**page** 35:5,6,7,21
44:22 46:4 108:2
108:19 202:4,14
202:19,23 204:5
**pale** 127:11
**pants** 154:5
156:14
**paper** 55:10,12,16
55:16 114:15
**paperwork** 54:17
113:11,12,15
144:16
**parents** 17:23
**park** 66:17
**parked** 66:22
67:10
**part** 40:15 63:21
80:12 92:19,23
101:8 106:2
129:20 132:10
**particular** 25:13
39:3 51:17 110:11
120:6 133:16
143:15 198:15
**particularly** 62:2
**parties** 3:4 203:14
**partner** 34:4
102:13,17 103:5
103:16 104:2,5,6
167:11,11

[partners - police]                                                      Page 19

| | | | |
|---|---|---|---|
| **partners** 32:25 | **perception** 88:14 | 132:3,5 179:8 | **please** 4:7,10 |
| 69:3 97:14 | 162:3 | **physically** 116:16 | 31:23 34:9 42:6 |
| **parts** 51:22 129:18 | **perfect** 172:18 | 117:24 120:25 | 81:12 95:3 129:12 |
| **pass** 127:9 | **period** 43:24 | 121:7,14,20 123:3 | **point** 12:14 16:13 |
| **passed** 12:22 | **periodically** 18:20 | 124:17 174:10 | 38:25 61:22 65:15 |
| **pat** 95:25 | **permission** 74:25 | **physics** 171:24 | 72:4 73:17 77:23 |
| **patience** 199:19 | 75:4 | **pick** 112:8,13,15 | 82:8 84:11,18 |
| **patient** 92:8 | **permitted** 31:18 | 179:4,10,16,21 | 85:3 94:21 96:9 |
| **patrol** 14:21 15:3 | **person** 13:17 | 182:7 | 96:22 98:3 99:15 |
| 15:20,21,24 16:11 | 19:14 20:14 21:10 | **picked** 106:7 | 100:21 101:4 |
| 28:15,25 29:5 | 22:6,23 23:4,5 | 181:8 | 102:19,21,24 |
| 33:10 36:8 49:21 | 24:19 25:23 27:9 | **picking** 97:5 | 105:23 113:14 |
| 49:22 60:4,5,14 | 27:14 28:3 31:13 | **place** 4:20 86:13 | 114:25 118:24 |
| 61:8,24 62:10,15 | 31:16 41:13 47:18 | 91:21 120:10,19 | 138:5,10,20,21 |
| **patrolling** 47:3 | 68:25 69:6 71:2 | 125:19,23 165:24 | 139:16 141:18,24 |
| **pause** 151:4 | 73:25 88:12 94:24 | **placed** 92:24 | 145:4,8,11 149:24 |
| **pausing** 135:9 | 110:12,12,20 | 120:6,15,17 144:6 | 150:9 151:22,24 |
| **pay** 75:23,25 77:3 | 111:14 112:19,22 | **places** 51:13 | 152:3,22 154:7,14 |
| 77:21 80:13 131:4 | 115:16 130:2,5 | **plaintiff** 1:3,19 2:3 | 154:19,20 155:8 |
| 148:16 162:7 | 135:13 140:2 | 4:18 203:3 | 156:3,19 160:16 |
| **paying** 140:4 | 148:2 178:14 | **plaintiff's** 34:11 | 161:2,3 163:15,25 |
| **penal** 83:7,24 | **person's** 23:2 | 34:15,19 35:3 | 167:21 169:4 |
| **pencil** 58:6 | **personally** 198:11 | 51:2 134:25 | 175:21 178:13 |
| **pending** 6:3 | **persons** 21:16,25 | 189:24 | 183:16 184:4 |
| **people** 21:15,16 | 28:17 68:15 | **planning** 17:4 | 185:25 186:20 |
| 31:5,14,17 36:22 | **perspective** | **play** 143:11 160:5 | 187:22 188:25 |
| 44:17 69:3 75:22 | 131:24 168:3 | 165:16 166:10 | **poisoning** 126:8 |
| 76:21 80:8 88:15 | **pertain** 159:12 | 168:2 169:6 | 126:12 128:3 |
| 92:5 109:9 110:13 | **pertains** 129:14 | 179:24 181:2 | **police** 1:7 4:12 |
| 139:20 143:20 | **pertinent** 132:13 | **playful** 122:20 | 11:2,5,24 12:15,20 |
| 147:2 159:7 172:5 | **pharmacist** 13:2 | **playing** 135:7 | 13:14,21 14:4,7,11 |
| 177:14,19,25 | **pharmacy** 12:13 | 137:9 140:16 | 14:14 17:9,11,12 |
| 179:11 197:3 | 12:25 13:12,15 | 141:9 142:5 | 18:7,10,24 19:4,5 |
| **perceive** 89:7 | **phone** 56:5,11 | 143:25 144:7,12 | 19:20,21 20:12 |
| 131:5 132:4 | **phones** 56:3,8 | 145:18 147:16 | 21:8,13 23:14 |
| 169:21 | **physical** 80:15,24 | 148:4 154:2 | 29:21 30:4,5,15 |
| **perceived** 82:16 | 116:14 117:20 | 156:10,12 161:8 | 32:3,13 38:2,11 |
| 82:18 168:11 | 118:4,9,13 121:11 | 162:11 164:8 | 44:17,19 48:8 |
| 174:3 | 121:17,18 129:19 | 176:19 181:19,23 | 66:24 74:2 77:9 |
| **percent** 53:22 56:7 | 129:23,24 130:4,9 | **plaza** 4:12 | 78:21 84:2 119:12 |
| 123:22 | 130:21 131:5,6,10 | | 124:6 133:11 |

