# 23-24cv

# United States Court of Appeals for the Second Circuit

BALWINDER SINGH,

*Plaintiff-Appellant,*

v.

THE CITY OF NEW YORK, P.O. MANDEEP CHEEMA,
Tax Id. No. 950196, Individually and in his Official Capacity,
POLICE OFFICERS JOHN DOE #1-10, Individually and in
their Official Capacity (the name John Doe being fictitious,
as the true names are presently unknown),

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT,
EASTERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## VOLUME IV OF VI (PAGES JA-619–JA-866)

COHEN & FITCH LLP
*Attorneys for Plaintiff-Appellant*
233 Broadway, Suite 900
New York, New York 10279
(212) 374-9115
jfitch@cohenfitch.com

NEW YORK CITY LAW DEPARTMENT
*Attorneys for Defendants-Appellees*
100 Church Street, Room 6-178
New York, New York 10007
(212) 356-2490
Alexander.li@usdoj.gov

0862

# TABLE OF CONTENTS

Docket Entries ........................................................................................JA-1

Complaint, Dated January 31, 2019 ..........................................................JA-10

Plaintiff's Notice of Motion for Summary Judgment,
Dated July 12, 2021 ..................................................................................JA-24

Plaintiff's Statement of Undisputed Facts, Dated July 12, 2021 ...............JA-26

Plaintiff's Supporting Declaration by Gerald M. Cohen,
Dated July 12, 2021 ..................................................................................JA-34

    Exhibit A to Cohen Declaration -
    Excerpts of Transcript of EBT of Balwinder Singh (Plaintiff),
    Taken October 5, 2020 ........................................................................JA-36

    Exhibit B to Cohen Declaration -
    Excerpts of Transcript of Video-Conference EBT of
    Amandeep Kaur (Non-Party Witness),
    Taken December 3, 2020 .....................................................................JA-49

    Exhibit C to Cohen Declaration -
    Excerpts of Transcript of EBT of P.O. Mandeep Cheema
    (Defendant), Taken October 7, 2020 ...................................................JA-53

    Exhibit D to Cohen Declaration -
    Audio Recording of the 911 Call.........................................................JA-99
    *(Submitted on Separate Thumbdrive)*

    Exhibit E to Cohen Declaration -
    Excerpts of Transcript of EBT of Nicole Milonas
    (Non-Party Witness), Taken October 22, 2020 ..............................JA-100

    Exhibit F to Cohen Declaration -
    Pre-Hospital Care Report of Jamaica Hospital Medical
    Center Regarding Balwinder Singh,
    Dated February 28, 2018 ...................................................................JA-116

Exhibit G(1-3) to Cohen Declaration -
Full Video Recording .....................................................................JA-119
*(Submitted on Separate Thumbdrive)*

Exhibit H to Cohen Declaration -
Aided Report from Incident Occurred,
Dated February 28, 2018.................................................................JA-120

Exhibit I to Cohen Declaration -
Excerpts of Transcript of EBT of Justin Davis
(Non-Party Witness), Taken November 5, 2020 .............................JA-122

Exhibit J to Cohen Declaration -
Excerpts of Transcript of EBT of Malinda Walker
(Non-Party Witness), Taken October 27, 2020 ..............................JA-131

Exhibit K to Cohen Declaration -
Expert Radiologist Reports .............................................................JA-137

Exhibit L to Cohen Declaration -
Photographs of Plaintiff's Face Injury.............................................JA-145

Exhibit M to Cohen Declaration -
Excerpts of Transcript of EBT of Marisabel Schapira
(Non-Party Witness), Taken October 22, 2020 ..............................JA-154

The City of New York and Officer Mandeep Chemma's
Notice of Cross-Motion for Summary Judgment,
Dated September 24, 2021 ..............................................................JA-156

The City of New York and Officer Mandeep Chemma's
Response to Statement of Undisputed Facts and
Counter-Statement of Material Fact, Dated September 24, 2021 ..........JA-158

The City of New York and Officer Mandeep Chemma's
Supporting Declaration by Hannah V. Faddis,
Dated September 24, 2021 ..............................................................JA-179

Exhibit A to Faddis Declaration -
Complaint, Dated January 31, 2019
(Reproduced herein at pgs. JA-10-JA-23).......................................JA-182

Exhibit B to Faddis Declaration -
City of New York and Mandeep Chemma's Answer,
Dated April 29, 2019.........................................................................JA-183

Exhibit C to Faddis Declaration -
Transcript of EBT of Balwinder Singh (Plaintiff),
Taken October 5, 2020......................................................................JA-193

Exhibit D to Faddis Declaration -
Transcript of EBT of P.O. Mandeep Cheema (Defendant),
Taken October 7, 2020......................................................................JA-384

Exhibit E to Faddis Declaration -
Transcript of EBT of Justin Davis (Non-Party Witness),
Taken November 5, 2020...................................................................JA-619

Exhibit F to Faddis Declaration -
Transcript of EBT of Malinda Walker (Non-Party Witness),
Taken October 27, 2020....................................................................JA-782

Exhibit G to Faddis Declaration -
Transcript of EBT of Nicole Milonas (Non-Party Witness),
Taken October 22, 2020....................................................................JA-867

Exhibit H to Faddis Declaration -
Transcript of EBT of Marisabel Schapira
(Non-Party Witness), Taken October 22, 2020 ...............................JA-986

Exhibit I to Faddis Declaration -
Transcript of Video-Conference EBT of Amandeep Kaur
(Non-Party Witness), Taken December 3, 2020.............................JA-1086

Exhibit J to Faddis Declaration -
Transcript of Video-Conference EBT of Lakhwinder Singh
(Non-Party Witness), Taken December 15, 2020..........................JA-1183

Exhibit K to Faddis Declaration -
NYPD Intergraph Computer Aided Dispatch System
Event Chronology .........................................................................JA-1298

Exhibit L to Faddis Declaration -
Pre-Hospital Care Report of Jamaica Hospital Medical
Center Regarding Balwinder Singh, Dated February 28, 2018
(Reproduced herein at pgs. JA-116-JA-118)...................................JA-1303

Exhibit M to Faddis Declaration -
Medical Records of Jamaica Hospital Medical Center
Regarding Balwinder Singh ...........................................................JA-1304

Exhibit N to Faddis Declaration -
EMS Video......................................................................................JA-1333
*(Submitted on Separate Thumbdrive)*

Exhibit O to Faddis Declaration -
Surveillance Video Still Images .....................................................JA-1334

Exhibit P to Faddis Declaration -
Audio Recording of the 911 Call made by Amandeep Kaur,
Dated February 28, 2018................................................................JA-1340
*(Submitted on Separate Thumbdrive)*

Plaintiff's Response to Defendants' Counter-Statement of Material
Facts Pursuant to Local Rule 56.1, Dated November 12, 2021 .............JA-1341

Plaintiff's Reply Affirmation by Gerald M. Cohen,
Dated November 29, 2021 .........................................................................JA-1376

Exhibit N to Cohen Reply Affirmation -
Video Recording .............................................................................JA-1378
*(Submitted on Separate Thumbdrive)*

Exhibit O-1 to Cohen Reply Affirmation -
Still Photo from Video of Incident..................................................JA-1379

Exhibit O-2 to Cohen Reply Affirmation -
Still Photo from Video of Incident..................................................JA-1380

Exhibit O-3 to Cohen Reply Affirmation -
Still Photo from Video of Incident..................................................JA-1381

Exhibit O-4 to Cohen Reply Affirmation -
Still Photo from Video of Incident..................................................JA-1382

v

Exhibit O-5 to Cohen Reply Affirmation -
Still Photo from Video of Incident..................................................JA-1383

Letter from Hannah V. Faddis to Hon. Eric Komitee,
Dated May 10, 2022 .....................................................................JA-1384

Report and Recommendation of Hon. Steven L. Tiscione,
Dated June 28, 2022 .....................................................................JA-1385

Memorandum and Order of Hon. Eric Komitee,
Dated September 30, 2022 ...........................................................JA-1404

Stipulation and Order of Partial Dismissal, Dated December 2, 2022..JA-1431

Judgment of United States District Court Eastern District of
New York, Dated December 6, 2022, Appealed From ............................JA-1434

Plaintiff's Notice of Appeal, Dated January 4, 2023...............................JA-1436

**[JA-619]**

```
                                                    Page 1

 1

 2     UNITED STATES DISTRICT COURT

 3     EASTERN DISTRICT OF NEW YORK

 4     CIVIL ACTION NO.:  19-cv-632 NGG-ST

 5     - - - - - - - - - - - - - - - - - - - -x

 6     BALWINDER SINGH,

 7                          Plaintiff,

 8           -against-

 9     THE CITY OF NEW YORK, P.O. MANDEEP CHEEMA,

10     Tax Id. No. 950196, Individually and in

11     his Official Capacity, and POLICE OFFICERS

12     "JOHN DOE" #1-10, individually and in

13     their Official Capacity

14                          Defendants.

15     - - - - - - - - - - - - - - - - - - - -x

16

                          November 5, 2020

17                          1:04 p.m.

18               DEPOSITION of POLICE OFFICER

       JUSTIN DAVIS, a Non-Party witness in the

19     above-entitled action, held via Veritext

       Virtual, taken before Barbara Tortora, a

20     Shorthand Reporter and Notary Public of

       the State of New York, pursuant to Rule 26

21     et seq. of the Federal Rules of Civil

       Procedure, Notice and stipulations between

22     Counsel.

23               *      *      *

24

25
```

```
                                                    Page 2

 1

 2    APPEARANCES:

 3

 4        COHEN & FITCH LLP

 5              Attorneys for Plaintiff

 6              233 Broadway, Suite 1800

 7              New York, New York 10279

 8        BY:  GERALD COHEN, ESQ.

 9

10

11

12        JAMES E. JOHNSON, ESQ.

13              CORPORATION COUNSEL

14              Attorney for Defendant

15              100 Church Street

16              New York, New York 10007

17        BY:  HANNAH FADDIS, ESQ.

18

19

20        ALSO PRESENT:

21              Ilyssa Fuchs, Esq.

22

23                    *      *      *

24

25
```

```
                                              Page 3
 1
 2   P.O. J U S T I N  D A V I S, having first
 3   been duly sworn by the Notary Public, was
 4   examined and testified as follows:
 5   EXAMINATION BY
 6   MR. COHEN:
 7        Q.    What is your name?
 8        A.    Police Officer Justin Davis.
 9        Q.    What is your work address?
10        A.    1 Police Plaza, New York, New
11   York.
12        Q.    Good afternoon, Officer Davis.
13        A.    Good afternoon, sir.
14        Q.    My name is Gerald Cohen, I
15   represent Mr. Singh, Balwinder Singh who
16   is a plaintiff in this action.  I'm going
17   to ask you a series of questions regarding
18   an incident that took place on February
19   28, 2018 while you were on duty, okay.
20   Before I do that, I'm going to go over a
21   couple of ground rules.
22             Because we have a Court Reporter
23   here, it's very important that all of your
24   answers to my questions are given to me
25   orally.  Do you understand?
```

```
                                                    Page 4
 1              POLICE OFFICER DAVIS
 2        A.     Okay.
 3        Q.     If you can, when I ask a
 4   question that requires a yes or no, while
 5   I understand what you mean by okay, can
 6   you say yes or no?
 7        A.     Yes.
 8        Q.     Also, there may be times during
 9   this questioning you can anticipate what
10   I'm asking.  For the same reasons, because
11   we have a reporter she can't record us
12   talking at the same time, so just wait
13   until I finish the question and then you
14   answer.  Is that okay?
15        A.     Yes.
16        Q.     Also, to the extent I'm asking a
17   question and you don't understand the
18   question, can you let me know that you
19   don't understand it.  If you answer the
20   question, I will assume you have
21   understood the question.  Do you
22   understand?
23        A.     Yes.
24        Q.     Finally, you have an attorney
25   here with you today, virtually here with
```

```
                                        Page 5
 1            POLICE OFFICER DAVIS
 2   you today since we're doing this remotely.
 3   There may be a point during this
 4   questioning that you want to take a break
 5   and speak with your attorney --
 6        A.    Okay.
 7        Q.    -- which is okay, okay?
 8        A.    Yes.
 9        Q.    However, if there's a question
10   pending and it's not asking for privileged
11   information or information that your
12   attorney directs you not to answer, I'm
13   going to ask you answer that question
14   before taking that break.  Do you
15   understand?
16        A.    Yes.
17        Q.    At the end of all this you're
18   going to have an opportunity to review
19   your testimony today.  Your testimony
20   today, Ms. Faddis will send over a
21   deposition transcript and you will have an
22   opportunity to change any of the answers
23   you give today.  However, if you do that
24   and this case proceeds to trial, I will be
25   able to comment on the changes you made.
```

**[JA-624]**

```
                                              Page 6
 1              POLICE OFFICER DAVIS
 2   Do you understand?
 3       A.    Yes.
 4       Q.    Officer Davis, how long have you
 5   been an officer?
 6       A.    Now?
 7       Q.    Yes.
 8       A.    Approximately, three and-a-half
 9   years.
10       Q.    At the time of the incident on
11   February 28, 2018, how long had you been
12   an officer?
13       A.    Approximately, seven to eight
14   months.
15       Q.    So you were a relatively new
16   officer at that time?
17       A.    Yes.  I graduated the academy
18   January 1st.
19       Q.    You had only been outside of the
20   academy about two months before this
21   incident happened?
22       A.    Yes.
23       Q.    Have you ever taken a deposition
24   before in a civil matter?
25       A.    No.
```

```
                                                Page 7
 1              POLICE OFFICER DAVIS
 2        Q.     Have you ever given testimony
 3   under oath in a criminal matter?
 4        A.     Yes.
 5        Q.     You understand the oath you took
 6   today is the same oath you took in any
 7   type of testimony you've taken in the
 8   past, right?
 9        A.     Yes.
10        Q.     How old are you, sir?
11        A.     Now I'm twenty-nine.
12        Q.     What is your approximate height?
13        A.     Five-five.
14        Q.     What is your approximate weight?
15        A.     170.
16        Q.     Was that your weight on the date
17   of the incident February 28, 2018?
18        A.     No.  I gained about ten to
19   fifteen pounds, so I was about 155, 160.
20        Q.     You haven't grown or shrunk
21   since February 28, 2018?
22        A.     No, sir.
23        Q.     Do you have any corrective
24   lenses or glasses that you wear?
25        A.     I wear reading glasses if I want
```

**[JA-626]**

```
                                              Page 8
 1           POLICE OFFICER DAVIS
 2   to read at night.
 3        Q.    Are you farsighted a little bit?
 4        A.    No.  I'm just more comfortable
 5   reading with them on.  The light helps in
 6   the day than at night.
 7        Q.    Have you seen a doctor that
 8   recommended that or prescribed that to
 9   you?
10        A.    Yes.
11        Q.    Do you have any kind of
12   condition with your eyes with respect to
13   lighting and stuff?
14        A.    No.
15        Q.    Do you know what your vision is,
16   is it otherwise 20/20?
17        A.    It's maybe 18/20.  It's not -- I
18   can function without my glasses on a
19   day-to-day basis.  I just use them to
20   read.
21        Q.    You don't need them to drive or
22   anything like that, right?
23        A.    No, sir.
24        Q.    How about in the evenings when
25   you're driving?
```

```
                                              Page 9
 1            POLICE OFFICER DAVIS
 2       A.    No, sir.
 3       Q.    What's your highest level of
 4    education, sir?
 5       A.    Right now or in when February
 6    2018?
 7       Q.    You can start with right now,
 8    then we can go back.
 9       A.    Right now I just finished my
10    master's.
11       Q.    Very nice.  What master's?
12       A.    Criminal justice.
13       Q.    Where did --
14       A.    John Jay.
15       Q.    Just going back because you were
16    anticipating my question and you answered
17    a little quickly --
18       A.    Okay.
19       Q.    -- she has to listen to my
20    question and then your answer, so just
21    wait, okay?
22       A.    Okay.
23       Q.    I know it's frustrating.
24            You finished your John Jay
25    master's, when did you finish that?
```

**[JA-628]**

```
                                              Page 10
 1              POLICE OFFICER DAVIS
 2       A.    April or May this year.
 3       Q.    Of 2020?
 4       A.    Yes, sir.
 5       Q.    You were doing that while you
 6   were working as an NYPD police officer?
 7       A.    Yes, sir.
 8       Q.    Were you taking classes in the
 9   evening or something else?
10       A.    I did online class while I was
11   away on military leave.
12       Q.    I'm going to ask about your
13   military leave.  When did you go away for
14   military leave?
15       A.    March 2018.
16       Q.    Before I go to that, what was
17   your highest level of education in
18   February of 2018?
19       A.    A bachelor's.
20       Q.    In what?
21       A.    Criminal justice.
22       Q.    Where did you go to get your
23   bachelor's degree?
24       A.    John Jay.
25       Q.    Prior to attending John Jay for
```

```
                                      Page 11
 1            POLICE OFFICER DAVIS
 2  your bachelor's degree, did you have any
 3  other educational experiences or degrees?
 4      A.    I have an associates in criminal
 5  justice from Queensborough.
 6      Q.    When did you obtain the
 7  associate's degree from Queensborough
 8  College?
 9      A.    2016.
10      Q.    Prior to becoming a police
11  officer, what's your employment history?
12      A.    Prior to becoming a police
13  officer I was active duty in the Navy.
14      Q.    When did you join the Navy?
15      A.    2012.
16      Q.    How long were you active duty in
17  the Navy?
18      A.    Four years.
19      Q.    So when you finished the Navy
20  you came and got an associate's degree at
21  Queensborough College?
22      A.    Yes.  I did the education
23  program, so I did a year at Queensborough
24  to finish my associates and then
25  approximately eight months to finish my
```

```
                                              Page 12
 1              POLICE OFFICER DAVIS
 2    bachelor's at John Jay.
 3         Q.    Where were you stationed when
 4    you were active duty in the Navy?
 5         A.    Virginia.
 6         Q.    You stayed there the entire
 7    time?
 8         A.    Yes, sir, was on a ship.  So the
 9    only time we left is if we were going out
10    to sea.
11         Q.    Did that occur at any point?
12         A.    I deployed in 2014.
13         Q.    Where?
14         A.    It was a sea tour, so we just
15    went out to sea and went to different
16    ports just to get food and supplies.  But
17    it's a sea tour.
18         Q.    When you returned from your
19    active a duty in 2016, you said you did a
20    one year program?
21         A.    Yes, at Queensborough Community
22    College.
23         Q.    You got your associate's degree
24    in one year?
25         A.    Yes, because they took my time
```

```
                                        Page 13
  1            POLICE OFFICER DAVIS
  2   in the military as education also.
  3       Q.     What did you do after you
  4   completed the one year program at
  5   Queensborough?
  6       A.     After the one year program I
  7   went directly into John Jay to finish the
  8   bachelor's portion of the program.
  9       Q.     When did you complete that?
 10       A.     July 2017.
 11       Q.     Were you working at all during
 12   that time period?
 13       A.     I did a work study program.
 14       Q.     Where did you work?
 15       A.     At Queensborough.
 16       Q.     In what capacity, what were you
 17   doing there?
 18       A.     I was a student advisor, or
 19   advisor under the actual advisor in the
 20   Veterans Affairs Office.
 21       Q.     Then what did you do once you
 22   completed your program at John Jay and
 23   finished your bachelor's degree?
 24       A.     I actually finished my
 25   bachelor's the same time I was starting
```

```
                                          Page 14
 1            POLICE OFFICER DAVIS
 2   the police academy.
 3        Q.    Was there any reason you decided
 4   to go to the police an academy?
 5        A.    It was something I felt would
 6   fit me, a job I wanted to come into.
 7        Q.    Do you have any family members
 8   that are police officers?
 9        A.    Both my parents were police
10   officers.
11        Q.    For the NYPD?
12        A.    Yes.
13        Q.    Are they retired or still police
14   officers?
15        A.    Yes, they're retired.
16        Q.    Then you did six months at the
17   police academy?
18        A.    Yes.
19        Q.    What kind of training did you
20   get at the police academy?
21        A.    It's a split between learning
22   the rules and regulations and patrol
23   guide, the penal laws that go along with
24   anything in the patrol guide, and then
25   tactics as well.
```

Page 15

1          POLICE OFFICER DAVIS
2      Q.     Did you ever get training while
3   you were in the police academy on how to
4   interact as an NYPD police officer with
5   individuals who are intoxicated?
6      A.     Yes.
7      Q.     What kind of training did that
8   entail?
9      A.     Someone whose intoxicated would
10  fall under the category as being
11  emotionally disturbed.  So we receive
12  training on how to deal with individuals
13  who are emotionally disturbed.
14     Q.     Can you tell us just generally
15  when someone you encounter as a police
16  officer is emotionally disturbed what
17  steps are you supposed to take with regard
18  to those individuals?
19     A.     First we would have to obviously
20  confer with EMS because we are not medical
21  professionals.  So EMS will be on scene.
22  And if EMS deems they need to go to a
23  medical facility and if they're
24  nonviolent, we'll escort them in the back.
25  If they're violent, we'll sit in the EMS

```
                                        Page 16

 1              POLICE OFFICER DAVIS

 2   truck with them.  Or if they just have

 3   someone whose having an emotional

 4   breakdown or someone who doesn't

 5   necessarily -- they don't need -- EMS

 6   doesn't let us know that they want us to

 7   travel, they let us know they're able to

 8   travel themselves, then EMS will go by

 9   themselves.

10       Q.    Did you ever get instruction

11   about whether you as a police officer need

12   to make an independent evaluation

13   regardless of what EMS is saying with

14   respect to how to take an individual to

15   the hospital, let's say?

16            MS. FADDIS:   Objection.  Go

17       ahead.

18       A.    No.

19       Q.    So if the EMS says the

20   individual has to go to the hospital or

21   needs medical attention, you have no

22   discretion whether or not you should take

23   that individual to the hospital?

24       A.    I wouldn't disagree with EMS

25   because I'm not a medical professional in
```

```
                                        Page 17
 1            POLICE OFFICER DAVIS
 2   that capacity.
 3        Q.     Were you instructed to that
 4   fact, to that particular scenario, if EMS
 5   says this individual needs to go to the
 6   hospital, is it your understanding as a
 7   police officer you have no discretion as
 8   to whether or not to decide whether they
 9   need to go to the hospital?
10        A.     Yes.
11             MS. FADDIS:   Objection to form.
12        But go ahead.
13        Q.     You understand my question, sir,
14   right?
15        A.     Yes.  You're asking if I can go
16   against EMS if they say that the person
17   has to go?
18        Q.     Yes.
19        A.     I don't believe I can go against
20   EMS because I'm not a medical
21   professional.
22        Q.     It's not necessarily that you go
23   against EMS, my question is a little more
24   than that.  I'm asking whether you have to
25   make an independent evaluation as to
```

Page 18

```
1              POLICE OFFICER DAVIS
2    whether someone is required to go to the
3    hospital.
4         A.    No.
5         Q.    You're not supposed to make an
6    independent evaluation as to whether or
7    not someone should go to the hospital?
8         A.    No, sir.
9         Q.    That's your understanding of the
10   training you received at the NYPD?
11        A.    Yes.
12        Q.    Are you aware of any training
13   materials you received at the police
14   academy that indicates that proposition?
15             MS. FADDIS:   Objection to form.
16        You can answer.
17        Q.    You can answer the question she
18   said.
19        A.    No, I don't know of any --
20   possibly in a training manual maybe, but I
21   don't know of anything specific.
22        Q.    But your understanding from
23   attending the training was that you do not
24   have to make an independent evaluation
25   with regard to whether you have to take
```

```
                                                   Page 19
 1              POLICE OFFICER DAVIS
 2   someone to the hospital, right?
 3        A.    Yes.
 4              MS. FADDIS:   Objection to form.
 5        You can answer.
 6        Q.    Under what circumstances can you
 7   forcibly take someone to the hospital?
 8        A.    If they're violent.  If they're
 9   incoherent, can't actually operate on
10   their own.
11        Q.    When you take someone to the
12   hospital, are you required to handcuff
13   them in all circumstances?
14        A.    Not in all circumstances.  Only
15   if they're a danger to themselves or
16   others.
17        Q.    You mentioned danger to
18   themselves or others.  How do you make
19   that determination whether they're a
20   danger to themselves or others?
21              MS. FADDIS:   Objection.  But go
22        ahead.
23        A.    A totality of the circumstances.
24   Maybe if -- how do I say?  How would I
25   make the determination?  If the person
```

Page 20

1              POLICE OFFICER DAVIS
2    seems as though they're going to harm
3    themselves or maybe possibly harm others
4    or their actions without them knowing
5    could hurt others or hurt themselves, then
6    you make that determination due to
7    experience and training.
8         Q.    Let me break it up.
9              How do you make the
10   determination if someone is a danger to
11   themselves?
12             MS. FADDIS:  Objection to form.
13        Go ahead.
14        A.    If they're a danger to
15   themselves, if it be -- like I said, the
16   totality of the circumstances.  If we get
17   there and they're incoherent, they can't
18   walk, they can't stand, they seem like
19   they don't know what's actually going on,
20   the surrounding area that they're in, and
21   also what EMS is tells us.
22        Q.    Do you look at factors as to
23   whether they're saying they're going to
24   harm themselves or they're going to commit
25   suicide?

Page 21

```
 1          POLICE OFFICER DAVIS
 2     A.     Yes, those can come into effect
 3   also.
 4            You're saying this is just to
 5   harm themselves, right?
 6     Q.     Yes, to harm themselves.
 7            If they're making statements to
 8   the effect of I'm going to stab myself or
 9   I'm going to commit suicide, that would be
10   something you would consider, correct?
11     A.     Yes.
12     Q.     What if they're not necessarily
13   saying those things explicitly and
14   they're, you know, just sitting on their
15   couch in their home and they're
16   intoxicated, is that enough to indicate
17   that they're a harm to themselves?
18            MS. FADDIS:  Objection.  Go
19       ahead.
20     A.     It would be also what's in the
21   home.  The home -- the living room, you're
22   obviously saying a couch, could be next to
23   the kitchen where there can be an object
24   they can harm themselves with.  They
25   could, you know, cut themselves.  They
```

Page 22

```
 1           POLICE OFFICER DAVIS
 2   could fall.  They could lay down and
 3   asphyxiate.  I can't make that
 4   determination, I'm not a medical
 5   professional.  Especially with regard to
 6   asphyxiation, someone laying down and
 7   showing they're intoxicated, they could be
 8   a harm to themselves, they could pass out
 9   and asphyxiate.
10       Q.    Would you have to observe that
11   individual to see if they're in fact that
12   intoxicated or, you know, they are
13   engaging in behavior that suggests they
14   would be a harm to themselves?
15       A.    By observe, you mean just sit
16   there and watch them for how long?
17       Q.    For the time that you're
18   investigating the situation that you've
19   been called to.
20       A.    Yes, of course we look at the
21   person and observe them to see what's
22   going on.
23       Q.    Let me go back to, how do you
24   make a determination whether someone is a
25   harm to others?
```

Page 23

```
                              POLICE OFFICER DAVIS
 1
 2        A.      Their form of aggression.  The
 3   way they're speaking to others.  The way
 4   that they're looking at them.  Also what
 5   the other individual is saying.  It's --
 6   it would be all the circumstances
 7   combined.  The others saying there's a
 8   history of the person being openly
 9   aggressive, maybe the person threatened
10   them.
11        Q.      Do you have to observe them
12   making threats or does another person have
13   to indicate that a threat was made?
14        A.      I don't have to physically
15   observe them making the threat
16   (indicating).  The person can tell me that
17   they made the threat, but I can also
18   observe them making a threat.
19        Q.      Now, you mentioned also the
20   magnitude in which they're talking, that
21   would be enough for you to determine
22   whether they're a danger to others?
23        A.      No, that wouldn't be enough.  As
24   a total, they're argumentative, if they're
25   yelling at someone, cursing them out is
```

**[JA-642]**

```
                                              Page 24
 1               POLICE OFFICER DAVIS
 2   what I mean.
 3       Q.     Before I go to the specifics of
 4   this incident, you said you went on
 5   military leave in March of 2018.
 6       A.     Yes.
 7       Q.     How long were you on military
 8   leave for?
 9       A.     Approximately, a year, little
10   more than a year.
11       Q.     Can you just explain to me,
12   because I'm unfamiliar, how does that work
13   for a police officer to go on military
14   leave?
15       A.     It's the same as any civilian,
16   military trumps any job anywhere.  As a
17   reservist in the military says you have to
18   be activated and go on employment, you
19   have to go with the military and then you
20   return.
21       Q.     You're a reservist and they
22   actually call upon you to come back?
23       A.     Yes.
24       Q.     Were you stationed anywhere?
25       A.     Yes, Little Creek Virginia.
```

```
                                         Page 25
 1            POLICE OFFICER DAVIS
 2       Q.    You went back to the same place?
 3       A.    No, I was in Norfolk.
 4       Q.    You came back in March of this
 5   year?
 6       A.    No, not 2020.  I came back
 7   towards the summer, the ending of 2019.  I
 8   was gone a little bit past a year.
 9       Q.    I want to direct your attention
10   to February 28, 2018.  Were you working
11   that day, sir?
12       A.    Yes.
13       Q.    Do you remember what your tour
14   of duty was?
15       A.    A midnight tour.
16       Q.    Roughly, what were your hours
17   that night?
18       A.    Eleven -- approximately, between
19   11:30 and 7:30.
20       Q.    So it was 11:30 on February 27,
21   2018 --
22       A.    Yes.
23       Q.    -- to 7:30 on February 28, 2018?
24       A.    Yes.
25       Q.    Do you remember who you were
```

```
                                      Page 26
 1            POLICE OFFICER DAVIS
 2  working with that day?
 3       A.    Officer Cheema and Officer
 4  Walker.
 5       Q.    At the time, what precinct were
 6  you working at?
 7       A.    The 102nd.
 8       Q.    Was that the only precinct you
 9  had worked at up until that point?
10       A.    Yes.
11       Q.    Are you currently still at the
12  102nd Precinct?
13       A.    Yes.
14       Q.    What's your position there?
15       A.    Police officer.
16       Q.    Was that your position on
17  February 28, 2018?
18       A.    Yes.
19       Q.    On that particular day, were you
20  part of a field training program?
21       A.    Yes.
22       Q.    Was that because you were a
23  relatively new officer?
24       A.    Yes.  You have to go into the
25  field training program for your first six
```

```
                                            Page 27
 1              POLICE OFFICER DAVIS
 2    months.
 3         Q.     Was Officer Cheema your field
 4    training officer?
 5         A.     Yes.
 6         Q.     Had you worked with Officer
 7    Cheema prior to that date?
 8         A.     Yes.
 9         Q.     How many times had you worked
10    with him?
11         A.     Approximately the whole two
12    months I was on midnights.
13         Q.     You were with him the whole
14    time?
15         A.     Yes.  He was my field training
16    officer on midnights.
17         Q.     I see you are in a room.  Are
18    you by yourself?
19         A.     Yes.  I just heard something, I
20    don't know what that was.
21         Q.     What precinct are you taking
22    this deposition from?
23         A.     One PP.
24         Q.     One Police Plaza?
25         A.     Yes.
```

Page 28

1            POLICE OFFICER DAVIS
2       Q.    How long did you work midnights
3    during that period?
4       A.    So, from January 2nd to sixty
5    days from then.  I worked from --
6    midnights until -- from January until the
7    end of February.
8       Q.    So was one of the last --
9       A.    Yes.
10      Q.    -- shifts on midnights; is that
11   right?
12      A.    Yes.
13      Q.    Have you worked with Officer
14   Cheema since then?
15      A.    On a couple of details, going to
16   the city protests, things like that.
17      Q.    Do you have a social
18   relationship with Officer Cheema outside
19   the NYPD?
20      A.    No.
21      Q.    Are you friendly with Officer
22   Cheema?
23      A.    Yes.
24      Q.    You were also working with
25   Officer Walker that evening, right?

```
                                                    Page 29
 1            POLICE OFFICER DAVIS
 2       A.    Yes.
 3       Q.    Had you worked with her before?
 4       A.    Yes, we worked in the field
 5   training program together.
 6       Q.    Were you generally working with
 7   her when you worked?
 8       A.    Yes.
 9       Q.    Do you have a social
10   relationship with Officer Walker outside
11   the NYPD?
12       A.    No.
13       Q.    You're just friendly through
14   work?
15       A.    Yes.
16       Q.    Prior to February 28, 2018, had
17   you made any arrests?
18       A.    Yes.
19       Q.    How many had you made during the
20   first two months of your tenure as a
21   police officer?
22       A.    Approximately, six or seven,
23   around there.
24       Q.    You were the arresting officer
25   on those six or seven?
```

```
                                        Page 30
 1           POLICE OFFICER DAVIS
 2      A.    Yes.
 3      Q.    Generally, what kind of arrests
 4  had you made?
 5      A.    Domestic violence arrests.
 6  Strangulation.
 7      Q.    Pretty active for the first two
 8  months of --
 9      A.    Yes.
10      Q.    -- your career.
11            You mentioned domestic violence
12  arrests.  In the course of doing an arrest
13  for domestic violence, what kind of
14  paperwork do you fill out?
15      A.    For an arrest?
16      Q.    Yes.
17      A.    A domestic incident report.
18  A -- it's called a sixty-one, which is
19  just a basic form of what happened, the
20  occurrence, the where, when, what and how.
21  If it's an actual arrest you go and do the
22  online portion of the paperwork.
23      Q.    I'm going to direct your
24  attention to the domestic incident report
25  you mentioned.
```

```
                                              Page 31
 1              POLICE OFFICER DAVIS
 2        A.    Okay.
 3        Q.    Do you only prepare a domestic
 4   incident report when there's an arrest?
 5        A.    No.
 6        Q.    In what circumstances do you
 7   prepare a domestic incident report other
 8   than arrest?
 9        A.    If there's a domestic incident
10   and the party wants a domestic incident
11   report, if it's something that is
12   reportable, such as harassment or anything
13   like that.  Sometimes even a verbal
14   dispute.
15        Q.    Who makes the determination
16   whether to do a domestic incident report?
17        A.    We will automatically do a
18   domestic incident report but ask if you
19   want one.  Sometimes a verbal incident
20   doesn't rise to the occasion of a domestic
21   incident report.  It's called an unfounded
22   domestic incident report.
23        Q.    So you're saying every time
24   you're called to a home where there's a
25   dispute, it's your understanding you have
```

```
                                              Page 32
 1            POLICE OFFICER DAVIS
 2   to fill out a domestic incident report?
 3        A.    No.  If it's a domestic dispute
 4   and it comes over the radio as a domestic
 5   dispute.
 6        Q.    Whether it comes over the radio
 7   as a domestic dispute or not, you appear
 8   at a location at someone's home and
 9   there's a dispute amongst domestic
10   partners, are you required to do a
11   domestic incident report?
12        A.    No.  It has to be an actual
13   dispute between -- has to actually be --
14   however the circumstances are on the radio
15   comes over, if it comes over as domestic
16   dispute when we go there, we can't
17   finalize the job without doing a domestic
18   incident report or unfounded domestic
19   incident accident report and then telling
20   the radio personnel what the ending of the
21   job was.  Not all disputes are domestic
22   jobs, even if it is two domestic partners.
23        Q.    Let me ask you this, if someone
24   calls over the radio for something else
25   but then you arrive on the scene and you
```

Page 33

```
                    POLICE OFFICER DAVIS
 1
 2   see domestic partners being aggressive to
 3   one another or threatening to one another,
 4   would that warrant a domestic incident
 5   report.
 6             MS. FADDIS:  Objection to form.
 7        You can answer.
 8        A.    No, wouldn't just warrant a
 9   domestic incident report because there's
10   no incident, they're just being
11   aggressive.  Now, if someone feels as
12   though the person was too aggressive to
13   them, either party, and they would like a
14   domestic incident report under a verbal
15   dispute that it wasn't actually a crime,
16   we can just fill out what each party said.
17   If they were a victim of a verbal dispute,
18   too much for them, and they want it
19   documented, and of course we'll do
20   paperwork and add to the bottom it was a
21   verbal dispute.
22        Q.    Certainly, if there was a crime
23   you observed while you were in the home,
24   that would warrant, require you to file a
25   domestic incident report, right?
```

Page 34

```
 1          POLICE OFFICER DAVIS
 2     A.     Yes.
 3          MS. FADDIS:   Objection.   Go
 4     ahead.
 5     Q.     Certainly if someone reported a
 6  crime to you in the home, it would require
 7  a domestic incident report even if you
 8  didn't observe it?
 9     A.     Under a domestic incident?
10     Q.     Yes.
11     A.     Yes.
12     Q.     Going back to February 28, 2018,
13  do you remember generally what activity
14  you did that day?
15     A.     Car stops, which are just
16  traffic stops more or less.   Answering
17  radio runs, whether the jobs came over the
18  radio.
19     Q.     Did you review any documentation
20  to refresh your recollection as to what
21  happened that day?
22     A.     I looked over my memo book once.
23     Q.     Do you have a specific memory of
24  the activity that happened that day or you
25  just know because you looked over your
```

```
                                        Page 35
 1            POLICE OFFICER DAVIS
 2    memo book?
 3        A.    I just know from looking over my
 4    memo book.  I don't remember all the
 5    activity from that day.
 6        Q.    Do you remember any of it, do
 7    you remember specifically what you did
 8    that day?
 9        A.    Specifically, in general, no,
10    not all the jobs.
11        Q.    Let me rephrase that.
12              Do you have any independent
13    recollection of what you did that day?
14        A.    Yes.
15        Q.    You do, okay.
16              Let's just pull up your memo
17    book.  I'm going to put up your memo book.
18              MR. COHEN:  This is Exhibit 1
19        for Officer Davis' deposition.
20              ( Plaintiff's Exhibit 1 was
21        marked for identification, as of this
22        date.)
23        Q.    I'm going to start with the
24    first page which is marked Bates stamped
25    D0153.  Officer Davis, is that a copy of
```

Case 23-24, Document 31, 04/19/2023, 3501830, Page42 of 254
**[JA-654]**

```
                                              Page 36
 1            POLICE OFFICER DAVIS
 2   the front cover of your memo book?
 3        A.    Yes, sir.
 4        Q.    I'm going to show you Bate stamp
 5   D0154, there's a big blackout here, I
 6   guess those are previous days, but at the
 7   bottom here, is this the first notation
 8   you put in your memo book?
 9        A.    Yes.
10        Q.    What does that indicate to you?
11        A.    022818, that is the day that I
12   was scheduled to work.  2315 is -- the X
13   in between that is by, and then 0750 is
14   end of tour.  So starting is 2315 by 0750.
15        Q.    That was just noting your tour
16   that day, correct?
17        A.    Yes.
18        Q.    There's a note on the back page
19   of your memo book for the next page which
20   is denoted as D0155.  Do you know what
21   that is?
22        A.    It looks like an ACR and a bus
23   number or EMS shield.
24        Q.    When you say ACR, can you tell
25   us for the record what that stands for?
```

```
                                              Page 37
 1            POLICE OFFICER DAVIS
 2       A.      The job number for EMS.
 3       Q.      The ACR stands for Ambulance
 4   Call Report; is that right?
 5       A.      I would say yes, but I don't
 6   know if that's the exact acronym for it.
 7       Q.      Do you know if this has anything
 8   to do with this case?
 9       A.      No, I don't know.  It's just
10   some notes if I needed to refer back and
11   go to my paperwork I would check that.
12       Q.      Then the following page, which
13   is marked D0156, there's a bunch of, I
14   guess, preliminary information.  We don't
15   need to go through all of it.  Can you sum
16   up what we see here on the top of the
17   page?
18       A.      It's just stating my assignment
19   for the day.  The sector I was working in.
20   The car that I was in.  The color.  Then I
21   go into myself being present for duty.
22   Who did roll call.  The Taser that I
23   signed out that day.  The car that I
24   signed out that day.  Who I was working
25   with.
```

```
                                          Page 38
 1            POLICE OFFICER DAVIS
 2        Q.     There's some information about
 3    the car you had, right?
 4        A.     Yes.
 5        Q.     You indicated you did a couple
 6    of car stops and things of that nature.
 7    It says here at 2350, which is 11:50 in
 8    the evening, you did some hospital
 9    canvases; is that right?
10        A.     Yes.
11        Q.     Do you specifically remember
12    what those jobs entailed?
13        A.     No.  So I put the 18th Precinct
14    and the 102 Precinct as a memory because I
15    can go back and look to see what the job
16    was in another computer system.  I put the
17    precinct as a memory.
18        Q.     So if you had to go back and
19    say, oh, do you remember if you did a
20    canvas for the 18th Precinct on February,
21    I guess this was still 27, 2018, you can
22    go back to your memo book and look at
23    that, right?
24        A.      I can see the precinct that I
25    did and then look at the time and then
```

Page 39

                    POLICE OFFICER DAVIS
1
2    recall the computer system.
3         Q.    Do you do that as a matter of
4    course with your memo book, you put down
5    notes so if you had to refresh your memory
6    or call up information from a long time
7    ago you can do that easily?
8         A.    Yes, I like to put the time and
9    the job because I could know in the
10   computer system I can put my information
11   in and search through the time and look at
12   what job it was and then I can look at the
13   job details.
14        Q.    Do you ever put notes in your
15   memo book so that you can easily remember
16   an incident?
17        A.    For traffic stops and arrests
18   for court purposes.
19        Q.    I'm sorry?
20        A.    For court purposes.
21        Q.    It's only traffic stops and
22   arrests that you put specific details?
23        A.    Or something I feel needs more
24   detail that I need to refer to back later.
25        Q.    When you say for court purposes,

Case 23-24, Document 31, 04/19/2023, 3501830, Page46 of 254

```
 1            POLICE OFFICER DAVIS
 2    because in traffic stops and arrests you
 3    may be called to testify, correct?
 4         A.    Yes.
 5         Q.    You want some detailed notes so
 6    you can remember the incident?
 7         A.    Yes.
 8         Q.    Seems to be blacked out the
 9    bottom of D0156 and the top of D0157.  Do
10    you have any recollection what you did
11    that day?
12         A.    It was a traffic stop.
13         Q.    Was there an arrest made during
14    that?
15         A.    No.  I just took that much notes
16    for the traffic stop.
17         Q.    Were you the officer issuing the
18    summons in that traffic stop?
19         A.    Yes.
20         Q.    Had you not been the officer
21    that issued the summons, would you have
22    this in notes?
23         A.    No.
24         Q.    Would you have noted it if you
25    were just a companion and, say, Walker had
```

```
                                            Page 41

 1             POLICE OFFICER DAVIS

 2    issued the summons?

 3        A.    I would put the car stop

 4    possibly in there, but if she didn't say

 5    anything, if I didn't feel like I needed

 6    to put it in there, then I'm not going to

 7    put it in there because it's not my car

 8    stop.

 9        Q.    Do you have an independent

10    recollection of this car stop?

11        A.    No.

12        Q.    The next point of activity is at

13    1:47.  Do you know what that's referring

14    to?

15        A.    I says 1010, which is a call for

16    help or some sort of call.

17        Q.    Okay.

18        A.    It's a very miscellaneous code.

19    It can be under anything.  Someone calling

20    because a door is open.  Or someone calls

21    because -- calling because they heard an

22    argument or something like that.  It's a

23    very miscellaneous code.

24        Q.    Do you have any independent

25    recollection of what's going on, what
```

```
                                              Page 42
 1            POLICE OFFICER DAVIS
 2   happened at 1:47?
 3        A.    No.
 4        Q.    At two A.M. there's a 90X code.
 5   What is that referring to?
 6        A.    So if you see where it says the
 7   number four next to the 1010 next to 147,
 8   that's my way of remembering, my memory of
 9   what job it was.   That's the fourth job we
10   went to.   Obviously when I finalize the
11   job I annotate the number of the job that
12   I'm writing the final for.   So that is a
13   90X finalizing that job.
14        Q.    The 90X means that whatever the
15   issue was was resolved?
16        A.    Yes, unfounded, nothing going
17   on.
18        Q.    At 2:35 it looks like a sergeant
19   inspected your memo book.
20        A.    Yes.
21        Q.    Do you have an understanding as
22   to what he's inspecting when he signs your
23   memo book?
24        A.    Yes.
25        Q.    What is he looking for?
```

```
                                         Page 43
 1            POLICE OFFICER DAVIS
 2       A.    It's both me as an officer and
 3   what I have, making sure my uniform is in
 4   compliance, making sure we are where we're
 5   supposed to be, making sure that
 6   everything is going in accordance,
 7   checking my memo book, making sure I'm
 8   annotating where I'm at and what I'm
 9   doing.  Having a conversation, see what's
10   going on.
11       Q.    He's making sure you're
12   annotating the activity that you're doing
13   that day, correct?
14       A.    The times.
15       Q.    The times, okay.
16             How about the details, is he
17   making sure the details are in there?
18       A.    He's just making -- they'll just
19   make sure that I'm making -- I'm putting
20   in where I'm at, what I'm doing.  It's
21   their way of looking back and seeing,
22   okay, so you did this many jobs.  Doesn't
23   have to be specific, but I can't not write
24   in my memo book what I was doing.  I try
25   to stay up to date so if it gets inspected
```

Case 23-24, Document 31, 04/19/2023, 3501830, Page50 of 254

```
                                              Page 44
 1            POLICE OFFICER DAVIS
 2   it shows that I'm staying up to date with
 3   my memo book.
 4        Q.    Looks like three in the morning
 5   another job 1063, what is that?
 6        A.    That is me taking a lunch break.
 7        Q.    Then at 4:02, is that the end of
 8   your lunch break?
 9        A.    Yes.
10        Q.    Now, at 6:30 in the morning is
11   the next job; is that right?
12        A.    Yes.
13        Q.    So from four A.M. to 6:30, would
14   it be fair to say you guys are on patrol
15   and you didn't really get any jobs?
16        A.    Yes.
17        Q.    At 6:30, is that the job we're
18   talking about today?
19        A.    Yes.
20        Q.    What is the code there?
21        A.    1010, call for help.
22        Q.    Does it --
23        A.    I can't say what central put it
24   over as.   1010 is generalizing usually
25   someone is calling for help.
```

```
                                               Page 45
 1          POLICE OFFICER DAVIS
 2      Q.    That's similar to the 1010 up
 3  here at 1:47, correct?
 4      A.    Yes.
 5      Q.    There's no specific indication
 6  here of who was calling for help or what
 7  it was referring to, right?
 8      A.    Not my memo book.  If I needed
 9  to look at it later, I could.
10      Q.    Right, because you --
11      A.    I wrote down the time and job
12  and the address.
13      Q.    You marked it as your fifth job
14  of the day?
15      A.    Yes.
16      Q.    You're going to cross reference
17  it with another system you cross reference
18  it with?
19      A.    There's a number of systems to
20  look back into the jobs.
21      Q.    What are the systems you look
22  back into the jobs?
23      A.    In specific, there's a way to
24  look at the exact job an the transcript of
25  the job.  It's called ICAD, so I can look,
```

```
                                            Page 46
 1            POLICE OFFICER DAVIS
 2   type in my name obviously, the sector I
 3   was working and look for that job at 6:30
 4   or around 6:30 and address and I can click
 5   on it and see what was the call.  It will
 6   tell me -- it will show who called, what
 7   they were saying originally to the central
 8   and then what got dispatched, EMS got
 9   dispatched.  Will say what time we got
10   there.  It will -- puts all the details in
11   there.
12        Q.    The next notation is 6:36, which
13   is six minutes later, you have a
14   ninety-one there.
15        A.    Yes.
16        Q.    What does that code refer to?
17        A.    A ninety-one means around 6:36
18   that a non-crime was corrected.
19        Q.    Does it indicate at all what you
20   did during this job?
21        A.    No.  It's more of a
22   generalization.  It's -- at some time
23   around 6:30 or in between -- the way I
24   write my memo book, I just put a general
25   time.  If I don't have a computer in front
```

```
                                                Page 47

  1              POLICE OFFICER DAVIS
  2   of me or something, I don't know when the
  3   job came over, whatever time I write in
  4   the memo book is whatever I put.  If I'm
  5   writing in the memo book at 6:30, then I
  6   put that because I don't usually -- so I
  7   know what time I wrote in the memo book.
  8        Q.    Would this indicate just looking
  9   at your memo book that this job took a
 10   total of six minutes and it was corrected
 11   within six minutes?
 12        A.    No.
 13        Q.    So is the memo book here
 14   inaccurate as to the time --
 15        A.    No, it's accurate when I wrote
 16   in the memo book and when the job was
 17   happening, that's how I write it.  Not --
 18   there's no general way on how to write a
 19   memo book.  I'm explaining how I write my
 20   memo book.
 21        Q.    I understand.
 22              My question is, how were you
 23   able to write that it was already
 24   corrected at 6:36?
 25        A.    Because 6:36 is maybe when we
```

```
                                            Page 48
 1            POLICE OFFICER DAVIS
 2   finalized the job or when I was writing in
 3   the book.  It's just when I wrote in the
 4   book.  I don't remember the time it was
 5   happening.
 6        Q.    Is your practice to notate in
 7   the book as the job is happening when you
 8   have a break during the job or do you do
 9   it at the end of the day?
10        A.    Yes, it's whenever I get a
11   chance to reach in my pocket and write in
12   the book.  Sometimes you can't write
13   before you get there because it's a very
14   intense situation.  Sometimes you write
15   into it and you have to refer back.  It's
16   whenever I can get in the book.  So if
17   during that six minutes there was a lull
18   and can I write in the book real quick,
19   then I put it in there.
20        Q.    I guess my question is, is the
21   time that you got the job at 6:30 or it's
22   around 6:30?
23        A.    I honestly didn't know, that's
24   why I put the address also.  Because when
25   I look in the system it will be a 1010 and
```

```
                                              Page 49
 1              POLICE OFFICER DAVIS
 2   that address.  So it could have happened
 3   at 5:47 and it's just around there and I
 4   know, like, that's the 1010.  Because once
 5   I click on the job it will show that I was
 6   the one that went to the job and I would
 7   know that's the job I'm looking at.
 8        Q.    Were you driving that day?
 9        A.    I'd have to look at my memo
10   book.  During the field training it's
11   usually the field training officer will
12   drive or let me drive or let -- you can go
13   back down.
14        Q.    I'm showing you if it
15   indicates --
16        A.    Right there.  No, Officer Cheema
17   was driving.
18        Q.    If you were a passenger in the
19   car and you got the job, do you notate
20   while you're a passenger in the car
21   usually?
22        A.    If I have the time.  Sometimes I
23   be on the radio trying to find out what's
24   going on or maybe I'm finishing other
25   paperwork.  All depends.
```

Page 50

```
        POLICE OFFICER DAVIS
```

1

2     Q.    If the job ended later than

3  6:36, would you have still put 6:36 as

4  having the time it ended or usually when

5  you put the job as ended it either ended

6  at 6:36 or before?

7     A.    No.  If we're speaking it's

8  gonna be a non-crime, because ninety-one

9  is non-crime, and we're correcting it, I

10  happen to have a moment to write in my

11  memo book that it's a non-crime being

12  corrected.  Now, if it changes, I can of

13  course one line that out, put my initials

14  and change the final.

15     Q.    Do you have a specific

16  independent recollection of this incident?

17     A.    Actually I do.

18     Q.    Tell me, do you remember where

19  you were called for this job?

20     A.    To the home of the individual.

21  I can't give the address off the top of my

22  head.  I believe it's this address right

23  here, 119-02 91st Avenue.

24     Q.    I honestly don't even know by

25  heart myself.

Page 51

1          POLICE OFFICER DAVIS

2          A.     Yes.

3          Q.     But if that was the job, would

4    that be what you would do, is that your

5    normal course of practice?

6          A.     Yes, I'd write an address in

7    there if that's the job.  Of course,

8    sometimes you don't have enough time to

9    write the exact job in the book.  That's

10   why it's two recorders in this vehicle, so

11   I go back to maybe Officer Walker's.

12         Q.     Do you remember where you were

13   when you got the job?

14         A.     No.

15         Q.     Do you remember how you arrived

16   at the location where this job was at?

17         A.     Drove up to the house.

18         Q.     Was it a house?

19         A.     I would just say house,

20   apartment.  That area is multifamily

21   dwellings.  The house will have multiple

22   floors that are technically apartments.

23         Q.     You said it was a house?

24         A.     I say house.  Doesn't generally

25   mean house.  Multifamily dwellings.

```
                                              Page 52
 1              POLICE OFFICER DAVIS
 2   Sometimes, like, an actual house has
 3   multiple floors in it in the form of,
 4   like, what you call an apartment, but it's
 5   a house.  I don't know if you understand
 6   what I'm saying.
 7        Q.    I know exactly what you're
 8   saying.  I'm very familiar with these kind
 9   of dwellings.
10             Do you remember this particular
11   house?
12        A.    No, I don't remember the outside
13   or the -- any specifics of that.
14        Q.    Is it possible that you got the
15   wrong address here?  I just looked and the
16   address for this incident that we're here
17   on for February 28, 2018 was 130-18
18   Atlantic Avenue.
19        A.    Okay.  So that's not that job.
20        Q.    Okay.
21        A.    So maybe Officer Walker put it
22   in or Officer Cheema put it in the book.
23        Q.    Is it possible you did not note
24   this job that we're here for today, the
25   one that we're discussing today, is it
```

Page 53

POLICE OFFICER DAVIS

1

2     possible you did not note that in your

3     memo book?

4          A.    Yes.  Like I said, if I had the

5     time to, then I'll put it in there the

6     best I can.  But if I don't have the time

7     to, then --

8          Q.    Do you ever at the end of your

9     tour go back and write in jobs that you

10    responded to?

11         A.    Not generally.  Especially when

12    it's a three-man car like that, like a

13    three-person vehicle, it's more than

14    enough information as to what we need.

15         Q.    Prior to coming here today you

16    looked at your memo book before we

17    started?

18         A.    Yes.

19         Q.    Did you look to see, you know,

20    for cross reference what you had here in

21    your memo book?

22         A.    I did, but I didn't see any

23    specific details on this incident in my

24    memo book.

25         Q.    A minute ago you said that you

Page 54

                    POLICE OFFICER DAVIS

1

2    believe that the job we just discussed at

3    6:30 to 6:36 was this incident.

4         A.    No, I said I don't know.  It

5    could be.  I don't know.  I just was --

6         Q.    Now that we know the address is

7    not the correct address, does that

8    indicate to you this is not this incident

9    at all?

10        A.    Yes.

11        Q.    You have an unredacted version

12   of your memo book; is that right?

13        A.    Yes.

14        Q.    Is there any portion of that

15   memo book you looked at that indicates

16   this job at all?

17        A.    No.  The information is as I

18   stated, in regards to a traffic stop and

19   it has someone's personal information in

20   there.

21        Q.    Once you got to the apartment,

22   do you remember what floor you went to or

23   how you got to the hospital?

24        A.    Possibly the second or third

25   floor.

Page 55

1           POLICE OFFICER DAVIS

2       Q.      Did you have to buzz in?

3       A.      I don't believe so.  I believe

4   EMS left the door open like what we do, FD

5   or PD, somehow stick something in the

6   door.

7       Q.      When you arrived at this

8   location, was EMS outside waiting for you

9   or inside waiting?

10      A.      Their car was outside, but they

11  were inside.

12      Q.      Did you have a conversation with

13  EMS workers when you arrived?

14      A.      Yes.

15      Q.      What was the nature of that

16  conversation?

17      A.      Just explaining to us what was

18  going on.  Obviously there was an

19  intoxicated male in the apartment.  The

20  wife was calling, she was very agitated,

21  angry and scared, going through her

22  emotions?  And that he had to -- you know,

23  we don't -- EMS, they're more or less the

24  on scene medical professional, so they

25  don't know how intoxicated he was or

```
                                            Page 56
 1            POLICE OFFICER DAVIS
 2   whatever, like his level of intoxicated.
 3   So whenever they get to a scene and it's
 4   like that they remove to -- what we say,
 5   remove to a hospital.  So they were saying
 6   that he, you know, has to go to the
 7   hospital.
 8        Q.    How many EMS workers were there?
 9        A.    I believe two.
10        Q.    Have you ever seen these EMS
11   workers before that night?
12        A.    I work -- I work in my capacity
13   with EMS workers, I've seen them.  I don't
14   know them generally.  I've seen them
15   before.
16        Q.    You recognized them from before
17   but you didn't know them by name or
18   anything like that?
19        A.    No.
20        Q.    Do you now know them by name or
21   know who these EMS workers were?
22        A.    No.
23        Q.    Do you know which of the two EMS
24   workers you spoke to?
25        A.    No.  Both of them actually.
```

```
                                              Page 57

 1              POLICE OFFICER DAVIS
 2   They both were telling me the information.
 3   Because one was explaining the situation
 4   and the other was obviously explaining
 5   their information.  Because we have to get
 6   information from them as well for us.
 7       Q.    Let's start with the one that
 8   was explaining what they had observed
 9   prior to you arriving.  What specifically,
10   if you remember, did they say to you?
11       A.    Just explained that he just too
12   drunk, he has to go to the hospital.
13       Q.    Did they indicate why they made
14   that determination he had to go to the
15   hospital?
16       A.    He just -- his -- the way he was
17   speaking.  And also the wife had told
18   us -- told them and us obviously when we
19   came in that he comes home drunk like this
20   all the time, she's worried, she doesn't
21   know how much he had to drink.  EMS kept
22   asking how much he had to drink.  They
23   couldn't determine how much he had to
24   drink.  He was uncooperative answering
25   them, only answered us.  So their
```

Case 23-24, Document 31, 04/19/2023, 3501830, Page64 of 254

Page 58

```
                POLICE OFFICER DAVIS
 1
 2     determination was he was under the
 3     influence of alcohol at a high level.
 4          Q.    Did they indicate to you that he
 5     appeared to be suffering from some sort of
 6     alcohol poisoning?
 7          A.    No, they didn't say.
 8          Q.    When you got there, was he
 9     vomiting?
10          A.    No.
11          Q.    Was he unable to stand up?
12          A.    Stumbling, yes.
13          Q.    I'm saying, was he unable to get
14     up at all?
15          A.    No.  He could get up with help,
16     you know, obviously.
17          Q.    Where was he when you first came
18     into the apartment?
19          A.    All of this transpired in the
20     living room.
21          Q.    Was he sitting when you first
22     came in, standing when you first came in?
23          A.    Standing, I believe.
24          Q.    He was standing when you first
25     came in?
```

Case 23-24, Document 31, 04/19/2023, 3501830, Page65 of 254

```
                                            Page 59
 1            POLICE OFFICER DAVIS
 2       A.    I believe.
 3       Q.    Have you seen a video in
 4  connection with this incident?
 5       A.    Yes.
 6       Q.    Did that help refresh your
 7  recollection of the incident?
 8       A.    Yes, definitely.
 9       Q.    You have an independent memory
10  of this incident --
11       A.    Yes.
12       Q.    -- aside from the video?
13       A.    Aside from the video, yes.
14       Q.    When did you see this video?
15       A.    Yesterday.
16       Q.    That was the first time you seen
17  it?
18       A.    Yes.
19       Q.    You said one of them was telling
20  you he was drunk and needed to go to the
21  hospital and they said they were giving
22  also information you needed, one of the
23  other EMS workers was giving you
24  information you needed.  What information?
25       A.    Who they are.  What generally
```

```
                                              Page 60
 1              POLICE OFFICER DAVIS
 2   they asked, who are you, what's going on.
 3   And the first, the main question is, where
 4   is he going.
 5        Q.    What did you observe Mr. Singh
 6   doing when you came into the apartment?
 7        A.    Yelling and arguing.
 8        Q.    What was he saying?
 9        A.    He was cursing at his wife,
10   angry at her for calling the police.  He
11   thought she called the police.
12        Q.    What kind of curses was he
13   using?
14        A.    I mean, am I allowed to curse?
15        Q.    Please, we have to get the truth
16   out, so I want to know.
17        A.    Okay.
18        Q.    You saw the video, right?
19        A.    Yes.
20        Q.    And the video has no volume,
21   right?
22        A.    No.
23        Q.    So you couldn't hear.  Since we
24   don't have that information, I need to get
25   as much of that information as possible
```

```
                                            Page 61
 1              POLICE OFFICER DAVIS
 2    from you.
 3        A.    Okay.  I didn't know if I could
 4    curse, that's why I'm saying.  More or
 5    less he was asking why the fuck would you
 6    call the cops.  What are you doing.  Why
 7    are there people in my fucking house.  You
 8    shouldn't be doing this.  This has nothing
 9    to do with anybody.  Back and forth
10    between English and his language.
11        Q.    Did you understand his language?
12        A.    No.
13        Q.    Did Officer Cheema understand
14    his language?
15        A.    Yes.
16        Q.    Did Officer Cheema tell you what
17    he was saying in his language?
18        A.    Yes.
19        Q.    What was he saying?
20        A.    He was telling basically the
21    equivalent of what he was saying to us in
22    English, just cursing her out more, why
23    would you fucking call them here, what's
24    wrong with you.  From what Officer Cheema
25    told me, he was threatening her.
```

Page 62

1           POLICE OFFICER DAVIS

2      Q.    What specific threat did he make

3   to her?

4      A.    He didn't necessarily say.

5      Q.    Did you hear him make a threat

6   to his wife?

7      A.    No.  He just kept cursing her

8   out.  And I remember he -- he kept

9   believing -- he thought that she called

10  the police to come and arrest him.

11     Q.    I understand.

12     A.    And he was telling her, why

13  would you try and get me arrested, what is

14  wrong with you, you know, why would you

15  fucking do this.  And then he told -- he

16  spoke to her in her language and -- in

17  their language and was just describing to

18  her, okay, if I get arrested then what's

19  gonna happen.  Then he was saying

20  everything back to us.  I was just

21  explaining to him, you know, you're not

22  under arrest, she didn't call the police

23  here.

24     Q.    He was cursing at her is what

25  you're saying.  You said that Cheema

Page 63

                    POLICE OFFICER DAVIS

1

2   indicated to you that he made a threat but

3   didn't specify what kind of threat it was,

4   right?

5        A.    No.  And he also told him -- the

6   defendant, if I can refer to him as,

7   didn't know that Officer Cheema also spoke

8   that language, so he would talk to us in

9   English and then curse her out in his

10  language and speak to her whatever he was

11  saying not knowing that someone else in

12  the room knew what he was saying.

13       Q.    Did it appear to you that they

14  were having a dispute?

15       A.    Yes.

16       Q.    A family dispute?

17       A.    Not a dispute, it -- it appeared

18  that in his mind she called the cops on

19  him and she was just scared.

20       Q.    Did she tell you she was scared?

21       A.    She just -- she was worried

22  about -- they also have a child there, and

23  she was worried about him coming home, he

24  always does this, brings up this stuff,

25  cursing her out.  She doesn't know what

```
                                          Page 64
 1            POLICE OFFICER DAVIS
 2   he's going to do.  Doesn't know what he's
 3   going to do because he's too drunk.
 4        Q.    Did she tell you she was scared?
 5        A.    Yes.
 6        Q.    Did she tell you she believed he
 7   could be violent with her?
 8        A.    Not with her.  He'll break stuff
 9   around and she was worried what could
10   happen with the kid, he shouldn't be doing
11   this in front of the kids or around the
12   kids.  She didn't know what he was gonna
13   do.
14        Q.    But --
15        A.    She was in fear for her safety,
16   yes, if that's what you're asking.
17        Q.    She specifically told you she
18   was in fear for her safety?
19        A.    No, she didn't say I'm fearful
20   for my safety.  She said I didn't know
21   what he was going to do.
22        Q.    But you understood from your
23   conversation that she was fearful for her
24   safety, she never explicitly told you she
25   was fearful for her safety?
```

```
                                              Page 65
1              POLICE OFFICER DAVIS
2         A.    Yes.
3         Q.    She didn't say if you don't take
4    him away I believe he's going to hurt me
5    or break something or do something to
6    endanger her or her child?
7         A.    No.
8         Q.    She didn't say that to you?
9         A.    No.
10        Q.    You believe that based on what
11   you observed?
12        A.    What she was saying.  She was
13   saying that he had a history of coming in
14   the house, being verbally violent with
15   her.  Being aggressive with her around the
16   house.  Being too inebriated.  Doing a lot
17   of things that made her scared that she
18   didn't know what he was going to do
19   because this wasn't the first time this
20   happened.
21        Q.    Did you do anything to confirm
22   that, like view to see if there was prior
23   domestic incident reports between them?
24        A.    No, because in that instance it
25   wasn't a domestic incident, it was what we
```

```
                                         Page 66
 1           POLICE OFFICER DAVIS
 2   were viewing as a -- how I do say?  Like
 3   an aid, what you would consider an aided
 4   job.  We were there to aid EMS.
 5       Q.    I understand that's how it came
 6   in.
 7       A.    That's how we were still viewing
 8   it as well.
 9       Q.    But I'm saying, when you got
10   there and you saw that she was making
11   those allegations that he had a prior
12   history of doing what you're saying, did
13   you go to see if there actually was
14   domestic incident issues with this
15   location?
16       A.    No, because --
17             MS. FADDIS:  Objection to form.
18       You can answer.
19       A.    No, there was no crime, so he --
20   we were just being guided by EMS in terms
21   of him needing medical help.  The entire
22   situation of us standing there and having
23   this conversation was to physically just
24   get him dressed.
25       Q.    You indicate there's no crime.
```

```
                                           Page 67
 1            POLICE OFFICER DAVIS
 2   So none of the verbal assaults as you
 3   described them a moment ago amounted to a
 4   crime; is that right?
 5       A.    No.
 6             MS. FADDIS:   Objection to form.
 7       You can answer.
 8       Q.    He wasn't committing harassment
 9   in your view; is that correct?
10       A.    No.
11       Q.    He wasn't menacing her in your
12   view; is that correct?
13       A.    No, no, he didn't attempt to
14   assault her while you were present,
15   correct.  No.
16       Q.    She never told you that he
17   assaulted her; is that right?
18       A.    Yes.
19       Q.    Yes, she never told you that he
20   assaulted her, right?
21       A.    Yes, she never told me.
22       Q.    Sorry, I maybe asked the
23   question in a weird way.
24             Throughout the entire time you
25   were there you didn't observe Mr. Singh
```

```
                                          Page 68
 1            POLICE OFFICER DAVIS
 2   commit a crime, correct?
 3        A.    No.
 4        Q.    Throughout the entire time you
 5   were there, no one in the apartment told
 6   you he had committed a crime prior to your
 7   arrival?
 8        A.    No.
 9        Q.    The entire time you were there,
10   your only understanding of your job was to
11   assist him, as to bring Mr. Singh to the
12   hospital?
13        A.    Yes.
14        Q.    You did not make an independent
15   evaluation when you arrived to Mr. Singh's
16   apartment as to whether he was a danger to
17   himself?
18            MS. FADDIS:  Objection.
19        A.    No, I was -- rephrase the
20   question.
21        Q.    The question is, did you make an
22   independent evaluation as to whether he
23   was a danger to himself?
24        A.    In my opinion, yes, just the way
25   he was acting, the way he was going at
```

Page 69

      POLICE OFFICER DAVIS

1        POLICE OFFICER DAVIS
2  everything.  And from my opinion also,
3  when an individual is that aggressive and
4  that inebriated, also being in that close
5  proximity to a kitchen always raises to a
6  level of more or less suspicion or warning
7  because the kitchen is one of the most
8  dangerous places in the house.
9     Q.   You believed he was a danger to
10  himself?
11     A.   Yes.  And also with him, there
12  is a couple of moments where he's
13  standing, also he'll sit on the couch.
14  Whenever someone is sitting down or laying
15  down like that it's an issue of
16  asphyxiation.
17     Q.   But --
18     A.   We're not -- our job isn't just,
19  okay, you want us to leave and we leave
20  and then you lay down on the couch and
21  asphyxiate.
22     Q.   Did you observe him have any
23  trouble breathing?
24     A.   As in, like, in and out
25  breathing, no.

Page 70

```
 1            POLICE OFFICER DAVIS
 2        Q.    Did you have a fear that he
 3    might asphyxiate?
 4        A.    Yes, if he laid down on the
 5    couch being that inebriated.  I'm not a
 6    medical professional, I don't know his
 7    medical history.  I don't know if he lays
 8    down if he's going to pass out and not
 9    wake up, if he's going to choke, if he's
10    going to fall on the floor.  I don't know
11    what could happen, I'm not a medical
12    professional.
13        Q.    I'm saying, you believed based
14    on your observation of him that he could
15    potentially asphyxiate, is that what
16    you're saying?
17        A.    In my opinion, yes, if he laid
18    on his back and started to throw up or
19    just stop breathing or anything like that,
20    I can't just leave you here if you're that
21    intoxicated.  I have to come to your aid.
22        Q.    You didn't measure his level of
23    intoxication, right?
24        A.    No.
25        Q.    You didn't observe him throwing
```

```
                                              Page 71
 1            POLICE OFFICER DAVIS
 2  up?
 3       A.    No.
 4       Q.    You did up observe him stand up?
 5       A.    Yes.
 6       Q.    He was a little unsteady on his
 7  feet, correct?
 8       A.    Very unsteady.
 9       Q.    Very unsteady, excuse me.
10            You believed he was to the level
11  of intoxication that he could potentially
12  asphyxiate?
13       A.    Or, like you just mentioned,
14  stand up and fall over, hit his head.
15  It's a totality, he could harm himself in
16  any way.
17       Q.    So you believed that you were --
18  well, you were going by what EMS was
19  telling you to do, correct?
20       A.    As well as observing him.
21       Q.    In your observation, you believe
22  he was intoxicated enough that he could
23  hurt himself potentially?
24       A.    Yes.
25       Q.    But you didn't observe him
```

Case 23-24, Document 31, 04/19/2023, 3501830, Page78 of 254

```
                                              Page 72
 1              POLICE OFFICER DAVIS
 2    indicate in any way that he is intending
 3    to hurt himself, correct?
 4         A.    No.
 5         Q.    He didn't tell you that I'm
 6    going to go stab myself?
 7         A.    No.
 8         Q.    He didn't tell you I feel I'm
 9    feeling suicidal?
10         A.    No.
11         Q.    He was upset, as you mentioned
12    earlier, predominantly because the police
13    were there, right?
14         A.    He believed that she called the
15    police on him to have him arrested.
16         Q.    Let's go back.  Did you believe
17    he was going to harm his wife if you guys
18    hadn't taken him to the hospital?
19         A.    That he was going to harm his
20    wife?
21         Q.    Yes.
22         A.    If he went to the hospital?
23         Q.    If he didn't go to the hospital.
24         A.    If he didn't go, yes.  He was
25    being very aggressive with her and she
```

Page 73

```
 1           POLICE OFFICER DAVIS
 2  seemed fearful.  And in some circles may
 3  have not wanted to tell us everything that
 4  was going on, but kept making the
 5  suggestion -- not suggestion, asking us to
 6  take him.  And based off my experience and
 7  training, that is usually a sign of
 8  someone who is being fearful if we leave
 9  something else might happen.
10       Q.    You didn't see him attempt to
11  strike her in any way?
12       A.    No.
13       Q.    We've already gone over this,
14  you didn't believe any of the comments he
15  was making to his wife rose to a level of
16  crime or offense under the New York Penal
17  Law or any other laws in New York?
18       A.    No.
19       Q.    Even though she appeared to you
20  to be fearful for her safety, you didn't
21  believe this incident warranted
22  documentation in a domestic incident
23  report?
24           MS. FADDIS:  Objection to form.
25       You can answer.
```

Page 74

1          POLICE OFFICER DAVIS

2      A.      No, didn't feel as though -- it

3  was more or less in our eyes a medical

4  case.  What we refer to as emotionally

5  disturbed, under the influence, not in his

6  right state of mind.  Just saying random

7  things, not coherent enough to argue with

8  anybody, saying random things.  If someone

9  said something he would say something

10 argumentative back, but it wasn't a back

11 and forth argument, a constructive

12 conversation more or less.  You understand

13 what I'm saying?

14     Q.      While you were there, at some

15 point did you convince him to go to the

16 hospital?

17     A.      Yes, we explained to him

18 multiple times.  In situations like that,

19 three officers, we'll all try to have a

20 conversation and just explain.  Because in

21 his mind he believed he was being

22 arrested.  We have to explain you're not

23 being arrested, we're just going to get

24 you to the hospital to see a medical

25 professional, see a doctor, get checked

Page 75

                    POLICE OFFICER DAVIS

 1

 2   out, make sure you're okay, you didn't

 3   overdrink and nothing else is going on.

 4   Because EMS, they can't make the

 5   determination what's going on.  He could

 6   have some sort of psychiatric issues that

 7   we don't know about, some sort of issue.

 8   We can't make that determination.  We're

 9   explaining to him, hey, you're going to

10   get checked out at the hospital, if

11   everybody is okay, you come right home,

12   not under arrest.

13       Q.    Did you ever tell him if he

14   refused to go to the hospital you would

15   have to force him to go to the hospital?

16       A.    Not in that way.  That's not

17   what we would say.  We would explain you

18   have to go to the hospital because you

19   might be actually hurt.  Don't know, might

20   be sick, might be overly drunk.  Just many

21   different ways trying to explain to him

22   that you're just going to the hospital.

23       Q.    Was he refusing to go to

24   hospital?

25       A.    He was back and forth.  He was

Page 76

```
               POLICE OFFICER DAVIS
 1
 2   saying yes, he was saying no, he was
 3   saying yes.  He kept saying yes, he was
 4   gonna go, but he was still under the -- he
 5   still kept believing that his wife called
 6   the cops and that we were lying to him.
 7   At one point he believed that we were
 8   lying to him, that he was under arrest.
 9   We explained you're not under arrest.  You
10   can walk out of your home peacefully, go
11   in the ambulance.  You're not being
12   fought, you're not being placed in custody
13   or anything like that, you're going to see
14   a medical professional.  Because, more or
15   less, it can be medical, psychiatric, it
16   can be anything, you have you to get
17   evaluated.
18       Q.    My question is, if he refused
19   completely, were you guys going to force
20   him to go to the hospital?
21             MS. FADDIS:  Objection to form.
22       Go ahead.
23       A.    If he verbally refused?
24       Q.    Yes.
25       A.    We would have just kept asking
```

Page 77

          POLICE OFFICER DAVIS

1

2    him.

3        Q.    You would have stayed there

4    until he agreed to go to the hospital?

5        A.    Yes.

6        Q.    So you didn't have a choice in

7    the matter in the sense that you guys were

8    not leaving until you took him to the

9    hospital; is that right?

10       A.    As long as EMS is still

11   suggesting that he has to go to the

12   hospital.  If at some point EMS says, you

13   know what, they'll call a supervisor,

14   because they have their own supervisor,

15   nothing to do with us, they'll explain the

16   situation.  If they tell us, hey, they

17   spoke -- however they handle their

18   situation, they tell us he can stay here,

19   speak to his doctor later on, maybe she

20   can call back, whatever EMS is saying,

21   whatever they're guided, we're guided by.

22   Whatever is going on, if we need a

23   supervisor on scene, we call.

24       Q.    You were guided by EMS, they

25   were the ones making the decision he

```
                                              Page 78
 1              POLICE OFFICER DAVIS
 2    needed to go to the hospital?
 3        A.    Yes.
 4        Q.    I'm going to show you the video
 5    of this incident and I'm going to ask you
 6    a few questions.
 7              MS. FADDIS:  Can we take a
 8        break?
 9              MR. COHEN:  Yes.
10              MS. FADDIS:  Can we take five?
11              MR. COHEN:  Five minutes is
12        good.
13              (At this time, a recess was
14        taken.)
15        Q.    Officer Davis, before I show you
16    the video, was there a point where you had
17    to handcuff Mr. Singh?
18        A.    Me handcuff him?
19        Q.    Yes.
20        A.    I believe we -- I assisted in
21    the handcuffing.
22        Q.    Did you make a decision to
23    handcuff him?
24        A.    No, I did not make the decision
25    to handcuff him.
```

```
                                         Page 79
 1          POLICE OFFICER DAVIS
 2     Q.     Who decided it was necessary to
 3  handcuff him?
 4     A.     Officer Cheema.
 5     Q.     Did he explain to you why he
 6  decided to handcuff the individual?
 7     A.     It was during the incident where
 8  he more or less was being compliant and he
 9  agreed to go to the hospital and then
10  started to become argumentative, which was
11  with us as we were walking out, and more
12  or less pretending like he was being, you
13  know, arrested or pretending like he was
14  leaving and then turning around quickly to
15  Officer Cheema.  And I also felt that he
16  was doing -- acting very suspicious or he
17  was gonna turn around and do something or
18  he was gonna start to go back to -- of
19  course the wife was in the house and the
20  child was in the house, that's in the back
21  of our mind, him turning around and
22  disagreeing.  Finally -- like I said, he
23  was very emotionally disturbed.  So if
24  he's going to turn around and start
25  disagreeing, could have jolted and ran at
```

```
                                          Page 80
 1          POLICE OFFICER DAVIS
 2   the wife.  There was no way to tell what
 3   he was going to do.
 4        Q.    But when you saw him, I guess,
 5   turn around, did you move to try to
 6   handcuff him as well or were you reacting
 7   to what Officer Cheema was doing?
 8        A.    I was reacting to both of them.
 9   Situations like that happen very fast.
10   Someone turning around like that,
11   especially like he could have hit one of
12   us, he could have had something in his
13   hand.  We don't know what he was doing.
14        Q.    My question is, prior to Officer
15   Cheema attempting to handcuff him, did you
16   believe that the actions Mr. Singh was
17   taking warranted you to go and try to
18   handcuff him as well?
19            MS. FADDIS:   Objection to form.
20        You can answer.
21        A.    I felt like he was being
22   verbally aggressive enough that it would
23   pass verbal aggression at some point.
24        Q.    But I'm saying, did you make an
25   attempt to handcuff him before Officer
```

                                                   Page 81

1              POLICE OFFICER DAVIS
2    Cheema did?
3         A.     No.
4         Q.     Did you think the actions he was
5    taking at the moment he was grabbed by
6    Officer Cheema to be handcuffed warranted
7    him to be handcuffed at that moment?
8         A.     Yes.
9         Q.     What was the reason it was
10   warranted for him to be handcuffed at that
11   moment?
12        A.     For the safety of others at that
13   point, which would include us as officers
14   and EMS and his family.  If he goes from
15   being compliant and wanting to leave and
16   get everything down to now turning around,
17   moving his arms like that, now he's
18   becoming a risk.  He is going into the
19   back of the EMS truck, we can't put him in
20   the back of the EMS truck making actions
21   like that because it could be a danger to
22   the EMS workers, as well as one of us
23   sitting there in close proximity.  A
24   rationale person is not going to turn
25   around and do things with his hands.

```
                                            Page 82
 1              POLICE OFFICER DAVIS
 2     Where we feel like now it's a safety
 3     issue, yes, you are placed in handcuff.
 4          Q.    Did you think he was about to
 5     attack you at the moment?
 6          A.    I thought he was going to run
 7     and try to attack somebody.
 8          Q.    Did you think at the moment that
 9     Officer Cheema reached out to Mr. Singh he
10     was going to attack you?
11              MS. FADDIS:  Objection to form.
12          Go ahead.
13          A.    Attack me, no.  I was standing
14     behind him or off to the side, so I
15     wouldn't be a victim of him attacking me.
16          Q.    Did you believe at the moment
17     that Officer Cheema grabbed Mr. Singh to
18     handcuff him that Mr. Singh was going to
19     attack your partner Officer Walker?
20          A.    No, she was not -- not in that
21     proximity.
22          Q.    Did you believe at the moment
23     that Officer Cheema went to handcuff Mr.
24     Singh that he was about to attack his
25     wife, Mr. Singh's wife?
```

Page 83

1          POLICE OFFICER DAVIS

2      A.    I believe that if he would have

3  got away from us he could have ran and

4  attacked her.

5      Q.    Was his wife anywhere in the

6  proximity of Mr. Singh at the moment that

7  Officer Cheema was trying to handcuff him?

8          MS. FADDIS:  Objection to form.

9      You can answer.

10     A.    She was in the living room,

11 which is where we all -- it's not a big

12 living room.  I don't know if you can

13 tell.

14     Q.    I guess my question is, were you

15 standing closer to Mr. Singh or was his

16 wife standing closer?

17     A.    Me.

18     Q.    Was Officer Walker also standing

19 closer to Mr. Singh than his wife?

20     A.    Yes.

21     Q.    At the moment that Officer

22 Cheema went to handcuff Mr. Singh, was it

23 a fact that all of you were surrounding

24 Mr. Singh?

25     A.    Not surrounding.  It was more or

Case 23-24, Document 31, 04/19/2023, 3501830, Page90 of 254
**[JA-702]**

```
                                          Page 84
 1              POLICE OFFICER DAVIS
 2   less a tactic in terms of trying to block
 3   him from any way of running or going --
 4   because there people in the back
 5   room, someone kind of standing there, so
 6   he can't run back there.  Obviously
 7   somebody here blocking him so he can't,
 8   you know, run and attack his wife.  I'm
 9   there making sure he can't run and attack
10   his wife or EMS workers, making sure he
11   can't go after anybody else.
12        Q.    In the academy were you trained
13   how you are supposed to handcuff an
14   individual?
15        A.    Yes.
16        Q.    And how much force you're
17   supposed to use in attempting to handcuff
18   that individual?
19        A.    Yes.
20        Q.    How much force are you allowed
21   to use in order to handcuff someone?
22        A.    The force necessary to get them
23   in handcuffs.
24        Q.    Does it have to be any kind of
25   force necessary or minimal amount of force
```

Case 23-24, Document 31, 04/19/2023, 3501830, Page91 of 254

Page 85

```
                POLICE OFFICER DAVIS
 1
 2   necessary?
 3       A.    You have to match the force --
 4   like, if they're resisting, you still have
 5   to try to get their arm into the
 6   handcuffs.  Sometimes you need more than
 7   one person.  Sometimes you need multiple
 8   officers, somebody stronger than you.  You
 9   have to match the force.  If they're
10   not -- if you're not -- your force has to
11   more or less match or overwhelm that force
12   so you can actually get them in the
13   handcuffs.
14       Q.    So the minimal amount of force
15   necessary to get them in handcuffs?
16       A.    Yes.
17       Q.    Under what circumstances are you
18   supposed to take someone down to the
19   ground when you're trying to place them in
20   their handcuffs?
21       A.    If the situation arises to that,
22   if it seems like he's at risk at lunging
23   at someone, he or she obviously, if that
24   person seems at risk they're lunging at
25   someone, if they're flailing their arms
```

Case 23-24, Document 31, 04/19/2023, 3501830, Page92 of 254
**[JA-704]**

```
                                            Page 86
 1            POLICE OFFICER DAVIS
 2    and you don't want them, you know, facing
 3    you, spitting on you, biting you, if it
 4    seems that person is aggressive and the
 5    only thing is to get them down to get
 6    their hands handcuffed, that's what's
 7    warranted to take them down.
 8        Q.    Under what circumstance should
 9    you take them to the ground versus putting
10    them against a wall or something else?
11            MS. FADDIS:   Objection to form.
12        You can answer.
13        A.    If putting them against the wall
14    isn't tactically sound, like I said, if
15    there's a way for them to get away from
16    you, if you can put them -- then you're
17    not going to put them on the wall.
18        Q.    I'm going to show a video and
19    then we can talk about some of the
20    instances here.
21            MR. COHEN:   This is going to be
22        Exhibit 2 in the transcript.   You
23        don't have to attach it.
24            ( Plaintiff's Exhibit 2 was
25        marked for identification, as of this
```

```
                                              Page 87
 1           POLICE OFFICER DAVIS
 2      date.)
 3      Q.    Can you see the video here,
 4  Officer Davis?
 5      A.    Yes, I see it.
 6      Q.    For some reason I can't see you.
 7      A.    Can you see me?
 8      Q.    It's not your fault, it's
 9  because I'm working off a laptop here.
10  Hold on.
11           MR. COHEN:  Off the record.
12           (Discussion held off the
13      record.)
14           MS. FADDIS:  Can you identify
15      the video by length.
16           MR. COHEN:  The title of the
17      video is called Police Video, it's an
18      8:50 video, and we are starting here
19      at the beginning.  Can you see the
20      video, guys?
21           MS. FADDIS:  Yes.
22           THE WITNESS:  Yes.
23      Q.    I'm starting at the 00 mark
24  here.  I'm going to play the first few
25  seconds until I see Officer Davis show up
```

```
                                          Page 88
 1              POLICE OFFICER DAVIS
 2   on the screen, okay.  I stopped it here at
 3   about the eight second mark.  You see the
 4   first officer that came into the
 5   apartment?
 6        A.    Me?
 7        Q.    Yes.
 8        A.    Okay, yeah, yeah.  Yes, Officer
 9   Cheema.
10        Q.    And then who came in after him?
11        A.    Me, Officer Davis.
12        Q.    And then behind you there
13   appears to be another officer with a hat
14   on, whose that?
15        A.    Officer Walker.
16        Q.    When you came in the apartment,
17   where is Mr. Singh?
18        A.    He is in the -- on the couch
19   next to Officer Cheema.
20        Q.    When you came in, earlier you
21   testified you believed he was standing
22   when you came in.  He wasn't standing,
23   right?
24        A.    No.  But I talked to him while
25   he was standing, so it's just my
```

```
                                      Page 89
 1           POLICE OFFICER DAVIS
 2   recollection of talking to him, I believe.
 3       Q.    At some point he was standing,
 4   but when you first came in he wasn't
 5   standing, right?
 6       A.    No.
 7       Q.    He was just sitting on his
 8   couch, right?
 9       A.    Yes, talking to EMS.
10       Q.    He's talking to EMS?
11       A.    Yes.
12       Q.    At the eight second mark EMS
13   workers were already there on the scene,
14   right?
15       A.    Yes.
16       Q.    They remained in the apartment
17   while they waited for you, right?
18       A.    Yes.
19       Q.    They didn't feel it was so
20   dangerous they had to leave the apartment,
21   correct?
22           MS. FADDIS:  Objection.  You can
23       answer.
24       A.    They were still talking to him,
25   they were still evaluating him.  They
```

```
                                          Page 90
 1            POLICE OFFICER DAVIS
 2   weren't done.
 3        Q.    It wasn't such a situation it
 4   was so dangerous to be around him that
 5   they had to leave the apartment, right?
 6            MS. FADDIS:  Objection.  You can
 7        answer.
 8        A.    No.
 9        Q.    Do you know what they were
10   saying to him when you first walked in at
11   the eight second mark?
12        A.    Still going through their
13   questioning.
14        Q.    Do you know what questioning it
15   was?
16        A.    That's his medical information,
17   what's wrong with him, you know.
18        Q.    Was he answering their
19   questions?
20        A.    Not necessarily.  He wasn't
21   being compliant with them, so they told us
22   he wasn't really being super compliant
23   with them.
24        Q.    Do you have a specific memory
25   what's being said at the eight second
```

```
                                          Page 91
 1              POLICE OFFICER DAVIS
 2   mark?
 3       A.    No.
 4       Q.    You just know generally he
 5   wasn't being too compliant?
 6       A.    Yes.
 7       Q.    Was he cursing at the point you
 8   walked in?
 9       A.    No.
10       Q.    Was he saying anything to his
11   wife when you walked in?
12       A.    It was a general conversation.
13   They were all talking.  It was
14   obviously -- that's the other individual,
15   I believe that's his brother, uncle, in
16   the other room.  It was walk in, kind of,
17   like, a loud situation.  The mom or the
18   female and the situation she's trying to
19   talk, EMS is talking, he's talking.
20       Q.    You said this is the brother
21   here in the white shirt?
22       A.    I have no clue who that is.  I
23   believe it was an uncle or someone.  He
24   was in the house when we got there.
25       Q.    Did you speak to him at all?
```

Page 92

```
                    POLICE OFFICER DAVIS
 1
 2        A.     I do not recall.  Just maybe
 3   told him to back up a couple of times or
 4   maybe asked him if he knew what was going
 5   on.
 6        Q.     Do you remember what he said to
 7   you?
 8        A.     I do remember him saying that
 9   this -- he gets like this sometimes more
10   or less.
11        Q.     I just started playing again,
12   I'm going to stop it around the twenty,
13   thirty second mark here.  I'm at the
14   twenty-seven second mark.  It appears from
15   the video that Officer Cheema initially
16   started talking to Mr. Singh, do you
17   remember what he said to him?
18        A.     Asking him what's going on.
19        Q.     Do you know what was the
20   response?
21        A.     I don't recall the exact
22   response that he gave.
23        Q.     You're looking to the side, like
24   you're facing the EMS workers.  Are you
25   speaking to them?
```

Page 93

```
1            POLICE OFFICER DAVIS
2        A.    Yes.
3        Q.    Do you know what you said to
4    them and they said to you?
5        A.    Just asked what was going on.
6    We just walked in the door, trying to
7    figure out the entire situation, what's
8    going on.
9        Q.    You see the time stamp in the
10   video over here, says 6:45 A.M.?
11       A.    Yes, I see it.
12       Q.    Do you know if that was the
13   accurate time when this incident happened?
14       A.    Around then, I would say.
15       Q.    I'm going to keep playing the
16   video, okay?
17       A.    Yes.
18       Q.    I'm stopping at the fifty-three
19   second mark.  You see the interaction with
20   the guy in the white Gap sweatshirt?
21       A.    Yes.  He was agitating him very
22   much.  They were arguing, because he was
23   explaining to Mr. Singh, the individual on
24   the couch, that, you know, he's too drunk,
25   he has to go to the hospital to get
```

```
                                        Page 94
 1            POLICE OFFICER DAVIS
 2   checked out.  He was agreeing with us and
 3   EMS and, you know, he was agreeing he
 4   needed to go.  You can't come home and do
 5   this.  It was more or less you can't come
 6   home and do this, your wife is here, your
 7   kid is here, you got to go to the
 8   hospital.  And Mr. Singh was believing, I
 9   I'm not going to jail, you can't tell me
10   what to do.  He was arguing with
11   everybody.
12        Q.    You're saying the guy in the
13   white shirt was also telling him to go to
14   the hospital?
15        A.    The gray hoodie or whatever.
16        Q.    It says Gap, right?
17        A.    Yes, he was agreeing, telling
18   him you're too drunk.
19        Q.    He was trying to get Mr. Singh
20   to go to the hospital as well?
21        A.    Yes.
22        Q.    Do you know what the officers
23   were telling the guy in the Gap hoodie?
24        A.    Just back up.  Because he was --
25   Mr. Singh was getting -- raising his voice
```

```
                                              Page 95
 1              POLICE OFFICER DAVIS
 2   yelling at him, pointing at him, screaming
 3   at him, arguing with him.  That's not
 4   something you want happening in the
 5   situation, especially when someone is
 6   emotionally disturbed.  Back away, let us
 7   talk to him and see what's going on,
 8   evaluate the situation and help whatever
 9   way we can.
10        Q.    I'm going to continue playing.
11   You see the gesture Officer Cheema did
12   towards the guy in the Gap hoodie?
13        A.    Yes, trying to get him to go to
14   the back.
15              MS. FADDIS:  Time stamp?
16              MR. COHEN:  Shortly before one
17        minute and two seconds.
18        Q.    I'm stopping at one minute
19   twenty seconds.  Looks like you have an
20   interaction with Mr. Singh.  Do you know
21   what that interaction entailed?
22        A.    Just try to talk to him.  We
23   call it verbal judo.  Try to explain to
24   him, like a speaking technique, just
25   talking to him, explaining to him what's
```

Page 96

```
            POLICE OFFICER DAVIS
 1
 2   going on, asking questions, asking why do
 3   you believe you had too much to drink, if
 4   he knows anything.
 5        Q.    Is it your testimony he didn't
 6   tell you how much he had to drink?
 7        A.    I don't believe he told me how
 8   much he had to drink.
 9        Q.    Did you see any alcohol in the
10   house when you were there?
11        A.    No.  From my recollection, the
12   wife saying that he had just got home or,
13   look, he had reached home that way, he
14   don't drink like that in the house.
15        Q.    Was he cursing at you when you
16   were talking to him up to that point at
17   one minute and twenty seconds?
18        A.    Yes, he was slurring his speech
19   and cursing because every time I was
20   speaking to him he thought I was trying to
21   arrest him.
22        Q.    What was he saying to you?
23        A.    Asking me why the fuck I was in
24   his house.  No, no, no, I'm not doing
25   that, no, that's not what -- I don't have
```

```
                                              Page 97
  1              POLICE OFFICER DAVIS
  2    to leave.  Nobody can tell me to leave.
  3    It's my wife, it's my house.
  4         Q.    I'm going to continue playing.
  5    It looks like he's pointing while he's
  6    sitting on the couch, right, at one minute
  7    forty seven seconds, right?
  8         A.    Yes.
  9         Q.    Do you know what he's pointing
 10    at, what he's saying?
 11         A.    That is him going back and forth
 12    with his wife.
 13         Q.    Was that in English or was it in
 14    his language?
 15         A.    It was back and forth between.
 16         Q.    Were they speaking English in
 17    front of you?
 18         A.    Did they speak English in front
 19    of me, yes.  They went back and forth
 20    between English and their language.
 21         Q.    Was he cursing at that time --
 22         A.    Yes.
 23         Q.    -- in English?
 24         A.    Yes, in English.  I don't know
 25    curse words in his language.
```

Page 98

POLICE OFFICER DAVIS

1

2      Q.      He was cursing the entire time,
3  as far as your testimony?
4      A.      Not every word was a curse, but,
5  yes, he was cursing, he said curse words.
6      Q.      I'm going to continue playing.
7  Now, you just bent over right next to him
8  at one minute and fifty-five seconds in
9  the video.  Do you know what you did?
10      A.      I believe I'm getting his shoes.
11  Because in between going back and forth
12  agreeing he's going to go to the hospital,
13  get checked out and disagreeing, agreeing,
14  disagreeing, agreeing.  And I'm just
15  trying to help the best I can.  Hey, where
16  are your pants.  I'm not gonna bring you
17  to the hospital without your pants.  Do
18  you know where your shoes are.  He's not
19  answering.  Asking the wife where the
20  shoes are maybe, she points, the shoes
21  right there.  I'm not gonna take the man
22  with no shoes on.
23      Q.      You were assisting him trying to
24  make it easier to go to the hospital?
25      A.      Yes, trying to give him help get

Case 23-24, Document 31, 04/19/2023, 3501830, Page105 of 254

```
                                              Page 99
 1              POLICE OFFICER DAVIS
 2   dressed.
 3        Q.    Okay.  I'll continue playing.
 4   I'm going to let it continue playing
 5   because -- what's he saying around here at
 6   the two minute and fourteen second mark,
 7   do you know?
 8        A.    I don't know exactly what he's
 9   saying.  Generally, you know, he's just
10   more or also trying to explain to us, and
11   this is me explaining to him you're not
12   being arrested.  You're just getting
13   checked out medically.  We don't know
14   what's wrong with you.  If there are
15   issues, they want to take you to the
16   hospital and get checked out.  Your wife
17   called us here for you to get checked out.
18        Q.    Did he say anything to you
19   during this interaction, there's nothing
20   illegal or wrong that requires me, you
21   know, from being drunk in my own house, I
22   can do that on my own?
23              MS. FADDIS:  Objection to form.
24        You can answer.
25        A.    Not that I recall.  Not in that
```

Page 100

                   POLICE OFFICER DAVIS

1

2    aspect.  He believed we were there to

3    arrest him, not that we were taking him to

4    the hospital.

5         Q.    Let me stop here at 3:16.  Your

6    understanding his objection was not that

7    he needed to go to the hospital, but he

8    thought you guys were trying to arrest

9    him?

10        A.    No, he believed that his wife

11   wanted him to get arrested.

12        Q.    I understand.  But he was

13   otherwise okay to go to the hospital but

14   he was under the misunderstanding that he

15   was going to get arrested?

16        A.    He was back and forth.  He

17   believed he was getting arrested.  He

18   believed he was going to the hospital.  He

19   believed he was okay.  There was no

20   coherent conversation happening

21   whatsoever.

22        Q.    I'm going to continue playing.

23   I'm stopping at the three minute and

24   twenty-seven second mark.  You see in the

25   far left corner of the video an individual

Page 101

1              POLICE OFFICER DAVIS
2    there?
3         A.    Yes.
4         Q.    Who is that?
5         A.    I believe maybe the wife.
6         Q.    So the wife got very close to
7    him while you were there, right?
8         A.    Um-hum.
9         Q.    Yes?
10        A.    Yes.
11        Q.    You didn't believe he was such a
12   danger to her that you were trying to keep
13   her away from him, right?
14             MS. FADDIS:   Objection to form.
15        You can answer.
16        A.    I believe she's helping him get
17   clothes.
18        Q.    I understand that.  But you
19   allowed her to get that close to him
20   because you didn't believe she was going
21   to gets assaulted by him; is that right?
22             MS. FADDIS:   Objection.  You can
23        answer.
24        A.    Yes, I believe helping him get
25   clothes because he was back and forth

```
                                              Page 102

 1              POLICE OFFICER DAVIS
 2    between being calm and irritated.  At this
 3    point he's calm enough to get clothes
 4    together, he's calm enough to come over
 5    there and get stuff together.
 6         Q.    But if you believed he was so
 7    erratic that he could at any moment become
 8    aggressive, you wouldn't have let his wife
 9    get that close to him, would you?
10              MS. FADDIS:  Objection.  You can
11         answer.
12         A.    It's not -- it's not at any
13    moment.  Like I said, he wasn't level at
14    one point, he was level at one point, up,
15    down, up, down.  We're only in the house
16    for about three minutes now and the entire
17    conversation is about him going to the
18    hospital at this point.
19         Q.    But at that point, at three
20    minutes and twenty-seven seconds while you
21    were in the house you haven't determined
22    that he's so erratic that you wouldn't let
23    his wife get that close to him, right?
24              MS. FADDIS:  Same objection.  Go
25         ahead.
```

```
                                              Page 103
 1            POLICE OFFICER DAVIS
 2       A.    I wouldn't object to her helping
 3   him getting clothes.  In my opinion, it's
 4   not her getting close to him physically.
 5   She's literally helping him, handing his
 6   clothes.
 7       Q.    How close is she if she's
 8   handing him the clothes?
 9       A.    She's right there next to him.
10       Q.    She's close enough to be lunged
11   at by him before you guys could stop it,
12   right?
13       A.    No, we could jump on him.
14       Q.    I'm saying, you would have
15   enough time to prevent him from attacking
16   her given that they're maybe less than a
17   foot away from each other?
18       A.    I believe we could jump on him
19   and stop him from doing anything at this
20   point with all three of us right there
21   next to him.
22       Q.    But you let his wife get within
23   a foot of him; is that right?
24       A.    Yes.
25            MS. FADDIS:  Objection.  You can
```

Page 104

```
                     POLICE OFFICER DAVIS
 1
 2        answer.
 3            Q.     If he was acting erratic and
 4        being super aggressive, would you let that
 5        happen?
 6                 MS. FADDIS:   Objection.   Go
 7            ahead.
 8            A.     Every situation is different.
 9        If he's calm enough to let her hand him
10        the clothes, we'll let her.
11            Q.     I'm asking this situation, he
12        was calm enough to let this happen?
13            A.     Yes, during this second, 3:27,
14        yes, he was calm enough for her to hand
15        him clothes.
16            Q.     And from zero to 3:27, the
17        entire time in the apartment, you did not
18        make a determination that he was so
19        dangerous she could not get that close to
20        him, correct?
21            A.     No, he was dangerous.   That's
22        what I'm saying it was up and down, up and
23        down.
24            Q.     So you were comfortable even
25        though he was still dangerous to let her
```

Page 105

            POLICE OFFICER DAVIS

1    approach him to that level of closeness?

2            MS. FADDIS:   Objection.   Go

3        ahead.

4        A.    He calmed down enough, yes, to

5    where we were okay with her approaching.

6        Q.    There was a point in the first

7    three minutes and twenty-seven seconds you

8    wouldn't let her get that close?

9        A.    When she was arguing with the

10   gentleman right there, when they were

11   going back and forth with each other, and

12   also when he's pointing at her arguing

13   with her, I wouldn't have.

14       Q.    Okay.

15       A.    If he agrees to leave and get

16   checked out, okay, we're handing your

17   stuff.

18       Q.    When you say arguing, you mean

19   Officer Cheema?

20       A.    No, the gentleman in the Gap

21   shirt.

22       Q.    I'm going to continue playing.

23   We're at about the three minutes and forty

24   second mark.  I'm going to let it continue

```
                                            Page 106
 1          POLICE OFFICER DAVIS
 2    playing.  Is this the moment he agreed to
 3    go to the hospital?
 4        A.    Yes.
 5        Q.    Was he still being aggressive
 6    during this time period?
 7        A.    Right now, no.  Right now he's
 8    not being aggressive.
 9            MS. FADDIS:  Objection.  What
10        time we at?
11            MR. COHEN:  Four minute mark.  I
12        started 3:30 to four minutes.
13        Q.    Was he being aggressive?
14        A.    No, he's agreeing to going to
15    the hospital now.
16        Q.    Do you know what he was saying
17    during that time period?
18        A.    He was still -- he was still
19    back and forth.  It wasn't a coherent
20    conversation.
21        Q.    But I'm saying, he's otherwise
22    calm, not coherent, but otherwise calm?
23        A.    We're just trying different ways
24    to convince him to put clothes on to get
25    to the hospital.  No coherent
```

```
                                              Page 107
 1            POLICE OFFICER DAVIS
 2    conversation.
 3        Q.    He's agreeing to go to the
 4    hospital at this point, correct?
 5        A.    Yes.
 6        Q.    Just to go back, I'm going to go
 7    back a few seconds, hold on.  We're at the
 8    three minutes and forty second mark here.
 9    I'm going to stop at 3:43.  You see him
10    stand up there?
11        A.    Yes.
12        Q.    Was that the first time he stood
13    up when you were in the house?
14        A.    I believe so.
15        Q.    So for the first three minutes
16    and forty-three seconds Mr. Singh was
17    sitting on the couch, correct?
18        A.    Yes.
19        Q.    So you had not had a chance yet
20    to determine how steady or unsteady he was
21    on his feet, correct?
22        A.    Yes.
23        Q.    Did the EMS workers tell you if
24    he was unsteady on his feet or had
25    observed him to be unsteady on his feet?
```

Page 108

```
 1          POLICE OFFICER DAVIS
 2      A.     Not that I recall.
 3      Q.     Because one of the reasons that
 4  you claim that he could be a danger to
 5  himself is he could fall.  But you had not
 6  seen him be unsteady yet, right?
 7      A.     Three minutes and forty-three
 8  seconds into the situation you asked if
 9  that was one of the things.  But if you
10  notice later on, yes, he's stumbling and
11  he can't really stand without help or have
12  balance.  Up to this point, no, I didn't
13  see him stand, so that's not part of why
14  my determination was he was intoxicated at
15  this moment.
16      Q.     Okay.  My question is, you were
17  already trying to convince him to go to
18  the hospital before you had ever seen
19  him --
20      A.     Stand?
21      Q.     -- being unsteady on his feet,
22  right?
23      A.     Yes.
24      Q.     So his unsteadiness on his feet
25  was not a factor that you considered; is
```

```
                                            Page 109
 1           POLICE OFFICER DAVIS
 2   that right?
 3               MS. FADDIS:  Objection.  Go
 4       ahead.
 5       A.    Not considered yet.  Once I see
 6   it, yes.
 7       Q.    So it was added to the other
 8   factors that you already made a decision
 9   and was the reasons to take him to the
10   hospital, correct?
11       A.    Yes.
12       Q.    That was mostly because EMS
13   workers were telling you he needed to go
14   to the hospital, correct?
15       A.    Yes.
16       Q.    I stopped at 4:01.  Is that a
17   conversation with his wife?  Do you know
18   what he's saying at that point?
19       A.    He asking her again why did you
20   call people here.
21       Q.    You did not attempt to separate
22   him from his wife at that point?
23       A.    No.
24       Q.    Neither did Officer Cheema,
25   right?
```

```
                                            Page 110
 1            POLICE OFFICER DAVIS
 2        A.    No.
 3        Q.    You guys didn't believe he was
 4   going to attempt to strike her or assault
 5   her in any way, right?
 6        A.    In that moment, no.
 7        Q.    I'm going to continue.  It
 8   appears I stopped at 4:32 on the video,
 9   you're having a conversation with Mr.
10   Singh while he's putting on his pants.  Do
11   you know what you're saying to him?
12        A.    It was just a conversation back
13   and forth that he was not being arrested,
14   nobody was calling him in, nobody was
15   doing him any harm.  There was a call for
16   help, EMS, you know, obviously
17   circumstances were his intoxicatedness.
18   We're explaining we're just trying to get
19   you to the hospital.  I'm only verbally
20   telling him we're only trying to get you
21   to the hospital to get you checked out.
22   If everything is fine, you'll go home and
23   that's that.  But you're only going to the
24   hospital.
25        Q.    Did you --
```

```
                                         Page 111
1            POLICE OFFICER DAVIS
2        A.    He was telling me, I remember
3    him telling me that he liked me, but the
4    other guy was an a-hole more or less.
5        Q.    He was referring to Officer
6    Cheema?
7        A.    Yes.  So in situations like
8    that, kind of spinoff on whose gonna be
9    the talker.  Obviously he's talking to me,
10   so I'm doing a lot of talking to him.
11       Q.    Was there any particular reason
12   he had that reaction to Officer Cheema?
13            MS. FADDIS:  Objection.  You can
14       answer.
15       A.    I believe around the time he
16   find out -- he find out that Officer
17   Cheema speaks his language.  So the
18   conversation that him and his wife was
19   saying that he thought maybe were
20   privileged, and I believe he start saying
21   something that he shouldn't be saying,
22   maybe threats or cursing, whatever.  And I
23   explained I know what you're saying.
24       Q.    I'm going to continue playing.
25   I'm going to stop it here at 5:32.  Do you
```

```
                                      Page 112
               POLICE OFFICER DAVIS
 1
 2    see a shorter person just started to walk
 3    down the hallway?
 4         A.    Yes.
 5         Q.    Who was that, if you know?
 6         A.    I don't.
 7         Q.    Was that his child?  Do you know
 8    if that was his child?
 9         A.    I don't recall.
10         Q.    Was there a child there?
11         A.    I believe maybe there was a
12    child.  I don't remember exactly.
13         Q.    You're not sure who that person
14    is?
15         A.    No, I can't tell from the back
16    honestly.
17         Q.    Did you ever tell the child to
18    go to his room or did you talk to the
19    child at all?
20         A.    I don't remember.  I just
21    remember them saying that the family was
22    there.
23         Q.    You didn't have any interaction
24    with that person?
25         A.    Not that I recall.
```

```
                                            Page 113
 1           POLICE OFFICER DAVIS
 2      Q.    As far as you remember?
 3      A.    Not that I remember.
 4      Q.    I'm stopping at 5:48.  Again,
 5  there's interaction between you and the
 6  guy with the hoodie, the Gap hoodie.  Do
 7  you remember what you said to him?
 8      A.    Now that I'm looking at it, I
 9  think that was his son who walked in
10  there.  But if I remember correctly, that
11  was his son.  I'm not going to say that's
12  the guy's brother or the brother of the
13  wife and the uncle.  I said go in the back
14  and worry about the kid, you're agitating
15  him, you're not helping the situation.
16      Q.    You were trying to clear out the
17  area; is that right?
18      A.    Yes.
19      Q.    Up to that point, was the son in
20  the room the entire time?
21      A.    I believe so, because this is
22  the living room area.  Yeah, that's the
23  son, yeah.
24      Q.    I'm going to continue playing.
25  You saw Mr. Singh, like, trip over a
```

Case 23-24, Document 31, 04/19/2023, 3501830, Page120 of 254
**[JA-732]**

```
                                             Page 114
 1              POLICE OFFICER DAVIS
 2    little bit over there?  This is at 6:10 I
 3    stopped it, right before 6:10.
 4        A.    Yeah, he was stumbling.
 5        Q.    What's he trying to do, put on
 6    his shoes?
 7        A.    Yes.
 8        Q.    Prior to that stumble, had you
 9    seen him stumble in this video before
10    that?
11        A.    No.  He was basically leaned up
12    on the couch for most of time.
13        Q.    I'm stopping at 6:33.  Do you
14    see Mr. Singh putting on his shoes?
15        A.    Yes.
16        Q.    How did he do that, can you
17    explain that?
18        A.    He needed help balancing because
19    he more or less didn't want to fall over
20    by bending over.  So he leaned on the wall
21    and wiggled his foot into the shoe while
22    he was at the wall.
23        Q.    So he was coordinated enough to
24    do that on his own?
25        A.    No, he was using a wall for
```

Page 115

```
                         POLICE OFFICER DAVIS
 1
 2   balance.
 3        Q.    I understand.  No one was
 4   assisting him or holding him up while he
 5   was doing that?
 6        A.    The wall was.
 7        Q.    You guys didn't have to assist
 8   him, no other individual, right?
 9        A.    No, no person.  He used the
10   wall.
11        Q.    At 6:38 he's standing up on his
12   own, right?
13        A.    He just released from the wall
14   and put the jacket on, grabbing the
15   jacket.
16        Q.    Right now at 6:38 he's standing
17   up on his own?
18        A.    Yes, this would be the first
19   time he's standing on his own.
20        Q.    He's not leaning against any
21   wall?
22        A.    Yes.
23        Q.    I'm going to continue playing,
24   but you let me know if he's putting on his
25   jacket all by himself.  Is that right, he
```

```
                                           Page 116
 1              POLICE OFFICER DAVIS
 2    put on his jacket all by himself?
 3         A.    Yes.
 4         Q.    He's remaining standing all by
 5    himself now for at least twenty seconds?
 6         A.    Yes.
 7              MS. FADDIS:  Objection.  Go
 8         ahead.
 9         Q.    Do you see an individual handing
10    something to Mr. Singh?
11         A.    Yes.
12         Q.    That's at seven minutes and four
13    seconds.  Do you know what she handed him?
14         A.    It was either his keys or maybe
15    his identification or his phone.  Some
16    sort of personal belonging.
17         Q.    Let me back it up a little.  Do
18    you see what she's handing him there?
19         A.    I cannot tell.
20         Q.    I'm going to continue playing.
21    Mr. Singh is zipping up his jacket now,
22    right?
23         A.    Yes.
24         Q.    Again, also not leaning against
25    a wall while he's doing that, right?
```

Page 117

```
 1            POLICE OFFICER DAVIS
 2       A.    No.
 3       Q.    Can you tell what Mr. Singh is
 4   doing now?
 5            MS. FADDIS:  Where?
 6       Q.    We'll continue playing more.  Do
 7   you see what Mr. Singh has in his hands
 8   right there?
 9       A.    Glasses.
10            MS. FADDIS:  Where?
11            MR. COHEN:  Seven minutes and
12       thirty-eight seconds.
13       Q.    He's holding in his hand
14   glasses; is that right?
15       A.    Yes.
16       Q.    At seven minutes and forty-five
17   seconds do you see what he's doing with
18   his hand to his mouth?
19       A.    Yes.
20       Q.    What is he saying, do you know?
21       A.    No, I don't know.
22       Q.    You don't remember what he said?
23       A.    No.
24       Q.    Is he saying anything to the
25   effect, look, people smoke, they're
```

```
                                              Page 118
 1            POLICE OFFICER DAVIS
 2    drinking, they're in their house, they're
 3    allowed to do that on their own, they
 4    don't need the government to come in and
 5    take him to the hospital?
 6         A.    Not that I recall.  I don't know
 7    what he was saying.
 8         Q.    Do you observe at 7:57 him
 9    making a gesture with his hands behind his
10    back?
11         A.    Yes, this is around when he
12    starts to act a little array.
13         Q.    Do you know what he said right
14    before he put his hands behind his back?
15         A.    Something along the lines of, if
16    you want to take me, take me, arrest me.
17    Or, you know, something along the lines of
18    that.
19         Q.    Was he joking or serious or you
20    couldn't tell?
21         A.    There was no way to tell.
22         Q.    What was Officer Cheema doing in
23    response to that?
24         A.    Now he's acting erratic, now he
25    takes his handcuffs out because he doesn't
```

```
                                         Page 119
  1           POLICE OFFICER DAVIS
  2    seem he's going to be compliant, puts
  3    handcuffs on with regard to safety.
  4         Q.    At any point did you hear
  5    Officer Cheema say to Mr. Singh, look, we
  6    can take you in with handcuffs or you can
  7    go in voluntarily, give him sort of a
  8    choice like that?
  9         A.    No.  Honestly, I don't recall.
 10         Q.    At any point did you hear Mr.
 11    Singh say to Officer Cheema, fine, you
 12    know what, I don't feel like going, but
 13    you're going to have to take me in
 14    handcuffs right before he did that
 15    maneuver?
 16         A.    No.  I don't recall.  I don't
 17    remember the words exactly that were being
 18    said, so I can't say that.
 19         Q.    we're at the eight minute mark.
 20    I'm going to bring you back a little bit
 21    to right when he finishes putting on his
 22    glasses or at 7:56 and play it through.
 23    You saw Mr. Singh make that maneuver with
 24    his hands behind his back?
 25         A.    Yes.
```

```
                                          Page 120
 1            POLICE OFFICER DAVIS
 2       Q.    Then he put his hands in front
 3  of him; is that right?
 4       A.    Yeah.  He kind of doing a lot of
 5  movement, so...
 6       Q.    Then he started to walk towards
 7  the door; is that right?
 8       A.    Can you bring it back a little
 9  bit?
10       Q.    You saw that, where he put his
11  hands behind his back, then in front of
12  him and then he started walking towards
13  the door; is that right?
14       A.    Yes, I believe so.
15       Q.    Did he make a step towards
16  Officer Walker?
17       A.    I mean, she's right there next
18  to him.  I can't say if it was towards
19  her, but he's in her direction.
20       Q.    Did you believe that he was
21  about to attack Officer Walker?
22       A.    I didn't believe anything.  I
23  didn't know what was going to happen.  He
24  was acting erratic.
25       Q.    I understand.  But my question
```

```
                                        Page 121

  1           POLICE OFFICER DAVIS
  2    is, when he walked towards the door in the
  3    direction that Officer Walker is, did you
  4    believe that he was about to attack her?
  5        A.    I had no belief of anything.  I
  6    didn't know what he was going to do at
  7    all.  I didn't have no idea.
  8        Q.    You had no belief that he was
  9    going to attack her, right?
 10              MS. FADDIS:  Objection.
 11        A.    I didn't say that.  I didn't
 12    know what he was gonna do at all.  He
 13    could have done anything.
 14        Q.    He could have done anything at
 15    any point; is that right?
 16        A.    Yes.
 17        Q.    At that very moment, did you
 18    believe he was going to attack Officer
 19    Walker?
 20              MS. FADDIS:  Objection.  You can
 21        answer.
 22        A.    I didn't believe anything.  As I
 23    was saying, I didn't know what he was
 24    going to do.
 25        Q.    Did the thought cross your mind
```

Page 122

1           POLICE OFFICER DAVIS

2    that he might attack Officer Walker?

3        A.    Her specific?  He could have

4    attacked anybody.  Could have been

5    anything.

6        Q.    I'm saying, at the moment that

7    this happened, was your thought that he

8    was going to attack Officer Walker?

9        A.    My thought, no, I didn't think

10   he was going to specifically target

11   Officer Walker.  I didn't know what he was

12   going to do.

13       Q.    At that moment, did you have the

14   thought cross your mind that he might

15   attack you?

16       A.    I said I don't know what he was

17   going to do.  I thought he could attack

18   anybody.

19       Q.    I understand you thought he

20   could attack anybody.  Let's step back.

21             Did you believe he was about to

22   attack someone at that moment?

23       A.    I believe there was a

24   possibility.

25       Q.    Did you believe that was a

Page 123

1             POLICE OFFICER DAVIS

2  possibility at any moment or just that

3  particular moment?

4       A.    That was definitely a higher

5  moment, he's standing up and flailing his

6  arms, I don't know what he's doing back

7  and forth.

8       Q.    Was he flailing his arms at that

9  moment?

10      A.    He's moving his arms back and

11 forth what I mean by flailing.  He's doing

12 things with his hands.  Could have done

13 anything.

14      Q.    Were those hands clenched in any

15 fists?

16      A.    No, I don't believe so.

17      Q.    Was his hands, did they look

18 like they were going to attack anybody at

19 that, moment?

20      A.    A fist isn't the only thing that

21 makes me believe somebody attacking.  Open

22 hands also.

23      Q.    At the moment that he turned

24 around with his hands up, I'm going to

25 move right back before Officer Cheema

Page 124

1              POLICE OFFICER DAVIS
2    actually grabs him, were you moving
3    towards restraining him physically?  Can
4    you see that?  I think we're at -- I moved
5    back to 7:54.  I'll do it right before
6    Officer Cheema grabs him where he made
7    that maneuver and his hands are in
8    front --
9        A.    I was just looking what he was
10   doing with his hands.
11            MS. FADDIS:  Wait for the
12       question.
13       Q.    He made the maneuver, he put his
14   hands forward, and you're looking at him,
15   right, sir?
16       A.    Yes.
17       Q.    We're stopped at 8:02.  Did you
18   make any attempt at that point to restrain
19   him?
20       A.    No.
21       Q.    Why not?
22       A.    At this moment it's seconds,
23   we're also trying to talk to him.
24       Q.    At this point you didn't make an
25   attempt to restrain him at eight minutes

```
                                              Page 125
 1              POLICE OFFICER DAVIS
 2     and two seconds in the video, correct?
 3          A.    No.
 4          Q.    He does the maneuver you just
 5     observed, hands behind his back and then
 6     hands forward; is that right (indicating)?
 7               MS. FADDIS:  Objection.  Go
 8         ahead.
 9          A.    Yes.
10          Q.    You're looking right at him when
11     he's doing that?
12          A.    Yes.
13          Q.    Is it fair to say you didn't go
14     to restrain him until you saw Officer
15     Cheema go and restrain him; is that right?
16          A.    Yes.
17          Q.    And Officer Cheema was your
18     field training officer; is that correct?
19          A.    Yes.
20          Q.    He was the one who was, you
21     know, in terms of seniority amongst the
22     three officers here, he was the one with
23     the highest seniority, right?
24          A.    Yes.
25          Q.    He's a supervisor of sorts at
```

Page 126

```
              POLICE OFFICER DAVIS
 1
 2   that point for you?
 3        A.    Yes.
 4        Q.    Based on your training at the
 5   academy, was there a different method by
 6   which Mr. Singh could have been restrained
 7   given the circumstances?
 8              MS. FADDIS:   Objection.   Go
 9        ahead.
10        A.    No.
11        Q.    Was there not available a less
12   amount of force that could have been used
13   to restrain Mr. Singh there?
14        A.    No.
15        Q.    You believe that the only way to
16   restrain Mr. Singh right there was to slam
17   him down to the ground as Officer Cheema
18   did?
19              MS. FADDIS:   Objection.   You can
20        answer.
21        A.    Well, he took him down.
22        Q.    Could Officer Cheema have put
23   Mr. Singh on top of the couch to the left?
24              MS. FADDIS:   Objection.   Go
25        ahead.
```

Case 23-24, Document 31, 04/19/2023, 3501830, Page133 of 254
**[JA-745]**

```
                                        Page 127
 1           POLICE OFFICER DAVIS
 2      A.      I can't determine what
 3   somebody's body does in a moment of time.
 4   If that's what his body did, then that's
 5   what his body did.  I can't say that he
 6   could have turned him that way and moved
 7   him to the couch or turned him that way or
 8   turned him that way, I can't say.
 9      Q.      Was there an opportunity to put
10   him up against the wall?
11      A.      No, there's no wall.
12      Q.      The little space between where
13   the door and the living room wall is,
14   there's not enough space to put him up
15   against the wall?
16      A.      No, there's no space.  That
17   would be tactically unsound.  He could
18   hurt himself, he could fall out the door.
19      Q.      How about grabbing him and not
20   putting him on the floor, is that
21   possible?
22      A.      Just grabbing him and holding
23   him?
24      Q.      Yes.
25      A.      Yeah, he could have done that.
```

```
                                          Page 128
 1            POLICE OFFICER DAVIS
 2   But he wasn't trying to grab him and hold
 3   him, he was trying to get him in custody.
 4   That's something different.
 5        Q.    But Mr. Singh was super
 6   intoxicated, is that right, sir, according
 7   your testimony?
 8        A.    From my understanding, viewing
 9   him the way he was acting, he was
10   intoxicated.  I can't determine what his
11   level of intoxication was.
12        Q.    What did Mr. Singh say as he did
13   that maneuver with his arms, if you
14   remember?
15        A.    I do not remember.
16        Q.    Did he say anything to indicate
17   that he was going to attack anybody in the
18   room?
19        A.    It was -- I can't remember the
20   specifics, but it was a combination of
21   things, like -- I really don't recall.
22        Q.    Does it appear to you that
23   Officer Cheema was getting impatient with
24   Mr. Singh because he was, you know,
25   continually refusing to the go to the
```

```
                                              Page 129
 1            POLICE OFFICER DAVIS
 2  hospital?
 3            MS. FADDIS:   Objection.   You can
 4       answer.
 5       A.    No, he was quiet the whole time.
 6  Just going through the, you know -- trying
 7  our best to stand in and talk to him.   We
 8  were only there for eight minutes.
 9       Q.    Who was quiet the whole time,
10  Officer Cheema?
11       A.    When I mean quiet, I mean he
12  wasn't being irritated, saying he was
13  irritated or anything like that.
14  Everybody was trying to talk to the guy
15  and explain to him.
16       Q.    I'm going to continue playing.
17  Now I'm stopping at eight minutes, eleven
18  seconds.   It appears that everybody is out
19  of the scene -- not everybody, Officer
20  Cheema, Mr. Singh and yourself are out of
21  the scene during this time period.   Can
22  you tell us what was going on there?
23       A.    I believe Officer Cheema was
24  handcuffing him.
25       Q.    Were you assisting in
```

```
                                              Page 130
 1            POLICE OFFICER DAVIS
 2   handcuffing him?
 3        A.     No.  I don't recall.  I think I
 4   helped pick him up.
 5        Q.     Was Officer Cheema's body on top
 6   of Mr. Singh's body when they got down to
 7   the ground?
 8        A.     I don't remember.
 9        Q.     Do you know what part of Mr.
10   Singh's body hit the ground when he went
11   to the ground?
12        A.     No.  I was behind him.
13        Q.     You were behind him, okay.  You
14   didn't see what part of his body hit the
15   ground?
16        A.     No, sir.
17        Q.     Did Officer Cheema have his legs
18   on top of Mr. Singh's legs or anything
19   like that, to that nature?
20        A.     I don't -- not that I recall.
21        Q.     Did you assist in handcuffing in
22   any way?
23        A.     No, not that I recall.  Had it
24   under control.
25        Q.     I'm going to press play.
```

                                                    Page 131

     1              POLICE OFFICER DAVIS

     2                   Sorry, did Mr. Singh resist

     3       being handcuffed?

     4          A.    I don't believe so.  I think he

     5       was already down on the ground and, you

     6       know, put his hands -- Officer Cheema had

     7       his hands behind his back by the time I

     8       walked over there.  I was behind him, so I

     9       don't know.

    10          Q.    Just prior to that, did you

    11       believe that Mr. Singh was resisting

    12       apprehension by making that maneuver?

    13                   MS. FADDIS:  Objection.  Go

    14          ahead.

    15          A.    Resisting apprehension?  He

    16       wasn't -- before that maneuver he wasn't

    17       being apprehended so how would he resist?

    18          Q.    I understand.

    19                   So the force used on Mr. Singh

    20       to apprehend him was in relationship to

    21       what, that he potentially could be a

    22       danger to other people?

    23                   MS. FADDIS:  Objection.  Go

    24          ahead.

    25          A.    The totality of circumstances,

```
                                            Page 132
 1            POLICE OFFICER DAVIS
 2   the way he was acting, standing in the
 3   hallway, his wife right there, he's
 4   turning around, he's doing this, doing
 5   that, he could run out the door, run back,
 6   he could do anything.  So Officer Cheema
 7   grabbed him and put the handcuffs just to
 8   be safe for everybody.
 9        Q.    He used the amount of force
10   necessary to do that in your view?
11        A.    Yes.
12        Q.    I'll continue playing.  Did you
13   assist in picking Mr. Singh off the floor?
14        A.    Yes.
15        Q.    Did you grab him by the arm to
16   pick him up off the floor?
17        A.    Looks like I kind of wrapped my
18   arm under and helped him lift him up and
19   used his legs mostly.
20        Q.    I'm going to stop at 8:20.  When
21   you're picking him up, what arm are you
22   picking him up with?
23        A.    What arm am I using?
24        Q.    Which of Mr. Singh's arms are
25   you using to get him up?
```

```
                                            Page 133
 1           POLICE OFFICER DAVIS
 2      A.     Looks like his left arm.
 3      Q.     Do you recall what happened once
 4  you left the apartment?
 5      A.     Took him to the -- as you can
 6  see there, he's not trying to leave still.
 7  And then took him to the back of the
 8  ambulance and took him to, if I'm not
 9  mistaken, Jamaica Hospital.
10      Q.     When you say he's not trying to
11  leave still, what are you referring to?
12  I'll move it back a little bit, start
13  playing from 8:26 and I stopped it at
14  8:29.  Are you referring to when he's
15  putting his leg back there?
16      A.     Yeah.
17      Q.     How much resistance was he
18  giving you?
19      A.     Body resistance.
20      Q.     Was he swinging his arms or
21  swinging his body at any point other than
22  that?
23      A.     He's moving his leg.  He can't
24  swing his arms he was handcuffed.
25      Q.     Did he kick you at any point?
```

Page 134

1               POLICE OFFICER DAVIS

2        A.     No.  I was in front of that.

3        Q.     Other than putting his leg

4   there, do you have any recollection of him

5   doing any other form of resistance?

6        A.     I remember he -- once he got to

7   the hospital there was a concern with the

8   doctors and everything.  But from there to

9   the hospital, I don't remember who road

10  with him or if anybody road with him or

11  what that was.  But I know -- the next

12  thing I remember is he got to Jamaica

13  Hospital, waited to check him in and

14  evaluate him.

15       Q.     You said there was an issue at

16  the hospital?

17       A.     Very argumentative with the

18  doctors going back and forth.

19       Q.     What specifically were they

20  arguing about?

21       A.     I remember that he told me he

22  liked me, that's what I remember, he liked

23  me.  Obviously he thought Officer Cheema

24  was asshole.

25       Q.     He told you at the hospital?

Page 135

1          POLICE OFFICER DAVIS

2      A.    Yeah, that's other what he told

3  me.

4      Q.    Did he tell you that in the

5  house as well, the apartment?

6      A.    I remember him saying something

7  like.  I think that's why I started

8  talking to him more, he told me I can talk

9  to you and not to anybody else.

10 Conversation was going well with me, I

11 guess.

12     Q.    What kind of argument was he

13 having with the hospital?  I know you said

14 you had a conversation with him.  What was

15 he saying with the doctors?

16     A.    He was just arguing, mad he was

17 there.  He didn't, I guess -- he was just

18 arguing with, cursing everybody out.  He

19 just was arguing as to why he was there.

20     Q.    But do you remember specifically

21 a conversation that --

22     A.    No, I don't remember

23 specifically what he was saying.

24     Q.    How long was he in handcuffs

25 for?

```
                                    Page 136
  1          POLICE OFFICER DAVIS
  2      A.    Five minutes, ten minutes.
  3      Q.    It was just from that moment
  4  when he was arrested in his house to when
  5  he got to the hospital?
  6      A.    Yes.  He went straight from
  7  there to Jamaica Hospital, if I'm not
  8  mistaken.
  9      Q.    When you got to Jamaica
 10  Hospital, who took off the handcuffs?
 11      A.    I don't remember.
 12      Q.    How long did you guys remain at
 13  Jamaica Hospital?
 14      A.    Couple of minutes, until he --
 15  until they, like, how you say, intake
 16  nurses and everybody checked him in.
 17      Q.    How long did you remain there
 18  when he was at the hospital?
 19      A.    Until -- a couple of minutes,
 20  until they said that he was, you know, a
 21  patient there.
 22      Q.    Did he need to be restrained at
 23  the hospital?
 24      A.    That's not on us.
 25      Q.    Did you ride with him in the
```

```
                                           Page 137
 1           POLICE OFFICER DAVIS
 2   truck?
 3       A.    I don't know who road with him.
 4       Q.    But did one of you three road
 5   with him in the truck?
 6       A.    I honestly don't remember.
 7       Q.    Do you know if he was handcuffed
 8   while he was in the ambulance?
 9       A.    Honestly, I don't remember that.
10       Q.    When did you become aware that
11   there was a lawsuit filed in this matter?
12       A.    End of October, I would say.
13       Q.    October of --
14       A.    This year.
15       Q.    You didn't know that prior?
16       A.    No.
17       Q.    Is that the first time you
18   thought about this incident again since it
19   happened?
20       A.    Yes.
21            MR. COHEN:  I don't have any
22        other questions.
23       A.    I'll make one correction.
24   Earlier you asked me where I was doing the
25   Zoom call from.  I thought you were asking
```

```
                                          Page 138
 1           POLICE OFFICER DAVIS
 2    the address.  This is the 107th precinct
 3    that I'm in.
 4         Q.    That's fine?
 5         A.    That address I guess that you
 6    asked, that's One PP.
 7         Q.    I understand.  I wanted to know
 8    what precinct you were at.
 9         A.    This is the 107th Precinct.
10         Q.    That's fine.  That's not an
11    important question.  Thank you for
12    clarifying that, Officer Davis.
13         A.    Yeah, I didn't know.
14             MR. COHEN:  Ms. Faddis, do you
15        have any questions for you officer?
16             MS. FADDIS:  I have nothing.
17             MR. COHEN:  Thank you very much
18        for your time.  Have a wonderful day.
19             (Continued on following page to
20        include jurat.)
21
22
23
24
25
```

Page 139

1          POLICE OFFICER DAVIS

2            MS. FADDIS:   Thanks.

3          (Time Noted:   3:38 p.m.)

4

5

6    _____

7            P.O. JUSTIN DAVIS

8

9    Subscribed and sworn to before me

10   this    day of          ,2020.

11

12          NOTARY PUBLIC

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                           Page 140

 1

 2              C E R T I F I C A T I O N

 3

 4

 5

 6      I, BARBARA TORTORA, a Shorthand

 7  Reporter and a Notary Public, do hereby

 8  certify that the foregoing witness,

 9  P.O. JUSTIN DAVIS, was duly sworn on the

10  date indicated, and that the foregoing is

11  a true and accurate transcription of my

12  stenographic notes.

13      I further certify that I am not

14  employed by nor related to any party to

15  this action.

16

17

18

19

20

21

22              BARBARA TORTORA

23

24

25
```

Page 141

1

2                    I N D E X

3   WITNESS          EXAMINATION BY      PAGE

4   J. Davis      Mr. Cohen              4

5

6

7                  E X H I B I T S

8   PLAINTIFF'S

9   EXHIBIT          DESCRIPTION      PAGE

10      1          Memo book          35

11      2          Video              86

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 142

```
 1
 2                    ERRATA SHEET
 3            VERITEXT/NEW YORK REPORTING, LLC
 4
 5   CASE NAME:  SINGH V THE CITY, et al.
 6   DATE OF DEPOSITION:  NOVEMBER 5, 2020
 7   WITNESS' NAME:  P.O. JUSTIN DAVIS
 8
 9   PAGE/LINE(S)/     CHANGE           REASON
10   ____/_____/_____/_____
     ____/_____/_____/_____
11   ____/_____/_____/_____
     ____/_____/_____/_____
12   ____/_____/_____/_____
     ____/_____/_____/_____
13   ____/_____/_____/_____
     ____/_____/_____/_____
14   ____/_____/_____/_____
     ____/_____/_____/_____
15   ____/_____/_____/_____
     ____/_____/_____/_____
16   ____/_____/_____/_____
     ____/_____/_____/_____
17   ____/_____/_____/_____
     ____/_____/_____/_____
18   ____/_____/_____/_____
     ____/_____/_____/_____
19   ____/_____/_____/_____
20        _____
              P.O. JUSTIN DAVIS
21
     SUBSCRIBED AND SWORN TO
22   BEFORE ME THIS_____DAY
     OF_____,2020.
23
     _____
24     NOTARY PUBLIC
25   MY COMMISSION EXPIRES_____
```

Case 1:19-cv-00632-EK-ST   Document 48-8   Filed 11/29/21   Page 143 of 163 PageID #: 966

**[& - ago]**                                                                Page 1

| **&** | | |
| --- | --- | --- |

**&**  2:4

| **0** | | |
| --- | --- | --- |

**00**  87:23
**022818**  36:11
**0750**  36:13,14

| **1** | | |
| --- | --- | --- |

**1**  3:10 35:18,20
  141:10
**1-10**  1:12
**100**  2:15
**10007**  2:16
**1010**  41:15 42:7
  44:21,24 45:2
  48:25 49:4
**102**  38:14
**10279**  2:7
**102nd**  26:7,12
**1063**  44:5
**107th**  138:2,9
**119-02**  50:23
**11:30**  25:19,20
**11:50**  38:7
**130-18**  52:17
**147**  42:7
**155**  7:19
**160**  7:19
**170**  7:15
**18/20**  8:17
**1800**  2:6
**18th**  38:13,20
**19**  1:4
**1:04**  1:17
**1:47**  41:13 42:2
  45:3
**1st**  6:18

| **2** | | |
| --- | --- | --- |

**2**  86:22,24 141:11
**20/20**  8:16

| **2012**  11:15 | | |
| --- | --- | --- |

**2014**  12:12
**2016**  11:9 12:19
**2017**  13:10
**2018**  3:19 6:11
  7:17,21 9:6 10:15
  10:18 24:5 25:10
  25:21,23 26:17
  29:16 34:12 38:21
  52:17
**2019**  25:7
**2020**  1:16 10:3
  25:6 139:10 142:6
  142:22
**2315**  36:12,14
**233**  2:6
**2350**  38:7
**26**  1:20
**27**  25:20 38:21
**28**  3:19 6:11 7:17
  7:21 25:10,23
  26:17 29:16 34:12
  52:17
**2nd**  28:4

| **3** | | |
| --- | --- | --- |

**35**  141:10
**3908**  140:21
**3:16**  100:5
**3:27**  104:13,16
**3:30**  106:12
**3:38**  139:3
**3:43**  107:9

| **4** | | |
| --- | --- | --- |

**4**  141:4
**4:01**  109:16
**4:02**  44:7
**4:32**  110:8

| **5** | | |
| --- | --- | --- |

**5**  1:16 142:6
**5:32**  111:25
**5:47**  49:3
**5:48**  113:4

| **6** | | |
| --- | --- | --- |

**632**  1:4
**6:10**  114:2,3
**6:33**  114:13
**6:38**  115:11,16
**6:45**  93:10

| **7** | | |
| --- | --- | --- |

**7:30**  25:19,23
**7:54**  124:5
**7:56**  119:22
**7:57**  118:8

| **8** | | |
| --- | --- | --- |

**86**  141:11
**8:02**  124:17
**8:20**  132:20
**8:26**  133:13
**8:29**  133:14
**8:50**  87:18

| **9** | | |
| --- | --- | --- |

**90x**  42:4,13,14
**91st**  50:23
**950196**  1:10

| **a** | | |
| --- | --- | --- |

**a.m.**  42:4 44:13
  93:10
**able**  5:25 16:7
  47:23
**academy**  6:17,20
  14:2,4,17,20 15:3
  18:14 84:12 126:5
**accident**  32:19
**accurate**  47:15
  93:13 140:11

**acr**  36:22,24 37:3
**acronym**  37:6
**act**  118:12
**acting**  68:25 79:16
  104:3 118:24
  120:24 128:9
  132:2
**action**  1:4,19 3:16
  140:15
**actions**  20:4 80:16
  81:4,20
**activated**  24:18
**active**  11:13,16
  12:4,19 30:7
**activity**  34:13,24
  35:5 41:12 43:12
**actual**  13:19 30:21
  32:12 52:2
**add**  33:20
**added**  109:7
**address**  3:9 45:12
  46:4 48:24 49:2
  50:21,22 51:6
  52:15,16 54:6,7
  138:2,5
**advisor**  13:18,19
  13:19
**affairs**  13:20
**afternoon**  3:12,13
**aggression**  23:2
  80:23
**aggressive**  23:9
  33:2,11,12 65:15
  69:3 72:25 80:22
  86:4 102:8 104:4
  106:5,8,13
**agitated**  55:20
**agitating**  93:21
  113:14
**ago**  39:7 53:25
  67:3

[agreed - attack] Page 2

| | | | |
|---|---|---|---|
| **agreed** 77:4 79:9 106:2 | 126:20 129:4 | **april** 10:2 | **arriving** 57:9 |
| **agreeing** 94:2,3,17 98:12,13,14 106:14 107:3 | **answered** 9:16 57:25 | **area** 20:20 51:20 113:17,22 | **aside** 59:12,13 |
| **agrees** 105:16 | **answering** 34:16 57:24 90:18 98:19 | **argue** 74:7 | **asked** 60:2 67:22 92:4 93:5 108:8 137:24 138:6 |
| **ahead** 16:17 17:12 19:22 20:13 21:19 34:4 76:22 82:12 102:25 104:7 105:4 109:4 116:8 125:8 126:9,25 131:14,24 | **answers** 3:24 5:22 | **arguing** 60:7 93:22 94:10 95:3 105:10,13,19 134:20 135:16,18 135:19 | **asking** 4:10,16 5:10 17:15,24 57:22 61:5 64:16 73:5 76:25 92:18 96:2,2,23 98:19 104:11 109:19 137:25 |
| | **anticipate** 4:9 | | |
| | **anticipating** 9:16 | **argument** 41:22 74:11 135:12 | |
| | **anybody** 61:9 74:8 84:11 122:4,18,20 123:18 128:17 134:10 135:9 | | |
| | | **argumentative** 23:24 74:10 79:10 134:17 | **aspect** 100:2 |
| **aid** 66:3,4 70:21 | **apartment** 51:20 52:4 54:21 55:19 58:18 60:6 68:5 68:16 88:5,16 89:16,20 90:5 104:17 133:4 135:5 | | **asphyxiate** 22:3,9 69:21 70:3,15 71:12 |
| **aided** 66:3 | | **arises** 85:21 | |
| **al** 142:5 | | **arm** 85:5 132:15 132:18,21,23 133:2 | **asphyxiation** 22:6 69:16 |
| **alcohol** 58:3,6 96:9 | | | |
| **allegations** 66:11 | | **arms** 81:17 85:25 123:6,8,10 128:13 132:24 133:20,24 | **assault** 67:14 110:4 |
| **allowed** 60:14 84:20 101:19 118:3 | **apartments** 51:22 | **array** 118:12 | **assaulted** 67:17,20 101:21 |
| | **appear** 32:7 63:13 128:22 | **arrest** 30:12,15,21 31:4,8 40:13 62:10,22 75:12 76:8,9 96:21 100:3,8 118:16 | **assaults** 67:2 |
| **ambulance** 37:3 76:11 133:8 137:8 | **appearances** 2:2 | | **asshole** 134:24 |
| **amount** 84:25 85:14 126:12 132:9 | **appeared** 58:5 63:17 73:19 | | **assignment** 37:18 |
| | **appears** 88:13 92:14 110:8 129:18 | **arrested** 62:13,18 72:15 74:22,23 79:13 99:12 100:11,15,17 110:13 136:4 | **assist** 68:11 115:7 130:21 132:13 |
| **amounted** 67:3 | | | **assisted** 78:20 |
| **angry** 55:21 60:10 | **apprehend** 131:20 | | **assisting** 98:23 115:4 129:25 |
| **annotate** 42:11 | **apprehended** 131:17 | **arresting** 29:24 | **associate's** 11:7,20 12:23 |
| **annotating** 43:8 43:12 | **apprehension** 131:12,15 | **arrests** 29:17 30:3 30:5,12 39:17,22 40:2 | **associates** 11:4,24 |
| **answer** 4:14,19 5:12,13 9:20 18:16,17 19:5 33:7 66:18 67:7 73:25 80:20 83:9 86:12 89:23 90:7 99:24 101:15,23 102:11 104:2 111:14 121:21 | **approach** 105:2 | **arrival** 68:7 | **assume** 4:20 |
| | **approaching** 105:6 | **arrive** 32:25 | **atlantic** 52:18 |
| | **approximate** 7:12 7:14 | **arrived** 51:15 55:7 55:13 68:15 | **attach** 86:23 |
| | **approximately** 6:8 6:13 11:25 24:9 25:18 27:11 29:22 | | **attack** 82:5,7,10 82:13,19,24 84:8,9 120:21 121:4,9,18 122:2,8,15,17,20 122:22 123:18 |

**[attack - calling]** Page 3

| | | | |
|---|---|---|---|
| 128:17 | 84:4,6 92:3 94:24 | 91:15,23 96:3,7 | 47:19,20 48:3,4,7 |
| **attacked** 83:4 | 95:6,14 97:11,15 | 98:10 101:5,11,16 | 48:12,16,18 49:10 |
| 122:4 | 97:19 98:11 | 101:20,24 103:18 | 50:11 51:9 52:22 |
| **attacking** 82:15 | 100:16 101:25 | 107:14 110:3 | 53:3,16,21,24 |
| 103:15 123:21 | 105:12 106:19 | 111:15,20 112:11 | 54:12,15 141:10 |
| **attempt** 67:13 | 107:6,7 110:12 | 113:21 120:14,20 | **bottom** 33:20 36:7 |
| 73:10 80:25 | 112:15 113:13 | 120:22 121:4,18 | 40:9 |
| 109:21 110:4 | 116:17 118:10,14 | 121:22 122:21,23 | **break** 5:4,14 20:8 |
| 124:18,25 | 119:20,24 120:8 | 122:25 123:16,21 | 44:6,8 48:8 64:8 |
| **attempting** 80:15 | 120:11 122:20 | 126:15 129:23 | 65:5 78:8 |
| 84:17 | 123:6,10,25 124:5 | 131:4,11 | **breakdown** 16:4 |
| **attending** 10:25 | 125:5 131:7 132:5 | **believed** 64:6 69:9 | **breathing** 69:23 |
| 18:23 | 133:7,12,15 | 70:13 71:10,17 | 69:25 70:19 |
| **attention** 16:21 | 134:18 | 72:14 74:21 76:7 | **bring** 68:11 98:16 |
| 25:9 30:24 | **balance** 108:12 | 88:21 100:2,10,17 | 119:20 120:8 |
| **attorney** 2:14 4:24 | 115:2 | 100:18,19 102:6 | **brings** 63:24 |
| 5:5,12 | **balancing** 114:18 | **believing** 62:9 | **broadway** 2:6 |
| **attorneys** 2:5 | **balwinder** 1:6 | 76:5 94:8 | **brother** 91:15,20 |
| **automatically** | 3:15 | **belonging** 116:16 | 113:12,12 |
| 31:17 | **barbara** 1:19 | **bending** 114:20 | **bunch** 37:13 |
| **available** 126:11 | 140:6,22 | **bent** 98:7 | **bus** 36:22 |
| **avenue** 50:23 | **based** 65:10 70:13 | **best** 53:6 98:15 | **buzz** 55:2 |
| 52:18 | 73:6 126:4 | 129:7 | |
| **aware** 18:12 | **basic** 30:19 | **big** 36:5 83:11 | **c** |
| 137:10 | **basically** 61:20 | **bit** 8:3 25:8 114:2 | **c** 140:2,2 |
| | 114:11 | 119:20 120:9 | **call** 24:22 37:4,22 |
| **b** | **basis** 8:19 | 133:12 | 39:6 41:15,16 |
| **b** 141:7 | **bate** 36:4 | **biting** 86:3 | 44:21 46:5 52:4 |
| **bachelor's** 10:19 | **bates** 35:24 | **blacked** 40:8 | 61:6,23 62:22 |
| 10:23 11:2 12:2 | **becoming** 11:10 | **blackout** 36:5 | 77:13,20,23 95:23 |
| 13:8,23,25 | 11:12 81:18 | **block** 84:2 | 109:20 110:15 |
| **back** 9:8,15 15:24 | **beginning** 87:19 | **blocking** 84:7 | 137:25 |
| 22:23 24:22 25:2 | **behavior** 22:13 | **body** 127:3,4,5 | **called** 22:19 30:18 |
| 25:4,6 34:12 | **belief** 121:5,8 | 130:5,6,10,14 | 31:21,24 40:3 |
| 36:18 37:10 38:15 | **believe** 17:19 | 133:19,21 | 45:25 46:6 50:19 |
| 38:18,22 39:24 | 50:22 54:2 55:3,3 | **book** 34:22 35:2,4 | 60:11 62:9 63:18 |
| 43:21 45:20,22 | 56:9 58:23 59:2 | 35:17,17 36:2,8,19 | 72:14 76:5 87:17 |
| 48:15 49:13 51:11 | 65:4,10 71:21 | 38:22 39:4,15 | 99:17 |
| 53:9 61:9 62:20 | 72:16 73:14,21 | 42:19,23 43:7,24 | **calling** 41:19,21 |
| 70:18 72:16 74:10 | 78:20 80:16 82:16 | 44:3 45:8 46:24 | 44:25 45:6 55:20 |
| 74:10 75:25 77:20 | 82:22 83:2 89:2 | 47:4,5,7,9,13,16 | 60:10 110:14 |
| 79:18,20 81:19,20 | | | |

Veritext Legal Solutions
www.veritext.com

Case 1:19-cv-00632-EK-ST   Document 48-8   Filed 11/29/21   Page 146 of 163 PageID #: 969

calls  32:24 41:20
calm  102:2,3,4
  104:9,12,14
  106:22,22
calmed  105:5
canvas  38:20
canvases  38:9
capacity  1:11,13
  13:16 17:2 56:12
car  34:15 37:20,23
  38:3,6 41:3,7,10
  49:19,20 53:12
  55:10
career  30:10
case  5:24 37:8
  74:4 142:5
category  15:10
central  44:23 46:7
certainly  33:22
  34:5
certify  140:8,13
chance  48:11
  107:19
change  5:22 50:14
  142:9
changes  5:25
  50:12
check  37:11
  134:13
checked  74:25
  75:10 94:2 98:13
  99:13,16,17
  105:17 110:21
  136:16
checking  43:7
cheema  1:9 26:3
  27:3,7 28:14,18,22
  49:16 52:22 61:13
  61:16,24 62:25
  63:7 79:4,15 80:7
  80:15 81:2,6 82:9

82:17,23 83:7,22
  88:9,19 92:15
  95:11 105:20
  109:24 111:6,12
  111:17 118:22
  119:5,11 123:25
  124:6 125:15,17
  126:17,22 128:23
  129:10,20,23
  130:17 131:6
  132:6 134:23
cheema's  130:5
child  63:22 65:6
  79:20 112:7,8,10
  112:12,17,19
choice  77:6 119:8
choke  70:9
church  2:15
circles  73:2
circumstance  86:8
circumstances
  19:6,13,14,23
  20:16 23:6 31:6
  32:14 85:17
  110:17 126:7
  131:25
city  1:9 28:16
  142:5
civil  1:4,21 6:24
civilian  24:15
claim  108:4
clarifying  138:12
class  10:10
classes  10:8
clear  113:16
clenched  123:14
click  46:4 49:5
close  69:4 81:23
  101:6,19 102:9,23
  103:4,7,10 104:19
  105:9

closeness  105:2
closer  83:15,16,19
clothes  101:17,25
  102:3 103:3,6,8
  104:10,15 106:24
clue  91:22
code  41:18,23 42:4
  44:20 46:16
cohen  2:4,8 3:6,14
  35:18 78:9,11
  86:21 87:11,16
  95:16 106:11
  117:11 137:21
  138:14,17 141:4
coherent  74:7
  100:20 106:19,22
  106:25
college  11:8,21
  12:22
color  37:20
combination
  128:20
combined  23:7
come  14:6 21:2
  24:22 62:10 70:21
  75:11 94:4,5
  102:4 118:4
comes  32:4,6,15
  32:15 57:19
comfortable  8:4
  104:24
coming  53:15
  63:23 65:13
comment  5:25
comments  73:14
commission
  142:25
commit  20:24 21:9
  68:2
committed  68:6

committing  67:8
community  12:21
companion  40:25
complete  13:9
completed  13:4,22
completely  76:19
compliance  43:4
compliant  79:8
  81:15 90:21,22
  91:5 119:2
computer  38:16
  39:2,10 46:25
concern  134:7
condition  8:12
confer  15:20
confirm  65:21
connection  59:4
consider  21:10
  66:3
considered  108:25
  109:5
constructive  74:11
continually
  128:25
continue  95:10
  97:4 98:6 99:3,4
  100:22 105:23,25
  110:7 111:24
  113:24 115:23
  116:20 117:6
  129:16 132:12
continued  138:19
control  130:24
conversation  43:9
  55:12,16 64:23
  66:23 74:12,20
  91:12 100:20
  102:17 106:20
  107:2 109:17
  110:9,12 111:18
  135:10,14,21

[convince - deposition]                                                   Page 5

| | | | |
|---|---|---|---|
| **convince**  74:15 | **creek**  24:25 | 87:2 140:10 142:6 | 121:1 122:1 123:1 |
| 106:24 108:17 | **crime**  33:15,22 | **davis**  1:18 3:8,12 | 124:1 125:1 126:1 |
| **coordinated** | 34:6 46:18 50:8,9 | 4:1 5:1 6:1,4 7:1 | 127:1 128:1 129:1 |
| 114:23 | 50:11 66:19,25 | 8:1 9:1 10:1 11:1 | 130:1 131:1 132:1 |
| **cops**  61:6 63:18 | 67:4 68:2,6 73:16 | 12:1 13:1 14:1 | 133:1 134:1 135:1 |
| 76:6 | **criminal**  7:3 9:12 | 15:1 16:1 17:1 | 136:1 137:1 138:1 |
| **copy**  35:25 | 10:21 11:4 | 18:1 19:1 20:1 | 138:12 139:1,7 |
| **corner**  100:25 | **cross**  45:16,17 | 21:1 22:1 23:1 | 140:9 141:4 142:7 |
| **corporation**  2:13 | 53:20 121:25 | 24:1 25:1 26:1 | 142:20 |
| **correct**  21:10 | 122:14 | 27:1 28:1 29:1 | **day**  8:6,19,19 |
| 36:16 40:3 43:13 | **currently**  26:11 | 30:1 31:1 32:1 | 25:11 26:2,19 |
| 45:3 54:7 67:9,12 | **curse**  60:14 61:4 | 33:1 34:1 35:1,19 | 34:14,21,24 35:5,8 |
| 67:15 68:2 71:7 | 63:9 97:25 98:4,5 | 35:25 36:1 37:1 | 35:13 36:11,16 |
| 71:19 72:3 89:21 | **curses**  60:12 | 38:1 39:1 40:1 | 37:19,23,24 40:11 |
| 104:20 107:4,17 | **cursing**  23:25 60:9 | 41:1 42:1 43:1 | 43:13 45:14 48:9 |
| 107:21 109:10,14 | 61:22 62:7,24 | 44:1 45:1 46:1 | 49:8 138:18 |
| 125:2,18 | 63:25 91:7 96:15 | 47:1 48:1 49:1 | 139:10 142:22 |
| **corrected**  46:18 | 96:19 97:21 98:2 | 50:1 51:1 52:1 | **days**  28:5 36:6 |
| 47:10,24 50:12 | 98:5 111:22 | 53:1 54:1 55:1 | **deal**  15:12 |
| **correcting**  50:9 | 135:18 | 56:1 57:1 58:1 | **decide**  17:8 |
| **correction**  137:23 | **custody**  76:12 | 59:1 60:1 61:1 | **decided**  14:3 79:2 |
| **corrective**  7:23 | 128:3 | 62:1 63:1 64:1 | 79:6 |
| **correctly**  113:10 | **cut**  21:25 | 65:1 66:1 67:1 | **decision**  77:25 |
| **couch**  21:15,22 | **cv**  1:4 | 68:1 69:1 70:1 | 78:22,24 109:8 |
| 69:13,20 70:5 | | 71:1 72:1 73:1 | **deems**  15:22 |
| 88:18 89:8 93:24 | **d** | 74:1 75:1 76:1 | **defendant**  2:14 |
| 97:6 107:17 | **d**  3:2 141:2 | 77:1 78:1,15 79:1 | 63:6 |
| 114:12 126:23 | **d0153**  35:25 | 80:1 81:1 82:1 | **defendants**  1:14 |
| 127:7 | **d0154**  36:5 | 83:1 84:1 85:1 | **definitely**  59:8 |
| **counsel**  1:22 2:13 | **d0155**  36:20 | 86:1 87:1,4,25 | 123:4 |
| **couple**  3:21 28:15 | **d0156**  37:13 40:9 | 88:1,11 89:1 90:1 | **degree**  10:23 11:2 |
| 38:5 69:12 92:3 | **d0157**  40:9 | 91:1 92:1 93:1 | 11:7,20 12:23 |
| 136:14,19 | **danger**  19:15,17 | 94:1 95:1 96:1 | 13:23 |
| **course**  22:20 | 19:20 20:10,14 | 97:1 98:1 99:1 | **degrees**  11:3 |
| 30:12 33:19 39:4 | 23:22 68:16,23 | 100:1 101:1 102:1 | **denoted**  36:20 |
| 50:13 51:5,7 | 69:9 81:21 101:12 | 103:1 104:1 105:1 | **depends**  49:25 |
| 79:19 | 108:4 131:22 | 106:1 107:1 108:1 | **deployed**  12:12 |
| **court**  1:2 3:22 | **dangerous**  69:8 | 109:1 110:1 111:1 | **deposition**  1:18 |
| 39:18,20,25 | 89:20 90:4 104:19 | 112:1 113:1 114:1 | 5:21 6:23 27:22 |
| **cover**  36:2 | 104:21,25 | 115:1 116:1 117:1 | 35:19 142:6 |
| | **date**  7:16 27:7 | 118:1 119:1 120:1 | |
| | 35:22 43:25 44:2 | | |

[described - erratic]                                                          Page 6

described  67:3
describing  62:17
description  141:9
detail  39:24
detailed  40:5
details  28:15
  39:13,22 43:16,17
  46:10 53:23
determination
  19:19,25 20:6,10
  22:4,24 31:15
  57:14 58:2 75:5,8
  104:18 108:14
determine  23:21
  57:23 107:20
  127:2 128:10
determined
  102:21
different  12:15
  75:21 104:8
  106:23 126:5
  128:4
direct  25:9 30:23
direction  120:19
  121:3
directly  13:7
directs  5:12
disagree  16:24
disagreeing  79:22
  79:25 98:13,14
discretion  16:22
  17:7
discussed  54:2
discussing  52:25
discussion  87:12
dispatched  46:8,9
dispute  31:14,25
  32:3,5,7,9,13,16
  33:15,17,21 63:14
  63:16,17

disputes  32:21
district  1:2,3
disturbed  15:11
  15:13,16 74:5
  79:23 95:6
doctor  8:7 74:25
  77:19
doctors  134:8,18
  135:15
documentation
  34:19 73:22
documented  33:19
doe  1:12
doing  5:2 10:5
  13:17 30:12 32:17
  43:9,12,20,24 60:6
  61:6,8 64:10
  65:16 66:12 79:16
  80:7,13 96:24
  103:19 110:15
  111:10 115:5
  116:25 117:4,17
  118:22 120:4
  123:6,11 124:10
  125:11 132:4,4
  134:5 137:24
domestic  30:5,11
  30:13,17,24 31:3,7
  31:9,10,16,18,20
  31:22 32:2,3,4,7,9
  32:11,15,17,18,21
  32:22 33:2,4,9,14
  33:25 34:7,9
  65:23,25 66:14
  73:22
door  41:20 55:4,6
  93:6 120:7,13
  121:2 127:13,18
  132:5
dressed  66:24 99:2

drink  57:21,22,24
  96:3,6,8,14
drinking  118:2
drive  8:21 49:12
  49:12
driving  8:25 49:8
  49:17
drove  51:17
drunk  57:12,19
  59:20 64:3 75:20
  93:24 94:18 99:21
due  20:6
duly  3:3 140:9
duty  3:19 11:13,16
  12:4,19 25:14
  37:21
dwellings  51:21,25
  52:9

e

e  2:12 140:2 141:2
  141:7
earlier  72:12
  88:20 137:24
easier  98:24
easily  39:7,15
eastern  1:3
education  9:4
  10:17 11:22 13:2
educational  11:3
effect  21:2,8
  117:25
eight  6:13 11:25
  88:3 89:12 90:11
  90:25 117:12
  119:19 124:25
  129:8,17
either  33:13 50:5
  116:14
eleven  25:18
  129:17

emotional  16:3
emotionally  15:11
  15:13,16 74:4
  79:23 95:6
emotions  55:22
employed  140:14
employment  11:11
  24:18
ems  15:20,21,22
  15:25 16:5,8,13,19
  16:24 17:4,16,20
  17:23 20:21 36:23
  37:2 46:8 55:4,8
  55:13,23 56:8,10
  56:13,21,23 57:21
  59:23 66:4,20
  71:18 75:4 77:10
  77:12,20,24 81:14
  81:19,20,22 84:10
  89:9,10,12 91:19
  92:24 94:3 107:23
  109:12 110:16
encounter  15:15
endanger  65:6
ended  50:2,4,5,5
engaging  22:13
english  61:10,22
  63:9 97:13,16,18
  97:20,23,24
entail  15:8
entailed  38:12
  95:21
entire  12:6 66:21
  67:24 68:4,9 93:7
  98:2 102:16
  104:17 113:20
entitled  1:19
equivalent  61:21
errata  142:2
erratic  102:7,22
  104:3 118:24

[erratic - follows]                                                                Page 7

| | | | |
|---|---|---|---|
| 120:24 | explaining 47:19 | familiar 52:8 | final 42:12 50:14 |
| escort 15:24 | 55:17 57:3,4,8 | family 14:7 63:16 | finalize 32:17 |
| especially 22:5 | 62:21 75:9 93:23 | 81:14 112:21 | 42:10 |
| 53:11 80:11 95:5 | 95:25 99:11 | far 98:3 100:25 | finalized 48:2 |
| esq 2:8,12,17,21 | 110:18 | 113:2 | finalizing 42:13 |
| et 1:21 142:5 | explicitly 21:13 | farsighted 8:3 | finally 4:24 79:22 |
| evaluate 95:8 | 64:24 | fast 80:9 | find 49:23 111:16 |
| 134:14 | extent 4:16 | fault 87:8 | 111:16 |
| evaluated 76:17 | eyes 8:12 74:3 | fd 55:4 | fine 110:22 119:11 |
| evaluating 89:25 | | fear 64:15,18 70:2 | 138:4,10 |
| evaluation 16:12 | **f** | fearful 64:19,23 | finish 4:13 9:25 |
| 17:25 18:6,24 | | 64:25 73:2,8,20 | 11:24,25 13:7 |
| 68:15,22 | f 140:2 | february 3:18 | finished 9:9,24 |
| evening 10:9 | facility 15:23 | 6:11 7:17,21 9:5 | 11:19 13:23,24 |
| 28:25 38:8 | facing 86:2 92:24 | 10:18 25:10,20,23 | finishes 119:21 |
| evenings 8:24 | fact 17:4 22:11 | 26:17 28:7 29:16 | finishing 49:24 |
| everybody 75:11 | 83:23 | 34:12 38:20 52:17 | first 3:2 15:19 |
| 94:11 129:14,18 | factor 108:25 | federal 1:21 | 26:25 29:20 30:7 |
| 129:19 132:8 | factors 20:22 | feel 39:23 41:5 | 35:24 36:7 58:17 |
| 135:18 136:16 | 109:8 | 72:8 74:2 82:2 | 58:21,22,24 59:16 |
| exact 37:6 45:24 | faddis 2:17 5:20 | 89:19 119:12 | 60:3 65:19 87:24 |
| 51:9 92:21 | 16:16 17:11 18:15 | feeling 72:9 | 88:4 89:4 90:10 |
| exactly 52:7 99:8 | 19:4,21 20:12 | feels 33:11 | 105:7 107:12,15 |
| 112:12 119:17 | 21:18 33:6 34:3 | feet 71:7 107:21 | 115:18 137:17 |
| examination 3:5 | 66:17 67:6 68:18 | 107:24,25 108:21 | fist 123:20 |
| 141:3 | 73:24 76:21 78:7 | 108:24 | fists 123:15 |
| examined 3:4 | 78:10 80:19 82:11 | felt 14:5 79:15 | fit 14:6 |
| excuse 71:9 | 83:8 86:11 87:14 | 80:21 | fitch 2:4 |
| exhibit 35:18,20 | 87:21 89:22 90:6 | female 91:18 | five 7:13,13 78:10 |
| 86:22,24 141:9 | 95:15 99:23 | field 26:20,25 27:3 | 78:11 98:8 117:16 |
| experience 20:7 | 101:14,22 102:10 | 27:15 29:4 49:10 | 136:2 |
| 73:6 | 102:24 103:25 | 49:11 125:18 | flailing 85:25 |
| experiences 11:3 | 104:6 105:3 106:9 | fifteen 7:19 | 123:5,8,11 |
| expires 142:25 | 109:3 111:13 | fifth 45:13 | floor 54:22,25 |
| explain 24:11 | 116:7 117:5,10 | fifty 93:18 98:8 | 70:10 127:20 |
| 74:20,22 75:17,21 | 121:10,20 124:11 | figure 93:7 | 132:13,16 |
| 77:15 79:5 95:23 | 125:7 126:8,19,24 | file 33:24 | floors 51:22 52:3 |
| 99:10 114:17 | 129:3 131:13,23 | filed 137:11 | following 37:12 |
| 129:15 | 138:14,16 139:2 | fill 30:14 32:2 | 138:19 |
| explained 57:11 | fair 44:14 125:13 | 33:16 | follows 3:4 |
| 74:17 76:9 111:23 | fall 15:10 22:2 | | |
| | 70:10 71:14 108:5 | | |
| | 114:19 127:18 | | |

[food - graduated]                                                    Page 8

**food** 12:16
**foot** 103:17,23
  114:21
**force** 75:15 76:19
  84:16,20,22,25,25
  85:3,9,10,11,14
  126:12 131:19
  132:9
**forcibly** 19:7
**foregoing** 140:8
  140:10
**form** 17:11 18:15
  19:4 20:12 23:2
  30:19 33:6 52:3
  66:17 67:6 73:24
  76:21 80:19 82:11
  83:8 86:11 99:23
  101:14 134:5
**forth** 61:9 74:11
  75:25 97:11,15,19
  98:11 100:16
  101:25 105:12
  106:19 110:13
  123:7,11 134:18
**forty** 97:7 105:24
  107:8,16 108:7
  117:16
**forward** 124:14
  125:6
**fought** 76:12
**four** 11:18 42:7
  44:13 106:11,12
  116:12
**fourteen** 99:6
**fourth** 42:9
**friendly** 28:21
  29:13
**front** 36:2 46:25
  64:11 97:17,18
  120:2,11 124:8
  134:2

**frustrating** 9:23
**fuchs** 2:21
**fuck** 61:5 96:23
**fucking** 61:7,23
  62:15
**function** 8:18
**further** 140:13

**g**

**gained** 7:18
**gap** 93:20 94:16
  94:23 95:12
  105:21 113:6
**general** 35:9 46:24
  47:18 91:12
**generalization**
  46:22
**generalizing** 44:24
**generally** 15:14
  29:6 30:3 34:13
  51:24 53:11 56:14
  59:25 91:4 99:9
**gentleman** 105:11
  105:21
**gerald** 2:8 3:14
**gesture** 95:11
  118:9
**getting** 94:25
  98:10 99:12
  100:17 103:3,4
  128:23
**give** 5:23 50:21
  98:25 119:7
**given** 3:24 7:2
  103:16 126:7
**giving** 59:21,23
  133:18
**glasses** 7:24,25
  8:18 117:9,14
  119:22
**go** 3:20 9:8 10:13
  10:16,22 14:4,23

15:22 16:8,16,20
  17:5,9,12,15,17,19
  17:22 18:2,7
  19:21 20:13 21:18
  22:23 24:3,13,18
  24:19 26:24 30:21
  32:16 34:3 37:11
  37:15,21 38:15,18
  38:22 49:12 51:11
  53:9 56:6 57:12
  57:14 59:20 66:13
  72:6,16,23,24
  74:15 75:14,15,18
  75:23 76:4,10,20
  76:22 77:4,11
  78:2 79:9,18
  80:17 82:12 84:11
  93:25 94:4,7,13,20
  95:13 98:12,24
  100:7,13 102:24
  104:6 105:3 106:3
  107:3,6,6 108:17
  109:3,13 110:22
  112:18 113:13
  116:7 119:7 125:7
  125:13,15 126:8
  126:24 128:25
  131:13,23
**goes** 81:14
**going** 3:16,20 5:13
  5:18 9:15 10:12
  12:9 20:2,19,23,24
  21:8,9 22:22
  28:15 30:23 34:12
  35:17,23 36:4
  41:6,25 42:16
  43:6,10 45:16
  49:24 55:18,21
  60:2,4 64:2,3,21
  65:4,18 68:25
  70:8,9,10 71:18

72:6,17,19 73:4
  74:23 75:3,5,9,22
  76:13,19 77:22
  78:4,5 79:24 80:3
  81:18,24 82:6,10
  82:18 84:3 86:17
  86:18,21 87:24
  90:12 92:4,12,18
  93:5,8,15 94:9
  95:7,10 96:2 97:4
  97:11 98:6,11,12
  99:4 100:15,18,22
  101:20 102:17
  105:12,23,25
  106:14 107:6,9
  110:4,7,23 111:24
  111:25 113:11,24
  115:23 116:20
  119:2,12,13,20
  120:23 121:6,9,18
  121:24 122:8,10
  122:12,17 123:18
  123:24 128:17
  129:6,16,22
  130:25 132:20
  134:18 135:10
**gonna** 50:8 62:19
  64:12 76:4 79:17
  79:18 98:16,21
  111:8 121:12
**good** 3:12,13
  78:12
**government** 118:4
**grab** 128:2 132:15
**grabbed** 81:5
  82:17 132:7
**grabbing** 115:14
  127:19,22
**grabs** 124:2,6
**graduated** 6:17

[gray - identification]                                                                Page 9

| | | | |
|---|---|---|---|
| **gray** 94:15 | **handcuffs** 84:23 | **heard** 27:19 41:21 | **hospital** 16:15,20 |
| **ground** 3:21 85:19 | 85:6,13,15,20 | **heart** 50:25 | 16:23 17:6,9 18:3 |
| 86:9 126:17 130:7 | 118:25 119:3,6,14 | **height** 7:12 | 18:7 19:2,7,12 |
| 130:10,11,15 | 132:7 135:24 | **held** 1:19 87:12 | 38:8 54:23 56:5,7 |
| 131:5 | 136:10 | **help** 41:16 44:21 | 57:12,15 59:21 |
| **grown** 7:20 | **handed** 116:13 | 44:25 45:6 58:15 | 68:12 72:18,22,23 |
| **guess** 36:6 37:14 | **handing** 103:5,8 | 59:6 66:21 95:8 | 74:16,24 75:10,14 |
| 38:21 48:20 80:4 | 105:17 116:9,18 | 98:15,25 108:11 | 75:15,18,22,24 |
| 83:14 135:11,17 | **handle** 77:17 | 110:16 114:18 | 76:20 77:4,9,12 |
| 138:5 | **hands** 81:25 86:6 | **helped** 130:4 | 78:2 79:9 93:25 |
| **guide** 14:23,24 | 117:7 118:9,14 | 132:18 | 94:8,14,20 98:12 |
| **guided** 66:20 | 119:24 120:2,11 | **helping** 101:16,24 | 98:17,24 99:16 |
| 77:21,21,24 | 123:12,14,17,22 | 103:2,5 113:15 | 100:4,7,13,18 |
| **guy** 93:20 94:12 | 123:24 124:7,10 | **helps** 8:5 | 102:18 106:3,15 |
| 94:23 95:12 111:4 | 124:14 125:5,6 | **hey** 75:9 77:16 | 106:25 107:4 |
| 113:6 129:14 | 131:6,7 | 98:15 | 108:18 109:10,14 |
| **guy's** 113:12 | **hannah** 2:17 | **high** 58:3 | 110:19,21,24 |
| **guys** 44:14 72:17 | **happen** 50:10 | **higher** 123:4 | 118:5 129:2 133:9 |
| 76:19 77:7 87:20 | 62:19 64:10 70:11 | **highest** 9:3 10:17 | 134:7,9,13,16,25 |
| 100:8 103:11 | 73:9 80:9 104:5 | 125:23 | 135:13 136:5,7,10 |
| 110:3 115:7 | 104:12 120:23 | **history** 11:11 23:8 | 136:13,18,23 |
| 136:12 | **happened** 6:21 | 65:13 66:12 70:7 | **hours** 25:16 |
| **h** | 30:19 34:21,24 | **hit** 71:14 80:11 | **house** 51:17,18,19 |
| **h** 141:7 | 42:2 49:2 65:20 | 130:10,14 | 51:21,23,24,25 |
| **half** 6:8 | 93:13 122:7 133:3 | **hold** 87:10 107:7 | 52:2,5,11 61:7 |
| **hallway** 112:3 | 137:19 | 128:2 | 65:14,16 69:8 |
| 132:3 | **happening** 47:17 | **holding** 115:4 | 79:19,20 91:24 |
| **hand** 80:13 104:9 | 48:5,7 95:4 | 117:13 127:22 | 96:10,14,24 97:3 |
| 104:14 117:13,18 | 100:20 | **hole** 111:4 | 99:21 102:15,21 |
| **handcuff** 19:12 | **harassment** 31:12 | **home** 21:15,21,21 | 107:13 118:2 |
| 78:17,18,23,25 | 67:8 | 31:24 32:8 33:23 | 135:5 136:4 |
| 79:3,6 80:6,15,18 | **harm** 20:2,3,24 | 34:6 50:20 57:19 | **hum** 101:8 |
| 80:25 82:3,18,23 | 21:5,6,17,24 22:8 | 63:23 75:11 76:10 | **hurt** 20:5,5 65:4 |
| 83:7,22 84:13,17 | 22:14,25 71:15 | 94:4,6 96:12,13 | 71:23 72:3 75:19 |
| 84:21 | 72:17,19 110:15 | 110:22 | 127:18 |
| **handcuffed** 81:6,7 | **hat** 88:13 | **honestly** 48:23 | **i** |
| 81:10 86:6 131:3 | **he'll** 64:8 69:13 | 50:24 112:16 | **icad** 45:25 |
| 133:24 137:7 | **head** 50:22 71:14 | 119:9 137:6,9 | **idea** 121:7 |
| **handcuffing** 78:21 | **hear** 60:23 62:5 | **hoodie** 94:15,23 | **identification** |
| 129:24 130:2,21 | 119:4,10 | 95:12 113:6,6 | 35:21 86:25 |
| | | | 116:15 |

| | | | |
|---|---|---|---|
| **identify** 87:14 | **indication** 45:5 | 55:19,25 56:2 | 66:4 68:10 69:18 |
| **illegal** 99:20 | **individual** 16:14 | 70:21 71:22 | **jobs** 32:22 34:17 |
| **ilyssa** 2:21 | 16:20,23 17:5 | 108:14 128:6,10 | 35:10 38:12 43:22 |
| **impatient** 128:23 | 22:11 23:5 50:20 | **intoxicatedness** | 44:15 45:20,22 |
| **important** 3:23 | 69:3 79:6 84:14 | 110:17 | 53:9 |
| 138:11 | 84:18 91:14 93:23 | **intoxication** 70:23 | **john** 1:12 9:14,24 |
| **inaccurate** 47:14 | 100:25 115:8 | 71:11 128:11 | 10:24,25 12:2 |
| **incident** 3:18 6:10 | 116:9 | **investigating** | 13:7,22 |
| 6:21 7:17 24:4 | **individually** 1:10 | 22:18 | **johnson** 2:12 |
| 30:17,24 31:4,7,9 | 1:12 | **irritated** 102:2 | **join** 11:14 |
| 31:10,16,18,19,21 | **individuals** 15:5 | 129:12,13 | **joking** 118:19 |
| 31:22 32:2,11,18 | 15:12,18 | **issue** 42:15 69:15 | **jolted** 79:25 |
| 32:19 33:4,9,10,14 | **inebriated** 65:16 | 75:7 82:3 134:15 | **judo** 95:23 |
| 33:25 34:7,9 | 69:4 70:5 | **issued** 40:21 41:2 | **july** 13:10 |
| 39:16 40:6 50:16 | **influence** 58:3 | **issues** 66:14 75:6 | **jump** 103:13,18 |
| 52:16 53:23 54:3 | 74:5 | 99:15 | **jurat** 138:20 |
| 54:8 59:4,7,10 | **information** 5:11 | **issuing** 40:17 | **justice** 9:12 10:21 |
| 65:23,25 66:14 | 5:11 37:14 38:2 | | 11:5 |
| 73:21,22 78:5 | 39:6,10 53:14 | **j** | **justin** 1:18 3:8 |
| 79:7 93:13 137:18 | 54:17,19 57:2,5,6 | **j** 3:2 141:4 | 139:7 140:9 142:7 |
| **include** 81:13 | 59:22,24,24 60:24 | **jacket** 115:14,15 | 142:20 |
| 138:20 | 60:25 90:16 | 115:25 116:2,21 | |
| **incoherent** 19:9 | **initially** 92:15 | **jail** 94:9 | **k** |
| 20:17 | **initials** 50:13 | **jamaica** 133:9 | **keep** 93:15 101:12 |
| **independent** 16:12 | **inside** 55:9,11 | 134:12 136:7,9,13 | **kept** 57:21 62:7,8 |
| 17:25 18:6,24 | **inspected** 42:19 | **james** 2:12 | 73:4 76:3,5,25 |
| 35:12 41:9,24 | 43:25 | **january** 6:18 28:4 | **keys** 116:14 |
| 50:16 59:9 68:14 | **inspecting** 42:22 | 28:6 | **kick** 133:25 |
| 68:22 | **instance** 65:24 | **jay** 9:14,24 10:24 | **kid** 64:10 94:7 |
| **indicate** 21:16 | **instances** 86:20 | 10:25 12:2 13:7 | 113:14 |
| 23:13 36:10 46:19 | **instructed** 17:3 | 13:22 | **kids** 64:11,12 |
| 47:8 54:8 57:13 | **instruction** 16:10 | **job** 14:6 24:16 | **kind** 8:11 14:19 |
| 58:4 66:25 72:2 | **intake** 136:15 | 32:17,21 37:2 | 15:7 30:3,13 52:8 |
| 128:16 | **intending** 72:2 | 38:15 39:9,12,13 | 60:12 63:3 84:5 |
| **indicated** 38:5 | **intense** 48:14 | 42:9,9,11,11,13 | 84:24 91:16 111:8 |
| 63:2 140:10 | **interact** 15:4 | 44:5,11,17 45:11 | 120:4 132:17 |
| **indicates** 18:14 | **interaction** 93:19 | 45:13,24,25 46:3 | 135:12 |
| 49:15 54:15 | 95:20,21 99:19 | 46:20 47:3,9,16 | **kitchen** 21:23 69:5 |
| **indicating** 23:16 | 112:23 113:5 | 48:2,7,8,21 49:5,6 | 69:7 |
| 125:6 | **intoxicated** 15:5,9 | 49:7,19 50:2,5,19 | **knew** 63:12 92:4 |
| | 21:16 22:7,12 | 51:3,7,9,13,16 | **know** 4:18 8:15 |
| | | 52:19,24 54:2,16 | 9:23 16:6,7 18:19 |

[know - matter]                                                        Page 11

| | l | liked 111:3 134:22 | loud 91:17 |
|---|---|---|---|

18:21 20:19 21:14
21:25 22:12 27:20
34:25 35:3 36:20
37:6,7,9 39:9
41:13 47:2,7
48:23 49:4,7
50:24 52:5,7
53:19 54:4,5,6
55:22,25 56:6,14
56:17,20,21,23
57:21 58:16 60:16
61:3 62:14,21
63:7,25 64:2,12,20
65:18 70:6,7,10
75:7,19 77:13
79:13 80:13 83:12
84:8 86:2 90:9,14
90:17 91:4 92:19
93:3,12,24 94:3,22
95:20 97:9,24
98:9,18 99:7,8,9
99:13,21 106:16
109:17 110:11,16
111:23 112:5,7
115:24 116:13
117:20,21 118:6
118:13,17 119:12
120:23 121:6,12
121:23 122:11,16
123:6 125:21
128:24 129:6
130:9 131:6,9
134:11 135:13
136:20 137:3,7,15
138:7,13
**knowing** 20:4
63:11
**knows** 96:4

**l**

**laid** 70:4,17
**language** 61:10,11
61:14,17 62:16,17
63:8,10 97:14,20
97:25 111:17
**laptop** 87:9
**law** 73:17
**laws** 14:23 73:17
**lawsuit** 137:11
**lay** 22:2 69:20
**laying** 22:6 69:14
**lays** 70:7
**leaned** 114:11,20
**leaning** 115:20
116:24
**learning** 14:21
**leave** 10:11,13,14
24:5,8,14 69:19,19
70:20 73:8 81:15
89:20 90:5 97:2,2
105:16 133:6,11
**leaving** 77:8 79:14
**left** 12:9 55:4
100:25 126:23
133:2,4
**leg** 133:15,23
134:3
**legs** 130:17,18
132:19
**length** 87:15
**lenses** 7:24
**level** 9:3 10:17
56:2 58:3 69:6
70:22 71:10 73:15
102:13,14 105:2
128:11
**lift** 132:18
**light** 8:5
**lighting** 8:13

**liked** 111:3 134:22
134:22
**line** 50:13 142:9
**lines** 118:15,17
**listen** 9:19
**literally** 103:5
**little** 8:3 9:17
17:23 24:9,25
25:8 71:6 114:2
116:17 118:12
119:20 120:8
127:12 133:12
**living** 21:21 58:20
83:10,12 113:22
127:13
**llc** 142:3
**llp** 2:4
**location** 32:8
51:16 55:8 66:15
**long** 6:4,11 11:16
22:16 24:7 28:2
39:6 77:10 135:24
136:12,17
**look** 20:22 22:20
38:15,22,25 39:11
39:12 45:9,20,21
45:24,25 46:3
48:25 49:9 53:19
96:13 117:25
119:5 123:17
**looked** 34:22,25
52:15 53:16 54:15
**looking** 23:4 35:3
42:25 43:21 47:8
49:7 92:23 113:8
124:9,14 125:10
**looks** 36:22 42:18
44:4 95:19 97:5
132:17 133:2
**lot** 65:16 111:10
120:4

**loud** 91:17
**lull** 48:17
**lunch** 44:6,8
**lunged** 103:10
**lunging** 85:22,24
**lying** 76:6,8

**m**

**mad** 135:16
**magnitude** 23:20
**main** 60:3
**making** 21:7 23:12
23:15,18 43:3,4,5
43:7,11,17,18,19
66:10 73:4,15
77:25 81:20 84:9
84:10 118:9
131:12
**male** 55:19
**man** 53:12 98:21
**mandeep** 1:9
**maneuver** 119:15
119:23 124:7,13
125:4 128:13
131:12,16
**manual** 18:20
**march** 10:15 24:5
25:4
**mark** 87:23 88:3
89:12 90:11 91:2
92:13,14 93:19
99:6 100:24
105:25 106:11
107:8 119:19
**marked** 35:21,24
37:13 45:13 86:25
**master's** 9:10,11
9:25
**match** 85:3,9,11
**materials** 18:13
**matter** 6:24 7:3
39:3 77:7 137:11

[mean - oath]                                                        Page 12

**mean** 4:5 22:15 24:2 51:25 60:14 105:19 120:17 123:11 129:11,11
**means** 42:14 46:17
**measure** 70:22
**medical** 15:20,23 16:21,25 17:20 22:4 55:24 66:21 70:6,7,11 74:3,24 76:14,15 90:16
**medically** 99:13
**members** 14:7
**memo** 34:22 35:2 35:4,16,17 36:2,8 36:19 38:22 39:4 39:15 42:19,23 43:7,24 44:3 45:8 46:24 47:4,5,7,9 47:13,16,19,20 49:9 50:11 53:3 53:16,21,24 54:12 54:15 141:10
**memory** 34:23 38:14,17 39:5 42:8 59:9 90:24
**menacing** 67:11
**mentioned** 19:17 23:19 30:11,25 71:13 72:11
**method** 126:5
**midnight** 25:15
**midnights** 27:12 27:16 28:2,6,10
**military** 10:11,13 10:14 13:2 24:5,7 24:13,16,17,19
**mind** 63:18 74:6 74:21 79:21 121:25 122:14

**minimal** 84:25 85:14
**minute** 53:25 95:17,18 96:17 97:6 98:8 99:6 100:23 106:11 119:19
**minutes** 46:13 47:10,11 48:17 78:11 102:16,20 105:8,24 106:12 107:8,15 108:7 116:12 117:11,16 124:25 129:8,17 136:2,2,14,19
**miscellaneous** 41:18,23
**mistaken** 133:9 136:8
**misunderstanding** 100:14
**mom** 91:17
**moment** 50:10 67:3 81:5,7,11 82:5,8,16,22 83:6 83:21 102:7,13 106:2 108:15 110:6 121:17 122:6,13,22 123:2 123:3,5,9,19,23 124:22 127:3 136:3
**moments** 69:12
**months** 6:14,20 11:25 14:16 27:2 27:12 29:20 30:8
**morning** 44:4,10
**mouth** 117:18
**move** 80:5 123:25 133:12

**moved** 124:4 127:6
**movement** 120:5
**moving** 81:17 123:10 124:2 133:23
**multifamily** 51:20 51:25
**multiple** 51:21 52:3 74:18 85:7

| n |
|---|

**n** 3:2 140:2 141:2
**name** 3:7,14 46:2 56:17,20 142:5,7
**nature** 38:6 55:15 130:19
**navy** 11:13,14,17 11:19 12:4
**necessarily** 16:5 17:22 21:12 62:4 90:20
**necessary** 79:2 84:22,25 85:2,15 132:10
**need** 8:21 15:22 16:5,11 17:9 37:15 39:24 53:14 60:24 77:22 85:6 85:7 118:4 136:22
**needed** 37:10 41:5 45:8 59:20,22,24 78:2 94:4 100:7 109:13 114:18
**needing** 66:21
**needs** 16:21 17:5 39:23
**neither** 109:24
**never** 64:24 67:16 67:19,21
**new** 1:3,9,20 2:7,7 2:16,16 3:10,10

6:15 26:23 73:16 73:17 142:3
**ngg** 1:4
**nice** 9:11
**night** 8:2,6 25:17 56:11
**nine** 7:11
**ninety** 46:14,17 50:8
**non** 1:18 46:18 50:8,9,11
**nonviolent** 15:24
**norfolk** 25:3
**normal** 51:5
**notary** 1:20 3:3 139:12 140:7 142:24
**notate** 48:6 49:19
**notation** 36:7 46:12
**note** 36:18 52:23 53:2
**noted** 40:24 139:3
**notes** 37:10 39:5 39:14 40:5,15,22 140:12
**notice** 1:21 108:10
**noting** 36:15
**november** 1:16 142:6
**number** 36:23 37:2 42:7,11 45:19
**nurses** 136:16
**nypd** 10:6 14:11 15:4 18:10 28:19 29:11

| o |
|---|

**o** 140:2
**oath** 7:3,5,6

[object - partner]                                                                          Page 13

**object** 21:23 103:2
**objection** 16:16
　17:11 18:15 19:4
　19:21 20:12 21:18
　33:6 34:3 66:17
　67:6 68:18 73:24
　76:21 80:19 82:11
　83:8 86:11 89:22
　90:6 99:23 100:6
　101:14,22 102:10
　102:24 103:25
　104:6 105:3 106:9
　109:3 111:13
　116:7 121:10,20
　125:7 126:8,19,24
　129:3 131:13,23
**observation** 70:14
　71:21
**observe** 22:10,15
　22:21 23:11,15,18
　34:8 60:5 67:25
　69:22 70:25 71:4
　71:25 118:8
**observed** 33:23
　57:8 65:11 107:25
　125:5
**observing** 71:20
**obtain** 11:6
**obviously** 15:19
　21:22 42:10 46:2
　55:18 57:4,18
　58:16 84:6 85:23
　91:14 110:16
　111:9 134:23
**occasion** 31:20
**occur** 12:11
**occurrence** 30:20
**october** 137:12,13
**offense** 73:16
**office** 13:20

**officer** 1:18 3:8,12
　4:1 5:1 6:1,4,5,12
　6:16 7:1 8:1 9:1
　10:1,6 11:1,11,13
　12:1 13:1 14:1
　15:1,4,16 16:1,11
　17:1,7 18:1 19:1
　20:1 21:1 22:1
　23:1 24:1,13 25:1
　26:1,3,3,15,23
　27:1,3,4,6,16 28:1
　28:13,18,21,25
　29:1,10,21,24 30:1
　31:1 32:1 33:1
　34:1 35:1,19,25
　36:1 37:1 38:1
　39:1 40:1,17,20
　41:1 42:1 43:1,2
　44:1 45:1 46:1
　47:1 48:1 49:1,11
　49:16 50:1 51:1
　51:11 52:1,21,22
　53:1 54:1 55:1
　56:1 57:1 58:1
　59:1 60:1 61:1,13
　61:16,24 62:1
　63:1,7 64:1 65:1
　66:1 67:1 68:1
　69:1 70:1 71:1
　72:1 73:1 74:1
　75:1 76:1 77:1
　78:1,15 79:1,4,15
　80:1,7,14,25 81:1
　81:6 82:1,9,17,19
　82:23 83:1,7,18,21
　84:1 85:1 86:1
　87:1,4,25 88:1,4,8
　88:11,13,15,19
　89:1 90:1 91:1
　92:1,15 93:1 94:1
　95:1,11 96:1 97:1

　98:1 99:1 100:1
　101:1 102:1 103:1
　104:1 105:1,20
　106:1 107:1 108:1
　109:1,24 110:1
　111:1,5,12,16
　112:1 113:1 114:1
　115:1 116:1 117:1
　118:1,22 119:1,5
　119:11 120:1,16
　120:21 121:1,3,18
　122:1,2,8,11 123:1
　123:25 124:1,6
　125:1,14,17,18
　126:1,17,22 127:1
　128:1,23 129:1,10
　129:19,23 130:1,5
　130:17 131:1,6
　132:1,6 133:1
　134:1,23 135:1
　136:1 137:1 138:1
　138:12,15 139:1
**officers** 1:11 14:8
　14:10,14 74:19
　81:13 85:8 94:22
　125:22
**official** 1:11,13
**oh** 38:19
**okay** 3:19 4:2,5,14
　5:6,7,7 9:18,21,22
　31:2 35:15 41:17
　43:15,22 52:19,20
　60:17 61:3 62:18
　69:19 75:2,11
　88:2,8 93:16 99:3
　100:13,19 105:6
　105:15,17 108:16
　130:13
**old** 7:10
**once** 13:21 34:22
　49:4 54:21 109:5

　133:3 134:6
**ones** 77:25
**online** 10:10 30:22
**open** 41:20 55:4
　123:21
**openly** 23:8
**operate** 19:9
**opinion** 68:24 69:2
　70:17 103:3
**opportunity** 5:18
　5:22 127:9
**orally** 3:25
**order** 84:21
**originally** 46:7
**outside** 6:19 28:18
　29:10 52:12 55:8
　55:10
**overdrink** 75:3
**overly** 75:20
**overwhelm** 85:11

**p**

**p.m.** 1:17 139:3
**p.o.** 1:9 3:2 139:7
　140:9 142:7,20
**page** 35:24 36:18
　36:19 37:12,17
　138:19 141:3,9
　142:9
**pants** 98:16,17
　110:10
**paperwork** 30:14
　30:22 33:20 37:11
　49:25
**parents** 14:9
**part** 26:20 108:13
　130:9,14
**particular** 17:4
　26:19 52:10
　111:11 123:3
**partner** 82:19

212-267-6868                                                                         516-608-2400

[partners - procedure]                                                                                   Page 14

**partners** 32:10,22
  33:2
**party** 1:18 31:10
  33:13,16 140:14
**pass** 22:8 70:8
  80:23
**passenger** 49:18
  49:20
**patient** 136:21
**patrol** 14:22,24
  44:14
**pd** 55:5
**peacefully** 76:10
**penal** 14:23 73:16
**pending** 5:10
**people** 61:7 84:4
  109:20 117:25
  131:22
**period** 13:12 28:3
  106:6,17 129:21
**person** 17:16
  19:25 22:21 23:8
  23:9,12,16 33:12
  53:13 81:24 85:7
  85:24 86:4 112:2
  112:13,24 115:9
**personal** 54:19
  116:16
**personnel** 32:20
**phone** 116:15
**physically** 23:14
  66:23 103:4 124:3
**pick** 130:4 132:16
**picking** 132:13,21
  132:22
**place** 3:18 25:2
  85:19
**placed** 76:12 82:3
**places** 69:8
**plaintiff** 1:7 2:5
  3:16

**plaintiff's** 35:20
  86:24 141:8
**play** 87:24 119:22
  130:25
**playing** 92:11
  93:15 95:10 97:4
  98:6 99:3,4
  100:22 105:23
  106:2 111:24
  113:24 115:23
  116:20 117:6
  129:16 132:12
  133:13
**plaza** 3:10 27:24
**please** 60:15
**pocket** 48:11
**point** 5:3 12:11
  26:9 41:12 74:15
  76:7 77:12 78:16
  80:23 81:13 89:3
  91:7 96:16 102:3
  102:14,14,18,19
  103:20 105:7
  107:4 108:12
  109:18,22 113:19
  119:4,10 121:15
  124:18,24 126:2
  133:21,25
**pointing** 95:2 97:5
  97:9 105:13
**points** 98:20
**poisoning** 58:6
**police** 1:11,18 3:8
  3:10 4:1 5:1 6:1
  7:1 8:1 9:1 10:1,6
  11:1,10,12 12:1
  13:1 14:1,2,4,8,9
  14:13,17,20 15:1,3
  15:4,15 16:1,11
  17:1,7 18:1,13
  19:1 20:1 21:1

22:1 23:1 24:1,13
  25:1 26:1,15 27:1
  27:24 28:1 29:1
  29:21 30:1 31:1
  32:1 33:1 34:1
  35:1 36:1 37:1
  38:1 39:1 40:1
  41:1 42:1 43:1
  44:1 45:1 46:1
  47:1 48:1 49:1
  50:1 51:1 52:1
  53:1 54:1 55:1
  56:1 57:1 58:1
  59:1 60:1,10,11
  61:1 62:1,10,22
  63:1 64:1 65:1
  66:1 67:1 68:1
  69:1 70:1 71:1
  72:1,12,15 73:1
  74:1 75:1 76:1
  77:1 78:1 79:1
  80:1 81:1 82:1
  83:1 84:1 85:1
  86:1 87:1,17 88:1
  89:1 90:1 91:1
  92:1 93:1 94:1
  95:1 96:1 97:1
  98:1 99:1 100:1
  101:1 102:1 103:1
  104:1 105:1 106:1
  107:1 108:1 109:1
  110:1 111:1 112:1
  113:1 114:1 115:1
  116:1 117:1 118:1
  119:1 120:1 121:1
  122:1 123:1 124:1
  125:1 126:1 127:1
  128:1 129:1 130:1
  131:1 132:1 133:1
  134:1 135:1 136:1
  137:1 138:1 139:1

**portion** 13:8 30:22
  54:14
**ports** 12:16
**position** 26:14,16
**possibility** 122:24
  123:2
**possible** 52:14,23
  53:2 60:25 127:21
**possibly** 18:20
  20:3 41:4 54:24
**potentially** 70:15
  71:11,23 131:21
**pounds** 7:19
**pp** 27:23 138:6
**practice** 48:6 51:5
**precinct** 26:5,8,12
  27:21 38:13,14,17
  38:20,24 138:2,8,9
**predominantly**
  72:12
**preliminary** 37:14
**prepare** 31:3,7
**prescribed** 8:8
**present** 2:20 37:21
  67:14
**press** 130:25
**pretending** 79:12
  79:13
**pretty** 30:7
**prevent** 103:15
**previous** 36:6
**prior** 10:25 11:10
  11:12 27:7 29:16
  53:15 57:9 65:22
  66:11 68:6 80:14
  114:8 131:10
  137:15
**privileged** 5:10
  111:20
**procedure** 1:21

proceeds 5:24
professional 16:25
17:21 22:5 55:24
70:6,12 74:25
76:14
professionals
15:21
program 11:23
12:20 13:4,6,8,13
13:22 26:20,25
29:5
proposition 18:14
protests 28:16
proximity 69:5
81:23 82:21 83:6
psychiatric 75:6
76:15
public 1:20 3:3
139:12 140:7
142:24
pull 35:16
purposes 39:18,20
39:25
pursuant 1:20
put 35:17 36:8
38:13,16 39:4,8,10
39:14,22 41:3,6,7
44:23 46:24 47:4
47:6 48:19,24
50:3,5,13 52:21,22
53:5 81:19 86:16
86:17 106:24
114:5 115:14
116:2 118:14
120:2,10 124:13
126:22 127:9,14
131:6 132:7
puts 46:10 119:2
putting 43:19 86:9
86:13 110:10
114:14 115:24

119:21 127:20
133:15 134:3

**q**

queensborough
11:5,7,21,23 12:21
13:5,15
question 4:4,13,17
4:18,20,21 5:9,13
9:16,20 17:13,23
18:17 47:22 48:20
60:3 67:23 68:20
68:21 76:18 80:14
83:14 108:16
120:25 124:12
138:11
questioning 4:9
5:4 90:13,14
questions 3:17,24
78:6 90:19 96:2
137:22 138:15
quick 48:18
quickly 9:17 79:14
quiet 129:5,9,11

**r**

r 140:2
radio 32:4,6,14,20
32:24 34:17,18
49:23
raises 69:5
raising 94:25
ran 79:25 83:3
random 74:6,8
rationale 81:24
reach 48:11
reached 82:9
96:13
reacting 80:6,8
reaction 111:12
read 8:2,20

reading 7:25 8:5
real 48:18
really 44:15 90:22
108:11 128:21
reason 14:3 81:9
87:6 111:11 142:9
reasons 4:10 108:3
109:9
recall 39:2 92:2,21
99:25 108:2 112:9
112:25 118:6
119:9,16 128:21
130:3,20,23 133:3
receive 15:11
received 18:10,13
recess 78:13
recognized 56:16
recollection 34:20
35:13 40:10 41:10
41:25 50:16 59:7
89:2 96:11 134:4
recommended 8:8
record 4:11 36:25
87:11,13
recorders 51:10
refer 37:10 39:24
46:16 48:15 63:6
74:4
reference 45:16,17
53:20
referring 41:13
42:5 45:7 111:5
133:11,14
refresh 34:20 39:5
59:6
refused 75:14
76:18,23
refusing 75:23
128:25
regard 15:17
18:25 22:5 119:3

regarding 3:17
regardless 16:13
regards 54:18
regulations 14:22
related 140:14
relationship 28:18
29:10 131:20
relatively 6:15
26:23
released 115:13
remain 136:12,17
remained 89:16
remaining 116:4
remember 25:13
25:25 34:13 35:4
35:6,7 38:11,19
39:15 40:6 48:4
50:18 51:12,15
52:10,12 54:22
57:10 62:8 92:6,8
92:17 111:2
112:12,20,21
113:2,3,7,10
117:22 119:17
128:14,15,19
130:8 134:6,9,12
134:21,22 135:6
135:20,22 136:11
137:6,9
remembering 42:8
remotely 5:2
remove 56:4,5
rephrase 35:11
68:19
report 30:17,24
31:4,7,11,16,18,21
31:22 32:2,11,18
32:19 33:5,9,14,25
34:7 37:4 73:23
reportable 31:12

**reported** 34:5
**reporter** 1:20 3:22 4:11 140:7
**reporting** 142:3
**reports** 65:23
**represent** 3:15
**require** 33:24 34:6
**required** 18:2 19:12 32:10
**requires** 4:4 99:20
**reservist** 24:17,21
**resist** 131:2,17
**resistance** 133:17 133:19 134:5
**resisting** 85:4 131:11,15
**resolved** 42:15
**respect** 8:12 16:14
**responded** 53:10
**response** 92:20,22 118:23
**restrain** 124:18,25 125:14,15 126:13 126:16
**restrained** 126:6 136:22
**restraining** 124:3
**retired** 14:13,15
**return** 24:20
**returned** 12:18
**review** 5:18 34:19
**ride** 136:25
**right** 7:8 8:22 9:5 9:7,9 17:14 19:2 21:5 28:11,25 33:25 37:4 38:3,9 38:23 44:11 45:7 45:10 49:16 50:22 54:12 60:18,21 63:4 67:4,17,20 70:23 72:13 74:6

75:11 77:9 88:23 89:5,8,14,17 90:5 94:16 97:6,7 98:7 98:21 101:7,13,21 102:23 103:9,12 103:20,23 105:11 106:7,7 108:6,22 109:2,25 110:5 113:17 114:3 115:8,12,16,25 116:22,25 117:8 117:14 118:13 119:14,21 120:3,7 120:13,17 121:9 121:15 123:25 124:5,15 125:6,10 125:15,23 126:16 128:6 132:3
**rise** 31:20
**risk** 81:18 85:22 85:24
**road** 134:9,10 137:3,4
**roll** 37:22
**room** 21:21 27:17 58:20 63:12 83:10 83:12 84:5 91:16 112:18 113:20,22 127:13 128:18
**rose** 73:15
**roughly** 25:16
**rule** 1:20
**rules** 1:21 3:21 14:22
**run** 82:6 84:6,8,9 132:5,5
**running** 84:3
**runs** 34:17

**s**

**s** 3:2,2 141:7 142:9
**safe** 132:8
**safety** 64:15,18,20 64:24,25 73:20 81:12 82:2 119:3
**saw** 60:18 66:10 80:4 113:25 119:23 120:10 125:14
**saying** 16:13 20:23 21:4,13,22 23:5,7 31:23 46:7 52:6,8 56:5 58:13 60:8 61:4,17,19,21 62:19,25 63:11,12 65:12,13 66:9,12 70:13,16 74:6,8,13 76:2,2,3,3 77:20 80:24 90:10 91:10 92:8 94:12 96:12 96:22 97:10 99:5 99:9 103:14 104:22 106:16,21 109:18 110:11 111:19,20,21,23 112:21 117:20,24 118:7 121:23 122:6 129:12 135:6,15,23
**says** 16:19 17:5 24:17 38:7 41:15 42:6 77:12 93:10 94:16
**scared** 55:21 63:19,20 64:4 65:17
**scenario** 17:4
**scene** 15:21 32:25 55:24 56:3 77:23 89:13 129:19,21

**scheduled** 36:12
**screaming** 95:2
**screen** 88:2
**sea** 12:10,14,15,17
**search** 39:11
**second** 54:24 88:3 89:12 90:11,25 92:13,14 93:19 99:6 100:24 104:13 105:25 107:8
**seconds** 87:25 95:17,19 96:17 97:7 98:8 102:20 105:8 107:7,16 108:8 116:5,13 117:12,17 124:22 125:2 129:18
**sector** 37:19 46:2
**see** 22:11,21 27:17 33:2 37:16 38:15 38:24 42:6 43:9 46:5 53:19,22 59:14 65:22 66:13 73:10 74:24,25 76:13 87:3,5,6,7 87:19,25 88:3 93:9,11,19 95:7,11 96:9 100:24 107:9 108:13 109:5 112:2 114:14 116:9,18 117:7,17 124:4 130:14 133:6
**seeing** 43:21
**seen** 8:7 56:10,13 56:14 59:3,16 108:6,18 114:9
**send** 5:20
**seniority** 125:21 125:23

[sense - staying]                                                                          Page 17

| | | | |
|---|---|---|---|
| **sense** 77:7 | 82:17,18,24 83:6 | **slurring** 96:18 | **spoke** 56:24 62:16 |
| **separate** 109:21 | 83:15,19,22,24 | **smoke** 117:25 | 63:7 77:17 |
| **seq** 1:21 | 88:17 92:16 93:23 | **social** 28:17 29:9 | **st** 1:4 |
| **sergeant** 42:18 | 94:8,19,25 95:20 | **somebody** 82:7 | **stab** 21:8 72:6 |
| **series** 3:17 | 107:16 110:10 | 84:7 85:8 123:21 | **stamp** 36:4 93:9 |
| **serious** 118:19 | 113:25 114:14 | **somebody's** 127:3 | 95:15 |
| **seven** 6:13 29:22 | 116:10,21 117:3,7 | **someone's** 32:8 | **stamped** 35:24 |
| 29:25 92:14 97:7 | 119:5,11,23 126:6 | 54:19 | **stand** 20:18 58:11 |
| 100:24 102:20 | 126:13,16,23 | **son** 113:9,11,19,23 | 71:4,14 107:10 |
| 105:8 116:12 | 128:5,12,24 | **sorry** 39:19 67:22 | 108:11,13,20 |
| 117:11,16 | 129:20 131:2,11 | 131:2 | 129:7 |
| **sheet** 142:2 | 131:19 132:13 | **sort** 41:16 58:5 | **standing** 58:22,23 |
| **shield** 36:23 | 142:5 | 75:6,7 116:16 | 58:24 66:22 69:13 |
| **shifts** 28:10 | **singh's** 68:15 | 119:7 | 82:13 83:15,16,18 |
| **ship** 12:8 | 82:25 130:6,10,18 | **sorts** 125:25 | 84:5 88:21,22,25 |
| **shirt** 91:21 94:13 | 132:24 | **sound** 86:14 | 89:3,5 115:11,16 |
| 105:22 | **sir** 3:13 7:10,22 | **space** 127:12,14 | 115:19 116:4 |
| **shoe** 114:21 | 8:23 9:2,4 10:4,7 | 127:16 | 123:5 132:2 |
| **shoes** 98:10,18,20 | 12:8 17:13 18:8 | **speak** 5:5 63:10 | **stands** 36:25 37:3 |
| 98:20,22 114:6,14 | 25:11 36:3 124:15 | 77:19 91:25 97:18 | **start** 9:7 35:23 |
| **shorter** 112:2 | 128:6 130:16 | **speaking** 23:3 | 57:7 79:18,24 |
| **shorthand** 1:20 | **sit** 15:25 22:15 | 50:7 57:17 92:25 | 111:20 133:12 |
| 140:6 | 69:13 | 95:24 96:20 97:16 | **started** 53:17 |
| **shortly** 95:16 | **sitting** 21:14 58:21 | **speaks** 111:17 | 70:18 79:10 92:11 |
| **show** 36:4 46:6 | 69:14 81:23 89:7 | **specific** 18:21 | 92:16 106:12 |
| 49:5 78:4,15 | 97:6 107:17 | 34:23 39:22 43:23 | 112:2 120:6,12 |
| 86:18 87:25 | **situation** 22:18 | 45:5,23 50:15 | 135:7 |
| **showing** 22:7 | 48:14 57:3 66:22 | 53:23 62:2 90:24 | **starting** 13:25 |
| 49:14 | 77:16,18 85:21 | 122:3 | 36:14 87:18,23 |
| **shows** 44:2 | 90:3 91:17,18 | **specifically** 35:7,9 | **starts** 118:12 |
| **shrunk** 7:20 | 93:7 95:5,8 104:8 | 38:11 57:9 64:17 | **state** 1:20 74:6 |
| **sick** 75:20 | 104:11 108:8 | 122:10 134:19 | **stated** 54:18 |
| **side** 82:14 92:23 | 113:15 | 135:20,23 | **statements** 21:7 |
| **sign** 73:7 | **situations** 74:18 | **specifics** 24:3 | **states** 1:2 |
| **signature** 140:21 | 80:9 111:7 | 52:13 128:20 | **stating** 37:18 |
| **signed** 37:23,24 | **six** 14:16 26:25 | **specify** 63:3 | **stationed** 12:3 |
| **signs** 42:22 | 29:22,25 46:13 | **speech** 96:18 | 24:24 |
| **similar** 45:2 | 47:10,11 48:17 | **spinoff** 111:8 | **stay** 43:25 77:18 |
| **singh** 1:6 3:15,15 | **sixty** 28:4 30:18 | **spitting** 86:3 | **stayed** 12:6 77:3 |
| 60:5 67:25 68:11 | **slam** 126:16 | **split** 14:21 | **staying** 44:2 |
| 78:17 80:16 82:9 | | | |

Case 23-24, Document 31, 04/19/2023, 3501830, Page166 of 254
**[JA-778]**

**steady** 107:20
**stenographic** 140:12
**step** 120:15 122:20
**steps** 15:17
**stick** 55:5
**stipulations** 1:21
**stood** 107:12
**stop** 40:12,16,18 41:3,8,10 54:18 70:19 92:12 100:5 103:11,19 107:9 111:25 132:20
**stopped** 88:2 109:16 110:8 114:3 124:17 133:13
**stopping** 93:18 95:18 100:23 113:4 114:13 129:17
**stops** 34:15,16 38:6 39:17,21 40:2
**straight** 136:6
**strangulation** 30:6
**street** 2:15
**strike** 73:11 110:4
**stronger** 85:8
**student** 13:18
**study** 13:13
**stuff** 8:13 63:24 64:8 102:5 105:18
**stumble** 114:8,9
**stumbling** 58:12 108:10 114:4
**subscribed** 139:9 142:21
**suffering** 58:5
**suggesting** 77:11

**suggestion** 73:5,5
**suggests** 22:13
**suicidal** 72:9
**suicide** 20:25 21:9
**suite** 2:6
**sum** 37:15
**summer** 25:7
**summons** 40:18 40:21 41:2
**super** 90:22 104:4 128:5
**supervisor** 77:13 77:14,23 125:25
**supplies** 12:16
**supposed** 15:17 18:5 43:5 84:13 84:17 85:18
**sure** 43:3,4,5,7,11 43:17,19 75:2 84:9,10 112:13
**surrounding** 20:20 83:23,25
**suspicion** 69:6
**suspicious** 79:16
**sweatshirt** 93:20
**swing** 133:24
**swinging** 133:20 133:21
**sworn** 3:3 139:9 140:9 142:21
**system** 38:16 39:2 39:10 45:17 48:25
**systems** 45:19,21

**t**

**t** 3:2 140:2,2 141:7
**tactic** 84:2
**tactically** 86:14 127:17
**tactics** 14:25
**take** 5:4 15:17 16:14,22 18:25

19:7,11 65:3 73:6 78:7,10 85:18 86:7,9 98:21 99:15 109:9 118:5 118:16,16 119:6 119:13
**taken** 1:19 6:23 7:7 72:18 78:14
**takes** 118:25
**talk** 63:8 86:19 91:19 95:7,22 112:18 124:23 129:7,14 135:8
**talked** 88:24
**talker** 111:9
**talking** 4:12 23:20 44:18 89:2,9,10,24 91:13,19,19 92:16 95:25 96:16 111:9 111:10 135:8
**target** 122:10
**taser** 37:22
**tax** 1:10
**technically** 51:22
**technique** 95:24
**tell** 15:14 23:16 36:24 46:6 50:18 61:16 63:20 64:4 64:6 72:5,8 73:3 75:13 77:16,18 80:2 83:13 94:9 96:6 97:2 107:23 112:15,17 116:19 117:3 118:20,21 129:22 135:4
**telling** 32:19 57:2 59:19 61:20 62:12 71:19 94:13,17,23 109:13 110:20 111:2,3

**tells** 20:21
**ten** 7:18 136:2
**tenure** 29:20
**terms** 66:20 84:2 125:21
**testified** 3:4 88:21
**testify** 40:3
**testimony** 5:19,19 7:2,7 96:5 98:3 128:7
**thank** 138:11,17
**thanks** 139:2
**thing** 86:5 123:20 134:12
**things** 21:13 28:16 38:6 65:17 74:7,8 81:25 108:9 123:12 128:21
**think** 81:4 82:4,8 113:9 122:9 124:4 130:3 131:4 135:7
**third** 54:24
**thirty** 92:13 117:12
**thought** 60:11 62:9 82:6 96:20 100:8 111:19 121:25 122:7,9,14 122:17,19 134:23 137:18,25
**threat** 23:13,15,17 23:18 62:2,5 63:2 63:3
**threatened** 23:9
**threatening** 33:3 61:25
**threats** 23:12 111:22
**three** 6:8 44:4 53:12,13 74:19 93:18 100:23

[three - video]                                                                 Page 19

102:16,19 103:20
105:8,24 107:8,15
107:16 108:7,7
125:22 137:4
**throw** 70:18
**throwing** 70:25
**time** 4:12 6:10,16
12:7,9,25 13:12,25
22:17 26:5 27:14
31:23 38:25 39:6
39:8,11 45:11
46:9,22,25 47:3,7
47:14 48:4,21
49:22 50:4 51:8
53:5,6 57:20
59:16 65:19 67:24
68:4,9 78:13 93:9
93:13 95:15 96:19
97:21 98:2 103:15
104:17 106:6,10
106:17 107:12
111:15 113:20
114:12 115:19
127:3 129:5,9,21
131:7 137:17
138:18 139:3
**times** 4:8 27:9
43:14,15 74:18
92:3
**title** 87:16
**today** 4:25 5:2,19
5:20,23 7:6 44:18
52:24,25 53:15
**told** 57:17,18
61:25 62:15 63:5
64:17,24 67:16,19
67:21 68:5 90:21
92:3 96:7 134:21
134:25 135:2,8
**top** 37:16 40:9
50:21 126:23

130:5,18
**tortora** 1:19 140:6
140:22
**total** 23:24 47:10
**totality** 19:23
20:16 71:15
131:25
**tour** 12:14,17
25:13,15 36:14,15
53:9
**traffic** 34:16 39:17
39:21 40:2,12,16
40:18 54:18
**trained** 84:12
**training** 14:19
15:2,7,12 18:10,12
18:20,23 20:7
26:20,25 27:4,15
29:5 49:10,11
73:7 125:18 126:4
**transcript** 5:21
45:24 86:22
**transcription**
140:11
**transpired** 58:19
**travel** 16:7,8
**trial** 5:24
**trip** 113:25
**trouble** 69:23
**truck** 16:2 81:19
81:20 137:2,5
**true** 140:11
**trumps** 24:16
**truth** 60:15
**try** 43:24 62:13
74:19 80:5,17
82:7 85:5 95:22
95:23
**trying** 49:23 75:21
83:7 84:2 85:19
91:18 93:6 94:19

95:13 96:20 98:15
98:23,25 99:10
100:8 101:12
106:23 108:17
110:18,20 113:16
114:5 124:23
128:2,3 129:6,14
133:6,10
**turn** 79:17,24 80:5
81:24
**turned** 123:23
127:6,7,8
**turning** 79:14,21
80:10 81:16 132:4
**twenty** 7:11 92:12
92:14 95:19 96:17
100:24 102:20
105:8 116:5
**two** 6:20 27:11
29:20 30:7 32:22
42:4 51:10 56:9
56:23 95:17 99:6
125:2
**type** 7:7 46:2

**u**

**u** 3:2
**um** 101:8
**unable** 58:11,13
**uncle** 91:15,23
113:13
**uncooperative**
57:24
**understand** 3:25
4:5,17,19,22 5:15
6:2 7:5 17:13
47:21 52:5 61:11
61:13 62:11 66:5
74:12 100:12
101:18 115:3
120:25 122:19
131:18 138:7

**understanding**
17:6 18:9,22
31:25 42:21 68:10
100:6 128:8
**understood** 4:21
64:22
**unfamiliar** 24:12
**unfounded** 31:21
32:18 42:16
**uniform** 43:3
**united** 1:2
**unredacted** 54:11
**unsound** 127:17
**unsteadiness**
108:24
**unsteady** 71:6,8,9
107:20,24,25
108:6,21
**upset** 72:11
**use** 8:19 84:17,21
**usually** 44:24 47:6
49:11,21 50:4
73:7

**v**

**v** 3:2 142:5
**vehicle** 51:10
53:13
**verbal** 31:13,19
33:14,17,21 67:2
80:23 95:23
**verbally** 65:14
76:23 80:22
110:19
**veritext** 1:19
142:3
**version** 54:11
**versus** 86:9
**veterans** 13:20
**victim** 33:17 82:15
**video** 59:3,12,13
59:14 60:18,20

[video - zipping]                                                                    Page 20

78:4,16 86:18
87:3,15,17,17,18
87:20 92:15 93:10
93:16 98:9 100:25
110:8 114:9 125:2
141:11
**view** 65:22 67:9,12
132:10
**viewing** 66:2,7
128:8
**violence** 30:5,11
30:13
**violent** 15:25 19:8
64:7 65:14
**virginia** 12:5
24:25
**virtual** 1:19
**virtually** 4:25
**vision** 8:15
**voice** 94:25
**volume** 60:20
**voluntarily** 119:7
**vomiting** 58:9

**w**

**wait** 4:12 9:21
124:11
**waited** 89:17
134:13
**waiting** 55:8,9
**wake** 70:9
**walk** 20:18 76:10
91:16 112:2 120:6
**walked** 90:10 91:8
91:11 93:6 113:9
121:2 131:8
**walker** 26:4 28:25
29:10 40:25 52:21
82:19 83:18 88:15
120:16,21 121:3
121:19 122:2,8,11

**walker's** 51:11
**walking** 79:11
120:12
**wall** 86:10,13,17
114:20,22,25
115:6,10,13,21
116:25 127:10,11
127:13,15
**want** 5:4 7:25 16:6
25:9 31:19 33:18
40:5 60:16 69:19
86:2 95:4 99:15
114:19 118:16
**wanted** 14:6 73:3
100:11 138:7
**wanting** 81:15
**wants** 31:10
**warning** 69:6
**warrant** 33:4,8,24
**warranted** 73:21
80:17 81:6,10
86:7
**watch** 22:16
**way** 23:3,3 42:8
43:21 45:23 46:23
47:18 57:16 67:23
68:24,25 71:16
72:2 73:11 75:16
80:2 84:3 86:15
95:9 96:13 110:5
118:21 126:15
127:6,7,8 128:9
130:22 132:2
**ways** 75:21 106:23
**we've** 73:13
**wear** 7:24,25
**weight** 7:14,16
**weird** 67:23
**went** 12:15,15
13:7 24:4 25:2
42:10 49:6 54:22

72:22 82:23 83:22
97:19 130:10
136:6
**whatsoever**
100:21
**white** 91:21 93:20
94:13
**wife** 55:20 57:17
60:9 62:6 72:17
72:20 73:15 76:5
79:19 80:2 82:25
82:25 83:5,16,19
84:8,10 91:11
94:6 96:12 97:3
97:12 98:19 99:16
100:10 101:5,6
102:8,23 103:22
109:17,22 111:18
113:13 132:3
**wiggled** 114:21
**witness** 1:18 87:22
140:8 141:3 142:7
**wonderful** 138:18
**word** 98:4
**words** 97:25 98:5
119:17
**work** 3:9 13:13,14
24:12 28:2 29:14
36:12 56:12,12
**worked** 26:9 27:6
27:9 28:5,13 29:3
29:4,7
**workers** 55:13
56:8,11,13,21,24
59:23 81:22 84:10
89:13 92:24
107:23 109:13
**working** 10:6
13:11 25:10 26:2
26:6 28:24 29:6
37:19,24 46:3

87:9
**worried** 57:20
63:21,23 64:9
**worry** 113:14
**wrapped** 132:17
**write** 43:23 46:24
47:3,17,18,19,23
48:11,12,14,18
50:10 51:6,9 53:9
**writing** 42:12 47:5
48:2
**wrong** 52:15 61:24
62:14 90:17 99:14
99:20
**wrote** 45:11 47:7
47:15 48:3

**x**

**x** 1:5,15 36:12
141:2,7

**y**

**yeah** 88:8,8
113:22,23 114:4
120:4 127:25
133:16 135:2
138:13
**year** 10:2 11:23
12:20,24 13:4,6
24:9,10 25:5,8
137:14
**years** 6:9 11:18
**yelling** 23:25 60:7
95:2
**yesterday** 59:15
**york** 1:3,9,20 2:7
2:7,16,16 3:10,11
73:16,17 142:3

**z**

**zero** 104:16
**zipping** 116:21

**[zoom - zoom]**                                                                          Page 21

**zoom**   137:25

```
                                            Page 1
 1

 2   UNITED STATES DISTRICT COURT

 3   EASTERN DISTRICT OF NEW YORK

 4   CIVIL ACTION NO.:  19-cv-632 NGG-ST

 5   - - - - - - - - - - - - - - - - - - - -x

 6   BALWINDER SINGH,

 7                        Plaintiff,

 8        -against-

 9   THE CITY OF NEW YORK, P.O. MANDEEP CHEEMA,

10   Tax Id. No. 950196, Individually and in

11   his Official Capacity, and POLICE OFFICERS

12   "JOHN DOE" #1-10, individually and in

13   their Official Capacity

14                        Defendants.

15   - - - - - - - - - - - - - - - - - - - -x

16

                         October 27, 2020

17                        2:31 p.m.

18           DEPOSITION of POLICE OFFICER

     MALINDA WALKER, a Non-Party witness in the

19   above-entitled action, held via Veritext

     Virtual, taken before Barbara Tortora, a

20   Shorthand Reporter and Notary Public of

     the State of New York, pursuant to Rule 26

21   et seq. of the Federal Rules of Civil

     Procedure, Notice and stipulations between

22   Counsel.

23              *      *      *

24

25
```

```
                                                    Page 2
 1

 2    APPEARANCES:

 3

 4        COHEN & FITCH LLP

 5             Attorneys for Plaintiff

 6             233 Broadway, Suite 1800

 7             New York, New York 10279

 8        BY:  GERALD COHEN, ESQ.

 9

10

11

12        JAMES E. JOHNSON, ESQ.

13             CORPORATION COUNSEL

14             Attorney for Defendant

15              100 Church Street

16             New York, New York 10007

17        BY:  HANNAH FADDIS, ESQ.

18

19

20

21

22                 *       *       *

23

24

25
```

```
                                          Page 3
 1
 2            (Plaintiff's Exhibit 1 was
 3       marked for identification, as of this
 4       date.)
 5  P.O. M A L I N D A  W A L K E R, having
 6  first been duly sworn by the Notary
 7  Public, was examined and testified as
 8  follows:
 9  EXAMINATION BY
10  MR. COHEN:
11       Q.    What is your name?
12       A.    Police Officer Malinda Walker.
13       Q.    What is your work address?
14       A.    1 Police Plaza, New York, New
15  York.
16       Q.    Good afternoon, Ms. Walker.  How
17  are you doing?
18       A.    Good afternoon.  I'm okay.  And
19  yourself?
20       Q.    Good.  My name is Gerald Cohen,
21  I represent Balwinder Singh, the plaintiff
22  in this action, against the City of New
23  York and Officer Cheema.  You are a
24  nonparty witness in this action, do you
25  understand?
```

Case 1:19-cv-00632-EK-ST   Document 48-9   Filed 11/29/21   Page 4 of 85 PageID #: 990

```
                                            Page 4
 1                      WALKER
 2        A.     Yes.
 3        Q.     At this time I'm going to go
 4   through a series of questions regarding an
 5   incident that happened on February 28th,
 6   2018.  Before I do that I want to just go
 7   over some of the ground rules.
 8             We have a Court Reporter here
 9   whose taking down everything that we're
10   saying, so it's very important that when I
11   ask a question you answer it orally.  Even
12   though I can see you and you can see me,
13   it's important that you make an oral
14   response so that it could be recorded in a
15   deposition transcript.  Do you understand?
16        A.     Yes.
17        Q.     Other thing is, sometimes I may
18   ask a question and you may anticipate what
19   I'm asking, for the same reasons that we
20   need to have you respond orally, I need
21   you to also wait until I'm finished with
22   the question and then answer, again, so
23   that the Court Reporter can type down or
24   write down what we're saying.  Do you
25   understand?
```

```
                                          Page 5
 1                    WALKER
 2        A.    Yes.
 3        Q.    Finally, if I ask a question and
 4  you don't understand the question, can you
 5  please let me know that you don't
 6  understand it, otherwise I'm going to
 7  assume you understood the question.  Okay?
 8        A.    Okay.
 9        Q.    You're also represented by
10  counsel who is present here remotely, Ms.
11  Faddis; is that right?
12        A.    Yes.
13        Q.    There might be a time where I
14  ask you a question and you would like to
15  consult with your counsel.  The only thing
16  I ask is that if you understand the
17  question, you answer it before you take a
18  break to speak with counsel, as long as
19  it's not obviously asking for privileged
20  information or hearsay or information that
21  you're not aware of.  Do you understand?
22        A.    Okay.
23        Q.    Can I just ask how old you are,
24  Officer Walker?
25        A.    I'm thirty-four.
```

```
                                         Page 6
 1                   WALKER
 2        Q.     What's your approximate height?
 3        A.     Five-two.
 4        Q.     I don't usually like to ask
 5   this, but it's important for the
 6   backround, how much do you weigh?
 7        A.     Approximately, 175.
 8        Q.     Were you the same weight on the
 9   date of the incident?
10        A.     No.
11        Q.     How much did you weigh on the
12   day of incident?
13        A.     Approximately, 140.
14        Q.     Do you wear corrective lenses of
15   any kind?
16        A.     No.
17        Q.     Is your eyesight 20/20?
18        A.     I'm not sure, but I think
19   they're pretty good.
20        Q.     When is the last time you had
21   your eyes checked?
22        A.     I guess my last physical.
23   Maybe, like, a year ago.
24        Q.     You had no issues with your
25   eyes?
```

```
                                              Page 7
 1                      WALKER
 2          A.      No.
 3          Q.      What's your highest level of
 4   education?
 5          A.      An associate's degree.
 6          Q.      Where did you get that?
 7          A.      At Berkeley College.
 8          Q.      Is that here in New York City?
 9          A.      Yes.
10          Q.      Prior to Berkeley College, were
11   you in high school?
12          A.      Yes.
13          Q.      What did you get your
14   associate's degree in, did you have a
15   specialized field of any sort?
16          A.      Business management.
17          Q.      Did you work after you went to
18   Berkeley College?
19          A.      Yes.
20          Q.      Where did you work?
21          A.      I worked at Burger King for a
22   few years.
23          Q.      What year did you become a
24   police officer?
25          A.      I joined the academy in 2017.
```

```
                                        Page 8
 1                  WALKER
 2       Q.    What were you doing, what was
 3   your employment just right before you
 4   joined the academy?
 5       A.    I was a correction officer.
 6       Q.    When did you become a
 7   corrections officer?
 8       A.    Probably a year before that.  I
 9   was only there for about a year
10   and-a-half.
11       Q.    A year and-a-half, okay.  You
12   were working at Rikers Island in New York
13   City?
14       A.    Yes.
15       Q.    Prior to becoming a corrections
16   officer, where were you, were you
17   employed?
18       A.    Yes, I was a school safety agent
19   for NYPD.
20       Q.    How long did you do school
21   safety for?
22       A.    Approximately, four years.
23       Q.    I'm not familiar, is school
24   safety agent different than a police
25   officer?  Is it part of the NYPD?  You
```

```
                                              Page 9
 1                    WALKER
 2   said you were with NYPD, but how does the
 3   structure work, if you know?
 4        A.    You're an agent, so you're in
 5   the school and you're dealing with kids.
 6   I don't have a firearm or a vest.
 7        Q.    Is there training for that?
 8        A.    Yes, we go through an academy as
 9   well.
10        Q.    How long is that academy for?
11        A.    It was four months.
12        Q.    Prior to becoming a safety
13   agent, what were you doing?
14        A.    I was unemployed.
15        Q.    What was the last job you held
16   before becoming a safety agent?
17        A.    I was for New York City Off
18   Track Betting before it shut down.  I took
19   bets over the phone.
20        Q.    You did about four years of
21   being a school safety agent and then you
22   joined the, Department of Corrections?
23        A.    Yes.
24        Q.    Did you have to go to another
25   training where you became a corrections
```

```
                                      Page 10
 1                 WALKER
 2    officer?
 3         A.    Yes, I also had to go to an
 4    academy there.
 5         Q.    Any reason why you decided to
 6    leave corrections?
 7         A.    Yeah, the overtime was too much
 8    for me.
 9         Q.    Do you have any prior military
10    experience?
11         A.    No.
12         Q.    Other than the law enforcement
13    experience you already told me about, do
14    you have any other law enforcement
15    experience?
16         A.    No.
17         Q.    You said you became an NYPD
18    police officer in 2017?
19         A.    Yes.
20         Q.    That's the year you joined the
21    academy?
22         A.    Yes.
23         Q.    How many months of the academy
24    did you do?
25         A.    Six months.
```

```
                                            Page 11
 1                    WALKER
 2        Q.     You got instruction at the
 3   academy through school instruction, and
 4   did you get any on-the-job training as
 5   well?
 6        A.     Yes, we did about a week or two
 7   weeks, I believe, of training in the
 8   field.
 9        Q.     Then after you finished the
10   academy, where did you go, what precinct?
11        A.     To the 102 Precinct.
12        Q.     What was your role at the 102
13   Precinct?
14        A.     I'm sorry, what do you mean my
15   role?
16        Q.     What was your assignment, what
17   was your first assignment as a NYPD police
18   officer?
19        A.     Patrol.
20        Q.     Were you part of a field
21   training team or anything like that?
22        A.     Yeah, for the first six months
23   we did field training.
24        Q.     So did you complete your six
25   month academy training in 2017?
```

```
                                             Page 12
 1                    WALKER
 2        A.    Yes.
 3        Q.    What month did you actually
 4   start at the 102nd Precinct?
 5        A.    January of 2018.
 6        Q.    So your first stint being a
 7   full-blown police officer was in 2018 of
 8   January at the 102nd Precinct?
 9        A.    Yes.
10        Q.    Your first assignment was to be
11   on patrol?
12        A.    Yes.  In field training, yes.
13        Q.    Were you generally in a vehicle
14   or on foot patrol or something else when
15   you first started?
16        A.    Every day was kind of different.
17   Some days I would have, like, the
18   stationhouse.  Or some days I go on patrol
19   with a field training officer.
20        Q.    How long were you in that role
21   sort of as a field training position at
22   the 102nd Precinct?
23        A.    For six months.
24        Q.    This incident happened in
25   February of 2018.  Were you in the field
```

```
                                        Page 13
 1                    WALKER
 2   training program at that time?
 3       A.    Yes.
 4       Q.    So you were relatively a brand
 5   new officer at the time, correct?
 6       A.    Correct.
 7       Q.    I want to go into a little bit
 8   of your training prior to this incident.
 9             Either at the academy or on the
10   job, did you get any training on how to
11   interact with individuals you come across
12   that are intoxicated?
13       A.    Yes.
14       Q.    What kind of training did you
15   get with respect to individuals who are
16   intoxicated?
17       A.    In the academy they would
18   basically give us, like, scenarios and
19   tell us how basically to communicate with
20   them.
21       Q.    Okay.
22       A.    But every situation is
23   different, I guess, so...
24       Q.    What were the general guidelines
25   you were supposed to follow, if you
```

```
                                        Page 14
 1                  WALKER
 2   remember, from your training at the
 3   academy?
 4        A.    To talk to the aided and see
 5   what's going on.  And make sure that
 6   they're not injured.  And try to get them
 7   help as best as we could.
 8        Q.    When you say aided, you're
 9   referring to intoxicated individuals as
10   aided?
11        A.    Yes.
12        Q.    Aided is short-term for anybody
13   whose injured or sick in any way?
14        A.    Or needs medical assistance.
15        Q.    You mentioned needs medical
16   assistance.  How do you determine if
17   someone needs medical assistance or how
18   are you supposed to determine whether
19   someone needs medical assistance?
20        A.    Well, if someone is intoxicated
21   and either someone called 911 on them or
22   they're acting out or an ambulance shows
23   up and they say that they're intoxicated,
24   then usually they have to go to the
25   hospital, they need medical attention.
```

```
                                                    Page 15

 1                      WALKER
 2         Q.      You mentioned a few things here
 3    under what circumstances someone needs
 4    medical assistance.   You indicated that if
 5    someone called 911 on them --
 6         A.      Yes.
 7         Q.      -- that's a basis for requiring
 8    them to have medical assistance.
 9         A.      Well, depends on what the person
10    says, how they're acting.
11         Q.      If the person says that they're
12    not necessarily committing a crime in any
13    fashion or not necessarily engaging in any
14    activity that would indicate they're a
15    harm to themselves, would you still
16    require them to get medical attention
17    simply because someone called 911?
18              MS. FADDIS:   Objection to form.
19         But go ahead.
20         A.      Well, usually when someone calls
21    911 there's usually an issue or a problem.
22         Q.      Okay.
23         A.      But if they're just being calm
24    and they just had a few drinks, then no.
25         Q.      I guess my question is, under
```

```
                                          Page 16
 1                    WALKER
 2   what circumstances can you forcibly take
 3   someone to the hospital, as far as you
 4   know?
 5        A.    If it seems like they're gonna
 6   be a harm to themselves or others.
 7        Q.    I guess the next question then
 8   would be, how do you determine if someone
 9   is a harm to themselves or others?
10        A.    Either by their acting out, how
11   they're responding to others or if the
12   person that called feels threatened.
13        Q.    Were you given any guidelines,
14   like written guidelines at the NYPD with
15   respect to how to make the determination
16   whether someone is a harm to themselves or
17   others?
18        A.    I don't remember if I was given
19   any written instructions on that.
20        Q.    Is the fact that someone is
21   intoxicated enough on its own to be
22   something that you considered them to need
23   medical attention?
24            MS. FADDIS:  Objection to form.
25        But you can answer.
```

```
                                           Page 17

 1                  WALKER

 2        A.    No.

 3        Q.    Have you ever taken a deposition

 4   before?

 5        A.    I'm sorry?

 6        Q.    Have you ever been in a

 7   deposition before?

 8        A.    Yes.

 9        Q.    Under what circumstances?

10        A.    For an arrest that I made.

11        Q.    It was a deposition or something

12   involving a criminal case?

13        A.    Well, it was, yeah, for a

14   criminal case.

15        Q.    Was it a civil lawsuit?

16        A.    No.

17        Q.    Is this the first time you were

18   ever involved in a deposition for a civil

19   lawsuit?

20        A.    Yes.

21        Q.    But you answered questions under

22   oath in the criminal case context, is that

23   right, is that what you're referring no?

24        A.    Yes, correct.

25        Q.    Was it a trial or grand jury or
```

```
                                              Page 18
 1                      WALKER
 2    something else?
 3        A.     A trial.
 4        Q.     But in terms of a deposition
 5    regarding a civil matter, is this the
 6    first time you ever had to encounter that?
 7        A.     Yes.
 8        Q.     One of the things I forgot to
 9    instruct you at the beginning, at the end
10    of this deposition you're going to get a
11    copy of the transcript, of the questions
12    and answers, and you're going to have an
13    opportunity to review that.  You may
14    change any of those answers if they're
15    incorrect or inaccurate.  However, if this
16    case would proceed to trial, I'd be able
17    to comment on those changes.  Do you
18    understand?
19        A.     Okay.
20        Q.     In your career, how many arrests
21    have you made so far?
22        A.     I'm not sure of an exact number,
23    but maybe, around twenty.
24        Q.     In the first two months when
25    this happened up until this incident where
```

```
                                          Page 19
 1                  WALKER
 2   you were a police officer, had you made
 3   any arrests?
 4        A.    I believe I probably made one or
 5   two at the time.
 6        Q.    Had you had any other
 7   interactions, other than this incident up
 8   until this incident, from when you started
 9   as a police officer, did you have any
10   other interactions with individuals that
11   were intoxicated?
12        A.    I don't remember.
13        Q.    I want to direct your attention
14   to February 28, 2018.  You were working
15   that day, ma'am?
16        A.    Yes.
17        Q.    Who were you working with?
18        A.    Can I just look at my memo book?
19        Q.    Sure.  I can show it to you, if
20   you like.
21             MS. FADDIS:  You're going to
22        pull up the exhibit so we're looking
23        at the same thing?
24        Q.    I'm showing you what's been
25   marked as Exhibit 1 which is your memo
```

```
                                            Page 20
 1                 WALKER
 2    book.  Do you recognize the front cover
 3    here?
 4         A.    Yes.
 5         Q.    That's a copy of the front cover
 6    of your memo book?
 7         A.    (No response.)
 8         Q.    Yes?
 9         A.    Yes.
10              MR. COHEN:  For the record,
11         that's Bate stamp 150.
12         Q.    I'm showing you Bates stamped
13    151.  Do you recognize this page of the
14    memo book?
15         A.    Yes.  So on this page, according
16    to my memo book --
17         Q.    Should I scroll up or down,
18    what's easier?
19         A.    Right here.  It says I worked
20    with P.O. Cheema and P.O. Davis.
21         Q.    Where are you looking, because
22    --
23         A.    Right under --
24         Q.    -- it's says number 6813 473
25    P.O. Cheema as operator, P.O. Davis as
```

```
                                              Page 21
 1                    WALKER
 2   recorder.
 3        A.    Yes.
 4        Q.    Yes, I see the top here, says
 5   Wednesday, 2/28/18.
 6        A.    Yes.
 7        Q.    Then it just goes over the
 8   general information of the day; is that
 9   right?
10        A.    Yes.
11        Q.    Like roll call, who the sergeant
12   was at the roll call; is that correct?
13        A.    Yes, correct.
14        Q.    Then in your memo book you
15   detail what car you used, how many miles
16   were in the car and who you were working
17   with, right?
18        A.    Yes.
19        Q.    There's also other information.
20   We don't need to go through all of that.
21             Do you have any independent
22   recollection of this incident?
23        A.    No.
24        Q.    So all you have is the notes you
25   reviewed here in your memo book?
```

```
                                           Page 22
 1                    WALKER
 2        A.    Yes, and the video recording I
 3    was shown.
 4        Q.    Prior to looking at that video
 5    recording, and we'll get to that in a
 6    little bit, did you have any independent
 7    recollection of this incident?
 8        A.    No.
 9        Q.    After having seen that video
10    recording, did it refresh your
11    recollection at all as to that incident?
12        A.    Like, a little bit.
13        Q.    Can you expound on that, what do
14    you mean by a little bit?
15        A.    I remember going to that job
16    after I seen the job.
17        Q.    We'll get to the details in a
18    second.  I'm going to stop sharing for a
19    moment and I'll go back to my questioning
20    here.
21              So you worked with P.O. Cheema
22    and P.O. Davis, correct?
23        A.    Yes.
24        Q.    Was Cheema your field training
25    officer?
```

```
                                            Page 23
1                    WALKER
2         A.    Yes.
3         Q.    Did you regularly work with
4    Cheema, Police Officer Cheema in that
5    regard, with him being your field training
6    officer?
7         A.    I mean, I got a different
8    assignment, and sometimes I would get a
9    different field training officer.
10        Q.    But during this time period, in
11   the field training, how often would you
12   say you worked with P.O. Cheema?
13        A.    Maybe two or three nights out of
14   the five nights that we worked.
15        Q.    Did you have a good working
16   relationship with Officer Cheema?
17        A.    Yes.
18        Q.    Do you socialize with him
19   outside of work?
20        A.    No.
21        Q.    How about Officer Davis, was he
22   often scheduled with you during the field
23   training program?
24        A.    Not a lot.
25        Q.    Was he also relatively new
```

Case 23-24, Document 31, 04/19/2023, 3501830, Page193 of 254
**[JA-805]**

```
                                              Page 24
 1                    WALKER
 2   officer?
 3        A.    Yes.
 4        Q.    Was he in your class?
 5        A.    We were in the same academy,
 6   yes.
 7        Q.    That's what I meant, your police
 8   academy class.
 9              Do you still work with Officer
10   Davis from time-to-time?
11        A.    Well, I'm not at that precinct
12   now, I'm at a different location, so no.
13        Q.    What precinct are you at now?
14        A.    This is the 90th Precinct.
15        Q.    What precinct are you working at
16   now?
17        A.    I'm at Brooklyn North Narcotics.
18        Q.    When did you move to Brooklyn
19   North Narcotics?
20        A.    Around June.
21        Q.    Of what year?
22        A.    Of this year, sorry, 2020.
23        Q.    Were you at the 102nd Precinct
24   from January 2018 until June of 2020?
25        A.    Yes.
```

```
                                           Page 25
 1                  WALKER
 2        Q.     Was your role in the 102nd
 3   Precinct the entire time as a patrol
 4   officer?
 5        A.     Yes.
 6        Q.     Did you ask for the transfer to
 7   be Brooklyn Narcotics?
 8        A.     No.
 9        Q.     How did that come about, they
10   just moved you there because they needed
11   help there or something else?
12        A.     Yes, because I'm limited.
13        Q.     Also, congratulations, I
14   understand you're expecting.
15        A.     Thank you.
16        Q.     So you're just doing that
17   because you're currently limited?
18        A.     Yes.
19        Q.     You don't go out on patrol in
20   this new role?
21        A.     No.
22        Q.     Just going back to the date of
23   incident, you were working with those two
24   officers and do you have any recollection
25   of what kind of jobs you had that day?  I
```

```
                                          Page 26
 1                    WALKER
 2   can share the screen again to look at the
 3   memo book, if that helps.
 4        A.    Yeah, I have to look at the memo
 5   book.
 6        Q.    Looking at your memo book, can
 7   you tell us just generally what kind of
 8   jobs you had that day when you came in?
 9        A.    Okay.  So it says to hospital
10   canvas, that could be going to Jamaica
11   Hospital looking for a missing person or
12   an EDP.  Then it looks like a dispute
13   also.
14        Q.    What was your tour of duty, I'm
15   not sure if I asked you that?
16        A.    So I worked from 2315, which is
17   11:15 P.M. at night, until 0750 in the
18   morning.
19        Q.    Were you regularly doing
20   nightshifts at that time?
21        A.    Yes, at that time.
22        Q.    So you did a couple of hospital
23   canvases.  There appears to be a car stop
24   at 2:05 in the morning.
25        A.    Yes.
```

```
                                              Page 27
 1                      WALKER
 2        Q.     Do you know if that resulted in
 3   an arrest or anything like that?
 4        A.     No, I don't remember.
 5        Q.     It's blacked out.  You have no
 6   recollection of making an arrest that
 7   evening or the early morning hours?
 8        A.     It couldn't have been an arrest
 9   because I don't think I would have made it
10   back out on patrol that same day.
11        Q.     Okay.
12               At some point you got called to
13   a house, an apartment; is that right?
14        A.     Correct.
15        Q.     That apartment was the apartment
16   that belonged to the plaintiff in this
17   case?
18        A.     Yes.
19        Q.     Mr. Balwinder Singh; is that
20   right?
21        A.     Yes.
22        Q.     What was the first thing you
23   observed when you got to the apartment?
24        A.     That I don't remember.
25        Q.     Do you remember how you got to
```

```
                                              Page 28
 1                  WALKER
 2   the apartment?
 3        A.    I'm sorry, what do you mean?
 4        Q.    Did you drive, did you walk or
 5   something else?
 6        A.    According to the memo book, it
 7   says Officer Cheema was the operator, so I
 8   guess he drove us to that apartment.
 9        Q.    You don't have any memory of how
10   you got there --
11        A.    No.
12        Q.    -- independent memory?
13             I understand you have your memo
14   book entries, you have notes there for it.
15   But you don't have independent
16   recollection of how you got there; is that
17   right?
18        A.    Correct.
19        Q.    Do you remember what type of
20   building it was, whether it was a large
21   apartment building, a two-family house,
22   something else?
23        A.    I'm not sure.  I don't remember.
24        Q.    Do you remember whether you had
25   to walk up stairs or take an elevator to
```

Page 29

                    WALKER

1

2    get to Mr. Singh's apartment?

3        A.    No, I don't remember.

4        Q.    I have to create a record.  It's

5    okay if you don't remember.  I'm not

6    trying to be annoying.  It's okay if you

7    say you don't remember.  I have to ask

8    these questions.  I suspect you're not

9    going to remember a lot of my questions,

10   but I'm going to still ask them.

11            You don't remember what you

12   first observed when you came into the

13   apartment, is that right, we went over

14   that, right?

15       A.    Right.

16       Q.    Did you speak to anybody when

17   you got into the apartment?

18       A.    Not that I remember, no.

19       Q.    Did Officer Cheema speak to

20   anybody?

21       A.    I don't remember him speaking to

22   anyone.  But he was the field training

23   officer, so he usually did most of the

24   talking.

25       Q.    At that point you were mostly

```
                                                Page 30
 1                    WALKER
 2   observing?
 3        A.    Yes.
 4        Q.    Did you encounter any EMS
 5   personnel when you got to the apartment?
 6        A.    When I watched the video I did
 7   notice EMS was there, yes.
 8        Q.    Right now I'm asking if you have
 9   any independent recollection?
10        A.    No.
11        Q.    Do you remember having any
12   conversation with the EMS?
13        A.    No.
14        Q.    Did you encounter Mr. Singh's
15   wife when you came to the apartment?
16        A.    I don't remember.
17        Q.    You don't remember any
18   conversation you may or may not have had
19   with Mr. Singh's wife?
20        A.    No, I don't remember.
21        Q.    Do you have any recollection as
22   to why you were called to this apartment?
23        A.    According to my memo book, it's
24   aided.
25        Q.    You don't have an independent
```

```
                                          Page 31
1                      WALKER
2    recollection of why you were called?
3         A.    No.
4         Q.    How do you know it was an aided,
5    what's the code on your memo book, what's
6    the entry in your memo book that indicates
7    it was an aided?
8         A.    At 0643 number seven says a
9    10-54.
10        Q.    10-54 is the code for an aided?
11        A.    Or ambulance assistance, yeah.
12        Q.    Ambulance assistance, okay.
13              Does it indicate anywhere in
14   your memo book in what way the individual
15   was an aided?
16        A.    No.
17        Q.    Doesn't indicate what kind of
18   illness they were suffering from; is that
19   right?
20        A.    Doesn't say here, no.
21        Q.    Sitting here today, after having
22   seen the video, you don't have any
23   independent recollection of why you were
24   called to this apartment; is that right?
25        A.    You said after seeing the video
```

```
                                            Page 32
 1                    WALKER
 2   or before?
 3        Q.     After seeing the video.
 4        A.     After seeing the video then I
 5   kind of remember a little bit.
 6        Q.     What do you now know sitting
 7   here today that you remember?  When I say
 8   remember, not that you saw yourself on the
 9   video, what do you actually remember in
10   terms of your interaction of what happened
11   in that apartment on February 28, 2018?
12        A.     After seeing the video, then I
13   remembered that we had a call for an
14   intoxicated male.  And when we went there
15   it was, like -- it was a while before we
16   actually left the apartment to go to the
17   hospital.
18        Q.     But do you remember, again,
19   after seeing the video, what, if any,
20   conversations you had with anybody in the
21   apartment on February 28, 2018?  When I
22   refer to the apartment, Mr. Singh's
23   apartment.
24        A.     No, I don't remember any
25   conversations.
```

```
                                              Page 33
 1                    WALKER
 2        Q.    Other than what you told me that
 3   you spent some time in the apartment
 4   before you went to the hospital, do you
 5   have any other recollection of what
 6   happened or what you observed while you
 7   were there?
 8        A.    I remember him giving a hard
 9   time at first.
10        Q.    Do you know, in what way was he
11   giving a hard time?
12        A.    He didn't want to go to the
13   hospital.
14        Q.    Do you remember why he needed to
15   go to the hospital?
16        A.    Do I remember why he needed to
17   go?
18        Q.    Yes.
19        A.    Because he was intoxicated.
20        Q.    Simply intoxicated or something
21   else?
22             MS. FADDIS:  Objection to form.
23        But you can answer.
24             MR. COHEN:  Let me reask the
25        question.
```

```
                                          Page 34
 1                    WALKER
 2       Q.     Was the only reason he needed to
 3   go to the hospital was because he was
 4   simply intoxicated?
 5              MS. FADDIS:   Same objection.
 6       A.     I don't --
 7       Q.     Pardon me?
 8       A.     I don't remember any other
 9   reason why.
10       Q.     Do you remember if anybody
11   reported to you or reported to Officer
12   Cheema in your presence that Mr. Singh was
13   a danger to himself or others?
14       A.     I don't remember them reporting
15   it in my presence.  But I kind of
16   remember, I think his wife made the phone
17   call.
18       Q.     Do you remember what the
19   substance of that phone call was?
20       A.     That he was drinking, that's all
21   I remember.
22       Q.     Other than drinking, you are
23   aware of no other reason he needed to go
24   to the hospital; is that right?
25       A.     That's right.
```

```
                                           Page 35
 1                    WALKER
 2        Q.    Just so wear clear, you didn't
 3   write anything in your memo book to
 4   indicate why Mr. Singh needed to go to the
 5   hospital?
 6        A.    No, I didn't write anything
 7   else.
 8        Q.    You didn't detail the incident
 9   in any way of what you observed or what
10   you saw, is that right, in your memo book?
11        A.    Correct.
12        Q.    Is it your practice to normally
13   detail this information in your memo book?
14             MS. FADDIS:   Objection to form.
15        You can answer.
16        A.    Usually I do write down what
17   happens in my memo book.  But it says see
18   operator for final, so I believe Cheema
19   wrote down the information in his memo
20   book that night.
21        Q.    So you were relying on Police
22   Officer Cheema to detail the information
23   so it was documented somewhere; is that
24   right?
25        A.    Correct.
```

Case 23-24, Document 31, 04/19/2023, 3501830, Page205 of 254
**[JA-817]**

```
                                            Page 36

 1                    WALKER

 2       Q.     What's your understanding what

 3  the purpose is of a memo book, Officer

 4  Walker?

 5       A.     To make note of things and to --

 6  so that we can always go back and refer to

 7  it.

 8       Q.     It's your understanding that

 9  it's to refresh your recollection in case

10  down the road, like today, you need to be

11  testifying about what occurred on the date

12  of the incident; is that right?

13            MS. FADDIS:  Objection.  You can

14       answer.

15       A.     Right.

16       Q.     Is there anything else you

17  remember from this incident on February

18  28, 2018 that you haven't told me thus

19  far?

20            MS. FADDIS:  Objection to form.

21       But you can answer.

22       A.     No.

23       Q.     You know, I know this is a

24  little frustrating, it happened two years

25  ago, but I want to make sure I got it all
```

```
                                        Page 37

 1                  WALKER
 2    down what you actually remember.  You told
 3    me that you remember being called to this
 4    location for an aided; is that right?
 5         A.    Correct.
 6         Q.    That you remember spending some
 7    time in the apartment, but don't have a
 8    recollection of any of the conversations
 9    you had with any of the individuals in the
10    apartment; is that right?
11         A.    Correct.
12              MS. FADDIS:  Objection to form.
13         You can answer.
14         Q.    You also remember that you were
15    taking the aided to the hospital because
16    he was intoxicated; is that correct?
17         A.    Correct.
18         Q.    You have some recollection that
19    the wife called to have the aided taken to
20    the hospital, but you don't have a memory
21    as to what the wife specifically said with
22    respect to the aided; is that right?
23              MS. FADDIS:  Objection to form.
24         You can answer.
25         A.    Correct.
```

```
                                        Page 38
 1                  WALKER
 2        Q.    This aided, Mr. Singh, wasn't
 3   arrested or charged with anything; is that
 4   correct?
 5        A.    Correct.
 6        Q.    In your experience, I know it's
 7   not very long experience, in your
 8   experience as a police officer, if he had
 9   committed a crime, would he have been
10   charged with something?
11            MS. FADDIS:  Objection to form.
12        But you can answer.
13        A.    I'm sorry, repeat the question.
14        Q.    Let me rephrase the question.
15            If Mr. Singh committed an
16   offense, a violation or crime of any sort,
17   would he have been charged in this
18   situation?
19            MS. FADDIS:  Objection.  You can
20        answer.
21        A.    If he committed a crime, yes, he
22   would have been arrested.
23        Q.    Certainly a domestic violence
24   type of situation, is it accurate to say,
25   the NYPD has a zero tolerance policy and
```

Page 39

```
1                    WALKER
2   must make an arrest if there's an
3   allegation of domestic violence?
4              MS. FADDIS:  Objection to form.
5        You can answer.
6        A.    To my understanding, yes.
7        Q.    Do you know if there was a
8   domestic incident report filed in
9   connection with this incident?
10       A.    Not that I know of.
11       Q.    You didn't prepare a domestic
12  incident report; is that right?
13       A.    Correct.
14       Q.    If a domestic incident report
15  was created, would you have had that
16  marked in your memo book?
17       A.    Yes.
18       Q.    Is there, like, a DIR number,
19  domestic incident report number that you
20  can reference?
21       A.    What do you mean?
22       Q.    I don't know, you know, like
23  summons have a summons number.  I'm
24  wondering if DIRs have the same kind of
25  thing.
```

Page 40

1                    WALKER

2        A.    Once it gets input into the

3    system then, yes, it will have a number.

4    I wouldn't have that number in my memo

5    book.

6        Q.    Under what circumstances are

7    domestic incident reports usually written?

8        A.    I'm sorry, repeat that question.

9        Q.    Under what circumstances are

10   domestic incident reports prepared?

11       A.    If the wife called and said

12   there was a dispute or some type of

13   disagreement, then it would have been

14   prepared.

15       Q.    So you're required to file a DIR

16   when there's some sort of dispute or

17   disagreement between family members?

18       A.    Yes, or an assault or anything.

19       Q.    But there are circumstances

20   under which a DIR is filled out, it's not

21   necessarily a crime and an arrest is not

22   necessarily made; is that correct?

23       A.    I'm sorry, I didn't understand

24   the question.

25       Q.    There are circumstances when a

```
                                              Page 41
 1                    WALKER
 2   DIR is completed, even though there isn't
 3   an arrest made?
 4        A.    Correct.
 5        Q.    The NYPD keeps track of even
 6   arguments if police are called; is that
 7   correct?
 8        A.    Correct.
 9        Q.    Generally when there's an
10   argument between spouses or other family
11   members a DIR is required; is that right?
12        A.    Correct.
13        Q.    I'm going to show you the video.
14   Just let me put that up on my computer.
15   Just give me one second.
16              Just to step back for one
17   second.  You know, I know you don't have a
18   lot of recollection of the incident or the
19   substance of the information given by Mr.
20   Singh's wife.  That said, if knowing what
21   you've already told me about the incident,
22   what you remember, that Mr. Singh's wife
23   called the police or called someone for
24   assistance, would this be a situation
25   which a DIR should have been filled out?
```

Case 23-24, Document 31, 04/19/2023, 3501830, Page211 of 254
**[JA-823]**

```
                                              Page 42
 1                 WALKER
 2            MS. FADDIS:  Objection to form.
 3      Go ahead.
 4      A.    No.  That she was just calling
 5   for help with him, then no, not
 6   necessarily.  If they didn't have any type
 7   of dispute or argument or she didn't
 8   feel -- no injuries or anything, no, it
 9   would not be prepared because he was going
10   to the hospital.
11      Q.    The fact that a DIR was not
12   completed in this particular incident
13   indicates to you that there was no
14   assault, there was no argument, no
15   allegations of domestic violence or
16   dispute in any fashion; is that right?
17            MS. FADDIS:  Objection to form.
18      You can answer.
19      A.    Correct.
20      Q.    I'm going to just open up this
21   video.  Can you see the video in front of
22   you?
23      A.    Yes.
24      Q.    I'm going to start the video and
25   I'm going to pause it once I see you in
```

```
                                           Page 43
  1                    WALKER
  2   the screen or who I believe is you in the
  3   screen.
  4            Actually, before I do that, can
  5   you identify any of the people that you
  6   see in this first shot at zero seconds?
  7        A.    From watching the video, I
  8   believe this is Mr. Singh sitting down in
  9   the blue shirt.
 10        Q.    Do you recognize any of the
 11   other people in the video?  I'm putting my
 12   mouse over an individual with a white gap
 13   shirt.
 14        A.    I don't remember who he is, no.
 15        Q.    After looking at the video, do
 16   you have any idea who that person is?
 17        A.    No.
 18        Q.    Do you even remember
 19   encountering this individual at all?
 20        A.    No.
 21        Q.    There's another individual whose
 22   hand you can make out on the door.  Do you
 23   know who that individual is?
 24        A.    No.
 25        Q.    As you sit here today, you have
```

```
                                              Page 44
 1                    WALKER
 2   no recollection of encountering that
 3   person at all?
 4        A.    No, I don't remember.
 5        Q.    Then there's what appears to be
 6   an individual in an uniform in the bottom
 7   right-hand corner.  Do you have any idea
 8   who that individual is?
 9        A.    It looks like it's EMS.
10        Q.    You can tell by the uniform?
11        A.    Yes.
12        Q.    Do you have any independent
13   recollection of interacting with that
14   person at all?
15        A.    No.  I don't remember
16   interacting with them, no.
17        Q.    EMS was in the apartment when
18   you came in?
19        A.    According to the video, yes.
20        Q.    But you don't have a
21   recollection of that happening?
22        A.    No, I don't remember.
23             MR. COHEN:  Just for the record,
24        this is the police video, it's eight
25        minutes and fifty seconds long.  I'm
```

```
                                              Page 45
 1                    WALKER
 2        going to mark this as Plaintiff's
 3        Exhibit 2 for this deposition.
 4              (Plaintiff's Exhibit 2 was
 5        marked for identification as of this
 6        date.)
 7        Q.    I'm going to hit play.  I'm
 8   stopping at the eight second mark in this
 9   video.  Do you see the two police officers
10   that just first walked in?
11        A.    Yes.
12        Q.    Can you identify them for me?
13        A.    Officer Cheema and Officer
14   Davis.
15        Q.    Cheema is the one with the
16   glasses?
17        A.    With the glasses, yes.
18        Q.    And Davis is a little bit
19   shorter than him to his left and it's the
20   right side from looking onto the screen?
21        A.    Correct.
22        Q.    Did you see yourself walk into
23   the apartment as well?
24        A.    Well, I didn't see my face, but
25   I see somebody else walking in the back.
```

```
                                          Page 46
 1                    WALKER
 2       Q.      I'm going to continue playing.
 3   I'm going to stop it at the forty-five
 4   second mark.  Were you able to identify
 5   yourself from the beginning of the video
 6   until now, to the forty-five second mark?
 7       A.    Yes, I saw my face a little bit.
 8       Q.    That's you standing closest to
 9   the door?
10       A.    Yes.
11       Q.    Do you have any recollection of
12   what was said during the first forty-five
13   seconds of this video by anybody in the
14   apartment?
15       A.    No.
16       Q.    I'm continuing to play.  There
17   was an interaction, it appears from the
18   video, I'm stopping at one minute and four
19   seconds, but just before that an
20   interaction between Officer Cheema and the
21   individual in the white shirt, in the
22   white sweatshirt.  Do you have any idea
23   what was said to that individual?
24       A.    No, I don't know what was said.
25   But it looks like he was telling him to go
```

```
                                        Page 47
 1                    WALKER
 2   back or go in the room.
 3        Q.    But you don't independently
 4   remember that; is that right?
 5        A.    Correct.
 6        Q.    You're just assuming that just
 7   based on the way the two interacted and
 8   the way the individual started to walk
 9   back towards the room?
10        A.    Correct.
11        Q.    Is that typical police procedure
12   that you would ask individuals to clear
13   out of the area?
14        A.    If the person is making the
15   situation worse, yes.
16        Q.    But you have no idea what was
17   being said or what was happening other
18   than what we see from this video?
19        A.    Correct.
20        Q.    I'm going to play from 1:04 and
21   play it for a little bit.  Actually, I'm
22   going to stop here, I'm going to bring it
23   back just a little bit.  I think it's at
24   1:06.  It says 1:09.  I'm at 1:08.  Do you
25   see the individual on the bottom
```

Case 23-24, Document 31, 04/19/2023, 3501830, Page217 of 254
**[JA-829]**

```
                                              Page 48
 1                    WALKER
 2    right-hand corner here (indicating)?
 3         A.    Yes.
 4         Q.    Do you recognize her?
 5         A.    No.
 6         Q.    You don't recognize this as an
 7    EMS person that works in the area?
 8         A.    An EMS worker, but I don't
 9    remember seeing her, no.
10         Q.    You don't know her from other
11    jobs or anything like that, do you?
12         A.    No, she doesn't look familiar.
13         Q.    I'm going to continue playing.
14    I'm stopping at 1:44.  Did you see Officer
15    Davis walk back and forth a couple of
16    times right before that?
17         A.    Yes.
18         Q.    Do you have any idea what he was
19    doing?
20         A.    It looks like he's talking to
21    the EMS workers.
22         Q.    Again, looking at the video up
23    until now, you still have no recollection
24    of what was being said in this video?
25         A.    No.
```

Page 49

1                    WALKER

2        Q.     Do you have any idea what Mr.

3   Singh was saying?

4        A.     No, I don't remember.

5        Q.     I'm stopping at 2:19.  Again,

6   I'm going to ask the same question, were

7   you aware if they were asking him to go to

8   the hospital or anything to that effect?

9        A.     I don't remember.

10       Q.     You don't remember what Mr.

11  Singh was saying and you don't remember

12  what either of the officers you were

13  working with were saying to him?

14       A.     No, I don't remember.

15       Q.     I'm going to play it all the way

16  through and I'm going to ask you one final

17  time so that we don't keep wasting time.

18  I'm going to let it keep playing but ask

19  you a question while it's playing.  Did

20  you see this entire video before this

21  deposition today?

22       A.     Yes.

23       Q.     I'm going to stop it at 3:20.

24  It looks like Officer Cheema is talking to

25  Mr. Singh in this section of the video.

Case 23-24, Document 31, 04/19/2023, 3501830, Page219 of 254

```
                                           Page 50
 1                    WALKER
 2  Do you have any idea what Officer Cheema
 3  was saying to him?
 4       A.    No, I don't remember.
 5       Q.    During this entire incident, did
 6  Mr. Singh threaten you in any way?
 7       A.    Not that I remember, no.
 8       Q.    Did Mr. Singh threaten any of
 9  your fellow officers?
10       A.    Not that I remember.
11       Q.    During this entire incident, did
12  Mr. Singh ever attempt to assault anybody
13  in the apartment?
14            MS. FADDIS:  Objection.  But you
15       can answer.
16       A.    I don't remember.
17       Q.    Did Mr. Singh threaten anybody
18  else in the apartment, did he threaten the
19  guy in the white shirt or his wife in your
20  presence?
21            MS. FADDIS:  Objection to form.
22       A.    I don't remember.
23       Q.    Was Mr. Singh acting violent
24  towards anybody in the apartment?
25       A.    I don't remember.
```

```
                                              Page 51
 1                    WALKER
 2        Q.     Was Mr. Singh saying in any way,
 3   shape or form that he was going to hurt
 4   himself?
 5        A.     I don't remember.
 6        Q.     I'm going to stop at 3:30.  Do
 7   you see a figure in the left-hand side of
 8   the video, it's to the left of Cheema, do
 9   you see that person?
10        A.     Yes.
11        Q.     Do you know who that person is?
12        A.     No, I'm not sure.
13        Q.     If Mr. Singh was violent, would
14   you allow a civilian to get close to him?
15             MS. FADDIS:  Objection.  You can
16        answer.
17        A.     No.
18        Q.     From looking at the video, does
19   it indicate to you that he wasn't acting
20   in a violent manner?
21             MS. FADDIS:  Objection.  Go
22        ahead.
23        A.     If I'm looking in the video it
24   looks like he was sitting down, so no.
25        Q.     I just want to stop it right
```

Case 23-24, Document 31, 04/19/2023, 3501830, Page221 of 254
**[JA-833]**

```
                                              Page 52

 1                    WALKER
 2   here, 3:38.  You saw Cheema come around,
 3   looks like having another interaction with
 4   the guy in a white sweater.  Do you see
 5   that?
 6        A.    Yes.
 7        Q.    Do you know what happened there?
 8        A.    It looks like he told him to go
 9   back again.
10        Q.    You don't have an independent
11   recollection of that, you're basing that
12   based on your experience and what you saw
13   in the video; is that right?
14        A.    Correct.
15        Q.    I'm going to let it continue to
16   play.  I'm going to stop it at four
17   minutes and forty-three seconds.  Does it
18   appear here that Mr. Singh is cooperating
19   with the officers or not cooperating with
20   the officers?
21             MS. FADDIS:   Objection.   Go
22        ahead.
23        A.    It looks like he's cooperating.
24        Q.    Do you know what he was doing?
25        A.    From the video, it looks like
```

```
                                        Page 53
 1                   WALKER
 2    he's getting dressed.
 3        Q.    You don't have a recollection of
 4    any of this, right?
 5        A.    No.
 6        Q.    Even after looking at the video
 7    it doesn't refresh your memory as to, you
 8    know, he was getting dressed and getting
 9    ready to go?
10        A.    No.
11        Q.    I'm going to continue to play
12    it.  I'm going to stop it at 6:43.  I'll
13    bring it back just a little bit.  I think
14    we're at 6:37.  Do you see another
15    individual in a uniform going towards the
16    front door?
17        A.    Yes.
18        Q.    Do you know who that individual
19    is?
20        A.    From the uniform, looks like an
21    EMS worker.
22        Q.    Do you know that person,
23    recognize that person at all?
24        A.    No.
25        Q.    Did you know there was more than
```

Case 23-24, Document 31, 04/19/2023, 3501830, Page223 of 254
**[JA-835]**

```
                                               Page 54
 1                    WALKER
 2   one EMS worker at the location?
 3        A.    Well, there's usually two EMS
 4   workers.
 5        Q.    But you don't have a
 6   recollection of who that EMS worker is as
 7   you sit here today?
 8        A.    No.
 9        Q.    Did you have any interaction
10   with her that you remember?
11        A.    Not that I remember, no.
12        Q.    You see you're opening the door
13   and she leaves, do you see that?
14        A.    Yes.
15        Q.    Do you have any idea where she
16   went?
17        A.    Probably going to the ambulance
18   to wait for us to bring him down.
19        Q.    7:05, you see someone just
20   handed Mr. Singh something?  Do you know
21   what was handed over to him?
22        A.    No, I don't.  I don't recall.
23        Q.    I'm going to play it for a
24   little bit more, see if you can identify
25   what was just handed to him.
```

Case 23-24, Document 31, 04/19/2023, 3501830, Page224 of 254
**[JA-836]**

```
                                               Page 55

   1                    WALKER
   2        A.      It looks like glasses.
   3        Q.      I stopped at 7:40.
   4        A.      Yes.
   5        Q.      You see there's a back and forth
   6   between Mr. Singh and Officer Cheema?   Do
   7   you know what's going on here at all?
   8        A.      No.
   9        Q.      You have no idea what they're
  10   talking about?
  11        A.      No, I don't remember.
  12        Q.      You're standing just a few feet
  13   away; is that right?
  14        A.      Correct.
  15        Q.      You just don't have a
  16   recollection because it happened so long
  17   ago; is that correct?
  18        A.      Correct.
  19        Q.      I'm going to stop it here at
  20   7:58.   You see Mr. Singh make a movement
  21   with putting his arms behind his back, you
  22   saw that?
  23        A.      Yes.
  24        Q.      Do you know what was going on
  25   there?
```

```
                                         Page 56
 1                    WALKER
 2        A.    No.
 3        Q.    Is it generally the practice of
 4   the NYPD to handcuff people who are
 5   intoxicated and being taken to the
 6   hospital?
 7        A.    It would if they're being irate.
 8        Q.    You don't have a specific memory
 9   of Mr. Singh being irate during this
10   incident, do you?
11        A.    No.
12        Q.    If I'm looking on the video,
13   does it indicate to you in any way that he
14   was being irate?
15             MS. FADDIS:   Objection to form.
16        You can may answer.
17        A.    Well, I'm not sure what he's
18   doing when he put his hands behind his
19   back.
20        Q.    I'm saying, before he put his
21   hands behind his back, throughout this
22   video we watched now for about eight
23   minutes, we're at seven minutes and
24   fifty-eight seconds, does it indicate to
25   you he was being irate?
```

Case 23-24, Document 31, 04/19/2023, 3501830, Page226 of 254
**[JA-838]**

```
                                              Page 57
 1              WALKER
 2         MS. FADDIS:  Objection to form.
 3     You can answer.
 4     A.     From looking at the video, no.
 5     Q.     Would his behavior, obviously I
 6  know you can't hear the sound, indicate
 7  that he needed to be handcuffed to be
 8  taken to the hospital?
 9         MS. FADDIS:  Objection to form.
10     You can answer.
11     A.    I don't remember what was being
12  said, but from looking at the video, no.
13     Q.     I'm going to back it up just a
14  little bit again so you can see the whole
15  shot.  I'm sure you already saw this when
16  you reviewed the video.  I'm going to back
17  it up to 7:55 or so.  You see he puts his
18  arms behind his back?  I'm stopping at
19  8:04.  Do you remember the events that
20  took place between 7:58 and 8:04?
21     A.    No.
22     Q.    Do you have any understanding as
23  to why Mr. Singh was, I guess, taken down
24  to the ground at that point?
25         MS. FADDIS:  Objection.  You can
```

```
                                              Page 58
 1                    WALKER
 2       answer.
 3       A.      From the video, it looks like he
 4   put his hand behind his back but then
 5   pulled away and did another movement.
 6       Q.      What was that movement?
 7       A.      He stepped forward.
 8       Q.      Did it look like he was going to
 9   attack anybody?
10       A.      I'm not too sure.
11       Q.      You don't have a recollection of
12   him trying to attack you at that moment at
13   8:03, 8:04?
14       A.      No, I don't remember.
15       Q.      As you sit here today, you don't
16   have any memory of him trying to attack
17   you?
18       A.      No.
19       Q.      You don't have any memory of
20   being in fear of being attacked by Mr.
21   Singh; is that right?
22       A.      Right.
23       Q.      If you were in fear of being
24   attacked, would that be something you
25   would have remembered?
```

Page 59

```
 1                WALKER
 2          MS. FADDIS:  Objection to form.
 3     You can answer.
 4     A.    I'm sorry, repeat the question.
 5     Q.    You were relatively a new
 6  officer at the time, correct?
 7     A.    Correct.
 8     Q.    I guess you had all that other
 9  prior enforcement experience, but do you
10  generally remember when you're in a
11  dangerous situation?
12          MS. FADDIS:  Objection.  You can
13     answer.
14     A.    Yes.
15     Q.    Is it fair to say that you don't
16  believe you felt you were in a dangerous
17  situation at that moment right before Mr.
18  Singh was taken to the ground?
19          MS. FADDIS:  Objection.  You can
20     answer.
21     A.    According to the video, it
22  looked so fast, I don't know if I would
23  remember at that point.
24     Q.    But now looking back at it and
25  you have no memory of it, is that unusual
```

```
                                            Page 60
 1                   WALKER
 2    for you to have no memory of a situation
 3    where you felt you were in danger?
 4         A.    Correct.
 5         Q.    Do you have any memory of trying
 6    to physically restrain Mr. Singh yourself?
 7         A.    No.
 8         Q.    Locking at the video, does it
 9    look like a situation where Mr. Singh
10    needed to be forcibly restrained?
11              MS. FADDIS:  Objection.  You can
12         answer.
13         A.    I'm sorry, you said looking at
14    the video?
15         Q.    Does it look like a situation
16    where Mr. Singh needed to be forcibly
17    restrained?
18         A.    From the few movements that he
19    did, yes.
20         Q.    Why is that, can you tell me?
21         A.    I'm not sure exactly what he was
22    trying to do at that point, it happened so
23    fast and he pulled away and then made
24    another movement.  So looking at the video
25    you can't really tell what he's doing, so
```

```
                                             Page 61
 1                      WALKER
 2   they restrained him just in case.
 3        Q.    Did you receive training on how
 4   to restrain individuals in the NYPD?
 5        A.    Yes.
 6        Q.    Did you receive training on what
 7   amount of force you're supposed to use?
 8        A.    Yes.
 9        Q.    What kind of training did you
10   receive with respect to the force you're
11   supposed to use with individuals when
12   attempting to restrain them?
13        A.    Enough force to gain compliance.
14        Q.    Are you supposed to use a
15   minimal amount of force necessary to gain
16   compliance?
17        A.    Correct.
18        Q.    Did it appear to you that
19   Officer Cheema was using the minimal
20   amount of force getting compliance from
21   Mr. Singh in that situation?
22        A.    Well, he took him down.  I can't
23   really see what he's doing right now.
24        Q.    I understand.  But just taking
25   him down in that fashion, does that
```

```
                                             Page 62

 1                    WALKER
 2   comport with your understanding of the
 3   training you receive in the NYPD?
 4             MS. FADDIS:  Objection to form.
 5        You can answer.
 6        A.    Well, my minimal force wouldn't
 7   be Officer Cheema's minimal force, so I'm
 8   not really too sure.
 9        Q.    I mean, do you believe in taking
10   someone down to the ground under those
11   circumstances that you viewed on the
12   video?
13             MS. FADDIS:  Objection to form.
14        You can answer.
15        A.    I'm not too sure.
16        Q.    Did you see what part of Mr.
17   Singh's body hit the floor when he went
18   down to the ground?
19             MS. FADDIS:  Objection to form.
20        You can answer.
21        A.    Did I -- from the camera or -- I
22   don't remember how he fell down.
23        Q.    Do you remember what happened
24   after -- let me continue playing.  I'm
25   playing from 8:04 to the end.  Actually,
```

Case 23-24, Document 31, 04/19/2023, 3501830, Page232 of 254
**[JA-844]**

```
                                            Page 63
 1                 WALKER
 2    I'm going to stop right here, looks like
 3    you're observing what's going on.  Did you
 4    get involved at all in arresting Mr.
 5    Singh?
 6         A.    I don't believe he was arrested.
 7         Q.    Sorry, handcuffing Mr. Singh,
 8    did you get involved at all in handcuffing
 9    Mr. Singh?
10         A.    I don't remember, but from the
11    video doesn't look like it, no.
12         Q.    I'm going to continue playing.
13    It appears you assisted with picking Mr.
14    Singh up off the ground; is that right?
15         A.    Correct.
16         Q.    I stopped at 8:22.  Is there a
17    way that you're supposed to pick an
18    individual up off the ground?
19         A.    What do you mean?
20         Q.    Did you get any training on how
21    to assist individuals who are in handcuffs
22    off the ground?
23         A.    Is there any specific way that
24    we lift them up off the ground?
25         Q.    Yes, to avoid from them having
```

```
                                        Page 64
 1                WALKER
 2  injury.
 3       A.    Not that I remember.
 4       Q.    You haven't received any
 5  training in that area?
 6       A.    In the academy I'm sure we
 7  received training on lifting them up off
 8  the ground, but I don't remember.  Like,
 9  you saying that he doesn't receive any
10  injuries?
11       Q.    Yes, it appears that you guys
12  pulled him up off the ground from his
13  arms.  I can back it up a little bit.  Is
14  that your understanding of the correct
15  procedure based on your training?  I'll
16  play it back for you and then you can
17  answer the question.  Did you see that?
18       A.    Yes.
19       Q.    Is that the proper procedure for
20  how to pick up an individual whose
21  handcuffed on the ground?
22            MS. FADDIS:  Objection to form.
23       You can answer.
24       A.    Yes, because it looks like we
25  picked him up on both sides.  We didn't
```

```
                                                    Page 65
 1                     WALKER
 2   pick him up one side where he would pull
 3   an arm or something, no.
 4        Q.    I'll continue playing.  Just
 5   going back in the video there appears to
 6   be at 8:29, you see Mr. Singh put his leg
 7   out?
 8        A.    Yes.
 9        Q.    Do you know what was going on
10   there?
11        A.    I don't remember, no.
12        Q.    Does it appear to you that he
13   was trying to avoid or still resist going
14   to the ambulance?
15        A.    That's what it looks like, yes.
16        Q.    Do you know what he was saying?
17        A.    No, I don't remember.
18        Q.    Did he indicate to you in any
19   way that he was injured?
20        A.    I don't remember him saying
21   that, no.
22        Q.    You don't remember him actually
23   resisting, though, you're just basing that
24   on what you saw on the video?
25        A.    Yes.
```

Page 66

1                    WALKER
2        Q.    Did you see what the EMS worker
3   just handed the lady in this video?
4        A.    No.
5        Q.    We're at 8:35.  Do you know what
6   happened after you left the apartment?
7        A.    No, I don't remember.
8        Q.    Do you know where you went after
9   you left the apartment?
10        A.    Being that he was handcuffed, I
11   would assume we went to the hospital with
12   him.
13        Q.    Did one of you drive in the
14   ambulance with him?
15        A.    Because he was handcuffed, one
16   of us would have been in the ambulance,
17   yes.
18        Q.    Do you know which one of you
19   were in the ambulance with him?
20        A.    No, I don't remember.
21        Q.    You know what hospital he went
22   to?
23        A.    Usually we always go to Jamaica
24   Hospital.
25        Q.    But you don't have a specific

```
                                              Page 67
 1                    WALKER
 2    memory of actually going to Jamaica
 3    Hospital?
 4         A.    No.
 5         Q.    What happened after you went to
 6    the hospital?
 7         A.    I don't remember.
 8         Q.    What happened at the hospital?
 9         A.    I don't remember.
10         Q.    Do you know how long you stayed
11    at the hospital?
12         A.    No, I'm not too sure.  I don't
13    remember.
14         Q.    Do you know if he was handcuffed
15    the entire time he was at the hospital?
16         A.    I don't remember.
17         Q.    Would your memo book indicate
18    how long you spent at the hospital?
19         A.     I think after, looks like I
20    wrote EOT, so it looks like I got off
21    regular time that day.
22         Q.    I'm going to put up your memo
23    book again, Exhibit 1, for this
24    deposition.  Does this refresh your
25    recollection how long you might have
```

Page 68

1                    WALKER

2    stayed at the hospital?

3        A.    So at 7:49 it says see operator

4    for final, so that would have been the

5    time we got back to the precinct.

6        Q.    How far is the precinct from the

7    hospital?

8        A.    Maybe, like, a ten minute drive.

9    Five to ten minute drive, approximately.

10       Q.    What time do you believe you got

11   to the hospital?  Can you tell from

12   looking at your memo book?

13       A.    No, I can't really tell.

14           MR. COHEN:  I'm going to need,

15       like, a five to ten minute break.  I'm

16       going to review my notes and see if

17       there's anything else I need to ask.

18       I think I'm pretty much done.

19           MS. FADDIS:  Okay.  You wanna

20       come back at four?

21           MR. COHEN:  Let's come back at

22       four.

23           (At this time, a recess was

24       taken.)

25           MR. COHEN:  Are you going to ask

```
                                                    Page 69

  1                     WALKER
  2          any questions, Hanna?
  3                MS. FADDIS:  Depends on whether
  4          or not you have any other questions,
  5          but I don't think so.
  6                MR. COHEN:  I have no further
  7          questions.
  8                MS. FADDIS:  I don't have
  9          anything.  Officer Walker, thank you
 10          very much for your time.
 11                THE WITNESS:  No problem.  Thank
 12          you.
 13             (Time Noted:  4:01 p.m.)
 14
 15
 16     _____
 17       POLICE OFFICER MALINDA WALKER
 18
 19     Subscribed and sworn to before me
 20     this    day of            ,2020.
 21
 22             NOTARY PUBLIC
 23
 24
 25
```

Page 70

```
 1
 2              C E R T I F I C A T I O N
 3
 4
 5
 6      I, BARBARA TORTORA, a Shorthand
 7   Reporter and a Notary Public, do hereby
 8   certify that the foregoing witness,
 9   POLICE OFFICER MALINDA WALKER, was duly
10   sworn on the date indicated, and that the
11   foregoing is a true and accurate
12   transcription of my stenographic notes.
13      I further certify that I am not
14   employed by nor related to any party to
15   this action.
16
17
18
19
20              Barbara Tortora
21
22              BARBARA TORTORA
23
24
25
```

```
                                                    Page 71

  1

  2                      I N D E X

  3     WITNESS          EXAMINATION BY      PAGE

  4     M. Walker    Mr. Cohen               4

  5

  6

  7                    E X H I B I T S

  8     PLAINTIFF'S

  9     EXHIBIT          DESCRIPTION      PAGE

 10        1          Memo book          4

 11        2          Video              45

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

```
                                            Page 72
 1
 2                    ERRATA SHEET
 3           VERITEXT/NEW YORK REPORTING, LLC
 4
 5    CASE NAME:  SINGH V THE CITY
 6    DATE OF DEPOSITION:  OCTOBER 27, 2020
 7    WITNESS' NAME:  POLICE OFFICER
 8                    MALINDA WALKER
 9
10    PAGE/LINE(S)/     CHANGE         REASON
11    ____/_____/_____/_____
      ____/_____/_____/_____
12    ____/_____/_____/_____
      ____/_____/_____/_____
13    ____/_____/_____/_____
      ____/_____/_____/_____
14    ____/_____/_____/_____
      ____/_____/_____/_____
15    ____/_____/_____/_____
      ____/_____/_____/_____
16    ____/_____/_____/_____
      ____/_____/_____/_____
17    ____/_____/_____/_____
      ____/_____/_____/_____
18    ____/_____/_____/_____
      ____/_____/_____/_____
19
                    _____
20            POLICE OFFICER MALINDA WALKER
21
      SUBSCRIBED AND SWORN TO
22    BEFORE ME THIS_____DAY
      OF_____,2020.
23
      _____
24      NOTARY PUBLIC
25    MY COMMISSION EXPIRES_____
```

**[& - arrest]** Page 1

**&**

& 2:4

**0**

0643 31:8
0750 26:17

**1**

1 3:2,14 19:25
67:23 71:10
1-10 1:12
10-54 31:9,10
100 2:15
10007 2:16
102 11:11,12
10279 2:7
102nd 12:4,8,22
24:23 25:2
11:15 26:17
140 6:13
150 20:11
151 20:13
175 6:7
1800 2:6
19 1:4
1:04 47:20
1:06 47:24
1:08 47:24
1:09 47:24
1:44 48:14

**2**

2 45:3,4 71:11
2/28/18 21:5
20/20 6:17
2017 7:25 10:18
11:25
2018 4:6 12:5,7,25
19:14 24:24 32:11
32:21 36:18
2020 1:16 24:22,24
69:20 72:6,22

**2315** 26:16
**233** 2:6
**26** 1:20
**27** 1:16 72:6
**28** 19:14 32:11,21
36:18
**28th** 4:5
**2:05** 26:24
**2:19** 49:5
**2:31** 1:17

**3**

3908 70:21
3:20 49:23
3:30 51:6
3:38 52:2

**4**

4 71:4,10
45 71:11
473 20:24
4:01 69:13

**6**

632 1:4
6813 20:24
6:37 53:14
6:43 53:12

**7**

7:05 54:19
7:40 55:3
7:49 68:3
7:55 57:17
7:58 55:20 57:20

**8**

8:03 58:13
8:04 57:19,20
58:13 62:25
8:22 63:16
8:29 65:6
8:35 66:5

**9**

90th 24:14
911 14:21 15:5,17
15:21
950196 1:10

**a**

able 18:16 46:4
academy 7:25 8:4
9:8,10 10:4,21,23
11:3,10,25 13:9,17
14:3 24:5,8 64:6
accurate 38:24
70:11
acting 14:22 15:10
16:10 50:23 51:19
action 1:4,19 3:22
3:24 70:15
activity 15:14
address 3:13
afternoon 3:16,18
agent 8:18,24 9:4
9:13,16,21
ago 6:23 36:25
55:17
ahead 15:19 42:3
51:22 52:22
aided 14:4,8,10,12
30:24 31:4,7,10,15
37:4,15,19,22 38:2
allegation 39:3
allegations 42:15
allow 51:14
ambulance 14:22
31:11,12 54:17
65:14 66:14,16,19
amount 61:7,15,20
annoying 29:6
answer 4:11,22
5:17 16:25 33:23
35:15 36:14,21

37:13,24 38:12,20
39:5 42:18 50:15
51:16 56:16 57:3
57:10 58:2 59:3
59:13,20 60:12
62:5,14,20 64:17
64:23
answered 17:21
answers 18:12,14
anticipate 4:18
anybody 14:12
29:16,20 32:20
34:10 46:13 50:12
50:17,24 58:9
apartment 27:13
27:15,15,23 28:2,8
28:21 29:2,13,17
30:5,15,22 31:24
32:11,16,21,22,23
33:3 37:7,10
44:17 45:23 46:14
50:13,18,24 66:6,9
appear 52:18
61:18 65:12
appearances 2:2
appears 26:23
44:5 46:17 63:13
64:11 65:5
approximate 6:2
approximately 6:7
6:13 8:22 68:9
area 47:13 48:7
64:5
argument 41:10
42:7,14
arguments 41:6
arm 65:3
arms 55:21 57:18
64:13
arrest 17:10 27:3
27:6,8 39:2 40:21

Case 23-24, Document 31, 04/19/2023, 3501830, Page243 of 254
**[JA-855]**

**[arrest - completed]**                                                      Page 2

41:3
**arrested** 38:3,22 63:6
**arresting** 63:4
**arrests** 18:20 19:3
**asked** 26:15
**asking** 4:19 5:19 30:8 49:7
**assault** 40:18 42:14 50:12
**assignment** 11:16 11:17 12:10 23:8
**assist** 63:21
**assistance** 14:14 14:16,17,19 15:4,8 31:11,12 41:24
**assisted** 63:13
**associate's** 7:5,14
**assume** 5:7 66:11
**assuming** 47:6
**attack** 58:9,12,16
**attacked** 58:20,24
**attempt** 50:12
**attempting** 61:12
**attention** 14:25 15:16 16:23 19:13
**attorney** 2:14
**attorneys** 2:5
**avoid** 63:25 65:13
**aware** 5:21 34:23 49:7

**b**

**b** 71:7
**back** 22:19 25:22 27:10 36:6 41:16 45:25 47:2,9,23 48:15 52:9 53:13 55:5,21 56:19,21 57:13,16,18 58:4 59:24 64:13,16 65:5 68:5,20,21

**backround** 6:6
**balwinder** 1:6 3:21 27:19
**barbara** 1:19 70:6 70:22
**based** 47:7 52:12 64:15
**basically** 13:18,19
**basing** 52:11 65:23
**basis** 15:7
**bate** 20:11
**bates** 20:12
**becoming** 8:15 9:12,16
**beginning** 18:9 46:5
**behavior** 57:5
**believe** 11:7 19:4 35:18 43:2,8 59:16 62:9 63:6 68:10
**belonged** 27:16
**berkeley** 7:7,10,18
**best** 14:7
**bets** 9:19
**betting** 9:18
**bit** 13:7 22:6,12,14 32:5 45:18 46:7 47:21,23 53:13 54:24 57:14 64:13
**blacked** 27:5
**blown** 12:7
**blue** 43:9
**body** 62:17
**book** 19:18 20:2,6 20:14,16 21:14,25 26:3,5,6 28:6,14 30:23 31:5,6,14 35:3,10,13,17,20 36:3 39:16 40:5

67:17,23 68:12 71:10
**bottom** 44:6 47:25
**brand** 13:4
**break** 5:18 68:15
**bring** 47:22 53:13 54:18
**broadway** 2:6
**brooklyn** 24:17,18 25:7
**building** 28:20,21
**burger** 7:21
**business** 7:16

**c**

**c** 70:2,2
**call** 21:11,12 32:13 34:17,19
**called** 14:21 15:5 15:17 16:12 27:12 30:22 31:2,24 37:3,19 40:11 41:6,23,23
**calling** 42:4
**calls** 15:20
**calm** 15:23
**camera** 62:21
**canvas** 26:10
**canvases** 26:23
**capacity** 1:11,13
**car** 21:15,16 26:23
**career** 18:20
**case** 17:12,14,22 18:16 27:17 36:9 61:2 72:5
**certainly** 38:23
**certify** 70:8,13
**change** 18:14 72:10
**changes** 18:17
**charged** 38:3,10 38:17

**checked** 6:21
**cheema** 1:9 3:23 20:20,25 22:21,24 23:4,4,12,16 28:7 29:19 34:12 35:18 35:22 45:13,15 46:20 49:24 50:2 51:8 52:2 55:6 61:19
**cheema's** 62:7
**church** 2:15
**circumstances** 15:3 16:2 17:9 40:6,9,19,25 62:11
**city** 1:9 3:22 7:8 8:13 9:17 72:5
**civil** 1:4,21 17:15 17:18 18:5
**civilian** 51:14
**class** 24:4,8
**clear** 35:2 47:12
**close** 51:14
**closest** 46:8
**code** 31:5,10
**cohen** 2:4,8 3:10 3:20 20:10 33:24 44:23 68:14,21,25 69:6 71:4
**college** 7:7,10,18
**come** 13:11 25:9 52:2 68:20,21
**comment** 18:17
**commission** 72:25
**committed** 38:9 38:15,21
**committing** 15:12
**communicate** 13:19
**complete** 11:24
**completed** 41:2 42:12

[compliance - exact]                                                          Page 3

| | | | |
|---|---|---|---|
| **compliance** 61:13 61:16,20 | **couple** 26:22 48:15 | **detail** 21:15 35:8 35:13,22 | **e** |
| **comport** 62:2 | **court** 1:2 4:8,23 | **details** 22:17 | **e** 2:12 3:5 70:2 71:2,7 |
| **computer** 41:14 | **cover** 20:2,5 | **determination** 16:15 | **early** 27:7 |
| **congratulations** 25:13 | **create** 29:4 | **determine** 14:16 14:18 16:8 | **easier** 20:18 |
| **connection** 39:9 | **created** 39:15 | **different** 8:24 12:16 13:23 23:7 23:9 24:12 | **eastern** 1:3 |
| **considered** 16:22 | **crime** 15:12 38:9 38:16,21 40:21 | | **edp** 26:12 |
| **consult** 5:15 | **criminal** 17:12,14 17:22 | **dir** 39:18 40:15,20 41:2,11,25 42:11 | **education** 7:4 |
| **context** 17:22 | **currently** 25:17 | **direct** 19:13 | **effect** 49:8 |
| **continue** 46:2 48:13 52:15 53:11 62:24 63:12 65:4 | **cv** 1:4 | **dirs** 39:24 | **eight** 44:24 45:8 56:22,24 |
| **continuing** 46:16 | **d** | **disagreement** 40:13,17 | **either** 13:9 14:21 16:10 49:12 |
| **conversation** 30:12,18 | **d** 3:5 71:2 | **dispute** 26:12 40:12,16 42:7,16 | **elevator** 28:25 |
| **conversations** 32:20,25 37:8 | **danger** 34:13 60:3 | **district** 1:2,3 | **employed** 8:17 70:14 |
| **cooperating** 52:18 52:19,23 | **dangerous** 59:11 59:16 | **documented** 35:23 | **employment** 8:3 |
| **copy** 18:11 20:5 | **date** 3:4 6:9 25:22 36:11 45:6 70:10 72:6 | **doe** 1:12 | **ems** 30:4,7,12 44:9 44:17 48:7,8,21 53:21 54:2,3,6 66:2 |
| **corner** 44:7 48:2 | **davis** 20:20,25 22:22 23:21 24:10 45:14,18 48:15 | **doing** 3:17 8:2 9:13 25:16 26:19 48:19 52:24 56:18 60:25 61:23 | **encounter** 18:6 30:4,14 |
| **corporation** 2:13 | **day** 6:12 12:16 19:15 21:8 25:25 26:8 27:10 67:21 69:20 72:22 | **domestic** 38:23 39:3,8,11,14,19 40:7,10 42:15 | **encountering** 43:19 44:2 |
| **correct** 13:5,6 17:24 21:12,13 22:22 27:14 28:18 35:11,25 37:5,11 37:16,17,25 38:4,5 39:13 40:22 41:4 41:7,8,12 42:19 45:21 47:5,10,19 52:14 55:14,17,18 59:6,7 60:4 61:17 63:15 64:14 | **days** 12:17,18 | **door** 43:22 46:9 53:16 54:12 | **enforcement** 10:12,14 59:9 |
| | **dealing** 9:5 | **dressed** 53:2,8 | **engaging** 15:13 |
| | **decided** 10:5 | **drinking** 34:20,22 | **entire** 25:3 49:20 50:5,11 67:15 |
| | **defendant** 2:14 | **drinks** 15:24 | **entitled** 1:19 |
| | **defendants** 1:14 | **drive** 28:4 66:13 68:8,9 | **entries** 28:14 |
| | **degree** 7:5,14 | **drove** 28:8 | **entry** 31:6 |
| **correction** 8:5 | **department** 9:22 | **duly** 3:6 70:9 | **eot** 67:20 |
| **corrections** 8:7,15 9:22,25 10:6 | **depends** 15:9 69:3 | **duty** 26:14 | **errata** 72:2 |
| **corrective** 6:14 | **deposition** 1:18 4:15 17:3,7,11,18 18:4,10 45:3 49:21 67:24 72:6 | | **esq** 2:8,12,17 |
| **counsel** 1:22 2:13 5:10,15,18 | | | **et** 1:21 |
| | **description** 71:9 | | **evening** 27:7 |
| | | | **events** 57:19 |
| | | | **exact** 18:22 |

[exactly - half]                                                                                          Page 4

| | | | |
|---|---|---|---|
| **exactly** 60:21 | **fear** 58:20,23 | **foregoing** 70:8,11 | 32:16 33:12,15,17 |
| **examination** 3:9 | **february** 4:5 | **forgot** 18:8 | 34:3,23 35:4 36:6 |
| 71:3 | 12:25 19:14 32:11 | **form** 15:18 16:24 | 42:3 46:25 47:2 |
| **examined** 3:7 | 32:21 36:17 | 33:22 35:14 36:20 | 49:7 51:21 52:8 |
| **exhibit** 3:2 19:22 | **federal** 1:21 | 37:12,23 38:11 | 52:21 53:9 66:23 |
| 19:25 45:3,4 | **feel** 42:8 | 39:4 42:2,17 | **goes** 21:7 |
| 67:23 71:9 | **feels** 16:12 | 50:21 51:3 56:15 | **going** 4:3 5:6 14:5 |
| **expecting** 25:14 | **feet** 55:12 | 57:2,9 59:2 62:4 | 18:10,12 19:21 |
| **experience** 10:10 | **fell** 62:22 | 62:13,19 64:22 | 22:15,18 25:22 |
| 10:13,15 38:6,7,8 | **fellow** 50:9 | **forth** 48:15 55:5 | 26:10 29:9,10 |
| 52:12 59:9 | **felt** 59:16 60:3 | **forty** 46:3,6,12 | 41:13 42:9,20,24 |
| **expires** 72:25 | **field** 7:15 11:8,20 | 52:17 | 42:25 45:2,7 46:2 |
| **expound** 22:13 | 11:23 12:12,19,21 | **forward** 58:7 | 46:3 47:20,22,22 |
| **eyes** 6:21,25 | 12:25 22:24 23:5 | **four** 5:25 8:22 | 48:13 49:6,15,16 |
| **eyesight** 6:17 | 23:9,11,22 29:22 | 9:11,20 46:18 | 49:18,23 51:3,6 |
| **f** | **fifty** 44:25 56:24 | 52:16 68:20,22 | 52:15,16 53:11,12 |
| | **figure** 51:7 | **front** 20:2,5 42:21 | 53:15 54:17,23 |
| **f** 70:2 | **file** 40:15 | 53:16 | 55:7,19,24 57:13 |
| **face** 45:24 46:7 | **filed** 39:8 | **frustrating** 36:24 | 57:16 58:8 63:2,3 |
| **fact** 16:20 42:11 | **filled** 40:20 41:25 | **full** 12:7 | 63:12 65:5,9,13 |
| **faddis** 2:17 5:11 | **final** 35:18 49:16 | **further** 69:6 70:13 | 67:2,22 68:14,16 |
| 15:18 16:24 19:21 | 68:4 | **g** | 68:25 |
| 33:22 34:5 35:14 | **finally** 5:3 | | **gonna** 16:5 |
| 36:13,20 37:12,23 | **finished** 4:21 11:9 | **gain** 61:13,15 | **good** 3:16,18,20 |
| 38:11,19 39:4 | **firearm** 9:6 | **gap** 43:12 | 6:19 23:15 |
| 42:2,17 50:14,21 | **first** 3:6 11:17,22 | **general** 13:24 21:8 | **grand** 17:25 |
| 51:15,21 52:21 | 12:6,10,15 17:17 | **generally** 12:13 | **ground** 4:7 57:24 |
| 56:15 57:2,9,25 | 18:6,24 27:22 | 26:7 41:9 56:3 | 59:18 62:10,18 |
| 59:2,12,19 60:11 | 29:12 33:9 43:6 | 59:10 | 63:14,18,22,24 |
| 62:4,13,19 64:22 | 45:10 46:12 | **gerald** 2:8 3:20 | 64:8,12,21 |
| 68:19 69:3,8 | **fitch** 2:4 | **getting** 53:2,8,8 | **guess** 6:22 13:23 |
| **fair** 59:15 | **five** 6:3 23:14 46:3 | 61:20 | 15:25 16:7 28:8 |
| **familiar** 8:23 | 46:6,12 68:9,15 | **give** 13:18 41:15 | 57:23 59:8 |
| 48:12 | **floor** 62:17 | **given** 16:13,18 | **guidelines** 13:24 |
| **family** 28:21 40:17 | **follow** 13:25 | 41:19 | 16:13,14 |
| 41:10 | **follows** 3:8 | **giving** 33:8,11 | **guy** 50:19 52:4 |
| **far** 16:3 18:21 | **foot** 12:14 | **glasses** 45:16,17 | **guys** 64:11 |
| 36:19 68:6 | **force** 61:7,10,13 | 55:2 | **h** |
| **fashion** 15:13 | 61:15,20 62:6,7 | **go** 4:3,6 9:8,24 | |
| 42:16 61:25 | **forcibly** 16:2 | 10:3 11:10 12:18 | **h** 71:7 |
| **fast** 59:22 60:23 | 60:10,16 | 13:7 14:24 15:19 | **half** 8:10,11 |
| | | 21:20 22:19 25:19 | |

[hand - know]                                                                Page 5

**hand** 43:22 44:7
48:2 51:7 58:4
**handcuff** 56:4
**handcuffed** 57:7
64:21 66:10,15
67:14
**handcuffing** 63:7
63:8
**handcuffs** 63:21
**handed** 54:20,21
54:25 66:3
**hands** 56:18,21
**hanna** 69:2
**hannah** 2:17
**happened** 4:5
12:24 18:25 32:10
33:6 36:24 52:7
55:16 60:22 62:23
66:6 67:5,8
**happening** 44:21
47:17
**happens** 35:17
**hard** 33:8,11
**harm** 15:15 16:6,9
16:16
**hear** 57:6
**hearsay** 5:20
**height** 6:2
**held** 1:19 9:15
**help** 14:7 25:11
42:5
**helps** 26:3
**high** 7:11
**highest** 7:3
**hit** 45:7 62:17
**hospital** 14:25
16:3 26:9,11,22
32:17 33:4,13,15
34:3,24 35:5
37:15,20 42:10
49:8 56:6 57:8

66:11,21,24 67:3,6
67:8,11,15,18 68:2
68:7,11
**hours** 27:7
**house** 27:13 28:21
**hurt** 51:3

**i**

**idea** 43:16 44:7
46:22 47:16 48:18
49:2 50:2 54:15
55:9
**identification** 3:3
45:5
**identify** 43:5
45:12 46:4 54:24
**illness** 31:18
**important** 4:10,13
6:5
**inaccurate** 18:15
**incident** 4:5 6:9,12
12:24 13:8 18:25
19:7,8 21:22 22:7
22:11 25:23 35:8
36:12,17 39:8,9,12
39:14,19 40:7,10
41:18,21 42:12
50:5,11 56:10
**incorrect** 18:15
**independent** 21:21
22:6 28:12,15
30:9,25 31:23
44:12 52:10
**independently**
47:3
**indicate** 15:14
31:13,17 35:4
51:19 56:13,24
57:6 65:18 67:17
**indicated** 15:4
70:10

**indicates** 31:6
42:13
**indicating** 48:2
**individual** 31:14
43:12,19,21,23
44:6,8 46:21,23
47:8,25 53:15,18
63:18 64:20
**individually** 1:10
1:12
**individuals** 13:11
13:15 14:9 19:10
37:9 47:12 61:4
61:11 63:21
**information** 5:20
5:20 21:8,19
35:13,19,22 41:19
**injured** 14:6,13
65:19
**injuries** 42:8
64:10
**injury** 64:2
**input** 40:2
**instruct** 18:9
**instruction** 11:2,3
**instructions** 16:19
**interact** 13:11
**interacted** 47:7
**interacting** 44:13
44:16
**interaction** 32:10
46:17,20 52:3
54:9
**interactions** 19:7
19:10
**intoxicated** 13:12
13:16 14:9,20,23
16:21 19:11 32:14
33:19,20 34:4
37:16 56:5

**involved** 17:18
63:4,8
**involving** 17:12
**irate** 56:7,9,14,25
**island** 8:12
**issue** 15:21
**issues** 6:24

**j**

**jamaica** 26:10
66:23 67:2
**james** 2:12
**january** 12:5,8
24:24
**job** 9:15 11:4
13:10 22:15,16
**jobs** 25:25 26:8
48:11
**john** 1:12
**johnson** 2:12
**joined** 7:25 8:4
9:22 10:20
**june** 24:20,24
**jury** 17:25

**k**

**k** 3:5
**keep** 49:17,18
**keeps** 41:5
**kids** 9:5
**kind** 6:15 12:16
13:14 25:25 26:7
31:17 32:5 34:15
39:24 61:9
**king** 7:21
**know** 5:5 9:3 16:4
27:2 31:4 32:6
33:10 36:23,23
38:6 39:7,10,22,22
41:17,17 43:23
46:24 48:10 51:11
52:7,24 53:8,18,22

53:25 54:20 55:7
55:24 57:6 59:22
65:9,16 66:5,8,18
66:21 67:10,14
**knowing**  41:20

**l**

**l**  3:5,5
**lady**  66:3
**large**  28:20
**law**  10:12,14
**lawsuit**  17:15,19
**leave**  10:6
**leaves**  54:13
**left**  32:16 45:19
51:7,8 66:6,9
**leg**  65:6
**lenses**  6:14
**level**  7:3
**lift**  63:24
**lifting**  64:7
**limited**  25:12,17
**line**  72:10
**little**  13:7 22:6,12
22:14 32:5 36:24
45:18 46:7 47:21
47:23 53:13 54:24
57:14 64:13
**llc**  72:3
**llp**  2:4
**location**  24:12
37:4 54:2
**locking**  60:8
**long**  5:18 8:20
9:10 12:20 38:7
44:25 55:16 67:10
67:18,25
**look**  19:18 26:2,4
48:12 58:8 60:9
60:15 63:11
**looked**  59:22

**looking**  19:22
20:21 22:4 26:6
26:11 43:15 45:20
48:22 51:18,23
53:6 56:12 57:4
57:12 59:24 60:13
60:24 68:12
**looks**  26:12 44:9
46:25 48:20 49:24
51:24 52:3,8,23,25
53:20 55:2 58:3
63:2 64:24 65:15
67:19,20
**lot**  23:24 29:9
41:18

**m**

**m**  3:5 71:4
**ma'am**  19:15
**making**  27:6 47:14
**male**  32:14
**malinda**  1:18 3:12
69:17 70:9 72:8
72:20
**management**  7:16
**mandeep**  1:9
**manner**  51:20
**mark**  45:2,8 46:4
46:6
**marked**  3:3 19:25
39:16 45:5
**matter**  18:5
**mean**  11:14 22:14
23:7 28:3 39:21
62:9 63:19
**meant**  24:7
**medical**  14:14,15
14:17,19,25 15:4,8
15:16 16:23
**members**  40:17
41:11

**memo**  19:18,25
20:6,14,16 21:14
21:25 26:3,4,6
28:6,13 30:23
31:5,6,14 35:3,10
35:13,17,19 36:3
39:16 40:4 67:17
67:22 68:12 71:10
**memory**  28:9,12
37:20 53:7 56:8
58:16,19 59:25
60:2,5 67:2
**mentioned**  14:15
15:2
**miles**  21:15
**military**  10:9
**minimal**  61:15,19
62:6,7
**minute**  46:18 68:8
68:9,15
**minutes**  44:25
52:17 56:23,23
**missing**  26:11
**moment**  22:19
58:12 59:17
**month**  11:25 12:3
**months**  9:11 10:23
10:25 11:22 12:23
18:24
**morning**  26:18,24
27:7
**mouse**  43:12
**move**  24:18
**moved**  25:10
**movement**  55:20
58:5,6 60:24
**movements**  60:18

**n**

**n**  3:5 70:2 71:2
**name**  3:11,20 72:5
72:7

**narcotics**  24:17,19
25:7
**necessarily**  15:12
15:13 40:21,22
42:6
**necessary**  61:15
**need**  4:20,20 14:25
16:22 21:20 36:10
68:14,17
**needed**  25:10
33:14,16 34:2,23
35:4 57:7 60:10
60:16
**needs**  14:14,15,17
14:19 15:3
**new**  1:3,9,20 2:7,7
2:16,16 3:14,14,22
7:8 8:12 9:17 13:5
23:25 25:20 59:5
72:3
**ngg**  1:4
**night**  26:17 35:20
**nights**  23:13,14
**nightshifts**  26:20
**non**  1:18
**nonparty**  3:24
**normally**  35:12
**north**  24:17,19
**notary**  1:20 3:6
69:22 70:7 72:24
**note**  36:5
**noted**  69:13
**notes**  21:24 28:14
68:16 70:12
**notice**  1:21 30:7
**number**  18:22
20:24 31:8 39:18
39:19,23 40:3,4
**nypd**  8:19,25 9:2
10:17 11:17 16:14
38:25 41:5 56:4

[nypd - question]                                                                 Page 7

| | | | |
|---|---|---|---|
| 61:4 62:3 | **official** 1:11,13 | 53:22,23 | 25:3 68:5,6 |
| **o** | **okay** 3:18 5:7,8,22 | **personnel** 30:5 | **prepare** 39:11 |
| **o** 70:2 | 8:11 13:21 15:22 | **phone** 9:19 34:16 | **prepared** 40:10,14 |
| **oath** 17:22 | 18:19 26:9 27:11 | 34:19 | 42:9 |
| **objection** 15:18 | 29:5,6 31:12 | **physical** 6:22 | **presence** 34:12,15 |
| 16:24 33:22 34:5 | 68:19 | **physically** 60:6 | 50:20 |
| 35:14 36:13,20 | **old** 5:23 | **pick** 63:17 64:20 | **present** 5:10 |
| 37:12,23 38:11,19 | **once** 40:2 42:25 | 65:2 | **pretty** 6:19 68:18 |
| 39:4 42:2,17 | **open** 42:20 | **picked** 64:25 | **prior** 7:10 8:15 |
| 50:14,21 51:15,21 | **opening** 54:12 | **picking** 63:13 | 9:12 10:9 13:8 |
| 52:21 56:15 57:2 | **operator** 20:25 | **place** 57:20 | 22:4 59:9 |
| 57:9,25 59:2,12,19 | 28:7 35:18 68:3 | **plaintiff** 1:7 2:5 | **privileged** 5:19 |
| 60:11 62:4,13,19 | **opportunity** 18:13 | 3:21 27:16 | **probably** 8:8 19:4 |
| 64:22 | **oral** 4:13 | **plaintiff's** 3:2 45:2 | 54:17 |
| **observed** 27:23 | **orally** 4:11,20 | 45:4 71:8 | **problem** 15:21 |
| 29:12 33:6 35:9 | **outside** 23:19 | **play** 45:7 46:16 | 69:11 |
| **observing** 30:2 | **overtime** 10:7 | 47:20,21 49:15 | **procedure** 1:21 |
| 63:3 | | 52:16 53:11 54:23 | 47:11 64:15,19 |
| **obviously** 5:19 | **p** | 64:16 | **proceed** 18:16 |
| 57:5 | | **playing** 46:2 48:13 | **program** 13:2 |
| **occurred** 36:11 | **p.m.** 1:17 26:17 | 49:18,19 62:24,25 | 23:23 |
| **october** 1:16 72:6 | 69:13 | 63:12 65:4 | **proper** 64:19 |
| **offense** 38:16 | **p.o.** 1:9 3:5 20:20 | **plaza** 3:14 | **public** 1:20 3:7 |
| **officer** 1:18 3:12 | 20:20,25,25 22:21 | **please** 5:5 | 69:22 70:7 72:24 |
| 3:23 5:24 7:24 8:5 | 22:22 23:12 | **point** 27:12 29:25 | **pull** 19:22 65:2 |
| 8:7,16,25 10:2,18 | **page** 20:13,15 71:3 | 57:24 59:23 60:22 | **pulled** 58:5 60:23 |
| 11:18 12:7,19 | 71:9 72:10 | **police** 1:11,18 3:12 | 64:12 |
| 13:5 19:2,9 22:25 | **pardon** 34:7 | 3:14 7:24 8:24 | **purpose** 36:3 |
| 23:4,6,9,16,21 | **part** 8:25 11:20 | 10:18 11:17 12:7 | **pursuant** 1:20 |
| 24:2,9 25:4 28:7 | 62:16 | 19:2,9 23:4 24:7 | **put** 41:14 56:18,20 |
| 29:19,23 34:11 | **particular** 42:12 | 35:21 38:8 41:6 | 58:4 65:6 67:22 |
| 35:22 36:3 38:8 | **party** 1:18 70:14 | 41:23 44:24 45:9 | **puts** 57:17 |
| 45:13,13 46:20 | **patrol** 11:19 12:11 | 47:11 69:17 70:9 | **putting** 43:11 |
| 48:14 49:24 50:2 | 12:14,18 25:3,19 | 72:7,20 | 55:21 |
| 55:6 59:6 61:19 | 27:10 | **policy** 38:25 | |
| 62:7 69:9,17 70:9 | **pause** 42:25 | **position** 12:21 | **q** |
| 72:7,20 | **people** 43:5,11 | **practice** 35:12 | |
| **officers** 1:11 25:24 | 56:4 | 56:3 | **question** 4:11,18 |
| 45:9 49:12 50:9 | **period** 23:10 | **precinct** 11:10,11 | 4:22 5:3,4,7,14,17 |
| 52:19,20 | **person** 15:9,11 | 11:13 12:4,8,22 | 15:25 16:7 33:25 |
| | 16:12 26:11 43:16 | 24:11,13,14,15,23 | 38:13,14 40:8,24 |
| | 44:3,14 47:14 | | 49:6,19 59:4 |
| | 48:7 51:9,11 | | 64:17 |

**questioning** 22:19
**questions** 4:4
  17:21 18:11 29:8
  29:9 69:2,4,7

**r**

**r** 3:5 70:2
**ready** 53:9
**really** 60:25 61:23
  62:8 68:13
**reask** 33:24
**reason** 10:5 34:2,9
  34:23 72:10
**reasons** 4:19
**recall** 54:22
**receive** 61:3,6,10
  62:3 64:9
**received** 64:4,7
**recess** 68:23
**recognize** 20:2,13
  43:10 48:4,6
  53:23
**recollection** 21:22
  22:7,11 25:24
  27:6 28:16 30:9
  30:21 31:2,23
  33:5 36:9 37:8,18
  41:18 44:2,13,21
  46:11 48:23 52:11
  53:3 54:6 55:16
  58:11 67:25
**record** 20:10 29:4
  44:23
**recorded** 4:14
**recorder** 21:2
**recording** 22:2,5
  22:10
**refer** 32:22 36:6
**reference** 39:20
**referring** 14:9
  17:23

**refresh** 22:10 36:9
  53:7 67:24
**regard** 23:5
**regarding** 4:4 18:5
**regular** 67:21
**regularly** 23:3
  26:19
**related** 70:14
**relationship** 23:16
**relatively** 13:4
  23:25 59:5
**relying** 35:21
**remember** 14:2
  16:18 19:12 22:15
  27:4,24,25 28:19
  28:23,24 29:3,5,7
  29:9,11,18,21
  30:11,16,17,20
  32:5,7,8,9,18,24
  33:8,14,16 34:8,10
  34:14,16,18,21
  36:17 37:2,3,6,14
  41:22 43:14,18
  44:4,15,22 47:4
  48:9 49:4,9,10,11
  49:14 50:4,7,10,16
  50:22,25 51:5
  54:10,11 55:11
  57:11,19 58:14
  59:10,23 62:22,23
  63:10 64:3,8
  65:11,17,20,22
  66:7,20 67:7,9,13
  67:16
**remembered**
  32:13 58:25
**remotely** 5:10
**repeat** 38:13 40:8
  59:4
**rephrase** 38:14

**report** 39:8,12,14
  39:19
**reported** 34:11,11
**reporter** 1:20 4:8
  4:23 70:7
**reporting** 34:14
  72:3
**reports** 40:7,10
**represent** 3:21
**represented** 5:9
**require** 15:16
**required** 40:15
  41:11
**requiring** 15:7
**resist** 65:13
**resisting** 65:23
**respect** 13:15
  16:15 37:22 61:10
**respond** 4:20
**responding** 16:11
**response** 4:14 20:7
**restrain** 60:6 61:4
  61:12
**restrained** 60:10
  60:17 61:2
**resulted** 27:2
**review** 18:13
  68:16
**reviewed** 21:25
  57:16
**right** 5:11 8:3
  17:23 20:19,23
  21:9,17 27:13,20
  28:17 29:13,14,15
  30:8 31:19,24
  34:24,25 35:10,24
  36:12,15 37:4,10
  37:22 39:12 41:11
  42:16 44:7 45:20
  47:4 48:2,16
  51:25 52:13 53:4

  55:13 58:21,22
  59:17 61:23 63:2
  63:14
**rikers** 8:12
**road** 36:10
**role** 11:12,15
  12:20 25:2,20
**roll** 21:11,12
**room** 47:2,9
**rule** 1:20
**rules** 1:21 4:7

**s**

**s** 71:7 72:10
**safety** 8:18,21,24
  9:12,16,21
**saw** 32:8 35:10
  46:7 52:2,12
  55:22 57:15 65:24
**saying** 4:10,24
  49:3,11,13 50:3
  51:2 56:20 64:9
  65:16,20
**says** 15:10,11
  20:19,24 21:4
  26:9 28:7 31:8
  35:17 47:24 68:3
**scenarios** 13:18
**scheduled** 23:22
**school** 7:11 8:18
  8:20,23 9:5,21
  11:3
**screen** 26:2 43:2,3
  45:20
**scroll** 20:17
**second** 22:18
  41:15,17 45:8
  46:4,6
**seconds** 43:6
  44:25 46:13,19
  52:17 56:24

[section - thank]                                                                                    Page 9

**section**  49:25
**see**  4:12,12 14:4
21:4 35:17 42:21
42:25 43:6 45:9
45:22,24,25 47:18
47:25 48:14 49:20
51:7,9 52:4 53:14
54:12,13,19,24
55:5,20 57:14,17
61:23 62:16 64:17
65:6 66:2 68:3,16
**seeing**  31:25 32:3
32:4,12,19 48:9
**seen**  22:9,16 31:22
**seq**  1:21
**sergeant**  21:11
**series**  4:4
**seven**  31:8 56:23
**shape**  51:3
**share**  26:2
**sharing**  22:18
**sheet**  72:2
**shirt**  43:9,13 46:21
50:19
**short**  14:12
**shorter**  45:19
**shorthand**  1:20
70:6
**shot**  43:6 57:15
**show**  19:19 41:13
**showing**  19:24
20:12
**shown**  22:3
**shows**  14:22
**shut**  9:18
**sick**  14:13
**side**  45:20 51:7
65:2
**sides**  64:25
**signature**  70:21

**simply**  15:17
33:20 34:4
**singh**  1:6 3:21
27:19 34:12 35:4
38:2,15 43:8 49:3
49:11,25 50:6,8,12
50:17,23 51:2,13
52:18 54:20 55:6
55:20 56:9 57:23
58:21 59:18 60:6
60:9,16 61:21
63:5,7,9,14 65:6
72:5
**singh's**  29:2 30:14
30:19 32:22 41:20
41:22 62:17
**sit**  43:25 54:7
58:15
**sitting**  31:21 32:6
43:8 51:24
**situation**  13:22
38:18,24 41:24
47:15 59:11,17
60:2,9,15 61:21
**six**  10:25 11:22,24
12:23
**socialize**  23:18
**somebody**  45:25
**sorry**  11:14 17:5
24:22 28:3 38:13
40:8,23 59:4
60:13 63:7
**sort**  7:15 12:21
38:16 40:16
**sound**  57:6
**speak**  5:18 29:16
29:19
**speaking**  29:21
**specialized**  7:15
**specific**  56:8 63:23
66:25

**specifically**  37:21
**spending**  37:6
**spent**  33:3 67:18
**spouses**  41:10
**st**  1:4
**stairs**  28:25
**stamp**  20:11
**stamped**  20:12
**standing**  46:8
55:12
**start**  12:4 42:24
**started**  12:15 19:8
47:8
**state**  1:20
**states**  1:2
**stationhouse**
12:18
**stayed**  67:10 68:2
**stenographic**
70:12
**step**  41:16
**stepped**  58:7
**stint**  12:6
**stipulations**  1:21
**stop**  22:18 26:23
46:3 47:22 49:23
51:6,25 52:16
53:12 55:19 63:2
**stopped**  55:3
63:16
**stopping**  45:8
46:18 48:14 49:5
57:18
**street**  2:15
**structure**  9:3
**subscribed**  69:19
72:21
**substance**  34:19
41:19
**suffering**  31:18

**suite**  2:6
**summons**  39:23
39:23
**supposed**  13:25
14:18 61:7,11,14
63:17
**sure**  6:18 14:5
18:22 19:19 26:15
28:23 36:25 51:12
56:17 57:15 58:10
60:21 62:8,15
64:6 67:12
**suspect**  29:8
**sweater**  52:4
**sweatshirt**  46:22
**sworn**  3:6 69:19
70:10 72:21
**system**  40:3

| t |
|---|

**t**  70:2,2 71:7
**take**  5:17 16:2
28:25
**taken**  1:19 17:3
37:19 56:5 57:8
57:23 59:18 68:24
**talk**  14:4
**talking**  29:24
48:20 49:24 55:10
**tax**  1:10
**team**  11:21
**tell**  13:19 26:7
44:10 60:20,25
68:11,13
**telling**  46:25
**ten**  68:8,9,15
**term**  14:12
**terms**  18:4 32:10
**testified**  3:7
**testifying**  36:11
**thank**  25:15 69:9
69:11

**thing**  4:17 5:15
  19:23 27:22 39:25
**things**  15:2 18:8
  36:5
**think**  6:18 27:9
  34:16 47:23 53:13
  67:19 68:18 69:5
**thirty**  5:25
**threaten**  50:6,8,17
  50:18
**threatened**  16:12
**three**  23:13 52:17
**time**  4:3 5:13 6:20
  13:2,5 17:17 18:6
  19:5 23:10 24:10
  24:10 25:3 26:20
  26:21 33:3,9,11
  37:7 49:17,17
  59:6 67:15,21
  68:5,10,23 69:10
  69:13
**times**  48:16
**today**  31:21 32:7
  36:10 43:25 49:21
  54:7 58:15
**told**  10:13 33:2
  36:18 37:2 41:21
  52:8
**tolerance**  38:25
**top**  21:4
**tortora**  1:19 70:6
  70:22
**tour**  26:14
**track**  9:18 41:5
**training**  9:7,25
  11:4,7,21,23,25
  12:12,19,21 13:2,8
  13:10,14 14:2
  22:24 23:5,9,11,23
  29:22 61:3,6,9
  62:3 63:20 64:5,7

64:15
**transcript**  4:15
  18:11
**transcription**
  70:12
**transfer**  25:6
**trial**  17:25 18:3,16
**true**  70:11
**try**  14:6
**trying**  29:6 58:12
  58:16 60:5,22
  65:13
**twenty**  18:23
**two**  6:3 11:6 18:24
  19:5 23:13 25:23
  28:21 36:24 45:9
  47:7 54:3
**type**  4:23 28:19
  38:24 40:12 42:6
**typical**  47:11

**u**

**understand**  3:25
  4:15,25 5:4,6,16
  5:21 18:18 25:14
  28:13 40:23 61:24
**understanding**
  36:2,8 39:6 57:22
  62:2 64:14
**understood**  5:7
**unemployed**  9:14
**uniform**  44:6,10
  53:15,20
**united**  1:2
**unusual**  59:25
**use**  61:7,11,14
**usually**  6:4 14:24
  15:20,21 29:23
  35:16 40:7 54:3
  66:23

**v**

**v**  72:5
**vehicle**  12:13
**veritext**  1:19 72:3
**vest**  9:6
**video**  22:2,4,9
  30:6 31:22,25
  32:3,4,9,12,19
  41:13 42:21,21,24
  43:7,11,15 44:19
  44:24 45:9 46:5
  46:13,18 47:18
  48:22,24 49:20,25
  51:8,18,23 52:13
  52:25 53:6 56:12
  56:22 57:4,12,16
  58:3 59:21 60:8
  60:14,24 62:12
  63:11 65:5,24
  66:3 71:11
**viewed**  62:11
**violation**  38:16
**violence**  38:23
  39:3 42:15
**violent**  50:23
  51:13,20
**virtual**  1:19

**w**

**w**  3:5
**wait**  4:21 54:18
**walk**  28:4,25
  45:22 47:8 48:15
**walked**  45:10
**walker**  1:18 3:12
  3:16 4:1 5:1,24
  6:1 7:1 8:1 9:1
  10:1 11:1 12:1
  13:1 14:1 15:1
  16:1 17:1 18:1
  19:1 20:1 21:1

22:1 23:1 24:1
  25:1 26:1 27:1
  28:1 29:1 30:1
  31:1 32:1 33:1
  34:1 35:1 36:1,4
  37:1 38:1 39:1
  40:1 41:1 42:1
  43:1 44:1 45:1
  46:1 47:1 48:1
  49:1 50:1 51:1
  52:1 53:1 54:1
  55:1 56:1 57:1
  58:1 59:1 60:1
  61:1 62:1 63:1
  64:1 65:1 66:1
  67:1 68:1 69:1,9
  69:17 70:9 71:4
  72:8,20
**walking**  45:25
**wanna**  68:19
**want**  4:6 13:7
  19:13 33:12 36:25
  51:25
**wasting**  49:17
**watched**  30:6
  56:22
**watching**  43:7
**way**  14:13 31:14
  33:10 35:9 47:7,8
  49:15 50:6 51:2
  56:13 63:17,23
  65:19
**wear**  6:14 35:2
**wednesday**  21:5
**week**  11:6
**weeks**  11:7
**weigh**  6:6,11
**weight**  6:8
**went**  7:17 29:13
  32:14 33:4 54:16
  62:17 66:8,11,21

[went - zero]                                    Page 11

| | |
|---|---|
| 67:5 | **years**  7:22 8:22 |
| **white**  43:12 46:21 |   9:20 36:24 |
|   46:22 50:19 52:4 | **york**  1:3,9,20 2:7 |
| **wife**  30:15,19 |   2:7,16,16 3:14,15 |
|   34:16 37:19,21 |   3:23 7:8 8:12 9:17 |
|   40:11 41:20,22 |   72:3 |
|   50:19 | **z** |
| **witness**  1:18 3:24 | **zero**  38:25 43:6 |
|   69:11 70:8 71:3 | |
|   72:7 | |
| **wondering**  39:24 | |
| **work**  3:13 7:17,20 | |
|   9:3 23:3,19 24:9 | |
| **worked**  7:21 20:19 | |
|   22:21 23:12,14 | |
|   26:16 | |
| **worker**  48:8 53:21 | |
|   54:2,6 66:2 | |
| **workers**  48:21 | |
|   54:4 | |
| **working**  8:12 | |
|   19:14,17 21:16 | |
|   23:15 24:15 25:23 | |
|   49:13 | |
| **works**  48:7 | |
| **worse**  47:15 | |
| **write**  4:24 35:3,6 | |
|   35:16 | |
| **written**  16:14,19 | |
|   40:7 | |
| **wrote**  35:19 67:20 | |
| **x** | |
| **x**  1:5,15 71:2,7 | |
| **y** | |
| **yeah**  10:7 11:22 | |
|   17:13 26:4 31:11 | |
| **year**  6:23 7:23 8:8 | |
|   8:9,11 10:20 | |
|   24:21,22 | |

Veritext Legal Solutions
www.veritext.com
212-267-6868                                          516-608-2400

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.