# 23-24cv

# United States Court of Appeals
# for the Second Circuit

BALWINDER SINGH,

*Plaintiff-Appellant,*

v.

THE CITY OF NEW YORK, P.O. MANDEEP CHEEMA,
Tax Id. No. 950196, Individually and in his Official Capacity,
POLICE OFFICERS JOHN DOE #1-10, Individually and in
their Official Capacity (the name John Doe being fictitious,
as the true names are presently unknown),

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT,
EASTERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## VOLUME V OF VI (PAGES JA-867–JA-1166)

COHEN & FITCH LLP
*Attorneys for Plaintiff-Appellant*
233 Broadway, Suite 900
New York, New York 10279
(212) 374-9115
jfitch@cohenfitch.com

NEW YORK CITY LAW DEPARTMENT
*Attorneys for Defendants-Appellees*
100 Church Street, Room 6-178
New York, New York 10007
(212) 356-2490
Alexander.li@usdoj.gov

0862

# TABLE OF CONTENTS

Docket Entries ..............................................................................JA-1

Complaint, Dated January 31, 2019............................................JA-10

Plaintiff's Notice of Motion for Summary Judgment,
Dated July 12, 2021 .....................................................................JA-24

Plaintiff's Statement of Undisputed Facts, Dated July 12, 2021...............JA-26

Plaintiff's Supporting Declaration by Gerald M. Cohen,
Dated July 12, 2021 ......................................................................JA-34

    Exhibit A to Cohen Declaration -
    Excerpts of Transcript of EBT of Balwinder Singh (Plaintiff),
    Taken October 5, 2020.......................................................JA-36

    Exhibit B to Cohen Declaration -
    Excerpts of Transcript of Video-Conference EBT of
    Amandeep Kaur (Non-Party Witness),
    Taken December 3, 2020 ....................................................JA-49

    Exhibit C to Cohen Declaration -
    Excerpts of Transcript of EBT of P.O. Mandeep Cheema
    (Defendant), Taken October 7, 2020..................................JA-53

    Exhibit D to Cohen Declaration -
    Audio Recording of the 911 Call.......................................JA-99
    *(Submitted on Separate Thumbdrive)*

    Exhibit E to Cohen Declaration -
    Excerpts of Transcript of EBT of Nicole Milonas
    (Non-Party Witness), Taken October 22, 2020 ...............JA-100

    Exhibit F to Cohen Declaration -
    Pre-Hospital Care Report of Jamaica Hospital Medical
    Center Regarding Balwinder Singh,
    Dated February 28, 2018................................................JA-116

Exhibit G(1-3) to Cohen Declaration -
Full Video Recording .......................................................................JA-119
*(Submitted on Separate Thumbdrive)*

Exhibit H to Cohen Declaration -
Aided Report from Incident Occurred,
Dated February 28, 2018....................................................................JA-120

Exhibit I to Cohen Declaration -
Excerpts of Transcript of EBT of Justin Davis
(Non-Party Witness), Taken November 5, 2020 .............................JA-122

Exhibit J to Cohen Declaration -
Excerpts of Transcript of EBT of Malinda Walker
(Non-Party Witness), Taken October 27, 2020 ..............................JA-131

Exhibit K to Cohen Declaration -
Expert Radiologist Reports ..............................................................JA-137

Exhibit L to Cohen Declaration -
Photographs of Plaintiff's Face Injury.............................................JA-145

Exhibit M to Cohen Declaration -
Excerpts of Transcript of EBT of Marisabel Schapira
(Non-Party Witness), Taken October 22, 2020 ..............................JA-154

The City of New York and Officer Mandeep Chemma's
Notice of Cross-Motion for Summary Judgment,
Dated September 24, 2021 ................................................................JA-156

The City of New York and Officer Mandeep Chemma's
Response to Statement of Undisputed Facts and
Counter-Statement of Material Fact, Dated September 24, 2021 ..........JA-158

The City of New York and Officer Mandeep Chemma's
Supporting Declaration by Hannah V. Faddis,
Dated September 24, 2021 ................................................................JA-179

Exhibit A to Faddis Declaration -
Complaint, Dated January 31, 2019
(Reproduced herein at pgs. JA-10-JA-23)........................................JA-182

Exhibit B to Faddis Declaration -
City of New York and Mandeep Chemma's Answer,
Dated April 29, 2019.......................................................................JA-183

Exhibit C to Faddis Declaration -
Transcript of EBT of Balwinder Singh (Plaintiff),
Taken October 5, 2020....................................................................JA-193

Exhibit D to Faddis Declaration -
Transcript of EBT of P.O. Mandeep Cheema (Defendant),
Taken October 7, 2020....................................................................JA-384

Exhibit E to Faddis Declaration -
Transcript of EBT of Justin Davis (Non-Party Witness),
Taken November 5, 2020.................................................................JA-619

Exhibit F to Faddis Declaration -
Transcript of EBT of Malinda Walker (Non-Party Witness),
Taken October 27, 2020..................................................................JA-782

Exhibit G to Faddis Declaration -
Transcript of EBT of Nicole Milonas (Non-Party Witness),
Taken October 22, 2020..................................................................JA-867

Exhibit H to Faddis Declaration -
Transcript of EBT of Marisabel Schapira
(Non-Party Witness), Taken October 22, 2020 ..............................JA-986

Exhibit I to Faddis Declaration -
Transcript of Video-Conference EBT of Amandeep Kaur
(Non-Party Witness), Taken December 3, 2020...........................JA-1086

Exhibit J to Faddis Declaration -
Transcript of Video-Conference EBT of Lakhwinder Singh
(Non-Party Witness), Taken December 15, 2020.........................JA-1183

Exhibit K to Faddis Declaration -
NYPD Intergraph Computer Aided Dispatch System
Event Chronology .........................................................................JA-1298

Exhibit L to Faddis Declaration -
Pre-Hospital Care Report of Jamaica Hospital Medical
Center Regarding Balwinder Singh, Dated February 28, 2018
(Reproduced herein at pgs. JA-116-JA-118)..................................JA-1303

Exhibit M to Faddis Declaration -
Medical Records of Jamaica Hospital Medical Center
Regarding Balwinder Singh ..........................................................JA-1304

Exhibit N to Faddis Declaration -
EMS Video..................................................................................JA-1333
*(Submitted on Separate Thumbdrive)*

Exhibit O to Faddis Declaration -
Surveillance Video Still Images ....................................................JA-1334

Exhibit P to Faddis Declaration -
Audio Recording of the 911 Call made by Amandeep Kaur,
Dated February 28, 2018...............................................................JA-1340
*(Submitted on Separate Thumbdrive)*

Plaintiff's Response to Defendants' Counter-Statement of Material
Facts Pursuant to Local Rule 56.1, Dated November 12, 2021 .............JA-1341

Plaintiff's Reply Affirmation by Gerald M. Cohen,
Dated November 29, 2021 ........................................................JA-1376

Exhibit N to Cohen Reply Affirmation -
Video Recording ..........................................................................JA-1378
*(Submitted on Separate Thumbdrive)*

Exhibit O-1 to Cohen Reply Affirmation -
Still Photo from Video of Incident.................................................JA-1379

Exhibit O-2 to Cohen Reply Affirmation -
Still Photo from Video of Incident.................................................JA-1380

Exhibit O-3 to Cohen Reply Affirmation -
Still Photo from Video of Incident.................................................JA-1381

Exhibit O-4 to Cohen Reply Affirmation -
Still Photo from Video of Incident.................................................JA-1382

v

Exhibit O-5 to Cohen Reply Affirmation -
Still Photo from Video of Incident..................................................JA-1383

Letter from Hannah V. Faddis to Hon. Eric Komitee,
Dated May 10, 2022 ......................................................................JA-1384

Report and Recommendation of Hon. Steven L. Tiscione,
Dated June 28, 2022 ......................................................................JA-1385

Memorandum and Order of Hon. Eric Komitee,
Dated September 30, 2022 ............................................................JA-1404

Stipulation and Order of Partial Dismissal, Dated December 2, 2022..JA-1431

Judgment of United States District Court Eastern District of
New York, Dated December 6, 2022, Appealed From .............................JA-1434

Plaintiff's Notice of Appeal, Dated January 4, 2023...............................JA-1436

```
                                                   Page 1
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   -----------------------------------------X
     BALWINDER SINGH,
 3
                             PLAINTIFF,
 4
             -against-    Case 1:19-cv-00632
 5
 6   THE CITY OF NEW YORK, P.O. MANDEEP CHEEMA,
     Tax Id. No. 950196, Individually and in his
 7   Official Capacity, and POLICE OFFICERS
     "JOHN DOE" #1-10, Individually and in their
 8   Official Capacity (the name John Doe being
     fictitious, as the true names are presently
 9   unknown),
10                           DEFENDANTS.
     -----------------------------------------X
11
12                   DATE: October 22, 2020
13                   TIME: 2:11 p.m.
14
15
16        EXAMINATION BEFORE TRIAL of the
17   Non-Party Witness, NICOLE MILONAS, taken by
18   the Plaintiff, pursuant to a Subpoena, held
19   on a Virtual Zoom, before Alexis A. Vargas,
20   a Notary Public of the State of New York.
21
22
23
24
25
```

```
                                                    Page 2
 1   A P P E A R A N C E S:

 2

 3   COHEN & FITCH, LLP
        Attorneys for the Plaintiff
 4      110 E. 59th Street, Suite 3200
        New York, New York 10022
 5      BY: ILYSSA FUCHS, ESQ. via Zoom

 6

 7   NEW YORK CITY LAW DEPARTMENT
        Attorneys for the Defendants
 8      100 Church Street
        New York, New York 10007
 9      BY: HANNAH FADDIS, ESQ. via Zoom

10

11   ALSO PRESENT: GERALD COHEN, ESQ. via Zoom

12

13                *          *          *

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                                                      Page 3
 1                      STIPULATIONS
 2          IT IS HEREBY STIPULATED AND AGREED,
 3     by and among counsel for the respective
 4     parties hereto, that the filing, sealing
 5     and certification of the within deposition
 6     shall be and the same are hereby waived;
 7          IT IS FURTHER STIPULATED AND AGREED
 8     that all objections, except as to form of
 9     the question, shall be reserved to the time
10     of the trial;
11          IT IS FURTHER STIPULATED AND AGREED
12     that the within deposition may be signed
13     before any Notary Public with the same
14     force and effect as if signed and sworn to
15     before the Court.
16                   *      *      *
17
18
19
20
21
22
23
24
25
```

```
                                        Page 4
 1   N I C O L E   M I L O N A S, called as a
 2   witness, having been first duly sworn by a
 3   Notary Public of the State of New York, was
 4   examined and testified as follows:
 5   EXAMINATION BY
 6   MS. FUCHS:
 7        Q.    Please state your name for the
 8   record.
 9        A.    Nicole Milonas.
10        Q.    Please state your address for
11   the record.
12        A.    97-03 98th Street, Ozone Park,
13   New York 11416.
14        Q.    Good afternoon, Ms. Milonas.
15   My name is Ilyssa Fuchs.  I represent the
16   Plaintiff, Balwinder Singh, in an action
17   that's currently pending against the City
18   of New York and a few police officers.  I'm
19   joined today by my co-counsel, Mr. Cohen,
20   and defense counsel for the city, Ms.
21   Faddis, and obviously we also have the
22   Court Reporter here, that's Ms. Vargas.
23        A.    Okay.
24        Q.    As you are probably aware, you
25   are not a defendant in this case.  You're
```

Case 23-24, Document 32, 04/19/2023, 3501832, Page11 of 306
**[JA-871]**

Page 5

```
 1              N. MILONAS
 2   not being sued.  You're just a witness.  We
 3   have you here today, because we want to
 4   find out what you observed on the date of
 5   the incident that this case is about, which
 6   is February 28th of 2018.  I might refer to
 7   that date as February 28th of 2018, or I
 8   might call it the date of the incident, but
 9   that's the date that I'm talking about.
10       A.    Okay.
11       Q.    I have just a few ground rules
12   before we get started with the questions.
13   First, when I'm asking a question, wait for
14   me to finish before you start to answer.
15   We're doing this through Zoom, so sometimes
16   if multiple people are talking at the same
17   time, Zoom can get glitchy, and then the
18   Court Reporter might not be able to get
19   things down, or I or the other participants
20   may not be able to hear you.  Even if the
21   Zoom doesn't glitch out, the Court
22   Reporter, Ms. Vargas, she can only take
23   down one person talking at a time.  If
24   you're anticipating what I'm asking,
25   because I haven't finished my question yet,
```

Case 23-24, Document 32, 04/19/2023, 3501832, Page12 of 306
**[JA-872]**

```
                                            Page 6
 1              N. MILONAS
 2   and you start to answer, and we're both
 3   talking at the same time, she may not get
 4   something down, and we want to make sure we
 5   get an accurate transcript.
 6        A.    Okay.
 7        Q.    Although we're on video, this
 8   is not being video recorded.  The only
 9   recording of this proceeding is going to be
10   the transcript, so I just ask that you make
11   sure all your answers are verbal, no head
12   nods or hand gestures.  If you do need to
13   make some type of physical gesture, do
14   please describe what you're doing verbally.
15   If you don't understand a question, that's
16   okay.  Tell me that you don't understand.
17   If you answer a question, then it's
18   presumed that you understand the question.
19   If you don't remember something, or you
20   don't know something, that's okay also.
21   Just tell us that you don't remember or you
22   don't know.  I may then ask you other
23   follow-up questions that you may also not
24   remember, and that is also okay.  It's just
25   so we have a record of it.
```

```
                                              Page 7
 1                  N. MILONAS
 2        A.    Okay.
 3        Q.    If you need to take a break to
 4   use the bathroom, get a drink, or anything
 5   like that, just let us know.  We're happy
 6   to pause if we need to.  We cannot pause if
 7   there's a question pending.  If I've asked
 8   you a question, and you haven't given an
 9   answer yet, please just answer the
10   question, and then let us know that you
11   want to take a break.  Do you understand
12   all of my instructions?
13        A.    Yes.
14        Q.    Do you have any questions
15   before we get started?
16        A.    No.
17        Q.    Have you ever testified before?
18        A.    Twice.
19        Q.    When were those two times?
20        A.    Once last year and once
21   probably the year before.  I'm not
22   completely sure of the exact dates, but it
23   was about that time frame.
24        Q.    The testimony that you gave
25   last year, what was that in connection
```

```
                                              Page 8
  1                  N. MILONAS
  2    with?
  3         A.    I don't think I'm authorized.
  4    You guys would have to ask my boss or risk
  5    management about that.
  6         Q.    Generally speaking, was it
  7    involving a lawsuit, or was it something
  8    personal, or something else?
  9         A.    I don't think it was a lawsuit.
 10    They just asked me to be a witness.  I
 11    don't know if anyone got sued or anything
 12    like that.  It was never anything like
 13    this.  I just went into the office and
 14    spoke to them and they recorded it.
 15         Q.    You were a witness in some type
 16    of proceeding similar to the fact that
 17    you're a witness today; is that correct?
 18         A.    Yes.
 19         Q.    Is that the same as the
 20    testimony that you gave the year before
 21    when you were also a witness in that
 22    proceeding?
 23         A.    Yeah.
 24         Q.    You understand that when you're
 25    testifying today, the oath that you took at
```

```
                                         Page 9
 1                N. MILONAS
 2   the beginning of this proceeding is the
 3   same as if you were taking an oath in court
 4   to tell the truth?
 5        A.    Yes.
 6        Q.    Before you came to meet with us
 7   today and in the past 24 hours, have you
 8   taken any drugs or medications that would
 9   impair your ability to testify truthfully
10   today?
11        A.    No.
12        Q.    Have you failed to take any
13   medications in the past 24 hours that you
14   were supposed to take?
15        A.    No.
16        Q.    Is there any reason why you
17   could not testify truthfully today?
18        A.    No.
19        Q.    What's your date of birth?
20        A.    XX/XX/1993.
21             MS. FUCHS:  We will only put
22          the year on the record, for her
23          privacy.
24        Q.    How old are you?
25        A.    I'm 26, about to be 27.
```

```
                                          Page 10
   1                    N. MILONAS
   2        Q.     What is your approximate
   3   height?
   4        A.     I am 5 foot 2 and a half.
   5        Q.     Was that your approximate
   6   height on the date of this incident,
   7   February 28th of 2018?
   8        A.     I would hope so, otherwise, I'm
   9   shrinking.
  10        Q.     What is your approximate
  11   weight?
  12        A.     About 125.
  13        Q.     Was that your approximate
  14   weight on the date of the incident?
  15        A.     Yes.
  16        Q.     Your eyesight, what is your
  17   current eyesight?
  18        A.     It's 20/20.
  19        Q.     Was that your eyesight on the
  20   date of the incident?
  21        A.     Yes.
  22        Q.     Do you wear any corrective
  23   lenses, glasses, contacts, anything like
  24   that?
  25        A.     No.
```

```
                                          Page 11
 1                  N. MILONAS
 2         Q.     What is your highest level of
 3    education?
 4         A.     College.
 5         Q.     Where did you attend college?
 6         A.     John Jay and then Westchester
 7    Community College.
 8         Q.     What did you study while you
 9    were at John Jay?
10         A.     Criminal Justice.
11         Q.     When did you attend John Jay?
12         A.     I graduated high school in
13    2011, so I guess the year after.
14         Q.     Did you graduate from John Jay?
15         A.     No.
16         Q.     How long were you at John Jay
17    before you left to go to Westchester
18    College?
19         A.     About two years.
20         Q.     Why did you decide to leave
21    John Jay to go to Westchester?
22         A.     When I was in John Jay, that's
23    when I wanted a career shift.  I wasn't
24    really a fan.  It was mainly, like, there
25    was English and History, and I wasn't about
```

```
                                    Page 12
 1              N. MILONAS
 2   that, so that's when I became an EMT, and I
 3   really liked that and wanted to pursue it,
 4   so I went to Westchester Community College.
 5        Q.    When did you start at
 6   Westchester Community College?
 7        A.    After the two years.  I became
 8   an EMT, did that for a little, and then
 9   after that I went to Westchester.  I don't
10   know the exact date.
11        Q.    Did you graduate from
12   Westchester?
13        A.    It was a paramedic program.  I
14   wasn't going for biology or anything like
15   that.
16        Q.    The specific courses that you
17   were taking were related, specifically, to
18   being a paramedic EMT; is that correct?
19        A.    Yes.
20        Q.    Other than your education at
21   John Jay and Westchester Community College,
22   did you attend any other college or
23   vocational training?
24        A.    No.
25        Q.    Do you have any military
```

```
                                    Page 13
 1                N. MILONAS
 2    experience?
 3         A.    No.
 4         Q.    Before you became an EMT, what,
 5    if any, jobs did you hold?
 6         A.    Mainly, I worked with my
 7    family, they owned a restaurant.  I worked
 8    at an ice cream shop when I was younger.
 9         Q.    Why did you decide you wanted
10    to become an EMT?
11         A.    I met a friend of mine,
12    actually, it was a spur of the moment
13    thing.  It was something I looked into and
14    I liked.  Once I got into it, that's when
15    my passion for it became more when I was
16    able to do the hands-on physical, when I
17    was able to get those jobs where I can feel
18    like I was making a difference, or I helped
19    that person.
20         Q.    Were any of your friends or
21    family members an EMT before you became an
22    EMT?
23         A.    One of my friend's.  She
24    currently works for FDNY.
25         Q.    You said you went to
```

```
                                              Page 14
 1                  N. MILONAS
 2    Westchester College to train to become an
 3    EMT; is that correct?
 4          A.    No.  I went to LIJ.  That's
 5    where I got my EMT.  Westchester Community
 6    College was for the paramedic program.
 7          Q.    Walk me through the training
 8    that you did at LIJ.  What did you have to
 9    do to become an EMT?
10          A.    It was six months.  Then it
11    was, basically, it went through each
12    chapter, each level of the human body,
13    going over medications, treatments,
14    different diseases, and then it went into
15    specific protocols that we would have to
16    know, each state and each city have
17    different protocols.  Then it went onto
18    hands-on skills, and you take what you
19    learn and apply it hands-on to an actual
20    patient.  We were all tested out and had to
21    do a ride-along.
22          Q.    You had to take an exam; is
23    that correct?
24          A.    Yes.
25          Q.    Did you obtain your
```

Page 15

```
              N. MILONAS
 1
 2    certification after you did the ride-along?
 3        A.    I got my certification.   When I
 4    first started EMT school, they encouraged
 5    us to link up with the volunteer system.    I
 6    was doing that throughout the EMT school.
 7    I was riding an ambulance.
 8        Q.    What was the difference between
 9    the EMT training that you did at LIJ and
10    the paramedic training that you did at
11    Westchester?
12        A.    Paramedic is a different
13    certification.   It's EMTP.   Basically, they
14    can do an EKG, they can give you
15    medication, they can administer
16    medications.   That's generally the main
17    difference.
18        Q.    What kind of training did you
19    do when you were at Westchester Community
20    College for the paramedic certification?
21        A.    It's basically the same exact
22    thing, just more advanced.   We still had
23    the hands-on.   We still had the book
24    learning.   What they had was more critical
25    thinking, and then it was the hands-on
```

```
                                          Page 16
 1                    N. MILONAS
 2    skills.
 3         Q.     Before you became an EMT at
 4    Jamaica Hospital, did you hold any other
 5    EMT positions?
 6         A.     No.
 7         Q.     When did you start working for
 8    Jamaica Hospital?
 9         A.     In 2014, I believe.  I did a
10    year with their transport, because I was 20
11    years old.  I turned 21, and that's when
12    they moved me over to the other side.
13         Q.     What's your official position
14    with Jamaica Hospital?
15         A.     I am a full-time EMT.
16         Q.     During your career as an EMT,
17    approximately, how many calls do you think
18    you've responded to?
19         A.     Thousands.  It feels like
20    thousands.
21         Q.     Out of these thousands of calls
22    that you probably responded to since you
23    became an EMT, approximately, how many of
24    them dealt with intoxicated people?
25         A.     A large portion.  If I worked
```

Case 23-24, Document 32, 04/19/2023, 3501832, Page23 of 306
**[JA-883]**

```
                                          Page 17
 1                    N. MILONAS
 2    eight hours, it's one shift or tour, and we
 3    would probably get like four.
 4         Q.     Four intoxicated people each
 5    shift you would say?
 6         A.     Yeah, and that's on a regular
 7    day.  That doesn't include holidays, that
 8    obviously goes up, the weekends of the
 9    holidays, and events, and stuff like that.
10         Q.     When we're talking about
11    intoxicated people, did you have any
12    specific training on dealing with
13    intoxicated people?
14         A.     Basically, our training goes
15    down to the protocols.  It has to do with
16    mental capacity.
17         Q.     What exactly were you trained
18    when it comes to dealing with intoxicated
19    people and mental capacity?
20         A.     We have to first make sure that
21    it is the alcohol that is causing this,
22    whether they admit it, the smell, the
23    alcohol bottles around them, mainly a
24    majority of the time, 99 percent of the
25    time, they admit that they are in fact
```

```
                                          Page 18
 1                  N. MILONAS
 2     drunk and did drink.
 3          Q.    What's the purposes of making a
 4     determination of whether somebody is
 5     intoxicated or something else?
 6          A.    It has to do with their mental
 7     state, if they have decision making
 8     capacity.
 9          Q.    When it comes to decision
10     making capacity, were you trained about
11     people refusing medical attention?
12          A.    Yes.
13          Q.    Under what circumstances can
14     someone refuse medical attention?
15          A.    If they are alert and oriented,
16     have decision making capacity, have a
17     Glasgow Coma Scale of 15, which means they
18     are oriented, they are able to follow basic
19     commands, and they are able to walk on
20     their own.  If they are mentally in tact.
21     We basically follow, there actually is
22     protocol that New York City has.  If a
23     patient is alert with a GCS of 15, and no
24     evidence of apparent medical or physical
25     conditions which may limit the patient's
```

```
                                                    Page 19
 1                    N. MILONAS
 2      ability to think rationally.
 3           Q.      When it comes to intoxicated
 4      people, are all intoxicated people
 5      automatically deemed ineligible to refuse
 6      medical attention, or does it still go to
 7      this assessment you're talking about, or
 8      something else?
 9           A.      If there is any type of gray
10      area, what we are allowed to do is contact
11      our doctor through telemetry.  Honestly, in
12      my experience, I haven't had one time that
13      I've contacted them where they haven't said
14      that the person has to go to the hospital.
15           Q.      If somebody is drunk and they
16      say they don't want to go to the hospital,
17      do they always have to go to the hospital?
18           A.      If they are drunk, what do you
19      mean by drunk?  I had a beer, or I'm highly
20      intoxicated?
21           Q.      That's what I'm trying to
22      figure out.  At what point do you make the
23      determination that somebody is intoxicated
24      that they can say they don't want to go to
25      the hospital versus they have to go to the
```

```
                                              Page 20
 1                    N. MILONAS
 2   hospital?
 3        A.     We refer to protocol.  If your
 4   gait is not stable, you're not able to walk
 5   properly without the possibility of
 6   falling, again, referring to the protocol,
 7   if you have no evidence of apparent medical
 8   or physical conditions which may limit your
 9   ability to think rationally.  You have to
10   be able to prove you have rational thought.
11        Q.     For example, if somebody is
12   home and they are on their couch and they
13   are drunk, but they are not meeting these
14   other criteria that you're describing,
15   would they have the ability to refuse to go
16   to the hospital if they didn't want to?
17              MS. FADDIS:  Objection to the
18        form.  You can answer.
19        A.     What was that?
20        Q.     For example, if somebody is
21   home and they are in their own home and
22   they are on their couch and they're drunk
23   and you arrive on the scene, would that
24   person, assuming they didn't meet any of
25   the other criteria that you described,
```

Case 23-24, Document 32, 04/19/2023, 3501832, Page27 of 306
**[JA-887]**

```
                                        Page 21
 1                 N. MILONAS
 2   would they be able to refuse treatment and
 3   refuse to go to the hospital?
 4        A.    If they are alert and they have
 5   the GCS of 15 with no apparent medical or
 6   physical conditions that could limit their
 7   ability to think rationally, then they do
 8   fit the criteria for an RMA, but we do
 9   contact our doctor just to make sure that
10   legally they are allowed to be home.
11        Q.    Are there any circumstances
12   where you're justified in using force to
13   get an individual to go to the hospital?
14        A.    We use tools, like the police,
15   and sedation.  I don't really call it
16   force, because you're not able to be
17   rational.  Basically, if you're a harm to
18   yourself or someone else, you are required
19   to go to the hospital.
20        Q.    How do you make that
21   determination, whether somebody is a harm
22   to themselves or somebody else?
23        A.    It basically has to do with the
24   situation of the job at hand, and we refer
25   back to our protocols.
```

Case 23-24, Document 32, 04/19/2023, 3501832, Page28 of 306
**[JA-888]**

```
                                              Page 22
 1                    N. MILONAS
 2         Q.     You mentioned the Glasgow 15.
 3    How do you determine whether someone has a
 4    Glasgow that's higher or lower than 15?
 5         A.     Each category within it is a
 6    number.  So, a GCS of 3 is basically a DOA.
 7    You're not moving, you're not able to do
 8    anything, and you're not alert, you are
 9    completely unresponsive.
10         Q.     When you say DOA, you mean dead
11    on arrival?
12         A.     Yes, or someone is in cardiac
13    arrest, they have a GCS of 3.  There are
14    some people who can function normally and
15    answer all of our questions, but they still
16    don't meet that rational ability to think
17    properly, or they can be a harm for
18    themselves or others, such as an EDP, or
19    anyone with psychiatric behavioral issues,
20    etcetera.
21         Q.     If a patient is refusing
22    medical attention, who makes the decision
23    about whether or not they have to go to the
24    hospital?
25         A.     We do and our doctors.  We go
```

```
                                             Page 23
 1                    N. MILONAS
 2   by our protocols, and if there's an issue,
 3   we contact our doctor or a boss.
 4          Q.     When you say we, you mean the
 5   EMTs; is that correct?
 6          A.     EMTs, paramedics.
 7          Q.     Generally, when you contact the
 8   doctor, is there somewhere specific, is it
 9   the doctor at Jamaica Hospital, because
10   that's where you work, or is it somewhere
11   else?
12          A.     FDNY has telemetry.  That
13   doctor gets on the phone with us.  We tell
14   them what's going on.  They are the ones
15   who make the final decision, if it gets to
16   that point.
17          Q.     I'm going to direct your
18   attention to February 28th of 2018, which
19   is the date of the incident.  Were you
20   working as an EMT for Jamaica Hospital that
21   day?
22          A.     Yes.
23          Q.     What was your tour of duty that
24   day?
25          A.     It says I was working
```

Page 24

1                    N. MILONAS

2       54F1-54F1, which is an overnight tour,

3       generally 12:00 to 8:00.

4            Q.    When you say it says, are you

5       referring to the Call Report?

6            A.    Yes.

7            Q.    I'm going to bring that up on

8       the screen right now.  In the future, if

9       you're testifying from something that you

10      saw in the report, that you don't have an

11      independent recollection of, just make sure

12      to let us know.

13           A.    Okay.

14           Q.    We are looking at the Call

15      Report, which is Exhibit 1.  The part that

16      you're referring to right now is the part

17      that says unit number; is that correct?

18           A.    Yes.

19           Q.    When you say 54F1-54F1, that

20      was your unit on February 28th of 2018?

21           A.    Yes.

22           Q.    Who were you working with that

23      evening?

24           A.    According to that PCR Report, I

25      was working with Marisabel Schapira.

**[JA-891]**

```
                                            Page 25
 1                N. MILONAS
 2        Q.    Do you remember working with
 3   her that night?
 4        A.    Two years ago, no.  I don't
 5   recall this specific incident.
 6        Q.    Do you generally work with
 7   Marisabel, is she your regular partner?
 8        A.    Recently she is, but just
 9   because you have a partner, doesn't mean
10   you work with them every shift.  We work
11   right now together one time each week.  If
12   we don't, sometimes we swap shifts, so we
13   don't work together.  Right now, we are
14   partners just for that one shift of the
15   week.  I don't know back then if we were
16   consistent partners, but it changes as
17   you're able to modify your schedule.
18        Q.    It's fair to say that that
19   evening you guys were working together on
20   the same midnight tour?
21        A.    Yes.
22        Q.    That tour went from what time
23   to what time?
24        A.    It runs from midnight to 8:00
25   a.m.
```

Page 26

1          N. MILONAS

2          Q.     Approximately, what time do you

3    think you got to work that evening?

4          A.     Well, we start at midnight, so

5    I don't know.

6          Q.     Do you generally get to work 10

7    minutes before, or 15 minutes before, a

8    half an hour before, something else?

9          A.     I can't recall the specific

10   date.  Sometimes I get there two hours

11   early.  My boss would know when I clocked

12   in.

13         Q.     Before you actually start your

14   tour, what do you do when you arrive at

15   your base?

16         A.     We go to base, we punch in, and

17   we get all of our equipment ready.  That's

18   all our personal stuff that we have.  We

19   put our uniform on.  When we get the truck,

20   we clean it, equipment is there, and we log

21   on and are available for jobs.

22         Q.     When you say the truck, you

23   mean an ambulance; is that correct?

24         A.     Yes.

25         Q.     After you get your equipment

```
                                                    Page 27
     1                    N. MILONAS
     2    together and you get in the ambulance,
     3    where do you go while you're waiting for
     4    jobs to come over?
     5         A.    We have what's called a cell,
     6    which is a specific area that we are
     7    supposed to be in, they call it an 89.
     8         Q.    What does that mean?
     9         A.    It's basically the area where
    10    you sit and wait for jobs.
    11         Q.    Did you have any specific
    12    assignment on February 28th of 2018?
    13         A.    You mean a specific 89?
    14         Q.    Yeah, any specific assignment.
    15         A.    Every truck has one.  We sit on
    16    Guy Brewer, generally.
    17         Q.    Did there come a time on
    18    February 28th of 2018 that you responded to
    19    a job at 130-18 Atlantic Avenue on the
    20    third floor?
    21         A.    Are you referring to the
    22    document?
    23         Q.    Yeah.  I'll bring that back up.
    24    You don't have an independent recollection
    25    of this job, correct?
```

```
                                          Page 28
 1              N. MILONAS
 2        A.    No.
 3        Q.    Based on your review of the
 4   Call Report, where it says the incident
 5   location, is it fair to say you responded
 6   to a job at the address that I just
 7   mentioned, 130-18 Atlantic Avenue, third
 8   floor, correct?
 9        A.    Yes.
10              MS. FADDIS:  Can we state that
11          the physical document that she is
12          referring to is the same as Exhibit
13          1, just so there's no confusion.
14        Q.    Nicole, I'm going to bring up
15   Exhibit 1, and I just want you to look
16   through it, and just tell us that the
17   document that you have is exactly the same
18   as the document that I have on the screen.
19   I am going to scroll down so that you can
20   see all three pages.
21        A.    Okay.
22              MS. FADDIS:  Did you guys send
23          her this copy, or did the witness
24          have her own copy of this document?
25              MS. FUCHS:  We sent her this.
```

Case 23-24, Document 32, 04/19/2023, 3501832, Page35 of 306
**[JA-895]**

```
                                              Page 29

 1                    N. MILONAS
 2         Q.    This is the same document that
 3    you have, correct?
 4         A.    Yes.
 5         Q.    How did you become alerted to
 6    the job at 130-18 Atlantic Avenue?
 7         A.    I would assume we were driving
 8    and they called us for an assignment, and
 9    when we put ourselves that we were going to
10    it, this was the job that came up, this
11    incident address.
12         Q.    When you say you would assume,
13    you're making that assumption because you
14    don't have any independent recollection of
15    it; is that correct?
16         A.    Yes.
17         Q.    Do you remember when dispatch
18    alerted you to the job what exactly you
19    were told about the job?
20         A.    They say the assignment, for
21    example, and they throw the job up on our
22    screen, and it would say the unit number,
23    the incident location, and what the call
24    type is, and then it would have a summary
25    of, generally, what it was about, but that
```

Case 23-24, Document 32, 04/19/2023, 3501832, Page36 of 306
**[JA-896]**

Page 30

1            N. MILONAS

2 I can't recall that it would be in front of

3 me in the text.

4      Q.     When you got the call that

5 evening, what did you do?

6      A.     We responded to it.

7      Q.     When you responded, did you use

8 lights and sirens?

9      A.     Yeah.

10       MS. FADDIS:   Can we note when

11     the witness is referring to the

12     document.

13      Q.     Let us know when you're looking

14 at the document versus what you're telling

15 us from memory, okay?

16      A.     I don't remember, but based on

17 my recollection of the document.

18      Q.     Do you recall the urgency of

19 the call when it came over?

20      A.     What are you referring to?   Can

21 you rephrase that?

22      Q.     When you got the dispatch call,

23 were you told that it was urgent,

24 non-urgent, that it was not particularly

25 urgent, are there different levels of

Page 31

N. MILONAS

1

2  emergency or urgency when a call comes

3  over?

4       A.    No.   They are in categories.

5  Every category is considered emergent.

6  Categories one through six, we respond

7  lights and sirens to.

8       Q.    When you say one through six,

9  what do you mean by that?

10       A.    One is a cardiac arrest.   Four

11  is a drug.   Five is an injury.   Six is a

12  sick job.

13       Q.    Do you know what level this job

14  was?

15       A.    I'm looking at the document.   I

16  don't see here where it says it.

17       Q.    I'm going to bring this back up

18  here for a second.   Right here where it

19  says clinical on the second page, drug 4

20  drug, would that refresh your recollection

21  that it was a level four call?

22       A.    Yes.

23       Q.    Do you have any independent

24  recollection of it being a level four call,

25  or are you just getting that from the

Page 32

1                  N. MILONAS

2    document?

3         A.    I have no recollection, but I'm

4    getting it off the document.

5         Q.    When the call came over,

6    without looking at the document, do you

7    remember if they told you it was drugs, or

8    alcohol, or a combination of both, or

9    something else?

10        A.    I have no recollection.

11        Q.    When you arrived at the

12   incident location, who, if anyone, did you

13   encounter?

14        A.    I would have to refer to the

15   document for that, because I don't recall.

16        Q.    Let's go to the narrative

17   section of the document.  We are at the

18   narrative.  You can read it to yourself.

19   Did you fill out this report?

20        A.    Yes, according to the document.

21   The tech signature and name is mine.

22        Q.    You're responsible for all the

23   information that's in this document,

24   correct?

25        A.    I am responsible for writing

```
                                              Page 33
 1                    N. MILONAS
 2   it, yes.
 3        Q.    Do you have a business duty to
 4   make this report?
 5        A.    This is a patient care report
 6   also.
 7        Q.    It's part of your job to make
 8   this report, correct?
 9        A.    Yes.
10        Q.    Part of your job is that you
11   have to make this report accurately,
12   correct?
13        A.    Yes.
14        Q.    What is the purpose of this
15   report?
16        A.    A portion of this report has to
17   do with the job, what the job was.  A
18   portion has to do with billing and patient
19   information, and then a portion has to do
20   with the treatment of the patient.
21        Q.    When do you write this report?
22   Do you do it immediately during the
23   incident, immediately after the incident,
24   the next day, something else?
25        A.    It is during the call.  We do
```

Case 23-24, Document 32, 04/19/2023, 3501832, Page40 of 306

Page 34

                    N. MILONAS
1
2   not complete a call until this PCR is
3   completed and sent through.
4        Q.    Is it fair to say that this
5   document was made in close proximity to the
6   time of the call?
7        A.    Yes.  This document was made in
8   real time in conjunction with the call.  It
9   was made, generally, we do it in the back
10  of the ambulance on the way to the
11  hospital, if possible.
12       Q.    Let's go to the narrative here.
13  We are going to walk through it.  The first
14  part says, "Unit dispatched to incident
15  address for the drug."  Do you see that?
16       A.    Yes.
17       Q.    Do you have any independent
18  recollection of being dispatched to this
19  address for a drug call?
20       A.    I have no recollection of being
21  dispatched to this address.
22       Q.    Do you remember whether they
23  told you that it was drugs, or alcohol, or
24  something else when they came over on
25  dispatch?

Page 35

```
                              N. MILONAS
 1
 2        A.     From what I wrote and what came
 3   up in the system, it says that it was for a
 4   drug.
 5        Q.     The next part says, "Upon
 6   arrival unit found thirty eight year old
 7   male seated on the couch in his residence."
 8   Do you have any independent recollection of
 9   finding a thirty eight year old male on the
10   couch in his residence?
11        A.     No.
12        Q.     Based on this report, is it
13   fair to say that you found a thirty eight
14   year old male seated on the couch; is that
15   correct?
16        A.     Yes.
17        Q.     I had asked you previously
18   what, if anything, did the wife tell you
19   when you arrived, and what did you tell me?
20        A.     I don't recall you asking about
21   his wife.  You asked if I had encountered
22   anyone when I first initially got there,
23   and I said I don't remember the job, let
24   alone if I encountered someone.
25        Q.     Does this paragraph refresh
```

Case 23-24, Document 32, 04/19/2023, 3501832, Page42 of 306
**[JA-902]**

```
                                              Page 36
 1                  N. MILONAS
 2   your recollection at all as to what you
 3   were told when you arrived?
 4        A.    I have read this narrative
 5   about four times now, and when you sent it
 6   to me, and I don't have any recollection of
 7   this job still.
 8        Q.    It says, "Patient's wife states
 9   that the patient woke her and her son up.
10   Patient's wife states that the patient was
11   drinking and is not acting normal."  You
12   don't have any independent recollection of
13   the wife telling you that; is that correct?
14        A.    I do not.
15        Q.    The next part says, "Patient's
16   wife states that the patient is a harm to
17   himself."  Do you have any independent
18   recollection of being told that
19   information?
20        A.    I do not.
21        Q.    Do you remember whether the
22   wife ever said that the thirty eight year
23   old male had threatened her?
24        A.    I don't recall that.
25        Q.    Do you have any recollection of
```

Case 23-24, Document 32, 04/19/2023, 3501832, Page43 of 306
**[JA-903]**

```
                                              Page 37
 1                  N. MILONAS
 2   the wife telling you that he had assaulted
 3   her, or that he attempted to assault her?
 4        A.    Again, I don't recall this job.
 5        Q.    Do you remember whether the
 6   wife ever mentioned that he had any liver
 7   disease of any kind?
 8        A.    I do not recall that.
 9        Q.    Generally speaking, in your
10   opinion, as an EMT and paramedic, if you
11   were told that somebody had liver disease
12   and that they had been drinking, in your
13   opinion, would that constitute on its own
14   an imminent threat to the persons health or
15   safety?
16        A.    It is threatening, but in a
17   cognitive state, they are aware of that,
18   being instructed by their doctor, and know
19   they are generally advised of the risks of
20   drinking.
21        Q.    Just because somebody is
22   drinking and has liver disease, that
23   doesn't necessarily mean they are a threat
24   to themselves; is that correct?
25        A.    I mean in the long term, but
```

Page 38

                    N. MILONAS

1

2    you're aware of that, and you're advised of

3    that, and I would assume that when you're

4    speaking to your personal doctor, you're in

5    a normal cognitive rational state where you

6    can understand that and then go from there.

7         Q.    Acutely, there's no imminent

8    threat; is that correct?

9         A.    That would be between him and

10   his doctor.  I can't place any opinion on

11   how bad someone's liver disease is, whether

12   it's the initial stage of it, or what it

13   came from.

14        Q.    Would that, in and of itself,

15   be something that you would say this person

16   has to go to the hospital right now, or you

17   would still have to do an evaluation of

18   additional factors?

19             MS. FADDIS:   Objection to form.

20        You can answer.

21        A.    Repeat that.

22        Q.    If you had that piece of

23   information, that somebody had liver

24   disease and that they were drinking, would

25   that, in and of itself, be something that

Case 23-24, Document 32, 04/19/2023, 3501832, Page45 of 306
**[JA-905]**

```
                                              Page 39

 1                 N. MILONAS
 2   you would have to take this person to the
 3   hospital, or would you still be required to
 4   do an assessment of other factors?
 5        A.    The main assessment would be
 6   referring to the protocol.  If they have
 7   the ability to think rationally, their
 8   medical history is taken into account, but,
 9   you know, if they are deemed that they are
10   not alert, they can't stand up on their
11   own, they are a harm to themselves that
12   they can fall down the steps, because they
13   can't stand up straight, that's the reason
14   they would need to go.
15        Q.    I want to ask you some more
16   about the report.  Before I do, I want to
17   show you a little bit of a video from this
18   incident to see if it refreshes your memory
19   about anything that happened when you got
20   onto the scene, okay?
21        A.    Okay.
22        Q.    This video is Exhibit 2, which
23   is a video of EMS.  It's a 4 minute and 48
24   second video.  I'm playing it from the
25   beginning.  I'm stopping here at two
```

```
                                            Page 40
 1                  N. MILONAS
 2   seconds.  Do you see yourself on the video?
 3        A.    I see the side of me.
 4        Q.    I'll play it further.  Just let
 5   us know if this is you on the video.
 6        A.    Yes, that is me.
 7        Q.    We're at nine seconds.  The
 8   other person who is at the door in this
 9   still, do you know who that is?
10        A.    That is my partner, Marisabel
11   Schapira.
12        Q.    I'm going to play a little bit
13   more of this.  Now, we've seen about 20
14   seconds of the video.  Can you describe to
15   me what's going on here in the first 20
16   seconds of the video?
17        A.    We were allowed into the house
18   or the apartment, and I would assume that's
19   the patient on the couch, just based from
20   what I wrote in my narrative, and we are,
21   generally, when you first walk in, it's
22   your initial assessment, identifying any
23   threats, figuring out what's going on, and
24   why we were called there.
25        Q.    Just seeing the first 20
```

```
                                            Page 41
 1              N. MILONAS
 2   seconds of this video, has that
 3   independently refreshed your recollection
 4   as to anything that happened this evening?
 5        A.    It does not.
 6        Q.    If, at any point, you remember
 7   something independently, just let me know.
 8   I will stop the video.
 9        A.    Okay.
10        Q.    I am going to stop at 47
11   seconds.  It looks like you're speaking to
12   the individual on the couch, is that fair?
13        A.    Yes.
14        Q.    Do you remember anything that
15   you were saying to the individual on the
16   couch at this point?
17        A.    I don't even recall this job,
18   let alone what I was saying.
19        Q.    Generally speaking, what do you
20   think you were saying?
21             MS. FADDIS:  Objection to the
22        form.  You can answer.
23        A.    Generally speaking, what
24   happens on every job, we walk in, we talk
25   to the patient.  When we go in, after our
```

Case 1:19-cv-00632-EK-ST   Document 48-10   Filed 11/29/21   Page 42 of 119 PageID #: 1113

```
                                                Page 42
 1                    N. MILONAS
 2   initial scan of what's going on and the
 3   scene, we will speak to the caller and find
 4   out what is going on, why we were called
 5   there, and then we will speak to the
 6   patient, him or herself.
 7        Q.    Generally speaking, you believe
 8   you spoke to the caller, the 911 caller
 9   this night, but you don't have any
10   independent recollection of it; is that
11   correct?
12        A.    I do not.
13        Q.    You clearly believe you spoke
14   to the patient that night based on the
15   video, but you also don't have any
16   independent recollection of that; is that
17   correct?
18        A.    The recollection I have of the
19   patient is from the narrative.
20        Q.    Did this video refresh your
21   recollection as to the fact that you spoke
22   to the patient that night?
23        A.    I still don't have any
24   recollection of the job, or speaking to the
25   patient, but from the video that you're
```

```
                                         Page 43
 1                N. MILONAS
 2   showing me, I was in a residence and I was
 3   speaking to a person.
 4        Q.    We are going back to the video.
 5   I'm going to stop it at 2 minutes and 22
 6   seconds.  Is there anything that you've
 7   seen from the start of the video until the
 8   2 minute and 22 second mark that refreshes
 9   your recollection as to the incident?
10        A.    I still don't remember anything
11   of the incident itself independently, but
12   from what it looks like, and what I wrote
13   in my narrative that I referred to, it
14   coincides.  He does seem like he's getting
15   agitated.  He hit his hands on his leg.  It
16   seems like he's somewhat agitated.
17        Q.    Let's switch gears and go back
18   to the report for a second.  We already
19   went through the first part of the
20   narrative.  I'm at the part where it says,
21   "Patient alert and oriented X four/four
22   with periods of incoherency."  Can you
23   describe what that means?
24        A.    Generally, if they are alert,
25   it's that they are looking at you and
```

Page 44

                    N. MILONAS
1
2    talking.  The four/four is if they are able
3    to answer four questions, person, place,
4    time and event, who are you, who is your
5    wife, where are you right now, what year is
6    it, and what's going on.
7         Q.    Based on the narrative here in
8    your report, was the patient able to answer
9    those four questions?
10        A.    He was.
11        Q.    The next part says, "Periods of
12   incoherency."  Can you describe what you
13   mean by that?  In what way was he
14   incoherent?
15        A.    If I'm writing, "With periods
16   of incoherency," that means he was able to
17   answer all four of the questions, but there
18   was a problem with his rationality where he
19   was speaking and it was incomprehensible or
20   unclear.  He wasn't directly answering our
21   questions when we were discussing other
22   things.  He wasn't able to take what we
23   were saying, understand it and respond.
24        Q.    Moving onto the next part that
25   says, "Positive semi steady gait."  What

```
                                              Page 45
 1                   N. MILONAS
 2    does that mean?
 3         A.     Steady gait is a regular
 4    person, you're able to walk back and forth,
 5    you can hold yourself up.  If you are
 6    unable to ambulate, he would be on the
 7    ground, and he wouldn't even be able to
 8    stand up on his own.  If I wrote semi
 9    steady gait, he's probably able to stand
10    up, but he's not balanced.
11         Q.     The next part says, "Patient in
12    an irrational state."  Can you describe
13    what you meant by that?
14              MS. FADDIS:  Objection.  You
15         can answer.
16         A.     I have no recollection of the
17    job, but if I wrote that in comparison to
18    what I wrote in the narrative, it was that
19    along that he was incoherent, he wasn't
20    able to take what we were saying,
21    understand it, and formulate a response
22    that was of a rational thinking.
23         Q.     As you sit here today, do you
24    have any independent recollection of his
25    behavior or his state that evening?
```

Page 46

```
                                   N. MILONAS
 1
 2          A.     I have no recollection.  I'm
 3     referring just based off what I wrote in
 4     the narrative.
 5          Q.     The next line says, "Patient
 6     not cooperative with unit questioning."  In
 7     what way was the patient not being
 8     cooperative with questioning?
 9          A.     Again, I have no recollection
10     of this job, but if I were to write that
11     along with the entire narrative, that means
12     that we were trying to ask him questions,
13     especially during an assessment, and he was
14     not forthcoming.  He did not want to
15     cooperate, answer the questions that we
16     were asking.
17          Q.     The next sentence says,
18     "Patient became aggressive with crew."  Do
19     you have any independent recollection as to
20     how he became aggressive?
21          A.     I have no recollection.
22          Q.     Was he threatening you or your
23     partner?
24          A.     I have no recollection of the
25     job, but from what I wrote directly after
```

```
                                          Page 47
 1                  N. MILONAS
 2   that, in the narrative it states, "Patient
 3   became aggressive with crew.  Patient began
 4   yelling profanities and belligerently
 5   approaching crew."  There was a threat.
 6        Q.   As you sit here today, do you
 7   remember what the patient was cursing, what
 8   profanities he was using?
 9        A.   I do not recall this job, let
10   alone what he could have been saying.
11        Q.   Do you remember what he was
12   yelling?
13        A.   I still do not recall this job,
14   let alone what he could have been yelling.
15        Q.   Can you recall any specific
16   threats that he made?
17        A.   I do not recall this job, let
18   alone what he threatened, stated or did.
19        Q.   Do you recall whether he ever
20   attempted to assault you, or your partner,
21   or anyone else?
22        A.   I do not independently recall
23   this job, but as it states, he approached
24   us belligerently, and there was a threat
25   that we felt, especially if someone is
```

```
                                          Page 48
 1                  N. MILONAS
 2    yelling profanities like I had written.
 3         Q.    If he had made a specific
 4    threat, would you have written what the
 5    threat was in this report?
 6         A.    Not necessarily.
 7         Q.    Just reviewing the narrative,
 8    there is nothing specifically written in
 9    the report as to what the threat was; is
10    that correct?
11         A.    Of a verbal threat, there's
12    nothing written.  The threat of him
13    belligerently approaching us is written in
14    the report, along with him yelling at us.
15    In your video you showed me, he seemed
16    agitated and he was sticking his finger at
17    me and pointing.
18         Q.    You don't have any independent
19    recollection in the manner in which he may
20    have been acting irrationally; is that
21    correct?
22         A.    Correct.
23         Q.    Do you remember whether he ever
24    said he was going to kill himself?
25         A.    I have no recollection of this
```

```
                                              Page 49
 1                  N. MILONAS
 2   job, aside from what I wrote.
 3         Q.     Looking at the narrative, you
 4   didn't write anything in there about him
 5   claiming that he was going to kill himself;
 6   is that correct?
 7         A.     I did not write anything in the
 8   report that states that.
 9         Q.     If he would have said that he
10   was going to kill himself, is that
11   something you would have put in the report?
12         A.     Yes.
13         Q.     If he attempted to assault you
14   or your partner, or did assault you or your
15   partner, is that something you would have
16   put in the report?
17         A.     Yes and no.  If he did assault
18   us, we would definitely put that.
19   Attempting falls along the line of
20   belligerently coming up to us in our space
21   and in our faces.  That's another way of
22   basically writing it.  He's coming at us
23   aggressively in our faces.  If you're
24   asking if I wrote that he tried to throw a
25   punch, no, that is not something I wrote.
```

Case 23-24, Document 32, 04/19/2023, 3501832, Page56 of 306
**[JA-916]**

Page 50

                    N. MILONAS

1

2        Q.    I asked you whether he said he
3    was going to kill himself.  Do you
4    recollect if he ever said he was going to
5    hurt himself?
6        A.    I have no independent
7    recollection of this job.
8        Q.    If he would have said that he
9    was going to hurt himself, is that
10   something you would have put in the report?
11       A.    Yes, that is something I would
12   have put in the report.
13       Q.    Based on your independent
14   recollection, do you remember anything that
15   would have made you think that he was going
16   to kill himself or hurt himself that
17   evening?
18       A.    I have no independent
19   recollection, but from what I wrote in my
20   report, the wife stated that the patient is
21   a harm to himself.  I may have not wrote
22   what she said specifically, but she did say
23   he was a harm to himself, or he might have
24   done something to make her feel this way.
25   Again, what I wrote was that the patient

```
                                              Page 51
 1                    N. MILONAS
 2    was not answering our questions and wasn't
 3    cooperating.  Most likely, I had asked him,
 4    which is something we ask people routinely,
 5    if he wanted to hurt himself, if he wanted
 6    to hurt anyone else, any auditory visible
 7    hallucinations.  If he's not cooperative
 8    with me, regardless of if I asked him that,
 9    he wouldn't have given me an answer.
10         Q.    As far as you know, was the
11    wife a medical professional?
12         A.    I don't recall this job, let
13    alone that she was a medical professional.
14         Q.    Based on your review of the
15    report and the video that we've seen so
16    far, did you think that the Plaintiff was
17    suicidal in any way?
18              MS. FADDIS:  Objection to the
19         form.  You can answer.
20         A.    The fact that the wife stated
21    that he is a harm to himself that I had
22    written in the narrative, that's what we
23    went by.
24         Q.    Did you know what her basis for
25    making the allegation that he was a threat
```

Case 23-24, Document 32, 04/19/2023, 3501832, Page58 of 306

Page 52

                    N. MILONAS
1
2    to himself was?
3        A.    I do not recall, specifically.
4    We do not write things verbatim all the
5    time.  Then it would be a 20 page paper.
6    If he is not acting normal, and he is a
7    harm to himself, and the fact that he was
8    not acting rational with me, that I stated
9    he wasn't cooperative and he became
10   belligerent, and didn't have rational
11   thinking, and he wasn't in a state normal
12   to his baseline as per his wife.
13       Q.    Looking at your narrative now,
14   you didn't write down anything in the
15   narrative, specifically, as to your
16   assessment that he was a harm to himself;
17   is that correct?
18       A.    That is correct.  I wrote that
19   he wasn't answering our questions and
20   wasn't cooperative.  I could have asked
21   him, but he most likely didn't tell me from
22   what I wrote.
23       Q.    Not answering questions or
24   being cooperative, in and of itself,
25   doesn't necessarily tell you if somebody is

```
                                          Page 53
 1                   N. MILONAS
 2    a harm to themselves, correct?
 3         A.    It does not.
 4         Q.    When it says, "Belligerently
 5    approaching crew," do you have any
 6    independent recollection as to the manner
 7    in which he approached you?
 8              MS. FADDIS:  Objection.  You
 9         can answer.
10         A.    I do not have any independent
11    recollection of this job.
12         Q.    At some point, did you make the
13    decision to contact the Police Department?
14         A.    I don't know.  I don't recall
15    if we called them, or they had already got
16    there, but if they were not there at the
17    time, and he was acting this way towards
18    us, it would have been an immediate call on
19    our radio that we are requesting PD.
20         Q.    When it says here in the
21    narrative, "PD arrived on the scene," based
22    on the report, you recall that the Police
23    Department arrived on the scene; is that
24    correct?
25         A.    Yes, that is what I wrote.
```

```
                                          Page 54
 1                  N. MILONAS
 2        Q.    You don't recall whether you
 3   called the police, or somebody else called
 4   the police, correct?
 5        A.    That I do not recall.  I would
 6   have to look at the dispatch, our unit
 7   history text.
 8            MS. FUCHS:  Hannah, can you put
 9        the Event Chronology up.  I don't
10        have it on my computer.
11            MS. FADDIS:  Sure.
12        Q.    The document that's on the
13   screen, this is Exhibit A.  Do you
14   recognize this document?
15        A.    I do not.
16        Q.    Generally speaking, do you know
17   what this document is?
18        A.    I've never seen a document like
19   this before.  This doesn't look like ours.
20        Q.    If I told you that this is the
21   dispatch document that was created with
22   respect to this job, would it match up with
23   your recollection of similar things that
24   come up on your computer system?
25        A.    It would not.  We have a
```

Page 55

1                    N. MILONAS
2    completely different text of this.  I've
3    never seen anything in this format before.
4         Q.    I'm going to scroll down.  We
5    are here at 6:28 in the morning.  Do you
6    see that?
7         A.    Yes.
8         Q.    It says, "Event comment EMS
9    unit on scene."  Do you see that?
10        A.    Yes.
11        Q.    Would it be fair to say that at
12   6:28 in the morning on 2/28/18 you were on
13   the scene at the Atlantic Avenue address?
14        A.    Comparing it with my report,
15   yes, it seems correct.
16        Q.    I'm going to direct your
17   attention to the 10 minutes later,
18   06:38:03.  Under the comments it says,
19   "Please send RMP, uncooperative PT."  Do
20   you see that?
21        A.    Yes.
22        Q.    Would that refresh your
23   recollection as to whether or not you
24   called for a Police Department, or they had
25   just arrived?

Case 23-24, Document 32, 04/19/2023, 3501832, Page62 of 306
**[JA-922]**

```
                                          Page 56

  1                   N. MILONAS

  2        A.    I still don't have any

  3   independent recollection of this job, but

  4   looking at that, it states that I or my

  5   partner called them.

  6        Q.    You said either you or your

  7   partner.  Do you remember who made the

  8   decision to call for police back-up?

  9        A.    I do not recall that.

 10        Q.    Generally speaking, if you need

 11   to call the police, do you make that call

 12   from inside the apartment, near the

 13   apartment, something else?

 14        A.    Generally, if there's a threat

 15   to ourselves, we will try to leave the

 16   apartment.  If there is any possible way

 17   that we can't, or we feel like it would be

 18   more of a threat if we did, then one of us

 19   would step out and do it, or we will turn

 20   away and call it over the air on the radio.

 21        Q.    Do you remember whether or not

 22   you stayed in the apartment while you

 23   waited for the Police Department in this

 24   case?

 25        A.    I do not recall.  Generally, if
```

```
                                                   Page 57
 1                    N. MILONAS
 2     it's a case where we would've had to leave,
 3     or been able to leave, it would be on that
 4     document where we would tell the dispatcher
 5     that we needed to leave the residence.
 6          Q.    Based on what we saw so far,
 7     there's nothing on the dispatch document
 8     that you saw that indicates that you left
 9     the apartment; is that correct?
10          A.    That is correct.
11          Q.    What were your intentions when
12     the police were called?
13               MS. FADDIS:  Objection to form.
14          Go ahead.
15          A.    There was no intention.  There
16     was a threat to myself and my partner, and
17     the patient was being uncooperative, so we
18     needed police there for our safety.
19          Q.    At that point, when you called,
20     there was no intention to have the police
21     remove the patient to the hospital, or
22     remove the patient from the apartment?
23               MS. FADDIS:  Objection.  Go
24          ahead.
25          A.    I don't recall this incident
```

Page 58

                    N. MILONAS

1
2   exactly.
3         Q.    Do you remember whether the
4   Plaintiff was appearing to be suffering
5   from any type of alcohol poisoning?
6         A.    I don't recall this job, let
7   alone that, but, generally, we don't deem
8   if a patient needs to go when the police
9   come.  We deem it in the initial assessment
10  of the patient.  If he was willing, and he
11  cooperated, and willingly went and didn't
12  threaten us, there would be no call for the
13  police.  The fact that he did all of that
14  from my narrative, we don't risk ourselves
15  for the patient.  We would leave.  At the
16  same time, we don't abandon the patient and
17  his care.  He still needs care.
18        Q.    Based on what you've told us so
19  far, the review of your document, is it
20  fair to say that it was your belief that he
21  needed medical treatment that evening?
22        A.    Yes, it is.
23        Q.    Is it fair to say that if you
24  didn't believe he needed medical treatment,
25  that he could have refused medical

Page 59

N. MILONAS

1
2    attention, you would have just left and not
3    called the police; is that correct, or is
4    that fair?
5         A.    If he had the ability to refuse
6    then, yes, you're more than welcome to
7    refuse.  We don't kidnap anyone.  If you're
8    intoxicated, you don't have rational
9    thinking, if you're not alert and oriented,
10   if you don't have decisional capacity, then
11   we don't just leave you.
12        Q.    Based on your independent
13   recollection, did he appear to be suffering
14   from any of the symptoms of alcohol
15   poisoning?
16        A.    I still don't recall this job.
17   It would be based off my narrative and the
18   patient care report summary.
19        Q.    If he would have exhibited
20   symptoms of alcohol poisoning, would you
21   have put that in the patient care summary?
22        A.    Yes, most likely.
23        Q.    Let's back up for a second.
24   Can you tell us what the symptoms of
25   alcohol poisoning are?

```
                                                    Page 60
 1                    N. MILONAS
 2         A.      Generally, he would have to be
 3    severely highly intoxicated, and he wasn't
 4    at that point from my assessment.  He was
 5    still able to answer the four questions.
 6    He wasn't on the floor unconscious.  He
 7    still had a semi steady gait.  He was
 8    cognitive enough to threaten us, or be
 9    belligerent and yell profanities.
10         Q.      Based on that, the information
11    that you just gave us, how did you make the
12    determination that he was unable to refuse
13    and had to go to the hospital?
14         A.      The fact that he's unable to
15    refuse, we refer to the army protocol.  I
16    stated this twice already.  He did not meet
17    the criteria.  He did not have rational
18    thinking.  He was able to stand, but he did
19    not have a complete steady gait, so he did
20    not fit the criteria where he was able to
21    refuse care.  He did not have that decision
22    making capacity.
23         Q.      I want to make sure I'm clear.
24    What was the basis for you to make the
25    determination that he needed medical
```

```
                                          Page 61
 1                  N. MILONAS
 2   attention?
 3        A.    I have no independent
 4   recollection of this call, but referring to
 5   what I wrote in my narrative, the fact that
 6   he's been drinking, and in conjunction from
 7   what we saw on the scene, that deemed the
 8   necessity for him to go to the hospital.
 9        Q.    As you sit here today, you
10   don't have any independent recollection as
11   to what you saw to make that determination;
12   is that correct?
13        A.    I still have no independent
14   recollection of this job.
15        Q.    Do you know what medical
16   condition he was suffering from?
17             MS. FADDIS:  Objection.  Go
18        ahead.
19        A.    Referring to the report, he had
20   a medical history of hyperlipidemia, which
21   is high cholesterol, GERD is acid reflux,
22   and he had anxiety, bipolar and depression.
23        Q.    Do any of the medical
24   conditions that are listed on the report
25   require immediate medical attention?
```

```
                                          Page 62
 1              N. MILONAS
 2         A.    They can all be deemed
 3    necessary.
 4         Q.    GERD is something that could
 5    need immediate medical attention?
 6         A.    Acid reflux, yes, I've taken
 7    multiple patients to the hospital for that.
 8         Q.    We are going to switch gears
 9    here.  I am going to play for you a little
10    bit of the other video, which is the police
11    arriving on the scene, and I will ask you
12    if you remember any of this stuff.  The
13    video I'm going to show you now is marked
14    Exhibit 3.  It's 8 minutes and 50 seconds.
15    We are going to watch part of it right now.
16    We are going to stop here at eight seconds.
17    In the first eight seconds of this video,
18    we see the police entering.  Do you see
19    yourself in this video?
20         A.    I do.
21         Q.    Where are you in the video?
22         A.    I am over to the right by what
23    I would assume is the kitchen.
24         Q.    You're by the paper towels; is
25    that correct?
```

```
                                          Page 63
 1                N. MILONAS
 2        A.    Yes.
 3        Q.    Do you know what you are doing?
 4        A.    I do not.  I can't see it
 5   clearly.
 6        Q.    I'm going to play a little more
 7   of the video.  If at any point while this
 8   is playing, you remember something
 9   independently, or the video refreshes your
10   memory as to something that happened, or
11   what you're doing, just stop us and let us
12   know.  I'm going to stop at 36 seconds.  It
13   looks like you're holding something in your
14   hand.  Can you tell what's going on here?
15        A.    I don't recall what happened,
16   but from what it looks like, that's my
17   tablet where we do the PCR on, the
18   narrative and the paperwork.  That's a bag,
19   and I'm taking stuff and putting it back
20   into it.  What I would assume is that those
21   are his medications.
22        Q.    Based on your review of the
23   video, you believe that you might have been
24   looking at his medications and taking down
25   information on the tablet?
```

```
                                              Page 64
 1                  N. MILONAS
 2        A.    Yes.
 3        Q.    Based on your review of the
 4   video, does that refresh your memory as to
 5   how many officers arrived on the scene?
 6        A.    I still don't even recall this
 7   job.
 8        Q.    I will go back to the
 9   beginning.  This officer at the five second
10   mark, do you know who that is?
11        A.    I don't know him.  I've seen
12   him a couple of times.  I don't know him.
13        Q.    When you say you've seen him a
14   couple of times, you mean on other jobs?
15        A.    We see them on jobs.  They may
16   not be the person responding to our job.
17   Sometimes they come in a group of them, and
18   we see them in the hospital, or like
19   leaving and entering the hospital.
20        Q.    Even though you don't know him
21   specifically, this first officer at the
22   five second mark, he's familiar to you?
23        A.    Yes.
24        Q.    Based on the video, we are at
25   the 11 second mark, so does that refresh
```

Page 65

```
                              N. MILONAS
 1
 2       your recollection as to how many officers
 3       responded to the call?
 4            A.    I have no idea.  I don't
 5       remember this job.  I have no idea how many
 6       officers were there.
 7            Q.    Looking at the video, it looks
 8       like there's three.  Does that seem about
 9       right, or you just really don't remember?
10            MS. FADDIS:  Objection.  Go
11          ahead.
12            A.    Where is the third?
13            Q.    One, two, three.
14            A.    I see a person.  I don't see
15       the badges or the shields that these two
16       have.  It could be a police officer.
17            Q.    I'm going to keep playing the
18       video.  I'm going to stop it at the one
19       minute mark.  Based on the video, from the
20       time that the officers entered until now,
21       the one minute mark, can you tell whether
22       or not you've spoken to the officers?
23            A.    I saw my face turn towards
24       them, but I don't think I spoke to them,
25       from what I see.  I'm not sure.
```

```
                                                    Page 66
 1                     N. MILONAS
 2          Q.     Do  you  have  any  independent
 3     recollection of speaking to them?
 4          A.      I  don't  have  any  independent
 5     recollection of this job still.
 6          Q.      Do  you  remember  whether  you
 7     ever told the officers that the Plaintiff
 8     had threatened you?
 9          A.      I don't have any recollection
10     of this job.
11          Q.      Do  you  remember  whether  you
12     ever told the officers that the Plaintiff
13     had assaulted you?
14          A.      I  still  don't  have  any
15     recollection of this job.
16          Q.      Do  you  remember  whether  you
17     ever told them that the Plaintiff had
18     attempted to assault you?
19          A.      I don't recall this job, let
20     alone what happened.
21          Q.      Do  you  remember  whether  you
22     ever told the police officers that the
23     Plaintiff had threatened your partner, or
24     assaulted your partner, or attempted to
25     assault your partner?
```

```
                                          Page 67
  1               N. MILONAS
  2        A.    I still don't recall this job.
  3        Q.    Do you have an independent
  4   recollection of ever telling the police
  5   officers that the Plaintiff had threatened
  6   his wife, or assaulted his wife, or
  7   attempted to assault his wife?
  8        A.    I don't recall this job.  I
  9   would assume, generally, they do what we
 10   do.  You figure out what's going on on all
 11   ends.  They will speak to the patient,
 12   generally.  They will speak to the caller,
 13   and then they will speak to us.
 14        Q.    As you sit here today, you
 15   don't remember speaking to them?
 16        A.    I do not.  I don't remember
 17   this job.
 18        Q.    I'm going to play this out a
 19   little further.  I'm going to stop it at 1
 20   minute and 54 seconds.  Do you see yourself
 21   on the right side of the screen still?
 22        A.    Yes.
 23        Q.    Do you have any idea what
 24   you're doing at this point?
 25        A.    It looks like I'm taking down
```

```
                                              Page 68
 1                   N. MILONAS
 2   medications.
 3        Q.    I'm going to stop here at 2
 4   minutes and 56 seconds.  It looks like
 5   you're holding something in your hand.  Is
 6   that your phone, a tablet, something else?
 7        A.    That's my phone from my back
 8   waistband where I keep it.
 9        Q.    What would you have been doing
10   on your phone at that time?
11        A.    If I'm taking down medications,
12   I would be looking up the names of the
13   medications, because a lot of the time the
14   bottles would give you the generic name, or
15   the trade name, and if it gave the generic
16   name, we look up the trade name.  Our
17   tablets sometimes will only have the
18   generic name, or only have the trade name,
19   to put it in the drop down box.
20        Q.    You think that at 2 minutes and
21   56 seconds you're probably looking up the
22   names of the medications in order to
23   properly enter them into your report; is
24   that correct?
25        A.    Yes.
```

Page 69

N. MILONAS

1

2      Q.    We are now at 2 minutes and 59

3  seconds.  It looks like you just turned.

4  Do you know what's going on here?

5      A.    I have no idea.  I turned once

6  before this too.

7      Q.    Do you think, at this point,

8  you might be speaking to somebody?

9      A.    I would have no idea.

10      Q.    At 3 minutes and 6 seconds, if

11  you can't see yourself, but it looks like

12  you see someone else's bag, is that your

13  partner, Ms. Schapira?

14      A.    Yes.

15      Q.    At 3 minutes and 32 seconds, it

16  looks like you just picked up the tablet;

17  is that correct?

18      A.    I'm sorry, I didn't see that.

19  Am I supposed to look at the officers or

20  myself?

21      Q.    Yourself at 3 minutes and 29

22  seconds.  You see that action in the corner

23  from 3 minutes and 29 seconds to 3 minutes

24  and 32 seconds, is that you picking up the

25  tablet?

Case 23-24, Document 32, 04/19/2023, 3501832, Page76 of 306
**[JA-936]**

```
                                          Page 70
 1              N. MILONAS
 2        A.    Yes.
 3        Q.    At 4 minutes and 31 seconds, do
 4   you see yourself on the right side?
 5        A.    Yes.
 6        Q.    It looks like you're holding
 7   your phone in one hand and also holding the
 8   tablet.  Do you have any idea what you're
 9   doing right there?
10        A.    Still the medications.  The
11   fact that I'm holding it, looking at it,
12   and then writing consecutively, shows that
13   it's most likely the medications.  I don't
14   use my phone on the job unless it's
15   something serious, like a supervisor or
16   boss calling us, or it's for medications.
17        Q.    Here at 4 minutes and 55
18   seconds, this is your partner here,
19   Marisabel, she's in the lower part of the
20   screen?
21        A.    Yes.
22        Q.    Do you recognize any of the
23   other officers?  You can see that there's
24   three of them.  Do you recognize any of
25   them aside from the one we already talked
```

```
                                              Page 71
 1                N. MILONAS
 2   about?
 3        A.    I don't remember the middle
 4   gentleman, but if the right one is a
 5   female, then I think I've seen her.
 6        Q.    You don't know her
 7   specifically; is that correct?
 8        A.    No, I don't know any of them
 9   specifically.  It's just if I happen to see
10   them.
11        Q.    I'm going to keep playing here.
12   I'm going to stop it at 6 minutes and 35
13   seconds.  Based on watching this, can you
14   tell what's going on here?
15        A.    I have no idea.  Unless I heard
16   what was going on, I wouldn't be able to
17   say.  I don't want to assume anything
18   that's incorrect.
19        Q.    You don't remember seeing him
20   get dressed though?
21        A.    I still don't recall anything.
22        Q.    Now, right here at 3 minutes
23   and 42 seconds, it looks like Ms. Schapira
24   exits the apartment; is that correct?
25        A.    Yes.
```

Case 23-24, Document 32, 04/19/2023, 3501832, Page78 of 306
**[JA-938]**

```
                                              Page 72
 1                    N. MILONAS
 2        Q.     Do you know why she would have
 3   left the apartment at this point?
 4        A.     I have no idea.  I would have
 5   to remember in that time why she left.
 6        Q.     Do you know whether she was the
 7   driver, or the tech, or something else that
 8   evening?
 9        A.     From the report, it says that
10   she was the driver.  Generally, it could be
11   a number of things.  There's so many things
12   she could be doing.  I'm not her, so I have
13   no idea what she's doing in this sense.
14        Q.     At this point, she's not in the
15   apartment anymore; is that correct?
16        A.     The door is still open.
17        Q.     Based on the review of the
18   video, you don't see her in the apartment
19   anymore; is that correct?
20        A.     I don't see her, but the door
21   is still open, so she could be right there.
22        Q.     When you say right there, you
23   mean in the doorway or in the hallway right
24   outside the door; is that correct?
25        A.     That is correct.
```

Case 23-24, Document 32, 04/19/2023, 3501832, Page79 of 306
**[JA-939]**

Page 73

```
 1              N. MILONAS
 2       Q.    At this point, 6 minutes and 50
 3  seconds, you're still in the apartment,
 4  correct, this is you on the right-hand
 5  side?
 6       A.    Yes.
 7       Q.    That was at 6 minutes and 57
 8  seconds.  It looks like you picked
 9  something up.  Do you know what that is
10  that you picked up?  Is that a backpack of
11  some sort?
12       A.    That is our tech bag.
13       Q.    What do you mean by the tech
14  bag?
15       A.    That is a bag with part of our
16  equipment in there.  The bag she was
17  holding has oxygen, stuff we would
18  administer the oxygen with.  This bag has
19  the trauma equipment, cold packs, etcetera.
20       Q.    If you are picking up the bag,
21  generally speaking, I know you can't
22  remember this incident, if you're picking
23  up the bag like that, does that generally
24  indicate that you're about to leave the
25  job?
```

```
                                              Page 74
 1                  N. MILONAS
 2        A.     Generally, yeah.
 3        Q.     Based on what you've seen so
 4   far, do you believe that you're getting
 5   ready to leave?
 6        A.     From what it shows on the
 7   video, that's what it looks like, but I
 8   still don't recall the event to give a
 9   definite answer.
10        Q.     I am going to stop it at 7
11   minutes and 4 seconds.  Do you see this
12   person who just appeared in the middle of
13   the screen wearing what looks like a gray
14   shawl?
15        A.     Yes.
16        Q.     Do you know who that is?
17        A.     I do not.
18        Q.     Do you recall whether you ever
19   spoke to this person that evening?
20        A.     I do not independently recall
21   this job.
22        Q.     We are at 7 minutes and 20
23   seconds.  Do you have any idea what's going
24   on at this point?
25        A.     I do not.
```

Page 75

```
 1              N. MILONAS
 2      Q.    I'm going to stop it at 7
 3  minutes and 42 seconds.  Do you see
 4  yourself in the video?
 5      A.    I do.
 6      Q.    That's the back of your head,
 7  right, that's your pony tail?
 8      A.    Yes.
 9      Q.    The gentleman in the orange and
10  white jacket, he appears to be saying
11  something, do you see that?
12      A.    I did not.
13      Q.    It's right here.  That was at 7
14  minutes and 39 seconds.  Did you see his
15  mouth moving?
16      A.    Yes.
17      Q.    Do you know what he was saying
18  there?
19      A.    No.  I don't remember this job,
20  let alone what that particular phrase was,
21  or what he said.
22      Q.    It looks like at 7 minutes and
23  47 seconds, it looks like he turns to you.
24  Do you know if he was speaking to you at
25  this point?
```

```
                                              Page 76
 1                 N. MILONAS
 2        A.    I don't recall.
 3        Q.    Right there he had turned
 4   around.   It looks like he put his hands
 5   behind his back.  Do you see that right
 6   there at 7 minutes and 58 seconds?
 7        A.    Yes.
 8        Q.    As an EMT, if you make a
 9   medical determination that someone needs to
10   go to the hospital, do you decide whether
11   to handcuff the person, or does the police
12   decide, or something else?
13        A.    It's a combination of the two,
14   depending if they are noncompliant, if they
15   are not willing to go, if they are
16   resisting us, if they are a possible threat
17   to us.  Some people are fine, and then they
18   just switch.  They'll be compliant one
19   second.  I can't see from the beginning,
20   but you can be compliant one second, and
21   then the next second you could be
22   noncompliant and belligerent again.
23        Q.    Is there ever a time where you
24   tell the police to put handcuffs on
25   somebody, or did they just make that
```

Case 23-24, Document 32, 04/19/2023, 3501832, Page83 of 306
**[JA-943]**

```
                                          Page 77
 1                N. MILONAS
 2   decision based on what you tell them?
 3              MS. FADDIS:   Objection to form.
 4        You can answer.
 5        A.    They make decisions based on
 6   their protocols, just like we make
 7   decisions based on ours.
 8        Q.    Has there ever been a time
 9   where you told a police officer to handcuff
10   somebody?
11        A.    Never.
12        Q.    We are at 8 minutes and 4
13   seconds.  Do you see what's going on here?
14        A.    Yes.
15        Q.    Based on what you are seeing in
16   the video, can you tell us what you see
17   going on?
18        A.    Just this specific clip?
19        Q.    Yes.
20        A.    Or what happened just before
21   this?
22        Q.    We will play this back again
23   from 7 minutes and 54 seconds to 8 minutes
24   and 5 seconds.  Did you see that?
25        A.    Yes.
```

Case 23-24, Document 32, 04/19/2023, 3501832, Page84 of 306
**[JA-944]**

Page 78

```
 1              N. MILONAS
 2       Q.    What did you see?
 3       A.    I saw what I assume is the
 4  patient put his hands behind his back.
 5  This is just based on what I'm seeing.
 6  There's a phrase that says to believe half
 7  of what you see and nothing of what you
 8  hear.  I can only say what I'm somewhat
 9  concluding from this based off of what I
10  see.  I still have no recollection of this
11  job, or what happened at this specific
12  time.  I saw in that specific clip that he
13  put his hands behind his back.  The guy, I
14  couldn't see what exactly is happening, and
15  I saw the patient pull his hands back up
16  and then move forward, because then I saw
17  the guy have to move forward in order to
18  get him.
19       Q.    You were in the apartment when
20  this occurred, correct, you're standing
21  right here on the right-hand side of the
22  screen?
23       A.    Yes, that is me.
24       Q.    Putting aside this video, on
25  the date of the incident, you observed this
```

Case 23-24, Document 32, 04/19/2023, 3501832, Page85 of 306
**[JA-945]**

```
                                              Page 79
 1              N. MILONAS
 2   takedown; is that correct?
 3              MS. FADDIS:  Objection.  You
 4       can answer.
 5       A.    I don't know if I would phrase
 6   it as a takedown.  That is not my
 7   vocabulary.  That's yours.  At that time, I
 8   was in that place when this occurred.
 9       Q.    When these events occurred over
10   the past 10 seconds in the video, you were
11   in the apartment, correct?
12       A.    From the video, yes, I'm right
13   there.
14       Q.    Do you have any independent
15   recollection of the events that we just saw
16   in the past 10 seconds of the video?
17       A.    I do not.
18       Q.    Based on what you're seeing in
19   the video, can you describe what the
20   officer was doing?
21       A.    I have no idea.  I'm not making
22   any conclusions, because I don't remember
23   this job.  From what I saw, the guy put his
24   hands behind his back, then the officer, I
25   didn't see exactly what he did, but I saw
```

```
                                          Page 80
 1                  N. MILONAS
 2    the guy pull his hands away and move
 3    forward, and then I saw the officer have to
 4    move forward in order to get the patient.
 5         Q.    Now, I'm at 8 minutes and 9
 6    seconds.  You see yourself on the
 7    right-hand side of the screen?
 8         A.    I do.
 9         Q.    That morning, did you see the
10    patient hit the floor?
11         A.    I do not recall this job still.
12         Q.    I want to switch back to the
13    report for a second.  I'm at the part where
14    it says, "PD arrived on the scene."  Based
15    on the review of the video, is it fair to
16    say that that's accurate?
17         A.    Yes.
18         Q.    The next line says, "Patient
19    still aggressive and uncooperative."  Can
20    you describe in what way he was being
21    aggressive?
22         A.    I can't describe in depth.  I
23    would assume it's still from what it was
24    earlier, because it says, "Patient still."
25    He was aggressively speaking to us, and he
```

Case 1:19-cv-00632-EK-ST   Document 48-10   Filed 11/29/21   Page 81 of 119 PageID #: 1152

```
                                        Page 81
 1              N. MILONAS
 2   was belligerent in the way he came up to
 3   us.
 4        Q.    Based on the review of the
 5   video that we just watched, did you see the
 6   patient being aggressive towards the police
 7   officers before the officer appears to have
 8   taken him down to the ground?
 9        A.    From what I saw, it's a video
10   that would solely be my opinion that I
11   would have to formulate.  I would have to
12   be in the incident.  I can't go off of a
13   video with no audio also.
14        Q.    Do you have any independent
15   recollection of the patient striking any of
16   the officers?
17        A.    I have no recollection of this
18   job.
19        Q.    You don't have any recollection
20   of the patient striking or attempting to
21   strike any of the officers; is that
22   correct?
23        A.    I can't answer that, because I
24   have no recollection of this job.
25        Q.    I want to direct your attention
```

Page 82

N. MILONAS

1

2    to this line where it says, "Positive

3    abrasion to the right side of patient's

4    forehead and right temporal region

5    sustained during patient resisting PD

6    apprehension."  Can you tell us in what way

7    the patient resisted apprehension?

8        A.    If you had asked me the day of

9    the incident, I probably would be able to,

10   but it's two years later.  I can't answer

11   that question in depth.  I can only go

12   based off of what I wrote, and I can't

13   infer anything that isn't true.  I would be

14   making it up to answer your question.

15       Q.    Independently, putting aside

16   the report, do you know how the patient

17   sustained this abrasion that's mentioned in

18   this report?

19       A.    Independently, no, I don't

20   recall this job.

21       Q.    The next line says, "Patient

22   transported to hospital 34 without

23   incident."  Hospital 34, that would be

24   Jamaica Hospital; is that correct?

25       A.    That is correct.

Case 23-24, Document 32, 04/19/2023, 3501832, Page89 of 306
**[JA-949]**

Page 83

1            N. MILONAS

2       Q.    When it says without incident,

3   what does that mean?

4       A.    That has to do with our care

5   with EMS.  There was no incident involving

6   us and the patient from the ambulance all

7   the way to the hospital.

8       Q.    When you say there was no

9   incident, what do you mean by that?

10      A.    There was no vehicle accident.

11  There was no malfunctioning with the

12  stretcher.  There was none of that.

13      Q.    Does that also refer to there

14  being no issues with the patient from the

15  time he's placed in the ambulance until the

16  time he arrives at Jamaica Hospital?

17      A.    No.

18      Q.    You were the tech on this job,

19  correct?

20      A.    According to the paperwork,

21  yes, I was.

22      Q.    If you were the tech on this

23  job, does that mean you would have ridden

24  with him in the back of the ambulance to

25  the hospital?

Page 84

1                    N. MILONAS

2          A.     Yes.

3          Q.     Do you have any recollection of

4    what happened in the back of the ambulance

5    from the time you left the location until

6    the time you arrived at Jamaica Hospital?

7          A.     I have no recollection.

8          Q.     You signed this report,

9    correct?

10         A.     Yes.

11         Q.     The patient did not sign this

12   report, correct?

13         A.     No, he did not.

14         Q.     Under here it says, "Unable to

15   sign, reason other."  Do you have any

16   recollection as to why he was unable to

17   sign?

18         A.     From looking at the paperwork,

19   it says that he is intoxicated in the sense

20   that he doesn't have the decisional making

21   capacity for me to give him something to

22   sign if he can't comprehend what it is.

23         Q.     Do you remember whether you

24   ever gave him the option to sign this

25   report?

```
                                          Page 85
 1               N. MILONAS
 2       A.    I can't recall this job.
 3  Generally, if someone doesn't have a
 4  decisional capacity, I will not be giving
 5  them anything to sign, because they can't
 6  properly review or understand what it is.
 7       Q.    I want to direct your attention
 8  to the second page of this report at 6:48
 9  a.m., and it says, "Glasgow Coma score."
10  Do you see what I'm talking about?
11       A.    Yes.
12       Q.    Based on this report, is it
13  correct that the Glasgow Coma score was 15?
14       A.    Yes.
15       Q.    Can you give me the breakdown
16  about how we got to the number 15?
17       A.    His motor was six, which is the
18  highest score you can get.  Verbal, he was
19  a five, and eye opening he was a four.
20  Everything that he was able to do he did,
21  but that doesn't have to do with your
22  mental capacity to think rationally.
23  That's only a piece of it.  Like I said in
24  my narrative, he was alert and oriented
25  four out of four, but he had periods of
```

Page 86

N. MILONAS

1
2       being incoherent.  He didn't have a
3       perfectly steady gait and he was acting
4       irrationally.
5           Q.    I want to go through some of
6       these other entries here.  According to
7       this entry that I see where it says,
8       "Assessment Type ABC."  His breathing was
9       normal?
10          A.    Yes, it wasn't labored.  He
11      didn't have any signs of difficulty
12      breathing.
13          Q.    Under neurological it says,
14      "Mental status, oriented-person,
15      oriented-place, oriented-time,
16      oriented-event."  Do you see that?
17          A.    Yes, I do.  That means he was
18      able to answer those four questions.
19          Q.    He had the Glasgow Coma score
20      of 15, and he was oriented four times four,
21      meaning to person, place, time and event;
22      is that correct?
23          A.    That is a GCS of 15 and no
24      evidence of apparent medical or physical
25      conditions, which may limit the patient's

```
                                         Page 87
 1              N. MILONAS
 2   ability to think rationally.  Those two are
 3   only a piece of what deems someone to have
 4   decisional making capacity.
 5        Q.    Putting aside decisional making
 6   capacity for a second, it's accurate that
 7   he had normal breathing, and he had a
 8   Glasgow Coma score of 15, and he was
 9   oriented to person, place, time and event,
10   that's accurate?
11        A.    That is accurate that I wrote
12   in the report.
13        Q.    I'm trying to nail down if the
14   report is accurate.
15        A.    Okay.
16        Q.    Where it says, "Chief complaint
17   (primary):  Alcohol Intox.  Provider
18   Impression: Monitoring required."  What
19   does that mean?
20        A.    The primary complaint was that
21   he was intoxicated and the result of him
22   being intoxicated.  The provider in
23   question was that he needed to be seen and
24   evaluated by a doctor.
25        Q.    Based on the review of this
```

```
                                          Page 88
 1              N. MILONAS
 2   report and the video that we saw, can you
 3   say, even without independent recollection,
 4   that this was a job that you had determined
 5   the patient was unable to refuse medical
 6   attention?
 7        A.    As I stated in my paperwork,
 8   yes, the patient at this time didn't have
 9   decision making capacity from what I can
10   read in my narrative.
11        Q.    If you determine that someone
12   has to go to the hospital, that they cannot
13   refuse medical attention, does the NYPD
14   have to make sure they go to the hospital?
15        A.    Yes.   There have been numerous
16   jobs that I've been on.   That's the kind of
17   last thing, but they don't just come for
18   that.   The reason why they came, from what
19   I can read, was that he was belligerent and
20   a threat to us, the EMS crew, and we
21   couldn't properly take care of him safely,
22   and the fact that he had to go to the
23   hospital.
24        Q.    Just so we're clear, and I know
25   we went over it, aside from the report, you
```

Case 23-24, Document 32, 04/19/2023, 3501832, Page95 of 306
**[JA-955]**

Page 89

N. MILONAS

1    don't have any independent recollection of

2    him being belligerent, or aggressive, or

3    threatening; is that correct?

4         A.    I have no independent

5    recollection of that.

6         Q.    Do you remember whether you

7    called telemetry on this case?

8         A.    It would have said it in my

9    report if I did, but we go by the protocols

10   first, and then if it's a gray area, or

11   there is, you know, a reason for us to call

12   telemetry, then we will call them.

13        Q.    Based on your review of the

14   report, it doesn't appear that you called

15   telemetry; is that correct?

16        A.    That is correct.  It wasn't

17   necessary to call telemetry.

18        Q.    Why was it not necessary?

19        A.    Because we followed the

20   protocols to the book.  The reason why the

21   police came was because, according to my

22   narrative, he was a threat to us.

23        Q.    So, there was no need to call

24   telemetry because you made the

```
                                              Page 90
 1              N. MILONAS
 2   determination that he needed to go to the
 3   hospital; is that correct?
 4        A.    That is correct.  We followed
 5   the protocols.
 6        Q.    If there's ever a disagreement
 7   between the EMTs and the Police Department
 8   as to somebody needing to be removed to the
 9   hospital, what happens?  Does your opinion
10   control, does the Police Department opinion
11   control, or something else?
12              MS. FADDIS:  Objection to form.
13         You can answer.
14        A.    We would call a boss, and
15   that's how it would work, and the boss
16   would speak to the police, or evaluate the
17   situation, and then it would go from there.
18              MS. FUCHS:  I need two minutes
19         to look over my outline.  I think
20         that's all I have.  Just give me a
21         minute.  I don't have any further
22         questions.  I am going to turn it
23         over to Hannah with the understanding
24         that I may have a few follow-up
25         questions.
```

```
                                              Page 91
 1                    N. MILONAS
 2   EXAMINATION BY
 3   MS. FADDIS:
 4        Q.    Nicole, we can see that you're
 5   in the Zoom, but your video is gone and we
 6   can't hear you.  My name is Hannah Faddis.
 7   I'm an attorney with the Law Department.  I
 8   represent the city and also Mandeep Cheema
 9   who is the defendant in this case.  I have
10   some follow-up questions for you based on
11   some of the things you testified about.  I
12   want to confirm, just so it's clear, you're
13   testifying via Zoom on your cell phone, is
14   that right?
15        A.    Yes.
16        Q.    The documents you're reviewing,
17   that's on the phone, right?
18        A.    Yes, correct.  The link
19   wouldn't let me go on through my laptop.
20        Q.    Are you certified as a
21   paramedic?
22        A.    I am a certified EMT.
23        Q.    You said you had training as a
24   paramedic?
25        A.    Yes.  I went to paramedic
```

Page 92

N. MILONAS

1

2       school, but the last semester my dog got

3       cancer, so I had to choose one or the

4       other.

5            Q.    You've answered a lot of

6       questions about the PCR you prepared in

7       this case.  The document we have been

8       looking at that, which is Exhibit 1, that

9       you have physically with you, you prepared

10      the contents of that report, right?

11           A.    Yes.

12           Q.    You put in all the details that

13      are contained in that report, you put into

14      this tablet that you testified about

15      earlier?

16           A.    Yes.

17           Q.    You said a lot of that you do

18      at the scene, right?

19           A.    The main stuff we will do.  The

20      patient's name, date of birth, and the

21      medications that we are able to get, but

22      the rest is done after.

23           Q.    The narrative section you would

24      have written once the patient had arrived

25      at the hospital or before that?

Page 93

N. MILONAS

1

2      A.     It could either be in the back

3   of the ambulance, or it could be most

4   likely, generally, at the hospital,

5   especially if the patient is belligerent,

6   or you kind of want to keep an eye on them

7   for your safety.

8      Q.     The details that are contained

9   in that document, Exhibit 1, those are

10   based on your observations and your

11   involvement in this event?

12      A.     Yes, for the most part.  Like I

13   stated, for me to write specific stuff, it

14   would be a 10 page paper.  I can't write

15   verbatim what I'm told.  It's possible that

16   I'm told more in depth things from the

17   family member, but at the same time, the

18   patient will get agitated if we're in the

19   same room discussing it.  The family member

20   will say something after.  Since we are

21   trying to diffuse as much as we can, if we

22   are in a threatened situation, until we get

23   PD or someone else there with us.

24      Q.     So, for example, looking at the

25   narrative section, this paragraph that

Page 94

                        N. MILONAS

1

2    you've written here, there is certain

3    information that is simply stated as fact.

4    For example, "Unit dispatch to incident

5    address."  That's just simply stated as a

6    fact, right?

7         A.    Right.

8         Q.    Is it fair to say that that was

9    based on your own personal knowledge of

10   what happened at this job?

11        A.    Yes, correct.  Unless it says

12   the patient's wife states that the patient

13   is a harm to himself.  Generally, I won't

14   include stuff that I can't say verbatim,

15   because I also don't want to leave out

16   words, or stuff that she said.  This is a

17   legal document.  I don't want to infer

18   words that were not directly told to me.

19        Q.    So, where you write, "Patient's

20   wife states," that's a summary of what you

21   were told by whoever you believe to be the

22   patient's wife, right?

23        A.    Yes.

24        Q.    The fact that you noted various

25   things as stated by the patient's wife,

```
                                              Page 95
 1                   N. MILONAS
 2    that indicates that you spoke to the wife?
 3         A.    Yes.
 4         Q.    The notation about the patient
 5    being uncooperative, indicates that you
 6    also tried to speak with the patient
 7    himself, right?
 8         A.    Yes.
 9         Q.    Based on your observations and
10    your communication with people at the
11    scene, you determined that he required
12    medical attention, right?
13         A.    Yes, correct.  Not just for the
14    alcohol intoxication, but the fact that she
15    said that he's a harm to himself, that is a
16    major statement to be said.  We take that
17    seriously.
18         Q.    You testified already that you
19    complete this form as a part of your
20    regular duties, right?
21         A.    Yes.
22         Q.    And you have a duty to complete
23    it accurately?
24         A.    As accurately to the best of my
25    ability.
```

Page 96

         1                    N. MILONAS
         2          Q.    Do you have any reason to think
         3     that the details that you recorded in this
         4     document are not accurate?
         5          A.    No, absolutely not.
         6          Q.    You testified earlier, when you
         7     were watching Exhibit 2, which is the first
         8     video you watched, that there's a portion
         9     of that video where it seems like the
        10     patient was getting agitated.  Do you
        11     remember saying that?
        12          A.    Yes.
        13          Q.    Your testimony was that that
        14     might have been what you were referring to
        15     in the narrative of the PCR, right?
        16          A.    Yes, that along with anything
        17     he might have been verbally saying to us.
        18          Q.    Do you know if the video we
        19     reviewed covers the entire interaction that
        20     you had with that patient?
        21          A.    Absolutely not.
        22          Q.    You don't have an independent
        23     recollection of what happened that day,
        24     right?
        25          A.    I do not.

Page 97

1              N. MILONAS

2        Q.    So, the portion of the PCR that

3    states he belligerently approached yourself

4    and your partner, you can't say what

5    specific actions that's referring to,

6    right?

7        A.    For me to say he belligerently

8    approached us, that means he aggressively

9    came up to us in our personal space.  I

10   don't know if those are portions of the

11   clip that were pulled, or if that is the

12   whole entire video.

13       Q.    You can't say, because you

14   don't have an independent recollection, you

15   can't say whether those actions are

16   reflected in the video, correct?

17       A.    Yes, correct.

18            MS. FADDIS:  I don't have

19       anything else.  Thank you very much.

20

21

22            (Continued on next page to

23       include jurat.)

24

25

Case 23-24, Document 32, 04/19/2023, 3501832, Page104 of 306
**[JA-964]**

```
                                                    Page 98
  1              N. MILONAS
  2              (Whereupon, at 4:20 p.m., the
  3       Examination of this Witness was
  4       concluded.)
  5
  6

                 _____
  7                    NICOLE MILONAS
  8
  9   Subscribed and sworn to before me
 10   this _____ day of _____ 20____.
 11

      _____
 12       NOTARY PUBLIC
 13
 14
 15
 16
 17
 18
 19
 20
 21
 22
 23
 24
 25
```

**[JA-965]**

```
                                                      Page 99

 1                    E X H I B I T S

 2

 3     (None)

 4

 5                      I N D E X

 6

 7     EXAMINATION BY                        PAGE

 8     MS. FUCHS                             4

 9     MS. FADDIS                            91

10

11       INFORMATION AND/OR DOCUMENTS REQUESTED

12     INFORMATION AND/OR DOCUMENTS          PAGE

13     (None)

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 100

```
1              C E R T I F I C A T E

2

3    STATE OF NEW YORK        )
                               :  SS.:
4    COUNTY OF RICHMOND        )

5

6         I, ALEXIS A. VARGAS, a Notary Public

7    for and within the State of New York, do

8    hereby certify:

9         That the witness whose examination is

10   hereinbefore set forth was duly sworn and

11   that such examination is a true record of

12   the testimony given by that witness.

13        I further certify that I am not

14   related to any of the parties to this

15   action by blood or by marriage and that I

16   am in no way interested in the outcome of

17   this matter.

18        IN WITNESS WHEREOF, I have hereunto

19   set my hand this 16th day of November 2020.

20

21

22   _____
           ALEXIS A. VARGAS
23

24

25
```

Case 23-24, Document 32, 04/19/2023, 3501832, Page107 of 306
**[JA-967]**

Page 101

**ERRATA SHEET**
**VERITEXT/NEW YORK REPORTING, LLC**

CASE NAME: Singh v. City Of New York, Et Al
DATE OF DEPOSITION: 10/22/2020
WITNESSES' NAME: EMT Nicole Milonas

PAGE   LINE (S)        CHANGE              REASON

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

                                    _____
                                    EMT Nicole  Milonas

SUBSCRIBED AND SWORN TO BEFORE ME
THIS ____ DAY OF _____, 20__.

_____        _____
(NOTARY PUBLIC)                    MY COMMISSION EXPIRES:

**[& - ahead]**                                                                                    Page 1

**&**

**&**  2:3

**0**

**00632**  1:4
**06:38:03**  55:18

**1**

**1**  24:15 28:13,15
  67:19 92:8 93:9
**1-10**  1:7
**10**  26:6 55:17
  79:10,16 93:14
**10/22/2020**  101:3
**100**  2:8
**10007**  2:8
**10022**  2:4
**11**  64:25
**110**  2:4
**11416**  4:13
**125**  10:12
**12:00**  24:3
**130-18**  27:19 28:7
  29:6
**15**  18:17,23 21:5
  22:2,4 26:7 85:13
  85:16 86:20,23
  87:8
**16th**  100:19
**1993**  9:20
**1:19**  1:4

**2**

**2**  10:4 39:22 43:5
  43:8 68:3,20 69:2
  96:7
**2/28/18**  55:12
**20**  16:10 40:13,15
  40:25 52:5 74:22
  98:10 101:22
**20/20**  10:18
**2011**  11:13

**2014**  16:9
**2018**  5:6,7 10:7
  23:18 24:20 27:12
  27:18
**2020**  1:12 100:19
**21**  16:11
**22**  1:12 43:5,8
**24**  9:7,13
**24796**  100:21
**26**  9:25
**27**  9:25
**28th**  5:6,7 10:7
  23:18 24:20 27:12
  27:18
**29**  69:21,23
**2:11**  1:13

**3**

**3**  22:6,13 62:14
  69:10,15,21,23,23
  71:22
**31**  70:3
**32**  69:15,24
**3200**  2:4
**34**  82:22,23
**35**  71:12
**36**  63:12
**39**  75:14

**4**

**4**  31:19 39:23 70:3
  70:17 74:11 77:12
  99:8
**42**  71:23 75:3
**47**  41:10 75:23
**48**  39:23
**4:20**  98:2

**5**

**5**  10:4 77:24
**50**  62:14 73:2
**54**  67:20 77:23

**54f1-54f1**  24:2,19
**55**  70:17
**56**  68:4,21
**57**  73:7
**58**  76:6
**59**  69:2
**59th**  2:4

**6**

**6**  69:10 71:12 73:2
  73:7
**6:28**  55:5,12

**7**

**7**  74:10,22 75:2,13
  75:22 76:6 77:23

**8**

**8**  62:14 77:12,23
  80:5
**89**  27:7,13

**9**

**9**  80:5
**91**  99:9
**911**  42:8
**950196**  1:6
**97-03**  4:12
**98th**  4:12
**99**  17:24

**a**

**a.m.**  25:25 85:9
**abandon**  58:16
**abc**  86:8
**ability**  9:9 19:2
  20:9,15 21:7
  22:16 39:7 59:5
  87:2 95:25
**able**  5:18,20 13:16
  13:17 18:18,19
  20:4,10 21:2,16
  22:7 25:17 44:2,8
  44:16,22 45:4,7,9

**45:20 57:3 60:5**
  60:18,20 71:16
  82:9 85:20 86:18
  92:21
**abrasion**  82:3,17
**absolutely**  96:5,21
**accident**  83:10
**account**  39:8
**accurate**  6:5 80:16
  87:6,10,11,14 96:4
**accurately**  33:11
  95:23,24
**acid**  61:21 62:6
**acting**  36:11 48:20
  52:6,8 53:17 86:3
**action**  4:16 69:22
  100:15
**actions**  97:5,15
**actual**  14:19
**acutely**  38:7
**additional**  38:18
**address**  4:10 28:6
  29:11 34:15,19,21
  55:13 94:5
**administer**  15:15
  73:18
**admit**  17:22,25
**advanced**  15:22
**advised**  37:19 38:2
**afternoon**  4:14
**aggressive**  46:18
  46:20 47:3 80:19
  80:21 81:6 89:3
**aggressively**  49:23
  80:25 97:8
**agitated**  43:15,16
  48:16 93:18 96:10
**ago**  25:4
**agreed**  3:2,7,11
**ahead**  57:14,24
  61:18 65:11

[air - basically]                                                                 Page 2

| | | | |
|---|---|---|---|
| air 56:20 | apparent 18:24 | 66:25 67:7 | aware 4:24 37:17 |
| al 101:2 | 20:7 21:5 86:24 | assaulted 37:2 | 38:2 |
| alcohol 17:21,23 | appear 59:13 | 66:13,24 67:6 | **b** |
| 32:8 34:23 58:5 | 89:15 | assessment 19:7 | b 99:1 |
| 59:14,20,25 87:17 | appeared 74:12 | 39:4,5 40:22 | back 21:25 25:15 |
| 95:14 | appearing 58:4 | 46:13 52:16 58:9 | 27:23 31:17 34:9 |
| alert 18:15,23 21:4 | appears 75:10 | 60:4 86:8 | 43:4,17 45:4 56:8 |
| 22:8 39:10 43:21 | 81:7 | assignment 27:12 | 59:23 63:19 64:8 |
| 43:24 59:9 85:24 | apply 14:19 | 27:14 29:8,20 | 68:7 75:6 76:5 |
| alerted 29:5,18 | apprehension 82:6 | assume 29:7,12 | 77:22 78:4,13,15 |
| alexis 1:19 100:6 | 82:7 | 38:3 40:18 62:23 | 79:24 80:12 83:24 |
| 100:22 | approached 47:23 | 63:20 67:9 71:17 | 84:4 93:2 |
| allegation 51:25 | 53:7 97:3,8 | 78:3 80:23 | backpack 73:10 |
| allowed 19:10 | approaching 47:5 | assuming 20:24 | bad 38:11 |
| 21:10 40:17 | 48:13 53:5 | assumption 29:13 | badges 65:15 |
| ambulance 15:7 | approximate 10:2 | atlantic 27:19 28:7 | bag 63:18 69:12 |
| 26:23 27:2 34:10 | 10:5,10,13 | 29:6 55:13 | 73:12,14,15,16,18 |
| 83:6,15,24 84:4 | approximately | attempted 37:3 | 73:20,23 |
| 93:3 | 16:17,23 26:2 | 47:20 49:13 66:18 | balanced 45:10 |
| ambulate 45:6 | area 19:10 27:6,9 | 66:24 67:7 | balwinder 1:2 |
| answer 5:14 6:2 | 89:11 | attempting 49:19 | 4:16 |
| 6:17 7:9,9 20:18 | army 60:15 | 81:20 | base 26:15,16 |
| 22:15 38:20 41:22 | arrest 22:13 31:10 | attend 11:5,11 | based 28:3 30:16 |
| 44:3,8,17 45:15 | arrival 22:11 35:6 | 12:22 | 35:12 40:19 42:14 |
| 46:15 51:9,19 | arrive 20:23 26:14 | attention 18:11,14 | 44:7 46:3 50:13 |
| 53:9 60:5 74:9 | arrived 32:11 | 19:6 22:22 23:18 | 51:14 53:21 57:6 |
| 77:4 79:4 81:23 | 35:19 36:3 53:21 | 55:17 59:2 61:2 | 58:18 59:12,17 |
| 82:10,14 86:18 | 53:23 55:25 64:5 | 61:25 62:5 81:25 | 60:10 63:22 64:3 |
| 90:13 | 80:14 84:6 92:24 | 85:7 88:6,13 | 64:24 65:19 71:13 |
| answered 92:5 | arrives 83:16 | 95:12 | 72:17 74:3 77:2,5 |
| answering 44:20 | arriving 62:11 | attorney 91:7 | 77:7,15 78:5,9 |
| 51:2 52:19,23 | aside 49:2 70:25 | attorneys 2:3,7 | 79:18 80:14 81:4 |
| answers 6:11 | 78:24 82:15 87:5 | audio 81:13 | 82:12 85:12 87:25 |
| anticipating 5:24 | 88:25 | auditory 51:6 | 89:14 91:10 93:10 |
| anxiety 61:22 | asked 7:7 8:10 | authorized 8:3 | 94:9 95:9 |
| anymore 72:15,19 | 35:17,21 50:2 | automatically | baseline 52:12 |
| apartment 40:18 | 51:3,8 52:20 82:8 | 19:5 | basic 18:18 |
| 56:12,13,16,22 | asking 5:13,24 | available 26:21 | basically 14:11 |
| 57:9,22 71:24 | 35:20 46:16 49:24 | avenue 27:19 28:7 | 15:13,21 17:14 |
| 72:3,15,18 73:3 | assault 37:3 47:20 | 29:6 55:13 | 18:21 21:17,23 |
| 78:19 79:11 | 49:13,14,17 66:18 | | 22:6 27:9 49:22 |

[basis - conditions]                                                      Page 3

| | | | |
|---|---|---|---|
| **basis** 51:24 60:24 | **business** 33:3 | **cell** 27:5 91:13 | **combination** 32:8 |
| **bathroom** 7:4 | | **certain** 94:2 | 76:13 |
| **beer** 19:19 | **c** | **certification** 3:5 | **come** 27:4,17 |
| **began** 47:3 | **c** 2:1 4:1 100:1,1 | 15:2,3,13,20 | 54:24 58:9 64:17 |
| **beginning** 9:2 | **call** 5:8 21:15 24:5 | **certified** 91:20,22 | 88:17 |
| 39:25 64:9 76:19 | 24:14 27:7 28:4 | **certify** 100:8,13 | **comes** 17:18 18:9 |
| **behavior** 45:25 | 29:23 30:4,19,22 | **change** 101:5 | 19:3 31:2 |
| **behavioral** 22:19 | 31:2,21,24 32:5 | **changes** 25:16 | **coming** 49:20,22 |
| **belief** 58:20 | 33:25 34:2,6,8,19 | **chapter** 14:12 | **commands** 18:19 |
| **believe** 16:9 42:7 | 53:18 56:8,11,11 | **cheema** 1:6 91:8 | **comment** 55:8 |
| 42:13 58:24 63:23 | 56:20 58:12 61:4 | **chief** 87:16 | **comments** 55:18 |
| 74:4 78:6 94:21 | 65:3 89:12,13,18 | **cholesterol** 61:21 | **commission** |
| **belligerent** 52:10 | 89:24 90:14 | **choose** 92:3 | 101:25 |
| 60:9 76:22 81:2 | **called** 4:1 27:5 | **chronology** 54:9 | **communication** |
| 88:19 89:3 93:5 | 29:8 40:24 42:4 | **church** 2:8 | 95:10 |
| **belligerently** 47:4 | 53:15 54:3,3 | **circumstances** | **community** 11:7 |
| 47:24 48:13 49:20 | 55:24 56:5 57:12 | 18:13 21:11 | 12:4,6,21 14:5 |
| 53:4 97:3,7 | 57:19 59:3 89:8 | **city** 1:6 2:7 4:17 | 15:19 |
| **best** 95:24 | 89:15 | 4:20 14:16 18:22 | **comparing** 55:14 |
| **billing** 33:18 | **caller** 42:3,8,8 | 91:8 101:2 | **comparison** 45:17 |
| **biology** 12:14 | 67:12 | **claiming** 49:5 | **complaint** 87:16 |
| **bipolar** 61:22 | **calling** 70:16 | **clean** 26:20 | 87:20 |
| **birth** 9:19 92:20 | **calls** 16:17,21 | **clear** 60:23 88:24 | **complete** 34:2 |
| **bit** 39:17 40:12 | **cancer** 92:3 | 91:12 | 60:19 95:19,22 |
| 62:10 | **capacity** 1:7,8 | **clearly** 42:13 63:5 | **completed** 34:3 |
| **blood** 100:15 | 17:16,19 18:8,10 | **clinical** 31:19 | **completely** 7:22 |
| **body** 14:12 | 18:16 59:10 60:22 | **clip** 77:18 78:12 | 22:9 55:2 |
| **book** 15:23 89:21 | 84:21 85:4,22 | 97:11 | **compliant** 76:18 |
| **boss** 8:4 23:3 | 87:4,6 88:9 | **clocked** 26:11 | 76:20 |
| 26:11 70:16 90:14 | **cardiac** 22:12 | **close** 34:5 | **comprehend** |
| 90:15 | 31:10 | **cognitive** 37:17 | 84:22 |
| **bottles** 17:23 | **care** 33:5 58:17,17 | 38:5 60:8 | **computer** 54:10 |
| 68:14 | 59:18,21 60:21 | **cohen** 2:3,11 4:19 | 54:24 |
| **box** 68:19 | 83:4 88:21 | **coincides** 43:14 | **concluded** 98:4 |
| **break** 7:3,11 | **career** 11:23 16:16 | **cold** 73:19 | **concluding** 78:9 |
| **breakdown** 85:15 | **case** 1:4 4:25 5:5 | **college** 11:4,5,7,18 | **conclusions** 79:22 |
| **breathing** 86:8,12 | 56:24 57:2 89:8 | 12:4,6,21,22 14:2 | **condition** 61:16 |
| 87:7 | 91:9 92:7 101:2 | 14:6 15:20 | **conditions** 18:25 |
| **brewer** 27:16 | **categories** 31:4,6 | **coma** 18:17 85:9 | 20:8 21:6 61:24 |
| **bring** 24:7 27:23 | **category** 22:5 31:5 | 85:13 86:19 87:8 | 86:25 |
| 28:14 31:17 | **causing** 17:21 | | |

**[JA-971]**

**[confirm - document]** Page 4

| | | | |
|---|---|---|---|
| **confirm** 91:12 | 81:22 82:24,25 | 101:22 | **details** 92:12 93:8 |
| **confusion** 28:13 | 83:19 84:9,12 | **dead** 22:10 | 96:3 |
| **conjunction** 34:8 | 85:13 86:22 89:4 | **dealing** 17:12,18 | **determination** |
| 61:6 | 89:16,17 90:3,4 | **dealt** 16:24 | 18:4 19:23 21:21 |
| **connection** 7:25 | 91:18 94:11 95:13 | **decide** 11:20 13:9 | 60:12,25 61:11 |
| **consecutively** | 97:16,17 | 76:10,12 | 76:9 90:2 |
| 70:12 | **corrective** 10:22 | **decision** 18:7,9,16 | **determine** 22:3 |
| **considered** 31:5 | **couch** 20:12,22 | 22:22 23:15 53:13 | 88:11 |
| **consistent** 25:16 | 35:7,10,14 40:19 | 56:8 60:21 77:2 | **determined** 88:4 |
| **constitute** 37:13 | 41:12,16 | 88:9 | 95:11 |
| **contact** 19:10 21:9 | **counsel** 3:3 4:19 | **decisional** 59:10 | **difference** 13:18 |
| 23:3,7 53:13 | 4:20 | 84:20 85:4 87:4,5 | 15:8,17 |
| **contacted** 19:13 | **county** 100:4 | **decisions** 77:5,7 | **different** 14:14,17 |
| **contacts** 10:23 | **couple** 64:12,14 | **deem** 58:7,9 | 15:12 30:25 55:2 |
| **contained** 92:13 | **courses** 12:16 | **deemed** 19:5 39:9 | **difficulty** 86:11 |
| 93:8 | **court** 1:1 3:15 | 61:7 62:2 | **diffuse** 93:21 |
| **contents** 92:10 | 4:22 5:18,21 9:3 | **deems** 87:3 | **direct** 23:17 55:16 |
| **continued** 97:22 | **covers** 96:19 | **defendant** 4:25 | 81:25 85:7 |
| **control** 90:10,11 | **cream** 13:8 | 91:9 | **directly** 44:20 |
| **cooperate** 46:15 | **created** 54:21 | **defendants** 1:10 | 46:25 94:18 |
| **cooperated** 58:11 | **crew** 46:18 47:3,5 | 2:7 | **disagreement** 90:6 |
| **cooperating** 51:3 | 53:5 88:20 | **defense** 4:20 | **discussing** 44:21 |
| **cooperative** 46:6,8 | **criminal** 11:10 | **definite** 74:9 | 93:19 |
| 51:7 52:9,20,24 | **criteria** 20:14,25 | **definitely** 49:18 | **disease** 37:7,11,22 |
| **copy** 28:23,24 | 21:8 60:17,20 | **department** 2:7 | 38:11,24 |
| **corner** 69:22 | **critical** 15:24 | 53:13,23 55:24 | **diseases** 14:14 |
| **correct** 8:17 12:18 | **current** 10:17 | 56:23 90:7,10 | **dispatch** 29:17 |
| 14:3,23 23:5 | **currently** 4:17 | 91:7 | 30:22 34:25 54:6 |
| 24:17 26:23 27:25 | 13:24 | **depending** 76:14 | 54:21 57:7 94:4 |
| 28:8 29:3,15 | **cursing** 47:7 | **deposition** 3:5,12 | **dispatched** 34:14 |
| 32:24 33:8,12 | **cv** 1:4 | 101:3 | 34:18,21 |
| 35:15 36:13 37:24 | | **depression** 61:22 | **dispatcher** 57:4 |
| 38:8 42:11,17 | **d** | **depth** 80:22 82:11 | **district** 1:1,1 |
| 48:10,21,22 49:6 | **d** 99:5 | 93:16 | **doa** 22:6,10 |
| 52:17,18 53:2,24 | **date** 1:12 5:4,7,8,9 | **describe** 6:14 | **doctor** 19:11 21:9 |
| 54:4 55:15 57:9 | 9:19 10:6,14,20 | 40:14 43:23 44:12 | 23:3,8,9,13 37:18 |
| 57:10 59:3 61:12 | 12:10 23:19 26:10 | 45:12 79:19 80:20 | 38:4,10 87:24 |
| 62:25 68:24 69:17 | 78:25 92:20 101:3 | 80:22 | **doctors** 22:25 |
| 71:7,24 72:15,19 | **dates** 7:22 | **described** 20:25 | **document** 27:22 |
| 72:24,25 73:4 | **day** 17:7 23:21,24 | **describing** 20:14 | 28:11,17,18,24 |
| 78:20 79:2,11 | 33:24 82:8 96:23 | | 29:2 30:12,14,17 |
| | 98:10 100:19 | | |

**[document - february]**                                                      Page 5

31:15 32:2,4,6,15
32:17,20,23 34:5,7
54:12,14,17,18,21
57:4,7 58:19 92:7
93:9 94:17 96:4
**documents** 91:16
99:11,12
**doe** 1:7,8
**dog** 92:2
**doing** 5:15 6:14
15:6 63:3,11
67:24 68:9 70:9
72:12,13 79:20
**door** 40:8 72:16,20
72:24
**doorway** 72:23
**dressed** 71:20
**drink** 7:4 18:2
**drinking** 36:11
37:12,20,22 38:24
61:6
**driver** 72:7,10
**driving** 29:7
**drop** 68:19
**drug** 31:11,19,20
34:15,19 35:4
**drugs** 9:8 32:7
34:23
**drunk** 18:2 19:15
19:18,19 20:13,22
**duly** 4:2 100:10
**duties** 95:20
**duty** 23:23 33:3
95:22

**e**

**e** 2:1,1,4 4:1 99:1,5
100:1,1
**earlier** 80:24
92:15 96:6
**early** 26:11

**eastern** 1:1
**edp** 22:18
**education** 11:3
12:20
**effect** 3:14
**eight** 17:2 35:6,9
35:13 36:22 62:16
62:17
**either** 56:6 93:2
**ekg** 15:14
**else's** 69:12
**emergency** 31:2
**emergent** 31:5
**ems** 39:23 55:8
83:5 88:20
**emt** 12:2,8,18 13:4
13:10,21,22 14:3,5
14:9 15:4,6,9 16:3
16:5,15,16,23
23:20 37:10 76:8
91:22 101:3,21
**emtp** 15:13
**emts** 23:5,6 90:7
**encounter** 32:13
**encountered** 35:21
35:24
**encouraged** 15:4
**ends** 67:11
**english** 11:25
**enter** 68:23
**entered** 65:20
**entering** 62:18
64:19
**entire** 46:11 96:19
97:12
**entries** 86:6
**entry** 86:7
**equipment** 26:17
26:20,25 73:16,19
**errata** 101:1

**especially** 46:13
47:25 93:5
**esq** 2:5,9,11
**et** 101:2
**etcetera** 22:20
73:19
**evaluate** 90:16
**evaluated** 87:24
**evaluation** 38:17
**evening** 24:23
25:19 26:3 30:5
41:4 45:25 50:17
58:21 72:8 74:19
**event** 44:4 54:9
55:8 74:8 86:16
86:21 87:9 93:11
**events** 17:9 79:9
79:15
**evidence** 18:24
20:7 86:24
**exact** 7:22 12:10
15:21
**exactly** 17:17
28:17 29:18 58:2
78:14 79:25
**exam** 14:22
**examination** 1:16
4:5 91:2 98:3 99:7
100:9,11
**examined** 4:4
**example** 20:11,20
29:21 93:24 94:4
**exhibit** 24:15
28:12,15 39:22
54:13 62:14 92:8
93:9 96:7
**exhibited** 59:19
**exits** 71:24
**experience** 13:2
19:12

**expires** 101:25
**eye** 85:19 93:6
**eyesight** 10:16,17
10:19

**f**

**f** 100:1
**face** 65:23
**faces** 49:21,23
**fact** 8:16 17:25
42:21 51:20 52:7
58:13 60:14 61:5
70:11 88:22 94:3
94:6,24 95:14
**factors** 38:18 39:4
**faddis** 2:9 4:21
20:17 28:10,22
30:10 38:19 41:21
45:14 51:18 53:8
54:11 57:13,23
61:17 65:10 77:3
79:3 90:12 91:3,6
97:18 99:9 99:9
**failed** 9:12
**fair** 25:18 28:5
34:4 35:13 41:12
55:11 58:20,23
59:4 80:15 94:8
**fall** 39:12
**falling** 20:6
**falls** 49:19
**familiar** 64:22
**family** 13:7,21
93:17,19
**fan** 11:24
**far** 51:10,16 57:6
58:19 74:4
**fdny** 13:24 23:12
**february** 5:6,7
10:7 23:18 24:20
27:12,18

[feel - hand]                                                     Page 6

**feel** 13:17 50:24 56:17
**feels** 16:19
**felt** 47:25
**female** 71:5
**fictitious** 1:8
**figure** 19:22 67:10
**figuring** 40:23
**filing** 3:4
**fill** 32:19
**final** 23:15
**find** 5:4 42:3
**finding** 35:9
**fine** 76:17
**finger** 48:16
**finish** 5:14
**finished** 5:25
**first** 4:2 5:13 15:4 17:20 34:13 35:22 40:15,21,25 43:19 62:17 64:21 89:11 96:7
**fit** 21:8 60:20
**fitch** 2:3
**five** 31:11 64:9,22 85:19
**floor** 27:20 28:8 60:6 80:10
**follow** 6:23 18:18 18:21 90:24 91:10
**followed** 89:20 90:4
**follows** 4:4
**foot** 10:4
**force** 3:14 21:12 21:16
**forehead** 82:4
**form** 3:8 20:18 38:19 41:22 51:19 57:13 77:3 90:12 95:19

**format** 55:3
**formulate** 45:21 81:11
**forth** 45:4 100:10
**forthcoming** 46:14
**forward** 78:16,17 80:3,4
**found** 35:6,13
**four** 17:3,4 31:10 31:21,24 36:5 43:21,21 44:2,2,3 44:9,17 60:5 85:19,25,25 86:18 86:20,20
**frame** 7:23
**friend** 13:11
**friend's** 13:23
**friends** 13:20
**front** 30:2
**fuchs** 2:5 4:6,15 9:21 28:25 54:8 90:18 99:8
**full** 16:15
**function** 22:14
**further** 3:7,11 40:4 67:19 90:21 100:13
**future** 24:8

**g**

**gait** 20:4 44:25 45:3,9 60:7,19 86:3
**gcs** 18:23 21:5 22:6,13 86:23
**gears** 43:17 62:8
**generally** 8:6 15:16 23:7 24:3 25:6 26:6 27:16 29:25 34:9 37:9 37:19 40:21 41:19 41:23 42:7 43:24

54:16 56:10,14,25 58:7 60:2 67:9,12 72:10 73:21,23 74:2 85:3 93:4 94:13
**generic** 68:14,15 68:18
**gentleman** 71:4 75:9
**gerald** 2:11
**gerd** 61:21 62:4
**gesture** 6:13
**gestures** 6:12
**getting** 31:25 32:4 43:14 74:4 96:10
**give** 15:14 68:14 74:8 84:21 85:15 90:20
**given** 7:8 51:9 100:12
**giving** 85:4
**glasgow** 18:17 22:2,4 85:9,13 86:19 87:8
**glasses** 10:23
**glitch** 5:21
**glitchy** 5:17
**go** 11:17,21 19:6 19:14,16,17,24,25 20:15 21:3,13,19 22:23,25 26:16 27:3 32:16 34:12 38:6,16 39:14 41:25 43:17 57:14 57:23 58:8 60:13 61:8,17 64:8 65:10 76:10,15 81:12 82:11 86:5 88:12,14,22 89:10 90:2,17 91:19

**goes** 17:8,14
**going** 6:9 12:14 14:13 23:14,17 24:7 28:14,19 29:9 31:17 34:13 40:12,15,23 41:10 42:2,4 43:4,5 44:6 48:24 49:5,10 50:3,4,9,15 55:4 55:16 62:8,9,13,15 62:16 63:6,12,14 65:17,18 67:10,18 67:19 68:3 69:4 71:11,12,14,16 74:10,23 75:2 77:13,17 90:22
**good** 4:14
**graduate** 11:14 12:11
**graduated** 11:12
**gray** 19:9 74:13 89:11
**ground** 5:11 45:7 81:8
**group** 64:17
**guess** 11:13
**guy** 27:16 78:13 78:17 79:23 80:2
**guys** 8:4 25:19 28:22

**h**

**h** 99:1
**half** 10:4 26:8 78:6
**hallucinations** 51:7
**hallway** 72:23
**hand** 6:12 21:24 63:14 68:5 70:7 73:4 78:21 80:7 100:19

[handcuff - jamaica]                                                                Page 7

| | | | |
|---|---|---|---|
| **handcuff** 76:11 77:9 | **history** 11:25 39:8 54:7 61:20 | **immediate** 53:18 61:25 62:5 | **indicate** 73:24 |
| **handcuffs** 76:24 | **hit** 43:15 80:10 | **immediately** 33:22 33:23 | **indicates** 57:8 95:2,5 |
| **hands** 13:16 14:18 14:19 15:23,25 43:15 76:4 78:4 78:13,15 79:24 80:2 | **hold** 13:5 16:4 45:5 | **imminent** 37:14 38:7 | **individual** 21:13 41:12,15 |
| | **holding** 63:13 68:5 70:6,7,11 73:17 | **impair** 9:9 | **individually** 1:6,7 |
| | **holidays** 17:7,9 | **impression** 87:18 | **ineligible** 19:5 |
| **hannah** 2:9 54:8 90:23 91:6 | **home** 20:12,21,21 21:10 | **incident** 5:5,8 10:6 10:14,20 23:19 25:5 28:4 29:11 29:23 32:12 33:23 33:23 34:14 39:18 43:9,11 57:25 73:22 78:25 81:12 82:9,23 83:2,5,9 94:4 | **infer** 82:13 94:17 |
| **happen** 71:9 | **honestly** 19:11 | | **information** 32:23 33:19 36:19 38:23 60:10 63:25 94:3 99:11,12 |
| **happened** 39:19 41:4 63:10,15 66:20 77:20 78:11 84:4 94:10 96:23 | **hope** 10:8 | | |
| | **hospital** 16:4,8,14 19:14,16,17,25 20:2,16 21:3,13,19 22:24 23:9,20 34:11 38:16 39:3 57:21 60:13 61:8 62:7 64:18,19 76:10 82:22,23,24 83:7,16,25 84:6 88:12,14,23 90:3,9 92:25 93:4 | | **initial** 38:12 40:22 42:2 58:9 |
| **happening** 78:14 | | **include** 17:7 94:14 97:23 | **initially** 35:22 |
| **happens** 41:24 90:9 | | **incoherency** 43:22 44:12,16 | **injury** 31:11 |
| **happy** 7:5 | | | **inside** 56:12 |
| **harm** 21:17,21 22:17 36:16 39:11 50:21,23 51:21 52:7,16 53:2 94:13 95:15 | | **incoherent** 44:14 45:19 86:2 | **instructed** 37:18 |
| | | **incomprehensible** 44:19 | **instructions** 7:12 |
| | **hour** 26:8 | **incorrect** 71:18 | **intention** 57:15,20 |
| **head** 6:11 75:6 | **hours** 9:7,13 17:2 26:10 | **independent** 24:11 27:24 29:14 31:23 34:17 35:8 36:12 36:17 42:10,16 45:24 46:19 48:18 50:6,13,18 53:6,10 56:3 59:12 61:3 61:10,13 66:2,4 67:3 79:14 81:14 88:3 89:2,5 96:22 97:14 | **intentions** 57:11 |
| **health** 37:14 | **house** 40:17 | | **interaction** 96:19 |
| **hear** 5:20 78:8 91:6 | **human** 14:12 | | **interested** 100:16 |
| | **hurt** 50:5,9,16 51:5,6 | | **intox** 95:17 |
| **heard** 71:15 | | | **intoxicated** 16:24 17:4,11,13,18 18:5 19:3,4,20,23 59:8 60:3 84:19 87:21 87:22 |
| **height** 10:3,6 | **hyperlipidemia** 61:20 | | |
| **held** 1:18 | | | |
| **helped** 13:18 | | | |
| **hereinbefore** 100:10 | **i** | **independently** 41:3,7 43:11 47:22 63:9 74:20 82:15,19 | **intoxication** 95:14 |
| **hereto** 3:4 | **ice** 13:8 | | **involvement** 93:11 |
| **hereunto** 100:18 | **idea** 65:4,5 67:23 69:5,9 70:8 71:15 72:4,13 74:23 79:21 | | **involving** 8:7 83:5 |
| **high** 11:12 61:21 | | | **irrational** 45:12 |
| **higher** 22:4 | | | **irrationally** 48:20 86:4 |
| **highest** 11:2 85:18 | **identifying** 40:22 | | **issue** 23:2 |
| **highly** 19:19 60:3 | **ilyssa** 2:5 4:15 | | **issues** 22:19 83:14 |
| | | | **j** |
| | | | **jacket** 75:10 |
| | | | **jamaica** 16:4,8,14 23:9,20 82:24 |

212-267-6868                                                              516-608-2400

Case 23-24, Document 32, 04/19/2023, 3501832, Page115 of 306

**[JA-975]**

83:16 84:6
**jay** 11:6,9,11,14
11:16,21,22 12:21
**job** 21:24 27:19,25
28:6 29:6,10,18,19
29:21 31:12,13
33:7,10,17,17
35:23 36:7 37:4
41:17,24 42:24
45:17 46:10,25
47:9,13,17,23 49:2
50:7 51:12 53:11
54:22 56:3 58:6
59:16 61:14 64:7
64:16 65:5 66:5
66:10,15,19 67:2,8
67:17 70:14 73:25
74:21 75:19 78:11
79:23 80:11 81:18
81:24 82:20 83:18
83:23 85:2 88:4
94:10
**jobs** 13:5,17 26:21
27:4,10 64:14,15
88:16
**john** 1:7,8 11:6,9
11:11,14,16,21,22
12:21
**joined** 4:19
**jurat** 97:23
**justice** 11:10
**justified** 21:12

**k**

**keep** 65:17 68:8
71:11 93:6
**kidnap** 59:7
**kill** 48:24 49:5,10
50:3,16
**kind** 15:18 37:7
88:16 93:6

**kitchen** 62:23
**know** 6:20,22 7:5
7:10 8:11 12:10
14:16 24:12 25:15
26:5,11 30:13
31:13 37:18 39:9
40:5,9 41:7 51:10
51:24 53:14 54:16
61:15 63:3,12
64:10,11,12,20
69:4 71:6,8 72:2,6
73:9,21 74:16
75:17,24 79:5
82:16 88:24 89:12
96:18 97:10
**knowledge** 94:9

**l**

**l** 4:1,1
**labored** 86:10
**laptop** 91:19
**large** 16:25
**law** 2:7 91:7
**lawsuit** 8:7,9
**learn** 14:19
**learning** 15:24
**leave** 11:20 56:15
57:2,3,5 58:15
59:11 73:24 74:5
94:15
**leaving** 64:19
**left** 11:17 57:8
59:2 72:3,5 84:5
**leg** 43:15
**legal** 94:17
**legally** 21:10
**lenses** 10:23
**level** 11:2 14:12
31:13,21,24
**levels** 30:25
**lights** 30:8 31:7

**lij** 14:4,8 15:9
**liked** 12:3 13:14
**limit** 18:25 20:8
21:6 86:25
**line** 46:5 49:19
80:18 82:2,21
101:5
**link** 15:5 91:18
**listed** 61:24
**little** 12:8 39:17
40:12 62:9 63:6
67:19
**liver** 37:6,11,22
38:11,23
**llc** 101:1
**llp** 2:3
**location** 28:5
29:23 32:12 84:5
**log** 26:20
**long** 11:16 37:25
**look** 28:15 54:6,19
68:16 69:19 90:19
**looked** 13:13
**looking** 24:14
30:13 31:15 32:6
43:25 49:3 52:13
56:4 63:24 65:7
68:12,21 70:11
84:18 92:8 93:24
**looks** 41:11 43:12
63:13,16 65:7
67:25 68:4 69:3
69:11,16 70:6
71:23 73:8 74:7
74:13 75:22,23
76:4
**lot** 68:13 92:5,17
**lower** 22:4 70:19

**m**

**m** 4:1
**main** 15:16 39:5
92:19
**major** 95:16
**majority** 17:24
**making** 13:18 18:3
18:7,10,16 29:13
51:25 60:22 79:21
82:14 84:20 87:4
87:5 88:9
**male** 35:7,9,14
36:23
**malfunctioning**
83:11
**management** 8:5
**mandeep** 1:6 91:8
**manner** 48:19
53:6
**marisabel** 24:25
25:7 40:10 70:19
**mark** 43:8 64:10
64:22,25 65:19,21
**marked** 62:13
**marriage** 100:15
**match** 54:22
**matter** 100:17
**mean** 19:19 22:10
23:4 25:9 26:23
27:8,13 31:9
37:23,25 44:13
45:2 64:14 72:23
73:13 83:3,9,23
87:19
**meaning** 86:21
**means** 18:17 43:23
44:16 46:11 86:17
97:8
**meant** 45:13
**medical** 18:11,14
18:24 19:6 20:7

Case 23-24, Document 32, 04/19/2023, 3501832, Page116 of 306
**[JA-976]**

21:5 22:22 39:8
51:11,13 58:21,24
58:25 60:25 61:15
61:20,23,25 62:5
76:9 86:24 88:5
88:13 95:12
**medication**  15:15
**medications**  9:8
  9:13 14:13 15:16
  63:21,24 68:2,11
  68:13,22 70:10,13
  70:16 92:21
**meet**  9:6 20:24
  22:16 60:16
**meeting**  20:13
**member**  93:17,19
**members**  13:21
**memory**  30:15
  39:18 63:10 64:4
**mental**  17:16,19
  18:6 85:22 86:14
**mentally**  18:20
**mentioned**  22:2
  28:7 37:6 82:17
**met**  13:11
**middle**  71:3 74:12
**midnight**  25:20,24
  26:4
**military**  12:25
**milonas**  1:17 4:9
  4:14 5:1 6:1 7:1
  8:1 9:1 10:1 11:1
  12:1 13:1 14:1
  15:1 16:1 17:1
  18:1 19:1 20:1
  21:1 22:1 23:1
  24:1 25:1 26:1
  27:1 28:1 29:1
  30:1 31:1 32:1
  33:1 34:1 35:1
  36:1 37:1 38:1

39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1,7
101:3,21
**mine**  13:11 32:21
**minute**  39:23 43:8
  65:19,21 67:20
  90:21
**minutes**  26:7,7
  43:5 55:17 62:14
  68:4,20 69:2,10,15
  69:21,23,23 70:3
  70:17 71:12,22
  73:2,7 74:11,22
  75:3,14,22 76:6
  77:12,23,23 80:5
  90:18
**modify**  25:17
**moment**  13:12
**monitoring**  87:18
**months**  14:10
**morning**  55:5,12
  80:9

**motor**  85:17
**mouth**  75:15
**move**  78:16,17
  80:2,4
**moved**  16:12
**moving**  22:7 44:24
  75:15
**multiple**  5:16 62:7

|n|
|---|

**n**  2:1 4:1,1 5:1 6:1
  7:1 8:1 9:1 10:1
  11:1 12:1 13:1
  14:1 15:1 16:1
  17:1 18:1 19:1
  20:1 21:1 22:1
  23:1 24:1 25:1
  26:1 27:1 28:1
  29:1 30:1 31:1
  32:1 33:1 34:1
  35:1 36:1 37:1
  38:1 39:1 40:1
  41:1 42:1 43:1
  44:1 45:1 46:1
  47:1 48:1 49:1
  50:1 51:1 52:1
  53:1 54:1 55:1
  56:1 57:1 58:1
  59:1 60:1 61:1
  62:1 63:1 64:1
  65:1 66:1 67:1
  68:1 69:1 70:1
  71:1 72:1 73:1
  74:1 75:1 76:1
  77:1 78:1 79:1
  80:1 81:1 82:1
  83:1 84:1 85:1
  86:1 87:1 88:1
  89:1 90:1 91:1
  92:1 93:1 94:1
  95:1 96:1 97:1
  98:1 99:5

**nail**  87:13
**name**  1:8 4:7,15
  32:21 68:14,15,16
  68:16,18,18 91:6
  92:20 101:2,3
**names**  1:8 68:12
  68:22
**narrative**  32:16,18
  34:12 36:4 40:20
  42:19 43:13,20
  44:7 45:18 46:4
  46:11 47:2 48:7
  49:3 51:22 52:13
  52:15 53:21 58:14
  59:17 61:5 63:18
  85:24 88:10 89:23
  92:23 93:25 96:15
**near**  56:12
**necessarily**  37:23
  48:6 52:25
**necessary**  62:3
  89:18,19
**necessity**  61:8
**need**  6:12 7:3,6
  39:14 56:10 62:5
  89:24 90:18
**needed**  57:5,18
  58:21,24 60:25
  87:23 90:2
**needing**  90:8
**needs**  58:8,17 76:9
**neurological**  86:13
**never**  8:12 54:18
  55:3 77:11
**new**  1:1,6,20 2:4,4
  2:7,8,8 4:3,13,18
  18:22 100:3,7
  101:1,2
**nicole**  1:17 4:9
  28:14 91:4 98:7
  101:3,21

**night** 25:3 42:9,14
  42:22
**nine** 40:7
**nods** 6:12
**non** 1:17 30:24
**noncompliant**
  76:14,22
**normal** 36:11 38:5
  52:6,11 86:9 87:7
**normally** 22:14
**notary** 1:20 3:13
  4:3 98:12 100:6
  101:25
**notation** 95:4
**note** 30:10
**noted** 94:24
**november** 100:19
**number** 22:6
  24:17 29:22 72:11
  85:16
**numerous** 88:15
**nypd** 88:13

**o**

**o** 4:1,1
**oath** 8:25 9:3
**objection** 20:17
  38:19 41:21 45:14
  51:18 53:8 57:13
  57:23 61:17 65:10
  77:3 79:3 90:12
**objections** 3:8
**observations**
  93:10 95:9
**observed** 5:4
  78:25
**obtain** 14:25
**obviously** 4:21
  17:8
**occurred** 78:20
  79:8,9

**october** 1:12
**office** 8:13
**officer** 64:9,21
  65:16 77:9 79:20
  79:24 80:3 81:7
**officers** 1:7 4:18
  64:5 65:2,6,20,22
  66:7,12,22 67:5
  69:19 70:23 81:7
  81:16,21
**official** 1:7,8 16:13
**okay** 4:23 5:10 6:6
  6:16,20,24 7:2
  24:13 28:21 30:15
  39:20,21 41:9
  87:15
**old** 9:24 16:11
  35:6,9,14 36:23
**once** 7:20,20 13:14
  69:5 92:24
**ones** 23:14
**open** 72:16,21
**opening** 85:19
**opinion** 37:10,13
  38:10 81:10 90:9
  90:10
**option** 84:24
**orange** 75:9
**order** 68:22 78:17
  80:4
**oriented** 18:15,18
  43:21 59:9 85:24
  86:14,15,15,16,20
  87:9
**outcome** 100:16
**outline** 90:19
**outside** 72:24
**overnight** 24:2
**owned** 13:7
**oxygen** 73:17,18

**ozone** 4:12

**p**

**p** 2:1,1
**p.m.** 1:13 98:2
**p.o.** 1:6
**packs** 73:19
**page** 31:19 52:5
  85:8 93:14 97:22
  99:7,12 101:5
**pages** 28:20
**paper** 52:5 62:24
  93:14
**paperwork** 63:18
  83:20 84:18 88:7
**paragraph** 35:25
  93:25
**paramedic** 12:13
  12:18 14:6 15:10
  15:12,20 37:10
  91:21,24,25
**paramedics** 23:6
**park** 4:12
**part** 24:15,16 33:7
  33:10 34:14 35:5
  36:15 43:19,20
  44:11,24 45:11
  62:15 70:19 73:15
  80:13 93:12 95:19
**participants** 5:19
**particular** 75:20
**particularly** 30:24
**parties** 3:4 100:14
**partner** 25:7,9
  40:10 46:23 47:20
  49:14,15 56:5,7
  57:16 66:23,24,25
  69:13 70:18 97:4
**partners** 25:14,16
**party** 1:17
**passion** 13:15

**patient** 14:20
  18:23 22:21 33:5
  33:18,20 36:9,10
  36:16 40:19 41:25
  42:6,14,19,22,25
  43:21 44:8 45:11
  46:5,7,18 47:2,3,7
  50:20,25 57:17,21
  57:22 58:8,10,15
  58:16 59:18,21
  67:11 78:4,15
  80:4,10,18,24 81:6
  81:15,20 82:5,7,16
  82:21 83:6,14
  84:11 88:5,8
  92:24 93:5,18
  94:12 95:4,6
  96:10,20
**patient's** 18:25
  36:8,10,15 82:3
  86:25 92:20 94:12
  94:19,22,25
**patients** 62:7
**pause** 7:6,6
**pcr** 24:24 34:2
  63:17 92:6 96:15
  97:2
**pd** 53:19,21 80:14
  82:5 93:23
**pending** 4:17 7:7
**people** 5:16 16:24
  17:4,11,13,19
  18:11 19:4,4
  22:14 51:4 76:17
  95:10
**percent** 17:24
**perfectly** 86:3
**periods** 43:22
  44:11,15 85:25
**person** 5:23 13:19
  19:14 20:24 38:15

39:2 40:8 43:3
44:3 45:4 64:16
65:14 74:12,19
76:11 86:14,21
87:9
**personal** 8:8 26:18
38:4 94:9 97:9
**persons** 37:14
**phone** 23:13 68:6
68:7,10 70:7,14
91:13,17
**phrase** 75:20 78:6
79:5
**physical** 6:13
13:16 18:24 20:8
21:6 28:11 86:24
**physically** 92:9
**picked** 69:16 73:8
73:10
**picking** 69:24
73:20,22
**piece** 38:22 85:23
87:3
**place** 38:10 44:3
79:8 86:15,21
87:9
**placed** 83:15
**plaintiff** 1:3,18 2:3
4:16 51:16 58:4
66:7,12,17,23 67:5
**play** 40:4,12 62:9
63:6 67:18 77:22
**playing** 39:24 63:8
65:17 71:11
**please** 4:7,10 6:14
7:9 55:19
**point** 19:22 23:16
41:6,16 53:12
57:19 60:4 63:7
67:24 69:7 72:3
72:14 73:2 74:24

75:25
**pointing** 48:17
**poisoning** 58:5
59:15,20,25
**police** 1:7 4:18
21:14 53:13,22
54:3,4 55:24 56:8
56:11,23 57:12,18
57:20 58:8,13
59:3 62:10,18
65:16 66:22 67:4
76:11,24 77:9
81:6 89:22 90:7
90:10,16
**pony** 75:7
**portion** 16:25
33:16,18,19 96:8
97:2
**portions** 97:10
**position** 16:13
**positions** 16:5
**positive** 44:25
82:2
**possibility** 20:5
**possible** 34:11
56:16 76:16 93:15
**prepared** 92:6,9
**present** 2:11
**presently** 1:8
**presumed** 6:18
**previously** 35:17
**primary** 87:17,22
**privacy** 9:23
**probably** 4:24
7:21 16:22 17:3
45:9 68:21 82:9
**problem** 44:18
**proceeding** 6:9
8:16,22 9:2
**profanities** 47:4,8
48:2 60:9

**professional** 51:11
51:13
**program** 12:13
14:6
**properly** 20:5
22:17 68:23 85:6
88:21
**protocol** 18:22
20:3,6 39:6 60:15
**protocols** 14:15,17
17:15 21:25 23:2
77:6 89:10,21
90:5
**prove** 20:10
**provider** 87:17,22
**proximity** 34:5
**psychiatric** 22:19
**pt** 55:19
**public** 1:20 3:13
4:3 98:12 100:6
101:25
**pull** 78:15 80:2
**pulled** 97:11
**punch** 26:16 49:25
**purpose** 33:14
**purposes** 18:3
**pursuant** 1:18
**pursue** 12:3
**put** 9:21 26:19
29:9 49:11,16,18
50:10,12 54:8
59:21 68:19 76:4
76:24 78:4,13
79:23 92:12,13
**putting** 63:19
78:24 82:15 87:5

**q**

**question** 3:9 5:13
5:25 6:15,17,18
7:7,8,10 82:11,14
87:23

**questioning** 46:6,8
**questions** 5:12
6:23 7:14 22:15
44:3,9,17,21 46:12
46:15 51:2 52:19
52:23 60:5 86:18
90:22,25 91:10
92:6

**r**

**r** 2:1 100:1
**radio** 53:19 56:20
**rational** 20:10
21:17 22:16 38:5
45:22 52:8,10
59:8 60:17
**rationality** 44:18
**rationally** 19:2
20:9 21:7 39:7
85:22 87:2
**read** 32:18 36:4
88:10,19
**ready** 26:17 74:5
**real** 34:8
**really** 11:24 12:3
21:15 65:9
**reason** 9:16 39:13
84:15 88:18 89:12
89:21 96:2 101:5
**recall** 25:5 26:9
30:2,18 32:15
35:20 36:24 37:4
37:8 41:17 47:9
47:13,15,17,19,22
51:12 52:3 53:14
53:22 54:2,5 56:9
56:25 57:25 58:6
59:16 63:15 64:6
66:19 67:2,8
71:21 74:8,18,20
76:2 80:11 82:20
85:2

[recognize - saying]                                                        Page 12

| | | | |
|---|---|---|---|
| **recognize**  54:14 | **refreshed**  41:3 | 61:19,24 68:23 | **reviewed**  96:19 |
| 70:22,24 | **refreshes**  39:18 | 72:9 80:13 82:16 | **reviewing**  48:7 |
| **recollect**  50:4 | 43:8 63:9 | 82:18 84:8,12,25 | 91:16 |
| **recollection**  24:11 | **refuse**  18:14 19:5 | 85:8,12 87:12,14 | **richmond**  100:4 |
| 27:24 29:14 30:17 | 20:15 21:2,3 59:5 | 88:2,25 89:10,15 | **ridden**  83:23 |
| 31:20,24 32:3,10 | 59:7 60:12,15,21 | 92:10,13 | **ride**  14:21 15:2 |
| 34:18,20 35:8 | 88:5,13 | **reporter**  4:22 5:18 | **riding**  15:7 |
| 36:2,6,12,18,25 | **refused**  58:25 | 5:22 | **right**  24:8,16 |
| 41:3 42:10,16,18 | **refusing**  18:11 | **reporting**  101:1 | 25:11,13 31:18 |
| 42:21,24 43:9 | 22:21 | **represent**  4:15 | 38:16 44:5 62:15 |
| 45:16,24 46:2,9,19 | **regardless**  51:8 | 91:8 | 62:22 65:9 67:21 |
| 46:21,24 48:19,25 | **region**  82:4 | **requested**  99:11 | 70:4,9 71:4,22 |
| 50:7,14,19 53:6,11 | **regular**  17:6 25:7 | **requesting**  53:19 | 72:21,22,23 73:4 |
| 54:23 55:23 56:3 | 45:3 95:20 | **require**  61:25 | 75:7,13 76:3,5 |
| 59:13 61:4,10,14 | **related**  12:17 | **required**  21:18 | 78:21,21 79:12 |
| 65:2 66:3,5,9,15 | 100:14 | 39:3 87:18 95:11 | 80:7 82:3,4 91:14 |
| 67:4 78:10 79:15 | **remember**  6:19,21 | **reserved**  3:9 | 91:17 92:10,18 |
| 81:15,17,19,24 | 6:24 25:2 29:17 | **residence**  35:7,10 | 94:6,7,22 95:7,12 |
| 84:3,7,16 88:3 | 30:16 32:7 34:22 | 43:2 57:5 | 95:20 96:15,24 |
| 89:2,6 96:23 | 35:23 36:21 37:5 | **resisted**  82:7 | 97:6 |
| 97:14 | 41:6,14 43:10 | **resisting**  76:16 | **risk**  8:4 58:14 |
| **record**  4:8,11 6:25 | 47:7,11 48:23 | 82:5 | **risks**  37:19 |
| 9:22 100:11 | 50:14 56:7,21 | **respect**  54:22 | **rma**  21:8 |
| **recorded**  6:8 8:14 | 58:3 62:12 63:8 | **respective**  3:3 | **rmp**  55:19 |
| 96:3 | 65:5,9 66:6,11,16 | **respond**  31:6 | **room**  93:19 |
| **recording**  6:9 | 66:21 67:15,16 | 44:23 | **routinely**  51:4 |
| **refer**  5:6 20:3 | 71:3,19 72:5 | **responded**  16:18 | **rules**  5:11 |
| 21:24 32:14 60:15 | 73:22 75:19 79:22 | 16:22 27:18 28:5 | **runs**  25:24 |
| 83:13 | 84:23 89:7 96:11 | 30:6,7 65:3 | |
| **referred**  43:13 | **remove**  57:21,22 | **responding**  64:16 | **s** |
| **referring**  20:6 | **removed**  90:8 | **response**  45:21 | **s**  2:1 4:1 99:1 |
| 24:5,16 27:21 | **repeat**  38:21 | **responsible**  32:22 | 101:5 |
| 28:12 30:11,20 | **rephrase**  30:21 | 32:25 | **safely**  88:21 |
| 39:6 46:3 61:4,19 | **report**  24:5,10,15 | **rest**  92:22 | **safety**  37:15 57:18 |
| 96:14 97:5 | 24:24 28:4 32:19 | **restaurant**  13:7 | 93:7 |
| **reflected**  97:16 | 33:4,5,8,11,15,16 | **result**  87:21 | **saw**  24:10 57:6,8 |
| **reflux**  61:21 62:6 | 33:21 35:12 39:16 | **review**  28:3 51:14 | 61:7,11 65:23 |
| **refresh**  31:20 | 43:18 44:8 48:5,9 | 58:19 63:22 64:3 | 78:3,12,15,16 |
| 35:25 42:20 55:22 | 48:14 49:8,11,16 | 72:17 80:15 81:4 | 79:15,23,25 80:3 |
| 64:4,25 | 50:10,12,20 51:15 | 85:6 87:25 89:14 | 81:9 88:2 |
| | 53:22 55:14 59:18 | | **saying**  41:15,18,20 |
| | | | 44:23 45:20 47:10 |

[saying - stage]                                                              Page 13

| | | | |
|---|---|---|---|
| 75:10,17 96:11,17 | 63:12 67:20 68:4 | **seriously** 95:17 | **somebody** 18:4 |
| **says** 23:25 24:4,17 | 68:21 69:3,10,15 | **set** 100:10,19 | 19:15,23 20:11,20 |
| 28:4 31:16,19 | 69:22,23,24 70:3 | **severely** 60:3 | 21:21,22 37:11,21 |
| 34:14 35:3,5 36:8 | 70:18 71:13,23 | **shawl** 74:14 | 38:23 52:25 54:3 |
| 36:15 43:20 44:11 | 73:3,8 74:11,23 | **sheet** 101:1 | 69:8 76:25 77:10 |
| 44:25 45:11 46:5 | 75:3,14,23 76:6 | **shields** 65:15 | 90:8 |
| 46:17 53:4,20 | 77:13,23,24 79:10 | **shift** 11:23 17:2,5 | **someone's** 38:11 |
| 55:8,18 72:9 78:6 | 79:16 80:6 | 25:10,14 | **somewhat** 43:16 |
| 80:14,18,24 82:2 | **section** 32:17 | **shifts** 25:12 | 78:8 |
| 82:21 83:2 84:14 | 92:23 93:25 | **shop** 13:8 | **son** 36:9 |
| 84:19 85:9 86:7 | **sedation** 21:15 | **show** 39:17 62:13 | **sorry** 69:18 |
| 86:13 87:16 94:11 | **see** 28:20 31:16 | **showed** 48:15 | **sort** 73:11 |
| **scale** 18:17 | 34:15 39:18 40:2 | **showing** 43:2 | **space** 49:20 97:9 |
| **scan** 42:2 | 40:3 55:6,9,20 | **shows** 70:12 74:6 | **speak** 42:3,5 67:11 |
| **scene** 20:23 39:20 | 62:18,18 63:4 | **shrinking** 10:9 | 67:12,13 90:16 |
| 42:3 53:21,23 | 64:15,18 65:14,14 | **sick** 31:12 | 95:6 |
| 55:9,13 61:7 | 65:25 67:20 69:11 | **side** 16:12 40:3 | **speaking** 8:6 37:9 |
| 62:11 64:5 80:14 | 69:12,18,22 70:4 | 67:21 70:4 73:5 | 38:4 41:11,19,23 |
| 92:18 95:11 | 70:23 71:9 72:18 | 78:21 80:7 82:3 | 42:7,24 43:3 |
| **schapira** 24:25 | 72:20 74:11 75:3 | **sign** 84:11,15,17 | 44:19 54:16 56:10 |
| 40:11 69:13 71:23 | 75:11,14 76:5,19 | 84:22,24 85:5 | 66:3 67:15 69:8 |
| **schedule** 25:17 | 77:13,16,24 78:2,7 | **signature** 32:21 | 73:21 75:24 80:25 |
| **school** 11:12 15:4 | 78:10,14 79:25 | 100:21 | **specific** 12:16 |
| 15:6 92:2 | 80:6,9 81:5 85:10 | **signed** 3:12,14 | 14:15 17:12 23:8 |
| **score** 85:9,13,18 | 86:7,16 91:4 | 84:8 | 25:5 26:9 27:6,11 |
| 86:19 87:8 | **seeing** 40:25 71:19 | **signs** 86:11 | 27:13,14 47:15 |
| **screen** 24:8 28:18 | 77:15 78:5 79:18 | **similar** 8:16 54:23 | 48:3 77:18 78:11 |
| 29:22 54:13 67:21 | **seen** 40:13 43:7 | **simply** 94:3,5 | 78:12 93:13 97:5 |
| 70:20 74:13 78:22 | 51:15 54:18 55:3 | **singh** 1:2 4:16 | **specifically** 12:17 |
| 80:7 | 64:11,13 71:5 | 101:2 | 48:8 50:22 52:3 |
| **scroll** 28:19 55:4 | 74:3 87:23 | **sirens** 30:8 31:7 | 52:15 64:21 71:7 |
| **sealing** 3:4 | **semester** 92:2 | **sit** 27:10,15 45:23 | 71:9 |
| **seated** 35:7,14 | **semi** 44:25 45:8 | 47:6 61:9 67:14 | **spoke** 8:14 42:8,13 |
| **second** 31:18,19 | 60:7 | **situation** 21:24 | 42:21 65:24 74:19 |
| 39:24 43:8,18 | **send** 28:22 55:19 | 90:17 93:22 | 95:2 |
| 59:23 64:9,22,25 | **sense** 72:13 84:19 | **six** 14:10 31:6,8,11 | **spoken** 65:22 |
| 76:19,20,21 80:13 | **sent** 28:25 34:3 | 85:17 | **spur** 13:12 |
| 85:8 87:6 | 36:5 | **skills** 14:18 16:2 | **ss** 100:3 |
| **seconds** 40:2,7,14 | **sentence** 46:17 | **smell** 17:22 | **stable** 20:4 |
| 40:16 41:2,11 | **serious** 70:15 | **solely** 81:10 | **stage** 38:12 |
| 43:6 62:14,16,17 | | | |

Case 1:19-cv-00632-EK-ST   Document 48-10   Filed 11/29/21   Page 115 of 119 PageID #: 1186

**[stand - throw]**                                                      Page 14

| | | | |
|---|---|---|---|
| **stand**  39:10,13 45:8,9 60:18 | **study**  11:8 | **tail**  75:7 | **thing**  13:13 15:22 88:17 |
| **standing**  78:20 | **stuff**  17:9 26:18 62:12 63:19 73:17 92:19 93:13 94:14 94:16 | **take**  5:22 7:3,11 9:12,14 14:18,22 39:2 44:22 45:20 88:21 95:16 | **things**  5:19 44:22 52:4 54:23 72:11 72:11 91:11 93:16 94:25 |
| **start**  5:14 6:2 12:5 16:7 26:4,13 43:7 | **subpoena**  1:18 | **takedown**  79:2,6 | **think**  8:3,9 16:17 19:2 20:9 21:7 22:16 26:3 39:7 41:20 50:15 51:16 65:24 68:20 69:7 71:5 85:22 87:2 90:19 96:2 |
| **started**  5:12 7:15 15:4 | **subscribed**  98:9 101:22 | **taken**  1:17 9:8 39:8 62:6 81:8 | |
| **state**  1:20 4:3,7,10 14:16 18:7 28:10 37:17 38:5 45:12 45:25 52:11 100:3 100:7 | **sued**  5:2 8:11 | **talk**  41:24 | |
| | **suffering**  58:4 59:13 61:16 | **talked**  70:25 | |
| | **suicidal**  51:17 | **talking**  5:9,16,23 6:3 17:10 19:7 44:2 85:10 | |
| | **suite**  2:4 | | |
| **stated**  47:18 50:20 51:20 52:8 60:16 88:7 93:13 94:3,5 94:25 | **summary**  29:24 59:18,21 94:20 | **tax**  1:6 | **thinking**  15:25 45:22 52:11 59:9 60:18 |
| | **supervisor**  70:15 | **tech**  32:21 72:7 73:12,13 83:18,22 | |
| | **supposed**  9:14 27:7 69:19 | **telemetry**  19:11 23:12 89:8,13,16 89:18,25 | **third**  27:20 28:7 65:12 |
| **statement**  95:16 | | | **thirty**  35:6,9,13 36:22 |
| **states**  1:1 36:8,10 36:16 47:2,23 49:8 56:4 94:12 94:20 97:3 | **sure**  6:4,11 7:22 17:20 21:9 24:11 54:11 60:23 65:25 88:14 | **tell**  6:16,21 9:4 23:13 28:16 35:18 35:19 52:21,25 57:4 59:24 63:14 65:21 71:14 76:24 77:2,16 82:6 | **thought**  20:10 |
| | | | **thousands**  16:19 16:20,21 |
| **status**  86:14 | **sustained**  82:5,17 | | |
| **stayed**  56:22 | **swap**  25:12 | | **threat**  37:14,23 38:8 47:5,24 48:4 48:5,9,11,12 51:25 56:14,18 57:16 76:16 88:20 89:23 |
| **steady**  44:25 45:3 45:9 60:7,19 86:3 | **switch**  43:17 62:8 76:18 80:12 | **telling**  30:14 36:13 37:2 67:4 | |
| **step**  56:19 | **sworn**  3:14 4:2 98:9 100:10 101:22 | **temporal**  82:4 | |
| **steps**  39:12 | | **term**  37:25 | **threaten**  58:12 60:8 |
| **sticking**  48:16 | | **tested**  14:20 | |
| **stipulated**  3:2,7,11 | **symptoms**  59:14 59:20,24 | **testified**  4:4 7:17 91:11 92:14 95:18 96:6 | **threatened**  36:23 47:18 66:8,23 67:5 93:22 |
| **stipulations**  3:1 | **system**  15:5 35:3 54:24 | | |
| **stop**  41:8,10 43:5 62:16 63:11,12 65:18 67:19 68:3 71:12 74:10 75:2 | | **testify**  9:9,17 | **threatening**  37:16 46:22 89:4 |
| | **t** | **testifying**  8:25 24:9 91:13 | |
| | **t**  99:1 100:1,1 | **testimony**  7:24 8:20 96:13 100:12 | **threats**  40:23 47:16 |
| **stopping**  39:25 | **tablet**  63:17,25 68:6 69:16,25 70:8 92:14 | | |
| **straight**  39:13 | | **text**  30:3 54:7 55:2 | **three**  28:20 65:8 65:13 70:24 |
| **street**  2:4,8 4:12 | | | |
| **stretcher**  83:12 | **tablets**  68:17 | **thank**  97:19 | **throw**  29:21 49:24 |
| **strike**  81:21 | **tact**  18:20 | | |
| **striking**  81:15,20 | | | |

**time** 1:13 3:9 5:17
5:23 6:3 7:23
16:15 17:24,25
19:12 25:11,22,23
26:2 27:17 34:6,8
44:4 52:5 53:17
58:16 65:20 68:10
68:13 72:5 76:23
77:8 78:12 79:7
83:15,16 84:5,6
86:15,21 87:9
88:8 93:17
**times** 7:19 36:5
64:12,14 86:20
**today** 4:19 5:3
8:17,25 9:7,10,17
45:23 47:6 61:9
67:14
**told** 29:19 30:23
32:7 34:23 36:3
36:18 37:11 54:20
58:18 66:7,12,17
66:22 77:9 93:15
93:16 94:18,21
**tools** 21:14
**tour** 17:2 23:23
24:2 25:20,22
26:14
**towels** 62:24
**trade** 68:15,16,18
**train** 14:2
**trained** 17:17
18:10
**training** 12:23
14:7 15:9,10,18
17:12,14 91:23
**transcript** 6:5,10
**transport** 16:10
**transported** 82:22
**trauma** 73:19

**treatment** 21:2
33:20 58:21,24
**treatments** 14:13
**trial** 1:16 3:10
**tried** 49:24 95:6
**truck** 26:19,22
27:15
**true** 1:8 82:13
100:11
**truth** 9:4
**truthfully** 9:9,17
**try** 56:15
**trying** 19:21 46:12
87:13 93:21
**turn** 56:19 65:23
90:22
**turned** 16:11 69:3
69:5 76:3
**turns** 75:23
**twice** 7:18 60:16
**two** 7:19 11:19
12:7 25:4 26:10
39:25 65:13,15
76:13 82:10 87:2
90:18
**type** 6:13 8:15
19:9 29:24 58:5
86:8

**u**

**unable** 45:6 60:12
60:14 84:14,16
88:5
**unclear** 44:20
**unconscious** 60:6
**uncooperative**
55:19 57:17 80:19
95:5
**understand** 6:15
6:16,18 7:11 8:24
38:6 44:23 45:21
85:6

**understanding**
90:23
**uniform** 26:19
**unit** 24:17,20
29:22 34:14 35:6
46:6 54:6 55:9
94:4
**united** 1:1
**unknown** 1:9
**unresponsive** 22:9
**urgency** 30:18
31:2
**urgent** 30:23,24
30:25
**use** 7:4 21:14 30:7
70:14

**v**

**v** 101:2
**vargas** 1:19 4:22
5:22 100:6,22
**various** 94:24
**vehicle** 83:10
**verbal** 6:11 48:11
85:18
**verbally** 6:14
96:17
**verbatim** 52:4
93:15 94:14
**veritext** 101:1
**versus** 19:25 30:14
**video** 6:7,8 39:17
39:22,23,24 40:2,5
40:14,16 41:2,8
42:15,20,25 43:4,7
48:15 51:15 62:10
62:13,17,19,21
63:7,9,23 64:4,24
65:7,18,19 72:18
74:7 75:4 77:16
78:24 79:10,12,16
79:19 80:15 81:5

81:9,13 88:2 91:5
96:8,9,18 97:12,16
**virtual** 1:19
**visible** 51:6
**vocabulary** 79:7
**vocational** 12:23
**volunteer** 15:5

**w**

**waistband** 68:8
**wait** 5:13 27:10
**waited** 56:23
**waiting** 27:3
**waived** 3:6
**walk** 14:7 18:19
20:4 34:13 40:21
41:24 45:4
**want** 5:3 6:4 7:11
19:16,24 20:16
28:15 39:15,16
46:14 60:23 71:17
80:12 81:25 85:7
86:5 91:12 93:6
94:15,17
**wanted** 11:23 12:3
13:9 51:5,5
**watch** 62:15
**watched** 81:5 96:8
**watching** 71:13
96:7
**way** 34:10 44:13
46:7 49:21 50:24
51:17 53:17 56:16
80:20 81:2 82:6
83:7 100:16
**we've** 40:13 51:15
**wear** 10:22
**wearing** 74:13
**week** 25:11,15
**weekends** 17:8
**weight** 10:11,14

Case 23-24, Document 32, 04/19/2023, 3501832, Page123 of 306
**[JA-983]**

[welcome - zoom]                                                    Page 16

welcome  59:6
went  8:13 12:4,9
  13:25 14:4,11,14
  14:17 25:22 43:19
  51:23 58:11 88:25
  91:25
westchester  11:6
  11:17,21 12:4,6,9
  12:12,21 14:2,5
  15:11,19
whereof  100:18
white  75:10
wife  35:18,21 36:8
  36:10,13,16,22
  37:2,6 44:5 50:20
  51:11,20 52:12
  67:6,6,7 94:12,20
  94:22,25 95:2
willing  58:10
  76:15
willingly  58:11
witness  1:17 4:2
  5:2 8:10,15,17,21
  28:23 30:11 98:3
  100:9,12,18
witnesses'  101:3
woke  36:9
words  94:16,18
work  23:10 25:6
  25:10,10,13 26:3,6
  90:15
worked  13:6,7
  16:25
working  16:7
  23:20,25 24:22,25
  25:2,19
works  13:24
would've  57:2
write  33:21 46:10
  49:4,7 52:4,14
  93:13,14 94:19

writing  32:25
  44:15 49:22 70:12
written  48:2,4,8
  48:12,13 51:22
  92:24 94:2
wrote  35:2 40:20
  43:12 45:8,17,18
  46:3,25 49:2,24,25
  50:19,21,25 52:18
  52:22 53:25 61:5
  82:12 87:11

**x**

x  1:2,10 43:21
  99:1,5
xx  9:20,20

**y**

yeah  8:23 17:6
  27:14,23 30:9
  74:2
year  7:20,21,25
  8:20 9:22 11:13
  16:10 35:6,9,14
  36:22 44:5
years  11:19 12:7
  16:11 25:4 82:10
yell  60:9
yelling  47:4,12,14
  48:2,14
york  1:1,6,20 2:4
  2:4,7,8,8 4:3,13,18
  18:22 100:3,7
  101:1,2
younger  13:8

**z**

zoom  1:19 2:5,9
  2:11 5:15,17,21
  91:5,13

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

```
                                            Page 1
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    -----------------------------------------X
      BALWINDER SINGH,
 3
                             PLAINTIFF,
 4
             -against-    Case 1:19-cv-00632
 5
 6    THE CITY OF NEW YORK, P.O. MANDEEP CHEEMA,
      Tax Id. No. 950196, Individually and in his
 7    Official Capacity, and POLICE OFFICERS
      "JOHN DOE" #1-10, Individually and in their
 8    Official Capacity (the name John Doe being
      fictitious, as the true names are presently
 9    unknown),
10                           DEFENDANTS.
      -----------------------------------------X
11
12                      DATE: October 22, 2020
13                      TIME: 11:12 a.m.
14
15
16           EXAMINATION BEFORE TRIAL of the
17    Non-Party Witness, MARISABEL SCHAPIRA,
18    taken by the Plaintiff, pursuant to a
19    Subpoena, held on a Virtual Zoom, before
20    Alexis A. Vargas, a Notary Public of the
21    State of New York.
22
23
24
25
```

```
                                              Page 2
 1   A P P E A R A N C E S:

 2

 3   COHEN & FITCH, LLP
        Attorneys for the Plaintiff
 4      110 E. 59th Street, Suite 3200
        New York, New York 10022
 5      BY: ILYSSA FUCHS, ESQ. via Zoom

 6

 7   NEW YORK CITY LAW DEPARTMENT
        Attorneys for the Defendants
 8      100 Church Street
        New York, New York 10007
 9      BY: HANNAH FADDIS, ESQ. via Zoom

10

11   ALSO PRESENT: GERALD COHEN, ESQ. via Zoom

12

13              *        *        *

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                                                    Page 3
 1                      STIPULATIONS
 2          IT IS HEREBY STIPULATED AND AGREED,
 3     by and among counsel for the respective
 4     parties hereto, that the filing, sealing
 5     and certification of the within deposition
 6     shall be and the same are hereby waived;
 7          IT IS FURTHER STIPULATED AND AGREED
 8     that all objections, except as to form of
 9     the question, shall be reserved to the time
10     of the trial;
11          IT IS FURTHER STIPULATED AND AGREED
12     that the within deposition may be signed
13     before any Notary Public with the same
14     force and effect as if signed and sworn to
15     before the Court.
16                   *       *       *
17
18
19
20
21
22
23
24
25
```

```
                                        Page 4
 1   M A R I S A B E L   S C H A P I R A, called
 2   as a witness, having been first duly sworn
 3   by a Notary Public of the State of New
 4   York, was examined and testified as
 5   follows:
 6   EXAMINATION BY
 7   MS. FUCHS:
 8        Q.    Please state your name for the
 9   record.
10        A.    Marisabel Schapira.
11        Q.    Please state your address for
12   the record.
13        A.    739 Rockaway Avenue, Valley
14   Stream, New York 11581.
15        Q.    Good morning, Ms. Schapira.
16   Before we get started, my name is Ilyssa
17   Fuchs.  I'm the attorney for the Plaintiff.
18   I'm joined by my co-counsel, Mr. Cohen, who
19   is also representing the Plaintiff in this
20   matter, Mr. Singh.  Ms. Vargas is the Court
21   Reporter, and Ms. Faddis represents the
22   City of New York.
23        A.    Okay.
24        Q.    As you're aware, you're not a
25   Defendant in this case.  You're not being
```

```
                                        Page 5
 1              M. SCHAPIRA
 2   sued.  We are all here today because we
 3   want to find out what you observed on the
 4   date of the incident that my client is
 5   bringing allegations against police
 6   officers in the city in this case.  For the
 7   record, the date of that incident was
 8   February 28th of 2018.  When I say on the
 9   incident date, we are referring to February
10   28th of 2018.  I just want to give you a
11   few ground rules before we get started,
12   which are pretty straightforward and
13   simple.
14        A.    Okay.
15        Q.    Number one, when I ask you a
16   question, just wait for me to finish the
17   question before you start to give your
18   answer.  The reason you're going to do that
19   is because we are on Zoom and so sometimes
20   if two people are talking at the same time,
21   the program will glitch out, and we can
22   miss something that you said, and also even
23   if the program doesn't glitch, Ms. Vargas
24   is taking down everything that is being
25   said today, and she can only take down one
```

```
                                            Page 6
 1              M. SCHAPIRA
 2  person talking at a time.  If I'm talking
 3  at the same time you're talking, or vice
 4  versa, or if you anticipate what I'm going
 5  to be asking you and you start to answer
 6  before I finish the question, Ms. Vargas
 7  might not be able to take both of us down.
 8  Number two, even though we are on video,
 9  this proceeding is not being video
10  recorded.  The only recording, so to speak,
11  of this proceeding is going to be the
12  written transcript.  I ask that you make
13  sure all your answers are verbal, no head
14  nods or hand gestures.  If you do need to
15  describe something, or you do make a
16  gesture, just tell us verbally what you are
17  gesturing so that we can have that down on
18  the record.
19       A.    Okay.
20       Q.    If you don't understand one of
21  my questions, please tell me.  I'm happy to
22  rephrase it for you.  If you do answer a
23  question, then it's presumed that you
24  understood what the question was.  Finally,
25  if you need to take a break, that's okay.
```

```
                                          Page 7
 1                  M. SCHAPIRA
 2   Just let us know and we can take a quick
 3   break, if you need to use the bathroom, get
 4   a glass of water, something like that.
 5   Just not while a question is pending.  Once
 6   I ask you a question, you have to give me
 7   an answer to the question before we can
 8   take a break.  Do you understand all of
 9   those ground rules?
10        A.    Yes.
11        Q.    Have you ever testified before?
12        A.    Yes.
13        Q.    About how many times have you
14   testified?
15        A.    Once.
16        Q.    What was that testimony given
17   in connection with?
18        A.    You mean to this same case, or
19   to a different case?
20        Q.    In another proceeding.
21        A.    I don't understand your
22   question.
23        Q.    The prior time that you
24   testified, what was that testimony in
25   connection with?
```

Case 23-24, Document 32, 04/19/2023, 3501832, Page133 of 306
**[JA-993]**

```
                                            Page 8
 1                    M. SCHAPIRA
 2        A.      In connection with?
 3        Q.      Was it another lawsuit?
 4        A.      It was a civil lawsuit.
 5        Q.      Was that a lawsuit that was
 6   brought against yourself or against
 7   somebody else?
 8        A.      Against someone else.
 9        Q.      In that case you were
10   testifying as a witness like you're doing
11   today?
12        A.      Yes.
13        Q.      Now, you understand that the
14   oath that you took this morning is the same
15   one that you take in court?
16        A.      Yes.
17        Q.      So, when you take the oath, you
18   agree that you're going to tell the truth
19   at these proceedings?
20        A.      Yes.
21        Q.      Now, in the past 24 hours, have
22   you taken any drugs or medications that
23   would impair your ability to testify
24   truthfully today?
25        A.      No.
```

```
                                              Page 9
 1                    M. SCHAPIRA
 2        Q.    Have you failed to take any
 3    medications in the past 24 hours that you
 4    were supposed to take?
 5        A.    No.
 6        Q.    Is there any reason that you
 7    can think of why you would not be able to
 8    testify truthfully today?
 9        A.    No.
10        Q.    What's your date of birth?
11        A.    XX/XX/1990.
12              MS. FUCHS:   Just put the year
13         on the record.
14        Q.    How old are you?
15        A.    I'm 30 years old.
16        Q.    Can you tell us your
17    approximate height?
18        A.    I am 5 foot 5.
19        Q.    Was that the same height that
20    you were on the date that this incident
21    occurred?
22        A.    I'm pretty sure.
23        Q.    What's your approximate weight?
24        A.    I'm 180 pounds.
25        Q.    Was that your approximate
```

```
                                           Page 10
  1                    M. SCHAPIRA
  2    weight on the date that this incident
  3    occurred?
  4          A.     I believe so.
  5          Q.     What is your current eyesight?
  6          A.     It's 20/20.
  7          Q.     Was it 20/20 on the date of the
  8    incident?
  9          A.     I believe so.
 10          Q.     Do you wear any glasses or
 11    corrective lenses of any kind?
 12          A.     No.
 13          Q.     What's your highest level of
 14    education?
 15          A.     College.
 16          Q.     Where did you attend college?
 17          A.     Nassau Community College.
 18          Q.     What did you study at Nassau
 19    Community College?
 20          A.     Applied Science.
 21          Q.     When you attended Nassau
 22    Community College, did you graduate?
 23          A.     No.
 24          Q.     About how many credits did you
 25    get while you were there?
```

```
                                         Page 11
 1                  M. SCHAPIRA
 2         A.     I got 58 credits.
 3         Q.     Other than attending Nassau
 4    Community College, did you attend any other
 5    college or vocational school?
 6         A.     Not right now.
 7         Q.     Do you have any prior military
 8    experience?
 9         A.     No.
10         Q.     What, if any, types of jobs did
11    you hold before you became an EMT?
12         A.     I have a question.  How is this
13    related to what we're discussing?
14         Q.     It's just background
15    information so that we can get a sense of
16    who you are as a witness, and just your
17    level of experience and training and
18    different types of interactions with
19    people.
20         A.     What was your question again?
21         Q.     What, if any, jobs did you hold
22    before you became an EMT?
23         A.     Before I became an EMT?
24         Q.     Yes.
25         A.     Several jobs.  It's too many to
```

```
                                            Page 12
 1                    M. SCHAPIRA
 2   name.
 3        Q.     Prior to becoming an EMT, what
 4   were you doing?
 5        A.     I was a bartender.
 6        Q.     When did you become an EMT?
 7        A.     It was in 2015, I believe.
 8        Q.     Why did you decide to become an
 9   EMT?
10        A.     I like helping people.
11        Q.     Are any members of your family
12   or friends EMTs?
13        A.     Yes, friends.
14        Q.     Are those friends that you made
15   after you became an EMT or before you
16   became an EMT?
17        A.     Before and after.
18        Q.     Did you have to get training to
19   become an EMT?
20        A.     Yes.
21        Q.     What kind of training did you
22   get?
23        A.     It's a six-month certification,
24   and you take several hours of training
25   throughout the year.
```

```
                                              Page 13
 1                    M. SCHAPIRA
 2         Q.      What kind of training do you
 3    take?
 4         A.      It's CPR, how to manage wounds,
 5    etcetera.
 6         Q.      Where did you take these
 7    classes?
 8         A.      In the Bronx.
 9         Q.      Was it a specific program that
10    you took?
11         A.      The school is called Code One
12    Training in the Bronx, and it was for an
13    EMT certification.
14         Q.      Approximately, how many months
15    was the class?
16         A.      It's a six-month certification.
17         Q.      After the six months of
18    classes, did you have to take an exam?
19         A.      Yes, every two years we retake
20    the class and we recertify.
21         Q.      When is the last time you
22    retook the class?
23         A.      About a year ago.
24         Q.      Prior to becoming an EMT at
25    Jamaica Hospital, did you work anywhere
```

```
                                              Page 14
 1                    M. SCHAPIRA
 2    else as an EMT?
 3         A.    Yes, in Brooklyn.
 4         Q.    Where in Brooklyn?
 5         A.    Assist Ambulance.
 6         Q.    When did you start working for
 7    Assist?
 8         A.    I'm not sure, to be honest, the
 9    times.  The dates was 2016 I worked there
10    for maybe like six months before I moved to
11    Jamaica.
12         Q.    Why did you change jobs to work
13    at Jamaica Hospital?
14         A.    It's closer to my house.
15         Q.    When did you start working at
16    Jamaica Hospital?
17         A.    I believe it was 2016 or 2017.
18         Q.    When you were hired at Jamaica,
19    what was your position?
20         A.    EMT.
21         Q.    That's the same position you
22    hold now?
23         A.    Yeah.
24         Q.    That is the same position you
25    were holding back on February 28th of 2018,
```

```
                                            Page 15
 1                    M. SCHAPIRA
 2   correct?
 3        A.    Yes.
 4        Q.    Now, as an EMT, approximately,
 5   how many jobs do you think you responded to
 6   since you've become an EMT?
 7        A.    That is a tough question.  I
 8   couldn't tell you a number.  I would say
 9   thousands.
10        Q.    Out of these thousands of calls
11   that you've responded to, have some of them
12   dealt with intoxicated people?
13        A.    Yeah, everyday.
14        Q.    About how many, if you had to
15   estimate, were you dealing with?
16        A.    Per day?
17        Q.    Yes.
18        A.    Seven jobs per day regarding
19   people who are intoxicated.
20        Q.    When you were taking those
21   classes, did you get any training in
22   dealing with intoxicated people?
23        A.    Yeah.
24        Q.    What kind of training did you
25   get?
```

**[JA-1001]**

```
                                            Page 16
 1              M. SCHAPIRA
 2      A.    I mean it goes the same for
 3  everyone, only that with intoxicated people
 4  you know that they are not one hundred
 5  percent mentally there.  You have to be a
 6  little more, how can I say, basically treat
 7  them with understanding that they are not
 8  going to get what you are saying.  They are
 9  not going to understand what you are
10  saying, most of them, depending on how
11  drunk they are.
12      Q.    What kind of skills were you
13  taught in terms of how to deal with those
14  types of issues and be more patient as you
15  say?
16      A.    If we cannot control a patient,
17  we ask for help.  That's what we do.  We
18  can't control a man who is being
19  belligerent.  We cannot control it.  We
20  leave the house.  We call for help.  When
21  help arrives, then we go back in.  That's
22  what we are supposed to do.
23      Q.    When you say call for help, you
24  mean call the Police Department; is that
25  correct?
```

```
                                           Page 17
 1                  M. SCHAPIRA
 2        A.    Yes.
 3        Q.    Now, aside from dealing with
 4   intoxicated persons, have you had any
 5   training regarding people who refuse
 6   medical attention?
 7        A.    If they are capable of making
 8   their own decision times three, then they
 9   can refuse, if they are not, such as an
10   intoxicated person, then they cannot.
11        Q.    You said something times three,
12   what do you mean by that?
13        A.    When they can make their own
14   decisions, and they know where they are,
15   they know what they are doing, there's no
16   drugs involved, and you can keep them from
17   making the wrong decisions, then they can
18   stay, but if not, then they have to go,
19   because they are a threat to themselves at
20   that point.
21        Q.    So, just simply being
22   intoxicated with nothing else could
23   constitute somebody being a threat to
24   themselves?
25        A.    Yes.
```

```
                                              Page 18

 1                M. SCHAPIRA

 2        Q.     How do you make that

 3   determination?

 4        A.     If they are unable to walk,

 5   unable to speak, unable to get up from the

 6   floor, then they are a threat to

 7   themselves.

 8        Q.     So, aside from people being

 9   intoxicated, under what other circumstances

10   would you ignore a patient if they were

11   refusing medical attention?

12        A.     If they are unconscious.  If

13   you are unconscious, you can't refuse.  You

14   are unconscious.

15        Q.     Are there any circumstances

16   where you've been taught it's justified to

17   use force on an individual to get them to

18   go to the hospital?

19        A.     I personally don't use force to

20   any patients.  I do not restrain any

21   patients.  I don't use any force.  That's

22   not part of my job.  Part of my job is to

23   go there and help them.  If they can't

24   allow me to do that, then I ask for help.

25        Q.     So, I know you don't, but if
```

```
                                           Page 19
 1                    M. SCHAPIRA
 2    force does need to be used on a patient,
 3    who usually makes that decision?
 4         A.    PD.
 5         Q.    The Police Department?
 6         A.    Yes.
 7         Q.    When we were talking about
 8    intoxicated people, are all intoxicated
 9    people unable to refuse medical attention?
10         A.    Like I said before, if they can
11    make their own decisions, they can walk,
12    they can talk, and they are in their home,
13    then yes.  If someone runs away from me,
14    I'm not going to chase them.
15         Q.    If somebody is intoxicated but
16    they can talk and they can walk, then they
17    can make the decision not to go to the
18    hospital?
19         A.    Yes, if they are not a threat
20    to themselves or others.
21         Q.    What level of intoxication
22    would you consider to be where somebody
23    could no longer make the decision not to go
24    to the hospital?
25         A.    Like I said before, if you
```

Case 1:19-cv-00632-EK-ST   Document 48-11   Filed 11/29/21   Page 20 of 100 PageID #: 1210

Page 20

```
 1              M. SCHAPIRA
 2  cannot make your own decisions, you cannot
 3  talk, you cannot walk, you cannot move,
 4  then you cannot refuse.  If you are
 5  unconscious on the ground, barely
 6  breathing, you cannot refuse that.
 7      Q.    Assuming, of course, somebody
 8  is not unconscious on the ground, how do
 9  you make a determination if someone is a
10  threat to themselves?
11      A.    If someone is beating on
12  someone else in the house, or if someone is
13  falling down the stairs, someone is barely
14  keeping standing on their feet, then, yes.
15      Q.    Let's shift gears a second.
16  I'm going to direct your attention to the
17  date of this incident, which is February
18  28th of 2018.  You were working for Jamaica
19  Hospital as an EMT on that date?
20      A.    Yes.
21      Q.    What was your tour of duty that
22  day?
23      A.    I don't know what tour that
24  was.  What is it?  Tell me, please, if you
25  can, what unit was it?
```

```
                                            Page 21

 1              M. SCHAPIRA
 2              MS. FUCHS:  Let's mark this,
 3         please.
 4              (Whereupon, a Call Report was
 5         marked as Plaintiff's Exhibit 1 for
 6         identification as of this date by the
 7         Reporter.)
 8         Q.    I'm going to show you what's
 9    been marked as Exhibit 1, which is the Call
10    Report.  You can look it over.  Give me a
11    second to share the screen.  If that
12    refreshes your recollection of what tour or
13    unit you were working that day, just let us
14    know.
15         A.    Okay.  It was an overnight
16    shift.
17         Q.    When you do an overnight shift,
18    what hours is that usually?
19         A.    That exact shift is from 12:00
20    to 8:00 in the morning.
21         Q.    So, 12:00 a.m. to 8:00 a.m. in
22    the morning?
23         A.    Yes.
24         Q.    That evening, prior to your
25    12:00 a.m. shift, approximately, what time
```

```
                                         Page 22
 1                  M. SCHAPIRA
 2  did you arrive at work?
 3       A.    I'm not sure.  I don't know if
 4  I arrived late or on time.  I'm not sure.
 5  I can't recall.
 6       Q.    Generally, what's your practice
 7  in terms of arriving before your shift?  Do
 8  you get there 15 minutes early, 20 minutes
 9  early, something else?
10       A.    Generally, not speaking about
11  that time and that date, I usually get
12  there about 10 minutes, 15 minutes before
13  my shift.
14       Q.    During that 10 to 15 minutes
15  before your shift starts, what are you
16  doing?
17       A.    I'm getting my paperwork done.
18  I'm getting radios, tablet, stuff that I
19  need to start working.
20       Q.    Is there some type of role call
21  that's given by your supervisor before you
22  start your shift?
23       A.    No.  We have to log on first,
24  and then we have to check our truck, make
25  sure we have everything we need in the
```

```
                                              Page 23
 1                    M. SCHAPIRA
 2    truck.
 3         Q.    When you arrive, are you
 4    assigned a partner, or do you have a
 5    regular partner that you work with?
 6         A.    Most likely, it's usually a
 7    regular partner.
 8         Q.    Who's your regular partner?
 9         A.    That day, I'm not sure if I was
10    changing shifts, or if I was doing
11    overtime.  I don't know, honestly, what it
12    was.
13         Q.    Who is your regular partner
14    now?
15         A.    Nicole Milonas.
16         Q.    Was she the person who you were
17    working with on the date of the incident?
18         A.    Yes.
19         Q.    You regularly work with Nicole
20    Milonas; is that correct?
21         A.    Yes.
22         Q.    Now, going back to the date of
23    the incident, what was your assignment that
24    day?
25         A.    From what it says on the
```

```
                                              Page 24
 1                  M. SCHAPIRA
 2   paperwork, let me see if I still have it.
 3        Q.     I can put it up on the screen
 4   for you.
 5        A.     Okay.  I can't really see what
 6   the assignment says.
 7        Q.     I see the unit.  Here next to
 8   that part it says, "Ground-Ambulance-BLS."
 9   What does that mean?
10        A.     That means you're an actual
11   ambulance on the ground.  You're not a
12   helicopter.
13        Q.     Were you assigned an ambulance
14   that day?
15        A.     Yes.
16        Q.     When you're working, do you
17   wait at the base for a call to come in, or
18   are you driving around in the ambulance, or
19   something else?
20        A.     No.  We go to our assigned 89,
21   which is an area where we wait for calls.
22        Q.     What was your assigned 89 on
23   February 28th of 2018?
24        A.     It's really not an assigned.
25   It's just an assigned, it's like a radius
```

**[JA-1010]**

```
                                              Page 25
 1                    M. SCHAPIRA
 2    of maybe three or four blocks.  You can
 3    park basically anywhere around there as
 4    long as you are assigned 89 in that area.
 5         Q.    When you do that, you park the
 6    ambulance, and then you just wait for a
 7    call to come through?
 8         A.    Yes, correct.  We just park the
 9    ambulance anywhere where we don't bother
10    anyone.  That's it.  We just wait for a
11    call.
12         Q.    So, on February 28th of 2018,
13    did there come a time where you got a call
14    to respond to a job that was at 130-18
15    Atlantic Avenue on the third floor?
16         A.    From what the paper says, yes.
17    I cannot recall that.
18         Q.    Showing you the Call Report,
19    that would refresh your recollection that
20    you responded to this location where it
21    says incident location?
22         A.    Right.  It doesn't refresh my
23    memory.  It just says there, and that's
24    what the paperwork says, so that is what
25    happened.
```

```
                                           Page 26
 1              M. SCHAPIRA
 2       Q.     Aside from the paperwork, do
 3  you remember responding to that location?
 4       A.     Honestly, I get thousands of
 5  jobs.  I don't want to sit here and lie,
 6  because I really cannot recall anything
 7  regarding this job other than what you're
 8  showing me in the paperwork.
 9       Q.     When you reviewed the
10  paperwork, did that refresh your memory as
11  to anything that happened on this job?
12       A.     Not at all.  Nothing at all.
13       Q.     I'm going to ask you some
14  questions, and maybe it will refresh your
15  memory, and if you don't remember, or you
16  don't know something, just let us know.
17       A.     Okay.
18       Q.     On February 28th of 2018, how
19  were you alerted to the job, or how would
20  you have been alerted to this job at 130-18
21  Atlantic Avenue?
22       A.     The dispatcher sends the jobs.
23       Q.     When the dispatcher sends them,
24  do they come over the radio?
25       A.     They come over the radio and
```

```
                                              Page 27
 1                   M. SCHAPIRA
 2    they send the job, yes.
 3         Q.     When the dispatcher sent you
 4    this job, what were you told?
 5         A.     To respond to the job.
 6         Q.     When you say respond to the
 7    job, did they give you any other
 8    information about what kind of job it was?
 9         A.     They usually don't.  They just
10    tell you the job.  I can't recall exactly
11    what happened.
12         Q.     Generally speaking, do they
13    tell you it's someone who is intoxicated,
14    it's somebody who is having a heart attack,
15    something like that?
16         A.     Sometimes they do.  It depends
17    on the dispatcher, how they do it.
18    Sometimes they do.
19         Q.     Were you told by the dispatcher
20    any specifics as to this job?
21         A.     I cannot recall.
22         Q.     Would there be anything on your
23    report that would refresh your memory as to
24    what you were told?
25         A.     No, because I read through the
```

```
                                          Page 28
 1                 M. SCHAPIRA
 2   narrative, and I cannot recall anything
 3   regarding this job.
 4        Q.    So, when you got the call about
 5   this job, what did you do?
 6        A.    When I got the call about this
 7   job, when I was working?
 8        Q.    Correct.
 9        A.    I guess we started driving
10   there.
11        Q.    Do you remember when you
12   arrived there?
13        A.    No.  I don't remember anything
14   about this job.
15        Q.    I'm going to actually see if I
16   can find the video.  I was going to wait
17   until later.  If I show you the video, it
18   might refresh your recollection about the
19   job.  Give me one second.
20        A.    Okay.
21             MS. FUCHS:  Let's mark this
22        video, please.
23             (Whereupon, a Video was marked
24        as Plaintiff's Exhibit 2 for
25             identification as of this date by the
```

```
                                              Page 29
 1               M. SCHAPIRA
 2         Reporter.)
 3         Q.    I'm going to show you what was
 4   marked as Exhibit 2, which is the video.
 5   We will talk about whether this refreshes
 6   your memory.
 7         A.    Okay.
 8         Q.    This video is labeled, "Video
 9   of EMS."  It's 4 minutes and 48 seconds
10   long.  There's no sound on these videos.
11   I'm pausing it at five seconds.  Do you
12   recognize the person who's on the video
13   right now?
14         A.    My partner.
15         Q.    When you say your partner, that
16   would be Nicole Milonas?
17         A.    Yes.
18         Q.    You're not in this shot yet; is
19   that correct, you don't see yourself?
20         A.    Yeah.
21         Q.    Let us know when you see
22   yourself and we will pause it.
23         A.    I do not see myself.
24         Q.    You entered the apartment at
25   about, approximately, nine seconds in the
```

```
                                          Page 30
 1                    M. SCHAPIRA
 2     video, would that be fair?
 3          A.    I can't see the time.  I can't
 4     tell you that.
 5          Q.    It's nine seconds into the
 6     video.  I don't think there's any objection
 7     to that, is there?
 8          A.    Okay.
 9          Q.    I'm going to play the rest of
10     the video.
11          A.    Okay.
12          Q.    Do you have any recollection of
13     the incident?
14          A.    Absolutely not.  There is no
15     recollection whatsoever.
16          Q.    I'm going to show you the other
17     video to see if that refreshes your
18     recollection of the incident.
19          A.    Okay.
20               MS. FUCHS:  Let's mark this
21          Video as Exhibit 3, please.
22               (Whereupon, a Video was marked
23          as Plaintiff's Exhibit 3 for
24          identification as of this date by the
25          Reporter.)
```

```
                                              Page 31
 1                 M. SCHAPIRA
 2       Q.    For the record, this is a video
 3  that I have marked, "Video of Police
 4  Officers."  It's 8 minutes and 50 seconds.
 5  I will just play a little part of it to see
 6  if this refreshes your recollection.  This
 7  is Exhibit 3.  Seeing this video, did that
 8  refresh your recollection as to anything
 9  that happened during this incident?
10       A.    No.
11       Q.    I'm going to go over a few more
12  questions with you.  If you don't recall,
13  or you don't remember, just let us know.
14  At least we saw some of this in the video.
15  What happened when you first got to the
16  Plaintiff's home?
17       A.    I don't know.  Like I said
18  before, I cannot recall anything about this
19  job.
20       Q.    When you got there, do you
21  remember speaking to anybody?
22       A.    I don't remember anything.
23       Q.    Do you remember what the
24  Plaintiff, Mr. Singh, said to you?
25       A.    No.
```

```
                                              Page 32
 1                   M. SCHAPIRA
 2        Q.    I'm going to go back over the
 3   video with you.  Before I get there, do you
 4   remember speaking to the wife?
 5        A.    No.
 6        Q.    Do you remember what, if
 7   anything, anybody said to you that evening,
 8   what the wife said to you?
 9        A.    No.
10        Q.    Do you remember what the cop
11   said to you?
12        A.    I don't remember anything
13   regarding this job.  I can't recall.
14        Q.    And you don't remember what
15   Mr. Singh said to you?
16        A.    I cannot recall.
17        Q.    I'm going to show you the first
18   video again.  I'm going to have you
19   describe for me what's going on in that
20   video, just based on what you see in the
21   video, even though I understand you don't
22   recall from your own memory.  I'm going to
23   stop the video at the 10 second mark.
24   What's going on here?
25        A.    It looks like my partner and I
```

```
                                            Page 33
 1                  M. SCHAPIRA
 2   walked into a house.
 3        Q.    Listen, I just want to say, I
 4   know you don't remember, so I'm not asking
 5   these things just to try to annoy you.  I'm
 6   just trying to make a record, even if that
 7   record is that you don't remember.
 8        A.    I understand.
 9             MS. FADDIS:  For the record,
10         what exhibit are we looking at?
11             MS. FUCHS:   Exhibit 2.
12        Q.    We just viewed another 10
13   seconds of the video from the 10 second
14   mark to the 20 second mark.  What is going
15   on in these 10 seconds of the video?
16        A.    Well, what it seems in the
17   video, not because I recall anything, it
18   seems like we are trying to speak to the
19   patient, if that is the patient.  I don't
20   know where the patient is sitting.  I don't
21   know if that's the patient sitting on the
22   chair.  I don't know that.
23        Q.    We are now at the 40 second
24   mark.  Over the past 20 seconds, what was
25   going on during that 20 seconds?
```

```
                                              Page 34
 1                  M. SCHAPIRA
 2        A.    I cannot recall anything, but
 3   we are standing in the video, and we are
 4   still speaking to the alleged patient.  I'm
 5   not sure if that's the patient, or the
 6   patient was sitting next to that person.  I
 7   don't know exactly if that is the patient
 8   that is shown in the video.
 9        Q.    Do you have any memory of what
10   this person in the video is saying to you?
11        A.    No.
12        Q.    Do you have any memory of what
13   you're saying to him?
14        A.    No, I do not.
15        Q.    I'm going to stop it at 1
16   minute and 15 seconds.  So far, what we've
17   seen in this 1 minute and 15 seconds in
18   this video, would it be fair to say you
19   come in the apartment and you're speaking
20   to this person?
21            MS. FADDIS:  Objection to form.
22        You can answer.
23        A.    For what it seems in the video,
24   we come in, we're talking to someone, and
25   it seems like it's that person that's in
```

```
                                                    Page 35
 1                    M. SCHAPIRA
 2    the video, but I am not sure if that is
 3    even the patient.  I can't see the whole
 4    house, the whole room.  I can't even tell
 5    you if that's the patient.  It seems like
 6    it is, but I don't know for sure.
 7         Q.    I'm going to actually switch
 8    over to the Call Report for a second and
 9    ask you if that refreshes your
10    recollection.  We are back over at the
11    Exhibit 1, which is the Call Report.  From
12    what you can see in the video, did that
13    appear to be the job that was described in
14    this Call Report?
15         A.    I can't give you an answer to
16    that.  I don't know that.  If that's the
17    video that belongs to this job to this
18    address at that time, then I guess it is.
19    I cannot give you a straight answer for
20    that.
21         Q.    Looking at this Call Report, do
22    you know what kind of job this was?
23         A.    Over here, it doesn't really
24    say what we were there for.  It just says
25    an address.  It just says that we are there
```

```
                                          Page 36
 1                  M. SCHAPIRA
 2   for a male.  It seems like he's 38 years
 3   old.
 4        Q.    Where do you see that in the
 5   report?
 6        A.    Under date of birth, Balwinder
 7   Singh.  It says the address, that he's 38
 8   years old, and that he's a male.  Through
 9   the video, I can't even see his face.
10        Q.    I'm going to go down to the
11   narrative section of the report.  You don't
12   have to read this out loud.  Let us know
13   when you're done reading it.
14        A.    Okay.
15        Q.    Having read the narrative here,
16   does that refresh your memory at all as to
17   what kind of job this was?
18        A.    No.  I cannot recall anything
19   regarding this job.
20        Q.    Let me ask you generally.  You
21   made a report in this case, correct?
22        A.    I made a report?  I believe my
23   partner was the one doing the paperwork,
24   because it says her name on the signature.
25        Q.    This report that we're looking
```

```
                                            Page 37
 1                  M. SCHAPIRA
 2   at, which is Exhibit 1, you believe that
 3   your partner, Nicole Milonas, made this
 4   report; is that correct?
 5         A.    Yes, because her signature is
 6   under signature.
 7         Q.    Can you tell us whether you
 8   provided her any of the information that's
 9   in this report?
10         A.    I cannot recall that.
11         Q.    When a report is done in
12   connection with a job, what is the purpose
13   of making the report?
14         A.    What is the purpose of making
15   the report?
16         Q.    Correct.
17         A.    So that it's on paper what we
18   did, what was done on the job, the
19   patient's condition, treatment, and
20   transportation.
21         Q.    Do you have a business duty to
22   make the report?
23         A.    We have to make a report under
24   the state law.
25         Q.    When you make these reports,
```

```
                                            Page 38
 1                    M. SCHAPIRA
 2    there's a duty to make them accurately,
 3    correct?
 4        A.    Yes.
 5        Q.    When are these reports usually
 6    written?
 7        A.    I'm not sure how management
 8    deals with the reports.  I cannot give you
 9    a straight answer.  I don't know if they
10    check everyday, every two days, every week.
11        Q.    When you or your partner write
12    this type of report, do you write it the
13    same day that you do the job, do you write
14    it the next day, do you right it as soon as
15    you complete the job?
16        A.    When is this report written?
17        Q.    Yes.
18        A.    We write the report when we're
19    doing the job.  Before we go 98, which is
20    before going available, after we drop off
21    the patient, the report should be done.
22        Q.    Let's go back to the report for
23    a second.  I'm going to walk you through
24    it.  It says, "Unit dispatched to incident
25    address for the drug."  When it says, "Unit
```

```
                                        Page 39
 1              M. SCHAPIRA
 2   dispatched to incident address for the
 3   drug," what does that mean?
 4              MS. FADDIS:  Objection to form.
 5        You can answer.
 6        A.    When it says the drug, it could
 7   be any drug, alcohol, cocaine, marijuana,
 8   it could be anything, any drug.  We don't
 9   know exactly what it is until we get there.
10        Q.    In this case, do you remember
11   what the drug refers to in this report?
12        A.    I cannot recall anything from
13   this job.
14        Q.    It says, "Patient's wife states
15   that the patient woke her and her son up.
16   Patient's wife states that the patient was
17   drinking and is not acting normal."  You
18   don't remember the wife saying that?
19        A.    I can't recall.
20        Q.    Do you remember the wife
21   stating that the patient is a harm to
22   himself?
23        A.    I cannot recall anything about
24   this job.
25        Q.    The next part where it says,
```

```
                                          Page 40
 1              M. SCHAPIRA
 2   "The patient was alert and oriented X
 3   four/four."  What does that mean?
 4        A.    All the questions that we ask
 5   to determine if the patient is conscious
 6   and oriented that we ask for the paperwork
 7   that he answered all correct.
 8        Q.    When it says, "With periods of
 9   incoherency."  What does that mean?
10        A.    That means that at times, as
11   per the report, that if we were to be
12   talking to a patient and trying to gather
13   exactly their mental status, that sometimes
14   at some points the patient was incoherent.
15   He didn't know what he was doing.  He
16   didn't know what he was saying.  I don't
17   know exactly what was happening there at
18   that time.
19        Q.    When you say you don't know
20   what was happening, specifically, in this
21   case, you don't remember what the Plaintiff
22   was doing that would have made him
23   incoherent; is that correct?
24        A.    Yes, I do not remember.
25        Q.    Where it says, "Positive semi
```

```
                                            Page 41
 1                    M. SCHAPIRA
 2   steady gait."  What does that mean?
 3        A.    It seems like, from what it
 4   says in the paperwork, that the patient
 5   maybe was trying to get up and most likely
 6   fell and didn't have a steady gait.
 7        Q.    But you don't, specifically,
 8   remember that?
 9        A.    You're asking me what that
10   means.  That's what it means to me,
11   personally.
12        Q.    You don't remember that
13   happening?
14        A.    I don't remember.
15        Q.    The next part says, "Patient in
16   an irrational state."  Can you describe
17   what kind of irrational state the patient
18   was in?
19        A.    I do not remember what kind of
20   irrational state the patient was in,
21   because I do not remember this job at all.
22        Q.    Was he cursing?
23        A.    If that's what it says on the
24   paperwork, then that's what was happening.
25        Q.    But you don't have any
```

```
                                           Page 42
 1                  M. SCHAPIRA
 2    independent recollection of that?
 3         A.    No.
 4         Q.    What about yelling, do you have
 5    any independent recollection of him
 6    yelling?
 7         A.    No.  I cannot recall anything
 8    regarding this job.
 9         Q.    Do you remember if he
10    threatened you?
11         A.    I do not remember anything
12    regarding this job.
13         Q.    Do you remember if he
14    threatened your partner?
15         A.    I cannot recall anything
16    regarding this job.  I wish I could be of
17    more help.  I have too many patients.
18         Q.    Do you remember if he ever said
19    that he was going to kill himself?
20         A.    No.  I do not remember.
21         Q.    Do you know if he said he was
22    going to hurt himself?
23         A.    I cannot recall anything
24    regarding this job.
25         Q.    We are going to go back to the
```

```
                                            Page 43
 1                  M. SCHAPIRA
 2  report for a second where it says, "Patient
 3  not cooperating with unit questioning."  Do
 4  you have any independent recollection of
 5  him not being cooperative with your
 6  questioning?
 7       A.    No.  I cannot recall anything.
 8       Q.    When it says, "Patient became
 9  aggressive with crew."  Can you describe in
10  what way he was being aggressive?
11       A.    I cannot describe in what way
12  he was being aggressive.
13       Q.    We already went over this, but
14  you couldn't remember whether he was
15  yelling profanities, correct?
16       A.    I cannot remember that or
17  anything regarding this job.
18       Q.    When it says that the patient
19  was belligerently approaching the crew, do
20  you remember anything about that?
21       A.    No.  I do not recall anything
22  regarding this job.
23       Q.    The next thing it says is, "PD
24  arrived on scene."  Do you remember the
25  Police Department arriving on the scene?
```

```
                                                    Page 44
 1                    M. SCHAPIRA
 2        A.     From what I saw in the video,
 3    the police arrived, but I personally cannot
 4    remember.
 5        Q.     Do you remember who called the
 6    police?
 7        A.     I don't remember that.
 8        Q.     Putting aside, specifically, in
 9    this incident who called the police, what's
10    the general practice when you need to call
11    the police?
12        A.     It's different things.  The
13    police could be assigned already, or we
14    could call for PD, or maybe there are other
15    calls being called for different things, so
16    PD had to come.  It's many different things
17    that the police could be assigned or
18    requested.
19        Q.     In this case, do you remember
20    whether the police were already assigned,
21    or you called them, or something else?
22        A.     No.  I do not remember.  I
23    cannot recall.
24        Q.     Do you remember whether the
25    Plaintiff was refusing medical attention?
```

```
                                        Page 45
 1                    M. SCHAPIRA
 2        A.     No.  I cannot remember that.
 3        Q.     Do you remember the Plaintiff's
 4   wife saying anything about him having liver
 5   disease?
 6        A.     No.  I do not recall that.
 7        Q.     Just generally speaking, if you
 8   were told that somebody had liver disease,
 9   would that on its own constitute an
10   imminent threat to the person's health or
11   safety?
12        A.     If someone has liver disease?
13   I cannot make any transport decisions by
14   someone telling me they have a liver
15   disease.  It depends on what I'm there for.
16   That's just a medical history.  That
17   doesn't determine who's going or who's not
18   going to the hospital.
19        Q.     What other information would
20   you need in order to make that decision?
21        A.     I need to know what's going on
22   with the patient at that time, at that
23   place, medical history, allergies to
24   medications, if there's any injuries,
25   mental status, etcetera.  That's a really
```

```
                                              Page 46
 1               M. SCHAPIRA
 2  broad question.  It's not a simple answer.
 3  It depends on what's going on.
 4      Q.    We are going to go back to the
 5  video for a second.  I want to show you a
 6  little more of it.  We may watch a little
 7  small piece of the Police Video, and after
 8  that I will have to take a short break.  I
 9  think after that we may be finished.  You
10  see at 3 minutes and 40 seconds, and before
11  that it was 3 minutes and 49 seconds.  You
12  see the gesture that's made there at the 3
13  minutes and 39 seconds mark?
14      A.    Yes.
15      Q.    Do you have any independent
16  recollection of what's going on there?
17      A.    No, I don't.  I'm sorry.
18           MS. FADDIS:  Can we confirm for
19       the record that we are on Exhibit 2.
20           MS. FUCHS:   Correct.
21      Q.    We are at the 3 minute and 40
22  seconds mark.  Right here, you see that he
23  stands up and he shakes his arms around?
24      A.    Yeah, I'm watching.
25      Q.    We were just at 3 minutes and
```

```
                                        Page 47
 1              M. SCHAPIRA
 2   40 seconds to 3 minutes and 50 seconds.  Do
 3   you have any independent recollection of
 4   what's going on here when he stands up?
 5        A.    No, I do not.
 6        Q.    Based on your review of this
 7   video and the report, in your opinion, as
 8   an EMT, does this person appear to be
 9   suffering from any alcohol poisoning?
10              MS. FADDIS:  Objection.
11        A.    From the video?
12        Q.    Yes.
13        A.    I won't be able to tell you
14   that.
15        Q.    Based on your training as an
16   EMT, what are the symptoms of alcohol
17   poisoning?
18        A.    Unsteady gait, you cannot make
19   your own decisions, you cannot walk, you
20   cannot talk.
21        Q.    Just based on what you're
22   seeing here in this video, which is Exhibit
23   2, do you think that the person in the
24   video qualifies for any of the symptoms or
25   was exhibiting any of the symptoms of
```

```
                                              Page 48
 1                    M. SCHAPIRA
 2   alcohol poisoning?
 3        A.    It's hard for me to say that.
 4   It's a video.  I cannot tell you that.
 5        Q.    You don't have any independent
 6   recollection of whether or not the person
 7   that you see on this video was suffering
 8   from any of the symptoms that you just
 9   described with respect to alcohol
10   poisoning?
11        A.    No, I do not.
12        Q.    I want to just switch videos
13   for a second.  We are going to watch
14   Exhibit 3, which is the Police Video.
15   It's, approximately, 8 minutes and 50
16   seconds.  I am going to ask you questions
17   about that, and if you remember anything
18   about the police encounter.  We are at
19   about nine seconds into the video.  Do you
20   see yourself in this frame?
21        A.    No.  I do not see myself here.
22        Q.    Do you see Nicole in this
23   frame?
24        A.    I think it looks like my
25   partner Nicole is there.
```

**[JA-1034]**

```
                                                Page 49
 1                     M. SCHAPIRA
 2          Q.     When you say it looks like her,
 3     she would be on the right side of the
 4     screen; is that correct?
 5          A.     Yes, next to the paper towel.
 6          Q.     Do you recall where you were?
 7          A.     No, no.  I do not recall where
 8     I was.
 9          Q.     I am going to stop it here at
10     20 seconds.  We are at 21 seconds in the
11     police video.  I know you said you didn't
12     see yourself on the video in the past 21
13     seconds.  Do you remember where you were?
14          A.     No, no.  I do not remember
15     exactly where I was.
16          Q.     Do you have any independent
17     recollection of what you were doing when
18     the police arrived?
19          A.     No, I do not.
20          Q.     Do you know whether you ever
21     spoke to the police officers?
22          A.     I don't recall that.  I cannot
23     recall that.
24          Q.     I am going to play the video.
25     If you see yourself come into the video,
```

Page 50

                    M. SCHAPIRA
1
2  just let us know.
3       A.    Okay.
4       Q.    I'm going to stop it at 1
5  minute and 31 seconds.  Do you still see
6  Nicole in the video?
7       A.    It looks like my partner, yes.
8       Q.    On the right side by the paper
9  towels?
10      A.    Yes.
11      Q.    Do you know whether she was
12  speaking to any officers at this point?
13      A.    I can't recall that.
14      Q.    Were you speaking to any of the
15  officers at this point?
16      A.    I can't recall that.
17      Q.    At any point during this
18  incident, did you ever tell any police
19  officers that the Plaintiff had threatened
20  you?
21      A.    I can't recall the job at all,
22  so I don't remember what happened there.
23      Q.    Did you ever tell the police
24  officers that the Plaintiff assaulted you,
25  or attempted to assault you?

Page 51

M. SCHAPIRA

1
2      A.    I cannot recall anything
3   regarding this job.
4      Q.    Did you ever tell the officers
5   that the Plaintiff threatened your partner,
6   Nicole?
7      A.    I cannot recall anything that
8   happened on this job.
9      Q.    Did you ever tell the police
10  officers that the Plaintiff threatened his
11  wife or assaulted his wife?
12     A.    I cannot recall anything
13  regarding this job.
14     Q.    We are going to play out some
15  more of this video, and I have a few more
16  questions about the video and the report.
17  We will try and get this wrapped up.  We
18  are at 2 minutes and 2 seconds.  I am going
19  to direct your attention to Nicole, who we
20  believe is the person standing by the paper
21  towels.  I want you to watch the video, and
22  tell me if you remember what she's doing
23  over here.  It looks like she's holding
24  something.  Do you have any recollection of
25  what Nicole is doing there in that about 15

```
                                            Page 52
 1                  M. SCHAPIRA
 2   seconds?
 3        A.    I can't see one hundred percent
 4   what's going on.  It looks like the tablet
 5   that we work on where we do our paperwork.
 6        Q.    When you say the paperwork,
 7   you're talking about the Call Report in
 8   this case?
 9        A.    It's part of it.  When you say
10   Call Report, do you mean narrative?  The
11   narrative is basically the last thing we
12   do.  We take names, phone numbers, date of
13   birth, medical history.  There's a bunch of
14   things that happen before we get to that.
15        Q.    Before you get to the
16   narrative?
17        A.    Yes.
18        Q.    We are paused at 2 minutes and
19   17 seconds.  If the Plaintiff had assaulted
20   you, would that have been something you
21   would have put in the narrative section?
22             MS. FADDIS:  Objection to form.
23        A.    Yes.
24        Q.    If the Plaintiff would have
25   assaulted his wife, is that something that
```

Page 53

1              M. SCHAPIRA

2    would have gone in the narrative section of

3    the report?

4         A.    It depends who's writing it.

5    The way I write it, everything I see, and

6    everything that is being told to me, then I

7    will put that on my narrative.  I don't

8    know how other people do their narratives.

9         Q.    On your narratives, if a

10   patient was to threaten you, you would put

11   it in the narrative?

12        A.    Yes.

13        Q.    If the patient was to assault

14   you, you would put it in the narrative?

15        A.    Yes, ma'am.

16        Q.    If a patient was to assault

17   somebody else, you would also put that in

18   the narrative?

19        A.    Yes.

20        Q.    I'm going to play out the

21   video.  We are at 3 minutes and 51 seconds.

22   You see at the very bottom of the video?

23        A.    Yes.

24        Q.    Is that your head?

25        A.    I cannot tell you if that's my

```
                                              Page 54
 1                    M.  SCHAPIRA
 2     head or not.
 3          Q.     For the record, we are at 3
 4     minutes and 51 seconds.  Do you recognize
 5     yourself?
 6          A.     Yeah, that's me.
 7          Q.     Do you remember what's going on
 8     at this point?
 9          A.     No, no.  I do not remember
10     what's going on.
11          Q.     If at any point you remember
12     something, let us know.  We are at 4
13     minutes and 48 seconds.  That's still you
14     in the video on the bottom right-hand
15     corner?
16          A.     Yeah, it looks like it.
17          Q.     Do you have any recollection of
18     what's going on at this point?
19          A.     No.  I do not have any
20     recollection.
21          Q.     I'm stopping here at 6 minutes
22     and 29 seconds.  Is that you on the
23     right-hand corner of the video?
24          A.     Yeah, it seems like it's me.
25          Q.     It looks like you just put
```

```
                                              Page 55
 1                  M. SCHAPIRA
 2    something on your back.  Do you know what
 3    that was?
 4         A.    On my back?
 5         Q.    It looks like there's something
 6    red that's around your shoulder, correct?
 7         A.    It looks like the trauma bag.
 8         Q.    What is the purpose of the
 9    trauma bag?
10         A.    We carry most of the things
11    that we need for most jobs there.
12         Q.    Do you remember whether you
13    used anything in the bag for this job?
14         A.    I don't remember anything
15    regarding this job.
16         Q.    Is that something that would be
17    in the report?
18         A.    If we use anything for any
19    patient?
20         Q.    Yes.
21         A.    Yes.
22         Q.    We will go back to the report
23    in a second.  Let's watch more of this.  We
24    just saw from about 6 minutes and 35
25    seconds until 6 minutes and 39 seconds, can
```

```
                                        Page 56
 1              M. SCHAPIRA
 2   you describe what you're doing there?
 3       A.    It looks like, as per the
 4   video, that I'm trying to open the door.
 5       Q.    Do you believe, at this point
 6   in the video, which is 6 minutes and 40
 7   seconds, you were getting ready to leave?
 8       A.    It seems like the patient is
 9   getting all his stuff ready to go, so it
10   seems like it, yes.
11       Q.    At 6 minutes and 43 seconds, it
12   looks like you exit the apartment; is that
13   correct?
14       A.    Yeah, it seems like it.
15       Q.    I'm going to pause it right
16   there at 6 minutes and 58 seconds.  Is that
17   Nicole who's still in the apartment on the
18   right-hand side of the screen?
19       A.    It seems like it, yes.
20       Q.    At this point, you have not
21   reentered the apartment, as far as you can
22   remember?
23       A.    Yes, as far as I can see in the
24   video.
25       Q.    I'm going to stop it at 7
```

```
                                              Page 57
                        M. SCHAPIRA
 1
 2    minutes and 5 seconds.  Do you know who
 3    this woman is?
 4         A.    No, no.  I do not know who that
 5    woman is.
 6             MS. FADDIS:  You're indicating
 7          the person in the center of the
 8          screen?
 9             MS. FUCHS:  Correct.
10         Q.    The only woman in the screen
11    who's not an EMT or a police officer, you
12    have no recollection of who that is,
13    correct?
14         A.    I do not.
15         Q.    Do you know whether you ever
16    spoke to that person this evening?
17         A.    I do not recollect speaking to
18    anyone.
19         Q.    We just watched from 8 minutes
20    to 8 minutes and 5 seconds.  Did you see
21    the officer take the Plaintiff down to the
22    ground in the video?
23         A.    I saw him put his arms around
24    him and turn him, but I cannot see the
25    ground, so I can't say that he threw him to
```

```
                                        Page 58
 1                 M. SCHAPIRA
 2   the ground.
 3        Q.    What you just observed in the
 4   video from 8 minutes to 8 minutes and 6
 5   seconds, did you observe that the night of
 6   the incident?
 7        A.    If I what?
 8        Q.    Did you observe that the night
 9   of the incident?
10        A.    If I observed that?
11        Q.    Did you see that action happen
12   on February 28th of 2018?
13        A.    Are you asking me if I
14   recollect seeing that, or if I can see that
15   from the video?
16        Q.    First, do you recollect that
17   from the night of the incident
18   independently?
19        A.    No.  I do not recollect that.
20        Q.    Based on the video, do you
21   believe that you were in the apartment when
22   that occurred?
23        A.    As per the video, I was there
24   in the apartment.  On the job, I was there.
25   I walked out of the door, so I didn't see
```

```
                                      Page 59
 1                  M. SCHAPIRA
 2    that.
 3         Q.     From your independent
 4    recollection, do you remember the Plaintiff
 5    striking any police officers that evening?
 6         A.     I can't recall anything
 7    regarding this job.
 8         Q.     Do you recall him resisting
 9    arrest?
10         A.     I cannot recall anything
11    regarding this job.
12         Q.     I'm going to switch over to the
13    report one more time.  I'm here where it
14    says, "Positive abrasion to right side of
15    patient's forehead and right temporal
16    region sustained during patient resisting
17    PD apprehension."  Do you have any
18    independent recollection of how the
19    Plaintiff came to obtain an abrasion to the
20    right side of his forehead?
21         A.     No.  I do not recollect any of
22    that.
23         Q.     Do you recollect him resisting
24    police apprehension?
25         A.     I cannot recall any of that.
```

```
                                                    Page 60
 1                    M. SCHAPIRA
 2        Q.     The next part says, "Patient
 3   transported to hospital thirty four without
 4   incident and care transferred for further
 5   evaluation."   What's Hospital thirty four?
 6   Is that Jamaica Hospital?
 7        A.     That's Jamaica Hospital.
 8        Q.     When the Plaintiff was
 9   transported, do you remember if you were
10   driving the ambulance, or riding in the
11   back, or something else?
12        A.     If the signature of my partner
13   is on the person who is checking, then that
14   means I was driving.
15        Q.     So, what you're saying is,
16   because Nicole signed this, you had to have
17   been the driver that night?
18        A.     Yes.
19        Q.     So, you wouldn't have been in
20   the back of the ambulance when he was
21   transported to Jamaica Hospital?
22        A.     Not while being transported,
23   yes.
24        Q.     You see this comment here where
25   it says, "Patient is intoxicated."?
```

```
                                              Page 61
 1                    M. SCHAPIRA
 2        A.    Okay.
 3        Q.    Under the comment section?
 4        A.    Yes.
 5        Q.    Do you have any independent
 6   recollection of him being intoxicated?
 7        A.    I cannot recollect anything
 8   regarding this job.
 9        Q.    When it says, "Unable to sign,
10   reason other," do you know what that means?
11        A.    That the patient wasn't able to
12   sign.  Other might be that comment it says
13   there, "Patient is intoxicated."  That
14   might be the reasoning.  I didn't do the
15   paperwork.
16        Q.    You don't have any independent
17   recollection of why he was unable to sign?
18        A.    No, I do not.
19        Q.    Do you remember what happened
20   when you arrived at the hospital?
21        A.    I cannot recollect anything
22   regarding this job.
23        Q.    Based on the Call Report that
24   we reviewed, and the video that we
25   reviewed, was this a job where you
```

```
                                          Page 62
 1                M. SCHAPIRA
 2   determined that the patient was unable to
 3   refuse medical attention?
 4                MS. FADDIS:  Objection.  You
 5          can answer.
 6       A.    What?
 7       Q.    Based on your review of the
 8   report and the video, is this a job where
 9   you determine that the patient was not able
10   to refuse medical attention?
11                MS. FADDIS:  Objection.
12       A.    I can't say I determined that,
13   because I don't remember that.  The job for
14   that address, for that specific patient, I
15   am guessing, as per the paperwork, and the
16   patient is transported most likely because
17   he needed to be transported, but I cannot
18   tell you exactly what happened that day,
19   because I do not remember that.
20       Q.    You don't have any independent
21   recollection about whether he was able to
22   refuse medical attention or not?
23       A.    No, I do not.
24       Q.    I'm going to take a quick break
25   for five minutes.  I will see if there are
```

```
                                            Page 63
 1                M. SCHAPIRA
 2   any other questions that I need to ask.
 3         A.    Okay.
 4               (Whereupon, a short break was
 5        taken.)
 6         Q.    The officers that you saw in
 7   the video, did you recognize them from any
 8   other jobs that you've ever done?
 9         A.    I recognize the big officer.
10         Q.    Where did you recognize them
11   from?
12         A.    From other jobs, I guess, on
13   the street with patrol.
14         Q.    Do you know him, specifically,
15   by name?  Do you have any relationship or
16   friendship with him?
17         A.    I do not know him.
18         Q.    Generally speaking, if you
19   determine that someone cannot refuse
20   medical attention and needs to go to the
21   hospital, does the NYPD just automatically
22   take them to the hospital, do you take them
23   to the hospital, who makes that final
24   decision?
25               MS. FADDIS:  Objection.  You
```

Page 64

```
 1                  M. SCHAPIRA

 2         can answer.

 3         A.    If they are our patient, then

 4    we have to transport the patient.  I don't

 5    know what the Police Department guidelines

 6    are regarding of how they manage their

 7    police officers.  What I only can tell you

 8    is that if it is my patient, and they need

 9    medical attention, they need to go with us.

10         Q.    That part I understand.  What

11    I'm trying to get at is, who makes that

12    final decision.  For example, if you

13    determine that somebody needs to go get

14    medical treatment, that they cannot refuse,

15    and there are police officers on the scene,

16    who forcibly removes the person to the

17    ambulance, is it the EMTs, the police?

18         A.    As EMTs, we do not force

19    anyone.  We can't physically do that, so we

20    ask for help.  We call for PD, because the

21    patient needs to go to the hospital.

22    That's usually what happens.

23         Q.    What happens if there's a

24    disagreement between the EMTs and the

25    Police Department?  For example, let's say
```

Page 65

```
 1              M. SCHAPIRA
 2   you don't think the person needs to go to
 3   the hospital, that it's not imminent, but
 4   the Police Department thinks that they do,
 5   who makes the final decision?
 6          MS. FADDIS:  Objection to form.
 7      A.    If it's medical, we decide to
 8   take the patient to the hospital.  Other
 9   than that, we have nothing to do there.  If
10   it's medical, we take the patient to the
11   hospital.  Other than that, it's not my
12   business what happens there, because if I'm
13   not needed, I'm not needed.
14      Q.    Is there ever a time where the
15   Police Department, that you know of, makes
16   their own determination that somebody is a
17   danger to themselves or somebody else and
18   needs to go to the hospital?
19      A.    That question is just about my
20   opinion, and I don't think it has anything
21   to do with this job, with this specific
22   reason I'm here.  I don't know.
23      Q.    Does the Police Department
24   always have to listen to you if you say
25   this person needs to go to the hospital?
```

```
                                              Page 66
 1              M. SCHAPIRA
 2              MS. FADDIS:  Objection to form.
 3       A.     When you say they always have
 4   to listen to us, it's not that they work
 5   for us.  I have come as a medical
 6   professional to determine that the patient
 7   is in need of medical attention, so I need
 8   help with this patient with taking them to
 9   the hospital for their own well-being.
10       Q.     So, the final decision about
11   whether or not a person goes to the
12   hospital falls on who?
13       A.     On the EMTs, or whoever has the
14   highest medical authority on the scene.
15              MS. FUCHS:  I have no further
16          questions right now.  I may have some
17          follow-up questions depending on what
18          Ms. Faddis asks.
19   EXAMINATION BY
20   MS. FADDIS:
21       Q.     Good afternoon.  Thank you for
22   spending time with us.  I just have some
23   follow-up.  My name is Hannah Faddis.  I'm
24   an attorney with the New York City Law
25   Department.  I represent the city and an
```

```
                                            Page 67
 1                    M. SCHAPIRA
 2    officer named Mandeep Cheema, who was one
 3    of the police officers involved in this
 4    case.  You said earlier that when you get a
 5    job from a dispatcher, it comes over the
 6    radio, right?
 7         A.    Yes.
 8         Q.    You also said that they also
 9    send the job.  Is that something you
10    received in writing?
11         A.    They send the job through our
12    KDT.  The KDT is a computer that's
13    installed inside the ambulance where we see
14    the job number, the job description, what
15    are we going for, the job address, and
16    whatever the dispatch conversation had with
17    whomever called 911, and also times.
18         Q.    So, you're able to see an event
19    chronology in that computer?
20         A.    Yes.
21              MS. FADDIS:  Let's mark this as
22         Exhibit A, please.
23              (Whereupon, an Event Chronology
24         was marked as Defendant's Exhibit A
25         for identification as of this date by
```

```
                                              Page 68
 1               M. SCHAPIRA
 2        the Reporter.)
 3        Q.    I want to show you what we've
 4   marked as Exhibit A.  Can you see an Event
 5   Chronology in front of you?
 6        A.    Yes.
 7        Q.    You're looking at this on a
 8   cell phone?
 9        A.    On a cell phone, yes.
10        Q.    Looking at this, do you see a
11   date for the incident that this chronology
12   refers to?
13        A.    02/28/2018.
14        Q.    Just for the record, we are
15   looking at a five page document.  Looking
16   at page one right now, do you see a start
17   time for the start of this event?
18        A.    There's a job number where it
19   says event.  I'm guessing that's the job
20   number, and the time is 06:13:23.
21        Q.    I want to go down to midway
22   down the page, time stamp 06:15:01, part of
23   that entry reads, "Type 54F1-Ambulance
24   Case."  Do you see that?
25        A.    Yeah.
```

```
                                         Page 69
 1                 M. SCHAPIRA
 2       Q.    Does that indicate that this
 3  was a job that was being assigned to EMS?
 4       A.    It seems like it, yes.
 5       Q.    I want to go down to page two
 6  of this document, which is D151.  I'm going
 7  to highlight number 06:16:33.  Do you see
 8  that highlighting?
 9       A.    Yes.
10       Q.    It says, "Event Comment EMS
11  unit dispatch."  Do you see that?
12       A.    Yes.
13       Q.    Underneath that it says, "Unit
14  ID:54F1."  Does that refer to your unit
15  that day?
16       A.    Yes, as per the paperwork, that
17  was my unit.
18       Q.    We are still on page two.  I'm
19  going to scroll down to an entry at
20  06:28:30.  There's another event comment
21  that says, "EMS unit on scene."  Do you see
22  that?
23       A.    Yes.
24       Q.    Would that correspond to when
25  you and your partner indicated you arrived
```

```
                                              Page 70
 1                M. SCHAPIRA
 2   at the job?
 3         A.    Yes, that's what it seems like.
 4         Q.    Now, the next entry just below
 5   that is time stamped.  Do you see that?
 6         A.    Yes.
 7         Q.    It says, "Comments, please send
 8   RMP un co-op PT."  Do you see that?
 9         A.    Yes.
10         Q.    Do you know what that refers
11   to?
12         A.    Uncooperative patient.
13         Q.    Is this a message that was
14   communicated by your unit to the
15   dispatcher?
16         A.    As per the paperwork, it seems
17   like it was.  I do not recall anything
18   regarding this job.
19         Q.    Then after that at 06:38:40,
20   you see another event comment?
21         A.    "Send RMP to location."
22         Q.    I'm going to go down to page
23   three.  This is going to be D152 at
24   06:44:15.  Do you see another event
25   comment?
```

Page 71

M. SCHAPIRA

1

2      A.      "RMP needed ASAP."  I'm not

3  sure if we called it, or it was just sent

4  by the dispatch.  It could be the dispatch

5  that sent that job again to PD.

6      Q.      The comments that we looked at

7  a moment ago back on page two that says,

8  "Please send RMP, uncooperative patient."

9  Is that a message that would have been

10  relaid from your unit, or a message that

11  would have come up with themselves?

12      A.      It's most likely something that

13  our unit would have requested if we needed

14  help on scene.

15      Q.      Based on your experience, is

16  there any other way that the dispatcher

17  could have learned that the patient was

18  uncooperative other than from the EMTs on

19  the scene?

20      A.      Maybe someone else called in

21  from the same house calling for help again,

22  saying that they needed the police there.

23  Other than that, it's EMS that calls.

24      Q.      If this came through the EMS

25  dispatcher, would that indicate that their

```
                                            Page 72
 1                    M. SCHAPIRA
 2   message came from the EMTs rather than a
 3   911 caller?
 4        A.    Yes, most likely.
 5        Q.    Back on page three, the note
 6   that says, "RMP needed ASAP."  That's at
 7   06:44?
 8        A.    Yes.
 9        Q.    I want to go back to the videos
10   that you saw a little while ago.
11        A.    Okay.
12        Q.    Can you see a still frame of
13   the video in front of you?
14        A.    Yes.
15        Q.    We are looking at what
16   Plaintiff has marked as Exhibit 2, and this
17   video begins with your partner, Nicole,
18   entering the apartment, right?
19        A.    Yes.
20        Q.    I am going to play it for a
21   couple of seconds.
22        A.    Okay.
23        Q.    We paused at the three second
24   marker.  The time stamp on the video itself
25   is three seconds.  Do you see a time and
```

```
                                               Page 73
 1                    M. SCHAPIRA
 2   date stamp on the screen that's being
 3   recorded in this video?
 4        A.     It says 2/28/2018, 06:32:22.
 5        Q.     Based on this, would it be fair
 6   to say that your partner entered the
 7   apartment, at least as depicted in this
 8   video, at about 6:32 in the morning?
 9        A.     Yes, that's what it seems like.
10        Q.     I'm going to skip to the end.
11   Fast forwarding to the end, which is the 4
12   minute and 48 second marker of the video.
13   Do you see the time and date stamp from
14   this recording depicted in the frame?
15        A.     02/28/18, 06:37:12.
16        Q.     That would indicate this video
17   clip ends at 6:37 in the morning, correct?
18        A.     Yes.
19        Q.     Let's go to Exhibit 3 very
20   quickly.  Can you see a still frame in
21   front of you?
22        A.     Yes.
23        Q.     The last video we watched ended
24   at, approximately, 6:38 a.m., right?
25        A.     Yes.
```

Case 23-24, Document 32, 04/19/2023, 3501832, Page199 of 306

```
                                              Page 74
 1                    M. SCHAPIRA
 2         Q.    This is Exhibit 3, and you've
 3    seen portions of this video today.  In the
 4    frame, can you see three people?
 5         A.    I see four, including my
 6    partner.
 7         Q.    Your partner is all the way on
 8    the right, and there's three civilians
 9    towards the middle and left of the frame?
10         A.    Yes.
11         Q.    We are going to play this for
12    just a couple of seconds.  We are paused at
13    the one second marker of the video, and you
14    see a police officer entering the
15    apartment?
16         A.    Yes.
17         Q.    Is this the police officer you
18    mentioned you had seen on the job before?
19         A.    Yeah, I saw him around my area.
20         Q.    The time stamp on this video
21    now is 6:44 in the morning, right?
22         A.    Yes.
23         Q.    When you were asked questions
24    about Exhibit 3 earlier, you testified
25    about a moment where it looks like you walk
```

```
                                        Page 75
  1              M. SCHAPIRA
  2   out the front door of the apartment and
  3   don't come back.  Do you remember that?
  4        A.    Yes.
  5        Q.    You testified repeatedly you
  6   don't have any independent recollection of
  7   this incident, right?
  8        A.    Right.
  9        Q.    Do you have any recollection of
 10   where you went after you exited the
 11   apartment?
 12        A.    No.
 13        Q.    Do you know if you were out on
 14   the landing, out downstairs in the
 15   ambulance, or something else?
 16        A.    No.  Usually when a patient is
 17   about to leave the house, what we usually
 18   do, if I am driving, I go set up the chair
 19   outside the door, or sometimes we need to
 20   go in front of the patient if there are
 21   stairs and they don't want to sit down,
 22   usually one of us has to go in the front,
 23   and the other one is behind the patient,
 24   just in case the patient falls, if the
 25   patient was to fall, then I will catch
```

```
                                          Page 76
 1                 M. SCHAPIRA
 2    them, if that is the case.  Even if they
 3    have a steady gait or not, that's usually
 4    protection for the patient.
 5         Q.    When you say set up the chair,
 6    what do you mean by that?
 7         A.    We have a stair chair that we
 8    use to carry patients down the stairs.
 9         Q.    I apologize if you answered
10    this already.  When were you first
11    certified as an EMT?
12         A.    I think it was 2015.
13         Q.    You've worked full-time as an
14    EMT since then?
15         A.    Yes.  I think it was the end of
16    2014, beginning of '15, in between that.
17         Q.    You testified already that it's
18    the responsibility of EMS on the scene to
19    make a determination, a medical
20    determination, as to whether or not a
21    patient needs to go to the hospital?
22         A.    Yes.
23         Q.    You said earlier that there are
24    certain circumstances where someone cannot
25    refuse medical attention, right?
```

```
                                               Page 77
 1                      M. SCHAPIRA
 2          A.    Yes.
 3          Q.    That's if they are not capable
 4   of making decisions for themselves?
 5          A.    Yes.
 6          Q.    Or if they are a threat to
 7   themselves?
 8          A.    Yes, and others, too.
 9          Q.    In what way, based on your
10   experience as an EMT, might someone who's
11   intoxicated be a threat to himself?
12          A.    Like I said before, if they are
13   unable to walk, they don't have a steady
14   gait, mentally, when you drink, you lose
15   your mental status as being, you know, able
16   to take responsibility of your actions, and
17   make decisions for yourself.  You don't
18   know what you're doing, that's what alcohol
19   does.  It blocks your wave of making the
20   right decisions.  Anyone could be a threat.
21   You could grab a knife and hurt someone.
22   You can punch someone.  You can fall down
23   the stairs.  You can hit yourself in the
24   tub.  Anything can happen.  Any injury or
25   injury to others while you're intoxicated
```

Page 78

```
                                M. SCHAPIRA
  1
  2    could happen.
  3         Q.     In making a determination as to
  4    whether or not someone is a threat to
  5    themselves, in your experience, other than
  6    your own observation of that person, what
  7    else might factor into your determination?
  8         A.     I would say if the family is
  9    telling me that they were abused or hit by
 10    him while intoxicated, the person cannot
 11    control themselves, then that adds up to
 12    it, because now he's a threat to him or
 13    others.  He's not responsible how other
 14    people, if the intoxicated person hit
 15    another person, now that other person can
 16    hit them back, and now you are a threat to
 17    yourself as well, because other people now
 18    are able to hit you and you cannot defend
 19    yourself, because you are also intoxicated.
 20         Q.     There was a question about
 21    whether or not you knew that this
 22    individual had a liver condition.  Do you
 23    remember that question?
 24         A.     Yes.
 25         Q.     You said that that would be a
```

Page 79

                    M. SCHAPIRA

1    part of a medical history, right?

2        A.    Yes.

3        Q.    Typically, in and of itself, a

4    liver condition wouldn't be a reason to

5    take someone to the hospital, right?

6        A.    Yes.

7        Q.    Does a patient's medical

8    history, or might a patient's medical

9    history, in your experience, affect your

10   determination as to whether or not their

11   intoxication was a threat to themselves?

12       A.    No.  If you're intoxicated, you

13   are intoxicated.  It doesn't matter what

14   medical history you have.  It can be

15   terminal cancer.  It can be diabetes.  It

16   could be anything.  It doesn't matter what

17   your medical history is.  You are

18   intoxicated and you are a threat to

19   yourself.

20       Q.    Someone who had a condition

21   that could be exacerbated by alcohol

22   consumption, based on your experience,

23   could that factor into a decision whether

24   to take them to a hospital against their

```
                                            Page 80
                        M. SCHAPIRA
 1
 2    will?
 3         A.    No.
 4         Q.    The decision to take them
 5    against their will has to do with their
 6    competency about seeking medical care
 7    themselves?
 8         A.    Yes.
 9              MS. FADDIS:  I don't think I
10         have anything else.
11    EXAMINATION BY
12    MS. FUCHS:
13         Q.    You just testified that you, as
14    the EMT, make a medical determination that
15    someone needs to go to the hospital,
16    correct?
17         A.    Yes, when it's medical related.
18         Q.    You, as the EMT, determine
19    whether or not somebody can or cannot
20    refuse medical attention, correct?
21         A.    Yes.
22         Q.    If you, as the EMT, make the
23    determination that somebody needs to go to
24    the hospital, do you decide whether the
25    person is placed in handcuffs, or does the
```

```
                                        Page 81
 1                M. SCHAPIRA
 2   Police Department decide that, or something
 3   else?
 4        A.    I do not decide that.
 5        Q.    Who decides that?
 6        A.    The Police Department, if
 7   that's what they feel more comfortable to
 8   do so.
 9        Q.    Ms. Faddis showed you the Event
10   Chronology.  You guys went through some of
11   it.  I don't have that exhibit.  If we need
12   to put it back up, we will put it back up.
13   Do you have any independent recollection of
14   any of the events that we have reviewed in
15   the Event Chronology?
16        A.    No.  I do not recall anything
17   that happened on that job.
18        Q.    The 6:38 call for the Police
19   Department for an RMP, do you have any
20   independent recollection of that?
21        A.    No, I do not.
22        Q.    Do you have any independent
23   recollection of the call about an
24   uncooperative patient?
25        A.    No, I do not.
```

Page 82

1               M. SCHAPIRA

2        Q.    Do you have any independent

3   recollection of why the RMP would have been

4   needed ASAP?

5        A.    No, I do not.

6        Q.    Finally, do you have any

7   independent recollection of being told that

8   the patient had hit or struck anyone?

9        A.    No, I do not.

10             MS. FUCHS:  I have no further

11         questions.  Thank you so much for

12         your time today.  I appreciate it.

13             (Whereupon, at 1:06 p.m., the

14         Examination of this Witness was

15         concluded.)

16

17

                 _____

18                  MARISABEL SCHAPIRA

19

20   Subscribed and sworn to before me

21   this _____ day of _____ 20____.

22

     _____

23     NOTARY PUBLIC

24

25

```
                                                    Page 83
 1                    E X H I B I T S

 2

 3   PLAINTIFF EXHIBITS

 4   EXHIBIT              EXHIBIT                    PAGE

 5   Exhibit 1           Call Report               21

 6   Exhibit 2           Video                     28

 7   Exhibit 3           Video                     30

 8   DEFENDANT EXHIBITS

 9   EXHIBIT              EXHIBIT                    PAGE

10   Exhibit A           Event Chronology          67

11

12          (Exhibits retained by Counsel.)

13

14                    I N D E X

15

16   EXAMINATION BY                    PAGE

17   MS. FUCHS                         4, 80

18   MS. FADDIS                        66

19

20     INFORMATION AND/OR DOCUMENTS REQUESTED

21   INFORMATION AND/OR DOCUMENTS      PAGE

22   (None)

23

24

25
```

```
                                              Page 84
 1              C E R T I F I C A T E

 2

 3    STATE OF NEW YORK        )
                               :  SS.:
 4    COUNTY OF RICHMOND       )

 5

 6         I, ALEXIS A. VARGAS, a Notary Public

 7    for and within the State of New York, do

 8    hereby certify:

 9         That the witness whose examination is

10    hereinbefore set forth was duly sworn and

11    that such examination is a true record of

12    the testimony given by that witness.

13         I further certify that I am not

14    related to any of the parties to this

15    action by blood or by marriage and that I

16    am in no way interested in the outcome of

17    this matter.

18         IN WITNESS WHEREOF, I have hereunto

19    set my hand this 16th day of November 2020.

20

21

22    _____

                ALEXIS A. Vargas

23

24

25
```

```
                                                              Page 85
  1                          ERRATA SHEET
                      VERITEXT/NEW YORK REPORTING, LLC
  2
         CASE NAME: Singh v. City Of New York, Et Al
  3      DATE OF DEPOSITION: 10/22/2020
         WITNESSES' NAME: EMT Marisabel Schapira
  4
  5      PAGE   LINE (S)      CHANGE              REASON
         ____|_____|_____|_____
  6
         ____|_____|_____|_____
  7
         ____|_____|_____|_____
  8
         ____|_____|_____|_____
  9
         ____|_____|_____|_____
 10
         ____|_____|_____|_____
 11
         ____|_____|_____|_____
 12
         ____|_____|_____|_____
 13
         ____|_____|_____|_____
 14
         ____|_____|_____|_____
 15
         ____|_____|_____|_____
 16
         ____|_____|_____|_____
 17
         ____|_____|_____|_____
 18
         ____|_____|_____|_____
 19
         ____|_____|_____|_____
 20
 21                                    _____
                                       EMT Marisabel Schapira
 22      SUBSCRIBED AND SWORN TO BEFORE ME
         THIS ____ DAY OF _____, 20__.
 23
 24
         _____   _____
 25      (NOTARY PUBLIC)               MY COMMISSION EXPIRES:
```

**[& - allow]**                                                    Page 1

| & | | | |
|---|---|---|---|

**&**

**&**  2:3

**0**

**00632**  1:4
**02/28/18**  73:15
**02/28/2018**  68:13
**06:13:23**  68:20
**06:15:01**  68:22
**06:16:33**  69:7
**06:28:30**  69:20
**06:32:22**  73:4
**06:37:12**  73:15
**06:38:40**  70:19
**06:44**  72:7
**06:44:15**  70:24

**1**

**1**  21:5,9 34:15,17
  35:11 37:2 50:4
  83:5
**1-10**  1:7
**10**  22:12,14 32:23
  33:12,13,15
**10/22/2020**  85:3
**100**  2:8
**10007**  2:8
**10022**  2:4
**110**  2:4
**11581**  4:14
**11:12**  1:13
**130-18**  25:14
  26:20
**15**  22:8,12,14
  34:16,17 51:25
  76:16
**16th**  84:19
**17**  52:19
**180**  9:24
**1990**  9:11
**1:06**  82:13

**1:19**  1:4

**2**

**2**  28:24 29:4 33:11
  46:19 47:23 51:18
  51:18 52:18 72:16
  83:6
**2/28/2018**  73:4
**20**  22:8 33:14,24
  33:25 49:10 82:21
  85:22
**20/20**  10:6,7
**2014**  76:16
**2015**  12:7 76:12
**2016**  14:9,17
**2017**  14:17
**2018**  5:8,10 14:25
  20:18 24:23 25:12
  26:18 58:12
**2020**  1:12 84:19
**21**  49:10,12 83:5
**22**  1:12
**24**  8:21 9:3
**24796**  84:21
**28**  83:6
**28th**  5:8,10 14:25
  20:18 24:23 25:12
  26:18 58:12
**29**  54:22

**3**

**3**  30:21,23 31:7
  46:10,11,12,21,25
  47:2 48:14 53:21
  54:3 73:19 74:2
  74:24 83:7
**30**  9:15 83:7
**31**  50:5
**3200**  2:4
**35**  55:24
**38**  36:2,7

**39**  46:13 55:25

**4**

**4**  29:9 54:12 73:11
  83:17
**40**  33:23 46:10,21
  47:2 56:6
**43**  56:11
**48**  29:9 54:13
  73:12
**49**  46:11

**5**

**5**  9:18,18 57:2,20
**50**  31:4 47:2 48:15
**51**  53:21 54:4
**54f1**  68:23 69:14
**58**  11:2 56:16
**59th**  2:4

**6**

**6**  54:21 55:24,25
  56:6,11,16 58:4
**66**  83:18
**67**  83:10
**6:32**  73:8
**6:37**  73:17
**6:38**  73:24 81:18
**6:44**  74:21

**7**

**7**  56:25
**739**  4:13

**8**

**8**  31:4 48:15 57:19
  57:20 58:4,4
**80**  83:17
**89**  24:20,22 25:4
**8:00**  21:20,21

**9**

**911**  67:17 72:3
**950196**  1:6

**98**  38:19

**a**

**a.m.**  1:13 21:21,21
  21:25 73:24
**ability**  8:23
**able**  6:7 9:7 47:13
  61:11 62:9,21
  67:18 77:15 78:18
**abrasion**  59:14,19
**absolutely**  30:14
**abused**  78:9
**accurately**  38:2
**acting**  39:17
**action**  58:11 84:15
**actions**  77:16
**actual**  24:10
**address**  4:11
  35:18,25 36:7
  38:25 39:2 62:14
  67:15
**adds**  78:11
**affect**  79:10
**afternoon**  66:21
**aggressive**  43:9,10
  43:12
**ago**  13:23 71:7
  72:10
**agree**  8:18
**agreed**  3:2,7,11
**al**  85:2
**alcohol**  39:7 47:9
  47:16 48:2,9
  77:18 79:22
**alert**  40:2
**alerted**  26:19,20
**alexis**  1:20 84:6,22
**allegations**  5:5
**alleged**  34:4
**allergies**  45:23
**allow**  18:24

Case 1:19-cv-00632-EK-ST   Document 48-11   Filed 11/29/21   Page 87 of 100 PageID #: 1277

| | | | |
|---|---|---|---|
| **ambulance** 14:5 24:8,11,13,18 25:6 25:9 60:10,20 64:17 67:13 68:23 75:15 | **arrived** 22:4 28:12 43:24 44:3 49:18 61:20 69:25 | **attorneys** 2:3,7 **authority** 66:14 **automatically** 63:21 | **belongs** 35:17 **big** 63:9 **birth** 9:10 36:6 52:13 |

**annoy** 33:5
**answer** 5:18 6:5 6:22 7:7 34:22 35:15,19 38:9 39:5 46:2 62:5 64:2
**answered** 40:7 76:9
**answers** 6:13
**anticipate** 6:4
**anybody** 31:21 32:7
**apartment** 29:24 34:19 56:12,17,21 58:21,24 72:18 73:7 74:15 75:2 75:11
**apologize** 76:9
**appear** 35:13 47:8
**applied** 10:20
**appreciate** 82:12
**apprehension** 59:17,24
**approaching** 43:19
**approximate** 9:17 9:23,25
**approximately** 13:14 15:4 21:25 29:25 48:15 73:24
**area** 24:21 25:4 74:19
**arms** 46:23 57:23
**arrest** 59:9
**arrive** 22:2 23:3

**arrives** 16:21
**arriving** 22:7 43:25
**asap** 71:2 72:6 82:4
**aside** 17:3 18:8 26:2 44:8
**asked** 74:23
**asking** 6:5 33:4 41:9 58:13
**asks** 66:18
**assault** 50:25 53:13,16
**assaulted** 50:24 51:11 52:19,25
**assigned** 23:4 24:13,20,22,24,25 25:4 44:13,17,20 69:3
**assignment** 23:23 24:6
**assist** 14:5,7
**assuming** 20:7
**atlantic** 25:15 26:21
**attack** 27:14
**attempted** 50:25
**attend** 10:16 11:4
**attended** 10:21
**attending** 11:3
**attention** 17:6 18:11 19:9 20:16 44:25 51:19 62:3 62:10,22 63:20 64:9 66:7 76:25 80:20
**attorney** 4:17 66:24

**available** 38:20
**avenue** 4:13 25:15 26:21
**aware** 4:24

**b**

**b** 4:1 83:1
**back** 14:25 16:21 23:22 32:2 35:10 38:22 42:25 46:4 55:2,4,22 60:11,20 71:7 72:5,9 75:3 78:16 81:12,12
**background** 11:14
**bag** 55:7,9,13
**balwinder** 1:2 36:6
**barely** 20:5,13
**bartender** 12:5
**base** 24:17
**based** 32:20 47:6 47:15,21 58:20 61:23 62:7 71:15 73:5 77:9 79:23
**basically** 16:6 25:3 52:11
**bathroom** 7:3
**beating** 20:11
**becoming** 12:3 13:24
**beginning** 76:16
**begins** 72:17
**believe** 10:4,9 12:7 14:17 36:22 37:2 51:20 56:5 58:21
**belligerent** 16:19
**belligerently** 43:19

**blocks** 25:2 77:19
**blood** 84:15
**bls** 24:8
**bother** 25:9
**bottom** 53:22 54:14
**break** 6:25 7:3,8 46:8 62:24 63:4
**breathing** 20:6
**bringing** 5:5
**broad** 46:2
**bronx** 13:8,12
**brooklyn** 14:3,4
**brought** 8:6
**bunch** 52:13
**business** 37:21 65:12

**c**

**c** 2:1 4:1 84:1,1
**call** 16:20,23,24 21:4,9 22:20 24:17 25:7,11,13 25:18 28:4,6 35:8 35:11,14,21 44:10 44:14 52:7,10 61:23 64:20 81:18 81:23 83:5
**called** 4:1 13:11 44:5,9,15,21 67:17 71:3,20
**caller** 72:3
**calling** 71:21
**calls** 15:10 24:21 44:15 71:23
**cancer** 79:16
**capable** 17:7 77:3

[capacity - deposition]                                    Page 3

| | | | |
|---|---|---|---|
| **capacity** 1:7,8 | **cocaine** 39:7 | **conversation** | 73:2,13 85:3 |
| **care** 60:4 80:6 | **code** 13:11 | 67:16 | **dates** 14:9 |
| **carry** 55:10 76:8 | **cohen** 2:3,11 4:18 | **cooperating** 43:3 | **day** 15:16,18 |
| **case** 1:4 4:25 5:6 | **college** 10:15,16 | **cooperative** 43:5 | 20:22 21:13 23:9 |
| 7:18,19 8:9 36:21 | 10:17,19,22 11:4,5 | **cop** 32:10 | 23:24 24:14 38:13 |
| 39:10 40:21 44:19 | **come** 24:17 25:7 | **corner** 54:15,23 | 38:14 62:18 69:15 |
| 52:8 67:4 68:24 | 25:13 26:24,25 | **correct** 15:2 16:25 | 82:21 84:19 85:22 |
| 75:24 76:2 85:2 | 34:19,24 44:16 | 23:20 25:8 28:8 | **days** 38:10 |
| **catch** 75:25 | 49:25 66:5 71:11 | 29:19 36:21 37:4 | **deal** 16:13 |
| **cell** 68:8,9 | 75:3 | 37:16 38:3 40:7 | **dealing** 15:15,22 |
| **center** 57:7 | **comes** 67:5 | 40:23 43:15 46:20 | 17:3 |
| **certain** 76:24 | **comfortable** 81:7 | 49:4 55:6 56:13 | **deals** 38:8 |
| **certification** 3:5 | **comment** 60:24 | 57:9,13 73:17 | **dealt** 15:12 |
| 12:23 13:13,16 | 61:3,12 69:10,20 | 80:16,20 | **decide** 12:8 65:7 |
| **certified** 76:11 | 70:20,25 | **corrective** 10:11 | 80:24 81:2,4 |
| **certify** 84:8,13 | **comments** 70:7 | **correspond** 69:24 | **decides** 81:5 |
| **chair** 33:22 75:18 | 71:6 | **counsel** 3:3 4:18 | **decision** 17:8 19:3 |
| 76:5,7 | **commission** 85:25 | 83:12 | 19:17,23 45:20 |
| **change** 14:12 85:5 | **communicated** | **county** 84:4 | 63:24 64:12 65:5 |
| **changing** 23:10 | 70:14 | **couple** 72:21 | 66:10 79:24 80:4 |
| **chase** 19:14 | **community** 10:17 | 74:12 | **decisions** 17:14,17 |
| **check** 22:24 38:10 | 10:19,22 11:4 | **course** 20:7 | 19:11 20:2 45:13 |
| **checking** 60:13 | **competency** 80:6 | **court** 1:1 3:15 | 47:19 77:4,17,20 |
| **cheema** 1:6 67:2 | **complete** 38:15 | 4:20 8:15 | **defend** 78:18 |
| **chronology** 67:19 | **computer** 67:12 | **cpr** 13:4 | **defendant** 4:25 |
| 67:23 68:5,11 | 67:19 | **credits** 10:24 11:2 | 83:8 |
| 81:10,15 83:10 | **concluded** 82:15 | **crew** 43:9,19 | **defendant's** 67:24 |
| **church** 2:8 | **condition** 37:19 | **current** 10:5 | **defendants** 1:10 |
| **circumstances** | 78:22 79:5,21 | **cursing** 41:22 | 2:7 |
| 18:9,15 76:24 | **confirm** 46:18 | **cv** 1:4 | **department** 2:7 |
| **city** 1:6 2:7 4:22 | **connection** 7:17 | | 16:24 19:5 43:25 |
| 5:6 66:24,25 85:2 | 7:25 8:2 37:12 | | 64:5,25 65:4,15,23 |
| **civil** 8:4 | **conscious** 40:5 | **d** | 66:25 81:2,6,19 |
| **civilians** 74:8 | **consider** 19:22 | **d** 83:14 | **depending** 16:10 |
| **class** 13:15,20,22 | **constitute** 17:23 | **d151** 69:6 | 66:17 |
| **classes** 13:7,18 | 45:9 | **d152** 70:23 | **depends** 27:16 |
| 15:21 | **consumption** | **danger** 65:17 | 45:15 46:3 53:4 |
| **client** 5:4 | 79:23 | **date** 1:12 5:4,7,9 | **depicted** 73:7,14 |
| **clip** 73:17 | **control** 16:16,18 | 9:10,20 10:2,7 | **deposition** 3:5,12 |
| **closer** 14:14 | 16:19 78:11 | 20:17,19 21:6 | 85:3 |
| | | 22:11 23:17,22 | |
| | | 28:25 30:24 36:6 | |
| | | 52:12 67:25 68:11 | |

[describe - fictitious]                                                      Page 4

describe 6:15
32:19 41:16 43:9
43:11 56:2
described 35:13
48:9
description 67:14
determination
18:3 20:9 65:16
76:19,20 78:3,7
79:11 80:14,23
determine 40:5
45:17 62:9 63:19
64:13 66:6 80:18
determined 62:2
62:12
diabetes 79:16
different 7:19
11:18 44:12,15,16
direct 20:16 51:19
disagreement
64:24
discussing 11:13
disease 45:5,8,12
45:15
dispatch 67:16
69:11 71:4,4
dispatched 38:24
39:2
dispatcher 26:22
26:23 27:3,17,19
67:5 70:15 71:16
71:25
district 1:1,1
document 68:15
69:6
documents 83:20
83:21
doe 1:7,8
doing 8:10 12:4
17:15 22:16 23:10
36:23 38:19 40:15

40:22 49:17 51:22
51:25 56:2 77:18
door 56:4 58:25
75:2,19
downstairs 75:14
drink 77:14
drinking 39:17
driver 60:17
driving 24:18 28:9
60:10,14 75:18
drop 38:20
drug 38:25 39:3,6
39:7,8,11
drugs 8:22 17:16
drunk 16:11
duly 4:2 84:10
duty 20:21 37:21
38:2

**e**

e 2:1,1,4 4:1 83:1
83:14 84:1,1
earlier 67:4 74:24
76:23
early 22:8,9
eastern 1:1
education 10:14
effect 3:14
ems 29:9 69:3,10
69:21 71:23,24
76:18
emt 11:11,22,23
12:3,6,9,15,16,19
13:13,24 14:2,20
15:4,6 20:19 47:8
47:16 57:11 76:11
76:14 77:10 80:14
80:18,22 85:3,21
emts 12:12 64:17
64:18,24 66:13
71:18 72:2

encounter 48:18
ended 73:23
ends 73:17
entered 29:24 73:6
entering 72:18
74:14
entry 68:23 69:19
70:4
errata 85:1
esq 2:5,9,11
estimate 15:15
et 85:2
etcetera 13:5
45:25
evaluation 60:5
evening 21:24
32:7 57:16 59:5
70:4
event 67:18,23
68:4,17,19 69:10
69:20 70:20,24
81:9,15 83:10
events 81:14
everyday 15:13
38:10
exacerbated 79:22
exact 21:19
exactly 27:10 34:7
39:9 40:13,17
49:15 62:18
exam 13:18
examination 1:16
4:6 66:19 80:11
82:14 83:16 84:9
84:11
examined 4:4
example 64:12,25
exhibit 21:5,9
28:24 29:4 30:21
30:23 31:7 33:10
33:11 35:11 37:2
46:19 47:22 48:14

67:22,24 68:4
72:16 73:19 74:2
74:24 81:11 83:4
83:4,5,6,7,9,9,10
exhibiting 47:25
exhibits 83:3,8,12
exit 56:12
exited 75:10
experience 11:8
11:17 71:15 77:10
78:5 79:10,23
expires 85:25
eyesight 10:5

**f**

f 84:1
face 36:9
factor 78:7 79:24
faddis 2:9 4:21
33:9 34:21 39:4
46:18 47:10 52:22
57:6 62:4,11
63:25 65:6 66:2
66:18,20,23 67:21
80:9 81:9 83:18
failed 9:2
fair 30:2 34:18
73:5
fall 75:25 77:22
falling 20:13
falls 66:12 75:24
family 12:11 78:8
far 34:16 56:21,23
fast 73:11
february 5:8,9
14:25 20:17 24:23
25:12 26:18 58:12
feel 81:7
feet 20:14
fell 41:6
fictitious 1:8

**filing** 3:4
**final** 63:23 64:12
  65:5 66:10
**finally** 6:24 82:6
**find** 5:3 28:16
**finish** 5:16 6:6
**finished** 46:9
**first** 4:2 22:23
  31:15 32:17 58:16
  76:10
**fitch** 2:3
**five** 29:11 62:25
  68:15
**floor** 18:6 25:15
**follow** 66:17,23
**follows** 4:5
**foot** 9:18
**force** 3:14 18:17
  18:19,21 19:2
  64:18
**forcibly** 64:16
**forehead** 59:15,20
**form** 3:8 34:21
  39:4 52:22 65:6
  66:2
**forth** 84:10
**forwarding** 73:11
**four** 25:2 40:3,3
  60:3,5 74:5
**frame** 48:20,23
  72:12 73:14,20
  74:4,9
**friends** 12:12,13
  12:14
**friendship** 63:16
**front** 68:5 72:13
  73:21 75:2,20,22
**fuchs** 2:5 4:7,17
  9:12 21:2 28:21
  30:20 33:11 46:20
  57:9 66:15 80:12

82:10 83:17
**full** 76:13
**further** 3:7,11
  60:4 66:15 82:10
  84:13

### g

**gait** 41:2,6 47:18
  76:3 77:14
**gather** 40:12
**gears** 20:15
**general** 44:10
**generally** 22:6,10
  27:12 36:20 45:7
  63:18
**gerald** 2:11
**gesture** 6:16 46:12
**gestures** 6:14
**gesturing** 6:17
**getting** 22:17,18
  56:7,9
**give** 5:10,17 7:6
  21:10 27:7 28:19
  35:15,19 38:8
**given** 7:16 22:21
  84:12
**glass** 7:4
**glasses** 10:10
**glitch** 5:21,23
**go** 16:21 17:18
  18:18,23 19:17,23
  24:20 31:11 32:2
  36:10 38:19,22
  42:25 46:4 55:22
  56:9 63:20 64:9
  64:13,21 65:2,18
  65:25 68:21 69:5
  70:22 72:9 73:19
  75:18,20,22 76:21
  80:15,23
**goes** 16:2 66:11

**going** 5:18 6:4,11
  8:18 16:8,9 19:14
  20:16 21:8 23:22
  26:13 28:15,16
  29:3 30:9,16
  31:11 32:2,17,18
  32:19,22,24 33:14
  33:25 34:15 35:7
  36:10 38:20,23
  42:19,22,25 45:17
  45:18,21 46:3,4,16
  47:4 48:13,16
  49:9,24 50:4
  51:14,18 52:4
  53:20 54:7,10,18
  56:15,25 59:12
  62:24 67:15 69:6
  69:19 70:22,23
  72:20 73:10 74:11
**good** 4:15 66:21
**grab** 77:21
**graduate** 10:22
**ground** 5:11 7:9
  20:5,8 24:8,11
  57:22,25 58:2
**guess** 28:9 35:18
  63:12
**guessing** 62:15
  68:19
**guidelines** 64:5
**guys** 81:10

### h

**h** 4:1 83:1
**hand** 6:14 54:14
  54:23 56:18 84:19
**handcuffs** 80:25
**hannah** 2:9 66:23
**happen** 52:14
  58:11 77:24 78:2
**happened** 25:25
  26:11 27:11 31:9

31:15 50:22 51:8
  61:19 62:18 81:17
**happening** 40:17
  40:20 41:13,24
**happens** 64:22,23
  65:12
**happy** 6:21
**hard** 48:3
**harm** 39:21
**head** 6:13 53:24
  54:2
**health** 45:10
**heart** 27:14
**height** 9:17,19
**held** 1:19
**helicopter** 24:12
**help** 16:17,20,21
  16:23 18:23,24
  42:17 64:20 66:8
  71:14,21
**helping** 12:10
**hereinbefore**
  84:10
**hereto** 3:4
**hereunto** 84:18
**highest** 10:13
  66:14
**highlight** 69:7
**highlighting** 69:8
**hired** 14:18
**history** 45:16,23
  52:13 79:2,9,10,15
  79:18
**hit** 77:23 78:9,14
  78:16,18 82:8
**hold** 11:11,21
  14:22
**holding** 14:25
  51:23
**home** 19:12 31:16

[honest - look]                                                    Page 6

**honest**  14:8
**honestly**  23:11
  26:4
**hospital**  13:25
  14:13,16 18:18
  19:18,24 20:19
  45:18 60:3,5,6,7
  60:21 61:20 63:21
  63:22,23 64:21
  65:3,8,11,18,25
  66:9,12 76:21
  79:6,25 80:15,24
**hours**  8:21 9:3
  12:24 21:18
**house**  14:14 16:20
  20:12 33:2 35:4
  71:21 75:17
**hundred**  16:4 52:3
**hurt**  42:22 77:21

**i**

**identification**  21:6
  28:25 30:24 67:25
**ignore**  18:10
**ilyssa**  2:5 4:16
**imminent**  45:10
  65:3
**impair**  8:23
**incident**  5:4,7,9
  9:20 10:2,8 20:17
  23:17,23 25:21
  30:13,18 31:9
  38:24 39:2 44:9
  50:18 58:6,9,17
  60:4 68:11 75:7
**including**  74:5
**incoherency**  40:9
**incoherent**  40:14
  40:23
**independent**  42:2
  42:5 43:4 46:15
  47:3 48:5 49:16

59:3,18 61:5,16
  62:20 75:6 81:13
  81:20,22 82:2,7
**independently**
  58:18
**indicate**  69:2
  71:25 73:16
**indicated**  69:25
**indicating**  57:6
**individual**  18:17
  78:22
**individually**  1:6,7
**information**  11:15
  27:8 37:8 45:19
  83:20,21
**injuries**  45:24
**injury**  77:24,25
**inside**  67:13
**installed**  67:13
**interactions**  11:18
**interested**  84:16
**intoxicated**  15:12
  15:19,22 16:3
  17:4,10,22 18:9
  19:8,8,15 27:13
  60:25 61:6,13
  77:11,25 78:10,14
  78:19 79:13,14,19
**intoxication**  19:21
  79:12
**involved**  17:16
  67:3
**irrational**  41:16
  41:17,20
**issues**  16:14

**j**

**jamaica**  13:25
  14:11,13,16,18
  20:18 60:6,7,21
**job**  18:22,22 25:14
  26:7,11,19,20 27:2

27:4,5,7,8,10,20
  28:3,5,7,14,19
  31:19 32:13 35:13
  35:17,22 36:17,19
  37:12,18 38:13,15
  38:19 39:13,24
  41:21 42:8,12,16
  42:24 43:17,22
  50:21 51:3,8,13
  55:13,15 58:24
  59:7,11 61:8,22,25
  62:8,13 65:21
  67:5,9,11,14,14,15
  68:18,19 69:3
  70:2,18 71:5
  74:18 81:17
**jobs**  11:10,21,25
  14:12 15:5,18
  26:5,22 55:11
  63:8,12
**john**  1:7,8
**joined**  4:18
**justified**  18:16

**k**

**kdt**  67:12,12
**keep**  17:16
**keeping**  20:14
**kill**  42:19
**kind**  10:11 12:21
  13:2 15:24 16:12
  27:8 35:22 36:17
  41:17,19
**knew**  78:21
**knife**  77:21
**know**  7:2 16:4
  17:14,15 18:25
  20:23 21:14 22:3
  23:11 26:16,16
  29:21 31:13,17
  33:4,20,21,22 34:7
  35:6,16,22 36:12

38:9 39:9 40:15
  40:16,17,19 42:21
  45:21 49:11,20
  50:2,11 53:8
  54:12 55:2 57:2,4
  57:15 61:10 63:14
  63:17 64:5 65:15
  65:22 70:10 75:13
  77:15,18

**l**

**l**  4:1
**labeled**  29:8
**landing**  75:14
**late**  22:4
**law**  2:7 37:24
  66:24
**lawsuit**  8:3,4,5
**learned**  71:17
**leave**  16:20 56:7
  75:17
**left**  74:9
**lenses**  10:11
**level**  10:13 11:17
  19:21
**lie**  26:5
**line**  85:5
**listen**  33:3 65:24
  66:4
**little**  16:6 31:5
  46:6,6 72:10
**liver**  45:4,8,12,14
  78:22 79:5
**llc**  85:1
**llp**  2:3
**location**  25:20,21
  26:3 70:21
**log**  22:23
**long**  25:4 29:10
**longer**  19:23
**look**  21:10

[looked - nods]                                                                                           Page 7

| | | | n |
|---|---|---|---|
| **looked** 71:6 | 78:3 | **members** 12:11 | n 2:1 83:14 |
| **looking** 33:10 | **male** 36:2,8 | **memory** 25:23 | **name** 1:8 4:8,16 |
| 35:21 36:25 68:7 | **man** 16:18 | 26:10,15 27:23 | 12:2 36:24 63:15 |
| 68:10,15,15 72:15 | **manage** 13:4 64:6 | 29:6 32:22 34:9 | 66:23 85:2,3 |
| **looks** 32:25 48:24 | **management** 38:7 | 34:12 36:16 | **named** 67:2 |
| 49:2 50:7 51:23 | **mandeep** 1:6 67:2 | **mental** 40:13 | **names** 1:8 52:12 |
| 52:4 54:16,25 | **marijuana** 39:7 | 45:25 77:15 | **narrative** 28:2 |
| 55:5,7 56:3,12 | **marisabel** 1:17 | **mentally** 16:5 | 36:11,15 52:10,11 |
| 74:25 | 4:10 82:18 85:3 | 77:14 | 52:16,21 53:2,7,11 |
| **lose** 77:14 | 85:21 | **mentioned** 74:18 | 53:14,18 |
| **loud** 36:12 | **mark** 21:2 28:21 | **message** 70:13 | **narratives** 53:8,9 |
| | 30:20 32:23 33:14 | 71:9,10 72:2 | **nassau** 10:17,18 |
| **m** | 33:14,24 46:13,22 | **middle** 74:9 | 10:21 11:3 |
| **m** 4:1 5:1 6:1 7:1 | 67:21 | **midway** 68:21 | **need** 6:14,25 7:3 |
| 8:1 9:1 10:1 11:1 | **marked** 21:5,9 | **military** 11:7 | 19:2 22:19,25 |
| 12:1 13:1 14:1 | 28:23 29:4 30:22 | **milonas** 23:15,20 | 44:10 45:20,21 |
| 15:1 16:1 17:1 | 31:3 67:24 68:4 | 29:16 37:3 | 55:11 63:2 64:8,9 |
| 18:1 19:1 20:1 | 72:16 | **minute** 34:16,17 | 66:7,7 75:19 |
| 21:1 22:1 23:1 | **marker** 72:24 | 46:21 50:5 73:12 | 81:11 |
| 24:1 25:1 26:1 | 73:12 74:13 | **minutes** 22:8,8,12 | **needed** 62:17 |
| 27:1 28:1 29:1 | **marriage** 84:15 | 22:12,14 29:9 | 65:13,13 71:2,13 |
| 30:1 31:1 32:1 | **matter** 4:20 79:14 | 31:4 46:10,11,13 | 71:22 72:6 82:4 |
| 33:1 34:1 35:1 | 79:17 84:17 | 46:25 47:2 48:15 | **needs** 63:20 64:13 |
| 36:1 37:1 38:1 | **mean** 7:18 16:2,24 | 51:18 52:18 53:21 | 64:21 65:2,18,25 |
| 39:1 40:1 41:1 | 17:12 24:9 39:3 | 54:4,13,21 55:24 | 76:21 80:15,23 |
| 42:1 43:1 44:1 | 40:3,9 41:2 52:10 | 55:25 56:6,11,16 | **new** 1:1,6,21 2:4,4 |
| 45:1 46:1 47:1 | 76:6 | 57:2,19,20 58:4,4 | 2:7,8,8 4:3,14,22 |
| 48:1 49:1 50:1 | **means** 24:10 40:10 | 62:25 | 66:24 84:3,7 85:1 |
| 51:1 52:1 53:1 | 41:10,10 60:14 | **moment** 71:7 | 85:2 |
| 54:1 55:1 56:1 | 61:10 | 74:25 | **nicole** 23:15,19 |
| 57:1 58:1 59:1 | **medical** 17:6 | **month** 12:23 | 29:16 37:3 48:22 |
| 60:1 61:1 62:1 | 18:11 19:9 44:25 | 13:16 | 48:25 50:6 51:6 |
| 63:1 64:1 65:1 | 45:16,23 52:13 | **months** 13:14,17 | 51:19,25 56:17 |
| 66:1 67:1 68:1 | 62:3,10,22 63:20 | 14:10 | 60:16 72:17 |
| 69:1 70:1 71:1 | 64:9,14 65:7,10 | **morning** 4:15 8:14 | **night** 58:5,8,17 |
| 72:1 73:1 74:1 | 66:5,7,14 76:19,25 | 21:20,22 73:8,17 | 60:17 |
| 75:1 76:1 77:1 | 79:2,8,9,15,18 | 74:21 | **nine** 29:25 30:5 |
| 78:1 79:1 80:1 | 80:6,14,17,20 | **move** 20:3 | 48:19 |
| 81:1 82:1 | **medications** 8:22 | **moved** 14:10 | **nods** 6:14 |
| **ma'am** 53:15 | 9:3 45:24 | | |
| **making** 17:7,17 | | | |
| 37:13,14 77:4,19 | | | |

Case 23-24, Document 32, 04/19/2023, 3501832, Page218 of 306
**[JA-1078]**

**non** 1:17
**normal** 39:17
**notary** 1:20 3:13
4:3 82:23 84:6
85:25
**note** 72:5
**november** 84:19
**number** 5:15 6:8
15:8 67:14 68:18
68:20 69:7
**numbers** 52:12
**nypd** 63:21

**o**

**oath** 8:14,17
**objection** 30:6
34:21 39:4 47:10
52:22 62:4,11
63:25 65:6 66:2
**objections** 3:8
**observation** 78:6
**observe** 58:5,8
**observed** 5:3 58:3
58:10
**obtain** 59:19
**occurred** 9:21
10:3 58:22
**october** 1:12
**officer** 57:11,21
63:9 67:2 74:14
74:17
**officers** 1:7 5:6
31:4 49:21 50:12
50:15,19,24 51:4
51:10 59:5 63:6
64:7,15 67:3
**official** 1:7,8
**okay** 4:23 5:14
6:19,25 21:15
24:5 26:17 28:20
29:7 30:8,11,19
36:14 50:3 61:2

63:3 72:11,22
**old** 9:14,15 36:3,8
**once** 7:5,15
**op** 70:8
**open** 56:4
**opinion** 47:7 65:20
**order** 45:20
**oriented** 40:2,6
**outcome** 84:16
**outside** 75:19
**overnight** 21:15
21:17
**overtime** 23:11

**p**

**p** 2:1,1 4:1
**p.m.** 82:13
**p.o.** 1:6
**page** 68:15,16,22
69:5,18 70:22
71:7 72:5 83:4,9
83:16,21 85:5
**paper** 25:16 37:17
49:5 50:8 51:20
**paperwork** 22:17
24:2 25:24 26:2,8
26:10 36:23 40:6
41:4,24 52:5,6
61:15 62:15 69:16
70:16
**park** 25:3,5,8
**part** 18:22,22 24:8
31:5 39:25 41:15
52:9 60:2 64:10
68:22 79:2
**parties** 3:4 84:14
**partner** 23:4,5,7,8
23:13 29:14,15
32:25 36:23 37:3
38:11 42:14 48:25
50:7 51:5 60:12
69:25 72:17 73:6

74:6,7
**party** 1:17
**patient** 16:14,16
18:10 19:2 33:19
33:19,20,21 34:4,5
34:6,7 35:3,5
38:21 39:15,16,21
40:2,5,12,14 41:4
41:15,17,20 43:2,8
43:18 45:22 53:10
53:13,16 55:19
56:8 59:16 60:2
60:25 61:11,13
62:2,9,14,16 64:3
64:4,8,21 65:8,10
66:6,8 70:12 71:8
71:17 75:16,20,23
75:24,25 76:4,21
81:24 82:8
**patient's** 37:19
39:14,16 59:15
79:8,9
**patients** 18:20,21
42:17 76:8
**patrol** 63:13
**pause** 29:22 56:15
**paused** 52:18
72:23 74:12
**pausing** 29:11
**pd** 19:4 43:23
44:14,16 59:17
64:20 71:5
**pending** 7:5
**people** 5:20 11:19
12:10 15:12,19,22
16:3 17:5 18:8
19:8,9 53:8 74:4
78:14,17
**percent** 16:5 52:3
**periods** 40:8

**person** 6:2 17:10
23:16 29:12 34:6
34:10,20,25 47:8
47:23 48:6 51:20
57:7,16 60:13
64:16 65:2,25
66:11 78:6,10,14
78:15,15 80:25
**person's** 45:10
**personally** 18:19
41:11 44:3
**persons** 17:4
**phone** 52:12 68:8
68:9
**physically** 64:19
**piece** 46:7
**place** 45:23
**placed** 80:25
**plaintiff** 1:3,18 2:3
4:17,19 31:24
40:21 44:25 50:19
50:24 51:5,10
52:19,24 57:21
59:4,19 60:8
72:16 83:3
**plaintiff's** 21:5
28:24 30:23 31:16
45:3
**play** 30:9 31:5
49:24 51:14 53:20
72:20 74:11
**please** 4:8,11 6:21
20:24 21:3 28:22
30:21 67:22 70:7
71:8
**point** 17:20 50:12
50:15,17 54:8,11
54:18 56:5,20
**points** 40:14
**poisoning** 47:9,17
48:2,10

[police - remember] Page 9

**police** 1:7 5:5
16:24 19:5 31:3
43:25 44:3,6,9,11
44:13,17,20 46:7
48:14,18 49:11,18
49:21 50:18,23
51:9 57:11 59:5
59:24 64:5,7,15,17
64:25 65:4,15,23
67:3 71:22 74:14
74:17 81:2,6,18
**portions** 74:3
**position** 14:19,21
14:24
**positive** 40:25
59:14
**pounds** 9:24
**practice** 22:6
44:10
**present** 2:11
**presently** 1:8
**presumed** 6:23
**pretty** 5:12 9:22
**prior** 7:23 11:7
12:3 13:24 21:24
**proceeding** 6:9,11
7:20
**proceedings** 8:19
**profanities** 43:15
**professional** 66:6
**program** 5:21,23
13:9
**protection** 76:4
**provided** 37:8
**pt** 70:8
**public** 1:20 3:13
4:3 82:23 84:6
85:25
**punch** 77:22
**purpose** 37:12,14
55:8

**pursuant** 1:18
**put** 9:12 24:3
52:21 53:7,10,14
53:17 54:25 57:23
81:12,12
**putting** 44:8

**q**

**qualifies** 47:24
**question** 3:9 5:16
5:17 6:6,23,24 7:5
7:6,7,22 11:12,20
15:7 46:2 65:19
78:20,23
**questioning** 43:3,6
**questions** 6:21
26:14 31:12 40:4
48:16 51:16 63:2
66:16,17 74:23
82:11
**quick** 7:2 62:24
**quickly** 73:20

**r**

**r** 2:1 4:1,1 84:1
**radio** 26:24,25
67:6
**radios** 22:18
**radius** 24:25
**read** 27:25 36:12
36:15
**reading** 36:13
**reads** 68:23
**ready** 56:7,9
**really** 24:5,24 26:6
35:23 45:25
**reason** 5:18 9:6
61:10 65:22 79:5
85:5
**reasoning** 61:14
**recall** 22:5 25:17
26:6 27:10,21

28:2 31:12,18
32:13,16,22 33:17
34:2 36:18 37:10
39:12,19,23 42:7
42:15,23 43:7,21
44:23 45:6 49:6,7
49:22,23 50:13,16
50:21 51:2,7,12
59:6,8,10,25 70:17
81:16
**received** 67:10
**recertify** 13:20
**recognize** 29:12
54:4 63:7,9,10
**recollect** 57:17
58:14,16,19 59:21
59:23 61:7,21
**recollection** 21:12
25:19 28:18 30:12
30:15,18 31:6,8
35:10 42:2,5 43:4
46:16 47:3 48:6
49:17 51:24 54:17
54:20 57:12 59:4
59:18 61:6,17
62:21 75:6,9
81:13,20,23 82:3,7
**record** 4:9,12 5:7
6:18 9:13 31:2
33:6,7,9 46:19
54:3 68:14 84:11
**recorded** 6:10
73:3
**recording** 6:10
73:14
**red** 55:6
**reentered** 56:21
**refer** 69:14
**referring** 5:9
**refers** 39:11 68:12
70:10

**refresh** 25:19,22
26:10,14 27:23
28:18 31:8 36:16
**refreshes** 21:12
29:5 30:17 31:6
35:9
**refuse** 17:5,9
18:13 19:9 20:4,6
62:3,10,22 63:19
64:14 76:25 80:20
**refusing** 18:11
44:25
**regarding** 15:18
17:5 26:7 28:3
32:13 36:19 42:8
42:12,16,24 43:17
43:22 51:3,13
55:15 59:7,11
61:8,22 64:6
70:18
**region** 59:16
**regular** 23:5,7,8
23:13
**regularly** 23:19
**relaid** 71:10
**related** 11:13
80:17 84:14
**relationship** 63:15
**remember** 26:3,15
28:11,13 31:13,21
31:22,23 32:4,6,10
32:12,14 33:4,7
39:10,18,20 40:21
40:24 41:8,12,14
41:19,21 42:9,11
42:13,18,20 43:14
43:16,20,24 44:4,5
44:7,19,22,24 45:2
45:3 48:17 49:13
49:14 50:22 51:22
54:7,9,11 55:12,14

56:22 59:4 60:9
61:19 62:13,19
75:3 78:23
**removes** 64:16
**repeatedly** 75:5
**rephrase** 6:22
**report** 21:4,10
25:18 27:23 35:8
35:11,14,21 36:5
36:11,21,22,25
37:4,9,11,13,15,22
37:23 38:12,16,18
38:21,22 39:11
40:11 43:2 47:7
51:16 52:7,10
53:3 55:17,22
59:13 61:23 62:8
83:5
**reporter** 4:21 21:7
29:2 30:25 68:2
**reporting** 85:1
**reports** 37:25 38:5
38:8
**represent** 66:25
**representing** 4:19
**represents** 4:21
**requested** 44:18
71:13 83:20
**reserved** 3:9
**resisting** 59:8,16
59:23
**respect** 48:9
**respective** 3:3
**respond** 25:14
27:5,6
**responded** 15:5,11
25:20
**responding** 26:3
**responsibility**
76:18 77:16

**responsible** 78:13
**rest** 30:9
**restrain** 18:20
**retained** 83:12
**retake** 13:19
**retook** 13:22
**review** 47:6 62:7
**reviewed** 26:9
61:24,25 81:14
**richmond** 84:4
**riding** 60:10
**right** 11:6 25:22
29:13 38:14 46:22
49:3 50:8 54:14
54:23 56:15,18
59:14,15,20 66:16
67:6 68:16 72:18
73:24 74:8,21
75:7,8 76:25
77:20 79:2,6
**rmp** 70:8,21 71:2
71:8 72:6 81:19
82:3
**rockaway** 4:13
**role** 22:20
**room** 35:4
**rules** 5:11 7:9
**runs** 19:13

---
**s**
---

**s** 2:1 4:1,1 83:1
85:5
**safety** 45:11
**saw** 31:14 44:2
55:24 57:23 63:6
72:10 74:19
**saying** 16:8,10
34:10,13 39:18
40:16 45:4 60:15
71:22
**says** 23:25 24:6,8
25:16,21,23,24

35:24,25 36:7,24
38:24,25 39:6,14
39:25 40:8,25
41:4,15,23 43:2,8
43:18,23 59:14
60:2,25 61:9,12
68:19 69:10,13,21
70:7 71:7 72:6
73:4
**scene** 43:24,25
64:15 66:14 69:21
71:14,19 76:18
**schapira** 1:17 4:10
4:15 5:1 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1,18 85:3
85:21

**school** 11:5 13:11
**science** 10:20
**screen** 21:11 24:3
49:4 56:18 57:8
57:10 73:2
**scroll** 69:19
**sealing** 3:4
**second** 20:15
21:11 28:19 32:23
33:13,14,23 35:8
38:23 43:2 46:5
48:13 55:23 72:23
73:12 74:13
**seconds** 29:9,11,25
30:5 31:4 33:13
33:15,24,25 34:16
34:17 46:10,11,13
46:22 47:2,2
48:16,19 49:10,10
49:13 50:5 51:18
52:2,19 53:21
54:4,13,22 55:25
55:25 56:7,11,16
57:2,20 58:5
72:21,25 74:12
**section** 36:11
52:21 53:2 61:3
**see** 24:2,5,7 28:15
29:19,21,23 30:3
30:17 31:5 32:20
35:3,12 36:4,9
46:10,12,22 48:7
48:20,21,22 49:12
49:25 50:5 52:3
53:5,22 56:23
57:20,24 58:11,14
58:25 60:24 62:25
67:13,18 68:4,10
68:16,24 69:7,11
69:21 70:5,8,20,24
72:12,25 73:13,20

[see - tell]                                                                    Page 11

| | | | |
|---|---|---|---|
| 74:4,5,14 | **simply** 17:21 | **stamped** 70:5 | **suite** 2:4 |
| **seeing** 31:7 47:22 | **singh** 1:2 4:20 | **standing** 20:14 | **supervisor** 22:21 |
| 58:14 | 31:24 32:15 36:7 | 34:3 51:20 | **supposed** 9:4 |
| **seeking** 80:6 | 85:2 | **stands** 46:23 47:4 | 16:22 |
| **seen** 34:17 74:3,18 | **sit** 26:5 75:21 | **start** 5:17 6:5 14:6 | **sure** 6:13 9:22 |
| **semi** 40:25 | **sitting** 33:20,21 | 14:15 22:19,22 | 14:8 22:3,4,25 |
| **send** 27:2 67:9,11 | 34:6 | 68:16,17 | 23:9 34:5 35:2,6 |
| 70:7,21 71:8 | **six** 12:23 13:16,17 | **started** 4:16 5:11 | 38:7 71:3 |
| **sends** 26:22,23 | 14:10 | 28:9 | **sustained** 59:16 |
| **sense** 11:15 | **skills** 16:12 | **starts** 22:15 | **switch** 35:7 48:12 |
| **sent** 27:3 71:3,5 | **skip** 73:10 | **state** 1:21 4:3,8,11 | 59:12 |
| **set** 75:18 76:5 | **small** 46:7 | 37:24 41:16,17,20 | **sworn** 3:14 4:2 |
| 84:10,19 | **somebody** 8:7 | 84:3,7 | 82:20 84:10 85:22 |
| **seven** 15:18 | 17:23 19:15,22 | **states** 1:1 39:14,16 | **symptoms** 47:16 |
| **shakes** 46:23 | 20:7 27:14 45:8 | **stating** 39:21 | 47:24,25 48:8 |
| **share** 21:11 | 53:17 64:13 65:16 | **status** 40:13 45:25 | |
| **sheet** 85:1 | 65:17 80:19,23 | 77:15 | **t** |
| **shift** 20:15 21:16 | **son** 39:15 | **stay** 17:18 | |
| 21:17,19,25 22:7 | **soon** 38:14 | **steady** 41:2,6 76:3 | **t** 83:1 84:1,1 |
| 22:13,15,22 | **sorry** 46:17 | 77:13 | **tablet** 22:18 52:4 |
| **shifts** 23:10 | **sound** 29:10 | **stipulated** 3:2,7,11 | **take** 5:25 6:7,25 |
| **short** 46:8 63:4 | **speak** 6:10 18:5 | **stipulations** 3:1 | 7:2,8 8:15,17 9:2 |
| **shot** 29:18 | 33:18 | **stop** 32:23 34:15 | 9:4 12:24 13:3,6 |
| **shoulder** 55:6 | **speaking** 22:10 | 49:9 50:4 56:25 | 13:18 46:8 52:12 |
| **show** 21:8 28:17 | 27:12 31:21 32:4 | **stopping** 54:21 | 57:21 62:24 63:22 |
| 29:3 30:16 32:17 | 34:4,19 45:7 | **straight** 35:19 | 63:22 65:8,10 |
| 46:5 68:3 | 50:12,14 57:17 | 38:9 | 77:16 79:6,25 |
| **showed** 81:9 | 63:18 | **straightforward** | 80:4 |
| **showing** 25:18 | **specific** 13:9 62:14 | 5:12 | **taken** 1:18 8:22 |
| 26:8 | 65:21 | **stream** 4:14 | 63:5 |
| **shown** 34:8 | **specifically** 40:20 | **street** 2:4,8 63:13 | **talk** 19:12,16 20:3 |
| **side** 49:3 50:8 | 41:7 44:8 63:14 | **striking** 59:5 | 29:5 47:20 |
| 56:18 59:14,20 | **specifics** 27:20 | **struck** 82:8 | **talking** 5:20 6:2,2 |
| **sign** 61:9,12,17 | **spending** 66:22 | **study** 10:18 | 6:3 19:7 34:24 |
| **signature** 36:24 | **spoke** 49:21 57:16 | **stuff** 22:18 56:9 | 40:12 52:7 |
| 37:5,6 60:12 | **ss** 84:3 | **subpoena** 1:19 | **taught** 16:13 |
| 84:21 | **stair** 76:7 | **subscribed** 82:20 | 18:16 |
| **signed** 3:12,14 | **stairs** 20:13 75:21 | 85:22 | **tax** 1:6 |
| 60:16 | 76:8 77:23 | **sued** 5:2 | **tell** 6:16,21 8:18 |
| **simple** 5:13 46:2 | **stamp** 68:22 72:24 | **suffering** 47:9 | 9:16 15:8 20:24 |
| | 73:2,13 74:20 | 48:7 | 27:10,13 30:4 |
| | | | 35:4 37:7 47:13 |
| | | | 48:4 50:18,23 |

[tell - videos]                                                                    Page 12

| | | | |
|---|---|---|---|
| 51:4,9,22 53:25 62:18 64:7 | **time** 1:13 3:9 5:20 6:2,3 7:23 13:21 | **truck** 22:24 23:2 | **united** 1:1 |
| **telling** 45:14 78:9 | 21:25 22:4,11 | **true** 1:8 84:11 | **unknown** 1:9 |
| **temporal** 59:15 | 25:13 30:3 35:18 | **truth** 8:18 | **unsteady** 47:18 |
| **terminal** 79:16 | 40:18 45:22 59:13 | **truthfully** 8:24 9:8 | **use** 7:3 18:17,19 |
| **terms** 16:13 22:7 | 65:14 66:22 68:17 | **try** 33:5 51:17 | 18:21 55:18 76:8 |
| **testified** 4:4 7:11 | 68:20,22 70:5 | **trying** 33:6,18 | **usually** 19:3 21:18 |
| 7:14,24 74:24 | 72:24,25 73:13 | 40:12 41:5 56:4 | 22:11 23:6 27:9 |
| 75:5 76:17 80:13 | 74:20 76:13 82:12 | 64:11 | 38:5 64:22 75:16 |
| **testify** 8:23 9:8 | **times** 7:13 14:9 | **tub** 77:24 | 75:17,22 76:3 |
| **testifying** 8:10 | 17:8,11 40:10 | **turn** 57:24 | |
| **testimony** 7:16,24 | 67:17 | **two** 5:20 6:8 13:19 | **v** |
| 84:12 | **today** 5:2,25 8:11 | 38:10 69:5,18 | |
| **thank** 66:21 82:11 | 8:24 9:8 74:3 | 71:7 | **v** 85:2 |
| **thing** 43:23 52:11 | 82:12 | **type** 22:20 38:12 | **valley** 4:13 |
| **things** 33:5 44:12 | **told** 27:4,19,24 | 68:23 | **vargas** 1:20 4:20 |
| 44:15,16 52:14 | 45:8 53:6 82:7 | **types** 11:10,18 | 5:23 6:6 84:6,22 |
| 55:10 | **tough** 15:7 | 16:14 | **verbal** 6:13 |
| **think** 9:7 15:5 | **tour** 20:21,23 | **typically** 79:4 | **verbally** 6:16 |
| 30:6 46:9 47:23 | 21:12 | | **veritext** 85:1 |
| 48:24 65:2,20 | **towel** 49:5 | **u** | **versa** 6:4 |
| 76:12,15 80:9 | **towels** 50:9 51:21 | | **vice** 6:3 |
| **thinks** 65:4 | **training** 11:17 | **un** 70:8 | **video** 6:8,9 28:16 |
| **third** 25:15 | 12:18,21,24 13:2 | **unable** 18:4,5,5 | 28:17,22,23 29:4,8 |
| **thirty** 60:3,5 | 13:12 15:21,24 | 19:9 61:9,17 62:2 | 29:8,12 30:2,6,10 |
| **thousands** 15:9,10 | 17:5 47:15 | 77:13 | 30:17,21,22 31:2,3 |
| 26:4 | **transcript** 6:12 | **unconscious** 18:12 | 31:7,14 32:3,18,20 |
| **threat** 17:19,23 | **transferred** 60:4 | 18:13,14 20:5,8 | 32:21,23 33:13,15 |
| 18:6 19:19 20:10 | **transport** 45:13 | **uncooperative** | 33:17 34:3,8,10,18 |
| 45:10 77:6,11,20 | 64:4 | 70:12 71:8,18 | 34:23 35:2,12,17 |
| 78:4,12,16 79:12 | **transportation** | 81:24 | 36:9 44:2 46:5,7 |
| 79:19 | 37:20 | **underneath** 69:13 | 47:7,11,22,24 48:4 |
| **threaten** 53:10 | **transported** 60:3 | **understand** 6:20 | 48:7,14,19 49:11 |
| **threatened** 42:10 | 60:9,21,22 62:16 | 7:8,21 8:13 16:9 | 49:12,24,25 50:6 |
| 42:14 50:19 51:5 | 62:17 | 32:21 33:8 64:10 | 51:15,16,21 53:21 |
| 51:10 | **trauma** 55:7,9 | **understanding** | 53:22 54:14,23 |
| **three** 17:8,11 25:2 | **treat** 16:6 | 16:7 | 56:4,6,24 57:22 |
| 70:23 72:5,23,25 | **treatment** 37:19 | **understood** 6:24 | 58:4,15,20,23 |
| 74:4,8 | 64:14 | **unit** 20:25 21:13 | 61:24 62:8 63:7 |
| **threw** 57:25 | **trial** 1:16 3:10 | 24:7 38:24,25 | 72:13,17,24 73:3,8 |
| | | 43:3 69:11,13,14 | 73:12,16,23 74:3 |
| | | 69:17,21 70:14 | 74:13,20 83:6,7 |
| | | 71:10,13 | **videos** 29:10 48:12 |
| | | | 72:9 |

[viewed - zoom]                                                          Page 13

| | | |
|---|---|---|
| **viewed** 33:12 | **witnesses'** 85:3 | **z** |
| **virtual** 1:19 | **woke** 39:15 | |
| **vocational** 11:5 | **woman** 57:3,5,10 | **zoom** 1:19 2:5,9 |
| **w** | **work** 13:25 14:12 | 2:11 5:19 |
| | 22:2 23:5,19 52:5 | |
| **wait** 5:16 24:17,21 | 66:4 | |
| 25:6,10 28:16 | **worked** 14:9 76:13 | |
| **waived** 3:6 | **working** 14:6,15 | |
| **walk** 18:4 19:11 | 20:18 21:13 22:19 | |
| 19:16 20:3 38:23 | 23:17 24:16 28:7 | |
| 47:19 74:25 77:13 | **wounds** 13:4 | |
| **walked** 33:2 58:25 | **wrapped** 51:17 | |
| **want** 5:3,10 26:5 | **write** 38:11,12,13 | |
| 33:3 46:5 48:12 | 38:18 53:5 | |
| 51:21 68:3,21 | **writing** 53:4 67:10 | |
| 69:5 72:9 75:21 | **written** 6:12 38:6 | |
| **watch** 46:6 48:13 | 38:16 | |
| 51:21 55:23 | **wrong** 17:17 | |
| **watched** 57:19 | **x** | |
| 73:23 | | |
| **watching** 46:24 | **x** 1:2,10 40:2 83:1 | |
| **water** 7:4 | 83:14 | |
| **wave** 77:19 | **xx** 9:11,11 | |
| **way** 43:10,11 53:5 | **y** | |
| 71:16 74:7 77:9 | | |
| 84:16 | **yeah** 14:23 15:13 | |
| **we've** 34:16 68:3 | 15:23 29:20 46:24 | |
| **wear** 10:10 | 54:6,16,24 56:14 | |
| **week** 38:10 | 68:25 74:19 | |
| **weight** 9:23 10:2 | **year** 9:12 12:25 | |
| **went** 43:13 75:10 | 13:23 | |
| 81:10 | **years** 9:15 13:19 | |
| **whatsoever** 30:15 | 36:2,8 | |
| **whereof** 84:18 | **yelling** 42:4,6 | |
| **wife** 32:4,8 39:14 | 43:15 | |
| 39:16,18,20 45:4 | **york** 1:1,6,21 2:4 | |
| 51:11,11 52:25 | 2:4,7,8,8 4:4,14,22 | |
| **wish** 42:16 | 66:24 84:3,7 85:1 | |
| **witness** 1:17 4:2 | 85:2 | |
| 8:10 11:16 82:14 | | |
| 84:9,12,18 | | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

```
                    VERITEXT LEGAL SOLUTIONS
              COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

        Veritext Legal Solutions represents that the
        foregoing transcript is a true, correct and complete
        transcript of the colloquies, questions and answers
        as submitted by the court reporter. Veritext Legal
        Solutions further represents that the attached
        exhibits, if any, are true, correct and complete
        documents as submitted by the court reporter and/or
        attorneys in relation to this deposition and that
        the documents were processed in accordance with
        our litigation support and production standards.

        Veritext Legal Solutions is committed to maintaining
        the confidentiality of client and witness information,
        in accordance with the regulations promulgated under
        the Health Insurance Portability and Accountability
        Act (HIPAA), as amended with respect to protected
        health information and the Gramm-Leach-Bliley Act, as
        amended, with respect to Personally Identifiable
        Information (PII). Physical transcripts and exhibits
        are managed under strict facility and personnel access
        controls. Electronic files of documents are stored
        in encrypted form and are transmitted in an encrypted
        fashion to authenticated parties who are permitted to
        access the material. Our data is hosted in a Tier 4
        SSAE 16 certified facility.

        Veritext Legal Solutions complies with all federal and
        State regulations with respect to the provision of
        court reporting services, and maintains its neutrality
        and independence regardless of relationship or the
        financial outcome of any litigation. Veritext requires
        adherence to the foregoing professional and ethical
        standards from all of its subcontractors in their
        independent contractor agreements.

        Inquiries about Veritext Legal Solutions'
        confidentiality and security policies and practices
        should be directed to Veritext's Client Services
        Associates indicated on the cover of this document or
        at www.veritext.com.
```

```
                                                        Page 1
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   -----------------------------------------X
     BALWINDER SINGH,
 3

                                    PLAINTIFF,
 4
 5              -against-       Case No.:
                               19-cv-632(NGG)(ST)
 6
 7   THE CITY OF NEW YORK, et al.,
 8                                  DEFENDANTS.
     -----------------------------------------X
 9
10                   DATE: December 3, 2020
11                   TIME: 1:09 p.m.
12
13
14              VIDEO-CONFERENCE DEPOSITION of a NON-PARTY
15   witness, AMANDEEP KAUR, taken by the Defendants, pursuant
16   to a Subpoena and to the Federal Rules of Civil Procedure,
17   held at the above date and time, before Rose Marie
18   Iacobellis, a Notary Public of the State of New York.
19
20
21
22
23
24
25
```

```
                                                      Page 2
 1    A P P E A R A N C E S:

 2

 3    COHEN & FITCH, PLLC
              Attorneys for the Plaintiff
 4            BALWINDER SINGH
              110 East 59th Street, Suite 3200
 5            New York, New York 10022
              BY: GERALD M. COHEN, ESQ.
 6            File #: N/A

 7

 8    JAMES E. JOHNSON, ESQ.
      CORPORATION COUNSEL
 9    NEW YORK CITY LAW DEPARTMENT
              Attorney for the Defendants
10            THE CITY OF NEW YORK, et al.
              100 Church Street
11            New York, New York 10007
              BY: HANNAH V. FADDIS, ESQ.
12            File #: 2019-008905
              Control #: 20-2329
13            hfaddis@lawa.nyc.gov

14

      ALSO PRESENT:
15

                  MOBEEN SOHAIL
16                Punjabi Interpreter
                  Geneva Worldwide, Inc.

17

18
                  *           *           *
19

20

21

22

23

24

25
```

```
                                                        Page 3
 1            F E D E R A L   S T I P U L A T I O N S

 2

 3

 4          IT IS HEREBY STIPULATED AND AGREED by and between

 5      the counsel for the respective parties herein that the

 6      sealing, filing and certification of the within deposition

 7      be waived; that the original of the deposition may be

 8      signed and sworn to by the witness before anyone authorized

 9      to administer an oath, with the same effect as if signed

10      before a Judge of the Court; that an unsigned copy of the

11      deposition may be used with the same force and effect as if

12      signed by the witness, 30 days after service of the

13      original & 1 copy of same upon counsel for the witness.

14

15          IT IS FURTHER STIPULATED AND AGREED that all

16      objections except as to form, are reserved to the time of

17      trial.

18

19                  *     *     *     *

20

21

22

23

24

25
```

A. KAUR

Page 4

1   M O B E E N   S O H A I L, a Punjabi interpreter, solemnly

2   swore to translate the following questions from English to

3   Punjabi and answers from Punjabi to English:

4

5   A M A N D E E P   K A U R, called as a witness, having

6   been first duly sworn by a Notary Public of the State of

7   New York, was examined and testified as follows:

8   EXAMINATION BY.

9   MS. FADDIS:

10      Q.    Please state your name for the record.

11      A.    Amandeep Kaur.

12      Q.    What is your address?

13      A.    130-18 Atlantic Avenue, 3rd floor, South Richmond

14   Hill, New York 11419.

15      Q.    Good afternoon, Ms. Kaur.

16      A.    Good afternoon.

17      Q.    My name is Hannah Faddis, I'm an attorney with

18   the New York City Law Department, we represent the City of

19   New York and Officer Mandeep Cheema in a lawsuit that your

20   husband has brought.

21          So, I'm going to ask you some questions today

22   about that lawsuit, okay?

23      A.    All right.

24      Q.    So, the first -- before we get started, I'm going

25   to give you some ground rules.

A. KAUR

Page 5

```
 1        A.      All right.
 2        Q.      The first rule is I need a verbal response from
 3   you to any question that I ask.
 4        A.      All right.
 5        Q.      And you understand that you've taken an oath to
 6   tell the truth today, correct?
 7        A.      Yes, correct, I understand.
 8        Q.      You understand that that oath has the same
 9   importance and seriousness here as it does in court, right?
10        A.      Yes, I will tell the truth.
11        Q.      And I'm going to ask that before you answer any
12   of my questions, you listen to the entire question, okay?
13        A.      All right.
14        Q.      Also, I'm also going to ask, because we do have
15   the services of an interpreter here, that you wait until
16   Mr. Sohail has finished interpreting the entire question
17   before you begin to answer even if you understand some of
18   the question in English, okay?
19        A.      All right.
20        Q.      If you do not understand a question that I ask,
21   please tell me, okay?
22        A.      All right.
23        Q.      If you do answer a question, I will assume that
24   you've heard it and understood it, okay?
25        A.      All right.
```

A. KAUR

Page 6

1      Q.      At any time during this deposition, if you need

2  to correct a mistake you made in a previous answer, you can

3  do that, just let me know, okay?

4      A.      All right.

5      Q.      Any time you feel that you need to take a break,

6  just to rest, get a drink of water, use the restroom,

7  anything, that's fine.  But please answer any question I

8  asked before you ask for a break, okay?

9      A.      All right.

10     Q.      After the deposition, there will be a written

11 transcript made of the deposition, and you will be provided

12 with a copy, okay?

13     A.      All right.

14     Q.      You will have the chance to review that

15 transcript and make any changes you need to you at that

16 point, okay?

17     A.      All right.

18     Q.      If you do make any changes to the transcript, I

19 would be able to comment on those changes if this case went

20 to trial in court; do you understand?

21     A.      All right.

22     Q.      Thank you.

23            Is there any reason that you cannot testify

24 truthfully, accurately and fully today?

25     A.      No.

Case 23-24, Document 32, 04/19/2023, 3501832, Page232 of 306
**[JA-1092]**

A. KAUR

Page 7

1    Q.    Do you have any condition that impairs your

2    memory?

3    A.    No.

4    Q.    Have you taken any medications or drugs in the

5    last 24 hours?

6    A.    No.

7    Q.    Have you failed to take any medication that you

8    do normally take in the last 24 hours?

9    A.    There was one medicine that I have, I take by a

10   prescription of the doctor, empty stomach, but I stopped

11   that in the last four or five days.

12   Q.    And is the fact that you're not taking that

13   medication going to affect your ability to testify today?

14   A.    No, I don't think so, because the doctor told me

15   that medicine is on as-needed basis, that medicine is

16   basically for acidity in the stomach and that has nothing

17   to do with the testimony.

18   Q.    Okay.  Thank you.

19         Have you had any alcoholic beverages in the last

20   24 hours?

21   A.    I do not drink, I never drink in my life.

22   Q.    Ms. Kaur, is Amandeep Kaur your full name?

23   A.    Yes.

24   Q.    Do you have any middle names or other names that

25   you use?

A. KAUR

```
                                                      Page 8
 1      A.      No, Amandeep is my name.

 2      Q.      Have you ever legally changed your name?

 3      A.      No.

 4      Q.      Have you ever gone by any other name?

 5      A.      My parents, when I was little, used to call me

 6   Bobby and -- but, you know, that's just in the house,

 7   nothing -- it has nothing to do with my official name.

 8      Q.      Okay.

 9              Ms. Kaur, how old are you?

10      A.      I was born in '83, so I'm 37.

11      Q.      And the address you gave on Atlantic Avenue at

12   the beginning of the deposition, how long have you lived

13   there?

14      A.      Actually, I arrived over here in September of

15   2017, but my husband and his family has been residing over

16   here for quite a while.

17      Q.      When you say you arrived in 2017, where did you

18   arrive from?

19      A.      From India.

20      Q.      Before 2017, had you lived in India your whole

21   life?

22      A.      Yes.

23      Q.      And when you first arrived to the United States

24   in 2017, you first lived at the address on Atlantic Avenue?

25      A.      Yes.
```

A. KAUR

Page 9

1      Q.      Have you ever lived at any other address in the

2   United States?

3      A.      No, never.

4      Q.      When you first arrived --

5              MS. FADDIS:  Withdrawn.

6      Q.      When you first began living at the address on

7   Atlantic Avenue in 2017, who was living there?

8      A.      It was my husband, my father-in-law, and then

9   there was one cousin, my husband's cousin used to live over

10  here, but he relocated, he moved after one or one and a

11  half months, he relocated.

12     Q.      And who was living in the apartment in February

13  of 2018?

14     A.      It was me, my husband, my father-in-law, who was

15  in India at that time, and my son.

16     Q.      And who lives there now?

17     A.      Sorry?  Are you talking about right now?

18     Q.      As of today, who lives in the apartment?

19     A.      It's me, my husband, my two kids.  But my

20  father-in-law is also here, but he mostly is in India.  But

21  whenever he visits the United States, he stays with us.

22     Q.      How long have you been married to Mr. Singh?

23     A.      I was married -- I got married in 2006.

24     Q.      Were you married in India or in the United States

25  or somewhere else?

A. KAUR

Page 10

1    A.     I was married in Thailand.

2    Q.     Before 2017, did you and Mr. Singh ever live

3    together?

4    A.     Yes.  We did reside in Thailand for a little

5    while when we got married.

6    Q.     How long was that for?

7    A.     I actually don't recall exact time frame, but

8    probably a month, but I don't recall the exact time frame.

9    Q.     And before you got married in 2006, how long had

10   you known Mr. Singh?

11   A.     I didn't knew him directly prior to marriage, it

12   was through one of my aunties, we got in contact with each

13   other and we started talking over the phone, and that's how

14   we started getting to know each other, and then we got

15   married.

16   Q.     So, when you first started speaking with him, was

17   he already living in the United States?

18   A.     Yes.

19   Q.     And was that in 2006 or before?

20   A.     No, it was 2006.

21   Q.     And you said you have two children?

22   A.     Yes.

23   Q.     How old are they now?

24   A.     My older kid is born in 2007 and my younger kid

25   is born in 2018.

A. KAUR

Page 11

1    Q.    Okay.

2          So, I want to talk about February 28th, 2018,

3    okay?

4    A.    All right, sure.

5    Q.    You were home that morning?

6    A.    Yes.

7    Q.    And had you been home all night leading into that

8    morning?

9    A.    Yes.

10   Q.    Do you know what time you went to bed the night

11   before?

12   A.    Probably 11:00, 11:30 p.m.

13   Q.    And do you remember who, if anyone, was in the

14   house with you when you went to sleep the night before?

15   A.    Talking about in the house or in the bedroom?

16   Q.    In the house.

17   A.    Yes, my elder son and my husband was in the

18   house.

19   Q.    And when you went to sleep, was your husband

20   still awake?

21   A.    Yes, he was awake.

22   Q.    Do you remember what he was doing when you went

23   to bed?

24   A.    Actually, he was in the living room and I was --

25   I went to my bedroom because I was pregnant at that time,

A. KAUR

Page 12

1   so usually I rest.  And so, I was resting and I fell asleep

2   and he was in the living room.

3        Q.     You said your younger child was born in 2018?

4        A.     Yes.

5        Q.     What month?

6        A.     July.  2nd, July.

7        Q.     And do you remember what your husband was doing

8   before you went to bed in the living room?

9        A.     He was on his phone, he was looking something on

10  his phone, I don't know what exactly what he was looking,

11  but he was on his phone.

12       Q.     Do you know if he'd gone to work that day?

13       A.     No, not that day.

14       Q.     And had he left the house at all that day?

15       A.     No, I don't think during the day, but, you know,

16  after I went to the room, I think he had a phone call

17  and -- from his friend, and then after the phone call, he

18  went outside.

19       Q.     Did you hear him take a phone call?

20       A.     Actually, I don't -- I have -- I did not heard

21  his voice, but I heard the ring of the phone, the ring tone

22  of the phone because my bedroom door was closed.

23       Q.     And did you hear anything else after you heard

24  the phone ring?

25       A.     Yeah, after that, I heard the main door open

A. KAUR

Page 13

1  because there's noise that the main door makes when

2  somebody opens and closes it.  So, I heard that, but I was

3  extremely tired, I didn't have the energy to get up and see

4  what happened, but I knew he went outside.

5      Q.    Do you remember what time you heard the phone

6  ring?

7      A.    No, I don't remember.

8      Q.    When you say the front door makes a noise, is it

9  like the door itself makes a noise or an alarm on the door

10 or something else?

11     A.    No, there's no alarm.  If you want, I can show

12 you the voice and I can have it, but there's no alarm on

13 the floor.

14     Q.    No, that's okay.  I'm just trying to understand

15 if you just mean like the door is heavy and makes a noise

16 or something like that or something else?

17     A.    Just as if -- if the door is actually old and

18 it's squeaking noise like, you know, when somebody closes

19 the door and there's squeaking noise, that's the noise the

20 door makes.

21     Q.    Understood, thank you.

22           Did you hear your husband come back after he went

23 out?

24     A.    No.  After that, I actually went to sleep, so I

25 cannot recall what time he came back.

A. KAUR

Page 14

1    Q.    When your husband was in the house before you

2    went to bed, had he been drinking at all?

3    A.    While I was awake, he wasn't drinking, I did not

4    see him drink.  So, after I went to sleep, what happened

5    after that, when he started drinking or not, I don't know.

6    Q.    At that time, did your husband ever keep alcohol

7    in the house?

8    A.    No, in my house since I'm here, never a day that

9    liquor entered the house.

10   Q.    Do you know a friend of your husband named Rupel

11   Singh?

12   A.    Yes, of course, I know Rupel Singh.

13   Q.    Who is Rupel Singh?

14   A.    I know him through my husband, he's one of my

15   husband's friends.

16   Q.    Do you know if your husband saw him that night?

17   A.    I found out later that he met with Rupel Singh,

18   but at that time, I had no clue what was going on, who he

19   was meeting or what happened.

20   Q.    After you fell asleep, when was the next time you

21   woke up that night?

22   A.    Actually, I was pregnant at that time, so I woke

23   up in the middle of the night, I wake up quite often

24   because like I said, I was pregnant, and I had to throw up

25   in the bathroom, I had to go to the kitchen.  So, I woke

A. KAUR

Page 15

1    up, I went to the bathroom, after that, I went to the

2    kitchen to drink some water.  And like I said, I don't

3    remember the exact time, I was not aware of any time at

4    that point, I was not feeling well.  So, I opened the tap

5    in the kitchen and from the faucet while I was drinking

6    water, I washed my hand and I took a napkin to wipe my

7    hand.  While I was throwing the napkin in the garbage, I

8    noticed that there were a couple of beer bottles by the

9    garbage, and I noticed that the beer was actually in the

10   house, in the kitchen and by the garbage, so somebody had

11   been drinking.  So, at that point, my husband was sitting

12   on the sofa, but I realized that somebody was drinking.

13        Q.    And you don't know what time that was?

14        A.    No, I don't because first, I just woke up in the

15   middle of the night, second, I was pregnant at that time, I

16   didn't feel well.

17        Q.    And when you said you saw beer bottles by the

18   garbage, how many bottles did you see?

19        A.    I think it's four.  Four.

20        Q.    Do you remember anything about those bottles, how

21   big they were, the color, anything like that?

22        A.    No, I don't recall.

23        Q.    Do you remember if they were empty, full,

24   something else?

25        A.    No, they were empty, they were empty by the

A. KAUR

Page 16

1    garbage.

2        Q.      And you said after you saw the bottles, then you

3    saw your husband sitting on the sofa?

4        A.      Yes, correct.

5        Q.      What did you do when you saw your husband sitting

6    on the sofa?

7        A.      I asked him -- I asked him that -- "Did you

8    brought liquor in the house, did you drink the beer?"

9        Q.      And what did he say?

10       A.      He said, "Yes, I bought it, I drink it."

11       Q.      And what happened next?

12       A.      I asked him that why -- why did you drink because

13   we have -- he has health problems, we have the same acid

14   problems, his acidity rises and liquor is not good for him.

15   So, I got a little upset, I said, hey, you know that I'm

16   pregnant and you have acidity problems and we both are not

17   well, and at this point you were drinking and who would

18   take care of you if something happens, because I also need

19   care.  So, I was upset at that point.

20       Q.      And what was your husband's response?

21       A.      He was acting funny at that point, he was

22   behaving very funny and he was saying that so what if I

23   drink, I'm not saying anything to you and, you know, I'm

24   not doing anything, and those responses, I was perceiving

25   those responses as if they were like so what, I can drink

A. KAUR

Page 17

1    more and I didn't want him to drink more, and that was the

2    response he was giving me.  Usually, that's not the right

3    response, the response should have been that -- I won't

4    drink it, but he was giving me -- he was acting funny and

5    he way saying that so what if I drink, you know, I'm not

6    doing anything against you.

7         Q.    When you say he was acting funny, what do you

8    mean by that?

9         A.    Childish, immature, that's what I mean and like,

10   you know -- like childish behavior.

11        Q.    Did he seem drunk?

12        A.    No, not at that point, no.

13        Q.    When you were speaking with him in the living

14   room, was he sitting down or standing up or something else?

15        A.    He was sitting on the sofa quite relaxed, you

16   know.

17        Q.    What was his tone of voice, was he quiet, was he

18   loud, something else?

19        A.    No.  Actually, he was actually afraid that I

20   found out, so he was afraid that my wife found out, so he

21   was hesitant to speak and he was hesitant to look me in the

22   eyes.  So, he was afraid, he was not angry.

23        Q.    Were you angry with him for drinking?

24        A.    I was concerned and angry at the same time, but I

25   was concerned for him that how can you look after me if you

A. KAUR

Page 18

1   can't even look after for yourself?

2       Q.      What was your concern for his health at that

3   paint?

4       A.      I was concerned because, you know, his acidity

5   level in his body is a lot, and because of drinking, it

6   raises that acidity level.  So, I was really concerned for

7   his health, and that's the only reason why I was concerned.

8       Q.      Had you ever known your husband to drink before

9   that day?

10      A.      No, this was the first time that he drink in

11  front of me.  In the past, I heard that liquor did cause a

12  lot of problems -- health problems, that, you know, this

13  caused vomiting, this caused a lot of acidity problems, his

14  immune system.  So, I heard that, but this was the first

15  time that he drink in front of me.

16      Q.      When you say you heard things before about his

17  drinking, previously or something else?

18      A.      No.  My mother-in-law basically, she passed away

19  in 2017, so my mother-in-law used to tell me that don't

20  ever let him drink because he has some health concerns and

21  that is caused by liquor English.  And even my husband,

22  Mr. Singh, he even told me numerous times that he did have

23  issues with drinking.  So, my mother-in-law always used to

24  tell me that he has these problems, so make sure that he

25  doesn't drink.

A. KAUR

                                                    Page 19

1       Q.      Did you know that he had a liver condition?

2       A.      No, I didn't' know before that his liver was --

3   he had a liver condition, but I knew that he had issues.

4       Q.      When you say you didn't know before, did you

5   learn at some point that he had a liver condition?

6       A.      I didn't knew about liver condition, I just knew

7   about the acidity in his system, I didn't knew anything

8   about a liver condition.

9       Q.      You said before that he was -- his behavior

10  seemed childish, how did it seem childish?

11      A.      For example, that, you know, I asked him that,

12  hey, did you drink?  And don't drink, I told you how many

13  times don't drink, and he would look at me and he would

14  say, oh, why don't you come sit next to me and, you know --

15  and he laughs and he says -- make me a promise I won't

16  drink, and he would shake his head and he was smiling, and

17  he would say, okay, come on tell me a joke and I promise I

18  won't drink.  Like that was a childish response.

19      Q.      Had you -- before that day, had you spoken to him

20  about drinking?

21      A.      No.

22      Q.      Had you ever told him before that day that he

23  shouldn't drink?

24      A.      Yeah, before that, you know, we used to

25  communicate, he used to tell me about his past and, you

A. KAUR

Page 20

1  know, his health -- like I said before, I heard it from him

2  that, you know, liquor used to give him problems.  So, I

3  told him that if it's causing you health problems, you

4  definitely stay away from it.

5      Q.     When did that come up before that day?

6      A.     I don't remember the exact date of the, you

7  know -- the conversations, but I do remember that, you

8  know, we used to have conversations even when I was back in

9  India, he used to call and he used to say that, oh, I'm

10  having guests over today and so, you know, I used to tell

11  him that make sure you don't drink, and he used to tell me,

12  no, no, I'm not drinking, you know, I'm just serving them,

13  but I'm not drinking.  So, it was conversations like that,

14  but I don't remember the exact date and times of those

15  conversations.

16      Q.     You said before that he seemed afraid that you

17  were going to be angry when you found out, is that what you

18  said before?

19      A.     Yes, he was hesitant because like I said, I asked

20  him like as I confronted him that did you drink, are those

21  beer bottles, did you drink those?  And then he replied,

22  "Huh?"  And he did not want to answer yes or no, because he

23  was probably thinking that what should I say, but he was

24  not answering me yes or no, he was just like, "Huh, what

25  did you say, what?"  So, just like that, he was hesitant.

A. KAUR

Page 21

1    Q.    Had you ever had any arguments between you before
2  about his drinking?
3    A.    No, there was no fighting, there was no arguing
4  before because he never drink in front of me before, so
5  there was no point of arguing before.
6    Q.    At some point, you called 9-1-1, right?
7    A.    Yes, because as I said before, my mother-in-law
8  did warn me that his health will deteriorate quickly if he
9  drinks.  So, I did not want to wait until he started
10  vomiting or, you know, if anything bad happens, so I was
11  afraid and I called 9-1-1.
12    Q.    Had your mother-in-law told you that his drinking
13  had caused him to vomit in the past?
14    A.    Yes, yes, indeed, my mother-in-law did say that,
15  you know, he had vomiting issues and even his throat used
16  to swell and he could not eat for almost two days, that's
17  what my mother-in-law told me.  So, I did not want to wait
18  until it gets to that point, so I called 9-1-1.
19    Q.    Did you understand at that point that your
20  husband had been an alcoholic or thought he just had health
21  complications or something else?
22    A.    No, I would not say that he's alcoholic because
23  since I started living with him, he's not been an
24  alcoholic.  I don't know what happened in the past, but he
25  does have health concerns, health issues, but he's not

A. KAUR

Page 22

1    alcoholic, since I'm in his life.  So, I have not seen him

2    drink prior to this, so I can assure that he's not an

3    alcoholic.

4        Q.    Let me ask it a different way, what I meant to

5    ask was, did you understand in 2018 that there was a period

6    in his life, maybe before you knew him, that he had been an

7    alcoholic, did you know that at that time?

8        A.    That -- that -- like I said, whatever happened in

9    the past is past, so I of course know that whatever the

10   past was, it was, but alcoholic is somebody who cannot live

11   without liquor, so there's nothing like that with, whatever

12   he did in the past was just the past.

13       Q.    And so, what did you say when you called 9-1-1?

14       A.    Actually, when I was calling 9-1-1, I was also

15   having second thoughts should I call 9-1-1 or should I not?

16   But when I called, they asked me for the address, they

17   asked me what happened and I told them my husband had a

18   drink, and that I need to go take him to the hospital, so

19   they asked me for the address where I am at and I gave them

20   my address.

21       Q.    When you say you were having second thoughts, you

22   mean you were having second thoughts about asking to have

23   him go to the hospital?

24       A.    Actually, I was double minded of calling the

25   ambulance.  I never even thought about calling the police

A. KAUR

                                                        Page 23

1    or I did not even have anything in mind that police would

2    be called, I only had hospital and ambulance involved in my

3    mind.

4        Q.    Okay.

5              Before you called 9-1-1, did you tell your

6    husband why you thought he needed to go to the hospital?

7        A.    No, I never, I didn't tell him.

8        Q.    When you called 9-1-1, did you go to another room

9    or did you call from the living room where he was sitting?

10       A.    I was in my bedroom.

11       Q.    So, before you called 9-1-1, your husband didn't

12   know you were calling 9-1-1?

13       A.    No, he did not.

14             MS. FADDIS:  Off the record.

15             (Whereupon, an off-the-record discussion was

16        held.)

17       Q.    The last question was, did your husband know that

18   you were calling 9-1-1 before you made the call, and you

19   said he didn't know, right?

20       A.    Yes, he didn't knew.

21       Q.    He didn't agree to go to the hospital before you

22   called 9-1-1, right?

23       A.    No, I did not even talk to him about hospital,

24   there was not even the word "hospital" involved because I

25   could not tell him to go to the hospital, I could not tell

A. KAUR

Page 24

1   him to drive himself to the hospital and I, myself don't
2   know how to drive.
3       Q.      So, at some point after you found him, you went
4   back to your bedroom; is that right?
5       A.      After I found him where?  After I found him
6   drinking?
7       Q.      Correct.
8       A.      No, I actually -- I sat down with him after that
9   and I talked to him why -- like I said, why -- I asked him,
10  "Why are you drinking?"
11      Q.      And how long did you talk to him in the living
12  room?
13      A.      I cannot recall the exact time frame of that, but
14  I will say that I probably talked to him for close to ten
15  to 15 minutes before I went back into the bedroom, because
16  I wanted him to say that, you know, fine, I will not drink,
17  but he did not say those words, so I talked to him for
18  close to ten to 15 minutes.
19      Q.      And when you went back in the bedroom, you called
20  9-1-1?
21      A.      No.  Before, I called his brother.
22      Q.      What's his brother's name?
23      A.      Lakhwinder Singh, L-A-K-H-W-I-N-D-E-R.
24      Q.      And why did you call his brother?
25      A.      Because -- I called him because I wanted to tell

A. KAUR

Page 25

1   his brother that he's not listening to me, he's not saying

2   anything and he's not stopping drinking, so why don't you

3   come here and tell him to stop drinking?

4       Q.      When you were speaking with your husband in the

5   living room, was he still drinking, did he have a drink

6   with him?

7       A.      No, at that time, he was not drinking, he did not

8   have any liquor in his hand, but I did saw empty four beer

9   bottles.

10      Q.      Was your concern at that point that he was going

11  to keep drinking in that moment, or that he was going to

12  keep drinking in life or something else?

13      A.      No.  Actually, I was afraid that he would keep on

14  drinking that night, that's what I was afraid.  Because he

15  was telling me no, why don't you go to sleep, you know, go

16  to sleep, I'm okay, I'm coming to sleep in a little bit.

17  So, I was afraid that he will be drinking more that night.

18      Q.      Do you know what time it was when you called your

19  brother-in-law?

20      A.      No, I don't remember the time.

21      Q.      Do you know if your husband had anything

22  alcoholic to drink while he was out of the house that

23  night?

24      A.      Like when Rupel Singh called that time you're

25  talking about?

A. KAUR

Page 26

1    Q.    Yes.

2    A.    No, there was no other liquor involved, it was

3   just the four beer bottles that I saw, empty beer bottles.

4    Q.    So, what did your brother-in-law say when you

5   called him?

6    A.    He said okay, you know, rest -- "Why don't you

7   rest and I'm on my way, I will come and I will talk with

8   him."

9    Q.    And at some point, did he arrive?

10    A.    Actually, it took him a while to arrive.  He did

11   arrive, but I thought, you know, that he's taking too long,

12   so that's why I called the ambulance.

13    Q.    And what did you tell 9-1-1 when you called them?

14    A.    I said my English is quite weak and my sentences,

15   you know, I cannot profound (sic) more sentences -- so when

16   I called 9-1-1, I said that my husband has been drinking, I

17   want to take him to the hospital.

18    Q.    And how long after you made that call did EMS --

19        MS. FADDIS:  Withdrawn.

20    Q.    At some point after you made that call, did the

21   emergency medical workers come to your house?

22    A.    Yes, they did arrive.

23    Q.    And did they come into the house?

24    A.    Yes, outside the house they parked the ambulance,

25   it was two female EMS workers, they came inside the house.

A. KAUR

```
                                                  Page 27
 1      Q.      How did the EMS workers get in the house?
 2      A.      I don't remember exactly, but I think my son went
 3   downstairs to open the door, they called me on my phone and
 4   they said that we are here.  So, I don't remember exactly
 5   if I went downstairs to open the door, I think my son went
 6   downstairs to open the door.
 7      Q.      At what point did your son wake up?
 8      A.      Actually, I woke him up when the EMS called me on
 9   my cell phone because I cannot go down the steps of stairs
10   and I cannot come back up, like I said, I was pregnant.
11   So, I woke him up to open the door, to go and open the door
12   downstairs.
13      Q.      And what happened when the EMS workers came into
14   the apartment?
15      A.      Yes.  At that point, they came inside and they
16   asked my husband, Mr. Singh, that they are here to take him
17   to the hospital, and my husband told them that I did not
18   call you guys, I did not -- I do not need help.  And they
19   said that, no, you did not call, your wife called us.  So,
20   then he asked me, he asked me that, hey, did you call them,
21   like I never tried to hurt you, why did you call them?  And
22   I told him that I did not say that you tried to hurt me,
23   but I'm concerned for your health.  And I want to mention
24   one more thing, that right after the EMS, right when the
25   EMS coming up inside the house, my husband's brother also
```

A. KAUR

Page 28

1   came right behind them.

2       Q.      Did you talk to the EMS workers at all?

3       A.      I have an English-speaking problem, that's why I

4   could not communicate well with them, but I tried to

5   communicate -- they asked me does he have history of doing

6   this or like does he have history of drinking alcohol, and

7   I told them that, you know, he has health issues, health

8   concerns, he has -- he starts throwing up and whatever my

9   mother-in-law told me, I tried to tell them, that's it.

10      Q.      Did the EMS workers talk to your husband?

11      A.      Yes, they were telling him that you have to come

12  with us.

13      Q.      And what was his reaction to that?

14      A.      He was telling them that -- he was telling the

15  EMS workers that I'm fine, I'm okay, I don't need to go to

16  the hospital, and I just had a little bit of liquor and I

17  will be fine, I don't need to go to the hospital.

18      Q.      When he was speaking to the EMS workers, was he

19  sitting or standing or something else?

20      A.      He was sitting down on the sofa.

21      Q.      And how was he behaving?

22      A.      No, he was actually having jokes with the EMS

23  workers, he was telling them that, hey, look, I'm fine, I

24  could walk a straight line, I could dance, I could lift my

25  arm, I'm fine, I don't need to go to the hospital.

A. KAUR

                                                    Page 29

1      Q.    Does he normally behave like that?

2      A.    No, he was just trying to make -- trying to show

3  the EMS workers that -- he was trying to show them that

4  he's fine, that he's okay.

5      Q.    Did his behavior seem normal to you?

6      A.    I would say the behavior was normal, the reaction

7  was normal that he did not want to go to the hospital, so

8  he did have presence of mind.

9      Q.    And at some point, were the police called?

10     A.    Yeah, the EMS member called the police.

11     Q.    Do you know why?

12     A.    Because they assessed that, you know, they were

13  ladies and they cannot physically make him go to the

14  hospital because he's a male, and they also assessed my

15  situation, I was pregnant at that time and they assessed

16  that maybe he should take a trip down to the hospital to

17  get checked up.  And that's why they realized and they

18  assessed that they should definitely call the cops to go to

19  the hospital.

20     Q.    Did you ever see your husband arguing with the

21  EMS workers?

22     A.    If you tell me -- if you're asking me that if he

23  said anything out of anger or arguing out of anger or

24  resisting, he did not.  He did not say anything out of

25  anger to me, to EMS members or to the police.

A. KAUR

                                                        Page 30

1      Q.      It's just about the EMS workers, was he arguing

2   with them?

3      A.      No, he did not argue with the EMS members, and if

4   he would argue with me or the EMS members, why wouldn't I

5   call the cops.  I would have called the cops, but I didn't

6   because he was not arguing or resisting.

7      Q.      When the EMS workers told him he needed to go to

8   the hospital, what was his reaction?

9      A.      He was telling them that he's okay, that I'm

10  okay, I don't need to go to the hospital, look, I can sit,

11  I can stand, I can do anything, that's what he said.

12     Q.      At that point, you still thought he needed to go

13  to the hospital, right?

14     A.      Yes, absolutely.

15     Q.      How long after the EMS workers called for the

16  police did the police arrive?

17     A.      Three to four minutes, right away they came.

18     Q.      How many officers came?

19     A.      I think three.  Three entered the house.

20     Q.      Could you describe the three officers who entered

21  the house.

22     A.      You're asking me to physically describe them?

23     Q.      Yeah.

24     A.      Well, there's the one officer who slammed my

25  husband down on the floor, he was really tall and he was

A. KAUR

Page 31

1    heavy-built.  And then the other officer, who was not that

2    tall in height, he was also there, but he was not that

3    built, not that tall.  The other two officers were not that

4    built and tall, but one officer who slammed my husband, he

5    was quite tall and built.

6        Q.      Do you remember anything else about that physical

7    descriptions of those three officers?

8        A.      The officer that slammed my husband down, that

9    officer was White, Caucasian, and the other two officers

10   were dark skin.

11       Q.      What happened after the three police officers

12   entered the apartment?

13       A.      As soon as the cops arrived, the EMS officers,

14   they told -- they stood aside and they told the cops that

15   we -- we need to take him -- you can talk to them.  So,

16   when the cops told my husband that we are here to take you,

17   my husband replied to them that what crime have I done that

18   you are here to take me, you are entering into my house,

19   but what have I done that you are here to take me?

20       Q.      And what did the police officers say?

21       A.      They said that your wife called 9-1-1 and you

22   require medical assistance, you are not going with them,

23   that's why you have to come with us.

24       Q.      And what happened, then?

25       A.      So, after that, my husband agreed that fine,

A. KAUR

                                                        Page 32

1    okay, I will go with you after the cops told him he has to

2    come with them.  So, then my husband said to me, "Can you

3    pass me my clothes and can you give me my glasses?"  So, I

4    passed him his clothes, his coat and his -- his pants and

5    his clothes, and he changed, and then after that, he was

6    cleaning his glasses to put on his glasses, and he told me,

7    "I'm going to the hospital, so it would be a while, so can

8    you give me a glass of water?"  And he was saying all of

9    this while we were standing in the hallway right before the

10   steps that lead downstairs to the exit.  So, I said, "Okay,

11   no problem, I will give you a glass of water."  So, I

12   turned around to get a glass of water and one of the

13   officers, the tall Caucasian officer told my husband to

14   turn around and put your hands on your back?  And my

15   husband looked at him and said, "Fine."  He put on his

16   glasses and he turned around, he did not even wait for my

17   husband to drink a glass of water to go to the hospital.

18   My husband turned around to -- for the officer and the

19   officer grabbed him and brutally slammed him on the floor,

20   and I was shocked, even I got shocked.  And when he slammed

21   him on the floor, my husband's glasses broke and the glass

22   pierced into the side of his eye.  And I'm just looking

23   that what the hell just happened, and that officer dragged

24   my husband down the steps like he is a criminal.  And what

25   I thought he was going to the hospital, not to no jail, so

A. KAUR

Page 33

1    I did not even knew what was he getting handcuffed for.

2    Therefore, I did not understand why he was being treated

3    that brutally?

4        Q.     Okay.  I just want to back up a minute.

5               So, you said initially the officers told your

6    husband that you had called 9-1-1 and he needed medical

7    attention, so he had to go to the hospital, right?

8        A.     Yes, that's what they said, that you have to come

9    with us.

10       Q.     And did your husband immediately tell the police,

11   okay, I will go to the hospital or something else?

12       A.     No, like I said, the taller officer did not say

13   any word like "hospital," he just said, "You have to come

14   with us."  And my husband asked them, "Why do I need to

15   come?  Did I commit any crime?  Is drinking a crime, is

16   smoking a crime?"  And he's taking (sic) from his hand

17   like, "Is smoking a crime, is drinking a crime?"  So,

18   that's what he stated.

19       Q.     You said earlier that one of the police officers

20   told your husband he needed medical attention; is that

21   right?

22       A.     No, that's what the EMS staff told my husband,

23   that you have to come to the hospital.

24       Q.     Did anyone tell your husband at any point that he

25   was being arrested or taken to jail or anything like that?

Case 23-24, Document 32, 04/19/2023, 3501832, Page259 of 306
**[JA-1119]**

A. KAUR

Page 34

```
 1      A.      No, nobody mentioned the word "jail" or being

 2  arrested, but none of the police officers mentioned the

 3  word "hospital" either, they did not mention that he is

 4  being taken to the hospital.

 5      Q.      None of the police officers ever told your

 6  husband that they were there to help get him to the

 7  hospital?

 8      A.      No, none of the police officers mentioned the

 9  exact full term that you have to come with us to the

10  hospital.  That's what I assumed the officers meant, that

11  they meant to say that you have to come with us to go to

12  the hospital, but they did not state the whole sentences,

13  all they stated was that you have to come with us, and my

14  husband interpreted it as that maybe he has to go with the

15  cops and he was getting arrested and he was going to jail.

16      Q.      So, you think that your husband didn't know he

17  was being taken to the hospital?

18      A.      Yes, he did not know.  But I also want to mention

19  one more thing over here.  Can I mention something?

20      Q.      Sure.

21      A.      Actually, I want to mention that when my husband

22  was putting his clothes on, so the tall officer said in

23  Punjabi that put your shoes on, so that's how I understood

24  that he knew Punjabi, he understood Punjabi.  And that's

25  when I knew that, you know, that he -- his name is Cheema
```

A. KAUR

Page 35

1    and he understood Punjabi.  So, when they dragged my
2    husband downstairs, and that officer -- and I went
3    downstairs while I was pregnant, I climbed the steps, I
4    went downstairs and I told -- I asked him that are you
5    arresting him or are you taking him to the hospital?
6        Q.    And what did he say?
7        A.    After he went to the -- they took him to the
8    hospital, but when they took him to the hospital, they
9    handcuffed him to the bed and he kept on begging the
10   officer that he wants to go to the bathroom, and they did
11   not even let him go to the bathroom, he had to do the
12   bathroom in his pants.  Can you believe it?  That's
13   unbelievable.  Who does that?
14       Q.    Were you there when that happened?
15       A.    No.  After that, I -- he came home and he came
16   home about like 3:00 or 4:00 p.m., he came home and he
17   cried when he came home.  And I noticed that he told me his
18   pants were wet, and I said, "What happened?"  He told me
19   the whole story what happened, and they did not even let
20   him use the bathroom.
21       Q.    Was your husband upset that the police came to
22   the apartment?
23       A.    No.  Like I said before, my husband was never
24   upset even for a minute, he was talking normally.
25       Q.    Your husband never raised his voice with you?

A. KAUR

Page 36

1     A.     Husband and wife talk normally, and he walked to
2   me normally, he talked with everybody normally.  I feel
3   fully secure with him and I fully trust him and I
4   absolutely believe what he says.  And we never argued
5   that day and we never argued prior to that and he was not
6   upset.
7     Q.     He never told you it was your fault that the
8   police had come?
9     A.     No, he never said those words that it's your
10  fault that police is here.  He just told me that -- he just
11  asked me -- like I said before, he asked me that why did
12  you call them?
13    Q.     And when he asked you that, he wasn't angry?
14    A.     No, he did not ask me angrily.  Like I said, he
15  asked me in a confused way that why are they here, did you
16  call them?  So, he asked me in a confused way.
17    Q.     And he was never aggressive with the EMS workers,
18  right?
19    A.     No, he was actually praising them that, you know,
20  thank you for coming over here, thank God that you guys are
21  doing a good job, you guys save people.  So, he was
22  praising them, you can even very verify with them.
23    Q.     You were worried that because he had been
24  drinking, he might get sick, right?
25    A.     Yeah.

A. KAUR

Page 37

1    Q.    After you called 9-1-1 from the bedroom, did you
2    go back to the living room?
3    A.    Yes.
4    Q.    To wait with him in case he got sick?
5    A.    Yes, I came back just to verify that, you know,
6    if he's drinking again or, you know, if he's hiding any
7    liquor anywhere, that's why I came back into the living
8    room and I sat with him.
9    Q.    You said you sat with him?
10   A.    Yes, actually, right next, there's a larger sofa,
11   and then there was a small sofa next -- I was sitting on
12   the small sofa, he was sitting on the larger sofa.
13   Q.    After you helped him get his clothes on, he was
14   standing by the front door right before he left the
15   apartment?
16   A.    Yes.
17   Q.    And where were you while he was standing by the
18   front door before he left?
19   A.    When you open the front door, you can see the
20   kitchen directly from the front door, main door, and you
21   can see the kitchen directly.  I was standing in the
22   kitchen.
23   Q.    And where were the police officers at that point?
24   A.    Standing right next to him.
25   Q.    Where were the EMS workers at that point?

A. KAUR

Page 38

1    A.      They were also in the living room, but they were

2    standing a little bit on the side, you know, in the corner

3    of the living room.

4    Q.      And you said the tall officer told your husband

5    that he wanted to handcuffed him; is that right?

6    A.      Yeah, you know, the tall officer told my husband

7    that put your hands behind your back, and my husband smiled

8    at him and he said, "Fine, here."  He put his hands behind

9    his back.  And then like I said, he slammed him on the

10   floor like he's a criminal of some sort.  My husband got

11   unconscious for a few minutes.

12   Q.      So, you saw that when your husband proffered his

13   hands behind his back, that's when the officer slammed him

14   on the ground?

15   A.      Yes.

16   Q.      Did you see your husband move his hands away and

17   try to step away from the officer?

18   A.      No, negative.

19   Q.      You didn't see that happen?

20   A.      No, that did not occur.  That did not occur.

21   It's not that I haven't seen it, that did not even occur.

22   Q.      You said after he was slammed on the floor, your

23   husband was unconscious for several minutes?

24   A.      Well, yeah, he was -- because he was unconscious

25   and he could not even move and the cops grabbed him and

A. KAUR

Page 39

1   just stood him up, and that's when he started like shaking

2   his head to try to like get his consciousness back.

3       Q.      So, you saw that he was unconscious when the

4   police officers picked him up off the ground?

5       A.      Yes.  At that time, I saw him when they stood him

6   back up and I screamed at the officer like, "I did not call

7   you here for this, what have you done?  This is not what I

8   called you here for."

9       Q.      Did any of the officers say anything at that

10  point?

11      A.      No, the officers completely ignored me and

12  brutally dragged him down the steps and took him, and

13  that's what I don't understand, why?

14      Q.      Did the EMS workers say anything when your

15  husband was taken to the floor?

16      A.      When they took him downstairs, you know, I was

17  just still in shock and in trauma of what just transpired,

18  so I just went downstairs with them, you know.

19      Q.      And did you talk to the EMS workers when you went

20  downstairs?

21      A.      I just talked to the police officers, like I

22  said.  And the police officers, I asked them that are you

23  taking him to jail or are you taking him to a hospital, and

24  that's when they told me, "We are taking him to the

25  hospital."

Case 23-24, Document 32, 04/19/2023, 3501832, Page265 of 306

A. KAUR

Page 40

1      Q.     Ms. Kaur, I'm going to play for you the 9-1-1

2    call in this case, which we're going to mark as Exhibit A.

3                  (Whereupon, the aforementioned video tape

4                  was marked as Exhibit A for identification as of

5                  this date by the Reporter.)

6                  (Whereupon, the 9-1-1 audio is playing.)

7      Q.     Ms. Kaur, can you hear the audio?

8      A.     Yes, I can hear it.

9      Q.     I'm going to start from the beginning and play it

10   all the way through, and then I have some questions.

11                 (Whereupon, the 9-1-1 audio is playing.)

12     Q.     Ms. Kaur, were you able to hear all of that tape?

13     A.     Yes, I heard it.

14     Q.     And you heard yourself -- did you yourself on

15   that tape?

16     A.     Yes, correct.

17     Q.     And did you hear yourself tell the operator that

18   your husband drank too much?

19     A.     Yes, correct.

20     Q.     And did you hear yourself tell the operator that

21   he was drunk?

22     A.     Yes, I did.

23     Q.     And did you hear the operator ask at one point if

24   you were fighting?

25     A.     As you can hear that I said "yes," I was

Case 23-24, Document 32, 04/19/2023, 3501832, Page266 of 306
**[JA-1126]**

A. KAUR

Page 41

1   answering "yes" to everything and I said before that my

2   English is not very proficient.  So, they were asking me

3   questions and I was just saying "yes, yes," and there was

4   no argument going on and I did not understood what was

5   going on.

6       Q.    At some point they asked you if he was breathing,

7   right?

8       A.    Yes.

9       Q.    You understood the word "breathing," correct?

10      A.    Yes, the word "breathing" I did understood.

11      Q.    But you didn't understand the word "fighting"?

12      A.    No, I did not.  That's what they said, they asked

13  me -- this is what I think they asked me that was he

14  fighting with you, and I did not meant to say he was

15  arguing with we or fighting with me.  What I meant was that

16  he -- I told him to stop drinking, and that's what I

17  understood, there was a misunderstanding over there.

18      Q.    So, what did you understand them to mean when

19  they said "fighting"?

20      A.    I understood that they asked me that if I was

21  arguing with him, if I was fighting with him, and that's

22  when I said yes, I was fighting, I was arguing with him,

23  that's -- and I did, I did, you know, told them I did.

24  Like I said before, I confronted him about that, so I did

25  confront him about drinking, and that's what I understood

A. KAUR

Page 42

1   they asked me that were you fighting with him, and I said

2   yes.

3       Q.      But he wasn't doing anything to fight back; is

4   that what you're saying?

5       A.      Yes, that's what I meant, that he was not arguing

6   back with me, he was not fighting back with me.  And even

7   until this day today, if I argue with him, if I fight him,

8   he still never argues back or fights back with me.

9       Q.      You also told the operator that he needed to go

10  to the hospital, right?

11      A.      Yes, correct.

12              MS. FADDIS:  Mark this as Exhibit B, which

13              is a video that was produced in this case.  It is

14              titled, "Video of EMS."

15              (Whereupon, the aforementioned Video of EMS

16              was marked as Exhibit B for identification as of

17              this date by the Reporter.)

18      Q.      I'm going to play this Exhibit B and I'm going to

19  stop it at various points to ask questions as we go, okay?

20      A.      All right.

21              (Whereupon, the EMS video is playing.)

22      Q.      Ms. Kaur, the video is paused right now at the

23  zero minute marker, so the beginning of the tape, okay?

24      A.      All right.

25      Q.      Do you see any people in this image?

A. KAUR

Page 43

1      A.      Yes, that's my husband and there's one lady over

2   here from the EMS.

3      Q.      And do you know where you were at this point in

4   time?

5      A.      I was also present in the room.

6      Q.      Do you know where you were in the room?

7      A.      I don't remember exactly where.

8              (Whereupon, the EMS video is playing.)

9      Q.      I'm going to pause at six seconds, and I'm just

10  going to ask you to look at the center of the video where

11  there's numbers at the top.

12             Do those appear to indicate the date and time of

13  this video?

14     A.      Yes, yes.

15     Q.      This video was taken from the security camera

16  inside your apartment, right?

17     A.      Yes.

18     Q.      As far as you know, is the time on that system

19  correct?

20     A.      Yes, correct.

21     Q.      So, would it be fair then to assume that the EMS

22  workers entered your apartment at about 6:32 in the

23  morning?

24     A.      Yes, correct.

25     Q.      We're going to continue playing from six seconds.

A. KAUR

Page 44

```
1                   (Whereupon, the EMS video is playing.)
2        Q.     We'll, pause at 11 seconds, two more people just
3    walked into the apartment.
4        A.     There's another EMS worker and that's my son
5    that's at the door.
6        Q.     Thank you.
7                   (Whereupon, the EMS video is playing.)
8        Q.     I'm going to pause it at 20 seconds.  In the
9    video we just watched, the two EMS workers appear to both
10   be talking.
11              Do you see that?
12       A.     Yes.
13       Q.     And the EMS worker closest to the door, did it
14   look like she was talking to your husband?
15       A.     Yeah, maybe she's talking to him.
16       Q.     The EMS worker closer to the camera, with the
17   blonde hair, is she talking to someone else off camera?
18       A.     Maybe she was talking to me, I think.
19       Q.     Would you have been on that side of the room?
20       A.     Yeah, maybe the -- one of the -- like I said, one
21   of the sofa is on this side.  Maybe I was sitting on this
22   side --
23       Q.     We're going to keep playing the recording.
24                  (Whereupon, the EMS video is playing.)
25       Q.     Do you see the EMS worker with blonde hair turned
```

Case 23-24, Document 32, 04/19/2023, 3501832, Page270 of 306

A. KAUR

Page 45

1   to face your husband in the video we just watched?

2       A.      Yes.

3       Q.      At that point in time, were they speaking?

4       A.      Yes.

5       Q.      Do you remember what was being said between that

6   EMS worker and your husband at that point?

7       A.      Exactly word for word, I don't remember, but all

8   I, you know -- because it's been such a long time, but I do

9   remember that her saying something like we received a phone

10  call that we have to take you to the hospital, something

11  like that.

12      Q.      We're going to keep playing -- before that, do

13  you remember if he said anything in response?

14      A.      I don't remember.

15      Q.      Do you see him moving his hands in that portion

16  of the video?

17      A.      The video is paused, how can I see him moving his

18  hands?

19      Q.      Sure.  I'll go back.  So, we played from 20

20  seconds to 51 so we can watch it again.

21                      (Whereupon, the EMS video is playing.)

22      Q.      We'll pause again at 51 seconds.  Did you see him

23  moving his hands?

24      A.      No, the hand that was moving, that was actually

25  the EMS worker.  He is not moving.

A. KAUR

Page 46

```
 1      Q.     I'm going to play some more now.

 2                     (Whereupon, the EMS video is playing.)

 3      Q.     I'm going to pause it here at 32 seconds.  Do you

 4      see the EMS worker with blonde hair in the front of the

 5      camera?

 6      A.     Yes.

 7      Q.     And she is wearing a blue glove on her hand,

 8      right?

 9      A.     It's not clear.

10      Q.     Sure.  I'll make it a little clearer.

11                     (Whereupon, the EMS video is playing.)

12      Q.     It's paused at 31 seconds, do you see the hand

13      now?

14      A.     Where is her hand?

15      Q.     On her arm.

16      A.     I cannot see her hand at all, I see the red bag.

17      Q.     So, we're going to keep playing?

18                     (Whereupon, the EMS video is playing.)

19      A.     Yes, I see now.  Yes, I see now, blue gloves in

20      the hand, yes.

21      Q.     Okay.  All right.  So, we're going to play it at

22      50 seconds again?

23                     (Whereupon, the EMS video is playing.)

24      Q.     Okay.  Here at 43 seconds we're paused.  Did you

25      just see your husband lift up his right hand?
```

A. KAUR

Page 47

```
 1      A.     Yes, yes.  Yes, and I would like to say that my
 2   husband was animated with whatever he was saying, so that's
 3   normal when somebody is talking, you know, they're
 4   animating with their hands when they are explaining
 5   something, like we are talking.
 6      Q.     So, you do remember him moving his hands when he
 7   was talking to them?
 8      A.     Yes, and, you know, now I'm seeing the video, he
 9   normally talks like this, he explains like somebody is
10   explaining something with their hands.
11      Q.     Do you remember what he was saying to them at
12   this point in time?
13      A.     Yes, he was -- maybe he was asking them, you
14   know, what happened, why are you here or like why am I
15   going to the hospital, or like are you -- why are you
16   taking me to the hospital?
17      Q.     We're going to keep playing through 43 seconds.
18             (Whereupon, the EMS video is playing.)
19      Q.     We're going to pause it at 41 seconds.  We've
20   been watching this since about 43 seconds, is it fair to
21   say that in those two minutes, the EMTs have been talking
22   to your husband the whole time?
23      A.     Yes, they were talking to him, and in all this
24   conversation, my husband -- I do recall my husband telling
25   them that, you know, my wife has called you guys, but I'm
```

A. KAUR

Page 48

1    fine, look, I'm okay, I don't know why my wife called you

2    guys, and I'm fine, I'm okay, I'm able to talk to you.

3        Q.    We're going to keep playing from 2 minutes 41

4    seconds?

5                (Whereupon, the EMS video is playing.)

6        Q.    We'll pause at 2 minutes and 53 seconds.  At this

7    point, the EMS worker has turned to talk to somebody else

8    off-screen, right?

9        A.    Yes, correct.

10       Q.    Was she talking to you or someone else?

11       A.    With me.  If I can remember, it's me.

12       Q.    Do you know what she was saying to you at that

13   point?

14       A.    I think they were telling me that, you know, you

15   called us here, but your husband does not want to go with

16   us, do you still want him to go with us, like, you know, do

17   you still want him to come with us?

18       Q.    And what did you say?

19       A.    Yeah, I told them that, yeah, I want him to go to

20   the hospital, I'm not sure if he's going to stay home and

21   drink more.

22       Q.    Do you remember -- you said earlier that your

23   husband had said to the EMS workers that he was fine and he

24   didn't know why you had called, do you remember if they

25   ever said anything back to him?

A. KAUR

Page 49

1     A.     Yes, I did reply back to him, I did say to him

2     that I felt the need that you have to go to the hospital,

3     that's why I called them.

4     Q.     You said that?

5     A.     What was that?

6            MS. FADDIS:  The last answer was -- I'm

7            sorry, can we have the last answer read back,

8            there was a little bit of feedback.

9            (Whereupon, the referred to answer was read

10           back by the Reporter.)

11           THE WITNESS:  Yes, like I said, I went to

12           the bedroom and I called the police -- called the

13           ambulance from the bedroom, I called 9-1-1 from

14           the bedroom.  So, that's why when he asked me

15           that did you call them and why did you call them?

16           And I replied back to him and I said yeah, I

17           called them because felt the need that you should

18           go to the hospital.

19     Q.     We're going to be playing from 2 minutes and 50

20     seconds?

21            (Whereupon, the EMS video is playing.)

22     Q.     We're at 3 minutes and 39 seconds.  Ms. Kaur, did

23     you see your husband just put both of his hands up in the

24     air?

25     A.     Yes, yes, yes.

A. KAUR

Page 50

1    Q.    Do you know what he was doing at that moment?

2    A.    Yes, at that point, I do remember him doing that

3    and he did that because he was telling the EMS workers that

4    my wife has been just concerned for no reason, she's

5    overreacting, look, I'm fine, look at my hands, I can

6    dance, I can lift my hands, I'm okay.  That's what he was

7    trying to do.

8    Q.    We're going to play this just a little bit more.

9          (Whereupon, the EMS video is playing.)

10   Q.    We paused at 3:52.  Ms. Kaur, you saw your

11   husband moving his arms and his body over the last portion

12   of the video we watched?

13   A.    Yes, and they -- this is, you know, basically he

14   was trying to show them that look, I can dance, I can get

15   up and this is the way he was trying to tell them that it's

16   my house and I'm okay, I'm okay over here, I can get up, I

17   can dance, he was explaining himself.

18   Q.    Did that seem like normal behavior for him?

19   A.    Yes.  Actually, this is a form of a dance, you

20   can search it online, this is the form of an Indian dance.

21   This is not something abnormal, he was trying to show them

22   that I can dance, and at the same time, he was -- he was

23   trying to tell them that I'm not drunk, I'm not a drunk

24   person right now, I'm not unconscious, I'm conscious, I'm

25   not drunk.

A. KAUR

Page 51

 1    Q.    And you didn't think he was drunk in that moment?

 2    A.    No.  At that point, I knew that he was not drunk

 3  at that point, but I was afraid that he might drink more.

 4    Q.    We're going to watch the end of the video

 5  starting at 3:52.

 6               (Whereupon, the EMS video is playing.)

 7    Q.    We paused it at 4 minutes and 1 second.  Ms.

 8  Kaur, did you see your husband just to have leaned forward

 9  towards the EMS workers at that point?

10    A.    Yes.

11    Q.    Was he being aggressive in that moment?

12    A.    No, he was not upset at that point.  You can look

13  at his face, he was not upset, he was not angry.

14    Q.    He wasn't arguing with her?

15    A.    No, he was not angry, he was just expressing

16  himself, he was just saying that I'm fine, I'm okay, I

17  don't know why you guys are here, I'm fine.  He usually

18  talks like that, he usually talks in an animated way like

19  with his hands but he was explaining himself, he was not

20  angry.

21    Q.    We're going to keep play from 4 minutes and 1

22  second.

23               (Whereupon, the EMS video is playing.)

24    Q.    I'm going to pause this at 4 minutes and 41

25  seconds, it's got 7 seconds left in the video.

A. KAUR

Page 52

1          Ms. Kaur, do you see the time stamp at the top of

2     the video?

3       A.    6:37.

4       Q.    So, I'm going to continue playing from 4 minutes

5     and 41 seconds?

6                (Whereupon, the EMS video is playing.)

7       Q.    So, we're going to go to Exhibit C, which is a

8     video marked police video.

9                (Whereupon, the aforementioned video marked

10               police video was marked as Exhibit C for

11               identification as of this date by the Reporter.)

12      Q.    So, we're going to play what we marked as Exhibit

13    C for this deposition which is a video of the Plaintiff in

14    this case entitled, "Police Video".

15          Ms. Kaur, before we start playing the video, do

16    you see the time stamp on this section of the video?

17               THE INTERPRETER:  Can you repeat the

18               question.

19      Q.    Sure.

20          Ms. Kaur, do you see a time stamp on this video?

21      A.    Yes, yes.

22      Q.    And that time is 6:44 a.m., right?

23      A.    Yes.

24      Q.    The last video we watched ended at approximately

25    6:37 a.m., right?

A. KAUR

Page 53

```
 1      A.      Yes.
 2      Q.      Do you know what happened -- in the 7 minutes
 3  between the two videos?
 4      A.      At that point, you know, the conversation was
 5  going on that, you know, he was being reluctant to go to
 6  the hospital, he was not moving from the chair, he said I
 7  do not want to go to the hospital.  And I was hearing, you
 8  know, the EMS workers talk to themselves that, you know, we
 9  might need to call the cops or they mentioned the word
10  "cops."  And then they asked me, are you sure you want to
11  send him to the hospital?  And I said yeah, I want to send
12  him to the hospital.  And, you know, that's what happened.
13      Q.      And so, we're going to play a couple of seconds
14  of this video.
15                      (Whereupon, the police video was played.)
16      Q.      So, I'm going to pause it at 1 second.
17              You can see someone just walked through the front
18  door, right?
19      A.      Yes, of course, I remember him.
20      Q.      Who was that?
21      A.      Yeah, he was the same officer that hit my
22  husband.
23      Q.      That's the tall officer you referred to earlier?
24      A.      Yes, yes, the same who's entering the door.
25      Q.      And is the individual in what appears to be a
```

A. KAUR

Page 54

1   white hooded sweatshirt in the middle of the frame?

2       A.      He's my brother-in-law.

3       Q.      The video that we watched previously, your

4   brother-in-law wasn't in that video, right?

5       A.      Yes, I mentioned before he arrived late.

6       Q.      Did he arrive at some point after that last video

7   ended and before this one starts?

8       A.      I would say two or three minutes prior to the

9   cops arrived.

10      Q.      We're going to play this forward from here.

11              (Whereupon, the police video was played.)

12      Q.      I'm going to pause it at 20 seconds.

13              Do you know what's happening at this point in the

14  video?

15      A.      Yes, I opened the door, I remember I went

16  downstairs to open the door, the cops did arrive.  Then you

17  can see the cop that is dark skin and shorter, he asked my

18  husband, "How are you, Mr. Singh?"

19      Q.      And where are you at this point?

20      A.      Yeah, I think I was, you know -- there's another

21  entrance to the kitchen, you can see I was actually on the

22  other side of the kitchen.  It's hard to explain because

23  it's a video, if you were here in my apartment, I would

24  explain it better, but it's hard to explain now -- I was

25  not over there at that point.

A. KAUR

Page 55

1    Q.    So, where we can see -- looking at the video on

2    the lower right side, you can see one of the EMS workers,

3    right?

4    A.    Yes, yes, yes.

5    Q.    Is the other entrance to the kitchen you're

6    describing past that EMS worker?

7    A.    Yes, you can see that, you know, where the EMS

8    workers were and there's a window next to her, and right

9    next to that window is where the entrance is at.  If you

10   want, I can show you right now.

11   Q.    That's okay.  Thank you, though.

12         So, you weren't on -- you weren't over on the

13   sofa where you had been before, right?

14   A.    No, when the cops arrived, I was not there.  I

15   was on this side where the EMS was standing.

16   Q.    We're going to play from 20 seconds.

17               (Whereupon, the police video was played.)

18   Q.    I'm going to pause it at 41 seconds.

19         Your brother-in-law moved into the hallway, do

20   you see that?

21   A.    Yes, yes, yes.

22   Q.    And he appears to have turned and now he's using

23   his hands and it looks like he's talking?

24   A.    No, he is using his hands to explain to my

25   husband that he -- why don't you just go to the hospital,

A. KAUR

Page 56

1    just go with them, you know, I remember him saying -- he

2    was talking to my husband, not to the cops.

3        Q.    He was telling your husband to go to the

4    hospital, right?

5        A.    I don't remember the exact words, but I do

6    remember he's speaking to my husband.

7        Q.    Without the exact words, do you remember

8    generally what he was saying, was he saying to go to the

9    hospital or was he talking about something else?

10       A.    As far as I can remember, I can say that he was

11   saying go with them.

12       Q.    We're going to play this forward from 41 seconds?

13             (Whereupon, the police video was played.)

14       Q.    And I paused it at 47 seconds.

15             It looks like your husband is sort of shaking his

16   finger at his brother and responded to him; is that fair?

17       A.    And my husband asking my brother-in-law that who

18   called you, I didn't even call you, who called you here?

19       Q.    We're going to keep playing from 47 seconds?

20             (Whereupon, the police video was played.)

21       Q.    At 1 minute and 29 seconds, do you know who your

22   husband is talking to at that moment?

23       A.    No, I overhear it, my husband is actually talking

24   to the EMS worker and saying that, ma'am, you can see --

25   you can tell the cops that I have not hurted (sic) my wife,

A. KAUR

Page 57

1  I have not done anything wrong and I'm okay, you can tell

2  the cops.  If you call them, you can send them back, I'm

3  okay.

4       Q.     Why was he telling the EMS worker that he hadn't

5  hurt you?

6       A.     Actually, that's what my husband thought

7  happened, that maybe the cops were here because maybe they

8  think I hurted my wife or maybe the EMS called the cops and

9  they think that I hurted my wife, that's what he thought.

10      Q.     Are you guessing or is that something he's told

11  you?

12      A.     No, this is something that he has said that, and

13  he said that over there, too, that, you know, that this is

14  my house and, you know, I'm not a criminal, so why did you

15  guys call them?  This is what he was saying, that it's not

16  a crime to sit and drink in your own house.

17      Q.     We're going to play from 1 minute and 29 seconds?

18                  (Whereupon, the police video was played.)

19      Q.     At 1 minute and 55 seconds, is one of the

20  officers giving your husband his shoes?

21      A.     Yes, correct.

22      Q.     At that point, had your husband agreed to go to

23  the hospital?

24      A.     Yes, he did not argue with the police officer at

25  all, he was just, you know, telling -- all I remember is

A. KAUR

Page 58

1   him saying to the cops that can you prove to me that

2   drinking in your house is a crime, you know, that's all he

3   said to the cops.

4        Q.     We're going to play forward?

5               (Whereupon, the police video was played.)

6        Q.     I paused at 2 minutes and 37 seconds.

7               Do you see the shorter darker-skinned officer

8   turned and is talking to someone on the right side of the

9   screen?

10       A.     Yes, maybe he's looking at me and talking.

11       Q.     Do you remember talking to him?

12       A.     No, I don't remember anything, him saying

13   anything to me.

14       Q.     Do you remember ever saying anything to him?

15       A.     No, I don't remember the exact -- exactly what I

16   said.

17       Q.     I'm now playing from 2:37.

18              (Whereupon, the police video was played.)

19       Q.     I paused it at 3 minutes and 17 seconds.

20              Do you see the tall officer talking to your

21   husband?

22       A.     Yes, yes.

23       Q.     Do you remember anything about what was being

24   said -- at that time?

25       A.     Yes.  At this point, my husband was telling him

A. KAUR

Page 59

1   can you prove me that, you know, is it a crime to drink in

2   your own house?  And this officer aggressively start saying

3   to where my husband was sitting and said, "We are not here

4   to prove you anything."

5       Q.     And again, you said that you don't remember the

6   officers ever telling him that they were there to take him

7   to the hospital, right?

8       A.     Yes, correct, correct.  "You have to come with

9   us," that's what they keep on saying.

10      Q.     We're going to play it from 3 minutes and 17

11  seconds.

12             (Whereupon, the police video was played.)

13      Q.     I paused at 3 minutes 26 seconds.

14             Did you come around next to your husband just

15  now?

16      A.     Yes, yes.  I turned, I came from the other side,

17  yes, that's me.

18      Q.     Are you handing him something?

19      A.     I was giving him his pants and his coat.

20      Q.     I'm playing from 3.6.

21             (Whereupon, the police video was played.)

22      Q.     I paused at 3:49.

23             You're handing some clothes to your husband?

24      A.     Yes, yes.

25      Q.     Was he saying anything to you at that point?

A. KAUR

Page 60

1      A.      He was not saying anything, he was just like, you

2    know, saying that can you tie my shoelaces, and I said I

3    cannot bend, so he's like okay.

4      Q.      Was there any reason why he couldn't have tied

5    his own shoelaces?

6      A.      He sometimes, you know, he -- if he cannot no

7    anything, he would just regularly ask me like normally,

8    like can you do this, can you do this for me, can you help

9    me up like regularly, you know.  So, he was maybe asking

10   for help.

11     Q.      At this point, he wasn't telling you that it was

12   your fault that the cops were in the apartment, right?

13     A.      No, no.

14     Q.      He never said anything like that to you that day,

15   right?

16     A.      No, he did not said anything like that to me at

17   this point.  He did mention something like -- like I said

18   before, that why have you called them before, but not at

19   this point, not over here in the video.

20     Q.      At any point, did he say anything to you along

21   the lines of you're going to pay for calling the police or

22   something like that?

23     A.      No, he did not.  I took a swear before giving

24   this testimony, so why would I lie?

25     Q.      We're going to play it from 3:49.

A. KAUR

```
                                                        Page 61
 1              (Whereupon, the police video was played.)
 2      Q.     We paused at 4:04, from 3 minutes and 49 seconds
 3   to 4 minutes and 4 seconds.
 4              Your husband was still talking to you, right?
 5      A.     Yes, he told me to get him a glass of water over
 6   here.
 7      Q.     We're going play it from 4:04.
 8              (Whereupon, the police video was played.)
 9      Q.     I paused at 5 minutes and 23 seconds.
10              Do you see around this time your husband appears
11   to still be talking?
12      A.     Yes, correct.
13      Q.     Do you know what he was saying at that point?
14      A.     Yes, I remember my husband was saying that he
15   wants to communicate with the dark skin officer because he
16   was very calm and he was communicating well, and my husband
17   said that he does not want to talk to the tall officer
18   because he was very rude and very aggressive.
19      Q.     I'm going to keep playing from 5 minutes -- well,
20   before I go on, did anyone say anything in response to
21   that?
22      A.     No, the response to that was the shorter officer
23   stated that everybody is okay, everybody is communicating
24   with you calmly, so don't worry about it.
25      Q.     So, he was speaking to the shorter police
```

A. KAUR

Page 62

1   officer, right?

2       A.      Yes, correct.

3       Q.      They were speaking in English?

4       A.      The taller officer just stated in Punjabi one

5   time that put your shoes on, and then later, he spoke again

6   when I stated that he said that we are not here to prove

7   you anything, he stated that in Punjabi in an aggressive

8   manner.

9       Q.      Did your husband ever say anything in Punjabi

10  while the police officers were in the apartment?

11      A.      No, he didn't.

12      Q.      He never said anything to you in Punjabi while

13  they were there?

14      A.      No, he did not said anything to me, and like I

15  said, all he said was that why did you call them, why did

16  you call all of them, what happened?

17      Q.      We're going to play it from 5:23?

18              (Whereupon, the police video was played.)

19      Q.      We're going to pause it at 5:49.

20              Did you see your brother-in-law just come back

21  out in the hallway?

22      A.      Yes.

23      Q.      And did the shorter officer say something to him?

24      A.      Yeah, the short officer said that all the kids to

25  stay inside, don't come outside.

A. KAUR

Page 63

1    Q.    Was that referring to your son?

2    A.    Yes, that was referring to my son and he said

3    that to my brother-in-law that tell the kids to stay

4    inside, don't come outside.

5    Q.    Okay.  I'm going to keep going.

6              (Whereupon, the police video was played.)

7    Q.    I paused it at 7 minutes and 26 seconds.

8              Your husband is putting on his glasses here?

9    A.    Yes, and I told -- he told me can you pass me my

10   glasses, and I passed him the glasses.

11   Q.    Up until this point, had any of the officers put

12   their hands on your husband at any point?

13   A.    No.

14   Q.    Had they said anything about handcuffing him?

15   A.    No.  At this point, nobody said the word

16   "handcuff," yet.

17   Q.    We're going to keep playing from 7:26?

18              (Whereupon, the police video was played.)

19   Q.    I paused it at 7:58.

20              Do you know what's happening at this point in the

21   video?

22   A.    Yes.  At this point, you know, he was -- the tall

23   officer, you know, told my husband that put your hands

24   behind your back and my husband did -- he said that in

25   Punjabi and my husband did not knew that that's what he

A. KAUR

Page 64

1   meant when he said that -- that he meant that he was going

2   to handcuff him, my husband did not knew that.  So, he was

3   just -- my husband thought he was just ordering like he's

4   been ordering all the time, as soon as he walked into the

5   apartment, he was the aggressive one.  So, you can see now

6   I was just -- I was just putting water in a glass because I

7   was getting my husband some water, that's all.

8       Q.      So, when this actually happened, you heard the

9   tall officer say "put your hands behind your back" in

10  Punjabi; is that right?

11      A.      Yes, exactly the same words, "Put your hands

12  behind you."

13      Q.      And your husband put his hands behind his back,

14  right?

15      A.      Yes, you can see it in the video.

16      Q.      And you said this was -- you recall that this was

17  the point in time where the officer grabbed him and put him

18  on the ground, right?

19      A.      Yes, correct.

20      Q.      So, we're going to play forward from 7:58.

21              (Whereupon, the police video was played.)

22      Q.      I paused at 8 minutes and 1 second.

23              Do you see your husband put his hands back in

24  front of him and start to step away from the officer?

25      A.      At this point, like I said, my husband did not

A. KAUR

Page 65

1  knew that he was saying that, so he -- because my husband

2  was going to get handcuffed, he did not knew that he was

3  going to get handcuffed.  He thought the officer was just

4  saying put your hands behind you, so maybe he was just

5  saying that because the officer wanted his hands behind him

6  for that moment, he did not knew that the officer wanted to

7  handcuff him.

8      Q.     Did he say that at that moment, "I didn't know

9  you wanted to handcuff me"?

10     A.     No, because the officer never stated that I'm

11 going to handcuff you, so my husband never asked.

12     Q.     I just want to make sure that I'm getting what

13 you know about the situation and you're not guessing, okay?

14     A.     Yes, yes.

15     Q.     So, why do you think that your husband didn't

16 understand that he -- that the officer wanted to handcuff

17 him?

18     A.     Even I was over there and even I did not believe

19 that the officer wanted to handcuff my husband because

20 that's not what they were there for.

21     Q.     I understand.  I just want to -- and that's your

22 understanding.  What I want to know is, did your husband

23 say to you at some point, "I didn't know he wanted to

24 handcuff me" or something like that, or are you guessing

25 what was in his mind?

A. KAUR

Page 66

1    A.    No.  Like I said, my husband did not knew that he

2    was going to get arrested and he did not knew at that point

3    he was getting handcuffed, and he did not knew that, you

4    know, what was going on.  He -- knew he was going to the

5    hospital, why would he be handcuffed if you go into the

6    hospital, so my husband knew that he was not a criminal, he

7    has not committed any crime and he has not committed any

8    crime in the video.  And that's why the officer said "put

9    your hands behind you" in Punjabi, he put his hands behind

10   him just so he could follow the command of the officer.

11   And that's exactly what he did, but he did not knew that he

12   was going to get handcuffed.  If he was getting handcuffed

13   and arrested, he would have complied either way, he would

14   have gotten handcuffed and he would have complied with

15   that, but the officer never stated that I'm going to arrest

16   you and handcuff you.

17   Q.    I understand, and I understand what you were

18   thinking about the situation.  But I'm just trying to

19   understand how you know your husband was thinking at that

20   moment, okay?  So, I want to ask the question again.

21         Did your husband say to you at some point that he

22   didn't understand that the officer was trying to handcuff

23   him at any point, did he say that to you?

24   A.    Yes, I -- I actually said that before, too, that,

25   you know, my husband also stated, also said that to me that

A. KAUR

Page 67

 1    he did not knew that he was getting arrested, and he did

 2    not knew that he was getting handcuffed, he said that to me

 3    numerous times.

 4        Q.      When did he say to you that he didn't understand

 5    the officer was trying to handcuff him?

 6        A.      When he came back from the hospital the next day,

 7    he told me and, you know, like I said, he was crying and he

 8    said that in a very emotional manner that he did not knew

 9    that he was getting arrested.

10        Q.      But what I want to focus on is this particular

11    moment, you're saying that you believe he moved his hands

12    away because he didn't know the officer was trying to

13    handcuff him; is that what you're saying?

14        A.      No, because you can see the officer, when the

15    officer said put your hands behind you, he was not holding

16    any handcuffs, he was not showing anything, any signs of

17    arresting, so he did not knew, my husband did not knew at

18    this point that he was getting arrested.

19        Q.      It's a very simple question and I want -- clear

20    set of answers.  What your testimony is, is that you

21    believe your husband didn't know at this moment that the

22    officer was trying to handcuff him, and I don't want to

23    know why he might have thought that, but I just want to

24    understand, that's what you're saying, in this moment, you

25    believe your husband did not know that the officer was

A. KAUR

Page 68

1  trying to handcuff him; is that correct?

2      A.    No, he did not.

3      Q.    And you believe that because your husband said to

4  you something later, or why do you believe that about this

5  moment?

6      A.    Yes, I will say that, you know, even I did not

7  knew, my husband did not knew and I've said that numerous

8  and numerous times, again and again and again that if the

9  cops were there to arrest my husband, I would have never

10  let them in my house.  And I said that again and again and

11  again that nobody knew at that point or even prior or --

12  that they were there to arrest him.

13      Q.    You said before in this deposition that the

14  officer tried to handcuff your husband --

15              MS. FADDIS:  Withdrawn.

16      Q.    You said before that the officer told your

17  husband to put his hands behind his back, and then threw

18  him on the ground, right?

19      A.    Yes, correct.

20      Q.    You said that the officer did that after your

21  husband put his hands behind his back, right?

22      A.    Yes.

23      Q.    And you said that you did not see your husband

24  move his hands away from the officer and step away from the

25  officer, right?

A. KAUR

```
                                                    Page 69

 1      A.      First of all, I want to say that you can see in

 2   this video that the shorter officer was standing right in

 3   front of me, so I didn't have a clear image of what was

 4   going on.  Or secondly, I want to say that my husband did

 5   not try to get away from the officers or did not try to run

 6   away, you know, because he has not done anything wrong, why

 7   would he want to move away or run away?

 8      Q.      All right.

 9              We're going to play from 8 minutes and 1 second.

10                  MR. COHEN:  Off the record.

11                  (Whereupon, an off-the-record discussion was

12              held.)

13                  (Whereupon, the police video was played.)

14      Q.      This is the portion of the incident where your

15   husband -- the police officer put your husband on the

16   floor?

17      A.      Yes, correct.

18      Q.      It's paused at 8:09, we're going to keep playing.

19                  (Whereupon, the police video was played.)

20      Q.      8:26, the officers are walking him off that door,

21   right?

22      A.      Yes.

23      Q.      And is your husband standing?

24      A.      He was actually unconscious at this point.

25      Q.      He looks like he's standing on his own two feet
```

A. KAUR

Page 70

1  but he's unconscious --

2      A.      No.  As you can see, and you can see the officers

3  are holding him from his arm and, you know, they slammed

4  him on the floor and he was blurred, he was, you know --

5  his eyes, like I said, his glasses were broken, and you can

6  see the officers are holding him in each arm.

7      Q.      The officer on his left side is one of the

8  shorter officers, right?

9      A.      The shorter officer went forward already, the one

10  behind is a female.

11      Q.      And so, that female officer is holding your

12  husband?

13      A.      Yes, you can see it from here.

14      Q.      Where do you see her holding him?

15      A.      You can see the taller officer holding my

16  husband, and you can see the video and play it back, the

17  tall officer slammed him on the floor, and then he was the

18  one who picked him up, my husband did not stood up on -- by

19  himself.

20      Q.      We're going to play forward from 8:26?

21              (Whereupon, the police video was played.)

22      Q.      I paused it at 8:39.

23              You just exited the apartment after your husband,

24  right?

25      A.      Yes, I left.

A. KAUR

Page 71

1      Q.     I'm going to play the last few seconds of the

2  video from 8:39.

3                (Whereupon, the police video was played.)

4      Q.     Ms. Kaur, do you know if there is any video --

5                MS. FADDIS:  Withdrawn.

6      Q.     The video that we watched came from your home

7  security system, right?

8      A.     No.

9      Q.     Do you know where the video came from?

10     A.     Yes, it's from the camera, from our camera.

11     Q.     Do you know how many cameras are on that system?

12     A.     In our house?

13     Q.     Yes.

14     A.     One is in the living room, one is outside in the

15  driveway.

16     Q.     Do you know how to operate at that video system?

17     A.     No, I don't.

18     Q.     Do you know if the video from February 28th is

19  still in the system?

20     A.     No, I don't think it will be there because I

21  remember my husband saying that one time that the data is

22  only being kept for 15 days, and it automatically deletes

23  itself.

24     Q.     Ms. Kaur, do you know if your husband was injured

25  during this incident?

A. KAUR

Page 72

1    A.      Yes, my husband was hurt, you know, he had -- he

2    was bruised up, he was bruised up on the forehead, on his

3    back and on his shoulders, he was hurt.

4    Q.      You said he was bruised on his forehead?

5    A.      Yes, he was bruised up on his forehead and, you

6    know, like I said before, that where the officers slammed

7    him on the floor, that side of his forehead was bruised up.

8    Q.      And what was the injury to his back?

9    A.      More injury to -- his back was sprained, but more

10   of the injury was on his shoulder.

11   Q.      Which shoulder?

12   A.      The side that they slammed my husband on, that

13   shoulder.

14   Q.      You're not sure if it's the left or the right?

15   A.      I think it's the right, maybe it's the right,

16   maybe.

17   Q.      Have you ever observed if that injury has

18   affected him in any way since the incident?

19   A.      Yes, you know, he cannot lift anything, he cannot

20   lift anything, he cannot lift any weight, you know.  He

21   could not drive, he cannot drive a car for long periods of

22   time, he cannot lift weight.

23   Q.      You said you came to live with him in 2017 in the

24   U.S.?

25   A.      Yes.

A. KAUR

Page 73

1      Q.     Do you know anything about his medical history

2   before you came to the U.S. in 2017?

3      A.     No, he did not have any medical problems before,

4   he did not have any medical history with lifting weight or,

5   you know, driving a car.  His job was to, you know, drive a

6   car and, you know, my husband was doing everything, like I

7   said, he was doing laundry, he was doing grocery, he was

8   doing everything, and he was handling everything.

9      Q.     Ms. Kaur, I just want to be clear, I'm not just

10  talking about right before the incident, I want to talk

11  about before you came to live with him in the United

12  States, do you know anything about any of his medical

13  history before 2017?

14     A.     Medical history --

15             MR. COHEN:  Off the record.

16             (Whereupon, an off-the-record discussion was

17         held.)

18             THE WITNESS:  Medical history, as in you're

19         saying that -- I don't understand your question,

20         what are you tying to ask?

21     Q.     I'll ask you a different question.  Do you know

22  if before you came to the United States in 2017 your

23  husband had ever had any injuries to his shoulder before?

24     A.     I don't know about that.  To be honest with you,

25  I don't know about that.

A. KAUR

Page 74

1    Q.    Do you know if before you came to the United

2    States in 2017, your husband had ever had any injury to his

3    back?

4    A.    Prior to 2017?

5    Q.    Yes.

6    A.    He was hurt on his back a long time ago, but he

7    had treatment for that and he was okay after that.

8    Q.    And as far as you know, on February 28th, before

9    the encounter with the police, your husband's shoulder was

10   fine?

11   A.    Yes, it was fine.

12   Q.    And the same question for the back, on February

13   28th, before your encounter with the police, as far as you

14   know, his back was fine?

15   A.    Yes, yes, his back was fine, he was working.

16   Q.    Have you ever come to the U.S. between 2006, when

17   you were married, and 2017 --

18   A.    No, I didn't.

19   Q.    Did you ever see your husband in-person between

20   2006 and when he came to the U.S. in 2017?

21   A.    Yes, in Thailand.  Yes, after marriage, we did

22   met in Thailand, yes.

23   Q.    Was that for the approximately one month you

24   mentioned earlier?

25   A.    No, that was the month of marriage.  After that,

A. KAUR

Page 75

1   again, you know, we met.

2       Q.    When was that?

3       A.    I don't remember.  I don't remember exact date, I

4   don't remember exact time, but it was either 2010 or 2011.

5       Q.    Was that the only time or did you see him any

6   other time before 2017?

7       A.    No, that was the only time.  No, I waited after

8   that, and then I came over here to the United States.

9       Q.    Did he ever visit you in India?

10      A.    No, he didn't.

11      Q.    Were you aware --

12             MS. FADDIS:  Withdrawn.

13      Q.    Are you aware that your husband was in a car

14  accident in 2017?

15      A.    No, I don't remember that.

16      Q.    Are you aware that he was in a car accident in

17  2018?

18      A.    Yes, the one in October, I was also with him at

19  that time.

20      Q.    Do you know if he suffered any injuries in that

21  October car accident?

22      A.    No, he was not hurt.  I was hurt in that

23  accident.

24      Q.    Ms. Kaur, do you work?

25      A.    No, I don't, I'm a housewife.

A. KAUR

                                                          Page 76

1       Q.      Have you had any jobs since you came to the

2   United States?

3       A.      No, I haven't.

4       Q.      Did you work when you were in India?

5       A.      No.

6       Q.      What's your highest level of education?

7       A.      I'm a graduate.

8       Q.      Of a high school, college or something else?

9       A.      Bachelor's.

10       Q.      Where did you get your bachelor's?

11       A.      India, Punjab.

12       Q.      Ms. Kaur, before today, had you watched either of

13   the videos that we watched today?

14       A.      Yes, I watched it before.

15       Q.      When is the last time before today that you saw

16   either of those videos?

17       A.      I don't remember the exact time, but the time

18   close to the incident I saw, when my husband saved it.  And

19   my lawyer also showed me this video and asked me questions,

20   and at that time I've also seen this video with my lawyer,

21   and this is only one or two days ago.

22       Q.      And who are you referring to when you say your

23   lawyer?

24       A.      Same lawyer as my husband's lawyer, you know,

25   that's exactly what I mean by our lawyer.

A. KAUR

Page 77

1      Q.     And so, you spoke with the lawyer in preparation

2    for your deposition today?

3      A.     Yes.

4      Q.     And what did you talk about?

5      A.     He told me that, you know, whatever happened,

6    tell everything truthfully, nothing but the truth and

7    whatever you remember, don't guess anything, just say -- if

8    you don't remember, just say you don't remember.

9      Q.     Ms. Kaur, is there anything else you'd like to

10   add to your deposition today?

11     A.     No, I stated everything truthfully as far as I

12   can.

13     Q.     Do you need to correct or change any of the

14   answers you've given?

15     A.     No, I stated everything truthfully and correctly.

16            MS. FADDIS:  All right.  I don't have

17            anything else.

18            Do you have anything.

19            MR. COHEN:  I'm okay.  Thank you so much.  I

20            don't have any questions.

21            (Whereupon, at 4:36 p.m., the Examination of

22            this witness was concluded.)

23

24            o           o           o           o

25

A. KAUR

Page 78

1          D E C L A R A T I O N

2

3          I hereby certify that having been first duly

4    sworn to testify to the truth, I gave the above testimony.

5

6          I FURTHER CERTIFY that the foregoing transcript

7    is a true and correct transcript of the testimony given by

8    me at the time and place specified hereinbefore.

9

10

11

_____

12                    AMANDEEP KAUR

13

14

15   Subscribed and sworn to before me

16   this _____ day of _____ 20____.

17

18

_____

19          NOTARY PUBLIC

20

21

22

23

24

25

A. KAUR

```
                                                    Page 79

 1                        E X H I B I T S

 2

 3     EXHIBITS

 4

 5     EXHIBIT       EXHIBIT                        PAGE

 6     LETTER        DESCRIPTION

 7     A             Video tape recording           40

 8

 9     B             Video of EMS                    42

10

11     C             Video marked police video      52

12

13                   (Exhibits retained by Counsel.)

14

15                        I N D E X

16

17     EXAMINATION BY                               PAGE

18     MS. FADDIS                                     4

19

20

21

22

23

24

25
```

A. KAUR

Page 80

1              INFORMATION AND/OR DOCUMENTS REQUESTED

2        INFORMATION AND/OR DOCUMENTS              PAGE

3        (None)

4

5

6                QUESTIONS MARKED FOR RULINGS

7        PAGE LINE     QUESTION

8        (None)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A. KAUR

Page 81

1                    C E R T I F I C A T E

2

3   STATE OF NEW YORK        )

                                    :   SS.:

4   COUNTY OF KINGS          )

5

6            I, ROSE MARIE IACOBELLIS, a Notary Public for

7   and within the State of New York, do hereby certify:

8            That the witness whose examination is

9   hereinbefore set forth was duly sworn and that such

10  examination is a true record of the testimony given by that

11  witness.

12           I further certify that I am not related to any

13  of the parties to this action by blood or by marriage and

14  that I am in no way interested in the outcome of this

15  matter.

16           IN WITNESS WHEREOF, I have hereunto set my hand

17  this 21st day of December 2020.

18

19

20   _____

              ROSE MARIE IACOBELLIS

21

22

23

24

25