# 23-24cv

# United States Court of Appeals for the Second Circuit

BALWINDER SINGH,

*Plaintiff-Appellant,*

v.

THE CITY OF NEW YORK, P.O. MANDEEP CHEEMA,
Tax Id. No. 950196, Individually and in his Official Capacity,
POLICE OFFICERS JOHN DOE #1-10, Individually and in
their Official Capacity (the name John Doe being fictitious,
as the true names are presently unknown),

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT,
EASTERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## VOLUME VI OF VI (PAGES JA-1167–JA-1437)

COHEN & FITCH LLP
*Attorneys for Plaintiff-Appellant*
233 Broadway, Suite 900
New York, New York 10279
(212) 374-9115
jfitch@cohenfitch.com

NEW YORK CITY LAW DEPARTMENT
*Attorneys for Defendants-Appellees*
100 Church Street, Room 6-178
New York, New York 10007
(212) 356-2490
Alexander.li@usdoj.gov

0862

# TABLE OF CONTENTS

Docket Entries ..........................................................................................JA-1

Complaint, Dated January 31, 2019.........................................................JA-10

Plaintiff's Notice of Motion for Summary Judgment,
Dated July 12, 2021 ................................................................................JA-24

Plaintiff's Statement of Undisputed Facts, Dated July 12, 2021...............JA-26

Plaintiff's Supporting Declaration by Gerald M. Cohen,
Dated July 12, 2021 ................................................................................JA-34

Exhibit A to Cohen Declaration -
Excerpts of Transcript of EBT of Balwinder Singh (Plaintiff),
Taken October 5, 2020.....................................................................JA-36

Exhibit B to Cohen Declaration -
Excerpts of Transcript of Video-Conference EBT of
Amandeep Kaur (Non-Party Witness),
Taken December 3, 2020 ..................................................................JA-49

Exhibit C to Cohen Declaration -
Excerpts of Transcript of EBT of P.O. Mandeep Cheema
(Defendant), Taken October 7, 2020..................................................JA-53

Exhibit D to Cohen Declaration -
Audio Recording of the 911 Call........................................................JA-99
*(Submitted on Separate Thumbdrive)*

Exhibit E to Cohen Declaration -
Excerpts of Transcript of EBT of Nicole Milonas
(Non-Party Witness), Taken October 22, 2020 ...............................JA-100

Exhibit F to Cohen Declaration -
Pre-Hospital Care Report of Jamaica Hospital Medical
Center Regarding Balwinder Singh,
Dated February 28, 2018................................................................JA-116

Exhibit G(1-3) to Cohen Declaration -
Full Video Recording .......................................................................JA-119
*(Submitted on Separate Thumbdrive)*

Exhibit H to Cohen Declaration -
Aided Report from Incident Occurred,
Dated February 28, 2018.................................................................JA-120

Exhibit I to Cohen Declaration -
Excerpts of Transcript of EBT of Justin Davis
(Non-Party Witness), Taken November 5, 2020 ............................JA-122

Exhibit J to Cohen Declaration -
Excerpts of Transcript of EBT of Malinda Walker
(Non-Party Witness), Taken October 27, 2020 .............................JA-131

Exhibit K to Cohen Declaration -
Expert Radiologist Reports ............................................................JA-137

Exhibit L to Cohen Declaration -
Photographs of Plaintiff's Face Injury...........................................JA-145

Exhibit M to Cohen Declaration -
Excerpts of Transcript of EBT of Marisabel Schapira
(Non-Party Witness), Taken October 22, 2020 .............................JA-154

The City of New York and Officer Mandeep Chemma's
Notice of Cross-Motion for Summary Judgment,
Dated September 24, 2021 ..............................................................JA-156

The City of New York and Officer Mandeep Chemma's
Response to Statement of Undisputed Facts and
Counter-Statement of Material Fact, Dated September 24, 2021 ..........JA-158

The City of New York and Officer Mandeep Chemma's
Supporting Declaration by Hannah V. Faddis,
Dated September 24, 2021 ..............................................................JA-179

Exhibit A to Faddis Declaration -
Complaint, Dated January 31, 2019
(Reproduced herein at pgs. JA-10-JA-23).......................................JA-182

Exhibit B to Faddis Declaration -
City of New York and Mandeep Chemma's Answer,
Dated April 29, 2019......................................................................JA-183

Exhibit C to Faddis Declaration -
Transcript of EBT of Balwinder Singh (Plaintiff),
Taken October 5, 2020...................................................................JA-193

Exhibit D to Faddis Declaration -
Transcript of EBT of P.O. Mandeep Cheema (Defendant),
Taken October 7, 2020...................................................................JA-384

Exhibit E to Faddis Declaration -
Transcript of EBT of Justin Davis (Non-Party Witness),
Taken November 5, 2020................................................................JA-619

Exhibit F to Faddis Declaration -
Transcript of EBT of Malinda Walker (Non-Party Witness),
Taken October 27, 2020.................................................................JA-782

Exhibit G to Faddis Declaration -
Transcript of EBT of Nicole Milonas (Non-Party Witness),
Taken October 22, 2020.................................................................JA-867

Exhibit H to Faddis Declaration -
Transcript of EBT of Marisabel Schapira
(Non-Party Witness), Taken October 22, 2020 ..............................JA-986

Exhibit I to Faddis Declaration -
Transcript of Video-Conference EBT of Amandeep Kaur
(Non-Party Witness), Taken December 3, 2020...........................JA-1086

Exhibit J to Faddis Declaration -
Transcript of Video-Conference EBT of Lakhwinder Singh
(Non-Party Witness), Taken December 15, 2020.........................JA-1183

Exhibit K to Faddis Declaration -
NYPD Intergraph Computer Aided Dispatch System
Event Chronology ........................................................................JA-1298

Exhibit L to Faddis Declaration -
Pre-Hospital Care Report of Jamaica Hospital Medical
Center Regarding Balwinder Singh, Dated February 28, 2018
(Reproduced herein at pgs. JA-116-JA-118) ..................................JA-1303

Exhibit M to Faddis Declaration -
Medical Records of Jamaica Hospital Medical Center
Regarding Balwinder Singh .........................................................JA-1304

Exhibit N to Faddis Declaration -
EMS Video ..................................................................................JA-1333
*(Submitted on Separate Thumbdrive)*

Exhibit O to Faddis Declaration -
Surveillance Video Still Images ....................................................JA-1334

Exhibit P to Faddis Declaration -
Audio Recording of the 911 Call made by Amandeep Kaur,
Dated February 28, 2018................................................................JA-1340
*(Submitted on Separate Thumbdrive)*

Plaintiff's Response to Defendants' Counter-Statement of Material
Facts Pursuant to Local Rule 56.1, Dated November 12, 2021 .............JA-1341

Plaintiff's Reply Affirmation by Gerald M. Cohen,
Dated November 29, 2021 ...........................................................JA-1376

Exhibit N to Cohen Reply Affirmation -
Video Recording ..........................................................................JA-1378
*(Submitted on Separate Thumbdrive)*

Exhibit O-1 to Cohen Reply Affirmation -
Still Photo from Video of Incident................................................JA-1379

Exhibit O-2 to Cohen Reply Affirmation -
Still Photo from Video of Incident................................................JA-1380

Exhibit O-3 to Cohen Reply Affirmation -
Still Photo from Video of Incident................................................JA-1381

Exhibit O-4 to Cohen Reply Affirmation -
Still Photo from Video of Incident................................................JA-1382

v

Exhibit O-5 to Cohen Reply Affirmation -
Still Photo from Video of Incident...................................................JA-1383

Letter from Hannah V. Faddis to Hon. Eric Komitee,
Dated May 10, 2022....................................................................JA-1384

Report and Recommendation of Hon. Steven L. Tiscione,
Dated June 28, 2022 ...................................................................JA-1385

Memorandum and Order of Hon. Eric Komitee,
Dated September 30, 2022 .........................................................JA-1404

Stipulation and Order of Partial Dismissal, Dated December 2, 2022..JA-1431

Judgment of United States District Court Eastern District of
New York, Dated December 6, 2022, Appealed From ............................JA-1434

Plaintiff's Notice of Appeal, Dated January 4, 2023...............................JA-1436

Page 82

1           ERRATA SHEET
        VERITEXT/NEW YORK REPORTING, LLC
2

    CASE NAME: SINGH, BALWINDER v. City Of New York Et Al.
3   DATE OF DEPOSITION: 12/3/2020
    WITNESSES' NAME: Amandeep Kaur
4
5   PAGE   LINE (S)        CHANGE            REASON
    ____|_____|_____|_____
6
    ____|_____|_____|_____
7
    ____|_____|_____|_____
8
    ____|_____|_____|_____
9
    ____|_____|_____|_____
10
    ____|_____|_____|_____
11
    ____|_____|_____|_____
12
    ____|_____|_____|_____
13
    ____|_____|_____|_____
14
    ____|_____|_____|_____
15
    ____|_____|_____|_____
16
    ____|_____|_____|_____
17
    ____|_____|_____|_____
18
    ____|_____|_____|_____
19
    ____|_____|_____|_____
20
21                              _____
                                Amandeep Kaur
22  SUBSCRIBED AND SWORN TO BEFORE ME
    THIS ____ DAY OF _____, 20__.
23
24
    _____        _____
25  (NOTARY PUBLIC)             MY COMMISSION EXPIRES:

Diamond Reporting
A Veritext Company
877.624.3287                                    www.veritext.com

**[& - alcoholic]**                                                      Page 1

| & |
| --- |
| **&**   2:3 3:13 |

| 1 |
| --- |
| **1**   3:13 51:7,21 53:16 56:21 57:17 57:19 64:22 69:9 |
| **100**   2:10 |
| **10007**   2:11 |
| **10022**   2:5 |
| **11**   44:2 |
| **110**   2:4 |
| **11419**   4:14 |
| **11:00**   11:12 |
| **11:30**   11:12 |
| **12/3/2020**   82:3 |
| **130-18**   4:13 |
| **15**   24:15,18 71:22 |
| **17**   58:19 59:10 |
| **19**   1:5 |
| **1:09**   1:11 |

| 2 |
| --- |
| **2**   48:3,6 49:19 58:6 |
| **20**   44:8 45:19 54:12 55:16 78:16 82:22 |
| **20-2329**   2:12 |
| **2006**   9:23 10:9,19 10:20 74:16,20 |
| **2007**   10:24 |
| **2010**   75:4 |
| **2011**   75:4 |
| **2017**   8:15,17,20,24 9:7 10:2 18:19 72:23 73:2,13,22 74:2,4,17,20 75:6 75:14 |
| **2018**   9:13 10:25 11:2 12:3 22:5 75:17 |

| (next column) |
| --- |
| **2019-008905**   2:12 |
| **2020**   1:10 81:17 |
| **21st**   81:17 |
| **23**   61:9 |
| **24**   7:5,8,20 |
| **24531**   81:19 |
| **26**   59:13 63:7 |
| **28th**   11:2 71:18 74:8,13 |
| **29**   56:21 57:17 |
| **2:37**   58:17 |
| **2nd**   12:6 |

| 3 |
| --- |
| **3**   1:10 49:22 58:19 59:10,13 61:2 |
| **3.6.**   59:20 |
| **30**   3:12 |
| **31**   46:12 |
| **32**   46:3 |
| **3200**   2:4 |
| **37**   8:10 58:6 |
| **39**   49:22 |
| **3:00**   35:16 |
| **3:49**   59:22 60:25 |
| **3:52**   50:10 51:5 |
| **3rd**   4:13 |

| 4 |
| --- |
| **4**   51:7,21,24 52:4 61:3,3 79:18 |
| **40**   79:7 |
| **41**   47:19 48:3 51:24 52:5 55:18 56:12 |
| **42**   79:9 |
| **43**   46:24 47:17,20 |
| **47**   56:14,19 |
| **49**   61:2 |
| **4:00**   35:16 |
| **4:04**   61:2,7 |

| (next column) |
| --- |
| **4:36**   77:21 |

| 5 |
| --- |
| **5**   61:9,19 |
| **50**   46:22 49:19 |
| **51**   45:20,22 |
| **52**   79:11 |
| **53**   48:6 |
| **55**   57:19 |
| **59th**   2:4 |
| **5:23**   62:17 |
| **5:49**   62:19 |

| 6 |
| --- |
| **632**   1:5 |
| **6:32**   43:22 |
| **6:37**   52:3,25 |
| **6:44**   52:22 |

| 7 |
| --- |
| **7**   51:25 53:2 63:7 |
| **7:26**   63:17 |
| **7:58**   63:19 64:20 |

| 8 |
| --- |
| **8**   64:22 69:9 |
| **83**   8:10 |
| **8:09**   69:18 |
| **8:26**   69:20 70:20 |
| **8:39**   70:22 71:2 |

| 9 |
| --- |
| **9-1-1**   21:6,11,18 22:13,14,15 23:5,8 23:11,12,18,22 24:20 26:13,16 31:21 33:6 37:1 40:1,6,11 49:13 |

| a |
| --- |
| **a.m.**   52:22,25 |
| **ability**   7:13 |
| **able**   6:19 40:12 48:2 |

| (next column) |
| --- |
| **abnormal**   50:21 |
| **absolutely**   30:14 36:4 |
| **accident**   75:14,16 75:21,23 |
| **accurately**   6:24 |
| **acid**   16:13 |
| **acidity**   7:16 16:14 16:16 18:4,6,13 19:7 |
| **acting**   16:21 17:4 17:7 |
| **action**   81:13 |
| **add**   77:10 |
| **address**   4:12 8:11 8:24 9:1,6 22:16 22:19,20 |
| **administer**   3:9 |
| **affect**   7:13 |
| **aforementioned** 40:3 42:15 52:9 |
| **afraid**   17:19,20,22 20:16 21:11 25:13 25:14,17 51:3 |
| **afternoon**   4:15,16 51:11 61:18 62:7 64:5 |
| **aggressive**   36:17 |
| **aggressively**   59:2 |
| **ago**   74:6 76:21 |
| **agree**   23:21 |
| **agreed**   3:4,15 31:25 57:22 |
| **air**   49:24 |
| **al**   1:7 2:10 82:2 |
| **alarm**   13:9,11,12 |
| **alcohol**   14:6 28:6 |
| **alcoholic**   7:19 21:20,22,24 22:1,3 22:7,10 25:22 |

**[amandeep - bought]**                                                                   Page 2

| | | | |
|---|---|---|---|
| **amandeep**  1:15 4:11 7:22 8:1 78:12 82:3,21 | **arguments**  21:1 | **attention**  33:7,20 | **bed**  11:10,23 12:8 14:2 35:9 |
| **ambulance**  22:25 23:2 26:12,24 49:13 | **arm**  28:25 46:15 70:3,6 | **attorney**  2:9 4:17 | **bedroom**  11:15,25 12:22 23:10 24:4 24:15,19 37:1 49:12,13,14 |
| **anger**  29:23,23,25 | **arms**  50:11 | **attorneys**  2:3 | |
| **angrily**  36:14 | **arrest**  66:15 68:9 68:12 | **audio**  40:6,7,11 | **beer**  15:8,9,17 16:8 20:21 25:8 26:3,3 |
| **angry**  17:22,23,24 20:17 36:13 51:13 51:15,20 | **arrested**  33:25 34:2,15 66:2,13 67:1,9,18 | **aunties**  10:12 | |
| **animated**  47:2 51:18 | **arresting**  35:5 67:17 | **authorized**  3:8 | **began**  9:6 |
| **animating**  47:4 | **arrive**  8:18 26:9 26:10,11,22 30:16 54:6,16 | **automatically**  71:22 | **begging**  35:9 |
| **answer**  5:11,17,23 6:2,7 20:22 49:6,7 49:9 | **arrived**  8:14,17,21 9:4 31:13 54:5,9 55:14 | **avenue**  4:13 8:11 8:24 9:7 | **beginning**  8:12 40:9 42:23 |
| **answering**  20:24 41:1 | **aside**  31:14 | **awake**  11:20,21 14:3 | **behave**  29:1 |
| **answers**  4:3 67:20 77:14 | **asked**  6:8 16:7,7 16:12 19:11 20:19 22:16,17,19 24:9 27:16,20,20 28:5 33:14 35:4 36:11 36:11,13,15,16 39:22 41:6,12,13 41:20 42:1 49:14 53:10 54:17 65:11 76:19 | **aware**  15:3 75:11 75:13,16 | **behaving**  16:22 28:21 |
| **apartment**  9:12,18 27:14 31:12 35:22 37:15 43:16,22 44:3 54:23 60:12 62:10 64:5 70:23 | | **b** | **behavior**  17:10 19:9 29:5,6 50:18 |
| **appear**  43:12 44:9 | | **b**  4:1 42:12,16,18 79:1,9 | **believe**  35:12 36:4 65:18 67:11,21,25 68:3,4 |
| **appears**  53:25 55:22 61:10 | | **bachelor's**  76:9,10 | **bend**  60:3 |
| **approximately**  52:24 74:23 | | **back**  13:22,25 20:8 24:4,15,19 27:10 32:14 33:4 37:2,5,7 38:7,9,13 39:2,6 42:3,6,6,8,8 45:19 48:25 49:1 49:7,10,16 57:2 62:20 63:24 64:9 64:13,23 67:6 68:17,21 70:16 72:3,8,9 74:3,6,12 74:14,15 | **better**  54:24 |
| **argue**  30:3,4 42:7 57:24 | **asking**  22:22 29:22 30:22 41:2 47:13 56:17 60:9 | | **beverages**  7:19 |
| **argued**  36:4,5 | **asleep**  12:1 14:20 | | **big**  15:21 |
| **argues**  42:8 | **assessed**  29:12,14 29:15,18 | | **bit**  25:16 28:16 38:2 49:8 50:8 |
| **arguing**  21:3,5 29:20,23 30:1,6 41:15,21,22 42:5 51:14 | **assistance**  31:22 | **bad**  21:10 | **blonde**  44:17,25 46:4 |
| | **assume**  5:23 43:21 | **bag**  46:16 | **blood**  81:13 |
| | **assumed**  34:10 | **balwinder**  1:2 2:4 82:2 | **blue**  46:7,19 |
| **argument**  41:4 | **assure**  22:2 | **basically**  7:16 18:18 50:13 | **blurred**  70:4 |
| | **atlantic**  4:13 8:11 8:24 9:7 | **basis**  7:15 | **bobby**  8:6 |
| | | **bathroom**  14:25 15:1 35:10,11,12 35:20 | **body**  18:5 50:11 |
| | | | **born**  8:10 10:24 10:25 12:3 |
| | | | **bottles**  15:8,17,18 15:20 16:2 20:21 25:9 26:3,3 |
| | | | **bought**  16:10 |

Case 23-24, Document 33, 04/19/2023, 3501834, Page10 of 277

**break** 6:5,8
**breathing** 41:6,9
  41:10
**broke** 32:21
**broken** 70:5
**brother** 24:21,24
  25:1,19 26:4
  27:25 54:2,4
  55:19 56:16,17
  62:20 63:3
**brother's** 24:22
**brought** 4:20 16:8
**bruised** 72:2,2,4,5
  72:7
**brutally** 32:19
  33:3 39:12
**built** 31:1,3,4,5

**c**

**c** 2:1 52:7,10,13
  78:1 79:11 81:1,1
**call** 8:5 12:16,17
  12:19 20:9 22:15
  23:9,18 24:24
  26:18,20 27:18,19
  27:20,21 29:18
  30:5 36:12,16
  39:6 40:2 45:10
  49:15,15 53:9
  56:18 57:2,15
  62:15,16
**called** 4:5 21:6,11
  21:18 22:13,16
  23:2,5,8,11,22
  24:19,21,25 25:18
  25:24 26:5,12,13
  26:16 27:3,8,19
  29:9,10 30:5,15
  31:21 33:6 37:1
  39:8 47:25 48:1
  48:15,24 49:3,12
  49:12,13,17 56:18

56:18 57:8 60:18
**calling** 22:14,24
  22:25 23:12,18
  60:21
**calm** 61:16
**calmly** 61:24
**camera** 43:15
  44:16,17 46:5
  71:10,10
**cameras** 71:11
**car** 72:21 73:5,6
  75:13,16,21
**care** 16:18,19
**case** 1:5 6:19 37:4
  40:2 42:13 52:14
  82:2
**caucasian** 31:9
  32:13
**cause** 18:11
**caused** 18:13,13
  18:21 21:13
**causing** 20:3
**cell** 27:9
**center** 43:10
**certification** 3:6
**certify** 78:3,6 81:7
  81:12
**chair** 53:6
**chance** 6:14
**change** 77:13 82:5
**changed** 8:2 32:5
**changes** 6:15,18
  6:19
**checked** 29:17
**cheema** 4:19 34:25
**child** 12:3
**childish** 17:9,10
  19:10,10,18
**children** 10:21
**church** 2:10

**city** 1:7 2:9,10
  4:18,18 82:2
**civil** 1:16
**cleaning** 32:6
**clear** 46:9 67:19
  69:3 73:9
**clearer** 46:10
**climbed** 35:3
**close** 24:14,18
  76:18
**closed** 12:22
**closer** 44:16
**closes** 13:2,18
**closest** 44:13
**clothes** 32:3,4,5
  34:22 37:13 59:23
**clue** 14:18
**coat** 32:4 59:19
**cohen** 2:3,5 69:10
  73:15 77:19
**college** 76:8
**color** 15:21
**come** 13:22 19:14
  19:17 20:5 25:3
  26:7,21,23 27:10
  28:11 31:23 32:2
  33:8,13,15,23 34:9
  34:11,13 36:8
  48:17 59:8,14
  62:20,25 63:4
  74:16
**coming** 25:16
  27:25 36:20
**command** 66:10
**comment** 6:19
**commission** 82:25
**commit** 33:15
**committed** 66:7,7
**communicate**
  19:25 28:4,5
  61:15

**communicating**
  61:16,23
**completely** 39:11
**complications**
  21:21
**complied** 66:13,14
**concern** 18:2
  25:10
**concerned** 17:24
  17:25 18:4,6,7
  27:23 50:4
**concerns** 18:20
  21:25 28:8
**concluded** 77:22
**condition** 7:1 19:1
  19:3,5,6,8
**conference** 1:14
**confront** 41:25
**confronted** 20:20
  41:24
**confused** 36:15,16
**conscious** 50:24
**consciousness**
  39:2
**contact** 10:12
**continue** 43:25
  52:4
**control** 2:12
**conversation**
  47:24 53:4
**conversations**
  20:7,8,13,15
**cop** 54:17
**cops** 29:18 30:5,5
  31:13,14,16 32:1
  34:15 38:25 53:9
  53:10 54:9,16
  55:14 56:2,25
  57:2,7,8 58:1,3
  60:12 68:9

Case 1:19-cv-00632-EK-ST   Document 48-12   Filed 11/29/21   Page 86 of 97 PageID #: 1376

**[copy - ems]**                                                                 Page 4

**copy**  3:10,13 6:12
**corner**  38:2
**corporation**  2:8
**correct**  5:6,7 6:2
  16:4 24:7 40:16
  40:19 41:9 42:11
  43:19,20,24 48:9
  57:21 59:8,8
  61:12 62:2 64:19
  68:1,19 69:17
  77:13 78:7
**correctly**  77:15
**counsel**  2:8 3:5,13
  79:13
**county**  81:4
**couple**  15:8 53:13
**course**  14:12 22:9
  53:19
**court**  1:1 3:10 5:9
  6:20
**cousin**  9:9,9
**cried**  35:17
**crime**  31:17 33:15
  33:15,16,17,17
  57:16 58:2 59:1
  66:7,8
**criminal**  32:24
  38:10 57:14 66:6
**crying**  67:7
**cv**  1:5

**d**

**d**  3:1 4:5 24:23
  78:1 79:15
**dance**  28:24 50:6
  50:14,17,19,20,22
**dark**  31:10 54:17
  61:15
**darker**  58:7
**data**  71:21
**date**  1:10,17 20:6
  20:14 40:5 42:17

43:12 52:11 75:3
  82:3
**day**  12:12,13,14
  12:15 14:8 18:9
  19:19,22 20:5
  36:5 42:7 60:14
  67:6 78:16 81:17
  82:22
**days**  3:12 7:11
  21:16 71:22 76:21
**december**  1:10
  81:17
**defendants**  1:8,15
  2:9
**definitely**  20:4
  29:18
**deletes**  71:22
**department**  2:9
  4:18
**deposition**  1:14
  3:6,7,11 6:1,10,11
  8:12 52:13 68:13
  77:2,10 82:3
**describe**  30:20,22
**describing**  55:6
**description**  79:6
**descriptions**  31:7
**deteriorate**  21:8
**different**  22:4
  73:21
**directly**  10:11
  37:20,21
**discussion**  23:15
  69:11 73:16
**district**  1:1,1
**doctor**  7:10,14
**documents**  80:1,2
**doing**  11:22 12:7
  16:24 17:6 28:5
  36:21 42:3 50:1,2
  73:6,7,7,8

**door**  12:22,25 13:1
  13:8,9,9,15,17,19
  13:20 27:3,5,6,11
  27:11 37:14,18,19
  37:20,20 44:5,13
  53:18,24 54:15,16
  69:20
**double**  22:24
**downstairs**  27:3,5
  27:6,12 32:10
  35:2,3,4 39:16,18
  39:20 54:16
**dragged**  32:23
  35:1 39:12
**drank**  40:18
**drink**  6:6 7:21,21
  14:4 15:2 16:8,10
  16:12,23,25 17:1,4
  17:5 18:8,10,15,20
  18:25 19:12,12,13
  19:16,18,23 20:11
  20:20,21 21:4
  22:2,18 24:16
  25:5,22 32:17
  48:21 51:3 57:16
  59:1
**drinking**  14:2,3,5
  15:5,11,12 16:17
  17:23 18:5,17,23
  19:20 20:12,13
  21:2,12 24:6,10
  25:2,3,5,7,11,12
  25:14,17 26:16
  28:6 33:15,17
  36:24 37:6 41:16
  41:25 58:2
**drinks**  21:9
**drive**  24:1,2 72:21
  72:21 73:5
**driveway**  71:15

**driving**  73:5
**drugs**  7:4
**drunk**  17:11 40:21
  50:23,23,25 51:1,2
**duly**  4:6 78:3 81:9

**e**

**e**  2:1,1,8 3:1,1 4:1
  4:1,5,5 24:23 78:1
  79:1,15 81:1,1
**earlier**  33:19
  48:22 53:23 74:24
**east**  2:4
**eastern**  1:1
**eat**  21:16
**education**  76:6
**effect**  3:9,11
**either**  34:3 66:13
  75:4 76:12,16
**elder**  11:17
**emergency**  26:21
**emotional**  67:8
**empty**  7:10 15:23
  15:25,25 25:8
  26:3
**ems**  26:18,25 27:1
  27:8,13,24,25 28:2
  28:10,15,18,22
  29:3,10,21,25 30:1
  30:3,4,7,15 31:13
  33:22 36:17 37:25
  39:14,19 42:14,15
  42:21 43:2,8,21
  44:1,4,7,9,13,16
  44:24,25 45:6,21
  45:25 46:2,4,11,18
  46:23 47:18 48:5
  48:7,23 49:21
  50:3,9 51:6,9,23
  52:6 53:8 55:2,6,7
  55:15 56:24 57:4
  57:8 79:9

[emts - glasses]                                                                 Page 5

emts  47:21
encounter  74:9,13
ended  52:24 54:7
energy  13:3
english  4:2,3 5:18
  18:21 26:14 28:3
  41:2 62:3
entered  14:9 30:19
  30:20 31:12 43:22
entering  31:18
  53:24
entire  5:12,16
entitled  52:14
entrance  54:21
  55:5,9
errata  82:1
esq  2:5,8,11
et  1:7 2:10 82:2
everybody  36:2
  61:23,23
exact  10:7,8 15:3
  20:6,14 24:13
  34:9 56:5,7 58:15
  75:3,4 76:17
exactly  12:10 27:2
  27:4 43:7 45:7
  58:15 64:11 66:11
  76:25
examination  4:8
  77:21 79:17 81:8
  81:10
examined  4:7
example  19:11
exhibit  40:2,4
  42:12,16,18 52:7
  52:10,12 79:5,5
exhibits  79:3,13
exit  32:10
exited  70:23
expires  82:25

explain  54:22,24
  54:24 55:24
explaining  47:4,10
  50:17 51:19
explains  47:9
expressing  51:15
extremely  13:3
eye  32:22
eyes  17:22 70:5

**f**

f  3:1 81:1
face  45:1 51:13
fact  7:12
faddis  2:11 4:9,17
  9:5 23:14 26:19
  42:12 49:6 68:15
  71:5 75:12 77:16
  79:18
failed  7:7
fair  43:21 47:20
  56:16
family  8:15
far  43:18 56:10
  74:8,13 77:11
father  9:8,14,20
faucet  15:5
fault  36:7,10 60:12
february  9:12
  11:2 71:18 74:8
  74:12
federal  1:16
feedback  49:8
feel  6:5 15:16 36:2
feeling  15:4
feet  69:25
fell  12:1 14:20
felt  49:2,17
female  26:25
  70:10,11
fight  42:3,7

fighting  21:3
  40:24 41:11,14,15
  41:19,21,22 42:1,6
fights  42:8
file  2:6,12
filing  3:6
fine  6:7 24:16
  28:15,17,23,25
  29:4 31:25 32:15
  38:8 48:1,2,23
  50:5 51:16,17
  74:10,11,14,15
finger  56:16
finished  5:16
first  4:6,24 5:2
  8:23,24 9:4,6
  10:16 15:14 18:10
  18:14 69:1 78:3
fitch  2:3
five  7:11
floor  4:13 13:13
  30:25 32:19,21
  38:10,22 39:15
  69:16 70:4,17
  72:7
focus  67:10
follow  66:10
following  4:2
follows  4:7
force  3:11
foregoing  78:6
forehead  72:2,4,5
  72:7
form  3:16 50:19
  50:20
forth  81:9
forward  51:8
  54:10 56:12 58:4
  64:20 70:9,20
found  14:17 17:20
  17:20 20:17 24:3

24:5,5
four  7:11 15:19,19
  25:8 26:3 30:17
frame  10:7,8
  24:13 54:1
friend  12:17 14:10
friends  14:15
front  13:8 18:11
  18:15 21:4 37:14
  37:18,19,20 46:4
  53:17 64:24 69:3
full  7:22 15:23
  34:9
fully  6:24 36:3,3
funny  16:21,22
  17:4,7
further  3:15 78:6
  81:12

**g**

garbage  15:7,9,10
  15:18 16:1
generally  56:8
geneva  2:16
gerald  2:5
getting  10:14 33:1
  34:15 64:7 65:12
  66:3,12 67:1,2,9
  67:18
give  4:25 20:2 32:3
  32:8,11
given  77:14 78:7
  81:10
giving  17:2,4
  57:20 59:19 60:23
glass  32:8,11,12
  32:17,21 61:5
  64:6
glasses  32:3,6,6,16
  32:21 63:8,10,10
  70:5

[glove - house]                                                                 Page 6

| | | | |
|---|---|---|---|
| **glove** 46:7 | **grabbed** 32:19 | 64:13,23 65:4,5 | **hereunto** 81:16 |
| **gloves** 46:19 | 38:25 64:17 | 66:9,9 67:11,15 | **hesitant** 17:21,21 |
| **go** 14:25 22:18,23 | **graduate** 76:7 | 68:17,21,24 | 20:19,25 |
| 23:6,8,21,25 25:15 | **grocery** 73:7 | **hannah** 2:11 4:17 | **hey** 16:15 19:12 |
| 25:15 27:9,11 | **ground** 4:25 38:14 | **happen** 38:19 | 27:20 28:23 |
| 28:15,17,25 29:7 | 39:4 64:18 68:18 | **happened** 13:4 | **hfaddis** 2:13 |
| 29:13,18 30:7,10 | **guess** 77:7 | 14:4,19 16:11 | **hiding** 37:6 |
| 30:12 32:1,17 | **guessing** 57:10 | 21:24 22:8,17 | **high** 76:8 |
| 33:7,11 34:11,14 | 65:13,24 | 27:13 31:11,24 | **highest** 76:6 |
| 35:10,11 37:2 | **guests** 20:10 | 32:23 35:14,18,19 | **hill** 4:14 |
| 42:9,19 45:19 | **guys** 27:18 36:20 | 47:14 53:2,12 | **history** 28:5,6 |
| 48:15,16,19 49:2 | 36:21 47:25 48:2 | 57:7 62:16 64:8 | 73:1,4,13,14,18 |
| 49:18 52:7 53:5,7 | 51:17 57:15 | 77:5 | **hit** 53:21 |
| 55:25 56:1,3,8,11 | | **happening** 54:13 | **holding** 67:15 70:3 |
| 57:22 61:20 66:5 | **h** | 63:20 | 70:6,11,14,15 |
| **god** 36:20 | **h** 4:1 24:23 79:1 | **happens** 16:18 | **home** 11:5,7 35:15 |
| **going** 4:21,24 5:11 | **hair** 44:17,25 46:4 | 21:10 | 35:16,16,17 48:20 |
| 5:14 7:13 14:18 | **half** 9:11 | **hard** 54:22,24 | 71:6 |
| 20:17 25:10,11 | **hallway** 32:9 | **head** 19:16 39:2 | **honest** 73:24 |
| 31:22 32:7,25 | 55:19 62:21 | **health** 16:13 18:2 | **hooded** 54:1 |
| 34:15 40:1,2,9 | **hand** 15:6,7 25:8 | 18:7,12,20 20:1,3 | **hospital** 22:18,23 |
| 41:4,5 42:18,18 | 33:16 45:24 46:7 | 21:8,20,25,25 | 23:2,6,21,23,24,25 |
| 43:9,10,25 44:8,23 | 46:12,14,16,20,25 | 27:23 28:7,7 | 24:1 26:17 27:17 |
| 45:12 46:1,3,17,21 | 81:16 | **hear** 12:19,23 | 28:16,17,25 29:7 |
| 47:15,17,19 48:3 | **handcuff** 63:16 | 13:22 40:7,8,12,17 | 29:14,16,19 30:8 |
| 48:20 49:19 50:8 | 64:2 65:7,9,11,16 | 40:20,23,25 | 30:10,13 32:7,17 |
| 51:4,21,24 52:4,7 | 65:19,24 66:16,22 | **heard** 5:24 12:20 | 32:25 33:7,11,13 |
| 52:12 53:5,13,16 | 67:5,13,22 68:1,14 | 12:21,23,25 13:2,5 | 33:23 34:3,4,7,10 |
| 54:10,12 55:16,18 | **handcuffed** 33:1 | 18:11,14,16 20:1 | 34:12,17 35:5,8,8 |
| 56:12,19 57:17 | 35:9 38:5 65:2,3 | 40:13,14 64:8 | 39:23,25 42:10 |
| 58:4 59:10 60:21 | 66:3,5,12,12,14 | **hearing** 53:7 | 45:10 47:15,16 |
| 60:25 61:7,19 | 67:2 | **heavy** 13:15 31:1 | 48:20 49:2,18 |
| 62:17,19 63:5,5,17 | **handcuffing** 63:14 | **height** 31:2 | 53:6,7,11,12 55:25 |
| 64:1,20 65:2,3,11 | **handcuffs** 67:16 | **held** 1:17 23:16 | 56:4,9 57:23 59:7 |
| 66:2,4,4,12,15 | **handing** 59:18,23 | 69:12 73:17 | 66:5,6 67:6 |
| 69:4,9,18 70:20 | **handling** 73:8 | **hell** 32:23 | **hours** 7:5,8,20 |
| 71:1 | **hands** 32:14 38:7 | **help** 27:18 34:6 | **house** 8:6 11:14,15 |
| **good** 4:15,16 | 38:8,13,16 45:15 | 60:8,10 | 11:16,18 12:14 |
| 16:14 36:21 | 45:18,23 47:4,6,10 | **helped** 37:13 | 14:1,7,8,9 15:10 |
| **gotten** 66:14 | 49:23 50:5,6 | **hereinbefore** 78:8 | 16:8 25:22 26:21 |
| | 51:19 55:23,24 | 81:9 | 26:23,24,25 27:1 |
| | 63:12,23 64:9,11 | | |

Case 1:19-cv-00632-EK-ST   Document 48-12   Filed 11/29/21   Page 89 of 97 PageID #: 1379

27:25 30:19,21
31:18 50:16 57:14
57:16 58:2 59:2
68:10 71:12
**housewife**  75:25
**huh**  20:22,24
**hurt**  27:21,22 57:5
72:1,3 74:6 75:22
75:22
**hurted**  56:25 57:8
57:9
**husband**  4:20 8:15
9:8,14,19 11:17,19
12:7 13:22 14:1,6
14:10,14,16 15:11
16:3,5 18:8,21
21:20 22:17 23:6
23:11,17 25:4,21
26:16 27:16,17
28:10 29:20 30:25
31:4,8,16,17,25
32:2,13,15,17,18
32:24 33:6,10,14
33:20,22,24 34:6
34:14,16,21 35:2
35:21,23,25 36:1
38:4,6,7,10,12,16
38:23 39:15 40:18
43:1 44:14 45:1,6
46:25 47:2,22,24
47:24 48:15,23
49:23 50:11 51:8
53:22 54:18 55:25
56:2,3,6,15,17,22
56:23 57:6,20,22
58:21,25 59:3,14
59:23 61:4,10,14
61:16 62:9 63:8
63:12,23,24,25
64:2,3,7,13,23,25
65:1,11,15,19,22

66:1,6,19,21,25
67:17,21,25 68:3,7
68:9,14,17,21,23
69:4,15,15,23
70:12,16,18,23
71:21,24 72:1,12
73:6,23 74:2,19
75:13 76:18
**husband's**  9:9
14:15 16:20 27:25
32:21 74:9 76:24

**i**

**iacobellis**  1:18
81:6,20
**identification**  40:4
42:16 52:11
**ignored**  39:11
**image**  42:25 69:3
**immature**  17:9
**immediately**  33:10
**immune**  18:14
**impairs**  7:1
**importance**  5:9
**incident**  69:14
71:25 72:18 73:10
76:18
**india**  8:19,20 9:15
9:20,24 20:9 75:9
76:4,11
**indian**  50:20
**indicate**  43:12
**individual**  53:25
**information**  80:1
80:2
**initially**  33:5
**injured**  71:24
**injuries**  73:23
75:20
**injury**  72:8,9,10
72:17 74:2

**inside**  26:25 27:15
27:25 43:16 62:25
63:4
**interested**  81:14
**interpreted**  34:14
**interpreter**  2:16
4:1 5:15 52:17
**interpreting**  5:16
**involved**  23:2,24
26:2
**issues**  18:23 19:3
21:15,25 28:7

**j**

**jail**  32:25 33:25
34:1,15 39:23
**james**  2:8
**job**  36:21 73:5
**jobs**  76:1
**johnson**  2:8
**joke**  19:17
**jokes**  28:22
**judge**  3:10
**july**  12:6,6

**k**

**k**  4:5 24:23
**kaur**  1:15 4:11,15
7:22,22 8:9 40:1,7
40:12 42:22 49:22
50:10 51:8 52:1
52:15,20 71:4,24
73:9 75:24 76:12
77:9 78:12 82:3
82:21
**keep**  14:6 25:11,12
25:13 44:23 45:12
46:17 47:17 48:3
51:21 56:19 59:9
61:19 63:5,17
69:18

**kept**  35:9 71:22
**kid**  10:24,24
**kids**  9:19 62:24
63:3
**kings**  81:4
**kitchen**  14:25 15:2
15:5,10 37:20,21
37:22 54:21,22
55:5
**knew**  10:11 13:4
19:3,6,6,7 22:6
23:20 33:1 34:24
34:25 51:2 63:25
64:2 65:1,2,6 66:1
66:2,3,4,6,11 67:1
67:2,8,17,17 68:7
68:7,11
**know**  6:3 8:6
10:14 11:10 12:10
12:12,15 13:18
14:5,10,12,14,16
15:13 16:15,23
17:5,10,16 18:4,12
19:1,2,4,11,14,24
20:1,2,7,8,10,12
21:10,15,24 22:7,9
23:12,17,19 24:2
24:16 25:15,18,21
26:6,11,15 28:7
29:11,12 34:16,18
34:25 36:19 37:5
37:6 38:2,6 39:16
39:18 41:23 43:3
43:6,18 45:8 47:3
47:8,14,25 48:1,12
48:14,16,24 50:1
50:13 51:17 53:2
53:4,5,8,8,12
54:13,20 55:7
56:1,21 57:13,14
57:25 58:2 59:1

[know - moment]                                                                                           Page 8

60:2,6,9 61:13
63:20,22,23 65:8
65:13,22,23 66:4
66:19,25 67:7,12
67:21,23,25 68:6
69:6 70:3,4 71:4,9
71:11,16,18,24
72:1,6,19,20 73:1
73:5,5,6,12,21,24
73:25 74:1,8,14
75:1,20 76:24
77:5
**known** 10:10 18:8

**l**

**l** 3:1,1 4:1 24:23
78:1
**ladies** 29:13
**lady** 43:1
**lakhwinder** 24:23
**larger** 37:10,12
**late** 54:5
**laughs** 19:15
**laundry** 73:7
**law** 2:9 4:18 9:8
9:14,20 18:18,19
18:23 21:7,12,14
21:17 25:19 26:4
28:9 54:2,4 55:19
56:17 62:20 63:3
**lawa.nyc.gov** 2:13
**lawsuit** 4:19,22
**lawyer** 76:19,20
76:23,24,24,25
77:1
**lead** 32:10
**leading** 11:7
**leaned** 51:8
**learn** 19:5
**left** 12:14 37:14,18
51:25 70:7,25
72:14

**legally** 8:2
**letter** 79:6
**level** 18:5,6 76:6
**lie** 60:24
**life** 7:21 8:21 22:1
22:6 25:12
**lift** 28:24 46:25
50:6 72:19,20,20
72:22
**lifting** 73:4
**line** 28:24 80:7
82:5
**lines** 60:21
**liquor** 14:9 16:8
16:14 18:11,21
20:2 22:11 25:8
26:2 28:16 37:7
**listen** 5:12
**listening** 25:1
**little** 8:5 10:4
16:15 25:16 28:16
38:2 46:10 49:8
50:8
**live** 9:9 10:2 22:10
72:23 73:11
**lived** 8:12,20,24
9:1
**liver** 19:1,2,3,5,6,8
**lives** 9:16,18
**living** 9:6,7,12
10:17 11:24 12:2
12:8 17:13 21:23
23:9 24:11 25:5
37:2,7 38:1,3
71:14
**llc** 82:1
**long** 8:12 9:22
10:6,9 24:11
26:11,18 30:15
45:8 72:21 74:6

**look** 17:21,25 18:1
19:13 28:23 30:10
43:10 44:14 48:1
50:5,5,14 51:12
**looked** 32:15
**looking** 12:9,10
32:22 55:1 58:10
**looks** 55:23 56:15
69:25
**lot** 18:5,12,13
**loud** 17:18
**lower** 55:2

**m**

**m** 2:5 4:1,5
**ma'am** 56:24
**main** 12:25 13:1
37:20
**male** 29:14
**mandeep** 4:19
**manner** 62:8 67:8
**marie** 1:17 81:6,20
**mark** 40:2 42:12
**marked** 40:4
42:16 52:8,9,10,12
79:11 80:6
**marker** 42:23
**marriage** 10:11
74:21,25 81:13
**married** 9:22,23
9:23,24 10:1,5,9
10:15 74:17
**matter** 81:15
**mean** 13:15 17:8,9
22:22 41:18 76:25
**meant** 22:4 34:10
34:11 41:14,15
42:5 64:1,1
**medical** 26:21
31:22 33:6,20
73:1,3,4,12,14,18

**medication** 7:7,13
**medications** 7:4
**medicine** 7:9,15
7:15
**meeting** 14:19
**member** 29:10
**members** 29:25
30:3,4
**memory** 7:2
**mention** 27:23
34:3,18,19,21
60:17
**mentioned** 34:1,2
34:8 53:9 54:5
74:24
**met** 14:17 74:22
75:1
**middle** 7:24 14:23
15:15 54:1
**mind** 23:1,3 29:8
65:25
**minded** 22:24
**minute** 33:4 35:24
42:23 56:21 57:17
57:19
**minutes** 24:15,18
30:17 38:11,23
47:21 48:3,6
49:19,22 51:7,21
51:24 52:4 53:2
54:8 58:6,19
59:10,13 61:2,3,9
61:19 63:7 64:22
69:9
**mistake** 6:2
**misunderstanding**
41:17
**mobeen** 2:15
**moment** 25:11
50:1 51:1,11
56:22 65:6,8

**[moment - period]**                                                         Page 9

66:20 67:11,21,24
68:5
**month**  10:8 12:5
74:23,25
**months**  9:11
**morning**  11:5,8
43:23
**mother**  18:18,19
18:23 21:7,12,14
21:17 28:9
**move**  38:16,25
68:24 69:7
**moved**  9:10 55:19
67:11
**moving**  45:15,17
45:23,24,25 47:6
50:11 53:6

**n**

**n**  2:1,6 3:1 4:1,5
24:23 78:1 79:15
**name**  4:10,17 7:22
8:1,2,4,7 24:22
34:25 82:2,3
**named**  14:10
**names**  7:24,24
**napkin**  15:6,7
**need**  5:2 6:1,5,15
16:18 22:18 27:18
28:15,17,25 30:10
31:15 33:14 49:2
49:17 53:9 77:13
**needed**  7:15 23:6
30:7,12 33:6,20
42:9
**negative**  38:18
**never**  7:21 9:3
14:8 21:4 22:25
23:7 27:21 35:23
35:25 36:4,5,7,9
36:17 42:8 60:14
62:12 65:10,11

66:15 68:9
**new**  1:1,7,18 2:5,5
2:9,10,11,11 4:7
4:14,18,19 81:3,7
82:1,2
**ngg**  1:5
**night**  11:7,10,14
14:16,21,23 15:15
25:14,17,23
**noise**  13:1,8,9,15
13:18,19,19
**non**  1:14
**normal**  29:5,6,7
47:3 50:18
**normally**  7:8 29:1
35:24 36:1,2,2
47:9 60:7
**notary**  1:18 4:6
78:19 81:6 82:25
**noticed**  15:8,9
35:17
**numbers**  43:11
**numerous**  18:22
67:3 68:7,8

**o**

**o**  3:1 4:1,1 78:1
**oath**  3:9 5:5,8
**objections**  3:16
**observed**  72:17
**occur**  38:20,20,21
**october**  75:18,21
**officer**  4:19 30:24
31:1,4,8,9 32:13
32:18,19,23 33:12
34:22 35:2,10
38:4,6,13,17 39:6
53:21,23 57:24
58:7,20 59:2
61:15,17,22 62:1,4
62:23,24 63:23
64:9,17,24 65:3,5

65:6,10,16,19 66:8
66:10,15,22 67:5
67:12,14,15,22,25
68:14,16,20,24,25
69:2,15 70:7,9,11
70:15,17
**officers**  30:18,20
31:3,7,9,11,13,20
32:13 33:5,19
34:2,5,8,10 37:23
39:4,9,11,21,22
57:20 59:6 62:10
63:11 69:5,20
70:2,6,8 72:6
**official**  8:7
**oh**  19:14 20:9
**okay**  4:22 5:12,18
5:21,24 6:3,8,12
6:16 7:18 8:8 11:1
11:3 13:14 19:17
23:4 25:16 26:6
28:15 29:4 30:9
30:10 32:1,10
33:4,11 42:19,23
46:21,24 48:1,2
50:6,16,16 51:16
55:11 57:1,3 60:3
61:23 63:5 65:13
66:20 74:7 77:19
**old**  8:9 10:23
13:17
**older**  10:24
**online**  50:20
**open**  12:25 27:3,5
27:6,11,11 37:19
54:16
**opened**  15:4 54:15
**opens**  13:2
**operate**  71:16
**operator**  40:17,20
40:23 42:9

**ordering**  64:3,4
**original**  3:7,13
**outcome**  81:14
**outside**  12:18 13:4
26:24 62:25 63:4
71:14
**overhear**  56:23
**overreacting**  50:5

**p**

**p**  2:1,1 3:1 4:5
**p.m.**  1:11 11:12
35:16 77:21
**page**  79:5,17 80:2
80:7 82:5
**paint**  18:3
**pants**  32:4 35:12
35:18 59:19
**parents**  8:5
**parked**  26:24
**particular**  67:10
**parties**  3:5 81:13
**party**  1:14
**pass**  32:3 63:9
**passed**  18:18 32:4
63:10
**pause**  43:9 44:2,8
45:22 46:3 47:19
48:6 51:24 53:16
54:12 55:18 62:19
**paused**  42:22
45:17 46:12,24
50:10 51:7 56:14
58:6,19 59:13,22
61:2,9 63:7,19
64:22 69:18 70:22
**pay**  60:21
**people**  36:21
42:25 44:2
**perceiving**  16:24
**period**  22:5

[periods - record]                                                                 Page 10

| | | | |
|---|---|---|---|
| **periods** 72:21 | **please** 4:10 5:21 | **pregnant** 11:25 | 63:23 64:9,11,13 |
| **person** 50:24 | 6:7 | 14:22,24 15:15 | 64:17,23 65:4 |
| 74:19 | **pllc** 2:3 | 16:16 27:10 29:15 | 66:8,9 67:15 |
| **phone** 10:13 12:9 | **point** 6:16 15:4,11 | 35:3 | 68:17,21 69:15 |
| 12:10,11,16,17,19 | 16:17,19,21 17:12 | **preparation** 77:1 | **putting** 34:22 63:8 |
| 12:21,22,24 13:5 | 19:5 21:5,6,18,19 | **prescription** 7:10 | 64:6 |
| 27:3,9 45:9 | 24:3 25:10 26:9 | **presence** 29:8 | |
| **physical** 31:6 | 26:20 27:7,15 | **present** 2:14 43:5 | **q** |
| **physically** 29:13 | 29:9 30:12 33:24 | **previous** 6:2 | **question** 5:3,12,16 |
| 30:22 | 37:23,25 39:10 | **previously** 18:17 | 5:18,20,23 6:7 |
| **picked** 39:4 70:18 | 40:23 41:6 43:3 | 54:3 | 23:17 52:18 66:20 |
| **pierced** 32:22 | 45:3,6 47:12 48:7 | **prior** 10:11 22:2 | 67:19 73:19,21 |
| **place** 78:8 | 48:13 50:2 51:2,3 | 36:5 54:8 68:11 | 74:12 80:7 |
| **plaintiff** 1:3 2:3 | 51:9,12 53:4 54:6 | 74:4 | **questions** 4:2,21 |
| 52:13 | 54:13,19,25 57:22 | **probably** 10:8 | 5:12 40:10 41:3 |
| **play** 40:1,9 42:18 | 58:25 59:25 60:11 | 11:12 20:23 24:14 | 42:19 76:19 77:20 |
| 46:1,21 50:8 | 60:17,19,20 61:13 | **problem** 28:3 | 80:6 |
| 51:21 52:12 53:13 | 63:11,12,15,20,22 | 32:11 | **quickly** 21:8 |
| 54:10 55:16 56:12 | 64:17,25 65:23 | **problems** 16:13,14 | **quiet** 17:17 |
| 57:17 58:4 59:10 | 66:2,21,23 67:18 | 16:16 18:12,12,13 | **quite** 8:16 14:23 |
| 60:25 61:7 62:17 | 68:11 69:24 | 18:24 20:2,3 73:3 | 17:15 26:14 31:5 |
| 64:20 69:9 70:16 | **points** 42:19 | **procedure** 1:16 | |
| 70:20 71:1 | **police** 22:25 23:1 | **produced** 42:13 | **r** |
| **played** 45:19 | 29:9,10,25 30:16 | **proffered** 38:12 | **r** 2:1 3:1 4:5 24:23 |
| 53:15 54:11 55:17 | 30:16 31:11,20 | **proficient** 41:2 | 78:1 81:1 |
| 56:13,20 57:18 | 33:10,19 34:2,5,8 | **profound** 26:15 | **raised** 35:25 |
| 58:5,18 59:12,21 | 35:21 36:8,10 | **promise** 19:15,17 | **raises** 18:6 |
| 61:1,8 62:18 63:6 | 37:23 39:4,21,22 | **prove** 58:1 59:1,4 | **reaction** 28:13 |
| 63:18 64:21 69:13 | 49:12 52:8,10,14 | 62:6 | 29:6 30:8 |
| 69:19 70:21 71:3 | 53:15 54:11 55:17 | **provided** 6:11 | **read** 49:7,9 |
| **playing** 40:6,11 | 56:13,20 57:18,24 | **public** 1:18 4:6 | **realized** 15:12 |
| 42:21 43:8,25 | 58:5,18 59:12,21 | 78:19 81:6 82:25 | 29:17 |
| 44:1,7,23,24 45:12 | 60:21 61:1,8,25 | **punjab** 76:11 | **really** 18:6 30:25 |
| 45:21 46:2,11,17 | 62:10,18 63:6,18 | **punjabi** 2:16 4:1,3 | **reason** 6:23 18:7 |
| 46:18,23 47:17,18 | 64:21 69:13,15,19 | 4:3 34:23,24,24 | 50:4 60:4 82:5 |
| 48:3,5 49:19,21 | 70:21 71:3 74:9 | 35:1 62:4,7,9,12 | **recall** 10:7,8 13:25 |
| 50:9 51:6,23 52:4 | 74:13 79:11 | 63:25 64:10 66:9 | 15:22 24:13 47:24 |
| 52:6,15 56:19 | **portion** 45:15 | **pursuant** 1:15 | 64:16 |
| 58:17 59:20 61:19 | 50:11 69:14 | **put** 32:6,14,15 | **received** 45:9 |
| 63:17 69:18 | **praising** 36:19,22 | 34:23 38:7,8 | **record** 4:10 23:14 |
| | | 49:23 62:5 63:11 | 23:15 69:10,11 |
| | | | 73:15,16 81:10 |

[recording - services]                                                                 Page 11

recording  44:23
  79:7
red  46:16
referred  49:9
  53:23
referring  63:1,2
  76:22
regularly  60:7,9
related  81:12
relaxed  17:15
relocated  9:10,11
reluctant  53:5
remember  11:13
  11:22 12:7 13:5,7
  15:3,20,23 20:6,7
  20:14 25:20 27:2
  27:4 31:6 43:7
  45:5,7,9,13,14
  47:6,11 48:11,22
  48:24 50:2 53:19
  54:15 56:1,5,6,7
  56:10 57:25 58:11
  58:12,14,15,23
  59:5 61:14 71:21
  75:3,3,4,15 76:17
  77:7,8,8
repeat  52:17
replied  20:21
  31:17 49:16
reply  49:1
reporter  40:5
  42:17 49:10 52:11
reporting  82:1
represent  4:18
requested  80:1
require  31:22
reserved  3:16
reside  10:4
residing  8:15
resisting  29:24
  30:6

respective  3:5
responded  56:16
response  5:2 16:20
  17:2,3,3 19:18
  45:13 61:20,22
responses  16:24
  16:25
rest  6:6 12:1 26:6
  26:7
resting  12:1
restroom  6:6
retained  79:13
review  6:14
richmond  4:13
right  4:23 5:1,4,9
  5:13,19,22,25 6:4
  6:9,13,17,21 9:17
  11:4 17:2 21:6
  23:19,22 24:4
  27:24,24 28:1
  30:13,17 32:9
  33:7,21 36:18,24
  37:10,14,24 38:5
  41:7 42:10,20,22
  42:24 43:16 46:8
  46:21,25 48:8
  50:24 52:22,25
  53:18 54:4 55:2,3
  55:8,10,13 56:4
  58:8 59:7 60:12
  60:15 61:4 62:1
  64:10,14,18 68:18
  68:21,25 69:2,8,21
  70:8,24 71:7
  72:14,15,15 73:10
  77:16
ring  12:21,21,24
  13:6
rises  16:14
room  11:24 12:2,8
  12:16 17:14 23:8

23:9 24:12 25:5
  37:2,8 38:1,3 43:5
  43:6 44:19 71:14
rose  1:17 81:6,20
rude  61:18
rule  5:2
rules  1:16 4:25
rulings  80:6
run  69:5,7
rupel  14:10,12,13
  14:17 25:24

s

s  2:1 3:1,1 4:1 79:1
  82:5
sat  24:8 37:8,9
save  36:21
saved  76:18
saw  14:16 15:17
  16:2,3,5 25:8 26:3
  38:12 39:3,5
  50:10 76:15,18
saying  16:22,23
  17:5 25:1 32:8
  41:3 42:4 45:9
  47:2,11 48:12
  51:16 56:1,8,8,11
  56:24 57:15 58:1
  58:12,14 59:2,9,25
  60:1,2 61:13,14
  65:1,4,5 67:11,13
  67:24 71:21 73:19
says  19:15 36:4
school  76:8
screamed  39:6
screen  48:8 58:9
sealing  3:6
search  50:20
second  15:15
  22:15,21,22 51:7
  51:22 53:16 64:22
  69:9

secondly  69:4
seconds  43:9,25
  44:2,8 45:20,22
  46:3,12,22,24
  47:17,19,20 48:4,6
  49:20,22 51:25,25
  52:5 53:13 54:12
  55:16,18 56:12,14
  56:19,21 57:17,19
  58:6,19 59:11,13
  61:2,3,9 63:7 71:1
section  52:16
secure  36:3
security  43:15
  71:7
see  13:3 14:4
  15:18 29:20 37:19
  37:21 38:16,19
  42:25 44:11,25
  45:15,17,22 46:4
  46:12,16,16,19,19
  46:25 49:23 51:8
  52:1,16,20 53:17
  54:17,21 55:1,2,7
  55:20 56:24 58:7
  58:20 61:10 62:20
  64:5,15,23 67:14
  68:23 69:1 70:2,2
  70:6,13,14,15,16
  74:19 75:5
seeing  47:8
seen  22:1 38:21
  76:20
send  53:11,11 57:2
sentences  26:14,15
  34:12
september  8:14
seriousness  5:9
service  3:12
services  5:15

[serving - taken]                                                                                   Page 12

| | | | |
|---|---|---|---|
| **serving** 20:12 | **sitting** 15:11 16:3 | 28:18 45:3 56:6 | **steps** 27:9 32:10 |
| **set** 67:20 81:9,16 | 16:5 17:14,15 | 61:25 62:3 | 32:24 35:3 39:12 |
| **shake** 19:16 | 23:9 28:19,20 | **specified** 78:8 | **stipulated** 3:4,15 |
| **shaking** 39:1 | 37:11,12 44:21 | **spoke** 62:5 77:1 | **stomach** 7:10,16 |
| 56:15 | 59:3 | **spoken** 19:19 | **stood** 31:14 39:1,5 |
| **sheet** 82:1 | **situation** 29:15 | **sprained** 72:9 | 70:18 |
| **shock** 39:17 | 65:13 66:18 | **squeaking** 13:18 | **stop** 25:3 41:16 |
| **shocked** 32:20,20 | **six** 43:9,25 | 13:19 | 42:19 |
| **shoelaces** 60:2,5 | **skin** 31:10 54:17 | **ss** 81:3 | **stopped** 7:10 |
| **shoes** 34:23 57:20 | 61:15 | **st** 1:5 | **stopping** 25:2 |
| 62:5 | **skinned** 58:7 | **staff** 33:22 | **story** 35:19 |
| **short** 62:24 | **slammed** 30:24 | **stairs** 27:9 | **straight** 28:24 |
| **shorter** 54:17 58:7 | 31:4,8 32:19,20 | **stamp** 52:1,16,20 | **street** 2:4,10 |
| 61:22,25 62:23 | 38:9,13,22 70:3,17 | **stand** 30:11 | **subpoena** 1:16 |
| 69:2 70:8,9 | 72:6,12 | **standing** 17:14 | **subscribed** 78:15 |
| **shoulder** 72:10,11 | **sleep** 11:14,19 | 28:19 32:9 37:14 | 82:22 |
| 72:13 73:23 74:9 | 13:24 14:4 25:15 | 37:17,21,24 38:2 | **suffered** 75:20 |
| **shoulders** 72:3 | 25:16,16 | 55:15 69:2,23,25 | **suite** 2:4 |
| **show** 13:11 29:2,3 | **small** 37:11,12 | **start** 40:9 52:15 | **sure** 11:4 18:24 |
| 50:14,21 55:10 | **smiled** 38:7 | 59:2 64:24 | 20:11 34:20 45:19 |
| **showed** 76:19 | **smiling** 19:16 | **started** 4:24 10:13 | 46:10 48:20 52:19 |
| **showing** 67:16 | **smoking** 33:16,17 | 10:14,16 14:5 | 53:10 65:12 72:14 |
| **sic** 26:15 33:16 | **sofa** 15:12 16:3,6 | 21:9,23 39:1 | **swear** 60:23 |
| 56:25 | 17:15 28:20 37:10 | **starting** 51:5 | **sweatshirt** 54:1 |
| **sick** 36:24 37:4 | 37:11,12,12 44:21 | **starts** 28:8 54:7 | **swell** 21:16 |
| **side** 32:22 38:2 | 55:13 | **state** 1:18 4:6,10 | **swore** 4:2 |
| 44:19,21,22 54:22 | **sohail** 2:15 5:16 | 34:12 81:3,7 | **sworn** 3:8 4:6 78:4 |
| 55:2,15 58:8 | **solemnly** 4:1 | **stated** 33:18 34:13 | 78:15 81:9 82:22 |
| 59:16 70:7 72:7 | **somebody** 13:2,18 | 61:23 62:4,6,7 | **system** 18:14 19:7 |
| 72:12 | 15:10,12 22:10 | 65:10 66:15,25 | 43:18 71:7,11,16 |
| **signature** 81:19 | 47:3,9 48:7 | 77:11,15 | 71:19 |
| **signed** 3:8,9,12 | **son** 9:15 11:17 | **states** 1:1 8:23 9:2 | |
| **signs** 67:16 | 27:2,5,7 44:4 63:1 | 9:21,24 10:17 | **t** |
| **simple** 67:19 | 63:2 | 73:12,22 74:2 | |
| **singh** 1:2 2:4 9:22 | **soon** 31:13 64:4 | 75:8 76:2 | **t** 3:1,1 78:1 79:1 |
| 10:2,10 14:11,12 | **sorry** 9:17 49:7 | **stay** 20:4 48:20 | 81:1,1 |
| 14:13,17 18:22 | **sort** 38:10 56:15 | 62:25 63:3 | **take** 6:5 7:7,8,9 |
| 24:23 25:24 27:16 | **south** 4:13 | **stays** 9:21 | 12:19 16:18 22:18 |
| 54:18 82:2 | **speak** 17:21 | **step** 38:17 64:24 | 26:17 27:16 29:16 |
| **sit** 19:14 30:10 | **speaking** 10:16 | 68:24 | 31:15,16,18,19 |
| 57:16 | 17:13 25:4 28:3 | | 45:10 59:6 |
| | | | **taken** 1:15 5:5 7:4 |
| | | | 33:25 34:4,17 |

Case 1:19-cv-00632-EK-ST   Document 48-12   Filed 11/29/21   Page 95 of 97 PageID #: 1385

**[taken - unconscious]**                                                            Page 13

| | | | |
|---|---|---|---|
| 39:15 43:15 | **ten** 24:14,18 | **time** 1:11,17 3:16 | **translate** 4:2 |
| **talk** 11:2 23:23 | **term** 34:9 | 6:1,5 9:15 10:7,8 | **transpired** 39:17 |
| 24:11 26:7 28:2 | **testified** 4:7 | 11:10,25 13:5,25 | **trauma** 39:17 |
| 28:10 31:15 36:1 | **testify** 6:23 7:13 | 14:6,18,20,22 15:3 | **treated** 33:2 |
| 39:19 48:2,7 53:8 | 78:4 | 15:3,13,15 17:24 | **treatment** 74:7 |
| 61:17 73:10 77:4 | **testimony** 7:17 | 18:10,15 22:7 | **trial** 3:17 6:20 |
| **talked** 24:9,14,17 | 60:24 67:20 78:4 | 24:13 25:7,18,20 | **tried** 27:21,22 |
| 36:2 39:21 | 78:7 81:10 | 25:24 29:15 39:5 | 28:4,9 68:14 |
| **talking** 9:17 10:13 | **thailand** 10:1,4 | 43:4,12,18 45:3,8 | **trip** 29:16 |
| 11:15 25:25 35:24 | 74:21,22 | 47:12,22 50:22 | **true** 78:7 81:10 |
| 44:10,14,15,17,18 | **thank** 6:22 7:18 | 52:1,16,20,22 | **trust** 36:3 |
| 47:3,5,7,21,23 | 13:21 36:20,20 | 58:24 61:10 62:5 | **truth** 5:6,10 77:6 |
| 48:10 55:23 56:2 | 44:6 55:11 77:19 | 64:4,17 71:21 | 78:4 |
| 56:9,22,23 58:8,10 | **thing** 27:24 34:19 | 72:22 74:6 75:4,5 | **truthfully** 6:24 |
| 58:11,20 61:4,11 | **things** 18:16 | 75:6,7,19 76:15,17 | 77:6,11,15 |
| 73:10 | **think** 7:14 12:15 | 76:17,20 78:8 | **try** 38:17 39:2 |
| **talks** 47:9 51:18 | 12:16 15:19 27:2 | **times** 18:22 19:13 | 69:5,5 |
| 51:18 | 27:5 30:19 34:16 | 20:14 67:3 68:8 | **trying** 13:14 29:2 |
| **tall** 30:25 31:2,3,4 | 41:13 44:18 48:14 | **tired** 13:3 | 29:2,3 50:7,14,15 |
| 31:5 32:13 34:22 | 51:1 54:20 57:8,9 | **titled** 42:14 | 50:21,23 66:18,22 |
| 38:4,6 53:23 | 65:15 71:20 72:15 | **today** 4:21 5:6 | 67:5,12,22 68:1 |
| 58:20 61:17 63:22 | **thinking** 20:23 | 6:24 7:13 9:18 | **turn** 32:14 |
| 64:9 70:17 | 66:18,19 | 20:10 42:7 76:12 | **turned** 32:12,16 |
| **taller** 33:12 62:4 | **thought** 21:20 | 76:13,15 77:2,10 | 32:18 44:25 48:7 |
| 70:15 | 22:25 23:6 26:11 | **told** 7:14 18:22 | 55:22 58:8 59:16 |
| **tap** 15:4 | 30:12 32:25 57:6 | 19:12,22 20:3 | **two** 9:19 10:21 |
| **tape** 40:3,12,15 | 57:9 64:3 65:3 | 21:12,17 22:17 | 21:16 26:25 31:3 |
| 42:23 79:7 | 67:23 | 27:17,22 28:7,9 | 31:9 44:2,9 47:21 |
| **tell** 5:6,10,21 | **thoughts** 22:15,21 | 30:7 31:14,14,16 | 53:3 54:8 69:25 |
| 18:19,24 19:17,25 | 22:22 | 32:1,6,13 33:5,20 | 76:21 |
| 20:10,11 23:5,7,25 | **three** 30:17,19,19 | 33:22 34:5 35:4 | **tying** 73:20 |
| 23:25 24:25 25:3 | 30:20 31:7,11 | 35:17,18 36:7,10 | |
| 26:13 28:9 29:22 | 54:8 | 38:4,6 39:24 | **u** |
| 33:10,24 40:17,20 | **threw** 68:17 | 41:16,23 42:9 | |
| 50:15,23 56:25 | **throat** 21:15 | 48:19 57:10 61:5 | **u** 3:1 4:5 |
| 57:1 63:3 77:6 | **throw** 14:24 | 63:9,9,23 67:7 | **u.s.** 72:24 73:2 |
| **telling** 25:15 28:11 | **throwing** 15:7 | 68:16 77:5 | 74:16,20 |
| 28:14,14,23 30:9 | 28:8 | **tone** 12:21 17:17 | **unbelievable** |
| 47:24 48:14 50:3 | **tie** 60:2 | **top** 43:11 52:1 | 35:13 |
| 56:3 57:4,25 | **tied** 60:4 | **transcript** 6:11,15 | **unconscious** 38:11 |
| 58:25 59:6 60:11 | | 6:18 78:6,7 | 38:23,24 39:3 |
| | | | 50:24 69:24 70:1 |

[understand - yeah]                                                                 Page 14

**understand** 5:5,7
5:8,17,20 6:20
13:14 21:19 22:5
33:2 39:13 41:11
41:18 65:16,21
66:17,17,19,22
67:4,24 73:19
**understanding**
65:22
**understood** 5:24
13:21 34:23,24
35:1 41:4,9,10,17
41:20,25
**united** 1:1 8:23 9:2
9:21,24 10:17
73:11,22 74:1
75:8 76:2
**unsigned** 3:10
**upset** 16:15,19
35:21,24 36:6
51:12,13
**use** 6:6 7:25 35:20
**usually** 12:1 17:2
51:17,18

**v**

**v** 2:11 82:2
**various** 42:19
**verbal** 5:2
**verify** 36:22 37:5
**veritext** 82:1
**video** 1:14 40:3
42:13,14,15,21,22
43:8,10,13,15 44:1
44:7,9,24 45:1,16
45:17,21 46:2,11
46:18,23 47:8,18
48:5 49:21 50:9
50:12 51:4,6,23,25
52:2,6,8,8,9,10,13
52:14,15,16,20,24
53:14,15 54:3,4,6

54:11,14,23 55:1
55:17 56:13,20
57:18 58:5,18
59:12,21 60:19
61:1,8 62:18 63:6
63:18,21 64:15,21
66:8 69:2,13,19
70:16,21 71:2,3,4
71:6,9,16,18 76:19
76:20 79:7,9,11,11
**videos** 53:3 76:13
76:16
**visit** 75:9
**visits** 9:21
**voice** 12:21 13:12
17:17 35:25
**vomit** 21:13
**vomiting** 18:13
21:10,15

**w**

**w** 24:23
**wait** 5:15 21:9,17
32:16 37:4
**waited** 75:7
**waived** 3:7
**wake** 14:23 27:7
**walk** 28:24
**walked** 36:1 44:3
53:17 64:4
**walking** 69:20
**want** 11:2 13:11
17:1 20:22 21:9
21:17 26:17 27:23
29:7 33:4 34:18
34:21 48:15,16,17
48:19 53:7,10,11
55:10 61:17 65:12
65:21,22 66:20
67:10,19,22,23
69:1,4,7 73:9,10

**wanted** 24:16,25
38:5 65:5,6,9,16
65:19,23
**wants** 35:10 61:15
**warn** 21:8
**washed** 15:6
**watch** 45:20 51:4
**watched** 44:9 45:1
50:12 52:24 54:3
71:6 76:12,13,14
**watching** 47:20
**water** 6:6 15:2,6
32:8,11,12,17 61:5
64:6,7
**way** 17:5 22:4
26:7 36:15,16
40:10 50:15 51:18
66:13 72:18 81:14
**we've** 47:19
**weak** 26:14
**wearing** 46:7
**weight** 72:20,22
73:4
**went** 6:19 11:10
11:14,19,22,25
12:8,16,18 13:4,22
13:24 14:2,4 15:1
15:1 24:3,15,19
27:2,5,5 35:2,4,7
39:18,19 49:11
54:15 70:9
**wet** 35:18
**whereof** 81:16
**white** 31:9 54:1
**wife** 17:20 27:19
31:21 36:1 47:25
48:1 50:4 56:25
57:8,9
**window** 55:8,9
**wipe** 15:6

**withdrawn** 9:5
26:19 68:15 71:5
75:12
**witness** 1:15 3:8
3:12,13 4:5 49:11
73:18 77:22 81:8
81:11,16
**witnesses'** 82:3
**woke** 14:21,22,25
15:14 27:8,11
**word** 23:24 33:13
34:1,3 41:9,10,11
45:7,7 53:9 63:15
**words** 24:17 36:9
56:5,7 64:11
**work** 12:12 75:24
76:4
**worker** 44:4,13,16
44:25 45:6,25
46:4 48:7 55:6
56:24 57:4
**workers** 26:21,25
27:1,13 28:2,10,15
28:18,23 29:3,21
30:1,7,15 36:17
37:25 39:14,19
43:22 44:9 48:23
50:3 51:9 53:8
55:2,8
**working** 74:15
**worldwide** 2:16
**worried** 36:23
**worry** 61:24
**written** 6:10
**wrong** 57:1 69:6

**x**

**x** 1:2,8 79:1,15

**y**

**yeah** 12:25 19:24
29:10 30:23 36:25

Case 23-24, Document 33, 04/19/2023, 3501834, Page22 of 277
**[JA-1182]**

**[yeah - zero]**                                                    Page 15

38:6,24 44:15,20
48:19,19 49:16
53:11,21 54:20
62:24
**york**   1:1,7,18 2:5
2:5,9,10,11,11 4:7
4:14,18,19 81:3,7
82:1,2
**younger**   10:24
12:3

**z**

**zero**   42:23

Case 1:19-cv-00632-EK-ST   Document 48-13   Filed 11/29/21   Page 1 of 115 PageID #: 1388

```
                                                    Page 1
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   ---------------------------------------------------X
     BALWINDER SINGH,
 3
                                    PLAINTIFF,
 4
 5           -against-              Case No.:
                                    19-CV-632(NGG)(ST)
 6
 7   THE CITY OF NEW YORK, et al.,
 8                                  DEFENDANTS.
     ---------------------------------------------------X
 9
10                       DATE: December 15, 2020
11                       TIME: 1:10 P.M.
12
13
14               DEPOSITION of a Non-Party Witness,
15   LAKHWINDER SINGH, taken by the Plaintiff, pursuant to a
16   Subpoena and to the Federal Rules of Civil Procedure, held
17   virtually via Zoom videoconferencing, before Kevin
18   Haghnazari, a Notary Public of the State of New York.
19
20
21
22
23
24
25
```

```
                                                    Page 2
 1    A P P E A R A N C E S:

 2

 3    COHEN & FITCH, PLLC
              Attorneys for the Plaintiff
 4            110 East 59th Street, Suite 3200
              New York, New York 10022
 5            BY: GERALD COHEN, ESQ.

 6

 7    JAMES E. JOHNSON, ESQ.
      ACTING CORPORATION COUNSEL
 8    NEW YORK CITY LAW DEPARTMENT
              Attorneys for the Defendants
 9            100 Church Street
              New York, New York 10007
10            BY: HANNAH FADDIS, ESQ.
              File #: 2019-008905
11            Control #: 20-2447

12

13

14
                      *          *          *
15

16

17

18

19

20

21

22

23

24

25
```

```
                                                        Page 3
 1                S T I P U L A T I O N S
 2    The plaintiff and defendants the City of New York and
 3    Mandeep Cheema, by their attorney James E. Johnson,
 4    Corporation Counsel of the City of New York, jointly
 5    stipulate to the following protocol for conducting the
 6    depositions of any parties or non-party witnesses by
 7    remote means in the above-captioned manner.
 8
 9    1. The depositions of the parties and non-party witnesses
10    shall be conducted remotely using videoconference
11    technology, and shall be recorded by a stenographer. No
12    video recording shall be made of such deposition, except by
13    a licensed videographer where duly noticed under the
14    Federal Rules of Civil Procedure, and on at least 48 hours
15    written confirmation to the opposing party, or as otherwise
16    agreed to in writing by the parties.
17
18    2. The parties agree that the party seeking each deposition
19    shall choose the service provider for court reporting and
20    remote deposition services, and that an employee of said
21    service provider may attend the remote deposition of the
22    parties and non-party witnesses to
23    troubleshoot any technological issues that may arise, and
24    administer virtual breakout rooms.
25
```

Page 4

1  3. The parties agree that the remote depositions of the

2  parties and non-party witnesses may be used at a trial or

3  hearing to the same extent that an in-person deposition may

4  be used at a trial or hearing, and the parties agree not to

5  object to the use of the record of such

6  depositions on the basis that the depositions were taken

7  remotely. The parties reserve all other objections to the

8  use of any deposition testimony at trial.

9

10  4. The deponent, court reporter, and counsel for the

11  parties will each participate in the videoconference

12  deposition remotely and separately, unless otherwise agreed

13  to in writing in advance of the deposition. Each person

14  attending a deposition shall be visible to all

15  other participants, shall be audible to all participants,

16  and shall strive to ensure their environment

17  is free from noise and distractions. The deponent shall not

18  utilize a virtual background.

19

20  5. Consistent with Local Rule 30.4, no counsel shall

21  initiate a private conference, including through text

22  message, electronic mail, or the chat feature in the

23  videoconferencing system, with the deponent while a

24  question is pending, except for the purpose of determining

25  whether a privilege should be asserted.

```
                                                    Page 5
  1

  2    6. During breaks in the deposition, the parties may use a

  3    breakout room feature provided by the service provider,

  4    which simulates a live breakout room through

  5    videoconference. Conversations in the breakout rooms shall

  6    not be recorded. The breakout rooms shall be established by

  7    the service provider prior to the deposition and be

  8    controlled by the service provider.

  9

 10    7. The remote deposition of the parties and non-party

 11    witnesses shall be recorded by stenographic means

 12    consistent with the requirements of Rule 30(b)(3), but

 13    given the COVID-19 pandemic, the court reporter will not be

 14    physically present with the defendant whose

 15    deposition is being taken. The parties agree not to

 16    challenge the validity of any oath administered

 17    By the court reporter, even if the court reporter is not a

 18    notary public in the state where the

 19    deponent resides.

 20

 21    8. The court reporter will stenographically record the

 22    testimony, and the court reporter's transcript shall

 23    constitute the official record.

 24

 25    9. The parties agree that the court reporter is an
```

Page 6

1   "Officer" as defined by Federal Rule of Civil Procedure

2   28(a)(2) and shall be permitted to administer the oath to

3   the witness via the videoconference.

4

5   10. The party seeking each deposition shall be responsible

6   for procuring a written transcript of the deposition and

7   providing same to opposing parties and any non-party

8   deponent, as appropriate.

9

10  11. The party seeking each deposition shall provide the

11  service provider with a copy of this Stipulation in advance

12  of the deposition.

13

14  12. At the beginning of each deposition, consistent with

15  Rule 30(b)(5)(A) of the Federal Rules of Civil Procedure,

16  the service provider employee responsible for

17  administering the video deposition shall "begin the

18  deposition with an on-the-record statement that includes:

19  (I) the officer's name and company affiliation; (ii) the

20  date, time, and place of the deposition; (iii) the

21  deponent's name; (iv) the officer's administration of the

22  oath or affirmation to the deponent; and (v) the identity

23  of all person's present."

24

25  13. At the beginning of each segment of the deposition,

Page 7

1  consistent with Rule 30(b)(5)(B) of the Federal Rules of

2  Civil Procedure, the service provider employee responsible

3  for administering the deposition shall begin that segment

4  of the remote deposition by reciting (i) the officer's name

5  and business address; (ii) the date, time, and place of the

6  deposition; and (iii) the deponent's name.

7

8  14. The parties agree to work collaboratively and in good

9  faith with the service provider to assess each deponent's

10  technological abilities and to troubleshoot any issues.

11  The parties also agree to work collaboratively to address

12  and troubleshoot technological issues that arise during a

13  deposition and make such provisions as are reasonable under

14  the circumstances to address such issues. This provision

15  shall not be interpreted to compel any party

16  to proceed with a deposition where the deponent cannot hear

17  or understand the other participants, or where the

18  participants cannot hear or understand the deponent.

19

20  15. The parties agree that any of the following methods for

21  administering exhibits may be employed during a remote

22  deposition, or a combination of one or more methods:

23  (i) Counsel may choose to send by electronic means copies

24  of the documents that may be used during the deposition via

25  electronic mail to opposing counsel and the court reporter,

L. SINGH

```
                                                           Page 8
 1    at least 24 hours in advance of the deposition; all such
 2    documents shall be Bates numbered; or (ii) Counsel
 3    may introduce exhibits electronically during the deposition
 4    by using the service provider's document-sharing
 5    technology, using the screen-sharing technology within the
 6    videoconferencing platform, or by sending the exhibit to
 7    the deponent and all individuals on the record via
 8    electronic mail.
 9
10              *              *              *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

L. SINGH

```
                                              Page 9
 1   L A K H W I N D E R   S I N G H, called as a witness, having
 2   been first duly sworn by a Notary Public of the State of
 3   New York, was examined and testified as follows:
 4   EXAMINATION BY
 5   MS. FADDIS:
 6       Q.     Please state your name for the record.
 7       A.     My name is Lakhwinder Singh.
 8   L-A-K-H-W-I-N-D-E-R.
 9       Q.     What is your full address?
10       A.     135-15 128th Street, South Ozone Park, New York
11   11420.
12       Q.     Good afternoon, Mr. Singh.  Mr. Cohen already
13   introduced me.  My name is Hannah Faddis.  I'm an attorney
14   with the New York City Law Department.  I represent the
15   City of New York and Officer Mandeep Cheema in a lawsuit
16   that your brother has brought.
17              Do you understand that?
18       A.     Yes, ma'am.
19       Q.     I want to thank you for being here today.  I'm
20   going to try to keep this pretty quick.
21              Before we get started, I have some rules, just so
22   this goes as smoothly as possible.  Okay?
23       A.     Yes, ma'am.
24       Q.     All right.  The first is that any question I ask,
25   I need you to give me a verbal response.  So the court
```

L. SINGH

```
                                                    Page 10
 1   reporter who is making a transcript, can't take down if you
 2   nod your head or shake your head.  He needs to hear a yes
 3   or no or something like that.  Okay?
 4        A.    Yes, ma'am.
 5        Q.    Do you understand that you've taken an oath to
 6   tell the truth today?
 7        A.    Yes, ma'am.
 8        Q.    And do you understand that's the same oath you
 9   would take in a courtroom if this case were to go to trial?
10        A.    Yes, ma'am.
11        Q.    So you understand that that oath has the same
12   seriousness and importance here as it does in court?
13   Right?
14        A.    Yes, ma'am, I do understand to everything.  Yes,
15   ma'am.
16        Q.    Are you at your own home today, or are you
17   somewhere else?
18        A.    No, my friend house.
19        Q.    And we've already been over this before we
20   started, but please don't have anyone else in the room with
21   you while you're testifying.  Okay?
22        A.    No one, no.  No one.
23        Q.    Please listen to my entire question before you
24   begin to answer.  Can you do that?
25        A.    Yes, ma'am.
```

L. SINGH

                                              Page 11

 1      Q.     Because we're doing this over Zoom, there's a

 2   little bit of a delay.  So just make sure you wait until

 3   I'm finished giving my question.  I'll wait until you're

 4   finished giving your answer.  And that way we will make

 5   sure the court reporter gets everything in the transcript.

 6      A.     Yes, ma'am.

 7      Q.     If you do not understand any of my questions,

 8   will you please tell me?

 9      A.     Yes, ma'am.

10      Q.     And if you need me to rephrase a question or

11   repeat it, please just ask me.  Okay?

12      A.     Yes, ma'am.

13      Q.     If you do answer a question, I'm going to assume

14   that you have understood it.  Okay?

15      A.     Yes, ma'am.

16      Q.     If at any time you realize you made any sort of

17   mistake, you need to correct anything you've said, add

18   anything, you can absolutely do that, just let us know.

19   Okay?

20      A.     Yes, ma'am.

21      Q.     You're welcome to take a break if you need to get

22   a drink, use the restroom, stretch your legs, whatever the

23   case may be, I just ask that you answer any question I've

24   asked you before you do that.  Okay?

25      A.     Yes, ma'am.

L. SINGH

Page 12

```
 1      Q.      After this deposition, there will be a
 2   transcript, a written record of everything that was said,
 3   that you will have an opportunity to review.  Okay?
 4      A.      Yes, ma'am.
 5      Q.      And you will have an opportunity to make any
 6   changes you need to, to that transcript.  Okay?
 7      A.      Yes, ma'am.
 8      Q.      If you do make any changes to the transcript
 9   after today, I will be able to comment on those changes if
10   this case went to trial.
11              Do you understand that?
12      A.      Yes, ma'am.
13      Q.      Is there any reason you cannot testify
14   truthfully, accurately, and fully today?
15      A.      Excuse me, ma'am?
16      Q.      Is there any reason that you cannot testify
17   truthfully, accurately, and fully today?
18      A.      No, everything is okay.
19      Q.      Do you have any issue with your memory?
20      A.      Yes, ma'am, everything is good.  Everything okay.
21   I remember everything.  You can ask me anything.
22      Q.      So no problem with your memory, right?
23      A.      No, nothing, ma'am.  Whatever I was told, what
24   has happened, everything.
25      Q.      Have you taken any medication or drugs in the
```

L. SINGH

```
                                                Page 13
 1    last 24 hours?
 2        A.      No, no, no, nothing, no.  No, ma'am.
 3        Q.      Is there any medicine you normally take, that you
 4    did not take in the last day?
 5        A.      Usually, I take metformin for the diabetic.  So I
 6    don't have it now.  It's a long time since I move from the
 7    apartment.  So it's okay, I'm normal, because I walk.
 8    Everything is okay, my memory, whatever happened, here,
 9    there, I'm fine, ma'am.
10        Q.      Okay, all right.  Thank you.
11        A.      Yes.
12        Q.      You gave your full name as Lakhwinder Singh.  Do
13    you have any other names, a middle name?  Any other names?
14        A.      Nothing, ma'am, no.
15        Q.      Have you ever legally changed your name?
16        A.      No, ma'am.
17        Q.      Have you ever gone by any other name?
18        A.      No, ma'am.
19        Q.      Can I ask what your date of birth is?  And we're
20    just going to put the year in the transcript.
21        A.      1981.
22        Q.      And Mr. Balwinder Singh is your brother?
23        A.      Yes, ma'am.
24        Q.      Mr. Singh, you understand that we are here to
25    discuss an incident involving the police at your brother's
```

L. SINGH

```
                                                        Page 14
 1    home on February 28th, 2018.
 2             Do you understand that?
 3        A.    Yes, ma'am.
 4        Q.    Were you at your brother's home on February 28th,
 5    2018?
 6        A.    I was at my brother's home, because my
 7    sister-in-law, she called me that night, that day, and she
 8    said Balwinder is not feeling good.
 9             And when I arrived there -- so there's the
10    ambulance -- the already two doctors was there, you know?
11    Yes.
12        Q.    What time did your sister-in-law call you?
13        A.    In the morning.  Around in the morning, around --
14    I don't remember the time exactly.  But it's in the morning
15    time.  Like in the afternoon time, when I finished, like --
16    I drive, you know, the Yellow Cab.
17        Q.    Okay.
18        A.    I finish that at 4:00, 5:00, 6:00.  I don't know
19    exactly time.
20        Q.    I'm sorry.
21        A.    Yes, ma'am?
22        Q.    No, I didn't mean to cut you off. Go ahead.
23        A.    Yes, so then they call me, I went there and
24    there's two doctors, nurses there.
25             So now you tell me.  What do you want me to
```

L. SINGH

Page 15

1    explain?

2        Q.      Were you at home when your sister-in-law called

3    you?

4        A.      Yes, I was -- this still is my memory serve, I

5    was coming from the work or I was -- I was home

6    100 percent.  That's what I was thinking.  I was home,

7    because she called me, and then I run right away.  I said,

8    Just wait for me, I'm coming.

9              And then I -- and then I saw two nurses over

10   there for the doctors.

11       Q.      Were you awake when she called, or were you

12   sleeping?

13       A.      I was not sleeping.  I mean, because we were

14   working, you know, nighttime and came home, sit down, you

15   know, help with the kids.  Sometimes my wife wake up early,

16   the kids go to school 6:30, 7:00, they woke up everybody.

17             But I wasn't -- not sleeping, ma'am, that's

18   100 percent.

19       Q.      Okay.

20       A.      Yes.

21       Q.      And how long did it take you to go to your

22   brother's house?

23       A.      It take me 15 minutes, 10, 15 minutes.

24       Q.      Do you recall exactly what your sister-in-law

25   said when she called you on the phone?

L. SINGH

Page 16

1    A.     Yes, she said the two have beer, drinking beer,

2    and he's not sleeping right now, he's not feeling good,

3    like that.  He said he put music, he's dancing, he's

4    relaxing, and like you're enjoying, you know?

5             He said -- so I said, I'm coming, don't worry.  I

6    talk to him, you know?  And I drive my car, I reach his

7    house, and then I see the doctor and nurse there.

8             And it was after that, right away, the cops come.

9    When I was there, I was talking to him, I said, don't

10   worry.  I told his wife, let him enjoy.  It's okay.

11            And it's like I didn't understand even -- I try

12   to explain to him, you know, in my language, my brother, I

13   said, Just sit down last minute, what happened to you?  You

14   Like go in the room and sleep.

15            And there's nurses said, We're going to take him

16   to the hospital.  But after the police came, I was just

17   talking, and they pushed me.  The officer said, Go, go, you

18   cannot talk to Balwinder.  And he sent me to the room, you

19   know, the officer.

20   Q.     When was the last time you spoke to your brother,

21   before you went to his house that morning?

22   A.     When I spoke with him, when I went to his house?

23   Q.     Before --

24   A.     Yes, we always -- we always talk in the morning,

25   evening, afternoon, like when we have, like, a new

L. SINGH

```
                                                  Page 17
 1    something, food, drink.

 2            Like every time he call me, like, in the evening,

 3    like when -- for the -- or he had to go some store to buy

 4    big food, stuff, he bring for me, like BJ, Costco.  They

 5    always --

 6        Q.    Specifically, though, do you remember, before

 7    that warning, when the last time was that you had spoken

 8    with him, specifically?

 9        A.    At that time, that same night, right?  Yes,

10    ma'am?

11        Q.    Before that morning, when was the last time you

12    had spoken with him?

13        A.    Ma'am, exactly, I have no idea, ma'am.

14        Q.    Okay.

15        A.    Before, when he's free, he call me.  He's always

16    busy, because he work with the Uber, and I was with the

17    Yellow Cab.

18            So Uber very strict, because now when you are

19    driving, you cannot talk to nobody.  It's all -- you know,

20    when we're free, if you are near something, call, or, you

21    know, talk to each other, exactly, you know, I don't

22    remember when we talk, what's going on.  It's not --

23        Q.    When you first got to the apartment, who let you

24    into the building?

25        A.    When I reach his house?
```

**[JA-1200]**

L. SINGH

Page 18

1    Q.    Yes, how did you get inside?  Who let you in?

2    A.    I get in before first thing, the door was open,

3  everything.  The ambulance people was over there, you know?

4  So I don't have to call and talk anybody, because all the

5  door was open.

6    Q.    So you went directly to his apartment when you

7  arrived?

8    A.    Yes, right away.

9    Q.    And when you went inside, what was the first

10  thing you saw?

11    A.    I -- first time when I reached there and they're

12  talking with the nurses and my brother wife, you know?

13  This is what happened, Why you call 9-1-1, what happened?

14  She said Balwinder is not, like, feeling good.  You should

15  take him to the hospital, he can sleep and relax and he

16  going to get better.  That, I saw when she was talking.

17         And I was talking also to my brother.  I said, if

18  you not feel good, go, man, go.  And right away, I have no

19  idea where the cops come.  I have no idea.  Because my

20  sister-in-law, she never called to the cops.

21         That time was surprise for that, the only time

22  the cops were there , because he's not doing anything.

23         So, yes, ma'am, go ahead.

24    Q.    So when you arrived, EMS was talking to your

25  sister-in-law?

Case 23-24, Document 33, 04/19/2023, 3501834, Page41 of 277

L. SINGH

Page 19

```
 1      A.      Yes, sister-in-law, my brother wife, you know.
 2      Q.      And she told them -- she asked them to take him
 3   to the hospital; is that right?
 4      A.      Yes.  She said Balwinder not feeling good,
 5   because he had one beer or two beer; I don't know.  So she
 6   said he's putting music very high, you know, listening to
 7   music, but everybody is sleeping, yes.
 8      Q.      And what did you say to your brother, if
 9   anything, when you first got there?
10      A.      What I said to my brother?
11      Q.      Yes.
12      A.      Yes, I said -- I told him in my language, I said,
13   if you're not feeling good, man, go to the hospital, you
14   know, if you're not feeling good.
15              He said I had a beer, man, let me go to sleep,
16   I'm okay, I'm okay.  That's how he was talking.  I'm okay,
17   man, you just go home, I'm okay, everything.  That's how he
18   talked.
19      Q.      How did he seem at that point?
20      A.      How I see him?
21      Q.      No, how did he seem?  Did he seem okay?
22      A.      Yes, he's -- he's okay, like, because his beer
23   drinking like it's okay, but he's not fighting like, you
24   know?  He's not hurting someone.  He was looking, he was
25   sitting on the sofa.  He was sitting on the sofa and he had
```

L. SINGH

```
                                                    Page 20
 1    remote control in his hand.  He putting the volume like

 2    music or some movies, I don't know what he's watching in

 3    the TV.  But I told him, I said, I'm tired, too, man, what

 4    are you doing, what happened?  Why is there noise over

 5    here?

 6              And the nurses, they are asking -- after

 7    arriving, one minute, two minute after that, I don't talk

 8    to anybody.

 9              The officer pushed me, said, Go over in the room,

10    man, what are you doing over here?

11              That's what I totally saw, ma'am.  What can I say

12    now?

13       Q.    Did your brother seem drunk when you first got

14    there?

15       A.    No, not really.  If he's drunk, he cannot like

16    remind me.  Like he cannot talk to me.  He knows that Pinky

17    is here, Pinky is my nickname.  He say, How you come,

18    brother, what happened?  I said, What happened to you, man?

19              But he remember everything, you know?  When he

20    saw me, he said, I'm okay, you should go home, I go to

21    sleep.  Okay?  You just go home.

22              I said, Your wife call me, my sister-in-law.  I

23    said Bobby.  I said, She call me, man.  You had a couple of

24    beers, whatever.  But it's no good like that.  And then I

25    talk to him.  Only three minutes I'm standing there, two,
```

L. SINGH

Page 21

1  three minutes, and then the cops come.  And then they

2  said -- I was explaining to my brother in front of the

3  cops, if you're okay, go to the doctor, get an injection

4  and you're okay.

5          Then the officer pushed me and said, Go, go, you

6  cannot talk to him.  And that's it.  That's what totally

7  happened, ma'am.

8      Q.    Was he speaking in a normal -- in a normal voice?

9      A.    Yes, he was not really -- it's nothing -- you

10  know, nothing activity, anything, jumping or bumping or

11  anything, no.  It's like a normal, like a normal person,

12  ma'am.  It's not anything big, like activity, you know?

13      Q.    You said your sister-in-law said he was playing

14  music loud and dancing.  Did she say that?

15      A.    Yes, ma'am.

16      Q.    And this was around -- between 6:00 and 7:00 in

17  the morning; is that right?

18      A.    Yes, it was -- he was -- but his wife in the

19  room, but he's sitting in the living room, you know?

20      Q.    Did that seem like normal behavior for him, to be

21  doing that?

22      A.    No, no, no.  It's not a normal, ma'am.  He never

23  have drink, two, three years.  He never take anything.  He

24  was just watch TV like -- normally when you come from home,

25  you know, turn on the TV, live on the third floor.  He not

L. SINGH

Page 22

1   bothering anyone.  That's what I think, you know?

2      Q.     My question, though, is your sister-in-law

3   describing him playing music and dancing loud at between

4   6:00 or 7:00 in the morning, does that seem like normal

5   behavior for him, as far as you know?

6      A.     No, no, no, it's not a normal, because I don't

7   see.  Because I don't live with him, what he do in the

8   morning, what he do in the evening, what he do in the

9   afternoon, at night.  He come from work, Uber.

10            Sometimes Uber people work in the daytime,

11  nighttime.  I have no idea.  Just she call me and she said

12  he's not feeling well.  That's why I got there, and I don't

13  know.  I don't know if he was putting music, whatever she

14  told me.

15            You know, when I talk to her, she said, Pinky,

16  just come here, home, and look after him.  That's when he

17  worked the shift, the six-hour, four-hour, like that Uber

18  shift.  What time they come, what time they go, there is no

19  timetable.  So usually I don't know what they do.  Because

20  I don't go to his house a lot, you know.  We are busy in

21  our house.

22      Q.     Mr. Singh, you said that he -- your brother told

23  you he was okay, right?

24      A.     Yes, he spoke to me.  He said I'm okay, why are

25  you here?  What happened, why are you here?  I said --

L. SINGH

                                            Page 23

     1      Q.     Okay.  So he said he was okay, right?

     2      A.     Yes, ma'am, yes.

     3      Q.     And you thought that he seemed okay.  Is that

     4   what you're saying?

     5      A.     Yes, he told me, he said, I'm okay, but he have

     6   beers, you know?  He have the beers, he drinking something,

     7   beer.  I think Corona, he drink one or two beers, three

     8   beers, because we find in the box, two, three beers full,

     9   and the two, three beers empty, you know, in the kitchen.

    10   He has a beer, Corona.

    11      Q.     Did he tell you how much he had to drink?

    12      A.     No, we looked at the beers over there.  Two beers

    13   he was drinking, you know, the rest in the box.  So he

    14   don't tell me how much he drink, I don't ask him how many

    15   he had.

    16      Q.     After you spoke to him and you saw him, did you

    17   think that he needed to go to the hospital?

    18      A.     It's not really.  If he follow -- if he go to the

    19   room, like he sleep, gets better.  Because when somebody

    20   have drink, beer, or whatever, if you fall asleep, you're

    21   going to get better.

    22             What are they going to do in the hospital?  What

    23   are they going to give him, injection to make him fall

    24   asleep?  I have no idea, ma'am.

    25             That's why I am confused.  When somebody is doing

L. SINGH

                                                      Page 24

1    this, you give them lemon juice or something or let them

2    sleep, because that's what I saw, ma'am.  Whatever I see, I

3    told you the truth.

4           It's -- even if I don't know how many beer he

5    have, we saw in the bag, the black box in the right.

6       Q.    Mr. Singh, let me ask you a different way.

7       A.    Yes, ma'am.

8       Q.    When you spoke to him, could you tell he had been

9    drinking just by talking to him?  Not thinking of what you

10   saw in the trash, but just from speaking to him, could you

11   tell that he had been drinking?

12      A.    When I see him, he have drink, ma'am.  He have a

13   drink, you know?  But he told me, How you are here, you

14   know?  So I just said the sister-in-law called me, what

15   happened, man, go sleep.  Why, what happened?  Why --

16      Q.    When you say that he had a drink when you saw

17   him, do you mean he was holding a drink or something else?

18      A.    No, nothing in his hand.  He's not holding

19   anything.

20      Q.    So what I'm asking, Mr. Singh, is how, just

21   specifically, what were your observations of your brother.

22   So without what you saw in the kitchen, empty cans,

23   anything like that, empty bottles, leaving all of that

24   aside, when you spoke with him --

25      A.    Yes.

Case 1:19-cv-00632-EK-ST   Document 48-13   Filed 11/29/21   Page 25 of 115 PageID #: 1412

L. SINGH

Page 25

1    Q.    -- could you tell that he had been drinking,

2  just from speaking to him?

3    A.    Yes, ma'am, he look like that, you know?  Yes.

4  He's like normal, but he look like he had beers or

5  something.  He have like that when I arrive here.  But

6  he's -- just I went inside, I told my sister, what

7  happened, did he hurt you something, you guys fight?

8  What's going on?

9        She said, No, he's not feeling good.  And now you

10  see, if he have drink, that's why he was talking to her,

11  something.  I don't -- what can I explain, ma'am?

12        What he told her, she don't tell me anything

13  about that.  And when I reach there, you know, the doctors

14  and nurses there, and I said, Just go, Balwinder.  If

15  you're not feeling good, go with them.

16        And right when the cops come, they push me.

17  That's what I can -- I didn't talk to him, because the

18  nurses talk to him.  He sit down, check on him, what's

19  going on.  That's what I totally saw, ma'am.  What am I

20  going to see in three minutes, you know?  I was not there

21  long time, ma'am.

22    Q.    Understood.

23    A.    Yes.

24    Q.    You were there about three minutes before the

25  police arrived?

Case 23-24, Document 33, 04/19/2023, 3501834, Page48 of 277

L. SINGH

Page 26

1      A.      Yes, ma'am, when the nurses were there, I reached

2   there, and then after the cops come, they don't stay too

3   long.  And the officer, he don't let me talk, and then two,

4   three minutes standing over there, and then he push me to

5   go, Go in your room, man.

6              I said, Don't push me, Officer.  I don't argue, I

7   say maybe they want to talk to him or something.  And then

8   I got to the bedroom.  And he don't even let me talk to

9   Balwinder.  Just like spoken two, three, words, you know.

10              There's officer there, the nurse is there,

11   doctor.

12              What can I say, ma'am?  It's not a long

13   distance -- yes, ma'am.

14      Q.      Mr. Singh, do you know if your brother has ever

15   had a problem with alcohol?

16      A.      This is a 10 years ago, long time.  He's not --

17   he's not a daily -- daily drinker.  He's never, never,

18   never.  Even any function, on any party, nothing, never,

19   ever.  He never had no --

20      Q.      At some point --

21      A.      Yes, ma'am.

22      Q.      At some point in his life, did he stop drinking,

23   as far as you know?

24      A.      He never touch, ma'am.  I never saw him with

25   three, five, beer.  No beer, no tobacco, no cigarette, no

L. SINGH

```
                                                    Page 27
 1   nothing.  Nothing else, ma'am, he never touch.
 2        Q.     You said for three to five years, but before
 3   that, did he drink?
 4        A.     Before that, when he come to work, he drive
 5   Yellow Cab.  Yes, come home, usually take one shot, sleep,
 6   nothing.  Not a regular drinker like the people do every
 7   weekend, party, dancing, go like to club, or drink every
 8   day, no, no.  He's a very sensitive person.
 9        Q.     You said for three to five years he hadn't
10   touched anything?
11        A.     Yes, ma'am, maybe he --
12        Q.     At some point, he stopped drinking, then.  Is
13   that what you're saying?
14        A.     He's not stop.  He's not started.  He's not an
15   alcoholic like people drink every day, every night.  Maybe
16   some party or a baby born, his gifts coming, like that
17   special day, Mother Day or Father Day party, or some party,
18   they usually take one shot.  But two, three beer, I never
19   seen, ma'am.
20             He never touch anything.  No alcohol, no beer, no
21   nothing.  He's normally drive Uber like that, you know, go
22   to work five, six, seven hours, and that's it.  I never saw
23   him, ma'am.
24             Even if he ever come to my house, Pinky, let's
25   open the bottle.  We can have some champagne or beer, no,
```

L. SINGH

```
                                                        Page 28
 1   nothing, ma'am.  Nothing.
 2       Q.     Mr. Singh, was your nephew home that day?
 3       A.     Yes, ma'am, he was -- he was sleeping.  My
 4   nephew, yes, comes and he was sleeping in his bedroom.
 5              Because that's the room the officer send me in,
 6   you know?  He push me and say, Go.  And then I go to the
 7   room and I see he's sleeping.  He is going to be asleep,
 8   to, but maybe -- I don't know what they did.  He's got to
 9   go to sleep, too, ma'am.
10       Q.     Your nephew was asleep when you arrived?
11       A.     Yes, ma'am.
12       Q.     Did anyone tell you what had happened inside the
13   apartment before you got there?
14       A.     No, ma'am, no.
15       Q.     Do you know --
16       A.     Nobody.
17       Q.     Do you know if your brother was arguing with the
18   medical workers, before you got there?
19       A.     Nobody told me anything.  I came after the
20   workers come, like two minutes or something.  I see the
21   police already there.  I don't see anything, ma'am.  I
22   don't -- just I was standing, like, listening, talking to
23   my brother and listening to the doctor, that they wanted to
24   give him treatment or take him.
25              But before anything happened, ma'am, I had no
```

Case 1:19-cv-00632-EK-ST   Document 48-13   Filed 11/29/21   Page 29 of 115 PageID #: 1416

L. SINGH

Page 29

1   idea, because since he call me, I arrive, like, 10 minutes,
2   15, 20 minutes.  And I don't see anything, him fighting
3   with anybody or nothing.
4          But I was -- when I was trying to talk to him and
5   the officer don't let me talk, the one officer -- one
6   officer is good, he don't say anything.
7          One officer, he said, No, go inside in your room,
8   don't talk to him.  He push me and I left.  That's what
9   happened.
10         He don't even let me talk to Balwinder, I can't
11  explain what's going on, Are you okay, are you not?  That's
12  what happened totally, ma'am.  Before -- but he never do
13  anything wrong, activity or something, jumping or bumping
14  or fighting with anybody, no.  I never heard any noise when
15  I reach there, you know, ma'am?
16  Q.    You said that when you got there, you asked your
17  sister-in-law if your brother had hurt her or if they had
18  been fighting.  Is that what you said?
19  A.    No, I told her, I said, everything -- Is anything
20  wrong?  She said, No, he don't hurt me, nothing, no.
21  That's it.
22         I said, Look, Balwinder is not feeling good,
23  that's what she told me.  And she was okay, she was there
24  in the kitchen, you know, around -- next to me.
25         And we tried to sit him down and give him water

L. SINGH

                                                        Page 30

1    for him to feel better.  There's nothing wrong, ma'am, I
2    don't see anything wrong, ma'am.  Whatever I see, you make
3    me swear, I tell you truth, whatever is in my memory, you
4    know.  I still have in my brain and eyes whatever I see,
5    ma'am.
6         Q.     Have you ever known your brother and his wife to
7    fight any other time?
8         A.     Another time, no, just to -- argument a little
9    bit.  Every family, they have like, Oh, go bring some food.
10   Why you late, go grocery, and something like that.  Oh,
11   you're late, go pick up the kids, the kids in the school.
12   You know, that in the morning, Balwinder, go pick up the
13   kids.
14           It's a normal life, and she was also pregnant,
15   you know?  I don't see any fight with them.  If they have
16   any problem, they can call us, you know?  She can talk to
17   my wife.  I don't see any activity, ma'am.
18        Q.     You don't know who called the police to come to
19   the apartment, right?  Let me ask it a different way.
20           Do you know who called the police to come to the
21   apartment?
22        A.     I -- the -- I think so, the nurses, doctor.
23        Q.     Did you hear them call?
24        A.     I think so, because my wife -- my wife -- my
25   brother's wife said she don't call to the police.

L. SINGH

                                                    Page 31

1    That's -- that's -- that's 100 percent.  I told her, I

2    said, Why is the cops over here?  And my brother, sister

3    said, I don't call the cops.

4           I have no idea, ma'am, about that.  You know, I

5    was -- I was just standing over there, just talking toward

6    my brother.  Are you okay, man, what happened to you?  And

7    they don't let me talk.  So I don't pay attention how the

8    police came, who called, like, you know?

9    Q.    Yes.

10   A.    It's like that, ma'am.

11   Q.    So you did not hear -- you didn't hear the

12   medical workers call for the police; is that right?

13   A.    Excuse me, ma'am?

14   Q.    Did you hear anyone, the medical workers or

15   anyone else, call for the police to come, or you're just

16   guessing?

17   A.    No, no, ma'am, no.  Not really, ma'am.  I never

18   gave, because I was tied to -- I didn't pay attention.

19   Like I said, just like normally, are you really going to

20   sleep?  What's the big deal?  But I have no problem, you

21   know, because if I don't come, she's going to mind.  I call

22   my brother, and he don't come.  That's why I go.

23          Usually, I don't go over there a lot, ma'am.  I

24   said, if I don't go, she's going to be mad if I don't come.

25   That's why I go, especially, you know, and what I see over

L. SINGH

Page 32

1    there -- uh-huh.

2        Q.      I'm sorry, I'm not trying to cut you off, I don't

3    want to take too much of your day.  So I just want to

4    ask -- it's specific questions I want to ask.  Okay?

5        A.      Yes, ma'am.

6        Q.      When the police arrived, were you in the living

7    room of the apartment?

8        A.      Yes, ma'am, I was -- I was there.  Yes, I was

9    there, ma'am, because I was next to -- like I was there in

10   the front of the door, and I see the officer, the one who

11   push me -- one officer was on Balwinder side, you know?

12            And it's like I talk to him in my language, my

13   brother.  I said, Are you okay?  Please relax, sit down,

14   and everything going to be okay, just go to sleep.  And

15   officer, he just -- he told me, Go, go, go, move a little.

16   He don't give me time to let me talk to him.  And that's

17   it, ma'am.  What can I say now?

18       Q.      Did your brother have any reaction to the police

19   coming into the apartment?

20       A.      No, no, no, no.  No jumping, no action.  Like he

21   was talking normally.  He said, Why are you come here, what

22   I did wrong?  And that's what he told to the officer.  What

23   I did wrong?  I'm not bothering anyone.  I'm okay, it's my

24   house.  I'm okay.  I'm not doing anything.  I'm not

25   bothering anyone.  I don't hurt anyone.  Why, what

Case 23-24, Document 33, 04/19/2023, 3501834, Page55 of 277

L. SINGH

```
                                                 Page 33
 1   happened?  Like that, he was talking, you know, and --
 2       Q.     And was he talking to a specific police officer
 3   or all of them?
 4       A.     I can hear, ma'am.  Nothing, no fight, no
 5   argument, no nothing.  When I came from the room, I heard a
 6   noise, boom, like that, something, and I came out from
 7   there.
 8              Because they're talking.  When I reach there, I
 9   heard the noise in the steps (indicating), like they're
10   pulling like an animal or someone, you know?  That's when I
11   said, Oh, my God.
12       Q.     Yes, we'll get to what happens later.  I want to
13   sort of focus going piece by piece here.
14       A.     Yes.
15       Q.     So when your brother asked -- you said he asked
16   the police what he did wrong, was he talking to someone
17   specific, or was he talking to everyone; do you remember?
18       A.     No, he was talking like that.  He said, Why you
19   officers, police is here?  He talk to his wife also.  He
20   said, What happened, Bobby?  His wife name Bobby.  He said,
21   what happened?  Why the police is here?  What I did wrong
22   in my home, my apartment?  I have a couple of beer, drink,
23   relaxing, why, why, why?  Like that, ma'am, nothing wrong,
24   what can I do, you know?
25       Q.     Did you hear --
```

L. SINGH

Page 34

```
 1      A.     It's like --
 2      Q.     Did you hear the police say anything to him in
 3   response?
 4      A.     What happened?  The voice -- I'm sorry.
 5      Q.     Let me rephrase that.  Let me rephrase that.
 6             When your brother said something to the effect
 7   of, "What did I do wrong," did the police answer his
 8   question?
 9      A.     The voice is double up.  Yes, ma'am?
10      Q.     I'm sorry, can you hear me now?
11                  THE COURT REPORTER:  He froze.  Let's go off
12             until we get him back.
13                  (Whereupon, an off-the-record discussion was
14             held.)
15      Q.     Can you hear me okay?
16      A.     Yes, sir -- yes, ma'am.
17      Q.     Okay.  When your brother asked the police,
18   essentially, What did I do wrong --
19      A.     Yes, ma'am.
20      Q.      -- did you hear the police answer his question
21   at all?
22      A.     No, they say, We take you to the hospital like
23   that.  They're talking like that, ma'am, and I don't stay
24   there even one minute.  They don't let me -- let me
25   standing there, like let me listen or talk to my brother.
```

L. SINGH

Page 35

1           Nothing, whatever they are discussing -- what
2  they were talking like, you know.  Not really.  Whatever I
3  see, ma'am.
4      Q.      But you didn't --
5      A.      I was talking, I said, why are the cops here,
6  man?  Everybody watching, the neighbor, it's not good.
7  That's the way we talk.  I said, that's no good, man.  What
8  happened?  That's no good, that's it.  And -- yes.
9      Q.      You heard one of the police officers tell your
10  brother that they were taking him to the hospital?
11      A.      No, no, ma'am.  I never heard they're going to
12  take him to the hospital.  No, no, no, no.  Nobody said
13  like this, We're taking him to the hospital.  They told him
14  to put your hand, and I don't know why they take him.  I
15  don't even ask him, ma'am.
16           I didn't even ask the officer where they taking
17  him, why they taking him?  Nothing.  I left in the room to
18  where the kids are sleeping, you know?  And --
19      Q.      Sorry, Mr. Singh, let me ask my question again,
20  then, because I misunderstood your answer or maybe you
21  misunderstood my question.
22           You said that you heard your brother ask the
23  police, essentially, What did I do wrong?
24           And my question is, did you hear any of the
25  police officers answer his question --

L. SINGH

Page 36

1      A.      Nobody give any answer, nobody, no.

2      Q.      Did you hear them say anything to him?

3      A.      No, ma'am, nothing.  They just tried to, like,

4  talking, but I don't know what they're talking to him.  I

5  didn't even remember, because I have a lot -- I also had an

6  accident, you know, when I was working after that.

7          So I'm not really -- just I put to the folks,

8  what they're talking, what's going on, why they're there,

9  what they spoke with him.  But I have no idea, ma'am,

10  totally, about that, you know?  But nobody said anything.

11          And nobody said the cops are going to take him to

12  the hospital, because there's -- there is the nurses over

13  there, the doctor over there, they're supposed to take him

14  to the hospital.  (Audio glitch) I don't know.

15      Q.      Mr. Singh, I just want to make sure we're getting

16  a clear transcript.

17          Did you hear the police say anything to your

18  brother, or are you saying you can't remember?

19      A.      No, no, no, nothing.  I hear nothing, ma'am.

20  They don't say they're taking him to the hospital.  No.

21      Q.      I'm just asking, I want to be clear.  I'm not

22  just asking if they told you anything about the hospital.

23  I'm asking, did you hear the police say anything to your

24  brother?

25      A.      Anything to my brother?  I was just standing

Case 23-24, Document 33, 04/19/2023, 3501834, Page59 of 277

**[JA-1219]**

L. SINGH

```
                                                      Page 37
 1   there.  After that, I don't see anything after they push me
 2   in the room.  They don't let me stop there -- they don't
 3   let me stay there.  I was talking --
 4       Q.     Let's break it down.
 5              Before you went to the bedroom, do you hear the
 6   police say anything to your brother?
 7       A.     They just talking, like the nurses, mostly, are
 8   talking.  The nurses.  And then this is all four over
 9   there, together, like two ambulance and two police officer.
10              What they're talking, they don't like people to
11   come home, yes, like what was wrong with him, like Officer
12   how to talk.  What's the business?  That's what they did.
13   That's what I heard, that's it.
14              And then I was talking to my brother.  I said, Go
15   to sleep, man.  You okay?  What's going on?
16              And then the officer said -- he push me and say,
17   Go over there.  That's it, ma'am.  What they did to him,
18   what they talk to him.  I went to the room, and I was
19   talking to my wife, you know?
20       Q.     You don't remember anything the police officers
21   may have said to your brother, before you went to the
22   bedroom --
23       A.     Nothing, ma'am, nothing was discussed, I have --
24   you know --
25       Q.     After you went to the bedroom, did you hear
```

Case 23-24, Document 33, 04/19/2023, 3501834, Page60 of 277

L. SINGH

Page 38

1    anything the police officers -- could you hear, from down

2    the hallway, anything the police officers said to your

3    brother?

4        A.    No, I heard the noise, and then I come --

5        Q.    Before the noise, could you hear -- before that

6    noise, could you hear --

7        A.    No, nothing, ma'am, no.  I was with my wife.  You

8    know, she was worried about what happened and nothing

9    happened, ma'am.

10            I didn't pay attention than more, you know.  I

11    said maybe it's normal, I came, and then they sent me to

12    the room, and I was in another room.  It's a little funk --

13    not really funk, but just in the room, close the door and

14    go to a different room, and that's it.  And after what they

15    did to him, what's going on, you know.

16        Q.    Mr. Singh, you said you couldn't hear anything

17    the police said to your brother.  Could you hear anything

18    that your brother was saying?

19        A.    Nothing.

20        Q.    The police or anyone else?

21        A.    No, ma'am, I was on the phone with my wife.

22    After they sent me in the room, my wife called me, What's

23    going on?  And I was in the room, you know?  I talk to my

24    wife, I said it's like that.  That's it.

25        Q.    Did you ever hear your brother speaking to his

L. SINGH

Page 39

1    wife in Punjabi that morning?

2        A.      Speaking with Punjabi with his wife?

3        Q.      Yes.

4        A.      Yes, he -- he told Bobby.  He said -- but he

5    don't speak with the Punjabi.  Why he going to speak with

6    the Punjabi when the police are over there?  Yes, he like

7    talking with my language, why the police is here.  That's

8    it.  That's what he's talking.  The same morning you're

9    talking about, right, when I was there?

10       Q.      Yes, sorry, so let me ask it a different way.

11               When you say your language, what language are you

12   referring to?

13       A.      Punjabi.

14       Q.      So did you hear your brother speaking to his

15   wife, in Punjabi, at all that morning?

16       A.      Yes, at that time, when I was there, he spoke.

17   He say why the police and ambulance is here.  That's his --

18   he don't talk the language in English, he talking the

19   Punjabi.  He said what he did?  Why he did like this?

20               He said I just called to the ambulance, I did not

21   call the cops.  That's all.  He said, That's not good,

22   Bobby, Bobby, like the nickname, you know?

23               That's all, ma'am.

24       Q.      So just, specifically, what do you remember him

25   saying?

L. SINGH

Page 40

1    A.    Yes, I'm going to put in my folks.  He said to

2  Bobby, like in my language, in Punjabi, What is this?  What

3  I did?  What you did?  Like that, he told me in Punjabi.

4  What you did, you know?  Why you did like this, what did I

5  wrong, Bobby?

6          Why is the police here, why is this here?  After

7  work I'm just relaxing.  What you did to me, like that, in

8  my language, you know?

9    Q.    What was his tone of voice when he was speaking

10  to her?

11    A.    Voice, maybe 30 square miles, his voice.  Not

12  very low, and not really very high.  Not really slow, but

13  like the way people talk.  They work -- why -- why you

14  call, Bobby?  What I did?  But not very high and not very

15  low.  It's in the middle, you know.  It's like a little --

16  look like it, because he's not very -- he's not cursing too

17  hard.  Like I see, he's not cursing too hard.

18          He said, Bobby, what you did?  Why is the cops

19  here, why is ambulance here?  I'm just relaxing myself.

20  I'm going to sleep, I told you, I'm going to sleep.  Give

21  me five, ten minutes, I'm going to sleep.  What is

22  everything here like this?

23          You don't feel ashamed, what is that, you insult

24  me, you make me like this, like that, in Punjabi.  He told

25  talking to her.  And I told her, too, what happened, Bobby?

L. SINGH

                                                      Page 41

1    Like Bobby would call, my brother wife.

2             That's how he was talking to her.  He said, I'm

3    going to bed, the Bobby.  What you did, what you did?  Why

4    you did?  He's talking to his wife, that's all the

5    conversation going on over there.

6             Then I start to talk, I told my brother, I said,

7    Relax, man, sit down.  If you get mad, you're going to get

8    arrested.

9             Don't cry, nothing wrong, so nothing going to

10   happen.  The police officer push me.  He don't let me

11   speak, talk, he said go in the room, why are you here?

12   What are you doing over here?  Like this, that, and I don't

13   answer.

14            I don't answer like other people.  I don't

15   answer, like quietly, I go in the room.

16            That's what happened, ma'am.

17   Q.    When your brother was talking to his wife about

18   what was going on, did he seem upset?

19   A.    No, it's like -- it's a little bit tense, because

20   he was standing on the TV stand, and the wife was on the

21   kitchen side.  And she said, I just call ambulance, you not

22   look like you good, and he was not -- he cannot do anything

23   over there.  Before -- before, he did nothing when he was

24   alone, she was alone.

25            So what you going to do in front of the police

L. SINGH

Page 42

1   officer, in front of the doctors?  What he's going to do?
2   Nothing.  Before, nobody was home.  And then a doctor come.
3   So he do nothing before, so what he going to do after that
4   when everybody was there, ma'am?  He not understand.
5           So before or after this tense, when he was next
6   to me, there was nothing, no physical problem.  He said,
7   Oh, my God, Bobby, what you did, why you did?  I was going
8   to sleep.
9           That's his conversation that he's talking in the
10  Punjabi to the wife.
11          Yes, ma'am.
12  Q.      I'm sorry, what do you mean when you say that
13  there was no physical problem?
14  A.      I said he don't hit her.  You said what he was
15  doing, how he was treating, what he was doing to her.  He
16  was not -- he's not cursing to her.  He's just talking,
17  Bobby, what you did?
18          When she called doctor or ambulance, police come,
19  he don't jump on her.  He was talking the language.  You
20  said, which language he was speaking?  So he was speaking
21  the language, Punjabi, you know, to her, What you did,
22  Bobby.
23  Q.      No, Mr. Singh, my question was a little more
24  specific.  Did he seem upset when he was speaking to her?
25  And by upset, I mean, did he seem angry or anything like

L. SINGH

Page 43

1  that?

2      A.      No, no, no, no.  Like that, the way the husband

3  talk, you know?  How the wife talk sometimes, you know?

4  You know that, ma'am.

5          How the wife would curse to the husband, how the

6  husband talk to the wife when somebody met, the same normal

7  things, you know?  Even if a customer talk to us, we go one

8  block over, we're like going to talk, Hey, what the -- this

9  and that, what you doing?  Where you taking us?  One block

10  before.

11          Same argument with the wife, cook now, cook

12  later, the argument, that's a normal, I think, the behave

13  he was talking to her.

14      Q.      I think I --

15      A.      They both graduation, ma'am.  They both

16  graduation.  His wife is good, you know?  Is nice, you

17  know?  What I explain, ma'am?

18      Q.      I think I understand.  I'm just -- I guess what

19  I'm trying to understand is, was he mad?  Is that what

20  you're saying or something else?

21      A.      No, but you told me, ma'am.  He was talking in

22  Punjabi or English or Bangladeshi.  He was talking to his

23  wife in Punjabi.

24          And that's I explained to you, ma'am.

25      Q.      And when he was speaking to her -- no, no, I get

L. SINGH

Page 44

1    it.  And you explained --

2        A.      Yes.

3        Q.      -- what he said.  I'm just trying to understand,

4    when he said those things, did you think that he was mad?

5    That's all.

6        A.      He's feeling bad.  He's not really mad.  He was

7    feeling bad, because he was shocked.  What's going on?

8    Everybody in the room, police and the fire and, like, you

9    know, the doctor, nurses, he's shocked.

10           He's not mad, he's upset.  He said, Oh, my God,

11   what you did?  I was relaxing, I was enjoying the bed.

12   Everybody does in the home, ma'am, you see.  I don't know,

13   the games, other people, they drink every day in the bar,

14   people fall.  He's not like that person.

15           He was sitting in the home, in the apartment, the

16   room.  Maybe she -- what can I say, ma'am?  He call me, I

17   came right over there, because I worry about them.  She

18   call me, I don't go, what happened, let me go.

19           Because usually, it's not like that.  Never

20   happen like that, you know?  I never see them fight or like

21   drinking or anything, you know?  I didn't make any drama or

22   anything, I never see, I never saw.

23       Q.      And Mr. Singh, you said that, at some point, you

24   heard a loud noise, right?

25       A.      No, no noise.  When I leave, only the door open.

L. SINGH

Page 45

1   The door open and I go, I don't have to call anyone.  I go,

2   the already the door open.  The doctor went over there, the

3   nurses --

4       Q.     No, no, sir.  Let me ask it a different way, I'm

5   sorry.

6              What I meant was, after you went back to the

7   bedroom, right, you said you called your wife or you spoke

8   to your wife on the phone?

9       A.     My wife was calling me to find out what's going

10  on, you know, they are okay, what happened?  Yes.

11      Q.     So while you were on the phone, you said you

12  heard -- at that point, you heard a loud noise from the

13  other room, right?

14      A.     Not a noise.  Like one time, boom, boom like --

15  something like noise come.  And then I come out, and then,

16  at that time, they are too king him in the step like

17  animals.  You know, in the step, in the door, I heard the

18  noise, the (indicating).

19             All of them are pulling him from the step.  The

20  third floor, it's a building, apartment one and two, and

21  third apartment.  That's totally what happened with the

22  noise.  And that's it, ma'am.

23             I don't even go out.  I don't even go out to

24  follow them, where they take him, what's going on.

25      Q.     Okay.

L. SINGH

Page 46

```
 1      A.      Yes.
 2      Q.      When you heard what you described as a boom, did
 3   you see what caused that boom?  Did you see it when it
 4   happened or you just heard it?
 5      A.      I just heard, ma'am.  I don't see anything, no.
 6   I don't see anything.  I just get a noise I heard and they
 7   took him, that's it.  What I can do?  I can't do anything.
 8   I don't even follow him.  I said, Okay, let them take him
 9   where they take him, I don't go, that's it.
10      Q.      Okay.
11      A.      Yes, ma'am.
12      Q.      And you said after you heard the boom, you came
13   out of the bedroom, right?
14      A.      From the room, yes, because when the police move
15   over there, then they came, you know?  I don't want to hear
16   argument with me, too, you know?
17      Q.      At that point, was your nephew still sleeping?
18      A.      Yes, ma'am.  He was in the room, he was sleeping,
19   yes.
20      Q.      And at that point, your brother only had the one
21   son and your sister-in-law was pregnant, right?
22      A.      Yes, ma'am.
23      Q.      And after you came out of the room, what did you
24   see?
25      A.      I see noise on the step.  You know, they going --
```

L. SINGH

Page 47

1    they took him out.  The noise come like somebody pulling,

2    you're not going normally, you know, like the people go,

3    the way the ambulance take the patient, not like that.  I

4    heard the noise on the step, too (indicating).  I don't

5    follow them.  I said, Let them go; I don't know what's

6    going on.

7        Q.    All right.

8        A.    Yes, ma'am.

9        Q.    All right.  Mr. Singh, I want to show you -- let

10   me ask you a question.

11             Before your deposition today, did you do anything

12   to prepare to testify today?

13       A.    No, I talk to his lawyer.

14       Q.    Okay.

15       A.    Yes, I spoke with him, he said, you have

16   deposition.  No, nothing prepared for what, ma'am?  I

17   remember everything in my memory, because when I see

18   something, I never forget, you know?

19             My neighbor, I see the person 20 years, 15 years,

20   I never forget.  So I see everything like in my time.  It's

21   not a story or somebody prepared me for what, ma'am.

22             He said, You were there?  I say, Yes.  He said,

23   we needs you, somebody wants to talk to you with the

24   lawyer, I said okay , I was there.  Whatever I saw, I don't

25   have to lie.  I'm not getting anything, just somebody

L. SINGH

Page 48

1    injured or something happened, I can talk.

2              I was there, yes, that's all, ma'am.

3        Q.     And Mr. Singh, did you have a chance to review

4    any videos from this case, before today?

5        A.     The video, I -- I also saw -- what happened was I

6    saw the video, too, ma'am.  I told my brother, before, you

7    know, let me see what happened, you know?

8              Why -- because I don't see.  He said, they took

9    me through here, there.  I said, I don't see, man.  But he

10   saw, he show me, my brother, you know?  My brother showed

11   me.

12       Q.     When was that?  When did he see the video?

13       A.     I saw the video almost a week, two weeks.

14       Q.     What --

15       A.     He told me -- before, he didn't discuss with me.

16   He said he was home that day, they want to spoke to you, so

17   you see they throw me out.

18             I said, I don't see, man.  But they said --

19   that's why the officer sent me in the room.  He pushed me

20   to, Go, Mister, and I don't listen and I go.  But after

21   they throw him on the floor, I see him moving, ma'am?  Why

22   I'm lying to you?

23       Q.     So that was a week or two weeks before now; is

24   that right?

25       A.     Yes, before the lawyer talk to me.  You know, he

L. SINGH

Page 49

1    said, You were there, you see?  I said, No, I don't see.

2    But they show me and I said, Oh, yes.  That's the noise I

3    heard.  You know, that's the noise I heard when they put

4    him on the floor, bam, like that, the voice, bam.  Then I

5    came out.  Because I was in the room.  I said, Let him

6    discuss to the doctor and officers, whatever they discuss.

7    But I saw the movie, ma'am, yes.

8         Q.      How many videos did you watch?

9         A.      I just saw the video of throwing him out and the

10   officer push me.  I remember I was talking to my brother

11   when he push me.  He said, Go.  Because I see in my eyes, I

12   was, you know, I was there.  So I was representing, like

13   what they call, at this part, you know?

14        Q.      Mr. Singh --

15        A.      So I guess I remember everything, ma'am.

16        Q.      Do you remember how many police officers were in

17   the apartment that day?

18        A.      Two.

19        Q.      And the police officer --

20        A.      The doctor or the two nurses, and I saw the two

21   officer, ma'am.  I don't know, two or three or four, five,

22   like -- not in a rush over there, ma'am.

23        Q.      Sorry, I want to make sure I'm understanding your

24   answer.

25               Was it two officers or more than two officers?

Case 23-24, Document 33, 04/19/2023, 3501834, Page72 of 277

L. SINGH

                                                            Page 50

 1        A.      I see one -- let me see.  There's maybe three
 2   officer.  One is Black, skinny.  I -- maybe three officer,
 3   ma'am, I think.  Three, two of the doctor, nurse.
 4        Q.      I just want to focus on the police for right now.
 5   You said you think it's three police officers?
 6        A.      Two, three, four.  Yes, ma'am, whatever I
 7   remember, you know?  Just to --
 8        Q.      Okay.  Mr. Singh, if you don't remember, that's
 9   fine, but I want to know what you do remember.
10              So do you remember three officers or something
11   different?
12        A.      Three.
13        Q.      Can you describe the officers that you remember
14   being there?
15        A.      Like remember?
16        Q.      Can you describe them physically?  What did they
17   look like?  Do you remember?
18        A.      Yes, one is, ma'am, the short is the Black man.
19   One is a tall one who push me (indicating), you know?
20        Q.      Can you describe this third officer?
21        A.      I can't -- I can't remember, ma'am.  Just he push
22   me and I left over there, you know.
23              But the tall one, the tall officer, he push me.
24   I don't remember everything, ma'am, how they are --
25        Q.      At any point that day, did the tall officer say

L. SINGH

                                                            Page 51

1    anything to you?

2       A.     He said, Don't talk to anybody, just go.  You

3    cannot stay here, you know?

4       Q.     Did either of the other two officers say anything

5    to you that day?

6       A.     No, ma'am.

7       Q.     Mr. Singh, I want to show you a video.  I'm going

8    to start with a video we've marked as Exhibit A.  Let me

9    (indicating) -- okay.  All right.

10             Mr. Singh, can you see the video in front of you?

11      A.     Yes, ma'am.

12      Q.     Are you on a cellphone or a computer?  Can I ask?

13      A.     The cellphone.

14      Q.     So let me know if this is a little -- if it's too

15   small or it's hard for you to see, I can rewind it.

16             This is going to be Exhibit A for the purposes of

17   this deposition, which is a file produced by plaintiff in

18   this case, as -- with the title of Video of EMS, is the

19   file name.

20             And it's at the zero second marker now.  And

21   Mr. Singh, if you can tell me, just looking at the first

22   frame of this video, do you know if this is the video you

23   watched before today?

24      A.     No, ma'am.

25      Q.     No, it's not, or, no, you can't tell?

L. SINGH

Page 52

1    A.    No, I don't watch.

2    Q.    Okay, all right.

3    A.    No.

4    Q.    So I'm just going to play this through, and I

5 just have a couple of questions for you about it, and then

6 we'll move on, okay?

7       It's about four -- a little under five minutes.

8 So I'm just going to play it from zero minutes.

9       (Whereupon, a video clip was played.)

10    Q.    Okay.  Mr. Singh, I paused this video at 13

11 seconds.  Did you see someone just walk in the door?

12    A.    Yes, ma'am.

13    Q.    And who did you see walk through the door, if you

14 know?

15    A.    They are -- in the movie, I can see this is the

16 doctors.  I never saw the movie before, but I see -- if I

17 see -- this is in the movie, the doctor, because they're

18 willing, you know?  This is the doctor, ambulance doctor.

19    Q.    You're indicating around your neck, like a

20 stethoscope that they're wearing?

21    A.    Stethoscope, and there, 100 percent, is the

22 doctors.

23    Q.    Did you see a third -- another person, a third

24 person come through the door with him?

25    A.    After that or before?

L. SINGH

Page 53

1      Q.     Just in the 13 seconds that we just saw.

2      A.     I don't remember everything, ma'am.  No face, no

3   nothing.  I've just seen the doctors and he goes, Oh, look

4   at the people sitting over there on the sofa.  And this

5   movie, I just saw, ma'am.  And I've seen this is the doctor

6   that came.  I came after them.  I was not there at that

7   time.

8      Q.     Mr. Singh, is that your brother sitting on the

9   sofa, in the video, on the last --

10      A.     Yes, yes, it's Balwinder, yes.

11      Q.     When you arrived at the apartment that morning,

12   is that where your brother was sitting?

13      A.     No, not really.  He's not sitting.  Maybe he was

14   talking to me and his wife.  He was talking.  He's not

15   sitting at that time.  He was sitting over there.  At that

16   time, I don't think he was sitting -- like sitting or

17   talking, but he was still over there.

18            When I was came, he was there, you know?  He was

19   in that same section that I sat.  And I was standing next

20   to the kitchen.

21      Q.     So when you arrived, your brother was on the

22   sofa; is that right?

23      A.     Not really.  He was standing or talking or

24   sitting; I don't remember, ma'am, properly.  But he was in

25   the same -- the same -- he was on the same side, because

L. SINGH

Page 54

1    when I came, I was on the kitchen side.  He was in the

2    living room, on the TV side, you know?

3        Q.     Okay.  We're going to play the video for 30

4    seconds.

5               (Whereupon, a video clip was played.)

6        Q.     All right.  So Mr. Singh, we're at the end of

7    this video, just four minutes and 48 seconds.  You were not

8    in the apartment during the video we just watched, right?

9        A.     Yes, ma'am.

10       Q.     You saw in the video that your brother was

11   talking to these two medical workers?

12       A.     Yes, when he get -- yes, si, si.

13       Q.     Did your brother ever tell you anything about

14   this conversation that he had with these medical workers,

15   before you arrived?

16       A.     Before I arrived?

17       Q.     What I mean is --

18       A.     No, no, no.  I don't, no.  Nothing, I don't --

19   that time, I don't see anything, no noise, no nothing.  I

20   just walk in after -- nothing conversation for anything,

21   ma'am.

22       Q.     No, I understand.

23       A.     He was still over there, yes.

24       Q.     I understand, let me be more specific.

25              What I mean is, after this whole thing, did your

L. SINGH

Page 55

1   brother ever, at any time, tell you anything about the

2   conversation that happened between him and the medical

3   workers that we just saw in this video?

4       A.    No, he said, I just want to sleep.  At that time,

5   what I heard.  I never had a conversation or anything with

6   him, you know?

7       Q.    So you don't have any reason to know what was

8   being said in the video we just watched?

9       A.    Yes, whatever he did, whatever, nothing, no,

10  ma'am.  I never ask him anything.  He just call me -- he

11  was there, whatever you saw, whatever happened.

12          You know, as his lawyer explained, I said I'm an

13  eyewitness, you know?

14      Q.    So Mr. Singh, this video is four minutes and 48

15  seconds long.  I'm just at the end.  I'm just going to back

16  up to four minutes and 40 seconds.

17          Do you see at the top of the screen, there's a

18  date and a time stamp?  Do you see that?  Do you see what

19  looks to be a date and a time on the video?

20      A.    2/28, and the time was 6:37, yes.

21      Q.    Is 6:37 a.m. around the time that your

22  sister-in-law called you and that you were coming to your

23  brother's house, is that approximately the right time

24  period?

25      A.    Even the time -- even, ma'am, the time is

L. SINGH

Page 56

1    1 o'clock or 2 o'clock or 12 o'clock, I have to come, you

2    know?  The time is sometimes the good time or sometimes bad

3    time.  Any time she call me, I have to come.

4           But this time, because I come from work this

5    time.  Usually, we not sleep this time, you know?  So 6:00

6    or 5:00 or 6:00.

7       Q.    I'm sorry, I cut you off.  All I'm trying to

8    understand is you said earlier, you're not sure what time

9    you went over there, so I'm just asking --

10      A.    That time is mostly -- that time is mostly the

11   1 o'clock or 2 o'clock in the night to bother someone, you

12   know?

13      Q.    Let me rephrase, so I'm clear what I'm asking.

14      A.    No, you said this time is right to call

15   someone --

16      Q.    No, no, no, I'm sorry.  That's not what I meant.

17   Let me rephrase the question.

18      A.    Okay.

19      Q.    What I meant was, you said earlier in the

20   deposition, you weren't sure exactly what time of morning

21   this all happened.

22           So all I'm asking is, looking at the time on the

23   video, does that refresh your memory as to what time this

24   happened?

25      A.    The memory was in the morning time, ma'am.  I

L. SINGH

Page 57

1   don't know what's the time or record anything, you know?  I

2   don't even remember going on my phone or something, you

3   know?

4       Q.      Could you say if you got a phone call, and then

5   you went to your brother's house sometime around 6:30 in

6   the morning or you don't remember?

7       A.      No, I don't remember, ma'am.  I have no idea

8   about the time or the call.  All I -- I pick up my car, I

9   come, you know?  Even -- there's no time, no, no, nothing I

10  remember, ma'am.

11      Q.      So let's go to -- this is going to be Exhibit B

12  for purposes of this deposition, which is a file received

13  from the plaintiff, bearing file name Police Video.  Okay.

14          Mr. Singh, can you see a different video in front

15  of you now?

16      A.      Yes, ma'am, I am standing over there with the

17  door.

18      Q.      You see yourself in the video?

19      A.      Yes, ma'am.

20      Q.      So we're at zero seconds of Exhibit B.  Is this

21  the video that you watched before the deposition today?

22      A.      No, not this one.  I don't know.  I just saw one

23  video when I was come from the room, you know?  When I was

24  coming from the room, then I watch.

25      Q.      Okay.  Mr. Singh, before we play this video, I'm

L. SINGH

Page 58

1  just going to direct your attention to the time that's

2  stamped on the video here, which says about 6:44 a.m.

3          Do you see that at the top of this video?

4      A.      Yes, before was 6:37, now it's 6:44, ma'am.

5      Q.      In this video, you said you saw yourself in this

6  frame.  Right?

7      A.      Yes, ma'am.

8      Q.      Just looking at the video, do you know how long

9  you had been inside the apartment at this point?

10     A.      Maybe a minute or two minutes.  No, I don't

11  remember.  I have no idea, ma'am.  I don't watch anything.

12  When I see when I was coming back from the room, you know?

13  I don't see any movies or nothing.  Whatever was there, I

14  was there.  I tell you the truth, ma'am, I don't have to --

15  yes.

16     Q.      And we're going to play from zero seconds, and

17  then I'm going to pause and ask you questions from time to

18  time.

19     A.      Yes, ma'am.

20              (Whereupon, a video clip was played.)

21     Q.      I'm going to pause at two seconds.  Did you see

22  someone just walk in the door?

23     A.      This is a police officer.

24     Q.      Do you know which police officer, of the three

25  you described earlier, that is?

L. SINGH

Page 59

```
 1      A.      I think this is the guy who push me, the tall

 2   one.

 3      Q.      We're going to play it again from two seconds.

 4              (Whereupon, a video clip was played.)

 5      Q.      Mr. Singh, we're paused at about 35 seconds.

 6   Does it appear, in the 30 seconds, approximately, we just

 7   watched, that the police officers are talking to your

 8   brother?

 9      A.      Mm-hmm, look like.

10      Q.      And in the video, we can see you, you're standing

11   sort of behind the tall officer; is that right?

12      A.      Yes.

13      Q.      Do you remember anything that was said between

14   your brother and the police officers in those 30 seconds?

15      A.      What you think, ma'am?  He's going to say, Hey,

16   what's going on?  What he going to say?

17      Q.      Do you remember --

18      A.      100 percent, that's what he was talking.  He

19   said, What's up, guys, what's going on?

20      Q.      Do you remember anything they said back to him?

21      A.      No, I don't remember who was talking, what's

22   going on, you know?  Nothing discussed.

23      Q.      We're going to play --

24      A.      What am I going to say now?  Everything is in

25   front of you.  What am I going to say?
```

L. SINGH

Page 60

1    Q.    I'm going to play the video.

2    A.    Yes, go play the video.

3

4    Q.    Okay, we paused at 42 seconds.  Did you see

5    yourself turn the hallway light on?

6    A.    I was going in the room over there, yes.

7    Q.    And you turned -- and it looks like you turned

8    and moved your arms, and said something back in the living

9    room.

10         Do you see that?

11   A.    Mm-hmm.

12   Q.    Do you remember what you were saying at that

13   point?

14   A.    I just told him to be relaxed and go sleep.  Or

15   go to the hospital and go to sleep.  That's what I was

16   explaining to him.  That's what I was talking to him.

17         He says, They're standing over there, the police,

18   you know?

19   Q.    Were you at all angry with him at this point?

20   A.    Not angry, the way the people tried to explain to

21   the son or the brother to the father, you know?  The way I

22   was trying to explain to him.

23   Q.    Was your brother at all angry with you at this

24   time?

25   A.    No, nothing angry.  He not angry with me.  I just

L. SINGH

```
                                                 Page 61
 1   tell him to go to sleep, or if you're not feeling good, go
 2   to the doctor or go to sleep.  That's all.
 3       Q.     Okay.  We're going to continue playing from 46
 4   seconds.  I paused at 47.  Do you see your brother sort of
 5   shaking his hands back at you?
 6       A.     Maybe he's saying to go home, ma'am.  Maybe.  I
 7   don't know what he's telling me.
 8       Q.     I'm going to play again from 47.  Okay.  We've
 9   paused at 50 seconds.
10              Can you see, in the lower left portion of the
11   video, one of the shorter officers is moving now?
12       A.     Shoulder moving to the officer?
13       Q.     Sure.  Let me go back to 47 seconds, hold on.  So
14   we're at 46.
15              And in this video, you see the tall officer right
16   in the middle, right?
17       A.     Mm-hmm.
18       Q.     And then to his left, can you see -- it's a
19   little dark, but can you see the shorter officer, the
20   shorter, Black officer standing next to him?  Do you see
21   that?
22       A.     Okay.
23       Q.     Now, we're going to play a few more seconds, and
24   then we're going to ask you a question.
25              (Whereupon, a video clip was played.)
```

L. SINGH

Page 62

1     Q.     So we're paused at 52.  Did you see the shorter

2     officer gesturing to you?

3     A.     So what they are showing to me, what?

4     Q.     Sorry --

5     A.     I tried to explain to you.  There's nothing any

6     major over there, ma'am.  They're try to explain to him,

7     ma'am, Are you okay?  Otherwise we take you -- it's nothing

8     of a serious matter over there.  They're talking.

9     Q.     My question is:  Was the officer talking to you?

10    My question is, was the officer talking to you at that

11    point?

12    A.     No.

13    Q.     So we're at 52.  We're going to keep playing.

14           (Whereupon, a video clip was played.)

15    A.     Now he was talking to me.

16    Q.     The tall one?

17    A.     He was talking to me.

18    Q.     So we're paused at 59 seconds.  Now the taller

19    officer is talking to you, right?

20    A.     Yes.

21    Q.     And, actually, at 59, does it look like the

22    taller officer sort of steps toward you?

23    A.     Look like.

24    Q.     Do you remember --

25    A.     Because he come to me.  I don't -- I don't go to

L. SINGH

Page 63

1   him.  He come to me, to push me to go in the room, because

2   I was talking to my brother.

3           I said, Are you okay?  Just relax, go sleep.  And

4   he come to me, and he told me to go, to go -- go in the

5   room.  That's what happened to me.

6       Q.    We're going to keep playing from 59 seconds.

7             (Whereupon, a video clip was played.)

8       Q.    Okay.  I'm paused at one minute and five seconds.

9   Is this the part -- up until now, have you seen the officer

10  push you?

11      A.    No, no, no.  Just -- not to push me, maybe close

12  the door over there, go in the room again, the same room in

13  the back, right?  He don't push me at that time.  After

14  that, I see my wife -- brother's wife said, You can talk,

15  you know, to Balwinder, he's okay or not, or go to the

16  doctors.

17          That's why I come to talk to him.  I don't tell

18  anything to the officer or Balwinder, nothing.  I don't

19  even touch.  I don't even touch Balwinder.  I'm just

20  talking in my language, I said, Just relax, man, sleep,

21  man, nothing going to happen to you.  These are normal

22  things, right?  And then --

23      Q.    Okay.  I'm just going to keep playing from one

24  minute and five seconds.

25      A.    Yes.

L. SINGH

Page 64

1          (Whereupon, a video clip was played.)

2     Q.    I'm going to pause at one minute and 29 seconds.

3          Mr. Singh, at this point, you're not in the

4    living room, right?

5     A.    Mm-hmm.

6     Q.    Could you hear any portion of the conversation

7    that was happening between your brother --

8     A.    How am I going to remember, ma'am?  You know, if

9    I wasn't there, how am I going to handle or remember hardly

10   anything, you know?

11    Q.    Okay.  I'm going to play --

12    A.    I don't know what you're trying to explain to me.

13   I don't know, ma'am.

14    Q.    We're going to play from one minute and 29

15   seconds.

16    A.    Yes.

17          (Whereupon, a video clip was played. )

18    A.    Three or four officer jump on him.  What am I

19   going to explain to you?  I don't know, what you want to

20   hear me?  I was not there.  What are you going to say,

21   ma'am?

22    Q.    Okay.  Mr. Singh, we're paused at two minutes and

23   five seconds now, and it looks like you just came back into

24   the hallway.

25          Do you see that?

L. SINGH

Page 65

1      A.     Yes, ma'am.

2      Q.     Do you know if there was a reason why you came

3  back out at that point?

4      A.     Maybe I heard the noise.  It look like something,

5  conversation, maybe the officer raise his voice or

6  something.  I said, I don't know what happened, let me go

7  to see if there is something wrong in there, to come to

8  look at what they're doing to my brother, ma'am.

9      Q.     Do you remember, specifically, if you --

10     A.     I heard the noise from the officer.  I heard the

11 noise from the officer, and then I come out.  Is there

12 something wrong?  Yes.  The officer come out.  Somebody

13 cursing to him, you know?

14     Q.     You said somebody was cursing to him?

15     A.     Something with the noise, that's why I come.  The

16 officer is cursing to Balwinder.  He's sitting in the sofa.

17 I heard something wrong, I cannot come back to see?  And he

18 send me again to back, and what they're doing to him, I

19 heard the noise and I come out, ma'am.

20     Q.     Mr. Singh -- sorry, Mr. Singh, I just want to be

21 clear.  I'm not suggesting you did anything wrong.  I'm

22 trying to understand what you remember about what happened,

23 that's all.

24     A.     Yes --

25     Q.     I'm just asking questions, that's all.

L. SINGH

Page 66

```
 1      A.      Yes.

 2      Q.      So all I'm asking is, if you remember

 3  specifically, if you --

 4      A.      Yes, I heard the noise, ma'am.  I heard the

 5  noise, and then he came.  The officer was talking to him

 6  something.  I said, Let's see what happened.

 7      Q.      Got it.

 8      A.      That's why I come out, yes, because of the noise,

 9  yes.

10      Q.      Can you be any more specific?  You said you heard

11  cursing.  Is that what you remember?

12      A.      They're talking, like cursing or raising the

13  voice.  I said, Let's see what happened.  And it was then

14  the same thing in front of you, ma'am.  What I have to

15  explain?  That's what I'm not understanding.

16      Q.      Do you remember the words that they used?

17      A.      No, ma'am, nothing, nothing.  No word, no,

18  nothing, ma'am.

19      Q.      And do you remember hearing your brother say

20  anything to them at this point?

21      A.      Nothing.  He don't say anything wrong.  What can

22  he do there?  He's alone over there.

23      Q.      We're at two minutes and 54 seconds.  We're going

24  to hit play.

25              (Whereupon, a video clip was played.)
```

L. SINGH

Page 67

1    Q.    Mr. Singh, I'm at three minutes and 35 seconds.

2    It looks like the tall officer just came over to you.  Is

3    this where he pushed you?

4    A.    Yes, it look like he push me to go, because he

5    push me, yes, to go in the room.

6    Q.    So we're going to play from here.

7          (Whereupon, a video clip was played.)

8    Q.    Mr. Singh, I paused this at four minutes and 53

9    seconds.  It looks like you just walked to a different room

10   at the end of a different hallway.  Did you see that?

11   A.    I was what?  I'm looking over there to the hall,

12   right?

13   Q.    Did you see yourself in the video just walk into

14   another room?

15   A.    Yes.

16   Q.    Up until that point, you've been at the end of

17   the hallway, right?  Do you want me to rephrase the

18   question?

19   A.    Yes, ma'am.

20   Q.    Okay.  In the portion of the video we just

21   watched, which is now paused at four minutes and 53

22   seconds, up until we paused it, from the time the officer,

23   the tall officer asked you to step back, until now, the

24   tall officer, asked you to step back, until now you've been

25   standing at the end of the hallway, right?

L. SINGH

Page 68

1      A.      I was inside of the room.   There's a room over

2   there, the left side (indicating).

3      Q.      I'm going to go back just a little bit.  We're at

4   four minutes and 53 seconds now.   I'm going back to four

5   minutes and 30 seconds.

6           At four minutes and 30 seconds, do you see

7   yourself?

8      A.      I was there, all the way at the end, yes.

9      Q.      So you're standing in the hallway, right?

10      A.      Yes.

11      Q.      So I'm going to go back to four minutes and

12   53 seconds.  And at this point, you've just stepped into

13   the room, right?

14      A.      Mm-hmm.

15      Q.      In that period of time, before you went into the

16   other room, you were watching what was going on with the

17   police and your brother?

18      A.      No, I was on the phone, I think, with my wife.  I

19   was talking to my wife.  My wife call me, What's going on

20   over there?  He's look -- cooperated with the officers, you

21   know?  He was cooperate.  He's not doing anything wrong.

22   Never was spoken to them.  I said, do whatever he want to

23   do.

24           Everything in front of you, ma'am.  I don't know

25   what you -- what I should explain, tell you.

L. SINGH

Page 69

```
1        Q.      Mr. Singh, I'm back at three minutes and 42
2   seconds.  Do you see yourself standing in the hallway?
3        A.      Yes, I was sitting over there, yes.
4        Q.      Are you on the phone at that point?
5        A.      I have no idea, ma'am.  I don't know that she
6   called me or not, because in the second you put me back,
7   you put me in the second forward, what you trying to
8   explain to me, ma'am, you know, I can't understand.  If
9   that's when she called me or not.  Anyway, yes.
10       Q.      Here's what we're going to do.  We're going to
11  watch it from three minutes, back to four minutes and 53
12  seconds, and you just tell me if you see yourself answering
13  the phone.  Okay?
14               (Whereupon, a video clip was played.)
15       A.      Look, his wife is next to him.
16       Q.      And that's it, about three minutes and 44
17  seconds.  Okay.
18               And at this point, now you're back at the far end
19  of the hallway?
20       A.      Yes, I'm all the way like that, yes.  Maybe
21  20 feet, it's not too far.
22       Q.      And you're watching what's going on in the living
23  room, right?
24       A.      Yes, everybody just have something happen in the
25  home.  Everybody watching what's going on.  He's
```

L. SINGH

Page 70

```
 1    cooperating with the officers.

 2        Q.    Does it look like you're holding a phone at that

 3    point?

 4        A.    No idea.

 5        Q.    So I'm going to play from three minutes and 43

 6    seconds.

 7        A.    This is no different, if I'm holding a phone or

 8    not, it's not the point.  I don't think why I'm holding a

 9    phone or when they call me, somebody three years ago, he

10    cooperate with the officer.  And I saw in the movie that he

11    throw him on the floor.  That's normal?  He's cooperating

12    with the officer.

13              Everything in the front of you, in the camera,

14    ma'am.  And you're talking with me that I'm on the phone or

15    not on the phone.  He push me two times to go, go, go, and

16    I'm listening to what they're doing to him, you know?

17        Q.    Okay.

18        A.    And I was all the way to the floor, like 30 feet

19    away.  And, at that time, whether I'm on the phone or not,

20    when the call come, then I pick up the phone.  I have no

21    reason to talk on the phone, you know?  Maybe the phone

22    come after five minute or two minute or 30 seconds, you

23    know?

24        Q.    Sure.  Mr. Singh, it's not a trick, and I'm not

25    accusing you of anything --
```

L. SINGH

```
                                                    Page 71

 1      A.      Yes, that's whatever, ma'am --

 2      Q.      What's going on --

 3      A.      I had three surgeries, you know, I'm cooperated

 4   with you.  I had three surgeries, I'm still sitting with

 5   you in front of the video.

 6      Q.      I'm trying to get this done as quickly as

 7   possible, I really am.

 8              So we're at four minutes and six seconds now, and

 9   you're still in the hallway, right?

10      A.      Yes, ma'am.

11      Q.      You said a second ago the officer pushed you

12   twice; is that what you said?

13      A.      No, not twice.  He one time only.

14      Q.      So four minutes and six seconds, we're going to

15   keep playing.

16              (Whereupon, a video clip was played.)

17      Q.      So Mr. Singh, we're back at four minutes and 53

18   seconds, which is when you walked into the other room,

19   right?

20      A.      Yes, ma'am.

21      Q.      In the video we just watched, which was from

22   three minutes to four minutes and 53 seconds, you were

23   standing in the hallway, watching what was going on with

24   the police officers and your brother, right?

25      A.      Mm-hmm.
```

L. SINGH

Page 72

1     Q.    Do you remember anything that the police officer

2 said to your brother during that time period?

3     A.    No, I have no idea what's going on outside or --

4 I think I was talking inside the phone, maybe.

5         I think so, I was in the room.  I was talking.

6 And everything -- I think in front of you, I don't have to

7 explain.  Whatever I don't see, how I know what's going on,

8 you know?

9     Q.    Mr. Singh, I'm just asking you to focus on the

10 time period we just watched, just so we're very clear.

11     A.    I was in the room, ma'am, and maybe I was talking

12 to my wife at that time.

13     Q.    Mr. Singh, I'm not talking about the room, I'm

14 talking about the video --

15     A.    Yes.

16     Q.    -- where we see you standing in the room --

17     A.    Okay.

18     Q.    -- less tan 20 feet away.

19         Do you remember anything said between the police

20 and your brother?  That's all.

21     A.    No, no, no.  No, ma'am, thank you.

22     Q.    We're going to play it from four minutes and

23 53 seconds.

24         (Whereupon, a video clip was played.)

25     A.    It look like he wearing his shoes , getting

L. SINGH

Page 73

```
 1    ready, yes.
 2        Q.     Mr. Singh, we're pausing at four minutes and
 3    40 seconds.  It looks like you're back in the hallway.
 4               Do you see that?
 5        A.     Yes, ma'am.
 6        Q.     Do you see yourself back in the hallway?
 7               Sorry.  Do you see yourself at this point, at
 8    five minutes and 40 seconds?
 9        A.     Yes, ma'am.
10        Q.     And do you know if there was a particular reason
11    why you came back out of the bedroom at this point or no?
12        A.     No, ma'am.
13        Q.     So we're at five minutes and 40 seconds --
14        A.     I've no idea.
15        Q.     Okay.  We're going to keep going.
16               (Whereupon, a video clip was played.)
17        Q.     All right.  We paused at five minutes and
18    46 seconds.  Do you see the shorter officer sort of in the
19    center of the video, closest to the camera; do you see him
20    (indicating)?
21        A.     The middle one?
22        Q.     Yes, so --
23        A.     I see.
24        Q.     So you see the tall officer on the left, right?
25        A.     Yes.
```

L. SINGH

Page 74

1    Q.    And you see your brother to his right?

2    A.    Yes, ma'am.

3    Q.    And then sort of --

4    A.    Yes.

5    Q.    -- between your brother and the camera, do you

6 see the other police officer standing there?

7    A.    It look a little dark over there, but anyway,

8 he's going to be over there.  Where is he going to go?  I

9 cannot see properly.

10    Q.    Did you see that officer lift his arm, in your

11 direction, in the six seconds that we just watched?

12    A.    I have no idea, ma'am.  My face is not there.  I

13 was not really paying attention, what they were doing to

14 him, you know.

15    Q.    So at five minutes and 46 seconds, you see

16 yourself, right?

17    A.    Yes.

18    Q.    And then you see this officer, the officer we

19 were just talking about, closest to the camera?

20    A.    Yes, ma'am.

21    Q.    So we're just going to watch about six seconds of

22 this, and I just want you to watch that officer.

23         (Whereupon, a video clip was played.)

24    A.    He's holding his arm, you said?

25    Q.    Do you see him lifting his arm in your direction,

L. SINGH

Page 75

1    and you start to walk away; do you see that happen?

2        A.      To Balwinder?

3        Q.      No, sir, you.  Do you see the police officer lift

4    his arm, in your direction, and you start to walk away?

5        A.      I was just -- yes (indicating).  Is something

6    wrong?

7        Q.      Was the officer talking to you at that point?

8        A.      No, nobody talk to me.  I don't remember, ma'am.

9    Was somebody?  Because the three officer, what they're

10   talking about, because they doesn't want to see to anybody

11   stay in that place.  That's their -- that's their warning,

12   you know, at that time.  When they come, they keep telling

13   me to go, go, go away.  I don't know why.

14           I'm not interfering with them.  I was always far.

15   They keep telling me to go away, go away, you cannot stay

16   here.  I don't know where you want to send me.  And I go

17   back to the room, and when I see the noise coming, and I

18   come back again.

19           That's what happened, ma'am.

20       Q.      So at this point in time, do you know if that's

21   what's happening?  Do you know if the officer was asking --

22       A.      No, nothing.  No, ma'am.  No memory of what they

23   did, what is going on.

24       Q.      I'm going to play this from five minutes and 46

25   seconds.

L. SINGH

```
                                                    Page 76
 1            (Whereupon, a video clip was played.)
 2      A.     With the nurse -- what was happening with my
 3   memory, what I see, I can explain, ma'am.
 4      Q.     Okay.  Mr. Singh, I paused at eight minutes and
 5   nine seconds.  Do you see yourself coming out of the
 6   doorway at the other end of the hallway?
 7      A.     I was right there.
 8      Q.     I'm sorry, what was that?
 9      A.     Yes, ma'am, I'm all the way at the head of the
10   door, yes.
11      Q.     And you see yourself holding -- it looks like
12   your hand is to your head at this point.
13             Do you see that?
14      A.     Yes, I'm on the phone with my wife, yes.  I came
15   out, because I heard the noise at the moment.  I was
16   talking to my wife, she was asking me what happened, you
17   know?  Is everything okay?
18             So go ahead, ma'am.  You are the boss, you can
19   ask me more question.  Go ahead.
20      Q.     All right.  So we're going to play from eight
21   minutes and nine seconds.
22             (Whereupon, a video clip was played.)
23      Q.     At eight minutes and 36 seconds, we're paused.
24   It looks like you just actually came all the way out of the
25   doorway, into the room; is that right?
```

L. SINGH

Page 77

1      A.      Yes, ma'am.

2      Q.      At this point, the police have already taken your

3  brother out of the front door?

4      A.      Yes, ma'am.

5      Q.      And we're going to play the last few seconds from

6  the video, from 8:36.

7              (Whereupon, a video clip was played.)

8      A.      I think he's fall down again, they put him,

9  because his wife -- there was a lot of noise then, I see.

10     Q.      Mr. Singh, you said you heard a loud noise.  Did

11  you see what happened -- well, let me rephrase that.

12             You didn't see what happened right before the

13  officers took your brother to the floor, right?

14     A.      No, ma'am.

15     Q.      What did you do after the police took your

16  brother out of the apartment?

17     A.      After I left, I went home.  I saw in the glasses,

18  they took him, and then I went to my home.

19     Q.      Sorry.  So the police took your brother down the

20  stairs.  Did you go down the stairs with him --

21     A.      No.

22     Q.      -- or did you say --

23     A.      No, no, I don't go nowhere.  I mean, I left to

24  home.  What can I do over there?

25     Q.      Did you see if your brother was put in an

L. SINGH

Page 78

1  ambulance or a car or something else?

2      A.     No, ma'am.

3      Q.     How long after the police took your brother out

4  of the apartment did you go home?

5      A.     I have no idea.  Maybe five minutes, ten minutes,

6  right away.  I don't know, ma'am.  Not really remember.

7  Maybe in the nighttime, and five minutes, seven minutes,

8  after coffee, tea, I don't know, maybe right away.  I don't

9  know, ma'am.

10      Q.     You didn't go to the hospital, right?

11      A.     No, ma'am.

12      Q.     When was the next time you talked to your brother

13  after that?

14      A.     After that happens?

15      Q.     Yes.

16      A.     I don't remember, ma'am.  Maybe the same day when

17  he came out or after two days, three days, no idea, ma'am.

18      Q.     Do you know if your brother was injured at all,

19  as a result of this incident?

20      A.     Yes, he was hurt in the shoulders and his disc,

21  he said he is hurting badly.  Maybe they threw him on the

22  floor, and he was using, you know, taking the tablet, the

23  medicine for the pain.  And he said my shoulder is, like is

24  hurting me.

25              After that, he got weak.  He really got hurt,

L. SINGH

Page 79

```
 1   like because he have it before.  He hurt.  That's what he
 2   told me.  He said he hurt very badly when they threw him,
 3   you know, on the floor.  This, he told me, he's hurting.
 4              Yes, ma'am, go ahead.
 5        Q.    Do you know if your brother had ever suffered a
 6   shoulder injury before that?
 7        A.    Yes, ma'am, 2010, I think.  It was a long time.
 8   He was driving a taxi, you know, Yellow Cab.  He's -- the
 9   taxi, you know the Medallion Taxi, the yellow?  And after
10   that, in four, five years, it took a long time for him to
11   get better, and then he start Uber, to come back to work,
12   Uber.
13              He had it -- yes, yes, ma'am, go ahead.
14        Q.    Other than in 2010, do you know if your brother
15   had ever hurt his shoulder before?
16        A.    Before that?
17        Q.    At any other time, before the accident.
18        A.    No, no, no.  No, no, no.  He was injured because
19   we were driving together.  That's why I remember.  You
20   know, he work nighttime, I work daytime.  So we shift same,
21   same car we would drive , you know?  So that's why I know
22   this happened to him, but he is hurting after that.  It's
23   normally, ma'am.  When you -- something somebody do with
24   the physical, it's going to be problem.  Even somebody push
25   your leg or your shoulder, it's going to be -- the muscle
```

L. SINGH

Page 80

1   is going to be pulled anywhere, but I told him hardly,

2   barely hit -- why they throw him like they when they cover

3   it everything?  But not to physical, I don't know, ma'am.

4        Q.     Other than the shoulder injury, do you know if

5   your brother sustained any other injuries?

6        A.     He had back problem, ma'am.  His back problem,

7   because he drive to work hard, accident happens, problem

8   comes, you know.  Normally, for everyone.  So -- but he get

9   hurt the way -- what can I say, ma'am?

10       Q.     Sorry.  Do you know if he's had any -- other than

11  this incident, if he's ever injured his back any other

12  time?

13       A.     The long time.  A long time, when he drive taxi,

14  Yellow Cab, that this happened with him.  And after that,

15  he was suffering like four, five years, get better, and he

16  started with the Uber.

17              He go back to work again with the company,

18  because business was down and his family's going to come,

19  and he said I'm driving the Uber, going back to the Uber

20  business.  And after that, you know, ma'am.

21       Q.     Other than the shoulder issue and his back , do

22  you know if he sustained any other injuries in this case?

23       A.     In this case, no, ma'am.  I don't ask him any

24  personally, what's going on, you know.  We have our own

25  problems.

Case 23-24, Document 33, 04/19/2023, 3501834, Page103 of 277

L. SINGH

Page 81

1          I don't tell, especially, where you hurt, what's

2    going on.  They should tell the doctor, you know, he's

3    hurting, what he's doing.  We don't go every day to each

4    other to see or something, you know?

5        Q.    Do you know how many car accidents your brother's

6    been in?

7        A.    No, no idea, ma'am.

8        Q.    You said that --

9        A.    Go ahead, ma'am.

10       Q.    You said that you were sharing a Yellow Cab for a

11   while?

12       A.    Yes, we were driving, ma'am.  We're driving with

13   brother, the father, the cousin, the uncle, anywhere you

14   find a partnership, you know?  That's normally.  You

15   find it --

16       Q.    How long --

17       A.    Huh?

18       Q.    How long were you working?

19       A.    We're living together before, 20 years, 15 years,

20   10 years, and we're working like, you know, day shift,

21   night shift.  We share, if you want to go five days,

22   six days.  We're working and living together, ma'am.

23   Everything together, ma'am.

24          And then my family come, I was next to the

25   school, to the 430 School.  I moved to Ozone Park, and he

L. SINGH

Page 82

1    staying over there, and mom pass away, and that's it.  His

2    family coming at that time, and he started working with

3    Uber.

4        Q.    During the time that you were working together,

5    do you know how many car accidents your brother was in?

6        A.    Maybe one.  I -- that time was -- one point that

7    happened when he drive with me.  That's all.  After that,

8    maybe one, two, three, five, seven, no idea what he did,

9    when he do, you know?  What time he go to work.  Sometime

10   we talk, sometime busy, the schedule, you know?

11       Q.    And you said you still drive a Yellow Cab?

12       A.    No, ma'am, I'm not driving.

13       Q.    What do you do, currently?

14       A.    Now, I'm not doing anything.  I had an accident

15   long time ago, 2018.  It's like two years now, I had an

16   accident at the LaGuardia, and I'm staying home.  I have

17   such pain in the back and the neck.  The bus fall down, the

18   shuttle, something.  When I went, they hit me.  I was

19   standing at the light, you know?

20       Q.    I see.  Mr. Singh, I'm almost done.

21             Can we take a five-minute break, just really

22   quickly, I'll just check my notes.  I think I'm almost

23   done.  Maybe 10 minutes?

24       A.    No problem, ma'am.  No problem, ma'am.

25       Q.    Can we come back at 3:06?

L. SINGH

Page 83

1      A.      Yes, ma'am.

2              (Whereupon, a short recess was taken.)

3      Q.      Mr. Singh, you said a couple of times that your

4   brother was cooperating with the police.  And I just wanted

5   to ask you what you meant when you say "cooperating"?

6      A.      They told him, We're going to take you to the --

7   you know, put the handcuff.  He said, Okay.  That's what he

8   said.  He don't say no or refuse or something.  That's why

9   I said cooperate.

10     Q.      When did that happen?

11     A.      The same day, the -- when I was there.  When I

12  was talking to brother, I said, Relax, man, sleep, what

13  happened to you?  And the officer told him, No, we're going

14  to take you to the custody, like that, the officer told

15  him.  So he said, Okay, like that.  Nothing wrong.  That's

16  why I said cooperate.

17     Q.      So I just wanted to understand -- when I say

18  when, I want to understand in the context of the incident.

19             So you're talking about before you went to the

20  bedroom the first time; is that right; is that when you're

21  talking about?

22     A.      No, when I was standing there, there was an

23  officer telling him, If you're not feeling good, we're

24  going to take you.  That's what they told him, you know?

25     Q.      Okay.

L. SINGH

Page 84

```
1       A.      Yes.

2       Q.      And did they say they were going to handcuff him

3   or something else?

4       A.      They handcuff him, yes.

5       Q.      And he said, Okay?

6       A.      Yes.

7       Q.      Okay.

8       A.      He said -- what are you going to say to -- even

9   when officer said anything, you know, anybody, you have to

10  be cooperating with officers.  You cannot argument with

11  officers or anybody or me or somebody else.  That's why I

12  said it's not a -- he's not doing activity.  When I was

13  standing there, he was sitting on the sofa.  So I was

14  trying to explain, in my language, to him, I said, Brother,

15  what happened to you?  If you want to go to doctor, to

16  hospital, go ahead, man, what's going on?  Relax.  He did

17  nothing.  I mean, even -- what's whatever I see, ma'am.

18  That's what I told you.  He's not jumping or jumping or

19  fighting with anybody, you know?

20      Q.      Was there anything else that the police officers

21  asked him to do, that he cooperated with?

22      A.      They told him to put your clothes, you know?  Get

23  ready.  His wife doing , giving him the jacket, shoes,

24  socks, like that, and I was -- they don't let me stop --

25  standing there, and I was going in the room.
```

L. SINGH

Page 85

1              But I can hear everything over there, ma'am.

2      It's not too far, it's 20 feet.  I was 20 feet away, the

3      door was open, but the officer don't let me standing there.

4      But I was listening to everything, you know?

5          Q.      Sorry.  So earlier I asked if you could hear

6      anything that could be said, and you said, No.  So could

7      you hear what was going on or no?

8          A.      Like what, ma'am?

9          Q.      Earlier, I asked you if you could hear what was

10     happening between your brother and the police officers, and

11     you said, No.  Now you said you could hear everything they

12     were saying?

13         A.      No, when I was on the phone, at that time, I was

14     not hearing when I was talking to my wife, you know?  Then

15     I don't pay attention over there.

16             When I was not on the phone, then I -- I hear

17     something like.  But brother said, Why you want me to hang

18     up?  Why you want to put me handcuff, you know?  That's

19     what he told officers.

20             So I was right there, but when I was on the

21     phone, that -- some -- something I don't hear, because I

22     was talking to my wife.  My wife answer, she said, What

23     happened?  So when I couldn't hear everything, I say no.

24             I tell you everything, ma'am.  If it's not

25     brother, whatever I see, I told you, ma'am.

L. SINGH

Page 86

1     Q.     When your brother asked why he needed to be
2   handcuffed, did the officers answer him?
3     A.     No, I have no idea, ma'am.  I have no idea why
4   they want to, no, because he don't let me stay there.
5   Every time I talk to my brother, he told me to go, go, go.
6   The second time, he push me.
7          He's not -- nothing wrong I was doing there.  But
8   he don't let me standing there.  What can I --
9     Q.     Mr. Singh, what I'm trying to understand is you
10   said you were standing 20 feet away, right?
11     A.     Uh-huh.
12     Q.     And you heard your brother ask why he needed to
13   be handcuffed, right?
14     A.     I don't know, ma'am.  This is -- I don't -- I
15   don't explain, ma'am.
16     Q.     I just -- it's -- I'm really just trying to
17   understand and make sure I'm getting your answers down
18   clearly, because I don't want a transcript where your
19   answers are not clear and your testimony is not clear.
20          You said a minute ago, that when you were not on
21   the phone, you heard your brother ask why he needed to be
22   handcuffed?
23     A.     I don't know, ma'am, I don't know.  I don't hear
24   anything but the handcuff.  I said I was on the phone with
25   my wife.

Case 23-24, Document 33, 04/19/2023, 3501834, Page109 of 277

L. SINGH

Page 87

```
 1      Q.      At any point, did you hear your brother ask why
 2   he needed to be handcuffed?
 3      A.      Why he?  No, no, I don't know anything like that,
 4   why.  You see the argument that they're talking, that's
 5   what I was hearing when I was there.  At that time, I was
 6   hearing.  After that, I don't hearing.  When I got back in
 7   the room, I was talking to my wife.  I don't hearing
 8   everything, what they're discuss, what they are talking
 9   about what they are doing with him, because officer told me
10   to go inside, and then I go.
11              And then my wife call and I was talking to my
12   wife in the room.  I don't pay attention what's going on or
13   say what they are doing to him, you know, why they want to
14   arrest him.  I don't hear anything about that.
15      Q.      So you did not hear your brother ask the police
16   officers why he was being handcuffed?
17      A.      No, ma'am, no, no, no, no.  No, that's why I have
18   no idea, because he did nothing wrong.  If it's something
19   he do wrong --
20      Q.      I'm not asking you about the answer.  I'm not
21   asking you about the answer right now.  Right now, I'm just
22   trying to see if you heard the question.
23              Did your brother ask the question, to the
24   officers, Why am I being handcuffed?  Did he say those
25   words?
```

L. SINGH

Page 88

1      A.      No, ma'am.  No, no, no, no, otherwise, they're
2   putting his arm to the back, you know?
3              That's -- they are --
4      Q.      Okay.  But you never saw that happen, right,
5   because you weren't there.  Did you ever see anyone --
6      A.      When I was there --
7      Q.      Let me rephrase the question.
8              Did you ever see the officers put his hand behind
9   his back?
10     A.      No, no.  I don't see, ma'am.
11     Q.      Mr. Singh, I just want -- I want to be really
12  clear, just so I make sure that I'm not misunderstanding
13  any of your testimony.
14     A.      Yes.
15     Q.      Do you remember any specific comments, that your
16  brother made to the police officers that day, at any time,
17  any time?
18     A.      Let me talk, ma'am?  I don't know what he wants
19  to talk to me now.  Let me talk to the lawyer, please,
20  ma'am.  Please, let me talk.  Close the door.  Why you open
21  the door?  Leave, close the door, please.  Yes, please, I'm
22  okay.
23              Yes, ma'am.
24     Q.      I'm sorry, I'm trying to be done.
25     A.      He just open the door for me, I said, Close the

L. SINGH

Page 89

1    door, let me concentrate with the lawyer, not with you.

2              THE WITNESS:  Yes, I'm okay, I'm okay.

3          Please close the door.  Close the door, close the

4          door.

5              Let me explain what I see, yes, ma'am.  Yes,

6          ma'am.

7      Q.    Okay.  Do you remember any specific comments that

8    your brother made to the police that day?

9      A.    When I was standing there, and they are coming,

10   like I was explaining to my brother, in my Punjabi

11   languages, I said, Are you okay?  What's wrong with you?

12   Do you want to sleep or -- that's what I concentrate with

13   him, with my brother.  But after what they are talking, all

14   the stories, I didn't hear everything, you know?  That's

15   what I was trying to explain.

16             Whatever I hear, whatever I see, but now you show

17   me some couple of movies or stories, but when I was there

18   they push me, Go, go, go, push me, go, go, go back.

19             And when they're talking to the officer, I don't

20   know all of the conversation, ma'am, what they talk, what

21   they want to explain to him, what they want to do.  Even I

22   don't go behind him, where they took him, what's going on,

23   you know?

24     Q.    Okay.

25     A.    Yes, ma'am.

L. SINGH

Page 90

1      Q.      Mr. Singh, you said you were talking to your

2    wife, right?

3      A.      Yes, ma'am.

4      Q.      What's her name?

5      A.      Santoscor.

6      Q.      Santoscor (phonetic)?

7      A.      She just call -- call me like, she said, How is

8    everything?  What's going on?  What happened?  And then I

9    was over there, but I don't pay attention to Balwinder,

10   what they're talking and what's going on all side.  When I

11   move, the worse comes a little bit, they're talking, but

12   the -- when they put his hand back, I don't see that time.

13   That, I know that, ma'am.

14     Q.      Mr. Singh, other than today, have you ever given

15   testimony before?  And what I mean by that is, have you

16   ever had -- taken an oath like today, and answer questions

17   like this in any way?

18     A.      Like all the -- yes, I did it when I -- when I

19   took a citizen, I swear oath, whatever is true is true,

20   ma'am.  What can I --

21     Q.      Have you ever testified like at a -- so this is a

22   deposition, what we're doing today with the questions and

23   answers.

24             Have you ever done something like this before?

25     A.      No, ma'am.

Case 23-24, Document 33, 04/19/2023, 3501834, Page113 of 277

L. SINGH

```
                                                     Page 91
  1      Q.      What about before?  Have you ever had to testify
  2   in court before?
  3      A.      Court before, when you went to -- to the front of
  4   the judge, you have to raise your hand and tell truth and
  5   the judge ask.  So I have, yes, ma'am.
  6      Q.      But have you ever been -- had to go to court
  7   before?
  8      A.      Yes, for my personal matters, I went.
  9      Q.      Have you ever testified in court, meaning, not
 10   just been there, but actually gotten up and answered
 11   questions?
 12      A.      No, no, no, nothing happen like that, never.
 13   First time.  This is the first time this happened to me,
 14   ma'am.
 15      Q.      And have you ever been convicted of any crimes?
 16      A.      No, ma'am.
 17      Q.      Mr. Singh, do you have any social media accounts,
 18   Facebook, Instagram, anything like that?
 19      A.      No, ma'am, nothing, just YouTube.
 20      Q.      Have everything you told me today been complete?
 21      A.      Yes, that's true.
 22      Q.      Is there anything you've said today that you'd
 23   like to change or correct?
 24      A.      No, nothing, ma'am.  Whatever I said, whatever I
 25   saw, whatever I hear, whatever, it is just true.  It's -- I
```

L. SINGH

```
                                                    Page 92

 1   saw when -- whatever was, you know?

 2              MS. FADDIS:  Mr. Singh, thank you very much

 3         for your time today.  I really appreciate it, and

 4         that's all I have.

 5              Gerald, do you have anything?

 6              MR. COHEN:  No.

 7              THE WITNESS:  No, ma'am, thank you.

 8              MS. FADDIS:  Thank you, everybody.

 9              (Whereupon, a video clip was marked as

10         Defendants' Exhibit A for identification as of

11         this date by the Reporter.)

12              (Whereupon, a video clip was marked as

13         Defendants' Exhibit B for identification as of

14         this date by the Reporter.)

15              (Whereupon, at 3:32 P.M., the Examination of

16         this witness was concluded.)

17

18              o           o           o           o

19

20

21

22

23

24

25
```

Case 23-24, Document 33, 04/19/2023, 3501834, Page115 of 277
**[JA-1275]**

L. SINGH

```
                                            Page 93
 1               D E C L A R A T I O N

 2

 3          I hereby certify that having been first duly

 4   sworn to testify to the truth, I gave the above testimony.

 5

 6             I FURTHER CERTIFY that the foregoing transcript

 7   is a true and correct transcript of the testimony given by

 8   me at the time and place specified hereinbefore.

 9

10

11

                        _____

12                           LAKHWINDER SINGH

13

14

15   Subscribed and sworn to before me

16   this _____ day of _____ 20__.

17

18

     _____

19       NOTARY PUBLIC

20

21

22

23

24

25
```

Case 23-24, Document 33, 04/19/2023, 3501834, Page116 of 277
**[JA-1276]**

L. SINGH

```
                                                      Page 94
 1                   E X H I B I T S

 2

 3    DEFENDANT EXHIBITS

 4

 5    EXHIBIT      EXHIBIT                           PAGE

 6    NUMBER       DESCRIPTION

 7    Exh A        a video clip

 8    Exh B        a video clip

 9

10            (Exhibits retained by Counsel.)

11

12                     I N D E X

13

14    EXAMINATION BY                                PAGE

15    MS. FADDIS                                    9

16

17          INFORMATION AND/OR DOCUMENTS REQUESTED

18    INFORMATION AND/OR DOCUMENTS                  PAGE

19     (None)

20

21

22              QUESTIONS MARKED FOR RULINGS

23    PAGE LINE    QUESTION

24     (None)

25
```

L. SINGH

```
                                                    Page 95

 1               C E R T I F I C A T E

 2

 3    STATE OF NEW YORK      )

                              :  SS.:

 4    COUNTY OF NASSAU       )

 5

 6               I, KEVIN HAGHNAZARI, a Notary Public for and

 7    within the State of New York, do hereby certify:

 8               That the witness whose examination is

 9    hereinbefore set forth was duly sworn and that such

10    examination is a true record of the testimony given by that

11    witness.

12               I further certify that I am not related to any

13    of the parties to this action by blood or by marriage and

14    that I am in no way interested in the outcome of this

15    matter.

16               IN WITNESS WHEREOF, I have hereunto set my hand

17    this 22nd day of December 2020.

18

19

20                                   KEVIN HAGHNAZARI

21

22

23

24

25
```

```
                                                             Page 96
 1                         ERRATA SHEET
                   VERITEXT/NEW YORK REPORTING, LLC
 2
      CASE NAME: Singh, Balwinder v. City Of New York, Et Al.
 3    DATE OF DEPOSITION: 12/15/2020
      WITNESSES' NAME: Balwinder Singh
 4
 5      PAGE   LINE (S)        CHANGE              REASON
     ____|_____|_____|_____
 6
     ____|_____|_____|_____
 7
     ____|_____|_____|_____
 8
     ____|_____|_____|_____
 9
     ____|_____|_____|_____
10
     ____|_____|_____|_____
11
     ____|_____|_____|_____
12
     ____|_____|_____|_____
13
     ____|_____|_____|_____
14
     ____|_____|_____|_____
15
     ____|_____|_____|_____
16
     ____|_____|_____|_____
17
     ____|_____|_____|_____
18
     ____|_____|_____|_____
19
     ____|_____|_____|_____
20
21                              _____
                                Balwinder Singh
22    SUBSCRIBED AND SWORN TO BEFORE ME
      THIS ____ DAY OF _____, 20__.
23
24
     _____          _____
25    (NOTARY PUBLIC)                 MY COMMISSION EXPIRES:
```

**[& - answering]** Page 1

**&**

**&** 2:3

**1**

**1** 3:9 56:1,11
**10** 6:5 15:23 26:16
 29:1 81:20 82:23
**100** 2:9 15:6,18
 31:1 52:21 59:18
**10007** 2:9
**10022** 2:4
**11** 6:10
**110** 2:4
**11420** 9:11
**12** 6:14 56:1
**12/15/2020** 96:3
**128th** 9:10
**13** 6:25 52:10 53:1
**135-15** 9:10
**14** 7:8
**15** 1:10 7:20 15:23
 15:23 29:2 47:19
 81:19
**19** 1:5 5:13
**1981** 13:21
**1:10** 1:11

**2**

**2** 3:18 6:2 56:1,11
**2/28** 55:20
**20** 29:2 47:19
 69:21 72:18 81:19
 85:2,2 86:10
 93:16 96:22
**20-2447** 2:11
**20010** 95:20
**2010** 79:7,14
**2018** 14:1,5 82:15
**2019-008905** 2:10
**2020** 1:10 95:17
**22nd** 95:17

**24** 8:1 13:1
**28** 6:2
**28th** 14:1,4
**29** 64:2,14

**3**

**3** 4:1 5:12
**30** 5:12 6:15 7:1
 40:11 54:3 59:6
 59:14 68:5,6
 70:18,22
**30.4** 4:20
**3200** 2:4
**35** 59:5 67:1
**36** 76:23
**3:06** 82:25
**3:32** 92:15

**4**

**4** 4:10
**40** 55:16 73:3,8,13
**42** 60:4 69:1
**43** 70:5
**430** 81:25
**44** 69:16
**46** 61:3,14 73:18
 74:15 75:24
**47** 61:4,8,13
**48** 3:14 54:7 55:14
**4:00** 14:18

**5**

**5** 4:20 6:15 7:1
**50** 61:9
**52** 62:1,13
**53** 67:8,21 68:4,12
 69:11 71:17,22
 72:23
**54** 66:23
**59** 62:18,21 63:6
**59th** 2:4
**5:00** 14:18 56:6

**6**

**6** 5:2
**632** 1:5
**6:30** 15:16 57:5
**6:37** 55:20,21 58:4
**6:44** 58:2,4

**7**

**7** 5:10
**7:00** 15:16 21:16
 22:4

**8**

**8** 5:21
**8:36** 77:6

**9**

**9** 5:25 94:15
**9-1-1** 18:13

**a**

**a.m.** 55:21 58:2
**abilities** 7:10
**able** 12:9
**absolutely** 11:18
**accident** 36:6
 79:17 80:7 82:14
 82:16
**accidents** 81:5
 82:5
**accounts** 91:17
**accurately** 12:14
 12:17
**accusing** 70:25
**acting** 2:7
**action** 32:20 95:13
**activity** 21:10,12
 29:13 30:17 84:12
**add** 11:17
**address** 7:5,11,14
 9:9
**administer** 3:24
 6:2

**administered** 5:16
**administering**
 6:17 7:3,21
**administration**
 6:21
**advance** 4:13 6:11
 8:1
**affiliation** 6:19
**affirmation** 6:22
**afternoon** 9:12
 14:15 16:25 22:9
**ago** 26:16 70:9
 71:11 82:15 86:20
**agree** 3:18 4:1,4
 5:15,25 7:8,11,20
**agreed** 3:16 4:12
**ahead** 14:22 18:23
 76:18,19 79:4,13
 81:9 84:16
**al** 1:7 96:2
**alcohol** 26:15
 27:20
**alcoholic** 27:15
**ambulance** 14:10
 18:3 37:9 39:17
 39:20 40:19 41:21
 42:18 47:3 52:18
 78:1
**angry** 42:25 60:19
 60:20,23,25,25
**animal** 33:10
**animals** 45:17
**answer** 10:24 11:4
 11:13,23 34:7,20
 35:20,25 36:1
 41:13,14,15 49:24
 85:22 86:2 87:20
 87:21 90:16
**answered** 91:10
**answering** 69:12

[answers - brother]                                                                     Page 2

**answers** 86:17,19
90:23
**anybody** 18:4 20:8
29:3,14 51:2
75:10 84:9,11,19
**anyway** 69:9 74:7
**apartment** 13:7
17:23 18:6 28:13
30:19,21 32:7,19
33:22 44:15 45:20
45:21 49:17 53:11
54:8 58:9 77:16
78:4
**appear** 59:6
**appreciate** 92:3
**appropriate** 6:8
**approximately**
55:23 59:6
**argue** 26:6
**arguing** 28:17
**argument** 30:8
33:5 43:11,12
46:16 84:10 87:4
**arm** 74:10,24,25
75:4 88:2
**arms** 60:8
**arrest** 87:14
**arrested** 41:8
**arrive** 25:5 29:1
**arrived** 14:9 18:7
18:24 25:25 28:10
32:6 53:11,21
54:15,16
**arriving** 20:7
**ashamed** 40:23
**aside** 24:24
**asked** 11:24 19:2
29:16 33:15,15
34:17 67:23,24
84:21 85:5,9 86:1

**asking** 20:6 24:20
36:21,22,23 56:9
56:13,22 65:25
66:2 72:9 75:21
76:16 87:20,21
**asleep** 23:20,24
28:7,10
**asserted** 4:25
**assess** 7:9
**assume** 11:13
**attend** 3:21
**attending** 4:14
**attention** 31:7,18
38:10 58:1 74:13
85:15 87:12 90:9
**attorney** 3:3 9:13
**attorneys** 2:3,8
**audible** 4:15
**audio** 36:14
**awake** 15:11

**b**
**b** 5:12 6:15 7:1,1
57:11,20 92:13
94:1,8
**baby** 27:16
**back** 34:12 45:6
55:15 58:12 59:20
60:8 61:5,13
63:13 64:23 65:3
65:17,18 67:23,24
68:3,4,11 69:1,6
69:11,18 71:17
73:3,6,11 75:17,18
79:11 80:6,6,11,17
80:19,21 82:17,25
87:6 88:2,9 89:18
90:12
**background** 4:18
**bad** 44:6,7 56:2
**badly** 78:21 79:2

**bag** 24:5
**balwinder** 1:2
13:22 14:8 16:18
18:14 19:4 25:14
26:9 29:10,22
30:12 32:11 53:10
63:15,18,19 65:16
75:2 90:9 96:2,3
96:21
**bam** 49:4,4
**bangladeshi** 43:22
**bar** 44:13
**barely** 80:2
**basis** 4:6
**bates** 8:2
**bearing** 57:13
**bed** 41:3 44:11
**bedroom** 26:8
28:4 37:5,22,25
45:7 46:13 73:11
83:20
**beer** 16:1,1 19:5,5
19:15,22 23:7,10
23:20 24:4 26:25
26:25 27:18,20,25
33:22
**beers** 20:24 23:6,6
23:7,8,8,9,12,12
25:4
**beginning** 6:14,25
**behave** 43:12
**behavior** 21:20
22:5
**better** 18:16 23:19
23:21 30:1 79:11
80:15
**big** 17:4 21:12
31:20
**birth** 13:19
**bit** 11:2 30:9 41:19
68:3 90:11

**bj** 17:4
**black** 24:5 50:2,18
61:20
**block** 43:8,9
**blood** 95:13
**bobby** 20:23 33:20
33:20 39:4,22,22
40:2,5,14,18,25
41:1,3 42:7,17,22
**boom** 33:6 45:14
45:14 46:2,3,12
**born** 27:16
**boss** 76:18
**bother** 56:11
**bothering** 22:1
32:23,25
**bottle** 27:25
**bottles** 24:23
**box** 23:8,13 24:5
**brain** 30:4
**break** 11:21 37:4
82:21
**breakout** 3:24 5:3
5:4,5,6
**breaks** 5:2
**bring** 17:4 30:9
**brother** 9:16
13:22 16:12,20
18:12,17 19:1,8,10
20:13,18 21:2
22:22 24:21 26:14
28:17,23 29:17
30:6 31:2,6,22
32:13,18 33:15
34:6,17,25 35:10
35:22 36:18,24,25
37:6,14,21 38:3,17
38:18,25 39:14
41:1,6,17 46:20
48:6,10,10 49:10
53:8,12,21 54:10

[brother - conversation]                                                                Page 3

| | | | |
|---|---|---|---|
| 54:13 55:1 59:8 | 45:1 49:13 55:10 | **citizen** 90:19 | 65:7,11,12,15,17 |
| 59:14 60:21,23 | 56:3,14 57:4,8 | **city** 1:7 2:8 3:2,4 | 65:19 66:8 70:20 |
| 61:4 63:2 64:7 | 68:19 70:9,20 | 9:14,15 96:2 | 70:22 75:12,18 |
| 65:8 66:19 68:17 | 87:11 90:7,7 | **civil** 1:16 3:14 6:1 | 79:11 80:18 81:24 |
| 71:24 72:2,20 | **called** 9:1 14:7 | 6:15 7:2 | 82:25 |
| 74:1,5 77:3,13,16 | 15:2,7,11,25 18:20 | **clear** 36:16,21 | **comes** 28:4 80:8 |
| 77:19,25 78:3,12 | 24:14 30:18,20 | 56:13 65:21 72:10 | 90:11 |
| 78:18 79:5,14 | 31:8 38:22 39:20 | 86:19,19 88:12 | **coming** 15:5,8 |
| 80:5 81:13 82:5 | 42:18 45:7 55:22 | **clearly** 86:18 | 16:5 27:16 32:19 |
| 83:4,12 84:14 | 69:6,9 | **clip** 52:9 54:5 | 55:22 57:24 58:12 |
| 85:10,17,25 86:1,5 | **calling** 45:9 | 58:20 59:4 61:25 | 75:17 76:5 82:2 |
| 86:12,21 87:1,15 | **camera** 70:13 | 62:14 63:7 64:1 | 89:9 |
| 87:23 88:16 89:8 | 73:19 74:5,19 | 64:17 66:25 67:7 | **comment** 12:9 |
| 89:10,13 | **cans** 24:22 | 69:14 71:16 72:24 | **comments** 88:15 |
| **brother's** 13:25 | **captioned** 3:7 | 73:16 74:23 76:1 | 89:7 |
| 14:4,6 15:22 | **car** 16:6 57:8 78:1 | 76:22 77:7 92:9 | **commission** 96:25 |
| 30:25 55:23 57:5 | 79:21 81:5 82:5 | 92:12 94:7,8 | **company** 6:19 |
| 63:14 81:5 | **case** 1:5 10:9 | **close** 38:13 63:11 | 80:17 |
| **brought** 9:16 | 11:23 12:10 48:4 | 88:20,21,25 89:3,3 | **compel** 7:15 |
| **building** 17:24 | 51:18 80:22,23 | 89:3 | **complete** 91:20 |
| 45:20 | 96:2 | **closest** 73:19 | **computer** 51:12 |
| **bumping** 21:10 | **caused** 46:3 | 74:19 | **concentrate** 89:1 |
| 29:13 | **cellphone** 51:12 | **clothes** 84:22 | 89:12 |
| **bus** 82:17 | 51:13 | **club** 27:7 | **concluded** 92:16 |
| **business** 7:5 37:12 | **center** 73:19 | **coffee** 78:8 | **conducted** 3:10 |
| 80:18,20 | **certify** 93:3,6 95:7 | **cohen** 2:3,5 9:12 | **conducting** 3:5 |
| **busy** 17:16 22:20 | 95:12 | 92:6 | **conference** 4:21 |
| 82:10 | **challenge** 5:16 | **collaboratively** | **confirmation** 3:15 |
| **buy** 17:3 | **champagne** 27:25 | 7:8,11 | **confused** 23:25 |
| | **chance** 48:3 | **combination** 7:22 | **consistent** 4:20 |
| **c** | **change** 91:23 96:5 | **come** 16:8 18:19 | 5:12 6:14 7:1 |
| **c** 2:1 93:1 95:1,1 | **changed** 13:15 | 20:17 21:1,24 | **constitute** 5:23 |
| **cab** 14:16 17:17 | **changes** 12:6,8,9 | 22:9,16,18 25:16 | **context** 83:18 |
| 27:5 79:8 80:14 | **chat** 4:22 | 26:2 27:4,5,24 | **continue** 61:3 |
| 81:10 82:11 | **check** 25:18 82:22 | 28:20 30:18,20 | **control** 2:11 20:1 |
| **call** 14:12,23 17:2 | **cheema** 3:3 9:15 | 31:15,21,22,24 | **controlled** 5:8 |
| 17:15,20 18:4,13 | **choose** 3:19 7:23 | 32:21 37:11 38:4 | **conversation** 41:5 |
| 20:22,23 22:11 | **church** 2:9 | 42:2,18 45:15,15 | 42:9 54:14,20 |
| 29:1 30:16,23,25 | **cigarette** 26:25 | 47:1 52:24 56:1,3 | 55:2,5 64:6 65:5 |
| 31:3,12,15,21 | **circumstances** | 56:4 57:9,23 | 89:20 |
| 39:21 40:14 41:1 | 7:14 | 62:25 63:1,4,17 | |
| 41:21 44:16,18 | | | |

conversations  5:1
convicted  91:15
cook  43:11,11
cooperate  68:21
    70:10 83:9,16
cooperated  68:20
    71:3 84:21
cooperating  70:1
    70:11 83:4,5
    84:10
copies  7:23
cops  16:8 18:19,20
    18:22 21:1,3
    25:16 26:2 31:2,3
    35:5 36:11 39:21
    40:18
copy  6:11
corona  23:7,10
corporation  2:7
    3:4
correct  11:17
    91:23 93:7
costco  17:4
counsel  2:7 3:4
    4:10,20 7:23,25
    8:2 94:10
county  95:4
couple  20:23
    33:22 52:5 83:3
    89:17
court  1:1 3:19
    4:10 5:13,17,17,21
    5:22,25 7:25 9:25
    10:12 11:5 34:11
    91:2,3,6,9
courtroom  10:9
cousin  81:13
cover  80:2
covid  5:13
crimes  91:15

cry  41:9
currently  82:13
curse  43:5
cursing  40:16,17
    42:16 65:13,14,16
    66:11,12
custody  83:14
customer  43:7
cut  14:22 32:2
    56:7
cv  1:5

**d**

d  9:1,8 93:1 94:12
daily  26:17,17
dancing  16:3
    21:14 22:3 27:7
dark  61:19 74:7
date  1:10 6:20 7:5
    13:19 55:18,19
    92:11,14 96:3
day  13:4 14:7 27:8
    27:15,17,17,17
    28:2 32:3 44:13
    48:16 49:17 50:25
    51:5 78:16 81:3
    81:20 83:11 88:16
    89:8 93:16 95:17
    96:22
days  78:17,17
    81:21,22
daytime  22:10
    79:20
deal  31:20
december  1:10
    95:17
defendant  5:14
    94:3
defendants  1:8 2:8
    3:2 92:10,13
defined  6:1

delay  11:2
department  2:8
    9:14
deponent  4:10,17
    4:23 5:19 6:8,22
    7:16,18 8:7
deponent's  6:21
    7:6,9
deposition  1:14
    3:12,18,20,21 4:3
    4:8,12,13,14 5:2,7
    5:10,15 6:5,6,10
    6:12,14,17,18,20
    6:25 7:3,4,6,13,16
    7:22,24 8:1,3 12:1
    47:11,16 51:17
    56:20 57:12,21
    90:22 96:3
depositions  3:6,9
    4:1,6,6
describe  50:13,16
    50:20
described  46:2
    58:25
describing  22:3
description  94:6
determining  4:24
diabetic  13:5
different  24:6
    30:19 38:14 39:10
    45:4 50:11 57:14
    67:9,10 70:7
direct  58:1
direction  74:11,25
    75:4
directly  18:6
disc  78:20
discuss  13:25
    48:15 49:6,6 87:8
discussed  37:23
    59:22

discussing  35:1
discussion  34:13
distance  26:13
distractions  4:17
district  1:1,1
doctor  16:7 21:3
    26:11 28:23 30:22
    36:13 42:2,18
    44:9 45:2 49:6,20
    50:3 52:17,18,18
    53:5 61:2 81:2
    84:15
doctors  14:10,24
    15:10 25:13 42:1
    52:16,22 53:3
    63:16
document  8:4
documents  7:24
    8:2 94:17,18
doing  11:1 18:22
    20:4,10 21:21
    23:25 32:24 41:12
    42:15,15 43:9
    65:8,18 68:21
    70:16 74:13 81:3
    82:14 84:12,23
    86:7 87:9,13
    90:22
door  18:2,5 32:10
    38:13 44:25 45:1
    45:2,17 52:11,13
    52:24 57:17 58:22
    63:12 76:10 77:3
    85:3 88:20,21,21
    88:25 89:1,3,3,4
doorway  76:6,25
double  34:9
drama  44:21
drink  11:22 17:1
    21:23 23:7,11,14
    23:20 24:12,13,16

24:17 25:10 27:3
27:7,15 33:22
44:13
**drinker**  26:17
27:6
**drinking**  16:1
19:23 23:6,13
24:9,11 25:1
26:22 27:12 44:21
**drive**  14:16 16:6
27:4,21 79:21
80:7,13 82:7,11
**driving**  17:19 79:8
79:19 80:19 81:12
81:12 82:12
**drugs**  12:25
**drunk**  20:13,15
**duly**  3:13 9:2 93:3
95:9

**e**

**e**  2:1,1,7 3:3 9:1,8
93:1 94:1,12 95:1
95:1
**earlier**  56:8,19
58:25 85:5,9
**early**  15:15
**east**  2:4
**eastern**  1:1
**effect**  34:6
**eight**  76:4,20,23
**either**  51:4
**electronic**  4:22
7:23,25 8:8
**electronically**  8:3
**employed**  7:21
**employee**  3:20
6:16 7:2
**empty**  23:9 24:22
24:23
**ems**  18:24 51:18

**english**  39:18
43:22
**enjoy**  16:10
**enjoying**  16:4
44:11
**ensure**  4:16
**entire**  10:23
**environment**  4:16
**errata**  96:1
**especially**  31:25
81:1
**esq**  2:5,7,10
**essentially**  34:18
35:23
**established**  5:6
**et**  1:7 96:2
**evening**  16:25
17:2 22:8
**everybody**  15:16
19:7 35:6 42:4
44:8,12 69:24,25
92:8
**exactly**  14:14,19
15:24 17:13,21
56:20
**examination**  9:4
92:15 94:14 95:8
95:10
**examined**  9:3
**excuse**  12:15
31:13
**exh**  94:7,8
**exhibit**  8:6 51:8,16
57:11,20 92:10,13
94:5,5
**exhibits**  7:21 8:3
94:3,10
**expires**  96:25
**explain**  15:1 16:12
25:11 29:11 43:17
60:20,22 62:5,6

64:12,19 66:15
68:25 69:8 72:7
76:3 84:14 86:15
89:5,15,21
**explained**  43:24
44:1 55:12
**explaining**  21:2
60:16 89:10
**extent**  4:3
**eyes**  30:4 49:11
**eyewitness**  55:13

**f**

**f**  95:1
**face**  53:2 74:12
**facebook**  91:18
**faddis**  2:10 9:5,13
92:2,8 94:15
**faith**  7:9
**fall**  23:20,23 44:14
77:8 82:17
**family**  30:9 81:24
82:2
**family's**  80:18
**far**  22:5 26:23
69:18,21 75:14
85:2
**father**  27:17 60:21
81:13
**feature**  4:22 5:3
**february**  14:1,4
**federal**  1:16 3:14
6:1,15 7:1
**feel**  18:18 30:1
40:23
**feeling**  14:8 16:2
18:14 19:4,13,14
22:12 25:9,15
29:22 44:6,7 61:1
83:23
**feet**  69:21 70:18
72:18 85:2,2

86:10
**fight**  25:7 30:7,15
33:4 44:20
**fighting**  19:23
29:2,14,18 84:19
**file**  2:10 51:17,19
57:12,13
**find**  23:8 45:9
81:14,15
**fine**  13:9 50:9
**finish**  14:18
**finished**  11:3,4
14:15
**fire**  44:8
**first**  9:2,24 17:23
18:2,9,11 19:9
20:13 51:21 83:20
91:13,13 93:3
**fitch**  2:3
**five**  26:25 27:2,9
27:22 40:21 49:21
52:7 63:8,24
64:23 70:22 73:8
73:13,17 74:15
75:24 78:5,7
79:10 80:15 81:21
82:8,21
**floor**  21:25 45:20
48:21 49:4 70:11
70:18 77:13 78:22
79:3
**focus**  33:13 50:4
72:9
**folks**  36:7 40:1
**follow**  23:18 45:24
46:8 47:5
**following**  3:5 7:20
**follows**  9:3
**food**  17:1,4 30:9
**foregoing**  93:6

**[forget - happened]**                                               Page 6

| | | | |
|---|---|---|---|
| **forget** 47:18,20 | **glasses** 77:17 | 25:8,19,20 28:7 | **grocery** 30:10 |
| **forth** 95:9 | **glitch** 36:14 | 29:11 31:19,21,24 | **guess** 43:18 49:15 |
| **forward** 69:7 | **go** 10:9 14:22 | 32:14 33:13 35:11 | **guessing** 31:16 |
| **four** 22:17 37:8 | 15:16,21 16:14,17 | 36:8,11 37:15 | **guy** 59:1 |
| 49:21 50:6 52:7 | 16:17 17:3 18:18 | 38:15,23 39:5 | **guys** 25:7 59:19 |
| 54:7 55:14,16 | 18:18,23 19:13,15 | 40:1,20,20,21 41:3 | **h** |
| 64:18 67:8,21 | 19:17 20:9,20,20 | 41:5,7,9,18,25 | **h** 9:1,1,8 94:1 |
| 68:4,4,6,11 69:11 | 20:21 21:3,5,5 | 42:1,3,7 43:8 44:7 | **haghnazari** 1:18 |
| 71:8,14,17,22 | 22:18,20 23:17,18 | 45:9,24 46:25 | 95:6,20 |
| 72:22 73:2 79:10 | 24:15 25:14,15 | 47:2,6 51:7,16 | **hall** 67:11 |
| 80:15 | 26:5,5 27:7,21 | 52:4,8 54:3 55:15 | **hallway** 38:2 60:5 |
| **frame** 51:22 58:6 | 28:6,6,9 29:7 30:9 | 57:2,11 58:1,16,17 | 64:24 67:10,17,25 |
| **free** 4:17 17:15,20 | 30:10,11,12 31:22 | 58:21 59:3,15,16 | 68:9 69:2,19 71:9 |
| **friend** 10:18 | 31:23,24,25 32:14 | 59:16,19,22,23,24 | 71:23 73:3,6 76:6 |
| **front** 21:2 32:10 | 32:15,15,15 34:11 | 59:25 60:1,6 61:3 | **hand** 20:1 24:18 |
| 41:25 42:1 51:10 | 37:14,17 38:14 | 61:8,23,24 62:13 | 35:14 76:12 88:8 |
| 57:14 59:25 66:14 | 41:11,15 43:7 | 63:6,21,23 64:2,8 | 90:12 91:4 95:16 |
| 68:24 70:13 71:5 | 44:18,18 45:1,1,23 | 64:9,11,14,19,20 | **handcuff** 83:7 |
| 72:6 77:3 91:3 | 45:23 46:9 47:2,5 | 66:23 67:6 68:3,4 | 84:2,4 85:18 |
| **froze** 34:11 | 48:20,20 49:11 | 68:11,16,19 69:10 | 86:24 |
| **full** 9:9 13:12 23:8 | 51:2 57:11 60:2 | 69:10,22,25 70:5 | **handcuffed** 86:2 |
| **fully** 12:14,17 | 60:14,15,15 61:1,1 | 71:2,14,23 72:3,7 | 86:13,22 87:2,16 |
| **function** 26:18 | 61:2,6,13 62:25 | 72:22 73:15,15 | 87:24 |
| **funk** 38:12,13 | 63:1,3,4,4,4,12,15 | 74:8,8,21 75:23,24 | **handle** 64:9 |
| **further** 93:6 95:12 | 65:6 67:4,5 68:3 | 76:20 77:5 79:24 | **hands** 61:5 |
| **g** | 68:11 70:15,15,15 | 79:25 80:1,18,19 | **hang** 85:17 |
| **g** 9:1 | 74:8 75:13,13,13 | 80:24 81:2 83:6 | **hannah** 2:10 9:13 |
| **games** 44:13 | 75:15,15,16 76:18 | 83:13,24 84:2,8,16 | **happen** 41:10 |
| **gerald** 2:5 92:5 | 76:19 77:20,23 | 84:25 85:7 87:12 | 44:20 63:21 69:24 |
| **gesturing** 62:2 | 78:4,10 79:4,13 | 89:22 90:8,10 | 75:1 83:10 88:4 |
| **getting** 36:15 | 80:17 81:3,9,21 | **good** 7:8 9:12 | 91:12 |
| 47:25 72:25 86:17 | 82:9 84:15,16 | 12:20 14:8 16:2 | **happened** 12:24 |
| **gifts** 27:16 | 86:5,5,5 87:10,10 | 18:14,18 19:4,13 | 13:8 16:13 18:13 |
| **give** 9:25 23:23 | 89:18,18,18,18,18 | 19:14 20:24 25:9 | 18:13 20:4,18,18 |
| 24:1 28:24 29:25 | 89:18,22 91:6 | 25:15 29:6,22 | 21:7 22:25 24:15 |
| 32:16 36:1 40:20 | **god** 33:11 42:7 | 35:6,7,8 39:21 | 24:15 25:7 28:12 |
| **given** 5:13 90:14 | 44:10 | 41:22 43:16 56:2 | 28:25 29:9,12 |
| 93:7 95:10 | **goes** 9:22 53:3 | 61:1 83:23 | 31:6 33:1,20,21 |
| **giving** 11:3,4 | **going** 9:20 11:13 | **gotten** 91:10 | 34:4 35:8 38:8,9 |
| 84:23 | 13:20 16:15 17:22 | **graduation** 43:15 | 40:25 41:16 44:18 |
| | 18:16 23:21,22,23 | 43:16 | 45:10,21 46:4 |

[happened - know]                                                        Page 7

48:1,5,7 55:2,11
56:21,24 63:5
65:6,22 66:6,13
75:19 76:16 77:11
77:12 79:22 80:14
82:7 83:13 84:15
85:23 90:8 91:13
**happening** 64:7
75:21 76:2 85:10
**happens** 33:12
78:14 80:7
**hard** 40:17,17
51:15 80:7
**head** 10:2,2 76:9
76:12
**hear** 7:16,18 10:2
30:23 31:11,11,14
33:4,25 34:2,10,15
34:20 35:24 36:2
36:17,19,23 37:5
37:25 38:1,5,6,16
38:17,25 39:14
46:15 64:6,20
85:1,5,7,9,11,16
85:21,23 86:23
87:1,14,15 89:14
89:16 91:25
**heard** 29:14 33:5,9
35:9,11,22 37:13
38:4 44:24 45:12
45:12,17 46:2,4,5
46:6,12 47:4 49:3
49:3 55:5 65:4,10
65:10,17,19 66:4,4
66:10 76:15 77:10
86:12,21 87:22
**hearing** 4:3,4
66:19 85:14 87:5
87:6,6,7
**held** 1:16 34:14

**help** 15:15
**hereinbefore** 93:8
95:9
**hereunto** 95:16
**hey** 43:8 59:15
**high** 19:6 40:12,14
**hit** 42:14 66:24
80:2 82:18
**hmm** 59:9 60:11
61:17 64:5 68:14
71:25
**hold** 61:13
**holding** 24:17,18
70:2,7,8 74:24
76:11
**home** 10:16 14:1,4
14:6 15:2,5,6,14
19:17 20:20,21
21:24 22:16 27:5
28:2 33:22 37:11
42:2 44:12,15
48:16 61:6 69:25
77:17,18,24 78:4
82:16
**hospital** 16:16
18:15 19:3,13
23:17,22 34:22
35:10,12,13 36:12
36:14,20,22 60:15
78:10 84:16
**hour** 22:17,17
**hours** 3:14 8:1
13:1 27:22
**house** 10:18 15:22
16:7,21,22 17:25
22:20,21 27:24
32:24 55:23 57:5
**huh** 32:1 81:17
86:11
**hurt** 25:7 29:17,20
32:25 78:20,25

79:1,2,15 80:9
81:1
**hurting** 19:24
78:21,24 79:3,22
81:3
**husband** 43:2,5,6

**i**

**idea** 17:13 18:19
18:19 22:11 23:24
29:1 31:4 36:9
57:7 58:11 69:5
70:4 72:3 73:14
74:12 78:5,17
81:7 82:8 86:3,3
87:18
**identification**
92:10,13
**identity** 6:22
**ii** 6:19 7:5 8:2
**iii** 6:20 7:6
**importance** 10:12
**incident** 13:25
78:19 80:11 83:18
**includes** 6:18
**including** 4:21
**indicating** 33:9
45:18 47:4 50:19
51:9 52:19 68:2
73:20 75:5
**individuals** 8:7
**information** 94:17
94:18
**initiate** 4:21
**injection** 21:3
23:23
**injured** 48:1 78:18
79:18 80:11
**injuries** 80:5,22
**injury** 79:6 80:4
**inside** 18:1,9 25:6
28:12 29:7 58:9

68:1 72:4 87:10
**instagram** 91:18
**insult** 40:23
**interested** 95:14
**interfering** 75:14
**interpreted** 7:15
**introduce** 8:3
**introduced** 9:13
**involving** 13:25
**issue** 12:19 80:21
**issues** 3:23 7:10,12
7:14
**iv** 6:21

**j**

**jacket** 84:23
**james** 2:7 3:3
**johnson** 2:7 3:3
**jointly** 3:4
**judge** 91:4,5
**juice** 24:1
**jump** 42:19 64:18
**jumping** 21:10
29:13 32:20 84:18
84:18

**k**

**k** 9:1,8
**keep** 9:20 62:13
63:6,23 71:15
73:15 75:12,15
**kevin** 1:17 95:6,20
**kids** 15:15,16
30:11,11,13 35:18
**king** 45:16
**kitchen** 23:9 24:22
29:24 41:21 53:20
54:1
**know** 11:18 14:10
14:16,18 15:14,15
16:4,6,12,19 17:19
17:21,21 18:3,12

Case 1:19-cv-00632-EK-ST   Document 48-13   Filed 11/29/21   Page 104 of 115 PageID #: 1491

**[know - ma'am]**                                                                   Page 8

| | | | |
|---|---|---|---|
| 19:1,5,6,14,24 | 82:5,9,10,19 83:7 | **licensed**  3:13 | **lot**  22:20 31:23 |
| 20:2,19 21:10,12 | 83:24 84:9,19,22 | **lie**  47:25 | 36:5 77:9 |
| 21:19,25 22:1,5,13 | 85:4,14,18 86:14 | **life**  26:22 30:14 | **loud**  21:14 22:3 |
| 22:13,15,19,20 | 86:23,23 87:3,13 | **lift**  74:10 75:3 | 44:24 45:12 77:10 |
| 23:6,9,13 24:4,13 | 88:2,18 89:14,20 | **lifting**  74:25 | **low**  40:12,15 |
| 24:14 25:3,13,20 | 89:23 90:13 92:1 | **light**  60:5 82:19 | **lower**  61:10 |
| 26:9,14,23 27:21 | **known**  30:6 | **line**  94:23 96:5 | **lying**  48:22 |
| 28:6,8,15,17 29:15 | **knows**  20:16 | **listen**  10:23 34:25 | |
| 29:24 30:4,12,15 | | 48:20 | **m** |
| 30:16,18,20 31:4,8 | **l** | **listening**  19:6 | **ma'am**  9:18,23 |
| 31:21,25 32:11 | **l**  3:1 9:1,8 93:1 | 28:22,23 70:16 | 10:4,7,10,14,15,25 |
| 33:1,10,24 35:2,14 | **laguardia**  82:16 | 85:4 | 11:6,9,12,15,20,25 |
| 35:18 36:4,6,10,14 | **lakhwinder**  1:15 | **little**  11:2 30:8 | 12:4,7,12,15,20,23 |
| 37:19,24 38:8,10 | 9:7 13:12 93:12 | 32:15 38:12 40:15 | 13:2,9,14,16,18,23 |
| 38:15,23 39:22 | **language**  16:12 | 41:19 42:23 51:14 | 14:3,21 15:17 |
| 40:4,8,15 42:21 | 19:12 32:12 39:7 | 52:7 61:19 68:3 | 17:10,13,13 18:23 |
| 43:3,3,4,7,16,17 | 39:11,11,18 40:2,8 | 74:7 90:11 | 20:11 21:7,12,15 |
| 44:9,12,20,21 | 42:19,20,21 63:20 | **live**  5:4 21:25 22:7 | 21:22 23:2,24 |
| 45:10,17 46:15,16 | 84:14 | **living**  21:19 32:6 | 24:2,7,12 25:3,11 |
| 46:25 47:2,5,18 | **languages**  89:11 | 54:2 60:8 64:4 | 25:19,21 26:1,12 |
| 48:7,7,10,25 49:3 | **late**  30:10,11 | 69:22 81:19,22 | 26:13,21,24 27:1 |
| 49:12,13,21 50:7,9 | **law**  2:8 9:14 14:7 | **llc**  96:1 | 27:11,19,23 28:1,3 |
| 50:19,22 51:3,14 | 14:12 15:2,24 | **local**  4:20 | 28:9,11,14,21,25 |
| 51:22 52:14,18 | 18:20,25 19:1 | **long**  13:6 15:21 | 29:12,15 30:1,2,5 |
| 53:18 54:2 55:6,7 | 20:22 21:13 22:2 | 25:21 26:3,12,16 | 30:17 31:4,10,13 |
| 55:12,13 56:2,5,12 | 24:14 29:17 46:21 | 55:15 58:8 78:3 | 31:17,17,23 32:5,8 |
| 57:1,1,3,9,22,23 | 55:22 | 79:7,10 80:13,13 | 32:9,17 33:4,23 |
| 58:8,12,24 59:22 | **lawsuit**  9:15 | 81:16,18 82:15 | 34:9,16,19,23 35:3 |
| 60:18,21 61:7 | **lawyer**  47:13,24 | **look**  22:16 25:3,4 | 35:11,15 36:3,9,19 |
| 63:15 64:8,10,12 | 48:25 55:12 88:19 | 29:22 40:16 41:22 | 37:17,23 38:7,9,21 |
| 64:13,19 65:2,6,13 | 89:1 | 50:17 53:3 59:9 | 39:23 41:16 42:4 |
| 68:21,24 69:5,8 | **leave**  44:25 88:21 | 62:21,23 65:4,8 | 42:11 43:4,15,17 |
| 70:16,21,23 71:3 | **leaving**  24:23 | 67:4 68:20 69:15 | 43:21,24 44:12,16 |
| 72:7,8 73:10 | **left**  29:8 35:17 | 70:2 72:25 74:7 | 45:22 46:5,11,18 |
| 74:14 75:12,13,16 | 50:22 61:10,18 | **looked**  23:12 | 46:22 47:8,16,21 |
| 75:20,21 76:17 | 68:2 73:24 77:17 | **looking**  19:24 | 48:2,6,21 49:7,15 |
| 78:6,8,9,18,22 | 77:23 | 51:21 56:22 58:8 | 49:21,22 50:3,6,18 |
| 79:3,5,8,9,14,20 | **leg**  79:25 | 67:11 | 50:21,24 51:6,11 |
| 79:21,21 80:3,4,8 | **legally**  13:15 | **looks**  55:19 60:7 | 51:24 52:12 53:2 |
| 80:10,20,22,24 | **legs**  11:22 | 64:23 67:2,9 73:3 | 53:5,24 54:9,21 |
| 81:2,4,5,14,20 | **lemon**  24:1 | 76:11,24 | 55:10,25 56:25 |
| | | | 57:7,10,16,19 58:4 |

Diamond Reporting
A Veritext Company

877.624.3287                                                                www.veritext.com

**[ma'am - night]**                                                                                     Page 9

| | | | |
|---|---|---|---|
| 58:7,11,14,19 | **marriage**  95:13 | 52:8 54:7 55:14 | 22:13 |

**n**

58:7,11,14,19
59:15 61:6 62:6,7
64:8,13,21 65:1,8
65:19 66:4,14,17
66:18 67:19 68:24
69:5,8 70:14 71:1
71:10,20 72:11,21
73:5,9,12 74:2,12
74:20 75:8,19,22
76:3,9,18 77:1,4
77:14 78:2,6,9,11
78:16,17 79:4,7,13
79:23 80:3,6,9,20
80:23 81:7,9,12,22
81:23 82:12,24,24
83:1 84:17 85:1,8
85:24,25 86:3,14
86:15,23 87:17
88:1,10,18,20,23
89:5,6,20,25 90:3
90:13,20,25 91:5
91:14,16,19,24
92:7
**mad**  31:24 41:7
43:19 44:4,6,10
**mail**  4:22 7:25 8:8
**major**  62:6
**making**  10:1
**man**  18:18 19:13
19:15,17 20:3,10
20:18,23 24:15
26:5 31:6 35:6,7
37:15 41:7 48:9
48:18 50:18 63:20
63:21 83:12 84:16
**mandeep**  3:3 9:15
**manner**  3:7
**marked**  51:8 92:9
92:12 94:22
**marker**  51:20

**marriage**  95:13
**matter**  62:8 95:15
**matters**  91:8
**mean**  14:22 15:13
24:17 42:12,25
54:17,25 77:23
84:17 90:15
**meaning**  91:9
**means**  3:7 5:11
7:23
**meant**  45:6 56:16
56:19 83:5
**medallion**  79:9
**media**  91:17
**medical**  28:18
31:12,14 54:11,14
55:2
**medication**  12:25
**medicine**  13:3
78:23
**memory**  12:19,22
13:8 15:4 30:3
47:17 56:23,25
75:22 76:3
**message**  4:22
**met**  43:6
**metformin**  13:5
**methods**  7:20,22
**middle**  13:13
40:15 61:16 73:21
**miles**  40:11
**mind**  31:21
**minute**  16:13 20:7
20:7 34:24 58:10
63:8,24 64:2,14
70:22,22 82:21
86:20
**minutes**  15:23,23
20:25 21:1 25:20
25:24 26:4 28:20
29:1,2 40:21 52:7

52:8 54:7 55:14
55:16 58:10 64:22
66:23 67:1,8,21
68:4,5,6,11 69:1
69:11,11,16 70:5
71:8,14,17,22,22
72:22 73:2,8,13,17
74:15 75:24 76:4
76:21,23 78:5,5,7
78:7 82:23
**mistake**  11:17
**mister**  48:20
**misunderstanding**
88:12
**misunderstood**
35:20,21
**mm**  59:9 60:11
61:17 64:5 68:14
71:25
**mom**  82:1
**moment**  76:15
**morning**  14:13,13
14:14 16:21,24
17:11 21:17 22:4
22:8 30:12 39:1,8
39:15 53:11 56:20
56:25 57:6
**mother**  27:17
**move**  13:6 32:15
46:14 52:6 90:11
**moved**  60:8 81:25
**movie**  49:7 52:15
52:16,17 53:5
70:10
**movies**  20:2 58:13
89:17
**moving**  48:21
61:11,12
**muscle**  79:25
**music**  16:3 19:6,7
20:2 21:14 22:3

22:13

**n**

**n**  2:1 3:1 9:1,1,8
93:1 94:12
**name**  6:19,21 7:4
7:6 9:6,7,13 13:12
13:13,15,17 33:20
51:19 57:13 90:4
96:2,3
**names**  13:13,13
**nassau**  95:4
**near**  17:20
**neck**  52:19 82:17
**need**  9:25 11:10,17
11:21 12:6
**needed**  23:17 86:1
86:12,21 87:2
**needs**  10:2 47:23
**neighbor**  35:6
47:19
**nephew**  28:2,4,10
46:17
**never**  18:20 21:22
21:23 26:17,17,18
26:18,19,24,24
27:1,18,20,22
29:12,14 31:17
35:11 44:19,20,22
44:22 47:18,20
52:16 55:5,10
68:22 88:4 91:12
**new**  1:1,7,18 2:4,4
2:8,9,9 3:2,4 9:3
9:10,14,15 16:25
95:3,7 96:1,2
**ngg**  1:5
**nice**  43:16
**nickname**  20:17
39:22
**night**  14:7 17:9
22:9 27:15 56:11

Case 23-24, Document 33, 04/19/2023, 3501834, Page128 of 277
**[JA-1288]**

| | o | officer's  6:19,21 | p |
|---|---|---|---|
| 81:21 | | 7:4 | |
| **nighttime**  15:14 | **o**  3:1 93:1 | **official**  5:23 | **p**  2:1,1 3:1 |
| 22:11 78:7 79:20 | **o'clock**  56:1,1,1,11 | **oh**  30:9,10 33:11 | **p.m.**  1:11 92:15 |
| **nine**  76:5,21 | 56:11 | 42:7 44:10 49:2 | **page**  94:5,14,18,23 |
| **nod**  10:2 | **oath**  5:16 6:2,22 | 53:3 | 96:5 |
| **noise**  4:17 20:4 | 10:5,8,11 90:16,19 | **okay**  9:22 10:3,21 | **pain**  78:23 82:17 |
| 29:14 33:6,9 38:4 | **object**  4:5 | 11:11,14,19,24 | **pandemic**  5:13 |
| 38:5,6 44:24,25 | **objections**  4:7 | 12:3,6,18,20 13:7 | **park**  9:10 81:25 |
| 45:12,14,15,18,22 | **observations** | 13:8,10 14:17 | **part**  49:13 63:9 |
| 46:6,25 47:1,4 | 24:21 | 15:19 16:10 17:14 | **participants**  4:15 |
| 49:2,3 54:19 65:4 | **officer**  6:1 9:15 | 19:16,16,16,17,21 | 4:15 7:17,18 |
| 65:10,11,15,19 | 16:17,19 20:9 | 19:22,23 20:20,21 | **participate**  4:11 |
| 66:4,5,8 75:17 | 21:5 26:3,6,10 | 21:3,4 22:23,24 | **particular**  73:10 |
| 76:15 77:9,10 | 28:5 29:5,5,6,7 | 23:1,1,3,5 29:11 | **parties**  3:6,9,16,18 |
| **non**  1:14 3:6,9,22 | 32:10,11,15,22 | 29:23 31:6 32:4 | 3:22 4:1,2,4,7,11 |
| 4:2 5:10 6:7 | 33:2 35:16 37:9 | 32:13,14,23,24 | 5:2,10,15,25 6:7 |
| **normal**  13:7 21:8 | 37:11,16 41:10 | 34:15,17 37:15 | 7:8,11,20 95:13 |
| 21:8,11,11,20,22 | 42:1 48:19 49:10 | 45:10,25 46:8,10 | **partnership**  81:14 |
| 22:4,6 25:4 30:14 | 49:19,21 50:2,2,20 | 47:14,24 50:8 | **party**  1:14 3:6,9 |
| 38:11 43:6,12 | 50:23,25 58:23,24 | 51:9 52:2,6,10 | 3:15,18,22 4:2 |
| 63:21 70:11 | 59:11 61:12,15,19 | 54:3 56:18 57:13 | 5:10 6:5,7,10 7:15 |
| **normally**  13:3 | 61:20 62:2,9,10,19 | 57:25 60:4 61:3,8 | 26:18 27:7,16,17 |
| 21:24 27:21 31:19 | 62:22 63:9,18 | 61:22 62:7 63:3,8 | 27:17 |
| 32:21 47:2 79:23 | 64:18 65:5,10,11 | 63:15,23 64:11,22 | **pass**  82:1 |
| 80:8 81:14 | 65:12,16 66:5 | 67:20 69:13,17 | **patient**  47:3 |
| **notary**  1:18 5:18 | 67:2,22,23,24 | 70:17 72:17 73:15 | **pause**  58:17,21 |
| 9:2 93:19 95:6 | 70:10,12 71:11 | 76:4,17 83:7,15,25 | 64:2 |
| 96:25 | 72:1 73:18,24 | 84:5,7 88:4,22 | **paused**  52:10 59:5 |
| **notes**  82:22 | 74:6,10,18,18,22 | 89:2,2,7,11,24 | 60:4 61:4,9 62:1 |
| **noticed**  3:13 | 75:3,7,9,21 83:13 | **open**  18:2,5 27:25 | 62:18 63:8 64:22 |
| **number**  94:6 | 83:14,23 84:9 | 44:25 45:1,2 85:3 | 67:8,21,22 73:17 |
| **numbered**  8:2 | 85:3 87:9 89:19 | 88:20,25 | 76:4,23 |
| **nurse**  16:7 26:10 | **officers**  33:19 35:9 | **opportunity**  12:3 | **pausing**  73:2 |
| 50:3 76:2 | 35:25 37:20 38:1 | 12:5 | **pay**  31:7,18 38:10 |
| **nurses**  14:24 15:9 | 38:2 49:6,16,25,25 | **opposing**  3:15 6:7 | 85:15 87:12 90:9 |
| 16:15 18:12 20:6 | 50:5,10,13 51:4 | 7:25 | **paying**  74:13 |
| 25:14,18 26:1 | 59:7,14 61:11 | **outcome**  95:14 | **pending**  4:24 |
| 30:22 36:12 37:7 | 68:20 70:1 71:24 | **outside**  72:3 | **people**  18:3 22:10 |
| 37:8 44:9 45:3 | 77:13 84:10,11,20 | **ozone**  9:10 81:25 | 27:6,15 37:10 |
| 49:20 | 85:10,19 86:2 | | 40:13 41:14 44:13 |
| | 87:16,24 88:8,16 | | 44:14 47:2 53:4 |

[people - questions]                                              Page 11

| | | | |
|---|---|---|---|
| 60:20 | **played** 52:9 54:5 | 77:2,15,19 78:3 | **pulled** 80:1 |
| **percent** 15:6,18 | 58:20 59:4 61:25 | 83:4 84:20 85:10 | **pulling** 33:10 |
| 31:1 52:21 59:18 | 62:14 63:7 64:1 | 87:15 88:16 89:8 | 45:19 47:1 |
| **period** 55:24 | 64:17 66:25 67:7 | **portion** 61:10 64:6 | **punjabi** 39:1,2,5,6 |
| 68:15 72:2,10 | 69:14 71:16 72:24 | 67:20 | 39:13,15,19 40:2,3 |
| **permitted** 6:2 | 73:16 74:23 76:1 | **possible** 9:22 71:7 | 40:24 42:10,21 |
| **person** 4:3,13 | 76:22 77:7 | **pregnant** 30:14 | 43:22,23 89:10 |
| 21:11 27:8 44:14 | **playing** 21:13 22:3 | 46:21 | **purpose** 4:24 |
| 47:19 52:23,24 | 61:3 62:13 63:6 | **prepare** 47:12 | **purposes** 51:16 |
| **personal** 91:8 | 63:23 71:15 | **prepared** 47:16,21 | 57:12 |
| **personally** 80:24 | **please** 9:6 10:20 | **present** 5:14 6:23 | **pursuant** 1:15 |
| **person's** 6:23 | 10:23 11:8,11 | **pretty** 9:20 | **push** 25:16 26:4,6 |
| **phone** 15:25 38:21 | 32:13 88:19,20,21 | **prior** 5:7 | 28:6 29:8 32:11 |
| 45:8,11 57:2,4 | 88:21 89:3 | **private** 4:21 | 37:1,16 41:10 |
| 68:18 69:4,13 | **pllc** 2:3 | **privilege** 4:25 | 49:10,11 50:19,21 |
| 70:2,7,9,14,15,19 | **point** 19:19 26:20 | **problem** 12:22 | 50:23 59:1 63:1 |
| 70:20,21,21 72:4 | 26:22 27:12 44:23 | 26:15 30:16 31:20 | 63:10,11,13 67:4,5 |
| 76:14 85:13,16,21 | 45:12 46:17,20 | 42:6,13 79:24 | 70:15 79:24 86:6 |
| 86:21,24 | 50:25 58:9 60:13 | 80:6,6,7 82:24,24 | 89:18,18 |
| **phonetic** 90:6 | 60:19 62:11 64:3 | **problems** 80:25 | **pushed** 16:17 20:9 |
| **physical** 42:6,13 | 65:3 66:20 67:16 | **procedure** 1:16 | 21:5 48:19 67:3 |
| 79:24 80:3 | 68:12 69:4,18 | 3:14 6:1,15 7:2 | 71:11 |
| **physically** 5:14 | 70:3,8 73:7,11 | **proceed** 7:16 | **put** 13:20 16:3 |
| 50:16 | 75:7,20 76:12 | **procuring** 6:6 | 35:14 36:7 40:1 |
| **pick** 30:11,12 57:8 | 77:2 82:6 87:1 | **produced** 51:17 | 49:3 69:6,7 77:8 |
| 70:20 | **police** 13:25 16:16 | **properly** 53:24 | 77:25 83:7 84:22 |
| **piece** 33:13,13 | 25:25 28:21 30:18 | 74:9 | 85:18 88:8 90:12 |
| **pinky** 20:16,17 | 30:20,25 31:8,12 | **protocol** 3:5 | **putting** 19:6 20:1 |
| 22:15 27:24 | 31:15 32:6,18 | **provide** 6:10 | 22:13 88:2 |
| **place** 6:20 7:5 | 33:2,16,19,21 34:2 | **provided** 5:3 | |
| 75:11 93:8 | 34:7,17,20 35:9,23 | **provider** 3:19,21 | **q** |
| **plaintiff** 1:3,15 2:3 | 35:25 36:17,23 | 5:3,7,8 6:11,16 | |
| 3:2 51:17 57:13 | 37:6,9,20 38:1,2 | 7:2,9 | **question** 4:24 9:24 |
| **platform** 8:6 | 38:17,20 39:6,7,17 | **provider's** 8:4 | 10:23 11:3,10,13 |
| **play** 52:4,8 54:3 | 40:6 41:10,25 | **providing** 6:7 | 11:23 22:2 34:8 |
| 57:25 58:16 59:3 | 42:18 44:8 46:14 | **provision** 7:14 | 34:20 35:19,21,24 |
| 59:23 60:1,2 61:8 | 49:16,19 50:4,5 | **provisions** 7:13 | 35:25 42:23 47:10 |
| 61:23 64:11,14 | 57:13 58:23,24 | **public** 1:18 5:18 | 56:17 61:24 62:9 |
| 66:24 67:6 70:5 | 59:7,14 60:17 | 9:2 93:19 95:6 | 62:10 67:18 76:19 |
| 72:22 75:24 76:20 | 68:17 71:24 72:1 | 96:25 | 87:22,23 88:7 |
| 77:5 | 72:19 74:6 75:3 | | 94:23 |
| | | | **questions** 11:7 |
| | | | 32:4 52:5 58:17 |

[questions - saw]                                                                    Page 12

| | | | |
|---|---|---|---|
| 65:25 90:16,22 91:11 94:22 **quick** 9:20 **quickly** 71:6 82:22 **quietly** 41:15 | **refresh** 56:23 **refuse** 83:8 **regular** 27:6 **related** 95:12 **relax** 18:15 32:13 41:7 63:3,20 83:12 84:16 **relaxed** 60:14 **relaxing** 16:4 33:23 40:7,19 44:11 **remember** 12:21 14:14 17:6,22 20:19 33:17 36:5 36:18 37:20 39:24 47:17 49:10,15,16 50:7,8,9,10,13,15 50:17,21,24 53:2 53:24 57:2,6,7,10 58:11 59:13,17,20 59:21 60:12 62:24 64:8,9 65:9,22 66:2,11,16,19 72:1 72:19 75:8 78:6 78:16 79:19 88:15 89:7 **remind** 20:16 **remote** 3:7,20,21 4:1 5:10 7:4,21 20:1 **remotely** 3:10 4:7 4:12 **repeat** 11:11 **rephrase** 11:10 34:5,5 56:13,17 67:17 77:11 88:7 **reporter** 4:10 5:13 5:17,17,21,25 7:25 10:1 11:5 34:11 92:11,14 | **reporter's** 5:22 **reporting** 3:19 96:1 **represent** 9:14 **representing** 49:12 **requested** 94:17 **requirements** 5:12 **reserve** 4:7 **resides** 5:19 **response** 9:25 34:3 **responsible** 6:5,16 7:2 **rest** 23:13 **restroom** 11:22 **result** 78:19 **retained** 94:10 **review** 12:3 48:3 **rewind** 51:15 **right** 9:24 10:13 12:22 13:10 15:7 16:2,8 17:9 18:8 18:18 19:3 21:17 22:23 23:1 24:5 25:16 30:19 31:12 39:9 44:17,24 45:7,13 46:13,21 47:7,9 48:24 50:4 51:9 52:2 53:22 54:6,8 55:23 56:14 58:6 59:11 61:15,16 62:19 63:13,22 64:4 67:12,17,25 68:9 68:13 69:23 71:9 71:19,24 73:17,24 74:1,16 76:7,20,25 77:12,13 78:6,8,10 83:20 85:20 86:10 86:13 87:21,21 88:4 90:2 | **room** 5:3,4 10:20 16:14,18 20:9 21:19,19 23:19 26:5 28:5,7 29:7 32:7 33:5 35:17 37:2,18 38:12,12 38:13,14,22,23 41:11,15 44:8,16 45:13 46:14,18,23 48:19 49:5 54:2 57:23,24 58:12 60:6,9 63:1,5,12 63:12 64:4 67:5,9 67:14 68:1,1,13,16 69:23 71:18 72:5 72:11,13,16 75:17 76:25 84:25 87:7 87:12 **rooms** 3:24 5:5,6 **rule** 4:20 5:12 6:1 6:15 7:1 **rules** 1:16 3:14 6:15 7:1 9:21 **rulings** 94:22 **run** 15:7 **rush** 49:22 |

**r**

| | | | |
|---|---|---|---|
| **r** 2:1 9:1,8 93:1 95:1 **raise** 65:5 91:4 **raising** 66:12 **reach** 16:6 17:25 25:13 29:15 33:8 **reached** 18:11 26:1 **reaction** 32:18 **ready** 73:1 84:23 **realize** 11:16 **really** 20:15 21:9 23:18 31:17,19 35:2 36:7 38:13 40:12,12 44:6 53:13,23 71:7 74:13 78:6,25 82:21 86:16 88:11 92:3 **reason** 12:13,16 55:7 65:2 70:21 73:10 96:5 **reasonable** 7:13 **recall** 15:24 **received** 57:12 **recess** 83:2 **reciting** 7:4 **record** 4:5 5:21,23 6:18 8:7 9:6 12:2 34:13 57:1 95:10 **recorded** 3:11 5:6 5:11 **recording** 3:12 **referring** 39:12 | | | |

**s**

| | | | |
|---|---|---|---|
| | | | **s** 2:1 3:1,1 9:1 94:1 96:5 **santoscor** 90:5,6 **sat** 53:19 **saw** 15:9 18:10,16 20:11,20 23:16 24:2,5,10,16,22 25:19 26:24 27:22 44:22 47:24 48:5 48:6,10,13 49:7,9 49:20 52:16 53:1 53:5 54:10 55:3 55:11 57:22 58:5 70:10 77:17 88:4 |

| | | | |
|---|---|---|---|
| 91:25 92:1 | 57:14,18 58:3,12 | **shaking**  61:5 | 73:2 76:4 77:10 |
| **saying**  23:4 27:13 | 58:13,21 59:10 | **share**  81:21 | 82:20 83:3 86:9 |
| 36:18 38:18 39:25 | 60:4,10 61:4,10,15 | **sharing**  8:4,5 | 88:11 90:1,14 |
| 43:20 60:12 61:6 | 61:18,19,20 62:1 | 81:10 | 91:17 92:2 93:12 |
| 85:12 | 63:14 64:25 65:7 | **sheet**  96:1 | 96:2,3,21 |
| **says**  58:2 60:17 | 65:17 66:6,13 | **shift**  22:17,18 | **sir**  34:16 45:4 75:3 |
| **schedule**  82:10 | 67:10,13 68:6 | 79:20 81:20,21 | **sister**  14:7,12 15:2 |
| **school**  15:16 30:11 | 69:2,12 72:7,16 | **shocked**  44:7,9 | 15:24 18:20,25 |
| 81:25,25 | 73:4,6,7,18,19,23 | **shoes**  72:25 84:23 | 19:1 20:22 21:13 |
| **screen**  8:5 55:17 | 73:24 74:1,6,9,10 | **short**  50:18 83:2 | 22:2 24:14 25:6 |
| **second**  51:20 69:6 | 74:15,18,25 75:1,3 | **shorter**  61:11,19 | 29:17 31:2 46:21 |
| 69:7 71:11 86:6 | 75:10,17 76:3,5,11 | 61:20 62:1 73:18 | 55:22 |
| **seconds**  52:11 | 76:13 77:9,11,12 | **shot**  27:5,18 | **sit**  15:14 16:13 |
| 53:1 54:4,7 55:15 | 77:25 81:4 82:20 | **shoulder**  61:12 | 25:18 29:25 32:13 |
| 55:16 57:20 58:16 | 84:17 85:25 87:4 | 78:23 79:6,15,25 | 41:7 |
| 58:21 59:3,5,6,14 | 87:22 88:5,8,10 | 80:4,21 | **sitting**  19:25,25 |
| 60:4 61:4,9,13,23 | 89:5,16 90:12 | **shoulders**  78:20 | 21:19 44:15 53:4 |
| 62:18 63:6,8,24 | **seeking**  3:18 6:5 | **show**  47:9 48:10 | 53:8,12,13,15,15 |
| 64:2,15,23 66:23 | 6:10 | 49:2 51:7 89:16 | 53:16,16,24 65:16 |
| 67:1,9,22 68:4,5,6 | **seen**  27:19 53:3,5 | **showed**  48:10 | 69:3 71:4 84:13 |
| 68:12 69:2,12,17 | 63:9 | **showing**  62:3 | **six**  22:17 27:22 |
| 70:6,22 71:8,14,18 | **segment**  6:25 7:3 | **shuttle**  82:18 | 71:8,14 74:11,21 |
| 71:22 72:23 73:3 | **send**  7:23 28:5 | **si**  54:12,12 | 81:22 |
| 73:8,13,18 74:11 | 65:18 75:16 | **side**  32:11 41:21 | **skinny**  50:2 |
| 74:15,21 75:25 | **sending**  8:6 | 53:25 54:1,2 68:2 | **sleep**  16:14 18:15 |
| 76:5,21,23 77:5 | **sensitive**  27:8 | 90:10 | 19:15 20:21 23:19 |
| **section**  53:19 | **sent**  16:18 38:11 | **signature**  95:20 | 24:2,15 27:5 28:9 |
| **see**  16:7 19:20 | 38:22 48:19 | **simulates**  5:4 | 31:20 32:14 37:15 |
| 22:7 24:2,12 | **separately**  4:12 | **singh**  1:2,15 9:7 | 40:20,20,21 42:8 |
| 25:10,20 28:7,20 | **serious**  62:8 | 9:12 13:12,22,24 | 55:4 56:5 60:14 |
| 28:21 29:2 30:2,2 | **seriousness**  10:12 | 22:22 24:6,20 | 60:15 61:1,2 63:3 |
| 30:4,15,17 31:25 | **serve**  15:4 | 26:14 28:2 35:19 | 63:20 83:12 89:12 |
| 32:10 35:3 37:1 | **service**  3:19,21 5:3 | 36:15 38:16 42:23 | **sleeping**  15:12,13 |
| 40:17 44:12,20,22 | 5:7,8 6:11,16 7:2 | 44:23 47:9 48:3 | 15:17 16:2 19:7 |
| 46:3,3,5,6,24,25 | 7:9 8:4 | 49:14 50:8 51:7 | 28:3,4,7 35:18 |
| 47:17,19,20 48:7,8 | **services**  3:20 | 51:10,21 52:10 | 46:17,18 |
| 48:9,12,17,18,21 | **set**  95:9,16 | 53:8 54:6 55:14 | **slow**  40:12 |
| 49:1,1,11 50:1,1 | **seven**  27:22 78:7 | 57:14,25 59:5 | **small**  51:15 |
| 51:10,15 52:11,13 | 82:8 | 64:3,22 65:20,20 | **smoothly**  9:22 |
| 52:15,16,17,23 | **shake**  10:2 | 67:1,8 69:1 70:24 | **social**  91:17 |
| 54:19 55:17,18,18 | | 71:17 72:9,13 | |

**[socks - talking]**                                                       Page 14

| | | | |
|---|---|---|---|
| socks 84:24 | square 40:11 | stipulate 3:5 | 35:12,14 36:11,13 |
| sofa 19:25,25 53:4 | ss 95:3 | stipulation 6:11 | 45:24 46:8,9 47:3 |
| 53:9,22 65:16 | st 1:5 | stop 26:22 27:14 | 62:7 82:21 83:6 |
| 84:13 | stairs 77:20,20 | 37:2 84:24 | 83:14,24 |
| somebody 23:19 | stamp 55:18 | stopped 27:12 | taken 1:15 4:6 |
| 23:25 43:6 47:1 | stamped 58:2 | store 17:3 | 5:15 10:5 12:25 |
| 47:21,23,25 65:12 | stand 41:20 | stories 89:14,17 | 77:2 83:2 90:16 |
| 65:14 70:9 75:9 | standing 20:25 | story 47:21 | talk 16:6,18,24 |
| 79:23,24 84:11 | 26:4 28:22 31:5 | street 2:4,9 9:10 | 17:19,21,22 18:4 |
| son 46:21 60:21 | 34:25 36:25 41:20 | stretch 11:22 | 20:7,16,25 21:6 |
| sorry 14:20 32:2 | 53:19,23 57:16 | strict 17:18 | 22:15 25:17,18 |
| 34:4,10 35:19 | 59:10 60:17 61:20 | strive 4:16 | 26:3,7,8 29:4,5,8 |
| 39:10 42:12 45:5 | 67:25 68:9 69:2 | stuff 17:4 | 29:10 30:16 31:7 |
| 49:23 56:7,16 | 71:23 72:16 74:6 | subpoena 1:16 | 32:12,16 33:19 |
| 62:4 65:20 73:7 | 82:19 83:22 84:13 | subscribed 93:15 | 34:25 35:7 37:12 |
| 76:8 77:19 80:10 | 84:25 85:3 86:8 | 96:22 | 37:18 38:23 39:18 |
| 85:5 88:24 | 86:10 89:9 | suffered 79:5 | 40:13 41:6,11 |
| sort 11:16 33:13 | start 41:6 51:8 | suffering 80:15 | 43:3,3,6,7,8 47:13 |
| 59:11 61:4 62:22 | 75:1,4 79:11 | suggesting 65:21 | 47:23 48:1,25 |
| 73:18 74:3 | started 9:21 10:20 | suite 2:4 | 51:2 63:14,17 |
| south 9:10 | 27:14 80:16 82:2 | supposed 36:13 | 70:21 75:8 82:10 |
| speak 39:5,5 41:11 | state 1:18 5:18 9:2 | sure 11:2,5 36:15 | 86:5 88:18,19,19 |
| speaking 21:8 | 9:6 95:3,7 | 49:23 56:8,20 | 88:20 89:20 |
| 24:10 25:2 38:25 | statement 6:18 | 61:13 70:24 86:17 | talked 19:18 78:12 |
| 39:2,14 40:9 | states 1:1 | 88:12 | talking 16:9,17 |
| 42:20,20,24 43:25 | stay 26:2 34:23 | surgeries 71:3,4 | 18:12,16,17,24 |
| special 27:17 | 37:3 51:3 75:11 | surprise 18:21 | 19:16 24:9 25:10 |
| specific 32:4 33:2 | 75:15 86:4 | sustained 80:5,22 | 28:22 31:5 32:21 |
| 33:17 42:24 54:24 | staying 82:1,16 | swear 30:3 90:19 | 33:1,2,8,16,17,18 |
| 66:10 88:15 89:7 | stenographer 3:11 | sworn 9:2 93:4,15 | 34:23 35:2,5 36:4 |
| specifically 17:6,8 | stenographic 5:11 | 95:9 96:22 | 36:4,8 37:3,7,8,10 |
| 24:21 39:24 65:9 | stenographically | system 4:23 | 37:14,19 39:7,8,9 |
| 66:3 | 5:21 | | 39:18 40:25 41:2 |
| specified 93:8 | step 45:16,17,19 | **t** | 41:4,17 42:9,16,19 |
| spoke 16:20,22 | 46:25 47:4 67:23 | t 3:1,1 93:1 94:1 | 43:13,21,22 49:10 |
| 22:24 23:16 24:8 | 67:24 | 95:1,1 | 54:11 59:7,18,21 |
| 24:24 36:9 39:16 | stepped 68:12 | tablet 78:22 | 60:16 62:8,9,10,15 |
| 45:7 47:15 48:16 | steps 33:9 62:22 | take 10:1,9 11:21 | 62:17,19 63:2,20 |
| spoken 17:7,12 | stethoscope 52:20 | 13:3,4,5 15:21,23 | 66:5,12 68:19 |
| 26:9 68:22 | 52:21 | 16:15 18:15 19:2 | 70:14 72:4,5,11,13 |
| | | 21:23 27:5,18 | |
| | | 28:24 32:3 34:22 | |

**[talking - twice]**                                                                 Page 15

| | | | |
|---|---|---|---|
| 72:14 74:19 75:7 75:10 76:16 83:12 83:19,21 85:14,22 87:4,7,8,11 89:13 89:19 90:1,10,11 | thing  18:2,10 54:25 66:14 | 56:2,2,3,3,4,5,5,8 56:10,10,14,20,22 56:23,25 57:1,8,9 58:1,17,18 60:24 | 45:21 |
| | things  43:7 44:4 63:22 | | touch  26:24 27:1 27:20 63:19,19 |
| tall  50:19,23,23,25 59:1,11 61:15 62:16 67:2,23,24 73:24 | think  22:1 23:7,17 30:22,24 43:12,14 43:18 44:4 50:3,5 53:16 59:1,15 68:18 70:8 72:4,5 72:6 77:8 79:7 82:22 | 63:13 67:22 68:15 70:19 71:13 72:2 72:10,12 75:12,20 78:12 79:7,10,17 80:12,13,13 82:2,4 82:6,9,15 83:20 85:13 86:5,6 87:5 88:16,17 90:12 91:13,13 92:3 93:8 | touched  27:10 |
| | | | transcript  5:22 6:6 10:1 11:5 12:2 12:6,8 13:20 36:16 86:18 93:6 93:7 |
| taller  62:18,22 | | | trash  24:10 |
| tan  72:18 | | | treating  42:15 |
| taxi  79:8,9,9 80:13 | thinking  15:6 24:9 | | treatment  28:24 |
| tea  78:8 | third  21:25 45:20 45:21 50:20 52:23 52:23 | | trial  4:2,4,8 10:9 12:10 |
| technological  3:23 7:10,12 | | times  70:15 83:3 | trick  70:24 |
| technology  3:11 8:5,5 | thought  23:3 | timetable  22:19 | tried  29:25 36:3 60:20 62:5 |
| | three  20:25 21:1 21:23 23:7,8,9 25:20,24 26:4,9,25 27:2,9,18 49:21 50:1,2,3,5,6,10,12 58:24 64:18 67:1 69:1,11,16 70:5,9 71:3,4,22 75:9 78:17 82:8 | tired  20:3 | |
| tell  10:6 11:8 14:25 23:11,14 24:8,11 25:1,12 28:12 30:3 35:9 51:21,25 54:13 55:1 58:14 61:1 63:17 68:25 69:12 81:1,2 85:24 91:4 | | title  51:18 | troubleshoot  3:23 7:10,12 |
| | | tobacco  26:25 | true  90:19,19 91:21,25 93:7 95:10 |
| | | today  9:19 10:6,16 12:9,14,17 47:11 47:12 48:4 51:23 57:21 90:14,16,22 91:20,22 92:3 | truth  10:6 24:3 30:3 58:14 91:4 93:4 |
| | | told  12:23 16:10 19:2,12 20:3 22:14,22 23:5 24:3,13 25:6,12 28:19 29:19,23 31:1 32:15,22 35:13 36:22 39:4 40:3,20,24,25 41:6 43:21 48:6,15 60:14 63:4 79:2,3 80:1 83:6,13,14,24 84:18,22 85:19,25 86:5 87:9 91:20 | |
| telling  61:7 75:12 75:15 83:23 | threw  78:21 79:2 | | truthfully  12:14 12:17 |
| ten  40:21 78:5 | throw  48:17,21 70:11 80:2 | | try  9:20 16:11 62:6 |
| tense  41:19 42:5 | throwing  49:9 | | trying  29:4 32:2 43:19 44:3 56:7 60:22 64:12 65:22 69:7 71:6 84:14 86:9,16 87:22 88:24 89:15 |
| testified  9:3 90:21 91:9 | tied  31:18 | | |
| testify  12:13,16 47:12 91:1 93:4 | time  1:11 6:20 7:5 11:16 13:6 14:12 14:14,15,15,19 16:20 17:2,7,9,11 18:11,21,21 22:18 22:18 25:21 26:16 30:7,8 32:16 39:16 45:14,16 47:20 53:7,15,16 54:19 55:1,4,18,19 55:20,21,23,25,25 | | |
| testifying  10:21 | | | turn  21:25 60:5 |
| testimony  4:8 5:22 86:19 88:13 90:15 93:4,7 95:10 | | tone  40:9 | turned  60:7,7 |
| | | top  55:17 58:3 | tv  20:3 21:24,25 41:20 54:2 |
| text  4:21 | | totally  20:11 21:6 25:19 29:12 36:10 | twice  71:12,13 |
| thank  9:19 13:10 72:21 92:2,7,8 | | | |

Diamond Reporting
A Veritext Company
877.624.3287                                                              www.veritext.com

Case 23-24, Document 33, 04/19/2023, 3501834, Page134 of 277
**[JA-1294]**

**[two - woke]**                                                                 Page 16

| | | | |
|---|---|---|---|
| **two** 14:10,24 15:9 16:1 19:5 20:7,25 21:23 23:7,8,9,12 26:3,9 27:18 28:20 37:9,9 45:20 48:13,23 49:18,20,20,21,25 49:25 50:3,6 51:4 54:11 58:10,21 59:3 64:22 66:23 70:15,22 78:17 82:8,15 | **utilize** 4:18 | **wait** 11:2,3 15:8 | **we've** 10:19 51:8 61:8 |
| | **v** | **wake** 15:15 | **weak** 78:25 |
| | **v** 6:22 96:2 | **walk** 13:7 52:11 52:13 54:20 58:22 67:13 75:1,4 | **wearing** 52:20 72:25 |
| | **validity** 5:16 | | **week** 48:13,23 |
| | **verbal** 9:25 | **walked** 67:9 71:18 | **weekend** 27:7 |
| | **veritext** 96:1 | **want** 9:19 14:25 26:7 32:3,3,4 33:12 36:15,21 46:15 47:9 48:16 49:23 50:4,9 51:7 55:4 64:19 65:20 67:17 68:22 74:22 75:10,16 81:21 83:18 84:15 85:17 85:18 86:4,18 87:13 88:11,11 89:12,21,21 | **weeks** 48:13,23 |
| | **video** 3:12 6:17 48:5,6,12,13 49:9 51:7,8,10,18,22,22 52:9,10 53:9 54:3 54:5,7,8,10 55:3,8 55:14,19 56:23 57:13,14,18,21,23 57:25 58:2,3,5,8 58:20 59:4,10 60:1,2 61:11,15,25 62:14 63:7 64:1 64:17 66:25 67:7 67:13,20 69:14 71:5,16,21 72:14 72:24 73:16,19 74:23 76:1,22 77:6,7 92:9,12 94:7,8 | | **welcome** 11:21 |
| | | | **went** 12:10 14:23 16:21,22 18:6,9 25:6 37:5,18,21,25 45:2,6 56:9 57:5 68:15 77:17,18 82:18 83:19 91:3 91:8 |
| **u** | | | |
| **u** 3:1 | | | **whereof** 95:16 |
| **uber** 17:16,18 22:9 22:10,17 27:21 79:11,12 80:16,19 80:19 82:3 | | | **wife** 15:15 16:10 18:12 19:1 20:22 21:18 30:6,17,24 30:24,25 33:19,20 37:19 38:7,21,22 38:24 39:1,2,15 41:1,4,17,20 42:10 43:3,5,6,11,16,23 45:7,8,9 53:14 63:14,14 68:18,19 68:19 69:15 72:12 76:14,16 77:9 84:23 85:14,22,22 86:25 87:7,11,12 90:2 |
| **uh** 32:1 86:11 | | **wanted** 28:23 83:4 83:17 | |
| **uncle** 81:13 | | | |
| **understand** 7:17 7:18 9:17 10:5,8 10:11,14 11:7 12:11 13:24 14:2 16:11 42:4 43:18 43:19 44:3 54:22 54:24 56:8 65:22 69:8 83:17,18 86:9,17 | | **wants** 47:23 88:18 | |
| | | **warning** 17:7 75:11 | |
| | | **watch** 21:24 49:8 52:1 57:24 58:11 69:11 74:21,22 | |
| | **videoconference** 3:10 4:11 5:5 6:3 | | |
| | **videoconferenci...** 1:17 4:23 8:6 | **watched** 51:23 54:8 55:8 57:21 59:7 67:21 71:21 72:10 74:11 | |
| **understanding** 49:23 66:15 | **videographer** 3:13 | | **willing** 52:18 |
| **understood** 11:14 25:22 | **videos** 48:4 49:8 | **watching** 20:2 35:6 68:16 69:22 69:25 71:23 | **witness** 1:14 6:3 9:1 89:2 92:7,16 95:8,11,16 |
| **united** 1:1 | **virtual** 3:24 4:18 | | |
| **upset** 41:18 42:24 42:25 44:10 | **virtually** 1:17 | **water** 29:25 | |
| | **visible** 4:14 | **way** 11:4 24:6 30:19 35:7 39:10 40:13 43:2 45:4 47:3 60:20,21 68:8 69:20 70:18 76:9,24 80:9 90:17 95:14 | **witnesses** 3:6,9,22 4:2 5:11 |
| **use** 4:5,8 5:2 11:22 | **voice** 21:8 34:4,9 40:9,11,11 49:4 65:5 66:13 | | **witnesses'** 96:3 |
| **usually** 13:5 22:19 27:5,18 31:23 44:19 56:5 | **volume** 20:1 | | **woke** 15:16 |
| | **w** | | |
| | **w** 9:1,8 | | |

Case 23-24, Document 33, 04/19/2023, 3501834, Page135 of 277
**[JA-1295]**

[word - zoom]                                                                    Page 17

| | |
|---|---|
| **word**  66:17 | **yellow**  14:16 17:17 |
| **words**  26:9 66:16 | 27:5 79:8,9 80:14 |
| 87:25 | 81:10 82:11 |
| **work**  7:8,11 15:5 | **york**  1:1,7,18 2:4 |
| 17:16 22:9,10 | 2:4,8,9,9 3:2,4 9:3 |
| 27:4,22 40:7,13 | 9:10,14,15 95:3,7 |
| 56:4 79:11,20,20 | 96:1,2 |
| 80:7,17 82:9 | **youtube**  91:19 |
| **worked**  22:17 | **z** |
| **workers**  28:18,20 | **zero**  51:20 52:8 |
| 31:12,14 54:11,14 | 57:20 58:16 |
| 55:3 | **zoom**  1:17 11:1 |
| **working**  15:14 | |
| 36:6 81:18,20,22 | |
| 82:2,4 | |
| **worried**  38:8 | |
| **worry**  16:5,10 | |
| 44:17 | |
| **worse**  90:11 | |
| **writing**  3:16 4:13 | |
| **written**  3:15 6:6 | |
| 12:2 | |
| **wrong**  29:13,20 | |
| 30:1,2 32:22,23 | |
| 33:16,21,23 34:7 | |
| 34:18 35:23 37:11 | |
| 40:5 41:9 65:7,12 | |
| 65:17,21 66:21 | |
| 68:21 75:6 83:15 | |
| 86:7 87:18,19 | |
| 89:11 | |
| **x** | |
| **x**  1:2,8 94:1,12 | |
| **y** | |
| **year**  13:20 | |
| **years**  21:23 26:16 | |
| 27:2,9 47:19,19 | |
| 70:9 79:10 80:15 | |
| 81:19,19,20 82:15 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Case 23-24, Document 33, 04/19/2023, 3501834, Page138 of 277
[JA-1298]

I/NetDispatcher -- Event Chronology                                    Page 1 of 5
Case 1:19-cv-00632-EK-ST   Document 48-14   Filed 11/29/21   Page 1 of 5 PageID #: 1503

# Event Chronology -- D18022803746 [5 Year Archive]

☑System Comments ☐Associated Events

| Event | Time | Date | Terminal | Operator | Action |
|-------|------|------|----------|----------|--------|
| 18022803746 | 06:13:23 | 2/28/2018 | ps2-c018 | 361851 | ANI NUM=89119149, CALLER NAME=WIRELESS-VERIZON WIRELESS(COMTE, ANI=(347) 593-4397, ALI=87115TH STRICHMOND HILL, COMMENT=: SE SECTOR, COMPANY=VZW, CLASS=WPH1,LAT=+040.697994,LONG=-073.834111,XY=XY(10302S125,19361844) |
| | 06:13:44 | 2/28/2018 | ps2-c018 | 361851 | ANI NUM=89119152, CALLER NAME=WIRELESS-VERIZON WIRELESS(COMTE, ANI=(347) 593-4397, ALI=87115TH STRICHMOND HILL, COMMENT=: SE SECTOR, COMPANY=VZW, CLASS=WPH2,LAT=+040.696052,LONG=-073.818147,XY=XY(103467936,19291970) |
| | 06:14:48 | 2/28/2018 | ps2-c018 | 361851 | ANI NUM=89119158, CALLER NAME=WIRELESS-VERIZON WIRELESS(COMTE, ANI=(347) 593-4397, ALI=87115TH STRICHMOND HILL, COMMENT=: SE SECTOR, COMPANY=VZW, CLASS=WPH2,LAT=+040.696052,LONG=-073.818147,XY=XY(103467936,19291970) |
| | 06:15:01 | 2/28/2018 | ps2-c018 | 361851 | EVENT CREATED: Location=130-18 ATLANTIC AVE QN ,PH : 3 FLR , Cross Streets=130 ST /131 ST , Name=WIRELESS-VERIZON WIRELESS(COMTE , Address=LL(-73:50:02.7997,40:41:52.7784): EST 87-52 115 ST QN , Call Source=ANI/ALI , Phone Number=(347) 593-4397 , Zone=Z28 , PCT/Sector=102A , Post=102PP01 ,EMD Pers=0664 |
| | 06:15:01 | 2/28/2018 | ps2-c018 | 361851 | Route=AMB, PCT=QN, Sector=QN, St=Pending, P=3, Current=F, Open =T, Type=54S1-AMBULANCE CASE: SERIOUS/INSIDE, Open/Current=F |
| | 06:15:01 | 2/28/2018 | ps2-c018 | 361851 | Route=D, PCT=102, Sector=102A, St=Pending, P=3, Current=F, Open =T, Type=54S1-AMBULANCE CASE: SERIOUS/INSIDE, Open/Current=F |
| | 06:15:01 | 2/28/2018 | ps2-c018 | 361851 | EVENT COMMENT=AIDED MLE |
| | 06:15:02 | 2/28/2018 | loi-search | 361851 | EVENT COMMENT=** LOI search completed at 02/28/18 06:15:02 |
| | 06:15:02 | 2/28/2018 | loi-search | 361851 | Event created at 130-18 ATLANTIC AVE QN,PH: 3 FLR overriding the threshold limit |
| | 06:15:02 | 2/28/2018 | loi-search | 361851 | between Caller Address and Event Location |
| | 06:15:02 | 2/28/2018 | loi-search | 361851 | EMS CAD ACK Received. |
| | 06:15:04 | 2/28/2018 | ps2-fd1 | 357276 | EVENT COMMENT=Event A18022803746 has been displayed by the covering dispatcher |
| | | | | | ** >>>> by: 357276 at 02/28/18 06:15:04 on terminal: ps2-fd1 |
| | 06:15:32 | 2/28/2018 | ps2-c018 | 361851 | EVENT COMMENT=40 YO |
| | 06:15:42 | 2/28/2018 | ps2-c018 | 361851 | EVENT COMMENT=AIDED AWAKE AND BREATHING |

D00150

2/12/2019

Case 23-24, Document 33, 04/19/2023, 3501834, Page139 of 277
**[JA-1299]**

| Time | Date | Terminal | ID | Event |
|---|---|---|---|---|
| 06:15:47 | 2/28/2018 | ps2-c018 | 361851 | EVENT COMMENT=AIDED INTOX |
| 06:16:16 | 2/28/2018 | s11mt9mdt01 | 1 | EVENT UPDATED: Location=130-18 ATLANTIC AVE QN ,PH : 3 FLR , Cross Streets=130 ST /131 ST , Name=WIRELESS-VERIZON WIRELESS(COMTE , Address=LL(-73:50:02.7997,40:41:52.7784): EST 87-52 115 ST QN , Call Source=ANI/ALI , Phone Number=(347) 593-4397 , Zone=Z28 , PCT/Sector=102A , Post=102PP01 ,EMD Num=180590608 ,EMD Pers=0664 |
| | | | | Route=AMB, PCT=QN, Sector=QN, St=Pending, P=3, Current=F, Open =T, Type=54S1-AMBULANCE CASE: SERIOUS/INSIDE, Open/Curent=F |
| | | | | Route=AMB, PCT=QN, Sector=QN, St=Held, P=3, Current=F, Open =T, Type=54S1-AMBULANCE CASE: SERIOUS/INSIDE, Open/Curent=F |
| | | | | EVENT COMMENT=** Event held by Route AMB |
| 06:16:17 | 2/28/2018 | ps2-c018 | 361851 | EVENT COMMENT=CB 347 593 4397 |
| 06:16:30 | 2/28/2018 | ps2-c018 | 361851 | EVENT COMMENT=RO GIVING PRE ARRIVAL INSTRUCTIONS |
| 06:16:33 | 2/28/2018 | s11mt9mdt01 | 1 | EVENT COMMENT=EMS Unit Dispatched NYPDJobNumber:18022803746 EMSJobNumber:180590608 |
| | | | | DateTime:20180228061633ES EMSOperatorNumber:8694 UnitId:54F1 UnitType:BLS |
| | | | | InitialDispatchFlag:I ETA:0627 |
| | | | | Comments: |
| 06:16:34 | 2/28/2018 | ps2-c018 | 361851 | EVENT COMMENT=ANI-ALI-3475934397 WIRELESS-VERIZON WIRELESS COMTE 87 115TH ST SE SECTOR |
| 06:16:34 | 2/28/2018 | ps2-c018 | 361851 | RICHMOND HILL COS:WPH2 LAT: 040.696052 LON: -073.818147 OPER VILMATELO, |
| 06:16:34 | 2/28/2018 | ps2-c018 | 361851 | MARGARITA-C-PCPPDVCP518-110 OPR 2698 |
| 06:17:14 | 2/28/2018 | ps1-d28 | 361701 | EVENT COMMENT=Event D18022803746 has been displayed by the covering dispatcher |
| | | | | ** >>>> by: 361701 at 02/28/18 06:17:14 on terminal: ps1-d28 |
| 06:17:19 | 2/28/2018 | ps1-d28 | 361701 | Route=D, PCT=102, Sector=102A, St=Held, P=3, Current=F, Open =T, Type=54S1-AMBULANCE CASE: SERIOUS/INSIDE, Open/Curent=F |
| | | | | EVENT COMMENT=** Event held by Route D |
| 06:28:30 | 2/28/2018 | s11mt9mdt01 | 1 | EVENT COMMENT=EMS Unit Onscene NYPDJobNumber:18022803746 EMSJobNumber:180590608 |
| | | | | DateTime:20180228062830ES EMSOperatorNumber:8149 UnitId:54F1 UnitType:BLS |
| | | | | RouteFlag:N Comments: |
| 06:38:03 | 2/28/2018 | s11mt9mdt01 | 1 | EVENT COMMENT=Route a Message NYPDJobNumber:18022803746 EMSJobNumber:180590608 |
| | | | | DateTime:20180228063803ES Comments:PLZ SEND RMP, UNCO-OP PT |
| 06:38:40 | 2/28/2018 | ps2-fd1 | 357276 | EVENT COMMENT=***************SEND RMP TO LOC ****************AMB LIA2218 |
| 06:38:52 | 2/28/2018 | ps1-ems2 | 328535 | Route=D, PCT=102, Sector=102A, St=Pending, P=3, Current=F, Open =T, Type=54S1-AMBULANCE CASE: SERIOUS/INSIDE, Open/Curent=F |

| Time | Date | Unit | ID | Detail |
|---|---|---|---|---|
| 06:38:58 | 2/28/2018 | ps1-ems2 | 328535 | Route=BS, PCT=QS, Sector=QS, St=Pending, P=3, Primary Member=0, Current=F, Open =T, Type=54S1-AMBULANCE CASE: SERIOUS/INSIDE, Open/Current=F |
| 06:42:33 | 2/28/2018 | ps1-d28 | 361701 | Route=D, PCT=102, Sector=102A, St=Pending, P=3, Current=F, Open =T, Type=54S1-AMBULANCE CASE: SERIOUS/INSIDE, Open/Current=F |
| | | | | Route=D, PCT=102, Sector=102A, St=Assigned, P=3, Primary Unit=102A-1, Primary Member=0, Current=F, Open =T, Type=54S1-AMBULANCE CASE: SERIOUS/INSIDE, Open/Current=F |
| | | | | Unit=102A-1, St=DP, Loc=130-18 ATLANTIC AVE QN,PH: 3 FLR |
| 06:44:15 | 2/28/2018 | s11mt9mdt01 | 1 | EVENT COMMENT=Route a Message NYPDJobNumber:18022803746 EMSJobNumber:180590608 |
| | | | | DateTime:20180228064415ES Comments:---RMP NEEDED ASAP--- |
| 06:44:40 | 2/28/2018 | ps1-ems1 | 358545 | EVENT COMMENT=E: UNIT ASSIGNED---AMB LIA 1143 |
| 06:45:23 | 2/28/2018 | s11mt9mdt01 | 1 | EVENT COMMENT=EMS Unit Dispatched NYPDJobNumber:18022803746 EMSJobNumber:180590608 |
| | | | | DateTime:20180228064523ES EMSOperatorNumber:0800 UnitId:C532 UnitType:UNK |
| | | | | InitialDispatchFlag:A ETA:0706 Comments:, RQ |
| 06:45:38 | 2/28/2018 | ps1-ems2 | 328535 | EVENT COMMENT=**NOTE EMS TEXT**AMB LIA OPR 1298 SF |
| 06:49:07 | 2/28/2018 | ps1-d28 | 361701 | Unit=102A-1, St=84, Loc=130-18 ATLANTIC AVE QN,PH: 3 FLR |
| 06:50:16 | 2/28/2018 | s11mt9mdt01 | 1 | EVENT COMMENT=EMS Unit Dispatched NYPDJobNumber:18022803746 EMSJobNumber:180590608 |
| | | | | DateTime:20180228065016ES EMSOperatorNumber:0800 UnitId:C642 UnitType:UNK |
| | | | | InitialDispatchFlag:A ETA:0705 Comments:, REQ ST CLOSER TO LOC |
| 06:50:27 | 2/28/2018 | s11mt9mdt01 | 1 | EVENT COMMENT=EMS Unit Preempt NYPDJobNumber:18022803746 EMSJobNumber:180590608 |
| | | | | DateTime:20180228065027ES EMSOperatorNumber:0800 UnitId:C532 UnitType:UNK |
| | | | | RemovalFlag:O Comments:, C64 ST CLOSER |
| 06:57:53 | 2/28/2018 | s11mt9mdt01 | 1 | EVENT COMMENT=EMS Unit Transporting Patient NYPDJobNumber:18022803746 EMSJobNumber:180590608 |
| | | | | DateTime:20180228065753ES EMSOperatorNumber:8149 UnitId:54F1 UnitType:BLS |
| | | | | HospitalCode:34 RouteFlag:N HospitalName:JAMAICA MEDICAL CENTER Comments: |
| 06:58:20 | 2/28/2018 | ps2-ems1 | 345227 | Route=AMB, PCT=QN, Sector=QN, P=3, Primary Member=0, Current=T, Open =F, Type=54S1-AMBULANCE CASE: SERIOUS/INSIDE, Open/Current=F |
| | | | | EVENT CLOSED |
| | | | | Disposition Assigned=CANCELEV |

**D00152**
2/12/2019

| 06:59:07 | 2/28/2018 | s11mt9mdt01 | 1 | EVENT COMMENT=EMS Unit Onscene NYPDJobNumber:18022803746 EMSJobNumber:180590608 |
| | | | | DateTime:20180228065907ES EMSOperatorNumber:0225 UnitId:C642 UnitType:UNK |
| | | | | RouteFlag:N Comments: |
| 06:59:51 | 2/28/2018 | s11mt9mdt01 | 1 | EVENT COMMENT=EMS Unit Preempt NYPDJobNumber:18022803746 EMSJobNumber:180590608 |
| | | | | DateTime:20180228065951ES EMSOperatorNumber:0225 UnitId:C642 UnitType:UNK |
| | | | | RemovalFlag:O Comments:, Automatic 98/GD while 84 |
| 07:19:07 | 2/28/2018 | ps1-ts06 | 345010 | Unit=102A-1, St=~, Loc=130-18 ATLANTIC AVE QN,PH: 3 FLR |
| 07:19:43 | 2/28/2018 | ps1-d28 | 359822 | Unit=102A-1, St=CU, Comment=Alarm Timer Extended: 30, Loc=130-18 ATLANTIC AVE QN,PH: 3 FLR |
| | | | | EVENT COMMENT=102A-1 -- Alarm Timer Extended: 30 |
| 07:33:29 | 2/28/2018 | ps1-d28 | 359822 | Unit=102A-1, St=UG, Comment=Secondary Unit ID updated from 102A to 102A-1 during logon unit [102A-2], Loc=130-18 ATLANTIC AVE QN,PH: 3 FLR |
| | | | | EVENT COMMENT=102A-1 -- Secondary Unit ID updated from 102A to 102A-1 during logon unit |
| | | | | [102A-2] |
| 07:49:07 | 2/28/2018 | ps2-ccmis | 323491 | Unit=102A-1, St=~, Loc=130-18 ATLANTIC AVE QN,PH: 3 FLR |
| 07:49:35 | 2/28/2018 | ps1-d28 | 359822 | Unit=102A-1, St=CU, Comment=Alarm Timer Extended: 30, Loc=130-18 ATLANTIC AVE QN,PH: 3 FLR |
| | | | | EVENT COMMENT=102A-1 -- Alarm Timer Extended: 30 |
| 08:01:03 | 2/28/2018 | s11mt9mdt01 | 1 | EVENT COMMENT=EMS Unit Preempt NYPDJobNumber:18022803746 EMSJobNumber:180590608 |
| | | | | DateTime:20180228080103ES EMSOperatorNumber:8149 UnitId:54F1 UnitType:BLS |
| | | | | RemovalFlag:N Comments: |
| 08:01:04 | 2/28/2018 | s11mt9mdt01 | 1 | EVENT COMMENT=EMS Complaint Closed NYPDJobNumber:18022803746 EMSJobNumber:180590608 |
| | | | | DateTime:20180228080103ES EMSOperatorNumber:8149 FinalDispositionCode:82B |
| | | | | Comments: |
| 08:02:24 | 2/28/2018 | ps1-d28 | 359822 | Route=D, PCT=102, Sector=102A, St=Assigned, P=3, Primary Unit=102A-1, Primary Member=0, Current=T, Open =F, Type=54S1-AMBULANCE CASE: SERIOUS/INSIDE, Open/Curent=F |
| | | | | EVENT CLOSED |
| | | | | Route=D, PCT=102, Sector=102A, St=Assigned, P=3, Primary Unit=102A-1, Primary Member=0, Current=F, Open =T, Type=54S1-AMBULANCE CASE: SERIOUS/INSIDE, Open/Curent=F |
| | | | | Unit=102A-1, St=AV, Comment=JAMAICA |
| | | | | EVENT COMMENT=JAMAICA |
| | | | | Disposition Assigned=97H |

**D00153**

2/12/2019

**[JA-1302]**

| | | | | |
|---|---|---|---|---|
| 08:24:26 | 2/28/2018 | ps1-rsqs | 326086 | EVENT COMMENT=Event B18022803746 has been displayed by the covering dispatcher |
| | | | | ** >>>> by: 326086 at 02/28/18 |
| | | | | 08:24:26 on terminal: ps1-rsqs |
| 08:24:30 | 2/28/2018 | ps1-rsqs | 326086 | Route=BS, PCT=QS, Sector=QS, P=3, Primary Member=0, Current=T, Open =F, Type=54S1-AMBULANCE CASE: SERIOUS/INSIDE, Open/Curent=F |
| | | | | EVENT CLOSED |
| | | | | Disposition Assigned=CANCELEV |

**D00154**

2/12/2019

[JA-1303]

**Exhibit L to Faddis Declaration -
Pre-Hospital Care Report of Jamaica Hospital Medical
Center Regarding Balwinder Singh, Dated February 28, 2018
(Reproduced herein at pgs. JA-116-JA-118)**

JAMAICA HOSPITAL MED CTR
8900 Van Wyck Expwy
Jamaica NY 11418-2832

SINGH,BALWINDER
MRN: ███
DOB: ███79, Sex: M
Adm: 2/28/2018, D/C: 2/28/2018

### Patient Demographics

| Address | Phone | E-mail Address |
| --- | --- | --- |
| 13018 ATLANTIC AVE. #3 SOUTH RICHMOND HILL NY 11419 | 347-593-4397 (Home) 347-593-4397 (Mobile) | blovbawyfkna@gmail.com |

#### Ethnic Background/Race/Religion/Language

| Ethnic Background | Race | Religion | Language |
| --- | --- | --- | --- |
| Not of Hispanic, Latino/a, or Spanish Origin | Asian Indian | Sikh | English |

### Admission Information - Patient Record Only

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| Arrival Date/Time: | 02/28/2018 0712 | Admit Date/Time: | 02/28/2018 0748 | IP Adm. Date/Time: | |
| Arbitration Type: | Emergency | Point of Origin: | Self Referral | Admit Category: | |
| Means of Arrival: | Jh Bls Ambulance | Primary Service: | Emergency Medicine | Secondary Service: | N/A |
| Transfer Source: | Home | Service Area: | Jamaica Hospital Medical Ctr | Unit: | Jhmc Emergency Room |
| Arbitrl Provider: | | Attending Provider: | John Boccio, DO | Referring Provider: | Physician Staff |

### Discharge Information - Patient Record Only

| Discharge Date/Time | Discharge Disposition | Discharge Destination | Discharge Provider | Unit |
| --- | --- | --- | --- | --- |
| 02/28/2018 1506 | Home/self Care | Home | None | Jhmc Emergency Room |

### Events

| Date/Time | Event | User | Pt Class | Unit | Room/Bed | Service |
| --- | --- | --- | --- | --- | --- | --- |
| 02/28/18 0712 | ED Arrival | Ines Rodriguez | | JHMC EMERGENCY ROOM | | |
| 02/28/18 0748 | ED Roomed | Abraham Resuello, RN | Emergency | JHMC EMERGENCY ROOM | A2-18/A2-18 | Emergency Medicine |
| 02/28/18 1506 | Discharge | Rose Ramirez, PN | Emergency | JHMC EMERGENCY ROOM | A2-18/A2-18 | Emergency Medicine |

### Allergies as of 2/28/2018

Review Complete On 2/1/2018 By: Vyacheslav Galibov, MD

No Known Allergies

### Immunizations

| Name | Date |
| --- | --- |
| INFLUENZA SEASONAL | 10/04/12 |
| INFLUENZA SEASONAL | 12/30/11 |
| Influenza Quad Intradermal Pres Free | 04/15/16 |
| Influenza Seasonal, Pres Free | 01/13/15 |
| Influenza Seasonal,Quadrivalent Pres Free 0.5mL | 03/28/17 |
| Influenza Whole | 10/12/10 |
| PPD Test | 12/02/10 |
| Tdap | 01/31/14 |

**Medical as of 2/28/2018**

| Past Medical History | Date | Comments | Source |
| --- | --- | --- | --- |
| Anxiety [F41.9] | | | Provider |
| Back pain [M54.9] | | | Provider |
| Bipolar disorder [F31.9] | | | Provider |
| Depression [F32.9] | | | Provider |
| Fatty liver [K76.0] | | | Provider |
| GERD (gastroesophageal reflux disease) [K21.9] | | | Provider |
| Hyperlipemia [E78.5] | | | Provider |
| Hypertension [I10] | | | Provider |
| Liver disease [K76.9] | | | Provider |
| Prostatitis [N41.9] | | | Provider |

| Pertinent Negatives | Date Noted | Comments | Source |
| --- | --- | --- | --- |
| ADHD (attention deficit hyperactivity disorder) [F90.9] | 8/11/2011 | | Provider |
| Angio-edema [T78.3XXA] | 8/17/2011 | | Provider |
| Asthma [J45.909] | 8/17/2011 | | Provider |
| Borderline personality [F60.3] | 8/11/2011 | | Provider |

Printed on 4/10/2018  9:42 AM

JAMAICA HOSPITAL MED CTR
8900 Van Wyck Expwy
Jamaica NY 11418-2832

SINGH,BALWINDER
MRN:
DOB: ▮▮79, Sex: M
Adm: 2/28/2018, D/C: 2/28/2018

| | | |
|---|---|---|
| Fatigue [R53.83] | 8/11/2011 | Provider |
| Headache(784.0) [R51] | 8/11/2011 | Provider |
| Neuropathy [G62.9] | 8/11/2011 | Provider |
| Obsessive-compulsive disorder [F42.9] | 8/11/2011 | Provider |
| Oppositional defiant disorder [F91.3] | 8/11/2011 | Provider |
| Psychosis [F29] | 8/11/2011 | Provider |
| PTSD (post-traumatic stress disorder) [F43.10] | 8/11/2011 | Provider |
| Recurrent upper respiratory infection (URI) | 8/17/2011 | Provider |
| Schizoaffective disorder [295.7 (ICD-9-CM)] | 8/11/2011 | Provider |
| Seizures [R56.9] | 8/11/2011 | Provider |
| Thyroid disease [E07.9] | 8/11/2011 | Provider |
| Urticaria [L50.9] | 8/17/2011 | Provider |

| Problem List as of 2/28/2018 | Reviewed: 7/5/2017 1:53 PM by Farshad Bagheri, MD |
|---|---|
| | **Noted - Resolved** |
| RESOLVED: Nasal polyps | 8/17/2011 - 8/2/2012 |
| | Entered by Stephen Reed, MD |
| | Resolved by Vyacheslav Galibov, MD |
| RESOLVED: Fatty liver disease, nonalcoholic | 8/19/2011 - 1/30/2013 |
| | Entered and resolved by Vyacheslav Galibov, MD |
| RESOLVED: Hyperlipemia | 8/19/2011 - 5/28/2012 |
| | Entered and resolved by Vyacheslav Galibov, MD |
| RESOLVED: HTN (hypertension) | 8/19/2011 - 4/18/2016 |
| | Entered and resolved by Vyacheslav Galibov, MD |
| **Overweight** | 8/19/2011 - Present |
| | Entered by Vyacheslav Galibov, MD |
| **Depression** | 3/22/2012 - Present |
| | Entered by Salma Gul, MD |
| RESOLVED: Back ache | 5/3/2012 - 8/27/2012 |
| | Entered and resolved by Vyacheslav Galibov, MD |
| RESOLVED: Allergic rhinitis | 5/3/2012 - 8/1/2016 |
| | Entered and resolved by Vyacheslav Galibov, MD |
| RESOLVED: History of prostatitis | 5/3/2012 - 11/7/2012 |
| | Entered and resolved by Vyacheslav Galibov, MD |
| RESOLVED: Testicular pain | 5/3/2012 - 8/27/2012 |
| | Entered and resolved by Vyacheslav Galibov, MD |
| **GERD (gastroesophageal reflux disease)** | 5/3/2012 - Present |
| | Entered by Vyacheslav Galibov, MD |
| RESOLVED: Lumbalgia | 8/27/2012 - 9/18/2015 |
| | Entered and resolved by Vyacheslav Galibov, MD |
| RESOLVED: Elevated LFTs | 8/28/2012 - 1/30/2013 |
| | Entered and resolved by Vyacheslav Galibov, MD |
| **Fatty liver** | 1/30/2013 - Present |
| | Entered by Vyacheslav Galibov, MD |
| RESOLVED: URI (upper respiratory infection) | 9/18/2015 - 9/18/2015 |
| | Entered and resolved by Vyacheslav Galibov, MD |
| RESOLVED: Chronic back pain | 9/18/2015 - 2/1/2018 |
| | Entered and resolved by Vyacheslav |

JAMAICA HOSPITAL MED CTR
8900 Van Wyck Expwy
Jamaica NY 11418-2832

SINGH,BALWINDER
MRN: ██████
DOB: ██████79, Sex: M
Adm: 2/28/2018, D/C: 2/28/2018

| Problem Lists as of 2/28/2018 (continued) | Reviewed 7/5/2017 1:53 PM by Farshad Bagheri, MD |
|---|---|
| | Noted - Resolved |
| | Galibov, MD |
| RESOLVED: Cough | 12/14/2015 - 4/15/2016 |
| | Entered and resolved by Vyacheslav Galibov, MD |
| RESOLVED: Throat pain | 12/14/2015 - 4/15/2016 |
| | Entered and resolved by Vyacheslav Galibov, MD |
| Benign essential HTN | 4/15/2016 - Present |
| | Entered by Vyacheslav Galibov, MD |
| Vitamin D deficiency | 4/15/2016 - Present |
| | Entered by Vyacheslav Galibov, MD |
| Hyperlipidemia, unspecified | 3/28/2017 - Present |
| | Entered by Vyacheslav Galibov, MD |
| RESOLVED: Elevated LFTs | 3/28/2017 - 5/17/2017 |
| | Entered and resolved by Vyacheslav Galibov, MD |
| RESOLVED: Dysuria | 3/28/2017 - 5/17/2017 |
| | Entered and resolved by Vyacheslav Galibov, MD |
| Hydrocele, bilateral | 5/17/2017 - Present |
| | Entered by Vyacheslav Galibov, MD |
| RESOLVED: Left shoulder pain | 5/17/2017 - 2/1/2018 |
| | Entered and resolved by Vyacheslav Galibov, MD |
| Cough | 5/17/2017 - Present |
| | Entered by Vyacheslav Galibov, MD |
| RESOLVED: Upper back pain | 5/17/2017 - 2/1/2018 |
| | Entered and resolved by Vyacheslav Galibov, MD |
| Chronic bilateral low back pain with bilateral sciatica | 2/1/2018 - Present |
| | Entered by Vyacheslav Galibov, MD |
| Throat pain | 2/1/2018 - Present |
| | Entered by Vyacheslav Galibov, MD |
| Elevated LFTs | 2/1/2018 - Present |
| | Entered by Vyacheslav Galibov, MD |
| Chronic seasonal allergic rhinitis | 2/1/2018 - Present |
| | Entered by Vyacheslav Galibov, MD |

## ED Records

### ED Arrival Information

| Expected | Arrival | Acuity | Means of Arrival | Escorted By | Service | Admission Type |
|---|---|---|---|---|---|---|
| | 2/28/2018 07:12 | Urgent | JH BLS Ambulance (54F/ 93478354) | Ambulance | Emergency Medicine | Emergency |

**Arrival Complaint**
wife called 911, aggressive behavior and alcohol intox, handcuffed

### Chief Complaint

| Aggressive Behavior | hand cuffed by police, verbally abusive, noisy and uncooperative. fs 154 bruises to rt forehead noted. |
|---|---|
| Alcohol Problem | |

### ED Disposition

| ED Disposition | Condition | Comment |
|---|---|---|
| Discharge | | Balwinder Singh discharge to home/self care. |

Printed on 4/10/2018  9:42 AM

**[JA-1307]**

JAMAICA HOSPITAL MED CTR
8900 Van Wyck Expwy
Jamaica NY 11418-2832

SINGH.BALWINDER
MRN: ███████
DOB: ████████ 79, Sex: M
Adm: 2/28/2018, D/C: 2/28/2018

## ED Records (continued)

### ED Disposition (continued)

| ED Disposition | Condition | Comment |
|---|---|---|
| | | Condition at discharge: Stable |

### Follow-up Information

| Follow up With | Details | Comments | Contact Info |
|---|---|---|---|
| Vyacheslav Galibov, MD | On 3/15/2018 | @545pm please bring discharge papers photo ID and insurance card | 8900 VAN WYCK EXPWY AMB CARE CENTER MED Jamaica NY 11418 718-206-7001 |
| Vyacheslav Galibov, MD | Schedule an appointment as soon as possible for a visit in 1 day | | 8900 VAN WYCK EXPWY AMB CARE CENTER MED Jamaica NY 11418 718-206-7001 |

**[JA-1308]**

| | |
|---|---|
| JAMAICA HOSPITAL MED CTR<br>8900 Van Wyck Expwy<br>Jamaica NY 11418-2832 | SINGH,BALWINDER<br>MRN: ▇<br>DOB: ▇79, Sex: M<br>Adm: 2/28/2018, D/C: 2/28/2018 |

## ED Notes

**ED Provider Notes by John Boccio, DO at 2/28/2018  8:00 AM**                                                    Version 3 of 3

| | | |
|---|---|---|
| Author: John Boccio, DO | Service: Emergency Medicine | Author Type: Physician |
| Filed: 2/28/2018  2:42 PM | Date of Service: 2/28/2018  8:00 AM | Status: Addendum |
| Editor: John Boccio, DO (Physician) | | |
| Related Notes: | Original Note by John Boccio, DO (Physician) filed at 2/28/18 12:40 PM | |

.First Provider Evaluation Time: File (02/28/18 0800)

## History

**Chief Complaint**

Patient presents with:

- **Aggressive Behavior**
  *hand cuffed by police, verbally abusive, noisy and uncooperative.fs 154.bruises to rt forehead noted.*
- **Alcohol Problem**

**HPI Comments:** Pt here from home drinking   Pt cooperative at this time

Patient is a 38 y.o. male presenting with intoxication.
<u>Alcohol Intoxication</u>

**Past Medical History:**

| Diagnosis | Date |
|---|---|
| • Anxiety | |
| • Back pain | |
| • Bipolar disorder | |
| • Depression | |
| • Fatty liver | |
| • GERD (gastroesophageal reflux disease) | |
| • Hyperlipemia | |
| • Hypertension | |
| • Liver disease | |
| • Prostatitis | |

**Past Surgical History:**

| Procedure | Laterality | Date |
|---|---|---|
| • ANAL FISSURECTOMY | | |
| • s/p right shoulder arthroscopic surgery | | |
| • S/P LIVER BIOPSY<br>  *NASH* | | 7/17/12 |
| • SPINE SURGERY<br>  *L4 L5 DISCECTOMY.* | | 8/31/12 |

**Family History**

| Problem | Relation | Age of Onset |
|---|---|---|
| • Atopy | Mother | |
| • Diabetes | Mother | |
| • High cholesterol | Mother | |

Printed on 4/10/2018  9:42 AM

JAMAICA HOSPITAL MED CTR
8900 Van Wyck Expwy
Jamaica NY 11418-2832

SINGH,BALWINDER
MRN:
DOB: [   ]79, Sex: M
Adm: 2/28/2018, D/C: 2/28/2018

**ED Notes (continued)**

ED Provider Notes by John Boccio, DO at 2/28/2018 8:00 AM (continued)                                    Version 3 of 3

| | |
|---|---|
| • Hypertension | Mother |
| • Cancer | Mother |
|   BREAST | |
| • Heart disease | Mother |
| • ADHD | Neg Hx |
| • Alcohol abuse | Neg Hx |
| • Anxiety disorder | Neg Hx |
| • Bipolar disorder | Neg Hx |
| • Dementia | Neg Hx |
| • Depression | Neg Hx |
| • Drug abuse | Neg Hx |
| • OCD | Neg Hx |
| • Paranoid behavior | Neg Hx |
| • Physical abuse | Neg Hx |
| • Schizophrenia | Neg Hx |
| • Seizures | Neg Hx |
| • Sexual abuse | Neg Hx |

Social History
Substance Use Topics

| | |
|---|---|
| • Smoking status: | Never Smoker |
| • Smokeless tobacco: | Never Used |
| • Alcohol use | No |
|   Comment: former. | |

Review of Systems
Constitutional: Negative.
HENT: Negative.
Respiratory: Negative.
Cardiovascular: Negative.
Gastrointestinal: Negative.
Genitourinary: Negative.
Musculoskeletal: Negative.
Skin: Negative.

**Physical Exam**
BP 135/90 | Pulse 116 | Temp 97.3 °F (36.3 °C) (Oral) | Resp 18 | Ht 5' 8" (1.727 m) | Wt 180 lb (81.6 kg) |
SpO2 96% | BMI 27.37 kg/m2

Physical Exam
Constitutional: He is oriented to person, place, and time. He appears well-developed and well-nourished.
HENT:
Head: Normocephalic and atraumatic.
Mouth/Throat: No oropharyngeal exudate.
**Erythema on right forehead  Denies fall**
Neck: Normal range of motion. Neck supple.

Printed on 4/10/2018  9:42 AM

JAMAICA HOSPITAL MED CTR
8900 Van Wyck Expwy
Jamaica NY 11418-2832

SINGH,BALWINDER
MRN: ▮▮▮▮
DOB: ▮▮▮▮▮79, Sex: M
Adm: 2/28/2018, D/C: 2/28/2018

## ED Notes (continued)

**ED Provider Notes by John Boccio, DO at 2/28/2018  8:00 AM (continued)**                                    Version 3 of 3

Cardiovascular: Normal rate, regular rhythm and normal heart sounds.
Pulmonary/Chest: Effort normal.
Musculoskeletal: Normal range of motion.
Neurological: He is alert and oriented to person, place, and time.
Skin: Skin is warm and dry.

## Assessment

Alcohol intox

## Plan

Iv fluids close observation
Ativan 1 mg
Home number wife Aman 347 593 4397
Social work consult

Cleared by social work pt stable for discharge
Steady gait  Pt cleared for discharge aaox3

## ED Course

Procedures

MDM

.

John Boccio, DO
02/28/18 0803

John Boccio, DO
02/28/18 1240

John Boccio, DO
02/28/18 1442

Electronically Signed by John Boccio, DO on 2/28/2018  2:42 PM

**ED Provider Notes by John Boccio, DO at 2/28/2018  8:00 AM**                                    Version 2 of 3

Author: John Boccio, DO                    Service: Emergency Medicine                    Author Type: Physician
Filed: 2/28/2018 12:40 PM                   Date of Service: 2/28/2018  8:00 AM           Status: Addendum
Editor: John Boccio, DO (Physician)
Related Notes:    Addendum by John Boccio, DO (Physician) filed at 2/28/2018  2:42 PM
                  Original Note by John Boccio, DO (Physician) filed at 2/28/2018  8:03 AM

JAMAICA HOSPITAL MED CTR                    SINGH,BALWINDER
8900 Van Wyck Expwy                          MRN: ▓▓▓▓
Jamaica NY 11418-2832                        DOB: ▓▓▓▓▓79, Sex: M
                                             Adm: 2/28/2018, D/C: 2/28/2018

**ED Notes (continued)**

**ED Provider Notes by John Boccio, DO at 2/28/2018 8:00 AM (continued)**                    Version 2 of 3
.First Provider Evaluation Time: File (02/28/18 0800)

## History

Chief Complaint
Patient presents with

- **Aggressive Behavior**
  *hand cuffed by police, verbally abusive, noisy and uncooperative.fs 154.bruises to rt forehead noted.*
- **Alcohol Problem**

**HPI Comments:** Pt here from home drinking    Pt cooperative at this time

Patient is a 38 y.o. male presenting with intoxication.
Alcohol Intoxication

Past Medical History:

| Diagnosis | Date |
|---|---|
| Anxiety | |
| Back pain | |
| Bipolar disorder | |
| Depression | |
| Fatty liver | |
| GERD (gastroesophageal reflux disease) | |
| Hyperlipemia | |
| Hypertension | |
| Liver disease | |
| Prostatitis | |

Past Surgical History:

| Procedure | Laterality | Date |
|---|---|---|
| ANAL FISSURECTOMY | | |
| s/p right shoulder arthroscopic surgery | | |
| S/P LIVER BIOPSY | | 7/17/12 |
| *NASH* | | |
| SPINE SURGERY | | 8/31/12 |
| *L4 L5 DISCECTOMY.* | | |

Family History:

| Problem | Relation | Age of Onset |
|---|---|---|
| Atopy | Mother | |
| Diabetes | Mother | |
| High cholesterol | Mother | |
| Hypertension | Mother | |
| Cancer | Mother | |
| *BREAST* | | |
| Heart disease | Mother | |

Printed on 4/10/2018  9:42 AM

JAMAICA HOSPITAL MED CTR
8900 Van Wyck Expwy
Jamaica NY 11418-2832

SINGH,BALWINDER
MRN: ▮▮▮
DOB: ▮▮▮▮79, Sex: M
Adm: 2/28/2018, D/C: 2/28/2018

**ED Notes (continued)**

ED Provider Notes by John Boccio, DO at 2/28/2018 8:00 AM (continued)                            Version 2 of 3

| | |
|---|---|
| • ADHD | Neg Hx |
| • Alcohol abuse | Neg Hx |
| • Anxiety disorder | Neg Hx |
| • Bipolar disorder | Neg Hx |
| • Dementia | Neg Hx |
| • Depression | Neg Hx |
| • Drug abuse | Neg Hx |
| • OCD | Neg Hx |
| • Paranoid behavior | Neg Hx |
| • Physical abuse | Neg Hx |
| • Schizophrenia | Neg Hx |
| • Seizures | Neg Hx |
| • Sexual abuse | Neg Hx |

Social History
Substance Use Topics

| | |
|---|---|
| • Smoking status: | Never Smoker |
| • Smokeless tobacco: | Never Used |
| • Alcohol use | No |

     Comment: former.

Review of Systems
Constitutional: Negative.
HENT: Negative.
Respiratory: Negative.
Cardiovascular: Negative.
Gastrointestinal: Negative.
Genitourinary: Negative.
Musculoskeletal: Negative.
Skin: Negative.

**Physical Exam**

BP 135/90 | Pulse 116 | Temp 97.3 °F (36.3 °C) (Oral) | Resp 18 | Ht 5' 8" (1.727 m) | Wt 180 lb (81.6 kg) |
SpO2 96% | BMI 27.37 kg/m2

Physical Exam
Constitutional: He is oriented to person, place, and time. He appears well-developed and well-nourished.
HENT:
Head: Normocephalic and atraumatic.
Mouth/Throat: No oropharyngeal exudate.
**Erythema on right forehead  Denies fall**
Neck: Normal range of motion. Neck supple.
Cardiovascular: Normal rate, regular rhythm and normal heart sounds.
Pulmonary/Chest: Effort normal.
Musculoskeletal: Normal range of motion.
Neurological: He is alert and oriented to person, place, and time.

Printed on 4/10/2018  9:42 AM

JAMAICA HOSPITAL MED CTR
8900 Van Wyck Expwy
Jamaica NY 11418-2832

SINGH.BALWINDER
MRN: ████
DOB: ████79, Sex: M
Adm: 2/28/2018, D/C: 2/28/2018

---

**ED Notes (continued)**

**ED Provider Notes by John Boccio, DO at 2/28/2018  8:00 AM (continued)**                                    Version 2 of 3

Skin: Skin is warm and dry.

**Assessment**

Alcohol intox

**Plan**
Iv fluids close observation
Ativan 1 mg
Home number wife Aman 347 593 4397
Social work consult

Cleared by social work pt stable for discharge

**ED Course**

Procedures

MDM

.

John Boccio, DO
02/28/18 0803

John Boccio, DO
02/28/18 1240

Electronically Signed by John Boccio, DO on 2/28/2018 12:40 PM

**ED Provider Notes by John Boccio, DO at 2/28/2018  8:00 AM**                                                Version 1 of 3
Author: John Boccio, DO           Service: Emergency Medicine         Author Type: Physician
Filed: 2/28/2018  8:03 AM         Date of Service: 2/28/2018  8:00 AM    Status: Signed
Editor: John Boccio, DO (Physician)
Related Notes:        Addendum by John Boccio, DO (Physician) filed at 2/28/2018 12:40 PM

.First Provider Evaluation Time: File (02/28/18 0800)

**History**

Chief Complaint
Patient presents with
• Aggressive Behavior
  *hand cuffed by police, verbally abusive, noisy and uncooperative.fs 154.bruises to rt forehead noted.*

Printed on 4/10/2018  9:42 AM

JAMAICA HOSPITAL MED CTR
8900 Van Wyck Expwy
Jamaica NY 11418-2832

SINGH,BALWINDER
MRN: ▉
DOB: ▉79, Sex: M
Adm: 2/28/2018, D/C: 2/28/2018

## ED Notes (continued)

**ED Provider Notes by John Boccio, DO at 2/28/2018 8:00 AM (continued)** Version 1 of 3
- Alcohol Problem

**HPI Comments:** Pt here from home drinking   Pt cooperative at this time

Patient is a 38 y.o. male presenting with intoxication.

<u>Alcohol Intoxication</u>

Past Medical History:

| Diagnosis | Date |
|---|---|
| - Anxiety | |
| - Back pain | |
| - Bipolar disorder | |
| - Depression | |
| - Fatty liver | |
| - GERD (gastroesophageal reflux disease) | |
| - Hyperlipemia | |
| - Hypertension | |
| - Liver disease | |
| - Prostatitis | |

Past Surgical History:

| Procedure | Laterality | Date |
|---|---|---|
| - ANAL FISSURECTOMY | | |
| - s/p right shoulder arthroscopic surgery | | |
| - S/P LIVER BIOPSY<br>*NASH* | | 7/17/12 |
| - SPINE SURGERY<br>*L4 L5 DISCECTOMY.* | | 8/31/12 |

Family History

| Problem | Relation | Age of Onset |
|---|---|---|
| - Atopy | Mother | |
| - Diabetes | Mother | |
| - High cholesterol | Mother | |
| - Hypertension | Mother | |
| - Cancer<br>*BREAST* | Mother | |
| - Heart disease | Mother | |
| - ADHD | Neg Hx | |
| - Alcohol abuse | Neg Hx | |
| - Anxiety disorder | Neg Hx | |
| - Bipolar disorder | Neg Hx | |
| - Dementia | Neg Hx | |
| - Depression | Neg Hx | |
| - Drug abuse | Neg Hx | |
| - OCD | Neg Hx | |

Printed on 4/10/2018  9:42 AM

JAMAICA HOSPITAL MED CTR
8900 Van Wyck Expwy
Jamaica NY 11418-2832

SINGH,BALWINDER
MRN: ███
DOB: ███79, Sex: M
Adm: 2/28/2018, D/C: 2/28/2018

## ED Notes (continued)

**ED Provider Notes by John Boccio, DO at 2/28/2018 8:00 AM (continued)**                                    Version 1 of 3

- Paranoid behavior          Neg Hx
- Physical abuse             Neg Hx
- Schizophrenia              Neg Hx
- Seizures                   Neg Hx
- Sexual abuse               Neg Hx

Social History
Substance Use Topics
- Smoking status:            Never Smoker
- Smokeless tobacco:         Never Used
- Alcohol use                No
      *Comment: former.*

Review of Systems
Constitutional: Negative.
HENT: Negative.
Respiratory: Negative.
Cardiovascular: Negative.
Gastrointestinal: Negative.
Genitourinary: Negative.
Musculoskeletal: Negative.
Skin: Negative.

## Physical Exam

BP 135/90 | Pulse 116 | Temp 97.3 °F (36.3 °C) (Oral) | Resp 18 | Ht 5' 8" (1.727 m) | Wt 180 lb (81.6 kg) | SpO2 96% | BMI 27.37 kg/m2

Physical Exam
Constitutional: He is oriented to person, place, and time. He appears well-developed and well-nourished.
HENT:
Head: Normocephalic and atraumatic.
Mouth/Throat: No oropharyngeal exudate.
**Erythema on right forehead  Denies fall**
Neck: Normal range of motion. Neck supple.
Cardiovascular: Normal rate, regular rhythm and normal heart sounds.
Pulmonary/Chest: Effort normal.
Musculoskeletal: Normal range of motion.
Neurological: He is alert and oriented to person, place, and time.
Skin: Skin is warm and dry.

## Assessment

Printed on 4/10/2018  9:42 AM

JAMAICA HOSPITAL MED CTR
8900 Van Wyck Expwy
Jamaica NY 11418-2832

SINGH,BALWINDER
MRN: ██████
DOB: ████ 79, Sex: M
Adm: 2/28/2018, D/C: 2/28/2018

---

**ED Notes (continued)**

**ED Provider Notes by John Boccio, DO at 2/28/2018  8:00 AM (continued)**                                    Version 1 of 3

Alcohol intox

**Plan**

Iv fluids close observation
Ativan 1 mg
Home number wife Aman 347 593 4397

**ED Course**

Procedures


MDM

.

John Boccio, DO
02/28/18 0803

Electronically Signed by John Boccio, DO on 2/28/2018  8:03 AM

**ED Notes by Rose Ramirez, RN at 2/28/2018 2:41 PM**                                                         Version 1 of 1
| Author: Rose Ramirez, RN | Service: Nursing | Author Type: Registered Nurse |
| Filed: 2/28/2018  2:42 PM | Date of Service: 2/28/2018 2:41 PM | Status: Signed |
| Editor: Rose Ramirez, RN (Registered Nurse) | | |

Pt cooperative, ambulating with steady gait, MD Boccio made aware.

Electronically Signed by Rose Ramirez, RN on 2/28/2018  2:42 PM

**ED Notes by Rose Ramirez, RN at 2/28/2018  1:38 PM**                                                        Version 1 of 1
| Author: Rose Ramirez, RN | Service: Nursing | Author Type: Registered Nurse |
| Filed: 2/28/2018  1:38 PM | Date of Service: 2/28/2018 1:38 PM | Status: Signed |
| Editor: Rose Ramirez, RN (Registered Nurse) | | |

Patient is resting comfortably.

Electronically Signed by Rose Ramirez, RN on 2/28/2018  1:38 PM

**ED Notes by Shu Jen Brooks, RN at 2/28/2018 12:12 PM**                                                      Version 1 of 1
| Author: Shu Jen Brooks, RN | Service: (none) | Author Type: Registered Nurse |
| Filed: 2/28/2018 12:12 PM | Date of Service: 2/28/2018 12:12 PM | Status: Signed |
| Editor: Shu Jen Brooks, RN (Registered Nurse) | | |

Patient is asleep but easily arouseable. No acute distress noted.

Electronically Signed by Shu Jen Brooks, RN on 2/28/2018 12:12 PM

**ED Notes by Rose Ramirez, RN at 2/28/2018 7:53 AM**                                                         Version 3 of 3
| Author: Rose Ramirez, RN | Service: Nursing | Author Type: Registered Nurse |
| Filed: 2/28/2018  8:05 AM | Date of Service: 2/28/2018 7:53 AM | Status: Addendum |
| Editor: Rose Ramirez, RN (Registered Nurse) | | |
| Related Notes: | Original Note by Rose Ramirez, RN (Registered Nurse) filed at 2/28/2018 7:59 AM | |

JAMAICA HOSPITAL MED CTR
8900 Van Wyck Expwy
Jamaica NY 11418-2832

SINGH.BALWINDER
MRN:
DOB: ███79, Sex: M
Adm: 2/28/2018, D/C: 2/28/2018

## ED Notes (continued)

**ED Notes by Rose Ramirez, RN at 2/28/2018 7:53 AM (continued)**                    Version 3 of 3

Received and greeted pt in area, alert and oriented x4 placed in yellow gown for close observation, fall risk and elopement risk. Pt tearful, expressing had three beers and wants to rest. MD Boccio at the bedside. Pt cooperative at this time.

*Electronically Signed by Rose Ramirez, RN on 2/28/2018 8:05 AM*

**ED Notes by Rose Ramirez, RN at 2/28/2018 7:53 AM**                    Version 2 of 3

| Author: Rose Ramirez, RN | Service: Nursing | Author Type: Registered Nurse |
| Filed: 2/28/2018 7:59 AM | Date of Service: 2/28/2018 7:53 AM | Status: Addendum |
| Editor: Rose Ramirez, RN (Registered Nurse) | | |
| Related Notes: | Addendum by Rose Ramirez, RN (Registered Nurse) filed at 2/28/2018 8:05 AM | |
| | Original Note by Rose Ramirez, RN (Registered Nurse) filed at 2/28/2018 7:58 AM | |

Received and greeted pt in area, alert and oriented x4 placed in yellow gown for fall risk and elopement risk. Pt tearful, expressing had three beers and wants to rest. MD Boccio at the bedside. Pt cooperative at this time.

*Electronically Signed by Rose Ramirez, RN on 2/28/2018 7:59 AM*

**ED Notes by Rose Ramirez, RN at 2/28/2018 7:53 AM**                    Version 1 of 3

| Author: Rose Ramirez, RN | Service: Nursing | Author Type: Registered Nurse |
| Filed: 2/28/2018 7:58 AM | Date of Service: 2/28/2018 7:53 AM | Status: Signed |
| Editor: Rose Ramirez, RN (Registered Nurse) | | |
| Related Notes: | Addendum by Rose Ramirez, RN (Registered Nurse) filed at 2/28/2018 7:59 AM | |

Received and greeted pt in area, alert and oriented x4 placed in yellow gown for fall risk. Pt tearful, expressing had three beers and wants to rest. MD Boccio at the bedside. Pt cooperative at this time.

*Electronically Signed by Rose Ramirez, RN on 2/28/2018 7:58 AM*

## Progress Notes - Encounter Notes

**Progress Notes by Mary Guzman, LMSW at 2/28/2018 12:38 PM**                    Version 2 of 2

| Author: Mary Guzman, LMSW | Service: Social Work | Author Type: Social Worker |
| Filed: 2/28/2018 3:09 PM | Date of Service: 2/28/2018 12:38 PM | Status: Addendum |
| Editor: Mary Guzman, LMSW (Social Worker) | | |
| Related Notes: | Original Note by Mary Guzman, LMSW (Social Worker) filed at 2/28/2018 12:54 PM | |

### Social Worker Assessment

**ED SW Psychosocial Discharge Planning Needs Assessment**

Pt is a 38 year old male admitted to JHMC ED on 2/28/2018 with complaints of aggressive behavior, alcohol problem; PMH of anxiety, back pain, bipolar depression fatty liver, GERD, hyperlipidemia, hypertension, liver disease, prostatitis. ED SW consult initiated as pt's wife called 911 due to ETOH.  MD requesting SW assess environment at home.

Prior to assessment, SW called and spoke with pt's spouse Amandeep Kaur (P#347-476-7268).  She reported she is married to the patient and have 1 child together.  She reported she called 911 because she is concerned about the pt's drinking habits and health as he has liver disease.  Spouse reported there is NO history of domestic violence in the home and she is not in danger.  Spouse reported once pt is medically cleared for DC, pt can return to the home as she feels safe, no history of domestic violence.

Case 1:19-cv-00632-EK-ST   Document 48-16   Filed 11/29/21   Page 15 of 29 PageID #: 1525

| JAMAICA HOSPITAL MED CTR | SINGH,BALWINDER |
|---|---|
| 8900 Van Wyck Expwy | MRN: ▮ |
| Jamaica NY 11418-2832 | DOB: ▮▮▮ 79, Sex: M |
| | Adm: 2/28/2018, D/C: 2/28/2018 |

### Progress Notes - Encounter Notes (continued)

Progress Notes by Mary Guzman, LMSW at 2/28/2018 12:38 PM (continued)                    Version 2 of 2

SW met with pt at bedside who was A&Ox3. Pt reported he lives in an an apartment with his spouse and 2 year old daughter.  Prior to admission, pt was independent with ADLS and used no devices for ambulation  Pt has no home care services.  Pt owns no DME.  Pt has a history of anxiety and bipolar depression.  Pt denied current symptoms of anxiety and denied current suicidal/homicidial ideation.  Pt reported he is taking psychotropic medication and follows at JHMC MH clinic.  Per chart review, pt's next MH apt is on 3/5/2018 at 5:30pm.  Pt has a history of ETOH abuse.  Pt reported he drank 6 beers yesterday.  Pt would not describe further alcohol use.  PT declined ETOH referral and resources as he stated he does not have a alcohol problem.  Pt encouraged to attend local AA meeting in his community.  Pt denied recreational drug abuse, tobacco use, DV.  Pt is employed as an uber driver and is insured through Healthfirst MCD.

Per MD team, pt is medically cleared for discharge.  Area II MD and RN informed as pt's spouse reported no concerns with pt returning back to the home, ok for pt to be discharged.  No further SW interventions at this time.  SW to remain available should needs arise.

Mary C Guzman, LMSW
2/28/2018
Ext 6062/ Beeper 10109

**ED Social Work Consult Complete**

Electronically signed by Mary Guzman, LMSW on 2/28/2018  3:09 PM

Progress Notes by Mary Guzman, LMSW at 2/28/2018 12:38 PM                    Version 1 of 2

| Author: Mary Guzman, LMSW | Service: Social Work | Author Type: Social Worker |
|---|---|---|
| Filed: 2/28/2018 12:54 PM | Date of Service: 2/28/2018 12:38 PM | Status: Signed |
| Editor: Mary Guzman, LMSW (Social Worker) | | |
| Related Notes: | Addendum by Mary Guzman, LMSW (Social Worker) filed at 2/28/2018  3:09 PM | |

### Social Worker Assessment

**ED SW Psychosocial Discharge Planning Needs Assessment**

Pt is a 38 year old male admitted to JHMC ED on 2/28/2018 with complaints of aggressive behavior, alcohol problem; PMH of anxiety, back pain, bipolar depression fatty liver, GERD, hyperlipidemia, hypertension, liver disease, prostatitis. ED SW consult initiated as pt's wife called 911 due to ETOH.  MD requesting SW assess environment at home.

Prior to assessment, SW called and spoke with pt's spouse Amandeep Kaur (P#347-476-7268).  She reported she is married to the patient and have 1 child together.  She reported she called 911 because she is concerned about the pt's drinking habits and health as he has liver disease.  Spouse reported there is NO history of domestic violence in the home and she is not in danger.  Spouse reported once pt is medically cleared for DC, pt can return to the home as she feels safe, no history of domestic violence.

SW met with pt at bedside who was A&Ox3.  Pt reported he lives in an apartment with his spouse and 2 year old daughter.  Prior to admission, pt was independent with ADLS and used no devices for ambulation  Pt has no home care services.  Pt owns no DME.  Pt has a history of anxiety and bipolar depression.  Pt denied current symptoms of anxiety and denied current suicidal/homicidial ideation.  Pt reported he is taking psychotropic medication and follows at JHMC MH clinic.  Per chart review, pt's next MH apt is on 3/5/2018 at 5:30pm.  Pt has a history of ETOH abuse.  Pt reported he drank 6 beers yesterday.  Pt would not describe further alcohol use.  PT declined ETOH referral and resources as he stated he does not have a alcohol

Printed on 4/10/2018  9:42 AM

Case 1:19-cv-00632-EK-ST   Document 48-16   Filed 11/29/21   Page 16 of 29 PageID #: 1526

JAMAICA HOSPITAL MED CTR
8900 Van Wyck Expwy
Jamaica NY 11418-2832

SINGH,BALWINDER
MRN:
DOB:      79, Sex: M
Adm: 2/28/2018, D/C: 2/28/2018

**Progress Notes - Encounter Notes (continued)**

Progress Notes by Mary Guzman, LMSW at 2/28/2018 12:38 PM (continued)                                     Version 1 of 2

problem.  Pt encouraged to attend local AA meeting in his community.  Pt denied recreational drug abuse, tobacco use, DV.  Pt is employed as an uber driver and is insured through Healthfirst MCD.

Per MD team, pt is medically cleared for discharge.  Area II MD and RN informed as pt's spouse reported no concerns with pt returning back to the home, ok for pt to be discharged.  No further SW interventions at this time.  SW to remain available should needs arise.

Mary C Guzman, LMSW
2/28/2018
Ext 6062/ Beeper 10109

Electronically signed by Mary Guzman, LMSW on 2/28/2018 12:54 PM

**Discharge Instructions**                                                            Singh, Balwinder (MR # 883261)

None

**[JA-1320]**

| | |
|---|---|
| JAMAICA HOSPITAL MED CTR | SINGH.BALWINDER |
| 8900 Van Wyck Expwy | MRN: ▮ |
| Jamaica NY 11418-2832 | DOB: ▮ 79, Sex: M |
| | Adm: 2/28/2018, D/C: 2/28/2018 |

**[JA-1321]**

Case 1:19-cv-00632-EK-ST   Document 48-16   Filed 11/29/21   Page 18 of 29 PageID #: 1528

JAMAICA HOSPITAL MED CTR
8900 Van Wyck Expwy
Jamaica NY 11418-2832

SINGH,BALWINDER
MRN: █
DOB: █79, Sex: M
Adm: 2/28/2018, D/C: 2/28/2018

## Nursing - All Orders and Results

### Close Observation Q 15 Minutes [105867987]

Electronically signed by: **John Boccio, DO** on 02/28/18 0800
Ordering user: John Boccio, DO 02/28/18 0800
Authorized by: John Boccio, DO
Ordering provider: John Boccio, DO
Status: **Discontinued**

Frequency: Until Discontinued 02/28/18 0801 - 24 Hours
Discontinued by: Automatic Discharge Provider 02/28/18 1706 [Patient Discharge]

**Close Observation Q 15 Minutes [105867988]**
Electronically signed by: **John Boccio, DO** on 02/28/18 0800
Ordering user: John Boccio, DO 02/28/18 0800
Authorized by: John Boccio, DO
Ordering provider: John Boccio, DO
Status: **Discontinued**

Discontinued by: Automatic Discharge Provider 02/28/18 1706 [Patient Discharge]

### Maintain IV access/Saline Lock [105867981]

Electronically signed by: **John Boccio, DO** on 02/28/18 0759
Ordering user: John Boccio, DO 02/28/18 0759
Authorized by: John Boccio, DO
Ordering provider: John Boccio, DO
Status: **Discontinued**

Frequency: Once 02/28/18 0800 - 1 Occurrences
Discontinued by: Automatic Discharge Provider 02/28/18 1706 [Patient Discharge]

**Maintain IV access/Saline Lock [105867986]**
Electronically signed by: **John Boccio, DO** on 02/28/18 0759
Ordering user: John Boccio, DO 02/28/18 0759
Authorized by: John Boccio, DO
Ordering provider: John Boccio, DO
Status: **Discontinued**

Discontinued by: Automatic Discharge Provider 02/28/18 1706 [Patient Discharge]

## Consult - All Orders and Results

### ED Consult to Social Work [105867989]

Electronically signed by: **John Boccio, DO** on 02/28/18 0804
Ordering user: John Boccio, DO 02/28/18 0804
Authorized by: John Boccio, DO
Ordering provider: John Boccio, DO
Status: **Discontinued**

Frequency: Once 02/28/18 0804 - 1 Occurrences
Discontinued by: Automatic Discharge Provider 02/28/18 1706 [Patient Discharge]

Questions:
   Reason for Consult? wife called 911  etoh  safe envirnment at home
   Pager/Contact Number Number not on file

**ED Consult to Social Work [105867990]**
Electronically signed by: **John Boccio, DO** on 02/28/18 0804
Ordering user: John Boccio, DO 02/28/18 0804
Authorized by: John Boccio, DO
Ordering provider: John Boccio, DO
Status: **Discontinued**

Discontinued by: Automatic Discharge Provider 02/28/18 1706 [Patient Discharge]
Questions:
   Reason for Consult? wife called 911  etoh  safe envirnment at home
   Pager/Contact Number Number not on file

## Point of Care Testing - All Orders and Results

### POCT-STATSTRIP GLUCOSE [104790928]

Electronically signed by: **Lab In Hlseven Edi** on 02/28/18 0744
Ordering user: Lab In Hlseven Edi 02/28/18 0744
Authorized by: Physician Staff
Ordering provider: Physician Staff
Status: **Completed**

Frequency: Once 02/28/18 0745 - 1 Occurrences

### POCT-STATSTRIP GLUCOSE [105867978]

Electronically signed by: **Lab In Hlseven Edi** on 02/28/18 0744
Ordering user: Lab In Hlseven Edi 02/28/18 0744
Authorized by: Physician Staff
Ordering provider: Physician Staff
Status: **Completed**

Final result, Resulted on: 02/28/18 0755 (Abnormal)

| Order status: | Completed | Resulting lab: | RALS |

**Specimen Collection**

| Type | Source | Collected On |
|---|---|---|
| | | 02/28/18 0744 |

**Components**

Printed on 4/10/2018  9:42 AM

**[JA-1322]**

JAMAICA HOSPITAL MED CTR
8900 Van Wyck Expwy
Jamaica NY 11418-2832

SINGH,BALWINDER
MRN: ▮▮▮▮
DOB: ▮▮▮▮79, Sex: M
Adm: 2/28/2018, D/C: 2/28/2018

### Point of Care Testing - All Orders and Results (continued)

**POCT-STATSTRIP GLUCOSE [105867978] (continued)**

| | Value | Reference Range | Flag | Lab |
|---|---|---|---|---|
| POCT-Statstrip Glucose | 154 | 70 - 110 mg/dL | H | |

### Lab - All Orders and Results

**BMP [105867984]**

Electronically signed by: **John Boccio, DO on 02/28/18 0759**          Status: **Completed**
Ordering user: John Boccio, DO 02/28/18 0759          Ordering provider: John Boccio, DO
Authorized by: John Boccio, DO
Final result, Resulted on: 02/28/18 0852 (Abnormal)

| Order status: | Completed | | Resulting lab: | JHMC LAB - JAMAICA |
|---|---|---|---|---|

**Specimen Collection**

| Type | Source | Collected On |
|---|---|---|
| Blood | | 02/28/18 0806 |

**Components**

| | Value | Reference Range | Flag | Lab |
|---|---|---|---|---|
| Glucose | 129 | 74 - 106 mg/dL | H | JH LAB |
| Blood Urea Nitrogen | 10 | 9 - 20 mg/dL | | |
| Creatinine | 0.9 | 0.7 - 1.3 mg/dL | | |
| Comment: Methodology: IDMS traceable Vitros Creatinine. | | | | |
| Calcium | 9.3 | 8.4 - 10.2 mg/dL | | |
| Sodium | 150 | 137 - 145 mEq/L | H | |
| Potassium | 3.9 | 3.5 - 5.1 mEq/L | | |
| Chloride | 111 | 98 - 107 mEq/L | H | |
| CO2 | 20 | 22 - 30 mEq/L | L | |
| Anion Gap | 19.00 | 5.00 - 16.00 mEq/L | H | |
| Anion gap with K | 22.90 | mmoL/L | | |

**Alcohol [105867985]**

Electronically signed by: **John Boccio, DO on 02/28/18 0759**          Status: **Completed**
Ordering user: John Boccio, DO 02/28/18 0759          Ordering provider: John Boccio, DO
Authorized by: John Boccio, DO
Final result, Resulted on: 02/28/18 0852 (Abnormal)

| Order status: | Completed | | Resulting lab: | JHMC LAB - JAMAICA |
|---|---|---|---|---|

**Specimen Collection**

| Type | Source | Collected On |
|---|---|---|
| Blood | | 02/28/18 0806 |

**Components**

| | Value | Reference Range | Flag | Lab |
|---|---|---|---|---|
| Alcohol Scrn | 247.0 | 0.0 - 10.0 mg/dL | H | JH LAB |

**BMP [105867979]**

Electronically signed by: **John Boccio, DO on 02/28/18 0759**          Status: **Completed**
Ordering user: John Boccio, DO 02/28/18 0759          Ordering provider: John Boccio, DO
Authorized by: John Boccio, DO
Frequency: Once 02/28/18 0800 - 1 Occurrences

**Alcohol [105867980]**

Electronically signed by: **John Boccio, DO on 02/28/18 0759**          Status: **Completed**
Ordering user: John Boccio, DO 02/28/18 0759          Ordering provider: John Boccio, DO
Authorized by: John Boccio, DO
Frequency: Once 02/28/18 0800 - 1 Occurrences

Printed on 4/10/2018  9:42 AM

**[JA-1323]**

**[JA-1324]**

Case 1:19-cv-00632-EK-ST   Document 48-16   Filed 11/29/21   Page 21 of 29 PageID #: 1531

JAMAICA HOSPITAL MED CTR
8900 Van Wyck Expwy
Jamaica NY 11418-2832

SINGH,BALWINDER
MRN: ▮
DOB: ▮79, Sex: M
Adm: 2/28/2018, D/C: 2/28/2018

## Medications

**All Meds and Administrations**

**Sodium chloride 0.9% IV infusion [105867982]**
Status: Discontinued (Past End Date/Time), Reason: Patient Discharge

Ordering Provider: John Boccio, DO
Ordered On: 02/28/18 0759
Dose (Remaining Total): - (-/-)
Route: Intravenous

Status/Ends: 02/28/18 0815 - 02/28/18 1706
Frequency: CONTINUOUS
Rate/Duration: 125 mL/hr / -

| Action Time | Action | Dose / Rate | Route | Other Information |
|---|---|---|---|---|
| 02/28/18 1443 | Stopped | 0<br>0 mL/hr | Intravenous | Given by: Rose Ramirez, RN |
| 02/28/18 0814 | New Bag | -<br>125 mL/hr | Intravenous | Given by: Rose Ramirez, RN |

**LORazepam (ATIVAN) 2 mg/mL injection (IM/IV) 1 mg [105867983]**
Status: Completed (Past End Date/Time)

Ordering Provider: John Boccio, DO
Ordered On: 02/28/18 0759
Dose (Remaining Total): 1 mg (0/1)
Route: IV Push
Admin Instructions: Medication is stored in the refrigerator.

Status/Ends: 02/28/18 0815 - 02/28/18 0814
Frequency: ONCE
Rate/Duration: - / -

| Action Time | Action | Dose | Route | Other Information |
|---|---|---|---|---|
| 02/28/18 0814 | Given | 1 mg | IV Push | Given by: Rose Ramirez, RN |

## Patient Education

**Education**

No education to display

Printed on 4/10/2018  9:42 AM

JAMAICA HOSPITAL MED CTR
8900 Van Wyck Expwy
Jamaica NY 11418-2832

SINGH,BALWINDER
MRN: ▮▮▮
DOB: ▮▮▮79, Sex: M
Adm: 2/28/2018, D/C: 2/28/2018

---

## Flowsheets (all recorded)

### Custom Formula Data - Wed February 28, 2018

| | 1450 | 0746 |
|---|---|---|
| **OTHER** | | |
| Pre Gavage Weight | | -1 oz (-0.028 kg)  AR |
| BSA (Calculated - sq m) | | 1.86 sq meters  AR |
| BSA (Calculated) | | 27.4  AR |
| IBWling (Calculated) MALE | | 68.4 kg  AR |
| Low Range Vt 6cc/kg MALE | | 410.4 mL  AR |
| Adult Moderate Range Vt 8cc/kg MALE | | 547.2 mL  AR |
| Adult High Range Vt 10cc/kg MALE | | 684 mL  AR |
| IBWling (Calculated) FEMALE | | 63.9 kg  AR |
| Low Range Vt 6cc/kg FEMALE | | 383.4 mL  AR |
| Adult Moderate Range Vt 8cc/kg FEMALE | | 511.2 mL  AR |
| Percent Weight Change Since Birth | | 0  AR |
| IBWling (Calculated) | | 68.4  AR |
| Low Range Vt 6cc/kg | | 410.4 mL  AR |
| Adult Moderate Range Vt 8cc/kg | | 547.2 mL  AR |
| Adult High Range Vt 10cc/kg | | 684 mL  AR |
| Systolic BP | 120  DE(n) MV (!) | 135  AR |
| **Relevant Labs and Vitals** | | |
| Temp (in Celsius) | 36.8  DE(n) MV (!) | 36.3  AR |

### Vaccination - Wed February 28, 2018

| | 0747 |
|---|---|
| **Vaccination** | |
| Vaccinations Up To Date | Unknown  AR |

### Close Observation - Wed February 28, 2018

| | 0826 |
|---|---|
| **Close Observation** | |
| Reason For Observation | Safety  RR |
| Location | Stretcher  AR |
| Communication Type | Verbal  RR |
| Observed Behavior | Interacting  RR |

### PCP Notification Acknowledgment - Wed February 28, 2018

| | 1426 |
|---|---|
| **PCP Notification Acknowledgment** | |
| Patient's PCP Notified of EG Visit? | (!) No  JB |

### Health Home Education/Consent - Wed February 28, 2018

| | 0757 |
|---|---|
| **MS ED Health Home Eligibility/Consent** | |
| Patient consents to Referral to Health Home | No  JBA |

### Triage Plan - Wed February 28, 2018

| | 0747 |
|---|---|
| **Triage Plan** | |
| ESI | 3  AR |
| Destination | Main  AR |
| Triage Complete | Triage Complete  AR |

Printed on 4/10/2018  9:42 AM

**[JA-1326]**

JAMAICA HOSPITAL MED CTR
8900 Van Wyck Expwy
Jamaica NY 11418-2832

SINGH,BALWINDER
MRN: ███
DOB: ███79, Sex: M
Adm: 2/28/2018, D/C: 2/28/2018

**Flowsheets (all recorded) (continued)**

**Triage Plan - Wed February 28, 2018 (continued)**

**Vital Signs - Wed February 28, 2018**

| | 1459 |
|---|---|
| **Vital Signs** | |
| Temp | 98.3 °F (36.8 °C) · DE (t) MV (t) |
| Temp src | Oral · DE (t) MV (t) |
| Pulse | 107 · DE (t) MV (t) |
| Heart Rate Source | Monitor · DE (t) MV (t) |
| Resp | 17 · DE (t) MV (t) |
| BP | 120/76 · DE (t) MV (t) |
| BP Location | Left arm · DE (t) MV (t) |
| BP Method | Automatic · DE (t) MV (t) |
| Patient Position | Lying · DE (t) MV (t) |
| **Oxygen Therapy** | |
| SpO2 | 96 % · DE (t) MV (t) |
| **IABP Pressures** | |
| Mean Pressure | 90.8 · DE (t) MV (t) |

**Vital Signs - Wed February 28, 2018**

| | 0748 |
|---|---|
| **Vital Signs** | |
| Temp | 97.5 °F (36.3 °C) · AR |
| Temp src | Oral · AR |
| Pulse | 116 · AR |
| Heart Rate Source | Monitor · AR |
| Resp | 18 · AR |
| BP | 135/90 · AR |
| BP Location | Right arm · AR |
| BP Method | Automatic · AR |
| Patient Position | Lying · AR |
| Pain Assessment | UTA · AR |
| **Sepsis Screening Criteria** | |
| Neuromuscular Disease | No · AR |
| Invasive Devices | None · AR |
| Alteration in Mental Status | No · AR |
| Immunocompromised (Meds, Cancer, Organ Transplant) | No · AR |
| **Oxygen Therapy** | |
| SpO2 | 96 % · AR |
| O2 Device | None (Room air) · AR |
| **Height and Weight** | |
| Height | 5'8" (1.727 m) · AR |
| Weight | 180 lb (81.6 kg) · AR |
| Weight Method | Stated · AR |

**Follow-Up Documentation - Wed February 28, 2018**

| | 0818 |
|---|---|
| **Follow-Up Documentation** | |
| Follow-up primary care visit scheduled? | Yes · JF |
| How was the appointment scheduled? | A · JF |
| Visit Scheduled With? | Patient's Primary Care Provider (PCP) · JF |

**Anthropometrics - Wed February 28, 2018**

| | 0748 |
|---|---|
| **Anthropometrics** | |
| Weight Change | 100 · AR |

Printed on 4/10/2018  9:42 AM

**[JA-1327]**

JAMAICA HOSPITAL MED CTR
8900 Van Wyck Expwy
Jamaica NY 11418-2832

SINGH,BALWINDER
MRN:
DOB: █████79, Sex: M
Adm: 2/28/2018, D/C: 2/28/2018

## Flowsheets (all recorded) (continued)

### HEENT - Wed February 28, 2018

| | 0819 |
|---|---|
| **HEENT** | |
| HEENT (WDL) | X -RR |
| Head and Face | -- |
| | redness nose to R |
| | forehead and R cheek |
| | -RR |

### Arrival Documentation - Wed February 28, 2018

| | 0735 |
|---|---|
| **Notification** | |
| Notification | No -AR |
| **Triage Call** | |
| Triage Call | Call 1x -AR |
| **Triage Start** | |
| Triage Start | Start -AR |
| **Prehospital Treatment** | |
| Prehospital Treatment | -- |
| | forensic restraint -AR |

### Abuse Indicators - Wed February 28, 2018

| | 0747 |
|---|---|
| **Screening** | |
| Screening (WDL) | WDL -AR |

### Care Handoff - Wed February 28, 2018

| | 1459 |
|---|---|
| **Care Handoff** | |
| Report Given to | Patient went home -RR |

### Departure Condition - Wed February 28, 2018

| | 1455 |
|---|---|
| **Departure Condition** | |
| Departure Condition | Stable -RR |
| Mobility at Departure | Ambulatory -RR |
| Departure Acuity | 5 -RR |
| Patient Teaching | Discharge instructions |
| | reviewed -RR |
| Departure Mode | By self -RR |

### Phlebotomy - Wed February 28, 2018

| | 0906 |
|---|---|
| **Phlebotomy** | |
| Site | Right -RR |
| Specimen Status | Sent for analysis -RR |
| How tolerated? | Tolerated well -RR |

### First Provider Evaluation - Wed February 28, 2018

| | 0800 |
|---|---|
| **First Provider Evaluation Time** | |
| First Provider | File -JB |
| Evaluation Time | |

### Vitals Reassessment - Wed February 28, 2018

| | 1450 | 0748 |
|---|---|---|
| **Vitals Assessment** | | |
| Repeat Vitals Taken | Yes -DE (p MV (t) | Yes -AR |

### Language Doc-AMB/ED - Wed February 28, 2018

| | 0742 |
|---|---|
| **Language Documentation** | |
| What is the patient's | English -AR |

Printed on 4/10/2018  9:42 AM

**[JA-1328]**

JAMAICA HOSPITAL MED CTR
8900 Van Wyck Expwy
Jamaica NY 11418-2832

SINGH,BALWINDER
MRN:
DOB: ████79, Sex: M
Adm: 2/28/2018, D/C: 2/28/2018

### Flowsheets (all recorded) (continued)

**Language Doc-AMB/ED - Wed February 28, 2018 (continued)**

| | 0742 |
|---|---|
| preferred language? | |
| Reason for Documentation | Collecting clinical information ·AR |
| Is the patient desirous of hearing? | No ·AR |

**Patient Belongings - Wed February 28, 2018**

| | 1435 | 1444 | 0747 |
|---|---|---|---|
| **Patient Belongings Sent to Safe** | | | |
| Belongings Sent to Safe | | Other ·PR | Other valuables one my state driver license, one no drivers license, one visa card one mastercard card No, jewelry, No cell phone ·CP |
| Money | | | $100, $50x2, $1x4 ·CP |
| Valuables Envelope # | | 1584507 ·PR | 1584507 ·CP |
| **Patient Belongings Secured** | | | |
| List Patient Belongings Secured | | | pants, one belt, shoes, one sweater, PT clothes in the ER closet. ·CP |
| **Patient Belongings At Discharge** | | | |
| Belongings At Discharge | None ·PR | | |

**Constant Observation Watch (1:1) - Wed February 28, 2018**

| | 1334 | 0929 | 0626 |
|---|---|---|---|
| **Constant Observation Watch (1:1)** | | | |
| Reason for Constant Observation | Other (Specify) alcohol problem ·MV | Other (Specify) alcohol problem ·MV | Other (Specify) alcohol agressive ·MV |
| Patient communicates verbally | No (Specify) ·MV | No (Specify) ·MV | No (Specify) ·MV |
| Expresses Suicidal/Homicidal Ideation | No ·MV | No ·MV | No ·MV |
| Safe Environment Management | Yes ·MV | Yes ·MV | |
| Behavior Observed | Calm/Sleeping ·MV | Calm/Sleeping ·MV | Agitated/Restless ·MV |
| Visitors Present? | No ·MV | No ·MV | Yes ·MV |
| Companion within arm's reach of patient | Yes ·MV | Yes ·MV | Yes ·MV |
| Status | Active ·MV | Active ·MV | Active ·MV |
| Reviewed by | murielle voltaire ·MV | murielle voltaire ·MV | murielle voltaire ·MV |

**Caregiver - Wed February 28, 2018**

| | 0759 |
|---|---|
| **Caregiver** | |
| Designated Caregiver? | Not at this time (comment) ·JBA |

**Columbia-Suicide Severity Rating Scale-(C-SSRS)-Initial Screening - Wed February 28, 2018**

| | 0742 |
|---|---|
| **INITIAL SCREENING: SUICIDE IDEATION DEFINITIONS AND PROMPTS** | |
| 1. In the past month, have you wished you were dead or wished you could go to sleep and not wake up? | No ·AR |
| 2. In the past month, have you actually had any thoughts of killing yourself? | No ·AR |

Printed on 4/10/2018  9:42 AM

JAMAICA HOSPITAL MED CTR
8900 Van Wyck Expwy
Jamaica NY 11418-2832

SINGH,BALWINDER
MRN: ▮
DOB: ▮ 79, Sex: M
Adm: 2/28/2018, D/C: 2/28/2018

---

**Flowsheets (all recorded) (continued)**

**Columbia-Suicide Severity Rating Scale-(C-SSRS)-Initial Screening - Wed February 28, 2018 (continued)**

| | 0742 |
|---|---|
| If answer to any of the above questions is "YES", continue with 3, 4, 5, and 6. | |
| Risk Level | NO RISK  :AR |

**Lines/Drains/Airways - Wed February 28, 2018**

| | 0857 |
|---|---|
| **[REMOVED] Peripheral IV 02/28/18 Right Antecubital** | |
| IV Properties | Placement Date: 02/28/18  :RR, Placement Time: 0857  :RR, Size (Gauge): 20 G  :RR, Orientation: Right  :RR, Location: Antecubital  :RR, Removal/Final Assessment Date: 02/28/18  :AD, Removal/Final Assessment Time: 1505  :AD |
| Site Assessment | Clean;Dry  :RR |
| Line Status | Infusing  :RR |
| Dressing Status | Clean;Dry  :RR |

**User Key**

(r) - Recorded By, (t) - Taken By, (c) - Cosigned By

| Initials | Name | Effective Dates |
|---|---|---|
| AR | Abraham Requello, RN | 06/30/15 |
| AD | Automatic Discharge Provider | |
| DE | Doc Flowsheet In Edit | |
| GP | Gloria Palacios | 10/12/11 - |
| JBA | Jorge Balalla | |
| JB | John Boccio, DO | 06/26/13 - |
| JR | Jose Robles | |
| MV | Murielle Voltaire | 10/15/11 - |
| RR | Rose Ramirez, RN | 09/14/15 - |

**Flowsheet Notes**

No notes of this type exist for this encounter.

JAMAICA HOSPITAL MED CTR
8900 Van Wyck Expwy
Jamaica NY 11418-2832

SINGH,BALWINDER
MRN: [redacted]
DOB: [redacted]79, Sex: M
Adm: 2/28/2018, D/C: 2/28/2018

**Encounter-Level Documents - 02/28/2018:**

Scan on 2/28/2018 : Clothing List (below)

Singh, Balwinder (MR # 883281)
**MediSys Health Network**

Encounter Date: 02/28/2018

**Admission Information**

Place of Service: JAMAICA HOSPITAL MEDICAL CTR Room: A2-18
Unit: JHMC EMERGENCY ROOM Bed: A2-18

RECORDED PATIENT BELONGINGS (all recorded)

**Patient Belongings**

02/28/18 0747

**Patient Belongings Sent to Safe**

| | |
|---|---|
| Belongings Sent to Safe | Other valuables<br>one ny state drivers license, one nc drivers license, one Visa card, one mastercard card. No jewelry, No cell phone. |
| Money | —<br>$10x1, $5x2, $1x4 |
| Valuables | — |
| Envelope # | 1904607 |

02/28/18 0747

**Patient Belongings Secured**

| | |
|---|---|
| List Patient Belongings Secured | —<br>pants, one belt, shoes, one sweater. Pt clothes in the ER room |

**Please note: The institution is not responsible for items left at the bedside. Belongings secured by Security/Cashier prior to dischar[ge] held for 30 days ONLY after discharge.**

**I, (Patient or Designee) acknowledge understanding of above information and certify that it is co[rrect to the] best of my knowledge.**

Signature: P/unable to sign
Date:

Print Name:
Relationship to Patient (if other than self):

**Witness/Transferring Staff**

Signature:
Date:

Print Name:
Title:

THIS FACILITY HAS ... CURRENCY IN THE ... AND CHECKS IN TH...

VALUABLES ENVELOPE

JAMAICA HOSPITAL MED CTR
8900 Van Wyck Expwy
Jamaica NY 11418-2832

SINGH,BALWINDER
MRN: ▮
DOB: ▮79, Sex: M
Adm: 2/28/2018, D/C: 2/28/2018

Scan on 2/28/2018 : RE SCAN (below)

---

Singh, Balwinder (MR # 862261)                                    Encounter Date: 02/28/2018

**MediSys Health Network**

**Admission Information**

| Place of Service: JAMAICA HOSPITAL MEDICAL CTR | Room: A2-18 |
| Unit: JHMC EMERGENCY ROOM | Bed: A2-18 |

**RECORDED PATIENT BELONGINGS (all recorded)**

**Patient Belongings**

| | 02/28/18 07:47 | |
| **Patient Belongings Sent to Safe** | | |
| Belongings Sent to Safe | Other valuables | |
| Money | | |
| Valuables Envelope # | 1264602 | |
| | 02/28/18 07:43 | |
| **Patient Belongings Secured** | | |
| Last Patient Belongings Secured | | |

Please note: The institution is not responsible for items left at the patient's
bedside. Belongings secured by Security/Cashier prior to discharge will be
held for 30 days ONLY after discharge.

I, (Patient or Designee) acknowledge understanding of above information and certify that it is correct to the
best of my knowledge.

Signature: _____
Date:

Print Name:
Relationship to Patient (if other than self): _____

Witness/Transferring Staff

Signature: _____
Date:

Print Name:
Title:

---

**[JA-1332]**

JAMAICA HOSPITAL MED CTR
8900 Van Wyck Expwy
Jamaica NY 11418-2832

SINGH,BALWINDER
MRN: ▮
DOB: ▮▮▮79, Sex: M
Adm: 2/28/2018, D/C: 2/28/2018

**Order-Level Documents:**

There are no order-level documents.

**Order-Level E-Signatures:**

There are no order-level e-signatures.

**Encounter-Level E-Signatures:**

There are no encounter-level e-signatures.

**[JA-1333]**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

BALWINDER SINGH,

                            Plaintiff,                  **NOTICE OF FILING IN
HARD COPY**

            -against-                      19-cv-632 (EK) (ST)

THE CITY OF NEW YORK, et al.,

                           Defendants.

-----------------------------------------------------------------------X


        Exhibits "N"-"P" to the Declaration of Hannah V. Faddis in support of

Defendants' Motion for Summary Judgment consists of video and audio files which be provided

in hard copy to the Court.


Dated: New York, New York
       November 29, 2021

                            GEORGIA M. PESTANA
                            Corporation Counsel of the City of New York
                            Attorney for Defendants
                            100 Church Street
                            New York, New York 10007
                            (212) 356-2486

                    By: /s/_____
                            Hannah V. Faddis
                            *Senior Counsel*

CC:   VIA ECF
      *All Counsel of Record*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

BALWINDER SINGH,

                       Plaintiff,

           -against-

THE CITY OF NEW YORK, et al.,

                     Defendants.

-----------------------------------------------------------------------X

**NOTICE OF FILING IN HARD COPY**

19-cv-632 (EK) (ST)


        Exhibits "N"-"P" to the Declaration of Hannah V. Faddis in support of Defendants' Motion for Summary Judgment consists of video and audio files which be provided in hard copy to the Court.


Dated: New York, New York
       November 29, 2021

                              GEORGIA M. PESTANA
                              Corporation Counsel of the City of New York
                              Attorney for Defendants
                              100 Church Street
                              New York, New York 10007
                              (212) 356-2486

                              By: /s/
                                  Hannah V. Faddis
                                *Senior Counsel*

CC:   VIA ECF
       *All Counsel of Record*

[JA-1335]



[JA-1336]





[JA-1338]



[JA-1339]



**[JA-1340]**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

BALWINDER SINGH,

                                        Plaintiff,                    **NOTICE OF FILING IN**
                                                                      **HARD COPY**
                        -against-
                                                                      19-cv-632 (EK) (ST)
THE CITY OF NEW YORK, et al.,

                                        Defendants.

-----------------------------------------------------------------------X


          Exhibits "N"-"P" to the Declaration of Hannah V. Faddis in support of

Defendants' Motion for Summary Judgment consists of video and audio files which be provided

in hard copy to the Court.


Dated: New York, New York
        November 29, 2021

                                        GEORGIA M. PESTANA
                                        Corporation Counsel of the City of New York
                                        Attorney for Defendants
                                        100 Church Street
                                        New York, New York 10007
                                        (212) 356-2486


                                  By:   /s/
                                        Hannah V. Faddis
                                        *Senior Counsel*

CC:     VIA ECF
        *All Counsel of Record*

Case 1:19-cv-00632-EK-ST   Document 49-1   Filed 11/29/21   Page 1 of 35 PageID #: 1577

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
BALWINDER SINGH,

|  |  |
|---|---|
| Plaintiff, | **PLAINTIFF'S RESPONSE TO DEFENDANTS' COUNTER-STATEMENT OF MATERIAL FACT PURSUANT TO LOCAL RULE 56.1** |
| -against- | **19 CV 632 (EK) (ST)** |

THE CITY OF NEW YORK, et. al,

Defendants.
-------------------------------------------------------------------X

Plaintiff Balwinder Singh, by his attorney, COHEN & FITCH LLP hereby submits this statement pursuant to Local Rule 56.1(c) of the Local Civil Rules of the United States District Court for the Southern and Eastern Districts of New York, in response to defendants' counter-statement of undisputed facts:

**PLAINTIFF'S RESPONSE TO DEFENDANTS' 56.1 STATEMENT:**[1]

49.     On February 28, 2018, plaintiff, Balwinder Singh resided at 131-18 Atlantic Avenue, Queens, New York (the "location"). (Complaint, Ex. A, Faddis Decl., ¶ 13).

**PLAINTIFF'S RESPONSE: Admit.**

50.     On February 28, 2018, Officer Mandeep Cheema was a member of the New York City Police Department ("NYPD") assigned to the 102nd Precinct in Queens. (Cheema Dep. Tr., Ex. C, Faddis Decl., 35:14-19).

---
[1] Plaintiff's responses appear in **bold** type.

1

**PLAINTIFF'S RESPONSE: Admit.**

51.    Plaintiff maintained a home security video system which recorded one view of the interior of his apartment, including a portion of the living room, kitchen, front door, and hallway. (Pl. Dep. Tr., Ex. C, Faddis Decl., 109:3-19).

**PLAINTIFF'S RESPONSE: Admit the substance of plaintiff's testimony insofar as plaintiff testified that he maintained a home security video system that had two cameras on the system on the date of incident and that one of those cameras was in the living room facing towards the front door (Pl. Dep. Tr., Ex. C, Faddis Decl., 109:3-19).**

52.    Plaintiff's home security video system records sound. (Pl. Dep. Tr., Ex. C, Faddis Decl., 115:23-116:12)

**PLAINTIFF'S RESPONSE: Admit that plaintiff's home security video system is capable of recording sound but deny insofar as plaintiff testified that he lacked the ability and know-how to record sound on the system (Pl. Dep. Tr., Ex. C, Faddis Decl., 115:23-116:12).**

53.    Plaintiff produced in this action video from his home security system, bearing time stamps from 6:32 a.m. to 6:37 a.m. ("EMS Video," Ex. N, Faddis Decl.) and 6:44:42 a.m. to 6:53:34 a.m. ("Police Video," Ex. O, Faddis Decl.)

**PLAINTIFF'S RESPONSE: Admit and respectfully refer the Court to the evidence cited.**

54.    The videos produced by plaintiff in this action are video recordings taken with a cell phone of playback from the plaintiff's home security video system. (Pl. Dep. Tr., Ex. C, Faddis Decl., 113:17-22).

**PLAINTIFF'S RESPONSE: Admit insofar as plaintiff testified that the videos produced by plaintiff in this action are video recordings taken with a cell phone but deny insofar as plaintiff testified that he lacked the ability and know-how to record the videos from the security system except by using his cell phone because it was very complicated and the instruction manual is hard to follow and that he tried to record it on the device but was unable to do so. (Pl. Dep. Tr., Ex. C, Faddis Decl., 112:14-24, 113:17-22, 114:7-11).**

55.     Plaintiff deleted the remainder of the video from his home security system from February 28, 2018. (Pl. Dep. Tr., Ex. C, Faddis Decl., 113:17-114:11).

**PLAINTIFF'S RESPONSE: Deny the factual allegations insofar as the testimony cited by defendants does not support the facts alleged except that plaintiff testified that the video from February 28, 2018, was deleted off of his home security system after he had recorded it on his cell phone, that the deletion was by accident, that the video would have automatically been deleted after fourteen (14) days, and that he did not record any other portion of the security footage (aside from "EMS Video," Ex. N, Faddis Decl. and ("Police Video," Ex. O, Faddis Decl.) because it was obvious to him that he did not need to record any other portions as those portions did not show him being assaulted by the police or interacting with anyone. (Pl. Dep. Tr., Ex. C, Faddis Decl., 112:25-113:6, 113:17-115:21, 117:1-118-13).**

56.     On the evening of February 27, 2018, plaintiff was drinking with his friend, Rupel Singh.  (Pl. Dep. Tr., Ex. C, Faddis Decl., 31:7-22, 33:10-13).

**PLAINTIFF'S RESPONSE: Deny the factual allegations insofar as the testimony cited by defendants does not support the facts alleged except that plaintiff testified that he had one or two beers with an old friend, that he thinks his first name is Rupel, and that most of the plaintiff's drinking on that occurred in his own home on February 28, 2018 (Pl. Dep. Tr., Ex. C, Faddis Decl., 31:7-22, 33:10-13).**

57.    Plaintiff does not recall where they were drinking. (Pl. Dep. Tr., Ex. C, Faddis Decl., 32:2-8).

**PLAINTIFF'S RESPONSE: Deny the factual allegations insofar as the testimony cited by defendants does not support the facts alleged except that plaintiff testified that he did not remember the exact location where he had a drink with Rupel Singh but believed it was a restaurant (Pl. Dep. Tr., Ex. C, Faddis Decl., 32:2-8).**

58.    Plaintiff does not recall how many drinks he had on the evening of February 27, 2018, but approximated that he consumed between five and six beers.  (Pl. Dep. Tr., Ex. C, Faddis Decl., 31:7-22, 35:2-4).

**PLAINTIFF'S RESPONSE: Admit insofar as plaintiff testified that he had one or two beers when he was out with his friend (Pl. Dep. Tr., Ex. C, Faddis Decl., 31:9-13) and then clarified that it was only one beer (Pl. Dep. Tr., Ex. C, Faddis Decl., 34:13-17) and then estimated that he consumed approximately four (4) beers upon arriving home (Pl. Dep. Tr., Ex. C, Faddis Decl., 35:2-4).**

59.     Plaintiff does not recall what time he arrived home on the morning of February 28, 2018. (Pl. Dep. Tr., Ex. C, Faddis Decl., 143:21-24).

**PLAINTIFF'S RESPONSE: Admit insofar as plaintiff testified that he could not recall the exact time he arrived home on February 28, 2018, and believed it was somewhere at or after midnight, estimated it was approximately between 12:00 a.m. and 1:00 a.m., (likely between approximately 12:30 a.m. and 12:45 a.m.), with the latest time likely being 1:00 a.m. (Pl. Dep. Tr., Ex. C, Faddis Decl., 31:23-25-32:1, 35:10-19) but couldn't be completely sure it was not later than 1:00 a.m. (Pl. Dep. Tr., Ex. C, Faddis Decl., 143:21-24).**

60.     At approximately 6 a.m., plaintiff's wife, Amandeep Kaur found him drinking in the living room of their apartment. (Pl. Dep. Tr., Ex. C, Faddis Decl., 35:20-22).

**PLAINTIFF'S RESPONSE: Admit.**

61.     Plaintiff's wife, Amandeep Kaur, called 911 at approximately 6:15 a.m. on February 28, 2018. (911 Call, Ex. P, Faddis Decl.; Pre-Hospital Care Report ("PCR"), Ex. L, Faddis Decl.; ICAD 911 Event Chronology ("ICAD"), Ex. K, Faddis Decl.)

**PLAINTIFF'S RESPONSE: Admit and respectfully refer the Court to the evidence cited.**

62.     Ms. Kaur reported to the 911 operator that her husband, the plaintiff, drank too much. (911 Call, Ex. P, Faddis Decl.)

**PLAINTIFF'S RESPONSE: Admit and respectfully refer the Court to the evidence cited.**

63.     Ms. Kaur reported to the 911 operator that the plaintiff needed to go to a hospital. (911 Call, Ex. P, Faddis Decl.)

**PLAINTIFF'S RESPONSE: Admit and respectfully refer the Court to the evidence cited.**

64.     Ms. Kaur reported to the 911 operator that she and the plaintiff were fighting. (911 Call, Ex. P, Faddis Decl.)

**PLAINTIFF'S RESPONSE: Deny and respectfully refer the Court to the evidence cited and to Ms. Kaur's testimony. Ms. Kaur was asked by the 911 operator whether they are fighting and responded by saying "yes, plaintiff needs to go to the hospital" and was then connected by the 911 with EMS (as opposed to the police department). More important, Ms. Kaur clarified at her deposition that when she said "yes" to the 911 operator she was "answering 'yes' to everything" because her "English is not very proficient" and that "there was no argument going on" (Kaur Dep. Tr., Ex. I, Faddis Decl., 40:23-41:5).**

65.     At approximately, 6:28 a.m., two emergency medical technicians ("EMTs") from Jamaica Hospital Medical Center, EMT Nicole Milonas and EMT Marisabel Schiapira, arrived at the location. (PCR, Ex. L, Faddis Decl.)

**PLAINTIFF'S RESPONSE: Admit and respectfully refer the Court to the evidence cited.**

66.     The plaintiff's wife, Ms. Kaur, told the EMT Milonas that he had been drinking and was not acting normal. (PCR, Ex. L, Faddis Decl.)

**PLAINTIFF'S RESPONSE: Admit insofar as EMT Milonas wrote in the Pre-Hospital Care Report ("PCR") that Ms. Kaur stated that plaintiff was drinking and not acting normal and respectfully refer the Court to the evidence cited but deny insofar as at the time of her deposition, EMT Milonas did not have any independent recollection of the underlying events and that the only recollection she had of plaintiff was from the PCR narrative (Milonas Dep. Tr., Ex. G, Faddis Decl., 29:12-16, 36:8-14, 42:18-19). Additionally, Ms. Kaur testified that she has issues speaking English but that she tried to explain to the EMS workers that plaintiff had health issues and she was concerned for his health and further testified that plaintiff's behavior seemed normal (Kaur Dep. Tr., Ex. I, Faddis Decl., 28:2-9, 29:5-8).**

67.    The plaintiff's wife, Ms. Kaur, told EMT Milonas that plaintiff was a harm to himself. (PCR, Ex. L, Faddis Decl.)

**PLAINTIFF'S RESPONSE: Admit insofar as EMT Milonas wrote in the PCR that Ms. Kaur told her that plaintiff was a harm to himself and respectfully refer the Court to the evidence cited but deny insofar as at the time of her deposition, EMT Milonas did not have any independent recollection of the underlying events and that the only recollection she had of plaintiff was from the PCR narrative (Milonas Dep. Tr., Ex. G, Faddis Decl., 29:12-16, 36:8-14, 42:18-19) and did not recall whether plaintiff's wife ever mentioned that plaintiff had a liver disease of any kind and further testified that in any event, drinking with liver disease is not on its own always an imminent threat to a person's health or safety (Milonas Dep. Tr., Ex. G,**

**[JA-1348]**

Case 1:19-cv-00632-EK-ST   Document 49-1   Filed 11/29/21   Page 8 of 35 PageID #: 1584

**Faddis Decl., 37:5-39:14). Additionally, plaintiff testified that Ms. Kaur merely told the EMTs that he should go to the hospital to check his liver (Pl. Dep. Tr., Ex. C, Faddis Decl., 44:12-17) and Ms. Kaur testified that she tried to explain to the EMS workers that plaintiff had health issues and she was concerned for his health but did not claim that he was a harm to himself (Kaur Dep. Tr., Ex. I, Faddis Decl., 27:19-23, 28:2-9).**

68.     EMT Milonas noted that plaintiff was alert and oriented with "periods of inconsistency," meaning "he was able to answer [four questions], but there was a problem with his rationality where he was speaking and it was incomprehensible or unclear.  He wasn't directly answering our questions when we were discussing other things.  He wasn't able to take what we were saying, understand it and respond." (Milonas Dep. Tr., Ex. G, Faddis Decl., p. 44:11-23; PCR, Ex. L, Faddis Decl.).

**PLAINTIFF'S RESPONSE: Admit insofar as EMT Milonas wrote this information in the PCR  and respectfully refer the Court to the evidence cited but deny insofar as EMT Milonas testified that based on her review of the PCR, plaintiff was able to answer four questions  (Milonas Dep. Tr., Ex. G, Faddis Decl., 43:24-44:10) and that at the time of her deposition, EMT Milonas did not have any independent recollection of the underlying events and that the only recollection she had of plaintiff was from the PCR narrative (Milonas Dep. Tr., Ex. G, Faddis Decl., 29:12-16, 42:18-19, 45:16-46:4).**

8

69.    EMT Milonas noted that plaintiff had a semi steady gait, meaning "he's probably able to stand up, but he's not balanced." (Milonas Dep Tr., Ex. G, Faddis Decl., p. 44:24-45:10; PCR, Ex. L, Faddis Decl.).

**PLAINTIFF'S RESPONSE: Admit insofar as EMT Milonas wrote this information in the PCR and respectfully refer the Court to the evidence cited, but deny insofar as at the time of her deposition, EMT Milonas did not have any independent recollection of the underlying events and that the only recollection she had of plaintiff was from the PCR narrative (Milonas Dep. Tr., Ex. G, Faddis Decl., 29:12-16, 42:18-19, 45:16-46:4).**

70.    EMT Milonas noted that plaintiff was "in an irrational state," meaning that "he was incoherent, he wasn't able to take what we were saying, understand it, and formulate a response that was of a rational thinking." (Milonas Dep. Tr., Ex. G, Faddis Decl., p. 45:11-22; PCR, Ex. L, Faddis Decl.).

**PLAINTIFF'S RESPONSE: Admit insofar as EMT Milonas wrote this information in the PCR and respectfully refer the Court to the evidence cited, but deny insofar as at the time of her deposition, EMT Milonas did not have any independent recollection of the underlying events and that the only recollection she had of plaintiff was from the PCR narrative (Milonas Dep. Tr., Ex. G, Faddis Decl., 29:12-16, 42:18-19, 45:16-46:4) and deny the materiality of these factual allegations.**

71.    EMT Milonas noted that the plaintiff was "not cooperative with unit questioning," meaning EMTs "were trying to ask him questions, especially during an assessment, and he was not forthcoming.  He did not want to cooperate, answer the

questions we were asking." (Milonas Dep. Tr., Ex. G, Faddis Decl., p. 46:5-16; PCR, Ex. L, Faddis Decl.).

> **PLAINTIFF'S RESPONSE: Admit insofar as EMT Milonas wrote this information in the PCR and respectfully refer the Court to the evidence cited, but deny insofar as at the time of her deposition, EMT Milonas did not have any independent recollection of the underlying events and that the only recollection she had of plaintiff was from the PCR narrative (Milonas Dep. Tr., Ex. G, Faddis Decl., 29:12-16, 42:18-19, 45:16-46:4).**

72.     EMT Milonas noted that the plaintiff "became aggressive with crew. Patient began yelling profanities and belligerently approaching crew," meaning "there was a threat." (Milonas Dep. Tr., Ex. G, Faddis Decl., p. 46:17-47:5; PCR, Ex. L, Faddis Decl.).

> **PLAINTIFF'S RESPONSE: Admit insofar as EMT Milonas wrote that plaintiff "became aggressive with crew. Patient began yelling profanities and belligerently approaching crew," in the PCR but only described plaintiff's action as a "threat" admitting at the time of her deposition, she did not have any independent recollection of the underlying events and that the only recollection she had of plaintiff was from the PCR narrative which did not state plaintiff threatened her. (Milonas Dep. Tr., Ex. G, Faddis Decl., 29:12-16, 42:18-19, 46:17-48-22). In addition, plaintiff testified that while he might have been a little bit loud, he was not yelling at the EMTs or in a bad mood and that he was in a "funny mood" and might have spoken loud in a funny way but was not being aggressive (Pl. Dep. Tr., Ex. C, Faddis Decl., 43:23-**

**44:4, 45:19-24, 153:24-154:2) and Ms. Kaur testified that plaintiff was never aggressive with the EMS workers and was praising them for doing a good job. (Kaur Dep. Tr., Ex. I, Faddis Decl., 36:17-22).**

73.    EMT Milonas concluded that plaintiff needed medical treatment. (Milonas Dep. Tr., Ex. G, Faddis Decl., p. 58:18-22).

**PLAINTIFF'S RESPONSE: Deny the factual allegations insofar as the testimony cited by defendants does not support the facts alleged except that EMT Milonas testified that based on her review of the PCR she believed that plaintiff needed medical treatment because at the time of her deposition, EMT Milonas did not have any independent recollection of the underlying events and that the only recollection she had of plaintiff was from the PCR narrative (Milonas Dep. Tr., Ex. G, Faddis Decl., 29:12-16, 42:18-19, 58:3-7).**

74.    EMT Milonas concluded that plaintiff was unable to refuse medical attention, because, "He did not meet the criteria.  He did not have rational thinking.  He was able to stand, but he did not have a complete steady gait, so he did not fit the criteria where he was able to refuse care.  He did not have that decision making capacity." (Milonas Dep. Tr., Ex. G, Faddis Decl., p. 60:10-22).

**PLAINTIFF'S RESPONSE: Deny the factual allegations insofar as the testimony cited by defendants does not support the facts alleged. All of EMT Milonas' testimony was based on her review of the PCR and she had no independent recollection about the events of February 28, 2018 (Milonas Dep. Tr., Ex. G, Faddis Decl., 29:12-16, 42:18-19, 60:23-61:14)**

75.     At approximately 6:38 a.m., the EMTs requested police assistance at the location. ("PLZ SEND RMP [radio motor patrol car], UNCO-OP PT", ICAD, Ex. K, Faddis Decl., p. 2).

**PLAINTIFF'S RESPONSE: Admit and respectfully refer the Court to the evidence cited.**

76.     At approximately 6:44 a.m., the EMTs again requested police assistance at plaintiff's home.  ("RMP NEEDED ASAP," ICAD, Ex. K, Faddis Decl., p. 3).

**PLAINTIFF'S RESPONSE: Admit and respectfully refer the Court to the evidence cited.**

77.     Plaintiff deleted the video from his home security system for the period of time during which the EMTs were requesting police assistance. (Pl. Dep. Tr., Ex. C, Faddis Decl., 113:17-114:25; EMS Video, Ex. N, Faddis Decl.; Police Video, Ex. O, Faddis Decl.)

**PLAINTIFF'S RESPONSE: Deny the factual allegations insofar as the testimony cited by defendants does not support the facts alleged except that plaintiff testified that the video from February 28, 2018, was deleted off of his home security system after he had recorded it on his cell phone, that the deletion was by accident, that the video would have automatically been deleted after fourteen (14) days, and that he did not record any other portion of the security footage (aside from "EMS Video," Ex. N, Faddis Decl. and ("Police Video," Ex. O, Faddis Decl.) because it was obvious to him that he did not need to record any other portions as those portions did not show him being assaulted by the police or interacting with anyone. (Pl. Dep. Tr., Ex. C,**

**Faddis Decl., 112:25-113:6, 113:17-115:21, 117:1-118-13) and deny the materiality of these factual allegations.**

78.     At approximately 6:44 a.m., defendant Officer Mandeep Cheema arrived at plaintiff's home with his two partners, Officer Justin Davis and Officer Malinda Walker. (Police Video, Ex. O, Faddis Decl.; Cheema Dep. Tr., Ex. D, Faddis Decl., 32:22-24).

**PLAINTIFF'S RESPONSE: Admit.**

79.     The officers spoke with the plaintiff, his wife, and the EMTs. (Cheema Dep. Tr., Ex. D, Faddis Decl., 71:17-19, 78:12-14).

**PLAINTIFF'S RESPONSE: Admit.**

80.     When Officer Cheema arrived at the apartment, he spoke with one of the EMTs. (Cheema Dep. Tr., Ex. D, Faddis Decl., 70:1-7).

**PLAINTIFF'S RESPONSE: Admit.**

81.     When Officer Cheema arrived at the apartment, he observed that plaintiff was intoxicated.  (Cheema Dep. Tr., Ex. D, Faddis Decl., 114:3-9).

**PLAINTIFF'S RESPONSE: Admit.**

82.     Officer Cheema was informed by one of the EMTs that plaintiff was being uncooperative with them to the point that they felt unsafe. (Cheema Dep. Tr., Ex. D, Faddis Decl., 71:20-71:5; 74:9-16).

**PLAINTIFF'S RESPONSE: Deny the factual allegations insofar as the testimony cited by defendants does not support the facts alleged and deny the materiality of these factual allegations. While defendant Cheema testified that he believed the EMTs told him that plaintiff was being uncooperative**

13

**with them to the point where it made them feel unsafe, defendant Cheema also testified that when he first spoke to the EMTs they stated that they were fine, he could not recall what exactly the EMTs explained to him about why they were feeling unsafe, and that the EMTs did not say plaintiff threatened to assault them, attempted to assault them, or assaulted them in any way nor did he observe plaintiff harm or attempt to harm anyone or document same in the Aided Report he filled out concerning the incident (Cheema Dep. Tr., Ex. D, Faddis Decl., 71:20-24, 72:6-11, 74:9-24, 118:2-17, 130:8-23; Aided Report, Ex. H, Cohen Decl.). In addition, plaintiff testified when he spoke to the EMTs, he was talking nicely to them and that while he might have been a little bit loud, he was not yelling at the EMTs or in a bad mood and that he was in a "funny mood" and might have spoken loud in a funny way but was not being aggressive (Pl. Dep. Tr., Ex. C, Faddis Decl., 43:19-44:4, 45:15-46:5, 153:24-154:2). Further, Ms. Kaur testified that plaintiff was never aggressive with the EMS workers and was praising them for doing a good job, that plaintiff animating with his hands as he was talking as he does normally and as many people do when they are explaining something, and that plaintiff was upset but not aggressive. (Kaur Dep. Tr., Ex. I, Faddis Decl., 36:17-22, 46:24-47:10, 51:7-20).**

83.     Officer Cheema understood from the EMTs that plaintiff was "intoxicated. He was incoherent.  He had signs of an altered mental state, and that they couldn't leave him for fear that something might happen to him if they didn't get him evaluated." (Cheema Dep. Tr., Ex. D, Faddis Decl., 72:19-73:3).

**PLAINTIFF'S RESPONSE: Deny. The cited evidence does not support the facts alleged except insofar as this was the substance of defendant Cheema's testimony insofar as he claims that's what he understood and deny the materiality of these factual allegations. Neither of the EMTs had any independent recollection of the events of February 28, 2018, nor what they told any police officers including defendant Cheema (Milonas Dep. Tr., Ex. G, Faddis Decl., 29:12-16, Schiapira Dep. Tr., Ex. H, Faddis Decl., 26:2-17). In addition, Defendant Cheema testified that plaintiff never attempted to physically harm himself nor did he indicate such on the Aided Form (Cheema Dep. Tr., Ex. D, Faddis Decl., 117:19-25, Aided Report, Ex. H, Cohen Decl.).**

84.     Plaintiff's wife thought that plaintiff needed to go to the hospital. (Kaur Dep. Tr., Ex. I, Faddis Decl., 30:12-14).

**PLAINTIFF'S RESPONSE: Admit.**

85.     Officer Cheema spoke with the plaintiff and asked him to voluntarily go to the hospital. (Cheema Dep. Tr., Ex. D, Faddis Decl., 84:7-89:12).

**PLAINTIFF'S RESPONSE: Admit insofar as defendant Cheema spoke with the plaintiff and tried to convince him to go to the hospital but deny that defendant asked plaintiff to go voluntarily. Defendant Cheema testified that plaintiff was informed that EMS felt that he could not be in his apartment, that the police couldn't just leave, and that plaintiff did not have a choice in the matter and would be forcibly removed to the hospital in handcuffs if he did not "agree" to go (Cheema Dep. Tr., Ex. D, Faddis Decl., 84:7-95:11).**

15

86.     Officer Cheema spoke "nicely" with the plaintiff. (Pl. Dep. Tr., Ex. C, Faddis Decl., 47:6-10).

**PLAINTIFF'S RESPONSE: Deny. The cited evidence does not support the facts alleged except insofar as this was the substance of plaintiff's testimony only with respect to Officer Davis. Plaintiff testified that Cheema hardly spoke to him. (Pl. Dep. Tr., Ex. C, Faddis Decl., 124:21-125:5).**

87.     The plaintiff was "pissed off" when police arrived at the location. (Pl. Dep. Tr., Ex. C, Faddis Decl., 46:6-15).

**PLAINTIFF'S RESPONSE: Admit.**

88.     The plaintiff was incoherent and argumentative.  ("He was rambling a lot. He was very incoherent.  I couldn't get anything out of him.  It was a lot of yelling and cursing in English and in Punjabi, which I understood." Cheema Dep. Tr., Ex. D, Faddis Decl., 74:4-8).

**PLAINTIFF'S RESPONSE: Deny. The cited evidence does not support the facts alleged except admit that this was the substance of defendant Cheema's testimony and deny the materiality of these factual allegations. Plaintiff testified that he was telling the officers it was unfair that he was being forced to go to the hospital and further told the officers that they drink and smoke and nobody takes them to the hospital and that he was not aggressive towards the police  (Pl. Dep. Tr., Ex. C, Faddis Decl., 129:1-10, 130:20-131:7, 154:3-5).  Further, plaintiff's wife testified that the substance of the conversation between plaintiff and the officers was that plaintiff asked the officers what crime he had committed, why they had entered his house, and**

16

**what had he done that they were here to take him. Plaintiff's wife further confirmed that plaintiff asked them whether he committed a crime and whether smoking and drinking were crimes. In addition, plaintiff's wife testified that plaintiff "talked with everybody normally" (Kaur Dep. Tr., Ex. I, Faddis Decl., 31:11-19, 33:10-18, 35:21-36:6).**

89.     The plaintiff told his wife in Punjabi, in sum and substance, that it was her fault EMS and police were in the apartment, that she should not speak with them, and that "he was going to take some type of action towards her once [they] left." (Cheema Dep. Tr., Ex. D, Faddis Decl., 75:14-76:24).

**PLAINTIFF'S RESPONSE: Deny. The cited evidence does not support the facts alleged except admit that this was the substance of defendant Cheema's testimony (Cheema Dep. Tr., Ex. D, Faddis Decl., 75:14-76:24). Plaintiff testified that the substance of his conversation with his wife (Ms. Kaur) was that he told her "this is not right, you are sending me to the hospital with handcuffs on. This is not right. I had not done anything," that he had not been aggressive towards Ms. Kaur, and that when he spoke to her in Punjabi, he told her that she had called the cops for nothing and it was not good but that he never threatened her (Pl. Dep. Tr., Ex. C, Faddis Decl., 59:13-21, 153:11-23, 155:5-23). Further, plaintiff's wife testified that plaintiff was talking normally, they had not argued, and that plaintiff never told her it was her fault the police had come, rather plaintiff had just asked he why she called them and that he had not threatened her nor told her she would pay for calling the police (Kaur Dep. Tr., Ex. I, Faddis Decl., 35:25-36:16, 60:11-**

24). **Additionally, none of the officers in plaintiff's apartment on February 28, 2018, who observed the events of that morning, arrested plaintiff for domestic violence nor noted anywhere that plaintiff attempted to physically harm anyone, which is required under the NYPD's zero-tolerance policy when there is an allegation of domestic violence, nor completed a Domestic Incident Report, which is required when there is an argument between spouses or other family members (Walker Dep. Tr., Ex. F, Faddis Decl., 38:1-42:19, 51:18-24; Cheema Dep. Tr., Ex. D, Faddis Decl., 118:2-17, 196:21-199:16; Davis Dep. Tr., Ex. E, Faddis Decl., 65:3-68:13).**

90.      Officer Cheema told the plaintiff that the police and EMS had determined that he needed medical attention, and if he would not go to the hospital voluntarily, they would have to take him involuntarily. (Cheema Dep. Tr., Ex. D, Faddis Decl., 85:3-86:16).

> **PLAINTIFF'S RESPONSE: Admit insofar as defendant Cheema spoke with the plaintiff and tried to convince him to go to the hospital but deny that plaintiff could go voluntarily in that voluntarily implies by its very nature that plaintiff could choose not to go when in fact plaintiff did not have that choice. Defendant Cheema testified that plaintiff was informed that EMS felt that he could not be in his apartment, that the police couldn't just leave, and that plaintiff did not have a choice in the matter and would be forcibly removed to the hospital in handcuffs if he did not "agree" to go (Cheema Dep. Tr., Ex. D, Faddis Decl., 84:7-95:11).**

91.    Plaintiff's wife wanted him to go to the hospital. (Pl. Dep. Tr., Ex. C, Faddis Decl., 42:23-25, 44:12-17).

**PLAINTIFF'S RESPONSE: Admit.**

92.    Plaintiff's brother wanted him to go to the hospital. (Pl. Dep. Tr., Ex. C, Faddis Decl., 57:13-18).

**PLAINTIFF'S RESPONSE: Admit.**

93.    Officer Cheema agreed with the EMTs assessment that plaintiff was so intoxicated that he required medical attention. (Cheema Dep. Tr., Ex. D, Faddis Decl., 95:4-11).

**PLAINTIFF'S RESPONSE: Deny the factual allegations as the testimony cited by defendants does not support the facts alleged except insofar as defendant Cheema testified that he decided to take plaintiff to the hospital no matter what because plaintiff had to get checked out and that said determination was made by defendant Cheema after consulting with EMS (Cheema Dep. Tr., Ex. D, Faddis Decl., 95:4-11).**

94.    At some point, plaintiff started to get dressed. (Cheema Dep. Tr., Ex. D, Faddis Decl, 95:12-14).

**PLAINTIFF'S RESPONSE: Admit.**

95.    When plaintiff began to get dressed, Officer Cheema believed the plaintiff was cooperating in going to the hospital (Cheema Dep. Tr., Ex. D, Faddis Decl., 97:8-11).

**PLAINTIFF'S RESPONSE: Admit.**

96.     After getting dressed, plaintiff changed his mind about going to the hospital and said, "I don't want to go." (Cheema Dep. Tr., Ex. D, Faddis Decl., 99:25-100:20).

> **PLAINTIFF'S RESPONSE: Deny the factual allegations as the testimony cited by defendants does not support the facts alleged except insofar as defendant Cheema testified that this was the sum and substance of his conversation with plaintiff (Cheema Dep. Tr., Ex. D, Faddis Decl., 99:25-100:20). However, plaintiff testified that when he was dressed he asked his wife for a glass of water, and then as he was about to be handcuffed he realized his wife had brought him the water and he then said "wait" and denied that he changed his mind about going to the hospital (Pl. Dep. Tr., Ex. C, Faddis Decl., 52:5-53:12, 131:16-132:5, 132:17-23). In addition, plaintiff's wife testified that after plaintiff was dressed he asked for a glass of water and that plaintiff replied "fine" to an officer when he was directed to put his hands behind his back before he was slammed to the floor. (Kaur Dep. Tr., Ex. I, Faddis Decl., 31:24-33:20, 38:4-10).**

97.     At that point, Officer Cheema told him they would have to handcuff him to take him to the hospital. (Cheema Dep. Tr., Ex. D, Faddis Decl., 101:18-25).

> **PLAINTIFF'S RESPONSE: Admit insofar as defendant Cheema testified that this was the sum and substance of his conversation with plaintiff (Cheema Dep. Tr., Ex. D, Faddis Decl., 101:18-25) and clarify that according to plaintiff, the police initially told him they would have to handcuff him to take him to the hospital shortly after they arrived and he was told by the**

**"black officer" not by defendant Cheema (Pl. Dep. Tr., Ex. C, Faddis Decl., 48:1-24) and that after plaintiff had gotten dressed, at the same time defendant Cheema was saying he was going to handcuff him, plaintiff started to put his hands behind his back and then observed his wife bring him a glass of water and he said "wait" (concerning being handcuffed) so he could get the water and was then immediately thrown to the ground (Pl. Dep. Tr., Ex. C, Faddis Decl., 52:5-53:15, 131:13-132:2)**

98.     When Officer Cheema told the plaintiff he would have to handcuff him, the plaintiff said "Fine. You're going to have to handcuff me" and put his hands behind his back. (Cheema Dep. Tr., Ex. D, Faddis Decl., 101:18-25).

**PLAINTIFF'S RESPONSE: Deny the factual allegations as the testimony cited by defendants does not support the facts alleged except insofar as defendant Cheema testified that this was the sum and substance of his conversation with plaintiff (Cheema Dep. Tr., Ex. D, Faddis Decl., 101:18-25) and deny the materiality of these factual allegations. Plaintiff testified that after he had gotten dressed, he asked for his wife to bring him a glass of water, and immediately thereafter, at the same time defendant Cheema was saying he was going to handcuff him, plaintiff started to put his hands behind his back and then observed his wife bring him a glass of water and he said "wait" (concerning being handcuffed) so he could get the water and was then immediately thrown to the ground (Pl. Dep. Tr., Ex. C, Faddis Decl., 52:5-53:15, 131:13-132:2). In addition, plaintiff's wife testified that after plaintiff was dressed he asked for a glass of water and that plaintiff replied "fine" to**

**an officer when he was directed to put his hands behind his back before he was slammed to the floor. (Kaur Dep. Tr., Ex. I, Faddis Decl., 31:24-33:20, 38:4-10).**

99.     Officer Cheema was getting ready to handcuff plaintiff, when plaintiff pulled his arms to the front, saying, "I'm just joking. You're not going to handcuff me," raises his hands to his chest, and took a sudden step toward Officer Walker.  (Cheema Dep. Tr., Ex. D, Faddis Decl., 102:2-17; Pl. Dep. Tr., Ex. C, Faddis Decl., 53:6-15).

> **PLAINTIFF'S RESPONSE: Admit insofar as defendant Cheema testified that this was the sum and substance of his conversation with plaintiff (Cheema Dep. Tr., Ex. D, Faddis Decl., 102:2-17) and admit that plaintiff had been making jokes. However, deny that plaintiff took a sudden step towards Officer Walker. Plaintiff testified that at the same time defendant Cheema was saying he was going to handcuff him, plaintiff started to put his hands behind his back and then observed his wife bring him a glass of water and he said "wait" (concerning being handcuffed) so he could get the water and was then immediately thrown to the ground (Pl. Dep. Tr., Ex. C, Faddis Decl., 52:5-53:15, 131:13-132:2). Plaintiff further testified that when he went to get the water, he nicely moved his hands towards his chest and said "wait" (Pl. Dep. Tr., Ex. C, Faddis Decl., 53:2-12) and that he did not step towards the door away from his wife or try to move towards the door, he merely moved forward to get the water (Pl. Dep. Tr., Ex. C, Faddis Decl., 131:16-132:5).**

100.   On February 28, 2018, Officer Walker was 5 feet two inches tall, and weighed approximately 140 pounds.  (Walker Dep. Tr., Ex. F, Faddis Decl., 6:2-13).

    **PLAINTIFF'S RESPONSE: Admit the substance of Officer Walker's testimony, but deny the materiality of these factual allegations.**

101.    Officer Walker flinched when plaintiff took a sudden step toward her. (Police Video, Ex. O, Faddis Decl., 8:02).

    **PLAINTIFF'S RESPONSE: Deny the substance and materiality of these factual allegations and respectfully refer the Court to the evidence cited. In addition, P.O. Walker testified that based on her review of the video, she had no memory of plaintiff trying to attack her or being in fear of being attacked by plaintiff and that it would be unusual for her to have no memory of a situation where she felt that she was in danger (Walker Dep. Tr., Ex. F, Faddis Decl., 58:11-60:4).**

102.    At the time plaintiff took a sudden step toward Officer Walker, Officer Cheema was standing behind the plaintiff. (Police Video, Ex. O, Faddis Decl., 8:02).

    **PLAINTIFF'S RESPONSE: Deny the substance and materiality of these factual allegations except insofar as at 8:02 in the video, defendant Cheema was standing behind plaintiff and respectfully refer the Court to the evidence cited. Plaintiff denies he took a sudden step towards Officer Walker. Plaintiff testified that at the same time defendant Cheema was saying he was going to handcuff him, plaintiff started to put his hands behind his back and then observed his wife bring him a glass of water and he said "wait" (concerning being handcuffed) so he could get the water and was then immediately thrown to the ground (Pl. Dep. Tr., Ex. C, Faddis Decl., 52:5-53:15, 131:13-132:2). Plaintiff further testified that when he went to get the water, he nicely**

moved his hands towards his chest and said "wait" (Pl. Dep. Tr., Ex. C, Faddis Decl., 53:2-12) and that he did not step towards the door away from his wife or try to move towards the door, he merely moved forward in order to get the water (Pl. Dep. Tr., Ex. C, Faddis Decl., 131:16-132:5). P.O. Walker testified that based on her review of the video, she had no memory of plaintiff trying to attack her or being in fear of being attacked by plaintiff and that it would be unusual for her to have no memory of a situation where she felt that she was in danger (Walker Dep. Tr., Ex. F, Faddis Decl., 58:11-60:4).

103.    At that point, based on the preceding events, Officer Cheema felt the scene was no longer safe. (Cheema Dep. Tr., Ex. D, 102:10-103:14).

104.    **PLAINTIFF'S RESPONSE: Deny substance and materiality of the facts alleged, insofar as Officer Cheema's subjective beliefs are legally irrelevant. Further, plaintiff disputes that the "preceding events" would have made the scene "no longer safe" as he had not been aggressive, nor threatening, nor had he committed any crimes against any person. Plaintiff testified that at the same time defendant Cheema was saying he was going to handcuff him, plaintiff started to put his hands behind his back and then observed his wife bring him a glass of water and he said "wait" (concerning being handcuffed) so he could get the water and was then immediately thrown to the ground (Pl. Dep. Tr., Ex. C, Faddis Decl., 52:5-53:15, 131:13-132:2). Plaintiff further testified that when he went to get the water, he nicely moved his hands towards his chest and said "wait" (Pl. Dep. Tr., Ex. C, Faddis Decl., 53:2-12) and that he did not step towards the door away from his wife**

or try to move towards the door, he merely moved forward in order to get the water
(Pl. Dep. Tr., Ex. C, Faddis Decl., 131:16-132:5). P.O. Walker testified that based on
her review of the video, she had no memory of plaintiff trying to attack her or being
in fear of being attacked by plaintiff and that it would be unusual for her to have no
memory of a situation where she felt that she was in danger (Walker Dep. Tr., Ex. F,
Faddis Decl., 58:11-60:4). In addition, the EMTs did not say plaintiff threatened to
assault them, attempted to assault them, or assaulted them in any way nor did he
observe plaintiff harm or attempt to harm anyone or document same in the Aided
Report he filled out concerning the incident (Cheema Dep. Tr., Ex. D, Faddis Decl.,
71:20-24, 72:6-11, 74:9-24, 118:2-17, 130:8-23). Further, plaintiff testified when he
spoke to the EMTs, he was talking nicely to them and that while he might have been
a little bit loud, he was not yelling at the EMTs or in a bad mood and that he was in
a "funny mood" and might have spoken loud in a funny way but was not being
aggressive (Pl. Dep. Tr., Ex. C, Faddis Decl., 43:19-44:4, 45:15-46:5, 153:24-154:2).
Moreover, Ms. Kaur testified that plaintiff was never aggressive with the EMS
workers, had not threatened her nor told her she would pay for calling the police
(Kaur Dep. Tr., Ex. I, Faddis Decl., 35:25-36:22, 46:24-47:10, 51:7-20m 60:11-24),
and none of the officers in plaintiff's apartment on February 28, 2018, who observed
the events of that morning, arrested plaintiff for domestic violence nor noted
anywhere that plaintiff attempted to physically harm anyone, which is required
under the NYPD's zero-tolerance policy when there is an allegation of domestic
violence, nor completed a Domestic Incident Report, which is required when there is
an argument between spouses or other family members (Walker Dep. Tr., Ex. F,

**Faddis Decl., 38:1-42:19, 51:18-24; Cheema Dep. Tr., Ex. D, Faddis Decl., 118:2-17, 196:21-199:16; Davis Dep. Tr., Ex. E, Faddis Decl., 65:3-68:13).**

105.    In response, Officer Cheema grabbed plaintiff from behind, wrapping his arms across his chest in a seatbelt hold, and took him to the ground. (Cheema Dep. Tr., 102:18-103:3; Police Video, Ex. O, Faddis Decl.; Pl. Dep. Tr., Ex. C, Faddis Decl., 62:5-12).

> **PLAINTIFF'S RESPONSE: Deny the factual allegations as the testimony cited by defendants does not support the facts alleged. Officer Cheema *did not* testify that he put plaintiff in a "seatbelt hold" at any time during his deposition nor do the phrases "seatbelt" or "seatbelt hold" appear anywhere in Defendant Cheema's deposition (Cheema Dep. Tr., Ex. D, Faddis Decl., Deposition Index Pages 22-23). Defendant Cheema testified that "I grabbed him [plaintiff] from behind, and then I took him to the floor" (Cheema Dep. Tr., Ex. D, Faddis Decl., 102:25-103:3, 105:22-24) and respectfully refer the Court to the evidence cited in Ex. O, Faddis Decl. However, both plaintiff and his wife (Ms. Kaur) characterize Officer Cheema's takedown of plaintiff as plaintiff being forcefully thrown or slammed down to the ground, which caused his eyeglasses to break and caused him injury and to lose consciousness for a short period of time (Pl. Dep. Tr., Ex. C, Faddis Decl., 53:13-15, 61:10-65:21, 70:4-13, 70:18-22, 71:20-23; Kaur Dep. Tr., Ex. I, Faddis Decl., 30:24-25, 31:4, 31:8, 32:18-24, 38:9-11, 38:22-39-2, 69:23-70:6, 70:14-19, 72:4-7, 72:11-13).**

26

106.    Officer Cheema and Officer Davis handcuffed the plaintiff on the floor. (Cheema Dep. Tr., Ex. D, 102:18-103:3).

**PLAINTIFF'S RESPONSE: Admit**

107.    After plaintiff was handcuffed, all three officers assisted him in standing up. (Police Video, Ex. O, Faddis Decl., 8:00-8:21).

**PLAINTIFF'S RESPONSE: Admit.**

108.    Officer Walker believed that taking plaintiff to the floor was a reasonable response to his unexpected movement. (Walker Dep. Tr., Ex. F, 60:18-61:1).

**PLAINTIFF'S RESPONSE: Deny substance and materiality of the facts alleged, insofar as Officer Walker's subjective beliefs are legally irrelevant. Further, plaintiff disputes that he made an "unexpected movement" towards P.O. Walker and disputes there was a possibility that he could attack anyone. Plaintiff testified that at the same time defendant Cheema was saying he was going to handcuff him, plaintiff started to put his hands behind his back and then observed his wife bring him a glass of water and he said "wait" (concerning being handcuffed) so he could get the water and was then immediately thrown to the ground (Pl. Dep. Tr., Ex. C, Faddis Decl., 52:5-53:15, 131:13-132:2). Plaintiff further testified that when he went to get the water, he nicely moved his hands towards his chest and said "wait" (Pl. Dep. Tr., Ex. C, Faddis Decl., 53:2-12) and that he did not step towards the door away from his wife or try to move towards the door, he merely moved forward in order to get the water (Pl. Dep. Tr., Ex. C, Faddis Decl., 131:16-132:5). P.O. Walker testified that based on her review of the video, she had**

no memory of plaintiff trying to attack her or being in fear of being attacked
by plaintiff and that it would be unusual for her to have no memory of a
situation where she felt that she was in danger (Walker Dep. Tr., Ex. F,
Faddis Decl., 58:11-60:4). In addition, the EMTs did not say plaintiff
threatened to assault them, attempted to assault them, or actually assaulted
them in any way nor did he observe plaintiff harm or attempt to harm
anyone or document same in the Aided Report he filled out concerning the
incident (Cheema Dep. Tr., Ex. D, Faddis Decl., 71:20-24, 72:6-11, 74:9-24,
118:2-17, 130:8-23, Aided Report, Ex. H, Cohen Decl.). Further, plaintiff
testified when he spoke to the EMTs, he was talking nicely to them and that
while he might have been a little bit loud, he was not yelling at the EMTs or
in a bad mood and that he was in a "funny mood" and might have spoken
loud in a funny way but was not being aggressive (Pl. Dep. Tr., Ex. C, Faddis
Decl., 43:19-44:4, 45:15-46:5, 153:24-154:2). Moreover, Ms. Kaur testified
that plaintiff was never aggressive with the EMS workers, had not
threatened her nor told her she would pay for calling the police (Kaur Dep.
Tr., Ex. I, Faddis Decl., 35:25-36:22, 46:24-47:10, 51:7-20m 60:11-24), and
none of the officers in plaintiff's apartment on February 28, 2018, who
observed the events of that morning, arrested plaintiff for domestic violence
nor noted anywhere that plaintiff attempted to physically harm anyone,
which is required under the NYPD's zero-tolerance policy when there is an
allegation of domestic violence, nor completed a Domestic Incident Report,
which is required when there is an argument between spouses or other family

members (**Walker Dep. Tr., Ex. F, Faddis Decl., 38:1-42:19, 51:18-24;**
**Cheema Dep. Tr., Ex. D, Faddis Decl., 118:2-17, 196:21-199:16; Davis Dep.**
**Tr., Ex. E, Faddis Decl., 65:3-68:13).**

109.    Officer Davis believed it was a possibility, at the moment that plaintiff
stepped in Officer Walker's direction, that he could attack anyone, including her.  (Davis
Dep. Tr., Ex. E, Faddis Decl., 120:15-122:24).

> **PLAINTIFF'S RESPONSE: Deny substance and materiality of the facts**
> **alleged, insofar as Officer Davis' subjective beliefs are legally irrelevant.**
> **Further, Notwithstanding, Officer Davis did not believe plaintiff was going to**
> **attack Officer Walker when he took the step forward. (Davis Dep., Tr. Ex. E,**
> **Faddis Decl., 82:16-21 ("Q. Did you believe at the moment that Officer**
> **Cheema grabbed Mr. Singh to handcuff him that Mr. Singh was going to**
> **attack your partner Officer Walker? A. No, she was not -- not in that**
> **proximity.") Moreover, plaintiff disputes that he "took a sudden step"**
> **towards P.O. Walker and disputes there was a possibility that he could**
> **attack anyone. Plaintiff testified that at the same time defendant Cheema was**
> **saying he was going to handcuff him, plaintiff started to put his hands behind**
> **his back and then observed his wife bring him a glass of water and he said**
> **"wait" (concerning being handcuffed) so he could get the water and was then**
> **immediately thrown to the ground (Pl. Dep. Tr., Ex. C, Faddis Decl., 52:5-**
> **53:15, 131:13-132:2). Plaintiff further testified that when he went to get the**
> **water, he nicely moved his hands towards his chest and said "wait" (Pl. Dep.**
> **Tr., Ex. C, Faddis Decl., 53:2-12) and that he did not step towards the door**

away from his wife or try to move towards the door, he merely moved forward in order to get the water (Pl. Dep. Tr., Ex. C, Faddis Decl., 131:16-132:5). P.O. Walker testified that based on her review of the video, she had no memory of plaintiff trying to attack her or being in fear of being attacked by plaintiff and that it would be unusual for her to have no memory of a situation where she felt that she was in danger (Walker Dep. Tr., Ex. F, Faddis Decl., 58:11-60:4). In addition, the EMTs did not say plaintiff threatened to assault them, attempted to assault them, or actually assaulted them in any way nor did he observe plaintiff harm or attempt to harm anyone or document same in the Aided Report he filled out concerning the incident (Cheema Dep. Tr., Ex. D, Faddis Decl., 71:20-24, 72:6-11, 74:9-24, 118:2-17, 130:8-23; Aided Report, Ex. H, Cohen Decl.). Further, plaintiff testified when he spoke to the EMTs, he was talking nicely to them and that while he might have been a little bit loud, he was not yelling at the EMTs or in a bad mood and that he was in a "funny mood" and might have spoken loud in a funny way but was not being aggressive. (Pl. Dep. Tr., Ex. C, Faddis Decl., 43:19-44:4, 45:15-46:5, 153:24-154:2). Moreover, Ms. Kaur testified that plaintiff was never aggressive with the EMS workers, had not threatened her nor told her she would pay for calling the police (Kaur Dep. Tr., Ex. I, Faddis Decl., 35:25-36:22, 46:24-47:10, 51:7-20m 60:11-24), and none of the officers in plaintiff's apartment on February 28, 2018, who observed the events of that morning, arrested plaintiff for domestic violence nor noted anywhere that plaintiff attempted to physically harm anyone,

30

**which is required under the NYPD's zero-tolerance policy when there is an allegation of domestic violence, nor completed a Domestic Incident Report, which is required when there is an argument between spouses or other family members. (Walker Dep. Tr., Ex. F, Faddis Decl., 38:1-42:19, 51:18-24; Cheema Dep. Tr., Ex. D, Faddis Decl., 118:2-17, 196:21-199:16; Davis Dep. Tr., Ex. E, Faddis Decl., 65:3-68:13).**

110.    Officer Davis did not see a tactically sound alternative means of restraining the plaintiff after he took the sudden step toward Officer Walker other than taking him to the floor. (Davis Dep. Tr., Ex. E, Faddis Decl., 126:4-128:4)

**PLAINTIFF'S RESPONSE: Deny substance and materiality of the facts alleged, insofar as Officer Davis' subjective beliefs are legally irrelevant. Moreover, Officer Davis did not believe plaintiff was going to attack Officer Walker when he took the step forward. (Davis Dep., Tr. Ex. E, Faddis Decl., 82:16-21 ("Q. Did you believe at the moment that Officer Cheema grabbed Mr. Singh to handcuff him that Mr. Singh was going to attack your partner Officer Walker? A. No, she was not -- not in that proximity."). Further, plaintiff disputes that he took a "sudden step" towards Officer Walker. Plaintiff testified that at the same time defendant Cheema was saying he was going to handcuff him, plaintiff started to put his hands behind his back and then observed his wife bring him a glass of water and he said "wait" (concerning being handcuffed) so he could get the water and was then immediately thrown to the ground (Pl. Dep. Tr., Ex. C, Faddis Decl., 52:5-53:15, 131:13-132:2). Plaintiff further testified that when he went to get the**

31

water, he nicely moved his hands towards his chest and said "wait" (Pl. Dep. Tr., Ex. C, Faddis Decl., 53:2-12) and that he did not step towards the door away from his wife or try to move towards the door, he merely moved forward in order to get the water. (Pl. Dep. Tr., Ex. C, Faddis Decl., 131:16-132:5). P.O. Walker testified that based on her review of the video, she had no memory of plaintiff trying to attack her or being in fear of being attacked by plaintiff and that it would be unusual for her to have no memory of a situation where she felt that she was in danger (Walker Dep. Tr., Ex. F, Faddis Decl., 58:11-60:4). In addition, the EMTs did not say plaintiff threatened to assault them, attempted to assault them, or actually assaulted them in any way nor did he observe plaintiff harm or attempt to harm anyone or document same in the Aided Report he filled out concerning the incident (Cheema Dep. Tr., Ex. D, Faddis Decl., 71:20-24, 72:6-11, 74:9-24, 118:2-17, 130:8-23; Aided Report, Ex. H, Cohen Decl.). Further, plaintiff testified when he spoke to the EMTs, he was talking nicely to them and that while he might have been a little bit loud, he was not yelling at the EMTs or in a bad mood and that he was in a "funny mood" and might have spoken loud in a funny way but was not being aggressive (Pl. Dep. Tr., Ex. C, Faddis Decl., 43:19-44:4, 45:15-46:5, 153:24-154:2). Moreover, Ms. Kaur testified that plaintiff was never aggressive with the EMS workers, had not threatened her nor told her she would pay for calling the police (Kaur Dep. Tr., Ex. I, Faddis Decl., 35:25-36:22, 46:24-47:10, 51:7-20m 60:11-24), and none of the officers in plaintiff's apartment on February 28, 2018, who

32

**observed the events of that morning, arrested plaintiff for domestic violence nor noted anywhere that plaintiff attempted to physically harm anyone, which is required under the NYPD's zero-tolerance policy when there is an allegation of domestic violence, nor completed a Domestic Incident Report, which is also required when there is an argument between spouses or other family members. (Walker Dep. Tr., Ex. F, Faddis Decl., 38:1-42:19, 51:18-24; Cheema Dep. Tr., Ex. D, Faddis Decl., 118:2-17, 196:21-199:16; Davis Dep. Tr., Ex. E, Faddis Decl., 65:3-68:13).**

111.    The officers escorted plaintiff down the stairs to the ambulance, which transported him to JHMC.  (Police Video, Ex. O, Faddis Decl., 8:20-8:30; PCR, Ex. L, Faddis Decl., JHMC Recs, Ex. M, Faddis Decl.)

**PLAINTIFF'S RESPONSE: Admit.**

112.    Plaintiff arrived at JHMC at approximately 7:48 a.m., almost two hours after his wife called 911.   (JHMC Recs., Ex. M, Faddis Decl., p. 1).

**PLAINTIFF'S RESPONSE: Admit.**

113.    At approximately 8:06 a.m., a blood sample was taken from the plaintiff by JHMC for alcohol screening. (JHMC Recs., Ex. M, Faddis Decl., p. 19).

**PLAINTIFF'S RESPONSE: Admit.**

114.    Plaintiff's blood alcohol level, two hours after his wife called 911, was 247 mg/dL. (JHMC Recs., Ex. M, Faddis Decl., p. 19).

**PLAINTIFF'S RESPONSE: Admit.**

115.    The New York State Vehicle and Traffic Law defines intoxication as any blood alcohol level exceeding 80 mg/dL.  N.Y. V.T.L. § 31-1192.

**PLAINTIFF'S RESPONSE: Admit but deny the materiality of these factual allegations.**

116.   JHMC staff noted the plaintiff was "hand cuffed by police, verbally abusive, noisy and uncooperative." (JHMC Recs., Ex. M, Faddis Decl., p. 5).

**PLAINTIFF'S RESPONSE: Admit the substance of what appears in the medical records but deny the materiality of these factual allegations.**

117.   Plaintiff's wife reported to JHMC staff that she called 911 because she was concerned about his drinking habits because plaintiff has liver disease. (JHMC Recs., Ex. M, Faddis Decl., p. 15).

**PLAINTIFF'S RESPONSE: Admit but deny the materiality of these factual allegations.**

118.   The officers left the plaintiff at the hospital approximately 40 minutes after his arrival.  (Cheema Dep. Tr., Ex. D, Faddis Decl., 185:9-12).

**PLAINTIFF'S RESPONSE: Admit.**

119.   Plaintiff was discharged from JHMC at approximately 3:06 p.m. on February 28, 2018.  (JHMC Recs., Ex. M, Faddis Decl., p. 1).

**PLAINTIFF'S RESPONSE: Admit.**

Dated: New York, New York
        November 12, 2021

                                    Respectfully submitted,


                                    By: _____/S_____
                                        GERALD M. COHEN
                                        JOSHUA P. FITCH
                                        ILYSSA S. FUCHS
                                        COHEN & FITCH LLP

*Attorneys for Plaintiff*
110 East 59th Street, Suite 3200
New York, N.Y. 10022
(212) 374-9115
gcohen@cohenfitch.com
jfitch@cohenfitch.com
ifuchs@cohenfitch.com

TO: **BY E-MAIL & ECF**

THE NEW YORK CITY LAW DEPT.
*Attorneys for Defendants*
100 Church St.
New York, NY 10007
Tel: (212) 356-2332
Fax: (212) 356-3509

By: Hannah V. Faddis, Esq.

35

Case 1:19-cv-00632-EK-ST   Document 49-2   Filed 11/29/21   Page 1 of 2 PageID #: 1612

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
BALWINDER SINGH,

                        Plaintiff,

       -against-                       **19 CV 00632**
                                              **(EK)(ST)**

THE CITY OF NEW YORK, et al.

                        Defendants.
-------------------------------------------------------X

**DECLARATION OF GERALD M. COHEN IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT & IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

    GERALD M. COHEN, an attorney admitted to practice in the State of New York, declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, as follows:

    1.      I am a partner with the law firm of Cohen & Fitch LLP, one of the attorneys of record for plaintiff Balwinder Singh. As such, I am familiar with the facts stated below, and I submit this Declaration to place on the record the relevant documents in support of plaintiff's motion for summary judgment.

    1.      Attached as **Exhibit N** is the portion of the video from the incident occuring on February 28, 2018 depicting plaintiff's interactions with the Emergency Medical Technicians ("EMTs").

    2.      Attached as **Exhibits O(1)-O(4)** are still photos from the video of the Incident occuring on February 28, 2018.

Dated: New York, New York
          November 29, 2021

                            Respectfully submitted,

1

**[JA-1377]**

Case 1:19-cv-00632-EK-ST   Document 49-2   Filed 11/29/21   Page 2 of 2 PageID #: 1613

_____/S_____
Gerald M. Cohen
Cohen & Fitch, LLP
110 E. 59th St., Suite 3200
New York, NY 10022
(212) 374-9115
gcohen@cohenfitch.com

2

**[JA-1378]**

# EXHIBIT

# "N"

(Video Recording Could Not Be Attached Due to the Digital Size
Constraints of ECF Filing. Original Provided to Defense Counsel & Filed
with the Court)

Case 1:19-cv-00632-EK-ST   Document 49-4   Filed 11/29/21   Page 2 of 6 PageID #: 1616

Ex. O(1)



Case 1:19-cv-00632-EK-ST   Document 49-4   Filed 11/29/21   Page 3 of 6 PageID #: 1617

Ex. O(2)



Case 1:19-cv-00632-EK-ST   Document 49-4   Filed 11/29/21   Page 4 of 6 PageID #: 1618

Ex. O(3)



Case 1:19-cv-00632-EK-ST   Document 49-4   Filed 11/29/21   Page 5 of 6 PageID #: 1619

Ex. O(4)



[JA-1383]

Case 1:19-cv-00632-EK-ST Document 49-4 Filed 11/29/21 Page 6 of 6 PageID #: 1620

Ex. O(5)



**[JA-1384]**



**HON. SYLVIA O. HINDS-RADIX**
*Corporation Counsel*

**THE CITY OF NEW YORK**
**LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK, N.Y. 10007

**HANNAH V. FADDIS**
*Senior Counsel*
phone: (212) 356-2486
fax: (212) 356-1148
hfaddis@law.nyc.gov

May 10, 2022

**VIA ECF**
Honorable Eric Komitee
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:  Balwinder Singh v. City of New York, et al.
        19-cv-632 (EK) (ST)

Your Honor:

I am the attorney assigned to represent the defendants City of New York (the "City") and Officer Mandeep Cheema in this matter.  Defendants write jointly with plaintiff in response to the Court's Order dated April 13, 2022 (ECF No. 53).

Having conferred, the parties do not consent to having Judge Tiscione decide the pending motions pending pursuant to 28 U.S.C. § 636(c).  Additionally, the parties do not consent to a referral of this matter to Judge Tiscione for all purposes.

Defendants thank the Court for its consideration.

Respectfully submitted,

/s/
Hannah V. Faddis
*Senior Counsel*
Special Federal Litigation Division

cc:    **VIA ECF**
        Gerald Cohen, Esq.
        Ilyssa Fuchs, Esq.
        *Attorneys for Plaintiff*

1

**[JA-1385]**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

BALWINDER SINGH,

                              Plaintiff,                    **REPORT AND RECOMMENDATION**

        -against-                                           **19-CV-00632 (EK) (ST)**

THE CITY OF NEW YORK, P.O. MANDEEP
CHEEMA, Tax Id. No. 950196, Individually and in his
Official Capacity, and POLICE OFFICERS "JOHN
DOE" #1-10, Individually and in their Official Capacity
(the name John Doe being fictitious, as the true names are
presently unknown),

                              Defendant.
-----------------------------------------------------------X

**TISCIONE, United States Magistrate Judge:**

        On February 1, 2019, Balwinder Singh ("Plaintiff") filed a Complaint against the City of

New York, and Police Officers Mandeep Cheema and John Doe #1-10 (collectively,

"Defendants").  Plaintiff alleged, *inter alia*, claims for false arrest and excessive force in

violation of the Fourth Amendment to the United States Constitution under 42 U.S.C. § 1983;

and claims for false arrest, assault, and battery under New York law.  Now before this Court are

(1) Plaintiff's Motion for Summary Judgment on the excessive force claim; and (2) Defendants'

Cross-Motion for Summary Judgment on excessive force, false arrest, and New York law claims.

The Honorable Eric Komitee referred the Motions to the undersigned to issue a Report and

Recommendation.

        For the reasons stated below, this Court respectfully recommends that (1) Plaintiff's

Motion for Summary Judgment be denied; and (2) Defendants' Cross-Motion for Summary

Judgment be granted in part and denied in part.

## I.     BACKGROUND

### A.  Factual Background

Plaintiff, an Indian American male, is a resident of Queens, New York.  Compl. ¶ 6.

Defendant City of New York is a municipal corporation that maintains New York City

Police Department ("NYPD").  Police Officers Mandeep Cheema and John Doe #1-10 are

employed by NYPD.  *Id.* ¶¶ 7-10.

On February 28, 2018, around mid-night, Plaintiff was shopping when he ran into an old

friend.  Pl.'s Mot. at 1; Pl.'s Dep. Tr. at 31, Ex. A, DE 46.  Plaintiff's friend asked him to join

him for a beer and Plaintiff agreed.  *Id.*  On the way home, Plaintiff purchased a pack of six

beers.  *Id.*  When Plaintiff reached home, he continued to drink beer throughout the night in his

living room.  *Id.*  Admittedly, Plaintiff consumed at least four beers that night.  Pl.'s Dep. Tr. at

34.  Notably, in 2004, Plaintiff received treatment for alcohol abuse and had been sober for many

years.  Pl.'s Mot. at 1.

At approximately 6:15 a.m., Plaintiff's wife found Plaintiff in an intoxicated state.  *Id.* at

2.  Out of concern for Plaintiff's health, his wife called 911 to request medical attention.  *Id.*;

Defs.' Cross Mot. at 3.  Upon receiving the medical request, the 911 operator immediately

transferred Plaintiff's wife to the Emergency Medical Services ("EMS").  *Id.*

At approximately 6:30 a.m., two EMS workers or Emergency Medical Technicians

("EMT"), Nicole Milonas and Marisabel Schiapira, arrived at Plaintiff's residence from Jamaica

Hospital Medical Center ("JHMC").  *Id.*  The EMTs found Plaintiff to be intoxicated and

determined that he needed medical evaluation.  *Id.*  Even though Plaintiff refused to go to the

hospital, the EMTs concluded that he needed medical evaluation because his wife had previously

stated that "[he] [was] a harm to himself" and also because Plaintiff was "non-cooperative with

2

[the EMTs'] questioning." *Id.*  EMT Milonas further noted that Plaintiff showed aggressiveness

in his response to their questioning, yelled profanities, and belligerently approached the EMTs,

but he was otherwise not violent towards anyone and did not physically assault anyone.  *Id.*;

Milonas Dep. Tr. at 49, Ex. E, DE 46.  Because Plaintiff refused to go to the hospital voluntarily,

EMT Milonas called the police for assistance.  Defs.' Cross Mot. at 3.  It is undisputed that

Plaintiff had a Glasgow Coma Score of 15, which indicated that he had the mental capacity to

refuse medical attention at that time.  Pl.'s Mot. at 2; PHC Report, Ex. L, DE 48.

  At approximately 7:00 a.m., Cheema and his fellow Police Officers, Justin Davis and

Malinda Walker (collectively, "Police Officers"), entered Plaintiff's residence.  Pl.'s Mot. at 3.

After initially trying to convince Plaintiff to voluntarily go to the hospital, Cheema finally told

Plaintiff that he had no choice and that he would be taken to the hospital one way or the other.

*Id.* at 4; Cheema Dep. Tr., Ex. C at 85-86, DE 46.  Specifically, Cheema told Plaintiff that he

could either go voluntarily, without handcuffs or the Police Officers would forcibly handcuff

Plaintiff and take him to the hospital.  Pl.'s Mot. at 4.  Plaintiff agreed to go voluntarily.  *Id.* at 5.

  As Plaintiff readied himself and stood near the front door of his apartment, surrounded by

all three Police Officers, he jokingly stated that he no longer wanted to go to the hospital.  *Id.*

Plaintiff then put his arms behind his back and jokingly stated the Police Officers should

"handcuff [him]." Pl.'s Mot. at 5-6; Cheema Dep. Tr. at 165, Ex. C, DE 46.  As Officer Cheema

approached Plaintiff to handcuff him, Plaintiff then brought his hands forward to the front of his

body, smiled back at Officer Cheema, and said, "I'm just joking.  You're not going to handcuff

me," after which Plaintiff took a step forward towards the door where Officer Walker was

standing.  Pl.'s Mot. at 6; Cheema's Dep. Tr. at 102; Video, Ex. G(1) at 7:57-8:03; Ex. G(2); Ex.

G(3)).  At that point, Cheema grabbed Plaintiff from behind, wrapped his arms across Plaintiff's

chest in a seatbelt hold, and took Plaintiff to the ground.  Defs.' Rule 56.1 St., ¶ 102-105; Pl.'s

Mot. at 7.  Cheema then handcuffed Plaintiff, with Davis' assistance.  *Id.*  Cheema believed

Plaintiff had taken a "sudden" step towards Walker, who was standing against the front door.

Cheema Dep. Tr. at 103, Ex. C, DE 46; Defs.' Mot. at 4.

After Plaintiff was handcuffed, all three Police Officers assisted him to his feet.  Defs.'

Rule 56.1 St. ¶ 106.  Plaintiff was then escorted out of the location and transported to JHMS.  *Id.*

¶¶ 110-111.  At approximately 8 a.m., Plaintiff's blood alcohol level was still approximately

three times the legal driving limit.  *Id.*  ¶¶ 112-114.  Officer Cheema left Plaintiff in the care of

JHMC shortly after his arrival.  *Id.* ¶ 117.  Plaintiff was discharged from JHMC at approximately

3 p.m. the same day.  *Id.* ¶ 119.

Cheema testified that his actions, including taking Plaintiff to the ground, were "based off

of everything that happened from the time that [they] got in and to that very moment, and the

different levels of escalation."  Defs.' Rule 56.1 St. ¶¶ 81-82.  Plaintiff, on the other hand,

highlights the impact of his fall and Cheema's weight of two hundred sixty-five-pounds and

height of six feet and three inches with which he slammed Plaintiff to the ground.  Cheema Dep.,

Ex. C at 7, DE 46; Pl.'s Mot. at 3.   As a result of the fall, Plaintiff landed directly on his right

shoulder, which had previously been injured in a car accident he had in 2010, and also hit his

head on the ground.  Pl.'s Mot. at 7.  The fall caused Plaintiff to suffer an abrasion to his head

and exacerbated his previous injuries.  *Id.*; *see* Plaintiff's Expert Reports, Cohen Dec., Ex. K;

Photographs of Plaintiff's Face Injury, Cohen Dec., Ex. L.

### B.  Procedural History

On February 1, 2019, Plaintiff filed a Complaint against Defendants.  DE 1.  The

Complaint alleged claims for excessive force, false arrest, and failure to intervene in violation of

the Fourth Amendment to the United States Constitution under 42 U.S.C. § 1983 and claims for false arrest, assault and battery, intentional infliction of emotional distress, and negligent hiring, training, or retention under New York law.  *Id.*

On November 29, 2021, Plaintiff filed his Motion for Summary Judgment for excessive force and Defendants filed their Cross-Motion for Summary Judgment for excessive force, false arrest, failure to intervene, and New York law claims for assault, battery, negligent hiring and retention, and intentional infliction of emotional distress.  DE 46-48.  Plaintiff withdrew the federal law claim for failure to intervene and the state law claims for negligent hiring and retention, and intentional infliction of emotional distress.  *See* Pl.'s Opp., n. 17 at 27.

On April 9, 2022, The Honorable Eric Komitee referred the Motions to the undersigned to issue a Report and Recommendation.  *See* Order Referring Motion, DE dated Apr. 9, 2022.

## II.    JURISDICTION

This action is brought pursuant to 42 U.S.C. §§ 1983, 1988, and the Fourth Amendment to the United States Constitution.  Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343 and 1367.

## III.    LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute exists as to a material fact when "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  In determining whether a genuine dispute exists as to a material fact, the Court is required to "resolve all ambiguities and draw all permissible factual inferences in favor

of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks and citation omitted). "If there is evidence in the record from which an inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper." *Holt v. KMI-Cont'l*, 95 F.3d 123, 129 (2d Cir. 1996).

A "party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as mere "conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). "The moving party bears the initial burden of establishing that there are no genuine issues of material fact[;] once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (internal citations omitted).

IV.    DISCUSSION

    A.    **Reasonableness of Cheema's Use of Force under 42 U.S.C. § 1983 is a Question for the Factfinder**

Plaintiff moves for summary judgment on his claim for Cheema's use of excessive force when he slammed Plaintiff to the ground. Defendants cross-move for summary judgment on Plaintiff's claim for excessive force.

"The Fourth Amendment protects individuals from the government's use of excessive force when detaining or arresting individuals." *Jones v. Parmley*, 465 F.3d 46, 61 (2d. Cir. 2006); *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999). "Determining excessiveness requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Douglas v. City*

*of New York*, 730 Fed. Appx. 12, 16 (2d Cir. 2018) (citing *Brown v. City of New York*, 798 F.3d

94, 100 (2d Cir. 2015)).  "The test of reasonableness under the Fourth Amendment is not capable

of precise definition or mechanical application." *See Graham* v. Connor, 490 U.S. 386, 395

(1989) (citing *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)).  The reasonableness of force can only

be determined based on an assessment of the totality of the circumstances.  *See Graham*, 490

U.S. at 395; *Sullivan v. Gagnier*, 225 F. 3d 161, 165 (2d Cir. 2000).

　　　　When determining whether police officers have employed excessive force, the Supreme

Court has instructed that courts should examine whether the use of force is objectively

unreasonable "in light of the facts and circumstances confronting them, without regard to [the

officers'] underlying intent or motivation." *Graham*, 490 U.S. at 397.  The touchstone of the

inquiry is reasonableness, and in measuring it, the courts consider factors "including the crime

committed, its severity, the threat of danger to the officer and society, and whether the suspect is

resisting or attempting to evade arrest." *Thomas*, 165 F.3d at 143.  Indeed, the Supreme Court

has further elaborated that it does "not consider this list to be exclusive," stating "[w]e mention

these factors only to illustrate the types of objective circumstances potentially relevant to a

determination of excessive force." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

　　　　Excessive force claims require an objective assessment of the reasonableness of any force

"at the moment" it was used. *Graham*, 490 U.S. at 396-97.  Indeed, the Supreme Court has

cautioned that in analyzing excessive force claims, courts must make "allowance for the fact that

police officers are often forced to make split-second judgments—in circumstances that are tense,

uncertain, and rapidly evolving—about the amount of force that is necessary in a particular

situation." *Id.*

Here, Plaintiff neither committed any crime nor violated any law nor resisted arrest.
Defendants' primary contention is that Plaintiff took a step towards Officer Walker that seemed
to be a potential physical threat.  Though the Second Circuit has not yet ruled on the issue, many
courts have viewed the "immediate threat to the safety of the officers or others" as the most
important *Graham* factor.  *Ramos v. Town of E. Hartford*, No. 3:16-CV-166 (VLB), 2019 WL
2785594 at 18 (D. Conn. July 2, 2019); *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994);
*Pauly v. White*, 874 F.3d 1197, 1216 (10th Cir. 2017) (this factor "is undoubtedly the 'most
important' and fact intensive factor in determining the objective reasonableness of an officer's
use of force").  It is this factor in particular that "must embody allowance for the fact that police
officers are often forced to make split-second judgments—in circumstances that are tense,
uncertain, and rapidly evolving—about the amount of force that is necessary in a particular
situation." *Rogoz v. City of Hartford*, 796 F.3d 236, 246 (2d Cir. 2015).

The Court finds that Plaintiff's excessive force claim cannot be resolved as a matter of
law at this juncture because there are disputed issues of material fact that preclude a grant of
summary judgment.  The reasonableness of the use of force is to be judged in light of the facts
and circumstances with which an officer is presented.  *Graham*, 490 U.S. at 397.  And here,
Cheema's use of force used against Plaintiff was deployed as an instantaneous response to a
potential safety threat he posed against Walker.  At the moment force was applied, Cheema
believed that Plaintiff posed a potential physical threat to Walker or others.  Cheema Dep. Tr. at
103, Ex. C, DE 46; Defs.' Mot. at 4.  It is undisputed that no force was used against Plaintiff up
to the point where he made a sudden movement toward Officer Walker.  When Plaintiff jokingly
avoided arrest and took a step while raising his hands towards the front door of his apartment
where Walker stood, Cheema took Plaintiff to the floor.  Cheema's observations led him to

**[JA-1393]**

believe that Plaintiff was intoxicated, erratic, and belligerent.  In that moment, Cheema made a split-second determination to take Plaintiff to the ground.  *Smith v. City of New Haven*, 166 F. Supp. 2d 636, 643 (D. Conn. 2001) (concluding on summary judgment that there was a genuine issue of material fact as to whether officers used excessive force when they "forced [the plaintiff] to the ground, face down," and when one of the officers then "sat on his back"); *Rogoz*, 796 F.3d at 248 (holding that "[t]he question of [Plaintiff's] credibility was a matter for the factfinder; it was not a matter that the court could properly resolve on a motion for summary judgment.").

Upon reviewing Plaintiff's Motion for Summary Judgment, were a jury to view evidence in favor of non-movants/Defendants, it could reasonably conclude that Cheema used a reasonable amount of force because Plaintiff posed a threat towards his fellow Police Officers. On Defendants' Cross-Motion, were a jury to credit evidence in favor of Plaintiff, it could reasonably conclude that when Cheema pushed Plaintiff to the ground, he used an unreasonable amount of force.  *See e.g.*, *Rogoz*, 796 F.3d at 248 (denying summary judgment because factual issues existed as to whether arrestee had been complying with arresting officer's directions); *Baker v. City of New York*, 551 F.Supp.3d 258 (S.D.N.Y. 2021) (Viewing the evidence "in the light most favorable" to Plaintiff and drawing "all reasonable inferences in its favor, […] the Court finds that Plaintiff's excessive force claim cannot be resolved as a matter of law at this juncture"); *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004) ("Given the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable.")

Thus, this Court respectfully recommends that Plaintiff's Motion and Defendants' Cross Motion for Summary Judgment be denied because there are genuine issues of fact as to the reasonableness of Cheema's use of force against Plaintiff.

### B.  Officer Cheema had Probable Cause to Arrest Plaintiff

Defendants moves for summary judgment on Plaintiff's false arrest claims under 42 U.S.C. § 1983 and New York law.

The Fourth Amendment of the United States Constitution provides a right to be free from unreasonable seizures, which includes the right to be free from arrest without probable cause. *See Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).  Probable cause to arrest is justification, and "is a complete defense to an action for false arrest." *Id.* (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)); *see also Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995); *Broughton v. State,* 37 N.Y.2d 451, 458 (1975).  Probable cause depends on the "totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 233 (1983).  "In sum, probable cause does not demand any showing that a good-faith belief be correct or more likely true than false." *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) (citing *Texas v. Brown*, 460 U.S. 730, 742 (1983)).

The elements of a false arrest claim under §1983 are analogous to those under New York law.[1]  *Id.*; *see Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (a § 1983 claim for false arrest that is alleged to have occurred in New York is "substantially the same as a claim

---

[1] The Court has "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).  "Claims are part of the same case or controversy if they derive from a common nucleus of operative fact[s]." *SAT Int'l Corp. v. Great White Fleet (US) Ltd.*, No. 03-CV-7481, 2006 WL 661042, at 5 (S.D.N.Y. Mar. 16, 2006) (citation omitted).  Here, Plaintiff's state and federal claims arise out of a common nucleus of operative facts, namely, Plaintiff's seizure and transportation to JHMS.

for false arrest under New York law); *Hygh v Jacobs*, 961 F.2d 359, 366 (2d Cir. 1992) (the elements of a claim of false arrest under § 1983 are "substantially the same as the elements of a false arrest claim under New York law).  Under federal and state law, a plaintiff bringing a false arrest and/or false imprisonment claim must demonstrate that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.  *Hatcher v. City of New York*, 15-CV-7500 (VSB), 2018 WL 1583036 at 3 (S.D.N.Y. Mar. 27, 2018); *Singer*, 63 F.3d at 118.  With respect to both the constitutional claim and the state law, probable cause operates as a complete defense.  *Weyant*, 101 F.3d at 852.

Here, it is undisputed that Defendants intended to confine Plaintiff, Plaintiff was conscious of the confinement, and Plaintiff did not consent to the confinement.  At issue is whether Plaintiff's arrest was privileged and whether Defendants had probable cause to arrest Plaintiff.

New York Mental Hygiene Law ("NYMHL") provides that "[a] person who appears to be incapacitated by alcohol and/or substances to the degree that there is likelihood to result in harm to the person or to others may be taken by…a police officer…to a treatment facility for purposes of receiving emergency services." *Ortiz v. City of N.Y.*, No. 15 Civ. 2206 (DLC), 2016 WL 7009059 at 2 (S.D.N.Y. Nov. 30, 2016) (citing N.Y. Mental Hyg. Law § 22.09(b)(2)).  A person is "incapacitated" if he or she "as a result of the use of alcohol and/or substances, is unconscious or has his or her judgment otherwise so impaired that he or she is incapable of realizing and making a rational decision with respect to his or her need for treatment." *Id.* § 22.09(a)(2).  Under NYMHL, the terms "likely to result in harm" or "likelihood to result in harm" are specifically defined as:

a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself, or (ii) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

NYMHL § 22.09(a)(3).  In interpreting this statute, courts have concluded that a "showing of probable cause in the mental health context requires only probability or substantial chance of dangerous behavior, not an actual showing of such behavior." *Heller v. Bedford Cent. Sch. Dist.*, 144 F. Supp. 3d 596, 622 (S.D.N.Y. 2015), aff'd, 665 Fed. App'x. 49 (2d Cir. 2016); *Dunkelberger v. Dunkelberger*, No. 14–CV–3877 (KMK), 2015 WL 5730605, at 12 (S.D.N.Y. Sept. 30, 2015).  Whether a person seized pursuant to the NYMHL is later found to be mentally competent and released is irrelevant to the probable cause analysis.  *See Bayne v. Provost*, No. 1:04 CV 44, 2005 WL 1871182 at 7 (N.D.N.Y. Aug. 4, 2005).

Consequently, "[a] warrantless seizure [under NYMHL] for the purpose of involuntary hospitalization may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized is dangerous to herself or to others." *Anthony v. City of New York*, 339 F.3d 129, 137 (2d Cir. 2003) (citation omitted).  In such instances, the relevant probable cause inquiry "is whether the facts and circumstances known to the [officers] at the time they determined to take Plaintiff into custody were sufficient to warrant a person of reasonable caution in the belief that Plaintiff might be […] conducting himself in a manner [ ] likely to result in serious harm to himself as those terms are defined by the MHL." *Burdick v. Johnson*, No. 1:06–CV–1465 (LEK/RFT), 2009 WL 1707475 at 6 (N.D.N.Y. June 17, 2009) (internal citations omitted).

Here, the circumstances known to Cheema indicated that Plaintiff was heavily intoxicated to the point that he might pose a danger to himself or others.  First, Plaintiff's wife called 911 to

**[JA-1397]**

request medical attention.  Defs.' Rule 56.1 St., ¶¶ 61-64, 91.  Plaintiff's wife reported that
Plaintiff was heavily intoxicated and that he was a harm to himself even though she later testified
that her intention was to convey that Plaintiff's health was at risk.  *Id.* ¶ 67.  Second, the EMTs
determined, based on their own observations, that Plaintiff was intoxicated and needed medical
evaluation.  The EMTs felt unsafe based on Plaintiff's aggressive movements toward them and
requested police assistance.  *Id.* ¶¶ 68-73.  The EMTs told the Police Officers that Plaintiff was
uncooperative towards their questioning and that he needed to go to the hospital for treatment.
*Id.*  Third, Cheema's own observations of Plaintiff's intoxication led him to conclude that
Plaintiff was too intoxicated to care for himself.  Cheema observed that Plaintiff was drunk and
incoherent.  *Id.* ¶¶ 72, 75-76.  Cheema also overheard Plaintiff making threats toward his wife in
his native language, Punjabi.  *Id.* ¶¶ 88-89.  Ultimately, while attempting to "jokingly" avoid
arrest, Plaintiff took a step towards the front door where Walker stood, at which point, Cheema
believed that Plaintiff posed a potential physical threat and took him to the ground to arrest him.
Pl.'s Mot. at 6; Cheema's Dep. Tr. at 102.  Based on these facts, a reasonable officer could have
concluded there was probable cause to believe Plaintiff was incapacitated within the meaning of
NYMHL § 22.09 and needed to be transported to the hospital for treatment.  See e.g., *Vallen v.
Connelly*, No. 99 Civ. 9947(SAS), 2004 WL 555698 at 8-9 (S.D.N.Y. Mar. 19, 2004) (holding
that the defendants had probable cause to arrest the plaintiff under the NYMHL because he
posed as danger to himself or others); *Burdick*, 2009 WL 1707475 at 6 (holding that probable
cause to arrest the plaintiff existed because he could have been a potential danger).

Thus, this Court recommends that Defendants' Cross-Motion for Summary Judgment
should be granted for Plaintiff's false arrest claim because Cheema had probable cause to arrest
Plaintiff under 42 U.S.C. §1983 and under NYMHL.

### C. Reasonableness of Cheema's Use of Force under New York Law is a Question for the Factfinder

Plaintiff's Complaint also alleged New York law claims for assault and battery against Defendants.  Defendants move for summary judgment on the alleged assault and battery claims.

The Second Circuit recently reiterated that the elements of, and defenses to, a state law assault and battery claim are the same as for a federal excessive force claim.  *See Tardif v. City of N.Y.*, 991 F.3d 394, 410 (2d Cir. 2021).  "The elements of New York assault and battery and Section 1983 excessive force claims are 'substantially identical.'"  *Id.* at 410 (citing *Posr v. Doherty,* 944 F.2d 91, 94-95 (2d Cir. 1991).  Here, Plaintiff's assault and battery claims are predicated on the same conduct of Plaintiff's seizure and transportation to JHMS, and are governed by the same standard of reasonableness, as his excessive force claim under § 1983.

"To succeed on assault or battery claims in the law enforcement context, a plaintiff must also demonstrate that the defendant officers' conduct 'was not reasonable within the meaning of the New York statute concerning justification of law enforcement's use of force in the course of their duties.'"  *Tardif*, 991 F. 3d at 410 (citing *Nimely v. City of N.Y.*, 414 F. 3d 381, 391 (2d Cir. 2005)).  The Court went on to explain that the justification defense available for law enforcement action under New York law "requires the jury to conduct precisely the same analysis as does the reasonableness standard" under the Fourth Amendment.  *Tardif*, 991 F.3d at 410 (citing *Heath v. Henning*, 854 F.2d 6, 9 (2d Cir. 1988)).  This defense extends to any force utilized in the performance of any "public duty."  *See Id.*, at 411.

The Court finds that Plaintiff's assault and battery claims, similar to Plaintiff's excessive force claims, cannot be resolved as a matter of law at this juncture because there are disputed issues of material fact that preclude a grant of summary judgment.  There are numerous disputes

14

concerning what the circumstances confronting Cheema were, including whether Plaintiff did in fact pose a threat to any or all the Officers.  *See e.g., Rizk v. City of New York*, 462 F.Supp.3d 203, 228 (E.D.N.Y. 2020) (holding that "the elements for a claim of assault and battery against law enforcement officers under New York law and a claim of excessive force under § 1983 are the same" and since "genuine issues of material facts preclude the Court from determining whether defendants used excessive force […] [,] defendants' motion for summary judgment with respect to the assault and battery claim is [also] denied.").

As stated above, this Court respectfully recommends that Plaintiff's Motion and Defendant's Cross-Motion for Summary Judgment be denied for excessive force claims under 42 U.S.C. § 1983.  In that vein, this Court further respectfully recommends that summary judgment for Plaintiff's state law claims for battery and assault should also be denied.

### D. Defendants are Entitled to Qualified Immunity for Plaintiff's False Arrest Claims but Factual Issues Preclude Resolution of this Issue for Excessive Force, Assault and Battery Claims

Defendants seek qualified immunity for Plaintiff's claims including false arrest, excessive force, and New York law claims for assault and battery.  Plaintiff argues that Defendants are not immune from the claims alleged.

"Governmental actors, including police officers, enjoy qualified immunity from suit for constitutional violations under 42 U.S.C. § 1983." *Guan v. City of New York*, 2020 WL 6688855 at 13 (S.D.N.Y. Sept. 18, 2020); quoting *Myers v. Patterson*, 819 F.3d 625, 633 (2d Cir. 2016). The Supreme Court has established a two-part inquiry to determine when a district court should hold that the doctrine of qualified immunity bars a suit against government officials: (1) the court must first consider whether the facts alleged, when taken in the light most favorable to the party

asserting the injury, demonstrate a violation of a constitutional right; and (2) the court must then consider whether the officials' actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known," *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); *Jones v. Parmley*, 465 F.3d 46 (2d. Cir. 2006); Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "Even assuming a state official violates a plaintiff's constitutional rights, the official is protected nonetheless if he objectively and reasonably believed that he was acting lawfully." *Id*.

As to false arrest, qualified immunity protects an officer "so long as he had 'arguable probable cause' to arrest, which 'exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" *Brock v. City of New York*, 15-CV-1832 (VSB), 2018 WL 3579099 at 7-8 (S.D.N.Y. July 25, 2018) (quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) ). "[T]o determine whether a mental-health seizure is justified by arguable probable cause, a court must review the specific observations and information available to the officers at the time of a seizure." *Myers*, 819 F.3d at 625. Here, even if Defendants' actions were not supported by probable cause, they were objectively reasonable under the circumstances. The facts establish that Plaintiff's wife requested medical help because he was highly intoxicated; that EMTs concluded his condition constituted incapacitation; and that Cheema's own observations led him to believe that Defendant was intoxicated and needed evaluation. Accordingly, Defendants are entitled to qualified immunity, which is an alternative basis to dismiss Plaintiff's false arrest claim, since Defendants did have probable cause to arrest Plaintiff. *See Vallen*, 2004 WL 555698 at 10; *Burdick*, 2009 WL 1707475 at 7.

As to excessive force, Defendants argue that Cheema's use of force to slam Plaintiff to the ground was objectively reasonable since he posed a threat to Walker.  Since the reasonableness of Defendants' actions is examined when deciding the excessive force claim as discussed above, as well as in the second step of the qualified immunity test, "[t]he conclusion that factual disputes preclude summary resolution of the excessive force claims also precludes a finding that the officers are entitled to qualified immunity with respect to the excessive force claims." *Hicks v. The City of New York*, 2015 WL 5774575 at 10 (E.D.N.Y. Aug. 27, 2015); quoting *Ryan v. Moss*, 2013 WL 956722, at 11 (W.D.N.Y. Mar.12, 2013).

As to New York law claims of false arrest, assault and battery, "New York law…grant[s] government officials qualified immunity except where the officials' actions are undertaken in bad faith or without a reasonable basis." *5 Borough Pawn, LLC v. City of N.Y.*, 640 F. Supp. 2d 268, 286 (S.D.N.Y. 2009) (citing *Papineau*, 465 F.3d at 63).  The Court in *5 Borough Pawn* further explained that qualified immunity under state law that, "as is true of federal law, an officer's entitlement to qualified immunity under New York law depends on the reasonableness of his actions." *5 Borough Pawn*, 640 F. Supp. 2d 268, 286 (S.D.N.Y. 2009) (citations omitted); *Hargroves v. City of N.Y.*, No. 03-CV-1668 (RRM)(VMS), 2014 U.S. Dist. LEXIS 41661, at 10-11 (E.D.N.Y. Mar. 26, 2014) (citing *Papineau*, 465 F.3d at 64 (reasoning that federal qualified immunity analysis "applies to, and controls, the qualified immunity questions presented under New York law")). "[T]hus, where an officer's actions are deemed objectively reasonable, that officer will be immune under both federal and state law." *Hargroves*, 2014 U.S. Dist. LEXIS 41661, at *10-11; *see also Mangino v. Inc. Vill. of Patchogue*, 814 F. Supp. 2d 242, 250 n.5 (E.D.N.Y. 2011) (applying the court's qualified immunity analysis on the federal claims to the identical state-law claims).  Even where qualified immunity under state law is not specifically

invoked, courts have held that, "because of the similarities between the federal and New York doctrines of qualified immunity, if defendants would be entitled to qualified immunity under federal law, summary judgment [is] similarly appropriate on…state law [claims]" *Garcia v. Cty. of Westchester*, No. 11-CV-7258 (KMK), 2017 U.S. Dist. LEXIS 191980, at *50 (S.D.N.Y. Nov. 20, 2017) (citing *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007)).  Since Defendants have qualified immunity for arresting Plaintiff under federal law, Defendant also have qualified immunity for arrest under New York State law.  As to Plaintiff's claim of assault and battery, since the reasonableness of Defendants' actions is examined when resolving these claims as well as in the second step of the qualified immunity test, the conclusion that factual disputes preclude summary resolution of the assault and battery claims also precludes a finding that the officers are entitled to qualified immunity with respect to such state law claims. *See Jones*, 465 F.3d at 64 (denying qualified immunity as to New York law claims of assault and battery since the resolution of these claims involves the assessment of reasonableness).

 Thus, this Court respectfully recommends that Defendants should have qualified immunity as to Plaintiff's false arrest claim, whereas the issue of qualified immunity should be resolved by the factfinder as to Plaintiff's excessive force, assault, and battery claims.

 **V.**  **CONCLUSION**

 For the foregoing reasons, this Court respectfully recommends that Plaintiff's Motion for Summary Judgment be denied, and Defendants' Cross-Motion for Summary Judgment be granted as to false arrest and denied as to excessive force, assault, and battery claims because there are issues of fact as to whether Cheema's use of force was reasonable under the given circumstances.  Defendants are further entitled to qualified immunity for Plaintiff's false arrest

Case 1:19-cv-00632-EK-ST   Document 55   Filed 06/28/22   Page 19 of 19 PageID #: 1700

claims but factual issues preclude resolution of this issue for excessive force, assault and battery

claims.

## VI.    OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report and

Recommendation to file written objections.  Failure to file timely objections shall constitute a

waiver of those objections both in the District Court and on later appeal to the United States

Court of Appeals.  *See Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir.

2018); *McConnell v. ABC-Amega, Inc.*, 338 F. App'x 24, 26 (2d Cir. 2009); *Tavarez v. Berryhill*,

No. 15-CV-5141 (CS) (LMS), 2019 WL 1965832, at 30 (S.D.N.Y. May 1, 2019); *see also*

*Thomas v. Arn*, 474 U.S. 140 (1985).

**SO ORDERED.**

                                                        /s/
                                            _____
                                            Steven L. Tiscione
                                            United States Magistrate Judge
                                            Eastern District of New York

Dated: Central Islip, New York
           June 28, 2022

**[JA-1404]**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------x

BALWINDER SINGH,

                Plaintiff,

        -against-

CITY OF NEW YORK, P.O. MANDEEP
CHEEMA, individually and in his
official capacity, et al.,

                Defendants.

-----------------------------------x

<u>**MEMORANDUM & ORDER**</u>
19-CV-632(EK)(ST)

ERIC KOMITEE, United States District Judge:

        Balwinder Singh brought this suit against several defendants, alleging Fourth Amendment claims under 42 U.S.C. § 1983, and various state-law claims.[1]  The parties cross-moved for summary judgment; those motions are the subject of Magistrate Judge Tiscione's Report and Recommendation (R&R) dated June 28, 2022.  ECF No. 55.  The R&R recommends that the Court deny Plaintiff's motion for summary judgment, grant Cheema's motion for summary judgment on Singh's false-arrest claim, and deny Cheema's motion on the claims for excessive force, and assault and battery.

_____

    [1] The full list of defendants included: the City of New York; P.O. Mandeep Cheema; and police officers "John Doe" #1-10.  As discussed in Section II.B of this order, Singh's remaining claims are as follows: Section 1983 excessive force, state-law false arrest, and state-law assault-and-battery against defendant Cheema; and Section 1983 municipal-liability against the City.  The only claims at issue in the instant cross-motions are the claims against Cheema.

**[JA-1405]**

Having reviewed the record, I adopt the R&R in part. Singh's motion for summary judgment on his excessive-force claim is DENIED.  Cheema's motion for summary judgment on Singh's claims for false arrest and excessive force under Section 1983, and assault and battery under state law, is GRANTED.  As detailed below, Cheema is entitled to qualified immunity on the excessive-force claim because no clearly established law prohibited the force he applied in the effort to handcuff Singh under the instant circumstances.  Summary judgment is warranted on Singh's false-arrest claim, as well, for the reasons set out in the R&R.

## I.   Background

The R&R capably sets out the factual background, which I will not repeat wholesale here.  Because I diverge from the R&R's recommendations on the excessive-force claim (and corresponding state-law battery claim), I recite certain key facts underlying those claims below.  I view the facts in the light most favorable to Singh, drawing any inferences in his favor.

Early in the morning on February 28, 2018, Singh's wife called 911 to say that her husband was intoxicated and that they were fighting.  Audio of 911 Call 01:22, Pl. Ex. D.  She asked the operator to send an ambulance.  Pl. Rule 56.1 Statement of Material Facts ("Pl. 56.1") ¶ 7, ECF No. 46-2.  EMS

2

workers arrived at Singh's home shortly thereafter and determined that he needed to go to the hospital because he was acting irrationally, speaking incoherently, and displayed an unsteady gait.  Pl. 56.1 ¶ 13; Dep. of Nicole Milonas 85:24-86:4, ECF No. 46-8.  Singh was uncooperative and refused to go to the hospital, so EMS workers called for police assistance. Pl. 56.1 ¶¶ 20-21.  It is undisputed that Plaintiff's blood alcohol level was more than three times the legal driving limit when he was tested at the hospital two hours later.  Pl. Resp. to Def. Rule 56.1 Statement of Material Facts ("Pl. Resp to Def. 56.1") ¶¶ 114-15, ECF No. 49-1 (admitting that Plaintiff's BAC was 247 mg/dL two hours after his wife called 911).

Singh's home security system recorded video and audio of the EMS workers' arrival and call to police, but Singh deleted this recording after the incident.  Pl. Resp. to Def. 56.1 ¶ 54.  (Before he did so, Singh used his cell phone to record the portion of the video showing what he alleges to be excessive force, as discussed below.[2])  Nevertheless, it is undisputed that EMS contacted the NYPD, stating that they were attending to an uncooperative subject, and indicating — in two

---

[2] Singh contends that he deleted the video by "accident" and that it would have been overwritten anyway, fourteen days later, absent preservation. But Singh obviously realized that the video might be relevant later, and selected the portion he wanted to preserve.  Pl. Resp. to Def. 56.1 ¶¶ 51-55; Pl. Ex. G(1), Video (hereinafter "Video").

successive communications — that they required the NYPD's
assistance "ASAP."[3]  When the officers arrived at Singh's home,
Officer Cheema spoke with the EMTs on the scene.  One of the
EMTs — Cheema did not recall which — told him, in substance,
that Singh was being uncooperative to the point where they felt
unsafe.  *Id.* ¶ 82.

Singh continued to refuse to go to the hospital.  Pl.
56.1 ¶¶ 33-35.  During this time, Singh addressed his wife in
Punjabi.  Cheema, who understood what Singh was saying,
testified that Singh was blaming his wife for the situation,
stating, "You did this to me, you're going to pay, you did
this," and "You're going to pay for what you did."  Dep. of
Mandeep Cheema ("Cheema Dep.") 77:15-23, 80:12-13, ECF No. 48-7.
Singh disputes that he threatened his wife but acknowledges that
he blamed her for the situation.  Pl. Resp. to Def. 56.1 ¶ 89
(Singh testified that he told her: "this is not right, you are
sending me to the hospital with handcuffs on.  This is not
right.  I had not done anything.").  After trying to convince
Singh to go to the hospital voluntarily, Cheema gave Singh a
choice: he could either go voluntarily, or the officers would
have to take him in handcuffs.  Pl. 56.1 ¶¶ 29-31; Cheema Dep.

---

[3] Pl. Resp. to Def. 56.1 ¶¶ 75-76 (admitting that the EMTs communicated
to police "PLZ SEND RMP [radio motor patrol car], UNCO-COP PT [uncooperative
patient]," and requested assistance a few minutes later, saying "RMP NEEDED
ASAP").

85:7-87:15.  Singh agreed to go voluntarily and began to get dressed.  Pl. 56.1 ¶¶ 31-33.

Singh's cell phone video shows the moments leading up to the incident, and the incident itself.  Singh and the officers stood close to the front door, preparing to leave the apartment.  Officer Malinda Walker opened the front door, as Officer Justin Davis stood to the side.  Video 7:24.  Officer Cheema stood behind Singh.  Rather than walking out, however, Singh leaned forward slightly and extended his arms behind his back, towards Officer Cheema.  Video 7:30.  There is no audio, but it is undisputed that at this point, Singh told Officer Cheema the officer would "have to handcuff" him.  Pl. 56.1 ¶ 34; Def. Rule 56.1 Statement of Material Facts ¶ 35, ECF No. 48-2.

Just as Officer Cheema took out handcuffs and began to place them on Singh, however, Singh abruptly withdrew his hands from behind his back, and said, "I'm just joking. You're not going to handcuff me."  Pl. 56.1 ¶ 35.  The video, which captured the scene from behind Cheema and Singh — and thus provides a perspective similar to Cheema's — shows that Singh withdrew his hands from behind his back and brought them out in front of him.  At the same time, he took a quick step away from Cheema and toward both the open door and Officer Walker.  Video 7:57-8:03; Dep. of Balwinder Singh ("Singh Dep.") 61:15-20, ECF No. 48-6; Dep. of Malinda Walker 58:3-7, ECF No. 48-9.

**[JA-1409]**

Case 1:19-cv-00632-EK-ST   Document 57   Filed 09/30/22   Page 6 of 27 PageID #: 1707

As Singh stepped toward Officer Walker and the open door, Officer Cheema followed, moving forward and wrapping his arms around Singh from behind – his right arm over Singh's right shoulder, and his left arm under Singh's left arm.  Video 8:00-8:05.  Still holding onto Singh, Cheema pulled Singh's body to the right and then down to the ground.  Video 8:05.  Once Singh was on the ground, Cheema and the two other officers handcuffed him, lifted him up, and escorted him out the door.  Video 8:00-8:45.

The parties dispute how to characterize Cheema's maneuver: Singh refers to it as "body-slamming," *see* Pl. Opp. to Def. Mot. for Summ. J. ("Pl. Opp.") 22-26, ECF No. 49-1, but Defendants call it an "arm-bar takedown."  Def. Br. in Support of Def. Mot. for Summ. J. ("Def. Br.") 12, ECF No. 48-1.  These competing characterizations are not critical, given that the action was captured on video, and the video speaks for itself.

Cheema's action caused an abrasion and bruising on Singh's forehead and exacerbated Singh's pre-existing shoulder injury.  *See* Photos of Pl. Face Injury, Ex. L to Cohen Decl., ECF No. 46-15; Pl. Expert Reports, Ex. K to Cohen Decl., ECF No. 46-14.

## II.  Legal Standard on Review of Report & Recommendation

Generally speaking, when neither party files objections to a report and recommendation, the district court

reviews the recommendation for clear error.  See Advisory Comm.
Notes to Fed. R. Civ. P. 72(b); *accord State Farm Mut. Auto.
Ins. Co. v. Grafman*, 968 F. Supp. 2d 480, 481 (E.D.N.Y. 2013).
Nevertheless, a district judge retains authority to "accept,
reject, or modify" any recommendation.  28 U.S.C. § 636(b)(1).
Section 636 gives R&Rs no "presumptive weight," *Mathews v.
Weber*, 423 U.S. 261, 271 (1976); instead, district courts are
free to review the case "in whole or in part anew."  *Id.*[4]

### III. Discussion

#### A.   Excessive Force Claim

> 1.   <u>Fourth Amendment Law on Excessive Force</u>

Under the Fourth Amendment, a police officer's
application of force is excessive "if it is objectively
unreasonable in light of the facts and circumstances confronting
them, without regard to their underlying intent or motivation."
*Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004).
Courts must view the "reasonableness of a particular use of
force . . . from the perspective of a reasonable officer on the
scene, rather than with the 20/20 vision of hindsight."  *Graham
v. Connor*, 490 U.S. 386, 396 (1989).

---

[4] *See also Mathews*, 423 U.S. at 271 (a district judge is "free to follow
[the R&R] or wholly to ignore it," but either way the "authority and the
responsibility to make an informed, final determination, we emphasize,
remains with" him or her); *Cole v. Rogers*, No. 14-CV-3216, 2017 WL 1155002,
at *1 (E.D.N.Y., 2017) (Bianco, D.J.) ("Although the parties have waived any
objections to the R&R and thus de novo review is not required, the Court has
conducted a *de novo* review of the R&R in an abundance of caution.").

Whether a particular use of force is reasonable or excessive depends on the specific facts and circumstances. Courts generally look at three factors: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.* Force must be "reasonably related to the nature of resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer." *Sullivan v. Gagnier*, 225 F.3d 161, 166 (2d Cir. 2000). Some circuit courts have recognized the second factor — the immediate threat to officer safety — as the most important. *See Pauly v. White*, 874 F.3d 1197, 1215-16 (10th Cir. 2017) ("The second *Graham* factor, whether the suspect posed an immediate threat to the safety of the officers or others, is undoubtedly the most important and fact intensive factor in determining the objective reasonableness of an officer's use of force."); *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994) (second factor is "the most important single element of the three specified factors").

When a subject refuses an order to place his hands behind his back to be handcuffed, officers may do what is "necessary to subdue [him] and apply handcuffs." *Husbands ex rel. Forde v. City of New York*, 335 F. App'x 124, 128 (2d Cir. 2009). The application of force is excessive in this context

**[JA-1412]**

(perhaps tautologically) when it goes "*beyond* what [is] necessary" to do the same.  *Id.; see also Curry v. City of Syracuse*, 316 F.3d 324, 332 (2d Cir. 2003) (plaintiff may prevail on excessive force claim "if he is able to show that [the officer] used more force than was necessary to subdue him").

    2.  <u>Qualified Immunity in the Excessive-Force Context</u>

        Singh's Fourth Amendment claim against Cheema, a police officer, must be viewed through the lens of qualified immunity.  *E.g.*, *City of Tahlequah v. Bond*, 142 S. Ct. 9 (2021) (per curiam); *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4 (2021) (per curiam).  "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  When an official asserts a qualified immunity defense, courts consider whether "(1) the official violated a statutory or constitutional right, and (2) . . . the right was clearly established at the time of the challenged conduct."  *Ricciuti v. Gyzenis*, 834 F.3d 162, 167 (2d Cir. 2016).[5]  "Officials are entitled to qualified immunity when their decision was reasonable, even if mistaken;

---

[5] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

the doctrine gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Rogoz v. City of Hartford*, 796 F.3d 236, 247 (2d Cir. 2015).

In excessive-force claims, the reasonableness inquiry often "overlap[s]" with the qualified immunity analysis. *See, e.g.*, *Cowan v. Breen*, 352 F.3d 756, 764 (2d Cir. 2003); *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003). The difference is that "the qualified immunity inquiry goes on to ask whether any constitutional violation was clearly established." *Jackson v. Tellado*, 236 F. Supp. 3d 636, 661 (E.D.N.Y. 2017). A constitutional right is clearly established "when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Rivas-Villegas*, 142 S. Ct. at 7; *see also Jones v. Treubig,* 963 F.3d 214, 224 (2d Cir. 2020) (right is clearly established when it would have been "clear to a reasonable officer that his conduct was unlawful in the situation he confronted").

The effort to identify clearly established controlling law "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam). The Supreme Court has "repeatedly told courts not to define clearly established law at

too high a level of generality." *City of Tahlequah*, 142 S. Ct. at 11.  "It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.; see also Kisela v. Hughes,* 138 S. Ct. 1148, 1152-53 (2018) (defendants will be "entitled to qualified immunity unless existing precedent *squarely governs the specific facts* at issue") (emphasis added).

Thus, although courts "do not require a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015).  "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Id.*  This is especially true in excessive force cases: the Supreme Court has said that "specificity is especially important in the Fourth Amendment context," where "it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.; see also Kisela*, 138 S. Ct. at 1153 ("Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.").

The upshot is that qualified immunity may protect an officer who employs force that is objectively excessive under the Fourth Amendment, provided that the officer could *reasonably* — but mistakenly — have believed otherwise in the press of circumstances: "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231.

In recent qualified immunity cases, the Supreme Court has emphasized the importance of video evidence at the summary judgment stage. "Courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing summary judgment," which "usually means adopting . . . the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, where the record contains uncontroverted video evidence, the court "should . . . view the facts in the light depicted by the videotape." *Id.* at 381. Following this protocol, the Supreme Court recently unanimously overruled two courts of appeals on qualified immunity grounds based on video footage of the events. In *City of Tahlequah*, the Court summarized the video footage of a police shooting before holding that the officers had not violated clearly established law. 142 S. Ct. at 10-11. And in *Rivas-Villegas*, the Court relied on footage showing the defendant-officer placing his knee

on the suspect's back "for no more than 8 seconds," to conclude that the officer was entitled to qualified immunity.  142 S. Ct. at 7.

Watching the video evidence here, it is not clear that any constitutional violation occurred — let alone a violation of clearly established Fourth Amendment law.

> 3.   Cheema's Actions Did Not Violate Clearly Established
> <u>Law</u>

As this caselaw establishes, a defendant is entitled to summary judgment when, "looking at the evidence in the light most favorable to, and drawing all inferences most favorable to" the plaintiff, no reasonable jury "could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right."  *Hartline v. Gallo*, 546 F.3d 95, 102 (2d Cir. 2008).  Put differently, summary judgment is appropriate here if no reasonable jury could conclude that Cheema violated a legal obligation that was "sufficiently clear that every reasonable official would have understood" his conduct to violate that obligation.  *Rivas-Villegas*, 142 S. Ct. at 7.

Evaluating the evidence and drawing inferences as such, no reasonable jury could so conclude.  Simply put, neither Plaintiff nor the R&R (nor I) have surfaced any case recognizing

a "clearly established" right that Cheema's actions, even viewed in the light most favorable to the plaintiff, could be held to violate.

        a.   Supreme Court and Second Circuit Cases on Excessive Force

      The Supreme Court and Second Circuit have decided a substantial number of qualified immunity cases involving allegations of excessive force.  Given the primacy of the "clearly established" standard here, it behooves us to review these cases in some detail.

      In *City of Tahlequah*, the Supreme Court unanimously held that officers were entitled to qualified immunity.  142 S. Ct. at 11.  There, the suspect's ex-wife had called the police to say that he was intoxicated and that she was concerned the situation would get "ugly."  *Id.* at 10.  The Court reviewed uncontroverted video evidence of the incident, which showed that when the officers tried to arrest the suspect, he refused to comply with their orders; and when he picked up a hammer and appeared ready to throw it at the officers, they shot him.  *Id.* at 10-11.  The Court declined to reach the constitutional question, instead proceeding directly to the "clearly-established" question.  *Id.* at 12.  The Court held that none of the cases relied on by the Tenth Circuit came even "close to establishing that the officers' conduct was unlawful."  *Id.*

Accordingly, the officers were thus entitled to qualified immunity.  *Id.*

In *Husbands ex rel. Forde v. City of New York*, the Second Circuit upheld the district court's grant of summary judgment to an officer who had punched a *minor* suspect in an effort to put him in handcuffs.  335 F. App'x at 128-29.  The record showed that the plaintiff, whom the police believed had a gun (but from whom no gun was recovered), "was doing something with his hands that made it difficult to arrest him."  *Id.* at 129.  Where the officers reasonably feared for their safety, the court held that "[o]ne punch to a suspect who is resisting being put in handcuffs does not rise to the level of excessive force."  The court held that no constitutional violation occurred *at all*, clearly established or otherwise.   *Id.*

The case that best supports Singh's argument is perhaps *Brown v. City of New York*, 798 F.3d 94, 102-03 (2d Cir. 2015).  There, the district court had granted summary judgment on constitutional — not qualified immunity — grounds, holding that no Fourth Amendment violation could be found where, after the plaintiff had refused to give her hands to be handcuffed, the officer took her to the ground, pushed her face into

pavement, and then pepper sprayed her twice in the face while she was on the ground.  *Id.*

The alleged excessive force in that case, too, was video-recorded.  Assessing the video, the Second Circuit found that all three *Graham* factors favored the plaintiff: the suspected crime was minor, she "posed no threat whatever to the safety of the officers or others," and "[a]s for actively resisting arrest, [she] was not fleeing, nor physically attacking an officer, *nor even making a move that an officer could reasonably interpret as threatening* an attack."  *Id.* (emphasis added).  On that basis, the Second Circuit concluded that the "assessment of a jury [was] needed."  *Id.* at 103; *see also id.* (stating that, for purposes of the constitutional analysis, "the factual determination of excessiveness" was for the jury in that case).

Singh's actions are distinguishable from Ms. Brown's. His quick move toward Officer Walker is reasonably interpreted as threatening, and / or as a first step toward flight through the open door.  Moreover, the amount of force the police used is

distinguishable: Brown was pepper-sprayed twice in the face at close range; no similar force was applied to Singh.[6]

*Brown* is distinguishable on another ground, as well: the Court of Appeals' analysis relied fairly prominently on the size disparity between the plaintiff and the officers who effectuated her arrest.  798 F.3d at 101 ("Officer Plevritis was 5'10" and weighed 215 pounds; Officer Naimoli was 5'7" and weighed 150-160 pounds; Brown was 5'6" and weighed 120 pounds.").  Reviewing the record, the Court of Appeals observed that "no reason appears why, with Brown standing, each officer could not have simply held one of her arms, brought it behind her, and put handcuffs on her wrists."  *Id.* at 102.  The court continued:

> Police officers must be entitled to make a reasonable selection among alternative techniques for making an arrest.  But when the amount of force used by two police officers involves taking a 120-pound woman to the ground and twice spraying her directly in the face with pepper spray, the availability of a much less aggressive technique is at least relevant to making

---

[6] Singh contends that Cheema's use of force exacerbated a pre-existing shoulder injury, Pl. Br. in Support of Pl. Mot. for Summ. J. 7, ECF No. 46-1, but the *Second Circuit* has limited the inferences that may be drawn from that contention in assessing whether the force was excessive.  In *Kalfus v. New York & Presbyterian Hosp.*, 476 F. App'x 877, 880-81 (2d Cir. 2012), the plaintiff had "resisted arrest by refusing to stand up or to permit himself to be handcuffed"; he alleged that the defendant patrolmen employed excessive force when they "turned him onto his stomach, pulled his arms behind his back, placed handcuffs on him, and lifted him onto his feet by pulling his arms, sweatshirt and waist."  In the process, they caused a "rotator cuff tear" that was "an extension of a pre-existing" injury.  *Id.* at 881.  The *Second Circuit* wrote that the plaintiff's shoulder injury did not support a claim of excessive force because the officers "had no reason to know that [his] existing shoulder injury might be aggravated if his arms were pulled or he were handcuffed."  *Id.*  Here, too, Cheema had no reason to know about Singh's pre-existing shoulder condition.

the ultimate determination of whether excessive force
was used.

*Id.* at 103.  Here, in contrast, Singh significantly outweighed

Officer Walker – the officer in whose direction he was headed

after he evaded Cheema's effort to handcuff him.  According to

the deposition testimony, Singh is five-foot-seven and weighed

190 pounds at the time of arrest, while Officer Walker was five-

foot-two and weighed approximately 140 pounds.  Singh Dep.

60:25-61:2; Dep. of Malinda Walker 6:2-13, ECF No. 48-9.[7]

The case of *Lennox v. Miller*, 968 F.3d 150, 156 (2d

Cir. 2020), is likewise distinguishable; there, the officer

brought plaintiff to the ground *after* he had already handcuffed

her, and then "put his full body weight on her, kneeling on her

back, and slammed her head into the ground, notwithstanding the

fact that she had already been handcuffed and positioned face

down."  *Id.*  The court held that a "jury could find that [the

officer] used unreasonable force on an individual who was not

resisting arrest and who was secured in such a manner that she

posed no threat to public safety."  *Id.; cf. Dunham v. City of

New York*, No. 11-CV-01223, 2021 WL 918373, at *7 (S.D.N.Y. Mar.

10, 2021) (no qualified immunity where "a reasonable jury could

---

[7] Following remand, the district court granted summary judgment again,
but on qualified immunity grounds — *i.e.*, on the basis that the Fourth
Amendment law had not been clearly established when Ms. Brown was arrested.
The Second Circuit upheld that decision.  *Brown v. City of New York*, 862 F.3d
182, 190-92 (2d Cir. 2017).

find that [plaintiff] no longer posed an immediate threat . . .
and . . . was no longer resisting," and therefore "that the
officers *gratuitously* inflicted pain in a manner that was not a
reasonable response to the circumstances once Plaintiff was no
longer resisting arrest" (emphasis added)).  For obvious
reasons, *Dunham* does not map well onto the instant facts: the
video leaves no dispute that Singh had declined to submit to
handcuffing at the time of Cheema's brief action.

Plaintiff cites some of these cases in passing, but in
the end does not successfully identify a source of clearly
established law that Cheema's actions could be found to violate.
In one brief paragraph analyzing the qualified immunity defense
to the excessive-force claim, the R&R invokes the unpublished
report and recommendation of the magistrate judge in *Hicks v.
City of New York*, 2015 WL 5774575, at *3 (E.D.N.Y. 2015).  The
allegations in that case were markedly different from those
here:

> Plaintiff states that the officers used something to
> break down his door and that the first officer to
> enter was wearing a helmet and shield.  He claims this
> officer punched him in the face and that the other
> officers attacked him by punching, kicking, and tasing
> him even before he had a chance to say anything.
> Specifically, Hicks claims that when the first officer
> entered, plaintiff simply stood there, tried to ask
> what was going on, but the officer punched him in the
> face and his head was slammed against a wall.
> According to plaintiff, even though he put up no
> fight, he was attacked by approximately eight officers
> and taken down to the floor. . . .  Plaintiff alleges

> that he was struck below his right eye with a taser
> prong, that this taser prong hooked into his cheek,
> and that an officer yanked the hooked prong out of his
> face.  He was also struck with the taser in the left
> arm and in his torso several times.

*Id.; see also id.* at *10 ("Hicks asserts he did nothing to

provoke any use of force and that the defendants' punches, kicks

and taser use were gratuitous.").  There was no video evidence

in that case.  *Hicks* does not "clearly establish," at the

requisite level of specificity, any rule of law applicable to

this case.[8]

>       b.   Cheema's Actions "Clearly Violate" No Rule
>            Emerging from These Cases

Applying these cases to the undisputed evidence here,

including especially the video footage, no reasonable jury could

conclude that Officer Cheema violated clearly established law.

Two of the three *Graham* factors strongly favor Cheema.  First,

the video makes clear that Singh was resisting being handcuffed.

Plaintiff acknowledges that he refused to go to the hospital

voluntarily, at which point Cheema gave Singh the choice: come

voluntarily, or the officers would place him in handcuffs.  Pl.

---

[8] Furthermore, it is not entirely clear that an order issued at the
district court level can "clearly establish" anything for purposes of
qualified immunity.  The Supreme Court has recently suggested (albeit
obliquely) that the relevant universe of case law may be limited to Supreme
Court authority.  *See, e.g., Reichle v. Howards*, 566 U.S. 658, 665-66 (2012)
("Assuming arguendo that controlling Court of Appeals' authority could be a
dispositive source of clearly established law in the circumstances of this
case, the Tenth Circuit's cases do not satisfy the 'clearly established'
standard here."); *Rivas-Villegas*, 142 S. Ct. at *2 ("Even assuming that
controlling Circuit precedent clearly establishes law for purposes of § 1983
. . . .").

Opp. 4 (citing Cheema Dep. 82-89).  Singh first indicated his
intent to go voluntarily, but then changed course: he said that
the officers would "have to handcuff him."  Pl. 56.1 ¶¶ 33-35.
As the video shows, Singh then extended his hands behind him,
and Officer Cheema took out handcuffs and began to place them on
Singh.  Then Singh changed course again: he withdrew his hands
from behind his back, brought them out in front of him, and took
a quick step away from Cheema.  Video 7:55-8:00.

        Second, the video shows that it was utterly reasonable
for Cheema to conclude that Singh posed a risk to officer safety
and a risk of flight through the open door.  The video shows
Singh taking a sudden step towards Cheema's partner, Officer
Walker, with his (Singh's) hands out in front of him.[9]  Cheema
watched Singh move in that direction.  *E.g.*, Cheema Dep. 102:16-
24 ("It was a sudden step towards my partner. . . . At that
point, based off of his behavior, and based off of everything
that led up to that point, just different levels of aggression
that he kept displaying the whole time, his behavior changing,
and at that point I no longer felt, like, okay this is a safe

_____

        [9] Cheema testified, and Singh does not dispute, that as Singh withdrew
his hands and stepped away from Cheema, he stated, "I'm just joking, you're
not going to handcuff me."  Pl. 56.1 ¶ 35.  It should go without saying that
Singh cannot benefit from his claim to have been joking.  Even if he had been
joking about *submitting to be handcuffed*, that says nothing about his intent
to flee or harm someone else on the premises.  Moreover, Singh's subjective
motivations are largely irrelevant.  "Our focus is not on [plaintiff's]
motivations but instead on the sequence of events from the perspective of a
reasonable officer at the scene."  *Tracy v. Freshwater*, 623 F.3d 90, 93, 97
(2d Cir. 2010).

21

scene. . . .").  The video also corroborates Cheema's testimony
that he could not see Singh's hands and did not know what he was
doing with them, because the video shows Cheema standing behind
Singh as he moves forward towards Officer Walker.  Video 8:00;
*see* Cheema Dep. 103:10-11 ("It was just the initial action of
him bringing his hands to the front and saying, 'No, no, no,
you're not going to handcuff me.' Then he took that sudden step,
which made me no longer feel safe.").[10]

　　　　As Judge Tiscione acknowledged, "Cheema's use of force
against Plaintiff was deployed as an instantaneous response to a
potential safety threat he posed against Walker."  R&R 8.  Singh
might have been able to overpower Walker or grab one of the
officers' weapons.  *See generally Pinero v. Burbran*, 18-CV-4698,
2021 WL 4224727, at *4 (S.D.N.Y. Sept. 16, 2021) ("Plaintiff's
active resistance of arrest and his physical hold on [the
officer's] uniform posed the immediate threat that Plaintiff
would be able to overpower the officers or grab one of their
weapons."); *see also MacLeod v. Town of Brattleboro*, 548 F.
App'x 6, 8 (2d Cir. 2013) (use of a taser was objectively
reasonable where fleeing motorist pulled into an abandoned lot
in surrender, got out of his car and kneeled on the ground, but

---

[10] The third officer on this scene — Officer Davis — shared Cheema's
assessment that Singh was potentially dangerous.  *E.g.*, Dep. of Justin Davis
120:15-122:24, ECF No. 48-8 ("I didn't know what he was going to do. . . .  I
thought he could attack anybody.").

subsequently "rose to his feet, turned to face the officers with his hands free and outstretched, and refused to return to the ground.").

        In sum, given Singh's apparent refusal to be handcuffed, his erratic behavior and high level of intoxication, the fact that the EMTs told him that before the police arrived, Singh was uncooperative to the point where they were concerned for their safety, and his sudden movement in the direction of Officer Walker, no reasonable jury could find Cheema liable over a qualified immunity defense.  Cheema is entitled to qualified immunity (and therefore summary judgment) on Plaintiff's excessive-force claim.

**B.    State-Law Claim for Assault and Battery**

        Summary judgment is also granted as to Plaintiff's state-law assault and battery claim.

        "Except for § 1983's requirement that the tort be committed under color of state law, the essential elements of excessive force and state law assault and battery claims are substantially identical." *Humphrey v. Landers*, 344 F. App'x 686, 688 (2d Cir. 2009).  While "the doctrine of qualified immunity applies to federal causes of action but is not generally understood to protect officials from claims based on state law," *Stein ex rel. Stein v. Barthelson*, 419 Fed. Appx. 67, 71 (2d Cir. 2011), New York State has its own analogue.  The

New York courts "grant government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without a reasonable basis." *Jones v. Parmley*, 465 F.3d 46, 63 (2d Cir. 2006).

Given my analysis on the excessive force claim, qualified immunity applies to the battery claim too. *See, e.g.*, *Felix v. City of New York*, 408 F. Supp. 3d 304, 312 (S.D.N.Y. 2019) ("The finding of qualified immunity on the excessive force claims requires a grant of summary judgment on assault and battery as well."); *Mesa v. City of New York*, No. 9-CV-10464, 2013 WL 31002, at *27 (S.D.N.Y. Jan. 3, 2013) ("Thus, as the force employed against Mesa was objectively reasonable under the circumstances – giving rise to a finding of qualified immunity – her assault and battery claims must fail as well.").

\*    \*    \*    \*    \*

There is a robust debate underway — in federal courts, in the academic literature, and elsewhere — about the origins and application of the doctrine of qualified immunity. *See, e.g.*, *McKinney v. City of Middletown,* 2022 WL 4454475, at *12-14, *20-23 (2d Cir. Sept. 26, 2022) (discussing the wisdom of qualified immunity in majority and dissenting opinions); *see also* William Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. 45 (2018). Together with *Monell v. Dept. of Social Servs.*, 436 U.S. 658 (1978), the doctrine of qualified immunity creates

**[JA-1428]**

a void in the constitutional landscape: it is a regular occurrence that citizens who believe their constitutional rights have been violated run headlong into the qualified immunity doctrine when they bring claims against individual law enforcement officers, and into *Monell* when they pursue the relevant municipality.

District courts must, however, take the law of qualified immunity as they find it.  And the facts of this case — involving an officer who used a single, facially reasonable maneuver to subdue a suspect who was undisputedly resisting arrest after a series of erratic actions (whether his intent was "joking" or not) — do not even approach the point where the shield of qualified immunity begins to lift, given recent Supreme Court precedent.

**C.   Other Claims**

Plaintiff originally brought additional claims against Cheema, the City, and "John Does" #1-10.  In Plaintiff's opposition brief, he agreed to dismiss several claims: negligent hiring and retention, failure to intercede, and intentional infliction of emotional distress.  Pl. Opp. 27 n.17; *see also* R&R 5.  These claims may be "dismissed at the plaintiff's

request only by court order."  Fed. R. Civ. P. 41(a)(2).  Those claims are hereby dismissed.

Plaintiff also brought a municipal liability claim against the City under Section 1983.  Defendants state, in their opposition brief, that "Plaintiff has agreed to withdraw this claim.  The parties will submit an appropriate stipulation of partial dismissal."  Def. Br. 1.  Upon review of the docket, however, the parties do not appear to have filed that stipulation.  The parties are ordered to indicate in letters, no later than October 6, 2022, whether Plaintiff has stipulated to the dismissal of the municipal liability claim, and if not, to describe the current status of that claim.

Finally, to the extent Plaintiff has any remaining claims against "John Doe" defendants, those are dismissed because Plaintiff has not identified them even after the close of discovery.  *See Keesh v. Artuz*, No. 97-CV-8417, 2008 WL 3166654, at *2 (S.D.N.Y. Aug. 6, 2008) ("Even after discovery, plaintiff has failed to identify the 'John Doe' and 'Jane Doe' defendants.  Accordingly, the complaint against them must be dismissed.").

### IV.  Conclusion

For these reasons, I adopt the R&R in part.  Plaintiff's motion for summary judgment on his excessive-force claim is DENIED, and Cheema's cross-motion for summary judgment

**[JA-1430]**

Case 1:19-cv-00632-EK-ST   Document 57   Filed 09/30/22   Page 27 of 27 PageID #: 1728

is GRANTED as to Plaintiff's Section 1983 claims for false

arrest and excessive force, and state-law claim for assault and

battery.  The parties shall file letters by October 6, 2022,

indicating whether they have stipulated to the dismissal of the

municipal liability claim, and (if not) whether they intend to

do so.


        SO ORDERED.



                              __/s/ Eric Komitee_____
                              ERIC KOMITEE
                              United States District Judge


Dated:      September 30, 2022
            Brooklyn, New York

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

BALWINDER SINGH,

                            Plaintiff,

                -against-

THE CITY OF NEW YORK, P.O. MANDEEP CHEEMA, Tax
Id. No. 950196, Individually and in his Official Capacity, and
POLICE OFFICERS "JOHN DOE" #1-10, Individually and in
their Official Capacity (the name John Doe being fictitious, as
the true names are presently unknown),

                          Defendants.

------------------------------------------------------------------------ x

**STIPULATION AND
ORDER OF PARTIAL
DISMISSAL PURSUANT
TO FED. R. CIV. P.
41(a)(1)(A)(ii)**

19-CV-632 (EK) (ST)

        **WHEREAS,** plaintiff commenced this action by filing a complaint on or about

February 1, 2019, alleging that defendants the City of New York and Mandeep Cheema violated

plaintiff's federal civil rights; and

        **WHEREAS,** defendants have denied any wrongdoing; and

        **WHEREAS**, plaintiff seeks to voluntarily dismiss all claims for municipal liability

brought pursuant to 42 U.S.C. § 1983 against the City of New York with prejudice; and

        **WHEREAS,** plaintiff has authorized his counsel to agree to the terms set forth

below;

        **NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED**, by and

between the undersigned, as follows:

        1.      The above-referenced claims for municipal liability brought pursuant to 42

U.S.C. § 1983 against the City of New York are hereby dismissed with prejudice;

        2.      Pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure,

**[JA-1432]**

Case 1:19-cv-00632-EK-ST   Document 62   Filed 12/02/22   Page 2 of 3 PageID #: 1761

any and all of the claims that were asserted or could have been asserted by or on behalf of plaintiff Balwinder Singh against defendant the City of New York, including its successors and assigns, for municipal liability pursuant to 42 U.S.C. § 1983, arising out of the facts and circumstances that are the subject of this action, are hereby dismissed and discontinued, with prejudice, and without attorney's fees, costs, or disbursements to any party as against the other;

      3.    This Stipulation contains all the terms and conditions agreed upon by counsel for defendants and counsel for plaintiff hereto, and no oral agreement entered into at any time nor any written agreement entered into prior to the execution of this Stipulation shall be deemed to exist, or to bind the parties hereto, or to vary the terms and conditions contained herein; and

      4.    This Stipulation shall be binding upon the parties immediately upon signature and shall be submitted to the Court for entry as an Order.

Dated: New York, New York
      December 2     , 2022


COHEN & FITCH LLP
*Attorneys for Plaintiff*
110 E. 59th St., Ste. 3200
New York, NY 10022
(212) 374-9115


By: _____
      Gerald M. Cohen
      *Attorney for Plaintiff*

HON. SYLVIA O. HINDS-RADIX
Corporation Counsel of the
      City of New York
*Attorney for Defendants City of New York,*
      *and Cheema*
100 Church Street, 3rd Floor
New York, New York 10007

By: _____
      Hannah V. Faddis
      *Senior Counsel*

SO ORDERED:


_____
HON. ERIC R. KOMITEE
UNITED STATES DISTRICT JUDGE

Dated: _____, 2022

**[JA-1434]**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
BALWINDER SINGH,

                Plaintiff,                 JUDGMENT
                                           19-CV-632 (EK) (ST)

              -against-

THE CITY OF NEW YORK, P.O. MANDEEP CHEEMA,
Tax Id. No. 950196, Individually and in his Official
Capacity, and POLICE OFFICERS "JOHN DOE" #1-10,
Individually and in their Official Capacity (the name
John Doe being fictitious, as the true names are
presently unknown),

                Defendants.
-------------------------------------------------------- X

        A Memorandum and Order of Honorable Eric Komitee, United States District Judge,

having been filed on September 30, 2022, adopting the Report and Recommendation of

Magistrate Judge Steven Tiscione, dated June 28, 2022, denying Plaintiff's motion for summary

judgment on his excessive-force claim; granting Cheema's cross-motion for summary judgment

as to Plaintiff's Section 1983 claims for false arrest and excessive force, and state-law claim for

assault and battery; and an Order having been filed on December 5, 2022, directing the Clerk of

Court to enter judgment consistent with the parties' *Monell* Stipulation and this Court's

Memorandum and Order dated September 30, 2022, and close this case; it is

        ORDERED and ADJUDGED that Plaintiff's motion for summary judgment on his

excessive-force claim is denied; that Cheema's cross-motion for summary judgment is granted as

to Plaintiff's Section 1983 claims for false arrest and excessive force, and state-law claim for

assault and battery; and the following is stipulated and agreed as follows:

        1. The above-referenced claims for municipal liability brought pursuant to 42 U.S.C. §

1983 against the City of New York are hereby dismissed with prejudice;

**[JA-1435]**

Case 1:19-cv-00632-EK-ST   Document 63   Filed 12/06/22   Page 2 of 2 PageID #: 1764

2. Pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure, any and all of the claims that were asserted or could have been asserted by or on behalf of plaintiff Balwinder Singh against defendant the City of New York, including its successors and assigns, for municipal liability pursuant to 42 U.S.C. § 1983, arising out of the facts and circumstances that are the subject of this action, are hereby dismissed and discontinued, with prejudice, and without attorney's fees, costs, or disbursements to any party as against the other;

3. This Stipulation contains all the terms and conditions agreed upon by counsel for defendants and counsel for plaintiff hereto, and no oral agreement entered into at any time nor any written agreement entered into prior to the execution of this Stipulation shall be deemed to exist, or to bind the parties hereto, or to vary the terms and conditions contained herein; and

4. This Stipulation shall be binding upon the parties immediately upon signature and shall be submitted to the Court for entry as an Order.

Dated: Brooklyn, NY                                  Brenna B. Mahoney
      December 6, 2022                         Clerk of Court


                                            By: */s/Jalitza Poveda*
                                                Deputy Clerk

**[JA-1436]**

Case 1:19-cv-00632-EK-ST   Document 64   Filed 01/04/23   Page 1 of 62 PageID #: 1765

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------
BALWINDER SINGH,

                    Plaintiff,

                                         **NOTICE OF APPEAL**

                                         **CV 19-0632 (EK)(ST)**

            -against-

THE CITY OF NEW YORK, et al.,

                    Defendants.

-------------------------------------------------------------------

       Come now Plaintiff, Balwinder Singh, by and through counsel, hereby gives notice of his appeal to the U.S. Court of Appeals for the Second Circuit from certain portions of the Judgment of the United States District Court for the Eastern District of New York entered in the above captioned cased on December 6, 2022 (Document 63), annexed hereto;

       Further, Plaintiff, by and through counsel, hereby gives notice of his appeal to the U.S. Court of Appeals for the Second Circuit from the District Court's September 30, 2022 Memorandum & Order (Document 57), which Adopted in Part and Reversed in Part the June 28, 2022 Report and Recommendation of the Magistrate Judge (Document 55), annexed hereto;

       Further, by incorporation,[1] Plaintiff, by and through counsel, hereby gives notice of his appeal to the U.S. Court of Appeals for the Second Circuit from the underlying

_____

[1] The District Court's September 30, 2022 Memorandum and Order *sua sponte* undertook *de novo* review

Case 1:19-cv-00632-EK-ST   Document 64   Filed 01/04/23   Page 2 of 62 PageID #: 1766

Report and Recommendation of the Magistrate Judge (Document 55) which Denied

Plaintiff's Motion for Partial Summary Judgment (Document 46) and Granted in Part and

Denied in Part Defendants' Cross Motion for Summary Judgment (Document 48),

annexed hereto.

Dated: January 4, 2023

BY: _____

JOSHUA FITCH
COHEN & FITCH LLP
Attorneys for Plaintiff
233 Broadway, Room 900
New York, N.Y. 10279
(212) 374-9115
jfitch@cohenfitch.com

---

the Magistrate Judge's June 28 2022 Report and Recommendation.