# 23-24cv

# United States Court of Appeals
# for the Second Circuit

BALWINDER SINGH,

*Plaintiff-Appellant,*

v.

THE CITY OF NEW YORK, P.O. MANDEEP CHEEMA,
Tax Id. No. 950196, Individually and in his Official Capacity,
POLICE OFFICERS JOHN DOE #1-10, Individually and in
their Official Capacity (the name John Doe being fictitious,
as the true names are presently unknown),

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT,
EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

COHEN & FITCH LLP
*Attorneys for Plaintiff-Appellant*
233 Broadway, Suite 900
New York, New York 10279
(212) 374-9115
jfitch@cohenfitch.com

1224

## <u>TABLE OF CONTENTS</u>

*Page*

PRELIMINARY STATEMENT............................................................1

STATEMENT OF JURISDICTION ...................................................2

QUESTIONS PRESENTED................................................................2

STATEMENT OF THE CASE.............................................................3

PROCEDURAL HISTORY .................................................................3

THE FACTS MOST FAVORABLE TO PLAINTIFF ........................4

THE DISTRICT COURT'S DECISION ............................................10

   A. The Court's Disregard of Evidence Favorable to Plaintiff on the
      Issue of Incapacitation .......................................................10

      i.  *The Conflicting Evidence of Incapacitation Within the EMS
         Report* ...........................................................................10

      ii.  *Conflicting Evidence of Incapacitation from Defendant
         Cheema*.........................................................................12

      iii.  *Other Evidence Inconsistent With Incapacitation*................3

   B. The Invention and Manipulation of Evidence Related to the Threat
      or Likelihood of Harm Posed by Plaintiff ...............................14

      i.  *Ex Post Facto Events Used to Justify Cheema's Belief as to
         Likelihood of Harm* ......................................................14

      ii.  *The Court's Distortion of the 911 Call* ................................15

      iii. *The Distortion of Facts Related to Plaintiff's Likelihood of
         Harm to Himself* ..........................................................17

      iv. *The Distortion of Plaintiff's Behavior Towards EMS* ........18

i

v. *The Mischaracterization of Information Known to Defendant Cheema* ..............................................................19

vi. *The Threats Plaintiff Never Made* .......................................21

C. Recasting the Factual Narrative of Plaintiff's Behavior Prior to the Use of Force..............................................................22

i. *Plaintiff's Fictional Resistance to Arrest/Handcuffing* .....................22

ii. *The One-Sided Conclusion Regarding Plaintiff's Movements Prior to the Use of Force*....................................23

SUMMARY OF ARGUMENT ................................................24

ARGUMENT

I. ALL ASPECTS OF THE DISTRICT COURT'S DECISION TO DISMISS ARE PROPERLY REVIEWABLE................................................25

A. The Court's Sua Sponte De Novo Review of the R&R Opens the Door to the Review of Both the Excessive Force and False Arrest Claims ..............................................................25

II. THE DECISION TO GRANT THE CITY QUALIFIED IMMUNITY UNDER STATE LAW WAS CLEARLY ERRONEOUS ...............................27

A. Individual Qualifiedly Immunity Under § 1983 Cannot Give Rise to Vicariously Immunity for the City Defendant Under State Law.................28

III. THE DISTRICT COURT'S DECISION TO GRANT DEFENDANT CHEEMA QUALIFIED IMMUNITY WAS ERRONEOUS .........................29

A. It is Clearly Established that the Use of Significant Force is Prohibited Where NONE of the Graham Factors Are Present .....................29

B. The Reasonableness of Defendant's Perception of the Facts is Factual Issue and the District Court Erred When It Substituted Its Findings for That of a Jury ......................................................33

    i. *There was No Evidence from Which to Reasonably Perceive Plaintiff's Actions as Resisting Arrest, a Failure to Cooperate, or an Attempt to Flee* ..........................................................35

    ii. *The Court's Vague Characterizations of Plaintiff's Erratic Behavior and Highly Intoxicated State are Abundantly Disputed by the Record* ....................................................38

    iii. *The Evidence Favoring Plaintiff Establishes the Unreasonableness of Cheema's Perception of Plaintiff as a Threat*...................................................................39

    iv. *The Court Ignored Every Reasonable Inference to be Drawn from the Choice Given to Plaintiff by Defendant Cheema*.................42

IV. THE COURT ERRED IN FINDING THAT PROBABLE CAUSE OR ARGUABLE PROBABLE CAUSE WAS ESTABLISHED AS A MATTER OF LAW ............................................................44

A. The Evidence Favoring Plaintiff was Insufficient to Establish Either Probable or Arguable Probable Cause for Incapacitation or Likelihood of Harm ......................................................45

    i. *The Level of Plaintiff's Intoxication was Either Directly Disputed by the Record or Otherwise Insufficient to Establish Incapacitation Under the Statute* ..........................................47

    ii. *There is No Version of the Facts Favorable to Plaintiff that Would Establish his Likelihood of Harm to Himself or Others* ..........................................................................49

CONCLUSION...................................................................56

CERTIFICATE OF COMPLIANCE....................................................57

# <u>TABLE OF AUTHORITIES</u>

*Page(s)*

**Cases:**

<u>Anderson v. Creighton,</u>
    483 U.S. 635 (1987)................................................................41, 42

<u>Aponte v. Kanbur,</u>
    2021 WL 3854069 (2d Cir. 2021)...................................................43

<u>Benny v. City of Long Beach,</u>
    2022 WL 9446910 (E.D.N.Y. 2022)................................................31

<u>Brosseau v. Haugen,</u>
    543 U.S. 194 (2004)......................................................................31

<u>Bryant v. Serebrenik,</u>
    2016 WL 6426372 (E.D.N.Y. 2016)...............................................46

<u>Callahan v. County of Suffolk,</u>
    602 F. Supp. 3d 399 (E.D.N.Y. 2022).......................................28, 29

<u>Capogrosso v. Gelbstein,</u>
    2019 WL 6406444 (E.D.N.Y. 2019)...............................................30

<u>Casey v. City of Fed. Heights,</u>
    509 F.3d 1278 (10th Cir. 2007)......................................................30

<u>Charles v. Johnson,</u>
    18 F.4th 686 (11th Cir. 2021).........................................................31

<u>Charlotte K. v. Commr. of Soc. Sec.,</u>
    2018 WL 4153925 (N.D.N.Y. 2018) ...............................................5

<u>Cowan ex rel. Est. of Cooper v. Breen,</u>
    352 F.3d 756 (2d Cir. 2003)...........................................................34

<u>DeLeon v. Strack,</u>
    234 F.3d 84 (2d Cir. 2000).............................................................26

iv

Deorle v. Rutherford,
    272 F.3d 1272 (9th Cir. 2001) ..................................................... 40-41

Garcia v. Dutchess County,
    43 F. Supp. 3d 281 (S.D.N.Y. 2014) ...........................................32

Garcia v. Sistarenik,
    603 Fed. Appx. 61 (2d Cir. 2015) ................................................32

Golodner v. Berliner,
    770 F.3d 196 (2d Cir. 2014) .........................................................30

Graham v. O'Connor,
    490 U.S. 396 (1989) ............................................................. *Passim*

Heller v. Bedford Cent. Sch. Dist.,
    144 F. Supp. 3d 596 (S.D.N.Y. 2015),
    *aff'd* 665 Fed. App'x. 49 (2d Cir. 2016) .......................................49

Henry v. Purnell,
    619 F.3d 323 (4th Cir. 2010) .......................................................41

In re Warburgh,
    644 F.3d 173 (2d Cir. 2011) .........................................................26

Jackson v. Washtenaw County,
    678 Fed. Appx. 302 (6th Cir. 2017) .............................................37

James v. City of Wilkes-Barre,
    2015 WL 4951826 (M.D. Pa. 2015) .............................................50

Johnson v. Courtois,
    2018 WL 6726892 (D. Minn. 2018) .............................................31

Jones v. Treubig,
    963 F. 3d 214 (2d Cir. 2020) ...........................................32, 34, 37

Kaplan v. County of Orange,
    2021 WL 1105618 (S.D.N.Y. 2021) .......................................................40, 52

Kerman v. City of New York,
    374 F.3d 93 (2d Cir. 2004)..................................................................33, 50

Ketcham v. City of Mt. Vernon,
    992 F.3d 144 (2d Cir. 2021)................................................................30, 37

Kowalski v. St. Francis Hosp. and Health Centers,
    21 N.Y.3d 480 (2013)55

Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,
    507 U.S. 163 (1993)...........................................................................28

Mario v. P & C Food Markets, Inc.,
    313 F.3d 758 (2d Cir. 2002)................................................................26, 27

Martin v. Anderson,
    107 F. Supp. 2d 1342 (M.D. Ala. 1999) .........................................................52

McKinney v. City of Middletown,
    49 F.4th 730 (2d Cir. 2022)................................................................37

Messerschmidt v. Millender,
    565 U.S. 535 (2012)..........................................................................38

Morris v. Noe,
    672 F.3d 1185 (10th Cir. 2012).............................................................32

Morse v. Fitzgerald,
    2013 WL 1195036 (W.D.N.Y. 2013) ..........................................................36

Moss v. Colvin,
    845 F.3d 516 (2d Cir. 2017)................................................................26

Mullenix v. Luna,
    577 U.S. 7 (2015)............................................................................44

Myers v. Patterson,
       819 F.3d 625 (2d Cir. 2016)................................................................50, 53, 54

Newman v. Guedry,
       703 F.3d 757 (5th Cir. 2012)...........................................................................31

Novak v. Saul,
       2020 WL 5760353 (W.D. Pa. 2020) .................................................................5

Olvera v. Long,
       2013 WL 5348425 (S.D. Cal. Sept. 20, 2013)..................................................5

Ortiz v. City of New York,
       2016 WL 7009059 (S.D.N.Y. 2016) ........................................................47, 49

Outlaw v. City of Hartford,
       884 F.3d 351 (2d Cir. 2018)............................................................................33

Rodriguez v. City of New York,
       72 F.3d 1051 (2d Cir.1995)

Rogoz v. City of Hartford,
       796 F.3d 236 (2d Cir. 2015)............................................................................30

Roldan v. Racette,
       984 F.2d 85 (2d Cir. 1993)....................................................................... 25-26

Romano v. Stanley,
       90 N.Y.2d 444 (N.Y. 1997) ............................................................................39

Saucier v. Katz,
       533 U.S. 194 (2001).................................................................................33, 42

Schoolcraft v. City of New York,
       103 F. Supp. 3d 465 (S.D.N.Y. 2015).............................................................53

Stanfield v. City of Lima,
       727 Fed. Appx. 841 (6th Cir. 2018).................................................................38

Stephenson v. Doe,
    332 F.3d 68 (2d Cir. 2003) .................................................................. 33-34

Thomas v. Arn,
    474 U.S. 140 (1985) ........................................................................... 26, 27

Triolo v. Nassau County,
    24 F.4th 98 (2d Cir. 2022) ........................................................................ 28

U.S. v. Colon,
    250 F.3d 130 (2d Cir. 2001) ..................................................................... 54

U.S. v. Male Juv. (95-CR-1074),
    121 F.3d 34 (2d Cir. 1997) ....................................................................... 26

U.S. v. Martinez,
    465 F.2d 79 (2d Cir. 1972) ....................................................................... 54

Warren v. Dwyer,
    906 F.2d 70 (2d Cir. 1990) ....................................................................... 33

Weather v. City of Mt. Vernon,
    474 Fed. Appx. 821 (2d Cir. 2012) ........................................................... 32

Winterrowd v. Nelson,
    480 F.3d 1181 (9th Cir. 2007) .................................................................. 40

Zellner v. Summerlin,
    494 F.3d 344 (2d Cir. 2007) ..................................................................... 33

**Rules, Laws & Statutes:**

28 U.S.C. § 1291 ......................................................................................... 2

42 U.S.C. § 1983 ........................................................................... 1, 3, 27, 28

New York Mental Health Law 22.09 ............................................... *Passim*

Plaintiff/Appellant Balwinder Singh ("plaintiff") respectfully submits this brief in support of his appeal from the judgment of the United States District Court for the Eastern District of New York entered on December 6, 2022, in favor of defendant Police Officer Mandeep Cheema ("defendant" or "Cheema") and the City of New York ("City") (collectively "defendants"), which dismissed plaintiff's constitutional claims under 42 U.S.C. § 1983 and pendant state law claims stemming from his unlawful seizure and the unlawful use of force against him on February 28, 2018.