134:24 172:10
199:5 202:8
**policy** 43:18
**pony** 135:18
**portable** 56:4
**pose** 27:11
**position** 82:11
153:24 186:8
**possible** 119:19
171:17 172:17,20
173:18 199:2
**potentially** 82:24
82:25 153:17
**pounds** 7:11,19
**practice** 73:24
140:14
**precinct** 11:3
13:24 14:4,15,16
14:19 15:9,11,14
15:17,19 16:3,6,7
16:14 18:23 30:21
35:19 41:5,10
52:24 53:3 54:14
64:10,11 179:6
195:20
**precise** 76:9
**prefer** 85:16
**prefilled** 116:20
117:8
**preparation**
133:22
**prepare** 54:16
55:9 56:18 57:16
60:19,22,25 61:6
191:24 198:12,16
**prepared** 54:23
55:7 61:2 108:9
113:8 190:16
192:2,4
**preprogrammed**
117:3

**prescription** 9:4
9:15,17
**presence** 15:4 78:6
**present** 2:11 35:23
35:24 81:14 95:15
97:20 98:6,21
**presented** 94:10
174:21
**presently** 1:9
**preserving** 192:14
**presumably** 66:22
**presume** 51:25
97:25
**presumption**
153:21,23
**pretty** 23:6 52:11
55:13 76:22 114:3
114:5 138:21
140:24 143:12
158:20
**previous** 40:6
41:21 46:3
**previously** 26:3
**prewritten** 116:23
**prior** 9:10 11:12
13:6,9,13 14:3
17:11 24:10 25:3
28:18 33:15 67:23
68:14 117:13
121:12 124:10
125:9 126:16
129:10 138:17
**priority** 42:4
57:24,25
**prisoner** 58:20
**private** 66:9
**privilege** 6:10
**probably** 29:11
46:3 63:7 137:24
138:7,8 142:20

**problem** 21:2
**problems** 76:5
126:19
**procedures** 29:2
**proceed** 6:21
**proceeded** 142:15
143:16 145:10
152:2
**proceedings** 38:19
**produced** 133:16
134:5,6,13 190:20
190:21,25 191:4
191:10
**professional** 88:11
**professionals**
27:13 85:25
**program** 16:15
33:5 55:15,19
**progress** 58:3
**progressively** 8:24
**prompted** 12:19
**proper** 62:5
**property** 58:18
**protocol** 85:13
**provide** 25:2
**provided** 25:11
**providing** 24:25
**psychiatric** 23:3
**public** 1:21 3:13
4:3 192:20 201:22
203:6 204:24
**publicly** 191:19,22
**pull** 8:13 129:15
**pulls** 102:10
**punch** 130:11
131:8
**punjabi** 17:19
74:8 75:12,17
76:3 149:15
**purpose** 37:6
43:14 119:23

197:16
**purposes** 108:3
191:5
**pursuant** 1:19
**pursue** 12:24
**push** 173:8,9
182:22
**put** 41:17 53:12
60:16,18 67:2,7
87:8 90:3 94:7
100:25 102:2
104:21 105:8,14
114:11,25 115:6
116:2,18,25
153:23 154:20
158:8 173:2,10
175:15 176:3,10
183:21
**puts** 99:18 162:13
164:19 166:4,12
**putting** 100:5
102:5 104:11
114:18 153:7
154:4,10 156:14
156:22 157:2
160:7,24

q

**qualifies** 23:22
**qualify** 121:18
**queens** 15:17
**queensborough**
11:17,20,23 12:3
12:10
**question** 3:9 5:10
5:11,12,18,20 6:3
6:4,5,12 18:14
19:10 20:18,23
21:6 30:3 38:24
54:3 63:14 94:12
110:10 116:12
138:18 174:18

[question - remember] Page 21

175:25 189:6
200:3 202:23
**questionable**
190:24
**questioning**
190:12 200:20
**questions**  4:22 5:6
34:25 91:25
109:21 156:11
192:8 195:12
199:18,20 200:13
202:22
**quick**  63:12
**quickly**  58:5
103:20 141:22
173:16

**r**

**r**  2:1 203:1
**race**  111:11
**radio**  49:13,14
65:15,17
**radius**  15:2
**raised**  163:19
**rambling**  74:4
96:19
**range**  7:21
**reacting**  150:2
**reacts**  171:22
**read**  35:15,21
36:11 39:24 42:13
42:14 43:2 191:23
**readily**  61:4
**ready**  64:15 102:7
152:5 163:11
165:24
**real**  63:12
**reality**  117:23
**really**  8:12 12:21
13:4 43:16 52:15
52:19 54:12 57:24
58:5,17 86:22,23

87:14,14 92:16,17
94:8 103:20
134:17 141:21
163:7 194:11
197:20,25
**reason**  16:22 90:5
114:10 177:13
198:15 204:5
**reasoning**  178:24
**reasons**  133:19
**recall**  7:14 30:11
50:13 51:22 68:4
68:7 79:25 81:4
178:9 182:18,21
186:16 189:21
200:16,20
**receive**  19:15 21:7
22:22 48:23
**received**  18:6
21:23 23:14 30:20
40:6,19
**receptive**  153:6
**recollect**  21:21
26:17 28:16
198:20
**recollection**  23:20
33:25 39:12 44:24
45:10 143:5 144:9
171:18 172:14
177:17 181:4
194:7 200:25
201:3,7
**record**  4:8,11
26:11 35:12 37:10
37:21 43:7 51:11
108:3 119:24
125:18 132:19,24
133:13 181:17
190:24 199:25
203:11