## PRELIMINARY STATEMENT

The District Court's decision in this case was the antithesis of the summary judgment standard. It ignored obvious factual disputes and refused to draw any inferences favorable to plaintiff. Where defendants' version of events was not enough, it exaggerated, and even invented facts to justify Cheema's seizure and use of force against plaintiff – whose only offense was being intoxicated in his home. Further, the court conflated questions of fact relevant to the constitutional reasonableness inquiry with questions of law specific to the qualified immunity analysis. Moreover, the court took the unprecedented step of granting the City – a municipality – qualified immunity under New York State law, ignoring decades of long-standing Supreme and Circuit court precedent. In sum, the District Court's

1

decision improperly usurped the jury's role as factfinder and then reframed the factual narrative in order to absolve defendants from liability in this case.

## STATEMENT OF JURISDICTION

This Court has jurisdiction, pursuant to 28 U.S.C. § 1291, of this appeal from the District Court's final judgment and orders.

## QUESTIONS PRESENTED

1)      Whether the District Court erred in dismissing plaintiff's federal excessive force claim based on qualified immunity and finding that defendant's perception of events was reasonable as a matter of law and/or that no clearly established law prohibited defendant's use of force.

2)      Whether the District Court erred in dismissing plaintiff's federal and state law claim for false arrest based on its finding that probable cause and/or arguable probable cause existed to believe that plaintiff was incapacitated and posed a likelihood of harm as defined by New York Mental Health Law ("NYMHL") § 22.09.

3)      Whether the District Court erred in resolving factual disputes and drawing inferences against plaintiff in contravention of the summary judgment standard.

4)      Whether District Court erred in granting qualified immunity to the City under state law and dismissing plaintiff's claims of assault and battery.

## STATEMENT OF THE CASE

**PROCEDURAL HISTORY**

Plaintiff commenced this action on February 1, 2019, in the United States District Court for the Eastern District of New York before the Honorable Eric R. Komitee[1] alleging constitutional violations pursuant to 42 U.S.C. § 1983 against all of the individually named defendants, as well as pendant state law claims against the City. (JA2). Specifically, plaintiff claimed that defendant had subjected him to an unlawful arrest in the absence of probable cause and had utilized excessive force against him in effectuating that arrest; and, that City was vicariously liable for defendant's acts under New York law.[2] (JA10-23).

Following discovery, plaintiff moved for summary judgment on the excessive force claim, and defendants moved for summary judgment on all claims except Monell. (JA7). On June 28, 2022, Magistrate Judge Tiscione issued a Report and Recommendation ("R&R") denying both defendants' and plaintiff's respective motions for summary judgment on excessive force but granting defendants' motion for summary judgment on the issue of probable cause to arrest under federal and

---

[1] The Honorable Nicholas G. Garaufis was originally assigned, but the matter was reassigned to Judge Komitee on February 12, 2020.

[2] The complaint also alleged Monell liability and Intentional Infliction of Emotional Distress under state law. (JA16; JA21). Those claims have been voluntarily dismissed and are not subject to this appeal.

state law. (JA7; JA1385). Neither party issued any objection to the R&R. Nonetheless, District Judge Komitee undertook de novo review, and on September 30, 2022, issued a Memorandum and Order ("decision") finding that dismissal of the false arrest claim was proper for the reasons given by the R&R, but reversing the R&R's denial of qualified immunity for Cheema on excessive force. (JA8; JA1404). The decision also found that the City was entitled to qualified immunity under state law for plaintiff's assault and battery claims. (Id.). On December 6, 2022, the Clerk entered judgment on the Court's decision and dismissed the case. (JA9; JA1434). This appeal followed.

**THE FACTS MOST FAVORABLE TO PLAINTIFF**

On February 28, 2018, plaintiff had been out drinking with a friend. (JA40). When he returned home, he continued to drink into the early hours of the morning. (JA34). Concerned with the impact that his drinking might have on his health issues, at approximately 6:15 a.m., Singh's wife, Amandeep Kaur, called 911. (JA36; JA51). Although she did not speak or understand English well, she made it clear to the 911 operator that her sole purpose in calling was to obtain an ambulance – not police – because she was concerned with plaintiff's drinking and wanted him to be taken to a hospital for evaluation. (JA99; JA1111). At no point during the call did she ever allege that she was scared or concerned for her safety, or that plaintiff was

4

violent, aggressive, dangerous, or suicidal. (JA99). Following a brief discussion with the 911 operator, Mrs. Kaur was transferred to the EMS dispatcher to whom she provided the same information. (Id.).

At approximately 6:32 a.m., EMS arrived at plaintiff's home. (JA119). Upon their arrival, plaintiff was alert, clear, rational, and possessed all of his mental and physical faculties. (JA116-118). On the first page of the EMT's Precare Hospital Report ("PCR"), EMS noted plaintiff to be breathing normally, not exhibiting any signs of alcohol poisoning, alert and oriented, and with pertinent negatives[3] indicating that plaintiff's mental status, neurological function, and gait were all normal. (Id.). The PCR also gave plaintiff a perfect Glasgow Coma Score ("GCS") of 15 for mental alertness, and perfect sub-scores for eye response ("e"), verbal response ("v"), and motor response ("m").[4] (Id.). The PCR contained no notations or indicia of any suicidal ideations, intentions to commit self-harm, or violent,

---

[3] Pertinent negatives refer to conditions that are **_not_** present and/or denied to exist, thus making them pertinent because of their non-existence. See, e.g., Novak v. Saul, 2020 WL 5760353, at *3 (W.D. Pa. 2020)("'Pertinent negative' in medical terminology means 'An element of the patient's history that aids diagnosis because the patient denies that it is present.'"); Charlotte K. v. Commr. of Soc. Sec., 2018 WL 4153925, at *13 (N.D.N.Y. 2018)("NP Miller listed 'medication side effects' under the heading 'pertinent negatives,' indicating that plaintiff was not having adverse side effects from her medications.").

[4] See e.g., Olvera v. Long, 2013 WL 5348425, at *2 (S.D. Cal. Sept. 20, 2013)(noting that a "Glascow Coma Score, which is used to evaluate mental status, [of] 15 [] is the best possible score and is given to 'someone awake like all of us.'"); "CDC Mass trauma Resources Glascow Coma Scale," *available at* https://www.cdc.gov/masstrauma/resources/gcs.pdf (last visited April 5, 2023).

assaultive, or threatening behavior toward anyone. (Id.). Additionally, the first five (5) minutes of the interaction with EMS were recorded by plaintiff's home surveillance camera. (JA1333). The video depicts plaintiff seated for all but ten (10) seconds having what appears to be a calm, civil, unanimated dialogue with the EMTs. (Id.). When plaintiff does stand, the video shows him standing and balancing normally without swaying or falling over. (Id). Nevertheless, because plaintiff refused to go to the hospital, he was deemed uncooperative, and the police were called for assistance. (JA923).

At approximately 6:44 a.m., defendant, and non-party police officers Davis and Walker arrived at plaintiff's home and surrounded plaintiff who was seated on the couch. (JA119). The entire nine (9) minute encounter with police was recorded by plaintiff's home surveillance camera. (Id.). Upon the officers' arrival, the video shows defendant Cheema (6'3" and 265 pounds) immediately approach Singh (5'8" and 180 pounds) as he sits docilely on his couch. (Id.; JA390; JA252). At no point in the video is Cheema ever seen speaking to EMTs. (JA119).

During this exchange, plaintiff can be seen seated the entire time having what appears to be a calm, peaceful discussion with Cheema and police. (JA119). There is nothing depicted in the video suggesting any violent or threatening behavior by plaintiff toward any officer, EMT, or his wife. (Id.). Nothing in the video suggests

that the situation is tense, volatile, or adversarial. (Id.) Indeed, plaintiff is allowed to move about freely at various times during the encounter and interact with officers at close range without incident or any indication that the circumstances are becoming hostile. (JA119). Plaintiff is also allowed to freely engage with his wife, who can be seen bringing him clothes and water at different points in the video. (Id.). Moreover, the officers admit that throughout this encounter plaintiff never verbally threatened or became physically aggressive, violent, or assaultive at any time toward anyone. (JA120-21; JA501; JA831; JA685). Additionally, at no point prior to the arrival of EMS or police did plaintiff ever threaten or attempt to harm anyone, nor did he threaten or attempt to harm himself. (JA1333; JA119; JA120-21; JA954-55; JA1121).

Nonetheless, Cheema informed plaintiff that he *must* go to the hospital whether he wanted to or not. (JA468-78). However, rather than handcuff and restrain plaintiff, Cheema gave Singh the *choice* to either leave the apartment on his own accord and accompany the officers without handcuffs; or, if he *chose* not to do that, he would be handcuffed and forcibly removed to the hospital, in which case Cheema would label him as uncooperative to medical staff, which would extend his hospital stay. (Id.). Presented with this Hobson's Choice, plaintiff reluctantly chose to go voluntarily and avoid handcuffing. (Id.). Plaintiff was then allowed to get dressed.

(Id.; JA119). During this period, the video shows plaintiff moving freely about amongst the officers while they watch as he puts on clothes. (JA119). In fact, at one point while plaintiff is struggling to put on his shoes, he moves very close to Officer Walker without incident or reaction from anyone. (Id.). Once plaintiff was fully dressed, he stood near the front door of his apartment and put on his jacket and glasses in order to leave, while the three officers surrounded him. (Id.).