**records**  192:20
193:2
**redacted**  63:15,18
63:21,24
**refer**  29:17 37:13
60:13,24 61:2,5,9
**reference**  113:10
**referenced**  113:7
**referred**  48:14
60:6 61:12,13
62:19,22 63:7
**referring**  41:4,18
46:8 47:15 48:19
51:3,8 52:25 64:6
64:8
**refers**  110:12
**refresh**  33:25 39:6
39:14,17 147:5
194:7
**refreshed**  201:7
**refused**  90:2
**regard**  30:24
**regarding**  23:12
26:12 79:4 121:20
179:20 190:12
195:12
**regardless**  94:15
94:19
**regards**  41:19
60:3
**regular**  92:8 119:7
**regularly**  8:20
29:15 61:9,10
**rehashing**  183:16
**related**  52:4 63:15
113:23 203:14
**relates**  63:24
**relating**  200:24
**relationship**  197:4
**relatively**  33:6

**reliability**  190:24
192:2,6
**rely**  37:15
**remain**  185:9
**remained**  185:13
**remember**  9:13
12:21 23:16 25:5
30:22 32:16 33:20
38:19 44:11 45:6
45:16 47:6 55:16
55:17 56:16 57:10
61:21,23 62:4
66:2,5,19 67:4
68:24 69:5,18
70:6 71:10,13
72:11 74:12 75:14
75:20 76:3,12,13
76:15,17,18 78:4,8
79:5,7 80:2 83:19
84:17,19 93:5,6,12
94:25 95:2 96:3
96:20,21 97:18
98:18 99:4,22
100:3,5,10 101:8
103:9,19,24 104:9
105:9 106:8
107:13 111:12,16
111:17 115:7,8
126:24 127:15
136:13 137:7
140:22 141:4
142:19 143:4,13
143:16,17 145:17
147:23 148:14
150:21 156:18,20
156:24 157:4,5
159:18 160:15
165:8 170:14,15
170:21 176:16
180:14 183:3,8
187:3,13 193:15

**[remember - saying]**                                                      Page 22

194:3,11,12
195:16,22 196:9
**remembered** 34:6
200:18
**removed** 125:16
**repeat** 21:6 30:3
138:18 195:9
**rephrase** 31:23
38:23 81:12
175:25
**report** 25:3 28:23
34:10 51:6 54:23
55:3,10 56:14
63:19,23 88:18,22
90:22 91:12 92:12
92:16 107:18,18
107:23 108:15
113:6 115:8
129:15 132:10,15
175:8 196:23,24
197:6,12,17
198:13,17 199:4
199:13 202:5
**reporter** 5:4,15
34:13,17,21 135:3
202:10
**reporting** 204:2
**reports** 25:12 55:6
107:8 116:22
124:9,15
**represent** 4:16
**request** 49:11
53:21 178:16
191:12
**requested** 191:8
191:17 202:18
**requesting** 49:25
69:22 70:8
**requests** 70:2
118:3

**require** 38:18
87:25
**required** 36:8
199:12
**requiring** 32:7
**reserved** 3:9
**resolved** 20:21
**respect** 61:7
130:24
**respective** 3:3
**respond** 15:4
20:24 44:20 47:20
49:24
**responded** 40:16
**responding** 54:9
**response** 191:18
**restrain** 104:20
187:9,11
**restrained** 187:17
**result** 80:16
194:15
**results** 42:22
53:13,17
**retained** 202:10
**retribution** 77:8
**return** 36:2 58:18
64:18
**review** 28:19,22
28:25
**reviewed** 28:23
**reviewing** 200:19
201:5
**rewind** 146:16
166:9,19 168:24
**richmond** 203:4
**riding** 183:24
**right** 7:10 14:5
35:10 36:6 39:25
40:9 45:8 47:6
50:23 51:9,10,18
51:24 54:10,25

57:4,19 62:18
65:13 84:20 90:14
92:7 94:6 95:6,10
98:4,10 99:19,25
100:22 102:4
105:13 106:21,24
106:25 107:2,3
108:21,23 109:18
109:22 111:24
112:2 113:4,9
115:13,16,17
116:14 117:9
118:6,9,14 121:15
123:8,11,13,19,21
130:10,18 135:16
135:24,25 136:8
136:16,18,23
137:20 138:11
139:7 143:10,14
144:15 145:14,25
146:19,20 151:4,7
152:8,9,10,16,17
152:20 153:10,11
154:5 155:16
156:13 157:23
164:19,21 165:12
166:8,24,25
167:22 169:25
170:2,4,22 171:2
171:11,11,15,16
171:18 175:10
176:4,22 177:2,7
180:16 182:9
185:7 187:3,14
192:19 193:7,10
197:7,22 199:13
**ring** 196:4
**rise** 83:23
**rite** 13:16,17
**rmp** 33:9,11,12
36:4,10 55:24

64:20,24
**road** 39:5
**robberies** 58:3
**rode** 183:22
**role** 33:16,21
35:24
**room** 139:7
140:25 153:10,13
157:16
**rose** 83:6,14
**rule** 20:19
**rules** 4:25
**rulings** 202:22
**run** 24:4 65:15,17
67:25
**runs** 134:16

**s**

**s** 2:1 48:16 202:1
204:5
**safe** 102:25 103:14
**safely** 189:2
**safest** 198:25
**safety** 74:15
**sake** 22:11
**saw** 97:25 106:4
117:7 142:16
157:7,21 166:13
171:14 176:12,23
**saying** 42:6 44:18
71:25 75:11,21
76:12,19 77:15
79:7,12,19 80:6
82:5,21 84:18
85:21 96:20 98:18
101:16 102:11
103:12 131:7,12
132:6,23 139:12
148:12 155:25
160:23 161:4
162:16,19,20
165:22 167:5

Case 1:19-cv-00632-EK-ST   Document 48-7   Filed 11/29/21   Page 227 of 235 PageID #: 815