At this point in the video, Officer Walker opens the door and stands in front of it to hold it ajar so plaintiff can walk out. (Id.). As he begins to leave, plaintiff then stops and sarcastically quips that Cheema is "going to have to handcuff him," briefly gesturing with his arms behind his back in a rear handcuffing position. (Id.; JA482-488). Cheema had neither commanded plaintiff to do this nor ordered him to submit to handcuffing. (Id.). In fact, Cheema issued no orders of any kind during the entire interaction. (Id.). Plaintiff made this move entirely of his own volition. (JA482-488). This joking gesture lasts approximately three seconds, in response to which Cheema can be seen removing his handcuffs from his belt. (JA119).

However, the video shows that before Cheema makes any attempt to handcuff Singh, plaintiff brings his hands out from behind his back and says, "I'm just joking, you don't need to handcuff me." (JA119; JA482-488; JA550). In response, Cheema allows plaintiff to withdraw his arms and bring them to his front, making no attempt

to grab his arms or hands, or otherwise secure plaintiff for handcuffing. (JA119; JA482-488). Cheema also never orders Singh to submit to handcuffing or inform him that he *must* be handcuffed at this time. (Id.). After plaintiff withdraws his arms, he then turns slightly to his right, smiles and leans back towards Cheema while showing his hands in a submissive posture close to his chest. (JA119). Neither Cheema nor any other officer around plaintiff appear to have any reaction whatsoever to this behavior. (JA119). Then, as Singh turns back towards the door and takes a step to leave – as he had been instructed to do – Cheema, without warning, grabs plaintiff from behind, picks him up, and violently body-slams him to the ground under the full weight of his 265 pound frame injuring plaintiff's head and right shoulder, which ultimately required surgery to repair. (JA119; JA197; JA291).

In connection with this incident, Cheema completed an Aided Report in which he indicated that plaintiff had *not* attempted physical harm to himself, had *not* attempted physical harm to others, had *not* physically threatened others, had *not* verbally threatened others, had *not* spoken of harming himself or others; had *not* placed himself in danger; and, was *not* unable to care for himself. (JA120-121). Plaintiff was never charged with any crime or violation of law. (JA571).

**THE DISTRICT COURT'S DECISION**

Both Magistrate Judge Tiscione's finding of probable cause in the R&R and District Judge Komitee's qualified immunity determination in the Memorandum & Order hinged almost entirely on conclusions regarding the reasonableness of Cheema's perception of events. In particular, the court[5] found it reasonable for Cheema to believe that plaintiff was incapacitated by alcohol; that he posed a likelihood of harm to himself or others; and, that under the circumstances, the force used was warranted. However, these determinations were *all* based on a lopsided, defendant-centric view of events.

**A) The Court's Disregard of Evidence Favorable to Plaintiff on the Issue of Incapacitation**

*i.   The Conflicting Evidence of Incapacitation Within the EMS Report*

The court's finding of incapacitation was based on the EMTs' "own observations." (JA1397). However, the EMTs had no recollection of this incident.

> Q.   You don't have an independent recollection of this job, correct?
> A.   No. (JA893-94).
>
> Q.   [D]o you remember responding to that location?
> A.   Honestly, I get thousands of jobs…I really cannot recall anything regarding this job... (JA1011).

---

[5] Except for its reversal of qualified immunity, the Memorandum & Order accepted the findings of law and fact set forth in the R&R. As such, unless otherwise specified, the term "District Court," "court" and/or "decision" will refer collectively to the findings made in *both* the R&R and Memorandum and Order.

Moreover, although the court allowed the defendant-favorable portions of the PCR to tip the scales in favor of dismissal, it ignored the portions favorable to plaintiff. For example, it discounted Singh's perfect GCS score of 15 and the numerous references to his "alert and oriented" mental status ("four/four") (JA116-18), which should have dictated that he was *capable* of refusing medical treatment, and thus not incapacitated.

> Q.    Under what circumstances can someone refuse medical attention?
>
> A.    If they are alert and oriented, have decision making capacity, have a Glasgow Coma Scale of 15, which means they are oriented, they are able to follow basic commands, and they are able to walk on their own…(JA886-887).

Puzzlingly, the R&R seemed to acknowledge this, but apparently forgot about it when it came time to dismiss the false arrest claim.

> "[i]t [wa]s undisputed that Plaintiff had a Glasgow Coma Score of 15, ***which indicated that he had the mental capacity to refuse medical attention at that time***." (JA1387).

Similarly, while the court found that plaintiff was "speaking incoherently" (JA1406), the PCR gave plaintiff a perfect GCS verbal ("v") sub-score of 5, which indicates an "oriented" person who does not have "confused conversation" or "incomprehensible speech."[6] (JA116-18). And, although the court found that

---

[6] A verbal score of 4 indicates "confused conversation," and a score of 2 would indicate "incomprehensible speech." See "CDC Mass trauma Resources Glasgow Coma Scale," *available at* https://www.cdc.gov/masstrauma/resources/gcs.pdf (last visited April 5, 2023).

plaintiff "displayed an unsteady gait" (JA1406), the PCR gave Singh a perfect GCS motor function ("m") sub-score and listed "abnormal gait" as a *pertinent negative* – meaning that plaintiff's gait was *not* abnormal. (<u>Id</u>.). However, these facts were disregarded by the court.

### ii. *Conflicting Evidence of Incapacitation from Defendant Cheema*

The court also found incapacitation based on "Cheema's own observations," which "led him to conclude that Plaintiff was too intoxicated to care for himself." (JA1397). However, this factual conclusion remains a mystery as Cheema's own Aided Report indicates exactly the opposite.

| |
|---|
| (Check all that apply) |
| "Unable to care for self: <u>**No**</u>" (JA120-21) |

In addition to the Aided Report where he specifically documented that plaintiff was *not* too intoxicated to care for himself, Cheema admitted at his deposition that he had no idea how intoxicated Singh was.

> Q. How drunk did you believe he was?
> A. There's no scale on level of intoxication. It's not like we did a breathalyzer. I don't know. (JA541).

### iii. *Other Evidence Inconsistent With Incapacitation*

In making its findings on incapacitation, the court also overlooked plaintiff's own testimony, that "[he] was absolutely fine, [] before [he] was thrown down to the ground" (JA263), as well as his wife's.

> Q. And you didn't think he was drunk in that moment?
> A. No. At that point, I knew that he was not drunk at that point, but I was afraid that he might drink more. (JA1136).
>
> A. I would say the behavior was normal, the reaction was normal that he did not want to go to the hospital, so he did have presence of mind. (JA1114).

Likewise, while the court found that "[t]he facts establish that [p]laintiff's wife requested medical help because he was highly intoxicated" (JA1400), Singh's wife made no such statement during the 911 call. (JA99). In fact, the only description she gave was that he "drink[sic] too much" and was "drunk." (Id.). Further, she testified that the reason she called 911 was *not* because Singh was "highly intoxicated," but rather because of his underlying health conditions and because she had been told to not let him drink.

> A. …my mother-in-law used to tell me that don't ever let him drink because he has some health concerns and that is caused by liquor English. And even my husband, Mr. Singh, he even told me numerous times that he did have issues with drinking. So, my mother-in-law always used to tell me that he has these problems, so make sure that he doesn't drink. (JA1103).

> A.  …I was really concerned for his health, and that's the only reason why I was concerned. (Id.).
>
> Q.  You were worried that because he had been drinking, he might get sick, right?
> A.  Yeah. (JA1121).

In any event, the court failed to realize that the only portion of the 911 call actually transmitted to Cheema was that plaintiff was "intox."

> Q.  Did you hear from dispatch that there had been a 911 call?
> A.  The dispatch did tell us that it was an intox male that EMS was requesting, but other than that we didn't get other information through our dispatcher. (JA453).

**B)  The Invention and Manipulation of Evidence Related to the Threat or Likelihood of Harm Posed by Plaintiff**

**i.  *Ex Post Facto Events Used to Justify Cheema's Belief as to Likelihood of Harm***

According to the court's probable cause analysis, one of "the circumstances known to Cheema [that] indicated that Plaintiff was heavily intoxicated to the point that he might pose a danger to himself or others" (JA1396) was that,

> "Plaintiff took a step towards the front door where Walker stood, at which point, Cheema believed that Plaintiff posed a potential physical threat and took him to the ground to arrest him." (JA1397).

However, Cheema had *already* decided that plaintiff was going to the hospital long before plaintiff ever took this step. In fact, Cheema had made this decision before plaintiff was fully dressed.

14

Q. So, you explained those options to him. What did he say after you explained those options to him?

A. I don't remember exactly what he said. I do remember him starting to go get dressed. (JA476).

Thus, the court's use of this fact retroactively to support probable cause was rather inexplicable.

## ii. *The Court's Distortion of the 911 Call*

The court made the following findings regarding the substance of the 911 call:

- "Plaintiff's wife reported that Plaintiff was heavily intoxicated and that he was a harm to himself" (JA1397);

- "Singh's wife called 911 to say that her husband was intoxicated and that they were fighting." (JA1405).

However, the 911 recording is unmistakably devoid of any statement that plaintiff was, or was likely to be, "a harm to himself" or anyone. Rather, the *only* words ever uttered referencing her husband were,

- "My husband drink[sic] too much;"

- "Please send him a hospital;"

- "Yah, he's breathing and drink too much;"

- "Yah he drank too much…Yah uh beer." (JA99).

Similarly, the court's assertion that plaintiff's wife called "to say [that] they were fighting" (JA1405) is a gross mischaracterization of the actual dialogue:

15

| Operator: | "Is this a private house or an apartment?" |
|---|---|
| Wife: | "My husband drink[sic] too much;" |
| Operator: | "Ok, ma'am wait is this a private house or are you in an apartment?" |
| Wife: | "This is Apartment…;" |
| Operator: | "And you're between 130 and 131 street on the corners?" |
| Wife: | "Uh, yes yes;" |
| Operator: | "And you said your husband is drunk? |
| Wife: | "Yah;" |
| Operator: | "And you guys are fighting?" |
| Wife: | "Yah, please send him a hospital;" |
| Operator: | "He has to go to the hospital;" |
| Wife: | "Yah." (JA99). |

Indeed, Singh's wife never mentions the word fighting or anything resembling that description. (Id.). Instead, the court's finding simply ascribes the ***911 operator's words*** to her but ignores her testimony regarding the language barrier – which is audibly apparent in the call – that effected her ability to understand the operator's questions.

> Q. And did you hear the operator ask at one point if you were fighting?
>
> A. As you can hear that I said "yes," I was answering "yes" to everything and I said before that my English is not very proficient. So, they were asking me questions and I was just saying "yes, yes," and there was no argument going on and I did not understood what was going on. (JA1125-26).

The court also ignored the fact that the substance of the 911 call – even the court's editorialized version – was never actually transmitted to Cheema. (JA453).

16

### iii. The Distortion of Facts Related to Plaintiff's Likelihood of Harm to Himself

A similar factual reformulation occurred in connection with the court's finding that Singh posed a harm to himself or others. First, while the court asserted that Singh's "wife stated that "[he] [was] a harm to himself" to EMTs (JA1397), this statement is not contained in the 911 recording (JA99) and plaintiff's wife denies ever making any such statement to EMS.