[says - self]                                                                                          Page 23

| | | | |
|---|---|---|---|
| **says** 35:15 36:11 | 119:9,14,20 120:2 | **scratched** 43:4,7 | 166:12 169:8 |
| 40:22,25 45:24 | 120:12 123:6 | 44:5 | 176:20,23 180:17 |
| 52:23 53:16 | 124:20 125:6,12 | **scratches** 44:13 | 180:22 |
| 101:12,18 110:16 | 126:9 127:4,13,18 | **scratching** 43:15 | **section** 108:19 |
| 113:23 115:4 | 128:8,14,20 132:7 | **screaming** 89:10 | 111:19 115:16 |
| 116:13,15 118:2,4 | 132:19 133:6,12 | **screen** 107:24 | 116:11 118:3 |
| 123:16 124:3 | 137:14 139:2 | 135:5,17,25 | **sectors** 36:7 |
| 125:15 131:21 | 144:18 148:25 | 136:18 142:2 | **secure** 183:23 |
| 132:2 187:2 | 150:6,19 151:14 | 144:5 146:12 | **security** 92:2,7 |
| 192:18 193:5 | 153:2,19 155:3 | 164:21 181:20,21 | 187:2,6 |
| **scale** 158:16 | 156:5 157:18 | 181:24 | **see** 5:3 7:24 8:6,7 |
| **scenario** 174:11 | 158:9,14 159:4 | **screening** 87:11 | 8:12 30:16 34:25 |
| **scene** 102:25 | 160:2 161:18 | **scroll** 35:20 | 41:12 45:20 50:19 |
| 138:12 143:20 | 162:5,24 163:5,12 | 116:21 | 70:23,24 80:21 |
| 151:13 169:22 | 164:14 165:6,13 | **sealing** 3:4 | 91:15 95:22 |
| 171:6 186:17 | 166:6,15,21 167:2 | **search** 95:25 | 107:23 108:4 |
| **scheduled** 179:15 | 167:19 168:6,18 | 195:6,7,15,17 | 113:15 120:25 |
| **scheiner** 2:9 6:2,8 | 169:10,18 170:12 | **searched** 40:8 | 132:11 133:20 |
| 6:14 9:21 17:6 | 170:19 171:3 | **seat** 58:21 | 135:4,10,19 |
| 18:12 19:8 20:2 | 172:7,12,22 173:3 | **seated** 146:4 | 136:20,25 137:10 |
| 20:15 21:19 22:3 | 173:11,21 174:6 | **second** 66:6 74:9 | 140:18 141:11 |
| 22:17 23:24 24:7 | 174:16 175:13,23 | 86:9,25 87:3 | 144:2,14,25 145:6 |
| 26:7,15 27:3,6,24 | 176:13 177:15,21 | 100:9 155:15 | 146:19 147:18 |
| 28:13 29:25 30:9 | 178:4,21 179:12 | 172:17 | 149:24 151:6 |
| 31:6,21 37:7,17,23 | 180:19,24 181:10 | **secondly** 60:15 | 152:4,6 156:14 |
| 38:6,14,21 39:8 | 181:15 183:13 | **seconds** 133:4 | 160:6 161:10 |
| 43:11,25 52:8,15 | 186:14 187:18 | 134:14 135:10 | 162:14 164:10,20 |
| 56:24 57:20 58:12 | 188:6,12,18 | 137:17 139:16 | 165:19 166:4 |
| 59:7,23 63:8,13 | 189:11 190:10,19 | 140:10,10,17 | 167:22,22,24 |
| 72:8 75:6 77:10 | 191:7,13,21 | 141:10 142:6 | 168:20 169:13 |
| 78:3,7,17 79:15 | 192:13,22 193:3,8 | 143:8,8 144:3,8,13 | 170:24 171:9,13 |
| 80:10 81:3,10,16 | 194:9,17 195:8 | 145:13,19 146:13 | 176:15,17,22 |
| 83:9,16 84:4 | 196:2,7,18 197:13 | 146:19 147:18 | 180:6,9,16 182:2,3 |
| 86:20 87:4 88:4,8 | 197:18,23 198:9 | 148:5,7,21,22 | 184:6 195:3,20 |
| 88:24 90:15 92:14 | 198:18 199:8,14 | 149:20,21 151:5 | 196:9 |
| 93:10,19 96:7 | 199:23 200:4,12 | 151:13,18 154:3 | **seeing** 84:7 |
| 97:15,22 103:17 | 200:15 201:10 | 155:9,24 156:9,12 | **seen** 134:8 |
| 104:7,24 105:20 | 202:16 | 156:13 157:2 | **selected** 112:4 |
| 106:22 109:12 | **school** 11:7 13:18 | 158:2 160:10,17 | **self** 116:14 120:6 |
| 110:7 114:21 | **scratch** 46:11 | 161:10,11 162:12 | 122:4 |
| 115:23 118:10,15 | | 164:10,19 165:19 | |

[send - stamped]                                                                Page 24