> Q.  Did you talk to the EMS workers at all?
> A.  I have an English-speaking problem, that's why I could not communicate well with them, but I tried to communicate -- they asked me does he have history of doing this or like does he have history of drinking alcohol, and I told them that, you know, he has health issues, health concerns, he has -- he starts throwing up and whatever my mother-in-law told me, I tried to tell them, ***that's it.*** (JA1113).

And, although this statement is noted in the PCR narrative, EMT Milonas did not recall ever being given this information.

> Q.  The next part says, "Patient's wife states that the patient is a harm to himself." Do you have any independent recollection of being told that information?
> A.  I do not. (JA902).

More importantly, Cheema's report specifically states that plaintiff was *not* a harm to himself.

| (Check all that apply) |
| --- |
| "Attem. Physical harm to self: **No**" |

"Placed self in dangerous situation: **No**"

"Spoke of harming self or others: **No**" (JA120-21)

Indeed, the only reason articulated by Cheema as to why plaintiff's intoxication posed any harm to *plaintiff* was a nondescript fear that he might fall, which in any event, did not apply *specifically* to plaintiff.

> Q. Did they explain what they feared might happen to him?
> A. …From my understanding, it was that he could accidentally fall, he could hit his head, it was something to that effect. (JA456)

> A. …[But] [t]hat was a general concern. Whenever we deal with people who are intoxicated, I don't know their exact level of intoxication. It's just a very general thing that could happen if you are intoxicated, so that was what we think about. ***It didn't pertain to him directly***. (JA452).

### iv. The Distortion of Plaintiff's Behavior Towards EMS

The court found the following facts in relation to plaintiff's interaction with EMS,

- "The EMTs felt unsafe based on Plaintiff's aggressive movements toward them" (JA1397); and,

- "Plaintiff showed aggressiveness in his response to their questioning, yelled profanities, and belligerently approached the EMTs." (JA1387).

18

Once again, however, the court's recitation overlooked the fact that apart from the notations in the PCR, EMT Milonas testified that she had no memory of this behavior,

> Q. Just so we're clear, and I know we went over it, aside from the report, you don't have any independent recollection of him being belligerent, or aggressive, or threatening; is that correct?
> A. I have no independent recollection of that. (JA954-55).

Moreover, plaintiff also denied ever being aggressive toward anyone at any time.

> Q. What about towards the EMTs; was your behavior towards them ever aggressive?
> A. No...(JA345-46)
>
> A. I spoke little loud, but in a funny way, not in, like, that. Not in like aggressive mood or aggressive. (JA237)

As did his wife,

> Q. And he was never aggressive with the EMS workers, right?
> A. No, he was actually praising them that, you know…(JA121)
>
> Q. Was he being aggressive in that moment?
> A. No, he was not upset at that point. You can look at his face, he was not upset, he was not angry. (JA1136).

Further, there was no visual evidence in the video recording to corroborate the court's conclusions regarding plaintiff's aggressive behavior toward EMS. (JA119).

### v. *The Mischaracterization of Information Known to Defendant Cheema*

The court's factual findings seemed to implicitly suggest that every piece of information in the record – whether contained in the 911 call, the PCR, or occurring

before Cheema's arrival on the scene – could be transposed to defendant. However,

as mentioned earlier, it is undisputed that Cheema was not privy to the 911 call.

> Q.  You didn't get information about whether someone called 911, or any specific information about what you were about to encounter in entering the apartment; is that correct?
> A.  Correct. (JA453).

It is also undisputed that defendant never saw the EMT's PCR.

> Q.  You cross referenced the document that's prepared by the EMTs, is that right?
> A.  No. I didn't cross reference. I don't look at their paperwork. (JA496)

In fact, the only information relevant to the issue of harm that Cheema claims to

have received was that plaintiff had been nonspecifically uncooperative with EMS

in some unknown manner, which made them feel vaguely unsafe for some unknown

reason.

> Q.  What, if anything, did [the EMT] say to you?
> A.  …[T]hey told us that the wife called saying that he was intoxicated and that he is being uncooperative with them. He was being uncooperative with them to the point where it made them feel unsafe. (JA454-55).

> Q.  Did they explain to you in what way they were feeling unsafe?
> A.  They did, but at this time, I don't remember exactly what was said. (Id.).

But, even *this* is in dispute, as the EMTs could not confirm that they ever spoke to

Cheema.

Q. Do you have any independent recollection of speaking to [police]?

A. I don't have any independent recollection of this job still. (JA932).

In fact, after watching the video – which shows no visual evidence of any conversation between Cheema and the EMTs (JA119) – EMT Milonas testified that she believed that she had never spoken with police at any point.

Q. I'm going to keep playing the video. I'm going to stop it at the one minute mark. Based on the video, from the time that the officers entered until now, the one minute mark, can you tell whether or not you've spoken to the officers?

A. I saw my face turn towards them, ***but I don't think I spoke to them, from what I see***. (JA931).

### *vi. The Threats Plaintiff Never Made*

According to the court, it was undisputed that "Cheema also overheard Plaintiff making threats toward his wife in his native language, Punjabi." (JA1397). However, plaintiff's testimony indicates no such *threats* were ever made.

A. …I was saying that -- I was saying, by -- by calling her name, Bobbi, this is not right. You -- you are sending me to the hospital with handcuffs on. This is not -- this is not right. I -- I -- even I had not done anything -- but she was -- she was quite on that -- on that thing. Didn't say anything. (JA347).

Plaintiff's wife also confirmed this.

Q. At any point, did he say anything to you along the lines of you're going to pay for calling the police or something like that?

A. No, he did not…(JA1145).

21

Further, while defendant claims to have heard this, Cheema's own paperwork suggests the opposite.

| (Check all that apply) |
| --- |
| *"**Verbally Threatened Others**: <u>No</u>"* (JA120-21) |

### C) Recasting the Factual Narrative of Plaintiff's Behavior Prior to the Use of Force

#### i. *Plaintiff's Fictional Resistance to Arrest/Handcuffing*

The court found it "clear that Singh was resisting being handcuffed" (JA1423) and that he was "resist[ing] arrest." (JA1428). However, this conclusion is belied by the fact that plaintiff was never charged with resisting arrest, and Cheema testified that plaintiff had not committed any crime, *including resisting arrest*.

> Q. Why did you not think that it would be appropriate to charge him with a crime?
>
> A. At that time, there was no crime that I could think of that he could be charged with. (JA571).

Moreover, Officer Walker testified that if plaintiff had committed any crime – including resisting arrest – "he would have been arrested" for it. (JA819). Similarly, Officer Davis wondered how plaintiff could resist arrest when there had never been any attempt to arrest him in the first place.

> Q. Just prior to that, did you believe that Mr. Singh was resisting apprehension by making that maneuver?

A. Resisting apprehension? He wasn't -- before that maneuver he wasn't being apprehended so how would he resist? (JA749).

Additionally, although the court's editorialized factual account asserts that Cheema had "beg[u]n to place the[] [handcuffs] on" plaintiff when he withdrew his hands from behind his back (JA1424), Cheema never once testified as to making any actual physical attempt to handcuff plaintiff.

A. He is saying, "They are going to have to handcuff me." Now, I'm **_getting ready_** to place him in handcuffs. (JA548).

Q. Is that when he put his hands behind his back?
A. Right when he said that statement, he started putting his hands behind his back, and then I was **_getting ready_** to handcuff him. (JA485).

### ii. The One-Sided Conclusion Regarding Plaintiff's Movements Prior to the Use of Force

The court found that plaintiff's "sudden step" or "quick move toward Officer Walker [was] reasonably interpreted as threatening, and/or as a first step toward flight through the open door." (JA1419). However, not a single other officer perceived plaintiff's movement to be a threat to Officer Walker. First, Officer Davis, who had the same vantage point as Cheema, had no visible reaction to this step and believed that it presented no danger to Officer Walker.

Q. Did you believe at the moment that Officer Cheema grabbed Mr. Singh to handcuff him that Mr. Singh was going to attack your partner Officer Walker?
A. No, she was not -- not in that proximity. (JA700).

23

Second, Officer Walker had no visible reaction whatsoever to plaintiff's movement and testified as having no recollection of perceiving any threat.

> Q. As you sit here today, you don't have any memory of him trying to attack you?
> A. No. (JA839).

Third, even Cheema himself, after watching the video seemed to tacitly admit that reasonable viewers might come to the opposite conclusion about plaintiffs' actions.

> Q. Looking at the video from this perspective, did it appear to you that he was going to attack Officer Walker?
> A. Again, ***looking from the video, I can't say for sure***. (JA551).

Lastly, in his report, Cheema specifically indicated that plaintiff had *never* engaged in any threatening behavior toward anyone or made any attempt to harm anyone.

| (Check all that apply) |
| :--- |
| *"**Attem. Physical Harm to Others: No**"* |
| *"**Physically Threatened Others: No**"* (JA120-21) |

## SUMMARY OF ARGUMENT

Plaintiff's argument for reversal will first briefly address the scope of appellate review as to all claims in light of the District Court's sua sponte decision to conduct de novo review of the magistrate's R&R and the entire summary judgment record.

Next, plaintiff will discuss the District Judge's erroneous grant of qualified immunity to the City under New York State law in light of long-standing precedent dictating that municipalities cannot obtain qualified immunity under any circumstance.

Third, plaintiff will examine the court's erroneous decision to grant qualified immunity under federal law to Cheema based on its improper conclusion regarding the reasonableness of his perception of events, which is a factual question that the court improperly determined as a matter of law and which is distinct from the legal question of qualified immunity.

Finally, plaintiff will discuss the error and impropriety of the court's wholesale acceptance of Cheema's version of events; its refusal to draw reasonable factual inferences in plaintiff's favor; and, its consistent resolution of factual disputes against plaintiff.

## **ARGUMENT**

## I. **ALL ASPECTS OF THE DISTRICT COURT'S DECISION TO DISMISS ARE PROPERLY REVIEWABLE**

### A. The Court's Sua Sponte De Novo Review of the R&R Opens the Door to the Review of Both the Excessive Force and False Arrest Claims

Generally, a "failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision.'" Roldan v.

Racette, 984 F.2d 85, 89 (2d Cir. 1993).[7] This promotes the "[]efficient use of judicial resources" and also "prevents a litigant from 'sandbagging' the district judge by failing to object and then appealing." In re Warburgh, 644 F.3d 173, 178-79 (2d Cir. 2011). Notwithstanding, the Supreme Court has "emphasize[d] that, because the rule is a nonjurisdictional waiver provision, the Court of Appeals may excuse the default in the interests of justice." Thomas v. Arn, 474 U.S. 140, 155 (1985).