| | | | |
|---|---|---|---|
| send  44:19 | side  90:5 106:16 | 146:15 148:2 | sounded  86:18 |
| sends  44:18 | 135:16 138:15 | 153:8 159:15 | sounds  90:12 |
| sense  161:16 | 142:8 151:6 | 180:2 | sources  140:6 |
| sent  18:22 | 164:21 170:22 | sir  7:9 19:11 32:13 | space  177:5,10 |
| separate  152:12 | 171:2,16,19 177:2 | 34:25 35:10 88:7 | 181:21 |
| september  10:21 | 186:10 | 108:5 135:11 | speak  17:15,18,19 |
| 16:21 | sighted  8:3,4,10 | sirens  67:3,8 | 52:16 54:15 59:18 |
| sergeant  35:24 | sign  64:12 119:2 | sit  143:9 | 71:6 123:3 129:6 |
| 46:11 | signal  44:18 | sitting  69:15 73:12 | 149:23 184:9 |
| serious  48:16,18 | signature  203:23 | 73:15 141:18 | 186:7 |
| 48:25 67:6 150:11 | signed  3:12,14 | situation  77:22 | speaking  140:11 |
| 150:13,14,24 | 43:7 119:6 120:5 | 79:20 80:18 82:19 | 140:11,14 163:18 |
| set  59:11 128:23 | significance | 85:8 86:4 88:17 | 163:19 |
| 155:23 178:9 | 182:17 | 92:6,17 96:12 | special  33:19 34:2 |
| 203:10,19 | significantly  7:18 | 120:7,11,16,17,19 | specific  12:6 21:22 |
| severe  86:8 | 8:25 | 150:15 171:22 | 26:4,9 60:18 |
| sh  46:14 | signing  118:18 | 172:16,21 174:21 | 70:13 75:15 77:6 |
| share  191:16 | signs  72:24 92:20 | six  14:9 124:8 | 78:5 79:8 144:11 |
| sheet  204:2 | 128:3 130:14 | skin  127:11,12 | 155:18 |
| shield  107:14 | similarly  5:9 | slightly  134:9 | specifically  19:12 |
| 190:3 | simple  173:23 | slowly  80:21 | 19:13 20:4,5 |
| shift  11:10 32:18 | simply  31:19 | small  9:19 | 47:13 59:25 69:18 |
| 40:7 64:13,14,16 | 89:22 90:24 | smaller  175:8 | 77:24 78:8 129:22 |
| shifts  11:9 | singh  1:2 4:17 | smile  166:5,18,20 | 163:24 |
| shirt  95:20 98:10 | 50:9 54:8 65:6 | smiled  166:13,24 | specify  18:18 |
| shoe  157:22 158:8 | 73:18,21 74:18,22 | smiling  167:7 | speculate  52:20 |
| 160:8 | 75:2,10 99:15 | snowing  47:10 | spoke  59:20 71:3 |
| short  71:12 87:14 | 108:10 130:8 | soblick  35:24 | 71:17 122:4 |
| 87:20 128:15,17 | 136:18 137:20 | sofa  101:14 | spoken  138:11 |
| 142:22 | 141:6,7,14 142:8 | solely  161:20 | ss  203:3 |
| shorter  175:19 | 143:22 145:3,5 | somebody  24:13 | staff  87:19,24 |
| shortly  148:6 | 146:3,4 148:6,8,24 | 31:14 41:6,9 | 90:23 91:10 |
| shorts  95:21 | 150:18 153:16 | 54:16 90:8 130:16 | 184:10 187:23 |
| shoulder  171:11 | 154:4 159:17,24 | 131:21 178:10 | 188:2,3 |
| 177:7 178:20 | 160:6,18 175:4 | someone's  178:20 | stairs  50:8 182:16 |
| show  15:4 34:22 | 180:11 182:8,19 | soon  134:6 137:18 | 182:20,23 183:2,6 |
| 107:17 128:11 | 184:6 186:2 | sorry  59:2 | stalling  163:10 |
| 130:13 189:23 | 187:24 188:11 | sort  31:15 77:8 | stamp  35:14 45:18 |
| sick  111:22 112:4 | 204:3 | 82:5 84:11 115:19 | 50:25 132:22 |
| 112:5,12 | singh's  54:21 | 115:20 163:10 | stamped  35:13 |
| | 65:18 75:2,5 | | 44:23 108:4 |

[stand - tablets]                                                                         Page 25

| | | | |
|---|---|---|---|
| **stand** 152:13 155:16 | 105:16,22 157:22 167:17,17,24 | **submit** 58:22,24 118:25 | 77:18 78:4 83:21 97:18 98:11 |
| **standing** 70:23 101:15 106:9 140:23 152:8,17 153:5 186:8 195:11 | **stepped** 167:10 **stepping** 168:16 174:4 **steps** 62:5,7 **stern** 150:4 156:2 **stint** 16:7 | **submitted** 120:18 120:21 **subscribed** 201:19 204:21 **substance** 21:18 113:25 | 103:19 105:4 114:3,6 116:24 128:16,23 129:16 137:23 138:21 142:11 143:12 151:24 152:2 |
| **stands** 43:19 **start** 11:10 128:22 135:7 164:8 | **stipulated** 3:2,7,11 **stipulations** 3:1 **stock** 13:17 | **substantially** 134:7 **sudden** 101:9 | 161:3,6 166:17 168:9 173:15 177:23 178:23 |
| **started** 13:17 32:19 55:13 64:18 93:13 95:12 96:21 96:23 97:3 100:11 102:5 145:12 155:6,12 156:11 162:19 | **stood** 155:11 **stop** 36:6 130:5 137:12 165:17 **stopped** 41:25 105:3 140:9 142:6 145:14 146:14,18 148:21 154:21 | 102:16 103:6,8,13 103:21,22 104:10 104:22 105:14,16 105:22 163:16 167:24 169:16 **sufficient** 133:7 **suicidal** 81:25 | 181:7 183:7,23 184:18 189:15 **suspected** 113:23 123:10,16 **suspicious** 47:18 48:7 **swear** 75:18 76:10 |
| **starting** 35:4 93:6 148:20 161:9 164:9 166:11 169:7 176:20 | **stopping** 137:17 139:16 140:17 141:10 144:3,8,13 145:19 147:17 148:5 154:3 | **suite** 2:4 **summarizes** 23:20 **summary** 45:4 **summons** 35:25 189:9 | **swearing** 75:20 **sweatshirt** 136:3 136:25 140:19 147:19 153:9 157:9,16 |
| **starts** 36:14 84:23 101:6 134:14,16 135:8 165:10 | **stops** 181:3 **street** 2:4,8 19:25 45:25 66:17 | **supervisor** 33:21 42:25 44:4,5,13 46:11 | **sweet** 163:11 **sworn** 3:14 4:2 201:19 203:10 204:21 |
| **state** 1:21 4:3,7,10 20:25 72:25 86:9 203:3,7 | **strength** 174:9 **stretcher** 92:9 **strictly** 55:17 | **supervisors** 38:10 **supposed** 19:16 21:8 26:5,12 | **symptoms** 126:7 **system** 57:5,6 108:16 112:9 |
| **stated** 86:6 **statement** 102:5 121:9,13 148:15 **statements** 82:16 83:6,19,22 | **strike** 186:3,12,12 **strip** 195:6,7,14,17 195:19 **student** 13:19 **studied** 29:18 | 28:11 36:12 43:9 177:25 179:4,9 190:3 199:4 **sure** 13:4 25:10 43:8,17,22 44:10 | 114:14,15,24 116:9 |
| **states** 1:1 17:21,24 **station** 46:15 **stay** 85:23 87:12 87:13,14,21 88:2 88:13 89:7 159:16 | **studying** 60:7 **stuff** 39:20 45:2 55:8 92:21,22 **subduing** 174:13 **subject** 31:12 | 44:20 45:17 47:8 48:22 52:2 53:22 55:11,14,15 56:7,9 56:13,15 58:10,17 | **t** |
| **step** 18:4 74:9 102:12,14,15,16 103:4,6,8,14,21,22 104:10,23 105:14 | 61:23 138:4,9 139:23 172:16 | 58:21,22 61:19 62:5,6,13,16,24 67:4,8,9,17 70:6 | **t** 125:16,18 202:1 203:1,1 **table** 85:15 89:12 **tablet** 55:20,22 62:14,17 **tablets** 55:13 61:20 |