For example, this Court has "disregarded the waiver rule and reached the merits" in instances "[w]here a district court conducts de novo review of an issue that was not raised in objection to the magistrate's report." Mario v. P & C Food Markets, Inc., 313 F.3d 758, 766 (2d Cir. 2002). In those instances, "the purposes of the waiver rule are not advanced…[and] there is no danger of 'sandbagging' the district judge." U.S. v. Male Juv. (95-CR-1074), 121 F.3d 34, 39 (2d Cir. 1997); see also DeLeon v. Strack, 234 F.3d 84, 87 (2d Cir. 2000)(same); Mario, 313 F.3d at 766 (same); Moss v. Colvin, 845 F.3d 516, 520 (2d Cir. 2017)(same).

Here, despite the lack of objection, the District Court undertook de novo review of the legal and factual conclusions contained within the R&R. Upon review, it found that "[s]ummary judgment [wa]s warranted on Singh's false-arrest claim [] for the reasons set out in the R&R" (JA1405) but reversed the R&R's denial of

---

[7] Unless otherwise designated, all case quotations herein adopt the alterations contained therein and omit all parallel citations, footnotes, and internal quotation marks.

qualified immunity on plaintiff's excessive force and related state law claims. As such, review of *all* claims is proper and the policy considerations governing the waiver rule are absent. This is true even though "the district court did not undertake a searching examination of [the false arrest] claim" to the same degree as the force claim, because regardless of the depth of review, it is clear that the court did not "consider[] the claim waived [and] indicated, albeit briefly, its agreement with the magistrate on the merits." <u>Mario</u>, 313 F.3d at 766 (alteration added). Accordingly, since "the district judge [] concluded that there [wa]s enough merit in [these] claim[s] to warrant careful consideration" in this case, the policies supporting the waiver rule simply do not apply, and "the interest in minimizing the risk of error should prevail over the interest in requiring strict compliance with procedural rules." <u>Thomas</u>, 474 U.S. at 157–58 (Stevens, J, dissenting)(alteration added).

## II. THE DECISION TO GRANT THE CITY QUALIFIED IMMUNITY UNDER STATE LAW WAS CLEARLY ERRONEOUS

The most obvious ground for reversal – and that which requires the least discussion – was the court's "finding [that] qualified immunity on the excessive force claims require[d] a grant of summary judgment on assault and battery as well." (JA1427). However, notwithstanding the impropriety of the court's qualified immunity analysis under § 1983 (Section III, <u>infra</u>), the decision's collateral

application of qualified immunity to the City on plaintiff's state law claims was nevertheless incorrect as a matter of law.

## A. Individual Qualifiedly Immunity Under § 1983 Cannot Give Rise to Vicariously Immunity for the City Defendant Under State Law

While a finding of qualified immunity under § 1983 for state actors may apply equally to analogous state law claims, "unlike various government officials, *municipalities do not enjoy immunity* from suit—either absolute or qualified—under § 1983." Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 166 (1993)(emphasis added). This rule applies with equal force to claims under state law, because "[u]nlike cases brought under [Section] 1983, municipalities may be liable for the common law torts, like false arrest and malicious prosecution, committed by their employees under the doctrine of *respondeat superior*." Callahan v. County of Suffolk, 602 F. Supp. 3d 399, 414 (E.D.N.Y. 2022). In other words, as this Court recently explained in Triolo v. Nassau County, 24 F.4th 98 (2d Cir. 2022), individual immunity under federal law "does not somehow transfer to [the] municipal employer" under state law. Id. at 110.

Here, the state law assault and battery claims are asserted against the City under the doctrine of respondeat superior. Thus, since the "state law claim of assault and battery against the [City] is alive due to the potential for vicarious liability for actions

of its police officers as its employees" (<u>Callahan</u>, 602 F. Supp. 3d at 414), it was error for the court to have granted the City immunity under state law.

## III. THE DISTRICT COURT'S DECISION TO GRANT DEFENDANT CHEEMA QUALIFIED IMMUNITY WAS ERRONEOUS

In reversing the magistrate's R&R, the court found that "no reasonable jury could conclude that Cheema violated a legal obligation that was sufficiently clear that every reasonable official would have understood his conduct to violate that obligation." (JA1416). However, as will be discussed herein, the decision's analysis ignored the principles set forth in <u>Graham v. O'Connor</u>, 490 U.S. 396 (1989) which made defendant's legal obligations sufficiently clear in this case; it conflated the factual inquiry into the reasonableness of defendant's perception of the facts with the *legal* question of the reasonableness of defendant's belief with respect to the state of the law; and, in resolving the former, the court ignored every single plaintiff-favorable fact and inference in contravention of the summary judgment standard.

### A. It is Clearly Established that the Use of Significant Force is Prohibited Where NONE of the <u>Graham</u> Factors Are Present

Over three decades ago, the Supreme Court articulated what have now come to be known as the "<u>Graham</u> factors," a non-exclusive list of considerations used to evaluate the reasonableness of a particular application of force. Specifically, they include "[1] the severity of the crime at issue, [2] whether the suspect poses an

29

immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" Ketcham v. City of Mt. Vernon, 992 F.3d 144, 148–49 (2d Cir. 2021). Although courts are free to consider *other* factors, it is clearly established that the Graham factors "*must* be considered" as part of any reasonableness analysis. Rogoz v. City of Hartford, 796 F.3d 236, 247 (2d Cir. 2015)(emphasis added).

While the overarching theme of Graham is reasonableness, the question of clearly established rights for purposes of qualified immunity typically demands a bit more particularity. Indeed, "[f]ew issues related to qualified immunity have caused more ink to be spilled than" the determination of "how generally or specifically to define the right at issue." Golodner v. Berliner, 770 F.3d 196, 205 (2d Cir. 2014). "For if the right is defined too narrowly, qualified immunity would be available in any situation," and if it "is defined too broadly, qualified immunity would rarely be available." Capogrosso v. Gelbstein, 2019 WL 6406444, at *15 (E.D.N.Y. 2019), report and recommendation adopted, 2019 WL 4686448 (E.D.N.Y. 2019). Accordingly, this creates a degree of tension with the "all-things-considered inquiry" under Graham, which "almost never" provides "a previously published opinion involving *exactly* the same circumstances." Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007). Nonetheless, the Supreme Court has acknowledged that

Graham itself can "[o]f course, in an obvious case, [] 'clearly establish' [certain] answer[s]" to the question of clearly established rights. Brosseau v. Haugen, 543 U.S. 194, 199 (2004).

For example, it is axiomatic that qualified immunity would be improper as a matter of law "where *none* of the Graham factors were met." Benny v. City of Long Beach, 2022 WL 9446910, at *2 (E.D.N.Y. 2022). Indeed, "the Eighth Circuit has held that, where none of the three *Graham* factors suggest that an officer's use of force was reasonable, the use of such force violates clearly established Fourth Amendment rights." Johnson v. Courtois, 2018 WL 6726892, at *12 (D. Minn. 2018). The Eleventh Circuit has similarly found that where "[n]one of the *Graham* factors support[] any use of force" then the "Graham analysis yields an answer that is clear beyond all doubt." Charles v. Johnson, 18 F.4th 686, 699 (11th Cir. 2021). Likewise, the Fifth Circuit has recognized that "the Graham excessive-force factors themselves 'can 'clearly establish' the answer, even without a body of relevant case law'" in situations where "[n]one of the *Graham* factors justifies [the use of force]." Newman v. Guedry, 703 F.3d 757, 764 (5th Cir. 2012)(alteration added). The Tenth Circuit has also "not require[d] a second decision with greater specificity" in situations where "the first *Graham* factor only marginally support[s] using

force…and the second two factors weigh[] heavily against it." Morris v. Noe, 672

F.3d 1185, 1198 (10th Cir. 2012).

Most importantly, however, this Court has reached a similar conclusion in

several cases. See, e.g., Garcia v. Dutchess County, 43 F. Supp. 3d 281, 297

(S.D.N.Y. 2014), aff'd in part, dismissed in part sub nom. Garcia v. Sistarenik, 603

Fed. Appx. 61 (2d Cir. 2015)(unpublished)(finding it to be "clearly established" that

"significant" force against an arrestee "who no longer actively resisted arrest or

posed a threat to officer safety" is prohibited); accord Jones v. Treubig, 963 F. 3d

214, 226-27 (2d Cir. 2020)( "[i]t was ... clearly established law in the Second Circuit

as of April 2000 that it was a Fourth Amendment violation to use 'significant' force

against arrestees who no longer actively resisted arrest or posed a threat to officer

safety"). Indeed, as this Court stated in Weather v. City of Mt. Vernon, 474 Fed.

Appx. 821 (2d Cir. 2012),

> The law protecting a person against excessive force in this situation is
> clearly established. Weather was breaking no law, was not resisting
> arrest, and was not placing himself or others in danger. No reasonable
> officer would believe that "twisting Mr. Weather's arm behind his back
> and pushing or shoving him into the brick wall outside the school" was
> a lawful use of force in this circumstance…

> Id. at 824.

Accordingly, since none of the Graham factors were present in this case under

plaintiff's version of events, and it is clearly established that the use of significant

force is prohibited where the Graham factors are absent or de minimus, the court's conclusion that there was "[no] case recognizing a clearly established right that Cheema's actions...could be held to violate" (JA1417) was plainly incorrect.

**B. The Reasonableness of Defendant's Perception of the Facts is Factual Issue and the District Court Erred When It Substituted Its Findings for That of a Jury**

While the court was correct that "the reasonableness inquiry often 'overlap[s]' with the qualified immunity analysis" (JA1413) in excessive force claims, "[t]he inquiries for qualified immunity and excessive force remain distinct." Saucier v. Katz, 533 U.S. 194, 195 (2001). Further, in order to determine qualified immunity, the court "must *know what the facts were that the officer faced or perceived*." Zellner v. Summerlin, 494 F.3d 344, 368 (2d Cir. 2007)(emphasis added). Indeed, only "[*a]fter* the factfinder's deci[sion as to] what the facts were that the officer faced or perceived," may the court "*then* [] make the ultimate legal determination of whether qualified immunity attaches on those facts." Outlaw v. City of Hartford, 884 F.3d 351, 367 (2d Cir. 2018) (alteration added); Zellner, 494 F.3d at 368 (same).

Moreover, "the finding of those facts" is squarely "a matter for the *jury*." Warren v. Dwyer, 906 F.2d 70, 77 (2d Cir. 1990)(Winter, J., dissenting)(emphasis added); Zellner, 494 F.3d at 368 (same); Outlaw, 884 F.3d at 367 (same); Kerman v. City of New York, 374 F.3d 93, 109 (2d Cir. 2004); Stephenson v. Doe, 332 F.3d

68, 81 (2d Cir. 2003)(same). Thus, it is firmly settled that "disputed material issues regarding the reasonableness of an *officer's perception of the facts (whether mistaken or not*) is the province of the *jury*," and not the court. <u>Jones</u>, 963 F.3d at 231.