[tactical - time]                                                                      Page 26

| | | | |
|---|---|---|---|
| **tactical** 174:11 | 167:12 | **test** 12:22 92:22 | **thinking** 94:22,25 |
| **tactics** 174:15 | **talks** 187:5 | **testified** 4:4 26:3 | 99:14 161:22 |
| **tail** 135:18 | **tall** 7:3 175:18 | 129:3 158:24 | 162:2 188:24 |
| **take** 24:21 26:23 | **taller** 175:18 | **testify** 37:14 39:5 | 198:21 |
| 27:2,17,22 28:3,4 | **tank** 40:4 | 60:2 | **third** 66:4,6 86:24 |
| 36:12,17,18 41:15 | **taser** 40:11 64:7 | **testimony** 27:25 | **thorough** 108:8 |
| 42:11 57:25 76:23 | 64:19 | 59:13,22 77:12 | **thought** 134:5,18 |
| 77:8 78:9 86:14 | **tasers** 64:9,12 | 88:5 129:10 | 168:10 189:7,14 |
| 86:15 87:9,11 | **tax** 1:7 | 170:25 193:22 | **threat** 121:17,18 |
| 91:22 93:17 94:14 | **technical** 133:18 | 203:12 | 129:24 130:4 |
| 95:5 96:10 101:23 | **technically** 32:19 | **textbooks** 28:8 | 131:2,6,6,11,13,14 |
| 106:20,20 128:15 | **technician** 12:13 | **thank** 64:2 182:5 | 131:15,16,20,25 |
| 128:16 167:6,24 | 12:25 13:12,16 | 199:21 201:11 | 132:12 149:8 |
| 169:9 172:5 | **techniques** 22:8 | **thermal** 98:10 | **threaten** 121:7 |
| 173:19,23 176:12 | **technology** 119:16 | **thing** 5:3 50:19 | 123:3,5 149:4,6 |
| 187:8 | **tell** 30:21 42:25 | 53:23 60:17 69:11 | **threatened** 74:11 |
| **taken** 1:18 59:6 | 45:22 46:23 47:12 | 69:13 71:22 91:23 | 74:13 78:16 |
| 126:2,3 128:6,19 | 48:13 59:25 62:13 | 94:6 112:11,13,15 | 120:25 121:20,23 |
| 189:14 196:20 | 62:23 64:7 66:14 | 112:16 114:8 | **threatening** 31:13 |
| 200:11 | 67:16 68:21 70:3 | 116:23 122:17 | 80:24 82:17 85:13 |
| **takes** 102:12,14 | 70:3,7,21 71:7,16 | 126:12 137:24 | 96:13,16 97:12,20 |
| 163:8 181:21 | 72:22 74:10 75:19 | 142:1 146:22 | 121:14 124:18 |
| **talk** 5:16 18:5 | 76:10 83:20 85:3 | 159:10 172:2 | 129:20 131:10 |
| 137:11 138:15 | 87:19 88:21 89:2 | 189:4 198:23 | 132:10 |
| 141:23 148:17 | 89:6,21 91:3 | **things** 8:7 30:17 | **threats** 78:5 79:4 |
| 150:25 155:22 | 92:11,24 97:17 | 49:3,6 59:13 60:3 | 121:11 129:23 |
| 168:25 187:6,22 | 126:11,15,21 | 82:6 131:22 | 131:23 |
| 187:25 | 128:5 129:12 | 138:13 186:4 | **three** 29:12 33:2 |
| **talked** 24:24 142:3 | 130:23 131:3 | 191:22 | 51:3 193:12 |
| 142:3 | 137:24 139:21 | **think** 20:23 58:14 | **threw** 105:18 |
| **talking** 25:8 39:13 | 140:21 145:20 | 60:16 62:3,21,25 | 166:25 |
| 76:6 82:6 115:20 | 146:22 149:4 | 79:13 99:3,9 | **tight** 182:13 |
| 122:18 131:23 | 150:8 151:17 | 101:7 106:15 | **tightly** 182:11 |
| 139:22 140:5 | 154:16 155:18 | 112:18 115:21 | **time** 1:14 3:9 5:17 |
| 141:5 142:14,15 | 158:11 164:4 | 133:3,7,10,17,17 | 8:24 9:3,11 10:23 |
| 144:25 145:22 | 180:21 188:3,8 | 134:4 138:6 | 13:3 14:20 16:6 |
| 146:2,3 147:6,9,9 | **telling** 59:17 139:8 | 146:23 159:11 | 16:13 22:9 23:17 |
| 147:10,13 148:6,8 | 148:16 149:5,9,11 | 162:10 173:14 | 24:13 25:6,7 |
| 149:14,19 150:5 | **tells** 25:23 129:2 | 181:25 188:15,21 | 26:18 29:9,18,20 |
| 150:18 154:19,21 | **temperature** 47:7 | 191:15 196:15,17 | 30:4,13,14,20,22 |
| 156:2,20,21 157:6 | 127:17,21,23 | | 33:4 36:12,15,16 |