Here, the decision concluded that Cheema was entitled to qualified immunity for his use of force because, according to the court, it was reasonable as a matter of law for Cheema to have perceived or interpreted, i) plaintiff's "resist[ance] [to] arrest" (JA1428) or "attempt or evade arrest by flight" (JA1411); ii) plaintiff's "erratic behavior and high level of intoxication" (JA1426); and iii) plaintiff's dangerousness as established by the fact that he "was uncooperative to the point where [the EMTs] were concerned for their safety" and "his sudden movement in the direction of Officer Walker." (<u>Id</u>.). However, as discussed below, "whether it was reasonable for [Cheema] to believe" any of these facts to be true "is the very question upon which [] there are genuine issues of material fact." <u>Cowan ex rel. Est. of Cooper v. Breen</u>, 352 F.3d 756, 764 (2d Cir. 2003). Therefore, since it was "the *jury's* role to consider the reasonableness of [Cheema's] stated belief" regarding his perception of these facts, "the district court [could] not substitute its view for [the jury's]." <u>Zellner</u>, 494 F.3d at 371 (alteration added). Moreover, this error was compounded by the court's failure to recognize the factual disputes pervading these issues and its refusal to draw inferences favorable to plaintiff which would have

clearly negated the reasonableness of the court's conclusion regarding Cheema's alleged perception of events.

> ### i. There was No Evidence from Which to Reasonably Perceive Plaintiff's Actions as Resisting Arrest, a Failure to Cooperate, or an Attempt to Flee

In an attempt to manufacture some <u>Graham</u> factor favoring Cheema, the court found that Singh had "undisputedly resisted arrest." (JA1428). However, defendants' motion for summary judgment *never* even suggested that this <u>Graham</u> factor weighed in Cheema's favor. Instead, they claimed that "the facts of this case [were] *not suitable* for a mechanical inquiry [into] whether plaintiff attempted to flee [or resist] arrest." (JA7, Dkt. 49 at 7). Further, the R&R found – based on the exact same evidence – that plaintiff had neither committed any crime "*nor resisted arrest*" (JA1392), thus making the perception of plaintiff's alleged resistance *at least* disputable. In addition, the court's conclusion is also belied by the fact that plaintiff was never *charged* with resisting arrest, which is notable given Officer Walker's testimony that plaintiff "would have been arrested" (JA819) if he had committed *any* crime, and Cheema's testimony that "there was no crime that [plaintiff] could be charged with." (JA571).

Moreover, the attempt to recast plaintiff's behavior in withdrawing his hands from behind his back as an attempt to "evade" Cheema's efforts "to place [the

handcuffs] on," is also misleading. (JA1421; JA1424). First, it is undisputed that Cheema never once issued any order or command for plaintiff to submit to handcuffing, and in fact, had no intention of handcuffing plaintiff until plaintiff requested it – albeit jokingly – and voluntarily put his arms behind his back. (JA482-488). Second, while the video depicts Cheema *removing* his handcuffs, it is clear from the video that he never actually attempts to "*to place them on*" – a fact acknowledged by the R&R. (JA)("Officer Cheema *approached* [p]laintiff to handcuff him, [p]laintiff then brought his hands forward")(JA1387). Indeed, Cheema never once claims to have been attempting to handcuff plaintiff, but instead describes his own behavior as "*getting ready* to place him in handcuffs." (JA548; JA485). Further, the video shows Cheema *allowing* plaintiff to remove his arms from behind his back and bring them forward without any attempt to grab or hold his arms or hands – actions that a reasonable juror might expect to see if he had *in fact* been attempting to handcuff Singh. (JA119). Accordingly, as even Officer Davis remarkably observed, "how [c]ould [plaintiff] resist" arrest when "before [Cheema's] maneuver he *wasn't being apprehended*" in the first place. (JA749); See e.g., Morse v. Fitzgerald, 2013 WL 1195036 (W.D.N.Y. 2013):

> Fitzgerald never told Plaintiff that he was being arrested, until after he pinned Plaintiff to the kitchen table [and] placed him in an arm bar…Consequently, Plaintiff never had an opportunity to resist being arrested prior to Fitzgerald's use of force. Fitzgerald's use of force was,

in effect, a sudden an unprovoked attack on a man who correctly believed that he was constitutionally protected from being arrested inside his home at that moment.

Id. at *10.[8]

Correspondingly, the court's editorialization of plaintiff's step towards the door as a "step towards flight" (JA1419) is also contradicted by Cheema himself who never claimed to believe that plaintiff was attempting to flee. Indeed, he testified to having the exact *opposite* perception.

> Q.   Officer Walker was in the same direction as the doorway?
> A.   Correct.
> Q.   So, he could have just been stepping towards the doorway as well, correct?
> A.   *I did not see that that was going to happen from his behavior.* (JA551).

In sum, "[b]y justifying the officers' actions on reasons of its *own invention*, the Court ignore[d] the reasons the officers actually gave," and as such, conducted an analysis "*far removed* from what qualified immunity analysis demands."

---

[8] Even assuming that plaintiff's act could properly be characterized as resistance, it was at best, passive. See, e.g., Jackson v. Washtenaw County, 678 Fed. Appx. 302, 306 (6th Cir. 2017)(describing active resistance as "characterized by physical force, a show of force, or verbal hostility coupled with failure to comply with police orders"). Accordingly, this Graham factor, which considers "whether [a person is] *actively* resisting arrest" (Ketcham, 992 F.3d at 148), would still not tilt in his favor. See, e.g., Jones, 963 F.3d at 223 (finding that using significant force "even though [plaintiff] was only engaged in passive resistance" was clearly established as being prohibited); see also McKinney v. City of Middletown, 49 F.4th 730, 742 (2d Cir. 2022)("the police may violate clearly established law by initiating significant force against a suspect who is only passively resisting").

Messerschmidt v. Millender, 565 U.S. 535, 568 (2012)(Sotomayor, J.,
dissenting)(emphasis added).

### ii. *The Court's Vague Characterizations of Plaintiff's Erratic Behavior and Highly Intoxicated State are Abundantly Disputed by the Record*

The same lopsided factual analysis was applied to the court's conclusion
regarding plaintiff's alleged "erratic behavior and high level of intoxication."
(JA1426). First, absent facts establishing that plaintiff was "threatening or hostile,
either verbally or physically," the mere fact of "[plaintiff's] intoxicated state" would
not have given a reasonable officer a basis to "conclude that [plaintiff] was a
materially greater threat than any non-intoxicated person." Stanfield v. City of Lima,
727 Fed. Appx. 841, 846–47 (6th Cir. 2018). Next, there is no visible evidence of
plaintiff's intoxication or erratic behavior in the video. (JA119). Plaintiff is not seen
stumbling, falling over, or unbalanced, and does not appear visibly agitated,
animated, or aggressive. (Id.).

Further, apart from the video evidence, both plaintiff and his wife testified
that he was "absolutely fine" (JA263), his "behavior was normal" (JA1114), and he
was not aggressive with EMS workers or police (JA121; JA237). Additionally, P.O.
Walker testified that plaintiff would have been handcuffed "if [he was] being irate"
or erratic (JA837), and it is undisputed that he was not handcuffed at any point before
Cheema's use of force. Similarly, while the court noted that "[p]laintiff's BAC was

247 mg/dL two hours after his wife called 911" (JA1406), Cheema admitted that he had no idea how intoxicated plaintiff was. (JA541). And, in any event, "it is well known that…a high blood alcohol count in the person served may not provide a sound basis for drawing inferences about the individual's appearance or demeanor." Romano v. Stanley, 90 N.Y.2d 444, 450–51 (N.Y. 1997). Moreover, plaintiff's perfect GCS score on the PCR suggests that he was not exhibiting outward signs of being highly intoxicated or erratic. (JA116-18). Accordingly, the disputed facts surrounding the court's findings only reinforce the error in granting qualified immunity.

### iii. The Evidence Favoring Plaintiff Establishes the Unreasonableness of Cheema's Perception of Plaintiff as a Threat

The District Court's conclusion that plaintiff's behavior could "reasonably [have been] interpreted as threatening" (JA1419) is equally disputed. Specifically, in contrast to the court's partisan account, plaintiff's movement immediately preceding Cheema's use of force was not "towards [Officer Walker]" (JA1424), but rather *backward* towards Officer Cheema with both of his hands in a submissive posture while smiling and stating, "I'm just joking." (JA119). Moreover, the video shows that Officer Walker did not react at all to plaintiff's movement – which is contrary to what one might expect if she had perceived a threat. (Id.).

Additionally, Officer Davis, who had the same vantage point as Cheema, testified that he "didn't think [plaintiff] was going to specifically target Officer Walker" (JA740) because "she was not -- not in that proximity." (JA700). Likewise, Officer Walker testified that she had no memory of being in fear of plaintiff's movement, and even after watching the video, was "not too sure" about what she believed his movement to be. (JA839). Most notably, however, even Cheema admitted that after "looking [at] the video, *[he] c[ouldn't]say for sure"* whether it reasonably appeared that plaintiff was going to attack anyone. (JA551). The credibility of Cheema's perception of plaintiff as a threat is also undermined by his own paperwork, wherein he indicated that plaintiff had not engaged in *any* threatening behavior.

| (Check all that apply) |
| --- |
| *"**Attem. Physical Harm to Others**: **No**"* |
| *"**Physically Threatened Others**: **No**"* (JA120-21) |

Similarly, the EMTs' alleged concern for their safety cannot salvage Cheema's perception. Specifically, without "facts that would have justified [their] fear," the EMT's "vague suspicions" and "generalized concerns, standing alone, cannot justify the use of force." <u>Winterrowd v. Nelson</u>, 480 F.3d 1181, 1185 (9th Cir. 2007(altered from original); <u>accord</u> <u>Deorle v. Rutherford</u>, 272 F.3d 1272, 1281

(9th Cir. 2001)("a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern."). Moreover, the EMTs had "no independent recollection" of plaintiff ever acting belligerent, threatening, or aggressive towards them (JA954-55); and, whether or not this information was ever communicated to Cheema in the first place is directly disputed by the video, which never once shows Cheema actually speaking with EMS. (JA119). Indeed, even EMT Milonas testified that after seeing the video, she did not believe that she ever spoke with Cheema.

> A. I saw my face turn towards them, *but I don't think I spoke to them, from what I see*. (JA931).

Further, the notations in the *EMT's PCR* cannot be imputed to Cheema because he never "look[ed] at their paperwork." (JA496). In addition, one might question why Cheema would have allowed plaintiff to remain unhandcuffed and roaming free during this entire encounter *if he had in fact been told* by EMTs that they were fearful for their safety.

Accordingly, since there was no *undisputed* evidence establishing the reasonableness of Cheema's perception, and his "subjective beliefs about [plaintiff's behavior] are irrelevant" to the qualified immunity analysis, the decision to dismiss was error. Anderson v. Creighton, 483 U.S. 635, 641 (1987); Henry v. Purnell, 619 F.3d 323, 344 (4th Cir. 2010) on reh'g en banc, 652 F.3d 524 (4th Cir. 2011)("both

Anderson and Saucier make clear that the qualified immunity inquiry does not ask what the officer subjectively and unreasonably thought his or the suspect's conduct to have been.")(emphasis added).