Case 1:19-cv-00632-EK-ST   Document 48-7   Filed 11/29/21   Page 231 of 235 PageID #: 819

43:23,24 53:10,11
53:18 54:9 55:7,8
55:11 56:20 57:3
57:9,10,11,17,25
58:6 61:11,17,21
62:8 63:2 64:5
72:10 73:12 77:15
78:11,13 80:2
95:24 98:6 100:8
100:9 102:23
104:16 105:2,5,7
109:4,10,15
112:15 114:7,25
115:7,25 116:8,20
116:24 124:6
125:18,21 132:22
134:22 138:13
139:25 140:8,9
142:23 147:11
153:21 155:17,19
155:23 158:23
160:21 161:21
162:8,18 163:7,11
164:2,3,16 168:10
169:6 172:15
173:14 174:23,25
175:6 178:8,15
184:19,24 185:14
186:9,17 187:4,25
188:20 191:12
194:3,19 197:22
200:22
**times**  24:18 36:14
42:22 57:4,8
61:18 62:21 63:4
63:7
**tint**  127:12
**today**  6:20 16:8
39:13 143:9
194:16

**told**  65:24 68:9,12
69:19,21 70:17
71:25 72:14 74:13
77:20 85:20 89:18
99:13 100:17
126:17 134:7
154:13 155:16
156:3
**tone**  77:7 149:18
149:22 150:17,22
**top**  30:23 45:20
106:13,16 108:18
113:22 170:10,15
170:18
**topics**  18:24
**touch**  104:2
**tour**  32:15 35:17
39:2 42:11 43:24
56:22 57:19 58:9
58:19 65:3,7
**track**  58:15
108:16
**traffic**  184:20
**trained**  38:9 92:21
171:23 174:13
177:12,18
**training**  14:10
18:6,7,9,17,21,23
19:3,6,15,19,23
20:9 21:7,24 22:2
22:5 23:12,15,17
26:4,10,20,20
28:10 30:21 33:3
33:5 172:4,5,9,11
177:24 178:6,11
178:12,25 179:2,7
179:7,8,10,16,21
**transcript**  6:17
**translate**  75:16
**translation**  134:4

**transmitted**  49:8,9
**transpired**  140:9
**treat**  23:21 26:13
112:21
**treatment**  110:14
125:17,25 126:5
**trial**  1:17 3:10
6:21 60:20
**tried**  42:17 90:5
100:8 140:24
149:16 175:22
**trip**  185:4
**trouble**  58:23
149:13
**true**  1:9 110:4
131:22 203:11
**try**  57:8 58:15
61:4 73:25 80:2
111:14 130:11,12
140:3 150:16
**trying**  82:8 84:8
88:13 93:25 94:4
94:8,23 97:9
106:17 140:5
142:21 155:20,21
157:21 170:15
**turn**  65:14 132:16
141:21
**turned**  137:19
141:13,19,24
169:25 170:4
**turning**  138:17
171:10
**turns**  134:19
**twisted**  106:12
**two**  8:5,22 15:2,3
21:22 36:22 42:22
42:23 51:13 56:23
60:3 61:17 71:12
71:17 76:16 85:11
86:23 87:13 88:3

89:3 90:12,12
91:19,20 92:13
108:2 129:21,22
134:3 141:17
189:22 193:11
200:8
**type**  76:23 110:16
115:2,9 197:3
198:3
**typed**  111:2

**u**

**ultimately**  88:19
171:7
**un**  63:21
**unable**  23:8 27:9
28:4 122:7,10
**unassisted**  158:21
**unconscious**  25:25
127:9
**uncooperative**
72:3,4,13 87:25
**uncuff**  184:22
**uncuffed**  186:23
187:3
**understand**  5:7,10
5:14 6:4,23 18:13
19:10 20:22 22:12
23:21 28:2 37:5
48:20 49:2 75:11
90:11 93:15 94:2
94:5 114:24
149:17 154:22
161:25 162:2
171:7
**understanding**
27:19 72:19 73:8
78:23 93:14
**understood**  5:13
6:7 74:8 79:6 93:8
93:22,23 94:13
105:5 151:11

**unfold** 84:8
**unfounded** 42:16
  42:21 46:2 48:5
**uniform** 15:5
  135:18
**union** 190:9,15,17
**unit** 44:19 66:8
**united** 1:1 17:20
  17:24
**unknown** 1:9
**unlawful** 195:6
**unpredictable**
  104:19
**unsafe** 72:5,7
**unusual** 29:16
  38:18 39:2 60:13
  62:7
**update** 57:3
**updated** 9:4 60:8
**ups** 8:20
**upset** 148:23
**use** 22:8,9 23:7
  130:3 133:21
  172:16 173:25
  178:13 190:22
  194:6
**useful** 133:8
**usually** 24:14 34:5
  49:23 107:14
  112:16
**utilize** 22:7