### iv. The Court Ignored Every Reasonable Inference to be Drawn from the Choice Given to Plaintiff by Defendant Cheema

The decision failed to draw any inference whatsoever from the "choice" or optionality given to plaintiff by defendant Cheema. However, unlike the factual disputes above, this choice was *actually* undisputed. Further, the inferences to be drawn from it affect the reasonableness of the court's conclusion on nearly every one of the facts allegedly perceived by Cheema. For example, if plaintiff was given the *option to choose* whether or not to be handcuffed, how can his act of *choosing* not to be handcuffed – or vacillating between options – possibly constitute "resist[ance]" or a "refusal to be handcuffed"? Relatedly, if plaintiff was being told to go to the hospital and being given the *choice* of walking out on his own, unhandcuffed, how could his act of doing exactly what he was being told to do – namely, walking out to go to the hospital – be reasonably construed as an "attempt at flight"?

Moreover, since it is undisputed that there was no explicit time limit on this choice, no prohibition against wavering between choices, and no order or command terminating this optionality, a reasonable juror might question Cheema's

interpretation of plaintiff's step towards the door as "sudden" or "threat[ening]" especially given that Cheema had created the risk of such behavior through his own actions. See, e.g., Aponte v. Kanbur, 2021 WL 3854069, at *5 (2d Cir. 2021)(this Circuit has recognized that "unreasonable police conduct prior to the use of force that foreseeably created the need to use it is a relevant factor in an excessive force analysis"). Similarly, a reasonable juror might also question whether a competent officer would have left an individual uncuffed with this level of optionality, *if he actually believed* them to be highly intoxicated, erratic, or behaving in a manner likely to result in harm. Likewise, they might question whether a reasonably competent officer would offer a choice[9] to an individual *if he actually believed* them to be so intoxicated that they lacked the "capab[ility] [to] realiz[e] and mak[e] rational decision[s]." N.Y. Mental Hyg. Law § 22.09(a)(2).

In sum, whether Cheema was plainly incompetent for leaving a highly intoxicated, erratic individual unhandcuffed and giving him the choice regarding his own handcuffing, *or,* that Cheema was lying about plaintiff's behavior to justify his unprovoked use of force – either of which would have precluded qualified immunity – the court's failure to draw *any* inference from this optionality was error. Cf.

---

[9] Choice is defined as "the act of selecting or making a decision when faced with two or more possibilities." Oxford Dictionary, *available at* https://www.oxfordlearnersdictionaries.com/us/definition/english/choice_1 (last visited April, 4, 2023).

Mullenix v. Luna, 577 U.S. 7, 15 (2015)(framing the qualified immunity inquiry as whether "only someone 'plainly incompetent' or who 'knowingly violate[s] the law' would have perceived a sufficient threat and acted as [defendant] did.").

## IV. THE COURT ERRED IN FINDING THAT PROBABLE CAUSE OR ARGUABLE PROBABLE CAUSE WAS ESTABLISHED AS A MATTER OF LAW

Under New York Mental Hygiene Law ("NYMHL") § 22.09(b)(2), an individual may be involuntarily seized/arrested and taken to a hospital when the person "appears to be incapacitated by alcohol and/or substances *to the degree that there is a likelihood to result in harm to the person or to others*." N.Y. MENTAL HYG. LAW § 22.09(b)(2). While NYMHL § 22.09(b)(2) discusses the standard for involuntary seizure, it must also be read in connection with the definitions of "inacapacit[ion] by alcohol" and "likely to result in harm" contained in NYMHL §§ 22.09(a)(2) and NYMHL § 22.09(a)(3), respectively. In other words, it is clear from the plain language of the statute that probable cause to arrest will not exist unless *both* criteria are met.

Upon de novo review, the District Court concluded that summary judgment was appropriate on plaintiff's false arrest claim "for the reasons set out in the R&R." (JA1405). According to the R&R, "there was probable cause to believe Plaintiff was incapacitated within the meaning of NYMHL § 22.09 and needed to be transported

to the hospital for treatment" (JA1397), and that he was "intoxicated to the point that he might pose a danger to himself or others." (Id.). As will be discussed herein, not only did the R&R incorrectly apply the standard for involuntary seizure under the law, but it relied upon a tilted version of the evidence in order to do so, in violation of the summary judgment standard.

### A. The Evidence Favoring Plaintiff was Insufficient to Establish Either Probable or Arguable Probable Cause for Incapacitation or Likelihood of Harm

The prerequisites for involuntary seizure under NYMHL § 22.09(b)(2) are "incapacit[ation] by alcohol," that is, intoxication to a degree,

> that he or she is incapable of realizing and making a rational decision with respect to his or her need for treatment;

*and*, the existence of a "likelihood [of] harm" to themselves or others, that is,

> a substantial risk of physical harm *to the person* as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself…[or] a substantial risk of physical harm *to other persons* as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

N.Y. MENTAL HYG. LAW §§ 22.09(a)(2) & (3).

Here, the R&R made the following conclusions regarding these statutory requirements,

> Plaintiff's wife called 911 to request medical attention [and] reported that Plaintiff was heavily intoxicated and that he was a harm to

himself…[and] the EMTs determined, based on their own observations, that Plaintiff was intoxicated and needed medical evaluation. The EMTs felt unsafe based on Plaintiff's aggressive movements toward them and…told the Police Officers that Plaintiff was uncooperative towards their questioning and that he needed to go to the hospital for treatment. [] Cheema's own observations of Plaintiff's intoxication [that Plaintiff was drunk and incoherent] led him to conclude that Plaintiff was too intoxicated to care for himself…Cheema also overheard Plaintiff making threats toward his wife in his native language, Punjabi. Ultimately, while attempting to "jokingly" avoid arrest, Plaintiff took a step towards the front door where Walker stood, at which point, Cheema believed that Plaintiff posed a potential physical threat and took him to the ground to arrest him. (JA1397)

However, much like the District Court's determination of qualified immunity on plaintiff's force claim, the evidence cited by the R&R to satisfy the requirements of NYMHL § 22.09(b)(2) – even under the defendant-centric construction of the facts used by the court – was woefully insufficient to establish probable or arguable probable cause[10] to believe that plaintiff was *either* incapacitated or posed a likelihood of harm, let alone both.

---

[10] As an alternative, the R&R granted qualified immunity for false arrest because, according to the court, "[p]laintiff's wife requested medical help;" the "EMTs concluded his condition constituted incapacitation;" and, Cheema's "own observations led him to believe that plaintiff was intoxicated and needed evaluation." (JA1400). However, since these same findings – and the evidence that disputes them – are discussed at length as they relate to the ultimate determination of probable cause, plaintiff will not repeat them again separately in connection with qualified immunity. Suffice it to say, "[t]he same disputed facts that prevent defendants from establishing probable cause also doom their qualified immunity defense at this stage." Bryant v. Serebrenik, 2016 WL 6426372, at *5 (E.D.N.Y. 2016).

> **i.** **The Level of Plaintiff's Intoxication was Either Directly Disputed by the Record or Otherwise Insufficient to Establish Incapacitation Under the Statute**

The R&R found that the first criteria under NYMHL § 22.09(b)(2) was satisfied because Singh's "wife reported that [he] was heavily intoxicated" (JA1397), that the "EMTs determined, based on their own observations, that Plaintiff was intoxicated and needed medical evaluation" (Id.); and, because of "Cheema's own observations…that [p]laintiff was drunk and incoherent." (Id.). These findings suffer from several fatal flaws, not the least of which is that they are all disputed by the evidence favorable to plaintiff.

First, it is clear from the plain meaning of NYMHL § 22.09(a)(2) that intoxication, or even a high degree of intoxication, is not tantamount to "incapacitat[ion]" under the statute. Thus, the R&R's findings that plaintiff was "heavily intoxicated," or "drunk" are simply insufficient standing alone to establish probable cause under the statute. See, e.g., Ortiz v. City of New York, 2016 WL 7009059 (S.D.N.Y. 2016):

> The defendants argue that summary judgment may nonetheless be granted because it is undisputed that the defendant had been drinking, and at the hospital he was diagnosed with, inter alia, 'alcohol intoxication.' This evidence is not sufficient, however, to establish that Ortiz appeared incapacitated at the time the officers seized him.
>
> Id. at *2.

47

Second, both the EMTs and Cheema's purported "observations" of plaintiff's incapacitation are disputed by plaintiff and their own internal paperwork. Indeed, the GSC scores and other parts of the PCR indicate that Singh was registering the highest possible mental alertness, verbal function, and motor response available. (JA116-18). Third, Cheema admitted that he had no idea and no way to determine the level of plaintiff's intoxication at the time; and, whether or not he was provided with *any* information from the EMTs is amply disputed by the record. (JA119; JA541). Fourth, plaintiff and his wife both claim that plaintiff was acting and reacting normally and with no impairment of his rational processes. (JA263; JA1114). Fifth, the video also demonstrates that plaintiff exhibited no difficulty standing, ambulating, or putting on clothes. (JA119). Lastly, and perhaps most telling, was the choice given to Singh by Cheema from which it can at least be inferred that Cheema believed plaintiff to be capable of making rational decisions – the antithesis of incapacitation under NYMHL § 22.09(a)(2). See N.Y. MENTAL HYG. LAW § 22.09(a)(2)(incapacitation requires a finding that a person is "incapable of realizing and making a rational decision[s]").

Accordingly, since the evidence contains "dramatically different descriptions of [Singh's] appearance and actions at the time of the seizure," and "[i]f a jury credits [plaintiff's] version of events, it would be entitled to find that there was no probable

cause" under NYMHL, the R&R erred in finding that plaintiff's incapacitation by alcohol was so undisputed as to warrant summary judgment. <u>Ortiz</u>, 2016 WL 7009059, at *2.

### ii. There is No Version of the Facts Favorable to Plaintiff that Would Establish his Likelihood of Harm to Himself or Others

Like its definition of incapacitation, the plain language of NYMHL § 22.09(a)(3), provides a very specific description of what constitutes "likelihood [of] in harm." In particular, as it relates to *oneself*, it must "manifest" in the form of "threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself." <u>Id</u>. And, as it relates to others, it must "manifest" in the form of "homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm." Thus, NYMHL § 22.09(a)(3) seems to track this Court's own interpretation of due process, which "does not permit the involuntary hospitalization of a person who is not a danger either to herself or to others." <u>Rodriguez v. City of New York</u>, 72 F.3d 1051, 1061 (2d Cir.1995).

Similarly, there must be "a *probability or substantial chance* of dangerous behavior" before a seizure is authorized – mere possibility of such behavior is *not enough*. <u>Heller v. Bedford Cent. Sch. Dist</u>., 144 F. Supp. 3d 596, 622 (S.D.N.Y. 2015), *aff'd*, 665 Fed. App'x. 49 (2d Cir. 2016)(internal quotation marks and brackets

omitted). In other words, seizures under NYMHL cannot be justified simply "based on the vague characterization that [p]laintiff may have been 'exhibiting behavior indicating that he was in immediate need of care and treatment [] which was likely to result in serious harm to himself or to others.'" Kaplan v. County of Orange, 2021 WL 1105618, at *12 (S.D.N.Y. 2021). Rather, "a court must review the *specific* observations and information available to the officers at the time of a seizure." Myers v. Patterson, 819 F.3d 625, 633 (2d Cir. 2016).