**v**

**v** 204:3
**vague** 174:18
**van** 41:20 42:16
**vargas** 1:20 203:6
  203:24
**various** 18:24
**verbal** 130:25
  131:2,13,14,25
  149:8

**verbally** 121:23
  123:4 124:18
  129:20 132:9
**veritext** 204:2
**version** 60:8,10,14
**versus** 167:17
**victim** 41:7
**video** 97:25 98:2
  100:4 128:11
  132:17,20 133:3
  133:11,16,20
  134:8,12,16,22,24
  135:4,10,11,25
  136:8,17,21
  137:10,11 139:10
  139:15 141:25
  145:24 154:16
  156:12 159:2
  160:6,17 161:9,10
  162:12 164:5,9
  166:18 168:3,8,25
  169:15,20,24
  170:24 171:13
  176:22 179:25
  181:2,13,17,17,18
  181:19,20,23,25
  200:19 202:8
**videoed** 181:19
**videos** 134:3,19
  200:24 201:6
**view** 145:23
**viewed** 171:5
**violation** 83:24,25
  189:7,8
**violations** 43:20
**violence** 80:15
**virtual** 1:20
**visited** 42:25
**vm** 42:19
**voicemail** 42:20

**volition** 92:10
**vomiting** 126:13
  126:16

**w**

**wait** 5:19 200:6
**waiting** 57:14
  200:6
**waived** 3:6
**walk** 50:7 66:5
  89:22 99:14,21
  100:2,8 138:12
**walked** 92:9
  100:11 150:10
  182:15
**walker** 32:24
  36:20 102:13
  167:13,17,22
  168:5,12,22
  169:17
**walking** 36:23
  182:20,23 183:2,6
**wall** 173:8
**want** 4:24 5:24
  12:24 18:4 39:19
  39:23 42:12,13
  45:22 52:20 54:22
  59:21 63:11 81:24
  86:11,12 87:7,9
  89:9 90:11 100:12
  100:15,19,20
  101:2,9,13,17,19
  129:2,9,13,16,18
  130:25 133:12
  137:11 140:23
  150:16 162:19
  168:24 173:17
  174:19,24 181:16
  190:10 196:16
  200:5
**wanted** 16:24 59:8
  59:12 60:2 62:4

95:2 133:24
**wants** 128:21
**warranted** 195:7
**watch** 57:9 98:2
  100:4
**water** 165:5,10
**way** 24:4 27:11
  32:6 42:8 49:15
  52:19 57:16 67:3
  69:15 72:7 74:11
  74:18,23 77:25
  81:25 85:16 96:21
  100:3 101:15
  104:13,20 107:5
  112:6 126:22
  127:2,3,8 128:2
  129:22 150:5
  156:2 158:22
  163:9 166:11
  168:23 169:21
  171:5 174:22
  177:18,25 178:10
  178:17,19 179:4
  181:16 183:11
  184:13,15 198:25
  203:16
**ways** 30:17 174:12
**weapons** 95:23
**wear** 10:3,6
**wearing** 7:24 8:16
  9:24 95:18 98:9
  98:12 108:25
  109:9,10 147:3
  180:4,12,14,18,23
**wednesday** 35:17
**week** 133:18 134:6
  191:12
**weigh** 7:9,10,12
  175:2
**weighs** 175:11

[went - zoom]                                                                 Page 29

**went**  45:11 67:11
  92:12 170:5 176:2
  184:2 196:11
**when's**  29:9
**whereof**  203:18
**white**  35:25 157:9
  157:15
**wife**  50:10 71:25
  75:5,21 76:13,19
  78:2,6,13 79:24
  80:25 81:6 82:17
  83:22 96:12 98:22
  107:9 130:22
  131:3 142:3
  146:15 147:8,10
  148:17 149:4,7
  150:5,25 151:10
  151:12 152:6,8,25
  153:12 154:25
  155:21 159:15
  161:6,11,14,22
  164:20 165:4,9
**wise**  155:6
**witness**  4:2 21:5
  59:7 128:20
  133:19 192:10
  200:3 201:13
  203:9,12,18 204:4
**woman**  69:14
**wondering**  146:9
**word**  40:23 87:8
  155:5
**worded**  49:15
**words**  75:11,15,18
  75:24 76:10,15,17
  79:19 89:17 96:22
  133:20 181:18
**work**  10:4 88:11
  88:15
**working**  9:25
  10:22 11:5,9 12:9

  32:12,17,22,23
  37:3 43:23 112:10
  136:10
**worn**  108:20
  109:24
**worse**  8:24 9:8,16
**worthy**  47:2
**wrestler**  171:23
**write**  50:11,16
  53:9 58:2 79:10
  79:18 113:15
  131:21 198:8
**written**  124:15
**wrong**  89:4,5 91:8
  98:15
**wrote**  64:5 111:22
  113:24
**wyck**  41:20 42:16

| **x** |
| --- |

**x**  1:2,11 202:1,12
**xeroxed**  35:5

| **y** |
| --- |

**yeah**  35:2 36:13
  44:9 54:2,11 66:9
  90:4 94:25 96:24
  98:23 105:12
  111:9 117:18
  120:14,22 124:4
  133:6 138:24
  146:21 158:23
  160:9 166:10
  171:14 198:11
**year**  8:22 9:6,10
  61:13,22,25 62:20
**years**  7:2 8:19
  16:18 23:15 29:12
  55:13 56:8 76:16
  114:16 124:8
**yelling**  74:7 96:21
  105:11 157:2,5

  185:23
**york**  1:1,6,21 2:4
  2:4,7,8,8 4:3,12,13
  4:19 6:2 10:17,19
  52:3 83:24 190:9
  190:14,16 203:3,7
  204:2,3

| **z** |
| --- |

**zoom**  1:20 2:5,9
  2:11

**[JA-617]**

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.