Here, because the issue of "whether a person is conducting himself in a manner that is likely to result in serious harm to himself or others is a question of fact…the court was not free to make this finding" *unless* it found that no reasonable view of the evidence could suggest otherwise. Kerman, 374 F.3d at 116. However, there is no plaintiff-favorable view of the evidence in this case that would have allowed the R&R to decide this issue as a matter of law. For instance, it is academic that "[b]eing obviously drunk, on its own, does not satisfy any of the criteria required to demonstrate a clear and present danger." James v. City of Wilkes-Barre, 2015 WL 4951826, at *9 (M.D. Pa. 2015)("A reasonable officer would not have committed an individual who was merely intoxicated but not exhibiting any extraordinary symptoms that demonstrate a willingness or capability to hurt oneself").

Next, while the R&R found that plaintiff's wife had called 911 and "reported" that plaintiff "was a harm to himself" (JA1397), this fictional account of events never occurred. Specifically, the recording of the 911 call makes it clear that plaintiff's wife never once uttered these words or anything remotely resembling them. (JA99). The only thing she said was that he was "drunk" and "needed a[sic] go to the hospital." (Id.). She makes no claim of any attempt to harm himself or cause harm to others, and certainly makes no allegation – as is required under NYMHL – that plaintiff had made "*threats of or attempts at suicide or serious bodily harm* or [engaged in] other conduct *demonstrating* that the person is dangerous to himself or herself." (Id.); N.Y. MENTAL HYG. LAW § 22.09(a)(3).

Moreover, while the court no doubt lifted this conclusion from the EMT's PCR narrative, which notes that "[patient's] wife states that the [patient] is a harm to himself" (JA121), plaintiff's wife denies ever saying this and the EMTs have no recollection of this statement. (JA113; JA902). And, if this were somehow insufficient to create a disputed fact on this issue, Cheema's own report stated that plaintiff had *not* "attempt[ed] physical harm to [him]self," *not* "[p]laced [him]self in danger[]," *not* "[s]poke of harming [him]self;" and, was *not* "[u]nable to care for [him]self." (JA120-121). In fact, the only harm to plaintiff that Cheema recalls the EMTs ever articulating was a general concern over the *possibility* that plaintiff might

fall and hit his head. (JA456). However, this is miles away from the likelihood of specific harm contemplated by the statute, and in any event, is controverted by the video evidence, plaintiff's GCS score and would not, standing alone, establish a likelihood of harm. See, e.g., Martin v. Anderson, 107 F. Supp. 2d 1342, 1354 (M.D. Ala. 1999)("The mere assertion by the arresting officer that the appellant was so drunk that she staggered or had difficulty walking does not alone support an inference that the appellant posed a danger to herself."). Accordingly, neither the court's invention of facts nor defendant's "vague characterization[s]" of harm (Kaplan, 2021 WL 1105618, at *12), which are directly controverted by the evidentiary record can render probable cause on this issue beyond dispute.

The R&R's finding of probable cause to believe plaintiff was a harm to *others* fares no better. For example, as previously discussed in the context of the court's force analysis, the assertion that "[t]he EMTs felt unsafe based on Plaintiff's aggressive movements toward them" (JA1397) finds no specific support in the record. (JA119; JA932). The EMTs don't recall any threatening behavior, there is no such behavior depicted in the video, and Cheema's report notes that no such threatening or dangerous behavior ever occurred. (JA120-121; JA119; JA954-55). Relatedly, both the EMTs and the video place the issue of whether any of this

information was even communicated to Cheema firmly in dispute. (JA119; JA931-32).

For this same reason, the court's finding that "EMTs told the Police Officers that Plaintiff was uncooperative towards their questioning" (JA1397) also provides no basis to establish a likelihood of harm. And, even if Cheema had been told that, this Court has recognized that neither the "refusal to accept medical treatment….[n]or [plaintiff's] refusal to allow [himself] to be interviewed by [EMT's] establish arguable probable cause to believe [plaintiff] presented a risk of serious physical harm." <u>Myers</u>, 819 F.3d at 634; <u>accord</u> <u>Schoolcraft v. City of New York</u>, 103 F. Supp. 3d 465, 505 (S.D.N.Y. 2015), <u>on reconsideration in part,</u> 133 F. Supp. 3d 563 (S.D.N.Y. 2015)(refusal of medical treatment "does not, by itself, establish that a person is dangerous to himself").

Similarly, the court's assertion that Cheema "overheard Plaintiff making threats toward his wife," (JA1397) is also insufficient to establish harm. Indeed, plaintiff denies ever threatening his wife; plaintiff's wife denies this threat; no one else heard this threat; and, even Cheema admits that it was not a threat that he perceived to be dangerous especially given that he affirmatively indicated in this report that plaintiff had not threatened anyone. (JA374; JA1145; JA120-121; JA514). Likewise, Cheema's vague claims of erratic or belligerent behavior are

firmly disputed by the evidentiary record as well; and, in any event, could not establish probable cause on this issue because "[a] person may be annoyed, uncooperative, and irrational *without* presenting a danger to herself or of violence to others." Myers, 819 F.3d at 634.

Lastly, and perhaps most detached from the probable cause calculus was the R&R's recitation of plaintiff's "step towards the front door" (JA1397) as a basis for concluding a likelihood of harm. In particular, this Court has firmly held that "ex post facto extrapolations" of facts not known or not considered at the time the decision to arrest is made cannot later be used to "retroactively validate[]" a seizure that is "a sham or fraud at the outset." U.S. v. Martinez, 465 F.2d 79, 81–82 (2d Cir. 1972); accord U.S. v. Colon, 250 F.3d 130, 138 (2d Cir. 2001)(recognizing that "additional information which would have given the arresting officers reasonable suspicion cannot retroactively make their actions objectively reasonable."). Therefore, even setting aside the inferences and disputes as to the reasonableness of Cheema's *perception* of plaintiff's "step," there is no dispute that defendant had already made the decision and informed plaintiff that he had to go to the hospital long before this "step" ever occurred. In other words, since plaintiff could not have been arrested *prior* to determining that he posed a likelihood of harm, and Cheema had *already* determined that he was going to the hospital before the "step" occurred,

it follows that the "step" was not – nor could it be – considered as a basis to support plaintiff's seizure under NYMHL § 22.09.

In sum, there was no undisputed evidence establishing the necessary prerequisites for plaintiff's arrest under NYMHL § 22.09. At best, plaintiff was drunk and there was a level of concern for his safety, however, there is no basis under the law justifying an involuntary seizure for purely cautionary purposes, and therefore, the court's decision must be vacated. See, e.g., Kowalski v. St. Francis Hosp. and Health Centers, 21 N.Y.3d 480 (2013).

> "few principles more basic than that the members of a free society may, with limited exceptions, come and go as they please. Of course there are people so mentally impaired that they must be denied this right, but that category is a narrow one and does not include everyone who would be safer in a detoxification facility than on the street. Thus the [] law permit[s] the restraint of people whose mental state might make them a danger to themselves or others only in extreme circumstances.

> Id. at 485-86.

## <u>CONCLUSION</u>

**THE DECISION SHOULD BE REVERSED, THE JUDGMENT VACATED, THE CASE REMANDED, AND REASSIGNED TO A NEW JUDGE FOR TRIAL.**

Dated: New York, New York
        April 19, 2023

                    Respectfully submitted,

                    By: */s/ JOSHUA P. FITCH, ESQ.*
                        JOSHUA P. FITCH
                        COHEN & FITCH LLP
                        Attorneys for Plaintiff
                        233 Broadway, Ste 900
                        New York, New York 10279

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. I certify that this brief complies with the type-volume limitation of Fed.R.App.P.32(a)(7)(B) because:

This brief contains 12,732 words, excluding the parts of the brief exempted by Fed.R.App.32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed.R.App.P.32(a)(5) and the type style requirements of Fed.R.App.P 32(a)(6) because:

This brief has been prepared in Proportionally-Space typeface using Microsoft Word, in Times New Roman, Font Size 14.

Dated: New York, New York
April 19, 2023

Special Appendix

i

# **TABLE OF CONTENTS**
*(Special Appendix)*

Judgment of United States District Court Eastern District of
New York, Dated December 6, 2022, Appealed From ...............................SPA-1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
                                            X
BALWINDER SINGH,

                  Plaintiff,                    JUDGMENT
                                                19-CV-632 (EK) (ST)

            -against-

THE CITY OF NEW YORK, P.O. MANDEEP CHEEMA,
Tax Id. No. 950196, Individually and in his Official
Capacity, and POLICE OFFICERS "JOHN DOE" #1-10,
Individually and in their Official Capacity (the name
John Doe being fictitious, as the true names are
presently unknown),

                  Defendants.
------------------------------------------------------------ X

        A Memorandum and Order of Honorable Eric Komitee, United States District Judge,

having been filed on September 30, 2022, adopting the Report and Recommendation of

Magistrate Judge Steven Tiscione, dated June 28, 2022, denying Plaintiff's motion for summary

judgment on his excessive-force claim; granting Cheema's cross-motion for summary judgment

as to Plaintiff's Section 1983 claims for false arrest and excessive force, and state-law claim for

assault and battery; and an Order having been filed on December 5, 2022, directing the Clerk of

Court to enter judgment consistent with the parties' *Monell* Stipulation and this Court's

Memorandum and Order dated September 30, 2022, and close this case; it is

        ORDERED and ADJUDGED that Plaintiff's motion for summary judgment on his

excessive-force claim is denied; that Cheema's cross-motion for summary judgment is granted as

to Plaintiff's Section 1983 claims for false arrest and excessive force, and state-law claim for

assault and battery; and the following is stipulated and agreed as follows:

        l. The above-referenced claims for municipal liability brought pursuant to 42 U.S.C. §

1983 against the City of New York are hereby dismissed with prejudice;

**[SPA-2]**

Case 1:19-cv-00632-EK-ST   Document 63   Filed 12/06/22   Page 2 of 2 PageID #: 1764

2. Pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure, any and all of the claims that were asserted or could have been asserted by or on behalf of plaintiff Balwinder Singh against defendant the City of New York, including its successors and assigns, for municipal liability pursuant to 42 U.S.C. § 1983, arising out of the facts and circumstances that are the subject of this action, are hereby dismissed and discontinued, with prejudice, and without attorney's fees, costs, or disbursements to any party as against the other;

3. This Stipulation contains all the terms and conditions agreed upon by counsel for defendants and counsel for plaintiff hereto, and no oral agreement entered into at any time nor any written agreement entered into prior to the execution of this Stipulation shall be deemed to exist, or to bind the parties hereto, or to vary the terms and conditions contained herein; and

4. This Stipulation shall be binding upon the parties immediately upon signature and shall be submitted to the Court for entry as an Order.

Dated: Brooklyn, NY                                  Brenna B. Mahoney
      December 6, 2022                       Clerk of Court


                                                    By: */s/Jalitza Poveda*
                                                            Deputy Clerk